ORIGINAL

FILED IN CLERK'S OFFICE
U.S D.C. Atlanta

*Dee*

AUG 1 8 2003

LUTHER D. THOMAS, Clerk
By:
*J Reed* Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNY A., by his next friend
Linda Winn, et al.,                     :

                                        :

    Plaintiffs,                         CIVIL ACTION

                                        :

v.                                      1:02-cv-1686-MHS

                                        :

SONNY PERDUE, et al.,

                                        :

    Defendants.

## **ORDER**

This action is before the Court on defendants' motions to dismiss and for protective order and on plaintiffs' motions for class certification and for leave to file their first amended complaint. For the following reasons, the Court grants in part and denies in part defendants' motions to dismiss, denies the motion for protective order, and grants plaintiffs' motions for class certification and for leave to amend their complaint.

### Procedural Background

On June 6, 2002, nine foster children in the custody of the Georgia Department of Human Resources filed this action in the Superior Court of Fulton County on behalf of a class of Fulton and DeKalb County foster



children and a subclass of African-American foster children.  The complaint

seeks to address alleged systemic deficiencies in foster care in Fulton and

DeKalb Counties.

Plaintiffs assert fifteen causes of action under federal and state law.[1] The

federal law claims are brought pursuant to 42 U.S.C. § 1983 for alleged

violations of plaintiffs' federal constitutional rights to substantive and

procedural due process under the Fourteenth Amendment (Counts IV and

XVII) and to liberty, privacy, and association under the First, Ninth, and

Fourteenth Amendments (Count V); and for alleged violations of plaintiffs'

federal statutory rights under the Adoption Assistance and Child Welfare Act

of 1980, as amended by the Adoption and Safe Families Act of 1997 (Count

VIII); the Multiethnic Placement Act of 1994, as amended by the Inter-ethnic

Adoption Provisions of 1996 (Count XV); and the Early and Periodic

Screening, Diagnosis, and Treatment Program of the Medicaid Act (Count

XVI).

---

[1] The complaint contains eighteen counts, but three of the counts do not
assert independent causes of action. Counts I and II seek permanent injunctive and
declaratory relief, respectively, and Count XVIII seeks recovery of plaintiffs'
litigation expenses, based on the statutory and constitutional violations alleged in
the other counts.

AO 72A
(Rev.8/82)

The state law claims allege violations of plaintiffs' rights to substantive due process and equal protection under the Georgia Constitution (Counts III and XIV); violations of O.C.G.A. §§ 49-5-12, 15-11-58, 15-11-13, and 20-2-690.1 (Counts VI, VII, IX, and X); nuisance (Count XI); breach of contract(Count XII); and inadequate and ineffective legal representation (Count XIII).

Plaintiffs sued the Governor of Georgia, initially Roy Barnes and now Sonny Perdue; the Georgia Department of Human Resources (DHR)and its Commissioner, Jim Martin; the Fulton County Department of Family and Children Services (Fulton DFCS) and its Director, Beverly Jones; and the DeKalb County Department of Family and Children Services (DeKalb DFCS) and its Director, Wayne Drummond (State Defendants); as well as Fulton and DeKalb Counties (County Defendants).  Contemporaneous with the filing of their complaint, plaintiffs filed a motion for class certification.  On June 19, 2002, defendants removed the case to this Court.

On July 1, 2002, the Court granted plaintiffs' motion for expedited discovery as to one aspect of this action:  the safety and well-being of foster

3

children in Fulton and DeKalb Counties' emergency shelters. On September 19, 2002, plaintiffs filed a motion for preliminary injunction seeking to enjoin defendants from continuing to manage and operate the shelters in a manner that allegedly violated the legal rights of foster children.   The Court conducted a hearing on the motion for preliminary injunction on November 14-15 and 18-19, 2002.  On December 12, 2002, the Court issued an Order denying the motion without prejudice.[2]   Since then, the parties have proceeded with discovery on plaintiffs' other claims.  Meanwhile, State Defendants and DeKalb County filed motions to dismiss plaintiffs' complaint in whole or in part, defendant Fulton County filed a motion for a protective order prohibiting plaintiffs' counsel from communicating with Fulton County juvenile court judges, and plaintiffs filed a supplemental motion for class certification and moved for leave to amend their complaint.

---

[2] The State Defendants subsequently reported to the Court that, in accordance with their previous assurances, the Fulton County shelter was closed on December 27, 2002; the DeKalb County shelter was closed on February 14, 2003; and the new DeKalb Children's Center was scheduled to open in March 2003. Therefore, plaintiffs' claims relating to the emergency shelters are now moot.

AO 72A
(Rev.8/82)

Discussion

## I. State Defendants' Motion to Dismiss

State Defendants move to dismiss plaintiffs' complaint in its entirety on

two grounds. First, they argue that *Younger v. Harris*, 401 U.S. 37 (1971),

requires the Court to abstain from hearing all of plaintiffs' claims because the

proceedings would impermissibly interfere with ongoing state judicial

proceedings. Second, they contend that plaintiffs' claims are barred by the

*Rooker-Feldman* doctrine.

Alternatively, State Defendants seek dismissal of many of plaintiffs'

federal and state law claims on the grounds that they fail to state a claim on

which relief can be granted.[3] Specifically, as to the federal claims, State

Defendants contend that plaintiffs have no private right of action to enforce

provisions of the Adoption Assistance and Child Welfare Act (Count VIII) or

---

[3] State Defendants do not seek dismissal of plaintiffs' claims for permanent injunctive and declaratory relief (Counts I-II), for alleged substantive due process violations of the Georgia and U.S. Constitutions (Counts III-IV), for alleged inadequate and ineffective legal representation (Count XIII)(asserted only against County Defendants), for alleged equal protection violations under the Georgia Constitution (Count XIV), for alleged violations of the Multiethnic Placement Act and Inter-ethnic Adoption Provisions of 1996 (Count XV), and for plaintiffs' litigation expenses (Count XVIII).

the Early and Periodic Screening, Diagnosis, and Treatment Program of the Medicaid Act (Count XVI); that plaintiffs fail to state a procedural due process claim because the statutes they seek to enforce create no rights (Count XVII); and that plaintiffs fail to state a claim for familial association under the First, Ninth, or Fourteenth Amendments (Count V).[4] As to the state law claims, State Defendants argue that plaintiffs' claims under O.C.G.A. §§ 49-5-12, 15-11-13, and 15-11-58 are not cognizable under Georgia law (Counts VI, VII, and IX); that O.C.G.A. § 20-2-690.1 is a criminal statute that does not create a private cause of action (Count X); that plaintiffs cannot maintain an action for private or public nuisance (Count XI); and that plaintiffs fail to state a claim for breach of contract (Count XII).

A. *Younger* Abstention

State Defendants argue that the Court should abstain from hearing this case because the broad injunctive relief sought by plaintiffs would interfere with ongoing juvenile court proceedings.   Plaintiffs respond that State

---

[4] State Defendants also argue that plaintiffs fail to state a claim under 42 U.S.C. § 1983 against the Department of Human Resources and the two Departments of Family and Children Services because they are not "persons" subject to suit. This argument is irrelevant because all of plaintiffs' § 1983 claims are asserted only against individual state officials.

Defendants waived their right to seek abstention by removing the case to federal court.  Plaintiffs also argue that abstention is inappropriate in any event because the relief they request will not interfere with state court proceedings, and because the state proceedings do not provide them an adequate opportunity to remedy violations of their federal rights.  The Court concludes that State Defendants have waived their right to seek abstention, and that even absent waiver, abstention would not be appropriate.

*Younger* abstention is a doctrine of federal-state comity that limits the extent to which state defendants may be sued in federal court.  *See Middlesex County Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 431 (1982). In this case, however, State Defendants are in federal court only because of their own decision to remove the case from state court.  It would be fundamentally unfair to permit State Defendants to argue that this Court must abstain from hearing the case after they voluntarily brought the case before this Court.  To do so would permit defendants effectively to prevent plaintiffs from pursuing their federal claims in *any* forum.

AO 72A
(Rev.8/82)

The Supreme Court foreclosed such tactics in *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002). In *Lapides*, the Supreme Court held that a state waives its Eleventh Amendment immunity when it removes a case from state court to federal court. Although *Lapides* involved Eleventh Amendment immunity rather than abstention, the rule stated in that case is directly applicable here: "[R]emoval is a form of voluntary invocation of a federal court's jurisdiction sufficient to waive the State's otherwise valid objection to litigation of a matter . . . in a federal forum." *Lapides*, 535 U.S. at 624; *see also Ohio Bureau of Employment Serv's v. Hodory*, 431 U.S. 471, 480 ("If the State voluntarily chooses to submit to a federal forum, principles of comity do not demand that the federal court force the case back into the State's own system"). Thus, having exercised their right to remove this action to federal court, State Defendants may not now seek to avoid the federal jurisdiction they themselves have invoked by asking the Court to abstain.

Furthermore, even if defendants had not waived their right to seek abstention, the *Younger* abstention doctrine would not apply in this case. At the outset, it is important to note that "[t]he doctrine of abstention . . . is an extraordinary and narrow exception to the duty of a District Court to

8

adjudicate a controversy properly before it." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976)(quoting *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188-89 (1959)). Accordingly, this Court will not lightly shirk its "virtually unflagging obligation to exercise the jurisdiction given [to it]." *Id.* at 818.

*Younger* requires abstention when federal proceedings would (1) interfere with ongoing state judicial proceedings that (2) implicate important state interests and (3) afford an adequate opportunity to raise the federal claims. *Middlesex*, 457 U.S. at 432; *31 Foster Children v. Bush*, 329 F.3d 1255, 1276 (11th Cir. 2003). In this case, there is no dispute that the named plaintiffs and the members of the class they seek to represent are all involved in ongoing deprivation proceedings in the juvenile court. Nor is there any dispute that these proceedings implicate important state interests in the care, disposition, and welfare of deprived children. Therefore, to determine whether to abstain, the Court must consider whether these proceedings will interfere with the ongoing state proceedings and whether the state proceedings afford plaintiffs an adequate opportunity to raise their federal claims.

