DFCS Defendants' demonstrated failure to secure a placement that can meet her needs. Kara is also at risk of being returned to the DeKalb Shelter, from which she is likely to run again, because at the shelter her safety will be in jeopardy and she will not have access to necessary mental health services or the structured and supervised environment she needs.

<div align="center">125.</div>

Kara recognizes her need for a structured, therapeutic setting, which she has communicated to DeKalb DFCS Defendants. Kara has deteriorated psychologically and emotionally while in foster care, and is at imminent risk of further deteriorating upon her release from her current placement if she is not placed in an appropriate, therapeutic setting.

<div align="center">C. <u>MAYA C.</u></div>

<div align="center">126.</div>

Maya C. is a sixteen-year-old girl who is in foster care, has been adjudicated deprived, and has an open case in DeKalb County DFCS. She came into foster because of physical abuse. Maya has been in foster care for approximately nine months, and her current foster placement is the DeKalb Shelter, where she has

<div align="center">-59-</div>

stayed for most of her time in foster care.

<div align="center">127.</div>

Maya's "room" at the shelter consists of a dimly-lit cubicle, containing a bed, a small cabinet and several shelves. Maya's cubicle provides inadequate light, space and privacy for her to study or read.  These poor living conditions have impeded and continue to impede her emotional well-being and development.  For many months, Maya had no place to secure her property and as a result many of her possessions have been stolen, including a number of clothing items that were supposedly in the care of shelter staff.

<div align="center">128.</div>

Maya is regularly exposed to dangerous, unsanitary and unhealthy conditions in the shelter facilities and on the shelter grounds, and often sees roaches in the shelter.

<div align="center">129.</div>

Maya has been routinely placed at risk of harm by the failure of the shelter staff to appropriately supervise shelter residents and by the staff's abusive tactics. Maya has been placed at risk of harm due to the numerous fights among other

<div align="center">-60-</div>

residents that have occurred in her presence and that have not been appropriately handled by staff, including one altercation where a resident hurled a hot iron at another, barely missing Maya's head.  On another occasion, a staff member unnecessarily used physical force to compel Maya to get out of her bed.

130.

As a result of the inadequate supervision and security measures in place at the shelter, Maya has left the facility at will without the permission or knowledge of shelter staff, subjecting her to the dangerous conditions and criminal activity prevalent in the surrounding neighborhood.

131.

Since entering care, Maya has been denied appropriate educational services. Despite her repeated requests, DeKalb DFCS Defendants failed to enroll Maya in school for several weeks after she initially came into care.  Although Maya has been an honor student, DeKalb DFCS Defendants have enrolled her in an "alternative school" that fails to provide her with an adequately challenging curriculum.

132.

Instead of taking the necessary steps to identify an appropriate foster family placement for Maya, her caseworker has recommended that Maya be placed in a residential drug treatment program, despite the fact that she has passed repeated drug screens. Maya's caseworker has failed to visit her on a regular basis and has failed to ensure her safety or discern her needs.

133.

DeKalb DFCS Defendants have failed to develop and implement a viable case plan that will allow Maya to leave foster care and secure a safe and appropriate permanent home in accordance with reasonable professional standards and law. Although the plan is to reunify Maya with her mother, DeKalb DFCS Defendants have failed to arrange regular visits between Maya and her mother.

134.

Maya does not believe she has ever met her child advocate attorney, does not recall any person claiming to represent her at her deprivation hearings, and has been denied adequate and effective assistance of counsel in her foster care proceedings in the Juvenile Court.

135.

DeKalb DFCS Defendants have failed and continue to fail to provide Maya with independent living or transitional services that will help prepare her to live on her own when she is discharged from state custody. Recently, as a result of shelter staff's failure to exercise reasonable professional judgment, Maya was placed in a locked juvenile detention facility for an extended period of time because she allegedly committed minor infractions of shelter rules.

136.

While at the shelter, Maya has been offered very few structured or enriching activities so that she has little to do much of the time. As a result of her placement in the DeKalb Shelter, Maya has deteriorated emotionally and psychologically. She has become very depressed and is in constant fear for her own safety which has led to substantial anxiety.

D. PHELICIA D.

137.

Phelicia D. is a twelve-year-old girl who is in foster care, has been adjudicated deprived, and has an open case in Fulton County DFCS. Phelicia came

-63-

into foster care in 2000 at age 10 because she had been abused and neglected and was a victim of child prostitution. She currently resides in a residential treatment facility.

138.

Phelicia has been diagnosed as suffering from Depression with Psychotic Features, and Post Traumatic Stress Disorder resulting from the sexual abuse she suffered as a young child and her subsequent sexual exploitation. Phelicia has a history of violent behavior and has stated she wants to kill herself.

139.

Because Fulton DFCS Defendants had no appropriate placement available for Phelicia when she initially came into care, she was left in a locked, juvenile detention facility for an unreasonable period of time.

140.

Fulton DFCS Defendants failed to provide Phelicia with a prompt professional psychiatric and psychological assessment when she came into foster care. While in care, she has reported that little green men were hiding under her bed and has had delusions that she was pregnant and gave birth to a child.

-64-

141.

Fulton DFCS Defendants have failed and continue to fail to provide Phelicia

with adequate mental health services to meet her severe mental health needs.

Fulton DFCS Defendants have failed to consistently provide her with her

prescribed medications, by failing to re-fill her prescriptions or failing to transfer

her medicine when she has been moved between foster placements.

142.

Fulton DFCS Defendants have shuffled Phelicia through numerous

inappropriate placements, including repeated lengthy stays at the Fulton Shelter,

several group homes, and a residential treatment facility that treats and houses

children who are sexually aggressive in close proximity to those who have been

victimized by sexual abuse and exploitation – a dangerous setting for a girl with

Phelicia's history.

143.

Phelicia is currently placed in an inappropriate residential facility housing

much older children, despite the fact that Fulton DFCS Defendants have been made

aware by an advocate for Phelicia that a facility is available for her that treats

-65-

children with her serious mental health needs who have been subject to sexual abuse.

<div align="center">144.</div>

Fulton DFCS Defendants have failed to ensure that Phelicia is consistently enrolled in and attending school. She has experienced numerous disruptions in her schooling since she came into foster care, because Fulton DFCS Defendants have failed to promptly enroll her in public school when she moved from one placement to another, and failed to ensure that she was attending school for much of the time that she was living in the Fulton Shelter. Although Fulton DFCS Defendants have knowledge that Phelicia functions significantly below grade level, they have failed to obtain a complete assessment of her educational needs or to ensure that she is enrolled in an appropriate educational program.

<div align="center">145.</div>

Fulton DFCS Defendants have failed and continue to fail to provide any regular visits between Phelicia and her mother, and to provide family support services to allow Phelicia to maintain critical family ties with her mother.

146.

Fulton DFCS Defendants have failed to develop and implement a viable case plan that will allow Phelicia to leave foster care and secure a safe and appropriate permanent home in accordance with reasonable professional standards and law. Fulton DFCS Defendants have failed and continue to fail to take reasonable steps and to provide services to timely and safely reunite Phelicia with her mother, or, if that is not possible, to take reasonable steps to place her in a permanent adoptive home, as required by law and reasonable professional standards.

147.

Phelicia does not see her caseworker on a regular basis and she has gone as long as several months without a caseworker visit.

E. SABRINA E. AND KORRINA E.

148.

Sabrina E. and Korrina E. are siblings who are currently ages three and one, respectively. They are in foster care, have been adjudicated deprived, are legally free for adoption, and have an open case in DeKalb County DFCS. Sabrina came

into care shortly after she was born, and Korrina has been in foster care since birth, because of neglect. They currently live together in a family foster home.

149.

DeKalb DFCS Defendants have denied and delayed and continue to deny and delay the placement of Sabrina and Korrina, who are African-American., because of their race and/or color.

150.

In January 2002, Mr. and Mrs. S., who are Caucasian and Hispanic respectively, initially expressed interest in adopting Sabrina and Korrina, who were available for adoption at that time. DeKalb DFCS Defendants refused to take the necessary steps to place Sabrina and Korrina with Mr. and Mrs. S. because the prospective couple was not African-American.

151.

Sabrina and Korrina remain in foster care, and there is no family whom DeKalb DFCS Defendants have approved to adopt them. Sabrina and Korrina have been and continue to be harmed emotionally and psychologically because DeKalb DFCS Defendants have failed to provide them with adequate permanency

planning services in a manner consistent with the exercise of reasonable professional judgment and law, and have deprived them of a permanent family home as a result of their refusal to place them with appropriate and willing non-African-American adoptive parents.

<div align="center">152.</div>

DeKalb DFCS Defendants have failed to develop and implement a viable case plan that will allow Sabrina and Korrina to leave foster care and secure a safe and appropriate permanent home in accordance with reasonable professional standards and law.

<div align="center">F.  TANYA F.</div>

<div align="center">153.</div>

Tanya F. is a fifteen-year-old girl who is in foster care, has been adjudicated deprived, is legally free for adoption, and has an open case in Fulton County DFCS. Tanya was removed from her home over eight years ago because of neglect. Tanya currently lives in a family foster home.

<div align="center">-69-</div>

154.

As a result of her history of sexual abuse and neglect, Tanya has serious

emotional, psychiatric, and psychological problems. She suffers from Oppositional

Defiant Disorder and from depression. She is also developmentally delayed with

an IQ in the 50s.

155.

A professional assessment conducted while Tanya was in foster care

determined that she was in need of a specialized therapeutic placement to address

her history of sexual abuse. Fulton DFCS Defendants have failed to secure such a

placement for her. Instead, Fulton DFCS Defendants have shuffled Tanya through

at least seven placements, most of which have disrupted because they could not

meet her special needs. As a result of her multiple placements, Tanya now has

difficulty forming positive relationships with others.

156.

Tanya has been placed several times in an overcrowded residential facility

for adolescents, which is directly operated by Fulton DFCS Defendants. This

-70-

facility failed to provide Tanya necessary services to address her mental health problems and developmental delays.

157.

For much of her time at this residential facility, Fulton DFCS Defendants failed to ensure that Tanya was enrolled in and attending school or receiving the special education and related services to which she is entitled. Tanya is currently not enrolled in school and has thus missed the greater part of this school year.

158.

Because of a lack of adequate supervision and security measures at this residential facility, on numerous occasions Tanya left the facility's grounds and remained absent for extended periods of time without staff knowing her whereabouts. On one of these occasions, Tanya was a victim of child prostitution.

