# ORIGINAL

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

NOV 1 7 2004

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk



## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

```
------------------------------------------x
KENNY A., by his next friend,            )
Linda Winn; et al.,                      )
                                         )
                 Plaintiffs,             )
                                         )
        vs.                              )    Civil Action No. 1: 02-CV- 1686-MHS
                                         )
Sonny Perdue, in his official            )
capacity as Governor of the              )
State of Georgia; et al.                 )
                                         )
                 Defendants.             )
------------------------------------------x
```

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR ORDER AUTHORIZING INTERVIEWS/INSPECTION

Marcia Robinson Lowry (*pro hac vice*)
Ira P. Lustbader (*pro hac vice*)
Douglas C. Gray (*pro hac vice*)
Erik S. Pitchal (*pro hac vice*)
CHILDREN'S RIGHTS
404 Park Avenue South, 11th Floor
New York, NY 10016
(212) 683-2210
FACSIMILE (212) 683-4015

Jeffrey O. Bramlett
Georgia Bar No. 075780
Gordon L. Hamrick
Georgia Bar No. 322075
BONDURANT, MIXSON &
    ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
(404) 881-4100
FACSIMILE (404) 881-4111

Table of Contents

Preliminary Statement ............................................................................. 2

Facts ........................................................................................................ 10

    The Opening of the WestCare Facilities ............................................ 10

    Overstays and Overcrowding in the WestCare
    Assessment Center .............................................................................. 12

    Conditions Worsen, With Little Response from
    DeKalb DFCS ..................................................................................... 13

    The Incidents of September 20-21, 2004 and State
    Defendants' Long-Delayed Response to the Overstays ..................... 20

    State Defendants Reject Plaintiffs' Proposal for
    Interviews/Inspection ......................................................................... 23

Argument ................................................................................................. 25

    A.    The Court Is Empowered to Grant the Relief Sought ............. 25

    B.    The Need for Interviews and Inspection Is Manifest ............... 27

    C.    The Interview and Inspection Procedures Plaintiffs
        Have Proposed Are Necessary and Appropriate to the
        Circumstances ........................................................................ 28

Conclusion .............................................................................................. 32

Table of Authorities

*Gaskin v. Commonwealth of Pennsylvania*, 1997 WL 734031
(E.D. Pa. Nov. 4, 1997)................................................................................. 26

*Morales v. Turman*, 59 F.R.D. 157 (E.D. Tex. 1972)
(*quoting* Wright & Miller § 2206) ................................................................ 26

*New York State Assoc. v. Casey* 706 F.2d 956 (2d Cir. 1983)...................... 26

Wright & Miller, 8A Fed. Prac. & Proc. Civ. 2d § 2206............................. 26

Ga. Comp. R. & Regs. Ch. 290-2-5-.07(b) (2003) ....................................... 29

Ga. Comp. R. & Regs. Ch. 290-4-2-.08 (2003)............................................ 29

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

```
--------------------------------------------x
```
KENNY A., by his next friend, )
Linda Winn; et al., )
                         )
          Plaintiffs, )
                         )
    vs. )   Civil Action No.  1: 02-CV- 1686-MHS
                         )
SONNY PERDUE, in his official )
capacity as Governor of the )
State of Georgia; et al. )
                         )
         Defendants. )
```
--------------------------------------------x
```

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR ORDER AUTHORIZING INTERVIEWS/INSPECTION

Plaintiffs Kenny A. *et al.* respectfully submit this brief in support of their

Motion, pursuant to Rules 26, 34 and 45 of the Federal Rules of Civil Procedure, for

an order authorizing (a) private interviews, to be conducted by Plaintiffs' consulting

expert, with Plaintiff foster children currently placed at the WestCare Assessment

Center and the DeKalb Children's Center (together, the "WestCare facilities") and a

contemporaneous walk-through inspection of these facilities; (b) private interviews by

Plaintiffs' consulting expert with those Plaintiff foster children who were placed in the

-1-

WestCare facilities between September 1 to September 22, 2004, but who have since been moved by State Defendants to other placements; and (c) private discussions, where favored by Plaintiff foster children, between the children identified pursuant to either (a) or (b) and the undersigned counsel.

Trial in this class action seeking declaratory and injunctive relief, including broad-based reform of the child welfare system in Fulton and DeKalb counties, is set to commence on February 14, 2005, a date that has been delayed several times. At a minimum, the mounting safety concerns at the WestCare facilities described in these papers warrant a court order granting Plaintiffs access to their clients and the facilities in which State Defendants have placed them. As will be shown at trial, State Defendants' unwillingness or inability to devote the resources and attention necessary to safely close and replace the DeKalb Children's Emergency Shelter is of a piece with State Defendants' other supposed efforts to date to reform numerous known and ongoing systemic dangers in Georgia foster care as operated in Fulton and DeKalb counties.

