**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

KENNY A., by his next friend, Linda : 
Winn, et al., :
:
      Plaintiffs, :
:
v. :     CIVIL ACTION FILE NO.
:     1:02-CV-1686-MHS
SONNY PERDUE, in his official :
capacity as Governor of the State of :
Georgia, et al., :
:
      Defendants. :
---------------------------------------------:

**JOINT MOTION FOR ORDER APPROVING**
**SETTLEMENT AGREEMENT AND CONSENT DECREE**

At the September 21, 2005 Fairness Hearing concerning final approval of

the proposed Settlement Agreement and Consent Decree between Plaintiffs and

State Defendants in this matter, the Court directed the settling parties jointly to

submit proposed findings of fact and conclusions of law within thirty days.

Pursuant to that direction, Plaintiffs and State Defendants submit the proposed

Order attached hereto as Exhibit A, containing proposed findings of fact and

conclusions of law.

This 19th day of October, 2005.

/s/Jeffrey O. Bramlett
Jeffrey O. Bramlett
Georgia Bar No. 075780
(bramlett@bmelaw.com)
Corey F. Hirokawa
Georgia Bar No. 357087
(hirokawa@bmelaw.com)
BONDURANT, MIXSON
& ELMORE, LLP
3900 One Atlantic Center
1201 W. Peachtree Street
Atlanta, Georgia  30309
(404) 881-4100

Marcia Robinson Lowry *(pro hac vice)*
Ira P. Lustbader *(pro hac vice)*
Douglas C. Gray *(pro hac vice)*
Children's Rights
404 Park Avenue South, 11th Floor
New York, New York 10016
(212) 683-2210

**COUNSEL FOR PLAINTIFF CLASS**

/s/Mark H. Cohen
Mark H. Cohen
Georgia Bar No. 174567
Mark.cohen@troutmansanders.com
TROUTMAN SANDERS LLP
5200 Bank of America Plaza
600 Peachtree Street, N.E.
Atlanta, Georgia  30308
(404)885-3597

Eddie Snelling, Jr., Esq.
Georgia Bar No. 665725
Senior Assistant Attorney General
Georgia Department of Law
40 Capitol Square, S.W.
Atlanta, Georgia  30334
(404) 651-5304

Jefferson James Davis, Esq.
Special Assistant Attorney General
Georgia Bar No.  210650
DAVIS & DAVIS
921 Wachovia Bank Building
315 West Ponce de Leon Avenue
Decatur, Georgia  30030
(404) 373-3620

**COUNSEL FOR STATE DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on October 19, 2005, I electronically filed **JOINT MOTION FOR ORDER APPROVING SETTLEMENT AGREEMENT AND CONSENT DECREE** with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to the following attorneys of record:

| | |
|---|---|
| Stephen Whitted<br>swhitted@co.dekalb.ga.us | Mark H. Cohen<br>mark.cohen@troutmansanders.com |
| Willie J. Lovett<br>willie.lovett@co.fulton.ga.us | Jefferson James Davis<br>davisanddavis@bellsouth.net |
| Eddie Snelling<br>eddie.snelling@law.state.ga.us | |

/s/Jeffrey O. Bramlett
Jeffrey O. Bramlett
Georgia Bar No. 075780
(bramlett@bmelaw.com)

Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| KENNY A., by his next friend, | ) | |
| Linda Winn; et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | No. 1:02-CV-1686-MHS |
| SONNY PERDUE, in his official | ) | |
| capacity as Governor of the | ) | |
| State of Georgia; et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>ORDER FOR FINAL APPROVAL OF CONSENT DECREE</u>

The Plaintiff class and the State Defendants, through their respective counsel, have jointly moved the Court to grant final approval of their Settlement Agreement (embodied in the terms of the proposed Consent Decree attached to this Order as Exhibit 1).

By Order dated July 5, 2005, this Court granted preliminary approval of the Consent Decree and scheduled a hearing on September 21, 2005 to consider whether the proposed settlement is fair, reasonable, and adequate.  The Court, having conducted that hearing, now makes the following Findings of Fact and Conclusions of Law in support of the final approval of the Consent Decree.

<u>FINDINGS OF FACT</u>

1.

The above-referenced action was initially filed by Plaintiffs in the Superior Court of Fulton County asserting systemic deficiencies in foster care in Fulton and DeKalb Counties and seeking declaratory and injunctive relief under federal and state law.  All Defendants joined in removing the case to federal court.

2.

Plaintiffs in this case have asserted against the State Defendants[1] an alleged series of systemic deficiencies in the foster care system as operated in Fulton and DeKalb Counties, including the failure to adequately monitor the safety of foster children; the failure to provide appropriate placement resources; the failure to provide adequate case planning and support services for foster children; the failure to provide timely permanent placements; the failure to provide essential services to children, including medical, dental and mental health services; and the failure to

---

[1]   The term "State Defendants" includes Sonny Perdue, in his official capacity as Governor of the State of Georgia; the Georgia Department of Human Resources ("DHR"); B.J. Walker, in her official capacity as DHR Commissioner; the Fulton County Department of Family and Children Services ("Fulton County DFCS"); Debra Keyes, in her official capacity as Director of Fulton County DFCS; the Dekalb County Department of Family and Children Services ("Dekalb County DFCS"); and Walker Solomon, III, in his official capacity as Director of Dekalb County DFCS.

maintain an adequate infrastructure, including high caseworker caseloads and

turnover, inadequate payments to providers of foster homes and other placements

in which foster children live, and the failure to maintain an adequate management

information system.  Plaintiffs alleged that that these systemic failures have

harmed and continue to harm children in foster care physically, emotionally and

psychologically in the following ways:  subjecting them to abuse, neglect, and

other harmful conditions while in foster care, such as overcrowding and corporal

punishment; moving them many times from one inappropriate foster home or

institution to another; placing them unnecessarily in institutional or congregate

placements; denying them opportunities to be safely reunited with their families,

meaningful visits with their families and siblings while in foster care, and

opportunities for alternative permanent homes such as adoption; and causing them

to spend years and often most of their lives in state custody.

3.

Throughout this litigation, the State Defendants have denied Plaintiffs'

factual allegations, and have denied violating any of Plaintiffs' constitutional or

statutory rights.  More specifically, in operating the Fulton and DeKalb County

foster care system, State Defendants assert that they have complied with many

existing federal standards, they have continued to make significant improvements

3

in that system, and their conduct has complied with prevailing and applicable legal precedent, which holds that liability exists only when the defendants' conduct is deliberately indifferent to the needs of the foster children at issue.  State Defendants contend that they have not now nor ever been deliberately indifferent to the needs of the Plaintiffs class.  State Defendants also contend that Plaintiffs' constitutional and statutory claims are not supported by existing Eleventh Circuit or Supreme Court precedent.

4.

During the past three years of this litigation, the parties have conducted comprehensive discovery, motion practice, and trial preparation.  The Court has ruled on numerous motions, including a motion for preliminary injunction, motions to dismiss, various motions related to discovery and potential trial testimony, and motions for summary judgment.  The Court previously certified a class of "All children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS of DeKalb County DFCS."

5.

On October 25, 2004, the Court referred this case to mediation and appointed Hon. Dorothy T. Beasley to serve as mediator.  Over the next eight

months, Judge Beasley presided over a series of more than 20 in-person confidential mediation sessions and numerous telephone conferences, as well as caucuses with one side or the other.  (Decl. of Dorothy Toth Beasley, ¶ 1.)

6.

The efforts of counsel for Plaintiffs and State Defendants, with the assistance of Judge Beasley, produced a settlement agreement, which was executed by the aforementioned parties between June 15-29, 2005.

7.

The proposed settlement is a result of arms-length, good faith, and intense negotiations and is not a product of either collusion or fraud. (Decl. of Dorothy Toth Beasley, § 4.)

8.

The Consent Decree has numerous provisions designed to benefit the Plaintiff class.  The centerpiece of the settlement agreement is a series of thirty-one outcome measures that State Defendants have agreed to meet and sustain for at least three consecutive six-month reporting periods.  The Outcome Measures, many of them requiring phased-in results over a two year period, seek to improve performance in the following areas: timely commencement and thorough completion of investigations of reported abuse or neglect; regular visits of foster

children by case workers; approval and licensure of foster homes and other placements; the percentage of children who are the victims of substantiated maltreatment while in foster care; the percentage of children in foster homes that exceed their licensed capacity; the percentage of children who have experienced multiple moves while in foster care; and periodic judicial reviews of the safety and status of foster children.[2]

9.

In addition, the proposed Consent Decree requires comprehensive and periodic delivery of medical, dental, and mental health services to foster children;[3] a detailed process for improved goal setting, case planning and periodic reviews of children's status while in foster care;[4] limits on the placement of children in emergency shelters and group homes and institutions, and protections against overcrowding in foster homes;[5] and the establishment of reimbursement rates to adequately compensate providers for caring for foster children.[6]  Moreover, State Defendants commit to reduced caseloads for all case managers and supervisors;[7] a

---

[2] Consent Decree, § 15.

[3] *Id.,* § 6.

[4] *Id.,* § 4.

[5] *Id.,* § 5.

[6] *Id.,* § 5.B.

[7] *Id.,* § 8.

fully implemented single statewide automated child welfare information system;[8] and maintaining or establishing placements and related services identified in a "needs assessment" to be conducted by a neutral expert.[9]  The settlement also includes processes for the supervision of private contract agencies that provide homes and services for foster children;[10] improvements in foster parent screening, licensing and training, as well as foster parent support and communication;[11] improvements in case manager training;[12] improvements in processes for addressing suspected abuse or neglect and suspected corporal punishment of children in foster care;[13] and improvements in efforts to maximize available federal funding.[14]   The settlement contemplates that two child welfare specialists will serve as the Court's independent accountability agents charged with the responsibility of measuring and reporting publicly on the State Defendants' compliance with these and other undertakings as specified in the Consent Decree.[15]

10.

---

[8] *Id.,* § 7.

[9] *Id.,* § 5(A).

[10] *Id.,* § 9.

[11] *Id.,* §11; §5(C)(6).

[12] *Id.,* § 10.

[13] *Id.,* § 12.

[14] *Id.,* § 14.

[15] *Id.,* § 16.

By Order dated July 5, 2005, this Court granted Plaintiffs' and State Defendants' Joint Motion for Preliminary Approval of Settlement Agreement, Class Notice, and Fairness Hearing.  The Court directed State Defendants to notify class members and other interested persons or entities of the proposed settlement and fairness hearing as provided in that Order.

11.

On July 29, 2005, State Defendants filed an affidavit certifying compliance with the notice provisions in the July 5, 2005 Order.

12.

Prior to the fairness hearing, the Court received approximately 30 written comments concerning the proposed settlement agreement.  Given the number of class members and notices transmitted to class members and other interested parties,[16] the number of comments received was extremely small.  Both the written and oral comments received were supportive of approval of the settlement agreement, either in whole or in part.  Those commenters that had objections to the settlement objected only to certain portions of the proposed agreement.

CONCLUSIONS OF LAW

---

[16] According to Counsel for State Defendants, currently there are over 2,200 individual class members and over 2,600 notices were transmitted in accordance with the Court's July 5, 2005 Order.  (Tr. 91).

1.

The issue for the Court to decide is whether the proposed settlement, taken as a whole, is "fair, reasonable and adequate" from the perspective of absent class members whose rights and interests are to be bound by its terms.  Fed.R.Civ.P. 23(e)(1)(C).  *See generally Manual for Complex Litigation, Fourth* § 21.634-.635.

2.

"[I]n class action suits, there is an overriding public interest in favor of settlement."  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977). [17]  The Court's responsibility in Rule 23 fairness determinations is to "scrutinize the settlement for the existence of any fraud or collusion."  *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. 297, 305 (N.D. Ga. 1993), *citing Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir. 1984).  The proponents of a settlement bear the burden of establishing fairness.  *In Re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. at 312, *citing In re General Motors Corp. Engine Interchange Litig.,* 594 F.2d 1106, 1126 (7th Cir. 1979); *Manual for Complex Litigation, Fourth* at § 21.634.

3.

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to September 30, 1981.

Rule 23 specifies procedural requirements for determining whether this burden has been met.   First, the Court is required to direct notice of the proposed settlement terms to class members in accordance with Fed.R.Civ.P. 23(e)(1)(B). Second, the Court is required to conduct a hearing pursuant to Fed.R.Civ.P. 23(e)(1)(C) at which objectors to the settlement are given reasonable opportunity to raise their concerns with the Court.  Finally, even where there are few objections, the Court is well-advised to make a "sufficient record as to the basis and justification for the settlement" and "specific findings as to how the settlement meets or fails to meet" the requirements of Rule 23.  *Id.,* at § 21.635.

4.

The Court finds that the proposed settlement was the result of intensive litigation and arm's length mediation, and passes scrutiny for fraud and collusion.

5.

If a proposed Rule 23 settlement passes scrutiny for fraud and collusion, courts in the Eleventh Circuit generally conduct a fairness evaluation by looking to a series of six factors that include: (1) the stage of the proceedings at which settlement was achieved; (2) the likelihood of success at trial; (3) the range of possible relief; (4) the point on the range at which settlement is fair, adequate, and reasonable; (5) the complexity, expense, and duration of litigation; and (6) the

10

substance and amount of opposition to settlement.  *See Bennett v. Behring Corp.,* 737 F.2d at 986; *In re Domestic Air Transp. Antitrust Litig.,* 148 F.R.D. at 305; *In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp.2d 1329, 1333 (N.D. Ga. 2000).  The Court may also rely upon the judgment of experienced counsel in conducting its independent evaluation of fairness.  *Ingram v. The Coca-Cola Co.,* 200 F.R.D. at 688-89.   Applying these factors to the proposed settlement in this case, the Court finds the settlement is fair, reasonable and adequate.

6.

The stage of the proceedings at which settlement was achieved

This case has progressed to a stage where the Court, counsel, and affected parties have had an ample basis upon which to evaluate the settlement.  Over the past three years, the Court has carefully managed the progress of the case, decided dispositive motions to dismiss and for summary judgment, heard evidence in connection with Plaintiffs' motion for a preliminary injunction, and ruled on a variety of discovery disputes.    All of this information and the Court's rulings are matters of public record.  The class notice provided class members, their representatives, and all affected parties with the means to access this information. No one has raised any complaint with respect to the adequacy of the case record. The Court finds that the proceedings have advanced to allow a full and fair

assessment of the settlement, and this factor weighs in favor of approval of the proposed settlement.

7.

The likelihood of success at trial

In evaluating likelihood of success in a proposed Rule 23 settlement, the Court "has neither the duty nor the right to reach any ultimate conclusions on the issues of fact or law which underlie the merits of the dispute." *In Re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D at 315. "The very uncertainty of outcome in litigation, as well as the avoidance of wasteful litigation and expense, lay behind Congressional infusion of a power to compromise. This is a recognition of the policy of the law generally to encourage settlements. This could hardly be achieved if the test on hearing for approval meant establishing success or failure to a certainty." *In Re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 212 (5th Cir. 1981).

8.

Again, the Court's previous supervision of this litigation makes the Court well-positioned to evaluate the strengths and weaknesses of each parties' respective positions. Comparing the litigation risks facing the class to the scope,

substance, immediacy, and certainty of relief promised in the proposed Consent Decree, the Court concludes that this factor weighs in favor of the proposed settlement.

9.

The range of possible relief

If Plaintiffs prevailed at a trial on liability issues, the parties and the Court would then be facing a second phase of litigation to determine the proper scope of injunctive relief.  The Court would be vested with broad equitable discretion to fashion a remedy within the "inherent limitation upon federal judicial authority" that requires tailoring any remedy imposed against a governmental unit to the nature and scope of the constitutional violation.  *Milliken v. Bradley*, 433 U.S. 267, 282 (1976).  However, the task of tailoring a remedy to the specific violation in contested proceedings would impose significant burdens on the Court and the litigants and may well divert governmental resources and energy that could be better applied to the immediate delivery of care and services to class members.

