**FILED IN CLERK'S OFFICE**
U.S.D.C. Atlanta

OCT 2 7 2005

LUTHER D. THOMAS, Clerk
By: _jckeed_ Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KENNY A., by his next friend,            )
Linda Winn; et al.,                      )
                                         )
        Plaintiffs,                      )
                                         )
     v.                              )    CIVIL ACTION
                                         )    No. 1:02-CV-1686-MHS
SONNY PERDUE, in his official            )
capacity as Governor of the             )
State of Georgia; et al.,               )
                                         )
        Defendants.                      )

## ORDER FOR FINAL APPROVAL OF CONSENT DECREE

The Plaintiff class and the State Defendants, through their respective counsel, have jointly moved the Court to grant final approval of their Settlement Agreement (embodied in the terms of the proposed Consent Decree attached to this Order as Exhibit 1).

By Order dated July 5, 2005, this Court granted preliminary approval of the Consent Decree and scheduled a hearing on September 21, 2005 to consider whether the proposed settlement is fair, reasonable, and adequate. The Court, having conducted that hearing, now makes the following Findings of Fact and Conclusions of Law in support of the final approval of the Consent Decree.

## FINDINGS OF FACT

1.

The above-referenced action was initially filed by Plaintiffs in the Superior Court of Fulton County asserting systemic deficiencies in foster care in Fulton and DeKalb Counties and seeking declaratory and injunctive relief under federal and state law.  All Defendants joined in removing the case to federal court.

2.

Plaintiffs in this case have asserted against the State Defendants[1] an alleged series of systemic deficiencies in the foster care system as operated in Fulton and DeKalb Counties, including the failure to adequately monitor the safety of foster children; the failure to provide appropriate placement resources; the failure to provide adequate case planning and support services for foster children; the failure to provide timely permanent placements; the failure to provide essential services to children, including medical, dental and mental health services; and the failure to maintain an adequate infrastructure, including high caseworker caseloads and

---

[1]  The term "State Defendants" includes Sonny Perdue, in his official capacity as Governor of the State of Georgia; the Georgia Department of Human Resources ("DHR"); B.J. Walker, in her official capacity as DHR Commissioner; the Fulton County Department of Family and Children Services ("Fulton County DFCS"); Debra Keyes, in her official capacity as Director of Fulton County DFCS; the DeKalb County Department of Family and Children Services ("DeKalb County DFCS"); and Walker Solomon, III, in his official capacity as Director of DeKalb County DFCS.

turnover, inadequate payments to providers of foster homes and other placements in which foster children live, and the failure to maintain an adequate management information system. Plaintiffs alleged that that these systemic failures have harmed and continue to harm children in foster care physically, emotionally and psychologically in the following ways: subjecting them to abuse, neglect, and other harmful conditions while in foster care, such as overcrowding and corporal punishment; moving them many times from one inappropriate foster home or institution to another; placing them unnecessarily in institutional or congregate placements; denying them opportunities to be safely reunited with their families, meaningful visits with their families and siblings while in foster care, and opportunities for alternative permanent homes such as adoption; and causing them to spend years and often most of their lives in state custody.

3.

Throughout this litigation, the State Defendants have denied Plaintiffs' factual allegations, and have denied violating any of Plaintiffs' constitutional or statutory rights. More specifically, in operating the Fulton and DeKalb County foster care system, State Defendants assert that they have complied with many existing federal standards, they have continued to make significant improvements in that system, and their conduct has complied with prevailing and applicable legal

precedent, which holds that liability exists only when the defendants' conduct is deliberately indifferent to the needs of the foster children at issue. State Defendants contend that they have not now nor ever been deliberately indifferent to the needs of the Plaintiff class. State Defendants also contend that Plaintiffs' constitutional and statutory claims are not supported by existing Eleventh Circuit or Supreme Court precedent.

4.

During the past three years of this litigation, the parties have conducted comprehensive discovery, motion practice, and trial preparation. The Court has ruled on numerous motions, including a motion for preliminary injunction, motions to dismiss, various motions related to discovery and potential trial testimony, and motions for summary judgment. The Court previously certified a class of "All children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS."

