FILED IN CLERK'S OFFICE
U.S D.C.  Atlanta

OCT 2 7 2005

LUTHER D. THOMAS, Clerk
By:
_____ Deputy Clerk

Exhibit 1

FILED IN CLERK'S OFFICE
U.S D.C. Atlanta

OCT 2 7 2005

LUTHER D. THOMAS, Clerk
By: _____ Deputy Clerk

```
------------------------------------------------x
KENNY A., by his next friend,          )
Linda Winn; et al.,                    )
                                       )
              Plaintiffs,              )
                                       )
       vs.                             )   Civil Action No. 1: 02-CV- 1686-MHS
                                       )
SONNY PERDUE, in his official          )
capacity as Governor of the            )
State of Georgia; et al.               )
                                       )
              Defendants.              )
------------------------------------------------x
```

## CONSENT DECREE

# Table of Contents

1.    INTRODUCTION ........................................................................................................... 1

2.    DEFINITIONS ……………………………………….........…….................................. 1

3.    PRINCIPLES ................................................................................................................ 3

4.    PLANNING .................................................................................................................. 5

      A.    For Children Entering Placement after the Entry of the Consent Decree .............. 5

      B.    For Children who have Reached their Sixth Month in Care after the
            Entry of the Consent Decree, and for the Remaining Period of Time
            While in DFCS Custody ……………………….….........……………………..……… 7

      C.    For Children who Reach their Thirteenth Month in Care after the
            Entry of the Consent Decree, and for the Remaining Period of Time
            While in DFCS custody ………………..……………….............……….....…….... 9

For Children who have Already Reached their Thirteenth Month in
            Care at the Time of the Entry of the Consent Decree……..……..........…….…….. 10

      E.    For all Children for whom Adoption has been Identified as the Goal …............... 10

      F.    For Children who Reach their Eighteenth Month in Care after the
            Entry of the Consent Decree, and Those who have been in Care for
            Eighteen Months or More upon Entry of the Consent Decree, and for
            the Remaining Period in Time while they are in DFCS Custody …….................. 11

5.    PLACEMENT .............................................................................................................. 12

      A.    Identification of Needs and Placement Options ...................................................
12

Reimbursement Rates for Placements .................................................................13

Ensuring that the Placement Process Secures the Most Appropriate
Placement for All Children ................................................................................. 15

      D.    Visitation ................................................................................................... 19

6.    HEALTH SERVICES TO CHILDREN ........................................................................ 20

7.   SINGLE STATEWIDE AUTOMATED CHILD WELFARE
     INFORMATION SYSTEM ......................................................................................... 22

8.   CASELOADS .................................................................................................. 22

9.   SUPERVISION OF CONTRACT AGENCIES ............................................................ 23

10.  TRAINING ..................................................................................................... 25

11.  FOSTER PARENT SCREENING, LICENSING, AND TRAINING ............................... 26

12.  ABUSE IN CARE INVESTIGATIONS ........................................................... 28

13.  CORRECTIVE ACTIONS ................................................................................ 30

14.  MAXIMIZATION OF FEDERAL FUNDING .............................................. 31

15.  OUTCOME MEASURES .............................................................................. 31

16.  ACCOUNTABILITY ...................................................................................... 38

17.  ENFORCEMENT ........................................................................................... 39

18.  QUALITY ASSURANCE ............................................................................... 42

19.  DURATION OF DECREE ……………………………….........………………………. 42

20.  MISCELLANEOUS PROVISIONS ............................................................. 43

21.  RELIEF FOR NAMED PLAINTIFFS ……………………………….........………… 46

22.  ATTORNEYS' FEES AND EXPENSES OF LITIGATION ………………..........………. 47

1.    **INTRODUCTION**

Plaintiffs brought this class action lawsuit by the filing of a complaint on June 6, 2002, in the Superior Court of Fulton County, seeking declaratory and prospective injunctive relief against Defendants based upon alleged violations of constitutional and statutory rights arising out of the operation of foster care systems in Fulton and DeKalb Counties. Plaintiffs alleged both federal and state law claims. All Defendants joined in removing the case to this Court, invoking the Court's federal question jurisdiction and denying that their operation of the Fulton and DeKalb County foster care systems violated any constitutional or statutory guidelines.

In order to resolve all issues pending between these parties without the expense, risks, delays and uncertainties of a trial and any appeals that might follow such a trial, Plaintiffs and State Defendants agree to the terms of this Consent Decree as stated below. By entering into this Consent Decree, State Defendants do not admit to the truth or validity of any claim made against them by Plaintiffs. State Defendants also do not speak for the Georgia General Assembly, which has the power under Georgia law to determine the appropriations for the State's programs for child welfare. However, State Defendants acting under their existing authority agree that it will be a condition of their conduct of the child welfare program covered by this Consent Decree to comply with the Consent Decree. If Plaintiffs seek a judicial remedy for State Defendants' noncompliance in accordance with Section 17 of this Consent Decree, and at any stage of subsequent enforcement proceedings State Defendants assert insufficient funds as a legal excuse, Plaintiffs may move to rescind their consent to the Consent Decree. State Defendants submit to the enforcement of this Consent Decree to the full extent permitted by law.

All parties acknowledge that the Court has jurisdiction over this case and authority to enter this Consent Decree and to enforce its terms. The Court shall retain jurisdiction of this matter to enforce this Decree in accordance with its terms.

