# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

KENNY A., by his next friend, :
Linda Winn, et al., :
 :
Plaintiffs, :   CIVIL ACTION
 :
   v. :   1:02-CV-01686-MHS
 :
SONNY PERDUE, et al., :
 :
Defendants. :

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF
## RENEWED MOTION FOR AN AWARD OF
## <u>REASONABLE ATTORNEYS' FEES AND EXPENSES</u>

Plaintiffs respectfully submit this reply brief in support of their Renewed

Motion for an Award of Reasonable Attorneys' Fees and Expenses [Dkt. 683].

## <u>PRELIMINARY STATEMENT</u>

Plaintiffs' Renewed Motion presents four distinct, severable, and well-

supported bases for an appropriate upward adjustment to the initial lodestar fee

award authorized by the Supreme Court's guidance in *Perdue v. Kenny A*, 130 S.

Ct. 1662, 1673-74 (2010).  State Defendants, having waged four years of appellate

litigation unsuccessfully urging a judicial prohibition on any Civil Rights

Attorneys' Fees Act award north of lodestar,[1] continue to oppose any enhancement in this case on the theory that the "true market value" of the legal services at issue was cast in stone by Plaintiffs' initial 2005 fee application offering proof of Standard Hourly Rates then prevailing in the Atlanta market for the garden-variety delivery of legal services in cases presenting no necessity for an extraordinary outlay of expenses and no exceptional delay in payment.  But the very reason the parties are back before this Court on remand is the Supreme Court's clarification of the standards on which hourly rates may be enhanced *prior* to the lodestar calculation.  Plaintiffs' Renewed Motion provides specific evidentiary support authorizing enhancement under the principles the Supreme Court has articulated.

Defendants seek to re-litigate four key factual determinations already made by this Court in its Order of October 3, 2006.  These findings of fact were left untouched on appeal.  As such, they constitute the law of this case.  First, this Court found that "plaintiffs' success in this case was truly exceptional."  454 F. Supp. 2d 1260, 1289 (N.D. Ga. 2006).  Second, this Court determined that class

---

[1] Following the United States Supreme Court's decisions in *Blum v. Stenson*, 465 U.S. 886 (1984) and *Hensley v. Eckerhart*, 461 U.S. 424 (1983) authorizing upward adjustments of lodestar in appropriate civil rights enforcement cases, certain members of Congress offered legislation to cap Civil Rights Attorneys Fees awards at lodestar.  Legal Fee Equity Act, S. 2802, 98th Cong. § 6(a)(2) (1984); *see also* Legal Fee Equity Act: Hearing on S. 2802 Before the Subcomm. on the Const. of the S. Comm. on the Judiciary, 98th Cong. 4-5 (1985).  This proposed legislation failed.

counsel's work "far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar." *Id.* Third, this Court found that the litigation was unnecessarily protracted due to the Defendants' conduct. *Id.* at 1266, 1268, 1296. Fourth, this Court found that the Standard Hourly Rates did not take into account the Plaintiffs' extraordinary investment of human and capital resources. *Id.* at 1288.

Defendants challenged these findings on appeal by urging both the Eleventh Circuit and the Supreme Court to render them irrelevant through judicial amendment of the Civil Rights Attorneys Fees Act through the fee cap Congress considered, but rejected. Instead, the Supreme Court reaffirmed that exceptional performance and results remain a valid basis for enhancement—and left this Court's findings intact. *Perdue*, 130 S. Ct. at 1673-74; *see also Perdue v. Kenny A.*, 129 S. Ct. 1907, 1907 (2009). The Supreme Court did not remand the case for a *de novo* inquiry into the facts justifying enhancement; rather, it asked this Court, if it continues to think enhancement appropriate, to "sufficiently link" each factor justifying enhancement to "proof in the record" and give a "reasonably specific explanation" for its fee computation. 130 S. Ct. at 1675-76.

Plaintiffs' Renewed Motion supplements the evidentiary record with case-specific evidence, including: market data identifying Atlanta hourly rates in

October of 2005; an expert economist's report evaluating the reasonableness of a fee award limited to 2005-vintage Standard Hourly Rates and analyzing the issues of permissible enhancement from an economics perspective; the testimony of four disinterested Atlanta lawyers with personal knowledge of the Atlanta legal community, the Atlanta market for legal services, and the business/law practice management realities facing lawyers and law firms contemplating prosecution of lengthy, complex and difficult class litigation; and an analysis of the appropriate rate of interest necessary to compensate Plaintiffs for shouldering the costs of this litigation from 2001 (when the pre-suit fact investigation began) until October 2005 (when the Court's fee and expense award began accruing interest).  This evidence independently and severally supports four specific grounds for enhancement:  (i) a "true up" of Plaintiffs' hourly rates to the high end of the Atlanta market; (ii) an adjustment for opportunity cost; (iii) compensation for the delay in payment of attorneys' fees; and (iv) compensation for the four-year delay in payment of expenses.

Defendants' response is short on rebuttal evidence; it amounts to unsupported argument that this Court should reconsider its now-settled findings of fact and reverse course on its prior determinations that a fee award limited to 2005-vintage lodestar (without adjustment) is unreasonably low and that enhancement is

necessary to fashion a reasonable award.   What is most notable about Defendants'

response is where it falls silent.  The Renewed Motion is supported by the

declarations of four well-respected members of the Atlanta bar who opine that

Standard Hourly Rates would be insufficient to attract counsel competent under the

standards of Rule 23(g) to prosecute a class case of this magnitude.[2]   Defendants

dispute this assertion, but offer no evidence to support their position.  In the

absence of such evidence, there is no material dispute that an award capped at

lodestar is inadequate and enhancement is necessary in this case to make the

Court's fee award reasonable.

