UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNY A., by his next friend Linda          :
Winn, *et al.*,                             :
                     Plaintiffs,            :        CIVIL ACTION NO.
v.                                          :        1:02-CV-1686-TWT
                                            :
NATHAN DEAL, *et al.*,                      :
                                            :
                     Defendants.            :

## STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN

On December 5, 2016, the Court entered the parties' Modified Consent Decree and Exit Plan [dkt. nos. 747 & 745-1] ("Exit Plan").  The parties jointly moved the Court to approve and enter this Stipulated Order to amend one Outcome Measure in the Exit Plan and incorporate the final Infrastructure Standards.

The parties have agreed (with the Accountability Agent's concurrence) to revise one Outcome Measure in the Exit Plan to make it consistent with DFCS' statewide policy regarding the time permitted to complete investigations of reported abuse or neglect of foster children.  Section VI.A.2 of the Exit Plan is hereby amended as follows (revision noted in underlined text):

2.  Completion of CPS Investigations Concerning Children in Foster Care: At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Chapter 6 of DFCS' Child Welfare Policy Manual, within 45 days of receipt of the report.

Section VIII of the Exit Plan set forth a process and timeline for establishing a set of Infrastructure Standards that will be used to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection to the Plaintiff Class of foster children in state custody in Fulton and DeKalb Counties.  After a specified negotiation period (which was extended through December 18, 2017 [dkt. no. 755]), the parties reached agreement on the Infrastructure Standards, which are attached hereto as <u>Exhibit A</u>. Pursuant to Section VIII.B of the Exit Plan, these "final Infrastructure Standards are enforceable obligations under th[e] Exit Plan, and the Accountability Agent, with the assistance of MTAT, will measure and report on the Infrastructure Standards in each subsequent reporting period."

Except as amended herein, all other provisions of the Modified Consent Decree and Exit Plan entered by this Court on December 5, 2016, shall remain in full force and effect.

IT IS SO ORDERED, this 19th  day of December, 2017.   

 **/s/Thomas W. Thrash**        
THOMAS W. THRASH

# EXHIBIT A

## INFRASTRUCTURE STANDARDS

DFCS retains the sole and complete authority to implement new or revise existing child welfare policies.  If DFCS proposes any revisions to the portions of the DFCS policies referenced in these Infrastructure Standards, DFCS will provide notice to the Accountability Agent and to Plaintiffs to discuss the potential impact on the Infrastructure Standards.  Once the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and Accountability Agent otherwise agree to revise the affected Infrastructure Standard(s).

## I.  COMPREHENSIVE PRACTICE MODEL

DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

## II. ASSESSMENT AND INVESTIGATION OF MALTREATMENT IN CARE

DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III.  To do so, DFCS will:
- conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case;
- take into account the traumatic stress of children;
- be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes;

- actively engage ongoing partnerships with families and stakeholders to assure child safety; and
- provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making.

A. Intake Assessment

1. As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle.

2. DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to:
   a. the family's previous response to intervention and treatment strategies;
   b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports;
   c. traumatic events affecting family members; and
   d. coping skills used by the family to deal with traumatic events.

B. Investigation

1. For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care.  The response time for a special investigation of maltreatment in care is immediate or within 24 hours.

2. For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below.

   a. When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all

placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s).

b. When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from the date of the report. The assessment includes, but is not limited to:
   i.   visiting the home of the caregiver;
   ii.  conducting separate face-to-face interviews with children, caregivers, and other household members; and
   iii. completing a policy violation assessment in the applicable foster parent record in SHINES.

c. Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months.

## III.   CASE PLANNING AND MANAGEMENT

DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making.

DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care.

A. DFCS will use current assessment information to inform case planning in foster care.

   1. A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised.

   2. The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term.  The FFA:
      a. includes engagement of the family in a partnership to identify safety concerns;
      b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine;
      c. tracks the sequence of everyday life events that led to the incident of maltreatment;
      d. identifies family developmental stages and associated challenges;
      e. identifies family supports;
      f. identifies child/youth development and associated vulnerabilities; and
      g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect.

B. DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (*see* DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs).  By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation.

C. DFCS will create and utilize genograms in case planning.

1. To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram.  The genogram will be used throughout the case process to identify potential placements and family supports.

2. Construction of the genogram shall:
   a. include at least three generations of family members on both sides of the family;
   b. embrace cultural differences regarding "who is family" and include all who serve in parental capacity;
   c. include natural helpers, friends, confidants of the caretakers, and older children; and
   d. indicate who was living in the home at the time of the assessment.

3. Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement.

D. DFCS shall assist the family to create plans, implement them and track progress.

1. DFCS shall assist the family in creating initial action plans and the case plan.  Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family and will be used to guide case planning for permanency.

2. Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval)

whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law.

3. DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s).

4. DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified.

5. DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being.

E. DFCS will take steps to promote timely and lasting permanency.

1. DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency.

2. The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency.   The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings.  Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues.

3. In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018.

   a. A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval).  The SWAT tool is used in lieu of other staffing

tools.  Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months.

b. Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator.  DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings.

4. Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness.  If revisions are needed to this process, those changes will replace requirements in this section.

## IV.   QUALITY PLACEMENT AND CAREGIVING

The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured.  DFCS prioritizes children being placed with relatives who are able to provide a safe, nurturing home for them.  Critical components of the screening, training, approval, and support process for all caregivers are also described in this section.

A. Screening, Training, and Approval Process for Prospective Foster and/or Adoptive Parents

1. DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised.

2. DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan.

3. DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis.

4. DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care. DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home. DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised.

B. Placement with Relatives and Fictive Kin

1. Diligent Search

   a. DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised.

   b. DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review.

2. Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:
   a. prior to placement, screen all household members;
   b. prior to placement, conduct criminal history search of adult household members; and
   c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety.

3. The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support.

C. Disclosure of Information

1. DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and

historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable.

2. DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home.

3. DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations.

4. DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home.  Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children.

D.  Support for Children and Caregivers

1. DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement.

2. DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers.

3. DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home.

4. DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey.

5. DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities.

## V. HEALTH AND EDUCATION

DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity.

   A. Initial Screenings and Follow-Up Treatment

     1. Physical Health Screening:  All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

     2. Dental Health Screening:  All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician.

     3. Mental Health:  All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional.

     4. All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional.

   B. Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx.

C. DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised.

D. DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns.

E. DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody).

F. DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised.

G. DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program.

H. DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school.

I. DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised.

## VI.   CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

The Infrastructure Standards below pertain to DFCS' obligation to continue to develop, maintain, and use an automated child welfare information system in which data accuracy and integrity is maintained on a continuous basis, and which is both compliant with current federal standards and meets current federal reporting standards.   The Statewide Automated Child Welfare Information System (SACWIS) shall include functionalities that support automated case management and that conform to DFCS Policy 2.1 (eff. Mar. 2015), as revised, including those functionalities necessary to support SBC. And finally, it shall support monitoring

and quality assurance efforts consistent with on-going continuous quality improvement efforts.

A. Meeting Federal Standards

1. The Comprehensive Child Welfare Information System (CCWIS) final rule became effective August 2016.  States have until August 1, 2018 to notify the Administration for Children and Families (ACF) of their intent to either transition the existing SACWIS System to CCWIS, develop a new CCWIS System, or opt out.

2. CCWIS requirements focus on quality data and program outcomes including: developing and implementing a data quality plan; new data exchanges; and requiring a data exchange standard.

B. Case Management Functionalities

1. The DFCS automated child welfare information application shall support end users in their obligation to enter child and case specific information across all stages of a child welfare case.

2. DFCS shall continue to modify system functionalities to align with the development and roll out of the DFCS comprehensive practice model.

3. DFCS shall continue to develop, validate, and modify reports based on data housed in the administrative data system that support on-going case management and case review.

C. Monitoring, Quality Assurance, and Continuous Quality Improvement

1. DFCS shall develop methodologies for monitoring adherence to Infrastructure Standards that rely on validated state administrative data analysis and reports.

2. DFCS shall develop methodologies for quality assurance, including case reviews that are reliant on data stored in the administrative database.

3. DFCS shall develop methodologies for on-going evaluation of progress on child welfare outcomes, including those specified in the Modified Consent Decree and Exit Plan, that are based on validated data stored in the state administrative data system.

## VII.   SUPERVISION OF CONTRACT AGENCIES

This section applies to any contract for the provision of placements and services to class members into which DHS enters during the contract cycle, or as soon as practicable following the entry of the Modified Consent Decree and Exit Plan. Standards below relate to these recommendations as well as the requirements that contract agencies comply with the terms of the Modified Consent Decree and Exit Plan, including its Principles, and meet or exceed agreed upon outcomes for children and families.

A. DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan.

B. DFCS shall only contract for placements or services with licensed contractors or sub-contractors.  No child shall be placed in an unlicensed facility.

C. DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary.

The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations.  The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract.

D. DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured.

E. DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve.  These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement.

F. DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type.

As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations.

The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary.  With respect to license-holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations.

G. The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified.

## VIII.  ROBUST WORKFORCE DEVELOPMENT

DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families.

A. Employee Selection Protocol

1. The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.

2. DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol.

3. DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce.

B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)

1. OHR will post positions within three (3) business days of an approved request.

2. OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director.

3. An OHR recruiter will conduct recruitment events at least monthly.

4. Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence.

5. OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting.

6. OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check.

7. OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

C. Training

1. No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training.

2. All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year.

3. DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors.

4. Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training.

5. All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program.

D. Caseload Management

1. In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases.  That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads.

2. Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.

3. DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:
   a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);
   b. climate and culture assessments; and
   c. metrics to strategize caseload management (including timely and safe case closure practices).

4. DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan.

## IX.   MAXIMIZATION OF FEDERAL FUNDING

Effective and cost-efficient child welfare systems depend on multiple funding streams to pay for services and supports for the children and families they serve. In recent years, DFCS leadership has made notable progress in securing state funds to provide needed child welfare services.  With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming.

DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding.  DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.

The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.