# Period 30
# Monitoring Report

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## *Kenny A. v. Kemp*

*State of Georgia*

August 12, 2021

# ACCOUNTABILITY AGENT AND
# MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge
Lakewood, New Jersey


The following persons were significant contributors to this report.

Eliza Byrne
Public Knowledge
Lakewood, New Jersey

Bonnie Hommrich
Public Knowledge
Lakewood, New Jersey

Fred Wulczyn
Chapin Hall

Chicago, Illinois

**Kenny A. v. Kemp**

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................... 1

COVID-19 CHANGES AND EFFORTS IN REGION 14 ..................................................................... 3
LEADERSHIP CHANGES AND CONTINUOUS QUALITY IMPROVEMENT ............................................. 3

II.    LONGITUDINAL CONTEXT DATA ................................................................................... 5

INTRODUCTION ........................................................................................................................ 5
ADMISSIONS TO FOSTER CARE IN FULTON AND DEKALB COUNTIES ............................................. 5
AGE AT FIRST ADMISSION ......................................................................................................... 6
TYPE OF FIRST PLACEMENT ...................................................................................................... 8
SHORT STAYS IN CARE ............................................................................................................ 10
TIME TO PERMANENCY ........................................................................................................... 11
TIME TO REUNIFICATION AND ADOPTION ................................................................................. 13
REENTRY TO CARE ................................................................................................................. 14

III.   PERIOD 30 MAJOR FINDINGS AND RESULTS ............................................................. 17

MAJOR FINDINGS .................................................................................................................... 17
  Permanency for Children and Youth in Foster Care ........................................................ 17
  Period 30 marks the first period that all visitation measures have satisfied the requirements of the Modified
  Consent Decree and Exit Plan and MTAT is recommending that they move to the attained category. ............ 25
  COVID-19 Deeply Affected the State's Ability to Meet the Health and Educational Needs of Children in Care.
  ................................................................................................................................... 26
  Virtual Caseworker Visits ............................................................................................... 26
  Wellbeing of Children and Youth in Foster Care ............................................................. 27
  Safety of Children and Youth in Foster Care .................................................................. 27

IV     CASELOAD REQUIREMENTS ......................................................................................... 36

CPS CASE MANAGERS ............................................................................................................ 36
FAMILY PRESERVATION CASE MANAGERS ................................................................................ 36
PERMANENCY CASE MANAGERS .............................................................................................. 37
CASE MANAGERS WITH CHILDREN ASSIGNED TO THEM WHO HAVE BEEN IN FOSTER CARE FOR 18 MONTHS OR LONGER ............. 37
SUPERVISORS ........................................................................................................................ 37
DEKALB COUNTY ON DECEMBER 31, 2020 .............................................................................. 37
FULTON COUNTY ON DECEMBER 31, 2020 ............................................................................... 37

V      PLACEMENT STANDARDS ............................................................................................. 38

DISCRIMINATORY PLACEMENT PRACTICES ............................................................................... 38
REIMBURSEMENT RATES ......................................................................................................... 39
MAJOR FINDINGS – PLACEMENT STANDARDS .......................................................................... 39

APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN ............................................... 42

APPENDIX B – GLOSSARY ...................................................................................................... 63

# TABLE OF TABLES

TABLE 1. CHANGING COUNT PATTERNS: PERIOD 28 (PRE-PANDEMIC) VS. PERIOD 29 ..................... **ERROR! BOOKMARK NOT DEFINED.**
TABLE 2. DEKALB AND FULTON COUNTY VISITATION, MARCH THROUGH JUNE ................................ **ERROR! BOOKMARK NOT DEFINED.**
TABLE 3. ROOM BOARD AND WATCHFUL OVERSIGHT (RBWO) RATE STRUCTURE .......................... **ERROR! BOOKMARK NOT DEFINED.**

TABLE 4. Period 29 Ongoing Outcome Measures ................................................................**Error! Bookmark not defined.**
TABLE 5. Period 29 Attained Outcome Measures ..............................................................**Error! Bookmark not defined.**
TABLE A-1: Measures Grid ...................................................................................................................27
TABLE A-2: Detailed Outcome Measures for Period 28 .......................................................................37
TABLE A-3: Case Managers Meeting Caseload Standards in DeKalb County on June 30, 2020 .......... 43
TABLE A-4: DeKalb County Supervisory Ratios on June 30, 2020 ...................................................... 43
TABLE A-5: Case Managers Meeting Caseload Standards in Fulton County on June 30. 2020 ........... 45
TABLE A-6: Fulton County Supervisory Ratios on June 30, 2020 .......................................................45
TABLE A-7: Region 14 Caseload Managers Meeting Caseload Standards on June 30, 2020 ...............46
TABLE A-8: Region 14 Supervisory Ratios on June 30, 2020 ..............................................................46

# I.   INTRODUCTION

This Period 30 report is the seventh monitoring report in which the Accountability Agent and the Monitoring and Technical Assistance Team (MTAT) report on the new outcomes delineated in the Modified Consent Decree and Exit Plan (Modified Exit Plan) that was filed in Federal District Court in December 2016.[1] In addition to this monitoring report, MTAT issued its Fourth Brief on the Infrastructure Standards in May 2021 and will issue its Fifth Brief on the Infrastructure Standards in the late Fall of 2021, in accordance with the Stipulated Order Amending the Modified Consent Decree and Exit Plan (Stipulated Order) filed with the Federal District Court in December 2017.

In this report, the MTAT's obligation is to report specifically on the measurable requirements articulated in Sections IV, V, and VI of the Modified Exit Plan that relate to activity in Metropolitan Atlanta from July 1 through December 31, 2020. In addition to discussing the Ongoing and Attained Outcomes Measures, MTAT also continues reviewing the use of congregate care, monitoring the use of hotels and other temporary placements for children in foster care, and reporting caseloads for case managers and supervisors. The next four sections of this report provide that information. Finally, as discussed in previous reports, MTAT continues to address the impact of COVID-19 on the system and the children and youth under its care. This will be an ongoing exploration for several more reporting periods as we develop deeper understanding.

The MTAT approach to monitoring serves not only as an accountability mechanism for the Court, the Plaintiffs, and the public, but also as an opportunity to assist DFCS to establish a culture of data-driven decision-making and continuous quality improvement (CQI). The goal is to establish a strong CQI process that will remain in place after the state satisfies the terms of the Modified Exit Plan and is no longer under federal court oversight.

The MTAT consistently reports on the same Modified Exit Plan standards and outcome measures approximately every six months, using a combination of qualitative and quantitative data.[2] In addition to this basic and consistent set of metrics to track progress over time as agreed upon in the Modified Exit Plan, the MTAT conducts a deep, quality-focused analysis on a handful of Infrastructure Standards at regular intervals. Data gathering for these can include

---

[1] Modified Consent Decree and Exit Plan, *Kenny A. v. Nathan Deal*, Civil Action NO. 1:02-CV-1686-TWT. Go to: https://www.childrensrights.org/wp-content/uploads/2014/08/2016.11.09-745-Exhibit-A-Modified-Consent-Decree-and-Exit-Plan.pdf

[2] Pursuant to the Modified Consent Decree, both the Ongoing Outcome Measures and Attained Outcome Measures have undergone substantial revision to reflect, when possible, the principles of best practices in measurement. Best practices principles include: 1) a clear statement of the analytic question with particular attention to identifying the risk population or the denominator associated with a particular inquiry; 2) use of entry cohorts and prospective measures to characterize systems dynamics and change in outcomes; 3) attention to the sources of variation in system outcomes (e.g. variation over time, among children, or in places); 4) understanding variation to track change accurately; 5) assessing expected change in the appropriate period of performance or window of time; 6) matching the analytic question to the appropriate source data; and 7) using well-understood and organized data resources that are designed to support asking and answering analytic questions.

interviews with stakeholders, focus groups, surveys, observations of processes, targeted case reviews, and reviews of Child and Family Service Reviews (CFSRs) findings.

The intention is to enable Parties to better understand several key factors associated with each of the Infrastructure Standards: 1) the expectations for practice and the extent to which these processes are occurring; 2) the capacity within the system to meet these expectations; and 3) the extent to which these processes are occurring with sufficient consistency and quality. Moreover, this enables the MTAT to focus on emerging issues to mitigate a reactive approach to monitoring.

The first brief on the Infrastructure Standards was focused on the comprehensive practice model (Section I), investigations of possible maltreatment in care (Section II), and the case planning process (Section III). This brief was finalized in March 2019.

The second brief on the Infrastructure Standards was focused on the comprehensive practice model (Section I), robust workforce development (Section VIII), quality placement, and caregiving (Section IV), and health and education (Section V). This brief was finalized in February 2020.

The third brief on the Infrastructure Standards was focused on the comprehensive practice model (Section I), federal funding (Section IX), the child welfare information and quality assurance systems (Section VI), and supervision of contract agencies (Section VII). This brief was finalized in October 2020.

The fourth brief on the Infrastructure Standards provided an update on the standards and recommendations made in the first and second infrastructure briefs. This brief was finalized in May 2020.

The fifth brief on the Infrastructure Standards will provide an update on the standards and recommendations made in the third infrastructure brief, an outline of the revised standards, and an updated analysis of the standards set forth in the fourth brief.

It is important to note that the practices and daily activities of DFCS were altered greatly during Periods 29 and 30 due to the worldwide Coronavirus (COVID-19) pandemic. In March 2020, in the state of Georgia, government agencies, the court system, school systems, nonprofits, corporations and many service providers closed their offices and moved to teleworking and virtual environments. Following the guidelines of public health officials, many of the practices required under the Consent Decree were not able to be performed in same manner. Period 30 marks the first full reporting period that occurred under these conditions. The recent distribution of vaccinations has led to new guidelines regarding person-to-person contact, and the state of Georgia has lifted its mask mandates. Thus, while Period 31 will continue reflecting markedly different practices due to the health pandemic, there is hope that the periods that follow will likely reveal a shift to a post-pandemic child welfare practice. DFCS continues evaluating the many lessons learned during the pandemic, especially regarding remote working and use of technology for virtual contact and court hearings. These lessons will provide insight for the practice moving forward. MTAT will continue providing a summary of the new policies, altered

practices, and efforts of the department as it strives to ensure the safety and well-being of children, youth, and families.

## *COVID-19 Changes and Efforts in Region 14*

During Period 30, the State of Georgia continued shuttering its offices except for essential workers. Likewise, the Supreme Court of Georgia extended its state of emergency, with juvenile courts in DeKalb and Fulton counties utilizing virtual platforms for conducting hearings on a more regular basis. Doctors, dentists, and other treatment and service providers continued conducting virtual appointments when possible. The federal government passed the Consolidated Appropriations Act 2021 and The Supporting Foster Youth and Families through the Pandemic Act, that included $400 million of additional funding through the Chafee Foster Care Independence Program for older youth in care and youth who aged out and chose to come back into care. The legislation also allows foster youth approaching the age of emancipation to remain in care if they choose during the pandemic and flexibility around kinship supports and family. Georgia received $10,367,523.

During Period 30, DFCS continued its emergency plan and issued new directives and policy changes to staff and caregiver network providers as the pandemic continued to impact services, placements, face-to-face visitation, and court processing of dependency cases.

The new patterns and practices that emerged within DFCS across the state, and specifically in Region 14, continued during Period 30. Fewer children and youth entered care. Case managers continued conducting virtual visits and in-person visits when required due to an elevated level of safety risk.

The Region is to be commended for its ongoing efforts in the face of uncertainty, increasing numbers of COVID-19 related deaths, and balancing the upheaval taking place within the families engaged with DFCS, as well as the upheaval occurring simultaneously within the families of the workforce itself. As of June 2020, all youth in care in Region 14 who tested positive for the virus have recovered and are doing well. The countless hours devoted to ensuring the safety of children and the safety of the workforce cannot be overstated.

