# Fifth Brief on Infrastructure Standards

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## Kenny A. v. Kemp

*State of Georgia*

January 2022

**ACCOUNTABILITY AGENT AND
MONITORING AND TECHNICAL ASSISTANCE TEAM**

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge (PK)
Lakewood, New Jersey

The following persons were significant contributors to this brief:

Eliza Byrne
Public Knowledge (PK)
Lakewood, New Jersey

Bonnie Hommrich
Public Knowledge (PK)
Lakewood, New Jersey

Doug Swisher
Public Knowledge (PK)
Lakewood, New Jersey

# TABLE OF CONTENTS

I.      INTRODUCTION ...................................................................................................................... 3

II.     STATUS OF THE INFRASTRUCTURE STANDARDS ...................................................... 6

    Overview of the Infrastructure Standards .......................................................................... 6
    Infrastructure Standard I: Comprehensive Practice Model .............................................. 6
    Infrastructure Standard VI: Child Welfare Information System and Quality Assurance ............ 7
        Child Welfare Information System ................................................................................... 7
        Quality Assurance .......................................................................................................... 8
    Infrastructure Standard VII: Supervision of Contract Agencies ..................................... 10
    Infrastructure Standard IX: Maximization of Federal Revenue ...................................... 11

APPENDIX A – INFRASTRUCTURE STANDARD ONE: COMPREHENSIVE PRACTICE MODEL ...................................... 1

APPENDIX B – INFRASTRUCTURE STANDARD TWO: ASSESSMENT OF MALTREATMENT IN CARE .......................... 2

APPENDIX C – INFRASTRUCTURE STANDARD THREE: CASE PLANNING AND MANAGEMENT ................................ 6

APPENDIX D – INFRASTRUCTURE STANDARD FOUR: QUALITY CAREGIVING AND PLACEMENT ........................... 13

APPENDIX E - INFRASTRUCTURE STANDARD FIVE: HEALTH AND EDUCATION .................................................. 22

APPENDIX F – INFRASTRUCTURE STANDARD EIGHT: ROBUST WORKFORCE DEVELOPMENT ............................... 26

APPENDIX G – INFRASTRUCTURE STANDARD SIX: CHILD WELFARE INFORMATION SYSTEM AND QUALITY
ASSURANCE ...................................................................................................................... 32

APPENDIX H- INFRASTRUCTURE STANDARD SEVEN: SUPERVISION OF CONTRACT AGENCIES ............................. 36

APPENDIX I-INFRASTRUCTURE STANDARD NINE: MAXIMIZATION OF FEDERAL REVENUE .................................. 40

APPENDIX J – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN ....................... 1

APPENDIX K – METHODOLOGY ........................................................................................................ 23

    Update Meetings ............................................................................................................. 23
    Infrastructure Standards Update Data ............................................................................ 23

# I.   INTRODUCTION

After negotiations, the parties jointly moved the Court to approve a Modified Consent Decree and Exit Plan on December 5, 2016. Section VIII of that Exit Plan established a process and timeline for the development of new Infrastructure Standards to correspond with the state's new practice model and reform efforts. The development and subsequent negotiations regarding the new standards extended to December 18, 2017, at which time the parties jointly filed to amend the Exit Plan to include these practice and process elements intended to improve outcomes for children and families in Fulton and DeKalb counties.

The purpose of this Fifth Brief on the Infrastructure Standards is to update parties on the following four Infrastructure Standards: Comprehensive Practice Model, CCWIS and Quality Assurance, Supervision of Contract Agencies, and Maximization of Federal Revenue and the extent to which the standard itself has been implemented as described in the December 2017 Stipulated Order Amending the Modified Consent Decree and Exit Plan.

While these issues are described in more detail in the Brief, here are some highlights:

- A comprehensive case practice model to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families is still in development. The Division of Family and Children's Services or DFCS's decision to tie the practice model with the implementation of the Family First Prevention Services Act (FFPSA) makes the timeline of the rollout of the practice model unknown as the FFPSA plan has been submitted, but not yet approved.

- SHINES (DFCS's CCWIS system) staff are actively engaged is soliciting user satisfaction and engaging staff more directly in improvement processes. They have concentrated initially on the Help Desk customer satisfaction and acknowledge that information systems management can be reactive and are trying to move toward a more capacity building approach.

- Georgia DFCS has devoted considerable resources to continuous quality improvement (CQI) and quality assurance (QA), though DFCS seems to concentrate on QA and the review of cases as opposed to using a broader CQI lens and reliance on administrative data to address system issues and performance agency wide.

- Some preliminary meetings have been held to consider whether and how DFCS could shift from the current system of monitoring contract agencies, which is based on process measures, to a monitoring system that relies on an agency's ability to promote and achieve positive outcomes for children and families. The current focus is on how to create more therapeutic foster care services and enter into Family First Prevention Services Act (FFPSA) contracts.

- The state is not fully maximizing the use of Title IV-E funding through candidacy claiming, training reimbursement, approving all relative and kin as foster parents in a timely manner, offering guardianship subsidies to relative and kin caregivers, or

approving all eligible children and youth.  The loss in potential federal revenue of 15-20 million for not claiming candidacy is considerable.

As background, the Monitoring and Technical Assistance Team (hereinafter "MTAT") developed a new approach and methodology for tracking the state's performance. The approach deliberately recognized that change in outcomes depends not only on a theory (or theories) of change that link practice and policy to core outcomes, but also on well-developed and carefully implemented plans to execute proposed innovations. The development and execution of those plans inevitably calls for adjustments to the process of care, the quality of care and the investments in capacity – in terms of skills and capabilities of the workforce and financial resources – that are necessary for well-defined and high-quality case practice. Thus, the MTAT's approach to monitoring includes not only the semi-annual outcome reports, but also the publication of a series of briefs that will directly consider the state's execution of the process, quality, and capacity investments necessary for the full implementation of the practices called for in the Infrastructure Standard.

Considering the timing needed for implementation of these standards, MTAT monitored and reported on these standards in several sections at a time.

The First Brief on the Infrastructure Standards, completed in March 2019, focused on the implementation of the new practice model, assessment and investigation of maltreatment in care, and case planning and management.

The Second Brief on the Infrastructure Standards, completed in February 2020, provided an update on the development of the new comprehensive practice model; and the processes related to quality caregiving and placement, child health and education, and the workforce.

The Third Brief on the Infrastructure Standards, completed in October 2020, provided an update on the development and implementation of the new comprehensive practice model, the child welfare information system and quality assurance, monitoring of contract agencies, and maximization of federal funds.

The Fourth Brief on the Infrastructure Standards, completed in June 2021, provided an update on progress being made on the first six Infrastructure Standards, originally reported in the first two briefs, as well as the status of whether DFCS decided to proceed with recommendations made by MTAT.

This Fifth Brief on the Infrastructure Standards follows in the same direction of the fourth brief, this time providing an update on the last three Infrastructure Standards, originally reported on in the Third Brief, including an update on the recommendations made. This brief is organized in three parts: an introduction; a summary status of the last three Infrastructure Standards; and appendices with updated data performance on all nine of the Infrastructure Standards.

Appendices A through I provide a detailed status report of each Infrastructure Standard and any associated recommendations except for those standards related to the child welfare information

system and quality assurance, monitoring of contract agencies and maximization of federal funds. The entire Stipulated Order Amending the Modified Consent Decree and Action Plan is included in Appendix J. The methodology for analysis and reporting included using the State's administrative data to generate information on child and family outcomes, case file reviews, interviews, focus groups with staff and stakeholders and observations. A thorough description of the methodology is included in Appendix K.

## II.     STATUS OF THE INFRASTRUCTURE STANDARDS

The detailed analysis that follows discusses the first and final three Infrastructure Standards reported in the third brief on the Infrastructure Standards, the current status of each standard, and the extent of the standard's implementation as described in the Modified Consent Decree and Exit Plan. This analysis also identifies where the Division decided to modify the standard because other strategies would achieve better outcomes for children and their families in Metropolitan Atlanta. This section will detail the original MTAT recommendations and their implementation status. Appendices A through I contain the status of all nine infrastructure standards and MTAT recommendations.

### *Overview of the Infrastructure Standards*

The Infrastructure Standards outlined in the Stipulated Consent Decree and Exit Plan (see Appendix J) were developed through party negotiations spanning a year. The Division identified key priorities and practices to achieve better outcomes if practiced with fidelity.

### *Infrastructure Standard I: Comprehensive Practice Model*

This Infrastructure Standard outlines DFCS's commitment to developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and achieve positive safety, permanency and wellbeing outcomes for children and families.

See Appendix K for the methodology.

See Appendix A for more information on this standard and associated recommendations.

The Division continues to develop a comprehensive practice model, but is doing so as part of a broader vision for a more prevention-oriented child and family well-being system.[1]  Leaders and stakeholders envision a system that expands family strengthening preventive services and community supports, one in which families have access to interventions within their own and communities.  For those children in foster care or who enter foster care in Georgia, these leaders and stakeholders are aiming for a foster care experience for children that preserves and promotes their relationships with their parents, enables more placements with relative and kin caregivers, has a therapeutic foster care component and only relies on congregate care to meet the behavioral and emotional needs of young persons for short periods of time.[2]

The plan is to implement the Family First Prevention Service Act Prevention Plan and comprehensive practice model simultaneously. The COVID-19 pandemic and the requirements and timelines associated with the Family First Prevention Services Act (FFPSA) have hindered progress.  While the Division has submitted an FFPSA Prevention Plan, the approval process is

---

[1] DFCS Theory of Change, March 2021: Children, youth, and families experience greater well-being and healing throughout the child welfare continuum; Deeper and more intrusive system involvement is prevented; Children and youth spend less time in foster care and more time with family; Communities and families are strengthened and empowered and share power in planning and decision-making.
Families have increased resiliency, self-sufficiency, stability, and lasting connections.
Structures that have perpetuated racial injustice are dismantled and rebuilt to promote equity.

[2] Georgia Theory of Change, March 2021

quite extensive, and as such, it could be difficult to anticipate when the comprehensive practice model will be completed and implemented. Recent integration efforts include:

- Both Georgia's comprehensive practice model and FFPSA place a strong emphasis on a thorough and comprehensive assessment. DFCS staff researched several other child welfare system assessment tools, consulted with Chapin Hall on the assessment process, and solicited feedback from field staff at all levels.
- DFCS leadership and the Practice Model Advisory Team made the decision to continue to use the current Family Functioning Assessment (FFA) to understand family capabilities and needs when undergoing a child protective services assessment.
- DFCS leaders and training staff are determining the practice supports that would be useful to staff and promote quality services. DFCS is focused on providing clearer expectations, training and technical assistance to support staff.
- The Division will track measures related to service referrals and outcomes.
- DFCS is revising several case planning tools, the foster care case plan and family plan, to be less cumbersome and confusing, and help facilitate better communication between families and courts.
- DFCS is creating business requirements that will address some of the SHINES barriers related to timely completion and entry of family plans.
- DFCS is offering training and technical assistance to help staff engage families in case planning.

## *Infrastructure Standard VI: Child Welfare Information System and Quality Assurance*

This Infrastructure Standard has two primary components. First, it outlines DFCS's plan to develop and maintain an information system with accurate data to meet federal standards and reporting standards and meet the case management functionalities necessary for child welfare system. Second, this Infrastructure Standard details DFCS's commitment to develop methodologies and strategies for monitoring all of the standards, as well as child welfare outcomes, using quality assurance.

See Appendix K for more information about the methodology.

Please see Appendix G for more information about each standard and recommendation.

