# Period 31
# <u>Monitoring Report</u>

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## *Kenny A. v. Kemp*

*State of Georgia*

January 2022

# ACCOUNTABILITY AGENT AND
# MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge
Lakewood, New Jersey


The following persons were significant contributors to this report.

Eliza Byrne
Public Knowledge
Lakewood, New Jersey

Bonnie Hommrich
Public Knowledge
Lakewood, New Jersey

Dr. Lijun Chen
Public Knowledge
Lakewood, New Jersey

*Kenny A. v. Kemp*

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................................ 3

    Period 31 Dynamics and Highlights ........................................................................ 4
    COVID-19 Changes and Efforts in Region 14 ........................................................ 6
    Leadership Changes and Continuous Quality Improvement .................................. 7

II.     CONTEXT DATA ............................................................................................................ 7

III.    PERIOD 31 MAJOR FINDINGS AND RESULTS ......................................................... 10

    Major Findings ..................................................................................................... 11
        Permanency for Children and Youth in Foster Care ....................................... 11
        Wellbeing of Children and Youth in Foster Care ........................................... 21
        Safety for Children and Youth in Foster Care ................................................ 22
    Table 3: Draft Period 31 Ongoing Modified Exit Plan Requirements ................. 27
    Table 4: Draft Period 31 Attained Outcome Measures ....................................... 29

IV      CASELOAD REQUIREMENTS ..................................................................................... 34

    Supervisors ......................................................................................................... 34
    CPS Case Managers ........................................................................................... 34
    Family Preservation Case Managers .................................................................. 35
    Permanency Case Managers ............................................................................... 35
    Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer ............. 35
    DeKalb County on June 30, 2021 ....................................................................... 35
    Fulton County on June 30, 2021 ........................................................................ 35

V       PLACEMENT STANDARDS ......................................................................................... 37

    Discriminatory Placement Practices .................................................................... 38
    Reimbursement Rates ........................................................................................ 38
    Major Findings – Placement Standards ............................................................. 39

APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN ........................................ 41

APPENDIX B – GLOSSARY ................................................................................................ 63

# I.   INTRODUCTION

This Period 31 report is the eighth monitoring report in which the Accountability Agent and the Monitoring and Technical Assistance Team (MTAT) report on the new outcomes delineated in the Modified Consent Decree and Exit Plan (Modified Exit Plan) that was filed in Federal District Court in December 2016.[1] In addition to this monitoring report, MTAT issued its Fifth Brief on the Infrastructure Standards in October of 2021, in accordance with the Stipulated Order Amending the Modified Consent Decree and Exit Plan (Stipulated Order) filed with the Federal District Court in December 2017.

In this report, the MTAT's obligation is to report specifically on the measurable requirements articulated in Sections IV, V, and VI of the Modified Exit Plan that relate to activity in Metropolitan Atlanta from January 1 through June 30, 2021. This is the mid-point for many of the annual measures, thus data provided is only preliminary, as the state has an additional six months to impact performance. In addition to discussing the Ongoing and Attained Outcome Measures, MTAT continues to review the use of congregate care, monitor the use of hotels and other temporary placements for children in foster care, and report caseloads for case managers and supervisors. As discussed in previous reports, MTAT continues to address the impact of COVID-19 on the system, and the children and youth under its care. This will be an ongoing exploration for several more reporting periods as we develop deeper understanding.

MTAT's approach to monitoring serves as being an accountability mechanism for the Court, the Plaintiffs, and the public. It also serves as an opportunity to assist DFCS to establish data-driven decision-making and continuous quality improvement (CQI). The goal is to create a strong CQI process that will remain in place after the state satisfies the terms of the Modified Exit Plan and is no longer under federal court oversight.

The MTAT reports on the same Modified Exit Plan standards and outcome measures approximately every six months, using a combination of qualitative and quantitative data.[2] In addition to the basic and consistent set of metrics as agreed upon in the Modified Exit Plan, the MTAT conducts a deep, quality-focused analysis on a handful of Infrastructure Standards at regular intervals. Data gathering for these can include interviews with stakeholders, focus groups, surveys, observations of processes, targeted case reviews, and reviews of Child and Family Service Reviews (CFSRs) findings.

---

[1] Modified Consent Decree and Exit Plan, *Kenny A. v. Nathan Deal,* Civil Action NO. 1:02-CV-1686-TWT. Go to: https://www.childrensrights.org/wp-content/uploads/2014/08/2016.11.09-745-Exhibit-A-Modified-Consent-Decree-and-Exit-Plan.pdf

[2] Pursuant to the Modified Consent Decree, both the Ongoing Outcome Measures and Attained Outcome Measures have undergone substantial revision to reflect, when possible, the principles of best practices in measurement. Best practices principles include: 1) a clear statement of the analytic question with particular attention to identifying the risk population or the denominator associated with a particular inquiry; 2) use of entry cohorts and prospective measures to characterize systems dynamics and change in outcomes; 3) attention to the sources of variation in system outcomes (e.g. variation over time, among children, or in places); 4) understanding variation to track change accurately; 5) assessing expected change in the appropriate period of performance or window of time; 6) matching the analytic question to the appropriate source data; and 7) using well-understood and organized data resources that are designed to support asking and answering analytic questions.

The intention of MTAT in this effort is to enable Parties' understanding in several key factors associated with each of the Infrastructure Standards:

1. The expectations for practice and the extent to which these processes are occurring

2. The capacity within the system to meet these expectations

3. The extent to which these processes are occurring with sufficient consistency and quality.

Moreover, this enables the MTAT to focus on emerging issues to mitigate a reactive approach to monitoring. The Infrastructure Standards are key practices and strategies that DFCS identified as their theory of change. If done with fidelity and quality, the standards should lead to improvement in the outcome measures assessed in this monitoring report.

## *Period 31 Dynamics and Highlights*

Throughout Period 31, 1256 children and youth spent time in Region 14's foster care system: 776 children and youth in DeKalb County and 480 in Fulton County. This is 197 fewer children and youth than during Period 30. DeKalb County had 94 fewer children in its care, and Fulton County had 103 fewer children in its care. 153 children entered care on or after January 1, 2021, and 283 children exited care by June 30, 2021.  More information on this dynamic is discussed in Section II, Context Data. The charts below depict additional dynamics regarding children in foster care during Period 31.

**Chart 1: Placement Type at the End of the Period for Children Who Entered Custody in Period 31, by Age Group**



Child Placing Agency (CPA) Family Foster Homes represent the largest proportion of placements across age groups, with the exception of youth aged 13 to 18, who were most commonly placed in Child Care Institutions (CCIs). Likelihood of placement with kinship homes, relative and fictive kin, were also predominant for children entering aged 12 and younger, but minimally utilized for older youth.

**Chart 2: Average Months in Care for Children Exiting in Period 31**



For children who exited custody in Period 31, Chart 2 depicts the average number of months to exit, by age group. For all age groups, Chart 3 shows the discharge reasons for those exiting. Reunification and Guardianship represented over 80% of the discharge reasons. It should be noted that there were slightly more emancipations (8%) in Period 31 than there were adoptions (7%), which is something that should be further monitored in future reports.

**Chart 3: Discharge Reason for Children Exiting Care in Period 31**



Typically, there is a direct correlation between fewer children in care and smaller caseloads for case managers. However, the workforce in Region 14 also decreased during Period 31. The region was able to hire 48 new case managers but lost 60 case managers; 47 resigned their position. This resulted in higher caseloads, especially in DeKalb County. For more details, see Section IV Caseload Requirements.

Despite these challenges, the Region continues to be on track to meet or exceed each of the permanency outcome measures, and it continues to trend in the right direction for preventing children who exit from re-entering foster care. MTAT is recommending one negotiated outcome measure regarding case worker continuity (OM 12) be moved to the attained category, and the outcome measure regarding six-month case reviews (OM 19) remain in the attained category. MTAT is recommending the outcome measure regarding court orders (OM 27) and the outcome measure regarding timely initiation of maltreatment in care investigations (OM1) be moved back to the ongoing category. More details are provided in Section III Period 31 Major Findings and Results.

## *COVID-19 Changes and Efforts in Region 14*

Throughout Period 31, DFCS continued its modified practices and policies due to the worldwide COVID-19 pandemic. From March 14, 2020, to June 7, 2021, the Georgia Supreme Court extended its Judicial Emergency Order fifteen times, allowing it to expire on June 30, 2021. This coincided with Governor Kemp's Public Health State of Emergency that also expired on June 30, 2021. Thus, throughout Period 31 all government systems and service providers continued operating under modified practices and policies. Public school systems in Metropolitan Atlanta, while initially operating exclusively virtual at the beginning of the COVID-19 pandemic, implemented a phased in option by grade level for families who wanted their children to return to in-person instruction. Virtual classes also continued to be offered. The DFCS workforce continued teleworking full-time but opened its offices for staff who wanted or needed time in the office. Visitation requirements under the Consent Decree continued to be modified to virtual visits with a phase back to in-person visits scheduled to be completed by September 1, 2021. Due to an upsurge in COVID cases over the summer due to the Delta variant, the complete phase-in process is delayed. Currently, caseworkers in Region 14 are expected to conduct one monthly in-person visit and one monthly virtual visit for each of the children and caregivers on their caseloads.

With the return to full in-person public school education in August 2021, and the lifting of the judicial and public health emergency orders in June 2021, Period 32 may begin reflecting post-pandemic practices and performance. DFCS continues its efforts to increase morale by offering additional support to staff and recognizing their hard work on behalf of children, youth, and families. Due to the inherent nature of the job, exacerbated by the changing winds of the pandemic and general trends in the nation's workforce, DFCS is experiencing higher turnover rates than usual. This is further discussed in Section IV Caseload Requirements.

The region is to be commended for its ongoing efforts in the face of uncertainty. As of November 2021, all youth in care in Region 14 who tested positive for COVID-19 have recovered. Many staff have spent time in offices overnight with children for which placements could not be secured or placements would not accept until they quarantined. The countless hours devoted to ensure the safety of children and the safety of the workforce cannot be overstated.

## *Leadership Changes and Continuous Quality Improvement*

Toward the end of Period 31, the new DeKalb County Director, Latoya Wright, joined the Region 14 leadership team. She fills a vital role that was vacant for 6 months. Regional Director Kristen Toliver and the DeKalb County leadership team are to be commended for taking on extra responsibilities throughout the review period.

On July 15, 2021, after the end of the Period 31, state Division Director Tom Rawlings resigned from office, after serving nearly three years. On July 16, 2021, Governor Kemp appointed his Chief of Staff, Candace Broce, as the Interim Division Director. On September 16, 2021, Governor Kemp also appointed Interim Division Director Broce as the Commissioner for the Department of Human Services. Under her leadership, the state office was reorganized to achieve greater efficiencies, eliminate redundancies, and better align the programs. These changes will be covered in the Period 32 monitoring report.