9

The Court concludes that the relief requested by plaintiffs would not interfere with ongoing juvenile court proceedings.[5] Although plaintiffs all have periodic reviews before the state juvenile courts, the declaratory and injunctive relief plaintiffs seek is not directed at their review hearings, or at Georgia's juvenile courts, juvenile court judges, or juvenile court personnel. Rather, plaintiffs seek relief directed solely at *executive* branch defendants to remedy their alleged failures as plaintiffs' custodians.

---

[5] The precise relief sought by plaintiffs remains somewhat unclear. Plaintiffs seek a declaratory judgment and a permanent injunction enforcing a long list of alleged constitutional and statutory rights. However, they have not specified the precise contours of such relief. Instead, they indicate their intention, following discovery, to "seek a particularized order of permanent injunctive relief, identifying, among other things, professionally accepted standards that the Defendants must meet in order to satisfy their statutory and constitutionally mandated duties." (Compl. ¶ 188.) Similarly, in their request for abstention, State Defendants do not attempt to identify specific remedies that would interfere with state court proceedings. Instead, they broadly contend that *"any* injunctive relief that addresses Plaintiffs' claims would necessarily interfere with these deprivation proceedings." (State Defs.' Br. in Supp. of Mot. to Dismiss at 7.)(Emphasis added.) Given the lack of specificity in both plaintiffs' prayer for relief and State Defendants' request for abstention, the Court's analysis is necessarily limited to the general nature of the relief sought. Nevertheless, the Court is confident that, if plaintiffs prevail on their claims, specific relief can be crafted that will not interfere with state court proceedings. *Cf. Henry v. First Nat. Bank of Clarksdale*, 595 F.2d 291, 301-02 (5th Cir. 1979)(district court narrowly crafted relief to avoid interference with state court proceedings).

AO 72A
(Rev.8/82)

As set out in the complaint, these alleged failures include (1) assigning excessive numbers of cases to inadequately trained and poorly supervised caseworkers; (2) not developing a sufficient number of foster homes properly screened to ensure the plaintiff children's safety; (3) not identifying adult relatives who could care for the plaintiff children as an alternative to strangers or impersonal institutions; (4) failing to provide relevant information and support services to foster parents in order to prevent foster placements from being disrupted; (5) failing to develop administrative controls such as an information management system that ensures plaintiff children are expeditiously placed in a foster home matched to meet the children's specific needs; (6) failing to provide timely and appropriate permanency planning, including failing to provide services that would enable plaintiffs to achieve their permanency planning goals; (7) placing plaintiffs in dangerous, unsanitary, inappropriate shelters and other placements; (8) failing to provide appropriate and necessary mental health, medical, and education services to children in their custody; and (9) separating teenage mothers in foster care from their own children and separating siblings in foster care from each other without providing visitation. (Compl. ¶¶ 39-97.)

AO 72A
(Rev.8/82)

If these claims are proven, an order by this Court remedying such failures would not interfere in any way with ongoing juvenile court proceedings. To the contrary, the relief sought by plaintiffs would at most simply support and further the juvenile court's own mission of ensuring that children removed from their parents' custody because of abuse or neglect are not further harmed when the juvenile court orders them into the custody of the state.[6]

Thus, for example, plaintiffs seek relief to ensure that caseloads are reduced to a reasonable level. The only conceivable effect on state court proceedings that could flow from such relief would be caseworkers appearing in juvenile court who are better prepared because they have reasonable caseloads. Likewise, plaintiffs seek to ensure that State Defendants develop an adequate and reliable computer database. Far from interfering with juvenile court proceedings, such relief would actually enable the juvenile

---

[6] In this connection, it is important to note that under Georgia law, once the juvenile court grants legal custody of a child to DFCS, the court is powerless to order DFCS to give physical custody of the child to any particular foster parent or otherwise restrict the actual placement of the child. O.C.G.A. § 49-5-3(12) (defining "legal custody" as including the "right to determine where and with whom" the child will live); *In the Interest of J.N.T.*, 212 Ga. App. 498, 499 (1994) ("any portions of a court's order purporting to control disposition of the child are merely exhortatory and not binding on the department") (quoting *In the Interest of A.S.*, 185 Ga. App. 11, 12 (1987)).

court to do its job better by providing it with more accurate and complete information about the children whose lives may be profoundly affected by its decisions.

The Court also concludes that the ongoing juvenile court proceedings do not afford plaintiffs an adequate opportunity to raise their federal claims. Plaintiffs seek prospective injunctive relief on behalf of themselves and others to remedy ongoing violations of their rights. The juvenile court, however, as a court of limited jurisdiction, lacks the power to grant such relief. Georgia juvenile courts have no equitable powers and thus cannot grant injunctive relief. *See H.C.S. v. Grebel*, 253 Ga. 404, 406-07 (1984) (Hill, C.J., concurring). Nor can that court order class-based relief. Even in individual cases, the juvenile court cannot order DFCS to provide a particular placement for a child, develop new placements, or enter orders regarding staff training, caseloads, the creation of new resources or other issues affecting what happens to children who come before it. *See* note 6 *supra*.

Furthermore, even if the juvenile court could afford plaintiffs the relief they seek, plaintiffs do not have full access to such relief because they are

13

dependent upon an allegedly overburdened and inadequate system of legal representation, which prevents them from raising their claims in the juvenile court. Although plaintiffs receive representation through a child advocate attorney, they have alleged that each such advocate has a caseload of approximately 500 children[7] (Compl. ¶ 99), which makes it impossible for the children to have their voices heard and their claims raised in juvenile court. Furthermore, since they are children, plaintiffs must rely on adult advocates to speak for them. They cannot, however, rely on defendants to represent them if it is defendants who are violating their rights. Thus, plaintiffs' very status as children combines with their lack of adequate adult representation to create insurmountable procedural obstacles that preclude them from using the juvenile courts to protect their rights.

The Court's conclusions are not altered by the Eleventh Circuit's recent decision in *31 Foster Children v. Bush*, 329 F.3d 1255 (11th Cir. 2003). In that case, the plaintiff children filed suit on behalf of themselves and all children in Florida's foster care system alleging, *inter alia*, that the state

---

[7] The Court must accept these allegations as true on a motion to dismiss that raises *Younger* abstention arguments. *Pompey v. Broward County*, 95 F.3d 1543, 1551 (11th Cir. 1996).

officials administering the system were violating plaintiffs' rights to safe care, prompt permanent placements, and services extended after their eighteenth birthdays, as guaranteed by substantive due process; procedural due process in determining the services they would receive; and family association with siblings as guaranteed by the First, Ninth, and Fourteenth Amendments. The district court dismissed these claims on *Younger* abstention grounds, *Bonnie L. ex rel. Hadsock v. Bush*, 180 F. Supp. 2d 1321, 1331-38 (S.D. Fla. 2001), and the court of appeals affirmed. *31 Foster Children*, 329 F.3d at 1274-82. This case, however, is distinguishable from *31 Foster Children*.

First and foremost, as discussed above, unlike *31 Foster Children*, defendants voluntarily submitted this case to federal court jurisdiction by removing it from state court. Under such circumstances, the Supreme Court has held that *Younger* principles of equity and comity simply do not apply. *Lapides*, 535 U.S. at 624; *Hodory*, 431 U.S. at 480.

Second, the relief requested in *31 Foster Children* went far beyond what is sought here. As described by the court of appeals, plaintiffs in *31 Foster Children* sought "to have the district court appoint a panel and give it

15

authority to implement a systemwide plan to revamp and reform dependency proceedings in Florida, as well as the appointment of a permanent children's advocate to oversee that plan." *31 Foster Children*, 329 F.3d at 1279. No such relief is requested by plaintiffs in this case. Also, in *31 Foster Children*, the court of appeals noted that "[t]he federal and state courts could well differ, issuing conflicting orders about what is best for a particular plaintiff, such as whether a particular placement is safe or appropriate or whether sufficient efforts are being made to find an adoptive family." *Id.* at 1278. In this case, however, plaintiffs do not ask the Court to make individualized determinations with respect to particular foster children. Instead, they seek relief mandating, on a system-wide basis, that State Defendants institute reforms to ensure that deprived children's constitutional and statutory rights are not violated.

The differences between this case and *31 Foster Children* are further illustrated by the Tenth Circuit's decision in *Joseph A. ex rel. Wolfe v. Ingram*, 275 F.3d 1253 (10th Cir. 2002), on which the Eleventh Circuit relied, and the district court's decision following remand in that case. *Joseph A. ex rel. Wolfe v. New Mexico Dep't of Human Serv's*, No. CIV 80-623 JC/DJS

16

(Jan. 16, 2003)(unpublished). In *Joseph A.*, the plaintiff children, who were in New Mexico's custody because of abuse or neglect, entered into a federal court consent decree with the New Mexico Department of Human Services. When the plaintiffs sought to have the Department held in contempt for violating the decree, the Department moved to dismiss based on *Younger* abstention. The district court granted the motion, but the Tenth Circuit vacated and remanded with directions to consider separately each provision of the consent decree. *Joseph A.*, 275 F.3d at 1273.

The Eleventh Circuit in *31 Foster Children* relied on the Tenth Circuit's decision in *Joseph A.* to support the proposition that *Younger* abstention is warranted even if the requested relief does not directly target an ongoing state proceeding. *31 Foster Children*, 329 F.3d at 1278. However, the Tenth Circuit did not explicitly rule that any of the provisions of the consent decree at issue required abstention. In fact, the court observed that enforcement of several provisions similar to the relief sought by plaintiffs in this case, governing training of social workers, development of a computerized management information system, and qualifications for social workers, "do not appear to risk interference with state court proceedings." *Joseph A.*, 275

17

F.3d at 1273.  Furthermore, following remand, the district court carefully

analyzed each of the consent decree's provisions and found that none of the

disputed provisions interfered with state court proceedings in such a way as

to warrant federal court abstention.[8] *Joseph A.*, No. CIV 80-623 JC/DJS (Jan.

16, 2003).