159.

Despite recommendations from health care professionals that Tanya requires long-term therapy and intensive case management, Fulton DFCS Defendants have failed and continue to fail to provide her with regular therapy and counseling to

address her emotional needs and help her cope with her history of sexual abuse. As a result, Tanya continues to deteriorate psychologically while in foster care.

160.

During her more than eight years in foster care, Fulton DFCS Defendants have failed to develop and implement a viable case plan that will allow Tanya to leave foster care and secure a safe and appropriate permanent home in accordance with reasonable professional standards and law. Fulton DFCS Defendants delayed any attempt to free Tanya for adoption until 1998 and have since failed to take necessary steps to find an adoptive home for her. Fulton DFCS Defendants have determined Tanya to be "unadoptable," and plan to have her remain in foster care until she is an adult. Fulton DFCS Defendants' failure to place Tanya in a permanent family setting has caused her emotional and psychiatric harm.

161.

While in foster care, Tanya became pregnant, and in December 2001, she gave birth to a baby girl. On information and belief, Fulton DFCS Defendants took custody of Tanya's child at birth and placed the child at the Fulton Shelter for several months, placing the baby in a grossly inappropriate and harmful setting and

denying Tanya the right to care for her baby and make basic child-rearing decisions on a daily basis.  The separation was not necessary to protect the health, safety or welfare of Tanya or her child.

<div align="center">162.</div>

Fulton DFCS Defendants recently placed Tanya and her baby in a foster home, but, because  Fulton DFCS Defendants have failed to provide a therapeutic placement equipped to address Tanya's serious mental health needs, there is a significant risk that this placement will disrupt and that Tanya will again be separated from her baby.

<div align="center">163.</div>

In addition, Fulton DFCS Defendants have failed to provide Tanya with regular and complete dental examinations since she came into care.

<div align="center">164.</div>

Inconsistent with the exercise of reasonable professional judgment, since 1998 Fulton DFCS Defendants have separated Tanya from her sisters, who have also been in foster care.  Fulton DFCS Defendants have failed to facilitate regular

<div align="center">-73-</div>

visits between Tanya and her sisters, and Tanya has not seen her sisters for at least a year.  Consequently, Tanya has been deprived of familial ties with her sisters.

## G. PRISCILLA G.

### 165.

Priscilla G. is an eleven-month-old girl who is in foster care, has been adjudicated deprived, and has an open case in DeKalb County DFCS.  Priscilla has been in foster care since birth because of her mother's violent and criminal history. Upon information and belief, she currently resides with a relative.

### 166.

Priscilla has had at least four different DFCS caseworkers in the eleven months since she has been in foster care.  As a result, there has been a lack of continuity and coordination in her casework services.  DeKalb DFCS Defendants have delayed taking necessary actions on her behalf, such as filing a petition to terminate the parental rights of her mother, who was convicted of attempted murder of two of her other children and has had no contact with Priscilla since birth.

167.

DeKalb DFCS Defendants have delayed and denied and continue to delay

and deny the adoption of Priscilla, on the basis of her race and/or color.  Priscilla,

who is African-American, was placed with Caucasian foster parents for

approximately ten months.  Priscilla's foster parents first informed DeKalb DFCS

Defendants that they wished to adopt Priscilla several months ago, but DeKalb

DFCS Defendants  refused to take the necessary steps to allow this adoption to

proceed.

168.

Priscilla formed a strong emotional bond with these foster parents, who have

been certified as foster-adoptive parents, and she has been and continues to be

harmed emotionally and psychologically by DeKalb DFCS Defendants' delay and

denial of her adoptive placement with them.

169.

Recently, DeKalb DFCS Defendants began arranging short visits between

Priscilla and a distant relative, with whom Priscilla has had no previous contact.

The distant relative frequently canceled these scheduled visits.  Only a few visits

took place until very recently, when DeKalb DFCS Defendants removed Priscilla from her foster home and placed her with this distant relative. Upon information and belief, there is no plan for this relative to adopt Priscilla.

170.

DeKalb DFCS Defendants' continued delay and denial of Priscilla's adoption on the basis of her race has harmed her and continues to expose her to an imminent risk of trauma and significant emotional and psychiatric harm.

## H. BRIANA H.

171.

Briana H. is a fourteen-year-old girl who is in foster care, has been adjudicated deprived, and has an open case in DeKalb County DFCS. She came into foster care because of physical abuse. She has been in foster care for approximately one year, and currently lives in the DeKalb Shelter.

172.

Briana is developmentally delayed, with an IQ in the 50s, and has been diagnosed as suffering from Adjustment Disorder, With Depressed Mood. She often does not want to get out of bed in the morning, appears to be depressed much

of the time, and has threatened to commit suicide.  DeKalb DFCS Defendants have

failed to provide Briana with appropriate mental health services, despite their

knowledge of her serious emotional, psychological, and psychiatric problems.

173.

Notwithstanding a June 2001 psychological evaluation recommending that

Briana be placed in a structured, therapeutic setting for children with special needs,

DeKalb DFCS Defendants have placed her in the DeKalb Shelter for the majority

of the time that she has been in foster care.

174.

While placed at the DeKalb Shelter, Briana was sexually assaulted by an

older male shelter resident.  This was a direct result of the absence of adequate

supervision by the shelter staff.

175.

While living at the DeKalb Shelter, Briana also has been in numerous fights

with other residents, including one altercation when she was injured and sustained

multiple abrasions.  Shelter staff have failed to adequately prevent these

altercations or to intervene appropriately when necessary.

-77-

176.

Briana has repeatedly left the DeKalb Shelter without the knowledge of shelter staff as a result of inadequate security and supervision at the facility. On one occasion, Briana and other shelter residents left the facility and got into a fight with other children in the neighborhood.

177.

Shelter staff members have repeatedly reported Briana to the police, often for minor infractions of shelter rules. As a result, DeKalb DFCS Defendants have shuffled Briana back and forth between the shelter and locked juvenile detention facilities.

178.

At the shelter, Briana is denied the opportunity to engage in meaningful and constructive activities or programs, impeding her development and exacerbating her depression. She has also been denied appropriate dental services while living in the shelter.

179.

DeKalb DFCS Defendants failed to enroll Briana in public school for several

months, and the so-called in-house educational program at the shelter failed to

provide any program to meet her special educational needs.

180.

For a short time, DeKalb DFCS Defendants placed Briana in an

inappropriate family foster home, where she was solicited to engage in prostitution

by another child in the home.  As a result, Briana refused to stay with this family

and was returned again to the shelter.

181.

While in the custody of DeKalb DFCS Defendants, Briana has been

physically injured and has deteriorated emotionally and psychologically.  Her

behavioral problems have increased, and her depression has become more severe.

182.

DeKalb DFCS Defendants have failed to develop and implement a viable

case plan that will allow Briana to leave foster care and secure a safe and

-79-

appropriate permanent home in accordance with reasonable professional standards and law.

## VIII.  CAUSES OF ACTION

183.

Counts IV, V, VIII, XV,  XVI, and XVII are brought pursuant to 42 U.S.C. §

1983.

### COUNT I
(Permanent Injunctive Relief)
(Asserted by all Plaintiffs and Class and Subclass members against all Defendants)

184.

Each and every allegation of the Complaint is incorporated herein as if fully

set forth.

185.

Plaintiffs and Class and Subclass members seek permanent injunctive relief

under O.C.G.A.   § 9-5-1 and § 9-5-8 .

186.

Defendants' actions and inactions have caused and continue to cause, or

create the risk of imminently causing, each named Plaintiff, Class and Subclass

member irreparable harm.  Plaintiffs and the members of the Class and Subclass
have no adequate remedy at law.

187.

As stated herein, the Defendants' customs, policies, and practices have
deprived and threaten to deprive Plaintiffs and Class and Subclass members of their
fundamental right to physical and emotional safety and other fundamental rights
while in government custody.  The well-being of these foster children remains in
imminent danger as a result of Defendants' actions and inactions.

188.

Plaintiffs and Class and Subclass members therefore request that the Court
enjoin the Defendants from violating their statutory and constitutional rights as
alleged herein.

189.

Following additional factual development, Plaintiffs and Class and Subclass
members will seek a particularized order of permanent injunctive relief,
identifying, among other things, professionally accepted standards that the
Defendants must meet in order to satisfy their statutory and constitutionally

-81-

mandated duties.  If appropriate, the requested order also will propose a sunset

provision under which the Court's oversight would terminate when the Defendants

have remedied their violations.

<div align="center">

## COUNT II
### (Declaratory Judgment)
(Asserted by all Plaintiffs and Class and Subclass members against all Defendants)

</div>

<div align="center">

190.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set

forth.

<div align="center">

191.

</div>

Plaintiffs and Class and Subclass Members seek a declaratory judgment

under O.C.G.A. §  9-4-1 et seq. to afford relief from uncertainty and insecurity

regarding their rights, status, and legal relations as foster children in government

custody.

<div align="center">

192.

</div>

A real and actual controversy exists in that the Plaintiffs and Class and

Subclass Members have suffered from or face the imminent risk of suffering from

<div align="center">

-82-

</div>

the loss of their fundamental rights as stated herein.  Moreover, the scope of their

statutory and constitutional rights is uncertain.

193.

The Plaintiffs and Class and Subclass Members therefore request that the

Court declare that:

a.  Foster children have a constitutional and statutory right to live

in safe and appropriate housing while in government custody,

consistent with the exercise of reasonable professional

judgment;

b.  Foster children have a constitutional and statutory right to have

plans timely created and implemented to find them permanent

homes in order to be promptly removed from government

custody, consistent with the exercise of reasonable professional

judgment;

c.  Foster children have a constitutional and statutory right not be

have their adoptions delayed or denied on the basis of their race

or color;

-83-

d.   Foster children have a constitutional and statutory right to appropriate health care services while in government custody, consistent with the exercise of reasonable professional judgment;

e.   Foster children have a constitutional and statutory right to receive appropriate educational services while in government custody, consistent with the exercise of reasonable professional judgment;

f.   Foster children have a constitutional right to adequate and effective counsel when Fulton County or DeKalb County undertakes to provide legal representation for them and a constitutional and statutory right to adequate and effective counsel upon filing of a petition to terminate parental rights;

g.   Foster children have a constitutional and statutory right to maintain family relationships absent compelling reason, consistent with the exercise of reasonable professional judgment;

Exhibit A
Page 85

h.    Foster children have a constitutional and statutory right to enjoy the protections afforded them under the federal and state statutes set forth herein, consistent with the exercise of reasonable professional judgment; and

i.    The Defendants have deprived the Plaintiffs and Class and Subclass members of the foregoing rights in the manner stated herein, resulting in harm, grave danger and the continuing threat of grave danger to these foster children.