## **Preliminary Statement**

In November 2002, following days of testimony about dangerous conditions at the emergency children's shelters operated by the Division of Family and Children

Services ("DFCS") and other public agencies in Fulton and DeKalb counties and the

harmful effects of these grossly inappropriate facilities on the children left to languish

in them for weeks and months at a time, State Defendants stood before this Court and

promised that these facilities would be shut down and replaced with a system of care

that would enable Fulton's and DeKalb's foster children to receive appropriate,

permanent placements within 23 hours. The Court credited these promises, issuing an

order denying Plaintiffs' motion for a preliminary injunction without prejudice. State

Defendants were given an opportunity, without mandate from the Court, to close and

replace the shelters with systems that meet the needs of abused and neglected Plaintiff

foster children "in need of emergency or short-term foster care."[1]

In February 2003, State Defendants filed a status report with the Court

indicating that the DeKalb Children's Emergency Shelter had been closed and was

scheduled for demolition.[2]  State Defendants reported that the shelter was to be

replaced by a new facility operated by WestCare Foundation, Inc., a facility that "will

not be an emergency shelter, but will assess and direct children to appropriate

---

[1] Ex. 1, Order filed December 12, 2002, at 5.  The Court noted, however, that "few concrete steps were taken to close the shelters before this lawsuit was filed." (*Id.* at 3.)
[2] Ex. 2, State Defendants' Status Report to the Court on DeKalb Shelter with Affidavit of James Francis Martin, dated February 18, 2003, at Affidavit ¶ 9.

placements, as well as contain a long term care component."[3] Jim Martin, then Commissioner of the Department of Human Resources ("DHR"), submitted an affidavit in support of the status report noting that this facility would be part of a "system of care" that would ensure that "each child should be placed in an appropriate setting with [sic] 23 hours of entering care."[4] The center was to be a "co-located" facility in the sense that it housed both the "WestCare Assessment Center" (the 23-hour assessment center) and a long-term residential care facility for high-needs foster children. In March 2003, State Defendants opened the DeKalb Children's Center on the same grounds as the old shelter with much fanfare. In a story in the DFCS newsletter entitled *Promises Made and Promises Kept with the New DeKalb County Children's Center*, the agency celebrated the August 2003 dedication ceremony for the WestCare facilities at which Governor Perdue noted the "solemn, moral obligation" of the State of Georgia to its foster children. The agency announced:

> When Dee Simms, Director of the Office of the Child Advocate, and area residents raised concerns about an inadequate children's shelter in Stone Mountain, DHR Commissioner Jim Martin promised Governor Perdue that the shelter would be closed and replaced with a better solution. Even though it was not the best of economic times, Commissioner Martin said,

---

[3] *Id.* at 1.
[4] *Id.* at Affidavit ¶ 11.

> 'The Governor expects you to keep promises.' Commissioner Martin kept his promise . . .[5]

Plaintiffs agree that promises were made – to this Court and many others in the community – regarding the closure of the DeKalb Children's Emergency Shelter and its replacement with a safe and appropriate system of care.  But, as this Motion and the overwhelming record marshaled in support of it demonstrates, these promises emphatically were not kept.  By September 2004, only a year and a month after State Defendants' WestCare dedication ceremony, a DeKalb County Juvenile Court Judge was so concerned about the deterioration of conditions at the WestCare facilities that he felt compelled to write to Jim Martin's replacement, current DHR Commissioner B.J. Walker, and to note:

> I was in the room not so many months ago when former Commissioner Martin explained what the "new shelter" would be like to the mayor of Stone Mountain . . . Those representations were disingenuous and were of course never met . . . My opinion is that this was a politically expedient fix.  We are left to deal with the challenges of a design of a shelter system which is flawed in its inception.[6]

---

[5] Ex. 3, DFCS EXPRESS, Division of Children and Family Services Quarterly Newsletter, November 2003, available at
*http://www2.state.ga.us/departments/dhr/dfcs/DFCSExpress/4Q2003/article06.htm.*
[6] Ex. 4, E-mail from DeKalb Juvenile Court Judge to Commissioner B.J. Walker, dated September 21, 2004, at 14-10D01929.

-5-

The Judge's comments were occasioned by a particularly egregious September 20, 2004 incident involving a DeKalb County Schools public safety officer who was escorting a child to the WestCare Assessment Center, a child reported to be the victim of sustained and severe sexual abuse. The officer was so concerned by the chaos at the facility – which included a report of a "brawl" and unsupervised residents threatening the child victim with sexual assault – that he refused to drop the child off at what even Commissioner Walker termed in her brief response "the Dekalb Shelter."[7]

And yet the events of September 20, 2004 were only the predictable results of nearly a year of institutional indifference to what – given State Defendants' representations to the Court – should have been a priority area for State Defendants. The litany of red flags raised regarding the WestCare Assessment Center – some of which have only recently come to light as a result of a subpoena Plaintiffs served on WestCare and deposition testimony – includes:

- Routine and lengthy overstays of the supposed 23-hour placement mandate as a result of State Defendants' failure to develop sufficient placement resources, beginning at least in November of 2003 – only a few months after the dedication ceremony – and continuing through September 2004. As with the shelter, "hard to place" children stayed in

---

[7] *Id.*

what was designed to be a less-than-a-day processing center for months at a time.[8]

- A February 12, 2004 inspection by DHR's Office of Regulatory Services ("ORS") that revealed that, by virtue of children being backed up in the WestCare Assessment Center, the "agency is operating a child caring institution without a license."[9] Not only did it become clear that foster children were being warehoused in the WestCare Assessment Center for days and weeks beyond the 23-hour placement restrictions, it was known to State Defendants that those Plaintiff foster children kept beyond the 23 hours were being denied basic services, including (i) casework services, (ii) educational services, and (iii) even adequate clothing.[10]

- A response to certain regulatory aspects of the problem of overstays in the WestCare Assessment Center that blurred the distinctions between children in the supposedly short-term Assessment Center and the long-term residential treatment center, thereby laying the foundation for a return to an emergency shelter.[11]

- In May 2004, the disclosure, by an ORS inspection report, that: (i) a January 2004 grievance that had been filed against a member of the WestCare maintenance staff for inappropriate sexual conduct had not been reported by WestCare to the state, as required by policy; (ii) this same staff-member's sexually inappropriate conduct with another resident

---

[8] *See, e.g.*, Ex. 5, State Defendants' Supplemental Responses to Plaintiffs' Third Interrogatories, Response No. 23 (indicating that 365 of the 725 children received at the WestCare Assessment Center between October 31, 2003 and September 20, 2004 stayed longer than 23 hours); Ex. 6, E-mails between Penny Cooper and Sharon Irving, dated November 24, 2003; Ex. 7, Assessment Center Roster, July-September 2004.