10.

The relief obtained in the proposed settlement is comprehensive, detailed, and favorable to class members.  It is highly unlikely that the Court would have imposed an injunction as intricately detailed and comprehensive in the context of

13

contested remedy-phase litigation.  *See Ingram v. The Coca-Cola Co.,* 200 F.R.D. at 689.  This factor weighs in favor of approval.

11.

<u>The point on the range at which settlement is fair, adequate and reasonable</u>

Considering the scope and detail of the comprehensive settlement reached by the parties in this case, particularly in light of the contentiousness of the litigation, complexity of the issues and the uncertainties and delays of further litigation, the court finds the result achieved by the parties to be extraordinary. Indeed, the court finds here that "a review of this record affirmatively shows great patience and diligence by counsel and the court in resolving a massive and difficult case.  It is a tribute to all concerned that such a just settlement was consummated." *Bennett v. Behring Corp.*, 737 F.3d 982, 988 (11th Cir. 1984).  This factor too weighs in favor of the settlement.[18]

12.

<u>The complexity, expense and duration of the litigation</u>

---

[18]   While objections to the settlement are addressed as a separate factor, the Court notes the comments submitted by National Council of Juvenile and Family Court Judges and by the Managing Attorney of the Supreme Court of Georgia's Child Placement Project.  The comments of both of these organizations were wholly supportive of the proposed settlement.

"[C]lass action suits have a well deserved reputation as being most complex." *Cotton v. Hinton,* 559 F.2d at 1331.  This case is certainly no exception. The sweep of the factual terrain, involving the lives of approximately 2,200 children in public custody, their birth and foster and adoptive families, their case managers, their caregivers, a State agency with a budget approaching $2.8 billion, and County governmental units responsible for delivering appropriate services to them, is immense.  The time and resources needed to try this case would be considerable. The parties have previously estimated that trial in this action on the liability phase would take up to four weeks.  Even if liability were sustained, the remedy phase would also be complex, in terms of fashioning remedies to fit the contours of any proven violations of law in the context of a complex child welfare system.  Plaintiffs' claims present complicated legal issues in areas of law that are developing rapidly.   Even after any final judgment, the appeals process could add a year or more of time and expense to the litigation, and potential delay in the implementation of any court ordered remedies.

13.

Weighing the litigation risks and what would be a significant delay in commencement of any relief which might be ordered by the Court against the certain and immediate terms of the proposed Consent Decree, the proposed

settlement is in the best interests of the class, and this factor weighs in favor of approval of the settlement.

14.

The substance and amount of opposition to the settlement

When, as here, the number of objections raised by actual class members or their representatives is exceedingly small compared to the number of persons in the class and individuals receiving notice, this factor weighs in favor of approval. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 326. "A small number of objectors from a plaintiff class of thousands is strong evidence of a settlement's fairness and reasonableness." *Id.*; *see also Bennett v. Behring Corp.*, 96 F.R.D. 343, 352-53 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

15.

Even when the Court becomes aware of one or more objecting parties, the Court is not "required to open to question and debate every provision of the proposed compromise." *Cotton v. Hinton*, 559 F.2d at 1331. The Court is not empowered to rewrite the settlement to accommodate the wishes of objectors, *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 305. Here, none of the objections, taken individually or collectively, undermines the considerable fairness, reasonableness and adequacy of the settlement.

16

16.

(a)   <u>Comments raised by individuals or entities affiliated with emergency shelters</u>[19]

These comments express concern with the specific provisions of the Consent Decree limiting the stay of any class member in an emergency shelter or temporary facility to no more than 30 days and no more than once in any one episode of foster care.[20]   This Court previously conducted a hearing, heard testimony and admitted evidence concerning the operation of emergency shelters in Fulton and DeKalb Counties in conjunction with Plaintiffs' Motion for Preliminary Injunction.   At that time, the Court did not enter any order requiring closure of those shelters, based upon State Defendants' representation that such shelters would be closed.   *See* Order of December 12, 2002.   Thereafter, State Defendants filed two reports with this Court confirming that the shelters had, indeed, been closed.   *See* State Defendants' Status Report to the Court, December 31, 2002 (Fulton shelter); State Defendants' Status Report to the Court on DeKalb Shelter, February 18, 2003.

---

[19] This group includes comments submitted or delivered by: Nancy Friauf (Gwinnett County Children's Shelter), Philip Kouns (Georgia Emergency Shelter Network), Frances Davis (Gwinnett County Public Schools), James H. Maughton (Hayes, James & Associates), and Melissa Reid, K.C., and L.Y. (children but not class members).   Some of the group homes and institutions referred to in note 20, below, also raise similar concerns about certain restrictions put on placement in emergency shelters.

[20] Consent Decree, § 5.C.4.c.

Based upon that earlier testimony and evidence admitted at the prior hearing, and subsequent action by State Defendants, the Court finds that the restrictions on shelter placement for class member children are themselves fair, reasonable, and adequate, and that the objections fail to undermine the fairness, reasonableness and adequacy of the settlement taken as a whole.  The Court also notes that the Consent Decree's provisions apply solely to the Plaintiff class and not to members outside the class who may be placed in emergency shelters.  While some individuals have expressed concern about these restrictions becoming applicable to non-class members, the Consent Decree applies only to class members who by definition have or will have an open case in Fulton County DFCS or DeKalb County DFCS. To the extent class members are placed in shelters outside Fulton or DeKalb Counties, the shelter restrictions in the Consent Decree apply, and, as the Court has found, are reasonable.

17.

    (b)    <u>Comments raised by individuals or entities affiliated with group homes and institutions</u>[21]

---

[21] This group includes comments submitted or delivered by:  Pam Ross and Robert Crutchfield (Christian City Home for Children), Mario Bolivar (Devereaux), John Blend (Goshen Valley Boys Ranch), Inner Harbour (Ron Scroggy), Kenneth Dobbs (Georgia Baptist Children's Homes), Abe Wilkinson (Elks Aidmore), Truett Cathey (WinShape Homes), Steve Rumford (Methodist Home for Children), Normer Adams (Georgia Association of Homes & Services for Children), Patricia Showell (Families First), Douglas Mead (Georgia AGAPE), Jack Bice (Lighthouse

These comments again express concern with only specific provisions of the Decree, including the following:  Non-family settings like group homes and institutions may be in the best interest of the child; the establishment of a specialized case manager for children in placement 18 months or longer may interrupt the child's relationship with his or her previous case manager; the composition of the Reimbursement Rate Task Force should be expanded; placement of a child within 50 miles of home, group care placement restrictions and minimum case manager visitation requirements may not meet the child's needs; unannounced inspections of placements may be disruptive; and foster care licensing standards should be uniform.

18.

The Court has carefully considered these comments but finds the corresponding provisions contained in the Consent Decree to be fair, reasonable, and adequate.  The Consent Decree builds in numerous exceptions to certain restrictions which specifically take into account the individual needs of the child, including the exceptions for placing a child within 50 miles from home[22] and

---

Care Center), Barry Kerr (Morningside Treatment Services), and Mike Watson (Georgia Christian Council).

[22] Consent Decree § 5(C)(4)(b); § 15(19).

justifying placement in group homes and institutions.[23]   There is nothing in the

provision for a specialized case manager which precludes the involvement of the

previous case manager in the decision making process for the child's well-being.[24]

The Reimbursement Rate Task Force is appropriately constituted and is not

precluded from receiving or even requesting comments and input from interested

parties.[25]   The proposed Consent Decree specifically provides for uniform

standards for foster care placements for all class members.[26]   The Court also

accepts the representations made by and on behalf of various group homes and

institutions that such placements, in appropriate circumstances, provide valuable

services in the best interests of some class members, and believes they can

continue to provide those services within the confines of the Consent Decree.  The

Court concludes that the objections raised by individuals and entities affiliated with

group care providers, individually and collectively, fail to undermine the fairness,

reasonableness and adequacy of the proposed settlement.

19.

---

[23] *Id.*, § 5(C)(4)(f).

[24] *Id.*, § 4(F).  The Court also does not question the appropriateness of the parties' negotiated decision to balance the need to minimize the number of case managers that a child experiences with the need for a specialized case manager who carries a reduced caseload in situations where the child has been in state custody for an extended period of time.

[25] *Id.*, § 5(B)(2).

[26] *Id.,* § 11(A) & (B).

(c)     Other Individuals and Groups

Two sets of foster parents submitted comments that do not pertain to the

Consent Decree but concern their individual dealings with local DFCS offices.  As

such, there is nothing in those comments impacting the Court's decision on

approval of the Decree.

20.

Linda Stacy, a Court Appointed Special Advocate in DeKalb County,

commented that she would like to see additional sections in the Consent Decree to

deal with diverted children, foster parent communications, and contracts with

private agencies.  The Court has considered these comments and finds that the

corresponding provisions in the proposed settlement are fair, reasonable and

adequate.  The settlement explicitly requires tracking of so-called "diverted"

children[27] and does not extinguish any claims (individual, class, damages or

injunctive) concerning the State Defendants' diversion program;[28] requires

continued timely and appropriate support and communications with foster

parents;[29] and addresses in detail the supervision of contract agencies.[30] The Court

---

[27]  *Id.*, § 20(G)(2).

[28]  *Id.*, § 19(C) & (D) & (E).

[29]  *Id.*, § 5(C)(6).

[30]  *Id.*, § 9.

finds that none of these objections, individually or collectively, overcome the finding that the Consent Decree's provisions are reasonable, fair, and adequate.

21.

Finally, the Barton Child Law and Policy Clinic of Emory University School of Law ("Barton") commented that, in its view, five of the 31 outcome measures are either too lenient or need to be redrafted to take into account the Clinic's concerns and, in addition, several more outcome measures should be added to deal with issues either not addressed in the Consent Decree or addressed inadequately. The Court has considered all of the Barton comments and objections carefully, and finds the corresponding provisions in the settlement are fair, reasonable and adequate, and that none of the objections, individually or collectively, undermine the fairness, reasonableness and adequacy of the settlement as a whole.

21.

Specifically, Barton argues that outcome measure 4 for "re-entry into care" should be 5% instead of 8.6%; that outcome measure 8(a) for "permanency outcomes" should be 60% instead of 40%; that outcome measure 9 should reduce a "backlog" pool of children in care by 45% in the second reporting period, instead of reductions of 35%, 40% and 40% in the second, third and fourth reporting periods, respectively; that outcome measure 16 concerning the placement of

siblings together should require at least 70% of siblings to be placed together for the entire time they are in foster care during the reporting period, instead of at least 70% placed together when they enter care at the end of the second reporting period and 80% placed together when they enter care at the end of the fourth reporting period; and that outcome measure 17 concerning multiple moves should capture only children in custody for less than twelve months as opposed to all children in custody.

22.

Barton also argues that there should be an additional placement restriction concerning children who re-enter custody to ensure, wherever possible, the placement of children in the last appropriate placement that the child was in during his/her most recent episode of foster care; and that there should be three additional outcome measures in the areas of recurrence of maltreatment, maltreatment following an unsubstantiated or diverted case, and discharges to runaway.[31]

---

[31] Barton also argues for a definition for "siblings" in the Consent Decree, and asks that "the implementation of this settlement and the concomitant accountability activities be conducted in an atmosphere of transparency, partnership and community involvement." In a filing subsequent to the fairness hearing, Barton comments that while the proposed settlement does require "some information related to recurrence of maltreatment" as well as "information on children related to the diversion program," there is concern with their definition, a lack of specific "targets" for these items, and need for a specific requirement that this information be included in the public reports issued by the Accountability Agents.

23.

The Court finds that the Barton objections seek to alter the particular numbers and definitions of specific provisions within the decree, which this Court will not do.  *See Cotton*, 559 F.2d at 1331.  The Court finds that the 31 Outcome Measures, if met by State Defendants and simultaneously sustained for three consecutive reporting periods, will result in a tremendous improvement in the foster care system in Fulton and DeKalb Counties.  The issue is not whether others would have negotiated different measures or whether additional measures, not included in the Decree, might also be beneficial for children in the class.  Rather, counsel for Plaintiffs and State Defendants have negotiated a Decree which, when fully implemented, will substantially improve the provision of foster care services for children in the Plaintiff class.[32]  The Court finds that the Barton objections, taken individually and collectively, fail to undermine the overall fairness, reasonableness and adequacy of the settlement.

13.

Finally, "[i]n a case where experienced counsel represent the class, the Court, 'absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel.'"  *Ingram v. The Coca-Cola Co.*, 200 F.R.D. at 691.

---

[32]   The Court notes that Barton does not offer comment or objection concerning the overwhelming majority of the proposed settlement.

Based upon the affidavit and the hearing statement of Marcia Robinson Lowry,

who has significant experience litigating challenges to foster care systems similar

to the one pending before this Court, and the hearing statement of Jeffrey O.

Bramlett, who has represented classes such as the one before this Court in *Ingram*,

class counsel believes this settlement provides an extraordinary result for their

clients and furthers the best interests of class members in their collective

professional judgment.  Their judgment also supports the Court's conclusion that

the settlement is fair, reasonable, and adequate.

<u>ORDER</u>

Accordingly, for the foregoing reasons, it is ORDERED that the Joint

Motion for Final Approval of the Consent Decree be and is hereby GRANTED,

and the Clerk is directed to enter the Consent Decree as the Order of this Court.

SO ORDERED this _____ day of _____, 2005.

_____
MARVIN H. SHOOB
Senior United States District Judge

Prepared by:

Jeffrey O. Bramlett
Counsel for Plaintiff Class

Mark H. Cohen
Counsel for State Defendants

Exhibit 1

```
-------------------------------------------------x
KENNY A., by his next friend,              )
Linda Winn; et al.,                        )
                                           )
                    Plaintiffs,            )
                                           )
         vs.                               )        Civil Action No.  1: 02-CV- 1686-MHS
                                           )
SONNY PERDUE, in his official              )
capacity as Governor of the                )
State of Georgia; et al.                   )
                                           )
                    Defendants.            )
-------------------------------------------------x
```

### CONSENT DECREE

**<u>Table of Contents</u>**

1.    INTRODUCTION ........................................................................................... 1

2.    DEFINITIONS ……………………………………………........…….................................... 1

3.    PRINCIPLES ................................................................................................... 3

4.    PLANNING ..................................................................................................... 5

        A.    For Children Entering Placement after the Entry of the Consent Decree ............. 5

        B.    For Children who have Reached their Sixth Month in Care after the Entry of the Consent Decree, and for the Remaining Period of Time While in DFCS Custody ……………………….............……………….…………… 7

        C.    For Children who Reach their Thirteenth Month in Care after the Entry of the Consent Decree, and for the Remaining Period of Time While in DFCS custody ……………..……………..............………..……….... 9

        D.    For Children who have Already Reached their Thirteenth Month in Care at the Time of the Entry of the Consent Decree…..…….............………... 10

        E.    For all Children for whom Adoption has been Identified as the Goal …............. 10

        F.    For Children who Reach their Eighteenth Month in Care after the Entry of the Consent Decree, and Those who have been in Care for Eighteen Months or More upon Entry of the Consent Decree, and for the Remaining Period in Time while they are in DFCS Custody ……................ 11

5.    PLACEMENT ................................................................................................ 12

        A.    Identification of Needs and Placement Options .................................... 12

        B.    Reimbursement Rates for Placements .................................................13

        C.    Ensuring that the Placement Process Secures the Most Appropriate Placement for All Children ..................................................................... 15

        D.    Visitation ............................................................................................. 19

6.    HEALTH SERVICES TO CHILDREN ........................................................ 20

i

7.     SINGLE STATEWIDE AUTOMATED CHILD WELFARE
       INFORMATION SYSTEM ............................................................. 22

8.     CASELOADS ............................................................................. 22

9.     SUPERVISION OF CONTRACT AGENCIES ........................... 23

10.    TRAINING ................................................................................. 25

11.    FOSTER PARENT SCREENING, LICENSING, AND TRAINING ............................. 26

12.    ABUSE IN CARE INVESTIGATIONS ..................................... 28

13.    CORRECTIVE ACTIONS .......................................................... 30

14.    MAXIMIZATION OF FEDERAL FUNDING .............................. 31

15.    OUTCOME MEASURES ............................................................ 31

16.    ACCOUNTABILITY .................................................................. 38

17.    ENFORCEMENT ....................................................................... 39

18.    QUALITY ASSURANCE ............................................................ 42

19.    DURATION OF DECREE ………………………….........………………………….. 42

20.    MISCELLANEOUS PROVISIONS ............................................ 43

21.    RELIEF FOR NAMED PLAINTIFFS ………………………………….........………. 46

22.    ATTORNEYS' FEES AND EXPENSES OF LITIGATION …………...........………. 47

1.     **INTRODUCTION**

Plaintiffs brought this class action lawsuit by the filing of a complaint on June 6, 2002, in the Superior Court of Fulton County, seeking declaratory and prospective injunctive relief against Defendants based upon alleged violations of constitutional and statutory rights arising out of the operation of foster care systems in Fulton and DeKalb Counties.  Plaintiffs alleged both federal and state law claims.  All Defendants joined in removing the case to this Court, invoking the Court's federal question jurisdiction and denying that their operation of the Fulton and DeKalb County foster care systems violated any constitutional or statutory guidelines.