5.

On October 25, 2004, the Court referred this case to mediation and appointed Hon. Dorothy T. Beasley to serve as mediator. Over the next eight months, Judge Beasley presided over a series of more than 20 in-person

confidential mediation sessions and numerous telephone conferences, as well as caucuses with one side or the other.  (Decl. of Dorothy Toth Beasley ¶¶ 1-2.)

6.

The efforts of counsel for Plaintiffs and State Defendants, with the assistance of Judge Beasley, produced a settlement agreement, which was executed by the aforementioned parties between June 15-29, 2005.

7.

The proposed settlement is a result of arms-length, good faith, and intense negotiations and is not a product of either collusion or fraud.  (Decl. of Dorothy Toth Beasley ¶ 4.)

8.

The Consent Decree has numerous provisions designed to benefit the Plaintiff class.  The centerpiece of the settlement agreement is a series of thirty-one outcome measures that State Defendants have agreed to meet and sustain for at least three consecutive six-month reporting periods.  The Outcome Measures, many of them requiring phased-in results over a two year period, seek to improve performance in the following areas: timely commencement and thorough completion of investigations of reported abuse or neglect; regular visits of foster children by case workers; approval and licensure of foster homes and other

5

placements; the percentage of children who are the victims of substantiated

maltreatment while in foster care; the percentage of children in foster homes that

exceed their licensed capacity; the percentage of children who have experienced

multiple moves while in foster care; and periodic judicial reviews of the safety and

status of foster children.[2]

9.

In addition, the proposed Consent Decree requires comprehensive and

periodic delivery of medical, dental, and mental health services to foster children;[3]

a detailed process for improved goal setting, case planning and periodic reviews of

children's status while in foster care;[4] limits on the placement of children in

emergency shelters and group homes and institutions, and protections against

overcrowding in foster homes;[5] and the establishment of reimbursement rates to

adequately compensate providers for caring for foster children.[6]  Moreover, State

Defendants commit to reduced caseloads for all case managers and supervisors;[7] a

fully implemented single statewide automated child welfare information system;[8]

and maintaining or establishing placements and related services identified in a

---

[2] Consent Decree § 15.
[3] *Id.* § 6.
[4] *Id.* § 4.
[5] *Id.* § 5.
[6] *Id.* § 5.B.
[7] *Id.* § 8.
[8] *Id.* § 7.

"needs assessment" to be conducted by a neutral expert.[9]  The settlement also includes processes for the supervision of private contract agencies that provide homes and services for foster children;[10] improvements in foster parent screening, licensing and training, as well as foster parent support and communication;[11] improvements in case manager training;[12] improvements in processes for addressing suspected abuse or neglect and suspected corporal punishment of children in foster care;[13] and improvements in efforts to maximize available federal funding.[14]  The settlement contemplates that two child welfare specialists will serve as the Court's independent accountability agents charged with the responsibility of measuring and reporting publicly on the State Defendants' compliance with these and other undertakings as specified in the Consent Decree.[15]

10.

By Order dated July 5, 2005, this Court granted Plaintiffs' and State Defendants' Joint Motion for Preliminary Approval of Settlement Agreement, Class Notice, and Fairness Hearing.  The Court directed State Defendants to notify

---

[9] *Id.* § 5.A.
[10] *Id.* § 9.
[11] *Id.* § 11; § 5.C.6.
[12] *Id.* § 10.
[13] *Id.* § 12.
[14] *Id.* § 14.
[15] *Id.* § 16.

class members and other interested persons or entities of the proposed settlement and fairness hearing as provided in that Order.

11.

On July 29, 2005, State Defendants filed an affidavit certifying compliance with the notice provisions in the July 5, 2005 Order.

12.