2.    **DEFINITIONS APPLICABLE TO CONSENT DECREE**

For purposes of this Consent Decree, the following terms have the meaning indicated below.

"Adoptive placement" means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

"Business days" mean every day except Saturdays, Sundays and legal holidays, pursuant to O.C.G.A. § 1-4-1.

"Calendar days" mean every day including Saturdays, Sundays, and legal holidays.

1

"Child" or "children" or "class member children" or "class members" shall mean a child or children who have been, are, or will be alleged or adjudicated deprived who (1) are or will be in the custody of any of the State Defendants; and (2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

"Commissioner" means the Commissioner of the Georgia Department of Human Resources.

"Corporal punishment" means any physical punishment of a child that inflicts pain.

"Day" or "days" mean calendar days unless otherwise indicated.

"DeKalb DFCS" means the DeKalb County Department of Family and Children Services.

"DFCS" when used alone means State DFCS.

"DHHS" means the United States Department of Health and Human Services.

"DHR" means the Georgia Department of Human Resources.

"Discipline or Other Serious Foster Care Violation" means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

"EPSDT" means the Early and Periodic Screening, Diagnosis and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

"Fulton DFCS" means the Fulton County Department of Family and Children Services.

"Georgia Health Check Program" means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT, and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

"Governor" means the Governor of the State of Georgia.

"Legal guardianship" means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter 15-11.

2

"One episode of foster care" means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

"Permanent legal custody" means custody granted in accordance with an order of the superior court or the juvenile court which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

"Permanent placement with relatives" means placement of a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

"State DFCS" means the Division of Family and Children Services of the Georgia Department of Human Resources.

"State Defendants" means Defendants Sonny Perdue (in his official capacity as Governor of Georgia), the Georgia Department of Human Resources, B.J. Walker (in her official capacity as Commissioner of the Georgia Department of Human Resources), Fulton County Department of Family and Children Services, Debra Keyes (in her official capacity as Administrator of Fulton DFCS), DeKalb County Division of Family and Children Services, and Walker Solomon (in his official capacity as Director of DeKalb DFCS).

"Suspected abuse or neglect" means being based on reasonable cause to believe that a child may have been abused or neglected.

"Suspected corporal punishment" means being based on reasonable cause to believe that corporal punishment may have been used on a child.


## 3.    **PRINCIPLES**

The parties to this Consent Decree agree that the following are desired principles that serve as the goals of Georgia's child welfare system and are not separately enforceable standards or provisions under which State Defendants' conduct under the terms of this Consent Decree shall be measured.

Georgia's child welfare system must actively promote and support the opportunity for children to grow up within a safe, nurturing family, either their biological family or, if that is not possible, within an adoptive family.

When children are in foster care, all non-destructive family ties should be maintained and nurtured. If appropriate, children should be placed with relatives who are able to provide a safe, nurturing home for them. Reasonable efforts should be made to place siblings together, and relationships with relatives and siblings should be facilitated and maintained by the child welfare agency, if it is in the child's best interest to do so.

Foster care should be as temporary an arrangement as possible, with its goal being to provide a permanent home for the child as quickly as possible. In making the determination about what plans and services will best meet this goal, the child's interests must be paramount.

The state has primary responsibility for the care and protection of children who enter the foster care system. Insofar as it relies on private contractors to assist in meeting this responsibility, it should only do so according to standards set by and rigorously monitored by the state.

All children in need of child welfare services should receive full and equal access to the best available services, regardless of race, religion, ethnicity, or disabilities.

Children in foster care placement should be in the least restrictive, most family-like setting possible, and the state should make reasonable efforts to avoid the use of non-family settings for children, particularly young children.

Children in foster care placement should have stable placements that meet their needs and the services necessary to address both the trauma of foster care placement and the problems surrounding their removal from their family. Children in foster care placement should have placements that meet their needs and the services necessary to promote the stability of their placements.

The Department of Human Resources, acting through its Commissioner, has the authority and responsibility to deliver foster care services by the means it deems appropriate consistent with the requirements of law.

## 4.    PLANNING

4

For children entering placement after the entry of the Consent Decree

Within 24 hours after a child's 72-hour hearing, DFCS will make a referral to a Comprehensive Child and Family Assessment ("CCFA") provider to initiate an assessment for the child.

An initial Family Team Meeting will be held within 3-9 days after a child comes into foster care.

Barring exigent circumstances, the Family Team Meeting participants shall include the DFCS case manager and supervisor and, if applicable, the case manager from the private contract agency which has the child in placement. DFCS will make reasonable efforts to ensure the attendance of the parents and the child (if 12 or older), and other persons significant to the family if appropriate, at the Family Team Meeting. The Family Team Meeting may also include the CCFA provider, relatives, and other persons significant to the family. A Family Team Meeting shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance. Efforts to ensure the attendance of participants shall be documented in the child's case file.

Participants at the Family Team Meeting will identify:

> The needs of the children and parents.

> Goals for meeting those needs.

> Steps for meeting the goals.

> Strengths of the family members with regard to meeting the needs of the child, the child's parents, and possible placements for the child.

At the Family Team Meeting, DFCS will make the following determinations and shall identify and ensure the provision of necessary services to achieve such determinations:

> Whether the child can be safely returned home.