## ARGUMENT

## I.      The Law of the Case Precludes Revisiting Prior Fact Findings.

Defendants devote a substantial portion of their response to contesting facts

already found by this Court in its Order of October 3, 2006.  The response

commences with an assertion that this case is neither rare nor exceptional.  Defs.'

Resp. in Opp'n to Pls.' Renewed Mot. for Reasonable Attorneys' Fees and

Expenses [Dkt. 694] ["Opp'n"] at 1.  Defendants' assertion swims upstream

against the Court's previous finding that "plaintiffs' success in this case was truly

---

[2] *See* Pls.' Br. in Support of an Upward Adjustment [Dkt. 683-1] (hereinafter "Opening Br.") at 21-22 (citing Chandler Supp. Decl. ¶ 10; Fellows Supp. Decl. ¶ 10; Knowles Supp. Decl. ¶ 9; Rawls Supp. Decl. ¶ 9).

exceptional," and that counsel's work "far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar." 454 F. Supp. 2d at 1289.  Defendants' response also attacks the Court's previous findings on how Defendants' litigation strategy and conduct bears on the amount of an appropriate fee award.  However, this Court already found, among other things, that Defendants unnecessarily delayed the progress of the litigation and prolonged its conclusion by "seeking repeatedly to limit plaintiffs' discovery efforts," *id.* at 1266, and to "hinder the discovery process," *id.* at 1268 (citing Order of January 7, 2003 [Dkt. 145], at 4); *see also id.* at 1266, 1296.

These findings are the settled law of this case.  *See United States v. Escobar-Urrego,* 110 F.3d 1556, 1560 (11th Cir. 1997) ("Under the law of the case doctrine, a legal decision made at one stage of the litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation, and the parties are deemed to have waived the right to challenge that decision at a later time.") (quoting *Williamsburg Wax Museum v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987)).  "Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous."  Fed. R. Civ. P. 52(a)(6).  Indeed, district courts are loathe to

reconsider fact findings that, notwithstanding a vacatur or reversal, were not disturbed on appeal.[3]

Neither the Eleventh Circuit nor the Supreme Court overturned this Court's previous determinations that Defendants' litigation strategy and conduct prolonged the litigation, delayed its resolution, and forced Class Counsel to absorb higher expenses, a larger investment of labor, and higher opportunity costs.[4]  Rather, the Supreme Court majority focused on its perceived need for a more particularized description of the basis and calculations underlying this Court's enhancement award.  130 S. Ct. at 1675-76 (concluding that the District Court must "sufficiently link" each factor justifying enhancement to "proof in the record" and give a

---

[3] *See Cobell v. Norton*, 224 F.R.D. 266, 283 (D.D.C. 2004) ("[T]he Court's findings of fact upon which the contempt orders were predicated were not vacated on remand, and thus 'the Court will treat those factual findings as having been established.'") (quoting *Cobell v. Norton*, 283 F. Supp. 2d 66, 85 (D.D.C. 2003)); *Rambus, Inc. v. Infineon Techs. AG*, 222 F.R.D. 280, 286 (E.D. Va. 2004) (relying on prior findings of fact because appellate court "left undisturbed those findings notwithstanding that it vacated the award of attorneys fees"); *Knight v. Alabama*, 900 F. Supp. 272, 374 (N.D. Ala. 1995) (incorporating findings of fact not reversed on appeal).

[4] *Perdue,* 130 S. Ct. at 1676 ("[W]e do not question the sincerity of the District Court's observations [regarding the "performance of counsel"], and we are in no position to assess their accuracy."); *see also Kenny A. v. Perdue*, 532 F.3d 1209, 1250 (11th Cir. 2008) (Wilson, J., concurring) ("In finding exceptional results here, the district court did not err in considering the fact that the remedies agreed upon by the parties exceeded its own expectations as to the nature and scope of relief likely to result from this litigation.").

"reasonably specific explanation for all aspects of a fee determination.").[5]  With

respect to the delay in reimbursement for extraordinary outlays of expenses, the

Court insisted only that the District Court provide a calculation of the amount of

enhancement attributable to this factor.  *Id.* at 1676 ("The District Court . . . did not

calculate the amount of the enhancement that is attributable to this factor. . . . [or]

provide a calculation of the cost to counsel of any extraordinary and unwarranted

delay").[6]  Indeed, the Supreme Court declined altogether to grant review of the

District Court's fact findings under the abuse-of-discretion standard.  *Perdue*, 129

S. Ct. at 1907.

The Supreme Court did not instruct the District Court to reconsider its

findings of exceptional performance and results or extraordinary delay; indeed,

there are no new rules governing that determination that would require

reconsideration.  Because this Court already made the predicate fact findings

---

[5] *See also* 130 S. Ct. at 1684 (Breyer J., concurring in part and dissenting in part)
(noting that the Supreme Court's decision "does not purport to prohibit the District
Court from awarding an enhanced fee on remand *if that court provides more
detailed reasoning supporting its decision*") (emphasis added).

[6] *See also* 532 F.3d at 1248 (Wilson, J., concurring) ("Here, the affidavit testimony
indicates that the rates used to calculate the lodestar, although current, would be
inadequate to provide a reasonable fee in light of the exceptionally high
commitment of capital resources by the attorneys and the three-year delay in
receipt of payment. The district court properly relied on this evidence in
concluding that an upward adjustment was warranted.").

entitling Plaintiffs to an enhancement to the lodestar, the sole task for this Court is to detail its calculation of enhancement and link those calculations to specific record evidence.