## *Leadership Changes and Continuous Quality Improvement*

At the end of Period 29, the DeKalb County DFCS Director resigned from the agency to pursue another opportunity. Region 14 Director Kristen Toliver stepped into the acting Director role while maintaining her role and responsibilities at the regional level. DFCS began recruiting for the new director and hired Latoya Wright, who worked with children and families in NYC for the last 20 years. She holds a Master of Social Work (MSW) degree from Stony Brook- State University of New York and a Bachelor of Arts (BA) degree in Psychology from Morgan State University. Latoya is a Licensed Master Social Worker (LMSW). She started at DFCS in mid - June 2021.

With this hire, the region is poised to gain momentum as it stabilizes leadership and continues implementing its reform priorities. One key focus for the region is the creation of a robust continuous quality improvement process that provides regular and accurate data to produce

evidence of which strategies are working, which strategies need work, and which strategies should be discontinued to create more time to implement effective practices. The state director of the Data Unit left the agency at the end of May 2021 to pursue another opportunity. Steven Reed, who served in the position before and brings years of experience and expertise, has now resumed the position in an acting capacity.

The Regional Director met with key leaders in both counties and State Office leaders to discuss the type of data, analysis and evidence needed to make key decisions and continue to shepherd system improvements. In the past, data reports were generated at the state level, the regional level, the county level, and sometimes the unit level. Often, these reports conflicted with each other and left leaders in the position of choosing among them. In addition, many weekly and monthly reports are generated and forwarded to leaders, and it is not clear as to whether all these reports are helpful or necessary.

The Region now has a protocol and a plan to address each of their key priorities through a regular CQI process that will be the focus of regular meetings as well as Measure + Leaders meetings each quarter. They are striving to develop the capacity to regularly produce public reports on their progress toward system improvement.

*Kenny A. v. Kemp*

# II.    LONGITUDINAL CONTEXT DATA

## *Introduction*

This section of the report will provide readers an overview of what happens to young people who enter the foster care system in Georgia. To accomplish this, we step back from the usual reporting and anchor our overview at the very beginning, when children first touch the placement system. We keep the focus of this section on the most fundamental questions: how many children enter care, what are their ages, and what type of care do they receive in the first instance. Children often change placements and their trajectories through the system are important, but by looking at the very first placement we understand what it means to enter out-of-home care. Once a young person is in care, the question is how long they stay in an alternative care arrangement before going home or leaving the system. The answer to this question has two dimensions. First, we need to understand how quickly children leave care. For the second, we want to know whether there are changes in the rate at which children leave the system. The first-dimension addresses whether the likelihood of leaving care depends on how long a young person has been in care. Using measures designed to address these questions, we can see differences in how the likelihood of reunification is very high early on but then declines the longer the child is in care. The same view allows stakeholders to understand that the chances a child will be adopted within 12 months of admission are quite low but rise quickly thereafter.

The last indicator is reentry. If a child comes into the welfare system for care, the goal is to make the first placement experience the last. Re-entry is difficult to operationalize, but it is an important standard. Placement away from home, though sometimes necessary, is a disruptive developmental influence. Effective child welfare agencies strive to minimize the number of re-entries children experience and reduce the trauma of repeated separations.

## *Admissions to Foster Care in Fulton and DeKalb Counties*

The number of children admitted for the first time by year is an important starting point to understand the rate of foster care in Georgia. Each year, pursuant (in most cases) to some type of maltreatment report, there are children who have been placed in foster care for the first time. A proficient system solves the problems brought forward during these initial encounters so that a second encounter is unnecessary.

Figures 1 and 2 show the first admissions into foster care trend in DeKalb and Fulton counties respectively. The time span is calendar year 2015 through 2020. The narrative for both counties is largely the same. Compared to 2015, admissions in 2020 are substantially lower. The drop over that time in DeKalb was from 600 admissions in 2015 to 250 in 2020. The comparable change in Fulton was from 465 to 152 respectively.



Figure 1: Number of Children Entering Foster Care for the
First Time in DeKalb County

Figure 2: Number of Children Entering Foster Care for the
First Time in Fulton County

The overall trend in both counties is downward, with a sharp decline from 2019 to 2020. This is most likely due to COVID-19.

## *Age at First Admission*

The age at first admission is almost as important as whether placement happens. When measuring the impact of placement on well-being, children placed in the first year of life are developmentally different than children whose first experiences in foster care start much later. The developmental context into which the placement experience is integrated is fundamentally

different. Public child welfare agencies must be prepared for differing needs to address the well-being of children in care.

It is important to show child first admissions by their age. For this presentation, we show age by single year because age groups may conceal certain patterns that are otherwise noteworthy from a policy and practice perspective. The results show that what is true across the country is true in DeKalb and Fulton counties. Infants (children younger than one) are the largest group of children entering foster care in DeKalb, (figure 3), and Fulton, (figure 4), counties. The next largest groups are teens between the ages of 13 and 16. On a percentage basis, children between the ages of 1 and 11 represent progressively smaller groups.

Figure 3: Age at First Entry by Year: DeKalb County





Figure 4: Age at First Entry by Year: Fulton County

## *Type of First Placement*

The type of initial placement is an important factor in a child's foster care experience. From a policy perspective, advocates and researchers have strong preferences for family-like settings. That said, Georgia maintains a variety of placement settings including foster family care, relative family care, and group care, a category that includes group homes and residential care. To judge how the various placement settings are used to meet the needs of young people as they enter care for the very first time, we divided the caseload by age at admission and placement type.

Figure 5 presents t views of placement type and age. The top two panels show first placement type and age for the years 2015 through 2020 combined. On the bottom half, the age/placement type combinations are displayed for 2019 alone. This is to demonstrate what is happening overall and with specific reference to a recent year. Among children who are age 12 and under, family settings (i.e., foster family and relative family) are the most common first placement types. Above the age of 12, relative placements are less common and congregate care placements are more common. For placements categorized as other (hospitals, PRTFs, runaway status, juvenile detention, etc.), these are most common among teenagers, although the findings for 2019 suggest that other placements as a starting point have increased in both DeKalb and Fulton.

*Kenny A. v. Kemp*

Figure 5: First Placement Type by Age at First Admission, County, and Year of Admission



## *Short Stays in Care*

Table 1 shows children who are placed briefly (less than 7 days or between 8 and 31 days). Table 2 further below shows the general time to permanency.

Table 1

| Placement | DeKalb | | | | | | | Fulton | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total |
| Total Entries | 602 | 437 | 322 | 328 | 372 | 251 | 2,312 | 465 | 343 | 357 | 296 | 321 | 152 | 1,934 |
| LE 7 Days | 71 | 46 | 23 | 12 | 15 | 18 | 185 | 109 | 77 | 63 | 52 | 58 | 42 | 401 |
| 8 to 30 Days | 71 | 45 | 30 | 29 | 17 | 37 | 229 | 45 | 39 | 30 | 22 | 17 | 13 | 166 |
| GE 31 Days | 460 | 346 | 269 | 287 | 340 | 196 | 1,898 | 311 | 227 | 264 | 222 | 246 | 97 | 1,367 |
| Among those with spells of LT 8 days | | | | | | | | | | | | | | |
| School Aged or older | 53 | 36 | 20 | 8 | 10 | 15 | 142 | 70 | 50 | 40 | 33 | 36 | 25 | 254 |
| Permanent Exits | 65 | 43 | 22 | 12 | 15 | 9 | 166 | 106 | 68 | 62 | 52 | 58 | 37 | 383 |
| Reentered within 1 Yr. | 9 | 12 | 8 | 1 | 1 | 0 | 31 | 11 | 16 | 9 | 10 | 2 | 7 | 55 |
| % All Entries | 12% | 11% | 7% | 4% | 4% | 7% | 8% | 23% | 22% | 18% | 18% | 18% | 28% | 21% |
| % School Aged at Entry | 75% | 78% | 87% | 67% | 67% | 83% | 77% | 64% | 65% | 63% | 63% | 62% | 60% | 63% |
| % Exit to Permanency | 92% | 93% | 96% | 100% | 100% | 50% | 90% | 97% | 88% | 98% | 100% | 100% | 88% | 96% |
| % Reentering (short stayers w/ perm ex) | 14% | 28% | 36% | 8% | 7% | 0% | 19% | 10% | 24% | 15% | 19% | 3% | 19% | 14% |
| Among those with spells of LT 31 days | | | | | | | | | | | | | | |
| School Aged or older | 97 | 68 | 44 | 31 | 21 | 36 | 297 | 95 | 71 | 52 | 47 | 46 | 34 | 345 |
| Permanent Exits | 132 | 87 | 51 | 39 | 32 | 31 | 372 | 148 | 106 | 90 | 74 | 75 | 44 | 537 |
| Reentered within 1 Yr. | 20 | 16 | 15 | 4 | 6 | 1 | 62 | 21 | 17 | 13 | 10 | 2 | 7 | 70 |
| % All Entries | 24% | 21% | 16% | 13% | 9% | 22% | 18% | 33% | 34% | 26% | 25% | 23% | 36% | 29% |
| % School Aged at Entry | 68% | 75% | 83% | 76% | 66% | 65% | 72% | 62% | 61% | 56% | 64% | 61% | 62% | 61% |
| % Exit to Permanency | 93% | 96% | 96% | 95% | 100% | 56% | 90% | 96% | 91% | 97% | 100% | 100% | 80% | 95% |
| % Reentering (short stayers w/ perm ex) | 15% | 18% | 29% | 10% | 19% | 3% | 17% | 14% | 16% | 14% | 14% | 3% | 16% | 13% |

When a young person is placed in foster care, the goal is to minimize the time spent away from the family. For that reason, short placements reflect that policy and practice objective. On the other hand, short placements raise the question whether the young person needed to be placed at all. With the electronic records Georgia uses to track the placement history of young children, it is difficult to answer whether placements were necessary without conducting a case file review. Nevertheless, with the computerized records, it is possible to assess how often short placements occur. That information may then be used as a springboard for further assessment as to the reason for placement, and if guidance to frontline staff might strengthen family preservation practice. This will be important as the state moves closer to implementation of the Families First Prevention Services Act.

For the purpose of looking at the experience of young people with short stays in foster care, our attention is focused on the shaded columns and rows in Table 1. This shows the total number of first admissions between 2015 and 2020, and whether the placement lasted seven or fewer days, 8 to 30 days, or 31 days or more. In addition, there are some summary characteristics included for certain sub-populations. We also include whether, upon leaving care, the young person exited to permanency (usually reunification) and then whether the young person returned to care. The shaded rows show each subpopulation with respect to the corresponding total.

Over the five years of results, roughly 8% of the first admissions in DeKalb ended within 7 days of admission. Young people who left care within a month accounted for 18% of the first admissions. Nearly 75% of the short-stayers are school-aged; nine out of ten leave care via one of the permanency exit types (i.e., adoption, reunification, guardianship); the reentry rate over the five-year period was about 17 percent.

The comparable findings for Fulton point to similar trends but a higher rate of rapid exit. For example, in Fulton County, 29% of the admissions ended in 30 or fewer days. 21% of the admissions lasted fewer than 8 days. The young people involved in short stays tend to be older (school aged and above). They leave for reasons of permanency and their reentry rates, across all the listed years stands at about 13%.

### *Time to Permanency*

Some young people enter care and then leave quickly, but what about young people who stay in care beyond 30 days? How quickly do they leave care? Table 2 answers this question, which shows the likelihood (or probability) of leaving care given how long a young person has already been in care. For example, reading down the column associated with children admitted in 2013, the findings show that 15% of the young people admitted that year left care for reasons of permanency. Of the young people who did not leave care within the first six months, the likelihood of leaving care between months 7 and 12 drops to 6 percent. Put another way, some of the young people admitted in 2013 were still in care at the start of the seventh month. Among the young people still-in-care, the likelihood of leaving care was 6 percent. That is, the likelihood of leaving care to permanency went down. That same framework is applied at each interval of time. Among young people who were still in care at the start of the month representing 13 months since admission, the likelihood of exit in the next six months was about 6 percent.