## Child Welfare Information System

SHINES is a modular, reusable case management information framework with standards that the Division uses develop and support program needs. As was reported in the Third Infrastructure Brief, DFCS is still pursuing CCWIS status. Data reported to the federal government continues to be of high quality, with the AFCARS quality points well within the allotted allowance for errors. Improvements to the information system are an ongoing process. Through a gap analysis

process, DFCS frequently identifies those areas of SHINES that need updates and enhancements. For example, SHINES staff are currently engaged in eight gap analyses with Child Protective Services Intake Communications Center (CICC) to update SHINES to reflect the new Clear Capture process.

One of the challenges of operating a child welfare information system is the sheer number of improvement opportunities that are needed. It is a complex process to prioritize them given competing legitimate demands. The SHINES Executive Steering Committee is responsible for prioritizing initiatives/projects while understanding the need for flexibility. Priorities and schedules are developed, however new program initiatives such as, Families First, can take precedent

Regarding MTAT's recommendation in the Third Infrastructure Brief develop and disseminate a survey to gauge user satisfaction with SHINES, SHINES staff are actively engaged in soliciting user satisfaction and engaging staff more directly in improvement processes. They concentrated initially on the Help Desk customer satisfaction. They acknowledge that information systems management can be very reactive and are trying to move toward a more capacity building approach. SHINES leadership stress it is critical to know when a problem arises so they can partner with program staff to address and resolve quickly. They believe a closer partnership with staff allows them to be more responsive and tailor responses. They are currently reviewing their work through a lens of effective utilization. In addition, it should be highlighted that DFCS's new leader, Director Broce, has placed a priority on technology and infrastructure enhancements, which should aid this process.

In recent years, DFCS has been very involved in on-going support and improvement of child welfare policy and practice, transition and maintenance of operational activities, and participated in several process improvement opportunities. SHINES staff are committed to system improvement and took on archiving and purging, even though it was not required by Administration of Children and Families (ACF), but they believe it was important to their system. SHINES staff discussed the challenges of data quality and the recent addition of a position to support CCWIS development. Data quality efforts remain focused on accuracy, timeliness, and completeness which is foundational to continuous quality improvement (CQI).

## Quality Assurance

The Director of Quality Management believes that everyone is critical to continuous quality improvement in Georgia and that State Office staff are consultants to the regions, not the ones driving the CQI process. Georgia DFCS has devoted considerable resources to CQI and quality assurance (QA), though DFCS seems to concentrate on QA and the review of cases and could benefit from using a broader CQI lens to address larger system issues. State Office QA staff use the Child and Families Services Review On-Site Review Instrument (CFSR/OSRI) to promote better practice and prepare for the next round of the Child and Family Services Review.

Georgia's general approach to CQI is to identify a problem, analyze it, seek to understand the underlying dynamics before developing a solution, and then track and adjust over time based on

the evidence about fidelity and impact.  While Georgia has a robust process for identifying a problem and analyzing qualitative and quantitative data before developing solutions, MTAT is recommending a greater emphasis or focus on tracking and adjusting overtime, through revisiting administrative data to understand the extent to which these practices or solutions are happening as envisioned and what are the impacts on stated goals.

Region 14 used this approach to address concerns about the number and percent of children re-entering foster care within one year of exit. At the time, nearly 25 percent of teenagers were re-entering foster care within this timeframe. To improve these outcomes, in May 2020, Region 14 completed the development of a Re-Entry Strategy Guide.  The major components were as follows:

- Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative or guardianship, no more than 8.3% shall have re-entered care within 12 months from the date of discharge. [Kenny A. Outcome 3]
- Children are safely maintained in their home whenever possible and appropriate. [CFSR Safety Outcome 2]
- Provide services to family to protect children in the home and prevent removal or re-entry into foster care. The goal is 59 percent. [CFSR Item 2]

Specific practice expectations were communicated to staff and training was provided on the following.

- *Conduct a pre-removal staffing to prevent any unnecessary foster care entries.* The Division's external stakeholders are included in the decision-making process to ensure all reasonable efforts have been explored prior to the dependency decision. The aim is to maintain a transparent relationship with external stakeholders and promote a team approach to service delivery and to engage the child's family. This meeting is also designed to support the staff with to determine if and when a child should enter foster care and strengthen the decisions about removal.

- *Transfer cases from one case manager to another case manager in a case transfer staffing.* The aim is to create a unified process for transferring cases from one program area to another. Information and history can be shared that may be useful to promote better relationships with families and outcomes.

- *Develop written statements when a child is removed from his or her parents to describe the behavioral change that must occur with respect to specific family circumstances, home environment, caregiver perception, behavior, caregiver capacity and/or support services that would allow for reunification to occur.* Staff are expected to ask what must exist in the home before a child can be returned to a safe environment. The judicial entities and DFCS must be clear on what these conditions are, and this information must be provided to parents.  These written statements are known as the conditions for return.

- *Plan for possible relapses within 45 to 60 days of discharge from foster care.* This multidisciplinary approach supports staff to determine if the family has met the conditions for return and if the case is ready to be referred for a formal Discharge Family Team Meeting (FTM).

- *Facilitate a task-oriented, and structured Family Team Meeting (FTM) centered on the family's needs prior to a child returning to his or her parents.* The aim of this meeting is to solidify decisions relating to child safety, permanency and well-being while building a consensus with the family.

Regional and state CQI teams have not had regular access to the quantitative administrative evidence needed to help Region 14 understand the extent to which these practices are being implemented as envisioned and expected nor the impact on the stated goals related to reducing re-entries into foster care and providing services to families.

The state CQI team regularly collaborates with Region XIV staff regarding CFSR priorities. However increased communication and collaboration between the region and state office CQI team regarding Kenny A priorities and strategies would likely result in improved alignment, and clarity of vision and purpose. A key element of a strong CQI process is the effective use of administrative data to sharpen the focus and understanding of the root causes of an identified problem. State office CQI staff referenced use of a tool called Six Boxes to help them drill down to root causes.

The Director of Data Integrity position is currently vacant, which may be hindering the agency's progress in addressing the most effective use of administrative data. The Director of Quality Management indicated they are looking to fill a position that would be strong in data analytics, which would enhance the Division's capability to use data more effectively.

MTAT continues to recommend DFCS adopt an established, administrative data evidence-informed CQI process in planning for exit from court oversight to include regional leadership and frontline staff.

## Infrastructure Standard VII: Supervision of Contract Agencies

This infrastructure standard specifies how DFCS will license and contract with Child Caring Institutions (CCI) and Child Placing Agencies (CPA) provider placements, and monitor those placements and placement agencies to ensure the safety and well-being of children. Specific prohibitions include no child being placed in an unlicensed facility, mandated reporter and safety requirements being detailed in contracts, monitoring compliance with data on outcomes and conducting routine safety reviews of foster homes, and licensing reviews of agencies.

See Appendix K for more information about the methodology.

Please see Appendix H for specific updates on each standard and recommendation.

The COVID-19 pandemic has a significant impact on monitoring of contract agencies for both the Office of Provider Management (OPM) and Residential Child Care Licensing (RCCL). OPM

share that they started going back out to foster homes in May 2021 to do safety reviews in person to ensure compliance, while previously having to try and address safety remotely. As reported in July 2021, RCCL has not been able to return to their previous in-person level of review and have been doing abbreviated in person visits and in their own words, not looking as deeply as they previously done. This has begun to change.  By January 1, 2022, they will be back to pre-pandemic levels of review. Leaders shared that most recently, eight providers that were on progressive compliance reviews due to low performance decided not to renew their contracts; in these instances the license wasn't revoked but surrendered by the agency. There have only been two involuntary closures since June 2020, and that was due to multiple violations.

RCCL also shared that monitoring efforts go beyond looking at concerns that are evident, including a recent example of investigating an agency that had not reported any violations or incidents in some time, which triggered the closer inspection. Monitoring is also reliant on open and constant communication among entities. OPM and RCCL both described good working relationships with provider agencies. They now share with providers current specific placement needs are for children and young persons in provider orientation. OPM and RCCL regularly discuss cases together. There are additional monthly risk management meetings between OPM, RCCL, Care Coordination Treatment Unit (CCTU), Department of Juvenile Justice (DJJ), and IV-E Eligibility to talk about trends and outstanding concerns with providers, which are then shared with the providers themselves.

Current priorities and focus are on implementing FFPSA and creating more Therapeutic Foster Care (TFC) homes in Georgia. This will have a significant impact on OPM and RCCL's workload.  OPM and RCCL believe that their good working relationship help them address the challenges of building TFC capacity and the consequences of reducing the use of congregate care due to FFPSA.
MTAT continues to recommend the need for a shift from the current system of monitoring contract agencies (Performance-Based Placement), which is based on process measures, to a monitoring system that relies on an agency's ability to promote and achieve positive outcomes for children and families. This includes demonstration of cultural competence and understanding of race equity, including directing resources to those agencies and community-based organizations most trusted by families, which is aligned with FFPSA. In concert with that, the payment methodology must be aligned with the Division's desired outcomes.

## *Infrastructure Standard IX: Maximization of Federal Revenue*

This Infrastructure Standard provides guidance relevant to the maximization of Federal funding. DFCS leadership committed to considering opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming. This standard is focused on maximizing Titles IV-B and IV-E of the Social Security Act, and Medicaid funding for families in Georgia.

See Appendix K for more information about the methodology.

For more information on each standard and recommendations, please see Appendix I.

*Maximizing Title IV-E Funding*

The state is not fully maximizing the use of Title IV-E funding through candidacy claiming, training reimbursement, approving all relative and kin as foster parents in a timely manner, offering guardianship subsidies to relative and kin caregivers, or approving all eligible children and youth.

On July 31, 2021, 23.3 percent of children in Region 14 were IV-eligible and reimbursable.

Of the 631 children in Region 14 who were not IV-E eligible on this date:
- 364 (57.7%) did not have a Reasonable Efforts determination made in 60 days;
- 306 (48.5%) had initial child removal orders lacking the proper judicial language; and
- 294 (46.6%) court orders did not give DFCS custody.

The monitoring and technical assistance team conducted a review of SHINES data to understand whether court orders are being entered timely into the system and identified ongoing opportunities for improvement.  Based on further analysis conducted by finance, legal and program staff, it appears that some case managers continue to lack a working knowledge of the data fields in the information system that are necessary to effectively satisfy the Court Order requirements.   While some staff have a deeper understanding of the Court Order data entry issue, SHINES must be enhanced in order to have the reporting capability Revenue Maximization staff need to make informed decisions. Revenue Maximization staff continue to be involved in discussions about refinements in SHINES to make the process more user-friendly.

Some of the issues with court orders is the responsibility of the Special Assistant to the Attorney Generals (SAAG) and Judges. Some SAAGs fall behind on drafting orders. There were also some delays in Judges signing the orders. Fulton and DeKalb courts revamped their court order protocols and started to implement them, though these same issues have remained. MTAT will conduct is a targeted review to assist the courts and the Division to evaluate this new protocol.

MTAT found at least one instance in which the manual override option was used to document IV-E denial which did not seem accurate based on the information provided. In this case, based on the information entered, the system determined the case to be IV-E eligible, but the worker conducted a manual override to make it ineligible, and the supervisor agreed. The justification for this decision was designated as the household being over the established AFDC income limits and also that there was no deprivation during the month of removal. Upon closer inspection, the documentation, or supporting evidence, of an excess of household income lacked the specific information needed to make this override decision. In addition, it was also found that the father was not present in the home at the time of removal; that fact alone would establish deprivation. In other instances discovered by MTAT, the documentation needed to make a more informed determination of eligibility, or ineligibility, was simply not evident or inadequate to make that determination. All staff must have a comprehensive working knowledge of the definition and application of the Deprivation finding. Training for those staff conducting secondary reviews needs to be enhanced.

The Division does not report that an increase in IV-E funding for training is a critical issue.

The Division made the decision to not claim for candidates for foster care, traditional candidate claiming or for the FFPSA IV-E prevention candidacy pool. This represents 15 to 20 million dollars of federal Title IV-E administrative dollars in potential resources for families in Georgia.