As discussed in previous reports, changes in leadership can often include changes in theories of change and philosophies regarding the way of work.  During the past 15 years of the *Kenny A* Consent Decree, there have been nine different Division Directors, six different DHS Commissioners, and many other leadership changes at the district, regional, and county levels. While some of these changes directly correlated with observed dips in performance for some outcomes, current new leadership is working closely with staff to mitigate any backsliding in progress toward exiting the Consent Decree.

The state continued to develop its continuous quality improvement efforts. The regular use of and reliance on administrative data remains a challenge, yet the state and regional quality assurance teams conducted frequent case file reviews to help counties understand system dynamics. With the priority of children achieving permanency and not re-entering foster care, case file reviews were conducted for children who reached their eighth month in care and for those children who exited and re-entered care during Period 31. The quality assurance teams reviewed the strategies being implemented to determine if they are consistently implemented with fidelity, and whether the strategies have the intended impact. Additional information regarding the state's CQI efforts is reported in greater detail in the Fifth Brief on the Infrastructure Standards

# II.   CONTEXT DATA

The narrative for the last few periods was upended by the COVID-19 pandemic. The full impact of the pandemic, including trauma experienced by children and their families on the child welfare system may not be known for years to come. However, MTAT wanted to start reviewing key select data points before, during, and current state of the pandemic to begin to understand some of the changes the pandemic has brought about in Region 14.

First looking at entries, Chart 4 below illustrates the substantial decrease in the number of children entering custody after the pandemic caused massive shutdowns during Period 29. Over three times as many children entered foster care during Period 28 than in the most recently reviewed Period 31. The change was less dramatic in the age of children entering custody, with children aged 0-3 consistently representing the largest proportion of children entering each

*Kenny A. v. Kemp*

period. A slightly larger proportion of teens 15-18 entering custody in Period 31 can be observed compared to early periods.

**Chart 4: Number of Entries for Each Reporting Period by Age Group**



As entries into custody have gone down from Periods 28 to 31, so to have exits to permanency, though less dramatic. However, when you look at the percent of entries, as illustrated below in Chart 5, the proportion of age groups entering custody has not changed substantially over the periods.

**Chart 5: Percent of Entries by Age Group for Each Reporting Period**

*Kenny A. v. Kemp*

Chart 6 below shows a steady decrease in exits from 423 in Period 28 to 283 in Period 31. Youth aged 15-18 consistently represent the largest number of exits across the periods, followed by children aged 3-6, and then children aged 0-3.[3]

**Chart 6: Number of Exits for Each Reporting Period by Age Group**



Chart 7 shows the changes in foster care population across the four periods, as well as the total caseload for Period 28 (inclusive of entries and those that were already in custody) and the ending total caseload at the end of Period 31. The number of exits outpaced the number of entries in each of the periods with the exception of Period 28, contributing to a total lower population in Period 31 by almost 300 children.

---

[3] It is important to keep in perspective that not all exits are positive exits, and a portion of youth aged 15-18 may not have elected to participate in extended foster care.

**Chart 7: Changes in Foster Care population during Each Period**



In sum, the number of entries and exits into foster care have decreased from pre-pandemic to now. However, some of the demographic dynamics for these cases appear to have remained similar.

## III.   PERIOD 31 MAJOR FINDINGS AND RESULTS

This section provides major findings regarding outcomes for children youth and families involved with Region 14 of Georgia DFCS during Period 31, January 1, 2021 – June 30, 2021. It also provides a listing of the performance for each county, and the region for each of the requirements under the Modified Exit Plan. This includes a status update on the requirements, specifically whether the task or outcome has been attained (or not) or is at risk of being re-designated as an ongoing task or outcome. Again, because this is the mid-point for several annual measures, only preliminary data is provided and will not affect the status of ongoing or attained.

As stated in the Modified Consent Decree and Exit Plan Section IX.E.1.b., "[A]n Ongoing Outcome Measure is automatically re-designated as an Attained Outcome Measure for the next reporting period, if in the previous three consecutive reporting periods (totaling 18 months) . . . State Defendants improved performance in the first period (as compared to the prior period) then met or exceeded the measure for the next two periods. An Attained Outcome Measure "will be re-designated as an Ongoing Outcome Measure only if both of the following conditions occur: (l) the Accountability Agent finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the

safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period." Modified Consent Decree and Exit Plan IX.E.2.b.

As discussed in the introductory section and past two monitoring reports, the COVID-19 pandemic greatly impacted the practices and performance of DFCS. These factors have continued into Period 31, with some steps taken to return to previous practice. Externally, most children are now engaged in full-time face-to-face educational settings. Doctors, dentists, psychologists, and other service providers reopened for appointments, and businesses that survived the economic downturn caused by the pandemic have reopened and are seeking new hires. Thus, it is difficult to ascertain whether the resulting outcomes and performance are indicative of well-developed strategy and theory of change or circumstances that will no longer exist once the pandemic is controlled through expanded vaccinations.

As of the writing of this report, nearly 60 percent of eligible residents in Fulton County, Georgia and fifty-eight percent of eligible residents in DeKalb County, Georgia are now fully vaccinated. Fulton County has a positive test rate of 3.4 percent and DeKalb has a positive test rate of 5.2 percent, placing both counties in the "very high" vulnerability level according to CovidActNow.org. Consequently, although communities have reopened, DFCS staff, caregivers, service providers, and stakeholders must utilize personal protective equipment and take precautions. Challenges continue for finding placements for youth entering care who test positive for COVID, and stress-related turnover rates among caseworkers and supervisors (see caseload and workforce section).

## *Major Findings*

### Permanency for Children and Youth in Foster Care

Ensuring that children who enter foster care achieve timely permanency is a major goal and responsibility for child welfare agencies across the country. In 2002, when the original *Kenny A* complaint was filed, there were 2000 children in foster care in Fulton County and 1000 children in foster care in DeKalb County.  One of the allegations in the lawsuit was that "foster children languished in foster care for years, because Defendants fail to send foster children home promptly when it is safe to do so and fail to place them for adoption promptly when they cannot safely be returned to their parents." As evidence, plaintiffs' counsel indicated that at the end of FY 2000, 900 children in Fulton and DeKalb counties (almost 1/3) had been in foster care for 4 years or more. The settlement agreement finalized and filed with the court in 2005, included improvement standards for DFCS to achieve regarding permanency for children in foster care in Fulton and DeKalb Counties.

In 2016, when parties to the *Kenny A* Consent Decree renegotiated a Modified Consent Decree and Exit Plan, they agreed to adopt the current federal requirements and methodology to determine progress toward improving rates and stability of permanency in Region 14. The current federal methodology uses an annual point in time analysis of three cohorts of children: those in care 12 months or less (OM 23), those in care 12-23 months (OM 6), and those children and youth in care over 24 months (OM 7). While using a point in time methodology is not as precise as an entry cohort analysis (like the one utilized in the longitudinal context section), the parties agreed that aligning *Kenny A* requirements with the existing federal mandates would

prevent dual reporting and potentially conflicting analysis. It also gives the agency an ability to compare performance across regions throughout the state.

In addition to the rates upon which children and youth exit foster care, it is important to ensure that once they exit, they do not return. Thus, re-entry rates are also evaluated on an annual basis utilizing the current federal requirements and methodology.

## 1. **For every permanency cohort, except those children in care for less than 12 months, the state is exceeding its previous midpoint performance.**

The midpoint snapshot for these annual measures suggest that the state is maintaining the progress demonstrated at the end of Period 30. The last midpoint data analyzed was Period 29, January 1, 2020 – June 30, 2020. The chart below provides a comparison to Period 31. While this is a positive indication that the region is on track to meet each of these measures, they must continue their efforts for the remaining months of 2021.

| Outcome Measure | Period 29 Midpoint | Period 30 Annual | Period 31 Midpoint | Period 32 Annual |
|---|---|---|---|---|
| **OM 6 – Exits for children in care 12 – 23 months. (Threshold 43.6%)** | 17.8% | 45% | 21.9% | (TBD) |
| **OM 7 – Exits for children in care over 24 months. (Threshold 30.3%)** | 16.6% | 37.4% | 20.7% | (TBD) |
| **OM 23 – Exits for children in care 12 months or less. (Threshold 40.5%)** | 37% | 41% | 32% | (TBD) |

MTAT developed a survey for Region 14 case workers and supervisors to ascertain their thoughts and beliefs regarding efforts to improve permanency. While there were only 64 respondents out of approximately 223 eligible staff (29%), their responses provide important insights for how the staff feel about current dynamics and efforts.

*Improving Permanency Rates*

**What do you think are the biggest barriers to achieving timely permanency for children (select top 3 reasons)?**



Court was most frequently identified as a barrier to permanency. In the comments, respondents further clarified some of the ways court delays permanency is through continuances, unrealistic expectations levied by courts, and the courts giving parents multiple chances. Appropriate placements and parent engagement were the next most common barriers identified to achieving timely permanency, followed by caseloads and workloads.

**To what extent do you feel there are enough staff to move cases to permanency?**



Sixty-nine percent of respondents feel there are "not really enough" staff to move cases to permanency.

## 2.  Likewise, Region 14 is on track toward continued improvement of its re-entry rates.

The midpoint snapshot for this annual measure suggests that with continued efforts, the Region could move closer to reaching the threshold requirement (less than 8.3%) by the end of calendar year 2021. The chart below illustrates a comparison between midpoint Period 29 (January to June 2020) to midpoint Period 31 (January to June 2021). It also provides the most recent annual performance reported in Period 30.

| Outcome Measure | Period 29 Midpoint | Period 30 Annual | Period 31 Midpoint | Period 32 Annual |
|---|---|---|---|---|
| **OM 3 – No more than 8.3% of children exiting care will re-enter care within 12 months.** | 13.5% | 13.1% | 11.9% | TBD |

As part of its CQI process, the quality assurance team did a case file review to see if evidence exists that the Region's permanency and re-entry strategies are helping to move the needle.

The quality assurance team conducted permanency reviews for all children who reached their eighth month in care during Period 31. The team reviewed 149 cases, of which 71% were from DeKalb and 29% were from Fulton. Recommendations from that review were provided to the regional leadership and staff. This on-going process of implementation and review will enable DFCS to test and enhance its theory of change toward ultimately improving outcomes for children, youth, and families.

The quality assurance team also reviewed 163 case files of children who entered foster care in Region 14 between October 2020 and June 2021. After removing cases of children who were in specialized processes such as voluntary temporary placements, Children in Need of Services (CHINS) cases, and law enforcement emergency deprivation cases, the team read 98 cases, 50 for DeKalb County and 48 for Fulton County. For each case, the team observed the occurrence and quality of the following four re-entry guide strategies:

- Pre-removal Staffings
- Relapse Planning
- Conditions for Return
- Discharge Staffings

In short, the review revealed evidence that very few of the strategies were implemented with fidelity or implemented at all. While this prevents the Region from determining why the permanency and re-entry rates continue to improve, it does provide an opportunity to re-emphasize, coach and provide additional training to implement each of the strategies with fidelity. MTAT suggests that the Region take this opportunity to consider prioritizing these strategies and re-implementing them one at a time. This would enable the quality assurance team to draw more direct correlations between the strategies and improved outcomes.