With respect to the adequacy of available remedies, in *31 Foster Children*,

the Eleventh Circuit found it significant that the Florida's juvenile courts

enjoy extensive authority to control a child's placement.  *31 Foster Children*,

329 F.3d 1279-81.  Specifically, among other things, the court observed that

under Florida law, the juvenile court "can determine whether a facility in

which a child is located is safe, either by appointing a child's representative

to make an inquiry or itself investigating conditions at the facility.  If the

investigation reveals that a child . . . is in a dangerous facility, the court can

take action, including finding the Department in contempt for failing to

---

[8] The parties agreed with the Tenth Circuit's preliminary view that one of the provisions, which categorically prohibited the Department from establishing emancipation as a planning goal for foster children under 13, violated *Younger* by prohibiting the Department from recommending or advocating a specific planning option to the state court.  State Defendants have not pointed to any relief requested by plaintiffs in this case that would similarly interfere with state court proceedings.

comply with the child's case plan." *Id.* at 1280 (citations omitted).  Under Georgia law, on the other hand, once the juvenile court has transferred temporary legal custody to DFCS, its authority is much more limited.  The court conducts periodic reviews of the child's placement plan and may order DFCS to comply with the plan or to devise a new plan "within available division resources." O.C.G.A. § 15-11-55(c).  However, the court's only other alternative is to remove the child from DFCS custody.  *Id.*  Any other directions from the court regarding a child's placement "are merely exhortatory and not binding on the department." *In the Interest of J.N.T.*, 212 Ga. App. 498, 499 (1994)(quoting *In the Interest of A.S.*, 185 Ga. App. 11, 12 (1987)).

Furthermore, even if the Georgia juvenile courts had the same authority as Florida's courts, this case would still be distinguishable because plaintiffs claim that they do not have adequate representation to raise their claims in the state courts.  In *31 Foster Children*, the Eleventh Circuit found it significant that "each of these plaintiffs is represented by counsel" who could present the plaintiffs' claims to the state courts in their dependency proceedings. *31 Foster Children*, 329 F.3d at 1281.  By contrast, as discussed

above, plaintiffs in this case allege that their appointed attorneys provide ineffective legal representation because they have caseloads of approximately 500 children each. Thus, even if the Georgia juvenile court had the power to direct State Defendants to undertake specific reforms to remedy violations of plaintiffs' rights, plaintiffs do not have adequate representation to raise those claims in that forum.

B. *Rooker-Feldman* Doctrine

Under the *Rooker-Feldman* doctrine, federal courts other than the United States Supreme Court lack subject matter jurisdiction to review the final judgments of state courts. *See District of Columbia Ct. of Appeals v. Feldman*, 460 U.S. 462, 486 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413, 415-16 (1923). "The doctrine extends not only to constitutional claims presented or adjudicated by a state court, but also to claims that are 'inextricably intertwined' with a state court judgment." *Siegel v. Lepore*, 234 F.3d 1163, 1172 (11th Cir. 2000). "A federal claim is inextricably intertwined with a state court judgment 'if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it.'" *Id.* (quoting *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 25 (1987)(Marshall, J., concurring)).

20

The doctrine applies even if the plaintiff failed to raise the federal issue in the state court, so long as he had a reasonable opportunity to do so. *Liedel v. Juv. Ct. of Madison County, Ala.*, 891 F.2d 1542, 1545 & n.4 (11th Cir. 1990).

State Defendants argue that the *Rooker-Feldman* doctrine applies here because plaintiffs' claims are inextricably intertwined with their juvenile court proceedings, and plaintiffs had a reasonable opportunity to raise those claims in the juvenile court but failed to do so.  Plaintiffs argue that their claims are not inextricably intertwined with the state court proceedings because they are not attacking any decisions of the juvenile court.  Plaintiffs also argue that, for the reasons already discussed above,  they did not have a reasonable opportunity to present their claims in the state court. The Court concludes that the *Rooker-Feldman* doctrine does not apply.

To apply the *Rooker-Feldman* doctrine on the basis that plaintiffs' federal claims are inextricably intertwined with their juvenile court proceedings, the Court must find that the federal claims can succeed only to the extent that the juvenile court's orders are erroneous. *Pennzoil*, 481 U.S. at 25.  It is clear, however, that the success or failure of plaintiffs' federal claims is completely

21

independent of whether the juvenile courts correctly decided any individual plaintiff's case. Plaintiffs do not challenge any juvenile court order, and the success of their claims does not depend upon a finding that any juvenile court order was wrongly decided.

The cases on which State Defendants rely are inapposite. In two of those cases, the primary relief sought was an injunction preventing enforcement of the state court's child custody order and returning custody to the aggrieved parent. *See Liedel*, 891 F.2d at 1545; *Staley v. Ledbetter*, 837 F.2d 1016, 1017 (11th Cir. 1988). In the third, a child's mother sought damages from DFCS employees for actions that supported the juvenile court's custody orders. *See Goodman ex rel. Goodman v. Sipos*, 259 F.3d 1327, 1334 (11th Cir. 2001). No such claims are asserted, and no such relief is sought, by plaintiffs in this case. Thus, the granting of all the relief sought by plaintiffs would not call into question the correctness of any juvenile court order. Therefore, the *Rooker-Feldman* doctrine does not deprive this Court of jurisdiction to hear plaintiffs' claims.

22

C. Federal Statutory Claims

In Counts VIII and XVI of their complaint, plaintiffs seek relief under 42 U.S.C. § 1983 for alleged violations of certain provisions of the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 (Adoption Act), comprising Parts B and E of Title IV of the Social Security Act, 42 U.S.C. §§ 620-628 and 670-679a; and the Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) program of the Medicaid Act, 42 U.S.C. §§ 1396a and 1396d. State Defendants argue that these federal funding statutes do not confer enforceable rights upon plaintiffs. Plaintiffs contend to the contrary. The Court concludes that the statutes do create rights enforceable under § 1983.

The Supreme Court has traditionally applied a three-part test to determine whether a federal statute confers a right enforceable under 42 U.S.C. § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 509 (1990). In *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002), the Court clarified the first requirement, stating that only an "unambiguously conferred right," as distinguished from mere benefits or interests, would support a cause of action under § 1983.

In addressing the first *Blessing* requirement, courts consider "whether the statute: (1) contains 'rights-creating' language that is individually focused; (2) addresses the needs of individual persons being satisfied instead of having a systemwide or aggregate focus; and (3) lacks an enforcement mechanism through which an aggrieved individual can obtain review." *31 Foster Children*, 329 F.3d at 1270. Taken together, these considerations must clearly indicate that Congress intended to create new individual rights. "Ambiguity precludes enforceable rights." *Id.*

Both the Adoption Act and the EPSDT program are federal funding laws that provide money to the states to fund child welfare, foster care and adoption assistance, and medical assistance programs. To receive the federal funding, the states must submit plans to the Secretary of Health and Human

24

Services that satisfy specified requirements. *See* 42 U.S.C. §§ 622 (state plans for child welfare services), 671 (state plans for foster care and adoption assistance), and 1396a (state plans for medical assistance). It is these plan requirements that plaintiffs contend confer upon them rights that are privately enforceable under 42 U.S.C. § 1983.

### 1. Adoption Act

Plaintiffs claim that the Adoption Act, specifically 42 U.S.C. §§ 622(b)(10)(B)(i)-(iii), 671(a)(10), 671(a)(16), 671(a)(22), 675(1), and 675(5)(D) and (E),[9] confers upon them the following privately enforceable rights:

(1) To placement in foster homes or other settings that conform to national professional standards and are subject to a uniformly applied set of standards, 42 U.S.C. § 671(a)(10);[10]

_____

[9] Plaintiffs also cite 42 U.S.C. §§ 672(b) and (c), which limit foster care maintenance payments and define "foster family home" and "child-care institution," respectively, but they have not articulated any claim explicitly based on these provisions.

[10] Section 671(a)(10) provides: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for the establishment or designation of a State authority or authorities which shall be responsible for establishing and maintaining standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions
(continued...)

AO 72A
(Rev.8/82)

(2) To have an individual case plan developed for them that contains specific mandated elements and to have that case plan implemented, 42 U.S.C. §§ 671(a)(16)[11] and 675(1);[12]

(3) To have services to facilitate the child's permanency plan, 42 U.S.C. § 622(b)(10)(B)(iii),[13] including services to facilitate the child's return to his or

---

[10](...continued)
or homes, including standards related to admission policies, safety, sanitation, and protection of civil rights, and provides that the standards so established shall be applied by the State to any foster family home or child care institution receiving funds under this part [42 U.S.C. §§ 670 *et seq.*] or part B of this title [42 U.S.C. §§ 620 *et seq.*].

[11] Section 671(a)(16) states: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides for the development of a case plan (as defined in . . . [42 U.S.C. § 675(1)]) for each child receiving foster care maintenance payments under the State plan and provides for a case review system which meets the requirements described in . . . [42 U.S.C. § 675(5)(B)] with respect to each such child."

[12] Section 675(1) defines "case plan"as a written document including at least certain specified elements. *See* notes 14, 15, & 17 *infra*.

[13] Section 622(b)(10)(B)(iii) provides: "Each plan for child welfare services under this subpart shall . . . provide assurances that the State . . . is operating, to the satisfaction of the Secretary . . .
(iii) a service program designed to help children–
    (I) where safe and appropriate, return to families from which they have been removed; or
    (II) be placed for adoption, with a legal guardian, or, if adoption or legal guardianship is determined not to be appropriate for a child, in some other planned, permanent living arrangement. . . ."

AO 72A
(Rev.8/82)

her family home or to another permanent placement, 42 U.S.C. § 675(1)(B),[14] or adoption planning and services for those children whose permanency goal is adoption, 42 U.S.C. § 675(1)(E);[15]

(4) To have quality foster care services that protect their health and safety, 42 U.S.C. § 671(a)(22);[16]

---

[14] Section 675(1)(B) defines "case plan" to include: "A plan for assuring that the child receives safe and proper care and that services are provided to the parents, child, and foster parents in order to improve the conditions in the parents' home, facilitate return of the child to his own safe home or the permanent placement of the child, and address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan."