<div align="center">

COUNT III
(Substantive Due Process Under The Georgia State Constitution)
(Asserted by all Plaintiffs and Class members against DFCS Defendants)

194.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

195.

</div>

The foregoing actions and inactions of DFCS Defendants constitute a failure to exercise an affirmative duty to protect the welfare of all Plaintiffs and Class members, which is a substantial factor leading to, and proximate cause of, the

<div align="center">

-85-

</div>

violation of the constitutionally protected liberty and privacy interests of all of the Plaintiffs and Class members. The forgoing actions and inactions of DFCS Defendants constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights and liberty and privacy interests of all Plaintiffs and Class members. As a result, all Plaintiffs and Class members have been and are being deprived of the substantive due process rights conferred upon them by Article I, Section I, Paragraph I of the Georgia State Constitution. Defendants have arbitrarily and capriciously deprived Plaintiffs and Class members of their due process rights in the absence of any countervailing state interest.

<div align="center">196.</div>

These substantive due process rights include, but are not limited to: the right to protection of their person and from unnecessary harm while in government custody; the right to a living environment that protects foster children's physical, mental and emotional safety and well-being; the right to services necessary to prevent foster children from deteriorating or being harmed physically,

<div align="center">-86-</div>

psychologically, or otherwise while in government custody, including but not limited to the right to safe and secure foster care placements, appropriate monitoring and supervision, appropriate planning and services directed toward ensuring that the child can leave foster care and grow up in a permanent family, and adequate medical, dental, psychiatric, psychological, and educational services; the right not to be deprived of liberty by retention in government custody or locked detention facilities beyond necessity; the right to treatment and care consistent with the purpose of the assumption of custody by DFCS Defendants; the right not to be retained in custody longer than is necessary to accomplish the purposes to be served by taking the child into custody; and the right to receive care, treatment and services determined and provided through the exercise of accepted, reasonable professional judgment.

## COUNT IV
### (Substantive Due Process Under The United States Constitution)
(Asserted pursuant to 42 U.S.C. § 1983 by all Plaintiffs and Class members against Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond)

-87-

197.

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

198.

The foregoing actions and inactions of Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond in their official capacities constitute a failure to exercise an affirmative duty to protect the welfare of all Plaintiffs and Class members, which is a substantial factor leading to, and proximate cause of, violation of the constitutionally protected liberty and privacy interests of all of the Plaintiffs and Class members. The forgoing actions and inactions of Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond in their official capacities constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights and liberty and privacy interests of all Plaintiffs and Class members. As a result, all Plaintiffs and Class members have been and are being deprived of the substantive due process rights conferred upon them by the Fourteenth Amendment to the United States

-88-

Constitution.  Defendants have arbitrarily and capriciously deprived Plaintiffs and

Class members of their due process rights in the absence of any countervailing state

interest.

<div align="center">199.</div>

These substantive due process rights include, but are not limited to:  the right

to protection from unnecessary harm while in government custody; the right to a

living environment that protects foster children's physical, mental and emotional

safety and well-being; the right to services necessary to prevent foster children

from deteriorating or being harmed physically, psychologically, or otherwise while

in government custody, including but not limited to the right to safe and secure

foster care placements, appropriate monitoring and supervision, appropriate

planning and services directed toward ensuring that the child can leave foster care

and grow up in a permanent family, and adequate medical, dental, psychiatric,

psychological, and educational services; the right not to be deprived of liberty by

retention in government custody or locked detention facilities beyond necessity; the

right to treatment and care consistent with the purpose of the assumption of custody

by DFCS Defendants; the right not to be retained in custody longer than is

<div align="center">-89-</div>

necessary to accomplish the purposes to be served by taking the child into custody; and the right to receive care, treatment and services determined and provided through the exercise of accepted, reasonable professional judgment.

<div align="center">

## COUNT V
### (First, Ninth, and Fourteenth Amendments to the United States Constitution)
(Asserted pursuant to 42 U.S.C. § 1983 by all Plaintiffs and Class members against Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond)

200.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

201.

</div>

The foregoing actions and inactions of Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond in their official capacities constitute a failure to exercise an affirmative duty to protect the welfare of all Plaintiffs and Class members, which failure is a substantial factor leading to, and proximate cause of, violation of the constitutionally protected liberty interests, privacy interests and associational rights of all of the Plaintiffs and Class members. The foregoing actions and inactions of Defendants Roy Barnes, James Martin, Beverly

<div align="center">

-90-

</div>

Jones and Wayne Drummond in their official capacities constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and also amounts to deliberate indifference to the serious and constitutionally protected rights and needs of the Plaintiffs and Class members. As a result, Plaintiffs and Class members are being deprived of their liberty interest, privacy interests and associational rights conferred on them by the First, Ninth, and Fourteenth Amendments to the United States Constitution not to be deprived of a child-parent or a child-sibling family relationship absent compelling reasons.

<div align="center">

COUNT VI
(Right to a Properly Screened and Supervised Home: O.C.G.A. § 49-5-12)
(Asserted by all Plaintiffs and Class Members against DFCS Defendants)

202.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

203.

</div>

As a result of the foregoing actions and inactions of DFCS Defendants, Plaintiffs and Class members who have been, are or will be in family foster homes

<div align="center">-91-</div>

have been deprived, or are at imminent risk of being deprived, of the right to have

their welfare safeguarded while in a foster home as a result of such Defendants'

failure to thoroughly investigate the home in which they are placed and the

character of the persons residing there and to supervise the home during the

placement, in violation of O.C.G.A. § 49-5-12(j).

<div align="center">

COUNT VII

(Right to Case Plans and Their Implementation and Permanent Placement:
O.C.G.A. § 15-11-58)
(Asserted by all Plaintiffs and Class Members against DFCS Defendants)

204.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully

set forth.

<div align="center">

205.

</div>

As a result of the foregoing actions and omissions of DFCS Defendants,

Plaintiffs and Class members are being deprived of rights conferred on them by

O.C.G.A. § 15-11-58(c), (j) and (m).  These rights include, but are not limited to:

the right to a timely written case plan containing mandated elements, and to the

implementation of these plans; the right to have a petition to terminate parental

rights filed, or have a compelling reason documented why such a petition has not

<div align="center">-92-</div>

been filed, in accordance with specified, statutory standards and time frames; and

the right to planning and services to obtain a permanent placement at the earliest

possible time, including documentation of the steps taken to secure permanency.

<p style="text-align:center">COUNT VIII<br>(The Federal Adoption Assistance Act)<br>(Asserted pursuant to 42 U.S.C. § 1983 by all Plaintiffs and Class members<br>against Defendants Roy Barnes, James Martin, Beverly Jones and Wayne<br>Drummond)</p>

<p style="text-align:center">206.</p>

Each and every allegation of the Complaint is incorporated herein as if fully

set forth.

<p style="text-align:center">207.</p>

As a result of the foregoing actions and omissions of Defendants Roy

Barnes, James Martin, Beverly Jones and Wayne Drummond in their official

capacities, these Defendants are engaging in a policy, pattern, practice, and/or

practice of depriving all Plaintiffs and Class members of rights conferred on them

by the federal Adoption Assistance and Child Welfare Act of 1980, as amended by

the Adoption and Safe Families Act of 1997 (collectively the "Adoption Assistance

Act") and the regulations promulgated under the Act, 45 C.F.R. Parts 1355-1357.

<p style="text-align:center">-93-</p>

These rights include, but are not limited to:  the right to timely written case plans containing mandated elements, and to the implementation of these plans; the right to placement in foster homes or other settings that conform to national professional standards and are subject to a uniformly applied set of standards;  the right to live in foster care placements that have the capacity to provide for the essential needs and services of children in their care by receiving adequate foster care maintenance payments; the right to have a petition to terminate parental rights filed, or have a compelling reason documented why such a petition has not been filed, in accordance with specified, statutory standards and time frames; the right of foster children whose permanency goal is adoption to planning and services to obtain a permanent placement, including documentation of the steps taken to secure permanency; the right to services to facilitate the child's return to his family home or the permanent placement of the child; the right to services that protect foster children's safety and health; the right to have health and educational records reviewed, updated, and supplied to foster parents or foster care providers with whom the child is placed at the time of placement; the right to receive services in a child welfare system that has an information system adequate to permit the state to

make fully informed decisions concerning each foster child's best interests; and, in

the case of a child who has reached 16 years of age, the right to services needed to

help the child prepare for the transition from foster care to independent living. 42

U.S.C.§§ 671(a)(1); 671(a)(10); 671(a)(16); 671(a)(22); 672(a), (b) and (c); 675(1);

675(4)(A) and (B); 675(5)(D); 675(5)(E); 622(b)(10)(B); 45 C.F.R. § 1355.20.

<u>COUNT IX</u>
<u>(Right to Care, Protection, Training, Education and Physical, Mental and Moral</u>
<u>Welfare:</u>
<u>O.C.G.A. § 15-11-13)</u>
(Asserted by all Plaintiffs and Class members against DFCS Defendants)

208.

Each and every allegation of the Complaint is incorporated herein as if fully

set forth.

209.

As a result of the foregoing actions and inactions of DFCS Defendants, these

Defendants have failed to provide for the care, protection, training, education, and

physical, mental and moral welfare of all Plaintiffs and Class members, all of

whom the Juvenile Court has placed in the custody of such Defendants pursuant to

O.C.G.A. § Title 15, Chapter 11, Article 1.  This failure violates the legal duty

-95-

these Defendants owe to Plaintiffs and Class members pursuant to O.C.G.A. § 15-11-13, and the violation of this duty harms such children, or places them at imminent risk of harm.

<div align="center">

COUNT X
(Right to Schooling: O.C.G.A. § 20-2-690.1)
(Asserted by all Plaintiffs and Class Members against DFCS Defendants)

210.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

211.