[9] Ex. 8, ORS Statement of Deficiencies and Plan of Correction, dated February 12, 2004, at 7-18S21507.

[10] *Id.* at 7-18S21475.

[11] Ex. 9, Letter from Wayne Drummond to Michael Langford, dated February 21, 2004.

in May 2004 resulted in a substantiated abuse/neglect finding against that staff-member; and (iii) *the staff-member involved had not received a criminal record check and, in fact, had a criminal record that should have disqualified him from working at the WestCare facilities.*[12] This incident ultimately resulted in the imposition of a civil penalty on WestCare for conduct "which jeopardized the health and safety of children in its care."[13]

- In June 2004, the release of a highly critical report by an independent monitor hired to assess WestCare's contractual performance that found, among other things, that WestCare's operation of the DeKalb Children's Center "borders on neglect."[14]

- In August and September 2004, further deterioration of conditions and services at the WestCare facilities, with routine overstays, overcrowding, and *no less than 95 separate incidents of children running away from the facilities in September alone.* (The prior monthly high for the combined 52-bed facilities had been 55 runaways.)[15]

Only after the events of September 20-21, 2004, and only after the DeKalb Juvenile Court Judge's direct contact with Commissioner Walker (his Honor also complained to Georgia's Office of the Child Advocate; Walker Solomon, the Director of DeKalb DFCS; and Steve Love, the Acting Director of DFCS), did State Defendants take action with respect to the WestCare facilities, and even that response

---

[12] Ex. 10, ORS Statement of Deficiencies, dated May 27, 2004.

[13] Ex. 11, Notice of Intent to Impose Civil Penalty, dated August 20, 2004, at 7-18S21475.

[14] Ex. 12, DeKalb County Children's Center, Contract Performance Review, dated June 16, 2004, at 14-9D00262.

[15] Ex. 13, AMA Count, April 2003-September 2004.

appears to have been limited. State Defendants have not terminated WestCare's contract, which continues month-to-month. Nor have they taken necessary action to address the placement shortages that create the continuing need for a shelter and continue to subject children to inappropriate short-term placements.

Plaintiffs have requested State Defendants' and WestCare's consent and cooperation in performing the interviews and walk-through inspection requested in this Motion. State Defendants have summarily dismissed these requests as "unreasonable and untimely," necessitating the Court's involvement.[16] Among other things, State Defendants have asserted that they do not have the authority to permit or facilitate the requested interviews/inspections, as they purportedly lack requisite authority over the private providers with whom DHR/DFCS contracts for placements (though, within a few days of the incident of September 20, 2004, a number of senior DFCS officials and the Director of ORS conducted a surprise visit to the facility that included interviews of children and staff). Plaintiffs have also approached WestCare seeking their permission and cooperation with the interviews/inspections. Discussions with WestCare's attorney are ongoing. Regardless of any arrangements worked out by Plaintiffs and WestCare, State Defendants remain the legal custodians of all

Plaintiff foster children, including those currently and formerly placed at WestCare, and the certainty and specificity of a Court order will be required for Plaintiffs to proceed with even that portion of the requested interviews/inspection process focused on WestCare.

For the stated reasons, Plaintiffs respectfully request the Court's assistance in obtaining access to our clients and the other relief requested, relief which is overwhelmingly supported by the evidence presented.

## Facts

### The Opening of the WestCare Facilities

In September 2002, Plaintiffs sought a preliminary injunction closing the emergency children's shelters operated by DFCS in DeKalb and Fulton counties. Following a four-day hearing on the conditions and deprivations faced by children at the shelters, the Court denied Plaintiffs' motion. Though the Court noted that "few concrete steps were taken to close the shelters before this lawsuit was filed" (*See* Ex. 1, Order filed December 12, 2002, at 3), it ultimately accepted State Defendants' representations that they would be closing the emergency shelters voluntarily and reforming their foster care intake, assessment, and placement systems. The Court

---

[16] Ex. 14, Letter from Mark Cohen to Ira Lustbader, dated November 8, 2004.

cautioned that "[s]uch an effort will demand a serious commitment of competent personnel and sufficient funds to protect and care for abused and neglected children in need of emergency or short-term foster care." (*Id.* at 5.)

On February 18, 2003, State Defendants filed a status report with the Court indicating that the DeKalb Children's Emergency Shelter had been closed and was scheduled for demolition. (Ex. 2, State Defendants' Status Report to the Court on DeKalb Shelter with Affidavit of James Francis Martin, dated February 18, 2003, at Affidavit ¶ 9.) The report noted that the emergency shelter was to be replaced by a new facility operated by WestCare Foundation, Inc. in March 2003, a facility that "will not be an emergency shelter, but will assess and direct children to appropriate placements, as well as contain a long term care component." (*Id.* at 1). Former Commissioner Martin submitted an affidavit as part of the update stating that the WestCare Assessment Center would be an important part of a "system of care" under which "each child should be placed in an appropriate setting with [sic] 23 hours of entering care." (Ex. 2, State Defendants' Status Report to the Court on DeKalb Shelter with Affidavit of James Francis Martin, dated February 18, 2003, at Affidavit ¶ 11.)