In order to resolve all issues pending between these parties without the expense, risks, delays and uncertainties of a trial and any appeals that might follow such a trial, Plaintiffs and State Defendants agree to the terms of this Consent Decree as stated below.  By entering into this Consent Decree, State Defendants do not admit to the truth or validity of any claim made against them by Plaintiffs.  State Defendants also do not speak for the Georgia General Assembly, which has the power under Georgia law to determine the appropriations for the State's programs for child welfare.  However, State Defendants acting under their existing authority agree that it will be a condition of their conduct of the child welfare program covered by this Consent Decree to comply with the Consent Decree.  If Plaintiffs seek a judicial remedy for State Defendants' noncompliance in accordance with Section 17 of this Consent Decree, and at any stage of subsequent enforcement proceedings State Defendants assert insufficient funds as a legal excuse, Plaintiffs may move to rescind their consent to the Consent Decree.  State Defendants submit to the enforcement of this Consent Decree to the full extent permitted by law.

All parties acknowledge that the Court has jurisdiction over this case and authority to enter this Consent Decree and to enforce its terms.  The Court shall retain jurisdiction of this matter to enforce this Decree in accordance with its terms.

2.     **DEFINITIONS APPLICABLE TO CONSENT DECREE**

For purposes of this Consent Decree, the following terms have the meaning indicated below.

> A.     "Adoptive placement" means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

> B.     "Business days" mean every day except Saturdays, Sundays and legal holidays, pursuant to O.C.G.A. § 1-4-1.

> C.     "Calendar days" mean every day including Saturdays, Sundays, and legal holidays.

D.      "Child" or "children" or "class member children" or "class members" shall mean a child or children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

E.      "Commissioner" means the Commissioner of the Georgia Department of Human Resources.

F.      "Corporal punishment" means any physical punishment of a child that inflicts pain.

G.      "Day" or "days" mean calendar days unless otherwise indicated.

H.      "DeKalb DFCS" means the DeKalb County Department of Family and Children Services.

I.      "DFCS" when used alone means State DFCS.

J.      "DHHS" means the United States Department of Health and Human Services.

K.      "DHR" means the Georgia Department of Human Resources.

L.      "Discipline or Other Serious Foster Care Violation" means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

M.      "EPSDT" means the Early and Periodic Screening, Diagnosis and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

N.      "Fulton DFCS" means the Fulton County Department of Family and Children Services.

O.      "Georgia Health Check Program" means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT, and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

P.      "Governor" means the Governor of the State of Georgia.

Q.      "Legal guardianship" means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter 15-11.

R.      "One episode of foster care" means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

S.      "Permanent legal custody" means custody granted in accordance with an order of the superior court or the juvenile court which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

T.      "Permanent placement with relatives" means placement of a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

U.      "State DFCS" means the Division of Family and Children Services of the Georgia Department of Human Resources.

V.      "State Defendants" means Defendants Sonny Perdue (in his official capacity as Governor of Georgia), the Georgia Department of Human Resources, B.J. Walker (in her official capacity as Commissioner of the Georgia Department of Human Resources), Fulton County Department of Family and Children Services, Debra Keyes (in her official capacity as Administrator of Fulton DFCS), DeKalb County Division of Family and Children Services, and Walker Solomon (in his official capacity as Director of DeKalb DFCS).

W.      "Suspected abuse or neglect" means being based on reasonable cause to believe that a child may have been abused or neglected.

X.      "Suspected corporal punishment" means being based on reasonable cause to believe that corporal punishment may have been used on a child.

## 3.      **<u>PRINCIPLES</u>**

The parties to this Consent Decree agree that the following are desired principles that serve as the goals of Georgia's child welfare system and are not separately enforceable standards

or provisions under which State Defendants' conduct under the terms of this Consent Decree shall be measured.

1.     Georgia's child welfare system must actively promote and support the opportunity for children to grow up within a safe, nurturing family, either their biological family or, if that is not possible, within an adoptive family.

2.     When children are in foster care, all non-destructive family ties should be maintained and nurtured. If appropriate, children should be placed with relatives who are able to provide a safe, nurturing home for them. Reasonable efforts should be made to place siblings together, and relationships with relatives and siblings should be facilitated and maintained by the child welfare agency, if it is in the child's best interest to do so.

3.     Foster care should be as temporary an arrangement as possible, with its goal being to provide a permanent home for the child as quickly as possible. In making the determination about what plans and services will best meet this goal, the child's interests must be paramount.

4.     The state has primary responsibility for the care and protection of children who enter the foster care system. Insofar as it relies on private contractors to assist in meeting this responsibility, it should only do so according to standards set by and rigorously monitored by the state.

5.     All children in need of child welfare services should receive full and equal access to the best available services, regardless of race, religion, ethnicity, or disabilities.

6.     Children in foster care placement should be in the least restrictive, most family-like setting possible, and the state should make reasonable efforts to avoid the use of non-family settings for children, particularly young children.

7.     Children in foster care placement should have stable placements that meet their needs and the services necessary to address both the trauma of foster care placement and the problems surrounding their removal from their family. Children in foster care placement should have placements that meet their needs and the services necessary to promote the stability of their placements.

8.     The Department of Human Resources, acting through its Commissioner, has the authority and responsibility to deliver foster care services by the means it deems appropriate consistent with the requirements of law.

4

4.      **PLANNING**

    A.      <u>For children entering placement after the entry of the Consent Decree</u>

        1.      Within 24 hours after a child's 72-hour hearing, DFCS will make a referral to a Comprehensive Child and Family Assessment ("CCFA") provider to initiate an assessment for the child.

        2.      An initial Family Team Meeting will be held within 3-9 days after a child comes into foster care.

            a.  Barring exigent circumstances, the Family Team Meeting participants shall include the DFCS case manager and supervisor and, if applicable, the case manager from the private contract agency which has the child in placement.  DFCS will make reasonable efforts to ensure the attendance of the parents and the child (if 12 or older), and other persons significant to the family if appropriate, at the Family Team Meeting.  The Family Team Meeting may also include the CCFA provider, relatives, and other persons significant to the family.  A Family Team Meeting shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance.  Efforts to ensure the attendance of participants shall be documented in the child's case file.

            b.  Participants at the Family Team Meeting will identify:

                i.   The needs of the children and parents.

                ii.  Goals for meeting those needs.

                iii. Steps for meeting the goals.

                iv.  Strengths of the family members with regard to meeting the needs of the child, the child's parents, and possible placements for the child.

            c.  At the Family Team Meeting, DFCS will make the following determinations and shall identify and ensure the provision of necessary services to achieve such determinations:

                i.   Whether the child can be safely returned home.

    ii.  Whether any evaluations are necessary of the child and/or parents to ensure the development of an appropriate case plan.

    iii.  If the child cannot safely be returned home, whether there is an appropriate relative with whom the child can be placed.

    iv.  If the child has siblings in placement and the siblings are not placed together, the identity of necessary steps to place the siblings together in accordance with Section 5.C.4.d, and necessary steps to ensure sibling visitation.

    v.  If the child is of school age, the identity of steps that can be taken to ensure that the child remains enrolled in school, does not miss school days extensively, and does not have to change schools if at all possible.

    vi.  The frequency with which visiting will take place between the child and the child's parents and significant family members.

d.  If DFCS is unable to secure the parents' attendance at a meeting after the child is placed, the meeting shall nevertheless be held with the other participants, and DFCS shall make reasonable efforts to notify and review with the parents the goals outlined at the meeting, as soon thereafter as possible.

e.  The outcomes of the Family Team Meeting will be reported to the Multidisciplinary Team ("MDT") for use at its meeting.

3.    Within 25 days of a child's placement in foster care, an MDT Meeting will be held.  Barring exigent circumstances, the MDT Meeting participants shall include the DFCS case manager and supervisor and, if applicable, the case manager from the private contract agency which has the child in placement.  DFCS will make reasonable efforts to ensure the attendance of the parents and the child, if appropriate, at the MDT Meeting.  The MDT Meeting may also include relatives, foster parents/placement providers, DFCS representatives, school representatives, therapists, mental health professionals, the CCFA provider, medical professionals, representatives from Public Health, and judicial representatives.  An MDT Meeting shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance. Efforts to ensure attendance of participants in the MDT shall be documented in the child's case file.

a.  The MDT will review the CCFA and make recommendations concerning the case plan and the services to be provided to the child and the family, including but not limited to the issues addressed at Family Team Meetings as described in section A.2. above, as well as (i) appropriateness of education (including special education); (ii) the creation and appropriateness of independent living plans and services for children 14 and older; and (iii) an appropriate permanency goal for the child and the services necessary to implement that goal.  The case plan will be an outgrowth of the CCFA assessment and shall be developed at the MDT meeting.

b.  DFCS shall identify and ensure the provision of necessary services to achieve the determinations made at the MDT meeting, and contained in the child's case plan, unless and until altered by the Juvenile Court.

4.  Within 30 days from the date of placement, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated and revised (with submission to the Juvenile Court for approval) whenever necessary, including after the MDT meeting, and at every six-month review and 12-month permanency review.

5.  DFCS will include training on facilitating family team meetings as part of its pre-service training.  DFCS shall have family team specialists who will attend and facilitate all family team meetings.  The Fulton County Administrator and the DeKalb County Director will designate staff to follow up on the results of all family team meetings.

B.  <u>For children who have reached their sixth month in care after the entry of the Consent Decree, and for the remaining period of time while in DFCS custody</u>

1.  Plaintiffs and State Defendants intend that within six months of the child's placement in foster care, and every six months thereafter, the child's case plan shall be reviewed by the Judicial Citizen Review Panel (JCRP) and/or the Juvenile Court, as long as the child remains in the custody of Fulton or DeKalb DFCS.

2.  Plaintiffs and State Defendants desire that the persons who participate at each JCRP or Juvenile Court review shall include the parents, the child, pre-adoptive parents or relatives providing care for the child, foster parents/placement providers, the DFCS case manager, the private provider case manager (if applicable), the case supervisor, other DFCS representatives, the CCFA providers, medical and mental health professionals, representatives from Public Health and the child's school,

and other professionals having specific knowledge or information relative to the child's case. The parties further desire that a JCRP or Juvenile Court review shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance.

3.   Plaintiffs and State Defendants intend that, at each six month case plan review, the JCRP and/or the Juvenile Court shall evaluate the following:

    a.   The necessity and appropriateness of the child's placement;

    b.   Whether reasonable efforts have been made to obtain permanency for the child;

    c.   The degree of compliance with the specific goals and action steps set out in the case plan;

    d.   Whether any progress has been made in improving the conditions that caused the child's removal from the home; and

    e.   Whether changes need to be made to the case plan, including a change in the permanency goal and the projected date when permanency for the child is likely to be achieved, or changes or the addition of any services needed by the child.

4.   Plaintiffs and State Defendants intend that, if the JCRP conducts the case plan review, the panel will submit a report to the Juvenile Court, which shall include the panel's findings and recommendations, as well as the findings and recommendations of Fulton or DeKalb DFCS, along with Fulton or DeKalb DFCS' proposed revised plan for reunification or other permanency plan.

5.   If the Juvenile Court conducts a review of the case plan, Fulton or DeKalb DFCS shall submit its recommendations to the court regarding a proposed revised plan for reunification or other permanency plan.

6.   Following a JCRP or a Juvenile Court review, the Juvenile Court may adopt a revised case plan, taking into consideration recommendations made by Fulton or DeKalb DFCS, the JCRP, and/or the parents and enter a supplemental order in accordance with Chapter 11 of Title 15 of the Official Code of Georgia Annotated.

7.      DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following the actions of the Juvenile Court.

8.      If deemed necessary by the case manager or case supervisor, additional meetings involving family members and professionals to discuss the implementation of the case plan may be conducted at any time.

9.      If the Juvenile Court does not convene a six-month JCRP or Juvenile Court review within 45 days from the date that is six months after the last review, DHR/DFCS shall cause to be filed with the Juvenile Court a request for an immediate JCRP or Juvenile Court six-month review.

10.     If the Juvenile Court does not convene a 12-month JCRP or Juvenile Court permanency review within 45 days from the date that is 12 months after the last permanency review, DHR/DFCS shall cause to be filed with the Juvenile Court a request for an immediate JCRP or Juvenile Court 12-month permanency review.

C.      For children who reach their thirteenth month in care after the entry of the Consent Decree and for the remaining period in time while in DFCS custody

1.      By the end of the 13th month after a child has been in placement, Fulton and DeKalb DFCS will forward a Permanency Report to the State Social Services Director. Prior to the forwarding of the Permanency Report, another Family Team Meeting will be convened in accordance with Paragraph A.2. of this Planning Section. This Family Team Meeting will consider the issues listed in Paragraph A.3.a. of this Section. The results of such Family Team Meeting shall be forwarded to the Social Services Director with the Permanency Report. The Permanency Report will include a profile description of the child, the case plan, a list of impediments for achieving permanency, the CCFA, and a list of steps to be taken by the county to achieve permanency. The State Social Services Director or his designee shall review the Permanency Report within five business days of its receipt, and shall either concur with the report or refer the case for a county/state staffing.

2.      A county/state staffing shall be held no later than ten days after the State Social Service Director's decision.

3.      Barring exigent circumstances, the county/state staffing shall include the Fulton or DeKalb County case manager and supervisor, regional adoption coordinator, regional field specialist, county program administrator, and State Social Services Director or his designee. A county/state staffing

9

shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance.

4.      The county/state staffing shall establish a plan to move the child toward permanency, and the State Social Services Director shall monitor the plan. DHR/DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following the county/state staffing.

5.      Additional meetings shall be held at any time when deemed necessary by the State Social Services Director or by the county case manager and supervisor, and may include those participants from the initial county/state staffing, provided that at least one additional county/state staffing meeting shall be conducted by the end of the 25th month after a child remains in placement.  DHR/DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following any subsequent county/state staffing.

6.      If the Juvenile Court orders aftercare supervision, the child's case manager shall make monthly visits with the child following discharge from foster care for the period of time specified by the Juvenile Court.  DFCS will determine whether additional services are necessary to ensure the continued success of the discharge.

D.      <u>For children who have already reached their 13th month in care at the time of the entry of the Consent Decree</u>

Within 120 days from the entry of the Consent Decree, Fulton and DeKalb DFCS will submit a Permanency Report for all children who have reached their 13th month in care at the time of the entry of the Consent Decree to the State Social Service Director for a permanency review as provided in Paragraphs 1-4 of Section C, above.