Prior to the fairness hearing, the Court received approximately 30 written comments concerning the proposed settlement agreement. Given the number of class members and notices transmitted to class members and other interested parties,[16] the number of comments received was extremely small. Both the written and oral comments received were supportive of approval of the settlement agreement, either in whole or in part. Those commenters that had objections to the settlement objected only to certain portions of the proposed agreement.

---

[16] According to Counsel for State Defendants, currently there are over 2,200 individual class members and over 2,600 notices were transmitted in accordance with the Court's July 5, 2005 Order. (Tr. 91).

## CONCLUSIONS OF LAW

### 1.

The issue for the Court to decide is whether the proposed settlement, taken as a whole, is "fair, reasonable and adequate" from the perspective of absent class members whose rights and interests are to be bound by its terms.  Fed.R.Civ.P. 23(e)(1)(C).  *See generally Manual for Complex Litigation, Fourth* § 21.634-.635.

### 2.

"[I]n class action suits, there is an overriding public interest in favor of settlement."  *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977).[17]  The Court's responsibility in Rule 23 fairness determinations is to "scrutinize the settlement for the existence of any fraud or collusion."  *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. 297, 305 (N.D. Ga. 1993).  The proponents of a settlement bear the burden of establishing fairness.  *Id.* at 312; *Manual for Complex Litigation, Fourth* § 21.634.

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to September 30, 1981.

3.

Rule 23 specifies procedural requirements for determining whether this burden has been met.   First, the Court is required to direct notice of the proposed settlement terms to class members in accordance with Fed.R.Civ.P. 23(e)(1)(B). Second, the Court is required to conduct a hearing pursuant to Fed.R.Civ.P. 23(e)(1)(C) at which objectors to the settlement are given reasonable opportunity to raise their concerns with the Court.  Finally, even where there are few objections, the Court is well-advised to make a "sufficient record as to the basis and justification for the settlement" and "specific findings as to how the settlement meets or fails to meet" the requirements of Rule 23.  *Manual for Complex Litigation, Fourth* § 21.635.

4.

The Court finds that the proposed settlement was the result of intensive litigation and arm's length mediation, and passes scrutiny for fraud and collusion.

5.

If a proposed Rule 23 settlement passes scrutiny for fraud and collusion, courts in the Eleventh Circuit generally conduct a fairness evaluation by looking to a series of six factors that include: (1) the stage of the proceedings at which settlement was achieved; (2) the likelihood of success at trial; (3) the range of

possible relief; (4) the point on the range at which settlement is fair, adequate, and

reasonable; (5) the complexity, expense, and duration of litigation; and (6) the

substance and amount of opposition to settlement. *See Bennett v. Behring Corp.,*

737 F.2d 982, 986 (11th Cir. 1984); *In re Domestic Air Transp. Antitrust Litig.,* 148

F.R.D. at 305; *In re Motorsports Merchandise Antitrust Litig.,* 112 F. Supp.2d

1329, 1333 (N.D. Ga. 2000).  The Court may also rely upon the judgment of

experienced counsel in conducting its independent evaluation of fairness.  *Ingram

v. The Coca-Cola Co.,* 200 F.R.D. 685, 688-89 (N.D. Ga. 2001).  Applying these

factors to the proposed settlement in this case, the Court finds the settlement is fair,

reasonable and adequate.

6.

The stage of the proceedings at which settlement was achieved

This case has progressed to a stage where the Court, counsel, and affected

parties have had an ample basis upon which to evaluate the settlement.  Over the

past three years, the Court has carefully managed the progress of the case, decided

dispositive motions to dismiss and for summary judgment, heard evidence in

connection with Plaintiffs' motion for a preliminary injunction, and ruled on a

variety of discovery disputes.    All of this information and the Court's rulings are

matters of public record.  The class notice provided class members, their

11

representatives, and all affected parties with the means to access this information.
No one has raised any complaint with respect to the adequacy of the case record.
The Court finds that the proceedings have advanced to allow a full and fair
assessment of the settlement, and this factor weighs in favor of approval of the
proposed settlement.

7.