> Whether any evaluations are necessary of the child and/or parents to ensure the development of an appropriate case plan.

> If the child cannot safely be returned home, whether there is an appropriate relative with whom the child can be placed.

> If the child has siblings in placement and the siblings are not placed together, the identity of necessary steps to place the siblings together in accordance with Section 5.C.4.d, and necessary steps to ensure sibling visitation.

> If the child is of school age, the identity of steps that can be taken to ensure that the child remains enrolled in school, does not miss school days extensively, and does not have to change schools if at all possible.
>
> The frequency with which visiting will take place between the child and the child's parents and significant family members.

d.  If DFCS is unable to secure the parents' attendance at a meeting after the child is placed, the meeting shall nevertheless be held with the other participants, and DFCS shall make reasonable efforts to notify and review with the parents the goals outlined at the meeting, as soon thereafter as possible.

e.  The outcomes of the Family Team Meeting will be reported to the Multidisciplinary Team ("MDT") for use at its meeting.

Within 25 days of a child's placement in foster care, an MDT Meeting will be held. Barring exigent circumstances, the MDT Meeting participants shall include the DFCS case manager and supervisor and, if applicable, the case manager from the private contract agency which has the child in placement. DFCS will make reasonable efforts to ensure the attendance of the parents and the child, if appropriate, at the MDT Meeting. The MDT Meeting may also include relatives, foster parents/placement providers, DFCS representatives, school representatives, therapists, mental health professionals, the CCFA provider, medical professionals, representatives from Public Health, and judicial representatives. An MDT Meeting shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance. Efforts to ensure attendance of participants in the MDT shall be documented in the child's case file.

The MDT will review the CCFA and make recommendations concerning the case plan and the services to be provided to the child and the family, including but not limited to the issues addressed at Family Team Meetings as described in section A.2. above, as well as (i) appropriateness of education (including special education); (ii) the creation and appropriateness of independent living plans and services for children 14 and older; and (iii) an appropriate permanency goal for the child and the services necessary to implement that goal. The case plan will be an outgrowth of the CCFA assessment and shall be developed at the MDT meeting.

DFCS shall identify and ensure the provision of necessary services to achieve the determinations made at the MDT meeting, and contained in the child's case plan, unless and until altered by the Juvenile Court.

Within 30 days from the date of placement, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated and revised (with submission to the Juvenile Court for

approval) whenever necessary, including after the MDT meeting, and at every six-month review and 12-month permanency review.

DFCS will include training on facilitating family team meetings as part of its pre-service training. DFCS shall have family team specialists who will attend and facilitate all family team meetings. The Fulton County Administrator and the DeKalb County Director will designate staff to follow up on the results of all family team meetings.

  B.  <u>For children who have reached their sixth month in care after the entry of the Consent Decree, and for the remaining period of time while in DFCS custody</u>

Plaintiffs and State Defendants intend that within six months of the child's placement in foster care, and every six months thereafter, the child's case plan shall be reviewed by the Judicial Citizen Review Panel (JCRP) and/or the Juvenile Court, as long as the child remains in the custody of Fulton or DeKalb DFCS.

Plaintiffs and State Defendants desire that the persons who participate at each JCRP or Juvenile Court review shall include the parents, the child, pre-adoptive parents or relatives providing care for the child, foster parents/placement providers, the DFCS case manager, the private provider case manager (if applicable), the case supervisor, other DFCS representatives, the CCFA providers, medical and mental health professionals, representatives from Public Health and the child's school, and other professionals having specific knowledge or information relative to the child's case. The parties further desire that a JCRP or Juvenile Court review shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance.

Plaintiffs and State Defendants intend that, at each six month case plan review, the JCRP and/or the Juvenile Court shall evaluate the following:

> The necessity and appropriateness of the child's placement;

> Whether reasonable efforts have been made to obtain permanency for the child;

> The degree of compliance with the specific goals and action steps set out in the case plan;

> Whether any progress has been made in improving the conditions that caused the child's removal from the home; and

> Whether changes need to be made to the case plan, including a change in the permanency goal and the projected date when permanency for the child is likely to be achieved, or changes or the addition of any services needed by the child.

Plaintiffs and State Defendants intend that, if the JCRP conducts the case plan review, the panel will submit a report to the Juvenile Court, which shall include the panel's findings and recommendations, as well as the findings and recommendations of Fulton or DeKalb DFCS, along with Fulton or DeKalb DFCS' proposed revised plan for reunification or other permanency plan.

If the Juvenile Court conducts a review of the case plan, Fulton or DeKalb DFCS shall submit its recommendations to the court regarding a proposed revised plan for reunification or other permanency plan.

Following a JCRP or a Juvenile Court review, the Juvenile Court may adopt a revised case plan, taking into consideration recommendations made by Fulton or DeKalb DFCS, the JCRP, and/or the parents and enter a supplemental order in accordance with Chapter 11 of Title 15 of the Official Code of Georgia Annotated.

DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following the actions of the Juvenile Court.

If deemed necessary by the case manager or case supervisor, additional meetings involving family members and professionals to discuss the implementation of the case plan may be conducted at any time.

If the Juvenile Court does not convene a six-month JCRP or Juvenile Court review within 45 days from the date that is six months after the last review, DHR/DFCS shall cause to be filed with the Juvenile Court a request for an immediate JCRP or Juvenile Court six-month review.