## II.   The Proof Warrants an Upward Adjustment in 2005 Hourly Rates.

### A.   <u>Plaintiffs Are Not Precluded from Seeking Upward Adjustment of the Standard Hourly Rates</u>

Defendants quote selectively from Plaintiffs' 2005 fee application and the finding of this Court that "the requested [standard] hourly rates are fair and reasonable," 454 F. Supp. 2d at 1286 & n.6, and contend that Plaintiffs are now, in effect, estopped from seeking enhancement based on the true market value of the services rendered.  Defendants' argument ignores the other half of the story: as the declarations supporting the initial 2005 fee application make plain, the Standard Hourly Rates were predicated on assumptions not present in this case, and as such, were insufficient.  Indeed, Defendants exclude the very next sentence of the quoted portion of this Court's opinion:  "If anything, [the Standard Hourly Rates] are too low."  *Id.*

As a threshold matter, Plaintiffs were *required* to submit unadjusted rates to calculate the lodestar before requesting enhancement.  In *Perdue*, the Supreme Court clarified that enhancement due to extraordinary performance and results now occurs as a part of (as opposed to after) the lodestar calculation.  The Supreme

Court instructed in *Perdue* that the district court must "adjust the attorney's *hourly rate* in accordance with specific proof linking the attorney's ability to a prevailing market rate." 130 S. Ct. 1674 (emphasis added). The method of computation under *Perdue* is different from the Supreme Court's prior cases, which spoke of adjustment of the lodestar as a whole. *E.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983) ("There remain other considerations that may lead the district court to adjust *the fee* upward or downward, including the important factor of the 'results obtained.'") (emphasis added); *Blum v. Stenson*, 465 U.S. 886, 897 (1984) ("[T]here may be circumstances in which the *basic standard* of reasonable rates multiplied by reasonably expended hours results in a fee that is either unreasonably low or unreasonably high.") (emphasis added). Not surprisingly, prior to *Perdue*, the Eleventh Circuit likewise observed that an enhancement due to results obtained should be made to the lodestar based upon a finding that the attorneys' normal hourly rate is insufficient. *Norman v. Hous. Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("If the results obtained were exceptional, then some *enhancement of the lodestar* might be called for. . . .") (emphasis added).

Thus, prior to *Perdue*, the rules governing enhancement required that the fee applicant claim *unadjusted* rates, and introduce evidence compelling adjustment of the lodestar as a whole. That is precisely what Plaintiffs did in their initial

application.  That does not foreclose Plaintiffs now from following *Perdue*'s

instruction to link class counsel's "true market value, as demonstrated in part

during the litigation" to a "prevailing market rate."  130 S. Ct. at 1674.

Notably, even prior to *Perdue*'s instruction that an applicant must seek

adjustment to the *hourly rate* as opposed to the *lodestar* as a whole—Plaintiffs

emphasized that the Standard Hourly Rates submitted with the original application

did not comport with the value conferred by class counsel's work.  As Plaintiffs

noted in the affidavits supporting their initial application, the Standard Hourly

Rates did not factor in various additional factors, including the substantial

investment of resources required and the result obtained and value conferred on the

plaintiffs' class.  Bramlett Decl. [Dkt. 495-4] ¶ 5; Bramlett Supp. Decl. [Dkt. 683-

2] ¶¶ 4-5; Opening Br. at 20-23.  This Court agreed.  *See* 454 F. Supp. 2d at 1288

("Specifically, the evidence shows that the hourly rates used in the lodestar

calculation do not take into account (1) the fact that class counsel were required to

advance case expenses of $1.7 million over a three-year period with no ongoing

reimbursement, (2) the fact that class counsel were not paid on an on-going basis

as the work was being performed, and (3) the fact that class counsel's ability to

recover a fee and expense reimbursement were completely contingent on the outcome of the case.").[7]

Indeed, based on its previous finding that the Standard Hourly Rates were an insufficient measure of the value conferred by class counsel's legal service, this Court already found that counsel's work "far exceeded what could reasonably be expected for the standard hourly rates used to calculate the lodestar." 454 F. Supp. 2d at 1289.  Therefore, the task left for this Court is to calculate the amount of enhancement due to this factor and identify the specific reasoning for the enhancement amount chosen.

B.   The Specific Evidence Justifies an Upward Adjustment of 50.16% to the Standard Hourly Rates

With their Renewed Motion, Plaintiffs supplemented the evidentiary record with an economist's valuation of the legal services provided in this case and comprehensive market data reflecting the hourly rates charged in Atlanta at the time the Consent Decree was entered in October of 2005.  Defendants do not dispute that the level of performance in this case was high,[8] and this Court

---

[7] Plaintiffs do not seek an upward adjustment in the Standard Hourly Rates based on contingency.  *See City of Burlington v. Dague*, 505 U.S. 557, 567 (1992).

[8] *See* Petitioner's Br. on the Merits at 59 ("[T]he fact that Plaintiffs' counsel performed with the highest degree of skill and professionalism entitles them to be compensated by the same reasonable hourly rate in the prevailing market as any

previously recognized that class counsel's performance during the merits litigation was superior.  454 F. Supp. 2d at 1286-88.  Therefore, Plaintiffs' analysis began with the premise that the value of the legal services delivered by class counsel tracked the upper level of rates in the Atlanta market for legal services.  Feinstein Report [Dkt. 683-8] ¶¶ 34-35.  Dr. Feinstein's report concluded that the Standard Hourly Rates used to calculate the lodestar must be upwardly adjusted by 50.16% to parallel the lower end of hourly rates charged in 2005 by the upper quartile (top 25%) of Atlanta law firms practicing non-intellectual-property litigation.  *Id.* ¶¶ 33-41.

### 1.   *The Feinstein Report is Admissible and Credible.*

Defendants have not moved to exclude the Feinstein Report.  Nevertheless, they argue that the Feinstein Report is not admissible because Dr. Feinstein is not an expert in "law firm economics" and he has not provided "documentation" of all data he considered in reaching his conclusions.  Opp'n at 31-34.  Neither objection forecloses fair consideration of the Feinstein Report.