Table 2: Time to Permanency for Children Admitted for the
First Time by County, Months Since Admission, and Year

| County and Months Since Admission | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|
| **DeKalb County** | | | | | | | | |
| 0 to 6 months | 15% | 15% | 15% | 12% | 12% | 12% | 8% | |
| 7 to 12 months | 6% | 6% | 7% | 5% | 5% | 5% | 3% | |
| 13 to 18 months | 6% | 6% | 6% | 4% | 4% | 5% | | |
| 19 to 24 months | 5% | 4% | 5% | 4% | 4% | 4% | | |
| 25 to 30 months | 4% | 4% | 4% | 3% | 3% | | | |
| 31 to 36 months | 5% | 5% | 6% | 4% | 4% | | | |
| 37 to 42 months | 5% | 5% | 5% | 4% | | | | |
| 43 to 48 months | 8% | 8% | 8% | 6% | | | | |
| 49 to 54 months | 8% | 8% | 8% | | | | | |
| 55 to 60 months | 4% | 4% | 4% | | | | | |
| 61 to 66 months | 6% | 6% | | | | | | |
| 67 to 72 months | 6% | 5% | | | | | | |
| **Fulton County** | | | | | | | | |
| 0 to 6 months | 29% | 26% | 22% | 21% | 19% | 22% | 19% | |
| 7 to 12 months | 8% | 7% | 6% | 5% | 5% | 6% | 5% | |
| 13 to 18 months | 6% | 5% | 4% | 4% | 4% | 4% | | |
| 19 to 24 months | 7% | 6% | 5% | 5% | 4% | 5% | | |
| 25 to 30 months | 9% | 8% | 6% | 6% | 5% | | | |
| 31 to 36 months | 8% | 7% | 6% | 5% | 5% | | | |
| 37 to 42 months | 9% | 8% | 7% | 6% | | | | |
| 43 to 48 months | 7% | 6% | 5% | 4% | | | | |
| 49 to 54 months | 10% | 9% | 7% | | | | | |
| 55 to 60 months | 4% | 4% | 3% | | | | | |
| 61 to 66 months | 3% | 3% | | | | | | |
| 67 to 72 months | 9% | 8% | | | | | | |

Reading down the columns of Table 2 shows how the likelihood of permanency changes with how long the young person has been in care. Reading across the rows shows how the likelihood of leaving care is changing over time. Table 1 showed the likelihood of exit after short stays is decreasing. This downward trend is found in both DeKalb and Fulton counties.

What about children who have been in care longer? The attention paid to the "long-stayers" often focuses on young people who have been in care for 24 months or more. Those children are found in the rows labeled 25 to 30 months and in the rows below that row. For young people from each entry cohort, the likelihood of leaving care to permanency stood at 4 percent in 2013 in DeKalb County and 9 percent for Fulton County. Reading from left to right on those rows, the likelihood of leaving care given the young person was still in care at 25 months has been declining in both counties with the sharper decline happening in Fulton County.

In general, then, as one reads from left to right across the rows, the results point to a general slowdown in the rate of exit, with the more pronounced changes happening in Fulton County. The shaded areas with empty cells refer to the time in care / year combination for which it is too soon to measure the likelihood of permanency. For example, among children admitted in 2015, no child would have reached the 67th month from the date of admission because that much calendar time has yet to elapse. Naturally, as we move closer to the present (i.e., 2019, 2020), the

amount of elapsed time limits what can be said about changing exit patterns. That said, the conditional likelihood of exit as presented in Table 2 is the most accurate way to portray the timing of permanency relative to the start of placement.

## *Time to Reunification and Adoption*

When children enter care, the case plan goal generally shows reunification. However, as time passes, case plan goals may shift to adoption as everyone involved with the case comes to realize that reunification is unlikely. As that happens, other permanency options come into focus, with much of the emphasis falling on adoption, although guardianship is also a possibility. In Figures 6 and 7, we show how the shifting priorities regarding permanency are reflected in the exit patterns.

To illustrate this point, we constructed two figures from the data presented in Table 2 with two modifications. First, we split the data into reunification and adoption exits. Second, we removed the time trend by taking the average over all the years. The results show patterns that are consistent with public policy. The likelihood of reunification in both DeKalb and Fulton counties is initially high, though initial reunification rates are higher in Fulton than DeKalb, which is consistent with what was reported earlier. Thereafter the probability of reunification goes down. Generally, the likelihood of reunification hovers around 5 to 8 percent. It is important to note that these percentages are applied to the young people who happen to be in care at that point. For example, in Fulton County, about 9 percent of the young people who are still in care 67 months after admission leave care between months 67 and 72. There are, however, relatively few children still in care at that point. Nevertheless, it does suggest that reunification is still possible even after that much time away from the family.

Figure 6: The Likelihood of Reunification by Time Since Admission and County



Figure 7 considers the same question – how likely is an exit from care given the passage of time? In this case, however, we are looking at exits to adoption. As public policy would predict, the likelihood of adoption is low within one year of placement. Thereafter, the likelihood of adoption climbs with comparable rates of increase in both DeKalb and Fulton counties through 2.5 years

(25 to 30 months). Thereafter, the chances of an adoption shift somewhat. However, the chances of adoption remain persistently high. Again, the likelihood of leaving care to adoption among young people who have been in care a long time is high but the number of children in care at those points in time is relatively small. To put it another way, of the young people still in care, there is a good chance that they will be adopted. The performance question that needs to be understood is whether their adoption might have happened sooner.

Figure 7: The Likelihood of Adoption by Time Since Admission and County



### Reentry to Care

When children leave care, it is the hope of everyone involved that a return to care will not be necessary. Nevertheless, reentry does happen. In this section, there are two views of reentry. The first considers the passage of time since leaving care. This view builds on the theme that time is an important factor when trying to understand how best to serve young people. The second view considers both age and the passage of time together. For example, someone who was previously in care faces a risk of returning to care. If the discharge was not so long ago, the risk of reentry may be defined by the time since leaving care. If the discharge from care was long ago, the risk of reentry might be elevated because the young person is an adolescent (i.e., their current age). When considering the risk of reentry, it is important to separate out the risk factors at work.

Figure 8 shows the likelihood of reentry given how much time has passed since the young person left either because of reunification or a discharge to the care of a relative. The pattern, which is reported for DeKalb and Fulton counties combined, fits what research generally shows. As time passes, the risk of reentry declines as the downward, right sloping bar graph shows.[3]

---

[3] There is no y-axis label because the metric is a statistical one that is less important than the impression left by how the bars get shorter from left to right. The height of the bar is associated with risk – the higher the bar the higher the risk.

In Figure 9, we show how age and reentry are related. Again, we are tracking the passage of time since discharge and the age of the young person involved. We do this by noting how old the young person is in relation to when they were discharged. The risk of return for a 6-year-old discharged 4 months ago is assessed separately from the risk facing a 6-year-old who was discharged 4 years ago. To capture the shift in risk, we compare children of other ages with the risk of reentry reported for children who were less than 1 year of age. This comparison group consists of children who were admitted to care and discharged from care all before their first birthday. Reentry rates for this group are the highest; this is reflected in the fact that the bars of the graph all fall below the blue horizontal line. The blue horizontal line represents the risk of an infant coming back to care. Again, we have omitted the y-axis metric in order to focus attention on the pattern. The length of the bar is correlated with how much lower the risk of reentry for the affiliated group of children is.

Figure 8: The Likelihood of Reentry by Time Since Exit



Generally speaking, younger children have a higher rate of reentry. Children in the middle years of childhood have a lower risk of reentry. However, as young people approach adolescence, the difference in risk compared to babies dissipates, as reflected in the shorter bars. The risk of reentry for 15- and 16-year-olds is only marginally lower than it is for babies. Note as well that as young people approach and move through adolescence, the risk of reentry rises as represented by the progressively shorter bars to the right in Figure 9.

*Kenny A. v. Kemp*

Figure 9: The Likelihood of Reentry by Time Since Exit and Current Age



Figures 8 and 9 do not represent the risk of reentry in DeKalb and Fulton counties separately. For that assessment, we broadened our view and considered the likelihood of reentry across all 159 counties. To do this we took into account age, gender, race/ethnicity, placement type, and year of admission. With those factors taken into account, we then assessed whether the county reentry rate is above or below the average for the state as a whole. This risk adjusted assessment of reentry risk provides a robust view of where the risk of reentry in DeKalb and Fulton counties falls in relation to other parts of the state.

The summary does not lend itself to be presented in tabular or graphic form because there are so many counties. The DeKalb County reentry rate is within range of the average for the state as a whole. The Fulton County reentry rate is above the average, which is to say children discharged to permanency are more likely to return to care than children in other parts of the state. It should be noted, however, that there is a group of 14 counties with above average reentry rates. Of that group, Fulton County's reentry rate is the closest to the average.

# III.   PERIOD 30 MAJOR FINDINGS AND RESULTS

This section provides major findings regarding outcomes for children youth and families involved with Region 14 of Georgia DFCS during Period 30, July 1, 2020 – December 31, 2020. It also provides a listing of the performance for each county and the region for each of the requirements under the Modified Exit Plan. This includes a status update on the requirements, specifically whether the task or outcome has been attained (or not) or is at risk of being re-designated as an ongoing task or outcome.

As stated in the Modified Consent Decree and Exit Plan Section IX.E.1.b., "an ongoing outcome measure can be automatically re-designated as an attained outcome measure in the next reporting period if in the previous three consecutive reporting periods (totaling18 months). State Defendant's improved performance in the first period (as compared to performance in the previous period) and then met or exceeded the measure for the next two reporting periods. An attained outcome measure will be re-designated as an ongoing outcome measure only if both of the following conditions occur: (l) the Accountability Agent finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period."

As discussed in the introductory section, and the Period 29 monitoring report, atypical external factors brought on by the COVID-19 pandemic greatly impacted the practices and performance of DFCS. These factors have continued through Period 30 and will most likely continue into Period 31. Thus, it is difficult to ascertain whether the resulting outcomes and performance are indicative of well-developed strategy and theory of change or circumstances that will no longer exist once the pandemic is controlled through effective vaccinations. Examples of external circumstances include the closure of school systems that comprise a significant proportion of referrals and intakes; the inability to conduct all of the in-person visits as defined by the Consent Decree; juvenile courts adhering to the Supreme Court of Georgia's emergency order and deciding which hearings to conduct, setting new dates for hearings, or continuing them; and foster homes and service providers who were not prepared or able to provide care for children who have been exposed to or infected by the virus. The result of any of these factors as well as others may artificially accelerate or decelerate the outcomes required under the Consent Decree. Throughout this section, when possible, MTAT offers an analysis as to whether the state should receive credit toward moving outcomes from the category ongoing to attained or whether a decline in performance should be considered in moving outcomes from the category attained to ongoing. In some instances, if outcomes were already under consideration for movement from one category to the other, MTAT may also recommend that the period of observation be extended.

## *Major Findings*

### Permanency for Children and Youth in Foster Care

Ensuring that children who enter foster care achieve timely permanency is a major goal and responsibility for child welfare agencies across the country.  In 2002, when the original *Kenny A*

complaint was filed, there were 2000 children in foster care in Fulton County and 1000 children in foster care in DeKalb County.  One of the allegations in the lawsuit was that "foster children languished in foster care for years, because Defendants fail to send foster children home promptly when it is safe to do so and fail to place them for adoption promptly when they cannot safely be returned to their parents."   As evidence, plaintiffs' counsel indicated that at the end of FY 2000, 900 children in Fulton and DeKalb counties (almost 1/3) had been in foster care for 4 years or more.  The settlement agreement finalized and filed with the court in 2005, included improvement standards for DFCS to achieve regarding permanency for children in foster care in Fulton and DeKalb Counties.

In 2016, when parties to the *Kenny A* Consent Decree renegotiated a Modified Consent Decree and Exit Plan, they agreed to adopt the current federal requirements and methodology to determine progress toward improving rates and stability of permanency in Region 14.  The current federal methodology uses an annual point in time analysis of three cohorts of children; those in care 12 months or less (OM 23); those in care 12-23 months (OM 6); and those children and youth in care over 24 months (OM 7).  While using a point in time methodology is not as precise as an entry cohort analysis (like the one utilized in the longitudinal context section), the parties agreed that aligning *Kenny A* requirements with the existing federal mandates would prevent dual reporting and potentially conflicting analysis.  It also gives the agency an ability to compare performance across regions throughout the state.