DFCS is continuing to help relative and kin caregivers become fully approved foster parents in Georgia, and are slowly starting to approve more relative and kinship homes. Leaders understand that administrative claiming is available to them while the family is going through the approval process.

DFCS continues to fund guardianship subsidies for relative and kin caregivers with federal Temporary Assistance to Needy Families (TANF) and state general fund dollars. The Division is not claiming Title IV-E funds for this purpose at this juncture, though could for IV-E eligible cases, and use TANF funds for those IV-E ineligible.  Division leaders understand there could be negative ramifications as a result of changes in TANF criteria in the future.

MTAT remains concerned that the Division is avoiding risk to such an extent that federal claims are minimized. The Division continues to be more focused about over-claiming than under-claiming, as that is the focus of Federal monitoring.

The Division is making progress in a number of areas.

- Revenue Maximization staff routinely review cases for accuracy and missed claiming opportunities. As a result, staff regularly revisit and amend Federal claims based on an assessment of the new documentation secured due to their more focused review efforts. Revenue Maximization staff recently found that of the 4,301 new entries, 17 continued to have missing information and of the 1,848 re-reviews, 28 have missing information.  The Revenue Maximization Director indicated that these data are shared with regional and state leaders to illustrate the progress.
- The Division has not begun work on revising their Random Moment Sampling (RMS) but anticipated doing so with the necessary updates, specifically focusing on FFPSA implementation.
- As of July 2021, Georgia had not yet to settle on a candidacy population, or identifying which kids will be eligible for reimbursement, relevant to FFPSA. Since that time, according to the Blueprint for Families First (www.blueprintfamilyfirst.org), "DFCS is defining "candidates for foster care" as children and youth who are in families currently receiving DFCS Family Preservation services"
- DFCS is still considering what the repercussions of QRTPs are for the State, given QRTPs are the only congregate care setting that IV-E will reimburse past 14 days for maintenance and care costs. Division leaders have been assured that any loss in federal funding for these placements would be addressed in the state budget.
- Annual training is provided to Revenue Maximization staff as a means to ensure available for families and children in Georgia.

*Medicaid*

DFCS can claim an additional $0.67 in federal Medicaid funds for each state dollar spent on children with significant behavioral health needs, which could result in an additional $46.9M in federal Medicaid funding for families in Georgia.

DFCS determined that providing more therapeutic foster care would help meet the needs of children and youth in foster care. Seven million state dollars have been allocated to the DFCS budget on a reoccurring basis to make this happen. This investment in state dollars will enable DFCS to claim more Medicaid funding and support. Child Placing Agencies (CPA) are expressing interest in providing therapeutic foster care. DFCS plans to provide start-up grants once the U.S. Centers for Medicaid and Medicare services approves this plan.

*Kenny A. v. Kemp*

## APPENDIX A – INFRASTRUCTURE STANDARD ONE: COMPREHENSIVE PRACTICE MODEL

| Infrastructure Standard | Status of Implementation as Reported in First Brief | Current Status |
|---|---|---|
| DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia. | As reported in the first brief, the practice model was considered to be Solution Based Casework and was in the process of being implemented. At the end of August 2018, 53% of foster care staff and 54% of CPS staff had been certified in Region 14 and increased to 60% and 71% respectively by mid-October 2018. Noted concerns were it not being well-defined and not encompassing all parts of child welfare. Strengths included the use of practice model coaches and planned roll out from region. | Solution Based Casework is no longer considered the practice model, so no data on certification is applicable. See body of report for update on the practice model. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX B – INFRASTRUCTURE STANDARD TWO: ASSESSMENT OF MALTREATMENT IN CARE

| Infrastructure Standard | Status of Implementation as Reported in First Brief* | Current Status |
|---|---|---|
| DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III. To do so, DFCS will: • conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case • take into account the traumatic stress of children • be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes; • actively engage ongoing partnerships with families and stakeholders to assure child safety • provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making | | |
| II.A.1 | As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle. | The Kenny A CPS case review from January-June 2018 found 86% (93 of 108) cases the CICC case manager identified 'all' stages of the family life cycle. | • The Kenny A CPS case review from January-June 2020 found 86.7% (59 of 68) cases the CICC case manager identified 'all' stages of the family life cycle. • The Kenny A CPS case review from January-June 2020 found 17.6% (12 of 68) cases the CICC case manager gathered information about family functioning, including identifying their stage of development in the family life cycle[3] |
| II.A.2 | DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to: | • The Kenny A CPS case review from January-June 2018 found that in 78% (84 of 108) cases, the CICC intake case manager asked, gathered and documented DFCS history. • The Kenny A CPS case review from January-June 2018 found that in 33% (36 | • The Kenny A CPS case review from January-June 2020 found that in 70.5% (31 of 44) applicable cases, the CICC intake case manager asked, gathered and documented DFCS history (performance may have been impacted by COVID) |

---

[3] Please note the transition to CLEAR capture was underway, which likely impacted the number asking these questions.

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First Brief* | Current Status |
|---|---|---|
| a. the family's previous response to intervention and treatment strategies; b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports; c. traumatic events affecting family members; and d. coping skills used by the family to deal with traumatic events. | of 108) cases, the CICC intake case manager asked about family supports. • Data was not available on the family's previous response to intervention and treatment strategies, traumatic events, and coping skills. | • The Kenny A CPS case review from January-June 2020 found that in 17% (12 of 68) cases, DFCS incorporated DFCS history as part of the intake assessment for possible maltreatment in care (performance may have been impacted by COVID) • The Kenny A CPS case review from January-June 2020 found that in 1.5% (1 of 68) cases, the CICC intake case manager asked about family supports (performance may have been impacted by COVID and transition to CLEAR capture) • The Kenny A CPS case review from January-June 2020 found that in 2.9% (2 of 68) cases, the CICC intake case manager gathered information on traumatic events affecting family members (performance may have been impacted by COVID and transition to CLEAR capture)) • The Kenny A CPS case review from January-June 2020 found that in 0% (0 of 68) cases, the CICC intake case manager gathered information on coping skills used by the family to deal with traumatic events (performance may have been impacted by COVID and transition to CLEAR capture)) |
| II.B.1 For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care. The response time for a special investigation of | The Kenny A CPS case review from January-June 2018 found that 124 of the 130 (95.4%) children involved in a maltreatment in care investigation were seen privately within 24 hours of the receipt of the report. | • The Kenny A CPS case review from January-June 2020 found that 124 of the 130 (77.4%) children involved in a maltreatment in care investigation were seen privately within 24 hours of the receipt of the report (performance may have been impacted by COVID) |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First Brief* | Current Status |
|---|---|---|
| | maltreatment in care is immediate or within 24 hours. | | • Monthly data provided by DFCS shows the percentage of cases receiving contacts within 24 hours from March-August 2021 ranged from 78.6%-94.4% for Region 14 |
| II.B.2 | For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below. | A 2018 MTAT survey of DFCS staff and leaders found that 24 of 61 (39.3%) of respondents who answered indicated CICC workers make appropriate assignments investigations are being monitored "consistently" or "usually." | In the first two quarters of 2021, 10 reports were screened in for policy violations. Twenty policy violations were received in calendar year 2020. |
| II.B.2.a | When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s). | Data was not yet available regarding this component of the infrastructure standard. | This information is tracked manually in the region. Data provided shows that the percent of contacts made within 24 hours from March through August of 2021 range from 78.6% to 94.4% monthly. |
| II.B.2.b | When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from | Data was not yet available regarding this component of the infrastructure standard. | • Data provided by OPM's data management system CareSolutions indicated that of the 144 out of 374 (38.1%) of incidents were completed within 15 days that were reported between January-June 2021. OPM shared that providers cannot submit a Policy Violation Assessment (PVA) until OPM requests one, and there may be a delay between the date of the incident and the date of the request. They indicate this delay is to |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First Brief* | Current Status |
|---|---|---|
| | the date of the report. The assessment includes, but is not limited to:<br>o   visiting the home of the caregiver;<br>o   conducting separate face-to-face interviews with children, caregivers, and other household members; and<br>o   completing a policy violation assessment in the applicable foster parent record in SHINES. | | allow time for CPS to conduct investigations without interruptions (a request stemming from the Special Investigations Unit (SIU).<br>• The DFCS Resource Development Program Director will begin tracking follow up with foster homes September 1, 2021. |
| II.B.2.c | Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months. | The Kenny A foster home case review from January-June 2018 found that in the 82 foster homes reviewed, there were six cases of alleged corporal punishment, none of which were screened in for a CPS investigation. Two of the six cases had corrective action plans developed which were implemented within three days of the required staffing. | • The Kenny A foster home case review from January-June 2020 found that in the 84 foster homes reviewed, there was one case of alleged corporal punishment, which was not screened in for a CPS investigation. It was ultimately determined a policy violation did not occur.<br>• Data provided by OPM's data management system CareSolutions indicated that of the 119 CAP's requested, 43 (33.6%) were received (timestamp) within 3 days. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX C – INFRASTRUCTURE STANDARD THREE: CASE PLANNING AND MANAGEMENT