The survey developed by MTAT for Region 14 case workers and supervisors also explored their thoughts and beliefs about efforts currently underway to prevent children from re-entering care. Some of their responses are depicted in the charts below.

*Preventing Re-Entry into Foster Care*

**How familiar are you with the re-entry guide?**



Most respondents to the survey indicated they were 'mostly or somewhat' familiar with the re-entry guide. However, almost a third of worker respondents indicated they were 'not really familiar' or 'didn't know what the survey was referencing'.

**To what extent do you feel the re-entry guide strategies have had a positive impact on reducing the re-entries into the foster care system?**



**Which strategy do you feel is having the most positive impact on preventing re-entries?**



Supervisors and workers felt conditions for return and discharge planning/relapse planning were having the most positive impact.  Supervisors believe that pre-removal staffings are least effective, while case workers believe that discharge family FTMs are least effective.

The Region is encouraged to follow up with staff to understand the basis for their responses. Utilizing the quality assurance review team and the data units, evidence should be sought to confirm or dissuade these beliefs, followed by the development of additional strategies to continue efforts or course correct on the Region's theory of change.

**Other Consent Decree Measures that Support Permanency**

There are several processes included in the consent decree that also have a direct impact on achieving permanency for children in foster care. The processes with the most direct impact involve the juvenile court system, its ability to hold timely hearings, and the production of valid court orders that document the reasons for removal, the reasonable efforts of DFCS, and the action steps needed to achieve permanency. Also important is consistent, regularly scheduled visitations, and the ability of DFCS to limit the number of changes in a child's assigned case worker. This mitigates trauma associated with being in foster care and prevents unnecessary delays in a child's case due to hand-offs between workers.

## 3.  Juvenile Courts in Fulton and DeKalb Counties rebounded and surpassed the threshold for six-month court reviews, while maintaining high performance for 12th month permanency reviews.

Prior to the pandemic, DFCS and the Juvenile Courts regularly held reviews for children who are in care for 6 months. During Period 28 (July1, 2019 – December 31, 2019), MTAT reported that 99% of cases were reviewed in the court system.  When the Supreme Court of Georgia issued its emergency order prohibiting jury trials and many in person hearings, the juvenile courts prioritized holding the 12th month permanency hearing, while it simultaneously worked through the logistics of holding virtual hearings. In addition, families, court staff, and DFCS staff were transitioning to teleworking, and. virtual learning. Many families lost employment, making it difficult to schedule and attend court hearings. Thus, the performance during Period 29 dropped

to 92 percent and Period 30 declined to 91 percent.  Once the court systems put their modified processes in place and the infection rates began to decline in February and March 2021, more six-month court reviews took place. In Period 31, the region rebounded back to 99 percent, above the required threshold.  Thus, MTAT is recommending that this measure remain in the attained category.



The courts and DFCS are also to be commended for continuing efforts to hold 12th month permanency court reviews.  During Period 31, both counties reviewed 100 percent of the cases analyzed.

> **4.  While the court systems have established protocols to improve the percentage of children with all applicable language in court orders necessary to be eligible for federal funding reimbursement (OM 27), this is the fourth consecutive reporting period that the counties did not meet the required 95 percent threshold.**

As the DeKalb and Fulton County court systems move toward post-pandemic operations, the judges continue to work with stakeholders so every child in a dependency case has timely executed and filed valid court orders. As part of those protocols, DFCS continues to implement its responsibilities by uploading the court orders into each child's electronic record in Georgia SHINES. The court order serves as a blueprint for permanency, delineating the reasons for removal and the actions and/or behavioral changes needed for reunification or other permanency options. Thus, it is a vital factor for achieving timely permanency. Moreover, the federal government requires valid court orders that include specific findings regarding custody and reasonable efforts for states to qualify for reimbursements to cover the costs of foster care.

During Period 31, the case file review revealed that 74 percent of children had all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. The Consent Decree threshold established by the parties is 95 percent and this is the fourth consecutive reporting period falling below this requirement. While the case file review is a statistically significant sample utilized by MTAT for its analysis, DFCS regularly evaluates IV-E eligibility for all children in its custody (penetration rate). Below is a graph of the statewide penetration rates from 2010 to present.



The statewide penetration rate decreased from a high of 58.1% in SFY 2010, down to 37% as of June 2021. Region 14's penetration rate is lower still at 23.3% (22 6 of 972) as of July 31, 2021. Out of the 972 children in care, 226 were eligible and their cases were reimbursable. Another 115 children were IV-E eligible, but their cases were not reimbursable, leaving 631 children in DeKalb and Fulton counties who were not IV-E eligible on that date.

Of the 631 children in Region 14 who were not IV-E eligible[4]:
- 364 (57.7%) did not have a Reasonable Efforts determination made in 60 days
- 306 (48.5%) had initial child removal orders lacking the proper judicial language
- 294 (46.6%) of court orders did not give DFCS custody

This data was provided by DFCS and is regularly reviewed by the state Revenue Maximization Unit (see Fifth Brief on the Infrastructure Standards). While the data above was pulled from the SHINES data base, the Revenue Maximization Unit also maintains eligibility worksheets for every child who enters foster care. When this unit discovers that things are missing (such as court orders) staff track down the information and upload it as an external document in SHINES. However, the case manager involved in each case must make the necessary changes to the child's record. Found court orders are uploaded as a Revenue Maximization document, not a court order document, and there is no mechanism to notify the case manager of its presence. During the Period 31 review, MTAT was informed of these data integrity challenges.

During Federal IVE audits, the state is provided a list of sample cases, and the Revenue Maximization Unit creates a paper file for each case. It is during this time that the state can pull information from SHINES, find missing court orders, and correct other administratively deficient aspects of the child's casefile. While they accept orders signed *Nunc Pro Tunc* (now for then), they do not accept orders signed over 12 months following a corresponding hearing date.

Since the intent of Outcome Measure 27 is to address court orders as a factor in maximizing federal funding, MTAT will mirror this process in its analysis. During the Period 32 review, MTAT has requested access to the Revenue Maximization worksheets for the sample of children for which a case file review will also be conducted. These sets of data will then be compared to ascertain any ongoing administrative gaps as well as more accurately analyze the presence of required court orders.

As part of its efforts to understand and address gaps in this process, the *Kenny A* review team is conducting a 100 percent review of files for children in care on a certain date in October 2021. In addition, the Office of the Attorney General, in collaboration with outside counsel, worked with the SAAGs to produce copies of court orders for children in care during Period 31. This information was provided to MTAT and to the Revenue Maximization Unit. Once this targeted case file review is completed MTAT will work with the Revenue Maximization Unit to analyze all the information, in addition to data gathered for Period 32, to ascertain whether the region is improving it performance under Outcome Measure 27. MTAT has also offered to assist the court systems to analyze whether the established court order protocols are being implemented with fidelity.

During the last reporting period, MTAT recommended that Outcome Measure 27 remain in the attained category to continue analyzing the impact of court disruptions during COVID on outcome performance. However, the challenges with valid court orders seem to be long-standing

---

[4] A child's case can have more than one reason that it is not IV-E eligible. Therefore, there is overlap in the numbers presented.

and complex. Judges, SAAGS, Child Attorneys, Parent Attorneys, DFCS Case Managers, and the SHINES system and the Court Plans Reporting System (CPRS) all play a role in the process.

While the courts and counties are to be commended for re-initiating previously developed court order protocols, it will take some time before these efforts result in significant changes in the penetration rate and the counties reach the required 95 percent threshold for cases reviewed by MTAT. Thus, MTAT is recommending that Outcome 27 remain in the attained category for at least one more period of analysis.

## 5.  This is the third consecutive period that the Region has met the requirements for continuity of case managers (OM12).

In accordance with the negotiated Modified Consent Decree and Exit Plan, the state agreed that each child should have no more than two assigned case managers while in foster care. The goal is that continuity of case managers would occur for at least 90 percent of children in care. Period 31 marks the third consecutive period that the Region has met and now exceeded this threshold (92% for Period 31), triggering a recommendation by MTAT that this measure be moved to the attained category.

The negotiated settlement built in numerous exceptions that are not considered "changes" when analyzing the number of caseworkers assigned to each child.  Those exceptions include the following:

- Cases transferred to an adoption case manager
- Case managers who have died, been terminated, promoted, or transferred to another county
- Case managers who have covered a case during another case manager's sick or maternity leave

Over the past 20 months of the pandemic, there was much movement within the workforce (see caseload section). The turnover rate among case managers (20.3% in DeKalb and 22.8% in Fulton) and supervisors (36.2% in DeKalb and 11.5% in Fulton) is much higher than the rest of the state (14.2% for case managers and 7.2% for supervisors). These changes in cases managers not only can delay permanency, but can also greatly impact the day-to-day foster care experience for children and youth who already have so many new people in their lives.[5]

While MTAT is requesting this change of status, it will also continue closely monitoring this dynamic and how it impacts the experience of children in foster care.

## 6.  The Region continues meeting and/or exceeding the threshold for all visitation measures, except for four visits within the first four weeks of

---

[5] Turnover data provided by Department of Human Services Human Resource Department.  While the counties have some staff in case manager and supervisor positions who are performing other functions, the vast majority carry caseloads.  YTD encompasses January 1, 2021, to September 30, 2021.

**every new placement. However, the staffing shortage in DeKalb County has led to higher caseloads and fewer staff to conduct the required visits.**

Following Period 30, MTAT recommended that all remaining visitation measures be moved to the attained category. The Region continued exceeding the threshold requirements during Period 31. However, there is one more visitation measure that does not have a threshold requirement.

Under the current Modified Consent Decree, the state agreed to visit children four times in the first four weeks of a new placement. In the original Consent Decree, the negotiated requirement was eight visits in the first eight weeks.  he original intent was to create stability and mitigate trauma for children coming into foster care and for those already in care and changing placements. These requirements are not state policy, and therefore are only required in Fulton and DeKalb counties. MTAT has not been able to observe evidence of a correlation between this practice and the original intent. Moreover, during exit interviews for case managers transferring to counties outside of Region 14, this practice is often cited as an onerous requirement that causes additional stress. Staff indicate that the requirement is not developmentally sound, and teenagers have expressed that the frequency of visits impedes their ability to get used to new placements.

During Period 31, 41% of all children who experienced a new placement received all four visits within the first four weeks. This is an improvement from the 37 percent of children who received all four visits in the first four weeks of a new placement during Period 30. The chart below provides additional detail for each county and each visit following a new placement.

| County/Region | Visit One | Visit Two | Visit Three | Percent of children with all 4 Visits |
|---|---|---|---|---|
| DeKalb | 67% | 64% | 51% | 18% |
| Fulton | 94% | 89% | 91% | 66% |
| Region 14 | 80% | 76% | 70% | 41% |

While the efficacy of four visits in the first four week to stabilize placements has not been demonstrated, it is concerning that DeKalb County only conducted 67% of all first week in-placement visits for children experiencing new placements. Beyond the Consent Decree, DFCS policy 10.01 (17) requires staff to: "Make purposeful face-to-face contact with the child in foster care within seven calendar days of an initial placement to assess the child's safety, adjustment to the placement, and any needs of the child or caregiver", and DFCS policy 10.03 (13) requires staff to "Conduct a purposeful contact in the home of the placement resource within seven calendar days of the placement change." The low performance in DeKalb County may be related to staff turnover rates and caseloads. It is also important to note that the DeKalb County Director left the agency just prior to the start of Period 31 and the new Director did not start until the last 15 days in the period.