[15] Section 675(1)(E) defines "case plan" to include: "In the case of a child with respect to whom the permanency plan is adoption or placement in another permanent home, documentation of the steps the agency is taking to find an adoptive family or other permanent living arrangement for the child, to place the child with an adoptive family, a fit and willing relative, a legal guardian, or in another planned permanent living arrangement, and to finalize the adoption or legal guardianship. At a minimum, such documentation shall include child specific recruitment efforts such as the use of State, regional, and national adoption exchanges including electronic exchange systems."

[16] Section 671(a)(22) provides: "In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which . . . provides that, not later than January 1, 1999, the State shall develop and implement standards to ensure that children in foster care placements in public or private agencies are provided quality services that protect the safety and health of the children."

(5) In the case of a child who has reached 16 years of age, to have services needed to help the child prepare for the transition from foster care to independent living, 42 U.S.C. § 675(1)(D);[17]

(6) To have a systemic review of their case plans so that with respect to each child certain rights are protected, 42 U.S.C. §§ 671(a)(16)[18] and 622(b)(10)(B)(ii);[19]

(7) To have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of the placement, 42 U.S.C. § 675(5)(D);[20]

---

[17] Section 675(1)(D) defines "case plan" to include: "Where appropriate, for a child age 16 or over, a written description of the programs and services which will help such child prepare for the transition from foster care to independent living."

[18] *See* note 11 *supra*.

[19] Section 622(b)(10)(B)(ii) provides: "Each plan for child welfare services under this subpart shall . . . provide assurances that the State . . . is operating, to the satisfaction of the Secretary . . .
(ii) a case review system (as defined in section 475(5) [42 U.S.C. § 675(5)] for each child receiving foster care under the supervision of the State. . . ."

[20] Section 675(5)(D) defines "case review system" to mean in part "a procedure for assuring that . . . a child's health and education record (as described in paragraph 1(A)) is reviewed and updated, and supplied to the foster parent or foster care provider with whom the child is placed, at the time of each placement of the child in foster care."

(8) To have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified statutory standards and time frames, 42 U.S.C. § 675(5)(E);[21] and

(9) To receive services in a child welfare system that has an information system adequate to permit the state to make fully informed decisions concerning each foster child's best interests, 42 U.S.C. § 622(b)(10)(B)(i).[22]

---

[21] Section 675(5)(E) defines "case review system" to mean in part "a procedure for assuring that . . . in the case of a child who has been in foster care under the responsibility of the State for 15 of the most recent 22 months, . . . the State shall file a petition to terminate the parental rights of the child's parents . . . and, concurrently, to identify, recruit, process, and approve a qualified family for an adoption, unless–
> (i) at the option of the State, the child is being cared for by a relative;
> (ii) a State agency has documented in the case plan (which shall be available for court review) a compelling reason for determining that filing such a petition would not be in the best interests of the child; or
> (iii) the State has not provided to the family of the child, consistent with the time period in the State case plan, such services as the State deems necessary for the safe return of the child to the child's home, if reasonable efforts of the type described in . . . [42 U.S.C. § 671(a)(15)(B)(ii)] are required to be made with respect to the child."

[22] Section 622(b)(10)(B)(i) provides: "Each plan for child welfare services under this subpart shall . . . provide assurances that the State . . . is operating, to the satisfaction of the Secretary . . .
> (i) a statewide information system from which can be readily determined the status, demographic characteristics, location, and goals for the placement of every child who is (or, within the immediately preceding 12 months, has been) in foster care. . . ."

(Compl. ¶ 206; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 34-37.)

The Court finds that the foregoing statutory provisions satisfy the standards established in *Blessing* and *Wilder* and clarified in *Gonzaga* for the creation of federal rights enforceable under 42 U.S.C. § 1983. First, foster children are the clearly intended beneficiaries of the provisions on which plaintiffs rely. *Brian A. v. Sundquist*, 149 F. Supp. 2d 941, 947 (M.D. Tenn. 2000). Second, the language throughout these provisions focuses on the needs of individual foster children, rather than having a systemwide or aggregate focus. *See* 42 U.S.C. §§ 622(b)(10)(B)(i)(requiring information system with data regarding "every child" in foster care), 622(b)(10)(B)(ii)(requiring case review system for "each child receiving foster care"), 622(b)(10)(B)(iii)(requiring service program designed to help "children"), 671(a)(16)(requiring case plan for "each child" in foster care and a case review system with respect to "each such child"), 671(a)(22)(requiring standards to protect heath and safety of "children in foster care"), 675(1)(defining "case plan" in terms of documents regarding each "child"), and 675(5)(defining "case review system" in terms of procedures regarding each "child"). Third, the statute lacks an enforcement mechanism through which

30

an aggrieved individual can obtain review. *31 Foster Children*, 329 F.3d at 1272. Finally, the provisions are not too "vague and amorphous" to be enforced by the judiciary, *Blessing*, 520 U.S. at 340-41; and they clearly impose a binding obligation on the States. *Brian A.*, 149 F. Supp. 2d at 947.

The Eleventh Circuit's decision in *31 Foster Children v. Bush* is not to the contrary. In that case, the court of appeals held that 42 U.S.C. §§ 675(5)(D) and (E), construed together with 42 U.S.C. § 671(a)(16), did not *alone* create privately enforceable rights. *31 Foster Children*, 329 F.3d at 1268-74. In this case, however, plaintiffs rely on additional statutory provisions which, as noted above, contain the requisite rights-creating language. Also, in *31 Foster Children*, the court of appeals relied in part on the fact that plaintiffs had not sued under 42 U.S.C. § 622(b)(10)(B)(ii). *Id.* at 1271 n.8. Here, on the other hand, plaintiffs have sued under that provision, which has been held by at least one court to create enforceable federal rights. *Brian A.*, 149 F. Supp. 2d at 947.[23]

---

[23] *But see Charlie H. v. Whitman*, 83 F. Supp. 2d 476, 489 (D. N.J. 2000)(holding that 42 U.S.C. § 622(b)(10)(B)(ii) does not create enforceable rights). This Court is not persuaded by the *Charlie H.* court's analysis and chooses to follow the reasoning of the *Brian A.* court.

31

2. <u>Early and Periodic Screening, Diagnosis, and Treatment Program</u>

Plaintiffs claim that the EPSDT program of the Medicaid Act, specifically 42 U.S.C. §§ 1396a(a)(10)(a), 1396a(a)(43), 1396d(a)(i)&(4)(B), and 1396d(r)(1)-(5), confers upon them the following privately enforceable rights:

(1) To medical assistance for all or part of the cost of the care and services to which they have a right under the Medicaid statute, 42 U.S.C. §§ 1396a(a)(43),[24] 1396d(a)(i) & (4)(D);[25]

(2) To screening services at intervals that meet standards of medical and dental practice and when medically necessary, including the development of

---

[24] Section 1396a(a)(43) provides in relevant part: "A State plan for medical assistance must– . . . provide for–
(A) informing all persons in the State who are under the age of 21 and who have been determined to be eligible for medical assistance including services described in section 1905r [42 U.S.C. § 1396d(r)], of the availability of early and periodic screening, diagnostic, and treatment services as described in section 1905(r) [42 U.S.C. § 1396d(r)] and the need for age-appropriate immunizations against vaccine-preventable diseases,
(B) providing or arranging for the provision of such screening services in all cases where they are requested,
(C) arranging for (directly or through referral to appropriate agencies, organizations, or individuals) corrective treatment the need for which is disclosed by such child health screening services. . . ."

[25] Section 1396d(a)(i) & (4)(D) defines "medical assistance" as "payment of part or all of the cost of the following care and services . . . for individuals . . . who are– . . . under the age of 21 . . . but whose income and resources are insufficient to meet all of such cost– . . . early and periodic screening, diagnostic, and treatment services (as defined in subsection (r)) for individuals who are eligible under the plan and are under the age of 21. . . ."

a comprehensive health and developmental history, 42 U.S.C. § 1396d(r)(1);[26]

and

(3) To early and periodic screening, diagnostic, and treatment services, as

defined in the Medicaid statute to include the right to vision, dental, and

hearing services at intervals that meet the standards of medical and dental

practice and when medically necessary; and the right to such other necessary

health care, diagnostic services, treatment, and other measures needed to

correct or ameliorate defects and physical and mental illnesses and conditions

discovered by the screening services. 42 U.S.C. § 1396d(r)(2)-(5).[27]

---

[26] Section 1396d(r)(1) defines "early and periodic screening, diagnostic, and treatment services" to include
"Screening services–
(A) which are provided–
(i) at intervals which meet reasonable standards of medical and dental practice, as determined by the State after consultation with recognized medical and dental organization involved in child health care and, with respect to immunizations under subparagraph (B)(iii), in accordance with the schedule referred to in sectin 1928(c)(2)(B)(i) [42 U.S.C. § 1396s(c)(2)(B)(i) for pediatric vaccines, and
(ii) at such other intervals, indicated as medically necessary, to determine the existence of certain physical or mental illnesses or conditions. . . ."

[27] Section 1396d(r)(2)-(5) defines "early and periodic screening, diagnostic, and treatment services" to include vision services, dental services, and hearing services "which are provided . . . at intervals which meet reasonable standards of medical practice. . ., and . . . at such other intervals, indicated as medically
(continued...)

AO 72A
(Rev.8/82)

(Compl. ¶ 225; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 51.)

The Court finds that these statutory provisions satisfy the standards for creation of enforceable rights. First, eligible children under 21, including foster children, are the clearly intended beneficiaries of the provisions. *See Bonnie L.*, 180 F. Supp. 2d at 1345, *aff'd in part and vacated in part on other grounds sub nom. 31 Foster Children v. Bush*, 329 F.3d 1255. Second, the language of these provisions focuses on the needs of individual foster children. *See* 42 U.S.C. § 1396a(a)(10)(A)(state plan must provide for making medical assistance available to "all individuals" who qualify); 42 U.S.C. § 1396a(a)(43)(state must inform "all persons" under 21 who are eligible of the availability of services and provide or arrange for provision of such services where requested and for corrective treatment as needed); and 42 U.S.C. § 1396d(a)(i) & (4)(B)("medical assistance" means payment of cost of services for "individuals" under 21 "whose income and resources are insufficient" to pay for "early and periodic screening, diagnostic, and treatment services"). Third,

---

[27](...continued)
necessary, to determine the existence of a suspected illness or condition. . ."; and "[s]uch other necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services. . . ."