</div>

As a result of the foregoing actions and inactions of DFCS Defendants, which have control or charge of Plaintiffs and the Class members of school age, these Defendants have failed to enroll and send the Plaintiffs and Class members to a school, or provide home-schooling, that meets statutory standards, or have placed the Plaintiffs and Class members at risk of such failure.  Through this failure, these Defendants violate the legal duty they owe to these foster children pursuant to O.C.G.A. § 20-2-690.1, and the violation of this duty harms such children or places them at imminent risk of harm.

<div align="center">-96-</div>

## COUNT XI
### (Nuisance: Georgia Common Law)
(Asserted by all Plaintiffs and Class members against all Defendants)

### 212.

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

### 213.

Defendants have been given notice and an ample opportunity to rectify their manner of operation of the Fulton and DeKalb Shelters. Defendants have been more than negligent in their operation of these facilities, which is creating a continuous condition that hurts, inconveniences or damages the Plaintiffs and Class members who reside there. The injury the shelter operation causes these residents is different from any harm the Fulton and DeKalb Shelters may cause the general public, and the conditions in the shelters impair the health and safety of these residents. By failing to rectify the manner of operation of the Fulton and DeKalb Shelters that has injured Plaintiffs and Class members who reside there, Defendants have violated legal duties they owe these foster children.

214.

As a result of Defendants' foregoing actions and inactions, the manner in which the Fulton and DeKalb Shelters have been operated have created and maintained and continue to create and maintain a public nuisance or, in the alternative, a private nuisance that harms Plaintiffs and Class members who reside in those facilities, and poses a risk of harm to Plaintiffs and Class Members who are at imminent risk of being placed in the Shelters.

## COUNT XII
### (Breach of Contract: O.C.G.A. § 9-2-20(b) and Georgia Common Law)
(Asserted by all Plaintiffs and Class members against DFCS Defendants)

215.

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

216.

Under Titles IV-B, IV-E and XIX of the Social Security Act, states receive certain federal reimbursements so long as they enter into plans approved by the United States Department of Health and Human Services and comply with their terms. The State of Georgia receives federal funding under Titles IV-B, IV-E and

XIX of the Social Security Act and has submitted such plans, which are legal

contracts between the federal government and the state (a Georgia "State Plan").

In the State Plan contracts, the state agrees to provide child welfare, foster care,

adoption and health services to Plaintiffs and Class members in accordance with

specific statutes and policies and all applicable federal regulations and other

official issuances of the United States Department of Health and Human Services.

217.

As a result of the foregoing actions and inactions of DFCS Defendants, these

Defendants have breached and continue to breach their obligations under the State

Plan contracts, and all Plaintiffs and Class members, as the intended third party

beneficiaries to the Georgia "State Plan" contracts, are being denied their rights to

the services and benefits that the State of Georgia is obligated to provide to them

under such contracts, and are harmed thereby.

COUNT XIII
(Inadequate and Ineffective Legal Representation:
Due Process Under Georgia State Constitution and O.C.G.A. § 15-11-98(A)
(Asserted by all Plaintiffs and Class members against Defendants Fulton County
and DeKalb County)

-99-

218.

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

219.

As a result of the foregoing actions and inactions of Defendants Fulton County and DeKalb County, all Plaintiffs and Class members have been deprived of their right to adequate and effective representation in their deprivation and termination-of-parental-rights proceedings before the Juvenile Courts of Fulton and DeKalb Counties in violation of Georgia Constitution, Art. I, § 1, Par. 1, and, with respect to foster children who are the subjects of a petition to terminate parental rights, in violation O.C.G.A. § 15-11-98(a),  causing each child serious injury and harm.

COUNT XIV
(Equal Protection Under the Equal Protection Clause of the Georgia Constitution)
(Asserted by Plaintiffs Sabrina E., Korrina E., Priscilla G. and Subclass Members against DFCS Defendants)

220.

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

Exhibit A
Page 101

221.

The foregoing actions and inactions of DFCS Defendants constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected fundamental right of the Plaintiffs who assert this claim and Subclass members to not have their adoptive placements delayed or denied on the basis of their race or color.

222.

DFCS Defendants intentionally discriminate against the Plaintiffs asserting this claim and Subclass members on the basis of their race or color by delaying or denying them adoptive placements that are or would be provided to similarly situated non-African-American foster children. As a result, Plaintiffs asserting this claim and Class members have been and are being deprived of their rights to equal protection conferred upon them by Article I, Section I, Paragraph II of the Georgia State Constitution. Defendants have arbitrarily and capriciously deprived these Plaintiffs and Subclass members of their right to not have their adoptive placements delayed or

-101-

denied on the basis of their race or color in the absence of any countervailing state interest.

<div align="center">

COUNT XV

(The Multiethnic Placement Act and the Inter-ethnic Adoption Provisions of 1996)
(Asserted pursuant to 42 U.S.C. § 1983 by Plaintiffs Sabrina E. and Korrina E.,
and Priscilla G., and Subclass Members against Defendants Roy Barnes, James
Martin, Beverly Jones and Wayne Drummond)

223.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

224.

</div>

As a result of the foregoing actions and inactions of the Defendants Roy Barnes, James Martin, Beverly Jones and Wayne Drummond in their official capacities, these Defendants are engaging in a policy, pattern, practice, and/or custom of depriving the Plaintiffs asserting this claim and other Subclass members of the rights conferred upon them by the federal Multiethnic Placement Act of 1994, as amended by the Inter-ethnic Adoption Provisions of 1996, 42 U.S.C. §§ 671(a)(18), 674, 1996b. These rights include, but are not limited to, the right not to have their adoptive placements delayed or denied on the basis of their race or color.

<div align="center">-102-</div>

<u>COUNT XVI</u>
<u>(Federal Early Periodic Screening, Diagnosis and Treatment Program ("EPSDT")</u>
<u>of the Medicaid Act)</u>
(Asserted pursuant to 42 U.S.C. § 1983 by all Plaintiffs and Class members
against Defendants Roy Barnes, James Martin, Beverly Jones and Wayne
Drummond)

225.

Each and every allegation of the Complaint is incorporated herein as if fully set

forth.

226.

As a result of the foregoing actions and omissions of Defendants Roy Barnes,

James Martin, Beverly Jones and Wayne Drummond in their official capacities, these

Defendants are engaging in a policy, pattern, practice, and/or custom of denying

Plaintiffs and Class members of the rights conferred upon them by the Early and

Periodic Screening, Diagnosis and Treatment ("EPSDT") program of the federal

Medicaid Act. These rights include but are not limited to the right to receive any and

all treatments deemed necessary by a qualified medical professional conducting any

of the periodic health examinations required by EPSDT.

-103-

COUNT XVII
(Procedural Due Process Under the United States Constitution)
(Asserted pursuant to 42 U.S.C. § 1983 by all Plaintiffs and Class members
against Defendants Roy Barnes, James Martin, Beverly Jones and Wayne
Drummond)

227.

Each and every allegation of the Complaint is incorporated herein as if fully set

forth.

228.

The foregoing actions and inactions of Defendants Roy Barnes, James Martin,

Beverly Jones and Wayne Drummond in their official capacities, constitute a failure

to exercise an affirmative duty to protect the welfare of all Plaintiffs and Class

members, which is a substantial factor leading to, and proximate cause of, the

violation of the constitutionally protected liberty and privacy interests of all of the

Plaintiffs and Class members. The forgoing actions and inactions of these Defendants

constitute a policy, pattern, practice and/or custom that is inconsistent with the

exercise of reasonable professional judgment and amounts to deliberate indifference

to the serious and constitutionally protected rights and liberty and privacy interests of

all Plaintiffs and Class members. As a result, children in the Class are being deprived

-104-

Exhibit A
Page 105

of federally-created and state-created liberty or property rights without due process of law. The federal law entitlements to which children have a constitutionally protected interest arise from the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. §§ 620-27, 670-679a, and regulations promulgated thereunder, the Multiethnic Placement Act of 1994, as amended by the Interethnic Placement Act of 1996, 42 U.S.C. §§ 671(a)(18), 674, 1996b, and the Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") program of the federal Medicaid Act. The state law entitlement to which Plaintiff children have a protected interest arise from the right to have their welfare safeguarded while in a foster home pursuant to O.C.G.A. § 49-5-12(j).

<div align="center">

COUNT XVIII
(Litigation Expenses)
(Asserted by All Plaintiffs and Class members against all Defendants)

</div>

<div align="center">

229.

</div>

Each and every allegation of the Complaint is incorporated herein as if fully set forth.

<div align="center">

-105-

</div>

230.

Plaintiffs are entitled to recover their expenses of litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. §§ 1920 and 1988, and their costs pursuant to O.C.G.A. § 9-4-9.

## IX.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff children respectfully request that this Honorable Court:

A.    Assert jurisdiction over this action;

B.    Order that Plaintiffs may maintain this action as a class action pursuant to O.C.G.A. § 9-11-23(a)(1).;

C.    Declare unconstitutional and unlawful pursuant to O.C.G.A. § 9-4-2(a):

1.    DFCS Defendants' violation of all Plaintiffs' and Class members' rights under the Due Process Clause of the Georgia State Constitution;

2.    Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of all Plaintiffs' and Class

-106-

members' rights under the Due Process Clause of the United State Constitution;

3.     Defendant Roy Barnes, James Martin, Beverly Jones and Wayne Drummond's violation of all Plaintiffs' and Class members' rights under the First, Ninth and Fourteenth Amendments to the United State Constitution;

4.     DCFS Defendants' violation of all Plaintiffs' and Class members' rights under O.C.G.A. § 49-5-12;

5.     DCFS Defendants' violation of all Plaintiffs' and Class members' rights under O.C.G.A. § 15-11-58;

6.     Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of all Plaintiffs' and Class members' rights under the federal Adoption Assistance and Child Welfare Act, as amended by the Adoption and Safe Families Act of 1997, and regulations promulgated thereunder;

7.     DCFS Defendants' violation of all Plaintiffs' and Class members' rights under O.C.G.A. § 15-11-13;

8.     DCFS Defendants' violation of all Plaintiffs' and Class members' rights under O.C.G.A. § 20-2-690.1;

9.     All Defendants' creation of a public or, in the alternative, a private nuisance through the operation of the Shelters, in violation of all Plaintiffs' and Class members' rights under Georgia common law;

10.     DCFS Defendants' breach of all Plaintiffs' and Class members' rights under the State Plan contracts, pursuant to Georgia common law and O.C.G.A. § 9-2-20(b);

11.     Defendant Fulton County's and DeKalb County's violation of all Plaintiffs' and Class members' rights to adequate and effective representation under the Georgia State Constitution and O.C.G.A. § 15-11-98(A);

12.     Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of the rights of Plaintiffs Sabrina E., Korrina E. and Priscilla G. and Subclass members under the Equal Protection Clause of the Georgia State Constitution;

13. Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of the rights of Plaintiffs Sabrina E., Korrina E. and Priscilla G. and Subclass members under the federal Multiethnic Placement Act of 1994 and the Inter-ethnic Adoption Provisions of 1996;

14. Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of the rights of all Plaintiffs' and Class members under the Early and Periodic Screening, Diagnosis and Treatment ("EPSDT") program of the federal Medicaid Act; and

15. Defendant Roy Barnes', James Martin's, Beverly Jones' and Wayne Drummond's violation of all Plaintiffs' and Class members' procedural due process rights under the United States Constitution.