**Overstays and Overcrowding in the WestCare Assessment Center**

Notwithstanding procedures requiring that all placements be made within 23 hours and State Defendants' various representations to the Court, Plaintiff foster children began systematically overstaying the 23-hour placement mandate in or around November 2003, just eight months after the WestCare facilities opened their doors. These overstays were well-known to State Defendants.[17] In late November, Jane "Penny" Cooper, the DeKalb County Social Services Administrator with responsibilities over the foster care program, requested that "an e-mail be sent to [her] at the end of every work day that tells the names of the children and their dates of birth and when their time expired for those children who are at the WestCare Assessment Center over 23 hours." (Ex. 6, E-mails between Penny Cooper and Sharon Irving, dated November 23, 2003.) These e-mails and subsequent daily and weekly reports – which appear to have been provided not only to the DeKalb DFCS

---

[17] Though DeKalb Deputy Director, Katherine Herren, acknowledged that the WestCare Assessment Center was not an appropriate long term placement for children, she indicated that "the overstays by themselves were an issue, but it had been something that I was willing to work through given the population of children that I knew we were getting that we were not having success at locating a placement for." (Ex. 30, Deposition of DeKalb County DFCS Deputy Director Katherine Herren, dated November 3, 2004, at 199-201, 215-16.)

County Director and other senior DeKalb DFCS staff, but also to various State DFCS managers – reflected growing numbers of children staying in the WestCare Assessment Center well beyond the 23-hour limit, sometimes for weeks and even months on end.

The overstays issue soon came to the attention of the regulators. A January 9, 2004 ORS investigation of an incident involving male residents sexually acting out in the WestCare Assessment Center concluded not only that WestCare had failed to adequately supervise the youth involved, but also that as a result of the overstays in the center the agency was "operating a child caring institution without a license." (Ex. 15, ORS Statement of Deficiencies, dated January 9, 2004, at 7-18S21511-12.) At the time of the visit, the inspector identified fifteen residents in the Assessment Center (which had only eight beds), six of whom had been at the center for more than 23 hours.  (*Id.*)

When ORS surveyors returned a month later, again in response to a report of children sexually acting out, things had only worsened.  At that time, seven of eleven residents at the assessment center had been there for over two weeks. (Ex. 8, ORS Statement of Deficiencies and Plan of Correction, dated February 12, 2004, at 7-18S21509.)  Moreover, the significant numbers of children overstaying the 23-hour

placement rule were receiving virtually no services at all during their extended stays in what had been designed to be a less-than-a-day assessment program. For example, children in the Assessment Center were receiving no counseling or other "casework care services" (*id.* at 21508) and were not provided access to educational services. (*Id.* at 21509.) Nor were they provided adequate clothing. As determined by the ORS surveyor: "Residents enter the program with only one set of clothing which has to be washed daily to ensure the residents' clothes are clean. Two of two residents observed and interviewed reported that they did not have adequate or properly fitting clothing." (*Id.* at 7-18S21510.)

A February 2, 2004 memo from Ms. Cooper to all DeKalb DFCS case workers and supervisors emphasized that basic foster care services were not being provided to children in the Assessment Center:

> We are beginning to assume that children can stay longer than 23 hours and they cannot. The WestCare Assessment Center is not an approved placement and we are violating policy every time a child remains there more than 23 hours. *The Assessment Center offers no services to meet the child's needs other than food and shelter.* We need every one's help in making this work for us!

(Ex. 16, Memorandum from Penny Cooper to staff, dated February 2, 2004 (emphasis added).)

-14-

In correspondence arising out of the licensure issues identified by ORS,

WestCare's vice-president noted that "some unassessed children, in fact, were staying

*for weeks*," but squarely laid the blame for the overstays on DeKalb DFCS:

> As you are well aware, the number of unassessed children at the DeKalb
> Children's Center is not due to any violation on the part of WestCare, but
> is the result of the day-to-day challenges DFACS faces in providing for
> the safety of DeKalb's children. Nor is the fact that the children remain
> unassessed and unplaced the responsibility of WestCare, since both of
> those functions remain outside our authority and purview.

(Ex. 17, Letter from Michael Langford to Wayne Drummond, dated January 29, 2004,

at WestCare 00296 (emphasis added).)   In his response, then DeKalb DFCS County

Director, Wayne Drummond, appeared to take full responsibility for the overstay

problem:

> It has been unfortunate that WestCare's compliance with contractual
> obligations required by the agreement with the DeKalb County
> Department of Family and Children Services has resulted in the necessity
> of citing of WestCare by the Office of Regulatory Services. Specifically,
> we expect WestCare to care for children entering the system of care in the
> current assessment center for up to 23 hours. *Because of the lack of
> immediate resources available to children DeKalb DFCS has left
> children at the center while placement activity continues for longer than
> 23 hours.*

(Ex. 9, Letter from Wayne Drummond to Michael Langford, dated February 21, 2004,

at WestCare 00298 (emphasis added).)[18]

## Conditions Worsen, With Little Response from DeKalb DFCS

The problems intensified over the course of the summer of 2004. Internal documents produced by State Defendants list 64 entries into the Assessment Center that resulted in stays in July 2004. Of these entries, 44 stayed for more than one day; 17 for more than five days; 11 for more than 14 days; and three for the entire month. (Ex. 7, Assessment Center Roster July – August 2004 at 7-10 D 00797-00799.) In August 2004, 75 entries into the Assessment Center were listed; 27 of the stays were for more than one day; 20 were for more than five days; and some were for more than 26 days. (*Id.* at 7-10 D 00800-00801.) In September 2004, 69 entries were listed; 29 of the stays were for more than 23 hours; 19 were for more than five days; and some were for 14, 16, or 19 days. (*Id.* at 7-10 D 00802-00806.)