E.      <u>For all children for whom adoption has been identified as the goal</u>

1.      DHR shall determine whether the foster parent(s) are appropriate potential adoptive parents and if so, determine whether they are interested in adoption, and shall make known to the foster parents the availability of adoption assistance.  Foster children who meet the eligibility criteria for the program, and who are special needs children, as defined in 42 U.S.C. § 673 and DFCS policy, shall be eligible to receive an adoption assistance subsidy.  If the child is eligible, DHR/DFCS will determine the child's adoption assistance subsidy based on the needs of the child.  Under no circumstance shall the subsidy amount exceed the family foster care

maintenance payment that the child would be eligible to receive at the time of the adoptive placement.  The amount and term of the adoption assistance subsidy shall be determined prior to the signing of the adoptive placement agreement.

2.      For children for whom the foster parent(s) are either inappropriate or uninterested in becoming adoptive parents, and for whom adoptive parents are not otherwise available, DFCS shall undertake child-specific adoption recruitment.  DFCS will not use as a documented compelling reason for not filing a petition for termination of parental rights the fact that there is an absence of an adoptive resource for the child.

3.      Where appropriate, DFCS shall make available post-adoption services to support and stabilize adoptions for a period of at least 18 months following adoption finalization.

F.    <u>For children who reach their 18th month in care after the entry of the Consent Decree, and those who have already been in care for 18 months or more upon the entry of the Consent Decree, and for the remaining period in time while they are in DFCS custody</u>

1.      DHR/DFCS will establish a Specialized Case Manager position to focus on and to remove barriers to permanence for children in DFCS custody for 18 months or longer.  The maximum caseload for any person serving in the Specialized Case Manager position will be 12.

2.      Within 60 days of the entry of this Consent Decree, all children who have already reached their 18th month in care upon the date of entry of this Consent Decree shall be assigned a Specialized Case Manager as described in this Section F.  Beginning 60 days after the entry of this Consent Decree and continuing thereafter, all children that reach their 18th month in care shall be assigned a Specialized Case Manager as described in this Section F.  The Specialized Case Manager, once assigned to a child, shall be the sole responsible DFCS case manager for the child. To the extent possible, the child's DFCS assignment to a particular Specialized Case Manager, once made, shall continue for the remaining period of time while the child is in DFCS custody.

3.      The Specialized Case Manager provided for in this paragraph shall do the following as appropriate for the children in this Section F:

a.    Convene meetings, access funding, and make independent decisions in order:

        i.   To determine the continuing appropriateness and effectiveness of the child's permanency goal and to seek court approved change of the goal if appropriate;

        ii.   To determine the continuing appropriateness and effectiveness of the services being provided to the child; whether new or different services are necessary for the child; and, if so, by whom and when they will be provided;

   b.   Partner with the county Independent Living Coordinator to determine whether adequate independent living services and plans are being provided for all children age 14 and older;

   c.   Evaluate the continuing appropriateness and effectiveness of services to biological parents and relatives, and determine whether new or different services are necessary to assist the biological parents and relatives in achieving the child's permanency goal;

   d.   Consult with public and private professionals and take all steps necessary to ensure the provision of services leading to the child achieving permanency;

   e.   No sooner than 30 days prior to discharge, regardless of the discharge destination, convene a special discharge planning meeting that shall be held to ensure that appropriate services and plans are in place to ensure a successful discharge.

**5.**   **PLACEMENT**

   A.   <u>Identification of Needs and Placement Options</u>

   1.   DFCS agrees to obtain, by means of a Request for Proposal, a qualified external expert to conduct a needs assessment in Fulton County and DeKalb County. The needs assessment shall be based on the standards for the placement of children identified in Section 5.C. below, as applied to factual data about individual children's needs obtained in Comprehensive Child and Family Assessments and case plans pursuant to Section 4 of this Consent Decree, and as applied to other factual data relevant to determining the needs of children in the Plaintiff Class. The needs assessment shall identify what new and/or different placements and related services, if any, are needed to provide substantially for the care of the Plaintiff Class.

12

2. Counsel for Plaintiffs and DFCS will jointly review the responses to the Request for Proposal, which shall be drafted to accomplish the purposes of this section of the Consent Decree, and shall jointly agree to the expert. The expert shall be selected within 90 days from the entry of this Consent Decree, and shall be selected in accordance with the procurement laws of the State of Georgia.

3. The needs assessment shall be completed no later than 120 days after the expert has been retained.

4. DFCS shall provide all of the placements and related services identified in the needs assessment, except that the expert will recommend the priority for implementing the findings of the needs assessment, based on the severity of the needs of the children whose needs are currently unmet or inadequately met. DFCS will phase in the implementation of the findings of the needs assessment, with the findings substantially implemented no later than 12 months after the completion of the needs assessment.

B. Reimbursement Rates for Placements

1. Basic foster care maintenance payments:

a. With regard to the provision of basic foster family services, including kinship care (limited to kin who are approved foster parents), effective July 1, 2005, DHR/DFCS shall set and pay the following basic foster care maintenance payments: for each child ages 0-6, $13.78; for each child ages 7-12, $15.50; and for each child age 13 and older, $17.75. DHR/DFCS shall ensure that this rate is paid to all foster parents providing basic foster family services, regardless of whether they are directly supervised by DFCS or directly supervised by private providers. These rates shall be uniform.

b. The Commissioner shall propose a periodic increase in the basic foster care maintenance payments referenced in subparagraph a., above, effective in succeeding fiscal years, based upon discussions with affected foster parent groups and consideration of whether an increase in any amount for any age group is needed to adequately compensate for basic foster care for the relevant age groups. Class counsel shall be notified of the amount of any such increase in the basic foster care maintenance payments within 30 days of the effective date of such change in payment.

c. Beginning July 1, 2007, and continuing until the termination of this Consent Decree as provided in Section 19, if Class Counsel forms a

> good faith opinion that the amounts paid by DHR for basic foster care maintenance payments are insufficient to adequately compensate for foster family care, then Class Counsel may seek judicial remedies under the provisions set forth in Section 17 of this Consent Decree, and shall have the burden to show that the payment structure set by the Commissioner fails to adequately compensate for basic foster care for a particular age group or groups.

2. Within 60 days after the parties sign the Consent Decree, DHR/DFCS shall establish a Reimbursement Rate Task Force. The Reimbursement Rate Task Force shall accept and shall not revise the base-level rate for the provision of family foster care services (including kinship care) as defined in subsection 1 above. The Reimbursement Rate Task Force shall create a rate structure based on measurable outcomes for all children in foster care (excluding basic, non-therapeutic foster family care) based on the reasonable cost for achieving these outcomes. The Reimbursement Rate Task Force shall examine the Level of Care system and make recommendations for either revising or replacing it, and shall also consider the results of various pilot programs being carried out across the state. The rate structure established by the Reimbursement Rate Task Force must comply with Title IV-E and Medicaid funding guidelines so that DHR/DFCS can draw down such funds.

3. The rate structure established by the Reimbursement Rate Task Force shall serve as the basis for performance-based contracting, and shall be phased in beginning 90 days after the Reimbursement Rate Task Force issues its findings, provided that the rates fixed by the Commissioner must be fully implemented in the contracting cycle beginning July 1, 2007.

4. Beginning in the July 1, 2006 contracting cycle and continuing thereafter, DHR/DFCS shall ensure that all approved foster parents (regardless of whether they are supervised directly by DFCS or by private providers) receive the same reimbursement rate for a given level of service.

5. If DHR/DFCS directly supervises any approved foster homes that provide therapeutic services or operates any specialized group facilities, those approved foster parents or group facilities shall be paid at the same rate. All specialized group facilities shall be paid at the same rate for the same level of services.

6. The Reimbursement Rate Task Force shall be composed of the following members: James L. Kunz, Howard A. Peters III, and Becky Butler. The Task Force may meet when necessary in order to accomplish its duties, and shall work to finalize its recommendations in the most efficient and

14

economical manner possible. The Reimbursement Rate Task Force shall have access to data, documents and information needed, and shall otherwise have the support needed to carry out its duties. DHR shall reimburse the members of the Task Force for approved expenses and fees incurred in performing its duties, in accordance with state regulations.

7.     The Task Force shall make every effort to present its findings no later than 120 days after the entry of the Consent Decree, unless the Task Force requests and the parties consent to an extension for the presentation of findings. The Task Force shall include recommendations on the priority for implementing its findings.

C.     Ensuring that the placement process secures the most appropriate placement for all children.

1.     Children for whom placement has determined to be necessary shall receive an assessment of their placement needs by a qualified professional no later than 30 business days after the child enters placement. The assessment shall include the initial physical health, dental health, and mental health screenings referred to in Section 6, Paragraph A. of this Consent Decree and all other required elements.

2.     As soon as the placement assessment is completed, the child's current placement shall be reevaluated to ensure that it meets the child's needs and if not a new placement shall be obtained as quickly as practicable.

3.     DHR shall ensure that each county has a placement process in place, including placement specialists with knowledge of both the resources available to enable the child to remain at home safely to avoid the need for placement if possible and of the placement resources, including the specific placement (foster home or group setting) available in a contract agency and its suitability for the particular child needing placement to reasonably ensure that each child receives the most appropriate placement for his/her individual needs.

4.     Children shall be placed according to the following standards:

a.  Children shall be placed in accordance with their individual needs, as determined by the needs assessment in paragraph C.1 of this section, taking into account the child's needs to be placed as close to home and community as possible, the need to place siblings together, the DHR/DFCS preference for placement with relative resources, and the need to place children in the least restrictive, most home-like setting.

15

b. Children shall be placed within their own county or within 50 miles of the home from which they were removed. This provision shall not apply if (i) the child's needs are so exceptional that they cannot be met by a family or facility within their own county or within 50 miles of the home from which they were removed, (ii) the child is placed through the ICPC consistent with its terms, (iii) the child is appropriately placed with relatives, or (iv) the child is in an adoptive placement.

c. No child shall be placed in an emergency or temporary facility or any other foster home or group facility beds used on a temporary basis, for more than 30 days. Children shall not be placed in more than one emergency or temporary facility within one episode of foster care. No child shall spend more than 23 hours in a county DFCS office, or any facility providing intake functions, including but not limited to the current Children's Center in DeKalb County and the Fulton Family Resource Center in Fulton County.

d. Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has such exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at the initial placement, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited.

e. No child shall be placed in a foster home if that placement will result in more than three (3) foster children in that foster home, or a total of six (6) children in the home, including the foster family's biological and/or adopted children, without the written approval of the Social Services Director based on a reasonable determination that the home is appropriate for and can meet the needs of the additional number of children. No placement will result in more than 3 children under the age of 3 residing in a foster home. The only exception to these limits shall be circumstances in which the placement of a sibling group in a foster home with no other children in the home would exceed one or more of these limits.

f. Group Care Restrictions

The capacity of a group care setting shall include all beds on the entire grounds of the setting, and includes the total number of beds in multiple cottages.

16

i.   No child under six years of age shall be placed in a group care setting without the express written approval of the Social Services Director based upon his or her certification that the individual child has exceptional needs which cannot be met in any foster home placement or other facility.  The certification shall describe the services which are available in the group care setting to address the child's exceptional needs.  No child under six years of age who shall be certified for a group care setting under the terms in this subparagraph shall be placed in any group care setting which has a total capacity in excess of 12 children.  This paragraph shall not apply to a child who is under six years of age and who is also the son or daughter of another child placed in a group care setting either prior to or after the entry of this Consent Decree.  This paragraph shall not apply to a child who is under six years of age who is also the sibling of another child who has been placed in a group care setting prior to the entry of this Consent Decree, except that any such sibling under the age of six shall be moved to a foster home placement within 12 months of the entry of this Consent Decree unless doing so would not be in the best interest of the children in question.

ii.  No child between the ages of six and 12 years of age shall be placed in a group care setting without the express written approval of the Social Services Director based upon his or her certification and specific findings that the individual child has needs which can be met in the particular group care setting and that the particular group setting is the least restrictive placement that can meet such needs.  The certification shall describe the services which are available in the group care setting to address the child's needs.  No child between the ages of six and 12 years of age who shall be certified for a group care setting under the terms in this subparagraph shall be placed in any group care setting which has a total capacity in excess of 12 children.  This paragraph shall not apply to a child between the ages of six and 12 years who is also the sibling of another child who has been placed in a group care setting prior to the entry of this Consent Decree, except that any such sibling between the ages of six and 12 years shall be moved to a foster home placement within 12 months of the entry of this Consent Decree unless doing so would not be in the best interest of the children in question.  For any other children between the ages of six and 12 who were placed in a group care setting prior to the entry of this Consent Decree, DHR/DFCS shall have 12 months from the entry of this Consent Decree to move such children to a

non-group care setting unless doing so would not be in the best interest of the child or children in question.

iii. Children who are at least 12 years of age and older may be placed in a group care setting without any of the restrictions contained in paragraphs i. or ii., above.

g. Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

h. Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family. DHR shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion, but may utilize its authority to contract with private providers to ensure that the pool of available foster and adoptive families reflects and meets the needs of children for whom foster and adoptive placements are needed, including placements for children for whom placement resources are scarce or unavailable.

i. DHR shall only contract for placements or services with licensed contractors or subcontractors. No child shall be placed in an unlicensed facility.

j. DFCS will ensure the basic physical needs of food, clothing and shelter for children in foster care. At the time of placement or at any placement move, DFCS will review the child's clothing needs to assess appropriateness and take necessary steps to ensure that the child has appropriate clothing.

5.  DFCS shall take steps to minimize any trauma which may be experienced by a child which is associated with either a change in placement or in case managers.

6.  DHR/DFCS shall take appropriate steps to ensure that foster children placed in foster family homes, whether directly supervised by DHR/DFCS or private providers, receive adequate supports, including the following:

    a.   DHR/DFCS shall ensure that before a child is placed in any approved foster family home, the foster parents have received uniform and appropriate pre-service training;

    b.   DHR/DFCS shall ensure that all approved foster parents with whom foster children are placed shall receive uniform and appropriate ongoing training, and that they are reasonably informed of any changes in laws or DHR/DFCS policies that affect foster parents;

    c.   DHR/DFCS shall ensure that all foster parents (including kinship providers) with whom foster children are placed can contact DHR/DFCS and receive information 24 hours a day, 7 days a week, so that questions or concerns can be timely and appropriately addressed;

    d.   DHR/DFCS shall ensure that available information concerning a specific foster child, including family history, medical, dental, mental health and educational information, and any other information that is relevant to the child's safety and well-being, is provided to approved foster parents, before the child is placed in the home, and that complete and accurate updated information is provided to the approved foster parents after the child is placed as such information becomes available.

D.    <u>Visitation</u>

The frequency and intensity of in-placement visits and other visits with a child shall be determined by the individual needs of the child.  An in-placement visit refers to a private face-to-face visit with the child *in the child's home/placement*, in order to monitor and document the child's adjustment to the placement, the appropriateness of the placement to meet the child's needs, the receipt of appropriate treatment and services by the child, the child's safety, and service goals.  A visit refers to a face-to-face visit with the child, in order to monitor and document the child's adjustment to the placement, the appropriateness of the placement to meet the child's needs, the receipt of appropriate treatment and services by the child, the child's safety, and service goals.  The following minimum in-placement visits and other visits shall apply:

    1.    For all children in placements other than adoptive placements:

    a.   For the first eight weeks after an initial placement or upon any change in placement, there shall be at least: (a) one in-placement visit during the first week of the placement; (b) one in-placement visit between the third and the eighth week of the placement; and (c) six additional visits during the eight week period.

       b.  Thereafter, there shall be at least one in-placement visit per month and one additional private visit per month.