The likelihood of success at trial

In evaluating likelihood of success in a proposed Rule 23 settlement, the
Court "has neither the duty nor the right to reach any ultimate conclusions on the
issues of fact or law which underlie the merits of the dispute." *In Re Domestic Air
Transp. Antitrust Litig.,* 148 F.R.D at 315. "The very uncertainty of outcome in
litigation, as well as the avoidance of wasteful litigation and expense, lay behind
Congressional infusion of a power to compromise. This is a recognition of the
policy of the law generally to encourage settlements. This could hardly be
achieved if the test on hearing for approval meant establishing success or failure to
a certainty." *In Re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 212 (5th
Cir. 1981)(quoting *Florida Trailer & Equip. Co. v. Deal,* 284 F.2d 567, 571 (5th
Cir. 1960)).

8.

Again, the Court's previous supervision of this litigation makes the Court well-positioned to evaluate the strengths and weaknesses of each parties' respective positions.  Comparing the litigation risks facing the class to the scope, substance, immediacy, and certainty of relief promised in the proposed Consent Decree, the Court concludes that this factor weighs in favor of the proposed settlement.

9.

The range of possible relief

If Plaintiffs prevailed at a trial on liability issues, the parties and the Court would then be facing a second phase of litigation to determine the proper scope of injunctive relief.  The Court would be vested with broad equitable discretion to fashion a remedy within the "inherent limitation upon federal judicial authority" that requires tailoring any remedy imposed against a governmental unit to the nature and scope of the constitutional violation. *Milliken v. Bradley*, 433 U.S. 267, 282 (1976).  However, the task of tailoring a remedy to the specific violation in contested proceedings would impose significant burdens on the Court and the litigants and may well divert governmental resources and energy that could be better applied to the immediate delivery of care and services to class members.

13

10.

The relief obtained in the proposed settlement is comprehensive, detailed, and favorable to class members.  It is highly unlikely that the Court would have imposed an injunction as intricately detailed and comprehensive in the context of contested remedy-phase litigation.  *See Ingram v. The Coca-Cola Co.,* 200 F.R.D. at 689.  This factor weighs in favor of approval.

11.

The point on the range at which settlement is fair, adequate and reasonable

Considering the scope and detail of the comprehensive settlement reached by the parties in this case, particularly in light of the contentiousness of the litigation, complexity of the issues and the uncertainties and delays of further litigation, the Court finds the result achieved by the parties to be extraordinary. Indeed, the Court finds here that "a review of this record affirmatively shows great patience and diligence by counsel and the court in resolving a massive and difficult case.  It is a tribute to all concerned that such a just settlement was consummated." *Bennett v. Behring Corp.,* 737 F.2d at 988.  This factor too weighs in favor of the settlement.[18]

_____

[18]   While objections to the settlement are addressed as a separate factor, the Court notes the comments submitted by the National Council of Juvenile and Family Court Judges and the Managing Attorney of the Supreme Court of Georgia's Child

12.

### The complexity, expense and duration of the litigation

"[C]lass action suits have a well deserved reputation as being most complex." *Cotton v. Hinton,* 559 F.2d at 1331.  This case is certainly no exception. The sweep of the factual terrain, involving the lives of approximately 2,200 children in public custody, their birth and foster and adoptive families, their case managers, their caregivers, a State agency with a budget approaching $2.8 billion, and County governmental units responsible for delivering appropriate services to them, is immense.  The time and resources needed to try this case would be considerable. The parties have previously estimated that trial in this action on the liability phase would take up to four weeks.  Even if liability were sustained, the remedy phase would also be complex, in terms of fashioning remedies to fit the contours of any proven violations of law in the context of a complex child welfare system.  Plaintiffs' claims present complicated legal issues in areas of law that are developing rapidly.   Even after any final judgment, the appeals process could add a year or more of time and expense to the litigation, and potential delay in the implementation of any court ordered remedies.

---

Placement Project.  The comments of both of these organizations were wholly supportive of the proposed settlement.

13.