If the Juvenile Court does not convene a 12-month JCRP or Juvenile Court permanency review within 45 days from the date that is 12 months after the last permanency review, DHR/DFCS shall cause to be filed with the Juvenile Court a request for an immediate JCRP or Juvenile Court 12-month permanency review.

      C.      <u>For children who reach their thirteenth month in care after the entry of the Consent Decree and for the remaining period in time while in DFCS custody</u>

By the end of the 13th month after a child has been in placement, Fulton and DeKalb DFCS will forward a Permanency Report to the State Social Services Director. Prior to the forwarding of the Permanency Report, another Family Team Meeting will be convened in accordance with Paragraph A.2. of this Planning Section. This Family Team Meeting will consider the issues listed in Paragraph A.3.a. of this Section. The results of such Family Team Meeting shall be forwarded to the Social Services Director with the Permanency Report. The Permanency Report will include a profile description of the child, the case plan, a list of impediments for achieving permanency, the CCFA, and a list of steps to be taken by the county to achieve permanency. The State Social Services Director or his designee shall review the Permanency Report within

five business days of its receipt, and shall either concur with the report or refer the case for a county/state staffing.

A county/state staffing shall be held no later than ten days after the State Social Service Director's decision.

Barring exigent circumstances, the county/state staffing shall include the Fulton or DeKalb County case manager and supervisor, regional adoption coordinator, regional field specialist, county program administrator, and State Social Services Director or his designee. A county/state staffing shall not be cancelled solely because of the absence of any participant as long as the required determinations can be made with the participants who are in attendance.

The county/state staffing shall establish a plan to move the child toward permanency, and the State Social Services Director shall monitor the plan. DHR/DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following the county/state staffing.

5.    Additional meetings shall be held at any time when deemed necessary by the State Social Services Director or by the county case manager and supervisor, and may include those participants from the initial county/state staffing, provided that at least one additional county/state staffing meeting shall be conducted by the end of the 25th month after a child remains in placement. DHR/DFCS shall identify and ensure the provision of necessary services to achieve the determinations made following any subsequent county/state staffing.

6.    If the Juvenile Court orders aftercare supervision, the child's case manager shall make monthly visits with the child following discharge from foster care for the period of time specified by the Juvenile Court. DFCS will determine whether additional services are necessary to ensure the continued success of the discharge.

D.    For children who have already reached their 13th month in care at the time of the entry of the Consent Decree

Within 120 days from the entry of the Consent Decree, Fulton and DeKalb DFCS will submit a Permanency Report for all children who have reached their 13th month in care at the time of the entry of the Consent Decree to the State Social Service Director for a permanency review as provided in Paragraphs 1-4 of Section C, above.

E.    For all children for whom adoption has been identified as the goal

1.      DHR shall determine whether the foster parent(s) are appropriate potential adoptive parents and if so, determine whether they are interested in adoption, and shall make known to the foster parents the availability of adoption assistance. Foster children who meet the eligibility criteria for the program, and who are special needs children, as defined in 42 U.S.C. § 673 and DFCS policy, shall be eligible to receive an adoption assistance subsidy. If the child is eligible, DHR/DFCS will determine the child's adoption assistance subsidy based on the needs of the child. Under no circumstance shall the subsidy amount exceed the family foster care maintenance payment that the child would be eligible to receive at the time of the adoptive placement. The amount and term of the adoption assistance subsidy shall be determined prior to the signing of the adoptive placement agreement.

2.      For children for whom the foster parent(s) are either inappropriate or uninterested in becoming adoptive parents, and for whom adoptive parents are not otherwise available, DFCS shall undertake child-specific adoption recruitment. DFCS will not use as a documented compelling reason for not filing a petition for termination of parental rights the fact that there is an absence of an adoptive resource for the child.

3.      Where appropriate, DFCS shall make available post-adoption services to support and stabilize adoptions for a period of at least 18 months following adoption finalization.

F.      For children who reach their 18th month in care after the entry of the Consent Decree, and those who have already been in care for 18 months or more upon the entry of the Consent Decree, and for the remaining period in time while they are in DFCS custody

1.      DHR/DFCS will establish a Specialized Case Manager position to focus on and to remove barriers to permanence for children in DFCS custody for 18 months or longer. The maximum caseload for any person serving in the Specialized Case Manager position will be 12.

2.      Within 60 days of the entry of this Consent Decree, all children who have already reached their 18th month in care upon the date of entry of this Consent Decree shall be assigned a Specialized Case Manager as described in this Section F. Beginning 60 days after the entry of this Consent Decree and continuing thereafter, all children that reach their 18th month in care shall be assigned a Specialized Case Manager as described in this Section F. The Specialized Case Manager, once assigned to a child, shall be the sole responsible DFCS case manager for the child. To the extent possible, the child's DFCS assignment to a particular

10

Specialized Case Manager, once made, shall continue for the remaining period of time while the child is in DFCS custody.