As an initial matter, the Eleventh Circuit's leading *Daubert* case rejected the very same argument that Defendants make here concerning Dr. Feinstein's

---

other lawyer who is required to represent his or her client with the same degree of skill and professionalism"); *id.* at 61 (acknowledging that "[c]lass counsel in this case performed extremely well," but contending that the lodestar was sufficient).

purported lack of expertise in a particular industry.  In *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001), the defendants challenged whether an economist could properly value the losses incurred by the plaintiffs in the real estate industry because the economist "ha[d] no real estate development experience" and therefore no basis to estimate the losses incurred by plaintiffs in their failed business investment.  *Id.* at 665.  The Eleventh Circuit rejected the argument, noting that the expert had a "Ph.D. in economics from Yale, extensive experience as a professional economist, and a substantial background in estimating damages." *Id.* Therefore, the valuation of the plaintiffs' real estate investment losses were "sufficiently within his expertise." *Id.*[9]

Dr. Feinstein holds four degrees in economics, including a Ph.D. in economics from Yale University.  He has extensive practice and teaching experience as a professional economist, including work experience at the Federal Reserve Bank of Atlanta.  Beyond his extensive practical valuation experience as both a professional economist and an educator, he has "conducted analyses and presented opinions related to markets and valuation in over 50 cases." *See*

---

[9] *See also McCurdy v. Ford Motor Co.*, 1:04-CV-155, 2006 WL 2793167, at * 4 (M.D. Ga. Sept. 26, 2006) ("An expert may testify who has general training, education and experience in the field in question without having to have been specifically trained in the particular specialized area in question.").

Feinstein Report ¶ 13 & Ex. 2.  As such, Dr. Feinstein is competent to provide a valuation of plaintiffs' legal services.

Furthermore, Dr. Feinstein's report is both relevant and reliable.  And, while its admissibility is not required to support the range of enhancements presented to the court, the report certainly offers assistance to the Court in fashioning a reasonable fee award.  Before arriving at his conclusions, Dr. Feinstein reviewed five data sources, seven pieces of academic scholarship, and the relevant legal documents relating to this motion.  Dr. Feinstein analyzed the data provided by the *Daily Report*'s survey of 2004, 2005, and 2006 hourly rates as well as hourly rate data compiled by PriceWaterhouseCoopers LLP from 21 Atlanta law firms specializing in non-intellectual-property litigation—the precise category of legal work at issue here.  Feinstein Report Ex. 1.   Defendants complain that Dr. Feinstein does not describe "what firms participated" or "which attorneys were included," but PriceWaterhouseCoopers conducts its survey without identifying the specific firms and attorneys in order to facilitate participation and accuracy. Defendants have offered no reason to call into question the accuracy of the PriceWaterhouseCoopers data or any other data on which Dr. Feinstein relied.

Nor must Dr. Feinstein have provided further "documentation" of the raw data underlying the surveys on which his report relies.  Defendants cite no rule of

law supporting their contention that an expert report that identifies and describes

the conclusions of an independent study or survey must nevertheless be excluded

as "unreliable" if it is not accompanied by every scrap of raw data underlying the

conclusions of the survey.  Moreover, Plaintiffs were constrained from filing the

PriceWaterhouseCoopers survey because the survey is conducted on a confidential

basis and, as a condition of participation, PriceWaterhouseCoopers requests that

the law firms who participate in the survey hold it as confidential.

Courts have often relied on expert economists in evaluating attorney fee

applications.  *E.g., Salazar v. District of Columbia*, 123 F. Supp. 2d 8, 15 (D.D.C.

2000) (relying on expert economist in fashioning reasonable hourly rates); *English*

*v. Sec'y of the Dep't of Health & Human Servs.*, No. 01-61V, 2006 WL 3419805, at

*1-2 n.5 (Fed. Cl. Nov. 9, 2006) (relying on expert economist's analysis in

adjusting attorney fee to market rates); *see also Kristian v. Comcast Corp.*, 446

F.3d 25, 52 (1st Cir. 2006) (relying on declaration of expert economist in finding

that, in light of "huge outlay of financial resources" and absence of sufficient

attorney fee award, plaintiff "would undoubtedly have an impossible time securing

legal representation").  The Feinstein Report simply offers assistance to the Court

in determining the market value of Plaintiffs' legal services.  Defendants offer no

plausible reason to dispute the Report's accuracy or validity.  It should therefore be considered.

       2.    *Plaintiffs' Other Comparator Evidence Supports Upward Adjustment.*

Defendants also contest Plaintiffs' use of the Fulton County *Daily Report* survey of 2005 Atlanta hourly rates.  They protest valuing the legal services delivered by Plaintiffs' counsel by comparison to the upper echelon of Atlanta lawyers.  These arguments are also easily rejected.

Defendants first argue that the rates of Children's Rights attorneys should be reduced because they received lower awards and did not seek enhancements in other litigation that resulted in negotiated settlements.  Opp'n at 28-29.  This argument—that this Court should consider other litigation brought by Children's Rights, in which fees were negotiated—has been twice rejected by this Court as "unpersuasive."  Order of May 13, 2010 [Dkt. 647] at 30-31; *see also* 454 F. Supp. 2d at 1286.  Furthermore, Plaintiffs sought no upward adjustment of the hourly rates awarded by this Court's Order of May 13, 2010, because compensation was sought for post-judgment monitoring work that did not require exceptional outlays of time and capital.

Defendants also argue for lower hourly rates reportedly charged by defense-oriented firms and reject the comparison of Plaintiffs' counsel to "highly

specialized, principally transaction" attorneys.  Defendants argue, again without

evidentiary support, that it is "commonly recognized" that these rates are "higher

than general litigation, much less civil rights litigation."  Opp'n at 37-42.