In addition to the rates upon which children and youth exit foster care, it is just as important to ensure that once they exit, they do not return.  Thus, re-entry rates are also evaluated on an annual basis utilizing the current federal requirements and methodology.

**This is the first reporting period that DFCS exceeded the requirements for achieving permanency in all three categories; OM 23 remains in the attained category; this is the third consecutive year that children in OM 7 improved, and exceeded the requirements triggering a recommendation to move this outcome to the attained category; and although OM 6 will remain in the ongoing category, Period 30 marks the first time DFCS has exceeded the requirements.**







The region is to be commended for maintaining a keen focus on permanency exits efforts. Pre-removal, transitional, and discharge staffings, as well as expanded use of transitional visits are all key strategies that the region is training, tracking, coaching, and analyzing evidence to determine if they are effective. The Regional Director and County Directors have begun efforts coordinating a strong and consistent continuous quality improvement process, working with data analyst in the region, in the state Kenny A unit and the State Data Unit (See CQI in Section 1).

Unpacking the impact of COVID-19 on all performance measures will take years to determine. We know that there are fewer children entering foster care. While this would seem to suggest that caseloads have been more manageable, the loss of staff during the pandemic and the hiring freeze by the state caused caseloads to continue being a challenge (see caseload section). As discussed below, the court system also experienced delays due to its transition to virtual hearing platforms, which seems to have greatly affected the frequency of six-month court case plan reviews. MTAT will continue examining the reverberating effects of COVID-19. However, MTAT is recommending that OM 7, children in care for 24+ months, move from the ongoing category to the attained category.

**While re-entry rates remain above the threshold, Period 30 marks a definite improvement from P28.  It is the first year that the State's performance has improved since 2017.**



While ensuring that children exit safely and timely from foster care, it is just as vital that DFCS do everything possible to prevent children from experiencing additional trauma by re-entering foster care. As depicted above, from 2017 to 2019, the re-entry rates steadily increased to an all-time high of 19.8 percent.   At the end of 2020, the region began rebounding by decreasing the rate of re-entry to 13.1 percent.  While this is still short of the requirement of 8.3 percent, it marks a significant improvement.  Of note, DeKalb's performance for 2020 was 9.8% which was close to meeting the threshold.  Fulton's performance of 17.5% is still high and is driving the high re-entry rate for the Region.

During 2020, Regional leadership and staff dedicated numerous hours to developing a comprehensive Region 14 Re-Entry Strategy Guide.  They worked hard to provide sufficient clarity to promote consistent practice based on the precision of the expectations.  The guide focuses on providing consultation and guidance to staff throughout a child and family's journey through care.  The guides were distributed to all staff, training was conducted for internal and external partners, and metrics were developed by the regional and state data units to track and evaluate the frequency and quality of key strategies to determine the effectiveness of each.

As the region implements its continuous quality improvement process, there are opportunities to gain deeper understanding of the characteristics for different populations of children, by age, gender, gender identity, sexual preference, and individual factors.  Given the high propensity of teens that re-enter care (see context data), this will be a vital population to provide even greater focus and attention.  The state has created an LGBTQIA working group to explore best practices

and services focused on the needs of this population of young people in foster care.  Moreover, within the Region is to be commended for hosting a series of townhalls for youth who self-identify as members of the LGBTQIA community, and for creating an LGBTQIA unit of staff in each county.  While creating an affirming culture within DFCS will be work for everyone, these units will receive comprehensive training (including joint training with LGBTQIA youth) and will serve as champions.  In addition, the state is to be commended for recently issuing a staff-wide survey to gauge the types of staff development needed to move the agency toward a diverse, equitable and inclusive approach to social work.  MTAT highly recommends that DFCS also engage the Title IVE Schools of Social Work programs across the state to ensure that future employees of the agency begin their work on these issues during their course of study.

**The Region continues to excel in ensuring that adoptions and guardianships are finalized within 12 months of a termination of parental rights (OM 8).**

If reunification does not occur, the state must seek other permanency options, such as adoptions or guardianships.  While this marks the fourth consecutive reporting period that DFCS has exceeded the requirements for this attained measure, the Region is to be commended for rebounding from all-time low of 43 percent in 2017 to an 87 percent throughout 2020.  It is also important to acknowledge the department's efforts and achievements on this aspect of permanency for children in its care.

In previous reports, MTAT has noted that prior state leadership believed that guardianship was not a suitable permanency option and established a strict waiver process for families wanting to pursue guardianship over adoption.  This translated to the staff as no guardianships allowed.  In Region 14 many relatives with on-going relationships with birth parents expressed a preference for guardianships.  This may have had a negative impact on the region's ability to achieve the Consent Decree standard.  Current leadership has clarified that guardianships are a positive permanency option for children in foster care.  Regional staff and state *Kenny A* staff have also worked closely with Juvenile and Superior Court Judges to ensure that they are aware of the requirement and when possible, will prioritize these cases on their dockets.

**Other Consent Decree Measures that Support Permanency**

There are several processes included in the consent decree that also have a direct impact on achieving permanency for children in foster care.  The processes with the most direct impact involve the juvenile court system, its ability to hold timely hearings, and the production of valid court orders that document the reasons for removal, the reasonable efforts of DFCS and the action steps needed to achieve permanency.

**The Juvenile Courts of Fulton and DeKalb Counties did an excellent job in continuing timely permanency hearings through the transitions to virtual hearings; however, this marks the second period in which timely six-month review of the case plans fell below the required threshold.**

Both court process measures have been met for more than three consecutive reporting periods and are therefore in the attained category of the Modified Consent Decree and Exit Plan.  During the onset of COVID-19, the Supreme Court issued an emergency order, shuttering courthouses

except for certain hearings.  The Juvenile Court Judges in DeKalb and Fulton counties quickly mobilized and prioritized permanency hearings to ensure that children and youth who were able to exit care would not be delayed. This was especially pressing given the uncertainty to the health pandemic and the high risks associated with congregate care and family foster care, in which caregivers were also functioning as essential workers or had underlying health conditions.

As a result, permanency hearings continued be held for 98 percent of children who reached their 12th month in care throughout calendar year 2020.   However, for six-month case reviews, 2020 marked the first year in which the state did not meet the 95 percent threshold requirement, since January 2017 (except for an isolated dip in performance in December 2018 at 94 percent). This may be the result of the need to prioritize certain hearings under the emergency order.  It also may be due to shutting down the Citizen Panel Review in both counties during the shutdown. Both counties designated these panels to conduct the six-month case plan review on behalf of the judges.  Thus, MTAT is recommending that OM 19 remain in the attained category until the impact of COVID-19 is more fully analyzed.

**Ensuring that valid court orders are contained in electronic case files continues to be a challenge for both counties.**

The process of drafting, reviewing, executing, filing, and uploading valid court orders into the DFCS SHINES database requires the coordination of many different stakeholders.  In Georgia, and specifically, in Region 14, the Special Assistant Attorneys General (SAAGs), who represent DFCS, are tasked by the court system with drafting most court orders in dependency cases.  The federal government requires these orders to contain certain findings to qualify for foster care funding reimbursement under Title IVE of the Social Security Act. Once drafted, the orders are circulated to all attorneys of record for review and revisions.  Following this review process, the final draft is submitted to the judge for review, signature and filing with the court.  Finally, the executed order must be uploaded into SHINES, the official case file record for children in foster care.  With so many stakeholders involved, there are many opportunities for this process to breakdown, resulting in delayed or missing court orders.

The threshold for OM 27, valid court orders, is 95 percent.  This measure remains in the ongoing category and has continued to decline to 88 percent during period 29 and 86 percent during period 30.  MTAT reviews a statistically representative sample of cases to determine performance on this measure.  In addition, the state has annual reviews by the federal government to determine its penetration rate under IVE (the percentage of cases that qualify for federal funding reimbursement).  This review includes whether cases have valid, fully executed court orders with all required findings.  Since 2011, Georgia DFCS has experienced a steady decline from 58.1 percent to 38.3 percent in December 2020.  The federal review indicates that the lack of valid court orders remains a significant factor in this decline.  The juvenile court judges in each county led efforts to create and implement court order protocols, however, these efforts were waylaid by COVID-19 and the adjustments needed to transition to virtual court hearings.  Recently, both counties have held stakeholder meetings to reignite implementation of court order protocols.  MTAT will be working closely with each county to track the effectiveness of these efforts.



**State IV-E Penetration Rates**

Source:  COSTAR through SFY 2010, SHINES SFY 2011  Beginning Jan 2011 SSI
Elig Children included in IV-E rate per Federal Policy.  (As of  02-24-21)

The state of Georgia implemented a Court Process Reporting System (CPRS) to make this process more efficient and effective.  It allows for electronic signatures and automatic uploads into SHINES.  However, full implementation of this system is still in process.  Both counties established stakeholder task forces to establish a protocol, including roles, responsibilities, and expected timeframes.  This work was coming to a conclusion right before the pandemic.  Recently, both counties have shared protocols that they intend to implement and MTAT is working with the judges to establish a CQI process.

Although this has been a challenge for quite a while, like other measures, MTAT is recommending that 2020 be viewed as year with unusual factors.  The team will continue working with all stakeholders as they implement the protocols established for each county.

**This is the second consecutive period that the Region has met the requirements for continuity of case managers (OM 12).**

A great deal of research has been done to correlate the continuity of case managers and a child's ability to achieve timely permanency.  Each time a case transfers from one case manager to another, there is a potential for inefficient transition of information to cause delays toward achieving permanency.  (cite some of the research).  Thus, continuity of case managers is a requirement in the Modified Consent Decree and Exit Plan (OM12).



**Period 30 marks the first period that all visitation measures have satisfied the requirements of the Modified Consent Decree and Exit Plan and MTAT is recommending that they move to the attained category.**

DFCS strives to minimize additional trauma for children and youth in foster care by helping them maintain family connections. Child and adolescent development researchers have also found that for infants and younger children in care, attachment and bonding disruptions can be detrimental across the life span and should therefore be mitigated through frequent and consistent visitation.[4] A report recently published by Casey Family Programs indicates that: "Family time is essential for healthy child development, especially for children in foster care, as it helps to maintain parent-child attachment, reduce a child's sense of abandonment, and preserve a sense of belonging as part of a family and community. Family time offers reassurance for children and their parents, opportunities to strengthen cultural and kinship connections, and motivation for parents to enroll in treatment or meet other permanency plan requirements."[5]

In addition to family time, it is also imperative that caseworkers regularly visit with children and youth, caregivers, and birth families. These visits help to stabilize placements, ensure that effective services are in place, and facilitate timely and lasting permanency. Thus, the Modified Consent Decree and Exit Plan sets forth 5 visitation measures, and an additional visitation standard for children experiencing their first placements and those who are changing from one placement to another.

---

[4] Wright, Lois E. Toolbox No. 1: Using Visitation to Support Permanency. Washington, DC: CWLA Press, 2001, 8–9. American Academy of Pediatrics Committee on Early Childhood, Adoption and Dependent Care. "Developmental Issues for Young Children in Foster Care." Pediatrics 105(5), 2000, 1146

[5] https://www.casey.org/family-time/

**COVID-19 Deeply Affected the State's Ability to Meet the Health and Educational Needs of Children in Care.**

During COVID-19, the federal government's Administration on Children, Youth and Families established guidelines for the use of virtual home visits. Georgia DFCS adopted policies that closely reflect this guidance. During Period 30, Region 14 continued the use of this digital platform, but also conducted face-to-face visits when the risk of safety was high.

*Virtual Caseworker Visits*

To understand more about the virtual caseworker visits occurring, DFCS asked the Kenny A. Case Record Review team to conduct a short, targeted case review to understand the quality of the virtual caseworker visits being conducted in Period 30. Of the 90 cases reviewed, 86 had at least one virtual caseworker visits conducted during the period, with the other four only having in person visits. Similar to the findings on the number of caseworker-child visits occurring for the entire class, the case review sample had an average of 10.4 virtual visits across the time the children were in custody during the period (range 1-29 visits), 87.5% of which (range 40%-100%) were conducted virtually. Only 2 of the 86 cases documented a technical challenge when conducting the visit.