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making. DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care. | | |
| III.A | DFCS will use current assessment information to inform case planning in foster care | |
| III.A.1 | A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised. | The Kenny A Diligent Search case review from January-June 2018 found that 39 of the 60 (65%) cases had a transfer staffing documented. Of those 29 cases, 24 (61.5%) were within 5 days. | The Kenny A Diligent Search case review from July-December 2020 found that 42 of the 60 (70.0%) cases had a transfer staffing documented. Of those 42 cases, 15 (35.7%) were within 5 days. |
| III.A.2 | The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term. The FFA:<br>a. includes engagement of the family in a partnership to identify safety concerns;<br>b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine; | • The Kenny A Diligent Search case review from January-June 2018 found that 59 of the 60 (98.3%) cases had a completed FFA, and of those 59 cases, 44 (74.6%) had findings of the FFA reflected in the initial case plan.<br>• Data was not available regarding the details included in the FFA. | • The Kenny A Diligent Search case review from July-December 2020 found that 59 of the 60 (98.3%) cases had a completed FFA, and of those 59 cases, 55 (93.2%) had findings of the FFA reflected in the initial case plan.<br>• The Kenny A Diligent Search case review from Jul-December found that:<br>  • 45 of the 59 (76.3%) FFAs includes engagement of family in partnership to identify safety concerns.<br>  • 58 of the 59 (98.3%) FFAs describes allegation of maltreatment both reported and found in context of family's everyday life routine.<br>  • 52 of 59 (88.1%) FFAs tracks sequence of everyday life events that led to incident of maltreatment. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| | c. tracks the sequence of everyday life events that led to the incident of maltreatment; d. identifies family developmental stages and associated challenges; e. identifies family supports; f. identifies child/youth development and associated vulnerabilities; and g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect. | • 56 of 59 (94.9%) FFAs identified family developmental stages and associated challenges. • 49 of 59 (83.1%) FFAs identifies family supports. • 54 of 50 (91.5%) FFAs identifies child/youth development and associated vulnerabilities. • 52 of 59 (88.1%) FFAs identifies caregiver patterns of behavioral issues that affect parental capacity to care and protect. |
| III.B | DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (see DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs). By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes | • The Kenny A Diligent Search case review from January-June 2018 found that 57 of the 60 (95%) cases had a completed FTM within the first 25 days, and of those 57 cases, 43 (75.4%) occurred within the first 9 days. • Of the 227 cases reviewed by the Kenny A Permanency Review Team for children in foster care 13 months between January-June 2017, 10 (less than 5 percent) had a FTM within the previous 90 days. | The Kenny A Diligent Search case review from July-December 2020 found that 53 of the 60 (88.3%) cases had a completed FTM within the first 25 days, and of those 53 cases, 24 (45.3%) occurred within the first 9 days, which is reflective of the different practices of the two counties. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| | for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation. | | |
| III.C | DFCS will create and utilize genograms in case planning. | | |
| III.C.1 | To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram. The genogram will be used throughout the case process to identify potential placements and family supports. | The Kenny A Diligent Search case review from January-June 2018 found that 36 of the 60 (60%) cases had a completed genogram. | The Kenny A Diligent Search case review from July-December 2020 found that 24 of the 60 (40%) cases had a completed genogram. |
| III.C.2 | Construction of the genogram shall: a. include at least three generations of family members on both sides of the family; b. embrace cultural differences regarding "who is family" and include all who serve in parental capacity; | Data was not available regarding these components of this standard. | • The Kenny A Diligent Search case review from July-December 2020 found that of the 24 cases with a completed genogram: <br> • 7 (29.2%) included at least 3 generations on both sides of the family. <br> • 7 (29.2%) case manager embraced cultural differences regarding "who is family" and included all who serve in parental capacity. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| | c. include natural helpers, friends, confidants of the caretakers, and older children; and<br>d. indicate who was living in the home at the time of the assessment. | | • 10 (41.7%) included natural helpers, friends, confidants and caretakers of older children and that they have been engaged and considered for placement.<br>• 11 (45.8%) included who was living in the home at the time of the assessment.<br>• The Kenny A Permanency Review of children in custody eight months from January-June 2021 found that 68% of those completed showed three generations and 77% identified other relatives and fictive kin. |
| III.C.3 | Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement. | Data was not available regarding these components of this standard. | Data was not available regarding these components of this standard. |
| III.D | DFCS shall assist the family to create plans, implement them and track progress. | | |
| III.D.1 | DFCS shall assist the family in creating initial action plans and the case plan. Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family | The Kenny A Diligent Search case review from January-June 2018 found that 17 of the 60 (28%) cases had a completed genogram. | • The Kenny A Diligent Search case review from July-December 2020 found that 16 of the 60 (26.7%) cases had an initial action plan developed.<br>• The Kenny A Diligent Search case review from July-December 2020 found that 12 of the 16 (75%) cases with an initial action plan had evidence that family members were involved in developing the action plan. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| | and will be used to guide case planning for permanency | | • The Kenny A Diligent Search case review from July-December 2020 found that 37 of 48 (77.1%) cases with a goal of reunification had evidence the case plan was co-developed with the family. |
| III.D.2 | Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval) whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law | Data was not available regarding these components of this standard. | Data is not available regarding case plan submission to Juvenile Court. The Kenny A Diligent Search case review from July-December 2020 found that all 60 cases had an initial case plan developed. |
| III.D.3 | DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s). | Data was not available regarding these components of this standard. | The Kenny A. Permanency Review on children in custody eight months for July-December 2020 noted that 134 of 144 (93%) of visits between mother and caseworker were of sufficient quality and 67 of 89 (75%) of visits between father and caseworker were of sufficient quality. |
| III.D.4 | DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified. | Data was not available regarding these components of this standard. | The Kenny A. Permanency Review on children in custody eight months July-December 2020 found that 173 of 185 (94%) cases had FLO and ILO included in the family agreement/case plan. |
| III.D.5 | DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based | Data was not available regarding these components of this standard. | • The Kenny A Diligent Search case review from July-December 2020 found that 58 of 60 (96.7%) cases |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| | on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being. | | showed case managers making service referrals in the first 90 days.<br>• The Kenny A Diligent Search case review from July-December 2020 found that 59 of 60 (98.3%) cases showed evidence that services noted in the initial case plan were implemented within 30 days of the plan. |
| III.E | DFCS will take steps to promote timely and lasting permanency. | | |
| III.E.1 | DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency. | All but one of the survey respondents of DeKalb and Fulton counties shared there were not enough supervisors and case managers to effectively move cases to permanency. | The most recent Kenny A Permanency Review of children in custody eight months found that for the 149 children reviewed, 37% did not have case consultations. Reviewers observed that case staffings lacked follow up and the recommendations were repeated for month to month. |
| III.E.2 | The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency. The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings. Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues. | Data was not available regarding these components of this standard. | Eight month case reviews are conducted quarterly by the Kenny A case review team, which occur on all children in custody for 8 months, to identify trends and barriers to permanency, and results are disseminated. These replaced the 13 month permanency reviews previously conducted In Period 31 (January-June 2021), 156 reviews were completed, and 97 (62%) of those cases had staffings. Commonly identified concerns discussed in staffings/coaching support include: reminders to review all history, ongoing efforts to engage fathers and exploring all relative resources. Synopses of identified barriers to achieving permanency are shared and discussed with regional leadership. |
| III.E.3 | In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through | Data was not available regarding these components of this standard. | War rooms, a part of the Push to Permanency initiative, which have replaced SWAT meetings, are occurring on a regular basis. Per the Standard Operating Procedures Provided, "The Push to Permanency (P2P) Initiative is a |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018. | | process that has been developed to engage the County staff at the 6th and 8th month case juncture of a case in an attempt to provide a specific and detailed blueprint for the case." |
| III.E.3.a A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval). The SWAT tool is used in lieu of other staffing tools. Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months. | Data was not available regarding these components of this standard. | Eight month case reviews (Kenny A Permanency Reviews) are conducted quarterly by the Kenny A case review team, which occur on all children in custody for 8 months, to identify trends and barriers to permanency, and results are disseminated. These replaced the 13 month permanency reviews previously conducted |
| III.E.3.b Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator. DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings. | Data was not available regarding these components of this standard. | The Standard Operating Procedures for the War Rooms (Push to Permanency Initiative) indicate "The required participants for the P2P case consultations will include the Case Manager (CM), Supervisor (SSS) and Administrator (SSA). The following participants will be invited to attend as their schedule permits: Program Directors (PD), Field Program Specialist (FPS) and Regional Adoption Coordinator (RAC)." |
| III.E.4 Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness. If revisions are needed | Data was not available regarding these components of this standard. | War rooms, of the Push to Permanency Initiative, have been in place since July 1, 2018. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| to this process, those changes will replace requirements in this section. | | |

## APPENDIX D – INFRASTRUCTURE STANDARD FOUR: QUALITY CAREGIVING AND PLACEMENT

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured. DFCS prioritizes children being placed with relatives who are able to provide a safe nurturing home for them. Critical components of the screening, training, approval, and support process for all caregivers are also described in this section. | | |
| IV.A.1   DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised. | • Reliable data not available on timeliness of initial screening and training<br>• The 2018 Foster Home Reevaluation Case Review (see methodology) found that 97 percent of foster parents self-reported on a survey receiving appropriate and adequate training to care for children placed in their homes. | • Data from OPM's data management system CareSolutions found that of the 249 homes with an initial SAFE homes study between January and June 2021 and a pre-service training completion date after the inquiry date:<br>  • 83 homes (33.3%) had the preservice training completed within 60 days of the Initial Home Study, with 146 being the average length of time.<br>  • 10 homes (4.0%) had training completed within 30 days of approval and opened in SHINES, with 171 days being the average length of time for these 249 homes to complete training. . |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.A.2 | DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan. | The 2018 Foster Home Reevaluation Case Review (see methodology) found that 179 of 282 (63.5%) of applicable CPA homes and 21 of 128 (16.4%) of applicable DFCS homes detailed how foster parents were working with birth parents. | The 2021 Foster Home Reevaluation Case Review found that 78 of 124 (62.9%) of applicable CPA homes and 6 of 65 (9.2%) of applicable DFCS homes detailed how foster parents were working with birth parents. |
| IV.A.3 | DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis. | The 2018 Foster Home Reevaluation Case Review found that a majority of re-evaluations are completed timely, with 361 of 405 applicable foster homes (89.1%) having their most recent re-evaluation completed prior to the due date. | • Data from OPM's data management system CareSolutions found that for the 158-268 re-evaluations due each month between January-June 2021, 54.85-62.68% were completed before they were due.<br>• The 2021 Foster Home Reevaluation Case Review found that a majority of re-evaluations are completed timely, with 124 of 189 applicable foster homes (65.6%) having their most recent re-evaluation completed prior to the due date. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.A.4 | DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care. DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home. DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised. | • A review of all re-evaluations completed in 2018 in DeKalb and Fulton counties found that 93% of DFCS foster parents and 96% of CPA foster parents self-reported on a survey that CPD trainings increased their ability parent children in care.<br>• Of the 403 applicable foster homes that had a re-evaluation in 2018 in Region 14 (see methodology), 336 (83.4%) had 15 or more training hours documented in their re-evaluation.<br>• Fifty of 66 (75.8%) of resource homes reviewed during the Kenny A foster home case review for the period July-December 2018 met the CPD requirement. | • The Kenny A Foster Home case review from July-December 2020 found that Fifty-three of 64 (82.8%) applicable resource homes reviewed met the CPD requirement.<br>• Data from OPM's data management system CareSolutions found that 2,527 foster homes statewide of 3,329 (75.9%) homes due to complete ongoing training hours met the training hour requirement in calendar year 2020.<br>• The 2021 Foster Home Reevaluation Case Review found that of the 189 applicable foster homes, 174 (92.1%) had 15 or more training hours documented in their re-evaluation. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| IV.B.1.a | DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised. | • Of the 60 cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review:<br>• 33 (55%) children were interviewed about any relatives<br>• 55 (92%) mothers were interviewed about any relatives<br>• 20 (33%) fathers were interviewed about any relatives<br>• 31 (52%) cases showed other collaterals were contacted who may have information<br>• Of the 60 cases reviewed from July-December 2018 as part of the Diligent Search case review, 34 (57%) had a court order present stating "reasonably diligent search for the parents, relatives, and person who have demonstrated an ongoing commitment to the child(ren) has been conducted by the DeKalb / Fulton County Division of Family and Children Services and has been properly and timely filed in this Court." | • The Kenny A Diligent Search Case review from July-December 2020 found that of the 60 cases reviewed:<br>• 35 (58.3%) children were interviewed about any relatives.<br>• 43 (71.7%) mothers were interviewed about any relatives.<br>• 27 (45%) fathers were interviewed about any relatives.<br>• 48 (80%) cases showed other collaterals were contacted who may have information.<br>• The Kenny A Diligent Search Case review from July-December 2020 found that of the 60 cases reviewed, 32 (53.3%) had a court order present stating "reasonably diligent search for the parents, relatives, and person who have demonstrated an ongoing commitment to the child(ren) has been conducted by the DeKalb / Fulton County Division of Family and Children Services and has been properly and timely filed in this Court." |
| IV.B.1.b | DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review | Of the 70 cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 37 (52%) cases showed continued diligent search activities throughout the six month period. | The Kenny A Placement case review from July-December 2020 found that 54 (75%) cases with missing parents showed continued diligent search activities throughout the six month period. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|
| IV.B.2 Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:<br>a. prior to placement, screen all household members;<br>b. prior to placement, conduct criminal history search of adult household members; and<br>c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety. | • Data was not available regarding the frequency in which DFCS is using the emergency placement process with relatives when children enter care.<br>• Of the 60 cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review, 39 (65%) were not placed with relatives, and 21 (35%) were either placed with relatives or were already placed with them. | • Data was not available regarding the frequency in which DFCS is using the emergency placement process with relatives when children enter care.<br>• The Kenny A Diligent Search case review from July-December 2020 found that 29 (48.3%) were not placed with relatives, and 31 (51.7%) were either placed with relatives or were already placed with them. |
| IV.B.3 The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support. | Data was not available regarding this component of the infrastructure standard. | Data was not available regarding this component of the infrastructure standard. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.C.1 | DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable. | • Foster parents responding to MTAT's foster parent survey reported receiving the following information "always" or "usually":<br>  • Current Information: 8 of 34 (23.6%)<br>  • Historical Information: 8 of 33 (24.2%)<br>  • Mental Health Information: 7 of 34 (20.6%)<br>  • Developmental Trajectory Information: 7 of 34 (20.6%)<br>  • Physical Health Information: 10 of 34 (29.4%)<br>  • Education Information: 10 of 34 (29.4%)<br>  • Child's Plan: 10 of 34 (29.4%)<br>  • Family's Plan: 10 of 34 (29.4%)<br>  • WTLP: 4 of 33 (12.1%) | • The 2021 Foster Home Re-Evaluation Case Review found that five of the nine (55.6%) foster parents who responded to the self-report survey question indicated they received the child passport for children placed in their home. In addition, 130 of 149 foster parent respondents with children placed in their home indicated they were well informed about the child's needs at the time of placement 'as expected', 'more than expected' or 'consistently more than expected'<br>• The eight month permanency review for January-June 2021 found that 25 of 37 applicable children (68%) discussed the WTLP. |
| IV.C.2 | DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home. | Data was available on this component of the infrastructure standard. | The 2021 Foster Home Re-Evaluation Case Review found that 154 of 155 (99.4%) foster parent respondents indicated they had been provided an opportunity to participate in case planning and decision making and 147 of 149 (98.7%) indicated they had been provided an opportunity to participate in visitation planning. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.C.3 | DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations. | • Twenty-three of 24 (99%) MTAT foster parent survey respondents indicated they "always" or "usually" discuss a plan of what they should do is an emergency arises.<br>• Twenty of 34 (59%) MTAT foster parent survey respondents indicated they were "always" or "usually" given information for an agency contact should emergencies arise. | The 2021 Foster Home Re-Evaluation Case Review found that:<br>• 94 of 121 (77.7%) of respondents indicated they had had a need to contact DFCS or CPA in the previous 30 days<br>• Four of 164 (2.4%) had filed a grievance since their last evaluation<br>• 144 of 157 (91.7%) felt DFCS/CPA was supporting them 'more than' or 'as expected' |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.C.4 | DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home. Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children. | • Twelve of 34 (35%) MTAT foster parent survey respondents indicated they were "always" or "usually" receive timely notice about upcoming court dates for children in their home.<br>• Foster parents self-reported in the survey as part of the 2018 re-evaluation packet review (see methodology) that on a scale of 1-5, DFCS homes rated an average 2.86 and CPA homes rated an average of 4.3 for the question, "Has DFCS/CPA provided timely written notification of judicial and administrative hearings?"<br>• Foster parents responding to MTAT's foster parent survey reported being encouraged to attend and participate in the following meetings "always" or "usually":<br>  • Court: 11 of 34 (32.4%)<br>  • Permanency Reviews: 9 of 34 (26.5%)<br>  • Family Meetings: 10 of 34 (29.4%) | The 2021 Foster Home Re-Evaluation Case Review found that all 153 respondents of the question indicated they had been provided timely notification of judicial and administrative hearings |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.D.1 | DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement. | Data was not available on this component of the infrastructure standard. | Data was not available on this component of the infrastructure standard. |
| IV.D.2 | DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers. | The resource development unit for DeKalb and Fulton has 10 staff-five responsible for relative and kin placements and five for other foster homes. | The resource development unit for DeKalb and Fulton has 10 staff dedicated for onboarding new foster homes-five responsible for relative and kin placements and five for other foster homes. There are also eight staff that monitor and support fully approved homes. |
| IV.D.3 | DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home. | This centralized number is operational and remains available to caregivers. | This centralized number is operational and remains available to caregivers. |
| IV.D.4 | DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey. | Foster parent exit meetings are conducted and reasons for foster parents terminating their service are captured. | Foster parent exit meetings are conducted and reasons for foster parents terminating their service are captured. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| IV.D.5 | DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities. | Prudent parenting is taught in the foster parent training, included in the policy and procedures manual, and handouts are provided to foster parents at the time of placement. | Prudent parenting is taught in the Initial Interest, Mutual Selection, Pre-Service Training, Assessment, Continuing Development and Teamwork (IMPACT) foster parent training, included in the policy and procedures manual, and handouts are provided to foster parents at the time of placement. |