## Wellbeing of Children and Youth in Foster Care

The closure of offices and agencies during COVID-19 greatly impacted DFCS's ability to identify and meet the medical, dental, mental health, educational, and developmental needs of children in care (OM 21). With fewer offices open to evaluate the needs of children, the overall number of children with identified needs declined significantly. With a smaller denominator, any needs not met greatly affected the overall percentage.

## 7. COVID-19 continued affecting the state's ability to meet identified health, dental, and mental health needs for children in foster care.

Prior to 2020 and the COVID-19 pandemic, DFCS achieved the attained category for meeting identified medical and educational needs. However, these measures experienced significant declines below the required thresholds in Period 29 (67% and 73% respectively) and began rebounding in Period 30 (88% and 77% respectively). During Period 31, the region is to be commended for meeting all the identified educational needs of students as they returned to in-person instruction (100%). However, the counties also experienced another decline in meeting identified medical needs (67%). Meeting dental health needs and mental health needs were in the ongoing category and continued challenging the department (45% and 75% respectively).

In May 2020, the Children's Defense Fund reported that up to 80% of children were not being seen by pediatricians for well-care, sick visits, or regular vaccines.[6] In September 2020, the Centers for Medicare & Medicaid Services (CMS) released data indicating that for children in Medicaid and CHIP, rates of vaccinations, primary, and preventive services sharply declined. CMS urged providers to reach out to patients and constituents in an effort to increase the number of children receiving care.[7] Unfortunately, during the fall of 2020, the Delta variant of COVID-19 began spreading and Georgia experienced a peak of new cases of the virus at the start of Period 31 (January 2021).[8]  By June 2021, the end of Period 31, only 33 percent of Georgians had been fully vaccinated for COVID, making the state susceptible for increased cases due to the Delta variant.

It is probable that this real and perceived increase in cases, coupled with the backlog from 2020, extended the decline of well-visits and preventive services for children. Misinformation about the COVID-19 vaccine has led to an increase of parents who elect not to get other childhood vaccinations. The rates of COVID-19 infections continue to decline and there is an effort to increase the overall rate of children receiving medical, dental, and mental health services. MTAT will closely monitor the availability of these services, national and state data related to post pandemic rates of pediatric preventive care visits, and the department's ability to identify and meet the needs of each child in foster care.

## <u>Safety for Children and Youth in Foster Care</u>

---

[6] https://www.childrensdefense.org/blog/pediatricians-are-concerned-with-declines-in-well-child-visits-and-vaccines-during-covid-19/

[7] https://www.cms.gov/newsroom/press-releases/cms-issues-urgent-call-action-following-drastic-decline-care-children-medicaid-and-childrens-health

[8] https://www.nytimes.com/interactive/2021/us/georgia-covid-cases.html

If children must enter foster care, a primary focus of the agency is ensuring that they are safe in their placements. In 2016, the parties agreed to align the measure with the federal maltreatment in care measure and methodology.

## 8.  The rate of maltreatment in care (OM 4) decreased below the maximum threshold

Since 2016, the rate for maltreatment in care decreased and then in 2019 began steadily increasing, finally surpassing the 8.50 victims per 100,000 days maximum threshold. However, during Period 31, the rate significantly declined to 5.16, well below the maximum.

- Period 27(January-June 2019) - 3.45
- Period 28(July – December 2019) – 7.28
- Period 29(January-June 2020) – 6.64
- Period 30(July-December 2020) – 9.65
- Period 31 (January-June 2021)– 5.16

Moreover, the rate of Recurrence of Maltreatment (Section VI.G.1 of the Modified Exit Plan and Consent Decree), decreased from 3.9 percent in Period 30 to 1.56 percent in Period 31. MTAT will closely monitor rates of maltreatment in care, but recommends that it remain in the attained category.

## 9.  This is the fourth consecutive reporting period that the region fell below the required threshold for timely initiating investigations of maltreatment in care.

Even with fewer children in care and fewer maltreatment in care cases, the state was still not able to initiate timely investigations. Outcome Measure 1 requires that at least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim within 24 hours of receipt of the report, in accordance with Section 2106 of the Social Services Manual,. Period 31 marks the fourth consecutive reporting period that the region fell below the required threshold.



With fewer children in foster care and consequently the number of children subject to a maltreatment in care investigation also likely lower, statistically, when a response time is missed, there is a greater impact on the overall performance. However, as depicted on the chart above, during Period 31 the number of children in foster care decreased, the total number of child victims of maltreatment in care remained steady, and yet the children not meeting this outcome increased.

More details are displayed in the chart below.

| OM 1 Timely Initiating Investigations for Maltreatment in Care (by county of child's legal custody) | Number Initiated Timely out of Total Number of Investigations | Percentage |
|---|---|---|
| DeKalb | 46/54 | 85.2% |
| Fulton | 23/30 | 76.7% |
| Region 14 | 69/84 | 82.1% |

There are instances in which staff within perimeter counties initiate and conduct investigations for children in the custody of DeKalb and Fulton County DFCS, but placed in a perimeter county. The chart below delineates the number of these investigations conducted by staff in perimeter counties.

| OM 1 Timely Initiating Investigations for Maltreatment in Care (by | Number Initiated Timely out of Total Number of Investigations | Percentage |
|---|---|---|

| county that conducted the investigation) | | |
|---|---|---|
| DeKalb | 24/29 | 82.8% |
| Fulton | 13/15 | 86.7% |
| Perimeter Counties | 32/40 | 80% |
| Total | 69/84 | 82.1% |

More work needs to be done within Region 14 as well as the perimeter counties to ensure that these investigations are initiated timely.  The safety of children in foster care depends upon the system's ability to respond quickly and thoroughly when allegations arise. While MTAT has delayed moving this outcome measure back to ongoing due to the continued upheaval associated with COVID-19, the performance continues declining. Safety of children in custody is a primary responsibility of DFCS, thus, MTAT is now recommending that this outcome measure return to the ongoing category for focused attention.

## 10. For the first time since Period 25, the state fell below the required threshold for placements in full approval status (OM 18).

Under the Modified Consent Decree and Exit Plan, the parties agreed that at least 98% of all foster placements serving class member children shall be in full approval or licensure status. The approval and licensure process enables DFCS to ensure caregivers are knowledgeable about policies, regulations, safety measures, and trauma-informed care for children in its custody. This is an attained measure that the state has been meeting or exceeding since July 2018. However, during Period 31, the percentage dipped to 96.3%.

Among the categories of placements, the provider supervised foster homes had the lowest percentage of fully approved placements at 90.7%. The state regularly tracks this information and provided the details for the below chart.

*Kenny A. v. Kemp*

**Outcome 18 - Placements in Full Approval Status**

| Placement Type | Number of Placements with a Class Member in Care on 06/30/2021 | Number of Placements with a Class Member in Care on 06/30/2021 that were in Full Approval Status | Overall Capacity of Placement Settings with a Class Member in Care on 06/30/2021 | Capacity of Placements with a Class Member in Care on 06/30/2021 that were in Full Approval Status | Capacity of Placements in Full Approval Status as a Percentage of Overall Placement Capacity |
|---|---|---|---|---|---|
| Relative Placement | 125 | 117 | 226 | 226 | 100.0% |
| DFCS - supervised Foster Home | 67 | 67 | 172 | 172 | 100.0% |
| Provider - supervised Foster Home | 293 | 250 | 803 | 728 | 90.7% |
| Child Caring Institution | 56 | 54 | 1386 | 1364 | 98.4% |
| Total | 541 | 488 | 2587 | 2490 | 96.3% |
| Of the 125 total Relative homes, 8 were excluded for various reasons. This left a total of 117 homes of which all were Approved. | | | | | |
| Of the 67 DFCS FH's, all were Approved at 67 | | | | | |
| Of the 293 total CPA FH's, 43 were unapproved for various reasons | | | | | |
| Of the 56 CCI's, 2 were Suspended, which left a total of 54 Full Active homes. | | | | | |

The Office of Provider Management (OPM) provides oversight for Child Placing Agencies (CPAs). That office set a 2021 goal to approve 70 new CPA foster families for Region 14. By the end of Period 31, 40 new CPA foster families were approved (16 in Fulton and 24 in DeKalb). However, 23 CPA foster homes were closed during this same period. Since the fully approved capacity is lowest among perimeter counties, CPAs must be full participants in correcting this trend. OPM informed MTAT that its staff are meeting monthly with CPAs and the agenda regularly includes how the agency can support improvements in the CPAs' recruitment and retention strategies and results.

In Region 14, the Resource Development (RD) Unit approved 25 new families during Period 31, including: 8 new partnership families (15 beds), 1 new resource family (2 beds), 8 new kinship partnership families (10 beds), 2 new kinship resource families (3 beds), no new kinship adopt

families, and 6 new adopt families (10 beds) were approved this period. However, 48 homes also closed during Period 31. MTAT is currently in discussions with the RD Unit, regional leadership, and state *Kenny A* leadership to better understand the current recruitment and retention strategies through the region's CQI process.

In accordance with Section IX E.2.b. of the Modified Consent Decree and Exit Plan, MTAT will gather additional information and assess the reasons for decline in this performance.

For a complete listing of Period 31 performance for all measures required in the Modified Consent Decree and Exit plan, see Tables 3 and 4 below.

This report also has three appendices. Appendix A is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Consent Decree and Exit Plan and describes the method for producing the metric. There is a technical document, Detailed Outcome Measures for Period 31, that provides the numerator and denominator for each metric displayed in Tables 4 and 5 and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan.

Appendix B contains a glossary of common terms that are relevant to Georgia.

### *Table 3: Draft Period 31 Ongoing Modified Exit Plan Requirements*

| Ongoing Outcome Measures | Period 30 Performance

Region 14 | Period 31 Performance

DeKalb | Period 31 Performance

Fulton | Period 31 Performance

Region 14 |
|---|---|---|---|---|
| **Outcome 3**: Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than **8.3%** shall have re-entered care within 12 months from the date of discharge. Children who were in foster care for less than eight days are not counted in this measure. | **13.1%** | 12% | 11.7% | **11.9%**[9] |
| **Outcome 6**: At least **43.6%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **45%** | 18.8% | 26.8% | **21.9%**[10] |

[9] This is a six-month snapshot of an annual measure.
[10] This is a six-month snapshot of an annual measure.