34

there is no enforcement mechanism through which an aggrieved individual can obtain review. *Bonnie L.*, 180 F. Supp. 2d at 1346-47. Finally, the provisions are not too "vague and amorphous" to be enforced by the judiciary, *Blessing*, 520 U.S. at 340-41; and they clearly impose a binding obligation on the States. *Bonnie L.*, 180 F. Supp. 2d at 1346.


D.  <u>State Statutory Claims</u>

In Counts VI, VII, and IX, respectively, of their complaint, plaintiffs assert claims based on implied private rights of action allegedly arising under O.C.G.A. §§ 49-5-12(j)(right to a properly screened and supervised home); 15-11-58(c), (j),[28] and (m)(right to case plans and their implementation and permanent placement); and 15-11-13 (right to care, protection, training, education, and physical, mental, and moral welfare).  State Defendants contend that none of these claims are cognizable under Georgia law because the statutes neither provide a basis for plaintiffs' claims nor a private right of action in general.  The Court concludes that each of these counts states viable claims under Georgia law.

---

[28] In 2002, the General Assembly amended Code § 15-11-58, so that the provisions formerly found in subsection (j) are now located, with some changes, in subsection (o)(1).

AO 72A
(Rev.8/82)

There is little Georgia authority on this subject. Generally, Georgia courts look to the statute as a whole to determine whether the legislature impliedly intended to allow a private right of action. *Cellular One, Inc. v. Emanuel County*, 227 Ga. App. 197, 199 (1997). In *Cellular One*, the court also relied on federal authority regarding implied private rights of action. Specifically, the court followed *Middlesex County Sewerage Auth. v. Nat. Sea Clammers Ass'n*, 453 U.S. 1 (1981), in concluding that where the statute in question is part of a comprehensive administrative scheme that includes enforcement provisions and remedies for statutory violations, a private right of action will not be implied. *Cellular One,* 227 Ga. App. at 199-200. In light of the Georgia courts' reliance on federal law in this area, this Court will look to federal authority for guidance.

In *Cort v. Ash*, 422 U.S. 66 (1975), the Supreme Court identified the following factors as relevant in determining whether a private remedy is implicit in a statute not expressly providing one: "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' . . . ? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the

36

underlying purpose of the legislative scheme to imply such a remedy for the plaintiff?" *Cort*, 422 U.S. at 78 (quoting *Texas & Pacific R. Co. v. Rigsby*, 241 U.S. 33, 39 (1916))(citations omitted)(emphasis in original).  Applying these factors to the statutes at issue here, the Court finds that a private right of action is implied.

First, each of these statutes imposes specific duties on State Defendants that are clearly intended for the especial benefit of the deprived children in their custody.  Thus, Georgia Code § 49-5-12(j) requires DFCS, "in placing children in foster family homes, . . . [to] safeguard the welfare of such children by thoroughly investigating each such home and the character and reputation of the persons residing therein and . . . [to] adequately supervise each home during the period of care."  Code § 15-11-58(c) requires DFCS, where the goal for a child is reunification with his or her family, to prepare a case plan containing certain specified elements, including specific time frames in which the goals of the plan are to be accomplished.  Code § 15-11-58(m) requires DFCS to file a petition to terminate parental rights and to seek a qualified family for adoption, if a child has been in foster care for 15 of the most recent 22 months, unless specific reasons for not doing so are

37

AO 72A
(Rev.8/82)

documented.  Code § 15-11-58(o)(1) requires DFCS to submit a permanency plan to the juvenile court containing certain specified elements, including documentation of steps to be taken by DFCS to finalize a child's permanent placement.  Finally, Code § 15-11-13 requires DFCS "to provide for the care, protection, training, and education and the physical, mental, and moral welfare of the child[ren]" in its custody.

Second, although there is no clear indication of legislative intent, it is completely consistent with the underlying purpose of the legislative scheme to imply a private right of action for plaintiffs.  The express purpose of the statutes is the protection of children.  *See* O.C.G.A. §§ 15-11-1 ("This chapter shall be liberally construed to the end . . . [t]hat children whose well-being is threatened shall be assisted and protected. . ."); 49-5-2 ("The purpose of this article is to promote, safeguard, and protect the well-being and general welfare of children and youth of this state. . .").  Thus, the clear public policy underlying Georgia Code § 49-5-12(j) is to ensure that children who are taken into the state's legal custody because they have been abused or neglected are not abused or neglected again by inappropriate caretakers chosen by the state.  Likewise, the public policy underlying Code § 15-11-58 is that foster

AO 72A
(Rev.8/82)

children either be returned to their homes or placed for adoption as soon as possible, and Code § 15-11-13 reflects a policy that all children in state custody be provided appropriate care, training, protection, and education. It is fully consistent with these clearly expressed public policies for the children who are intended to benefit to be able to sue to compel the state to comply with its legal obligations.[29]

In Count X of their complaint, plaintiffs assert a claim under O.C.G.A. § 20-2-690.1 arising from State Defendants' alleged failure to enroll and send plaintiffs to a school or provide home schooling that meets statutory standards. State Defendants contend that this is a criminal statute that does not give rise to a private civil cause of action. The Court concludes that a civil cause of action should be implied.

Georgia Code § 20-2-690.1 requires that "[e]very parent, guardian, or other person . . . having control or charge of" a child must enroll the child in school

---

[29] The Court notes that although the statutes at issue are part of a comprehensive child welfare program, they do not include any enforcement mechanism by which the state and its officials, when granted legal custody of a child, can be compelled to comply with the mandates of the law.

or provide suitable home schooling.  O.C.G.A. § 20-2-690.1(a).  Violation of this section is a misdemeanor punishable by a fine not to exceed $100.00 or imprisonment not to exceed 30 days, or both.  O.C.G.A. § 20-2-690.1(b).

"Violation of a criminal statute does not always give rise to civil liability, but, civil liability may be authorized where the legislature has indicated a strong public policy for imposing a civil as well as criminal penalty for violation of a penal statute."  *Key v. Grant*, 238 Ga. App. 818, 818 (1999)(citations omitted).  The courts have implied a civil cause of action from a criminal statute where it was consistent with the public policy underlying the statute and the victim of the crime was within the class of persons the statute was intended to protect.  *Id.* at 819.

Here, school-age children such as plaintiffs are clearly the persons intended to benefit from Code § 20-2-690.1, and considerations of public policy strongly favor the conclusion that such children may sue to compel compliance with the law.  The fact that children ordinarily cannot sue their parents is irrelevant, because State Defendants are not plaintiffs' parents. By mandating that "every" guardian must enroll and send their children to

school, the legislature clearly intended that the state and its officials, when appointed as guardian to a child, would comply with this mandate. The ability of children in plaintiffs' position to sue state officials to force such compliance is essential to their realizing the benefit the statute was intended to confer.

### E. Procedural Due Process Claim

In Count XVII of their complaint, plaintiffs allege that they have been deprived of their rights under the Adoption Act; the Multiethnic Placement Act of 1994 (MEPA), as amended by the Inter-ethnic Adoption Provisions of 1996; the EPSDT program of the Medicaid Act; and O.C.G.A. § 49-5-12(j) in violation of federal procedural due process guarantees. State Defendants contend that these claims must fail because, for the reasons discussed above, these statutes do not create privately enforceable rights or interests.[30] The Court has concluded, however, that these statutes do create privately enforceable rights. Therefore, plaintiffs' procedural due process claim survives.

---

[30] Defendants have not contended that MEPA does not create privately enforceable rights. Thus, they have offered no basis for dismissing plaintiffs' procedural due process claim based on that statute.

41

F.  Familial Association Claim

In Count V of their complaint, plaintiffs allege that they are being deprived of their liberty interests, privacy interests, and associational rights, conferred upon them by the First, Ninth, and Fourteenth Amendments to the U.S. Constitution, not to be deprived of a child-parent or a child-sibling family relationship absent compelling reasons. (Compl. ¶ 200.) Specifically, plaintiffs allege that their rights to family integrity are violated by State Defendants' systemic denial of meaningful visitation with parents and siblings, failure to place children with relatives when they first enter foster care, and failure to facilitate plaintiffs' prompt reunification with their families whenever safe and appropriate. (Compl. ¶¶ 65, 77-79, 82, 113, 132, 144, 163.)

State Defendants argue that these allegations fail to state a claim on which relief can be granted, because "there . . . is no constitutional right for plaintiffs 'to rely on an agency to strengthen and reunite their families even if that agency has a statutory duty to do so.'" (Br. in Supp. of State Defs.' Mot. to Dismiss at 24)(quoting *Dixey v. Jewish Child Care Ass'n*, 522 F. Supp. 913, 916 (S.D. N.Y. 1981)).  Plaintiffs argue that this claim is not based upon an

42

alleged right to have defendants *strengthen* their familial bonds but upon a right to have defendants not *destroy* such bonds.  Plaintiffs also argue that once the state interferes with the intimate child-parent relationship by removing a child from his or her home, it assumes an affirmative responsibility to take appropriate steps, in accordance with reasonable professional judgment, to reunify the child with his or her parents when reunification would be safe and appropriate.  The Court concludes that plaintiffs have adequately stated a claim based on alleged violation of their right to family integrity.

The Supreme Court has recognized a right to family integrity derived from the First Amendment's broad right of association, the Ninth Amendment's reservation of rights to the people, and the Fourteenth Amendment's substantive due process protections. *See Roberts v. United States Jaycees*, 468 U.S. 609, 617-20 (1984); *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).  The constitutional right to family integrity encompasses the right of children in foster care to have meaningful contact with their siblings and parents.  *See Aristotle P. v. Johnson*, 712 F. Supp. 1002, 1006 (N.D. Ill. 1989).  Therefore, plaintiffs state

43

a viable claim when they allege that State Defendants have systematically denied them meaningful visitation with their parents and siblings.