D. Permanently enjoin Defendants from subjecting members of the Plaintiff Class and Subclass to practices that violate their rights, pursuant to O.C.G.A. § 9-5-1 and § 9-5-8;

-109-

E.   Order appropriate remedial relief to ensure Defendants' future compliance with their legal obligations to Plaintiffs;

F.   Award to the Plaintiffs the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 42 U.S.C. §§ 1920 and 1988, and O.C.G.A. § 9-4-9;

G.   Grant such other and further equitable relief as the court deems just, necessary and proper to protect the Plaintiffs, Class members and Subclass members from further harm by Defendants.

Exhibit A
Page 111

Respectfully submitted, this 3rd day of January, 2003.

_Marcia Robinson Lowry by express permission by_

Marcia Robinson Lowry (<u>pro hac vice</u>)
Ira P. Lustbader (<u>pro hac vice</u>)
Jeffrey K. Powell (<u>pro hac vice</u>)
Sarah B. Hechtman (<u>pro hac vice</u>)
Erik S. Pitchal (<u>pro hac vice</u>)

CHILDREN'S RIGHTS, INC.
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210

Jeffrey O. Bramlett
Georgia Bar No. 075780
Corey F. Hirokawa
Georgia Bar No. 357087
Gordon L. Hamrick
Georgia Bar No. 322075

BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 881-4100
FACSIMILE (404) 881-4112

Don Keenan
Georgia Bar No. 410650

KEENAN'S KIDS LAW CENTER
148 Nassau Street, N.W.
Atlanta, GA 30303
(404) 523-2200

**COUNSEL FOR PLAINTIFFS**

Exhibit A
Page 112



# EXHIBIT / ATTACHMENT



(To be scanned in place of tab)

Only the Westlaw citation is currently available.


United States District Court, N.D. Illinois, Eastern
Division.

COILCRAFT INCORPORATED Plaintiff,
v.
INDUCTOR WAREHOUSE Defendant.

No. 98 C 140.

May 4, 2000.


*MEMORANDUM OPINION AND ORDER*

GUZMAN, J.

 **\*1** Pending is Coilcraft, Incorporated's ("Coilcraft")
motion for leave to file its second amended complaint
pursuant to Fed. R. Civ. Proc. 15(a). For the reasons
set forth below this motion is granted.


*BACKGROUND FACTS*

 This is an action for trademark infringement, unfair
competition and deceptive business practices arising
out of defendant Inductor Warehouse's ("Inductor")
alleged unauthorized use of Coilcraft's trademark in
advertisements and in the sale of non-conforming and
second hand Coilcraft electronic components as new
Coilcraft electronic components, Inductor's falsely
holding itself out as an authorized distributor of
Coilcraft electronic components, Inductor's false
advertising in representing that its private label
components are equal to Coilcraft components, and
Inductor's deceptive scheme of selling non-Coilcraft
electronic components or non-conforming Coilcraft
components obtained on the secondary market to
customers who expect to receive first-quality
Coilcraft components.

 In January of 1998, Coilcraft filed their initial
complaint against Inductor. On January 21, 1998
Coilcraft filed a one count amended complaint
against Inductor. Coilcraft alleged that Inductor was
holding itself out as an authorized Coilcraft
distributor. Second, Coilcraft alleged that Inductor
was engaging in "bait and switch" sales tactics, i.e.
substituting non-Coilcraft parts for customers who
ordered and believed they were receiving Coilcraft
parts from Inductor. The parties have engaged in
extensive discovery. No date for the completion of

discovery has been set. Coilcraft now seeks leave to
filed its second amended complaint which sets forth
four counts.

 In Count I Coilcraft seta forth a claim for
infringement of its federal trademark alleging that
Inductor's sale of products infringed on the Coilcraft
trademark and violates Section 32 of the Lanham
Act, 15 U.S.C. § 1114(1), as such sale of products is
likely to cause confusion, mistake and deception
among the general purchasing public, and is likely to
deceive the public into believing Inductor's products
are associated with, or are otherwise authorized by
Coilcraft. In Count II Coilcraft alleges that Inductors'
misappropriation and use of Coilcraft's trademark
falsely suggests to the general public the origin and
source of Coilcraft's products and creates a likelihood
of confusion by the ultimate purchasers of such
products, in violation of section 43(a) of the Lanham
Act, 15 U.S.C. § 1125(a). Count III sets forth a claim
for trademark infringement under Illinois law and
Count IV unfair competition under Illinois law.
Count V alleges violations of Illinois' Consumer
Fraud and Deceptive Practices Act, 815 ILCS §
505/2 and Count VI alleges violations of the Illinois
Uniform Deceptive Trade Practices Act, 815 ILCS §
510/2.

 Coilcraft filed its first motion to compel on July 20,
1999. After unsuccessfully attempting to resolve
discovery disputes relating to Coilcraft's most recent
discovery served on September 28, 1999. Coilcraft
filed its second motion to compel on November 16,
1999. The first motion to compel was denied as moot
by Judge Shadur on September 7, 1999. The second
motion to compel is pending before the Court.

 **\*2** During the course of discussions between the
parties on these discovery disputes, it became
apparent that the parties differ in their interpretations
of the scope of the First Amended Complaint. It is
Coilcraft's belief that the allegations of trademark
infringement and unfair competition in its amended
complaint are broad enough to include its claims for
false advertising relating to Inductor's advertisements
for its private label components and claims for
trademark infringement and unfair competition in the
sale of non-conforming Coilcraft components by
Inductor. Coilcraft claims that it had no knowledge of
a number of Inductor's wrongful acts at the time it
filed its First Amended Complaint, some of which
Inductor allegedly commenced after the filing of the
Coilcraft's Amended Complaint, and which Coilcraft
only became aware of during the course of discovery.
On the other hand, Inductor asserts that the Amended
Complaint does not sufficiently plead a cause of

Exhibit B
Page 1

action for these acts, and it, therefore, objects to certain of the discovery now at issue as seeking information and documents outside the scope of the First Amended Complaint.

### DISCUSSION

Rule 15(a) allows for the amendment of pleadings upon leave of Court and declares that this leave "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). As the Supreme Court recognized in *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 223, 9 L.Ed.2d 222 (1962), "this mandate is to be heeded." *Id* at 182. Although the decision of whether to grant or deny leave is ultimately left to the trail court's discretion, the Seventh Circuit has held that leave to amend pleadings should be liberally granted. See *King v. Cooke*, 26 F.3d 720, 722-24 (7th Cir.1994), *cert. denied*, 514 U.S. 1023 (1995). Courts should deny a request to amend a complaint where there is undue delay; bad faith or dilatory motive of the part of the movant; repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, or futility of the proposed amendment. See *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.# d 1074, 1085 (7th Cir.1997) (citing, inter alia *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); see also *Orix Credit*, 125 F.3d at 480 (citing *Ferguson v. Roberts*, 11 F.3d 696, 706 (7th Cir.1993).

Inductor sets forth three reasons as to why Coilcraft's motion to amend it's complaint a second time should be denied: undue delay, bad faith and prejudice. In addition, Inductor seeks reimbursement of expenses for previous unnecessary expenses if the second amendment is in fact allowed.

### Undue Delay

As far as delay goes, Coilcraft's motion for leave to file its second amended complaint was filed on December 3, 1999, almost two years after filing its first amended complaint and eighteen months after Inductor answered the amended complaint on March 23, 1998. Coilcraft claims that it had no knowledge of these wrongful acts, some of which Inductor commenced after the filing of the Amended Complaint, at the time it filed its First Amended Complaint,. Inductor points out, however, that in its answers to written discovery back in the middle part of 1998, Coilcraft was put on notice of the facts related to these new claims. Inductor's written answers to Interrogatory No's 2 and 3 indicate that

Coilcraft products were purchased from approximately 100 brokers, dealers and distributors and that all of Coilcraft's products sold by Inductor were new at the time of sale. Answer to Interrogatory No. 4 reveals that the Electronic Source Book is the catalogue that refers to Coilcraft's products. This Electronic Source Book reveals that Central Technologies (Inductor's private label components) products were being advertised to be equivalent to Coilcraft's products. (Exhibit # C00001).

*3 While a review of this Exhibit # C00001 clearly reveals that Inductor was in fact advertising its private products to be equivalent to Coilcraft's products it does not disclose any information as to trademark infringement, the deceptive practices and the consumer fraud issues. Although it is arguable that Coilcraft should have been aware of this equivalent theory more than a year ago, we cannot conclude that failure to previously amend constitutes undue delay because in many respects these new allegations clarify the nature of Coilcraft's claims in the First Amended Complaint and the various forms of liability involve significant and material overlap of Coilcraft's initial claims. Inductor cites to *Chaveriat v. Williams Pipe Line*, 11 F.3d 1420 (7th Cir.1993), to support its argument that Coilcraft's second motion to amend should be denied. We agree that *Chaveriat* is distinguishable from the facts here. In *Chaveriat*, the plaintiff's original complaint sought damages for a gasoline spill that occurred in 1944. *Id.* at 1423. Subsequently, the plaintiff sought to amend the complaint to include a claim for damages resulting from an entirely separate alleged spill of diesel fuel that occurred a year later. *Id.* at 1426-7. Finding that the two occurrences related to two completely different torts and that the new claim was a weak one at best, our Court of Appeals affirmed the district court's denial of leave to amend. Here, Coilcraft's second amended complaint claims are very much related to the claims it set forth in its First Amended Complaint and the consumer fraud and deceptive practices act claims are a logical extension of such. Thus, we find that Coilcraft did not unduly delayed filing its second motion to amend its complaint.