Moreover, by summer 2004, the overstays were starting to be eclipsed by other problems. In May 2004, the state received a complaint that a maintenance man at the

---

[18] DeKalb County DFCS Director Walker Solomon conceded that he did not believe moving children through the WestCare Assessment Center was WestCare's responsibility, but rather that it was DeKalb DFCS's responsibility to make the placements available for those children to go to. (Ex. 29, Deposition of DeKalb County DFCS Director Walker Solomon, dated October 26, 2004, at 154-55.)

WestCare facilities had engaged in inappropriate sexual behavior with a female resident; that a grievance had been filed by another child about inappropriate conduct by this staff member in January 2004; and that WestCare had failed to adequately investigate or report the matter. (Ex. 10, ORS Statement of Deficiencies and Plan of Correction, dated May 27, 2004.) ORS's May 27, 2004 investigation revealed that the staff member in question had not had a complete criminal background check done before he was hired, and that in fact, he was a convicted felon with a criminal record in multiple states. (*Id.* at 7-18S21499.) In part because of WestCare's documented history of non-compliance with ORS regulations requiring criminal background checks, the state ultimately commenced an enforcement action and imposed a civil penalty on WestCare for this rule violation "which jeopardized the health and safety of children in care." (Ex. 11, Notice of Intent to Impose Civil Penalty, dated August 20, 2004, at 7-18S21475.)[19]

---

[19] Even though ORS completed its investigation of this incident on June 2, 2004, it appears that it was not until June 22, 2004 that WestCare's program director issued a memorandum to all staff directing them to have their fingerprints taken by June 25, 2004. (Ex. 18, Memorandum to All Staff from Maria Johnson, dated June 22, 2004.) Despite this directive, another memorandum was circulated on July 16, 2004, directing all staff to "fill out a Criminal History Record form" by July 20. (Ex. 19, Memorandum to All Staff from Helen Matthews, dated July 16, 2004.) Thus, almost two months after an inspection by ORS revealed the presence of a

Around this time, ORS was continuing to document WestCare's inability to maintain control over the children who had been placed by State Defendants at the facility. A May 3, 2004 investigation resulted in a citation to WestCare for failing to exercise control over a foster child who ran away from the premises and had engaged in sexual activity with two adult men. (Ex. 20, ORS Statement of Deficiencies, dated May 3, 2004, at 7-18S21505.) A subsequent inspection found that another resident ran away and was readmitted to WestCare eight times between March 29 and April 22, 2004. (Ex. 10, ORS Statement of Deficiencies, dated May 27, 2004, at 7-18S21501.) Other evidence of this lack of control comes from logs maintained by WestCare documenting "AMA" incidents, or runaways "against medical advice." The report, subpoenaed directly from WestCare, reflected 55 and 52 separate runaway incidents in March and April 2004, respectively, a figure that apparently increased

---

convicted felon on staff, more than six months after a child reported being sexually abused by that staff member, and almost a year after the first ORS finding that WestCare had hired staff without adequate criminal background checks, complete criminal histories were *still* not available for all staff having daily contact with vulnerable children. DeKalb County DFCS Director Walker Solomon testified in his deposition that DeKalb DFCS did not follow up on the incident, and though he would expect that WestCare would have moved quickly to obtain the requisite background checks, he did nothing to ensure that this was happening. (Ex. 29, Solomon Dep., at 143-44.)

-18-

dramatically to 95 runaway incidents (for a total of 52 beds) for the month of September 2004. (Ex. 13, AMA Count, April 2003-September 2004.)[20]

A June 2004 "Contract Performance Review" issued by an independent contract monitor named Marquis C. Baeszler, LCSW, should have raised further questions about the services being provided to Plaintiff foster children by WestCare. After an initial quarterly report and a WestCare corrective action plan geared off of it, the consultants produced a "Second Quarter Report" on or about June 16, 2004. This report concludes:

> Part of West Care's initial response to Lake Yonah Consulting Inc.'s first quarter report was to present their Performance Improvement Plan. . .a grand and sweeping document demonstrating that the national office of West Care understands what it takes to improve a program. *The schism between their grand plan and what is happening in DeKalb County is sad; their support of the DeKalb County Children's Center borders on neglect.*

(Ex. 12 DeKalb County Children's Center, Contract Performance Review, dated June 16, 2004, at 14-9D00257-58 (emphasis added).)

---

[20] Walker Solomon, DeKalb County DFCS Director, testified that he would be "surprised" to know that there had been a significant spike in the number of runaways from WestCare during the month of September. (Ex. 29, Solomon Dep. at 155.)