2.  For all children in adoptive placements, there shall be (a) one in-placement visit the day after the child is placed; and (b) at least one in-placement visit per month after the placement but before the adoption petition is filed; and (c) at least one in-placement visit per quarter after the adoption petition is filed.

**6.**    **HEALTH SERVICES TO CHILDREN**

A.    Initial Screenings and Follow-Up Treatment

1.    Physical Health Screening: All children shall receive a medical screening within ten days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

2.    Dental Health Screening: All children shall receive a dental screening within ten days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist.

3.    Mental Health: All children four years of age and older shall receive a mental health screening conducted by a licensed mental health professional and completed within 30 days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional. The mental health screening shall be commenced prior to the MDT meeting provided in Section 4.A.3. of this Consent Decree. All children under four years of age shall receive a developmental assessment conducted by a licensed professional and completed within 30 days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional. The developmental assessment shall be commenced prior to the MDT meeting provided in Section 4.A.3. of this Consent Decree.

B.    Periodic Health Screenings and Treatment

1.    Ages zero through six months:  All children between the ages of zero to six months shall receive no less than three periodic EPSDT/Georgia Health Check Program health screenings.

2.    Ages six months through 18 months:  All children between the ages of six months through 18 months shall receive no less than four periodic EPSDT/Georgia Health Check Program health screenings performed at approximate three month intervals.

3.    Ages 18 months through five years:  All children between the ages of 18 months through five years shall receive no less than one periodic EPSDT/Georgia Health Check Program health screening performed every six months.

4.    Ages six years and over:  All children of six years of age and older shall receive no less than one periodic EPSDT/Georgia Health Check Program health screening performed every year.

5.    All children shall receive any follow-up treatment or care as directed by the physician who administered the periodic EPSDT/Georgia Health Check Program health screening.

6.    Every child shall receive an EPSDT/Georgia Health Check Program health screening within ten days of receiving a final discharge from placement.

7.    Children's health needs, including dental and mental health needs, between periodic screenings shall be met as provided by EPSDT.

8.    All children age 3 and over shall receive at least one annual dental screening in compliance with EPSDT standards, including at a minimum, the components identified in the EPSDT/Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist.

C.    All medication prescribed for a child will be administered as ordered in such prescription(s).  Only designated, authorized, and appropriately trained personnel shall administer the taking of any prescribed medication for children in any non-foster family care placement.

7. **SINGLE STATEWIDE AUTOMATED CHILD WELFARE INFORMATION SYSTEM**

    A.    State Defendants shall have a fully implemented, single statewide automated child welfare information system ("SACWIS") containing at a minimum:

        1.    The system shall have the functionalities as identified and described in Appendix "A" hereto;

        2.    The system shall have the data integrity and quality assurance processes as identified and described in Appendix "B" hereto; and

        3.    The system shall have the security and data recording and recovery elements as identified and described in 45 CFR Part 95, Subpart F, § 95.621.

    B.    The date certain for full implementation shall be set forth in a contract with a selected vendor, with the vendor selected and the contract effective on or before December 31, 2005. The date for full implementation shall be added to this Consent Decree after the contract is executed.

    C.    Both leading up to and subsequent to the full implementation of a single statewide automated child welfare information system, State Defendants shall at all times satisfy all federal reporting requirements and shall maintain data integrity and accuracy on a continuous basis.

8. **CASELOADS**

    A.    DFCS will phase in a reduction in its caseload in Fulton and DeKalb Counties for its CPS investigators, ongoing case managers, placement case managers, and adoption case managers over a two year period as provided below. In the event that a worker has a mixed caseload, the caseload shall be weighted to reflect the standards in this section.

        1.    By the end of the second reporting period, the following caseloads will exist in Fulton and DeKalb County DFCS:

            a.  No CPS case manager shall have more than 20 cases.
            b.  No ongoing case manager shall have more than 20 cases.
            c.  No placement case manager shall have more than 25 cases.
            d.  No adoption case manager shall have more than 22 cases.

    2.     By the end of the fourth reporting period and continuing thereafter, the following caseloads will exist in Fulton and DeKalb County DFCS:

        a.  No CPS case manager shall have more than 12 cases.
        b.  No ongoing case manager shall have more than 17 cases.
        c.  No placement case manager shall have more than 15 cases.
        d.  No adoption case manager shall have more than 16 cases.

B.     DFCS will phase in a reduction in the ratio of supervisors to case managers in Fulton and DeKalb County over a two-year period as provided below.

    1.     By the end of the second reporting period, no supervisor shall supervise more than six case managers at any one time in Fulton and DeKalb County DFCS.

    2.     By the end of the fourth reporting period and continuing thereafter, no supervisor shall supervise more than five case managers at any one time in Fulton and DeKalb County DFCS.

C.     DFCS will phase in elimination in the employment or utilization of temporary personnel ("PRNs") as case managers in Fulton and DeKalb County over a one-year period as provided below.

    1.     From the period beginning six months from the entry of the Consent Decree up through the period ending one year from the entry of the Consent Decree, PRNs shall comprise no more than 11% of the total allocation of social services case managers for Fulton and DeKalb County DFCS, respectively.

    2.     From the period beginning one year from the entry of the Consent Decree and continuing thereafter, no PRNs shall be employed or utilized as case managers in Fulton and DeKalb County DFCS.

D.     The caseloads for Specialized Case Managers shall be governed by Section 4.F. of this Consent Decree.

## 9.    **SUPERVISION OF CONTRACT AGENCIES**

A.     DHR shall require, and shall take appropriate steps to ensure, that all child-caring institutions or child-placing agencies that provide placements and services to class members meet all applicable terms of this Consent Decree.

B.      This Section 9 applies to any contract for the provision of placements and services to class members into which DHR enters during the contract cycle beginning July 1, 2005, or as soon as practicable following the entry of the Consent Decree. Into any such contract, which shall be annual performance-based contracts, DHR will incorporate all applicable requirements of this Consent Decree, but will do so without reference to the Consent Decree itself. DHR will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placements or services shall be reported to DHR for investigation, that all placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in that provider's care shall be reported to DHR for screening, assessment or investigation as necessary. The findings of investigations of suspected abuse or neglect, or of the assessment or investigation of suspected corporal punishment, shall be included in the criteria that DHR uses in determining whether to renew the license of a contract agency. With respect to contract agencies' contractual violations, DHR may use such contractual remedies as provided by the contract and by applicable Georgia statutes and Rules and Regulations. The failure of a contract agency to report suspected abuse or neglect of a child to DHR/DFCS shall result in appropriate process being issued in accordance with applicable statutes, rules and regulations for immediate termination of the contract or placement of the provider on probation, and a repeated failure within one year shall result in termination of the contract.

C.      DHR shall ensure that all child-caring institutions or child-placing agencies that provide placements and services to class members report to DHR accurate data on at least a bi-annual (6 months) basis so that their compliance with the terms of this Consent Decree can be measured.

D.      DHR, through its Office of Regulatory Services ("ORS"), shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placements and services to class members, to ensure, among other things, the safety and well being of class members and to ensure that the contract agency is complying with the applicable terms of this Consent Decree. As part of such evaluations, ORS shall ensure that each child-caring institution and child-placing agency shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations, and that, in addition, 5% of family foster homes or a total of 10 homes (whichever is greater, or all homes for agencies providing less than 10 homes in total) provided by each child-placing agency shall receive such an unannounced annual inspection to review all relevant aspects of the agency/institution's operations. ORS shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license-holders' deficiencies, ORS may use such remedies as are provided by applicable Georgia statutes and Rules and Regulations.

24

10.   **TRAINING**

A.    No case manager shall assume responsibility for a CPS, ongoing, foster care or adoption case, until after completing pre-service training as specified below and after passing an appropriate skills-based competency test, as determined by DHR/DFCS.  No case manager supervisor shall assume supervisory responsibility until after completing pre-service training as specified below and after passing an appropriate skills-based competency test, as determined by DHR/DFCS.

B.    DFCS shall have a full time Education and Training Services Section headed by a manager of Education and Training with appropriate qualifications, as determined by DHR/DFCS.

1.    The training unit shall provide comprehensive and appropriate child welfare pre-service training to ensure that all case managers and supervisors responsible for children will have training to permit them to comply with the terms of this Consent Decree, law, DFCS policy and reasonable professional standards, as determined by DHR/DFCS.

2.    DHR/DFCS management shall determine, on an annual basis, those DFCS workers in need of re-training, as indicated by workers' failure to ensure that the cases for which they are responsible comply with the terms of this Consent Decree, law, DFCS policy and reasonable professional standards, as determined by DHR/DFCS, and shall ensure that additional training is provided to them.

3.    All new case managers shall have a minimum of 160 hours of pre-service training, including instructional training and supervised field training, unless waived by the Director of Education and Training Services in accordance with the Office of Child Protective Services New Case Manager Training Waiver Guidelines issued April 1, 2005, or comparable guidelines.  All case manager supervisors shall receive a minimum of 40 hours of in-service training that is directed specifically at the supervision of child welfare workers, prior to receiving any supervisory duties.  All case managers shall receive a minimum of 20 hours of ongoing training each year.  All case managers with supervisory responsibility shall receive a minimum of 20 hours of in-service training each year.

4.    Private provider agencies with whom DFCS contracts for the provision of placements for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have met the following criteria:

     a.  Have an undergraduate degree from an accredited college or university;

     b.  Have completed a training curriculum consisting of at least 160 hours of classroom, internet and/or supervised field instruction, unless waived by the Director of Education and Training Section in accordance with the Office of Child Protective Services New Case Manager Training Waiver Guidelines issued April 1, 2005, or comparable guidelines.  The curriculum shall be approved by DHR/DFCS to ensure that the general content areas are appropriate to the work being performed.  Where case work activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DHR/DFCS' pre-service and in-service training;

     c.  Have a passing score on the case manager and/or supervisor online assessment required for new worker certification as of July 1, 2005; and

     d.  Have 20 hours of job related ongoing professional development annually.

C.    All case manager supervisors employed after the entry of this Consent Decree shall have a minimum of a bachelor's degree in social work, and at least two years of experience as a case manager in social services.

## 11.   FOSTER PARENT SCREENING, LICENSING AND TRAINING

A.    All paragraphs in this section shall apply to all class members, whether they are in placements supervised directly by DHR/DFCS, or in placements supervised directly or provided by private contract agencies.

B.    DHR/DFCS shall develop and maintain uniform standards for the approval, and re-approval, of all foster and pre-adoptive families with whom class members may be placed.  These standards shall comply with federal law.

C.    The actual processes for approval and re-approval of all foster and pre-adoptive families/parents with whom class members may be placed, shall be developed and carried out by DFCS in conjunction with ORS.

D.    DHR/DFCS shall require uniform training of all foster and pre-adoptive families/parents with whom class members may be placed.  Uniform training for all foster parents shall be required prior to the placement of any children with a

foster or pre-adoptive family. All foster parents shall also be required to complete annual training, as part of an annual re-approval process.

E.     Within 90 days of the entry of this Consent Decree, DHR/DFCS shall have an automated information system that can provide the following:

    1.     For every foster and pre-adoptive family/parents with whom class members may be placed, the name, address, phone number, and, if supervised directly by a private provider, the name and address of the private provider.

    2.     For every foster and pre-adoptive family/parents with whom class members may be placed, a list of all foster children in the home, the number and age of any other children in the home, any other adults who are providing direct care or supervision for class members in the home, and the county DFCS office with custody of each foster child.

    3.     For every foster or pre-adoptive family/parents with whom class members may be placed, the approval or re-approval status of the home.

    4.     For every foster or pre-adoptive family/parents with whom class members may be placed, a complete history beginning in January 1, 2002 and going forward, of any reports of abuse or neglect and any substantiated reports of abuse or neglect.

    5.     DHR/DFCS shall consider the information above before a child is placed with any foster or pre-adoptive family/parents, and before any approval, or re-approval is granted.

F.     DHR/DFCS shall not allow any foster or pre-adoptive family/parents to be given approval or re-approval, and shall not allow any class members to be placed or to continue to be placed with such foster or pre-adoptive family/parents, if that same foster or pre-adoptive family/parents has been found to be the perpetrator of substantiated abuse or neglect, or has had their home closed as the result of a policy violation that threatened the safety of a child, has had their home closed as a result of two violations of the corporal punishment policy, or has had their home closed as a result of a single violation of the corporal punishment policy where the family was not amenable to change, correction, or DFCS intervention. DHR/DFCS shall be able to identify if (a) foster or pre-adoptive family/parents were the perpetrators of substantiated abuse or neglect, or had their homes closed, while being supervised by a private contract agency, and they subsequently seek to become approved or re-approved with a different private contract agency or directly as a DFCS supervised foster or pre-adoptive family/parents; or (b) foster or pre-adoptive family/parents were the perpetrators of substantiated abuse or

neglect, or had their homes closed, while being supervised directly by DFCS, and they subsequently seek to become approved or re-approved with a  private contract agency.

G.      DHR/DFCS shall also maintain the following information in accessible paper file form:

    1.      For every foster or pre-adoptive family/parents with whom class members may be placed, the approval or re-approval status of the home, and for any foster or pre-adoptive family/parents not in full approval or re-approval status, the reasons for lack of full approval or re-approval status.

    2.      For every foster or pre-adoptive family/parents with whom class members may be placed, a complete history for the prior 5 years of any reports of possible abuse or neglect and any substantiated reports of abuse or neglect (and the nature of the report and the nature of the substantiation), home closings (and the reasons therefore) or refusals to place further children in the home (and reasons therefore), or other corrective actions or disciplinary actions ever taken against the foster or pre-adoptive family/parents (and reasons therefore).

    3.      DHR/DFCS shall consider the information above before a child is placed with any foster or pre-adoptive family/parents, and before any approval, or re-approval is granted.

## 12.   ABUSE IN CARE INVESTIGATIONS

A.      All referrals of reports of suspected abuse or neglect of children in foster care shall be investigated by DFCS child protective services staff in the manner and within the time frame provided by law and DFCS policy.

B.      All referrals of suspected abuse or neglect of foster children in institutional, group, residential or foster family homes provided or directly supervised by private providers shall also be referred to and reviewed by the Office of Regulatory Services and the Social Services Treatment Services Unit.  The purpose of this review is to determine whether a pattern of abuse or neglect exists within the institutional, group, residential, foster family homes or private provider agency that contributed to the abuse or neglect; whether the contract should be terminated; whether particular homes or facilities should be closed; and what other steps are necessary to safeguard the safety and well-being of children.

C. Corporal Punishment.

    1.    DHR/DFCS shall continue to require that foster parents and other placement resources for children in the custody of DHR shall not use corporal punishment of children in their care, nor shall they authorize or permit any other individual or agency to administer corporal punishment.

    2.    When a report of suspected corporal punishment of a foster child in DHR/DFCS custody is received, the allegations must be immediately screened by the Child Protective Services intake unit or the Regional Field Program Specialist. Such personnel shall have appropriate training in child protective services including the screening of reports of potential corporal punishment and abuse/neglect and in discerning the difference between them. No such personnel shall also have any responsibility for the selection, recruitment, approval or re-approval, retention or matching of foster, adoptive or other placement options for foster children. If there is reasonable cause to believe that abuse or neglect occurred, the report of corporal punishment must be treated as an abuse referral and forwarded immediately to the Child Protective Services Supervisor who will follow policy requirements for abuse or neglect reports. All reports of suspected corporal punishment in child caring institutions shall be treated as an abuse referral and forwarded immediately to the Child Protective Services Supervisor who will follow policy requirements for abuse or neglect reports.