Weighing the litigation risks and what would be a significant delay in commencement of any relief which might be ordered by the Court against the certain and immediate terms of the proposed Consent Decree, the proposed settlement is in the best interests of the class, and this factor weighs in favor of approval of the settlement.

14.

The substance and amount of opposition to the settlement

When, as here, the number of objections raised by actual class members or their representatives is exceedingly small compared to the number of persons in the class and individuals receiving notice, this factor weighs in favor of approval. *See In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 326. "A small number of objectors from a plaintiff class of thousands is strong evidence of a settlement's fairness and reasonableness." *Id.*; *see also Bennett v. Behring Corp.*, 96 F.R.D. 343, 352-53 (S.D. Fla. 1982), *aff'd*, 737 F.2d 982 (11th Cir. 1984).

15.

Even when the Court becomes aware of one or more objecting parties, the Court is not "required to open to question and debate every provision of the proposed compromise." *Cotton v. Hinton*, 559 F.2d at 1331. The Court is not

16

empowered to rewrite the settlement to accommodate the wishes of objectors. *In re Domestic Air Transp. Antitrust Litig.*, 148 F.R.D. at 305. Here, none of the objections, taken individually or collectively, undermines the considerable fairness, reasonableness and adequacy of the settlement.

16.

(a)   <u>Comments raised by individuals or entities affiliated with emergency shelters</u>[19]

These comments express concern with the specific provisions of the Consent Decree limiting the stay of any class member in an emergency shelter or temporary facility to no more than 30 days and no more than once in any one episode of foster care.[20] This Court previously conducted a hearing, heard testimony and admitted evidence concerning the operation of emergency shelters in Fulton and DeKalb Counties in conjunction with Plaintiffs' Motion for Preliminary Injunction. At that time, the Court did not enter any order requiring closure of those shelters, based upon State Defendants' representation that such shelters would be closed. *See* Order of December 12, 2002. Thereafter, State Defendants filed two reports with

---

[19] This group includes comments submitted or delivered by: Nancy Friauf (Gwinnett County Children's Shelter), Philip Kouns (Georgia Emergency Shelter Network), Frances Davis (Gwinnett County Public Schools), James H. Maughton (Hayes, James & Associates), and Melissa Reid (The Alcove, Inc.), K.C., and L.Y. (children but not class members). Some of the group homes and institutions referred to in note 21, below, also raise similar concerns about certain restrictions put on placement in emergency shelters.

[20] Consent Decree, § 5.C.4.c.

17

this Court confirming that the shelters had, indeed, been closed. *See* State

Defendants' Status Report to the Court, December 31, 2002 (Fulton shelter); State

Defendants' Status Report to the Court on DeKalb Shelter, February 18, 2003.

Based upon that earlier testimony and evidence admitted at the prior hearing, and

subsequent action by State Defendants, the Court finds that the restrictions on

shelter placement for class member children are themselves fair, reasonable, and

adequate, and that the objections fail to undermine the fairness, reasonableness and

adequacy of the settlement taken as a whole. The Court also notes that the Consent

Decree's provisions apply solely to the Plaintiff class and not to members outside

the class who may be placed in emergency shelters. While some individuals have

expressed concern about these restrictions becoming applicable to non-class

members, the Consent Decree applies only to class members who by definition

have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

To the extent class members are placed in shelters outside Fulton or DeKalb

Counties, the shelter restrictions in the Consent Decree apply, and, as the Court has

found, are reasonable.

17.

(b)   Comments raised by individuals or entities affiliated with group
       homes and institutions[21]

These comments again express concern with only specific provisions of the

Decree, including the following:  non-family settings like group homes and

institutions may be in the best interest of the child; the establishment of a

specialized case manager for children in placement 18 months or longer may

interrupt the child's relationship with his or her previous case manager; the

composition of the Reimbursement Rate Task Force should be expanded;

placement of a child within 50 miles of home, group care placement restrictions

and minimum case manager visitation requirements may not meet the child's

needs; unannounced inspections of placements may be disruptive; and foster care

licensing standards should be uniform.