3. The Specialized Case Manager provided for in this paragraph shall do the following as appropriate for the children in this Section F:

Convene meetings, access funding, and make independent decisions in order:

To determine the continuing appropriateness and effectiveness of the child's permanency goal and to seek court approved change of the goal if appropriate;

To determine the continuing appropriateness and effectiveness of the services being provided to the child; whether new or different services are necessary for the child; and, if so, by whom and when they will be provided;

Partner with the county Independent Living Coordinator to determine whether adequate independent living services and plans are being provided for all children age 14 and older;

Evaluate the continuing appropriateness and effectiveness of services to biological parents and relatives, and determine whether new or different services are necessary to assist the biological parents and relatives in achieving the child's permanency goal;

d. Consult with public and private professionals and take all steps necessary to ensure the provision of services leading to the child achieving permanency;

e. No sooner than 30 days prior to discharge, regardless of the discharge destination, convene a special discharge planning meeting that shall be held to ensure that appropriate services and plans are in place to ensure a successful discharge.

## 5. PLACEMENT

### A. Identification of Needs and Placement Options

1. DFCS agrees to obtain, by means of a Request for Proposal, a qualified external expert to conduct a needs assessment in Fulton County and DeKalb County. The needs assessment shall be based on the standards for the placement of children identified in Section 5.C. below, as applied to factual data about individual children's needs obtained in Comprehensive Child and Family Assessments and case plans pursuant to Section 4 of this

Consent Decree, and as applied to other factual data relevant to determining the needs of children in the Plaintiff Class. The needs assessment shall identify what new and/or different placements and related services, if any, are needed to provide substantially for the care of the Plaintiff Class._

2.   Counsel for Plaintiffs and DFCS will jointly review the responses to the Request for Proposal, which shall be drafted to accomplish the purposes of this section of the Consent Decree, and shall jointly agree to the expert. The expert shall be selected within 90 days from the entry of this Consent Decree, and shall be selected in accordance with the procurement laws of the State of Georgia.

3.   The needs assessment shall be completed no later than 120 days after the expert has been retained.

4.   DFCS shall provide all of the placements and related services identified in the needs assessment, except that the expert will recommend the priority for implementing the findings of the needs assessment, based on the severity of the needs of the children whose needs are currently unmet or inadequately met. DFCS will phase in the implementation of the findings of the needs assessment, with the findings substantially implemented no later than 12 months after the completion of the needs assessment.

B.   Reimbursement Rates for Placements

Basic foster care maintenance payments:

With regard to the provision of basic foster family services, including kinship care (limited to kin who are approved foster parents), effective July 1, 2005, DHR/DFCS shall set and pay the following basic foster care maintenance payments: for each child ages 0-6, $13.78; for each child ages 7-12, $15.50; and for each child age 13 and older, $17.75. DHR/DFCS shall ensure that this rate is paid to all foster parents providing basic foster family services, regardless of whether they are directly supervised by DFCS or directly supervised by private providers. These rates shall be uniform.

b.   The Commissioner shall propose a periodic increase in the basic foster care maintenance payments referenced in subparagraph a., above, effective in succeeding fiscal years, based upon discussions with affected foster parent groups and consideration of whether an increase in any amount for any age group is needed to adequately compensate for basic foster care for the relevant age groups. Class counsel shall be

notified of the amount of any such increase in the basic foster care maintenance payments within 30 days of the effective date of such change in payment.

Beginning July 1, 2007, and continuing until the termination of this Consent Decree as provided in Section 19, if Class Counsel forms a good faith opinion that the amounts paid by DHR for basic foster care maintenance payments are insufficient to adequately compensate for foster family care, then Class Counsel may seek judicial remedies under the provisions set forth in Section 17 of this Consent Decree, and shall have the burden to show that the payment structure set by the Commissioner fails to adequately compensate for basic foster care for a particular age group or groups.

2.     Within 60 days after the parties sign the Consent Decree, DHR/DFCS shall establish a Reimbursement Rate Task Force. The Reimbursement Rate Task Force shall accept and shall not revise the base-level rate for the provision of family foster care services (including kinship care) as defined in subsection 1 above. The Reimbursement Rate Task Force shall create a rate structure based on measurable outcomes for all children in foster care (excluding basic, non-therapeutic foster family care) based on the reasonable cost for achieving these outcomes. The Reimbursement Rate Task Force shall examine the Level of Care system and make recommendations for either revising or replacing it, and shall also consider the results of various pilot programs being carried out across the state. The rate structure established by the Reimbursement Rate Task Force must comply with Title IV-E and Medicaid funding guidelines so that DHR/DFCS can draw down such funds.

3.     The rate structure established by the Reimbursement Rate Task Force shall serve as the basis for performance-based contracting, and shall be phased in beginning 90 days after the Reimbursement Rate Task Force issues its findings, provided that the rates fixed by the Commissioner must be fully implemented in the contracting cycle beginning July 1, 2007.

4.     Beginning in the July 1, 2006 contracting cycle and continuing thereafter, DHR/DFCS shall ensure that all approved foster parents (regardless of whether they are supervised directly by DFCS or by private providers) receive the same reimbursement rate for a given level of service.

5.     If DHR/DFCS directly supervises any approved foster homes that provide therapeutic services or operates any specialized group facilities, those approved foster parents or group facilities shall be paid at the same rate.

All specialized group facilities shall be paid at the same rate for the same level of services.

6.  The Reimbursement Rate Task Force shall be composed of the following members: James L. Kunz, Howard A. Peters III, and Becky Butler. The Task Force may meet when necessary in order to accomplish its duties, and shall work to finalize its recommendations in the most efficient and economical manner possible. The Reimbursement Rate Task Force shall have access to data, documents and information needed, and shall otherwise have the support needed to carry out its duties. DHR shall reimburse the members of the Task Force for approved expenses and fees incurred in performing its duties, in accordance with state regulations.