When the 94th Congress enacted Section 1988, it made clear that "civil

rights plaintiffs should not be singled out for different and less favorable

treatment."  H.R. Rep. No. 94-1558, p. 9 (1976).  Furthermore, this Court has

firmly "reject[ed] any suggestion that bankrupt corporations are entitled to better-

paid counsel than abused and neglected children."  Order of May 13, 2010 at 28.

While Defendants find comparisons to lower-priced attorneys convenient, they

offer no evidence and no plausible justification for equating the demands and

opportunity costs presented by this case with the discounted level of hourly rates

negotiated between law firms and insurance companies in return for a high volume

of repetitive legal work.  Defendants' position overlooks the fact that the rigorous

scrutiny of would-be class counsel specified in Rule 23(g) imposes a set of

demands on class counsel in class actions quite different from "general litigation"

and more akin to specialized transactional counsel.

Indeed, this Court has previously considered and relied upon the hourly rate

surveys conducted by the *Daily Report* in evaluating the reasonableness of

plaintiffs' request for monitoring fees, and found that class counsel compare to the

higher end of these rates "in light of the above average skill and experience of plaintiffs' co-lead counsel and the above average quality of plaintiffs' counsel's work in this case." Order of May 13, 2010 at 26-27.[10] This determination was never challenged by Defendants.

> ### 3. *Defendants Offer No Specific Evidence to Dispute that No Lawyers Competent to Pursue this Action Would Have Been Adequately Attracted by the Lodestar Alone.*

The evidence accompanying Plaintiffs Renewed Motion establishes that members of the private bar in Atlanta with the legal ability, expertise, and necessary resources to successfully handle a comparably complex federal class action would not have been attracted to take this case by the prospect of being paid Standard Hourly Rates. For example, John Chandler attested under oath that "no competent lawyer or law firm would accept and prosecute this case on a fee limited to the Standard Hourly Rates . . . . Any private, for-profit law firm, would be ill-advised to take such a case, and I do not think any would." *See* Opening Br. at 21-22 (citing Chandler Supp. Decl. ¶ 10.) Three other well-respected members of the Atlanta Bar expressed a similar opinion. *See id.* at 21-22 (citing Fellows Supp. Decl. ¶ 10; *also* Knowles Supp. Decl. ¶ 9; Rawls Supp. Decl. ¶ 9).

---

[10] The Court also observed that Defendants hired litigation attorneys at substantially higher hourly rates than those included within the *Daily Report* survey. *Id.* at 28-30.

839318.1

Defendants attack this opinion testimony as guided by a "self-interest" in inflating hourly rates. Opp'n at 44-45. Tellingly, Defendants' response does not offer a shred of evidence to support this assertion. Defendants offer no contrary opinion. Indeed, Defendants do not provide a single declaration of opinion that lodestar would have attracted competent counsel, much less identify a lawyer in Atlanta competent and willing to litigate this case for Standard Hourly Rates.

Defendants also recycle their argument that lower hourly rates awarded in other cases brought in the Northern District of Georgia show that no enhancement is necessary in this case. *Id.* at 55-56. Of course, not a single one of these cases involved a class action. None was found to be "rare" or "exceptional." None involved the extraordinary human and capital resources advanced in this case. None was found to be exceptionally protracted due to the defendant's dilatory conduct.[11] This Court previously observed that non-class cases are unlikely to be

---

[11] Defendants argue that no enhancement was awarded in *Webster v. Fulton County*, 112 F. Supp. 2d 1339, 1376-78 (N.D. Ga. 2000) (Thrash, J.). But *Webster*, which involved a landscape company's claim of discrimination against Fulton County in the manner in which Fulton County awarded contracts, was not certified as a class action, involved less than the a quarter of the work required in *Kenny A.* and less than $1/20^{th}$ the expenses, "did not break new ground," and required no "special economies of time" or "unusually difficult circumstances that are not already reflected in the lodestar calculation." *Id.*

Defendants also cite *Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004), where Republican-affiliated plaintiffs challenged legislative redistricting by the Democratic-controlled Georgia General Assembly following the 2000 census. In

appropriate comparators.  Order of May 13, 2010 [Dkt. 647] at 30 (concluding that

Defendants' reliance on "the fee awards granted in a handful of other cases in this

Court" were "not persuasive" because "[a]ll involved relatively simple individual

claims; none was a class action" involving "systemic reform of a state agency" and

because none "purport to be a comprehensive survey or a statistically accurate

sampling of the hourly rates awarded in this district and division").[12]

Revealing the weakness of their position, Defendants even characterize

Plaintiffs' request for an upward adjustment as "demeaning" because attorneys

should feel compelled to litigate civil rights cases in the public interest on a *pro

bono* basis.  (Opp'n at 60 n. 41.)   However, Congress recognized that the viability

of organizations like Children's Rights largely hinges on the availability of

---

contrast to this case, *Larios* was litigated start to finish on an expedited basis less
than two years.  The level of capital outlay in *Larios* was less than 10% of what
was required in this case and it is unclear whether that expense was borne by
plaintiffs' counsel.  Likewise, in *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d
1326 (N.D. Ga. 2005), no enhancement was sought in a case where the plaintiffs
successfully sought a preliminary injunction against enforcement of Georgia's
voter-identification law before the law was subsequently amended.

[12] Defendants also included a chart of over 200 out-of-district civil rights cases.
Defendants argue that the fact that lawyers took these cases at lower rates and
without enhancement shows that un-enhanced awards of hourly rates adequately
attract counsel nationwide to handle civil rights cases.  These cases are unavailing,
because none of them remotely shares the factual characteristics or scope of *Kenny
A.*, and not a *single* case listed in this chart was litigated in the Northern District of
Georgia or involved Atlanta market rates.