Reviewers were asked to answer a few questions about the quality of the most recent virtual visit in the period. The results show that for the most part, quality of virtual visits were being maintained, supporting DFCS's movement to the attain column, despite the proportion of visits being virtual. In 79% of the most recent visits, the child was documented as being seen privately and alone or the child was too young for it to be appropriate. Eighty-six percent of cases documented an assessment of safety and risk of harm to the child and 81.4% of cases documented evidence of the caseworker asking about needs and the provision of services of children. However, there is room to improve the quality of the virtual visits and adhere to the standard operating procedure developed by the state office. Only 5.8% of cases documented the case worker being shown around the house and observing what they saw and 29.1% of cases documented evidence of children being involved in case planning, though these low numbers should be considered in the context of the increased number of visits occurring with the advent of the use of the virtual platform.

As vaccinations continue to be distributed and the rate of infections continue declining, DFCS issued new guidance requiring 1/3 of cases to receive in-person visits during the months of May, June, and July 2021, with the intent for all cases to have an in-person visit during this three-month period. Starting August 1, 2021, Resource Development Staff will resume all previously required in-person visits and all staff will resume 100% in-person visitation by September 1, 2021.

MTAT is recommending that OM 14 (Visitation Parent-Child), OM 16 (Sibling Visitation), OM 26 (Private Visitation Worker – Child) all be moved to the attained category. MTAT will continue evaluating the department's implementation of visitation in accordance with its new policy that will phase in 100% in-person visitation by September 1, 2021.

## Wellbeing of Children and Youth in Foster Care

The closure of offices and agencies during COVID-19 greatly impacted DFCS's ability to identify and meet the medical, dental, mental health and educational/developmental need of children in care (OM 21). With fewer offices open to evaluate the needs of children the overall number of children with identified needs declined significantly. With a smaller denominator, any needs not met greatly affected the overall percentage.

Prior to 2020 and the public health pandemic, DFCS had achieved the attained category for meeting identified medical and educational needs. However, these measures experienced significant declines below the required thresholds in Period 29 (67% and 73% respectively) and began rebounding in Period 30 (88% and 77% respectively). Meeting dental health needs and mental health needs were in the ongoing category and continued challenging the department.

Given the external pandemic factors affecting service providers, MTAT is recommending that all four of these measures remain in their current categories. As the state continues reopening, MTAT will closely monitor the availability of these services and the department's ability to identify and meet the needs of each child in foster care.

**Youth Aging Out of Care Received a High School Diploma or GED at the Highest Rates Yet.**

The Region partnered with the Multi-Agency Alliance for Children (MAAC) to implement wrap around educational services and increased educational attainment to the highest performance since the first monitoring report in 2005.

The Modified Consent Decree and Exit Plan requires at least 56 percent of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. This is an annual measure and by the end of December 2020, 54 percent of children had earned a high school diploma or GED. Working with MAAC and the educational advocates in each county office, students received tutoring, coaching and other services. The state office is now exploring ways to scale this intervention to serve even more children in foster care across the state.

## Safety of Children and Youth in Foster Care

If children must enter foster care, a primary focus of the agency is ensuring that they are safe in their placements. In 2016, the parties agreed to align the measure with the federal maltreatment in care measure and methodology. Since 2016, the rate decreased and then has been steadily increasing, finally surpassing the 8.50 victims per 100,000 days:

- *2017 – 6.54*
- *2018 – 4.19*
- *2019 – 7.28*
- *2020 – 9.65*

**This is the first time since the parties renegotiated the Modified Consent Decree and Exit Plan that DFCS did not meet the threshold requirement for maltreatment in care.**

MTAT will closely monitor this attained measure to determine if Period 30 was an outlier or indicative of challenges that need to be addressed.

For a complete listing of Period 30 performance for all measures required in the Modified Consent Decree and Exit plan, see Tables 3 and 4 below.

This report also has three appendices. Appendix A is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Consent Decree and Exit Plan and describes the method for producing the metric. There is a technical document, Detailed Outcome Measures for Period 29, that provides the numerator and denominator for each metric displayed in Tables 4 and 5 and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan.

Appendix B contains a glossary of common terms that are relevant to Georgia.

**Table 3: Draft Period 30 Ongoing Modified Exit Plan Requirements**

| Ongoing Outcome Measures | Period 29 Performance<br><br>Region 14 | Period 30 Performance<br><br>DeKalb | Period 30 Performance<br><br>Fulton | Period 30 Performance<br><br>Region 14 |
|---|---|---|---|---|
| **Outcome 3**: Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than **8.3%** shall have re-entered care within 12 months from the date of discharge. Children who were in foster care for less than eight days are not counted in this measure. | **13.5%**[6] | 9.8% | 17.6% | **13.1%** |
| **Outcome 6**: At least **43.6%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **17.8%**[7] | 37.3% | 54% | **45%** |
| **Outcome 7**: At least **30.3%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of | **16.6%**[8] | 40.7% | 32% | **37.4%** |

[6] This is a sixth month observation for an annual measure. The previous annual measure, P28, was 19.8%.
[7] This is a sixth month observation for an annual measure. The previous annual measure, P28, was 35.5%.
[8] This is a sixth month observation for an annual measure. The previous annual measure, P28, was 38.6%.

| Ongoing Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | | |
| **Outcome 12**: Caseworker Continuity: At least **90%** of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | **90%** | 87% | 96% | **90%** |
| **Outcome 14**: Visitation (Parent-Child): At least **85%** of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | **95%** | 92.5% | 94.5% | **93.2%** |
| **Outcome 16**: Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least **90%** of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | **97.1%** | 95.2% | 98.6% | **96.6%** |
| **Outcome 17**: Education: At least **56%** of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | **N/A[9]** | 53% | 55% | **54%** |
| **Outcome 21**: Health and Educational Needs: Of children in care at a point in time at the end of the reporting period, according to the service needs documented in the child's most recent case plan: [10] | | | | |
| **Outcome 21b**: At least **92%** shall not have any unaddressed dental needs | **60%** | 57% | 60% | **58%** |

---

[9] This is an annual measure. The previous annual measure, P28, was 52%.

[10] All health and educational needs data are very limited due to COVID-19, so numbers are very skewed.

*Kenny A. v. Kemp*

| Ongoing Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 21c**: At least **92%** shall not have any unaddressed mental health needs | **80%** | 100% | 0% | **67%** |
| **Outcome 26**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of monthly *private*, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | **98.94%** | 97.86% | 98..48% | **98.10%** |

**Table 4: Draft Period 30 Attained Outcome Measures**

| Attained Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 1**: Commencement of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | **77%** | 91.9% | 95.2% | **92.8%**[11] |
| **Outcome 2**: Completion of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 30 days of receipt of the report. | **100%** | 98% | 100% | **98.5%**[12] |
| **Outcome 4**: Maltreatment in Care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than **8.50** victims per 100,000 days. | **6.64** | 11.7 | 6.08 | **9.65** |
| **Outcome 5**: Search for Relatives: At least **95%** of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | **95%** | 100% | 100% | **100%** |
| **Outcome 8**: Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least **80%** will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | **87%** | 82% | 93% | **87%** |
| **Outcome 9**: Permanency Efforts (15/22): At least **95%** of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or | **97%** | 94% | 96% | **95%** |

[11] Four children were removed from the sample (numerator and denominator) for this outcome. Three children were on runaway, and one child was removed due to extenuating circumstances from COVID-19 impacting their ability to meet response times despite efforts and adhering to protocols.

[12] Three investigations were from the sample (numerator and denominator) for this outcome. Two where the children were on runaway, and one due to the extenuating circumstances from COVID-19.

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | | | | |
| **Outcome 10**: Sibling Placement: At least **80%** of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relatives. | **100%** | 100% | 100% | **100%** |
| **Outcome 11**: Multiple Placement Moves: The rate of placement moves in foster care shall be no more than **3.67** moves per 1,000 days in foster care. | **3.39** | 3.18 | 3.47 | **3.29** |
| **Outcome 13**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | **99.1%** | 98.02% | 98.48% | **98.2%** |
| **Outcome 15**: Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least **95%** of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | **98.4%** | 96.8% | 98.2% | **97.3%** |
| **Outcome 18**: Placements Not in Full Approval Status: At least **98%** of all foster placements serving class member | **98%** | | | **99%** |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | | | | |
| **Outcome 19**: Six-Month Case Plan Review: At least **95%** of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | **92%** | 88% | 94% | **91%** |
| **Outcome 20**: Permanency Hearing: At least **95%** of foster children in custody for 12 or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | **98%** | 100% | 975 | **98%** |
| **Outcome 21a**: At least **92%** shall not have any unaddressed medical needs | **67%** | 80% | 100% | **88%** |
| **Outcome 21d**: At least **92%** shall not have any unaddressed education/development needs. | **73%** | 78% | 75% | **77%** |
| **Outcome 22**: Corporal Punishment: At least **98%** of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | **99%** | | | **100%** |
| **Outcome 23**: Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least **40.5%** shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, | **37%**[13] | 35.8% | 46.6% | **40.7%** |

[13] This is a sixth month observation for an annual measure. The previous annual measure, P28, was 41.0%.

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| living with a relative, guardianship, or adoption. | | | | |
| Outcome 24: Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | 0% | | | 0% |
| Outcome 25: Placement Within County: At least **90%** of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, b) the child is placed through the ICPC consistent with its terms, c) the child is appropriately placed with relatives, or d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | 96% | | | 96% |
| Outcome 27: Court Orders: At least **95%** of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | 88% | 93% | 76% | 86% |
| Outcome 28: Capacity Limits: No more than **10%** of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home with no other children in the home. | 0% | | | 1% |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 29 Performance Region 14 | Period 30 Performance DeKalb | Period 30 Performance Fulton | Period 30 Performance Region 14 |
|---|---|---|---|---|
| **Other Consent Decree Requirements** | | | | |
| 4x4 Visitation. | **43%** | | | **37%** |
| (VI.G.1) Recurrence of Maltreatment. | **3.6%** | 4.3% | 3.4% | **3.9%** |
| (VI.G.2) Number of children who were victims of a second substantiated investigation within 12 months of FSS case. | **2.1%** | 2.7% | 2.4% | **2.5%** |

# IV   CASELOAD REQUIREMENTS

For the purpose of this report, this section is focused solely on the caseload standards and supervisory ratios included in the Modified Consent Decree and Exit Plan Section V.[14]

- ♦ No CPS case manager shall have more than 12 cases.
- ♦ No ongoing case manager shall have more than 17 cases.
- ♦ No placement case manager shall have more than 15 cases.
- ♦ No adoption case manager shall have more than 16 cases.
- ♦ No specialized case manager shall have more than 12 cases.
- ♦ No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties.

For Period 30 it appears that the hiring freeze has started to take its toll. Between July 2020 – December 2020, DeKalb only had 1 hiring compared to 32 losses (30 resignations) while Fulton had 10 hires and 24 losses (18 resignations). In DeKalb it appears these deficits are having a negative impact on the workload for current staff especially for permanency and specialized case managers. (see below).  For Fulton, it appears that the hiring freeze has had less of an impact on caseloads.  However with vaccinations being deployed in mass and many systems opening back up (including the school system) there is a high probability that the number of children in care will start to increase therefore it will be imperative that the Agency start onboarding new workers as soon as feasible.

Of the 190 CPS, family preservation, permanency, and specialized case managers who were active on December 31, 2020 in Region 14, 150 (79%) of them were meeting caseload expectations.

As of December 31, 2020, out of 58 supervisors overseeing CPS investigations, family preservation and permanency for children in foster care in Region 14, 54 (93%) were assigned five or fewer case managers.

## *CPS Case Managers*

For CPS case managers, 94 percent (50 of 53) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of December 31, 2020. An additional 17 cases were assigned to case managers on leave and/or supervisors, awaiting assignment, which is an increase compared to 10 cases during Period 29.

## *Family Preservation Case Managers*

Family preservation case managers have generally been assigned 17 or fewer families to be able to provide services and help ensure child safety. The same was true on December 31, 2020. All

---

[14] Modified Consent Decree and Exit Plan Section V: Caseloads states that these "caseloads will exist in Fulton DFCS and DeKalb DFCS and will apply to all case managers, including deployed case managers, who carry caseloads that include any class member children. In the event that a case manager has a mixed caseload, the caseload shall be weighted to reflect the standards in this section."