## APPENDIX E - INFRASTRUCTURE STANDARD FIVE: HEALTH AND EDUCATION

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity. | | | |
| V.A.1 | Physical Health Screening: All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician | • Of the 60 cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review, 22 (37%) received an initial health screen within 10 days and 38 (63%) received an initial health screen after 10 days of entry. <br> • Of the 11 applicable cases reviewed with identified medical needs from July-December 2018 as part of the Kenny A Placement case review, 9 (92%) had their needs met. | • The Kenny A Diligent Search case review from July-December 2020 found that of the 60 cases reviewed 36 (60%) received an initial health screen within 10 days and 24 (40%) received an initial health screen after 10 days of entry. <br> • The Kenny A Placement case review from July-December 2020 found that of the 8 applicable cases reviewed 7 (87.5%) had their needs met. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| V.A.2 | Dental Health Screening: All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician. | • Of the 60 cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review, 12 (20%) received an initial dental screen within 10 days, 45 (75%) received an initial dental screen after 10 days of entry, and 3 did not receive an initial dental screen by the end of the period.<br>• Of the 22 applicable cases reviewed with identified dental needs from July-December 2018 as part of the Kenny A Placement case review, 13 (59%) had their needs met. | • The Kenny A Diligent Search case review from July-December 2020 found that of the 60 cases reviewed 17 (28.3%) received an initial dental screen within 10 days, 36 (60%) received an initial dental screen after 10 days of entry, and 7 did not receive an initial dental screen by the end of the period.<br>• The Kenny A Placement case review from July-December 2020 found that of the 12 applicable cases reviewed 8 (75%) had their needs met. |
| V.A.3 | Mental Health: All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional. | • Of the 44 applicable cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review, 29 (66%) received an initial trauma assessment in 45 days, and 15 (34%) did not receive an initial trauma assessment by the end of the period.<br>• Of the 17 applicable cases reviewed with identified needs identified in the trauma assessment from July-December 2018 as part of the Kenny A Placement case review, 14 (82%) had their needs met. | • The Kenny A Diligent Search case review from July-December 2020 found that of the 36 applicable cases reviewed 27 (75%) received an initial trauma assessment in 45 days, and 15 (34%) did not receive an within 30 days of entering care.<br>• The Kenny A Placement case review from July-December 2020 found that of the 7 applicable cases reviewed with identified needs identified in the trauma assessment 4 (57.1%) had their needs met. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| V.A.4 | All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional. | • Of the 16 applicable cases reviewed from July-December 2018 as part of the Kenny A Diligent Search case review, 12 (75%) received an initial developmental assessment in 45 days, and 4 (25%) did not receive an initial developmental assessment by the end of the period.<br>• Of the 4 applicable cases reviewed with identified developmental needs from July-December 2018 as part of the Kenny A Placement case review, 3 (75%) had their needs met. | • The Kenny A Diligent Search case review from July-December 2020 found that of the 24 applicable cases reviewed 9 (37.5%) received an initial developmental assessment in 30 days, and 15 (62.5%) did not receive an initial developmental assessment by the end of the period.<br>• The Kenny A Placement case review from July-December 2020 found that of the 2 applicable cases 2 (100%) had their needs met. |
| V.B | Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx. | Of the 92 cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 77 (84%) received a timely annual health screen, 13 (14%) received an annual health screen but it was not timely, and 2 (2%) did not receive an annual health screen by the end of the period. | The Kenny A Placement case review from July-December 2020 found that of the 71 applicable cases reviewed 57 (80.3%) received a timely annual health screen, 13 (18.3%) received an annual health screen but it was not timely, and 1 (1.4%) did not receive an annual health screen by the end of the period. |
| V.C | DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised. | Data was not available for this part of the infrastructure standard. | Data does not exist for this infrastructure standard, however MTAT was provided with DFCS's protocol for monitoring psychotropic medication. |
| V.D | DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns. | Of the 87 applicable cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 3 (<5%) contained evidence that parents were invited to all medical appointments. | The Kenny A Placement case review from July-December 2020 found that of the 40 applicable cases reviewed 1 (2.5%) contained evidence that parents were invited to all medical appointments, and 2 (5%) contained evidence that parents were invited to some of the medical appointments. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | | Status of Implementation as Reported in First and Second Briefs* | Current Status |
|---|---|---|---|
| V.E | DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody). | Of the 55 applicable cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 5 (9%) had a documented educational assessment in SHINES. | The Kenny A Placement case review from July-December 2020 found that of the 92 cases reviewed 11 (12%) had a documented educational assessment completed during the PUR. |
| V.F | DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised. | Of the 55 applicable cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 48 (9%) were enrolled in school or pursuing a GED, 3 (6%) were enrolled with gaps and 4 (7%) were not enrolled. | The Kenny A Diligent Search case review from July-December 2020 found that of the 62 applicable cases reviewed 56 (90.3%) were enrolled in school or pursuing a GED, 3 (4.8%) were enrolled with gaps and 1 (1.6%) were not enrolled. |
| V.G | DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program. | Data was not available for this part of the infrastructure standard. | Youth are automatically referred for an EPAC assessment upon entry. |
| V.H | DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school. | Of the 55 applicable cases reviewed from July-December 2018 as part of the Kenny A Placement case review, 25 (45%) moved from their current school. Of these 25, 21 (84%) had no documentation of advocating to keep the child in their same school. | The Kenny A Diligent Search case review from July-December 2020 found that of the 62 applicable cases reviewed 20 (32.3%) moved from their current school. Of these 20, 11 (55%) had no documentation of advocating to keep the child in their same school. |
| V.I | DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised. | Data was not available for this part of the infrastructure standard. | Data was not available for this part of the infrastructure standard. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX F – INFRASTRUCTURE STANDARD EIGHT: ROBUST WORKFORCE DEVELOPMENT