*Kenny A. v. Kemp*

| Ongoing Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 12**: Caseworker Continuity: At least **90%** of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | **90%** | 90% | 97% | **93%** |
| **Outcome 17**: Education: At least **56%** of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | **54%** | | | **N/A** |
| **Outcome 21**: Health and Educational Needs: Of children in care at a point in time at the end of the reporting period, according to the service needs documented in the child's most recent case plan: [11] | | | | |
| **Outcome 21b**: At least **92%** shall not have any unaddressed dental needs | **58%** | 57% | 25% | **45%** |
| **Outcome 21c**: At least **92%** shall not have any unaddressed mental health needs | **67%** | 75% | –[12] | **75%** |

---

[11] All health and educational needs data are very limited due to COVID-19, so numbers are very skewed.

[12] In Fulton County there were no mental health need identified during Period 31.

*Kenny A. v. Kemp*

## *Table 4: Draft Period 31 Attained Outcome Measures*

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 1**: Commencement of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | **92.8%** | 85.2% | 76.7% | **82.1%**[13] |
| **Outcome 2**: Completion of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | **98.5%** | 100% | 100% | **100%**[14] |
| **Outcome 4**: Maltreatment in Care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than **8.50** victims per 100,000 days. | **9.65** | 4.88 | 5.66 | **5.16** |
| **Outcome 5**: Search for Relatives: At least **95%** of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | **100%** | 95% | 100% | **97%** |
| **Outcome 7**: At least **30.3%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **37.4%** | 22.5% | 17.8% | **20.7%**[15] |
| **Outcome 8**: Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least **80%** will | **87%** | 60% | 100% | **83%** |

---

[13] One case was removed from analysis due to the child being on runaway.

[14] One case was removed from analysis due to the child being on runaway.

[15] This is a six-month snapshot of an annual measure.

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | | | | |
| **Outcome 9**: Permanency Efforts (15/22): At least **95%** of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | **95%** | 94.2% | 99.3% | **96.3%** |
| **Outcome 10**: Sibling Placement: At least **80%** of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relatives. | **100%** | 100% | 100% | **100%** |
| **Outcome 11**: Multiple Placement Moves: The rate of placement moves in foster care shall be no more than **3.67** moves per 1,000 days in foster care. | **3.29** | 2.74 | 3.25 | **2.92** |
| **Outcome 13**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | **98.2%** | 95.59% | 98.6% | **96.7%** |
| **Outcome 14**: Visitation (Parent-Child): At least **85%** of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | **93.2%** | 86.0% | 92.4% | **88.0%** |
| **Outcome 15**: Visitation (Worker-Caregiver): DFCS placement case | **97.3%** | 97.2% | 97.5% | **96.6%** |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least **95%** of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | | | | |
| **Outcome 16**: Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least **90%** of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | **96.6%** | 96.0% | 96.4% | **95.8%** |
| **Outcome 18**: Placements Not in Full Approval Status: At least **98%** of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | **99%** | | | **96.3%** |
| **Outcome 19**: Six-Month Case Plan Review: At least **95%** of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | **91%** | 100% | 97% | **99%** |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 20**: Permanency Hearing: At least **95%** of foster children in custody for 12 or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | **98%** | 100% | 100% | **100%** |
| **Outcome 21a**: At least **92%** shall not have any unaddressed medical needs | **88%** | 75% | 60% | **67%** |
| **Outcome 21d**: At least **92%** shall not have any unaddressed education/development needs. | **77%** | - | 7/7 | **100%** |
| **Outcome 22**: Corporal Punishment: At least **98%** of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | **100%** | | | **100%** |
| **Outcome 23**: Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least **40.5%** shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | **40.7%** | 27.1% | 40.4% | **31.6%**[16] |
| **Outcome 24**: Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | **0%** | 0% | 0% | **0%** |
| **Outcome 25**: Placement Within County: At least **90%** of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these | **96%** | | | **94%** |

[16] This is a six-month snapshot of an annual measure.

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| geographical restrictions, b) the child is placed through the ICPC consistent with its terms, c) the child is appropriately placed with relatives, or d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | | | |
| **Outcome 26**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of monthly *private*, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | **98.10%** | 95.51% | 98.6% | **96.6%** |
| **Outcome 27**: Court Orders: At least **95%** of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | **86%** | 72% | 77% | **74%**[17] |
| **Outcome 28**: Capacity Limits: No more than **10%** of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home with no other children in the home. | **1%** | | | **0.3%** |
| **Other Consent Decree Requirements** | | | | |
| 4x4 Visitation. | **37%** | 18% | 66% | **41%** |
| (VI.G.1) Recurrence of Maltreatment. | **3.9%** | 2.29% | 0.8% | **1.56%** |

[17] While the initial analysis indicated the existence of 74 percent of required valid court orders, the state provided additional information that will continue to be assessed.  MTAT was also made aware of new data that will more accurately reflect performance of Outcome Measure 27 moving forward.

| Attained Outcome Measures | Period 30 Performance Region 14 | Period 31 Performance DeKalb | Period 31 Performance Fulton | Period 31 Performance Region 14 |
|---|---|---|---|---|
| (VI.G.2) Number of children who were victims of a second substantiated investigation within 12 months of FSS case. | **2.5%** | 2.23% | 2.7% | **2.54%** |

# IV   CASELOAD REQUIREMENTS

For the purpose of this report, this section is focused solely on the caseload standards and supervisory ratios included in the Modified Consent Decree and Exit Plan Section V.[18]

- No CPS case manager shall have more than 12 cases.
- No ongoing case manager shall have more than 17 cases.
- No placement case manager shall have m*ore than 15 cases.*
- No adoption case manager shall have more than 16 cases.
- No specialized case manager shall have more than 12 cases.
- No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties.

For Period 31 Fulton did an outstanding job ensuring designated case manager caseload caps were met. Of the 96 case managers in Fulton on June 30, 2021, 91 (95%) of them met the designated caps. DeKalb had many case managers that did not meet the caseload caps. Of the 74 CPS, family preservation, permanency and specialized case managers that were active on June 30, 2021, only 42 (58%) met the specified caps. Of note, only 8 out of 15 (53%) permanency case managers and 6 out of 27 (22%) of specialized case managers had caseloads meeting the designated caseload caps.

Even though DeKalb has the majority of children in care (approximately 62%) in Region 14, they had 74 case managers active on June 30, 2021, compared to 96 case managers in Fulton. For Period 31, there were 27 new hires and 29 losses (24 resignations) in DeKalb while in Fulton there were 21 hires and 31 losses (23 resignations) for the same period.

## *Supervisors*

As of June 30, 2021, all 53 Region 14 supervisors overseeing CPS investigations, family preservation, permanency, and specialized case managers for children in foster care were assigned five or fewer case managers.

## *CPS Case Managers*

For CPS case managers, 83 percent (45 of 54) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of June 30, 2021. An additional 11 cases were assigned

---

[18] Modified Consent Decree and Exit Plan Section V: Caseloads states that these "caseloads will exist in Fulton DFCS and DeKalb DFCS and will apply to all case managers, including deployed case managers, who carry caseloads that include any class member children. In the event that a case manager has a mixed caseload, the caseload shall be weighted to reflect the standards in this section."

to case managers on leave or supervisors, awaiting assignment, which is a decrease compared to 17 cases during Period 30.

### *Family Preservation Case Managers*

Family preservation case managers generally were assigned 17 or fewer families to be able to provide services and help ensure child safety. The same was true on June 30, 2021. All 17 of these case managers met the standard. Of note, no cases were assigned to case managers on leave or supervisors, awaiting assignment.

### *Permanency Case Managers*

On June 30, 2021, 82% (27 out of 33) of permanency case managers were meeting caseload expectations. This is an increase from the 65% who met caseload expectations during Period 30.

### *Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer*

Previously known as specialized case managers, case managers who are assigned to children who were in foster care for 18 months or longer are to be assigned no more than 12 children at any given time. Many of these children require extra support to achieve permanency. During Period 31, 68% (44 of 65) of these case managers met caseload expectations on June 30, 2021. This is a slight decrease from the performance (72%) for Period 30.

### *DeKalb County on June 30, 2021*

The caseloads for 42% of the case managers in DeKalb County on June 30, 2021, were too high. This is similar to their Period 30 performance in which 45% had caseloads exceeding the requirements. It should be noted that all family preservation case managers were assigned caseloads that met agreed upon standards. As previously indicated, 8 out of the 15 (53%) Permanency Case Managers and 6 out of 27 (22%) specialized case managers that met the caseload requirement. See Appendix A, *Table A-3 and Table A-4* for more information.

### *Fulton County on June 30, 2021*

On this same date, only five percent of Fulton County case managers exceeded caseload expectations, which was consistent to their performance in Period 30 when only 4 percent exceeded the requirement. It should also be noted that all family preservation, permanency and specialized case managers met the case load requirements during Period 31. See Appendix A, *Table A-5 and Table A-6* for more information.

As indicated earlier in this section, there are more case managers exiting than entering. The Region continues to develop and implement strategies to recruit, strengthen, educate, and retain its workforce, in the middle of a pandemic. According to DFCS, the deficit of front-line staff is due to 'Region 14 experiencing a deceleration in hiring in the first quarter of 2020, compounded with the current effects of COVID-19 on the workforce and the 'mass resignation' of staff around the state and country.' The top three reasons for leaving DFCS provided in exit interviews completed by regional leadership were looking for higher paying jobs, supervision or leadership asking them to do tasks they didn't want to do and moving to live with relatives out of state. However, review of recent HR reports shows encouraging trends of more robust hiring and

increased emphasis on retaining current talent. MTAT recommends that the region should allow for full implementation of any strategies developed with fidelity and measure the effectiveness of each strategy before moving on to new or additional strategies.

MTAT surveyed supervisors and case workers in Region 14 to ascertain their thoughts and beliefs about caseloads, workloads, and the impact on the workforce. As discussed in the Major Findings Section of this report, while there were only 64 respondents out of approximately 223 eligible staff (29%), their responses provide important insights for how the staff feel about these current dynamics and efforts underway to support the workforce.

**Is your caseload higher, the same or lower than your 'normal'?**



The overwhelming majority of respondents believed that their caseloads were the same or lower than normal. This may be because nearly two-thirds of the respondents (65.6%) work in Fulton County, where 95% of case workers and 100% of supervisors met the designated caseload caps.

**To what extent does your caseload/workload impact your ability to do your job?**



Adding to the story, when asked, nearly two-thirds (42 of 64) of survey respondents indicated that the challenge is both caseload and workload equally, and over a quarter (20 of 64) indicated workload was the greater challenge.

All of these challenges, coupled with the stressors of the pandemic, have led to a massive increase in turnovers in the region. To better understand some of the factors that may be influencing decisions to leave DFCS, MTAT asked survey respondents a few questions to try and begin to unpack the challenge. The majority of respondents (41 of 64) felt 'very' or 'mostly' supported by their supervisor, suggesting this may be less of an issue. Specifically related to the pandemic, just under half of respondents (30 of 64) indicated they felt 'very' or 'usually' supported by DFCS as they navigate their job in child welfare during a pandemic, with over a quarter (17 of 64) indicating they felt 'not really supported'. Exactly half of respondents (32 of 64) felt 'very' or 'usually' safe as they navigated their job during the pandemic, with the remaining half answering 'sometimes' or 'not really' safe.