Courts have also held that once the state has removed a child from the custody of her parents, it assumes certain affirmative responsibilities for her safety and welfare and cannot deliberately and without justification place her in a position of danger without violating her rights under the Due Process Clause of the Fourteenth Amendment. *See Camp v. Gregory*, 67 F.3d 1286, 1292-93 (7th Cir. 1995). Similarly, this Court finds that once the state has removed a child from his or her family, it cannot deliberately and without justification deny that child the services necessary to facilitate reunification with his or her family, when safe and appropriate, without violating the child's right to family integrity. Therefore, plaintiffs also state a viable claim by alleging that State Defendants have systematically failed to facilitate their prompt reunification with their families whenever safe and appropriate.

G.  Nuisance Claim

In Count XI of their complaint, plaintiffs contend that the operation of the DeKalb County and Fulton County emergency shelters constitutes either a

44

public or a private nuisance.[31] Since the shelters have been closed, *see* note
2 *supra*, this claim is now moot and will therefore be dismissed.


H.  Breach of Contract

In Count XII of their complaint, plaintiffs allege that the plans submitted
by the state to the Secretary of Health and Human Services in order to
receive funding under Titles IV-B, IV-E, and XIX of the Social Security Act
(the State Plans) constitute binding contracts between the state and the
federal government, which require the state to provide child welfare, foster
care, adoption, and health services to plaintiffs in accordance with applicable
federal laws and regulations.  Plaintiffs allege that State Defendants have
breached their obligations under these contracts and that, as intended third-
party beneficiaries, they may assert a claim for such breach pursuant to
O.C.G.A. § 9-2-20(b)[32] and Georgia common law.  State Defendants contend
that the State Plans are not contracts, and even if they were, plaintiffs are

---

[31] Plaintiffs subsequently abandoned their private nuisance claim.  (Pls.'
Reply Mem. in Further Supp. of Pls.' Mot. for Prelim. Inj. at 12 n.10.)

[32] Georgia Code § 9-2-20(b) states: "The beneficiary of a contract made
between other parties for his benefit may maintain an action against the promisor
on the contract."

AO 72A
(Rev.8/82)

not third-party beneficiaries who may enforce such contracts. The Court concludes that the State Plans are contracts enforceable by plaintiffs as intended third-party beneficiaries.[33]

First, the Supreme Court has recognized that "legislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Indeed, the State Plans embody all the requisite elements of a contract. The federal government has offered to provide funding to the state for its use in providing child welfare, foster care, adoption, and health services to children in its custody. The state has accepted that offer by creating the required State Plans, accepting funding, and at least partially performing services thereunder. Consideration is found in the state's promise to abide by specific obligations in the delivery of services as set out in the

---

[33] The State Plans themselves are not in the record before the Court. This alone would justify denial of State Defendants' motion to dismiss this claim. *See Brian A. v. Sundquist*, 149 F. Supp. 2d at 952. In lieu of the Plans themselves, however, the Court has based its analysis on the statutory requisites for the State Plans set out in Title IV-B, IV-E, and XIX of the Social Security Act. *See* 42 U.S.C. §§ 622(b), 671(a), and 1396a(a).

State Plans and in the federal government's promise to provide funding so long as the state meets its obligations. *See* O.C.G.A. § 13-3-1;[34] Restatement (Second) of Contracts §§ 24, 50, 71 (1981) (defining "offer," "acceptance," and "consideration").

The cases relied on by defendants are inapposite. In *Pa. Dep't of Pub. Welfare v. United States*, 48 Fed. Cl. 785 (2001), the court held that a State Plan prepared pursuant to a funding grant under Title IV-B of the Social Security Act was not a contract for purposes of a suit against the United States under the Tucker Act,[35] because the plaintiff had failed to allege facts sufficient to prove that a government representative with actual authority to bind the government had approved the State Plan. However, since plaintiffs are suing state officials, and not the United States, approval of the State

---

[34] Georgia Code § 13-3-1 reads: "To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate."

[35] The Tucker Act provides the Court of Federal Claims jurisdiction over claims against the United States founded either upon the Constitution, an Act of Congress, a regulation of an executive department, or upon an express or implied contract with the United States. 28 U.S.C. § 1491(a).

(Rev.8/82)

Plans by a government official with authority to bind the United States is not an element of plaintiffs' contract claim in this case.

In *Charlie H. v. Whitman*, 83 F. Supp. 2d at 503, the court held that the plaintiffs could not circumvent the court's holding that the Adoption Act and another federal statute did not create rights enforceable under 42 U.S.C. § 1983 by asserting a third-party beneficiary claim. In this case, however, the Court has held that the federal statutes at issue do create rights enforceable under § 1983; therefore, plaintiffs' third-party beneficiary claim in no way circumvents this Court's ruling.

Furthermore, the State Plans at issue were clearly intended for the direct, as opposed to incidental, benefit of foster children. *See Beverly v. Macy*, 702 F.2d 931, 940 (11th Cir. 1983) ("The crucial inquiry involves a determination of intent, and third parties may sue on the contract only if it may be said to have been intended for their direct, as opposed to incidental, benefit")(quoting *Ross v. Imperial Constr. Co.*, 572 F.2d 518, 520 (5th Cir. 1978)). The Plan requirements, as set out in the governing federal statutes, specify in detail

48

required Plan provisions that are entirely and directly for the benefit of such foster children.

Once again, the cases cited by defendants are inapposite. In *Miree v. United States*, 242 Ga. 126 (1978), the Georgia Supreme Court held that survivors of passengers killed in an air crash at DeKalb Peachtree Airport could not maintain an action as third-party beneficiaries based upon alleged breach of contracts between DeKalb County and the Federal Aviation Administration that provided funding to the airport in return for DeKalb County's agreement "to maintain the airport in an adequate and safe condition for the benefit of aeronautical users thereof and for the benefit of the public." *Id.* at 129. The court's ruling, however, was based on its finding that the contract was meant to benefit the general public and not any particular individuals. "Each plaintiff in these cases had no more standing than any other member of the public, and we cannot conclude that the contract was intended for the individual benefit of any claimant." *Id.* at 136. In this case, on the other hand, the State Plans are clearly for the especial benefit of foster children in State custody and not merely for the benefit of the general public.

In *Stephens v. Roadway Express Co.*, No. C82-367A, 1982 WL 358 (N.D. Ga. July 14, 1982), the court held that the plaintiff employee, who was handicapped, was not a third-party beneficiary of contracts between the defendant employer and the United States under the Rehabilitation Act, which required the employer to take affirmative action to employ and advance in employment qualified handicapped individuals. The *Stephens* court's analysis, however, followed its related holding that the Rehabilitation Act did not "create a federal right in favor of the plaintiff," *id.* at *4 (quoting *Cort v. Ash*, 422 U.S. 66, 78 (1975)), while this Court, as noted above, has found that the federal statutes at issue in this case do create privately enforceable federal rights. In addition, the court found the contracts at issue in *Stephens* "substantively no different" than those involved in *Miree. Id.* at *5. As noted above, the State Plans at issue in this case, unlike the contracts in *Miree*, are not merely for the benefit of the general public but are clearly intended for the direct benefit of foster children.

## II. DeKalb County's Motion to Dismiss

Defendant DeKalb County moves to dismiss all claims asserted against it insofar as such claims are based on allegations concerning the funding of and

50

conditions at its emergency shelter.  Since, as noted above, *see* note 2 *supra*, the DeKalb shelter has now been closed, all such claims have been rendered moot and will therefore be dismissed.


III.  Motion for Class Certification

Plaintiffs seek an order certifying this case as a class action under Fed. R. Civ. P. 23(a) and (b)(2) with the class defined as

> All children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

Plaintiffs also seek certification of a subclass defined as

> All children in the Class who are African-American and who have had, or are subject to the risk of having, their adoption delayed or denied on the basis of their race or color.

State Defendants oppose class certification on the grounds that plaintiffs fail to satisfy the commonality and typicality requirements of Rule 23(a).[36] County Defendants oppose class certification as to plaintiffs' claims regarding the emergency shelters on the grounds that plaintiffs lack standing and/or their claims are moot.  The Court need not address these arguments because,

---

[36] State Defendants also reiterate their argument that the Court should abstain from hearing this case, but the Court has already rejected this argument.

51

as noted above, the closing of the shelters has mooted these claims.  The only claims remaining against the County Defendants relate to their alleged denial of adequate and effective legal representation in juvenile court proceedings.  With respect to these claims, County Defendants oppose class certification on the grounds that plaintiffs' claims lack the requisite commonality and typicality.  The Court concludes that plaintiffs satisfy all the requirements for class action status under Rules 23(a) and 23(b)(2), and that class certification is therefore appropriate.

Rule 23 of the Federal Rules of Civil Procedure provides for certification of a lawsuit as a class action if the four prerequisites of Rule 23(a) and one of the prerequisites of Rule 23(b) are satisfied.  *Griffin v. Dugger*, 823 F.2d 1476, 1482 (11th Cir. 1987).  The four prerequisites for maintenance of a class action under Rule 23(a) are:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  In turn, Rule 23(b)(2) permits certification when all the Rule 23(a) prerequisites are satisfied and "the party opposing the class has

acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2).

In this case, defendants do not dispute that plaintiffs satisfy the numerosity and fair and adequate representation requirements of Rule 23(a)(1) and (4), as well as the requirements of Rule 23(b)(2). The Court concurs that these requirements are satisfied. Defendants, however, contend that plaintiffs fail to satisfy the commonality and typicality requirements of Rule 23(a)(2) and (3). Therefore, the Court will turn its attention to those requirements.

Rule 23(a)(2) requires that there be questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). "The threshold for commonality is not high." *Hernandez v. Meadows*, 209 F.R.D. 665, 669 (S.D. Fla. 2002). "It is only necessary to find at least one issue common to all class members." *Pottinger v. City of Miami*, 720 F. Supp. 955, 958 (S.D. Fla. 1989). "Moreover, factual differences between class members do not preclude a finding of commonality, as long as common questions of law exist." *Hernandez*, 209 F.R.D. at 669.