### Bad Faith

Inductor argues that Coilcraft has acted in bad faith because it has known about how Inductor acquires its products and the nature of Inductor's advertisements for quite some time. We disagree. Coilcraft has introduced relevant evidence to support its request to amend it's complaint and has never mischaracterized the nature of the lawsuit. The record reveals that it has made reasonable inquiry into the facts supporting

2000 WL 555501
**(Cite as: 2000 WL 555501 (N.D.Ill.))**

its cause of action. Therefore, we cannot conclude that Coilcraft has acted in bad faith.

### Undue Prejudice

We turn to the next question, whether the granting of Coilcraft's motion to amend would unduly prejudice Inductor. Other than arguing in a very conclusory fashion that permitting this amendment will require Inductor to both respond to and initiate discovery and it will significantly delay the trial, Inductor fails to demonstrate that permitting leave to second amend will unduly prolong discovery. Although Coilcraft did take the Rule 30(b)(6) deposition in January of 1999, that deposition was not comprehensive in that Inductor failed to provide its sales and revenue information. Since then Inductor has refused to allow Coilcraft to take three additional depositions. Moreover, Inductor has not taken any depositions in this case nor has a discovery cut off date been set or violated. Based upon the record before us, we are not convinced that granting Coilcraft's motion, even at this late date, would so unduly prejudice Inductor so as to require us to deny Coilcraft's motion for leave to amend its complaint.

*4 Inductor's Request For Attorney's Fees

Inductor's request for attorneys fees as to discovery it has already conducted is denied without prejudice. If Coilcraft attempts to do unnecessarily duplicate discovery sanctions will be imposed and it will be ordered to pay Inductor for the costs related to the unnecessary expenses.

### CONCLUSION

For the reasons set forth above, Coilcraft's motion to amend its complaint a second time is granted. Inductor's motion for attorney's fees is denied without prejudice (# 38-1).

SO ORDERED

2000 WL 555501, 2000 WL 555501 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



# EXHIBIT / ATTACHMENT

## C

(To be scanned in place of tab)

1993 WL 390176                                                    Page 1
(Cite as: 1993 WL 390176 (N.D.Ill.))

Only the Westlaw citation is currently available.


United States District Court, N.D. Illinois, Eastern
Division.

Richard L. COHN and RLC Enterprises, Inc.,
Plaintiffs,
v.
TACO BELL CORPORATION, Defendant.

No. 92 C 5852.

Oct. 1, 1993.


MEMORANDUM ORDER

BOBRICK, United States Magistrate Judge.

*1 This case comes before the court as a result of
Richard L. Cohn's and RLC Enterprises, Inc.'s
("RLC") motion for leave to amend the complaint for
the first time, pursuant to Federal Rule of Civil
Procedure 15(a).

I. BACKGROUND

This suit concerns the deterioration of the business
relationship between RLC and Taco Bell
Corporation.   From 1983 to 1988, Mr. Richard L.
Cohn bought from Taco Bell a total of nine restaurant
franchises, located in the north and northwest suburbs
of Chicago.  Mr. Cohn paid Taco Bell approximately
$500,000 for each restaurant, plus from $35,000 to
$45,000 in fees.  Also, Mr. Cohn was required to pay
from 8 1/2 % to 10% of each week's gross sales of
each restaurant to Taco Bell, as part of the franchise
agreements.   In 1990, Mr. Cohn assigned the
franchises to RLC Enterprises, Inc., of which Mr.
Cohn is the President and a shareholder.

For several years the relationship appeared to be a
happy one, but in 1989 something happened to
change that.   What exactly that something may be is
the subject of this lawsuit.   In RLC's initial
complaint, plaintiffs alleged four Counts, centering
around Taco Bell's alleged breach of an implied
covenant of good faith and fair dealing in its conduct
towards RLC.  (See, Plaintiff's Proposed First
Amended Complaint at 9-14).   According to RLC,
Taco Bell began actively trying to force RLC to sell
its franchises back to Taco Bell, by denying RLC
sufficient technical support and by attempting to

undercut business at two of RLC's franchises, in
Mundelein and Hawthorn, by building or threatening
to build another restaurant nearby.   (Plaintiffs'
Proposed First Amended Complaint at 9-11, 13-14).
Taco Bell vigorously denies any wrongdoing.

RLC's initial complaint was filed on September 1,
1992.   Discovery began soon after, and continued for
many months.   Taco Bell filed its Amended Answer
and Affirmative Defenses in July of 1993.   Now,
after substantial discovery has taken place, RLC
desires to file an Amended Complaint, adding Counts
V through VIII, based on facts and depositions
obtained during discovery.   The new Counts add
allegations of breaches of express, written and oral
promises and tortious breach of contract.  (Plaintiffs'
Proposed First Amended Complaint at 15-26).   Taco
Bell opposes the motion, alleging that RLC has
unduly delayed its proposed Amended Complaint,
that such delay and the need for considerable extra
discovery would unduly prejudice Taco Bell, and that
the proposed additional Counts would not survive a
motion to dismiss and are thus futile.

II. ANALYSIS

Federal Rule of Civil Procedure 15(a) requires that
when a party seeks leave to amend a pleading, "leave
shall be freely given when justice so requires."   The
Supreme Court has stated that Rule 15(a) is to be
liberally construed, in order that lawsuits may be
resolved on the merits whenever possible.   Foman v.
Davis, 371 U.S. 178, 182 (1962).   The Seventh
Circuit follows this policy.   See, e.g., Eades v.
Thompson, 823 F.2d 1055 (7th Cir.1987);   Ray v.
Karris, 780 F.2d 636 (7th Cir.1985);   Seifert v.
Solem, 387 F.2d 925 (7th Cir.1967).   In fact, as a
general rule leave to amend should only be denied
when certain circumstances are present which would
render the amendment unduly burdensome to either
the opposing party or the court system.   Foman, 371
U.S. at 182.   These circumstances include:   undue
delay by the movant;  bad faith or dilatory motive on
the part of the movant;  repeated failure to cure
deficiencies by amendments previously allowed;
undue prejudice to the opposing party;  futility of the
amendment.   Id.   In the Seventh Circuit, courts have
focused upon whether the opposing party would be
unduly prejudiced by the amendment as the key
factor in deciding whether to grant a motion to
amend.   See, e.g., Eades v. Thompson, 823 F.2d at
1063;   Vardon Golf Co., Inc. v. Supreme Golf Sales,
Inc., 741 F.Supp. 152, 154 (N.D.Ill.1990);   Lanigan
v. LaSalle National Bank, 108 F.R.D. 660, 663
(N.D.Ill.1985).   Alternatively, leave to amend may
be denied where the amendments would prove futile,

Exhibit C
Page 1

1993 WL 390176
(Cite as: 1993 WL 390176 (N.D.Ill.))

Page 2

as for example, where they would not withstand a motion to dismiss. *Perkins v. Silverstein*, 939 F.2d 463 (7th Cir.1991); *Glick v. Koenig*, 766 F.2d 265 (7th Cir.1985).

### A. Whether the Amendment Would Unduly Prejudice the Defendant

*2 Taco Bell alleges that it would in fact be unduly prejudiced if this court granted RLC's motion. Taco Bell asserts that RLC has been unjustifiably late in making its motion, Defendant's Memorandum in Opposition to Plaintiffs' Emergency Motion for Leave to File Their First Amended Complaint ("Defendant's Memorandum" at 3), and that the new Counts would necessitate extensive additional discovery by Taco Bell which would severely burden it. *Id.* at 5.

Taco Bell claims that RLC has unduly delayed filing its motion. It alleges that RLC's new claims are based on facts which were within the knowledge of RLC at the time it filed its initial Complaint. *Id.* at 7. Therefore, according to Taco Bell, RLC has no good reason for delaying the inclusion of Counts V-VIII in the Complaint and the motion should be denied. *Id.* at 7-8. *Feldman v. Allegheny Int'l., Inc.*, 850 F.2d 1217, 1225-26 (7th Cir.1988); *McCann v. Frank B. Hall & Co.*, 109 F.R.D. 363, 366-68 (N.C.Ill.1986). However, a simple perusal of the Proposed Amended Complaint is enough to defeat this claim. The new Counts are largely based on material which RLC received from Taco Bell in the course of discovery, such as documents from Taco Bell's corporate offices in Irvine, California, and depositions of top Taco Bell executives. For example, the existence of tape recordings of conversations between Richard Cohn and Dirk Smith, a witness in the case, was only revealed during the deposition of Dirk Smith taken on July 16, 1993. Plaintiffs' Reply Memorandum in Support of Their Motion for Leave to File Their First Amended Complaint ("Plaintiffs' Reply Memorandum" at 8). Since RLC had no way of knowing that this material existed prior to discovery, it obviously could not use it as the basis for Counts in its Complaint. *Lanigan*, 108 F.R.D. at 663.

Furthermore, the pace of discovery in this case has been slowed down considerably. The main reasons for this delay are numerous discovery disputes, involving defendant's refusal to provide plaintiff with documents or make corporate officials available for depositions. RLC's first request for production of documents was filed along with its initial Complaint on September 1, 1992. Seven months went by before Taco Bell finally responded with the

appropriate material. (Plaintiffs' Reply Memorandum at 7). In addition, the depositions of the Taco Bell executives in Irvine did not take place until July 12, 1993. *Id.* As a result of these delays, both sides agreed to an extension of the time allowed for discovery. Taco Bell sought leave to file its Amended Answer and Affirmative Defenses on July 19, 1993, and three weeks later RLC filed its motion to amend the complaint. *Id.* at 9. Thus, RLC had not completed a substantial part of its discovery until July of 1993, and when it finally had sufficient facts at hand, it requested permission to amend its Complaint. It does not appear that RLC has been unduly dilatory with its motion. *Lanigan*, 108 F.R.D. at 663 ("It is not uncommon that facts disclosed in discovery lead to new claims, and courts may properly allow the plaintiff to amend the complaint in light of this new information"). *See also*, *Gregg Communications v. American Tel. and Tel. Co.*, 98 F.R.D. 715, 721 (N.D.Ill.1983).