**The Incidents of September 20-21, 2004 and State**
**Defendants' Long-Delayed Response to the Overstays**

A report that appears to have been generated by State Defendants indicates that as of September 21, 2004, there were 16 children located in the WestCare Assessment Center. All but four of these children were in violation of the 23-hour mandate. One 13-year-old child had been in the Assessment Center for more than a month. (Ex. 21, WestCare Facility Complaint Information, at 14-10D01920-21.) The day before, September 20, a police officer from the DeKalb School System Department of Public Safety transported a child reported to be the victim of sever abuse from the child's school to WestCare. (*See* Ex. 22, Letter from J.M. Wood-Shuffett to DeKalb Juvenile Court Judge, dated September 22, 2004, attaching reports, at 3.) The officer called ahead to WestCare to ask that dinners be set aside for the children who would be arriving after mealtime. Per the officer's report, the staff-member who answered the phone said there was a "brawl" underway and that he could not speak on the phone. When the officer and children arrived at WestCare, the officer reports that there was no staff member available to let them in and instead a resident walked in from the street and entered a code on the keypad to open the door. (*Id.*)

Upon entering the WestCare facilities, the officer reported that he was met

by several residents. His report recounts:

> One of them yelled out, "Hell yea, we got a white girl. You gon be sucking my dick tonight white girl." Another one yelled out, "Yea, she kinda fine. I'm gon fuck you." We stood at the administrator's door, no one was in the office I then looked around and a black male came up to me and advised that I could go into the office and sit down. I then asked, "Who are you." He then replied, "I work here, but I don't know how to do the paper work to receive them. You are going to have to wait on that lady." I waited approximately five minutes for a suitable staff member to respond. When she came in the office, she looked at the kids and then at myself and then stated to me, "I can see that they are terrified, and I will try to get them into an emergency shelter tonight. Let me call DFACS." She attempted to call [DFCS]. . . Due to the "cat calls" from the unsupervised black males in the hall, the administrator closed the door. Once the door was closed, bangs and kicks on the door began to rang
> [sic] out. A voice from behind the door called out, "Open the door bitch, so we can see that white pussy."

(*Id.*)

The officer refused to leave the children at WestCare because of his concerns for their safety. When the officer spoke to a DFCS representative on the telephone from his squad car, he was told to take the children back to WestCare. Instead, the officer took the children from the facility and helped to develop a safety plan for their care that did not involve DFCS, a plan that was later approved by the Juvenile Court. (*Id.*)

The report described is dated and relates to events occurring on September 20, 2004. The day after, another public safety officer dropping off a female child,

described a similar incident at the WestCare Assessment Center:

> As I approached the entrance of the shelter, I observed several males looking out of a window adjacent to the doorway. As we entered, I [heard] the comment, "We got us a new bitch", obviously referring to the victim that was being deprived. This comment, along with a group of males [staring] and whispering to each other as we entered, caused the victim to be quite uncomfortable and scared.

(*Id.*)

Though State Defendants had received troubling reports regarding the WestCare facilities for a year and a half, the DeKalb Juvenile Court's referral of these matters directly to Commissioner Walker (*see* Ex. 4, E-mail to B.J. Walker, dated September 21, 2004) appeared to have finally resulted in some action by State Defendants. [21] A delegation of senior DFCS managers – including Acting State DFCS

---

[21] Surprisingly, DeKalb DFCS County Director Solomon seemed to disclaim responsibility for the incidents:

> Q. Do you plan to do any type of follow-up with respect to either of these two incidents?
>
> A. No.
>
> Q. So in your mind, the matter is closed?
>
> Mr. Snelling: Object to form.
>
> A. The matter is closed? No.

Director Steven Love; State DFCS Deputy Director Cliff O'Connor; Director of ORS, Martin J. Rotter; Social Services Director Wilfred Hamm; and DeKalb County DFCS Director Walker Solomon – made an unannounced site visit to the WestCare facilities on or about September 24, 2004,[22] by which time the WestCare Assessment Center had already been emptied by virtue of a DeKalb DFCS September 22, 2004 edict that the center not be used as a placement for children following placement disruptions. (*See* Ex. 24, Memorandum from Kathy Herren, dated September 22, 2004.) However, given the state's continuing failure to develop appropriate alternative placements for these children, Plaintiffs have grave concern about where children are now being sent.

**State Defendants Reject Plaintiffs' Proposal for Interviews/Inspection**

By letter dated November 4, 2004, Plaintiffs' counsel asked State Defendants to

---

Q. In what way is the matter not concluded for you? You've indicated that you're not going to do any type of follow-up?

A. It's not my issue.

Q. Whose issue is it?

A. WestCare and the police officer through the resource office.

(Ex. 29, Solomon Dep. at 129-130.)

[22] *See, e.g.,* Ex. 23, Solomon Dep. at 113-118; Deposition of State DFCS Deputy Director Cliff O'Connor, dated November 4, 2004, at 265-275; Deposition of Acting State DFCS Director Steve Love, dated November 10, 2004, at 135-140.

consent to an unannounced walk-through inspection of the WestCare facilities by Plaintiffs' consulting expert and private interviews with any Plaintiff foster children in residence there. In recognition of the fact that many, if not all, of the children who were present at the WestCare facilities between September 1-22, 2004 have since been transferred to other placements, Plaintiffs' counsel also sought to have State Defendants identify the location of these children and to grant Plaintiffs permission to have their consulting expert meet privately with them in their current placements. As part of this request, Plaintiffs also sought State Defendants' assurance that any Plaintiff foster children who wished to do so be permitted to speak privately with Plaintiffs' counsel and identified a list of congregate and foster home placements that Plaintiffs' counsel wished to visit. Plaintiffs' proposal included a detailed set of ground rules for the interviews and inspection, including proposed, neutral language to be read to children so that they would understand the purpose of the inspection and meetings and to offer them a fair chance to participate or to decline to participate. (Ex. 25, Letter from Ira Lustbader to Mark Cohen, dated November 4, 2004.)