    3.    If suspected corporal punishment in DHR/DFCS custody does not result in an abuse referral, the following provisions shall apply to assessments of foster homes:

        a.  Assessment:

            i.   The assessment of suspected corporal punishment shall be conducted in the manner and within the time frames required by law and DFCS policy.

           ii.  No additional placements may be made in the foster home until the investigation is complete.

        b.  Assessment and Conclusions:

            i.   If the allegation of suspected corporal punishment is supported by the assessment findings, the home must be closed if:

        a.  the violation had direct impact on the safety and well being of the child or posed a serious risk factor for the child in the home;

        b.  the violation is the second Discipline or Other Serious Foster Care Violation; or

        c.  the family is not amenable to change, correction or DFCS intervention.

      ii.  If the allegation that the discipline policy has been violated is supported and none of the conditions listed in i. above is present, then the home may remain open and a corrective action plan must be developed, agreed upon, and signed by all participants. DHR/DFCS shall ensure that the corrective action plan is appropriately monitored and enforced. The county director may close the foster home in his or her discretion. In deciding whether to close the foster home, the county director should consider: the severity of the incident, the pattern of behavior and history of the foster parents, the identified needs of the child, the willingness of the foster parents to look at alternative approaches to discipline, and the quality of the relationship between the child and foster parent.

4.      Office of Regulatory Service Regulation 290-2-5.18 prohibits the use of corporal punishment in child caring institutions. Violation of this regulation shall be enforced by the Office of Regulatory Services and shall be punishable by fine, probation, suspension or revocation of license and other sanctions under the Rules and Regulation of the Department of Human Resources.

## 13.   **CORRECTIVE ACTIONS**

A.      Within 60 days of the final entry of this Consent Decree, DHR/DFCS shall identify all class member children in custody for 12 months or more who have not had a medical examination within the prior 12 months, and all foster children in custody for more than 30 days and less than 12 months who have not have a medical examination since their most recent entry into custody. The identified children shall be provided with a medical examination and treatment as set forth in Section 6 of this Consent Decree concerning Health Services to Children by the end of the first reporting period.

B. Within 60 days of the final entry of this Consent Decree, DHR/DFCS shall identify all foster care placements (foster family homes or non-foster family homes, DFCS-supervised, or private provider-supervised) in which one or more class member children have been placed in the past 6 months, for which placements there have been 2 or more substantiated reports of abuse or neglect in the past 18 months. For each placement identified, by the end of the first reporting period, DHR/DFCS shall conduct an unannounced inspection of the home to determine if there are any risks to the health, safety and well-being of children living in such placements, and shall take all appropriate actions.

## 14.    **MAXIMIZATION OF FEDERAL FUNDING**

DHR/DFCS shall maximize funds available to it through Title IV-B and IV-E of the Social Security Act.  DHR/DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.  The parties intend that any increases achieved in federal funding shall not supplant state funds for foster care services. DHR/DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agents that DHR/DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DHR and the Governor that that their policy will be to urge the General Assembly that state dollars committed to DHR/DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.

## 15.    **OUTCOME MEASURES**

State Defendants shall meet the following Outcome Measures in the Reporting Periods specified.  Performance percentages required "by the end of" a Reporting Period will be measured during the immediately subsequent Reporting Period.  Each Reporting Period shall be six months.  State Defendants will comply with each Outcome Measure according to its terms for the duration provided for Outcome Measures in Section 19 of this Consent Decree.

1. Commencement of CPS investigations concerning foster children:  By the end of the first reporting period, at least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report.

2. Completion of CPS investigations concerning foster children:  By the end of the first reporting period, at least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with

Section 2106 of the Social Services Manual, within 30 days of receipt of the report.

3.    Contact with the alleged victim: By the end of the first reporting period, at least 99% of all investigations of reported abuse or neglect of foster children during the reporting period shall include timely face-to-face, private contact with the alleged victim, including face-to-face, private contact with a child who is non-verbal due to age or for any other reason.

4.    Re-entry into care:  By the end of the second reporting period, no more than 8.6% of all foster children entering custody shall have re-entered care within 12 months of the prior placement episode.

5.    Maltreatment in care:  By the end of the first reporting period, no more than 1.27% of all children in foster care shall be the victim of substantiated maltreatment while in foster care.  By the end of the second reporting period, no more than .94% of all children in foster care shall be the victim of substantiated maltreatment while in foster care.  By the end of the fourth reporting period, no more than .57% of all children in foster care shall be the victim of substantiated maltreatment while in foster care.

6.    By the end of the second reporting period, 90% of all foster homes will not have an incident of corporal punishment within the previous six months.  By the end of the third reporting period, 98% of all foster homes will not have an incident of corporal punishment within the previous 12 months.

7.    Search for relatives:  By the end of the second reporting period, at least 70% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 90 days of entering foster care.  By the end of the fourth reporting period, at least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care.

8.    (a)    Of all children entering custody following the entry of the Consent Decree, at least 40% shall have had one of the following permanency outcomes within 12 months or less after entering custody: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship.  Performance on this measure shall be taken on the first day after the end of the second reporting period, and shall be taken at the end of subsequent reporting periods, as necessary.  For example, to sustain compliance at the end of the third reporting period, of all children who entered custody after the entry of the Consent Decree, at least 40% shall

have had one of the following permanency outcomes within 12 months or less after entering custody: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship. Performance on this measure shall be taken on the first day after the end of the third reporting period.

(b)     Of all children entering custody following the entry of the Consent Decree, at least 74%: (1) shall have had one of the following permanency outcomes within 12 months or less after entering custody: reunification or permanent placement with relatives; or (2) shall have had one of the following permanency outcomes within 24 months or less after entering custody: adoption, permanent legal custody or guardianship. Performance on this measure shall be taken on the first day after the end of the fourth reporting period, and shall be taken at the end of subsequent reporting periods, as necessary. For example, to sustain compliance at the end of the fifth reporting period, of all children who entered custody after the entry of the Consent Decree, at least 74% shall have had one of the permanency outcomes within the types of permanent placement and time frames as listed in (1) or (2) above. Performance on this measure shall be taken on the first day after the end of the fifth reporting period.

9.      Children in custody for up to 24 months and still in custody upon entry of the Consent Decree (children in the "24 month backlog pool"): For all children in the 24 month backlog pool, by the end of the second reporting period at least 35% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship. For children in the 24-month backlog pool who remain in custody at the end of the second reporting period, by the end of the third reporting period at least 40% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship. For children in the 24-month backlog pool who remain in custody at the end of the third reporting period, by the end of the fourth reporting period at least 40% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship.

10.     Children in custody for more than 24 months and still in custody upon entry of Consent Decree (children in the "over 24 month backlog pool"): For all children in the over 24 month backlog pool, by the end of the second reporting period at least 35% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship. For all children in the over 24 month backlog pool who remain in custody by the end of the

second reporting period, by the end of the third reporting period at least 35% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship.  For all children in the over 24 month backlog pool who remain in custody by the end of the third reporting period, by the end of the fourth reporting period at least 35% shall have one of the following permanency outcomes: reunification, permanent placement with relatives, permanent legal custody, adoption, or guardianship.

11.   By the end of the second reporting period, for all children whose parental rights have been terminated or released during the reporting period, 80% will have their adoptions or legal guardianships finalized within 12 months of final termination or release of parental rights.

12.   For children whose parental rights have been terminated or released and the child has an identified adoptive or legal guardian resource at the time of the entry of the Consent Decree, 90% shall have had their adoptions or legal guardianships finalized within six months after the entry of the Consent Decree.

13.   For all children for whom parental rights have been terminated or released at the time of entry of the Consent Decree, and the child does not have an identified adoptive resource, 95% shall have been registered on national, regional, and local adoption exchanges, and have an individualized adoption recruitment plan or plan for legal guardianship within 60 days of the entry of the Consent Decree.

14.   Adoption disruptions:  No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period.

15.   Permanency efforts (15/22):  By the end of the second reporting period, at least 80% of all foster children who reached the point of being in state custody for 15 of the prior 22 months, shall have had either (1) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable OR (2) documented compelling reasons in the child's case record why termination of parental rights should not be filed.

By the end of the fourth reporting period, at least 95% of all foster children who reached the point of being in state custody for 15 of the prior 22 months, shall have had either (1) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable OR (2) documented compelling reasons in the child's case record why termination of parental rights should not be filed.

16.     Sibling Placement:  By the end of the second reporting period, at least 70% of all foster children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings.  By the end of the fourth reporting period, at least 80% of all foster children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings.

17.     Multiple Placement Moves: By the end of the second reporting period, at least 86.7% of all children in care shall have had 2 or fewer moves during the prior 12 months in custody. By the end of the fourth reporting period, at least 95% of all children in care shall have had 2 or fewer moves during the prior 12 months in custody.

18.     Caseworker continuity:  By the end of the second reporting period, at least 90% of all children in care at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody.  This measure shall not apply to cases that are transferred to an adoption worker or to a Specialized Case Manager as referenced in Section 4.F.; case managers who have died, been terminated, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave.

19.     Placement within county: By the end of the second reporting period, at least 70% of all children in care shall be placed in their own county (the county from which they were removed) or within a 50 mile radius of the home from which they were removed, subject to the exceptions in Paragraph 5.C.4.b(ii) and (iii) above.  By the end of the third reporting period, at least 80% of all children at a point in time during the reporting period shall be placed in their own county (the county from which they were removed) or within a 50 mile radius of the home from which they were removed, subject to the exceptions in Paragraph 5.C.4.b(ii) and (iii) above.  By the end of the fourth reporting period, at least 90% of all children at a point in time during the reporting period shall be placed in their own county (the county from which they were removed) or within a 50 mile radius of the home from which they were removed, subject to the exceptions in Paragraph 5.C.4.b(ii) and (iii) above.

20.     Visitation (worker-child): By the end of the second reporting period, at least 95% of children in care at a point in time during the reporting period shall have had at least one in-placement visit and one other visit, as defined in Section 5.D, each month by their case manager during the prior 12 months in custody.

21. Visitation (parent-child when goal is reunification): By the end of the third reporting period, 75% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. By the end of the fourth reporting period, 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification.

22. Visitation (worker–caregiver): By the end of the second reporting period, at least 90% of all children in care at a point in time during the reporting period shall have had visits between their DFCS placement case manager and their foster parent, group care, institutional or other caretaker at least one time each month during the prior 12 months in custody.

23. Visitation (between siblings): By the end of the second reporting period, at least 80% of children in the Class at a point in time during the reporting period who have one or more siblings in custody with whom they are not placed shall have had visits with their siblings at least one time each month during the prior 12 months in custody, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative.

24. Achievement Measures on Discharge: A baseline measure shall be developed that shows the percentage of children discharged from foster care at age 18 or older during the 12 months prior to the entry of the consent decree who have graduated from high school or earned a GED. By the end of the second reporting period, that percentage shall increase by 10 percentage points. By the end of the fourth reporting period, that percentage shall increase by an additional 10 percentage points.

25. Placements not in full approval status: By the end of the first reporting period, at least 85% of all foster children in custody at a point in time during the reporting period shall be in placements that are in full approval and/or licensure status. By the end of the second reporting period, at least 95% of all foster children in custody at a point in time during the reporting period shall be in placements that are in full approval and/or licensure status. By the end of the fourth reporting period, at least 98% of all foster children in custody at a point in time during the reporting period shall be in placements that are in full approval and/or licensure status.

26. Case files not containing required court ordered language: By the end of the second reporting period, at least 85% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under

36

Title IV-E of the Social Security Act.  By the end of the fourth reporting period, at least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act.  This outcome shall be measured for court orders entered after the entry of the Consent Decree.

27.     By the end of the second reporting period, at least 80% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review.  By the end of the third reporting period, at least 85% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review.  By the end of the fourth reporting period, at least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review.

28.     By the end of the second reporting period, at least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing.

29.     By the end of the third reporting period, no more than 5% of all children in the physical custody of DHR/DFCS for 12 months or more shall have had a lapse in their legal custody within the prior 13 months.  For the purposes of this outcome measure, a lapse in legal custody is defined as any period of expired legal custody.  This Outcome Measure shall not apply to children who have been placed in the custody of another person and returned to the custody of DFCS during the 13-month period.

37

30.     Meeting children's service needs:  By the end of the second reporting period, at least 80% of children in care at a point in time at the end of the reporting period shall not have any unmet medical, dental, mental health, education or other service needs, according to the service needs documented in the child's most recent case plan.  By the end of the fourth reporting period, at least 85% of children in care at a point in time at the end of the reporting period shall not have any unmet medical, dental, mental health, education or other service needs, according to the service needs documented in the child's most recent case plan.

31.     By the end of the second reporting period and continuing thereafter, no more than 10% of all children in foster homes shall be placed in foster care homes that exceed the capacity limits referenced in Section 5.C.4.e. of this Consent Decree, concerning the requirement that no child shall be placed in a foster home if that placement will result in more than three (3) foster children in that foster home, or a total of six (6) children in the home, including the foster family's biological and/or adopted children.

## 16.   ACCOUNTABILITY

A.     The Court shall appoint James T. Dimas and Sarah Morrison as the Court's independent Accountability Agents.  In the event that either Mr. Dimas or Ms. Morrison is unable to fulfill his or her duties under this agreement, the parties will select a replacement with the advice and consent of the remaining Accountability Agent.  The parties agree that data support will be provided to the Accountability Agents by Chapin Hall Center for Children at the University of Chicago and Georgia State University.  The Accountability Agents shall conduct the factual investigation and verification of data and state documentation necessary to compile and to issue public record reports on State Defendants' performance relative to the terms of the Consent Decree directly to the Court and to the parties. These reports shall be issued for each six month reporting period, commencing approximately 90 days after the close of the first reporting period.

B.     DHR, through its employees or agents, will collect data with regard to each element of performance under this Consent Decree, and make it available on a timely basis to the Accountability Agents.  DHR shall cooperate with the Accountability Agents in providing access to personnel, documents and other information necessary to perform their duties, as determined by the Accountability Agents, including without limitation interviews with agency staff, contract agency personnel, and interviews with DHR clients.  The Accountability Agents shall conduct case record and other reviews as they deem necessary,

including recommending or requiring DHR to conduct regular case reviews according to a systematic process.

C.    DHR shall provide the Accountability Agents and/or the organizations through which they are employed with the necessary resources to perform their duties, including payment of their approved fees and expenses in accordance with state regulations. The Accountability Agents will prepare an initial budget proposal to the parties and the Court within 30 days of the signing of the consent decree. This budget will be updated and revised annually on or about the anniversary date of entry of the consent decree.

D.    All actions required for Plaintiff class members shall be documented within the individual case file of each member of the class on a timely and accurate basis. DFCS shall ensure that all required information concerning all foster parents, whether supervised by DFCS or by private providers, is timely and accurately entered into a foster parent file for each foster parent. DFCS shall ensure that a copy of all required information concerning contract agency providers is timely and accurately entered into a file for each contract agency provider and housed centrally at DFCS.

## 17.    ENFORCEMENT

A.    Except for the Principles set forth in Section 3 ("the Principles"), all provisions of this Consent Decree are separately and independently enforceable.

B.    All provisions of this Consent Decree shall apply to all class members, regardless of whether they are in custody under the direct supervision of DCFS or of a contract provider.

C.    If Class Counsel notify State Defendants that, to the best of Class Counsel's knowledge, information, and belief (formed after an inquiry reasonable under the circumstances), State Defendants are in violation of this Consent Decree, Plaintiffs may give notice to State Defendants in writing, and if so shall state with specificity the alleged noncompliance.

D.    Except when Class Counsel allege, in conformity with subsection E below, the existence of imminent danger of substantial harm to class members, the provisions of this paragraph shall apply.

1.    When notice of an alleged violation is given pursuant to subsection C, above, State Defendants shall respond to Class Counsel in writing within 25 days by asserting that Class Counsel has alleged only a violation of the Principles, by denying that any substantial noncompliance has occurred, or

by accepting (without necessarily admitting) the allegation of noncompliance and proposing steps that State Defendants shall take, and by when, to cure the alleged noncompliance.

2.    If State Defendants (a) fail to respond within 25 days; (b) assert that Class Counsel has alleged only a violation of the Principles; or (c) deny that any substantial noncompliance has occurred, Class Counsel may thereafter seek an appropriate judicial remedy.