---

[21] This group includes comments submitted or delivered by:  Pam Ross and Robert
Crutchfield (Christian City Home for Children); Mario Bolivar (Devereaux
Georgia Treatment Network); John Blend (Goshen Valley Boys Ranch); Ron
Scroggy (Inner Harbour for Children and Families); Kenneth Dobbs (Georgia
Baptist Children's Homes); Abe Wilkinson (Elks Aidmore); Truett Cathey, Tyra
Walker, and Ruth Claiborne (WinShape Homes); Steve Rumford (Methodist Home
for Children); Normer Adams (Georgia Association of Homes & Services for
Children); Patricia Showell (Families First); Douglas Mead (Georgia AGAPE);
Jack Bice (Lighthouse Care Center); Barry Kerr (Morningstar Treatment Services);
Mike Watson (Georgia Christian Council); and Larry Freels (Hephzibah Children's
Home).

18.

The Court has carefully considered these comments but finds the corresponding provisions contained in the Consent Decree to be fair, reasonable, and adequate. The Consent Decree builds in numerous exceptions to certain restrictions which specifically take into account the individual needs of the child, including the exceptions for placing a child within 50 miles from home[22] and justifying placement in group homes and institutions.[23] There is nothing in the provision for a specialized case manager which precludes the involvement of the previous case manager in the decision making process for the child's well-being.[24] The Reimbursement Rate Task Force is appropriately constituted and is not precluded from receiving or even requesting comments and input from interested parties.[25] The proposed Consent Decree specifically provides for uniform standards for foster care placements for all class members.[26] The Court also accepts the representations made by and on behalf of various group homes and institutions that such placements, in appropriate circumstances, provide valuable

---

[22] Consent Decree §§ 5.C.4.b; 15(19).

[23] *Id.* § 5.C.4.f.

[24] *Id.* § 4.F. The Court also does not question the appropriateness of the parties' negotiated decision to balance the need to minimize the number of case managers that a child experiences with the need for a specialized case manager who carries a reduced caseload in situations where the child has been in state custody for an extended period of time.

[25] *Id.* § 5.B.2.

[26] *Id.* § 11.A & B.

services in the best interests of some class members, and believes they can

continue to provide those services within the confines of the Consent Decree.  The

Court concludes that the objections raised by individuals and entities affiliated with

group care providers, individually and collectively, fail to undermine the fairness,

reasonableness and adequacy of the proposed settlement.

19.

(c)    Other Individuals and Groups

Two sets of foster parents submitted comments that do not pertain to the

Consent Decree but concern their individual dealings with local DFCS offices.  As

such, there is nothing in those comments impacting the Court's decision on

approval of the Decree.

20.

Linda Stacy, a Court Appointed Special Advocate in DeKalb County,

commented that she would like to see additional sections in the Consent Decree to

deal with diverted children, foster parent communications, and contracts with

private agencies.  The Court has considered these comments and finds that the

corresponding provisions in the proposed settlement are fair, reasonable and

adequate.  The settlement explicitly requires tracking of so-called "diverted"

children[27] and does not extinguish any claims (individual, class, damages or injunctive) concerning the State Defendants' diversion program;[28] requires continued timely and appropriate support and communications with foster parents;[29] and addresses in detail the supervision of contract agencies.[30] The Court finds that none of these objections, individually or collectively, overcome the finding that the Consent Decree's provisions are reasonable, fair, and adequate.

21.

Finally, the Barton Child Law and Policy Clinic of Emory University School of Law ("Barton") commented that, in its view, five of the 31 outcome measures are either too lenient or need to be redrafted to take into account the Clinic's concerns and, in addition, several more outcome measures should be added to deal with issues either not addressed in the Consent Decree or addressed inadequately. The Court has considered all of the Barton comments and objections carefully, and finds the corresponding provisions in the settlement are fair, reasonable and adequate, and that none of the objections, individually or collectively, undermine the fairness, reasonableness and adequacy of the settlement as a whole.