7.  The Task Force shall make every effort to present its findings no later than 120 days after the entry of the Consent Decree, unless the Task Force requests and the parties consent to an extension for the presentation of findings. The Task Force shall include recommendations on the priority for implementing its findings.

C.  <u>Ensuring that the placement process secures the most appropriate placement for all children.</u>

1.  Children for whom placement has determined to be necessary shall receive an assessment of their placement needs by a qualified professional no later than 30 business days after the child enters placement. The assessment shall include the initial physical health, dental health, and mental health screenings referred to in Section 6, Paragraph A. of this Consent Decree and all other required elements.

2.  As soon as the placement assessment is completed, the child's current placement shall be reevaluated to ensure that it meets the child's needs and if not a new placement shall be obtained as quickly as practicable.

3.  DHR shall ensure that each county has a placement process in place, including placement specialists with knowledge of both the resources available to enable the child to remain at home safely to avoid the need for placement if possible and of the placement resources, including the specific placement (foster home or group setting) available in a contract agency and its suitability for the particular child needing placement to reasonably ensure that each child receives the most appropriate placement for his/her individual needs.

4.  Children shall be placed according to the following standards:

14

Children shall be placed in accordance with their individual needs, as determined by the needs assessment in paragraph C.1 of this section, taking into account the child's needs to be placed as close to home and community as possible, the need to place siblings together, the DHR/DFCS preference for placement with relative resources, and the need to place children in the least restrictive, most home-like setting.

Children shall be placed within their own county or within 50 miles of the home from which they were removed. This provision shall not apply if (i) the child's needs are so exceptional that they cannot be met by a family or facility within their own county or within 50 miles of the home from which they were removed, (ii) the child is placed through the ICPC consistent with its terms, (iii) the child is appropriately placed with relatives, or (iv) the child is in an adoptive placement.

No child shall be placed in an emergency or temporary facility or any other foster home or group facility beds used on a temporary basis, for more than 30 days. Children shall not be placed in more than one emergency or temporary facility within one episode of foster care. No child shall spend more than 23 hours in a county DFCS office, or any facility providing intake functions, including but not limited to the current Children's Center in DeKalb County and the Fulton Family Resource Center in Fulton County.

Siblings who enter placement at or near the same time shall be placed together, unless doing so is harmful to one or more of the siblings, one of the siblings has such exceptional needs that can only be met in a specialized program or facility, or the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together. If a sibling group is separated at the initial placement, the case manager shall make immediate efforts to locate or recruit a family in whose home the siblings can be reunited.

No child shall be placed in a foster home if that placement will result in more than three (3) foster children in that foster home, or a total of six (6) children in the home, including the foster family's biological and/or adopted children, without the written approval of the Social Services Director based on a reasonable determination that the home is appropriate for and can meet the needs of the additional number of children. No placement will result in more than 3 children under the age of 3 residing in a foster home. The only exception to these limits shall be circumstances in which the placement of a sibling group in a

foster home with no other children in the home would exceed one or more of these limits.

f.   Group Care Restrictions

The capacity of a group care setting shall include all beds on the entire grounds of the setting, and includes the total number of beds in multiple cottages.

i.   No child under six years of age shall be placed in a group care setting without the express written approval of the Social Services Director based upon his or her certification that the individual child has exceptional needs which cannot be met in any foster home placement or other facility.  The certification shall describe the services which are available in the group care setting to address the child's exceptional needs.  No child under six years of age who shall be certified for a group care setting under the terms in this subparagraph shall be placed in any group care setting which has a total capacity in excess of 12 children.  This paragraph shall not apply to a child who is under six years of age and who is also the son or daughter of another child placed in a group care setting either prior to or after the entry of this Consent Decree.  This paragraph shall not apply to a child who is under six years of age who is also the sibling of another child who has been placed in a group care setting prior to the entry of this Consent Decree, except that any such sibling under the age of six shall be moved to a foster home placement within 12 months of the entry of this Consent Decree unless doing so would not be in the best interest of the children in question.

ii.  No child between the ages of six and 12 years of age shall be placed in a group care setting without the express written approval of the Social Services Director based upon his or her certification and specific findings that the individual child has needs which can be met in the particular group care setting and that the particular group setting is the least restrictive placement that can meet such needs.  The certification shall describe the services which are available in the group care setting to address the child's needs.  No child between the ages of six and 12 years of age who shall be certified for a group care setting under the terms in this subparagraph shall be placed in any group care setting which has a total capacity in excess of 12 children.  This paragraph shall not apply to a child between the ages of six and 12 years who is also the sibling of another child who has been placed in a group care

16

setting prior to the entry of this Consent Decree, except that any such sibling between the ages of six and 12 years shall be moved to a foster home placement within 12 months of the entry of this Consent Decree unless doing so would not be in the best interest of the children in question.  For any other children between the ages of six and 12 who were placed in a group care setting prior to the entry of this Consent Decree, DHR/DFCS shall have 12 months from the entry of this Consent Decree to move such children to a non-group care setting unless doing so would not be in the best interest of the child or children in question.

    iii. Children who are at least 12 years of age and older may be placed in a group care setting without any of the restrictions contained in paragraphs i. or ii., above.

g.  Children for whom the permanency goal is adoption should, whenever possible, be placed with a family in which adoption is a possibility.

h.  Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility.  Race and/or ethnicity shall otherwise be appropriate considerations in evaluating the best interest of an individual child to be matched with a particular family.  DHR shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion, but may utilize its authority to contract with private providers to ensure that the pool of available foster and adoptive families reflects and meets the needs of children for whom foster and adoptive placements are needed, including placements for children for whom placement resources are scarce or unavailable.