839318.1

attorney fee awards guaranteed by Section 1988 and so "did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization." *Blum v. Stenson,* 465 U.S. 886, 894 (1984).[13]

The specific evidence described above and on pages 23-33 of Plaintiffs' opening brief demonstrates that the market value of class counsel's legal services exceeded the Standard Hourly Rates by a measure of $3,016,305.32 (50.16%). Because Defendants offer no valid basis to dispute this evidence, this measure of adjustment is fully justified.[14]

---

[13] In *Blum,* the Court upheld the fee award for lawyers from the Legal Aid Society of New York, which, like Children's Rights, is a private non-profit legal assistance organization. The Court then allowed the charitable foundation attorneys to recover fees at the market rate for attorneys in the area. *Id.* at 894; *see also Tillman v. Wheaton-Haven Recreation Ass'n,* 517 F.2d 1141, 1148 (4th Cir. 1975) (concluding "when an allowance of attorneys' fees is justified, it should be measured by the reasonable value of the lawyer's services. It should not be diminished because the attorney has agreed to contribute the money, in whole or in part, to a civil rights organization whose aims have stimulated him to work voluntarily."); *see also Blanchard v. Bergeron,* 489 U.S. 87, 94-95 (1989).

[14] Defendants mischaracterize Plaintiffs' Renewed Motion as a single, indivisible compound request for "97.83% more than the lodestar," *i.e.*, "an amount even greater than the . . . enhancement . . . that was reversed by the Supreme Court." (Opp'n at 13.) This is incorrect. Plaintiffs advance four well-supported and entirely severable arguments to support a range of reasonable enhancements and ask the Court to select the level of enhancement it deems reasonable and appropriate. (Opening Br. at 6, 54.)

### III.   An Upward Adjustment for Opportunity Cost is Supported by the Specific Evidence.

As an additional and severable argument supporting enhancement, Plaintiffs also introduced evidence that Atlanta law firms qualified under Rule 23(g) to pursue class representation would have demanded a premium above hourly rates to compensate them for the opportunity cost of pursuing this litigation in lieu of other class action matters.  *See* Opening Br. at 39-40.  Specifically, John Chandler, Ralph Knowles, and James Rawls attested that, in light of the increased overhead, significant investment of resources, and the opportunity cost of financing this case instead of undertaking more lucrative defense work or plaintiffs' class action cases, Rule 23(g) qualified lawyers would insist upon an additional and separate premium of between 20-100% above the fee amount generated by an hourly-rate based lodestar calculation.  *Id.* (citing Chandler Supp. Decl. ¶ 11 (premium of 50%); Knowles Supp. Decl. ¶ 12 (premium of 25-100%); Rawls Supp. Decl. ¶ 10 (premium of 20%)).  On the basis of this evidence, Plaintiffs requested the lowest measure of 20% as an independent and non-contingent factual measure of what qualified law firms would charge for class counsel's time expenditures in this class action.

Defendants assert that compensating Plaintiffs for their lost opportunity costs would amount to double compensation for Plaintiffs' delay in recovery of

fees and expenses as measured by the initial lodestar award.  However, the cost of

foregoing a more remunerative fee award in other class action matters is separate

and apart from recovering for delay in payment of that fee award.  Each declarant

explicitly distinguished between opportunity cost and these other factors as a basis

for enhancement.  *See* Knowles Supp. Decl. [Dkt. 683-6] ¶ 12 (distinguishing

between lost opportunity costs, delay in payment of expenses, and delay in

payment of attorneys' fees); Chandler Supp. Decl. [Dkt. 683-4] ¶¶ 10-13 (noting

that opportunity-cost enhancement was "additional and separate" from

reimbursement for delay in payment of costs and attorney's fees); Rawls Supp.

Decl. [Dkt. 683-7] ¶¶ 10-12 (same)).

Defendants offer no evidence to dispute this valuation, and instead argue

that valuing the opportunity cost constitutes a forbidden request for a contingency-

based enhancement.  This is simply incorrect.  This measure of adjustment is

necessary to achieve attorney-fee parity between class civil rights and other

*presumptively successful* class cases, in order to adequately attract competent

counsel to pursue a meritorious class civil rights action.  *See Norman*, 836 F.2d at

1300 (attorney's fee awards under Section 1988 in "[m]ajor civil rights class action

matters might be akin to plaintiff's class actions in antitrust and securities

matters"); *Daly v. Hill,* 790 F.2d 1071, 1082 n. 15 (4th Cir. 1986) ("A proper

analysis of the question of whether other employment is precluded should consider the extent to which time spent on the case in question precludes the attorneys from engaging in other gainful employment.  This *Johnson* factor recognizes that the effect of the case on an attorney's ability to do other potentially lucrative work may *in some cases make an upward adjustment of the hourly rate necessary to accomplish full compensation.*") (emphasis added).  This factor does not compensate Plaintiffs for risk of loss because the opportunity cost is measured against only class actions which are presumptively successful.

Because the undisputed evidence shows that Atlanta attorneys would have expected, at a minimum, a premium above lodestar to adequately attract class counsel qualified under Rule 23(g), Plaintiffs request the most conservative measure supported by this unrebutted evidence, *i.e.*, an enhancement of 20% over the lodestar computation.

## IV.   The Delay in Payment of Both Attorneys' Fees and Reimbursable Expenses Should Be Compensated at the Standard Rate of Interest Identified in the Feinstein Report.