18 of these case managers met the standard. Of note, no cases were assigned to case managers on leave and/or supervisors, awaiting assignment. There were 5 cases in Period 29.

### Permanency Case Managers

For many years, permanency case managers were consistently meeting or exceeding a caseload expectation of 15 or fewer. However, this began to shift in 2015.[15] On December 31, 2020, 65 percent (35 of 54) of permanency case managers were meeting caseload expectations. This is a decrease from the 72 percent who met caseload expectations during Period 29.

### Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer

Previously known as specialized case managers, case managers who are assigned to children who have been in foster care for 18 months or longer are to be assigned no more than 12 children at any given time. Many of these children require extra support to achieve permanency. During Period 30, 72 percent (47 of 65) of these case managers were meeting caseload expectations on December 31, 2020. This is consistent with their performance (73%) for Period 29.

### Supervisors

On December 31, 2020, 100 percent (27 of 27) of Child Protective Services supervisors in Metropolitan Atlanta were assigned five or fewer case managers. Of the 31 permanency supervisors, 87 percent (27 of 31) were meeting expectations.

### DeKalb County on December 31, 2020

Caseloads for only 55 percent of the case managers in DeKalb County on December 31, 2020 were meeting the caseload requirement. This is a decrease from Period 29 in which 65 percent had caseloads that met the requirements.  Permanency case managers and specialized case managers are driving these low numbers with only 10% and 35% respectively meeting caseload expectations.  It should be noted that all CPS and Family Preservation case managers were assigned caseloads that met agreed upon standards.  See Appendix A, *Table A-3 and Table A-4* for more information.

### Fulton County on December 31, 2020

On this same date, only four percent of Fulton County case managers were exceeding caseload expectations, an improvement from June 30, 2020 on which 18 percent exceeded the caseload requirement. It should also be noted that all Family Preservation and Permanency case managers met the case load requirements during Period 30. See Appendix A, *Table A-5 and Table A-6* for more information.

The Region continues to develop and implement strategies to recruit, strengthen, educate, and retain its workforce, with the complication of virtual working conditions and increasing numbers of persons infected with the virus. MTAT recommends that once strategies are determined, the Region should allow for full implementation with fidelity and measure the effectiveness of each strategy before moving on to new or additional strategies.

---

[15] See *Period 24 Final Data Report Kenny A. v. Deal.*

# V    PLACEMENT STANDARDS

The quality placement and caregiving standards include specific DFCS commitments to ensure that every child in foster care will have a stable, nurturing placement in accordance with the principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured; children are able to remain with parents and relatives as often as possible; and the screening, training, approval, and support process for all caregivers are operating well. The Second and Fourth Brief on the Infrastructure Standards included an analysis of these standards.

This section of the report provides an update on agreed upon placement standards in the Modified Consent Decree and Exit Plan § IV.

## *Discriminatory Placement Practices*

Section IV.B.3 of the Modified Consent Decree and Exit Plan prohibits discriminatory placement practices.[16] MTAT is currently working with the state office to evaluate its array of placement providers. While the focus is on outcomes, MTAT is also exploring the willingness of providers to accept all children within their stated scope of expertise, regardless of race, ethnicity, religion, sexual orientation, or gender identity. In addition, MTAT has begun working with the Regional Resource Development Unit to ascertain the effectiveness of its recruitment and retention of suitable placements for all children and youth who enter foster care. The Fifth Brief of the Infrastructure Standards will provide data and analysis in these two areas.

The Region has undertaken a great deal of work to create an affirming workforce for children and youth who self-identify as members of the LGBTQIA community. There have been several cases of concern for which the parties have worked collaboratively to ensure that issues of discrimination were addressed, however the parties also agree that a systemic approach is needed to provide this same level of service for all children in care. For example, a pattern is starting to emerge regarding group home placements for and treatment of transgender and gender nonconforming youth. Currently, providers must seek a waiver from the state office to place youth in cottages that correlate with their identified gender. Preliminary feedback is that the process is onerous and the politically charged debates within the Georgia Legislature makes is a risky proposition for nonprofits. A survey was sent to all DFCS staff to ascertain current levels of knowledge about and skills to affirm the LGBTQIA community. Region 14 has now established LGBTQIA foster care units who will work with and serve as champions for this population of youth in care. The state office has also launched an LGBTQIA working group of staff and community stakeholders.

---

[16] Specifically, this section states: "Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. DHS shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion…" Moreover, the Principles outlined in the Exit Plan include: "All children in need of child welfare services should receive; full and equal access to the best available services, regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity."

## *Reimbursement Rates*

The standard reimbursement rates for foster care remain the same as previously reported. However, the state of Georgia is investing $6.7 million to establish a therapeutic foster care program, providing specialized treatment for children with an assortment of behavioral, mental and developmental challenges. In an interview with *Youth Today,* State Director Tom Rawlings shared his belief that this pilot initiative will demonstrate the agency's ability to "fill a critical gap in care for children facing difficult challenges." He further added that, "it serves as a needed step-down service for a child who may no longer be in need of inpatient care at a psychiatric treatment facility but would not receive adequate treatment in a traditional foster care setting with less trained caregivers."

Under this new initiative, foster parents will be recruited to receive specialized training and will provide services to children 24 hours a day, 7 days a week. The rates for this program will be higher than the standard reimbursement rates.

Currently, Region 14 continues face challenges in placing teenagers with histories/patterns of mental health and/or aggressive behavior. With the elimination of the use of hotels, staff are often left with no other choice but to spend the night in the offices with youth until a placement can be secured. While therapeutic foster care may offer a long-term solution to stabilize strong placements for these youth, regional and county leadership are also conceptualizing new and innovative approaches to more fully assess youth when they enter care to determine the types of placements needed.

The major findings regarding the placement standards during Period 30 are presented below.

## *Major Findings – Placement Standards*

1. **The region continues avoiding placing children in hotels, motels, or similar non-child welfare overnight commercial enterprises as temporary placements and continues its efforts to limit the amount of time youth spend in a DFCS office, especially during overnight hours.**

During Period 30, region did not place children in hotels, unless needed for COVID-related quarantining.

The Modified Consent Decree also states, "no child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placement needs require a safe bed in a home-like environment."

During Period 30, Fulton unfortunately had 2 youth who had office stays more than 23 hours. Each youth had a history of extensive behavior issues, including aggression and running away, which resulted in multiple placement disruptions.  The Resource Development Unit made diligent efforts to meet their placement needs, including searching for relatives, fictive kin, and out of state placements. These two youth had histories of rejecting identified placements, which also contributed to them staying in the office past 23 hours.  Overall, there were 25 separate

instances of office stays in the Region[17], which is a substantial decrease from Period 29 (37). Of the 25 instances, 9 involved children experiencing their first removal, 14 were disrupted placements and 2 involved children who re-entered care. As in previous reports, the lack of behavioral aides was a contributing factor in extended stays with some of the cases.

**2.  The state continues to ensure young children are not placed in congregate care placements unless necessary for the child's welfare.**

The Consent Decree has several restrictions related to the use of group care, including limiting the use of congregate care for young children. The reported information is for all children under the age of 12 in care between July 1 and December 30, 2020.

According to verified state reports, no children under the age of 12 entering foster care or already in care during the period were placed in group homes or child caring institutions except as allowed under the Modified Exit Plan. During Period 30, of youth in care or who entered foster care in the period, who were under the age of 12, 17 children and youth were placed in hospitals to meet their physical health needs and 11 children were hospitalized for mental health issues. These numbers are a decrease from Period 29 where the numbers were 22 and 14, respectively.

**3.  The overwhelming number of children are not remaining in temporary facilities longer than 30 days and the region continues to place fewer children in more than one temporary facility while in foster care.**

The Modified Consent Decree states:

a.  No child shall be placed in a temporary facility or any other foster home or group facility beds used on any temporary basis, for more than 30 days; and

b.  Children shall not be placed in more than one temporary facility within one episode of foster care (meaning the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care).

During Period 30, out of the 1529 children who were in foster care at the beginning of the period or entered during the period, there was one child placed in a temporary facility or any other foster home or group facility beds used on a temporary basis for more than 30 days (46 days)[18].

In addition, the state continues to strive to reduce the number of children experiencing two or more temporary placements. During Period 30, 22 of 498 (4%) children were placed in two or more temporary facilities within one episode of foster care.

---

[18] The youth has multiple pending criminal charges and a history of aggression towards other youth as well as adults that has made it difficult to secure a long-term placement.

# APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN

This Appendix contains two tables summarizing the metrics under the Modified Exit Plan, and the methods for generating each of them.

*Table A-1* is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Ext Plan, and then describes the method for producing that metric.

*Table A-2* is a technical document, Detailed Outcome Measures Period 28, that provides the numerator and denominator for each metric displayed in *Tables 4 and 5* above and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan. It also contains additional technical explanations, and/or historical data that provides context for reviewing and interpreting Period 28 performance data.

*Tables A-3 through A-8* provide caseload data as reported from the state.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.1a | No child shall be placed in a temporary facility or any other foster home or group facility bed used on any temporary basis, for more than 30 days. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | Number of in care at the start of the period and number of children deprived during the period: How many were placed in a temporary facility for more than 30 days during the period. | State Data Unit & Kenny A. Team |
| IV.B.1b | Children shall not be placed in more than one temporary facility within one episode of foster care. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | By calendar year cohorts (year of entry), how many enterers had more than one temporary placement episode EXCLUDING any temporary placement following a runaway episode. Follow cohorts over time. | State Data Unit & Kenny A. Team |
| IV.B.1c | No child shall spend more than 23 consecutive hours in county DFCS office. Any child who spends time in county DFCS office between 8 pm-8 am shall be reported to the MTAT. | | Weekly documentation by county; reported to the MTAT | Kenny A teams |
| IV.B.1d | Hotel use for class members to end by June 30, 2017. | Number of distinct children; Number of distinct episodes; Number of nights. | Region 14 tracks and reports weekly to the MTAT. All data originates from SHINES. | Kenny A Team with verification by State Data Unit |
| IV.B.2b | No child under six shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report | State Data Unit |
| IV.B.2c | No child between ages of 6-12 shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report State Data Unit | State Data Unit |
| IV.B.3 | Race/Ethnicity /religion shall not be basis for delay or denial of placement. DFCS shall not contract with private provider that gives preference based on race/eth/religion. | | | |
| IV.B.4 | DFCS to ensure basic physical needs of food, clothing, and shelter are met. Clothing to be reviewed with every placement / placement change. | | | Kenny A. Case Review Team |

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.5 | In placement visitation: four in four for new placements; monthly thereafter. There should be at least one in-placement visit and one private, face-to-face. | Drop children in care for only one week. -measure one in placement visit for all in first week -measure four for all the placement for four weeks. | Number of new placements with one visit in one week; four in four weeks. | State Data Unit supplies list; Kenny A Team reviews performance |
| V.A | CPS caseloads – no more than 12 cases. | No change. | Generated weekly as part of CAP reports after getting data from each county | State Data Unit & Kenny A. Team |
| V.B | Family Preservation and Family Support caseloads– no more than 17. | No change. Weights are applied to produce equivalence for caseworkers with mixed caseloads. | Counts of Caseworkers, by program at end of period

Counts of cases assigned to verified case managers | |
| V.C | Placement caseloads – no more than 15. | | | |
| V.D | Adoption caseloads – no more than 16. | | | |
| V.E | Specialized caseloads - no more than 12. | | | |
| V.F | Supervisor – no more than five CM. | | | |
| VI.A.1[19] | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | NOTE: There is a change here b/c old OM one and three have been combined. Those two outcomes used two different denominators (child/inv). New metric is at the child level. | Denominator: Children in foster care who are alleged victims of maltreatment Numerator: Number of child- investigations that started within 24 hours of referral Numerator: Number of children w/ face to face w/in 24 hours | Kenny A Case Review Team |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 30 days of receipt of the report. | No change. Effective 7/1/2017 – the standard became 45 days | Denominator: Number of MIC investigations referred in the PUR Numerator: Number of MIC investigations completed within 30 (45) days of receipt | Kenny A Case Review Team |

---

[19] The current VI.A measures are the ongoing measures.