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families. | | |
| VIII.A.1 The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS. | • The ESP was re-implemented in late spring 2019. <br> • 375 staff were trained in the new process as of June 30, 2019. | The June 2021 statewide ESP fidelity review found that of the 20 applicants assessed, 5 (25%) had the ESP checklist fully completed and uploaded in HR pass. |
| VIII.A.2 DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol. | The first fidelity review of the ESP was scheduled for early 2020. | Monthly reports are developed answering 15 questions assessing the extent to which ESP is utilized and whether staff involved are trained. |
| VIII.A.3 DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce. | DFCS participated in a Comprehensive Organizational Health Assessment in June 2019 as part of a Workforce Excellence site from the National Child Welfare Workforce Institute (NCWWI). | The same as reported in the previous Brief, participation in the Workforce Excellence site selection remains in lieu of an employee satisfaction survey. |
| VIII.B.1 Office Human Resources (OHR) will post positions within three (3) business days of an approved request. | Data was not provided as it relates to this portion of the infrastructure standard. OHR began 'continuous job posting' beginning May 1, 2019. | Data shared from the Office of Human Resource (OHR) showed that for the 72 requisitions (positions to post) in June 2021, and the 11 requisitions in July 2021, the average time to post was 1 business day |
| VIII.B.2 OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director | Data was not provided as it relates to this portion of the infrastructure standard. | A monthly report is provided by OHR. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| VIII.B.3 An OHR recruiter will conduct recruitment events at least monthly. | Data was not provided as it relates to this portion of the infrastructure standard. | Data not provided for this standard. |
| VIII.B.4 Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence. | Data was not provided as it relates to this portion of the infrastructure standard. | Data not provided for this standard, however email correspondence appears to be occurring. |
| VIII.B.5 OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting. | OHR indicated it takes 3-5 days for the HR recruiter to bet candidates, and a day or so for conducting a telephone screening of candidates. | Data shared from OHR showed that for the 72 requisitions in June 2021, the average time from job posting closure to candidate referral was 9 days, and for the 11 requisitions in July 2021, the average time from job posting closure to candidate referral was 2 days. |
| VIII.B.6 OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check. | • Data was not provided as it relates to this portion of the infrastructure standard.<br>• Background checks were reported to take 1-2 weeks, and upon receipt of the screens, and the HR generalist offers the candidate a job, it may take up to two weeks for the candidate to begin work, as start days are always on the 1st or 15th of the month. | Data shared from OHR showed that for the 72 requisitions in June 2021, and the 11 requisitions in July 2021, the average time to post was 1 business day. |
| VIII.B.7 OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director | The average number of days to complete 114 routine and non-routine salary increases and compensation requests between July 1-August 31, 2019 was 6.92 days. | According to OHR, 679 compensation requisitions were received and completed July 1, 2020 to June 30, 2021 and took on average 1.90 business days to process. |
| VIII.C.1 No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or | • From the period of January-June 2018, 5 of 164 caseload carrying case managers in DeKalb had a "provisional status" and 0 of | It was reported that there is no longer a provisional status. As soon as workers pass their test at the end of pre-service training, they are caseload eligible. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| adoption case, until achieving certification as a result of their successful participation in new worker training. | 104 caseload carrying case managers in Fulton had a "provisional status." <br>• From the period of July-December 2018, 1 of 135 caseload carrying case managers in DeKalb had a "provisional status" and 6 of 99 caseload carrying case managers in Fulton had a "provisional status."' | |
| VIII.C.2 All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year. | Data was not available for this part of the infrastructure standard. | Data was not available for this part of the infrastructure standard. |
| VIII.C.3 DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors. | Data was not available for this part of the infrastructure standard, however the mentoring program was implemented. | There is a mentoring program for supervisors that is in place. |
| VIII.C.4 Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas | Data was not available for this part of the infrastructure standard. | Per DFCS: "All provider staff in a Case Management or Supervisory roles are required to complete RBWO Foundations Training. The training was developed from the DFCS training and is updated as needed to ensure it remains comparable to the DFCS training. The RBWO Foundations training consists of a classroom component and an e-learning component.  Due to the pandemic, [there was a] temporarily pause the in-person classroom training for several months.  From March of 2020 through October |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training | | 2020, [they] were unable to host the classroom portion of the training, however, [they] developed the training on a virtual platform and resumed offering the classroom portion in November 2020.  Since January 2021, [they] have held 11 RBWO Foundations Classroom trainings virtually, training a total of 120 provider staff during this period. [They] have also had 67 E-Learning trainings that have been completed during this time as well." |
| VIII.C.5 All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program. | Data was not available for this part of the infrastructure standard. | Per the Office of Human Resources (OHR) in August 2021, 26 of 73 (36%) supervisors in Fulton and DeKalb had a master's degree or doctorate, and 47 of 73(64%) had a bachelor's degree. Data was not provided on the years of experience part to this standard. |
| VIII.D.1 In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases. That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads | • Looking over the two year period 2017-2018 (in four 6 month increments of the monitoring periods the percent of caseworkers meeting the caseload caps ranged from:<br>• Family Preservation: 73%-100%<br>• CPS Investigations: 69%-86%<br>• Permanency: 32%-63%<br>• Specialized Case Managers: 13%-36% | Looking at the Period 30 monitoring period (July-December 2020), the percent of caseworkers meeting the caseload caps were:<br>• Family Preservation: 100%<br>• CPS Investigations: 94%<br>• Permanency: 65%<br>• Specialized Case Managers: 72% |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| VIII.D.2 Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case. | • See above | See above. |
| VIII.D.3 DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve: a. workforce dynamics (recruitment, hiring, turnover and vacancy rates); b. climate and culture assessments; and c. metrics to strategize caseload management (including timely and safe case closure practices). | • Data was not available for much of this part of the infrastructure standard. • The region produces the following regular reports: • average number of social service case managers and social service supervisors, as well as turnover rates for both populations • all metro county positions filled and vacant, by county • all metro staff starting as well as leaving the agency, by month | • The region produces the following regular reports: • average number of social service case managers and social service supervisors, as well as turnover rates for both populations. • all metro county positions filled and vacant, by county. • all metro staff starting as well as leaving the agency, by month. • No data was provided on climate and culture assessments and metrics to strategize caseload management |
| VIII.D.4 DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing | Data was not available for this part of the infrastructure standard | • The Kenny A 2021 Q1 Quarterly Report found that the percent of timely initiation of investigations was 84.3% (113 of 134) and percent of timely initiation of initial safety assessments was 92.5% (1880 of 2033) in Region 14. In the calendar year of 2020, the percent was 86.4% for investigations and 91.1% for initial safety assessments. • The Kenny A 2021 Q1 Quarterly Report found that the percent of timely completed investigations was 65.8% and 58.6% for Family Support, compared to 92.4% and 92.4% in calendar year 2020 for Region 14 (please note approximately 1/3 of Q1 2021 were still pending when the report was generated 4/13/2021) • The Kenny A 2021 Q1 Quarterly Report found that the substantiation rate for Q1 2021 in Region 14 was |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in Second Briefs* | Current Status |
|---|---|---|
| goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan. | | 10.5% (with 26.9% pending results), compared to 13.5% in calendar year 2020<br>• The Kenny A 2021 Q1 Quarterly Report indicated 5 policy violations in Q1 2021, compared to 15 in the calendar year 2020 in Region 14 |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX G – INFRASTRUCTURE STANDARD SIX: CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

| Infrastructure Standard | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|
| VII.A.1 The Comprehensive Child Welfare Information System (CCWIS) final rule became effective August 2016. States have until August 1, 2018 to notify the Administration for Children and Families (ACF) of their intent to either transition the existing SACWIS System to CCWIS, develop a new CCWIS System, or opt out. | • No data relevant for this standard, though DFCS indicated they are pursing CCWIS | DFCS is still pursuing CCWIS. |
| VII.A.1 CCWIS requirements focus on quality data and program outcomes including: developing and implementing a data quality plan; new data exchanges; and requiring a data exchange standard. | • No data relevant for this standard, though DFCS 2019 profile found to be within allowances for errors, and majority showing no errors | The State does have a data dictionary for Georgia SHINES (an all-inclusive document and ER Studio Data Architect). It is shared when engaged with a vendor or requested. Currently there are no 3rd party data quality tools being used. However, the Georgia SHINES database does contain integrated constraints which provisions the data quality. Georgia SHINES also has field validations which promotes data quality. When contracts are established, data sharing standards, data governance, and management of the data are detailed in the contract language, per the GA APDU 2020. |
| VII.B.1 The DFCS automated child welfare information application shall support end users in their obligation to enter child and case specific information across all stages of a child welfare case | | • When issues with SHINES are identified, or elements of the system are enhanced, Data Integrity Specialists reach out to the SHINES team to help identify what will help the field the most.<br>• Staff go to Data Integrity Specialists (DIS) to work out issues and if issues need to be |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|---|
| | | | escalated, they go to the help desk. If more is needed, they go to the Office of Information Technology (OIT). Staff are able to send suggestions for improvement as well. <br> • DIS serve as liaisons to the region. They receive a twice weekly list from OIT about outstanding tickets and progress being made, and they follow up as well on pending issues. OIT just started sending out automated notifications on issues recently. <br> • In period 31 (January-June 2021), the following modifications were made to SHINES: Military notification, anti-human trafficking, Diligent Search Notification, Investigation Outcomes Notification System (IONS) interface. |
| VII.B.2 | DFCS shall continue to modify system functionalities to align with the development and roll out of the DFCS comprehensive practice model. | • | The comprehensive practice model has not rolled out, though SHINES staff report being involved in practice model development meetings. |
| VII.B.3 | DFCS shall continue to develop, validate, and modify reports based on data housed in the administrative data system that support on-going case management and case review. | • | • When data reports are run, users will let data reporting know if something doesn't look right. They will run an ad-hoc report to dig into the identified issue, and then make recommendations. DFCS reports this process has worked smoothly. <br> • When there are policy or practice changes, they will re-run reports and look at it in the new context. The data team will know if database didn't refresh and will check with |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|---|
| | | | DBA. They will then check the refresh date first thing in the morning. |
| VII.C.1 | DFCS shall develop methodologies for monitoring adherence to Infrastructure Standards that rely on validated state administrative data analysis and reports. | | • DFCS has quarterly meetings to discuss any anomalies with the data reported in the MTAT reports and discuss findings.<br>• The data unit reports they have started having more conversations about Infrastructure Standards in monthly meetings, and whether administrative data exists or if a case review is needed.<br>• When new Infrastructure Standard briefs are released, DFCS staff, relevant to the specific standard, meets with the different sections to discuss the results. |
| VII.C.2 | DFCS shall develop methodologies for quality assurance, including case reviews that are reliant on data stored in the administrative database. | | This is in development.  Using the example of re-entry, a case review was completed and administrative data analysis to dig deeper into the findings is currently in the works. |
| VII.C.3 | DFCS shall develop methodologies for on-going evaluation of progress on child welfare outcomes, including those specified in the Modified Consent Decree and Exit Plan that are based on validation of data stored in the state administrative data system. | | No specific update was provided in this area, however the Kenny A Manager indicated regular meetings are occurring at the state and regional level on performance on outcomes. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| MTAT Recommendations | Comments |
|---|---|
| In planning for an exit of the Kenny A. Settlement agreement, DFCS should adopt an established, evidence informed CQI process to include regional leadership and frontline staff developed in consultation with the MTAT. | Some processes are in place, particularly around Quality Assurance. See the body of the report for more information. |
| In consultation with the MTAT, develop and disseminate a survey (both internally and externally) to gauge user satisfaction with the statewide automated child welfare information system, SHINES, to identify functionality or system performance issues quickly for front-end resolution and utility of reports for CQI. | DFCS reports other processes are in place to receive feedback from users on their satisfaction with SHINES. See the body of the report for more information. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX H- INFRASTRUCTURE STANDARD SEVEN: SUPERVISION OF CONTRACT AGENCIES

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|---|
| VII.A | DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan | • The RBWO incorporates applicable terms for the Modified Consent Decree. | The RBWO incorporates applicable terms for the Modified Consent Decree. |
| VII.B | DFCS shall only contract for placements or services with licensed contractors or sub-contractors. No child shall be placed in an unlicensed facility. | • 92% of children placed in approved placements in Period 28 (July-December 2019). | 99% of children placed in approved placements in Period 30 (July-December 2020). |
| VII.C | DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary. The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations. The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare | • This is incorporated into the RBWO manual. | This is incorporated into the RBWO manual. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|
| policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract. | | |
| VII.D DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured | ● | The RBWO incorporates applicable terms for the Modified Consent Decree. Information provided is manually validated during reviews. |
| VII.E DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve. These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement. | ● A review of 50 contracted agencies with Kenny A children placed in the second quarter of FY2020 found average scorecard score of over 90% | DFCS still relies on the scorecard system for assessing performance of contract agencies. MTAT did not conduct an updated review of the scorecards. |
| VII.F DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type. As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations. The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations. | ● | Licensing evaluations are still occurring, but will start up to pre-pandemic level review by January 1, 2022. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief* | Current Performance |
|---|---|---|---|
| VII.G | The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified. | • A case review of 50 safety reviews found average score for CPAs of 74.6% and 73.4% CCIs | Data provided by OPM's data management system called CareSolutions found that for the 33 safety reviews that occurred in foster homes from January 1, 2020-July 31, 2021 involving Kenny A children, the average score was 85%. |

| MTAT Recommendations | Comments |
|---|---|
| Shift from the current system of monitoring contract agencies (Performance-Based Placement), which is based on process measures, to a monitoring system that relies on an agency's ability to promote and achieve positive outcomes for children and families. This includes demonstration of cultural competence and understanding of race equity, including directing resources to those agencies and community-based organizations most trusted by families. In concert with that, the payment methodology must be aligned with the Division's desired outcomes. | DFCS reported while they are still considering this recommendation, their current focus and priorities are Families First Prevention Services Act and Therapeutic Foster Care implementation. |
| Determine the extent to which there are adequate staffing and resources to monitor the performance of the 180 + contract agencies statewide including, conducting safety reviews and ensuring children are placed in approved homes. | RCCL and OPM both indicated they are currently looking at the caseload for each specialist. RCCL lost three positions in recent years, though got one back, and OPM has lost four positions, none of which they have gotten back. |
| DFCS shall not contract with an agency whose license has been revoked. While it is understood that when RCCL has deemed it necessary to revoke an agency's license, they are not bound to cancel that agency's contract. | It was shared that this does not generally happen. It was explained that sometimes licenses are approved at times when DFCS is not seeking new contracts. It was further clarified that the primary example of when this could happen is that providers do not need a license for youth who have aged out but indicated that in most cases if a provider did not have or lost their license, the contract would also be cancelled. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