The Region should take the opportunity to discuss these results with staff and continue co-creating recruitment and retention strategies that mitigate stress and help staff continue realizing the "why" behind their decision to become social workers.

# V   PLACEMENT STANDARDS

The quality placement and caregiving standards include specific DFCS commitments to ensure every child in foster care will have a stable, nurturing placement in accordance with the principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks so family ties are maintained and nurtured, children are able to remain with parents and relatives as often as possible, and the screening, training, approval, and support process for all caregivers are operating well. The Second and Fourth Brief on the Infrastructure Standards included an analysis of these standards.

This section of the report provides an update on agreed upon placement standards in the Modified Consent Decree and Exit Plan § IV.

## *Discriminatory Placement Practices*

Section IV.B.3 of the Modified Consent Decree and Exit Plan prohibits discriminatory placement practices.[19] MTAT is currently working with the state office to evaluate its array of placement providers. While the focus is on outcomes, MTAT is exploring the willingness of providers to accept all children within their stated scope of expertise, regardless of race, ethnicity, religion, sexual orientation, or gender identity. In addition, MTAT started working with the Regional Resource Development Unit to ascertain the effectiveness of its recruitment and retention of suitable placements for all children and youth who enter foster care. The Fifth Brief of the Infrastructure Standards will provide data and analysis in these two areas.

The region undertook a great deal of work to create an affirming workforce for children and youth who self-identify as members of the lesbian, gay, transgendered, questioning, intersex, and asexual (LGBTQIA) community. There were several cases of concern for which the parties have worked collaboratively to ensure that issues of discrimination were addressed. The parties agreed a systemic approach is needed to provide this same level of service for all children in care. For example, a pattern is starting to emerge regarding group home placements for and treatment of transgender and gender nonconforming youth. Currently, providers must seek a waiver from the state office to place youth in cottages that correlate with their identified gender. Preliminary feedback is that the process is onerous and the politically charged debates within the Georgia Legislature makes is a risky proposition for nonprofits. A survey was sent to all DFCS staff to ascertain current levels of knowledge about and skills to affirm the LGBTQIA community. Region 14 established LGBTQIA foster care units who will work with and serve as champions for this population of youth in care. The state office has also launched an LGBTQIA working group of staff and community stakeholders.

## *Reimbursement Rates*

The standard reimbursement rates for foster care remain the same as previously reported. The state of Georgia is still working with CMS to approve its plan for therapeutic foster care. The state of Georgia has committed $6.7 million of new funding to DFCS to establish the program. Once approved, the rates for this program will be higher than the standard reimbursement rates.

In the meantime, Region 14 continues facing challenges in placing teenagers with histories or patterns of mental health or aggressive behavior. While the state continues working toward implementation of a therapeutic foster care program, MTAT has recommended that the state issue a request for proposal (RFP) for one or two providers to create comprehensive programs to provide appropriate services and placements for these youth. Since the state is currently expending up to $1500 per day to place children in hotels with behavioral aides (only those children outside of Region 14), the contracts under this proposed RFP could pay more than the current rate and still be in compliance with the Consent Decree.

---

[19] Specifically, this section states: "Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. DHS shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion…" Moreover, the Principles outlined in the Exit Plan include: "All children in need of child welfare services should receive; full and equal access to the best available services, regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity."

The trauma for children and staff who are forced to stay in county offices awaiting placements has become untenable. In the recent survey of case workers and supervisors in Region 14, 44 of 64 (68.8%) respondents reported having had to stay in the office at some point with a child when a placement could not be located.

The major findings regarding the placement standards during Period 31 are presented below.

## *Major Findings – Placement Standards*

**1.  The region continues avoiding placing children in hotels, motels, or similar non-child welfare overnight commercial enterprises as temporary placements. However, the number of youth and the amount of time they spend in DFCS offices awaiting placements have increased significantly.**

During Period 31, there were five incidences of hotel stays due to children testing positive for COVID, and consequently requiring quarantining. After following the CDC quarantine guidelines, the children were then moved back to their placements.

The Modified Consent Decree also states, "no child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placement needs require a safe bed in a home-like environment."

During Period 31, there was an increased challenge with youth, mainly over 14 years old, staying in county offices more frequently and for longer durations.  DFCS acknowledged that certain youth in Region 14 have been in and out of the offices for more than 6 months.  The chart below shows the increased use of office stays between Period 30 and 31. The lack of resources for these hard to place youth has become very concerning and is counter to ensuring every youth is placed in a setting which is conducive to their well-being.  Unfortunately, this is a national trend. For the next Infrastructure Brief, MTAT will be conducting an in-depth analysis of Office Stays, and more importantly, the resources needed by youth for which it is consistently hard to find appropriate placements.

| Period 30 | Period 31 |
|---|---|
| • 25 office stays (1.5 hours to 59 days)<br>• Average length of stay 2.8 days; median 12 hours<br>• 14 unique children (average age 14)<br>• 2 stays over 24 hours (3 days, 59 days)<br>• 1 stay over 5 days<br>• 1 youth still in office at the end of P30 | • 47 office stays (2 hours to 68.5 days)<br>• Average length of stay 7.4 days; median 3.7 days<br>• 32 unique children (average age 14)<br>• 31 stays over 24 hours<br>• 16 stay over 5 days<br>• 4 youth still in office at the end of P31 |

**2.  The state continues to ensure young children are not placed in congregate care placements unless necessary for the child's welfare.**

The Consent Decree has several restrictions related to the use of group care, including limiting the use of congregate care for young children. The reported information is for all children under the age of 12 in care between January 1 and June 30, 2021.

According to verified state reports, no children under the age of 12 entering foster care or already in care during the period were placed in group homes or child caring institutions except as allowed under the Modified Exit Plan. During Period 31, of youth in care or who entered foster care in the period, who were under the age of 12, 17 children and youth were placed in hospitals to meet their physical health needs and 8 children were hospitalized for mental health issues.

**3.   The overwhelming number of children are not remaining in temporary facilities longer than 30 days and the region continues to place fewer children in more than one temporary facility while in foster care.**

The Modified Consent Decree states:

a.   No child shall be placed in a temporary facility, or any other foster home or group facility beds used on any temporary basis, for more than 30 days; and

b.   Children shall not be placed in more than one temporary facility within one episode of foster care (meaning the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care).

During Period 31, out of the 1291 children who were in foster care at the beginning of the period or entered during the period, there was only two children placed in a temporary facility or any other foster home or group facility beds used on a temporary basis for more than 30 days (55 and 110 days)[20].

In addition, the state continues striving to reduce the number of children experiencing two or more temporary placements. During Period 31, 3 of 158 (2%) children were placed in two or more temporary facilities within one episode of foster care.

---

[20] Both youth have multiple pending criminal charges and a history of aggression towards other youth as well as adults that has made it difficult to secure a long-term placement.

# APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN

This Appendix contains two tables summarizing the metrics under the Modified Exit Plan, and the methods for generating each of them.

*Table A-1* is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Ext Plan, and then describes the method for producing that metric.

*Table A-2* is a technical document, Detailed Outcome Measures Period 28, that provides the numerator and denominator for each metric displayed in *Tables 4 and 5* above and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan. It also contains additional technical explanations, and/or historical data that provides context for reviewing and interpreting Period 28 performance data.

*Tables A-3 through A-8* provide caseload data as reported from the state.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.1a | No child shall be placed in a temporary facility or any other foster home or group facility bed used on any temporary basis, for more than 30 days. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | Number of in care at the start of the period and number of children deprived during the period: How many were placed in a temporary facility for more than 30 days during the period. | State Data Unit & Kenny A. Team |
| IV.B.1b | Children shall not be placed in more than one temporary facility within one episode of foster care. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | By calendar year cohorts (year of entry), how many enterers had more than one temporary placement episode EXCLUDING any temporary placement following a runaway episode. Follow cohorts over time. | State Data Unit & Kenny A. Team |
| IV.B.1c | No child shall spend more than 23 consecutive hours in county DFCS office. Any child who spends time in county DFCS office between 8 pm-8 am shall be reported to the MTAT. | | Weekly documentation by county; reported to the MTAT | Kenny A teams |
| IV.B.1d | Hotel use for class members to end by June 30, 2017. | Number of distinct children; Number of distinct episodes; Number of nights. | Region 14 tracks and reports weekly to the MTAT. All data originates from SHINES. | Kenny A. Team with verification by State Data Unit |
| IV.B.2b | No child under six shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report | State Data Unit |
| IV.B.2c | No child between ages of 6-12 shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report State Data Unit | State Data Unit |
| IV.B.3 | Race/Ethnicity /religion shall not be basis for delay or denial of placement. DFCS shall not contract with private provider that gives preference based on race/eth/religion. | | | |
| IV.B.4 | DFCS to ensure basic physical needs of food, clothing, and shelter are met. Clothing to be reviewed with every placement / placement change. | | | Kenny A. Case Review Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.5 | In placement visitation: four in four for new placements; monthly thereafter. There should be at least one in-placement visit and one private, face-to-face. | Drop children in care for only one week. -measure one in placement visit for all in first week -measure four for all the placement for four weeks. | Number of new placements with one visit in one week; four in four weeks. | State Data Unit supplies list; Kenny A Team reviews performance |
| V.A | CPS caseloads – no more than 12 cases. | No change. | Generated weekly as part of CAP reports after getting data from each county | State Data Unit & Kenny A. Team |
| V.B | Family Preservation and Family Support caseloads– no more than 17. | No change. Weights are applied to produce equivalence for caseworkers with mixed caseloads. | Counts of Caseworkers, by program at end of period | |
| V.C | Placement caseloads – no more than 15. | | | |
| V.D | Adoption caseloads – no more than 16. | | Counts of cases assigned to verified case managers | |
| V.E | Specialized caseloads - no more than 12. | | | |
| V.F | Supervisor – no more than five CM. | | | |
| VI.A.1[21] | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | NOTE: There is a change here b/c old OM one and three have been combined. Those two outcomes used two different denominators (child/inv). New metric is at the child level. | Denominator: Children in foster care who are alleged victims of maltreatment Numerator: Number of child- investigations that started within 24 hours of referral Numerator: Number of children w/ face to face w/in 24 hours | Kenny A Case Review Team |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 30 days of receipt of the report. | No change. Effective 7/1/2017 – the standard became 45 days | Denominator: Number of MIC investigations referred in the PUR Numerator: Number of MIC investigations completed within 30 (45) days of receipt | Kenny A Case Review Team |