Also, because plaintiffs seek class certification under Rule 23(b)(2), there is no requirement that common issues of law or fact predominate. *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001). Indeed, Rule 23(b)(2) "[c]lass actions seeking injunctive or declaratory relief . . . by their very nature present common questions of law or fact." *Haitian Refugee Ctr., Inc. v. Nelson*, 694 F. Supp. 864, 877 (S.D. Fla. 1988), *aff'd*, 872 F.2d 1555 (11th Cir. 1989).

Despite this low threshold for establishing commonality, State Defendants assert that there are no common questions of law or fact. Specifically, State Defendants allege that there are no common questions of fact because of differences in the ways that foster children come into foster care; where foster children are placed while in foster care; and the type and quality of services, treatment, and care provided to each child. Additionally, State Defendants claim that there are no common questions of law because there are allegedly no common statutory and constitutional claims among putative class members. Finally, State Defendants argue that *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280 (10th Cir. 1999), supports their position that the commonality

54

requirement is not met. (State Defs.' Br. in Opp'n to Pls.' Mot. for Class Certification at 10-13.) The Court finds all of these arguments without merit.

This case is on all fours with the case of *Baby Neal v. Casey*, 43 F.3d 48 (3d Cir. 1994), in which the Third Circuit held that the district court's denial of class certification was an abuse of discretion. In *Baby Neal*, plaintiffs alleged a pattern and practice of systemic deficiencies in the provision of care and services to abused and neglected children in the custody of the Philadelphia Department of Human Services in violation of their federal constitutional and statutory rights. *Id.* at 53. In rejecting the district court's finding of no commonality, the court characterized the plaintiffs' complaint as "challenging common conditions and practices under a unitary regime." *Id.* at 60. The court held that "the district court committed the error of overly fragmenting the plaintiffs' claims," emphasizing factual and legal differences that were "largely irrelevant" in light of the nature of the injunctive relief sought. *Id.* at 61. The court concluded that "plaintiffs' attack on the DHS's systemic deficiencies in providing legally mandated child care services" was a sufficiently common legal basis to support class certification. *Id.*

55

State Defendants' lack of commonality argument in this case is without merit for the same reasons. The factual distinctions between foster children alleged by State Defendants are irrelevant to class certification. Differences in how each child came into state custody are irrelevant because this case deals only with the "common conditions and practices under a unitary regime" that all foster children face once they are already in state custody. *Baby Neal*, 43 F.3d at 60. Differences in individual placements of foster children are also irrelevant because plaintiffs allege a unified course of conduct at the system level toward children in all placements. Similarly, it is irrelevant that each foster child does not receive the same services, care, and treatment because plaintiffs challenge systemic deficiencies in the organization and implementation of support programs and services for all foster children in State Defendants' custody. Finally, as in *Baby Neal*, plaintiffs and all putative class members claim entitlement to the same legally mandated rights and services under state and federal law, and all seek the same system-wide declaratory and injunctive relief requiring State Defendants to address and remedy their violations of foster children's common legal rights and to provide legally mandated care, protection,

56

AO 72A
(Rev.8/82)

services, and treatment. This is plainly sufficient to satisfy the commonality requirement.

The Court is not persuaded to the contrary by the Tenth Circuit's decision in *J.B. ex rel. Hart v. Valdez*, 186 F.3d 1280. In that case, plaintiffs sought "structural reform of New Mexico's system for evaluating and treating children with mental and developmental disabilities in its custody." *Id.* at 1283. In a 2-1 decision, the Tenth Circuit panel affirmed the district court's denial of class certification due to the lack of any common issue of fact or law. *Id.* at 1287-90. With regard to factual commonality, the court noted "[t]he diverse situations of the named plaintiffs" and concluded that "[o]ther than all being disabled in some way and having had some sort of contact with New Mexico's child welfare system, no common factual link joins these plaintiffs." *Id.* at 1288, 1289. The court also concluded that plaintiffs' allegation that "systemic failures in the defendants' child welfare delivery system deny all members of the class access to legally-mandated services which plaintiffs need because of their disabilities" failed to create a common question of law. *Id.* at 1289.

57

In a strongly worded dissent, Judge Mary Beck Briscoe rejected the majority's reasoning on the class certification issue. *J.B.*, 186 F.3d at 1297-1301 (Briscoe, J., concurring and dissenting).  Emphasizing the systemic nature of the complaint, she concluded that plaintiffs had satisfied Rule 23's commonality requirement:

> As previously stated, plaintiffs do not seek redress for individual deprivations, but seek systemic relief that, if obtained, will remedy every violation suffered by any child in state custody.  Hence, the dominant common legal theme asserted by every plaintiff is that the systemic deficiencies in the defendant's treatment service system deprive all children in state custody who suffer from mental and developmental disorders of rights guaranteed them by statute or the Constitution. This satisfies Rule 23(a)(2)'s commonality requirement.

*Id.* at 1299 (citation omitted).  Judge Briscoe also found "troubling the majority's unexplained rejection" of both *Baby Neal* and the Second Circuit's decision in *Marisol A. v. Giuliani*, 126 F.3d 372 (2d Cir. 1997), which upheld class certification in another child welfare case. *Id.* at 1300. She specifically found that "[t]he facts in this case are as compelling as those in *Baby Neal*" and concluded that "[t]he district court here denied class certification by citing factual differences that are largely irrelevant to the class issue and

misconstruing the unitary systemic claim on which plaintiffs' proposed class rests." *Id.* at 1301. This Court agrees with Judge Briscoe.[37]

Turning to the typicality requirement, Rule 23(a)(3) requires that the claims or defenses of the proposed class representatives be typical of the claims or defenses of the putative class. Fed. R. Civ. P. 23(a)(3). State Defendants argue that the named plaintiffs fail to satisfy the typicality requirement because each named plaintiff does not allege that he or she has been deprived of the same services, treatment, and care as the other named plaintiffs and members of the putative class. Rule 23(a)(3), however, does not require that "the proposed class representatives each personally experience every difficulty outlined in the complaint. Rather, it is sufficient that the claims of the proposed class representatives are substantially similar to the claims of the class." *Dyer v. Publix Super Markets, Inc.*, No. 97-2706-CIV-

---

[37] State Defendants also cite Judge Carnes's recent decision denying class certification in *Fluellen v. Wetherington*, No. 1:02-CV-479-JEC (N.D. Ga. March 21, 2003) (unpublished). In that case, plaintiffs sought to certify a class of mentally ill and mentally retarded prisoners at Phillips State Prison, alleging that they were being systematically mistreated and abused by prison staff. Relying on *J.B. v. Valdez*, Judge Carnes found that the plaintiffs failed to satisfy the commonality requirement of Rule 23(a)(2). Slip op. at 28-36. For the reasons outlined in the text and discussed in detail in *Baby Neal* and in Judge Briscoe's dissent in *J.B.*, this Court respectfully disagrees with Judge Carnes' analysis.

T25E, 2000 WL 33339613 at *6 (M.D. Fla. March 22, 2000).  Furthermore, "[w]here an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice." *Baby Neal*, 43 F.3d at 58.

In this case, the named plaintiffs challenge the same policies and practices of the State Defendants that give rise to the legal claims of the putative class members.  The central allegation of the named plaintiffs and the putative class members is the same—that State Defendants have failed to put into place a system that delivers appropriate services, care, and treatment in accordance with statutory and constitutional mandates.  Moreover, the named plaintiffs and putative class members all claim injuries arising from the systemic deficiencies in the child welfare system, and all request the same system-wide declaratory and injunctive relief.  Thus, plaintiffs clearly satisfy the typicality requirement.

Finally, the County Defendants argue that plaintiffs' claim against them based upon allegedly inadequate and ineffective assistance of legal counsel

AO 72A
(Rev.8/82)

fails to satisfy the commonality and typicality requirements of Rule 23. Plaintiffs' claim is based upon the County Defendants' statutory duty to provide funding for compensation and expenses of counsel appointed to represent children in deprivation and termination of parental rights proceedings in the juvenile court. *See* O.C.G.A. § 15-11-8(a)(3). Plaintiffs alleged that due to insufficient funding provided by County Defendants, there are only four child advocate attorneys to represent the vast majority of the approximately 2,000 foster children in Fulton County, and only 2 child advocate attorneys to represent the vast majority of the approximately 1,000 foster children in DeKalb County. (Compl. ¶ 99.) Plaintiffs assert that caseloads of approximately 500 children per attorney make it impossible for these attorneys to provide effective and adequate legal representation, thus depriving plaintiffs and members of the putative class of their right to such representation.

County Defendants argue that class certification with respect to this claim is inappropriate because resolution of the claim would require individualized, fact-intensive inquiries that are not susceptible to class treatment. In making this argument, however, County Defendants improperly rely on the

61

ineffective assistance of counsel test applied in direct criminal appeals and habeas corpus proceedings. *See Strickland v. Washington*, 466 U.S. 668 (1984). In *Strickland*, the Supreme Court held that in order to prove ineffective assistance of counsel, a prisoner must show (1) that his counsel's performance was deficient, and (2) that the deficiency prejudiced the outcome of the criminal proceeding. *Id.* at 687. The Eleventh Circuit, however, has held that "[t]his standard is inappropriate for a civil suit seeking prospective relief." *Luckey v. Harris*, 860 F.2d 1012, 1017 (11th Cir. 1988).

In *Luckey*, a class of indigent criminal defendants and criminal defense attorneys sought prospective relief for alleged systemic deficiencies in Georgia's indigent criminal defense system. *Luckey*, 860 F.2d at 1013. The court held that in class actions seeking prospective relief to redress institutional deficiencies in the provision of counsel, class members need not "establish that ineffective assistance was inevitable for each class member." *Id.* at 1017. Rather, class members need only meet the traditional standard for the application of equitable relief, which requires a showing of a substantial likelihood that members of the class will receive ineffective assistance from their counsel. *Id.* at 1017-18. The court went on to point out

62

that "systemic" evidence, such as evidence of inadequate resources for appointed counsel, are sufficient to state a claim for injunctive relief. *Id.* at 1018.