*3 Taco Bell also asserts that it will be unduly prejudiced if the motion is granted because it will have to undertake considerable new discovery which will be overly burdensome. (Defendant's Memorandum at 8). *UNR Industries, Inc. v. Continental Ins. Co.*, 623 F.Supp. 1319 (N.D.Ill.1985). The fact that extra discovery is required once the Complaint is amended is not enough by itself to warrant denial of the motion to amend. *Ray v. Karris*, 780 F.2d at 645; *Gregg Communications*, 98 F.R.D. at 721. It is fairly common that discovery will lead to the uncovering of new causes of action, and where those causes of action are sufficiently related to the previous claims, leave to amend should be freely given absent undue prejudice to the opposing party. *Farr v. United Airlines, Inc.*, 84 F.R.D. 618, 620 (N.D.Ill.1979).

The claim by Taco Bell is that the extra discovery would be particularly burdensome in this case, as the new Counts are not related to the previous ones, but amount to an entirely new theory of the case. (Defendant's Memorandum at 9); *McCann*, 109 F.R.D. at 368; *UNR Industries, Inc.*, 623 F.Supp. at 1325-27. However, RLC's new Counts do not "change the entire orientation of the case," *McCann*, 109 F.R.D. at 368, as Taco Bell asserts. Rather, Counts V-VIII are basically additional allegations of breaches of contract and other promises which were allegedly made to RLC by Taco Bell. E.g., Plaintiffs' Proposed First Amended Complaint at 15. They are grounded in facts found during discovery, and which were almost entirely within the knowledge of Taco Bell, such as in the documents stored in Taco Bell's Irvine, California offices. Because these new Counts

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Exhibit C
Page 2

are substantially related to the facts and causes of action in the initial Complaint, RLC should be allowed to include them in the amended Complaint. *Eades*, 823 F.2d at 1063.

Taco Bell states that the new discovery which it claims it will be required to do is so burdensome that it amounts to undue prejudice against it. (Defendant's Memorandum at 8). But where the proposed causes of action are related to the claims contained in the initial complaint, and where the need to amend did not become apparent until after some discovery is completed, the general rule is to allow the movant to amend its complaint. *Eades*, 823 F.2d at 1063; *Lanigan*, 108 F.R.D. at 663; *Gregg Communications*, 98 F.R.D. at 721. Further, the risk of prejudice is small where the proposed counts are based on the same facts and circumstances as the original counts, as this will limit the amount of extra discovery which the opposing party must do. *Lanigan*, 108 F.R.D. at 663. This risk is reduced even more where as here the plaintiff is seeking the same remedies as relief for the proposed amended counts as in the original counts. Thus, the defendant will not have to change its strategy greatly in order to effectively answer the new complaint. *Id.*

Although Taco Bell contends repeatedly that it will be prejudiced in other ways by the amendment, it fails to give any specific examples of how it would be adversely affected. *Vardon Golf Co., Inc.*, 741 F.Supp. at 154. Such conclusory statements are insufficient to defeat a motion to amend a complaint, especially where the proposed amendment is the first one by the plaintiff, and the new counts themselves are functionally sound. *Thompson v. New York Life Ins. Co.*, 644 F.2d 439, 444 (5th Cir.1981); *Vardon Golf Co., Inc.*, 741 F.Supp. at 154.

**B.** *Whether the Amendments Would Be Futile*
*4 A motion to amend a complaint may be defeated if the new charges are futile; i.e. they would not withstand a motion to dismiss, and hence are a waste of time for the court and the parties. *Foman*, 371 U.S. at 182; *Perkins v. Silverstein*, 939 F.2d 463 (7th Cir.1991); *Searight v. Kaiser Aluminum and Chemical Corp.*, 625 F.Supp. 17 (N.D.Ill.1984). A proposed new claim is considered futile if it is "clearly frivolous on its face." *Searight*, 625 F.Supp. at 18. Taco Bell makes several arguments as to why RLC's new Counts are futile.

First, defendant argues that proposed Count VIII is merely a rehash of Count III. (Defendant's Memorandum at 12). According to Taco Bell, since Count VIII alleges the same conduct and the same

damages as Count III, it is duplicative and irrelevant. *Coleman v. Ramada Hotel Operating Co.*, 933 F.2d 470 (7th Cir.1991). But, as RLC points out in its reply brief, Taco Bell has already claimed that Counts V-VIII are "four distinct new theories of plaintiffs' alleged damage," which would unduly prejudice defendant. (Defendant's Memorandum at 4). As applied to Count VIII, this means Taco Bell is in effect arguing that either Count VIII is a brand new theory of relief which is prejudicial, or in the alternative it is merely a rehash of Count III and is futile. Putting aside this logical inconsistency, it is nevertheless clear that Count VIII is not merely restating the claim of Count III. Count III is a claim for breach of an implied covenant of good faith and fair dealing, while Count VIII is a claim for a breach of a written contract for two franchises which RLC alleges were promised to it by Taco Bell. (Plaintiffs' Proposed First Amended Complaint at 13, 25). Further, Count VIII is clearly based on facts which were uncovered during discovery. As Count VIII rests on different grounds for relief, it is not duplicative or irrelevant. *Lanigan*, 108 F.R.D. at 663.

Taco Bell next argues that proposed Count VII cannot stand because the facts show that either RLC released those claims in a written agreement, or that Count VII has already been pled as Counts III and IV. (Defendant's Memorandum at 13-15). In response to these arguments, it must first be noted that Count VII is a claim for a breach of an oral promise as to the two franchises allegedly promised to RLC. By contrast, Count III is a claim for a breach of an implied covenant of good faith and fair dealing, and Count IV is a claim of unfair competition on the part of Taco Bell. (Plaintiffs' Proposed First Amended Complaint at 13, 14, 23). While it is true that all three Counts are based on the same circumstances and overall fact pattern, it is equally true that the same facts can support more than one cause of action. For example, in *Lanigan*, the plaintiff initially pled a breach of fiduciary duty owed to her by the defendants in the operation of a trust, where the plaintiff was a beneficiary of that trust. 108 F.R.D. at 661-62. The plaintiff alleged that the defendants had breached the duty by attempting to extend the duration of the trust without her consent. *Id.* Based on exactly the same conduct by the defendant, and after substantial discovery, the court allowed the plaintiff to add a second count requesting that the extension of the trust agreement be declared void and that the trust be put into receivership. *Id.* at 662. Similarly, as discussed above regarding Count VIII, Count VII is based on facts obtained during discovery, and rests on different grounds for relief

from Counts III and IV.    It is therefore neither
cumulative nor irrelevant. *Id.* at 663.

*5 As to Taco Bell's argument that the facts show
Count VII is barred by a previous release, it is
important to remember that the standard for
measuring futility is whether the proposed counts
would withstand a motion to dismiss.  *Glick v.
Koenig,* 766 F.2d 265 (7th Cir.1985); *Searight,* 625
F.Supp. at 18.    When considering a motion to
dismiss under Fed.R.Civ.P. 12(b)(6), a court must
review the motion in the light most favorable to the
nonmovant.  *Caldwell v. City of Elwood,* 959 F.2d
670, 671 (7th Cir.1992).   In this case, RLC has
alleged sufficient facts to oppose Taco Bell's claim
that Count VII is barred by the previous release;
basically stating that the release only operates to
negate claims which RLC knew existed at the time it
entered into the agreement, which allegedly would
not include Taco Bell's breach of that agreement.
*See, Farm Credit Bank of St. Louis v. Whitlock,* 144
Ill.2d 440, 581 N.E.2d 664 (1991).  Of course, Taco
Bell is free to oppose this statement of the law and
facts during the trial, and it could well succeed in
convincing the court that the release does include the
claims in Count VII. Nevertheless, from the state of
the Complaint it is impossible to say that Count VII
is "clearly frivolous on its face." *Searight,* 625
F.Supp. at 18, such that its inclusion in the Complaint
is not warranted at this stage in the proceedings.

Next, Taco Bell urges that Count VI for tortious
breach of contract is futile because under California
law, which governs the franchise agreements, there is
no such cause of action.  *Premier Wine & Spirits v.
E. & J. Gallo Winery,* 846 F.2d 537 (9th Cir.1988);
*Harris v. Atlantic Richfield Co.,* 14 Cal.App.4th 70,
17 Cal.Rptr.2d 649 (1993).  RLC replies that under
California law, there is an exception to the rule that
breaches of contract may not normally allow for
recovery of punitive damages, in situations where the
breach is also a tort.  *Harris,* 14 Cal.App.4th at 78, 17
Cal.Rptr.2d at 654;   *Godfrey v. Steinpress.* 128
Cal.App.3d 154, 180 Cal.Rptr. 95 (1982).

Taco Bell is correct in stating that under California
law, the cause of action described as "tortious breach
of contract" (also known as "breach of contract in
violation of public policy"), does not extend outside
the employer-employee relationship, except when
there is a "special relationship" between the parties.
*Premier Wine & Spirits,* 846 F.2d at 540;  *Johns-
Manville Sales Corp. v. United States,* 622 F.Supp.
443 (N.D.Cal.1985);  *Harris,* 17 Cal.Rptr.2d at 651-
56. This does not aid defendants, though, as the type
of action contemplated by the plaintiff here cannot

properly be characterized as a breach of contract in
violation of public policy.    That charge exists
primarily when an employee sues an employer for
discharge, where the discharge came because the
employee refused to perform an illegal act.  *See, e.g.,
Tamaney v. Atlantic Richfield Co.,* 610 P.2d 1330
(Cal.1980).

*6 RLC's own designation of the charge as a tortious
breach of contract is perhaps misleading, for what
they are really alleging is a claim for compensatory
and punitive damages resulting from alleged tortious
conduct by Taco Bell which involved a breach of a
contract.  This conduct is said by RLC to be various
misrepresentations and deliberate attempts by Taco
Bell to harm plaintiffs' businesses.    (Plaintiffs'
Proposed First Amended Complaint at 22).  Our
review of California law, which both sides seem to
agree controls the franchise agreements, reveals that
such a cause of action does exist, and a party may sue
in tort for a breach of contract where the breach
involves tortious conduct by the other party.  *See,
e.g., Harris,* 17 Cal.Rptr.2d at 654;  *Schroeder v.
Auto Driveaway Co.,* 523 P.2d 662 (Cal.1974) ("The
[plaintiffs] very clearly pleaded and, we hold, proved
a cause of action in tort for fraud and deceit ... The
action, to the extent that it may be said to pertain to a
contract, is actually for the breach of an obligation
imposed by law--in which exemplary damages may
also be sought." (citations omitted));  *Squire's Dept.
Store, Inc. v. Dudum,* 252 P.2d 418 (Cal.App.1953).