On November 8, 2004, State Defendants' counsel rejected all aspects of Plaintiffs' proposal. (Ex. 14, Letter from Mark Cohen to Ira Lustbader, dated November 8, 2004.) Among other things, State Defendants' position is that they have

"no authority to authorize a private inspection of the facilities or interviews of children within those facilities." (*Id.* at 2.)[23]

## **Argument**

### A.   **The Court Is Empowered to Grant the Relief Sought**

Rule 34(a)(2) of the Federal Rules of Civil Procedure provides that any party may serve on any other party a request "to permit entry upon designated land or other property in the possession or control of the party upon whom the request is served for the purpose of inspection and measuring, surveying, photographing, testing or sampling the property or an designated object or operation thereon . . ." In parallel fashion, Rule 45(a)(1)(C) provides that a party may issue a subpoena commanding the person to whom it is directed to "permit inspection of premises, at a time and place therein specified." Commentators and courts agree that since the 1991 Amendments to Rule 45, a subpoena may be used to "obtain virtually equal access to documents or premises in the custody of a nonparty" as may be obtained pursuant to Rule 34. *See,*

---

[23] Also covered in this correspondence of November 4 and 8, 2004 is a more general request by Plaintiffs regarding access to certain members of the Plaintiff class. Though this proposal was rejected by State Defendants, it is Plaintiffs' intention to make further efforts to resolve this issue directly with State Defendants.

*e.g.,* Wright & Miller, 8A Fed. Prac. & Proc. Civ. 2d § 2206. *See also Gaskin v. Commonwealth of Pennsylvania*, 1997 WL 734031 (E.D. Pa. Nov. 4, 1997). And as this Court recognized in its Order of July 23, 2002, inspections of land or property under Rule 34, and by extension Rule 45, are "designed to permit[] the 'broadest sweep of access.'" *Morales v. Turman*, 59 F.R.D. 157, 158 (E.D. Tex. 1972) (*quoting* Wright & Miller § 2206).

In civil rights class actions, especially where the property or premises to be inspected serve as the custodial residence of plaintiff class members, appropriate "access" for purposes of conducting physical inspections pursuant to Rules 34 and 45 may go beyond rights enumerated in the Federal Rules of Civil Procedure and may include interviews. Thus, in *New York State Assoc. v. Casey*, a case involving reform of a facility for mentally ill children, the Second Circuit determined that the district court had not abused its discretion by permitting plaintiffs' counsel, consultants, and experts the right to inspect the facility and "to take photographs, make observations, take notes, and form conclusions *and interview any class member, staff member, or employee desired outside the presence of State Defendants, their counsel, and representatives.*" 706 F.2d 956, 960-61 (2d Cir. 1983) (emphasis added). In *Morales v. Turman*, a case filed by a group of Texas juvenile offenders challenging their

-26-

conditions of confinement by the Texas Youth Council, the district court went further,

permitting a "participant observations study" pursuant to which four experts were

actually to be placed within certain juvenile institutions. "These experts, trained in the

fields of sociology and psychology, plan to live in the dormitories with the inmates,

attend academic or vocational classes, eat meals with the inmates, and generally live

under conditions for a period of time that closely parallel those under which the

inmates live." 59 F.R.D. at 158.  In granting the relief sought, the Court noted that:

> Plaintiffs, all minor children, have alleged that the conditions of their
> confinement constitute violations of the First, Fifth, Sixth, Eighth, and
> Fourteenth Amendments. *When important civil rights are in issue in*
> *complex litigation of widespread concern, a court must make every effort*
> *to enhance the fact-finding process available to counsel for both sides.*

*Id.* at 159 (emphasis added).

These same weighty concerns should guide discovery in this case and sanction

the grant of the flexible discovery procedures sought by Plaintiffs in this motion.

**B.    The Need for Interviews and Inspection Is Manifest**

Respectfully, the factual record speaks for itself with regard to the need for the

requested interviews and walk-through inspection.    The purposes of the

interviews/inspection would include:  (i) establishing the experiences of Plaintiff

foster children in the WestCare facilities generally; (ii) establishing experiences of

-27-

Plaintiff foster children in the WestCare facilities as of September 2004; and (iii) establishing the experiences of Plaintiff foster children following State Defendants' response to the events of September 20-21, 2004, particularly the appropriateness of the facilities to which children are now being sent given Defendants' new policy of not returning children to WestCare.

Plaintiffs have selected as their chosen consulting expert Jon Trzcinski, a social worker with extensive experience interviewing foster children and conducting site visits to institutional placements. A copy of Mr. Trzcinski's resume is annexed as Exhibit 26 hereto.

## C.   The Interview and Inspection Procedures Plaintiffs Have Proposed Are Necessary and Appropriate to the Circumstances

Though State Defendants exercise contractual and regulatory control over WestCare and hold legal custody of each Plaintiff foster child placed there, State Defendants have indicated that they "have no authority to authorize a private inspection of the facilities or interviews of children within those facilities." (Ex. 14, Letter from Mark Cohen to Ira Lustbader, dated November 8, 2004, at 2.) The precise issue of whether and to what extent WestCare is an agent of State Defendants for discovery purposes need not be determined for this motion to be granted in full.

-28-

Applicable law gives ORS, part of a Defendant (DHR), the right to perform unannounced inspections on the WestCare facilities. *See* Ga. Comp. R. & Regs. Chs. 290-2-5-.07(b), 290-4-2-.08 (2004). Regardless of whether advance notice of an inspection is given, WestCare is obligated to give ORS "meaningful access to all staff, parts of the premises, all children present, and all records required by [the ORS] rules." Ga. Comp. R. & Regs. Ch. 290-2-5-.07(b).[24] Indeed, State Defendants availed themselves of this right when numerous DFCS officials conducted a surprise inspection of the WestCare facilities following the DeKalb Juvenile Court's September 21, 2004 complaint. This is precisely the access sought by Plaintiffs in this motion.