3.    If State Defendants timely respond by accepting noncompliance and proposing curative action by a specified deadline, Class Counsel may accept State Defendants' proposal or may offer a counterproposal for a different curative action or deadline and negotiate over the appropriate action and deadline, but in no event shall Class Counsel seek an appropriate judicial remedy for the accepted noncompliance until at least 45 days after State Defendants have responded under subsection D.1 above and until both sides have conferred in good faith to resolve any differences.  The parties may, by mutual agreement, extend the time period specified in this subsection.

4.    If no agreement on the issue of appropriate curative action or deadline is reached within the timeframe set in subsection D.3 above, Class Counsel may seek an appropriate judicial remedy.

5.    If the parties reach agreement on a plan and timetable for curative action, but State Defendants thereafter fail to implement the curative action within the time specified in the agreement, Class Counsel may seek an appropriate judicial remedy upon ten (10) days written notice to State Defendants.

6.    If the parties reach agreement on a plan of curative action and State Defendants implement the plan, but the plan fails to correct substantially the alleged violation within the time specified in the agreement, Class Counsel may seek an appropriate judicial remedy upon ten (10) days written notice to State Defendants, unless State Defendants issue a written revised proposal for curative action accepting that the violation alleged in Class Counsel's initial noncompliance notice is continuing, and specifying: (i) why, in their view, the initial plan of curative action failed to produce compliance by the deadline and (ii) a revised proposal for curative action specifying a deadline for compliance.

7.    If State Defendants issue a timely revised proposal for curative action and deadline in conformance with subsection D.6. above, the parties shall engage in good faith negotiations to attempt to reach agreement on a

revised plan for curative action and deadline.  If the parties fail to reach agreement on a revised plan within 25 days of State Defendants' issuance of a revised proposal, Class Counsel may seek an appropriate judicial remedy.

8.    If the parties reach agreement on a revised plan for curative action but that revised plan fails to correct substantially the noncompliance within the time specified in the agreement, Class Counsel may seek an appropriate judicial remedy within ten (10) days written notice to State Defendants; provided, however, that the parties may, at their option, continue to attempt to reach agreement on further curative action, further extension of the compliance deadline specified in the Consent Decree, or modification of the Consent Decree.

E.    The provisions of this paragraph shall apply when Class Counsel allege the existence of imminent danger of substantial harm to class members.

1.    If Class Counsel acting in conformity with subsection C above notify State Defendants that, to the best of Class Counsel's knowledge, information, and belief (formed after an inquiry reasonable under the circumstances), a violation of this Consent Decree has caused or threatens to cause an imminent danger of substantial harm to class members, Class Counsel may give emergency notice of their allegations to State Defendants by electronic mail or facsimile transmission, and if so, shall state with specificity the alleged violation and the alleged imminent danger of substantial harm.

2.    Within four business hours of the receipt by the State Defendants of Class Counsel's emergency notice, State Defendants shall respond with their position by electronic mail or facsimile transmission.

3.    If State Defendants fail to respond within 4 business hours, or if State Defendants respond by denying the danger is imminent, the threatened harm is substantial, or there is substantial noncompliance with the Consent Decree, Class Counsel may thereafter seek an appropriate judicial remedy.

4.    If State Defendants timely respond to an emergency notice with a proposal for specific investigative or curative steps, the parties shall immediately thereupon engage in good faith efforts to reach agreement on appropriate investigative or curative action, including a time period for implementation.

41

5.     If the parties are unable after conferring in good faith to agree on appropriate investigative and curative action and a timetable for implementation, Class Counsel may seek an appropriate judicial remedy.

F.     Class Counsel and their clients shall not issue a noncompliance notice or seek a judicial remedy for the first six months after entry of this Consent Decree except with respect to an alleged case of imminent danger of substantial harm to class members, as described in subsection E above. Nothing in this Consent Decree shall authorize or enable the Class or its Counsel to initiate discovery without order of the Court following the filing of a motion by Class Counsel as authorized by the Federal Rules of Civil Procedure and the local rules of Court.

## 18.     QUALITY ASSURANCE

DFCS shall maintain an appropriate quality assurance system that will meet the requirements of federal law, and will monitor, through case reviews, Fulton and Dekalb County DFCS' compliance with DFCS policy and the terms of this Consent Decree.

## 19.     DURATION OF DECREE

A.     With respect to the State Defendants, this Consent Decree shall remain in effect until (1) State Defendants are in substantial compliance with the final measures on all Outcome Measures in Section 15 of this Consent Decree simultaneously for three consecutive reporting periods; and (2) a motion to terminate jurisdiction over this Consent Decree is approved by the Court. Plaintiffs shall not contest a timely and appropriate motion to terminate unless: (i) Plaintiffs dispute State Defendants' assertion that they have achieved and sustained substantial compliance on all Outcome Measures for the requisite time period; (ii) an unresolved motion relating to non-compliance with any other provision of this Consent Decree pursuant to Section 17 remains pending; or (iii) any Court Order or Stipulation providing a remedy for a prior allegation of such non-compliance with any other provision of this Decree is in effect or has not been complied with at the time of the motion to terminate.

B.     The parties intend and agree that this Consent Decree shall remain in effect and shall be enforceable by a court of competent jurisdiction for the entire duration of this Consent Decree as provided in Section 19.A. above. The parties intend and agree that State Defendants may only request termination of jurisdiction under the terms of Section 19.A.(1) above.

C.     The parties acknowledge that this Consent Decree is a final resolution of all claims of any type on behalf of Plaintiff class members, whether known or

42

unknown, that have been brought or could have been brought by or on behalf of the Plaintiffs against the State Defendants up through the date on which the Consent Decree is entered.  This paragraph explicitly does not bar claims on behalf of any children in Fulton or DeKalb Counties concerning any programs or services for children prior to a child's placement into State custody, including, but not limited to, any diversion, differential response, or other programs or services providing an alternative to the investigation and/or substantiation of a report of abuse or neglect and/or the removal of a child from their home and placement into State custody, and any programs or services for investigations of reported abuse or neglect for children not in State custody.

D.      In the interest of permitting the parties to focus upon and achieve the objectives of this Consent Decree, Plaintiffs agree that they shall not commence any new action for systemic declaratory, injunctive or other form of equitable relief based on facts, events, actions or omissions by the State Defendants that relate in any way to any claim that was raised or could have been raised in the present case and that occur after the entry of this Consent Decree and prior to the entry of a termination order pursuant to this Section.  This paragraph explicitly does not bar claims on behalf of any children in Fulton or DeKalb Counties concerning any programs or services for children prior to a child's placement into State custody, including, but not limited to, any diversion, differential response, or other programs or services providing an alternative to the investigation and/or substantiation of a report of abuse or neglect and/or the removal of a child from their home and placement into State custody, and any programs or services for investigations of reported abuse or neglect for children not in State custody.

E.      This paragraph shall not prevent an action, at any time, by an individual plaintiff for damages or equitable relief tailored solely to the specific circumstances of that individual plaintiff.  Further, nothing in this paragraph shall prevent Plaintiffs in any action for systemic declaratory, injunctive or other form of equitable relief brought after the entry of a termination order pursuant to this Section and based on claims arising after the entry of such order, from offering into evidence facts arising prior to such order.

## 20.   **MISCELLANEOUS PROVISIONS**

A.      Each party agrees that it will perform its obligations under this Consent Decree in accordance with all applicable laws.

B.      Unless otherwise provided in this Consent Decree, all notices under this Consent Decree shall be deemed duly given upon delivery by hand, or three days after posting, if sent by registered mail, return receipt requested.  All notices under this Decree shall be provided to the party at the address set forth as follows:

43

<u>As to Plaintiffs:</u>

Marcia Robinson Lowry, Esq.
Ira Lustbader, Esq.
Children's Rights, Inc.
404 Park Avenue South, 11th Floor
New York, NY 10016
Phone:  (212) 683-2210
Facsimile:  (212) 683-4015
E-mail:  mlowry@childrensrights.org; ilustbader@childrensrights.org

Jeffrey O. Bramlett, Esq.
Bondurant, Mixson & Elmore, L.L.P.
3900 One Atlantic Center
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-4100
Facsimile: (404) 881-4111
E-mail: Bramlett@bmelaw.com

<u>As to State Defendants:</u>

Brenda K. Woodard, Esq.
Chief Legal Officer
Georgia Department of Human Resources
2 Peachtree Street, N.W.
Atlanta, GA  30303
Phone:  (404) 656-4421
Facsimile:  (404) 657-1123
E-mail:  bkwoodard@dhr.state.ga.us

Steven E. Love (or his successor)
Acting Director, Division of Family and Childrens Services
Georgia Department of Human Resources
2 Peachtree Street, N.W.
Atlanta, GA  30303
Phone:  (404) 657-5202
Facsimile:  (404) 657-5105
E-mail:  selove@dhr.state.ga.us

Shalen S. Nelson, Esq. (or her designee)
Senior Assistant Attorney General

State Law Department
132 State Judicial Building
40 Capitol Square, S.W.
Atlanta, GA  30334
Phone:  (404) 656-3377
Facsimile: (404) 463-1062
E-mail:   shalen.nelson@law.state.ga.us

C.      This Consent Decree constitutes the entire agreement between the parties with
        regard to the subject matters contained therein, and hereby supersedes all prior
        agreements, representations, statements, negotiations, and undertakings.

D.      All parties to the Consent Decree have participated in its drafting and,
        consequently, any ambiguity shall not be construed either for or against any party.

E.      If, for any reason, the Court fails or refuses to enter this proposed Consent Decree
        as signed by the authorized signatories, or as altered in accordance with their
        consent freely given prior to entry, then the proposed Consent Decree itself, and
        any agreement or statement contained in the proposed Consent Decree, is null and
        void and may not be enforced.

F.      The Department of Human Resources shall bear all costs of notice prescribed by
        the Court pursuant to Fed. R. Civ. P. 23 in connection with the process for final
        Court approval of this Consent Decree.

G.      DHR agrees to provide data and information concerning children in Fulton and
        DeKalb Counties to the Accountability Agents sufficient to enable the
        Accountability Agents to issue reports at the intervals specified in Section 16.A.,
        verifying the items below.  For purposes of the following items, "children" is
        meant to include only those children who were not in foster care custody at the
        time that the substantiated maltreatment took place, and    "cases" is meant to
        include only those cases involving families with children who were not in foster
        care custody at the time there was a referral into DHR's diversion program.

        1.      (a)   The number of children in each county who, during the reporting
                period, experienced substantiated maltreatment, and (b) the number and
                percentage of children in (a) of this item who also experienced
                substantiated maltreatment during the preceding 12 month period.  For
                purposes of this item, for the term "percentage," the numerator would be
                the number of children in (a) who had substantiated maltreatment during
                the preceding 12 months, and the denominator would be all children who
                had substantiated maltreatment during the reporting period.

45

2.  (a)  The number of cases in each county during the reporting period in which there was a referral into DHR's diversion program, and (b) the number and percentage of the cases in (a) of this item in which there was substantiated maltreatment within 11 – 365 days after the referral.  For purposes of this item, for the term "percentage," the numerator would be the number of cases in (a) in which there was substantiated maltreatment within 11-365 days after referral to DHR's diversion program, and the denominator would be all cases referred to DHR's diversion program during the reporting period.  In addition, for purposes of this item, "DHR's diversion program" refers to action taken by the Department which provides for an alternative to the opening of a CPS case and/or the removal of children from their home and placement into state custody by providing additional instruction, services, or support to the child's legal custodian either by DFCS or other family and child services agencies and programs.

21.  **RELIEF FOR NAMED PLAINTIFFS**

A.  The State Social Services Director shall monitor the individual cases of the named plaintiffs in this action for as long as they are in DHR/DFCS custody, or if they are discharged from and return to DHR/DFCS custody, to ensure that all necessary and appropriate plans are developed and implemented and that all necessary placements and services are provided.  As of the date of the signing of this Consent Decree, two named plaintiffs are in DHR/DFCS custody.

B.  The parties shall meet and attempt to agree on necessary services and plans for the named plaintiffs that remain in DHR/DFCS custody within 60 days after the parties sign this Consent Decree.

C.  The DHR Commissioner, through the State Social Services Director, shall ensure that Plaintiffs' Counsel receive documents and reports every 90 days concerning the status of the named plaintiffs in this action, services that have been provided, and implementation of plans, for as long as they are in DHR/DFCS custody.  Plaintiffs' Counsel shall receive notification within one calendar day of any significant events or developments concerning the named plaintiffs in this action for as long as they are in DHR/DFCS custody, including but not limited to: any change in placement, services, permanency goal or permanency plans; any reports of any incident of alleged abuse or neglect or violations of disciplinary policy involving any of the named plaintiffs or occurring at the placements where any of the named plaintiffs are placed; any other serious incidents involving any of the named plaintiffs or occurring at the placements where any of the named plaintiffs are placed.

46

D.      A staffing shall be held in-person or by conference call every 90 days upon Plaintiffs' request, within 10 days after Plaintiffs receive updated documents and reports referenced in Paragraph C above, for the purpose of discussing, with Plaintiffs' Counsel, the status of the named plaintiffs in this action for as long as they are in DHR/DFCS custody, services that have been provided, and implementation of plans. The staffing shall include plaintiffs' counsel, the State Social Services Director or his designee, the child's DFCS case manager, the private agency case manager, if any, the child, and such others that may be needed for the discussion. The parties may on consent modify the schedule of any particular staffing under this paragraph.

## 22.    ATTORNEYS' FEES AND EXPENSES OF LITIGATION

A.      For purposes of the Consent Decree, the parties acknowledge that Plaintiff Class is entitled to recover its expenses of litigation, including reasonable attorneys' fees and nontaxable costs, pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 23(h).

B.      The parties shall attempt without court intervention to resolve the proper amount of Class Counsel's fees and expenses of litigation. If any agreement is reached by the parties regarding recovery of fees and expenses of litigation, the Court shall determine whether the agreed amount and mode of payment are appropriate in accordance with applicable law and procedure.

C.      If the parties cannot reach agreement on the proper amount of attorneys' fees and expenses of litigation, Class Counsel shall file an application for fees and expenses in accordance with the requirements of applicable law and procedure within twenty-five (25) days following entry of this Consent Decree. Any objection to Class Counsel's motion seeking a fee award shall be filed within twenty-five (25) days following the docketing of Class Counsel's motion. The amount of any award shall be determined by the Court in accordance with the requirements of applicable law and procedure.

D.      All parties reserve whatever rights each may have to appeal the amount of attorneys' fees and expenses awarded by the Court.

CONSENTED TO:

For the Plaintiffs:

_____          _____
Marcia Robinson Lowry, Esq.              Date   6/15/05
Co-Lead Counsel

_____          _____
Jeffrey O. Bramlett, Esq.                Date   6·15·05
Co-Lead Counsel




For the State Defendants:

_____          _____
Sonny Perdue                             Date   6/27/05
Governor, State of Georgia

_____          _____
B.J. Walker                              Date   6/29/05
Commissioner, Georgia Department of Human Resources

## APPENDIX A

I.      **REQUIRED PROGRAM / SYSTEM FUNCTIONS:**

A.      **INTAKE MANAGEMENT**: This function consists of processing referrals for service, conducting an investigation, and assessing the need for service.

1.      **INTAKE**

a.      **Record contact/referral** – The automated system must record initial contacts regarding allegations of abuse or neglect, or provide for the input of a formal referral for protective services, voluntary placement services, juvenile corrections and other services.

b.      **Collect intake/referral information** – The automated system must allow for input of available situation and demographic information, including the cross-referencing of relationships among participants and the reason for referral.

c.      **Search for prior history (persons/incidents)** – The automated system must provide for a search to the database(s) to check for prior incidents and other available information.  For a single incident, the system must allow for more than one report of that incident by including information on each individual or agency making a report (such additional reports may or may not be counted in the total number or reports, depending on State policy).

d.      **Record "information only" requests** – The automated system must provide for the recording of calls or contacts that do not involve a specific allegation or referral.