---

[27] *Id.* § 20.G.2.
[28] *Id.* § 19.C & D & E.
[29] *Id.* § 5.C.6.
[30] *Id.* § 9.

21.

Specifically, Barton argues that outcome measure 4 for "re-entry into care" should be 5% instead of 8.6%; that outcome measure 8(a) for "permanency outcomes" should be 60% instead of 40%; that outcome measure 9 should reduce a "backlog" pool of children in care by 45% in the second reporting period, instead of reductions of 35%, 40% and 40% in the second, third and fourth reporting periods, respectively; that outcome measure 16 concerning the placement of siblings together should require at least 70% of siblings to be placed together for the entire time they are in foster care during the reporting period, instead of at least 70% placed together when they enter care at the end of the second reporting period and 80% placed together when they enter care at the end of the fourth reporting period; and that outcome measure 17 concerning multiple moves should capture only children in custody for less than twelve months as opposed to all children in custody.

22.

Barton also argues that there should be an additional placement restriction concerning children who re-enter custody to ensure, wherever possible, the placement of children in the last appropriate placement that the child was in during his/her most recent episode of foster care; and that there should be three additional

outcome measures in the areas of recurrence of maltreatment, maltreatment

following an unsubstantiated or diverted case, and discharges to runaway.[31]

23.

The Court finds that the Barton objections seek to alter the particular

numbers and definitions of specific provisions within the decree, which this Court

will not do. *See Cotton*, 559 F.2d at 1331.  The Court finds that the 31 Outcome

Measures, if met by State Defendants and simultaneously sustained for three

consecutive reporting periods, will result in a tremendous improvement in the

foster care system in Fulton and DeKalb Counties.  The issue is not whether others

would have negotiated different measures or whether additional measures, not

included in the Decree, might also be beneficial for children in the class.  Rather,

counsel for Plaintiffs and State Defendants have negotiated a Decree which, when

fully implemented, will substantially improve the provision of foster care services

---

[31] Barton also argues for a definition for "siblings" in the Consent Decree, and asks
that "the implementation of this settlement and the concomitant accountability
activities be conducted in an atmosphere of transparency, partnership and
community involvement."  In a filing subsequent to the fairness hearing, Barton
comments that while the proposed settlement does require "some information
related to recurrence of maltreatment" as well as "information on children related
to the diversion program," there is concern with their definition, a lack of specific
"targets" for these items, and need for a specific requirement that this information
be included in the public reports issued by the Accountability Agents.

for children in the Plaintiff class.[32]  The Court finds that the Barton objections, taken individually and collectively, fail to undermine the overall fairness, reasonableness and adequacy of the settlement.

24.

Finally, "[i]n a case where experienced counsel represent the class, the Court, 'absent fraud, collusion, or the like, should hesitate to substitute its own judgment for that of counsel.'" *Ingram v. The Coca-Cola Co.*, 200 F.R.D. at 691 (quoting *Cotton*, 559 F.2d at 1330).  Based upon the affidavit and the hearing statement of Marcia Robinson Lowry, who has significant experience litigating challenges to foster care systems similar to the one pending before this Court, and the hearing statement of Jeffrey O. Bramlett, who has represented classes such as the one before this Court in *Ingram*, class counsel believes this settlement provides an extraordinary result for their clients and furthers the best interests of class members in their collective professional judgment.  Their judgment also supports the Court's conclusion that the settlement is fair, reasonable, and adequate.

---

[32]  The Court notes that Barton does not offer comment or objection concerning the overwhelming majority of the proposed settlement provisions.

<u>ORDER</u>

Accordingly, for the foregoing reasons, the Court GRANTS the Joint

Motion for Final Approval of Settlement Agreement and Consent Decree [#475,

#482] and DIRECTS the Clerk to enter the Consent Decree attached hereto as

Exhibit 1 as the Order of this Court.

SO ORDERED this 27th day of _____Oct_____, 2005.

_____
MARVIN H. SHOOB, Senior Judge
United States District Court
Northern District of Georgia