DHR shall only contract for placements or services with licensed contractors or subcontractors.  No child shall be placed in an unlicensed facility.

DFCS will ensure the basic physical needs of food, clothing and shelter for children in foster care.  At the time of placement or at any placement move, DFCS will review the child's clothing needs to assess appropriateness and take necessary steps to ensure that the child has appropriate clothing.

5.    DFCS shall take steps to minimize any trauma which may be experienced by a child which is associated with either a change in placement or in case managers.

6.  DHR/DFCS shall take appropriate steps to ensure that foster children placed in foster family homes, whether directly supervised by DHR/DFCS or private providers, receive adequate supports, including the following:

    a.  DHR/DFCS shall ensure that before a child is placed in any approved foster family home, the foster parents have received uniform and appropriate pre-service training;

    b.  DHR/DFCS shall ensure that all approved foster parents with whom foster children are placed shall receive uniform and appropriate ongoing training, and that they are reasonably informed of any changes in laws or DHR/DFCS policies that affect foster parents;

    c.  DHR/DFCS shall ensure that all foster parents (including kinship providers) with whom foster children are placed can contact DHR/DFCS and receive information 24 hours a day, 7 days a week, so that questions or concerns can be timely and appropriately addressed;

    d.  DHR/DFCS shall ensure that available information concerning a specific foster child, including family history, medical, dental, mental health and educational information, and any other information that is relevant to the child's safety and well-being, is provided to approved foster parents, before the child is placed in the home, and that complete and accurate updated information is provided to the approved foster parents after the child is placed as such information becomes available.

## D.   Visitation

The frequency and intensity of in-placement visits and other visits with a child shall be determined by the individual needs of the child. An in-placement visit refers to a private face-to-face visit with the child *in the child's home/placement*, in order to monitor and document the child's adjustment to the placement, the appropriateness of the placement to meet the child's needs, the receipt of appropriate treatment and services by the child, the child's safety, and service goals. A visit refers to a face-to-face visit with the child, in order to monitor and document the child's adjustment to the placement, the appropriateness of the placement to meet the child's needs, the receipt of appropriate treatment and services by the child, the child's safety, and service goals. The following minimum in-placement visits and other visits shall apply:

For all children in placements other than adoptive placements:

For the first eight weeks after an initial placement or upon any change in placement, there shall be at least: (a) one in-placement visit during the first week of the placement; (b) one in-placement visit between the third and the eighth week of the placement; and (c) six additional visits during the eight week period.

Thereafter, there shall be at least one in-placement visit per month and one additional private visit per month.

For all children in adoptive placements, there shall be (a) one in-placement visit the day after the child is placed; and (b) at least one in-placement visit per month after the placement but before the adoption petition is filed; and (c) at least one in-placement visit per quarter after the adoption petition is filed.

## 6.   HEALTH SERVICES TO CHILDREN

Initial Screenings and Follow-Up Treatment

Physical Health Screening: All children shall receive a medical screening within ten days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

Dental Health Screening: All children shall receive a dental screening within ten days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist.

Mental Health: All children four years of age and older shall receive a mental health screening conducted by a licensed mental health professional and completed within 30 days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional. The mental health screening shall be commenced prior to the MDT meeting provided in Section 4.A.3. of this Consent Decree. All children under four years of age shall receive a developmental assessment conducted by a licensed professional and completed within 30 days of placement in compliance with EPSDT standards, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and

19

all treatment as directed by the child's assessing professional.  The developmental assessment shall be commenced prior to the MDT meeting provided in Section 4.A.3. of this Consent Decree.

Periodic Health Screenings and Treatment

Ages zero through six months:  All children between the ages of zero to six months shall receive no less than three periodic EPSDT/Georgia Health Check Program health screenings.

Ages six months through 18 months:  All children between the ages of six months through 18 months shall receive no less than four periodic EPSDT/Georgia Health Check Program health screenings performed at approximate three month intervals.

Ages 18 months through five years:  All children between the ages of 18 months through five years shall receive no less than one periodic EPSDT/Georgia Health Check Program health screening performed every six months.

Ages six years and over:  All children of six years of age and older shall receive no less than one periodic EPSDT/Georgia Health Check Program health screening performed every year.

All children shall receive any follow-up treatment or care as directed by the physician who administered the periodic EPSDT/Georgia Health Check Program health screening.

Every child shall receive an EPSDT/Georgia Health Check Program health screening within ten days of receiving a final discharge from placement.

Children's health needs, including dental and mental health needs, between periodic screenings shall be met as provided by EPSDT.

All children age 3 and over shall receive at least one annual dental screening in compliance with EPSDT standards, including at a minimum, the components identified in the EPSDT/Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist.