Plaintiffs' supplemental brief also requests that the Court fashion a standard rate of interest to compensate Plaintiffs' for the delay in payment of attorney's fees and reimbursable expenses.  Dr. Feinstein opined that the appropriate rate is the Merrill Lynch High Yield Bond Index, which represents the high end of corporate

borrowing rates during the 2002-05 time period of this litigation.  Feinstein Report ¶¶ 52-56.

Besides improperly re-litigating this Court's finding of extraordinary delay (discussed *supra* at Section I), Defendants contend that Plaintiffs were already compensated for the delay in payment of fees because the Court fashioned its lodestar award based upon 2005 hourly rates.  However, in light of the extraordinary amount of human and capital resources invested in this case, Plaintiffs' evidence demonstrates that an award limited to 2005 hourly rates would have been insufficient to attract competent counsel to make the substantial investment of capital and human resources to pursue this case.  Opening Br. at 43-49.  Accordingly, Plaintiffs seek an enhancement based upon the standard rates of interest applicable during the relevant time period *reduced by* the increase in the award attributable to the use of 2005 rates for all work performed between 2002 and 2005.  This amount does not result in double compensation because the use of 2005 hourly rates is removed from Plaintiffs' calculation of the appropriate enhancement for delay in payment of attorney's fees.[15]

---

[15] Nor do Plaintiffs seek reimbursement for the delay in payment of the lodestar award between the entry of the Consent Decree on October 27, 2005, and Defendants' belated payment of the lodestar fee in May 2010.  Plaintiffs have acknowledged that this delay has been compensated by post-judgment interest. *See* Opening Br. at 50 & n.27; Feinstein Report ¶ 60.

839318.1

Neither *Perdue* nor the Eleventh Circuit's subsequent decision in *Gray v. Bostic*, 613 F.3d 1035, 1046 (11th Cir. 2010), forbid this computation.  *Perdue* reaffirmed that an upward adjustment may be warranted for a delay in reimbursement of expenses, "particularly where the delay is unjustifiably caused by the defense."  130 S. Ct. at 1675.  Indeed, although *Perdue* recognized that such delay could be compensated by basing the award on current rates or by adjusting the attorney's hourly rate to present value, it expressed a preference for the measure Plaintiffs seek.  *Id.* at 1674-75 (holding that "the enhancement [for delay in payment of fees] should be calculated" by applying a "standard rate of interest" to the fees awarded).  And in *Gray*, the Eleventh Circuit simply emphasized that a Court could not award both current hourly rates *and* a standard rate of interest. 613 F.3d at 1045-46.  That is not what Plaintiffs seek here, since the fee increase due to use of 2005 rates has been eliminated by subtracting the rate of inflation in legal fees from the applied standard rate of interest.  *See* Feinstein Report ¶¶ 57 - 59.

Given the extraordinary outlay of resources required to advance almost 30,000 hours of attorney time, the more appropriate measure of the cost of delay in this case is the cost Plaintiffs would be required to incur to borrow the funds

necessary to finance this case.[16]   As Judge Wilson recognized in his concurring

opinion, an award limited to 2005 hourly rates would not sufficiently compensate

Plaintiffs for these carrying costs:

> But we did not hold in *Norman* that the use of current rates will always be sufficient to compensate for delayed payment. Here, the affidavit testimony indicates that the rates used to calculate the lodestar, although current, would be inadequate to provide a reasonable fee in light of the exceptionally high commitment of capital resources by the attorneys and the three-year delay in receipt of payment. The district court properly relied on this evidence in concluding that an upward adjustment was warranted.

532 F.3d at 1248 (Wilson, J., concurring).

---

[16] Other courts have likewise expressed a preference for this approach.  *See*, *e.g.*, *FDIC v. Maxxam, Inc.*, 523 F.3d 566, 596 & n. 170 (5th Cir. 2008) (affirming delay reimbursement on this basis and noting that "[t]he district court's assessment of costs . . . captures the actual costs of the attorney's fees by including the cost of a loan that might be required to pay those fees—*i.e.*, the opportunity cost of money that could have been used for other purposes but instead went to the payment of fees." (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 402 (6th Cir. 2009) (noting that "two other circuits have held that a court may include a 'delay factor' as part of a sanctions award in order to account for the opportunity cost of money that could have been allocated to other purposes but instead went to pay attorney fees to defend against frivolous claims."); *Copeland v. Marshall*, 641 F.2d 880, 893 (7th Cir. 1980) ("That delay [in payment of attorneys' fees] can present cash-flow problems for the attorneys.  In any event, payment today for services rendered long in the past deprives the eventual recipient of the value of the use of the money in the meantime, which use, particularly in an inflationary era, is valuable.").

Defendants introduce no evidence to dispute the reasonableness of using standard corporate borrowing rates as the appropriate measure of reimbursement for delay.  Defendants assert that any interest applied to fees or expenses should equal the post-judgment interest rate, which is based upon the one-year constant maturity Treasury yield.  28 U.S.C. § 1961(a).  Since no one other than the United States Government could feasibly borrow funds at that interest rate (which in the previous year has fluctuated between 0.25 and 0.45%), it would be unrealistic to use it as a measure of the market value of the cost Plaintiffs incurred as a result of the delay in payment.  *See Gaines v. Dougherty County Bd. of Educ.,* 775 F.2d 1565, 1572 n. 14 (11th Cir. 1985) ("[U]sing current rates to account for the delay in payment is somewhat inaccurate as it assumes that the increase in legal fees mirrors that of inflation, which in many instances is not the case.  A more accurate method for adjusting for delays in payment would be to apply to the award a figure which is recognized as representing the time value of money over the period of the litigation.").