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | CFSR 3 measure. Children in care for less than eight days are dropped from outcome measure. SDU will report CY 2014-2016. Reporting for period 23 will start with first half of year, and then be completed for Period 24. | Denominator: CY entries, duration greater than eight days that exited to permanency within one year of entry. Numerator: Those who reentered w/in year of exit date. | State Data Unit |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | CFSR 3 measure. All substantiated of maltreatment in care regardless of perpetrator, are included. Report at six and 12 months. | Denominator: all days for every child in care for a least one day in the period. Numerator: every substantiated maltreatment episode in period. | State Data Unit generates list for Kenny A case reviewers to review |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | No change. | Denominator: children in placement sample who are in first 60 days of placement. Numerator: number of children in denominator whose files show clear evidence of diligent search. | Kenny A Case Review Team |
| VI.A.6 | At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | CFSR 3 measure. Report at six and 12 months SDU will report CY 2014-2016. | Denominator: All children in care on first day of CY who had been in care for 12-23 months. Numerator: # who achieved permanency w/in calendar year. | State Data Unit |
| VI.A.7 | At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or | CFSR 3 measure Report at six and 12 months | Denominator: All children in care on first day of CY who had been in care for 24+ months. | State Data Unit |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|-----|------------------|-------|--------------------|--------------------|
| | more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | SDU will report CY 2014-2016. | Numerator: # who achieved permanency w/in calendar year. | |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | No change. | Denominator: Children TPR'd during the most recent six-month period for whom 12 months can be observed. Numerator: Those in the denominator who were adopted/reached guardianship during the period. | Kenny A Team |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons why the child's case record why termination of parental rights should not be filed. | No change. | Denominator: Eligible children who have been in care 15-22 months in the period. Numerator: Those who have had TPR filed OR a documented compelling reason not to. | Kenny A Team |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group | No change to method, add large sibling groups of four or more to exclusions. | Denominator: children with siblings who were in care or who had exited by end of period. Numerator: placed together on last day of period OR if they discharged, were together at discharge. | Kenny A Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | together; or (d) the siblings are placed with relative. | | | |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | CFSR 3 measure Adjusted standard to reflect history of in care and admits SDU will report CY 2014-2016. Children in care less than eight days are dropped. | Denominator: All days by children who were served during the period. Numerator: All moves, excluding DJJ, respite, jail, AWOL, hospitals. | State Data Unit |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | No change to method, Promoted caseworkers are now excepted. | Denominator: All children in care at end of the period. Numerator: number of those with LE 2 case managers. | Kenny A Team |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| Vi.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster | No change | Denominator: All visits required for children in care during the period. | State Data Unit supplies list; Kenny A |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | | Numerator: All of the visits that occurred during period. | Team reviews performance |
| Vi.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | No change in method. Include in the numerator qualifying youth who have an IEP or 504 plan who achieved a special ed diploma prior to exit. | Denominator: youth 18+ who were discharged during the year. Numerator: number who have graduated or who have GED. | Kenny A Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by... |
|---|---|---|---|---|
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | No change in method<br>Only include children who have been in unapproved home for 30 days.<br>Break out by relative, public, and private foster homes. | Denominator: placements with child at end of period.<br>Numerator: number of placements fully approved. | State Data Unit provides list, Kenny A Team reviews and develops measure |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review | No Change | Denominator:<br>Numerator: | Kenny A Team, including case review team |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | No Change | Denominator:<br>Numerator: | Kenny A Team, including case review team |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92 percent shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | No change in method<br>Standard changed. | Denominator: For each area, number of children from placement case review with identified need.<br>Numerator: Number of children in each denominator for whom there is evidence that need was addressed. | Kenny A case review team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.B.[20]22 | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | No Change | Denominator: All foster homes in the sample. Numerator: instances of Corporal Punishment. | Kenny A case review team |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | CFSR measure; SDU will report CY 2014-2016. Reporting for period 23 will start with first half of year, and then be completed for Period 24. Note: numerator is denominator for the reentry measure. | Denominator: All children under 18 entering Region 14 during the CY period. Numerator: Number of children in the denominator who exited to permanency w/in 12 months of entry. | State Data Unit |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | Dissolution means that a child: 1) been adopted; 2) returned to foster care; and 3) has had a subsequent TPR or surrender from his or her adoptive parents within one year of the adoption finalization. | Denominator: Adoptions completed during the most recent six-month period for whom 12 months can be observed. Numerator: Dissolutions w/in one year. | State Data Unit generates list for Kenny A Team to review |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the | Changed to rely on SHINES data and to cover full class. | Denominator: All children in placement on the last day of the period. Numerator: Children in the denominator who were either placed in home court, or who were placed within 50 miles of removal. | State Data Unit provides list, Kenny A Team reviews and develops measure |

---

[20] VI.B metrics are currently Attained Outcomes.

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | | |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | No change | Denominator: Case review sample. Numerator: All children in denominator who have document court order language. | Case review |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home. | No change

This only includes approved foster homes. | Denominator: Foster homes with one or more children in their home on the last day of the period. Numerator: Number of foster homes that exceed the capacity limit. | State Data Unit provides list, Kenny A Team reviews and develops measure |

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by... |
|-----|------------------|-------|--------------------|--------------------|
| **VII.G.1** | Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | Use earliest report and first subsequent report following. | Denominator: Number of children who had substantiated report during the prior year. Numerator: Number of children in the denominator who were subjects of a substantiated report within 12 months of the first report. | State Data Unit |
| **VII.G.2** | Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. | FSS can mean any alternative to opening a CPS case or removal. | Denominator: Number of children referred to FSS in a prior 12-month period. Numerator: Number of those who had substantiated report w/in 11-365 days of the referral. | State Data Unit |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 30**

|  | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.1 | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | DeKalb: 28<br>Fulton: 16<br>Perimeter: 33<br>Total: 77 | DeKalb: 30<br>Fulton: 17<br>Perimeter: 36<br>Total: 83 | DeKalb: 93.3%<br>Fulton: 88.9%<br>Perimeter: 94.3%<br>Total: 97.5% |
| | * Four children were removed from the sample (numerator and denominator) for this outcome. Three children were on runaway, and one child was removed due to extenuating circumstances from COVID-19 impacting their ability to meet response times despite efforts and adhering to protocols. | | | |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | DeKalb: 23<br>Fulton: 12<br>Perimeter: 32<br>Total: 67 | DeKalb: 24<br>Fulton: 12<br>Perimeter: 32<br>Total: 68 | DeKalb: 95.8%<br>Fulton: 100%<br>Perimeter: 100%<br>Total: 98.5% |
| | * Three investigations were from the sample (numerator and denominator) for this outcome. Two where the children were on runaway, and one due to the extenuating circumstances from COVID-19. | | | |
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | DeKalb: 17<br>Fulton: 23<br>Total: 40 | DeKalb: 174<br>Fulton: 131<br>Total: 305 | DeKalb: 9.8%<br>Fulton: 17.6%<br>Total: 13.1% |

This is new measure which relies on the CFSR 3 Reentry methodology. Because that method requires observing children enter, stay at least eight days, exit to permanency within one year, and then reenter from that exit within one year – it is necessary to refer to prior entry cohorts in order to generate the metric. The figures above represent entries to Region 14 from CY 2017. Of them 338 exited to permanency within one year of entry (by 12/2018) and of them, 67 reentered care within one year of exit so far. This could increase because one full year since exit has not yet been observed. The State Unit Generated historical versions of this metric, as well as what is currently observable for the more recent entry cohorts. That performance is provided below – shaded cells contain incomplete data – not enough time has elapsed to fully observe the performance.

| These data were generated by the State Data Unit Oct 2018. For this reason, the 2015 data are the most recent | Entry Year | Perm Exit w/in 1 Year | Reentry w/in 6 Mos. | Reentry win 1 Year | 6 Mos. | 12 Mos. |
|---|---|---|---|---|---|---|
| | 2014 | 627 | 76 | 109 | 12% | 17% |
| | 2015 | 562 | 68 | 95 | 12% | 17% |
| | 2016 | 384 | 47 | 67 | 12% | 17% |

**Table A-2: Detailed Outcome Measures for Period 30**

| | Outcome | | | Numerator | | Denominator | | Metric |
|---|---|---|---|---|---|---|---|---|
| | complete cohort and are used for this measure. | 2017 | 335 | 44 | 65 | | 13% | 19% |
| | | 2018 | 228 | 19 | 25 | | 8% | 11% |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | | | DeKalb: 16 Fulton: 5 Total: 21 | | DeKalb: 136482 Fulton: 82297 Total: 217459 | | DeKalb: 11.7 Fulton: 6.08 Total: 9.65 |
| | This a new measure which relies on the CFSR 3 methodology. That methodology controls for "exposure time" for the risk of maltreatment by calculating the total number of days that children with a least one day of care in the period experienced. It also counts any substantiated investigation associated with a child in care, regardless of who was the perpetrator of the maltreatment. | | | | | | | |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | | | DeKalb: 35 Fulton: 25 Total: 60 | | DeKalb: 35 Fulton: 25 Total: 60 | | DeKalb: 100% Fulton: 100% Total: 100% |
| | 60 cases were reviewed (32 from DeKalb and 28 from Fulton). Of the 60, 18 were given credit because language was in the court order, and 31 were placed with relatives, 10 had evidence of diligent search in the file. | | | | | | | |
| VI.A.6 | Permanency: At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | DeKalb: 60 Fulton: 74 Total: 134 | | DeKalb: 161 Fulton: 137 Total: 298 | | DeKalb: 37.3% Fulton: 54% Total: 45% |
| VI.A.7 | Permanency: At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | DeKalb: 132 Fulton: 66 Total: 198 | | DeKalb: 324 Fulton: 206 Total: 530 | | DeKalb: 40.7% Fulton: 32% Total: 37.4% |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | | | DeKalb: 46 Fulton: 39 Total: 85 | | DeKalb: 56 Fulton: 42 Total: 98 | | DeKalb: 82% Fulton: 93% Total: 87% |
| | Any exclusions to be noted here. | | | | | | | |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or | | | DeKalb: 442 Fulton: 310 | | DeKalb: 471 Fulton: 324 | | DeKalb: 94% Fulton: 96% |

**Table A-2: Detailed Outcome Measures for Period 30**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | Total: 752 | Total: 795 | Total: 95% |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relative. | DeKalb: 44 Fulton: 41 Total: 85 | DeKalb: 44 Fulton: 41 Total: 85 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | DeKalb: 883 Fulton: 689 Total: 1502 | DeKalb: 273510 Fulton: 178729 Total: 456239 | DeKalb: 3.18 Fulton: 3.47 Total: 3.29 |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave. | DeKalb: 617 Fulton: 398 Total: 1015 | DeKalb: 713 Fulton: 413 Total: 1126 | DeKalb: 87% Fulton: 96% Total: 90% |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | DeKalb: 4307 Fulton: 2653 Total: 6960 | DeKalb: 4394 Fulton: 2694 Total: 7088 | DeKalb: 98.02% Fulton: 98.48% Total: 98.2% |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | DeKalb: 2040 Fulton:1145 Total: 3185 | DeKalb: 2205 Fulton: 1211 Total: 3416 | DeKalb: 92.5% Fulton: 94.5% Total: 93.2% |
| VI.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same | DeKalb: 4237 Fulton: 2621 Total: 6858 | DeKalb4376 Fulton: 2670 Total: 7046 | DeKalb: 96.8% Fulton: 98.2% Total: 97.3% |