*Kenny A. v. Kemp*

## APPENDIX I-INFRASTRUCTURE STANDARD NINE: MAXIMIZATION OF FEDERAL REVENUE

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief | Current Performance |
|---|---|---|---|
| IX | With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming. DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding. DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding. The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding. | • DFCS could pull down an additional $0.67 in federal Medicaid funds for each state dollar spent on children with significant behavioral health needs, resulting in an additional $46.9M<br>• On August 18, 2020, 18% of children in care were iv-e eligible and reimbursable<br>• 2,653 of 11,785 (22.5%) kids in care lacked evidence of an initial custody court order granting custody<br>• 21 of 450 children reviewed in January 2020 denied IV-E temporarily due to lack of a 12-mo permanency finding<br>• During 2019 calendar year, $868,331 federal funding claimed for training costs of staff, providers and partners; no claims for candidate administrative costs<br>• On August 13, 2020, 20% of kids placed in unapproved homes and 21% of kids placed in DeKalb | On July 31, 2021,23.3% of children in Region 14 were IV-Eligible and Reimbursable.<br>• As of July 31, 2021, of the 631 children in Region 14 Non IV-E eligible:<br>  • 364 (57.7%) did not have a Reasonable Efforts determination made in 60 days,<br>  • 306 (48.5%) initial child removal orders lacked the proper judicial language, and<br>  • 294 (46.6%) court orders did not give DFCS custody.<br>• On June 30, 2021, 14.2% of children statewide placed in unapproved, pending or closed homes, and 13% of children in DeKalb and Fulton homes placed in unapproved, pending or closed homes (Note: this is a different data source and process than what is reported in the Monitoring Reports) |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| Infrastructure Standard | | Status of Implementation as Reported in the Third Brief | Current Performance |
|---|---|---|---|
| | | and Fulton homes considered unapproved, pending or closed | |

| MTAT Recommendations | Comments |
|---|---|
| Generate and use accurate and valid data to understand IV-E eligibility, including those children who are considered IV-E eligible and those considered ineligible and the specific reasons. Data validity is a critical issue. Oftentimes reports utilized, both administratively and in the regions, are incongruent. Data production and verification must align for staff to have confidence that reports they are using inform practice in an effective manner. Without validated data it is difficult, if not impossible, to improve federal IV-E claiming. | Ongoing discussion and development of SHINES Eligibility Summary Page Modifications are occurring, including updates to add AFDC requirements and judicial requirements, and providing Rev Max the ability to indicate on the Eligibility Summary Page any updates made since the initial submission of the initial IV-E application and initial determination. |
| Isolate the statistic where there are only one or two reasons the child is not IV-E eligible, placing a focused emphasis on those that are not permanent. Identify those reasons for ineligibility that can be fixed, such as issues with placement facility, 12-month permanency findings, SSI income, and IV-E eligibility in non-licensed homes. These reasons should be recorded and tracked on a monthly basis in order to establish patterns in the system for documentation that may be effectively addressed in the future. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| Regularly identify those children placed in unapproved DFCS or CPA homes or otherwise placed with relatives. As part of the process, determine why these homes are unapproved and whether they could be IV-E eligible. Develop a database that specifies the reason(s) a relative or kinship foster home cannot be "fully licensed".<br><br>• If a relative foster home applicant does not meet the training requirement and that is the only reason they are not "fully licensed," there should be a waiver of the training requirement and the home should be considered "fully licensed" for IV-E purposes. This is already allowable under current Georgia licensing standards.<br><br>• Revise the initial and annual training requirement for all foster care applicants. DFCS has already established that initial and annual training is not a safety standard. Thus, there should be some modification of the current standard. For example: a) initial training can be only a few hours and can be conducted by the licensing agent at the time of the home study, b) DFCS should make the DFCS-approved training requirement a simple process and relatively easy to achieve.<br><br>• Implementation of this recommendation will take longer and will require a change in the administrative code. However, it is important to remember that children are still being placed into "approved" relative and kinship foster, or pre-adoptive homes and the providers are being paid the same amount as homes that are fully licensed. The only difference being that none of the maintenance costs are IV-E reimbursable and the care is completely being paid for by other funds, including state general funds | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| For those who are IV-E eligible, DFCS must partner with the court system, the Administrative Office of the Courts (AOC), the Attorney General's Office and the Council of Juvenile Court Judges (CJCJ) to ensure that a valid court order granting custody to DFCS is executed and uploaded into SHINES.<br>• In this process, two gaps in practice have been identified. The first was the timely submission of court orders and the second was the final order being uploaded into SHINES for utilization in IV-E determinations. A number of steps have been developed and implemented to address these gaps.<br>• Another process DFCS implemented is the creation, adoption and utilization of the Court Process Reporting System (CPRS). CPRS is a secure, web-based system that provides child-specific case plan information to juvenile court stakeholders. The system should be fully implemented statewide.<br>• Children and youth without court orders properly granting DFCS custody should not be included as a part of the denominator when calculating the penetration rate. | See analysis in the body of the brief for response. |
| Conduct periodic reviews (either monthly, quarterly or at the discovery of an abundance of errors by staff) by administrative staff to add a third level of vetting to ensure DFCS Policy 17.3 is being consistently applied regarding the Initial Custody Order. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Add the candidate for foster care definition to Georgia's Random Moment Study (RMS) for Child Welfare. According to the Georgia CB-496 documents for the quarters ending on March 31, 2018 and running through December 31, 2019 (actually, all quarters reviewed), DFCS does not claim any federal reimbursement for "Candidates for Foster Care". This will benefit DFCS to have experience in using this activity when its use will potentially enhance federal reimbursement through the Family First Prevention Services Act. In the interim, there will be additional federal reimbursement based on the current IV-E foster care eligibility ratio. | See analysis in the body of the brief for response. |

\*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| Schedule regular (monthly, quarterly) supervisory reviews of a sample of IV-E documentation in order to conduct reviews and the findings from those reviews be recorded and tracked. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Develop a CQI process that will ensure system-generated permanency finding alerts are addressed according to established time frames. This process should alert the Case Manager after 10 months that a 12-month permanency finding is due in 2 months and that the Case Manager should schedule a hearing with the court to address the permanency finding requirements. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Develop and implement a federally funded subsidized permanent guardianship program as an additional permanency option for children and youth in foster care. DFCS is currently using state funding for some guardianships. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Increase the number of Social Service Techs/Family Services Workers and Revenue Maximization Specialists to assist Case Managers in the collection of documentation and information needed to determine eligibility. This would allow Revenue Maximization Specialists greater access to Case Managers, which would then allow for the acquisition of needed or missing documentation in a timely manner. Family Service Workers should also be trained and encouraged to work closely with Case Managers to collect accurate information regarding income and other eligibility documentation and supply that information to each individual Case Manager | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Revise the income verification and documentation process as it is more restrictive than should be required. It is noted that because the income test for IV-E eligibility is very low, it will always be a major factor on why a foster child is not IV-E eligible. Georgia's current policy would allow for a parent's self-declaration of income and resources be a part of the application. Georgia's IV-E eligibility determination process should include the acceptance of the parent's self-declaration and that no further verification or documentation is needed unless there is good reason to doubt the validity of the self-declaration. | See analysis in the body of the brief for response. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| Obtaining IV-E eligibility should be more aggressive. For example, if the Revenue Maximization Specialist does not receive the Self-Declaration of Income and Resources form within 10 business days of receiving the application, they should always notify the Case Manager of the need for completing the application process. If the Revenue Maximization Specialist does not receive the Declaration within 15 days of the application, he/she should notify their supervisor, who in turn will notify the Case Manager's supervisor of the need for the document. | See analysis in the body of the brief for response. |
| Change procedures to determine first if there is an absent parent and if not, review the primary wage earner's current employment to see if the child can meet the deprivation test and become IV-E eligible. It might be that the Revenue Maximization Specialist cannot determine eligibility because of the lack of information on the foster care eligibility application form | See analysis in the body of the brief for response. |
| In any case being reviewed for deprivation, all efforts must be utilized to make the correct determination. The current DFCS policy regarding determination is more than adequate to ensure proper determination. Revenue Maximization Specialists should be trained to be (and encouraged to be) vigorous in engaging Case Managers and their supervisors, if needed, in obtaining complete and accurate deprivation determinations. | See analysis in the body of the brief for response. |
| Examine and improve training of staff on meeting the unemployment and under-employment requirements would benefit DFCS in the correct determinations of deprivation. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Update the Random Moment Sample (RMS) and Cost Allocation Plan to identify candidates more comprehensively. When FFPSA is implemented it is even more critical since there will then be two candidacy pools as opposed to the previous one only. Georgia must update its Cost Allocation Plan to properly allocate training costs to Title IV-E and other benefiting programs based on the curriculum of the training provided to staff, foster and kinship parents and providers. | See analysis in the body of the brief for response. |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| Enhance the focus on claiming IV-E funding for administrative training at the rate allowable. Based on the provided curriculum, documentation of staff time associated with creating and conducting these trainings should be tracked electronically and monitored on a monthly or quarterly basis. This should then be allocated to the benefitting programs. The time staff actually spends completing the trainings on the provided curriculum is also not being properly documented and is under-claimed. Completion of these trainings should be tracked electronically and monitored on a monthly or quarterly basis. | See analysis in the body of the brief for response. |
| Director Rawlings has a list of recommendations relative to Medicaid, and other, claiming issues in his White Paper. The recommendations in that document should be closely scrutinized for possible inclusion in any resulting action plan. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| Amend Georgia's Cost Allocation Plan (CAP) so that RMS data is informing the CAP in a more efficient manner and is more consistently identifying the correct activities for the proper benefitting programs. The CAP does not accurately represent the activities being conducted. Staff should be more properly trained in the thorough documentation of the activities they are performing on a daily basis that may be coded as Medicaid eligible activities. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| DFCS should review its data for children who are otherwise IV-E eligible but have been found to be not IV-E eligible because the placement setting is unlicensed. There appeared to be no evidence of a rigorous process for the consistent determination of the reasons why a placement might not be properly licensed. | See analysis in the body of the brief for response. |
| Currently, the Revenue Maximization Unit is reviewing those determinations for children that have been deemed eligible for IV-E. DFCS should increase checks and balances. Consideration should be given to requiring quality reviews of both eligible and non-eligible determinations. Eligibility should always be determined. This information is available from the case record, interview with family, income verification, self-declaration, etc. DFCS' policy on this issue is more than adequate to ensure this is carried out to the fullest on each case. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

| | |
|---|---|
| The Division should immediately start a fiscal impact study on the implementation of Family First to include a focus on classification of programs as QRTPs and that effect on the system. | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |
| The Division should conduct a full review of its RMS and Cost Allocation Plan to ensure they include activities that are charged to the appropriate benefitting programs (IV-E, IV-B, Medicaid, State, or other federal programs). | While MTAT's original recommendation was reviewed, work has not been done to date, based on data received. However, the recommendation may be re-assessed with the new leadership |

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

# APPENDIX J – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN

This Order is included behind this page in its entirety.