---

[21] The current VI.A measures are the ongoing measures.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by... |
|---|---|---|---|---|
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | CFSR 3 measure. Children in care for less than eight days are dropped from outcome measure. SDU will report CY 2014-2016. Reporting for period 23 will start with first half of year, and then be completed for Period 24. | Denominator: CY entries, duration greater than eight days that exited to permanency within one year of entry. Numerator: Those who reentered w/in year of exit date. | State Data Unit |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | CFSR 3 measure. All substantiated of maltreatment in care regardless of perpetrator, are included. Report at six and 12 months. | Denominator: all days for every child in care for a least one day in the period. Numerator: every substantiated maltreatment episode in period. | State Data Unit generates list for Kenny A case reviewers to review |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | No change. | Denominator: children in placement sample who are in first 60 days of placement. Numerator: number of children in denominator whose files show clear evidence of diligent search. | Kenny A Case Review Team |
| VI.A.6 | At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | CFSR 3 measure. Report at six and 12 months SDU will report CY 2014-2016. | Denominator: All children in care on first day of CY who had been in care for 12-23 months. Numerator: # who achieved permanency w/in calendar year. | State Data Unit |
| VI.A.7 | At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or | CFSR 3 measure Report at six and 12 months | Denominator: All children in care on first day of CY who had been in care for 24+ months. | State Data Unit |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | SDU will report CY 2014-2016. | Numerator: # who achieved permanency w/in calendar year. | |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | No change. | Denominator: Children TPR'd during the most recent six-month period for whom 12 months can be observed. Numerator: Those in the denominator who were adopted/reached guardianship during the period. | Kenny A Team |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons why the child's case record why termination of parental rights should not be filed. | No change. | Denominator: Eligible children who have been in care 15-22 months in the period. Numerator: Those who have had TPR filed OR a documented compelling reason not to. | Kenny A Team |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group | No change to method, add large sibling groups of four or more to exclusions. | Denominator: children with siblings who were in care or who had exited by end of period. Numerator: placed together on last day of period OR if they discharged, were together at discharge. | Kenny A Team |

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | together; or (d) the siblings are placed with relative. | | | |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | CFSR 3 measure Adjusted standard to reflect history of in care and admits SDU will report CY 2014-2016. Children in care less than eight days are dropped. | Denominator: All days by children who were served during the period. Numerator: All moves, excluding DJJ, respite, jail, AWOL, hospitals. | State Data Unit |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | No change to method, Promoted caseworkers are now excepted. | Denominator: All children in care at end of the period. Numerator: number of those with LE 2 case managers. | Kenny A Team |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| Vi.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster | No change | Denominator: All visits required for children in care during the period. | State Data Unit supplies list; Kenny A |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | | Numerator: All of the visits that occurred during period. | Team reviews performance |
| Vi.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | No change in method. Include in the numerator qualifying youth who have an IEP or 504 plan who achieved a special ed diploma prior to exit. | Denominator: youth 18+ who were discharged during the year. Numerator: number who have graduated or who have GED. | Kenny A Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | No change in method Only include children who have been in unapproved home for 30 days. Break out by relative, public, and private foster homes. | Denominator: placements with child at end of period. Numerator: number of placements fully approved. | State Data Unit provides list, Kenny A Team reviews and develops measure |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review | No Change | Denominator: Numerator: | Kenny A Team, including case review team |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | No Change | Denominator: Numerator: | Kenny A Team, including case review team |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92 percent shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | No change in method Standard changed. | Denominator: For each area, number of children from placement case review with identified need. Numerator: Number of children in each denominator for whom there is evidence that need was addressed. | Kenny A case review team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.B.[22]22 | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | No Change | Denominator: All foster homes in the sample.<br>Numerator: instances of Corporal Punishment. | Kenny A case review team |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | CFSR measure;<br>SDU will report CY 2014-2016.<br>Reporting for period 23 will start with first half of year, and then be completed for Period 24.<br>Note: numerator is denominator for the reentry measure. | Denominator: All children under 18 entering Region 14 during the CY period.<br>Numerator: Number of children in the denominator who exited to permanency w/in 12 months of entry. | State Data Unit |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | Dissolution means that a child: 1) been adopted; 2) returned to foster care; and 3) has had a subsequent TPR or surrender from his or her adoptive parents within one year of the adoption finalization. | Denominator: Adoptions completed during the most recent six-month period for whom 12 months can be observed.<br>Numerator: Dissolutions w/in one year. | State Data Unit generates list for Kenny A Team to review |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the | Changed to rely on SHINES data and to cover full class. | Denominator: All children in placement on the last day of the period.<br>Numerator: Children in the denominator who were either placed in home court, or who were placed within 50 miles of removal. | State Data Unit provides list, Kenny A Team reviews and develops measure |

---

[22] VI.B metrics are currently Attained Outcomes.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | | |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | No change | Denominator: Case review sample. Numerator: All children in denominator who have document court order language. | Case review |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home. | No change This only includes approved foster homes. | Denominator: Foster homes with one or more children in their home on the last day of the period. Numerator: Number of foster homes that exceed the capacity limit. | State Data Unit provides list, Kenny A Team reviews and develops measure |

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|-----|------------------|-------|--------------------|--------------------|
| **VII.G.1** | Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | Use earliest report and first subsequent report following. | Denominator: Number of children who had substantiated report during the prior year. Numerator: Number of children in the denominator who were subjects of a substantiated report within 12 months of the first report. | State Data Unit |
| **VII.G.2** | Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. | FSS can mean any alternative to opening a CPS case or removal. | Denominator: Number of children referred to FSS in a prior 12-month period. Numerator: Number of those who had substantiated report w/in 11-365 days of the referral. | State Data Unit |

**Table A-2: Detailed Outcome Measures for Period 31**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.1 | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | DeKalb: 24<br>Fulton: 13<br>Perimeter: 32<br>Total: 69 | DeKalb: 29<br>Fulton: 15<br>Perimeter: 40<br>Total: 84 | DeKalb: 82.8%<br>Fulton: 86.7%<br>Perimeter: 80.0%<br>Total: 82.1% |
| | * One child were removed from the sample (numerator and denominator) for this outcome, due to being on runaway for the response time. | | | |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | DeKalb: 17<br>Fulton: 11<br>Perimeter: 32<br>Total: 60 | DeKalb: 17<br>Fulton: 11<br>Perimeter: 32<br>Total: 60 | DeKalb: 100%<br>Fulton: 100%<br>Perimeter: 100%<br>Total: 100% |
| | * One child were removed from the sample (numerator and denominator) for this outcome, due to being on runaway for the response time. | | | |
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | DeKalb: 18<br>Fulton: 19<br>Total: 37 | DeKalb: 150<br>Fulton: 162<br>Total: 312 | DeKalb: 12%<br>Fulton: 11.7%<br>Total: 11.9% |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | DeKalb: 6<br>Fulton: 4<br>Total: 10 | DeKalb: 122928<br>Fulton: 70691<br>Total: 193619 | DeKalb: 4.88<br>Fulton: 5.66<br>Total: 5.16 |
| | This a new measure which relies on the CFSR 3 methodology. That methodology controls for "exposure time" for the risk of maltreatment by calculating the total number of days that children with a least one day of care in the period experienced. It also counts any substantiated investigation associated with a child in care, regardless of who was the perpetrator of the maltreatment. | | | |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | DeKalb: 35<br>Fulton: 23<br>Total: 58 | DeKalb: 37<br>Fulton: 23<br>Total: 60 | DeKalb: 95%<br>Fulton: 100%<br>Total: 97% |

**Table A-2: Detailed Outcome Measures for Period 31**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.6 | Permanency: At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 40 Fulton: 37 Total: 77 | DeKalb: 213 Fulton: 138 Total: 351 | DeKalb: 19% Fulton: 27% Total: 22% |
| VI.A.7 | Permanency: At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 62 Fulton: 30 Total: 92 | DeKalb: 276 Fulton: 169 Total: 445 | DeKalb: 22.5% Fulton: 17.8% Total: 20.7% |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | DeKalb: 6 Fulton: 13 Total: 19 | DeKalb: 10 Fulton: 13 Total: 23 | DeKalb: 60% Fulton: 100% Total: 83% |
| | Any exclusions to be noted here. | | | |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | DeKalb: 398 Fulton: 282 Total: 680 | DeKalb: 422 Fulton: 284 Total: 706 | DeKalb: 94% Fulton: 99% Total: 96% |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relatives. | DeKalb: 22 Fulton: 20 Total: 42 | DeKalb: 22 Fulton: 20 Total: 42 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | DeKalb: 333 Fulton: 224 Total: 557 | DeKalb: 121376 Fulton: 68857 Total: 190233 | DeKalb: 2.74 Fulton: 3.25 Total: 2.92 |

**Table A-2: Detailed Outcome Measures for Period 31**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave. | DeKalb: 558 Fulton: 345 Total: 903 | DeKalb: 621 Fulton: 355 Total: 976 | DeKalb: 90% Fulton: 97% Total: 93% |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | DeKalb: 3793 Fulton: 2246 Total: 6039 | DeKalb: 3968 Fulton: 2279 Total: 6247 | DeKalb: 95.59% Fulton: 98.6% Total: 96.7% |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | DeKalb: 1843 Fulton:954 Total: 2797 | DeKalb: 2145 Fulton: 1032 Total: 3177 | DeKalb: 86.0% Fulton: 92.4% Total: 88.0% |
| VI.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 3788 Fulton: 2199 Total: 5987 | DeKalb: 3941 Fulton: 2256 Total: 6197 | DeKalb: 96.1% Fulton: 97.5% Total: 96.6% |
| VI.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 591 Fulton: 344 Total: 935 | DeKalb: 619 Fulton: 357 Total: 976 | DeKalb: 96.0% Fulton: 96.4% Total: 95.8% |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | | | |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 31**

| | Outcome | | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
| | This metric is generated annually in the report covering the period that ends December 31 of each year. | | | | |
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | | Total: 2490 | Total: 2587 | Total: 96% |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | | DeKalb:55<br>Fulton: 28<br>Total: 83 | DeKalb: 55<br>Fulton: 29<br>Total: 84 | DeKalb: 100%<br>Fulton: 97%<br>Total: 99% |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | | DeKalb: 47<br>Fulton: 24<br>Total: 71 | DeKalb: 47<br>Fulton: 24<br>Total: 71 | DeKalb: 100%<br>Fulton: 100%<br>Total: 100% |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | | See Below | | |
| | | Medical Needs | DeKalb: 3<br>Fulton: 3<br>Total: 6 | DeKalb: 4<br>Fulton: 5<br>Total: 9 | DeKalb: 75%<br>Fulton: 60%<br>Total: 67% |
| | | Dental Needs | DeKalb: 4<br>Fulton: 1<br>Total: 5 | DeKalb: 7<br>Fulton: 4<br>Total: 11 | DeKalb: 57%<br>Fulton: 25%<br>Total: 45% |
| | | Mental Health Needs | DeKalb: 3<br>Fulton: n/a<br>Total: 3 | DeKalb: 4<br>Fulton: n/a<br>Total: 4 | DeKalb: 75%<br>Fulton: n/a<br>Total: 75% |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 31**

|  | Outcome | | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
|  |  | Education/Develop-mental Needs | DeKalb: n/a<br>Fulton: 7<br>Total: 7 | DeKalb: n/a<br>Fulton: 7<br>Total: 7 | DeKalb: n/a<br>Fulton: 100%<br>Total: 100% |
| VI.B.22[23] | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | | Total: 82 | Total: 82 | Total: 100% |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | | DeKalb: 78<br>Fulton: 59<br>Total: 137 | DeKalb: 288<br>Fulton: 146<br>Total: 434 | DeKalb: 27.1%<br>Fulton: 40.4%<br>Total: 31.6% |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | | DeKalb: 0<br>Fulton: 0<br>Total: 0 | DeKalb: 73<br>Fulton: 49<br>Total: 122 | DeKalb: 82%<br>Fulton: 0%<br>Total: 0% |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | Total: 926 | Total: 985 | Total: 94% |

As noted above, the methodology for this metric changed. Rather than being evaluated through case review, the Data Unit generated a metric using the entire class of children in placement on the last day of the period. To generate the final metric – they considered who in placement on 6/30/2018 was placed in the w/in 50 miles of their removal address, was placed within the same county as their removal county or qualified for an exception as stipulated in the agreement. The numerator was adjusted upward to reflected both those that met the standard AND those who were exceptions. The reciprocal of the numerator is the measure. See below for the adjustments.

|  | Placed | Denominator | Numerator | % |
|---|---|---|---|---|
| Total in Placement on 06/30/2021 | 985 | 985 | 926 | 94% |

---

[23] VI.B metrics are currently Attained Outcomes.