As to the showing of "prejudice" required under the *Strickland* test, the *Luckey* court noted that "[w]hether an accused has been prejudiced by the denial of a right is an issue that relates to relief–whether the defendant is entitled to have his or her conviction overturned–rather than the question of whether such a right exists and can be protected prospectively." *Id.* at 1017. Consequently, the Eleventh Circuit held that the prejudice prong of *Strickland* does not apply in cases seeking prospective, rather than post-conviction, relief. *Id.*

Thus, County Defendants' reliance on *Strickland* is misplaced. Because plaintiffs' ineffective assistance of counsel claim is based on allegations of systematically high caseloads and inadequate funding, and because the Eleventh Circuit has ruled that case-by-case determinations of individualized prejudice are unnecessary in similar class actions seeking injunctive relief, certification of plaintiffs' claim against County Defendants is proper.

IV. <u>Motion to Amend Complaint</u>

Plaintiffs seek to add an additional claim to their cause of action under the federal Adoption Act, 42 U.S.C. §§ 670 *et seq.*, alleging that State Defendants systematically fail to provide foster care maintenance payments that are sufficient to cover the costs of caring for foster children in Fulton and DeKalb Counties. Specifically, plaintiffs seek to amend Count VIII of the original complaint to plead State Defendants' alleged violation of plaintiffs' and class members right to live in foster care placements that have the capacity to provide for the essential needs and services of children in their care by receiving adequate foster care maintenance payments under 42 U.S.C. §§ 671(a)(1), 672(a) and (b), 675(4)(A) and (B), and 45 C.F.R. § 1355.20.

State Defendants oppose the amendment on the grounds that it would be subject to dismissal for failure to state a claim on which relief can be granted and is therefore futile. The basis for this argument is the same as that advanced with respect to plaintiffs' other claims under the Adoption Act, namely, that the Adoption Act does not create rights that are privately enforceable under 42 U.S.C. § 1983. The Court concludes that the Adoption

Act provisions underlying plaintiffs' proposed amendment do create privately enforceable rights; therefore, the amendment should be allowed.

As discussed above, the Court applies a three-part test to determine whether a federal statute creates a right enforceable under 42 U.S.C. § 1983. The statutory provision (1) must have been intended by Congress to benefit the plaintiffs; (2) must not be so "'vague and amorphous' that its enforcement would strain judicial competence;" and (3) "must unambiguously impose a binding obligation on the States." *Blessing v. Freestone*, 520 U.S. at 340-41. The Adoption Act provisions at issue here satisfy all of these requirements.

First, the mandated payments are intended to benefit foster children by covering the costs of their care and required services while in state custody. Furthermore, the language of the statute is focused on individual children, rather than having an aggregate focus. *See* 42 U.S.C. §§ 672(a) (payments required "with respect to a child" meeting specified requirements), 672(b) (payments may be made "only on behalf of a child" who is either in a foster family home or a child-institution), 675(4)(A) (defining "foster care

maintenance payments" to mean payments to cover costs of food, clothing, etc., "with respect to a child").

Second, the statutory provisions are not so "vague and amorphous" as to render judicial enforcement impossible. *Blessing*, 520 U.S. at 340. The categories of costs to be covered by the payments are defined with sufficient particularity to enable a court to assess the sufficiency of the rates paid by the state. *See* 42 U.S.C. § 675(4)(A) and 45 C.F.R. § 1355.20. Although the actual costs of certain basic child care necessities such as food, clothing, and shelter may vary, the Court is equipped to determine whether the current foster care maintenance rates fall outside the range of reasonable payments necessary to provide adequate care for children in Fulton and DeKalb Counties.

Third, the statutory provisions indisputably "impose a binding obligation" on the State to provide sufficient foster care maintenance payments for each plaintiff foster child. *Blessing*, 520 U.S. at 341. The Adoption Act explicitly states that each state receiving federal funding under Title IV-E of the Social Security Act, 42 U.S.C. §§ 670 *et seq.*, "*shall* make foster care maintenance

66

payments" with respect to foster children.   42 U.S.C. § 672(a)(emphasis added); *see also* 42 U.S.C. § 671(a)(1)(To be eligible for federal funding, state "*shall* have a plan approved by the Secretary which . . . provides for foster care maintenance payments")(emphasis added).

Finally, there is no evidence of congressional intent to foreclose private causes of action.  Not only is there no express exclusion of such remedies, but there is also no "comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Blessing*, 520 U.S. at 341.  The Adoption Act merely sets forth an administrative scheme for providing federal funds to child welfare programs, for overseeing these programs, and for withholding funding for noncompliance with federal mandates.  There is no mechanism for foster children to seek redress for violations of their rights under the statute.  Therefore, the remedies available under the Adoption Act do not preclude a private enforcement action under 42 U.S.C. § 1983. *See Mo. Child Care Ass'n v. Cross*, 294 F.3d 1034, 1039-40 (8th Cir. 2002).

Accordingly, the Court grants plaintiffs' motion for leave to file their first amended complaint. The first amended complaint shall be deemed filed as of the date of entry of this order.

## V. Fulton County's Motion for Protective Order

Fulton County moves for a protective order prohibiting plaintiffs' counsel from communicating with Fulton County Juvenile Court Judge Sanford Jones or any other Fulton County juvenile court judge regarding the subject matter of this litigation.[38]   Fulton County contends that plaintiffs' counsel's communications with Judge Jones violate Rule 4.2(a) of the Georgia Rules of Professional Conduct, which prohibits a lawyer from communicating directly with a represented person about the subject matter of the representation. Plaintiffs argue that Rule 4.2 does not apply to Judge Jones in this case. The Court concludes that Judge Jones is not a represented person with respect to any of the claims in this lawsuit. Therefore, the Court denies the motion for a protective order.

---

[38] Fulton County also moved to quash a subpoena served by plaintiffs' counsel on Judge Jones to testify at the preliminary injunction hearing. Plaintiffs did not call Judge Jones to testify at the hearing, so that motion is now moot.

68

Rule 4.2(a) of the Georgia Rules of Professional Conduct states:

> A lawyer who is representing a client in a matter shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by constitutional law or statute.

When the opposing party is an organization such as Fulton County, the rule prohibits communications only with those employees or agents "having a managerial responsibility on behalf of the organization . . . [or] whose act or omission in connection with . . . [the] matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization."  Rule 4.2(a), Comment [4A].  Judge Jones does not meet these criteria with respect to any of the claims in this case.

The vast majority of plaintiffs' claims are asserted only against the State Defendants, and not against Fulton County. Although Judge Jones, by virtue of his regular contact with children in DFCS custody, may be an important fact witness regarding many of plaintiffs' claims against the State Defendants, he can in no way be considered to have any "managerial responsibility" with respect to claims against state officials, the state

AO 72A
(Rev.8/82)

Department of Human Resources, or the two state Departments of Family and Children Services.  In addition, his actions cannot be imputed to Fulton County for purposes of establishing liability on these claims, and he cannot make binding admissions on the part of the County with respect to these claims, for the obvious reason that plaintiffs have alleged no liability on the part of the County with respect to these claims.

Plaintiffs' sole claim against Fulton County regards the adequacy of representation provided by the County to children in juvenile court proceedings.[39]  This claim relates to the alleged systemic failure of Fulton County, at the executive level, to ensure that there are a sufficient number of child advocate attorneys to provide adequate and effective representation to children in deprivation proceedings.  Although juvenile court judges have some statutory authority to appoint child advocate attorneys in individual cases, they have no authority to affect the number of child advocate attorneys available or to ensure that the number of child advocate attorneys employed by the County is adequate to meet the needs of the children requiring

---

[39] The only other claim asserted against Fulton County was with regard to conditions at its emergency shelter, which has now been closed.

representation. Judge Jones has no managerial authority with respect to the systemic staffing and budgetary decisions that plaintiffs challenge. These decisions are made by the County's executive officers. Similarly, because the decisions plaintiffs challenge rest with executive officials, and not with individual juvenile court judges, Judge Jones's acts and omissions with respect to these decisions could not be imputed to the County, and his statements regarding these issues could not be considered binding admissions.

Summary

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART State Defendants' motion to dismiss [#70-1] and defendant DeKalb County's motion to dismiss [#78-1]. The motions to dismiss are GRANTED with respect to Count XI of the complaint and all other claims relating to the operation of the Fulton County and DeKalb County emergency shelters, which have now been closed; therefore, these claims are DISMISSED WITHOUT PREJUDICE AS MOOT. The motions to dismiss are DENIED in all other respects. The Court GRANTS State Defendants' motion to exceed page limitation for brief in support of motion to dismiss [#71-1]; DENIES AS

MOOT defendant Fulton County's motion to quash subpoena [#90-1];

DENIES defendant Fulton County's motion for protective order [#90-2];

GRANTS plaintiffs' unopposed motion to extend page limit [#100-1]; DENIES

AS MOOT State Defendants' motion to compel [#103-1]; GRANTS plaintiffs'

motion for leave to supplement motion for class certification [#129-1];

GRANTS plaintiffs' supplemental motion for class certification [#129-1] and

CERTIFIES the following class:

> All children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS;

and the following subclass:

> All children in the Class who are African-American and who have had, or are subject to the risk of having, their adoption delayed or denied on the basis of their race or color;

GRANTS plaintiffs' motion for leave to file their first amended complaint

[#141-1], which shall be deemed filed as of the date of entry of this order;

GRANTS plaintiffs' motion to extend page limit [#153-1]; and GRANTS

72

plaintiffs' motion to file supplemental brief in further opposition to State

Defendants' motion to dismiss [#166-1].

IT IS SO ORDERED, this 15th day of August, 2003.

Marvin H. Shoob, Senior Judge
United States District Court
Northern District of Georgia

ENTERED ON DOCKET

AUG 1 9 2003

L.D.T., CLERK

BY _____ DEPUTY CLERK

73