Of course, as Taco Bell points out, RLC must still
meet the same standards for pleading this tort count
as it must for any other.  *UNR Industries, Inc.,* 623
F.Supp. at 1325, 1329, 1331.  Paragraphs 1 to 57 of
Count VI contain detailed accounts of activity
allegedly carried on by Taco Bell officials, and each
instance of supposed misrepresentation and other acts
to the detriment of RLC's business interests are set
out in full.  It is quite clear from the face of Count VI
what conduct is the basis of the cause of action and
what remedy RLC requests from the court.
Therefore, despite RLC's inaccurate labelling of the
cause of action, the Count is pled with sufficient
clarity and specificity to survive a motion to dismiss,
and so can be included in the Amended Complaint.
*Shashoua v. Quern,* 612 F.2d 282, 285 (7th
Cir.1979).

Finally, defendant contends that Count V of the
Proposed Amended Complaint must be stricken
because the facts do not support it.  (Defendant's
Memorandum at 15).  As in the discussion of Count
VII, Count V will only fall if it is "clearly frivolous
on its face," and cannot survive a motion to dismiss.

*Searight,* 625 F.Supp. at 18.   Taco Bell opposes RLC's version of the facts with the deposition of Dirk Smith, apparently a key player in this affair.   In his deposition, Mr. Smith denies every instance of wrongdoing by either himself or Taco Bell which RLC asserts.   (*See,* Defendant's Memorandum at 16-17).   Taco Bell also denies that it attempted to sabotage RLC's franchises in Mundelein and Hawthorn by threatening to build another restaurant nearby and thus take sales away from the RLC-owned restaurants.   *Id.* at 18.   Regardless of whether Taco Bell's version of the events will ultimately be proved correct, under Fed.R.Civ.P. 12(b)(6) the facts must still be taken in the light most favorable to the plaintiff, RLC.   *Caldwell,* 959 F.2d at 671.   Under this standard, in Count V RLC alleges sufficient facts to establish the propriety of the cause of action.   No more is required under the Rule, and RLC may keep Count V in its Amended Complaint.

*7 To conclude, Taco Bell has failed to demonstrate that it will be unduly prejudiced in any way by the inclusion of the new Counts in the Amended Complaint.   RLC has not been unduly dilatory in making the motion to amend, and Taco Bell has not shown that RLC acted in bad faith by requesting leave to amend.   RLC has pled the new causes of action with sufficient substance to withstand a motion to dismiss, and so they are not futile.   In short, as there is no demonstrable adverse effect on either Taco Bell or the judicial system, the motion to amend the complaint will be granted.

### III. CONCLUSION

For those reasons set forth herein, plaintiff's Motion To Amend Their Complaint is hereby GRANTED.   Defendant shall file its response within 20 days from the date of this order.

1993 WL 390176, 1993 WL 390176 (N.D.Ill.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Exhibit C
Page 5



# EXHIBIT / ATTACHMENT

## D

(To be scanned in place of tab)

Only the Westlaw citation is currently available.


United States District Court, N.D. Illinois, Eastern Division.

FIRST OPTIONS OF CHICAGO, INC., a Delaware corporation, Plaintiff,
v.
Harry POLONITZA, Helen A. Polonitza, and Jard Polonitza, Defendants.

No. 88 C 2998.

Feb. 1, 1989.


*MEMORANDUM OPINION AND ORDER*

WILLIAM T. HART, District Judge.

*1 Plaintiff First Options of Chicago, Inc. has moved to amend its complaint. Defendants Harry, Helen, and Jard Polonitza, all of whom are directors of Harry C. Polonitza & Co., Inc., [FN1] vigorously oppose the amendment on two grounds. They argue the proposed amended complaint is subject to dismissal for failure to join an indispensable party. *See* Fed.R.Civ.P. 12(b)(7), 19(b). They also argue plaintiff was dilatory in seeking the amendment and that the amendment would cause them undue prejudice. [FN2]

This case is before the court on diversity jurisdiction. Plaintiff is incorporated in Delaware with its principal place of business in Illinois. All three defendants are citizens of California. Rollin Polonitza, a nondefendant who is alleged to be a director and officer of the Company, is apparently a citizen of Illinois. The original complaint alleges three counts against all three defendants. The first two are labeled fraud claims and the third a breach of fiduciary duty claim. The proposed amended complaint contains four counts. Amended Count I is essentially the same as original Count I except it is only stated against Harry. Amended Count II largely restates original Count II except this time it is presented as a breach of fiduciary duty claim and it is only stated against Harry. Amended Count III essentially restates original Count III. Amended Count IV states a new theory of breach of fiduciary duty against Harry. All the amended counts allege additional details as to Rollin's involvement.

Central to all the disputes is the allegation that the Company owes plaintiff substantial amounts of money following the October 19, 1987 downturn in the stock market. The Company had a market-maker account with plaintiff who, as a clearing firm, guaranteed the account. The account has had a large deficit since the market closed on October 19, 1987. The alleged fraudulent scheme is that Rollin purported to be making trades that were actually being traded by other persons to whom plaintiff would not have granted the same privileges. It is alleged in Amended Count I that Harry participated in, approved of, or acquiesced in the scheme. Amended Count II alleges Harry breached his fiduciary duties to plaintiff in permitting this scheme to continue without informing plaintiff as to who was actually trading in the accounts. Amended Count III alleges all three defendants breached their fiduciary duties by not seeking to collect from its traders the 50% of account debit balances that the traders owe to the Company and which in turn would enable plaintiff to receive payment in part from the Company. Amended Count IV alleges Harry breached his fiduciary duties by participating in Rollin's avoidance of a debt Rollin had to the Company.

Defendants argue Rollin is an indispensable party. Since the joinder of Rollin as a defendant would destroy diversity, the applicable section of Rule 19 is 19(b). *Pasco International (London) Ltd. v. Stenograph Corp.*, 637 F.2d 496, 500 (7th Cir.1980); *Bio-Analytical Services, Inc. v. Edgewater Hospital, Inc.*, 565 F.2d 450, 452 (7th Cir.), *cert. denied*, 439 U.S. 820 (1977). Under Rule 19(b) the inquiry is "whether in equity and good conscience the action should proceed among the parties." Fed.R.Civ.P. 19(b). Rule 19 is to be applied pragmatically with a focus on a realistic analysis of the facts of each case. *See Provident Trademens Bank v. Patterson*, 390 U.S. 102, 118-19 (1968); *Schmidt v. E.N. Maisel & Associates*, 105 F.R.D. 157, 159 (N.D.Ill.1985). Four factors must be considered: (1) the prejudicial effect of a judgment rendered in the absence of the party; (2) the extent to which such prejudice may be avoided; (3) the adequacy of the judgment in the party's absence; and (4) the availability of an adequate remedy if the action is dismissed. *Bio-Analytical*, 565 F.2d at 452.

*2 It is doubtful that Rollin would suffer any prejudice at all if defendants were found liable. While a finding that Rollin committed fraud would be necessary to defendants being liable on at least some counts, such a finding would not be binding upon Rollin in any further proceeding. *See Pasco,*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

637 F.2d at 501-02 & n. 12. *See also CRTF Corp. v. Federated Department Stores, Inc.,* 683 F.Supp. 422, 426-27 (S.D.N.Y.1988) (collecting cases).   The cases cited by defendants are inapposite.   They involve situations in which the absent director would be held directly liable or the corporation would be ordered to take action that would affect the rights of the absent director.   In the present case, finding the defendants liable for damages will not impose a liability upon or affect a right of Rollin. Defendants also suffer no prejudice by Rollin's absence.   He is apparently still within the subpoena power of the court and defendants would still be able to pursue an indemnity action if they are found liable.   Also, if defendants find the need for Rollin's presence to be so important, they likely can bring a third-party action against him.   As for plaintiff, it can apparently obtain a fully adequate judgment even without Rollin's presence.   The only factor at all favoring defendants is that a state court action against Rollin and all the defendants is apparently an available alternative.   That, however, is not a determinative factor, *see Pasco,* 637 F.2d at 501, especially here where Rollin's absence does not prejudice either him or any party.   Rollin is not an indispensable party.

Harry also argues he would be unduly prejudiced by permitting the amendment at this time.   He argues plaintiff has planned the amendment for months, but waited until discovery was about to close to seek to amend.   Leave to amend should "be freely given when justice so requires." Fed.R.Civ.P. 15(a).   As a general matter, delay in seeking such leave is not, standing alone, sufficient reason to deny leave to amend.   *See Tamari v. Bache & Co. (Lebanon) S.A.L.,* 838 F.2d 904, 909 (7th Cir.1988);   *UNR Industries, Inc. v. Continental Insurance Co.,* 623 F.Supp. 1319, 1324-25 (N.D.Ill.1985). Generally, there must also be prejudice to the opposing party-- though the longer the delay, the less prejudice need be shown.   *Tamari, supra; UNR, supra.*   Harry claims he is prejudiced because discovery closes the same day as this ruling and Count IV requires additional discovery.   Harry claims he will have to redepose all of plaintiff's employees to discover what information they have regarding placing trust and confidence in Harry.   This court doubts that any significant additional discovery is necessary.   Most of the facts concerning Count IV should already be known to defendants.   Moreover, defendant concedes that his counsel was generally informed about the contents of the amended complaint in mid-November.   *See* Defendants' Memorandum of Law at 12 n. 3.   He argues that conversation, which is not detailed or supported. was not fully consistent with the proposed amended complaint actually filed. The

purported inconsistencies, however, do not concern amended Count IV. Defendants have not sufficiently shown that any one of them would be unduly prejudiced by the proposed amendment.   Leave to amend is granted.   The court will, however, consider during the status hearing at which this ruling is issued whether further discovery should be permitted.

*3 IT IS THEREFORE ORDERED that plaintiff's motion for leave to file first amended complaint is granted.   Defendants shall file their answer by February 14, 1989.

> FN1. Hereinafter all the Polonitzas will be referred to by their first names.  Polonitza & Co. will be referred to as the Company.   It is also alleged Harry is the president and sole stockholder of the Company and Jard is its treasurer.

> FN2. Since no new claims are alleged against Helen or Jard, it is actually only Harry who raises this argument.

1989 WL 8506. 1989 WL 8506 (N.D.Ill.)

END OF DOCUMENT