By Order dated July 23, 2002, in connection with the shelter hearings, the Court determined the broad scope of access that Plaintiffs should be entitled to in connection with inspections/interviews with Plaintiff foster children in this case:

> Given the extremely serious nature of the claims asserted by plaintiffs regarding the safety and well-being of children in defendants' custody, and the evidence supporting these claims that has already been presented, the Court concludes that plaintiffs should be allowed free and broad access to

---

[24] The Director of ORS, Martin Rotter, confirmed at deposition that complaint investigations by ORS Surveyors are typically unannounced. (Ex. 27, Deposition of ORS Director Martin Rotter, dated April 2, 2003, at 54-55.)

-29-

> the shelters, their staff, and residents. Such access should
> not be limited to formal discovery mechanisms such as
> depositions or Rule 34 inspections. Informal interviews are
> a perfectly legitimate discovery method and are particularly
> warranted in this case, where it is important that plaintiffs
> be able to gather as much information as possible in as
> expeditious a manner as possible.

(Ex. 28, Order, filed July 23, 2002, at 6-7.)

Admittedly, the access requested here is slightly broader, in that private provider-operated facilities are involved and Plaintiffs are requesting private interviews with children and that the interviews/inspections be on notice only to State Defendants.   However, on the factual record presented, and in view of the presumptions in civil rights litigations of the sort outlined in Point A. *supra*, it is respectfully submitted that (i) Plaintiffs should be granted access commensurate to that enjoyed by State Defendants with regard to interviewing Plaintiff foster children and conducting walk-through inspections, and (ii) such interviews/inspections should be permitted on 48-hour notice to State Defendants.

Submitted herewith is a proposed Order Authorizing Interviews/Inspection (the "Proposed Order") that provides for, among other things, private interviews between Plaintiffs' expert and Plaintiff foster children and a walk-through inspection of the WestCare facilities.  The Proposed Order requires that Plaintiffs' counsel provide

-30-

State Defendants' counsel with 48-hour written notice, in a prescribed manner, of their intention to conduct site visits pursuant to the Proposed Order. No advance notice to WestCare or other private providers is required under the Proposed Order. Moreover, pending the inspections, the Proposed Order requires State Defendants and their attorneys to keep confidential the scheduling of any interviews/inspections or to otherwise seek to undermine the unannounced nature of the visits. Included within the Proposed Order is an appropriate protective order addressed to the confidentiality concerns of the WestCare facilities' residents and staff. The Proposed Order is consistent with this Court's prior Order of July 23, 2002 regarding the shelter interviews/inspection to the extent that it permits Plaintiffs' expert representatives to talk to "any staff members and child residents who wish to speak with them" (*id. at 8-10*); provides appropriate procedures for selection and approach of potential interview subjects; and requires the parties to inform both staff members and child residents that no retaliation will be taken against them. The Proposed Order outlines similar procedures for interviews of Plaintiff foster children who previously resided at the WestCare facilities, by Plaintiffs' counsel and their consulting expert.

-31-

## Conclusion

For the foregoing reasons, Plaintiffs request that the Court grant their motion

for interviews and inspection, issue the Proposed Order submitted herewith, and grant

such other and further relief as to the Court seems just and proper.

Respectfully submitted this 17th day of November, 2004

Marcia Robinson Lowry (*pro hac vice*)
Ira P. Lustbader (*pro hac vice*)
Douglas C. Gray (*pro hac vice*)
Erik S. Pitchal (*pro hac vice*)
Children's Rights
404 Park Avenue South, 11th Floor
New York, New York 10016
(212) 683-2210

Jeffrey O. Bramlett, Georgia Bar No. 075780
Gordon L. Hamrick, IV, Georgia Bar. No. 322075
BONDURANT, MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, GA 30309
404-881-4100

Counsel for Plaintiffs

-32-

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the foregoing **BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR ORDER AUTHORIZING INTERVIEWS/INSPECTION** upon counsel of record via hand delivery as follows:

| | |
|---|---|
| Eddie Snelling, Jr., Esq.<br>Senior Assistant Attorney General<br>40 Capitol Square, S.W.<br>Atlanta, Georgia  30334 | Vivica M. Brown, Esq.<br>DeKalb County Law Department<br>The Maloof Center, 5th Floor<br>1300 Commerce Drive<br>Decatur, Georgia  30030 |
| Willie J. Lovett, Esq.<br>Supervising Attorney<br>Office of the County Attorney<br>141 Pryor Street, S.W., Suite 4038<br>Atlanta, Georgia  30303 | Jefferson James Davis, Esq.<br>Special Assistant Attorney General<br>Suite 921<br>315 West Ponce de Leon Avenue<br>Decatur, Georgia  30030 |
| Mark H. Cohen, Esq.<br>Special Assistant Attorney General<br>Troutman Sanders LLP<br>5200 Bank of America Plaza<br>600 Peachtree Street, N.E.<br>Atlanta, Georgia  30308 | James Timothy Mast, Esq.<br>McKenna Long & Aldridge LLP<br>303 Peachtree St., Suite 5300<br>Atlanta, GA 30308 |

This 17th day of November, 2004.

Gordon L. Hamrick
Georgia Bar No. 322075

-33-