2.      **SCREENING**

a.      **Evaluate intake information** – The automated system must support the evaluation of the received information to determine the necessity of establishing a case.

b.      **Record the results of the screening evaluation** – The automated system must provide for the recording of the determination resulting from the screening process.

c.     **Establish case record** – The automated system must provide for the establishment of a new case, the association of a new allegation with an existing open case, or the re-opening of a closed case.

d.     **Assign case to worker** – The automated system must support and record the assignment of the case to a worker and for the tracking of that case through the process.

e.     **Refer for investigation and/or service, as appropriate** – The automated system must support the referral/transfer of the case for investigation, if necessary, or for assessment, if the allegation is not related to maltreatment.

3.    **INVESTIGATION**

a.     **Collect and record investigation information** – The automated system must provide for the input of information collected during the investigation process, including the recording of contacts made during the investigation.

b.     **Record investigation decision** – The automated system must provide for the recording of the decision resulting from the investigation.

c.     **Generate documents as needed in response to investigation** – The system must support the preparation of alerts, notifications and reports required during, and as a result of, the investigative process.

4.    **ASSESSMENT**

a.     **Determine and record risk assessment** – The automated system must support the evaluation and determination of risk factors affecting the case (this may be initiated during intake or investigation)

b.     **Perform risk assessment** – The automated system must perform an automated risk assessment, which may use rules-based technology to determine the relative level of risk.

c.     **Collect and record special needs/problems** – The automated system must assist in the determination and documentation of special needs/problems (e.g., special

education, developmental disabilities, medical assessment, etc.).

d.    **Determine and record needed services** – The automated system must support the determination of needed services and record those services, including the assignment and recording of the level of care (placement locations, in-home care, etc.)

e.    **Record client contacts** – The automated system must provide for the recording of client contacts in the electronic case folder.

f.    **Prepare and record referrals to other agencies** – The automated system must provide for the preparation and recording in the electronic case folder of referrals to other agencies.

g.    **Collect and record further case information** – The automated system must provide for the recording in the electronic case record of additional case information gathered during the assessment process.

h.    **Generate documents, notices and reports based on review as needed** – The automated system must support the generation of documents, notices, and reports during, or resulting from, the assessment process.

B.    **ELIGIBILITY**: This function consists of determining programs for which funding support is available for clients receiving services. Program eligibility must include funding for foster care/adoption payments and determining the type of programs that will allow a client to receive Medicaid coverage. This function is usually initiated sometime during the Intake Function.

1.    **INITIAL ELIGIBILITY DETERMINATION**

a.    **Determine title IV-E eligibility** – The automated system must provide for the exchange and referral of information necessary to determine eligibility under title IV-E through an interface with the title IV-A system.

b.    **Verify eligibility for other programs** – The automated system must provide for the exchange and referral of information necessary to determine eligibility/status under

other related programs such as title XIX (Medicaid) and title IV-D.

    c.    **Record authorization decisions** – The automated system must provide for the recording of the eligibility authorization decisions.

    d.    **Generate documents related to eligibility determinations** – The automated system must produce the alerts, notices and reports (e.g., exception reports) needed to provide information on and track the initial eligibility determinations.

  2.    **CHANGES IN ELIGIBILITY**

    a.    **Redeterminations** – The automated system must provide for the processing of regularly scheduled and as needed program redeterminations and recording of redetermination decisions.

    b.    **Generate documents related to eligibility determinations** – The automated system must produce the alerts, notices and reports (e.g., exception reports) needed to provide information on and track the changes in eligibility status.

C.    **CASE MANAGEMENT**: This function entails the preparation of service plans, determining whether the agency can provide the services, authorizing the provision of services, and managing the delivery of those services. The service/case plan must include the required elements specified in section 475.

  1.    **SERVICE/CASE PLAN**

    a.    **Prepare and document service/case plan** – The automated system must support case plan development by documenting the services, available in the State, that are required to meet the specific needs identified in the assessment function in such areas as:

        i.    **Adoption**: record and track information about adoptive placements and post-adoptive services, including subsidy benefits

        ii.    **Family preservation**: institute in-home services to prevent the need for placement

iii.    **Foster care**: determine and track level of care, placement information, reunification services, legal requisites

iv.    **Independent living**: determine and track services to provide transitional living assistance for State foster care youths

v.    **Interstate compact**: process/submit supervision requests from/with other states for children and youth

vi.    **Identify and match services to meet client's case plan needs** – The system must provide automated support in the identification and matching of service needs and available resources.

vii.    **Record contact with and acquisition of needed resources/services** – The automated system must support and record the preparation of necessary service requests or referrals.

viii.    **Track and update service/case plan** – The automated system must support the monitoring of the progress of plan and update of the service/case plan in the electronic folder.

ix.    **Match client to placement alternatives, if needed** – The system must provide automated support in the identification and matching of clients with available placement alternatives.

x.    **Generate documents as needed** – The automated system must support the generation of alerts, notices, and reports as necessary to track the progress of the service/case plan.

xi.    **Request and record supervisory approval of plan, if needed** – The automated system must provide support for obtaining supervisory approval of the service/case plan.

xii.    **Compute estimated and track actual costs of resources/services** – The automated system must include a component which estimates and tracks the

costs of required/provided resources and services to assist in service/case plan management and tracking.

xiii. **Identify program outcome measures** – The automated system must include a component which identifies and tracks program outcome measures.

2. **CASE REVIEW/EVALUATION**

a. **Generate alerts to conduct case review/evaluation as needed** – The automated system must support the timely identification and continued tracking of cases requiring review/evaluation.

b. **Conduct and record results of case review** – The automated system must support the case review process and provide for documentation of the reassessment decisions in the electronic case folder, including documentation of action items resulting from the reassessment.

c. **Generate documents, notices and reports based on review as needed** – The automated system must support the generation of documents, notices, and reports during, or resulting from, the evaluation process.

d. **Record collateral contacts** – The automated system must provide for the recording of client collateral contacts and information resulting from those contacts.

3. **MONITORING SERVICE/CASE PLAN SERVICES**

a. **Track and record services identified in the service/case plan** – The automated system must provide for the recording in the electronic case folder of the types, duration, and frequency of services.

b. **Generate documents, notices and reports** – The automated system must support the generation of documents, notices, and reports to track the services and provided to the client.

D. **RESOURCE MANAGEMENT**: This function supports the maintenance and monitoring of information on an array of service providers, including prevention programs, placement services, and foster care providers.

1.   **FACILITIES SUPPORT**

   a.   **Record and update provider information** - The automated system must support the collection and maintenance of provider information such as license/certification status, types of services, level of care provided, level of care compliance and cost of care.

   b.   **Generate alerts/action items on licensing status changes** - The automated system must support the timely identification and continued tracking of cases and/or facilities requiring a review or other action as a result of a change in provider information.

   c.   **Generate reconciliation and evaluation reports as needed** – The automated system must support the generation of documents, notices, and reports, as needed.

2.   **FOSTER /ADOPTIVE HOMES SUPPORT**

   a.   **Maintain and update foster care and adoptive home information as needed** – As appropriate to the type of home, the automated system must support the collection and maintenance of foster care and adoptive home information such as licensing decision, violations and revocations, required AFCARS information and received training.

   b.   **Record foster care home abused/neglect allegations and investigation results** – The automated system must support the identification of foster care families where allegations of abuse/neglect been reported and substantiated, as required by State law.  The automated system must support the investigation of such allegations and document the results.

   c.   **Process foster care/adoptive home applications** – The automated system must provide for the recruitment and processing of foster family applications.

   d.   **Generate alerts/action items as needed if foster care license is revoked** - The automated system must support

the identification and tracking of cases requiring a review or other action as a result of changing information.

3.    **RESOURCE DIRECTORY**

    a.    **Maintain directory** – The automated system must provide a directory/inventory of available resources and services.

    b.    **Generate reports** – The automated system must support the generation of management reports, as well as other alerts, bulletins notices related to resource availability.

E.    **COURT PROCESSING**: This function encompasses an array of legal activities and documentation procedures involving judicial events requiring action on the part of the State agency.

1.    **COURT DOCUMENTS** - The automated system must provide for the preparation of State agency documents for the courts, such as petitions, letters, attorney approvals, and supervisory approvals.

2.    **NOTIFICATIONS** - The automated system must provide notifications to inform relevant parties of impending court actions.

3.    **TRACKING** – The automated system must be used to monitor and track court-related events requiring State agency action, such as recording and outcomes for all petitions, trials, hearings, detention proceedings, periodic reviews, adoptions, and change of placements. Court decisions may be recorded in the electronic case folder.

4.    **INDIAN CHILD WELFARE ACT** - The automated response systems must be used to support the Indian Child Welfare Act requirements.

F.    **FINANCIAL MANAGEMENT**: This function tracks and manages financial transactions.  It may be part of the SACWIS itself or may be an automated interface to a department or statewide financial system.

1.    **ACCOUNTS PAYABLE** – The automated system must provide support for accounts payable to providers (billing, vouchers, etc.).

2.    **ACCOUNTS RECEIVABLE** – The automated system must provide support for accounts receivable (e.g., overpayments, trust funds, SSI, etc.).

3.   **CLAIMS** – The automated system must provide support for the generation of provider payment and remittance advice. The automated system must support the update procedures necessary to adjust the claims process as a result of notification of status changes (including information received from title IV-A and other Federal/Sate programs), including termination of the case.

G.   **ADMINISTRATION**: This function incorporates procedures for ensuring support for efficient management of as well as reliable and accurate operation of the system.

   1.   **STAFF MANAGEMENT** - This function covers various aspects of agency human resources, maintaining information of employees, work assignments, and staff performance.

      a.   **Record and update employee information** – The system must contain records of employees, showing name, employee number and office. These records must also contain demographic information and results of Background Criminal Investigation (BCI) checks.

      b.   **Record and track case assignment** – The system must provide for the assignment of cases to workers, track workload assignments and identify on-call staff.

      c.   **Assist in workload management** – The system must support the decision-making process and the assignment of case to workers and help workers to manage their own caseloads by providing "to do" lists and prioritization of alerts.

   2.   **REPORTING** – This function produces information on a periodic and as-needed basis.

      a.   **Produce Federal and State reports** – The system must generate required State and Federal reports (e.g., AFCARS) in either paper or electronic formats as required.

      b.   **Produce reports** – The system must generate regular ad hoc management reports (e.g., workload status, client/case status, performance factors, outcome measures, etc.)

      c.   **Produce statistical reports** – The system must generate statistical reports needed to assist in the analysis of the program.

3. **ADMINSTRATIVE SUPPORT** - This function incorporates procedures for assuring adequate documentation and accurate data.

    a. **Provide hardware and software security** – The hardware, telecommunications network, software applications and data must be secured to protect from damage, destruction and loss, as well as fraud and abuse. Contingency plans and disaster recovery plans should be tested and readied in case of emergency.

    b. **Archive and purge** – The system must provide for purging and archiving, as needed, of inactive records and closed cases

    c. **Provided office automation** – The system must provide automation tools (e.g., word processing, ticklers, alerts, calendaring, electronic mail, system broadcast, etc.) apart and in addition to those tools available within the program functions.

    d. **Provide on-line system documentation** – The system must provide an on-line policy/procedure manual, user guides, and other system documentation as needed, such as field help screens.

    e. **Provide on-line training** - The system must provide on-line, computer-based training for system users.

**II.** **INTERFACES:** This function creates an electronic link between the child welfare and other systems to receive, transmit, and verify case and client information.

    A. **REQUIRED INTERFACES**: The automated system must provide for a periodic electronic data interface with the following systems:

        1. **Title IV-A (AFDC/TANF)**: The interface between the state's SACWIS and the Title IV-A system must (1) allow for the automatic exchange of common and/or relevant data between the two systems (to prevent duplicate entry), (2) accept and process updated or new case data and (3) identify potential duplicate payments under Title IV-E and Title IV-A programs.

        2. **Title IV-D (Child Support Enforcement)**: the interface between the state's SACWIS and the Title IV-D system must (1) provide for the exchange of data necessary to

establish a child support case, (2) accurately record child support collections on appropriate Title IV-E federal reports, (3) identify potential support resources for the Title IV-E child, (4) allow for the automatic exchange of common and/or relevant data between the two systems (to prevent duplicate entry), (5) accept and process updated or new case data, (6) capture the data necessary to report AFCARS foster care data element number 62, and (7) provide the Title IV-D system with the current foster care maintenance payment either from the SACWIS or, if the state chooses, from a statewide financial system.

3. **Title XIX (Medicaid)**: the interface between the state's SACWIS and the Title XIX system must (1) provide for the exchange of information needed by the State Medicaid eligibility system to calculate and track Medicaid eligibility for children in foster care, (2) allow for the automatic exchange of common and/or relevant data between the two systems (to prevent duplicate entry), and (3) capture the data necessary to report AFCARS foster care element number 63.

4. **Child abuse and neglect ("NCAND") data system**: the interface between the state's SACWIS and CAN system and must (1) allow for the automatic exchange of common and/or relevant data between the two systems (to prevent duplicate entry). Relevant data should include data collected during the screening, investigation and assessment of an incident, as well as SACWIS case management information that had been collected during a previous foster care episode.

B. **OTHER INTERFACES** - The automated system must provide for interfaces with other automated systems within the State, such as:

1. State Central Registry
2. Social Security Administration for title II and SSI information
3. State financial system
4. State licensing system
5. Vital Statistics
6. Court system
7. Juvenile Justice
8. Mental health/retardation
9. State Department of Education

## APPENDIX B

I. **QUALITY ASSURANCE:** It is essential that information systems developed under the SACWIS regulations incorporate automated quality assurance measures, processes, and functions. One aspect of quality assurance is to ensure the completeness, accuracy and consistency of critical data. In order to better assure validity and accuracy, SACWIS must be designed to support/enforce good case management practices as well as to provide the capability for profiling pertinent case file characteristics and outcome measurements. The following is necessary to meet quality assurance requirements:

    A.    The SACWIS must provide appropriate edits, range checks and prompts for critical or incomplete data. Critical data includes anything required for state or federal reporting or audit (e.g., AFCARS data, child welfare program and eligibility reviews).

    B.    The SACWIS must provide for a review of case files for accuracy, completeness and compliance with federal requirements and state standards, including procedures for appropriate supervisory oversight and authorization.

    C.    The system must allow for random sampling, based on variable characteristics, for audit purposes. The system must be capable of recording and tracking the results of an audit, as well as any necessary corrective actions identified.

    D.    The system must facilitate the establishment and tracking of outcome measures by program managers, and support trend analysis of results.

    E.    The system must generate summary management reports on client demographics and needs. The system must produce reports on the length of time in foster care categorized by identified service needs and services provided.

    F.    The system must track referrals and all required time sensitive actions for Title IV-B and IV-E related cases, such as initial and ongoing Administrative Case Reviews, investigations, and time sensitive treatment and service plans. At the point a required action is delayed beyond a federal, state or court mandated time frame, the system must alert line, supervisory and management staff, when appropriate.

    G.    In cases where a reviewer enters information on an apparent problem of abuse or neglect in a foster home, the system must automatically request an investigation and track the case to ensure its completion.

H.   The system must maintain and link variable and static data used to determine eligibility for Title IV-E payments.  The system must also establish data entity relationships between providers, clients and payments.

I.   The SACWIS (or separate financial system) must account for appropriate financial reconciliation of payments including overpayments and recovery by occurrence.

J.   The system must capture and transmit all known cases in the AFCARS report, including cases with incomplete information or untimely actions.

K.   The system must contain all data necessary to effectively manage a case, and must be able to track a child across multiple occurrences and/or cases.