C.    All medication prescribed for a child will be administered as ordered in such prescription(s).  Only designated, authorized, and appropriately trained personnel shall administer the taking of any prescribed medication for children in any non-foster family care placement.

7.  **SINGLE STATEWIDE AUTOMATED CHILD WELFARE INFORMATION SYSTEM**

A.  State Defendants shall have a fully implemented, single statewide automated child welfare information system ("SACWIS") containing at a minimum:

  1.  The system shall have the functionalities as identified and described in Appendix "A" hereto;

  2.  The system shall have the data integrity and quality assurance processes as identified and described in Appendix "B" hereto; and

  3.  The system shall have the security and data recording and recovery elements as identified and described in 45 CFR Part 95, Subpart F, § 95.621.

B.  The date certain for full implementation shall be set forth in a contract with a selected vendor, with the vendor selected and the contract effective on or before December 31, 2005. The date for full implementation shall be added to this Consent Decree after the contract is executed.

C.  Both leading up to and subsequent to the full implementation of a single statewide automated child welfare information system, State Defendants shall at all times satisfy all federal reporting requirements and shall maintain data integrity and accuracy on a continuous basis.


8.  **CASELOADS**

DFCS will phase in a reduction in its caseload in Fulton and DeKalb Counties for its CPS investigators, ongoing case managers, placement case managers, and adoption case managers over a two year period as provided below. In the event that a worker has a mixed caseload, the caseload shall be weighted to reflect the standards in this section.

By the end of the second reporting period, the following caseloads will exist in Fulton and DeKalb County DFCS:

  a.  No CPS case manager shall have more than 20 cases.
  b.  No ongoing case manager shall have more than 20 cases.
      No placement case manager shall have more than 25 cases.
      No adoption case manager shall have more than 22 cases.

By the end of the fourth reporting period and continuing thereafter, the following caseloads will exist in Fulton and DeKalb County DFCS:

    a.  No CPS case manager shall have more than 12 cases.
    b.  No ongoing case manager shall have more than 17 cases.
       No placement case manager shall have more than 15 cases.
       No adoption case manager shall have more than 16 cases.

DFCS will phase in a reduction in the ratio of supervisors to case managers in Fulton and DeKalb County over a two-year period as provided below.

By the end of the second reporting period, no supervisor shall supervise more than six case managers at any one time in Fulton and DeKalb County DFCS.

By the end of the fourth reporting period and continuing thereafter, no supervisor shall supervise more than five case managers at any one time in Fulton and DeKalb County DFCS.

DFCS will phase in elimination in the employment or utilization of temporary personnel ("PRNs") as case managers in Fulton and DeKalb County over a one-year period as provided below.

From the period beginning six months from the entry of the Consent Decree up through the period ending one year from the entry of the Consent Decree, PRNs shall comprise no more than 11% of the total allocation of social services case managers for Fulton and DeKalb County DFCS, respectively.

From the period beginning one year from the entry of the Consent Decree and continuing thereafter, no PRNs shall be employed or utilized as case managers in Fulton and DeKalb County DFCS.

D.    The caseloads for Specialized Case Managers shall be governed by Section 4.F. of this Consent Decree.

**9.**    <u>**SUPERVISION OF CONTRACT AGENCIES**</u>

A.    DHR shall require, and shall take appropriate steps to ensure, that all child-caring institutions or child-placing agencies that provide placements and services to class members meet all applicable terms of this Consent Decree.

B.     This Section 9 applies to any contract for the provision of placements and services to class members into which DHR enters during the contract cycle beginning July 1, 2005, or as soon as practicable following the entry of the Consent Decree. Into any such contract, which shall be annual performance-based contracts, DHR will incorporate all applicable requirements of this Consent Decree, but will do so without reference to the Consent Decree itself. DHR will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placements or services shall be reported to DHR for investigation, that all placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in that provider's care shall be reported to DHR for screening, assessment or investigation as necessary. The findings of investigations of suspected abuse or neglect, or of the assessment or investigation of suspected corporal punishment, shall be included in the criteria that DHR uses in determining whether to renew the license of a contract agency. With respect to contract agencies' contractual violations, DHR may use such contractual remedies as provided by the contract and by applicable Georgia statutes and Rules and Regulations. The failure of a contract agency to report suspected abuse or neglect of a child to DHR/DFCS shall result in appropriate process being issued in accordance with applicable statutes, rules and regulations for immediate termination of the contract or placement of the provider on probation, and a repeated failure within one year shall result in termination of the contract.

C.     DHR shall ensure that all child-caring institutions or child-placing agencies that provide placements and services to class members report to DHR accurate data on at least a bi-annual (6 months) basis so that their compliance with the terms of this Consent Decree can be measured.

D.     DHR, through its Office of Regulatory Services ("ORS"), shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placements and services to class members, to ensure, among other things, the safety and well being of class members and to ensure that the contract agency is complying with the applicable terms of this Consent Decree. As part of such evaluations, ORS shall ensure that each child-caring institution and child-placing agency shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations, and that, in addition, 5% of family foster homes or a total of 10 homes (whichever is greater, or all homes for agencies providing less than 10 homes in total) provided by each child-placing agency shall receive such an unannounced annual inspection to review all relevant aspects of the agency/institution's operations. ORS shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license-holders' deficiencies, ORS may use such remedies as are provided by applicable Georgia statutes and Rules and Regulations.