Defendants also challenge Plaintiffs' computation of the delay in payment of reimbursable expenses by contending that Plaintiffs "can only calculate interest based on the respective actual dates on which the expenses were incurred, from the date the Complaint was filed going forward . . . ."  Opp'n at 68.  In effect,

Defendants contend that Plaintiff should have presented to this Court an individualized time-value calculation of every single expenditure among the $739,958.67 in expenses advanced by class counsel.  However, Plaintiffs recognized in presenting their computation that not all expenses were advanced at the beginning of the litigation.  Accordingly, Plaintiffs' analysis assumed that these reimbursable expenditures "were incurred continuously over the four years leading up to October 2005."  Feinstein Report ¶ 68.  This is a conservative measure because a substantial number of Plaintiffs' expenses were incurred in the beginning and middle of the 2001-05 time period—before fact and expert discovery closed in February 2004 and before the parties embarked on over four months of settlement negotiations.  Furthermore, it is ill-advised for Defendants to advocate a rule requiring counsel to incur the additional fees and costs associated with adjusting to present value hundreds of individual expenditures—time which Defendants would likely be required to ultimately reimburse.  In cases involving voluminous fee documentation, well-grounded estimates are preferred.  *See Loranger v. Stierheim,* 10 F.3d 776, 783 (11th Cir. 1994) ("Where fee documentation is voluminous, . . . an hour-by-hour review is simply impractical and a waste of judicial resources.").

In sum, an enhancement comprising the value of class counsel's costs in advancing the extraordinary legal costs and expenses is necessary to fashion a fully

compensatory award in this case.  Accordingly, Plaintiffs request that the Court

upwardly adjust the lodestar by 21.11% for the delay in payment of their attorneys'

fees and 6.56% for the delay in payment of their qualifying expenses.

## V.     Post-Judgment Interest Should Be Awarded on Any Enhancement Award.

Defendants do not offer any response to Plaintiffs' argument that post-

judgment interest will have accrued on any portion of the enhancement that is

reinstated by this Court.  *See* Opp'n at 69-70.  Accordingly, Plaintiffs request that

the Court award post-judgment interest on any award of enhancement accruing as

of October 27, 2005.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court

exercise its discretion to award an upward adjustment of the Court's 2005 lodestar

fee award.  Plaintiffs have provided evidence to support enhancement on any or all

of the following bases:

1) An hourly rate adjustment of 50.16% to "true up" the hourly rates awarded in this case to higher hourly rates charged by Atlanta law firms in 2005;

2) An upward adjustment of 20% to compensate class counsel for the opportunity cost of pursuing this class action as opposed to more remunerative class action matters;

3)  An upward adjustment of 21.11% to recompense class counsel for the protracted delay in reimbursement of attorneys' fees; and

4)  An upward adjustment of 6.56% to recompense class counsel for the protracted delay in reimbursement of compensable expenditures.

Plaintiffs also ask that this Court award post-judgment interest accruing as of

October 27, 2005, on any enhancement award.

This 31st day of January, 2011.

/s/ Michael A. Caplan
JEFFREY O. BRAMLETT
Georgia Bar No. 075780
bramlett@bmelaw.com
MICHAEL A. CAPLAN
Georgia Bar No. 601039
caplan@bmelaw.com
BONDURANT, MIXSON & ELMORE, LLP
1201 W. Peachtree St. N.W., Ste. 3900
Atlanta, GA 30309
Phone: (404) 881-4100
Fax: (404) 881-4111

MARCIA ROBINSON LOWRY
*pro hac vice*
mlowry@childrensrights.org
IRA P. LUSTBADER
*pro hac vice*
ilustbader@childrensrights.org
LAURENCE D. BORTEN
*pro hac vice*
lborten@childrensrights.org
CHILDREN'S RIGHTS
330 7th Ave., Fl. 4

839318.1

New York, NY 10001
Phone: (212) 683-2210
Fax: (212) 683-4015

**COUNSEL FOR THE PLAINTIFFS'
CLASS**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rule 7.1D of the Local Rules for the District Court for the

Northern District of Georgia, I hereby certify that the foregoing pleadings has been

prepared in Times New Roman, 14 point font, as permitted by Local Rule 5.1B.

Respectfully submitted this 31st day of January, 2011.


<u>/s/ *Michael A. Caplan*</u>
Michael A. Caplan
Georgia Bar No. 601039

839318.1

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31st, 2011, I electronically filed Plaintiffs'

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF RENEWED MOTION**

**FOR AN AWARD OF REASONABLE ATTORNEYS' FEES AND**

**EXPENSES** with the Clerk of Court using the CM/ECF system, which will

automatically send e-mail notification of such filing to the following attorneys of

record:

Carmen R. Alexander
alexander.carmen@dol.gov

Elizabeth B. Taylor
elizabeth.taylor@cobbcunty.org

Mark Howard Cohen
mark.cohen@troutmansanders.com

Rolesia Butler Dancy
rolesia.dancy@fultoncountyga.gov

Thurbert E. Baker
tbaker@law.ga.gov

Vivica Mitchell Brown
vmbrown@co.dekalb.ga.us

Willie Jake Lovett, Jr.
willie.lovett@fultoncountyga.gov

Winston A. Denmark
wdenmark@fdwlaw.com

839318.1

Shalen S. Nelson
snelson@law.ga.gov
Andrew George MacKenzie
amackenzie@augustaga.gov

Overtis Hicks Brantley
ov.brantley@co.fulton.ga.us

Stephen E. Whitted
swhitted@co.dekalb.ga.us

William J. Linkous, III
blinkous@fmglaw.com

Charissa Ann Ruel
charissa.ruel@law.state.ga.us

J. Timothy Mast
tim.mast@troutmansanders.com

Terry Robert Howell
thowell@fieldshowell.com

Joshua Luke Becker
jbecker@alston.com


/s/ *Michael A. Caplan*
Michael A. Caplan
Georgia Bar No. 601039
(caplan@bmelaw.com)

839318.1