**Table A-2: Detailed Outcome Measures for Period 30**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | child in excess of the required one visit per month shall be excluded when calculating this percentage. | | | |
| VI.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 637 Fulton: 434 Total: 1071 | DeKalb: 669 Fulton: 440 Total: 1109 | DeKalb: 95.2% Fulton: 98.6% Total: 96.6% |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | DeKalb: 21 Fulton: 22 Total: 43 | DeKalb: 40 Fulton: 40 Total: 80 | DeKalb: 53% Fulton: 55% Total: 54% |
| | This metric is generated annually in the report covering the period that ends December 31 of each year. | | | |
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | Total: 2567 | Total: 2605 | Total: 99% |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | DeKalb:37 Fulton: 31 Total: 68 | DeKalb: 42 Fulton: 33 Total: 75 | DeKalb: 88% Fulton: 94% Total: 71% |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | DeKalb: 30 Fulton: 28 Total: 58 | DeKalb: 30 Fulton: 29 Total: 59 | DeKalb: 100% Fulton: 97% Total: 98% |

**Table A-2: Detailed Outcome Measures for Period 30**

| | Outcome | | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | | See Below | | |
| | | Medical Needs | DeKalb: 4<br>Fulton: 3<br>Total: 7 | DeKalb: 5<br>Fulton: 3<br>Total: 8 | DeKalb: 80%<br>Fulton: 100%<br>Total: 88% |
| | | Dental Needs | DeKalb: 4<br>Fulton: 3<br>Total: 7 | DeKalb: 7<br>Fulton: 5<br>Total: 12 | DeKalb: 57%<br>Fulton: 60%<br>Total: 58% |
| | | Mental Health Needs | DeKalb: 2<br>Fulton: 0<br>Total: 2 | DeKalb: 2<br>Fulton: 1<br>Total: 3 | DeKalb: 100%<br>Fulton: 0%<br>Total: 67% |
| | | Education/Develop-mental Needs | DeKalb: 7<br>Fulton: 3<br>Total: 10 | DeKalb: 9<br>Fulton: 4<br>Total: 13 | DeKalb: 78%<br>Fulton: 75%<br>Total: 77% |
| VI.B.22[21] | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | | Total: 81% | Total: 82% | Total: 99% |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | | DeKalb: 149<br>Fulton: 163<br>Total: 312 | DeKalb: 416<br>Fulton: 350<br>Total: 766 | DeKalb: 35.8%<br>Fulton: 46.6%<br>Total: 40.7% |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | | DeKalb: 0<br>Fulton: 0<br>Total: 0 | DeKalb: 96<br>Fulton: 50<br>Total: 146 | DeKalb: 0%<br>Fulton: 0%<br>Total: 0% |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's | | | | |

[21] VI.B metrics are currently Attained Outcomes.

**Table A-2: Detailed Outcome Measures for Period 30**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | Total: 1099 | Total: 1141 | Total: 96% |

| | | | | | |
|---|---|---|---|---|---|
| | As noted above, the methodology for this metric changed. Rather than being evaluated through case review, the Data Unit generated a metric using the entire class of children in placement on the last day of the period. To generate the final metric – they considered who in placement on 6/30/2018 was placed in the w/in 50 miles of their removal address, was placed within the same county as their removal county or qualified for an exception as stipulated in the agreement. The numerator was adjusted upward to reflected both those that met the standard AND those who were exceptions. The reciprocal of the numerator is the measure. See below for the adjustments. | | | | |
| | | Placed | Denominator | Numerator | % |
| | Total in Placement on 12/31/2019 | 1141 | 1141 | 1099 | 96% |
| | | | % of those placed | | |
| | Placed in Same County | 363 | 32% | 363 | |
| | Placed in Different County | 778 | 68% | | |
| | Different county & exception placement | 247 | 22% | 247 | |
| | Different county | 531 | 47% | 531 | |
| | Diff county & placed w/in 50 miles | 489 | 43% | 489 | |
| | Diff county & place greater than 50 miles | 42 | 4% | 0 | |
| | Diff county, > than 50 miles & exempt | 6 | 1% | 6 | |
| | Diff county, > than 50 miles & NOT exempt | 40 | 3% | 40 | |

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | DeKalb: 4300<br>Fulton: 2653<br>Total: 6953 | DeKalb: 4394<br>Fulton: 2694<br>Total: 7088 | DeKalb: 98.02%<br>Fulton: 98.48%<br>Total: 98.10% |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 30**

|  | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | DeKalb: 51<br>Fulton: 28<br>Total: 79 | DeKalb: 55<br>Fulton: 37<br>Total:92 | DeKalb: 91%<br>Fulton: 76%<br>Total: 86% |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of 6 children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster. | Total: 3 | Total: 396 | Total: 1% |
| VII.G.1 | Recurrence of substantiated investigations: Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | DeKalb: 22<br>Fulton: 15<br>Total: 37 | DeKalb: 513<br>Fulton: 442<br>Total: 955 | DeKalb: 4.3%<br>Fulton: 3.4%<br>Total: 3.9% |
| VII.G.2 | Substantiated investigation following FSS case. Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. For Period 25 – partial data are provided. | DeKalb: 47<br>Fulton: 89<br>Total: 136 | DeKalb: 1,746<br>Fulton: 3,749<br>Total: 5,495 | DeKalb: 2.7%<br>Fulton: 2.4%<br>Total: 2.5% |

*Kenny A. v. Deal*

**Table A-3: Case Managers Meeting Caseload Standards in DeKalb County on December 31, 2020**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/20 | Number of Active, On-leave Staff on 6/30/20 | Actual Performance | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 24 | 0 | 24 | 100% | 0 | 0% | 15 |
| Family Preservation | 17 families | 9 | 0 | 9 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 21 | 0 | 2 | 10% | 19 | 90% | 1 |
| Specialized Case Manager | 12 children | 26 | 0 | 9 | 35% | 17 | 65% | 0 |
| Adoption Case Manager[22] | 16 children | | 0 | | | | | |
| Total | | 80 | 0 | 44 | 55% | 36 | 45% | 16 |

**Table A-4: DeKalb County Supervisory Ratios on December 31, 2020**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 11 | 11 | 100% | 0 | 0% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 15 | 14 | 93% | 1 | 7% |

---

[22] All adoptions caseloads are included in the specialized and permanency totals. There were 12 adoptions case managers in DeKalb on this date.

*Kenny A. v. Deal*

**Table A-5: Case Managers Meeting Caseload Standards in Fulton County on December 31. 2020**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/20 | Number of Active, On-leave Staff on 6/30/20 | Actual Performance Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 0 | 26 | 90% | 3 | 10% | 2 | 0 |
| Family Preservation | 17 families | 0 | 9 | 100% | 0 | 0% | 0 | 0 |
| Permanency Case Manager | 15 children | 0 | 33 | 100% | 0 | 0% | 0 | 0 |
| Specialized Case Manager | 12 children | 0 | 38 | 97% | 1 | 3% | 0 | 0 |
| Adoption Case Manager[23] | 16 children | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | | 0 | 106 | 96% | 4 | 4% | 2 | 0 |

**Table A-6: Fulton County Supervisory Ratios on December 31, 2020**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 16 | 16 | 100% | 0 | 0% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 16 | 13 | 81% | 3 | 19% |

---

[23] All adoptions caseloads are included in the specialized and permanency totals. There were five adoptions case managers in Fulton on this date.

*Kenny A. v. Deal*

**Table A-7: Region 14 Caseload Managers Meeting Caseload Standards on December 31, 2020**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/20 | Number of Active, On-leave Staff on 6/30/20 | Actual Performance | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 53 | 0 | 50 | 94% | 3 | 6% | 17 |
| Family Preservation | 17 families | 18 | 0 | 18 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 54 | 0 | 35 | 65% | 19 | 35% | 1 |
| Specialized Case Manager | 12 children | 65 | 0 | 47 | 72% | 18 | 28% | 0 |
| Adoption Case Manager[24] | 16 children | | 0 | | | | | |
| Total | 12 children | 190 | 0 | 150 | 79% | 40 | 21% | 18 |

**Table A-8: Region 14 Supervisory Ratios on December 31, 2020**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 27 | 27 | 100% | 0 | 100% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 31 | 27 | 87% | 4 | 13% |

---

[24] All adoptions caseloads are included in the specialized and permanency totals. There were 15 adoption case managers in the Region on this date.

*Kenny A. v. Deal*

# APPENDIX B – GLOSSARY

**Adoptive Placement** means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

**Child or Children or Class Member Children or Class Members** mean a child or children who have been, are or will be alleged or adjudicated deprived who 1) are or will be in the custody of the State Defendants; and 2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

**Child Caring Institution (CCI)** is any child-welfare facility which provides full-time room, board, and watchful oversight (RBWO) to six or more children up to 18 years of age. Some CCIs are approved to care for youth up to age 21. The CCI must be approved through the Office of Provider Management (OPM) to serve children in DFCS custody.

**Child Placing Agency (CPA)** is agency that places children in foster and adoptive homes for individualized care, supervision, and oversight. Child placing agencies are responsible for assessing the placement regarding the appropriateness of the room, board, and watchful oversight that the prospective foster and adoptive families will provide. The CPA's employees and their foster and adoptive parents work as a team to provide a stabilizing and nurturing environment that promotes safety, permanency, and well-being.

**Corporal Punishment** means any physical punishment on a child that inflicts pain.

**CPA Foster Home** is a foster home approved by a Child Placing Agency for the temporary placement of children in foster care.

**DeKalb DFCS** means DeKalb County Department of Family and Children Services.

**DFCS** when used alone means the Georgia Division of Family and Children Services.

**DFCS Foster Home** is a non-relative foster homes approved by DFCS for the temporary placement of children in foster care.

**DFCS or CPA Adoptive Home** is an adoptive home approved for the foster care placement of a child for whom the established goal is adoption. Adoptive homes must meet the regular standards of care required for approved family foster homes and any conditions specified in that approval.

**DFCS Relative Foster Home** is a relative foster home approved by DFCS for the temporary placement of minor relatives. It is DFCS' preference that all relatives are approved as foster parents and receive a foster care per diem. The goal of relatives becoming foster parents is to ensure that the child has services to address his/her needs.

**DHHS** means the United States Department of Health and Human Services.

**DHR** means Georgia Department of Human Resources.

**Discipline or Other Serious Foster Care Violation** means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

**EPSDT** means the Early and Periodic Screening, Diagnosis, and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

**Fictive Kin** means a person who is known to a child as a relative, but is not, in fact, related by blood.

**Foster Parent** means volunteers who are trained and certified by DFCS or Child Placing Agencies to provide for the temporary care of children placed in the custody of DFCS. Foster parents work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster parents are asked to assume the responsibility of parenting the children placed in their home.

**Foster Relative** means biological kin who are trained and certified by DFCS to provide for the care of relative children placed in the custody of DFCS. Foster relatives work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster relatives are asked to assume the responsibility of parenting the children placed in their home.

**Fulton DFCS** means the Fulton County Department of Family and Children Services.

**Georgia Health Check Program** means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

**Governor** means the Governor of the State of Georgia.

**Legal Guardianship** means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter15-11-2(36).

**One Episode of Foster Care** means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

**Permanent Legal Custody** means custody granted in accordance with an order of the superior court or the juvenile court, which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

**Permanent Placement with Relatives** means placing a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain

in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

**Psychiatric Residential Treatment Facility (PRTF)** is a temporary non-hospital facility with a provider agreement with a State Medicaid Agency to provide intensive therapeutic intervention to a child to ensure safety and stability. PRTFs offer intensive behavioral health services to children in Georgia.

**Relatives** are persons who are related by blood, marriage or adoption including the spouse of any of those persons even if the marriage was terminated by death or divorce.

**Relative Placement** refers to placement in the home of a relative or fictive kin who do not receive a foster care per diem for the care of the child. The relative placement may be a non-paid placement or the relative may receive TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin are not eligible for TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin must become foster parents to receive financial assistance.

Placement with relatives or fictive kin may occur very quickly if there is a satisfactory CPS history check, safety and home assessment check, and a Georgia Crime Information Center (GCIC) check through the Office of the Inspector General (OIG) on all household members 18 years of age or older. A Relative or Non-Relative Care Assessment must be completed no later than 30 calendar days after the placement of a child.

**State DFCS** means the Division of Family and Children Services of the Georgia Department of Human Resources.

**Suspected Abuse or Neglect** means being based on reasonable cause to believe that a child may have been abused or neglected.

**Suspected Corporal Punishment** means being based on reasonable cause to believe that corporal punishment may have been used on a child.

*Kenny A. v. Deal*