*Please Note: multiple interventions were in the process of being implemented during the first Infrastructure Brief, and therefore data was not available.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KENNY A., by his next friend Linda | : | |
| Winn, *et al.*, | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| v. | : | 1:02-CV-1686-TWT |
| NATHAN DEAL, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**STIPULATED ORDER AMENDING THE
MODIFIED CONSENT DECREE AND EXIT PLAN**

On December 5, 2016, the Court entered the parties' Modified Consent

Decree and Exit Plan [dkt. nos. 747 & 745-1] ("Exit Plan").  The parties jointly

moved the Court to approve and enter this Stipulated Order to amend one Outcome

Measure in the Exit Plan and incorporate the final Infrastructure Standards.

The parties have agreed (with the Accountability Agent's concurrence) to

revise one Outcome Measure in the Exit Plan to make it consistent with DFCS'

statewide policy regarding the time permitted to complete investigations of

reported abuse or neglect of foster children.  Section VI.A.2 of the Exit Plan is

hereby amended as follows (revision noted in underlined text):

2. Completion of CPS Investigations Concerning Children in Foster Care: At least
   95% of all investigations of reported abuse or neglect of foster children shall be
   completed, in accordance with Chapter 6 of DFCS' Child Welfare Policy Manual,
   within <u>45</u> days of receipt of the report.

Section VIII of the Exit Plan set forth a process and timeline for establishing a set of Infrastructure Standards that will be used to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection to the Plaintiff Class of foster children in state custody in Fulton and DeKalb Counties.  After a specified negotiation period (which was extended through December 18, 2017 [dkt. no. 755]), the parties reached agreement on the Infrastructure Standards, which are attached hereto as Exhibit A. Pursuant to Section VIII.B of the Exit Plan, these "final Infrastructure Standards are enforceable obligations under th[e] Exit Plan, and the Accountability Agent, with the assistance of MTAT, will measure and report on the Infrastructure Standards in each subsequent reporting period."

Except as amended herein, all other provisions of the Modified Consent Decree and Exit Plan entered by this Court on December 5, 2016, shall remain in full force and effect.

IT IS SO ORDERED, this 19th  day of December, 2017.

       /s/Thomas W. Thrash
THOMAS W. THRASH

# EXHIBIT A

Kenny A. v. Kemp

## INFRASTRUCTURE STANDARDS

DFCS retains the sole and complete authority to implement new or revise existing child welfare policies.  If DFCS proposes any revisions to the portions of the DFCS policies referenced in these Infrastructure Standards, DFCS will provide notice to the Accountability Agent and to Plaintiffs to discuss the potential impact on the Infrastructure Standards.  Once the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and Accountability Agent otherwise agree to revise the affected Infrastructure Standard(s).

## I.  COMPREHENSIVE PRACTICE MODEL

DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

## II. ASSESSMENT AND INVESTIGATION OF MALTREATMENT IN CARE

DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III.  To do so, DFCS will:
- conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case;
- take into account the traumatic stress of children;
- be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes;

1

- actively engage ongoing partnerships with families and stakeholders to assure child safety; and
- provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making.

A. Intake Assessment

1. As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle.

2. DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to:
   a. the family's previous response to intervention and treatment strategies;
   b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports;
   c. traumatic events affecting family members; and
   d. coping skills used by the family to deal with traumatic events.

B. Investigation

1. For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care.  The response time for a special investigation of maltreatment in care is immediate or within 24 hours.

2. For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below.

   a. When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all

placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s).

b. When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from the date of the report. The assessment includes, but is not limited to:
   i. visiting the home of the caregiver;
   ii. conducting separate face-to-face interviews with children, caregivers, and other household members; and
   iii. completing a policy violation assessment in the applicable foster parent record in SHINES.

c. Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months.

## III.   CASE PLANNING AND MANAGEMENT

DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making.

DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care.

*Kenny A. v. Kemp*

A. DFCS will use current assessment information to inform case planning in foster care.

   1. A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised.

   2. The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term.  The FFA:
      a. includes engagement of the family in a partnership to identify safety concerns;
      b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine;
      c. tracks the sequence of everyday life events that led to the incident of maltreatment;
      d. identifies family developmental stages and associated challenges;
      e. identifies family supports;
      f. identifies child/youth development and associated vulnerabilities; and
      g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect.

B. DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (*see* DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs).  By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation.

4

C. DFCS will create and utilize genograms in case planning.

    1. To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram. The genogram will be used throughout the case process to identify potential placements and family supports.

    2. Construction of the genogram shall:
       a. include at least three generations of family members on both sides of the family;
       b. embrace cultural differences regarding "who is family" and include all who serve in parental capacity;
       c. include natural helpers, friends, confidants of the caretakers, and older children; and
       d. indicate who was living in the home at the time of the assessment.

    3. Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement.

D. DFCS shall assist the family to create plans, implement them and track progress.

    1. DFCS shall assist the family in creating initial action plans and the case plan. Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family and will be used to guide case planning for permanency.

    2. Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval)

whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law.

3. DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s).

4. DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified.

5. DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being.

E. DFCS will take steps to promote timely and lasting permanency.

1. DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency.

2. The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency.   The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings. Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues.

3. In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018.

   a. A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval).  The SWAT tool is used in lieu of other staffing

tools. Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months.

b. Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator. DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings.

4. Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness. If revisions are needed to this process, those changes will replace requirements in this section.

## IV. QUALITY PLACEMENT AND CAREGIVING

The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured. DFCS prioritizes children being placed with relatives who are able to provide a safe, nurturing home for them. Critical components of the screening, training, approval, and support process for all caregivers are also described in this section.

A. Screening, Training, and Approval Process for Prospective Foster and/or Adoptive Parents

1. DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised.

2. DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan.

3. DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis.

4. DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care. DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home. DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised.

B. Placement with Relatives and Fictive Kin

  1. Diligent Search

     a. DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised.

     b. DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review.

  2. Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:
     a. prior to placement, screen all household members;
     b. prior to placement, conduct criminal history search of adult household members; and
     c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety.

  3. The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support.

C. Disclosure of Information

  1. DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and

8

historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable.

2.  DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home.

3.  DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations.

4.  DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home.  Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children.

D.  Support for Children and Caregivers

1.  DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement.

2.  DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers.

3.  DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home.

4.  DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey.

5.  DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities.

## V. HEALTH AND EDUCATION

DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity.

   A. Initial Screenings and Follow-Up Treatment

   1. Physical Health Screening:  All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

   2. Dental Health Screening:  All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician.

   3. Mental Health:  All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional.

   4. All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional.

   B. Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx.

10

C. DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised.

D. DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns.

E. DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody).

F. DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised.

G. DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program.

H. DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school.

I. DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised.

## VI.   CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

The Infrastructure Standards below pertain to DFCS' obligation to continue to develop, maintain, and use an automated child welfare information system in which data accuracy and integrity is maintained on a continuous basis, and which is both compliant with current federal standards and meets current federal reporting standards. The Statewide Automated Child Welfare Information System (SACWIS) shall include functionalities that support automated case management and that conform to DFCS Policy 2.1 (eff. Mar. 2015), as revised, including those functionalities necessary to support SBC. And finally, it shall support monitoring

and quality assurance efforts consistent with on-going continuous quality improvement efforts.

A. Meeting Federal Standards

1. The Comprehensive Child Welfare Information System (CCWIS) final rule became effective August 2016.  States have until August 1, 2018 to notify the Administration for Children and Families (ACF) of their intent to either transition the existing SACWIS System to CCWIS, develop a new CCWIS System, or opt out.

2. CCWIS requirements focus on quality data and program outcomes including: developing and implementing a data quality plan; new data exchanges; and requiring a data exchange standard.

B. Case Management Functionalities

1. The DFCS automated child welfare information application shall support end users in their obligation to enter child and case specific information across all stages of a child welfare case.

2. DFCS shall continue to modify system functionalities to align with the development and roll out of the DFCS comprehensive practice model.

3. DFCS shall continue to develop, validate, and modify reports based on data housed in the administrative data system that support on-going case management and case review.

C. Monitoring, Quality Assurance, and Continuous Quality Improvement

1. DFCS shall develop methodologies for monitoring adherence to Infrastructure Standards that rely on validated state administrative data analysis and reports.

2. DFCS shall develop methodologies for quality assurance, including case reviews that are reliant on data stored in the administrative database.

3. DFCS shall develop methodologies for on-going evaluation of progress on child welfare outcomes, including those specified in the Modified Consent Decree and Exit Plan, that are based on validated data stored in the state administrative data system.

### VII.   SUPERVISION OF CONTRACT AGENCIES

This section applies to any contract for the provision of placements and services to class members into which DHS enters during the contract cycle, or as soon as practicable following the entry of the Modified Consent Decree and Exit Plan. Standards below relate to these recommendations as well as the requirements that contract agencies comply with the terms of the Modified Consent Decree and Exit Plan, including its Principles, and meet or exceed agreed upon outcomes for children and families.

> A. DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan.

> B. DFCS shall only contract for placements or services with licensed contractors or sub-contractors.  No child shall be placed in an unlicensed facility.

> C. DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary.

> The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations.  The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract.

D. DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured.

E. DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve. These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement.

F. DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type.

As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations.

The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license-holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations.

G. The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified.

## VIII. ROBUST WORKFORCE DEVELOPMENT

DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families.

A. Employee Selection Protocol

1. The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.

2. DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol.

3. DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce.

B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)

1. OHR will post positions within three (3) business days of an approved request.

2. OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director.

3. An OHR recruiter will conduct recruitment events at least monthly.

4. Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence.

5. OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting.

6. OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check.

7. OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

*Kenny A. v. Kemp*

C.  Training

1.  No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training.

2.  All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year.

3.  DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors.

4.  Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training.

5.  All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program.

D.  Caseload Management

1.  In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases.  That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads.

2. Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.

3. DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:
   a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);
   b. climate and culture assessments; and
   c. metrics to strategize caseload management (including timely and safe case closure practices).

4. DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan.

## IX.  MAXIMIZATION OF FEDERAL FUNDING

Effective and cost-efficient child welfare systems depend on multiple funding streams to pay for services and supports for the children and families they serve. In recent years, DFCS leadership has made notable progress in securing state funds to provide needed child welfare services.  With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming.

DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding.  DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.

*Kenny A. v. Kemp*

The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.

*Kenny A. v. Kemp*

## APPENDIX K – METHODOLOGY

### *Update Meetings*

- July 17th: Maximization of Federal Revenue
- July 22nd: Comprehensive Child Welfare Information System
- July 23rd: Supervision of Contract Agencies
- August 11th: Comprehensive Practice Model
- August 12th: Quality Assurance
- August 31st: Quality Assurance
- October 8th: Maximization of Federal Revenue

### *Infrastructure Standards Update Data*

- MTAT relied on the following reports to update some of the Infrastructure Standard Appendices:
  - Kenny A Diligent Search Case Review Guide Results for Period 30 (July-December 2020)
  - Kenny A Placement Case Review Guide Results for Period 30 (July-December 2020)
  - Kenny A CPS Case Review Guide Results for Period 30 (July-December 2020)
  - Kenny A Permanency Review Report on 8 Month Reviews (April-June 2020)
  - Re-Evaluation Case Review Conducted by the Kenny A Review Teams for a sample of 189 Foster Homes due for a re-evaluation August 1, 2020-July 31, 2021
  - MTAT conducted a sample review of approximately 20 cases of IV-E determinations

- MTAT requested updated data for all infrastructure standards from the Kenny A Director. MTAT received a variety of responses including ad hoc data, procedures, protocols and memos. That information was incorporated into the various Appendices tables.