**Table A-2: Detailed Outcome Measures for Period 31**

|  | Outcome |  | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
|  |  |  | % of those placed |  |  |
|  | Placed in Same County | 268 | 27% |  |  |
|  | Placed in Different County | 717 | 73% |  |  |
|  | Different county & exception placement | 229 | 23% |  |  |
|  | Different county | 488 | 50% |  |  |
|  | Diff county & placed w/in 50 miles | 429 | 44% |  |  |
|  | Diff county & place greater than 50 miles | 59 | 6% | 0 |  |
|  | Diff county, > than 50 miles & exempt | 0 | 0% |  |  |
|  | Diff county, > than 50 miles & NOT exempt | 59 | 6% | 59 |  |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. |  | DeKalb: 3790<br>Fulton: 2246<br>Total: 6036 | DeKalb: 3968<br>Fulton: 2279<br>Total: 6247 | DeKalb: 95.51%<br>Fulton: 98.6%<br>Total: 96.60% |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. |  | DeKalb: 41<br>Fulton: 27<br>Total: 68 | DeKalb: 57<br>Fulton: 35<br>Total:92 | DeKalb: 72%<br>Fulton: 77%<br>Total: 74% |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of 6 children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster. |  | Total: 1 | Total: 360 | Total: 0.3% |
| VII.G.1 | Recurrence of substantiated investigations: Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. |  | DeKalb: 9<br>Fulton: 3<br>Total: 12 | DeKalb: 393<br>Fulton: 375<br>Total: 768 | DeKalb: 2.3%<br>Fulton: 0.8%<br>Total: 1.6% |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 31**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| **VII.G.2** | Substantiated investigation following FSS case. Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. For Period 25 – partial data are provided. | DeKalb: 22<br>Fulton: 48<br>Total: 70 | DeKalb: 985<br>Fulton: 1776<br>Total: 2761 | DeKalb: 2.2%<br>Fulton: 2.7%<br>Total: 2.5% |

*Kenny A. v. Deal*

**Table A-3: Case Managers Meeting Caseload Standards in DeKalb County on June 30, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/21 | Number of Active, On-leave Staff on 6/30/21 | Actual Performance | | | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 23 | 0 | 19 | 83% | 4 | 17% | *6 |
| Family Preservation | 17 families | 9 | 0 | 9 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 15 | 0 | 8 | 53% | 7 | 47% | **8 |
| Specialized Case Manager | 12 children | 27 | 0 | 6 | 22% | 21 | 78% | 0 |
| Adoption Case Manager[24] | 16 children | NA | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | | 74 | 0 | 42 | 58% | 32 | 42% | 0 |

All adoptions caseloads are included in the other totals. There are 11 adoptions case managers

*Cases for assignment. **8 cases still assigned to newly promoted supervisor. SSAdmin was also supporting the unit.

**Table A-4: DeKalb County Supervisory Ratios on June 30, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 11 | 11 | 100% | 0 | 0% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 11 | 11 | 100% | 0 | 0% |

[24] All adoptions caseloads are included in the specialized and permanency totals. There were 12 adoptions case managers in DeKalb on this date.

*Kenny A. v. Deal*

**Table A-5: Case Managers Meeting Caseload Standards in Fulton County on June 30, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/21 | Number of Active, On-leave Staff on 6/30/21 | Actual Performance Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 31 | 0 | 26 | 84% | 5 | 16% | *5 |
| Family Preservation | 17 families | 8 | 0 | 8 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 19 | 0 | 19 | 100% | 0 | 0% | 0 |
| Specialized Case Manager | 12 children | 38 | 0 | 38 | 100% | 0 | 0% | 0 |
| Adoption Case Manager[25] | 16 children | NA | 0 | 0 | 0% | 0 | 0% | 0 |
| Total | | 96 | 0 | 91 | 95% | 5 | 5% | 5 |

All adoptions caseloads are included in other totals.there are 14 adoptions case managers

*Cases for assignment

**Table A-6: Fulton County Supervisory Ratios on June 30, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 16 | 16 | 100% | 0 | 0% |

---

[25] All adoptions caseloads are included in the specialized and permanency totals. There were five adoptions case managers in Fulton on this date.

| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 15 | 15 | 100% | 0 | 0% |
|---|---|---|---|---|---|

**Table A-7: Region 14 Caseload Managers Meeting Caseload Standards on June 30, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/21 | Number of Active, On-leave Staff on 6/30/21 | Actual Performance | | | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 54 | 0 | 45 | 83% | 9 | 17% | 11 |
| Family Preservation | 17 families | 17 | 0 | 17 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 33 | 0 | 27 | 82% | 6 | 18% | 8 |
| Specialized Case Manager | 12 children | 65 | 0 | 44 | 68% | 21 | 32% | 0 |
| Adoption Case Manager[26] | 16 children | NA | 0 | 0 | 0% | 0 | 0% | 0 |
| Total | 12 children | 169 | 0 | 133 | 79% | 36 | 21% | 19 |

All adoptions caseloads are included in the other totals: there are 25 adoptions case managers

**Table A-8: Region 14 Supervisory Ratios on June 30, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |

---

[26] All adoptions caseloads are included in the specialized and permanency totals. There were 15 adoption case managers in the Region on this date.

| | | | | | |
|---|---|---|---|---|---|
| Child Protective Services (Investigations and Family Preservation) | 27 | 27 | 100% | 0 | 0% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 26 | 26 | 100% | 0 | 0% |

# APPENDIX B – GLOSSARY

**Adoptive Placement** means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

**Child or Children or Class Member Children or Class Members** mean a child or children who have been, are or will be alleged or adjudicated deprived who 1) are or will be in the custody of the State Defendants; and 2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

**Child Caring Institution (CCI)** is any child-welfare facility which provides full-time room, board, and watchful oversight (RBWO) to six or more children up to 18 years of age. Some CCIs are approved to care for youth up to age 21. The CCI must be approved through the Office of Provider Management (OPM) to serve children in DFCS custody.

**Child Placing Agency (CPA)** is agency that places children in foster and adoptive homes for individualized care, supervision, and oversight. Child placing agencies are responsible for assessing the placement regarding the appropriateness of the room, board, and watchful oversight that the prospective foster and adoptive families will provide. The CPA's employees and their foster and adoptive parents work as a team to provide a stabilizing and nurturing environment that promotes safety, permanency, and well-being.

**Corporal Punishment** means any physical punishment on a child that inflicts pain.

**CPA Foster Home** is a foster home approved by a Child Placing Agency for the temporary placement of children in foster care.

**DeKalb DFCS** means DeKalb County Department of Family and Children Services.

**DFCS** when used alone means the Georgia Division of Family and Children Services.

**DFCS Foster Home** is a non-relative foster homes approved by DFCS for the temporary placement of children in foster care.

**DFCS or CPA Adoptive Home** is an adoptive home approved for the foster care placement of a child for whom the established goal is adoption. Adoptive homes must meet the regular standards of care required for approved family foster homes and any conditions specified in that approval.

**DFCS Relative Foster Home** is a relative foster home approved by DFCS for the temporary placement of minor relatives. It is DFCS' preference that all relatives are approved as foster parents and receive a foster care per diem. The goal of relatives becoming foster parents is to ensure that the child has services to address his/her needs.

**DHHS** means the United States Department of Health and Human Services.

**DHR** means Georgia Department of Human Resources.

**Discipline or Other Serious Foster Care Violation** means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

**EPSDT** means the Early and Periodic Screening, Diagnosis, and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

**Fictive Kin** means a person who is known to a child as a relative, but is not, in fact, related by blood.

**Foster Parent** means volunteers who are trained and certified by DFCS or Child Placing Agencies to provide for the temporary care of children placed in the custody of DFCS. Foster parents work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster parents are asked to assume the responsibility of parenting the children placed in their home.

**Foster Relative** means biological kin who are trained and certified by DFCS to provide for the care of relative children placed in the custody of DFCS. Foster relatives work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster relatives are asked to assume the responsibility of parenting the children placed in their home.

**Fulton DFCS** means the Fulton County Department of Family and Children Services.

**Georgia Health Check Program** means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

**Governor** means the Governor of the State of Georgia.

**Legal Guardianship** means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter15-11-2(36).

**One Episode of Foster Care** means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

**Permanent Legal Custody** means custody granted in accordance with an order of the superior court or the juvenile court, which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

**Permanent Placement with Relatives** means placing a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain

in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

**Psychiatric Residential Treatment Facility (PRTF)** is a temporary non-hospital facility with a provider agreement with a State Medicaid Agency to provide intensive therapeutic intervention to a child to ensure safety and stability. PRTFs offer intensive behavioral health services to children in Georgia.

**Relatives** are persons who are related by blood, marriage or adoption including the spouse of any of those persons even if the marriage was terminated by death or divorce.

**Relative Placement** refers to placement in the home of a relative or fictive kin who do not receive a foster care per diem for the care of the child. The relative placement may be a non-paid placement or the relative may receive TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin are not eligible for TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin must become foster parents to receive financial assistance.

Placement with relatives or fictive kin may occur very quickly if there is a satisfactory CPS history check, safety and home assessment check, and a Georgia Crime Information Center (GCIC) check through the Office of the Inspector General (OIG) on all household members 18 years of age or older. A Relative or Non-Relative Care Assessment must be completed no later than 30 calendar days after the placement of a child.

**State DFCS** means the Division of Family and Children Services of the Georgia Department of Human Resources.

**Suspected Abuse or Neglect** means being based on reasonable cause to believe that a child may have been abused or neglected.

**Suspected Corporal Punishment** means being based on reasonable cause to believe that corporal punishment may have been used on a child.

*Kenny A. v. Deal*