# Period 32
# Monitoring Report

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## Kenny A. v. Kemp

*State of Georgia*

June 2022

*Kenny A. v. Kemp*

## ACCOUNTABILITY AGENT AND
## MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge
Lakewood, New Jersey

Eliza Byrne
Public Knowledge
Lakewood, New Jersey

The following persons were significant contributors to this report.

Dr. Lijun Chen
Public Knowledge
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge
Lakewood, New Jersey

**Kenny A. v. Kemp**

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................................... 3

  Period 31 Dynamics and Highlights ....................................................................................... 4
  COVID-19 Changes and Efforts in Region 14 ......................................................................... 6
  Leadership Changes and Continuous Quality Improvement .................................................. 7

II. CONTEXT DATA ..................................................................................................................... 8

III. PERIOD 31 MAJOR FINDINGS AND RESULTS ...................................................................... 12

  Major Findings ..................................................................................................................... 13
    Permanency for Children and Youth in Foster Care .......................................................... 13
    Wellbeing of Children and Youth in Foster Care ............................................................... 20
    Safety for Children and Youth in Foster Care .................................................................... 21
  Table 3: Draft Period 31 Ongoing Modified Exit Plan Requirements ........................... **Error! Bookmark not defined.**
  Table 4: Draft Period 31 Attained Outcome Measures .................................................. **Error! Bookmark not defined.**

IV  CASELOAD REQUIREMENTS ................................................................................................ 33

  Supervisors ...................................................................................................... **Error! Bookmark not defined.**
  CPS Case Managers .......................................................................................... **Error! Bookmark not defined.**
  Family Preservation Case Managers ................................................................. **Error! Bookmark not defined.**
  Permanency Case Managers ............................................................................. **Error! Bookmark not defined.**
  Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer ........ **Error! Bookmark not defined.**
  DeKalb County on June 30, 2021 ...................................................................... **Error! Bookmark not defined.**
  Fulton County on June 30, 2021 ....................................................................... **Error! Bookmark not defined.**

V   PLACEMENT STANDARDS .................................................................................................... 35

  Discriminatory Placement Practices ..................................................................................... 36
  Reimbursement Rates ......................................................................................................... 36
  Major Findings – Placement Standards ................................................................................ 37

APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN ....................................................... 39

APPENDIX B – GLOSSARY ....................................................................................................... 60

*Kenny A. v. Kemp*

# I.   INTRODUCTION

This Period 32 report is the ninth monitoring report in which the Accountability Agent and the Monitoring and Technical Assistance Team (MTAT) report on the new outcomes delineated in the Modified Consent Decree and Exit Plan (Modified Exit Plan) that was filed in Federal District Court in December 2016.[1] In addition to this monitoring report, MTAT will issue its Sixth Brief on the Infrastructure Standards in Summer 2022, in accordance with the Stipulated Order Amending the Modified Consent Decree and Exit Plan (Stipulated Order) filed with the Federal District Court in December 2017.

In this report, the MTAT's obligation is to report specifically on the measurable requirements articulated in Sections IV, V, and VI of the Modified Exit Plan that relate to activity in Metropolitan Atlanta from July 1 through December 31, 2021. In addition to discussing the Ongoing and Attained Outcome Measures, MTAT continues to review the use of congregate care, monitor the use of hotels and other temporary placements for children in foster care, and report caseloads for case managers and supervisors. As discussed in previous reports, MTAT continues to address the impact of COVID-19 on the system, the children and youth under its care, and the families and caregivers with whom it engages. This will be an ongoing exploration for a few more reporting periods as we develop deeper understanding.

MTAT's approach to monitoring serves as an accountability mechanism for the Court, the Plaintiffs, and the public. It also serves as an opportunity to assist the Division of Family and Children Services (DFCS) in establishing data-driven decision-making processes and continuous quality improvement (CQI). The goal is to create a strong CQI process that will remain in place after the state satisfies the terms of the Modified Exit Plan and will no longer be under federal court oversight.

The MTAT reports on the same Modified Exit Plan standards and outcome measures approximately every six months, using a combination of qualitative and quantitative data.[2] In addition to the basic and consistent set of metrics as agreed upon in the Modified Exit Plan, the MTAT conducts a deep, quality-focused analysis on a handful of Infrastructure Standards at regular intervals. Data gathering for these can include interviews with stakeholders, focus groups, surveys, observations of processes, targeted case reviews, and reviews of Child and Family Service Reviews (CFSRs) findings.

---

[1] Modified Consent Decree and Exit Plan, *Kenny A. v. Nathan Deal,* Civil Action NO. 1:02-CV-1686-TWT. Go to: https://www.childrensrights.org/wp-content/uploads/2014/08/2016.11.09-745-Exhibit-A-Modified-Consent-Decree-and-Exit-Plan.pdf
[2] Pursuant to the Modified Consent Decree, both the Ongoing Outcome Measures and Attained Outcome Measures have undergone substantial revision to reflect, when possible, the principles of best practices in measurement. Best practices principles include: 1) a clear statement of the analytic question with particular attention to identifying the risk population or the denominator associated with a particular inquiry; 2) use of entry cohorts and prospective measures to characterize systems dynamics and change in outcomes; 3) attention to the sources of variation in system outcomes (e.g. variation over time, among children, or in places); 4) understanding variation to track change accurately; 5) assessing expected change in the appropriate period of performance or window of time; 6) matching the analytic question to the appropriate source data; and 7) using well-understood and organized data resources that are designed to support asking and answering analytic questions.

MTAT's intention in this effort is to enable Parties' understanding in several key factors associated with each of the Infrastructure Standards:

1. The expectations for practice and the extent to which these processes are occurring

2. The capacity within the system to meet these expectations

3. The extent to which these processes are occurring with sufficient consistency and quality

Moreover, this enables MTAT to focus on emerging issues to mitigate a reactive approach to monitoring. The Infrastructure Standards are key practices and strategies that DFCS identified as their theory of change. If done with fidelity and quality, the standards should lead to improvement in the outcome measures assessed in this monitoring report.

## Period 32 Dynamics and Highlights

Throughout Period 32, 1128 children and youth spent time in Region 14's foster care system:

- 698 children and youth in DeKalb County and 430 in Fulton County.

    - This is 128 fewer children and youth than during Period 31. DeKalb County had 78 fewer children in its care, and Fulton County had 50 fewer children in its care.

- 191 children entered care on or after July 1, 2021, and 228 children exited care by December 31, 2021.

The charts below depict additional dynamics regarding children in foster care during Period 32[3].

---

[3] The charts were developed based on information provided in the final class list for Period 32. An updated class list will be provided by DFCS shortly to reflect a few additional children and these numbers will be updated accordingly with the final report.

**Chart 1: Placement Type at the End of the Period for Children Who Entered Custody in Period 32, by Age Group[4]**



Child Placing Agency (CPA) Family Foster Homes represent the largest proportion of placements across age groups for those entering custody in Period 32, except for youth aged 13 to 18, who were most commonly placed in Child Care Institutions (CCIs). Likelihood of placement with kinship homes, relatives and fictive kin, were also predominant for children aged 12 and younger who entered custody in Period 32.

**Chart 2: Average Number of Months in Custody for Children Exiting in Period 32, by Age Group**



---

[4] 'Other' encompasses: Hospital, Other Resource, Runaway, Non-Custodial Parent, Parent/Primary Caretaker, Jail. and YDC/RYDC

For children who exited custody in Period 32, the chart above depicts the average number of months to exit, by age group at removal. Not surprisingly, the average number of months in custody before exit grew with each age group exiting custody. This is a complete shift from Period 31, during which the average months in care for infants was 24.7 and 14.5 months for youth aged 13-18. When looking further at those exiting custody in Period 32, by exit type, while similar proportions of exits were Reunification in both counties (48, 40% DeKalb; 49, 45% Fulton), the proportion exiting to Guardianship was twice as large in DeKalb as Fulton (48, 40% DeKalb; 21, 19% Fulton). Understanding the impact of these dynamics, given their impact on permanency for children, is worth further scrutiny.

As noted above, the number of children in custody continued to decrease in Period 32. Typically, there is a direct correlation between fewer children in care and smaller caseloads for case managers. However, because the workforce in Region 14 continued decreasing during Period 32, caseloads increased. The region was able to hire 106 new case managers but lost 109 case managers. One hundred five voluntarily resigned their position. This resulted in higher caseloads, especially in DeKalb County, where staffing levels were already deficient. For more details, see Section IV Caseload Requirements.

Despite these challenges, the region continues trending in the right direction for preventing children who exit from re-entering foster care, the rate of maltreatment in care decreased, and more children received timely guardianships and adoptions following termination of parental rights. However, several of the attained outcomes fell below the threshold during Period 32, placing them on the "watch" list for MTAT to review over the next period (6 months for some measures and, 1 year for annual measures), to determine whether they will transition back to the ongoing category. This includes OM 12, case worker continuity, which transitioned to the attained category after Period 31. More details are provided in Section III Period 32 Major Findings and Results.

## **COVID-19 Changes and Efforts in Region 14**

Throughout Period 32, DFCS continued some of its modified practices and policies, such as virtual visitations, due to the worldwide COVID-19 pandemic. Although the Georgia Supreme Court's Judicial Emergency Order expired on June 30, 2021, some local judicial emergency orders remain in place. The DeKalb and Fulton County Juvenile Courts continue hearing most cases virtually, with some dependency cases set for hybrid or in-person hearings.

During Period 32, school systems in Fulton and DeKalb counties returned to full in-person instruction. Service providers continued transitioning back to fully in-person appointments with precautions such as mask mandates and accepting last minute cancellations due to fever or illnesses. The DFCS workforce continued teleworking, with volunteer options to work in the offices.

As predicted and discussed above, Period 32 began reflecting post-pandemic dynamics. Unfortunately, as discussed during Period 31, DFCS was not immune to general trends in the nation's workforce, in which workers are electing to transition to less stressful jobs, most of which can be performed remotely from home. As a result, DFCS continued experiencing higher turnover rates than usual. This is further discussed in Section IV Caseload Requirements.

There is a need to continue strengthening leadership, supervision, and coaching for new and existing staff to increase morale and improve workforce retention, However, the region is to be commended for its ongoing efforts to improve timeliness for children to achieve permanency, prevent re-entry, and stabilize the workforce in the face of uncertainty, due to the changing nature of the virus, the declining workforce, and placement challenges. These challenges, coupled with long-standing gaps in Georgia's placement array, resulted in staff staying in the offices overnight with youth without placements. In order to combat the lack of placements, during Period 32, the state worked with two providers to open cottages and provide wrap around services for youth with high complex needs. Unfortunately, the provider designated for region 14 ultimately denied placements for many young people, who continued staying in offices.  Office stays have led to increased instability for youth and increased turn-over of staff, which will be further discussed in detail in Section V Placements.

## Leadership Changes

During Period 32, Governor Kemp appointed his Chief Operating Officer and Chief Deputy Executive Counsel, Candice Broce, as the Interim Division Director and the Commissioner for the Department of Human Services. She reorganized DHS with the stated goal of achieving greater efficiencies, by eliminating redundancies and aligning programmatic areas.

Commissioner Broce hired Craig Foster, Governor Kemp's Deputy Director of Policy as Chief of Staff and appointed Chris Hempfling as the Deputy Chief of Staff and Senior Deputy Commissioner providing leadership oversight for each of DHS's programs, including Child Welfare (DFCS), Family Independence (OFI), State Programs & Human Resources (Child Support, Aging, and Refugee Resettlement), and the Office of the General Counsel.  Seven Deputy Commissioner positions and an Office of the General Counsel and Chief Ethics were created: Information Technology, Venkat R Krishnan (Appointed); Operations, Sunny Patel (Appointed); Finance, R. Demetrius Taylor (Hired); External Affairs, LaMarva Ivory (Appointed); Child Welfare, Mary Havick (Appointed); Family Independence, Jon Anderson (Appointed); State Office Programs and Human Resources, Tangular Grey (Appointed); and General Counsel and Chief Ethics Officer, Stephen Harris (Hired).(See 2022 Organization Chart in Appendix C).

As of the writing of this report, leadership in several of these positions has changed again. Chris Hempfling, who had been with DFCS for several years, and previously represented DFCS as a Special Assistant Attorney General in Rockdale County, is no longer with the agency in the role of Deputy Chief of Staff and Senior Deputy Commissioner. While his position as Senior Deputy Commissioner over DHS's programmatic areas will not be filled, Mathew Krull has been hired into the position of Deputy Chief of Staff. Mr. Krull previously was appointed as Executive Counsel for the Georgia Department of Community Health. All eight Deputy Commissioners and the General Counsel will now report directly to the Chief of Staff. (See 2022 Organization Chart in Appendix C).

Jon Anderson, Deputy Commissioner of Family Independence, retired during Period 32, and Melody DeBussey was hired to fill this role. Ms. DeBussey previously served as Director, Georgia State Senate Budget and Evaluation Office. Tangular Grey, Deputy Commissioner, State Office Programs and Human Resources, left DHS to assume the role of Commissioner for the

federal Office of Child Support Enforcement. Breanna Thomas was appointed as Deputy Commissioner.  Ms. Thomas was serving as the Assistant Deputy Commissioner and previously served as Deputy Director of Election Services in the Secretary of State's Office.

Within DFCS, in addition to the loss of Chris Hempfling, Colleen Mousinho retired from her role as Director of Practice and Program Guidance.  Glenene Lanier and Shaun Johnson have assumed these responsibilities.  Both have extensive experience and expertise working in various roles within Georgia's child welfare system. Leadership within Region 14 has remained steady. Previously, under the leadership of DFCS State Division Director, Bobby Cagle (2014-2017), the reporting structure for the agency changed, such that the DFCS State Division Director reported directly to the Governor and remained administratively connected to DHS. This reporting structure was in place until the reorganization in 2021, which brought DFCS back within DHS reporting up to Commissioner Broce, who now serves in the dual role of Commissioner of DHS and DFCS Division Director.

At the regional level several changes took place during Period 33.  The Fulton County Director, Tinadinne Paul-bazil, resigned her position, and Regional Director Kristin Toliver has assumed these responsibilities in addition to her own.  The DeKalb County Deputy Director Erica Barnes transferred to a leadership position in Gwinnett County.  Ms. Nora Lindsey was hired to fill the position.  Ms. Lindsey brings a lot of experience from her role as a training specialist for DFCS.

As discussed in previous reports, changes in leadership can often include shifts in change theories and the way of work philosophies. During the past 16 years of the *Kenny A* Consent Decree, there have been ten different Division Directors, eight different DHS Commissioners, and many other leadership changes at the district, regional, and county levels. While some of these changes directly correlated with observed dips in performance for some outcomes, the combination of leadership changes, COVID-19, and the current workforce crisis has without doubt led to a steady decline in performance across many of the Consent Decree requirements.

## II.   CONTEXT DATA

In past reports, MTAT used this section to provide broader context to the findings of the monitoring period by highlighting specific issues or exploring specific child welfare outcomes from a longitudinal perspective. Important context to consider also includes demographics, socioeconomic tensions, and larger systemic trends within the child welfare offices in Fulton and DeKalb. The Atlanta area is a large, diverse, segregated metropolitan area. The map below shades block-groups by race (W-white/B-black/O-other) and income (HI-high, MI-middle, LI-low) and intends to show the extent of racial and economic segregation in the two-county area.

*Kenny A. v. Kemp*

**Chart 3: Racial and Economic Segregation in Fulton and DeKalb Counties**



Source: www.fosteringcourtimprovement.com

The two counties form the bulk of the Atlanta metro area but are quite different in their child welfare system outcomes and challenges. Fulton County's child welfare agency deals with challenges more common in juvenile justice. Half of all entries in the county were for abandonment or children with high complex needs. Ninety percent of children over 12 are in group settings, and relative care is infrequently used. One in six removals are returned home within a month. DeKalb is challenged more by slow processes, likely due to a much higher rate of removal than Fulton or the state. The removal reasons are poverty related: neglect, inability to cope, drugs, and inadequate housing. Nearly a third of removals are for inadequate housing. One in eight first placements are to an institution, raising questions of whether families are not able to directly access services for behavioral health problems.

The racial composition of children in placement is similar between the two counties, but it is much different than the overall county population racial composition.  While just under half of the population in the two counties is Black, children out of home during Period 32 were 90 percent Black. For decades researchers, policymakers and practitioners have continued unpacking the reasons for this type of disproportionality in child welfare.  Some of the often-cited underlying factors include cultural bias, a punitive and fearful agency climate, workforce issues, poor delivery systems, and systemic racism.[5]

---

5

https://pubmed.ncbi.nlm.nih.gov/20632656/#:~:text=Factors%20contributing%20to%20disproportionality%20include,service%20delivery%2C%20and%20workforce%20issues.

**Table 1: Racial Composition of Children in Placement Compared to County**

| | Racial Composition of Children in Placement Compared to County | | | | | | |
|---|---|---|---|---|---|---|---|
| | Dekalb | Fulton | Dekalb | Fulton | Total In Care | DeKalb Population | Fulton Population |
| **Black** | 604 | 386 | 88% | 90% | 89% | 52% | 42% |
| **White** | 30 | 20 | 4% | 5% | 4% | 33% | 44% |
| **Latinx** | 49 | 23 | 7% | 5% | 6% | 9% | 7% |
| **Asian** | 4 | 0 | 1% | 0% | 0% | 6% | 7% |
| | 687 | 429 | 100% | 100% | 100% | 100% | 100% |

The state and county's use of out-of-home care has varied widely over the past twenty years. The rates in the table below are corrected for population fluctuations and show periods with much more and much less use of out-of-home care than at the present time. Caseload peak was in 2004. The lowest level was about ten years later in early 2014. At its peak, Fulton and DeKalb had higher rates out of home than the state, though now their rate remains just below the state's.

**Chart 4: Average Number in Custody on Last Day of the Month per 10,000 Children in Region 14**



In 2020, the entry rate into foster care for the state was at a near low of 1.9 per 10,000 and was much lower in Region 14. This was at the height of the COVID-19 pandemic, when schools were closed, and much activity was at a standstill. The national rate of entry in SFY 2020 was at a low of 3.4 entries per 10,000 children, still higher than the Georgia or Region 14 rate. Still, the very slow movement to reunification and adoption in the state results in above average total days out of home. This is especially true in Fulton and DeKalb counties, where more children enter care for abandonment and child behavior, creating challenges in placement and for reunification.

Other important context to consider is the current workforce crisis underway in Region 14, as well as the rest of the state. Comparing turnover rates between Period 31 and Period 32 alone shows the impact on the region and the state.

**Table 2: Turnover Rate Comparison between Period 31 and 32**

|  | **Period 31** | **Period 32** |
|---|---|---|
| **Case Managers** | | |
| DeKalb | 20.3% | 26.7% |
| Fulton | 22.8% | 33.4% |
| State | 14.2% | 28.2% |
| **Supervisors** | | |
| DeKalb | 36.2% | 27.0% |
| Fulton | 11.5% | 11.7% |
| State | 7.2% | 12.0% |

Worker turnover increased substantially between the two periods, particularly in Fulton County as well as statewide. While Supervisor turnover remained the same or decreased in Region 14, it increased across the state of Georgia. There are other negative consequences of the workforce crisis on children, youth and families in the region. According to an information packet developed by Casey Family Programs, workforce turnover has a direct impact on permanency rates for children and youth in foster care.[6] Despite progress in Kenny A outcome measures relating to permanency, the percentage of children who have been in custody for long periods of time has increased in recent periods, which is in part due to having their cases managed by multiple different caseworkers during their time in care.



---

[6] https://caseyfamilypro-wpengine.netdna-ssl.com/media/HO_Turnover-Costs_and_Retention_Strategies.pdf

The percentage of children in custody in Region 14 for over four years has grown since Period 28 from approximately 13 percent to nearly 18 percent in Period 32. While the number of children in custody has decreased, the proportion of those in custody for longer periods of time has been increasing and creating their own set of challenges for achieving permanency.

The challenges discussed earlier in this section around worker morale, turnover, and the lack of safe placements for children are related to the large number of removals for reasons other than child abuse or neglect, like child behavior or abandonment. Staff report that youth often enter care under abandonment if a parent fails to retrieve their child from the police or school. The next section explores the major findings from the Period 32 data and outcomes.

## III.   PERIOD 32 MAJOR FINDINGS AND RESULTS

This section provides major findings regarding outcomes for children, youth, and families involved with Region 14 of Georgia DFCS during Period 32, June 1, 2021 – December 31, 2021. It also provides a list for the performance for each county, and the region for each of the requirements under the Modified Exit Plan. This includes a status update on the requirements, specifically whether the task or outcome has been attained or is at risk of being re-designated as an ongoing task or outcome. Period 32 includes completed annual measures. The chart below reflects whether MTAT is recommending that the measure moves to the attained category (green), moves to the ongoing measure (red), or is on the watch list for possible movement out of attained to ongoing (yellow).

| Attained | | | | |
|---|---|---|---|---|
| Outcome 1 | Outcome 2 | Outcome 4 | Outcome 5 | Outcome 7 |
| Outcome 8 | Outcome 9 | Outcome 10 | Outcome 11 | Outcome 12 |
| Outcome 13 | Outcome 14 | Outcome 15 | Outcome 16 | Outcome 18 |
| Outcome 19 | Outcome 20 | Outcome 21a | Outcome 21d | Outcome 22 |
| Outcome 23 | Outcome 24 | Outcome 25 | Outcome 26 | Outcome 27 |
| Outcome 28 | Visitation 1st Week | Recurrence of Maltreatment | 2nd Substantiation w/I 12mo of FSS | |
| Ongoing | | | | |
| Outcome 3 | Outcome 6 | Outcome 17 | Outcome 21 | Outcome 21b |
| Outcome 21c | | | | |

As stated in the Modified Consent Decree and Exit Plan Section IX.E.1.b., "[A]n Ongoing Outcome Measure is automatically re-designated as an Attained Outcome Measure for the next reporting period, if in the previous three consecutive reporting periods (totaling 18 months) . . ." [or three years for annual measures] State Defendants improved performance in the first period (as compared to the prior period) then met or exceeded the measure for the next two periods. An Attained Outcome Measure "will be re-designated as an Ongoing Outcome Measure only if both of the following conditions occur: (l) the Accountability Agent finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period." Modified Consent Decree and Exit Plan IX.E.2.b.

## *Major Findings*

### Permanency for Children and Youth in Foster Care

Ensuring that children who enter foster care achieve timely permanency is a major goal and responsibility for child welfare agencies across the country. In 2002, when the original *Kenny A* complaint was filed, there were 2000 children in foster care in Fulton County and 1000 children in foster care in DeKalb County. One of the allegations in the lawsuit was that "foster children languished in foster care for years, because Defendants fail to send foster children home promptly when it is safe to do so and fail to place them for adoption promptly when they cannot safely be returned to their parents." As evidence, plaintiffs' counsel indicated that at the end of FY 2000, 900 children in Fulton and DeKalb counties (nearly 33%) had been in foster care for 4 years or more. The settlement agreement finalized and filed with the court in 2005, included improvement standards for DFCS to achieve regarding permanency for children in foster care in Fulton and DeKalb Counties. At the beginning of FY 2022 (July 1, 2021), 172 children in Fulton and DeKalb counties (Just over 15%) had been in foster care for 4 years or more. Thus, while the region continues implementing strategies to improve the rates of timely permanency, this demonstrates significant improvement since the inception of the lawsuit and settlement. However, as noted above, the number has been increasing in recent years and should be monitored closely.

In 2016, when parties to the *Kenny A* Consent Decree renegotiated a Modified Consent Decree and Exit Plan, they agreed to adopt the current federal requirements and methodology to determine progress toward improving rates and stability of permanency in Region 14. The current federal methodology uses an annual point in time analysis of three cohorts of children: those in care 12 months or less (OM 23), those in care 12-23 months (OM 6), and those children and youth in care over 24 months (OM 7). While using a point in time methodology is not as precise as an entry cohort analysis, the parties agreed that aligning *Kenny A* requirements with the existing federal mandates would prevent dual reporting and potentially conflicting analysis. It also gives the agency an ability to compare performance across regions throughout the state.

In addition to the rates upon which children and youth exit foster care, it is important to ensure that once they exit, they do not return. Thus, re-entry rates are also evaluated on an annual basis utilizing the current federal requirements and methodology.

**1. The region continued exceeding the permanency threshold for children in care over 24 months (OM 7). However, permanency for children in care less than 12 months (OM 23), and children in care between 12-23 months (OM 6) fell below required thresholds.**

The three permanency annual measures are calculated each year at the end of December. The chart below provides a comparison over the course of four years, 2018, 2019, 2020, and 2021.

| Outcome Measure | Period 26 Annual | Period 28 Annual | Period 30 Annual | Period 32 Annual |
|---|---|---|---|---|
| **OM 6 – Exits for children in care 12 – 23 months. (Threshold 43.6%)** | 22.3% | 35.5% | 45% | 42% |
| **OM 7 – Exits for children in care over 24 months. (Threshold 30.3%)** | 31.3% | 38.6% | 37.4% | 38% |
| **OM 23 – Exits for children in care 12 months or less. (Threshold 40.5%)** | 37% | 41% | 41% | 35% |

While OM 7 continued exceeding the Consent Decree required threshold, during Period 32, OM 6 and OM 23 fell below their respective thresholds. For children in care between 12-23 months, the region had steadily improved its performance until Period 32. MTAT is recommending that OM 6 remain in the ongoing category. For children in care less than 12 months, the decline in performance was more significant, declining from 41 percent to 35 percent. MTAT will place this outcome on the "watch" list until December 2022 to determine if it should transition from the attained to the ongoing category.

As discussed in Section IV Caseload Requirements, the high turnover rates among case managers lead to increases in caseloads and workloads for the case managers who remain. As many case managers are leaving without notice, there is little to no transfer of case information to the newly assigned case managers. Moreover, the increased load negatively affects quality services and engagement with children, youth, and families. As a result, many studies have concluded that there is a direct correlation between case manager turnover and delayed permanency. The high rates of turnover in DeKalb and Fulton counties have most likely contributed to the decreased rates of permanency for children in foster care between 0-23 months.

**2. Region 14 continues improving re-entry rates but has not met or exceeded the threshold.**

The Region moved closer to reaching the threshold requirement (less than 8.3%) for the percent of children re-entering foster care within 12 months of exiting care. The chart below illustrates a comparison of performance over the past four years

| Outcome Measure | Period 26 Annual | Period 28 Annual | Period 30 Annual | Period 32 Annual |
|---|---|---|---|---|
| **OM 3 – No more than 8.3% of children exiting care will re-enter care within 12 months.** | 17.4% | 19.8% | 13.1% | 11.9% |

As part of its CQI process, the quality assurance team continues to work with the region to conduct case file reviews to see if evidence exists that the region's permanency and re-entry strategies are helping to move the needle. Specifically, the team observes the occurrence and quality of the following four re-entry guide strategies:

- Pre-removal Staffings
- Relapse Planning
- Conditions for Return
- Discharge Staffings

The review during Period 32 revealed that very few of the strategies were being implemented with fidelity. This lack of implementation is a continuation from previous periods.  Once again, this may be due to high workforce turnover and high case and workloads.  However, the CQI team will continue working with the region to determine whether the strategies need to continue being a priority for the region. MTAT will report on this in further detail in the Period 33 monitoring report.

**Other Consent Decree Measures that Support Permanency**

There are several processes included in the consent decree that also have a direct impact on achieving permanency for children in foster care. The processes with the most direct impact involve the juvenile court system, its ability to hold timely hearings, and the production of valid court orders that document the reasons for removal, the reasonable efforts of DFCS, and the action steps needed to achieve permanency. Also important is consistent, regularly scheduled visitations, and the ability of DFCS to limit the number of changes in a child's assigned case worker. This mitigates trauma associated with being in foster care and prevents unnecessary delays in a child's case due to hand-offs between workers and caregivers.

**3. Juvenile courts in Fulton and DeKalb counties continued meeting and exceeding the threshold requirements for six-month court reviews (OM 19), twelfth- month permanency reviews (OM 20), and timely finalizations of adoptions and guardianships (OM 8).**

As previously discussed in Section I, the juvenile courts of DeKalb and Fulton Counties continued successfully operating with virtual hearings and specially set in-person or hybrid hearings. During Period 32, the six-month case plan review hearings, the twelfth-month permanency hearings, and timely finalizations of adoptions and guardianships occurred for 88 to 100 percent of families.

The only court process that declined in performance during Period 32 was the six-month case plan review that fell from 99 percent in Period 31 to 95 percent in Period 32. With 95 percent as the established Consent Decree threshold, it is important to pay attention to this measure. While Fulton County timely held 100 percent of these hearings, DeKalb County held 93 percent. Both juvenile courts are to be commended for holding timely twelfth-month permanency hearings for 100 percent of eligible cases. The finalizations of adoptions and guardianships within twelve months of a Termination of Parental Rights (TPR) increased from 83 percent in Period 31 to 88 percent in Period 32. For this measure, DeKalb County successfully and timely processed 93 percent of adoptions and guardianships, while Fulton County successfully and timely processed 84 percent of these cases.

## 4. After exceeding the requirement for continuity of case managers (OM 12) for three consecutive periods, the region dropped below the required threshold in Period 32.

In accordance with the negotiated Modified Consent Decree and Exit Plan, the state agreed that each child should have no more than two assigned case managers while in foster care. The goal is that continuity of case managers would occur for at least 90 percent of children in care. Period 31 marked the third consecutive period that the region met / exceeded this threshold (93% for Period 31), triggering a recommendation by MTAT that this measure be moved to the attained category. However, during Period 32, the region fell below the threshold to 83 percent, a significant decline in performance. This is especially troubling given the numerous exceptions that are not considered "changes" when analyzing the number of case managers assigned to each child.[7]

Over the past two years of the pandemic, there was a great deal of movement within the workforce (see caseload section). During Period 32 the turnover rate among case managers (26.7% in DeKalb and 33.4% in Fulton) is higher in Fulton but lower for Dekalb than the state (28.2%). Supervisor's turnover rates are higher in DeKalb (27.0%) but nearly equal for Fulton (11.7%) than the rest of the state (12.0%).[8]

A recent survey distributed by MTAT to workers and supervisors in Region 14 found an overwhelming lack of satisfaction with their jobs, leading to a large portion of staff considering employment elsewhere. When respondents were asked how satisfied they were with their jobs, less than half of Fulton County respondents (26 of 59) and less than a third of DeKalb County respondents (11 of 36) indicated they were "absolutely" or "mostly" satisfied. Additionally, while 88.9 percent of DeKalb respondents and 79.7 percent of Fulton respondents have considered leaving DFCS in the past for another job, 50 percent of DeKalb respondents and 52.5 percent of Fulton respondents indicated they were currently actively seeking employment elsewhere.

---

[7] Exceptions built into OM 12 for analysis of case worker continuity include: Cases transferred to an adoption case manager; Case managers who have died, been terminated, promoted, or transferred to another county; and Case managers who have covered a case during another case manager's sick or maternity leave

[8] Turnover data provided by Department of Human Services Human Resource Department. While the counties have some staff in case manager and supervisor positions who are performing other functions, the vast majority carry caseloads. YTD encompasses January 1, 2021, to September 30, 2021.

Due to the ongoing workforce crisis and the significant decline in performance during Period 32, MTAT is placing this outcome on the "watch" list. If the region does not meet or surpass the threshold during Period 33, MTAT will recommend that OM12 transition back to the ongoing category.

**5.  While the court systems have established protocols to improve the percentage of children with all applicable language in court orders necessary to be eligible for federal funding reimbursement (OM 27), this is the sixth consecutive reporting period that the counties did not meet the required 95 percent threshold.**

As the DeKalb and Fulton County court systems move toward post-pandemic operations, judges continue to work with stakeholders so every child in a dependency case has timely executed and filed valid court orders. As part of those protocols, DFCS continues to implement its responsibilities by uploading the court orders into each child's electronic record in Georgia SHINES. The court order serves as a blueprint for permanency, delineating the reasons for removal and the actions and / or behavioral changes needed for reunification or other permanency options. Thus, it is a vital factor for achieving timely permanency. The federal government requires valid court orders that include specific findings regarding custody and reasonable efforts for states to qualify for reimbursements to cover the costs of foster care.

During Period 32, the case file review revealed that only 75 percent of children had all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. The Consent Decree threshold established by the parties is 95 percent and this is the fifth consecutive reporting period falling below this requirement. While the case file review is a statistically significant sample utilized by MTAT for its analysis, DFCS regularly evaluates IV-E eligibility for all children in its custody (penetration rate). Below is a graph of the statewide penetration rates from 2010 to present.



Source: COSTAR through SFY 2010, SHINES SFY 2011 Beginning Jan 2011 SSI Elig Children included in IV-E rate per Federal Policy.   (As of 02-11-22)

The statewide penetration rate decreased from a high of 58.1 percent in SFY 2011, down to 35 percent as of December 2021 During Federal IV-E audits, the state is provided a list of sample cases, and the Revenue Maximization Unit (RevMax) creates a paper file for each case. It is during this time that the state can pull information from SHINES, find missing court orders, and correct other administratively deficient aspects of the child's casefile. While they accept orders signed *Nunc Pro Tunc* (now for then), they do not accept orders signed over 12 months following a corresponding hearing date.

Since the intent of Outcome Measure 27 is to address court orders as a factor in maximizing federal funding, MTAT will mirror this process in its analysis. During the Period 32 review, MTAT requested access to the Revenue Maximization worksheets for the sample of children for which a case file review was also conducted. The goal was to compare these sets of data to ascertain any ongoing administrative gaps as well as more accurately analyze the presence of required court orders.

Unfortunately, RevMax reports that since Covid-19 related teleworking policies were implemented in April 2020, the court order tracking forms were not deemed essential to the funding determination and therefore were no longer uploaded into SHINES.  RevMax did report

that of the 92 cases reviewed by the Kenny A Review Team, their records indicate that only 31 are funded through federal IVE reimbursement.  Moreover, the RevMax Quality assurance unit reports that it conducts annual reviews only for the active IVE case records.  MTAT will continue working with RevMax to determine if their records and data can be utilized in a coordinated fashion moving forward.

As part of its efforts to understand and address gaps in this process, state leadership and the *Kenny A* review team initiated a 100 percent review of files for children in care on a certain date in October 2021(n=924 children), which was completed in February 2022. This signals an internal ability, capacity, and desire to utilize a CQI process to better understand and address system dynamics and barriers. As previously reported, MTAT will work with the Revenue Maximization Unit to analyze all the information from the targeted case review, in addition to other data gathered for Period 32, to ascertain whether the region is improving its performance under Outcome Measure 27. MTAT has also offered to assist the court systems to analyze whether the established court order protocols are being implemented with fidelity.

During the last reporting period, MTAT recommended that Outcome Measure 27 remain in the attained category to continue analyzing the impact of court disruptions during COVID on outcome performance. However, the challenges with valid court orders seem to be long-standing and complex. Judges, Special Assistant Attorney General (SAAGs), child attorneys, parent attorneys, DFCS case managers, and the SHINES system and the Court Plans Reporting System (CPRS) all play a role in the process.

While the courts and counties are to be commended for re-initiating previously developed court order protocols, it will take some time before these efforts result in significant changes in the penetration rate and the counties reach the required 95 percent threshold for cases reviewed by MTAT. Thus, MTAT is recommending that Outcome 27 transition from the attained category back to the ongoing category.

## 6. The impact of staff shortages and high caseloads have resulted in a decline in visitation for three of the five visitation measures. This is despite the continued policy allowing virtual visits.

While children are in foster care, it is vital that they continue visiting with their birth families (including siblings) to maintain connections and bonds, minimize trauma, and decrease depression, anxiety, and behavioral challenges. According to Casey Family Programs, many studies have concluded that families that regularly visit are more likely to achieve timely reunification.[9] Moreover, visitation between case managers and children in foster care can assist in stabilizing placements and preventing additional trauma associated with placement changes.

Following Period 30, MTAT recommended that all remaining visitation measures be moved to the attained category. The Region continued exceeding the threshold requirements for all five measures during Period 31. However, during Period 32, rates of visitation decreased in every category except monthly private in-placement visits between case managers and children (OM 26), and monthly visits by placement case managers to caregivers (OM15). One visitation

---

[9] https://www.casey.org/family-time/

measure declined in performance but remained above the required threshold; visitation between siblings (OM 16) fell from 95.9 percent in Period 31 to 92 percent in Period 32. However, two additional visitations measures in the attained category not only declined but fell below the required threshold: visitation between parents and children (OM14) declined from 88 percent in Period 31 to 80 percent in Period 32; and twice monthly visitation between case managers and children (OM 13) declined from 96.7 percent in Period 31 to 95.9 percent in Period 32. Each of the visitation measures is heavily reliant on assigned case managers.

The turmoil and turnover of the workforce will continue impacting the region's ability to coordinate visitation.  Thus, MTAT is placing OM 13 and OM 14 on the "watch" list. If they do not rebound above the thresholds during Period 33, MTAT will recommend that they transition from the attained to the ongoing category.

## Wellbeing of Children and Youth in Foster Care

OM 21 addresses DFCS's ability to identify and meet the medical, dental, mental health, educational, and developmental needs of children in care. As the substitute guardian for children when they enter foster care, it is imperative that the state meet each child's individualized needs. In fact, separating a child from his/her parent for abuse or neglect and then neglecting to meet the child's needs undermines the mission of the child welfare system.  Screenings and assessments are completed for each child when they enter care and periodically through well-child visits in accordance with the Early Periodic Screening, Diagnostic, & Treatment (EPSDT) schedule outlined by Medicaid. It is then up to the case manager to coordinate follow-up for needs identified during these screenings. With the high rates of case manager turnover, the follow up is often lacking and is evident in the data analyzed during Period 32.

## 7.  The region continued struggling to meet identified health, dental, and mental health needs for children in foster care.

Prior to 2020 and the COVID-19 pandemic, DFCS achieved the attained category for meeting identified medical and educational needs. However, these measures experienced significant declines below the required thresholds in Period 29 (67% and 73% respectively) and began rebounding in Period 30 (88% and 77% respectively). During Period 31, the region was commended for meeting all the identified educational needs of students as they returned to in-person instruction (100%). However, the counties also experienced another decline in meeting identified medical needs (67%). During Period 31, meeting dental health needs and mental health needs were in the ongoing category and continued challenging the department (45% and 75% respectively).

During Period 32 the region rebounded again in meeting medical needs (from 67% to 88% (7 of 8)), and increased meeting identified dental needs (from 45% to 50% (2 of 4)). However, meeting education needs, and mental health needs decreased from the Period 31 performance (100% to 88% (15 of 17) and 75% to 57% (4 of 7) respectively). Fulton County should be commended for meeting 100% of the medical and educational needs identified during Period 32. However, the staffing challenges that began heightening in Period 32 reached crisis levels in Period 33, especially in Fulton County. Thus, MTAT anticipates that performance under OM 21

will continue fluctuating. Moreover, as the universe of children with identified needs continues to decrease, missing any follow up greatly impacts the performance measured by percentage. At the same time, with fewer children identified with needs, there should also be an increased opportunity to meet all the needs. Thus, MTAT is recommending that OM 21 - medical and educational - be placed on the "watch" list to determine if they need to be shifted back to the ongoing category.

### 8. For the first time since the inception of the Consent Decree, the region surpassed the threshold requirement for children exiting care after age 18 with a high school diploma or GED.

The State should be highly commended for their performance in OM17 that requires at least 56 percent of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. The State's performance of 58 percent not only exceeds the threshold, but it does so for the first time since the inception of the Consent Decree in 2005. Much of this increase in performance can be attributed to the development of Project Grad and their partnership with the Multi-Agency Alliance for Children (MAAC) in 2018 to address educational needs of youth in foster care. Working with MAAC and the educational advocates in each county office, students received wraparound services including tutoring, coaching and other support services. The state office is now exploring ways to scale this intervention to serve even more children in foster care across the state.

### Safety for Children and Youth in Foster Care

If children must enter foster care, a primary focus of the agency is ensuring that they are safe in their placements. In 2016, the parties agreed to align the consent decree measure with the federal maltreatment in care measure and methodology.

### 9. The rate of maltreatment in care (OM 4) continued decreasing below the maximum threshold, and the decrease in the number of allegations impacted the percentage of CPS investigations commenced timely for children in foster care (OM 1).

Since 2016, the rate for maltreatment in care decreased and then in 2019 began steadily increasing, finally surpassing the 8.50 victims per 100,000 days maximum threshold. However, during Period 31, the rate significantly declined to 5.16, well below the maximum, and continued declining to the rate of 3.93 during Period 32.

- Period 27 (January-June 2019) - 3.45
- Period 28 (July – December 2019) – 7.28
- Period 29 (January-June 2020) – 6.64
- Period 30 (July-December 2020) – 9.65
- Period 31 (January-June 2021)– 5.16
- Period 32 (July – December 2021) – 3.93

Moreover, the rate of Recurrence of Maltreatment (Section VI.G.1 of the Modified Exit Plan and Consent Decree), decreased from 3.9% in Period 30 to 1.56 percent in Period 31, and then increased to 2.26 percent in Period 32. MTAT will closely monitor rates of maltreatment in care but recommends that it remain in the attained category.

Continuing from the last period, even with fewer children in care and fewer maltreatment in care (MIC) cases, the state was not able to meet the threshold for initiating timely investigations. Outcome Measure 1 requires that at least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim within 24 hours of receipt of the report, in accordance with Section 2106 of the Social Services Manual. The chart below illustrates the extent to which the number of children has decreased while performance on this outcome measure has also decreased.



The number of children subject to a MIC investigation decreased by over 40 percent from 84 in Period 31 to 55 in Period 32, and the number of children who did not meet the timeliness threshold dropped by almost 2/3 from 15 to 6. This significantly impacted the region's ability to meet the standard. Looking at performance to the threshold by investigating county and/or perimeter county, performance by all three entities started decreasing in Period 29, with the start of the COVID-19 pandemic.



Investigations commenced by perimeter counties or Special Investigations Unit (SIU) have consistently performed the lowest since Period 25, with DeKalb and Fulton often taking turns in outperforming the other county. While factors impacting the ability of the region to meet the standard include decreasing number of children subject to MIC investigations as noted above or large sibling groups placed together in previous periods, both of which are positives, indications are that a reengagement around this outcome measure, particularly with perimeter counties, is warranted.

## 10. Region 14 rebounded above the required threshold of 98 percent for placements in full approval status (OM 18).

Under the Modified Consent Decree and Exit Plan, the parties agreed that at least 98% of all foster placements serving class member children shall be in full approval or licensure status. The approval and licensure process enables DFCS to ensure caregivers are knowledgeable about policies, regulations, safety measures, and trauma-informed care for children in its custody. This is an attained measure that the state has been meeting or exceeding since July 2018. However, during Period 31, the percentage dipped to 96.3 percent.

As a result, MTAT placed OM 18 on the "watch" list to determine if the decline was a trend or an anomaly. During Period 32, 98.6 percent of placements were in full approval status. MTAT is therefore recommending that OM 18 remain in the attained category.

*Kenny A. v. Kemp*

| Outcome 18 - Placements in Full Approval Status | | | | | |
|---|---|---|---|---|---|
| **Placement Type** | **Number of Placements with a Class Member in Care on 12/31/2021** | **Number of Placements with a Class Member in Care on 12/31/2021 that were in Full Approval Status** | **Overall Capacity of Placement Settings with a Class Member in Care on 12/31/2021** | **Capacity of Placements with a Class Member in Care on 12/31/2021 that were in Full Approval Status** | **Capacity of Placements in Full Approval Status as a Percentage of Overall Placement Capacity** |
| **Relative Placement** | **120** | **119** | **251** | **250** | **99.6%** |
| **DFCS - supervised Foster Home** | **73** | **70** | **183** | **174** | **95.1%** |
| **Provider - supervised Foster Home** | **272** | **268** | **821** | **805** | **98.1%** |
| **Child Caring Institution** | **47** | **46** | **978** | **972** | **99.4%** |
| **Total** | **512** | **503** | **2233** | **2201** | **98.6%** |
| **Change from Period 31** | **-29** | **+15** | **-354** | **-289** | **-0.8%** |
| Of the 125 total Relative homes, 5 were excluded for various reasons. This left a total of 120 homes of which all were Approved. | | | | | |
| Of the 73 DFCS FH's, 3 were unapproved for various reasons.  This left a total of 70 Approved. | | | | | |
| Of the 272 total CPA FH's, 4 were unapproved for various reasons | | | | | |
| Of the 47 CCI's, 1 was Suspended, which left a total of 46 Full Active. | | | | | |

The Region 14 Resource Development Unit reports a continued focus on recruiting more homes for teens and developing better support for homes currently taking teens, as well as increasing receiving homes and kinship partnership and adoptive homes. The unit believes that these three areas represent the biggest placement needs. During Period 32, 36 new families were approved, including 20 homes specifically for teens (10 kinship homes and 10 traditional partnership and adoptive homes). This is double the number of homes from the last review period. During Period 32, 34 homes also closed. he Resource Development Unit reported the following from exit interviews:

- 71 percent of closures were kinship homes that closed due to placements ending through reunification, guardianship, or adoption

- The closures included eight partnership homes (down from 12 the previous period), 24 kinship homes, one resource home, and one adoptive family

- No homes closed due to substantiated CPS claims

- One kinship home was closed due to not being amenable to change (same as previous period)

- Three homes closed for personal reasons

- Three partnership families moved out of the region

- Four kinship homes closed due to the kinship placement ending

- Seven homes closed due to guardianship being granted

- Eleven homes closed due to successful adoptions (up from 5 last period, 8 being kinship)

The closure trends are mostly consistent; however, there was a decrease in guardianships and in adoptions. There was also a continued decrease in closures due to COVID. With a net of two positive, additional recruitment strategies must be implemented. During Period 33, the number of children without placements, sleeping in county offices reached crisis levels necessitating an emergency approach, including increasing the per diem rates, offering a $5000 grant for providers accepting youth with high complex needs, and frequent staffing meetings that included state, regional and county staff and leadership. MTAT will continue monitoring this placement crisis and will provide additional details in the Sixth Brief on the Infrastructure Standards that will be released late summer 2022.

For a complete listing of Period 32 performance for all measures required in the Modified Consent Decree and Exit plan, see the below tables.

This report also has three appendices. Appendix A is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Consent Decree and Exit Plan and describes the method for producing the metric. There is a technical document, Detailed Outcome Measures for Period 32, that provides the numerator and denominator for each metric displayed and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan.

Appendix B contains a glossary of common terms that are relevant to Georgia.

Appendix C contains organizational charts that reflect the reorganization and leadership changes.

## Period 32 Ongoing Modified Exit Plan Requirements

| Ongoing Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 3**: Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than **8.3%** shall have re-entered care within 12 months from the date of discharge. Children who were in foster care for less than eight days are not counted in this measure. | **11.9%[10]** | 12.0% | 11.7% | **11.9%** |
| **Outcome 6**: At least **43.6%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **21.9%[11]** | 38.0% | 47.8% | **42%** |
| **Outcome 17**: Education: At least **56%** of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | **58%** | 52% | 67% | **58%** |
| **Outcome 21**: Health and Educational Needs: Of children in care at a point in time at the end of the reporting period, according to the service needs documented in the child's most recent case plan: [12] | | | | |
| **Outcome 21b:** At least **92%** shall not have any unaddressed dental needs | **45%** | 33% | 100% | **50%** |
| **Outcome 21c:** At least **92%** shall not have any unaddressed mental health needs | **75%** | 60% | 50% | **57%** |

---

[10] This is a six-month snapshot of an annual measure.
[11] This is a six-month snapshot of an annual measure.
[12] All health and educational needs data are very limited due to COVID-19, so numbers are very skewed.

*Kenny A. v. Kemp*

**Draft Period 32 Attained Outcome Measures**

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 1**: Commencement of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | **82.1%[13]** | 87% | 94% | **89%** |
| **Outcome 2**: Completion of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | **100%[14]** | 100% | 100% | **100%** |
| **Outcome 4**: Maltreatment in Care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than **8.50** victims per 100,000 days. | **5.16** | 6.12 | 0 | **3.93** |
| **Outcome 5**: Search for Relatives: At least **95%** of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | **97%** | 100% | 100% | **100%** |

---

[13] One case was removed from analysis due to the child being on runaway.

[14] One case was removed from analysis due to the child being on runaway.

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 7**: At least **30.3%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **20.7%**[15] | 42.0% | 31.4% | **38.0%** |
| **Outcome 8**: Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least **80%** will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | **83%** | 93% | 84% | **88%** |
| **Outcome 9**: Permanency Efforts (15/22): At least **95%** of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | **96.3%** | 94% | 99% | **96%** |
| **Outcome 10**: Sibling Placement: At least **80%** of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding | **100%** | 100% | 100% | **100%** |

[15] This is a six-month snapshot of an annual measure.

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| diligent efforts to place the group together; or (d) the siblings are placed with relatives. | | | | |
| **Outcome 11**: Multiple Placement Moves: The rate of placement moves in foster care shall be no more than **3.67** moves per 1,000 days in foster care. | **2.92** | 2.75 | 3.81 | **3.13** |
| **Outcome 12**: Caseworker Continuity: At least **90%** of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave**.** | **93%** | 80% | 80% | **83%** |
| **Outcome 13**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | **96.7%** | 95.2% | 97.2% | **95.9%** |
| **Outcome 14**: Visitation (Parent-Child): At least **85%** of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | **88.0%** | 79% | 84% | **80%** |
| **Outcome 15**: Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least **95%** of the total minimum | **96.6%** | 96% | 98% | **97%** |

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage. | | | | |
| **Outcome 16**: Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least **90%** of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | **95.8%** | 91% | 94% | **92%** |
| **Outcome 18**: Placements Not in Full Approval Status: At least **98%** of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | **96.3%** | | | 98.6% |
| **Outcome 19**: Six-Month Case Plan Review: At least **95%** of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six- | **99%** | 93% | 100% | **95%** |

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| month case plan review within 45 days of the expiration of the six-month period following the last review. | | | | |
| **Outcome 20**: Permanency Hearing: At least **95%** of foster children in custody for 12 or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | **100%** | 100% | 100% | **100%** |
| **Outcome 21a**: At least **92%** shall not have any unaddressed medical needs | **67%** | 75% | 100% | **88%** |
| **Outcome 21d**: At least **92%** shall not have any unaddressed education/development needs. | **100%** | 80% | 100% | **88%** |
| **Outcome 22**: Corporal Punishment: At least **98%** of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | **100%** | | | **99%** |
| **Outcome 23**: Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least **40.5%** shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | **31.6%**[16] | 29.3% | 45.6% | **35.0%** |
| **Outcome 24**: Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt | **0%** | 0% | 0% | **0%** |

[16] This is a six-month snapshot of an annual measure.

| Attained Outcome Measures | Period 31 Performance Region 14 | Period 32 Performance DeKalb | Period 32 Performance Fulton | Period 32 Performance Region 14 |
|---|---|---|---|---|
| within the 12 months subsequent to the reporting period. | | | | |
| **Outcome 25**: Placement Within County: At least **90%** of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, b) the child is placed through the ICPC consistent with its terms, c) the child is appropriately placed with relatives, or d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | **94%** | | | **96%** |
| **Outcome 26**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of monthly *private*, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | **96.6%** | 97.7% | 97.0% | **97.44%** |
| **Outcome 27**: Court Orders: At least **95%** of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | **74%** | 79% | 69% | *75%* |
| **Outcome 28**: Capacity Limits: No more than **10%** of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three | **0.3%** | | | **2.0%** |

| Attained Outcome Measures | Period 31 Performance<br><br>Region 14 | Period 32 Performance<br><br>DeKalb | Period 32 Performance<br><br>Fulton | Period 32 Performance<br><br>Region 14 |
|---|---|---|---|---|
| foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home with no other children in the home. | | | | |
| **Other Consent Decree Requirements** | | | | |
| In -placement Visitation in First Week of New Placement | **76%** | 49% | 86% | **68%** |
| (VI.G.1) Recurrence of Maltreatment. | **1.56%** | 2.97% | 1.53% | **2.26%** |
| (VI.G.2) Number of children who were victims of a second substantiated investigation within 12 months of FSS case. | **2.54%** | 2.34% | 3.27% | **2.93%** |

# IV    CASELOAD REQUIREMENTS

For the purpose of this report, this section is focused solely on the caseload standards and supervisory ratios included in the Modified Consent Decree and Exit Plan Section V.[17]

- No CPS case manager shall have more than 12 cases
- No ongoing case manager shall have more than 17 cases
- No placement case manager shall have m*ore than 15* cases
- No adoption case manager shall have more than 16 cases
- No specialized case manager shall have more than 12 cases
- No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties

For Period 32, Fulton continued to do a good job ensuring designated case manager caseload caps were met except for CPS investigators. Of the 66 case managers in Fulton on December 31, 2021, 59 (89%) met the designated caps. However, only 12 out of 19 (63%) CPS investigators met the caseload cap. DeKalb had many case managers that did not meet the caseload caps. Of

---

[17] Modified Consent Decree and Exit Plan Section V: Caseloads states that these "caseloads will exist in Fulton DFCS and DeKalb DFCS and will apply to all case managers, including deployed case managers, who carry caseloads that include any class member children. In the event that a case manager has a mixed caseload, the caseload shall be weighted to reflect the standards in this section."

the 72 CPS, family preservation, permanency and specialized case managers that were active on December 31, 2021, only 44 (61%) met the specified caps.

For Period 32, there were 48 new hires, 11 re-hires and 47 losses (46 resignations) in DeKalb, while Fulton had 21 hires, 5 re-hires and 62 losses (58 resignations) for the same period. The number of resignations for Period 32 is very concerning and are a sharp increase from Period 31. In Period 31 Dekalb had 24 resignations and Fulton had 23. Additionally, after several focus groups with staff at all levels, it appears this negative trend continues. For Infrastructure Standards Brief 6 MTAT will be doing a more extensive analysis on the workforce dynamics in Region 14.

## Supervisors

As of December 31, 2021, Dekalb showed a significant decrease in the number of supervisors overseeing CPS investigations, family preservation, permanency, and specialized case managers for children in foster care that were assigned five or fewer case managers. Only 44 supervisors out of 72 (61%) met the required ratio while Fulton had 59 supervisors out of 66 (89%) meet the ratio. For Period 31, all supervisors in Region 14 met the 1 to 5 ratio.

## CPS Case Managers

For CPS case managers only 64 percent (27 of 42) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of December 31, 2021. An additional 23 cases were assigned to case managers on leave or supervisors, awaiting assignment, which is an increase compared to 11 cases during Period 31.

## Family Preservation Case Managers

Family preservation case managers generally were assigned 17 or fewer families to be able to provide services and help ensure child safety. The same was true on December 31, 2021. All 18 of these case managers met the standard. Of note, no cases were assigned to case managers on leave or supervisors, awaiting assignment.

## Permanency Case Managers

On December 31, 2021, 83 percent (24 out of 29) of permanency case managers were meeting caseload expectations. This is similar to the performance in Period 31 (82%).

## Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer

Previously known as specialized case managers, case managers who are assigned to children who were in foster care for 18 months or longer are to be assigned no more than 12 children at any given time. Many of these children require extra support to achieve permanency. During Period 32, 69 percent (34 of 49) of these case managers met caseload expectations on December 31, 2021. This is similar to the performance (68%) for Period 31.

## DeKalb County on December 31, 2021

The caseloads for 39 percent of the case managers in DeKalb County on December 31, 2021, exceeded the caseload cap. This is a slight decrease to their Period 31 performance in which 42

percent had caseloads exceeding the requirements. It should be noted that all family preservation case managers were assigned caseloads that met agreed upon standards. In addition, 11 out of the 16 (69%) Permanency Case Managers and 10 out of 25 (40%) specialized case managers met the caseload requirement. See Appendix A for more information.

## Fulton County on December 31, 2021

For Fulton County, 11 percent of case managers exceeded caseload expectations, which was a slight increase to their performance in Period 31 when only 5 percent exceeded the requirement. It should also be noted that all family preservation, permanency, and specialized case managers met the case load requirements during Period 32. See Appendix A for more information.

As indicated earlier in this section, there are more case managers exiting than entering. The region continues to develop and implement strategies to recruit, strengthen, educate, and retain its workforce, in the middle of a pandemic. According to DFCS, the deficit of front-line staff is due to "Region 14 experiencing a deceleration in hiring in the first quarter of 2020, compounded with the current effects of COVID-19 on the workforce and the "mass resignation" of staff around the state and country." The top three reasons for leaving DFCS provided in exit interviews completed by regional leadership were looking for higher paying jobs, supervision or leadership asking them to do tasks they did not want to do and moving to live with relatives out of state.

During Period 32, the staffing shortages became even more pronounced leading to multiple hiring fairs, streamlining the hiring process, and reexamining the length and content of the initial training and onboarding process. Seasoned staff from other counties are being loaned to Fulton County, and Field Placement Specialists, Kenny A File Reviewers, and other non-caseload carrying staff are now managing cases.

# V    PLACEMENT STANDARDS

The quality placement and caregiving standards include specific DFCS commitments to ensure every child in foster care will have a stable, nurturing placement in accordance with the principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks, so family ties are maintained and nurtured, children are able to remain with parents and relatives as often as possible, and the screening, training, approval, and support process for all caregivers are operating well. The Second and Fourth Brief on the Infrastructure Standards included an analysis of these standards.

This section of the report provides an update on agreed upon placement standards in the Modified Consent Decree and Exit Plan § IV.

## Discriminatory Placement Practices

Section IV.B.3 of the Modified Consent Decree and Exit Plan prohibits discriminatory placement practices.[18] MTAT continues working with the state office to evaluate its array of placement providers. While the focus is on outcomes, the state continues exploring the willingness of providers to accept all children within their stated scope of expertise, regardless of race, ethnicity, religion, sexual orientation, or gender identity.

Over the past several years, the region undertook a great deal of work to create an affirming workforce for children and youth who self-identify as members of the lesbian, gay, transgendered, questioning, intersex, and asexual (LGBTQIA) community. There were several cases of concern for which the parties have worked collaboratively to ensure that issues of discrimination were addressed. The parties agreed a systemic approach is needed to provide this same level of service for all children in care. For example, a pattern has emerged regarding group home placements for and treatment of transgender and gender nonconforming youth. Currently, providers must seek a waiver from the state office to place youth in cottages that correlate with their identified gender. Preliminary feedback is that the process is onerous and the politically charged debates within the Georgia Legislature make it a risky proposition for nonprofits. During the on-going placement crisis that continued into Period 32, one provider agreed to accept youth without placements including transgender youth. However, they would not allow the youth to sleep in the cottages of their preferred gender, while purporting to provide an affirming environment. One transgender youth has now transitioned to another provider. There is more work to be done so that all youth in Georgia's foster care system will feel affirmed and safe. During a recent meeting of the parties, it was recommended that providers receive additional training regarding what constitutes an affirming environment for youth.  In addition to focusing on the treatment and care of youth who identify as LGBTQIA, the disproportionate number of African American children in the system, as shown in the Context section of this report, warrants further exploration.

### *Reimbursement Rates*

Starting in FY23, reimbursement rates for foster care will increase by ten percent across all program types and designations.  In addition, for children without placements, (those children currently staying in offices/hotels), the state has offered providers a higher rate of per diem and a $5,000 grant to cover services needed to address each youth's high complex needs.

The major findings regarding the placement standards during Period 32 are presented below.

---

[18] Specifically, this section states: "Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. DHS shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion…" Moreover, the Principles outlined in the Exit Plan include: "All children in need of child welfare services should receive; full and equal access to the best available services, regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity."

## Major Findings – Placement Standards

**1. The region continues avoiding placing children in hotels, motels, or similar non-child welfare overnight commercial enterprises as temporary placements. However, the number of youth and the amount of time they spend in DFCS offices awaiting placements continue to increase significantly.**

The Modified Consent Decree also states, "no child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placement needs require a safe bed in a home-like environment."

During Period 32, the numbers of youth that stay in the office overnight continue to be a major challenge for Region 14. Children 14 and older staying in offices presented the greatest issue with reports of drug use, vandalism, runaways, and general unruly behavior. These issues are negatively impacting the morale of an already depleted workforce. The chart below shows the increased use of office stays between Period 31 and 32. The lack of resources for these hard-to-place youth has become very concerning and is counter to ensuring every youth is placed in a setting that is conducive to their well-being. Additionally, a preliminary look at office stays during Period 33 indicates that this issue is getting worse. As of May 8th, 2022, there were 95 instances of office stays in the region with Fulton accounting for 60 of those stays. For the next Infrastructure Brief, MTAT will be conducting an in-depth analysis of Office Stays, and more importantly, the resources needed by youth for which it is consistently hard to find appropriate placements.

| Period 31 | Period 32 |
|---|---|
| • 47 office stays (2 hours to 68.5 days) <br> • Average length of stay 7.4 days; median 3.7 days <br> • 32 unique children (average age 14) <br> • 31 stays over 24 hours <br> • 16 stays over 5 days | • 79 office stays (1 hours to 87.8 days) <br> • Average length of stay 11.3 days; median 3.7 days <br> • 49 unique children (average age 14) <br> • 60 stays over 24 hours <br> • 40 stays over 5 days |

**2. The state continues to ensure young children are not placed in congregate care placements unless necessary for the child's welfare.**

The Consent Decree has several restrictions related to the use of group care, including limiting the use of congregate care for young children. The reported information is for all children under the age of 12 in care between July 1 and December 31, 2021.

According to verified state reports, no children under the age of 12 entering foster care or already in care during the period were placed in group homes or child caring institutions except as allowed under the Modified Exit Plan. During Period 32, of youth in care or who entered foster

care in the period, who were under the age of 12, 24 children and youth were placed in hospitals to meet their physical health needs, 7 children were hospitalized for mental health issues and one child was placed in a receiving home.

**3. The overwhelming number of children are not remaining in temporary facilities longer than 30 days and the region continues to place fewer children in more than one temporary facility while in foster care.**

The Modified Consent Decree states:

a. No child shall be placed in a temporary facility, or any other foster home or group facility beds used on any temporary basis, for more than 30 days; and

b. Children shall not be placed in more than one temporary facility within one episode of foster care (meaning the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care).

During Period 32, out of the 1175 children who were in foster care at the beginning of the period or entered during the period, there were twelve children placed in a temporary facility or any other foster home or group facility beds used on a temporary basis for more than 30 days. For Period 31 there were only 2 children in a temporary facility.

In addition, the state continues striving to reduce the number of children experiencing two or more temporary placements. During Period 32, 20 of 353 (6%) children were placed in two or more temporary facilities within one episode of foster care.  There were only 3 out of 158 (2%) in Period 31.

*Kenny A. v. Deal*

# APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN

This Appendix contains two tables summarizing the metrics under the Modified Exit Plan, and the methods for generating each of them.

*Table A-1* is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Ext Plan, and then describes the method for producing that metric.

*Table A-2* is a technical document, Detailed Outcome Measures Period 28, that provides the numerator and denominator for each metric displayed in *Tables 4 and 5* above and includes additional explanation and/or data that support interpretation of the outcome metric under the Modified Consent Decree and Exit Plan. It also contains additional technical explanations, and/or historical data that provides context for reviewing and interpreting Period 28 performance data.

*Tables A-3 through A-8* provide caseload data as reported from the state.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.1a | No child shall be placed in a temporary facility or any other foster home or group facility bed used on any temporary basis, for more than 30 days. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | Number of in care at the start of the period and number of children deprived during the period: How many were placed in a temporary facility for more than 30 days during the period. | State Data Unit & Kenny A. Team |
| IV.B.1b | Children shall not be placed in more than one temporary facility within one episode of foster care. | Jails, runaways, hospitals, PRTFs, respite care will not be considered temporary. Placement type "other resource" and placement category of hotels, receiving homes, office stays. | By calendar year cohorts (year of entry), how many enterers had more than one temporary placement episode EXCLUDING any temporary placement following a runaway episode. Follow cohorts over time. | State Data Unit & Kenny A. Team |
| IV.B.1c | No child shall spend more than 23 consecutive hours in county DFCS office. Any child who spends time in county DFCS office between 8 pm-8 am shall be reported to the MTAT. | | Weekly documentation by county; reported to the MTAT | Kenny A teams |
| IV.B.1d | Hotel use for class members to end by June 30, 2017. | Number of distinct children; Number of distinct episodes; Number of nights. | Region 14 tracks and reports weekly to the MTAT. All data originates from SHINES. | Kenny A. Team with verification by State Data Unit |
| IV.B.2b | No child under six shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report | State Data Unit |
| IV.B.2c | No child between ages of 6-12 shall be placed in group care setting. | No changes. | Tracked with Congregate Care Report State Data Unit | State Data Unit |
| IV.B.3 | Race/Ethnicity /religion shall not be basis for delay or denial of placement. DFCS shall not contract with private provider that gives preference based on race/eth/religion. | | | |
| IV.B.4 | DFCS to ensure basic physical needs of food, clothing, and shelter are met. Clothing to be reviewed with every placement / placement change. | | | Kenny A. Case Review Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| IV.B.5 | In placement visitation: four in four for new placements; monthly thereafter. There should be at least one in-placement visit and one private, face-to-face. | Drop children in care for only one week. -measure one in placement visit for all in first week -measure four for all the placement for four weeks. | Number of new placements with one visit in one week; four in four weeks. | State Data Unit supplies list; Kenny A Team reviews performance |
| V.A | CPS caseloads – no more than 12 cases. | No change. | Generated weekly as part of CAP reports after getting data from each county | State Data Unit & Kenny A. Team |
| V.B | Family Preservation and Family Support caseloads– no more than 17. | No change. Weights are applied to produce equivalence for caseworkers with mixed caseloads. | Counts of Caseworkers, by program at end of period | |
| V.C | Placement caseloads – no more than 15. | | | |
| V.D | Adoption caseloads – no more than 16. | | Counts of cases assigned to verified case managers | |
| V.E | Specialized caseloads - no more than 12. | | | |
| V.F | Supervisor – no more than five CM. | | | |
| VI.A.1[19] | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | NOTE: There is a change here b/c old OM one and three have been combined. Those two outcomes used two different denominators (child/inv). New metric is at the child level. | Denominator: Children in foster care who are alleged victims of maltreatment Numerator: Number of child- investigations that started within 24 hours of referral Numerator: Number of children w/ face to face w/in 24 hours | Kenny A Case Review Team |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 30 days of receipt of the report. | No change. Effective 7/1/2017 – the standard became 45 days | Denominator: Number of MIC investigations referred in the PUR Numerator: Number of MIC investigations completed within 30 (45) days of receipt | Kenny A Case Review Team |

---

[19] The current VI.A measures are the ongoing measures.

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | CFSR 3 measure. Children in care for less than eight days are dropped from outcome measure. SDU will report CY 2014-2016. Reporting for period 23 will start with first half of year, and then be completed for Period 24. | Denominator: CY entries, duration greater than eight days that exited to permanency within one year of entry. Numerator: Those who reentered w/in year of exit date. | State Data Unit |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | CFSR 3 measure. All substantiated of maltreatment in care regardless of perpetrator, are included. Report at six and 12 months. | Denominator: all days for every child in care for a least one day in the period. Numerator: every substantiated maltreatment episode in period. | State Data Unit generates list for Kenny A case reviewers to review |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | No change. | Denominator: children in placement sample who are in first 60 days of placement. Numerator: number of children in denominator whose files show clear evidence of diligent search. | Kenny A Case Review Team |
| VI.A.6 | At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | CFSR 3 measure. Report at six and 12 months SDU will report CY 2014-2016. | Denominator: All children in care on first day of CY who had been in care for 12-23 months. Numerator: # who achieved permanency w/in calendar year. | State Data Unit |
| VI.A.7 | At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or | CFSR 3 measure Report at six and 12 months | Denominator: All children in care on first day of CY who had been in care for 24+ months. | State Data Unit |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | SDU will report CY 2014-2016. | Numerator: # who achieved permanency w/in calendar year. | |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | No change. | Denominator: Children TPR'd during the most recent six-month period for whom 12 months can be observed. Numerator: Those in the denominator who were adopted/reached guardianship during the period. | Kenny A Team |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | No change. | Denominator: Eligible children who have been in care 15-22 months in the period. Numerator: Those who have had TPR filed OR a documented compelling reason not to. | Kenny A Team |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group | No change to method, add large sibling groups of four or more to exclusions. | Denominator: children with siblings who were in care or who had exited by the end of period. Numerator: placed together on last day of period OR if they discharged, were together at discharge. | Kenny A Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | together; or (d) the siblings are placed with relative. | | | |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | CFSR 3 measure Adjusted standard to reflect history of in care and admits SDU will report CY 2014-2016. Children in care less than eight days are dropped. | Denominator: All days by children who were served during the period. Numerator: All moves, excluding DJJ, respite, jail, AWOL, hospitals. | State Data Unit |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | No change to method, Promoted caseworkers are now an exception. | Denominator: All children in care at end of the period. Numerator: number of those with LE 2 case managers. | Kenny A Team |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| Vi.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster | No change | Denominator: All visits required for children in care during the period. | State Data Unit supplies list; Kenny A |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | | Numerator: All of the visits that occurred during period. | Team reviews performance |
| Vi.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period. Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | No change in method. Include in the numerator qualifying youth who have an IEP or 504 plan who achieved a special ed diploma prior to exit. | Denominator: youth 18+ who were discharged during the year. Numerator: number who have graduated or who have GED. | Kenny A Team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|-----|------------------|-------|--------------------|--------------------|
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | No change in method Only include children who have been in unapproved home for 30 days. Break out by relative, public, and private foster homes. | Denominator: placements with child at end of period. Numerator: number of placements fully approved. | State Data Unit provides list, Kenny A Team reviews and develops measure |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review | No Change | Denominator: Numerator: | Kenny A Team, including case review team |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | No Change | Denominator: Numerator: | Kenny A Team, including case review team |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92 percent shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | No change in method Standard changed. | Denominator: For each area, number of children from placement case review with identified need. Numerator: Number of children in each denominator for whom there is evidence that need was addressed. | Kenny A case review team |

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| VI.B.[20]22 | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | No Change | Denominator: All foster homes in the sample.<br>Numerator: instances of Corporal Punishment. | Kenny A case review team |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | CFSR measure; SDU will report CY 2014-2016.<br>Reporting for period 23 will start with first half of year, and then be completed for Period 24.<br>Note: numerator is denominator for the reentry measure. | Denominator: All children under 18 entering Region 14 during the CY period.<br>Numerator: Number of children in the denominator who exited to permanency w/in 12 months of entry. | State Data Unit |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | Dissolution means that a child: 1) been adopted; 2) returned to foster care; and 3) has had a subsequent TPR or surrender from his or her adoptive parents within one year of the adoption finalization. | Denominator: Adoptions completed during the most recent six-month period for whom 12 months can be observed.<br>Numerator: Dissolutions w/in one year. | State Data Unit generates list for Kenny A Team to review |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the | Changed to rely on SHINES data and to cover full class. | Denominator: All children in placement on the last day of the period.<br>Numerator: Children in the denominator who were either placed in home court, or who were placed within 50 miles of removal. | State Data Unit provides list, Kenny A Team reviews and develops measure |

[20] VI.B metrics are currently Attained Outcomes.

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| | child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | | |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | No change | Denominator: All visits required for children in care during the period.<br>Numerator: All of the visits that occurred during period. | State Data Unit supplies list; Kenny A Team reviews performance |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | No change | Denominator: Case review sample.<br>Numerator: All children in denominator who have document court order language. | Case review |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home. | No change<br><br>This only includes approved foster homes. | Denominator: Foster homes with one or more children in their home on the last day of the period.<br>Numerator: Number of foster homes that exceed the capacity limit. | State Data Unit provides list, Kenny A Team reviews and develops measure |

*Kenny A. v. Deal*

**Table A-1: Measures Grid**

| Sec | Standard/Outcome | Notes | Measurement Method | Data Produced by… |
|---|---|---|---|---|
| **VII.G.1** | Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | Use earliest report and first subsequent report following. | Denominator: Number of children who had substantiated report during the prior year. Numerator: Number of children in the denominator who were subjects of a substantiated report within 12 months of the first report. | State Data Unit |
| **VII.G.2** | Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. | FSS can mean any alternative to opening a CPS case or removal. | Denominator: Number of children referred to FSS in a prior 12-month period. Numerator: Number of those who had substantiated report w/in 11-365 days of the referral. | State Data Unit |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 32**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| **VI.A.1** | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | DeKalb: 24<br>Fulton: 13<br>Perimeter: 32<br>Total: 69 | DeKalb: 29<br>Fulton: 15<br>Perimeter: 40<br>Total: 84 | DeKalb: 82.8%<br>Fulton: 86.7%<br>Perimeter: 80.0%<br>Total: 82.1% |
| | * One child was removed from the sample (numerator and denominator) for this outcome, due to being on runaway for the response time. | | | |
| **VI.A.2** | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | DeKalb: 17<br>Fulton: 11<br>Perimeter: 32<br>Total: 60 | DeKalb: 17<br>Fulton: 11<br>Perimeter: 32<br>Total: 60 | DeKalb: 100%<br>Fulton: 100%<br>Perimeter: 100%<br>Total: 100% |

|  |  |  |  |  |
|---|---|---|---|---|
|  | * One child was removed from the sample (numerator and denominator) for this outcome, due to being on runaway for the response time. |  |  |  |
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | DeKalb: 18<br>Fulton: 19<br>Total: 37 | DeKalb: 150<br>Fulton: 162<br>Total: 312 | DeKalb: 12%<br>Fulton: 11.7%<br>Total: 11.9% |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | DeKalb: 7<br>Fulton: 0<br>Total: 7 | DeKalb: 114349<br>Fulton: 63972<br>Total: 178321 | DeKalb: 6.12<br>Fulton: 0<br>Total: 3.93 |
|  | This a new measure which relies on the CFSR 3 methodology. That methodology controls for "exposure time" for the risk of maltreatment by calculating the total number of days that children with a least one day of care in the period experienced. It also counts any substantiated investigation associated with a child in care, regardless of who was the perpetrator of the maltreatment. |  |  |  |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | DeKalb: 37<br>Fulton: 23<br>Total: 60 | DeKalb: 37<br>Fulton: 23<br>Total: 60 | DeKalb: 100%<br>Fulton: 100%<br>Total: 100% |
| VI.A.6 | Permanency: At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 81<br>Fulton: 37<br>Total: 147 | DeKalb: 213<br>Fulton: 138<br>Total: 351 | DeKalb: 38%<br>Fulton: 27%<br>Total: 42% |
| VI.A.7 | Permanency: At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 116<br>Fulton: 53<br>Total: 169 | DeKalb: 276<br>Fulton: 169<br>Total: 445 | DeKalb: 42%<br>Fulton: 31.4%<br>Total: 38% |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | DeKalb: 25<br>Fulton: 26<br>Total: 51 | DeKalb: 27<br>Fulton: 31<br>Total: 58 | DeKalb: 93%<br>Fulton: 84%<br>Total: 88% |
|  | Any exclusions to be noted here. |  |  |  |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either | DeKalb: 402 | DeKalb: 428 | DeKalb: 94% |

| | | | | |
|---|---|---|---|---|
| | (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | Fulton: 266<br><br>Total: 668 | Fulton: 270<br><br>Total: 698 | Fulton: 99%<br><br>Total: 96% |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions:<br>(a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relative. | DeKalb: 56<br>Fulton: 15<br>Total: 71 | DeKalb: 56<br>Fulton: 15<br>Total: 71 | DeKalb: 100%<br>Fulton: 100%<br>Total: 100% |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | DeKalb: 637<br>Fulton: 497<br>Total: 1134 | DeKalb: 231981<br>Fulton: 130211<br>Total: 362192 | DeKalb: 2.75<br>Fulton: 3.81<br>Total: 3.13 |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave. | DeKalb: 470<br>Fulton: 280<br>Total: 750 | DeKalb: 588<br>Fulton: 321<br>Total: 909 | DeKalb: 80%<br>Fulton: 87%<br>Total: 83% |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | DeKalb: 5403<br>Fulton: 3002<br>Total: 8405 | DeKalb: 5673<br>Fulton: 3088<br>Total: 8761 | DeKalb: 95.24%<br>Fulton: 97.2%<br>Total: 95.9% |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | DeKalb: 1368<br>Fulton:640<br>Total: 2008 | DeKalb: 1738<br>Fulton: 761<br>Total: 2499 | DeKalb: 78.7%<br>Fulton: 84.1%<br>Total: 80.4% |
| VI.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 3302<br>Fulton: 1822<br>Total: 5124 | DeKalb: 3430<br>Fulton: 1860<br>Total: 5290 | DeKalb: 96.3%<br>Fulton: 98.0%<br>Total: 96.9% |

| VI.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | | DeKalb: 493 Fulton: 238 Total: 731 | DeKalb: 539 Fulton: 252 Total: 791 | DeKalb: 91.5% Fulton: 94.4% Total: 92.4% |
|---|---|---|---|---|---|
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | | | | |
| | This metric is generated annually in the report covering the period that ends December 31 of each year. | | | | |
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | | Total: 2201 | Total: 2233 | Total: 99% |
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | | DeKalb:50 Fulton: 30 Total: 80 | DeKalb: 54 Fulton: 30 Total: 84 | DeKalb: 93% Fulton: 100% Total: 95% |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | | DeKalb: 48 Fulton: 24 Total: 71 | DeKalb: 48 Fulton: 24 Total: 71 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | | See Below | | |
| | | Medical Needs | DeKalb: 3 Fulton: 4 Total: 7 | DeKalb: 4 Fulton: 4 Total: 8 | DeKalb: 75% Fulton: 100% Total: 88% |

| | | Dental Needs | DeKalb: 1<br>Fulton: 1<br>Total: 2 | DeKalb: 3<br>Fulton: 1<br>Total: 4 | DeKalb: 33%<br>Fulton: 100%<br>Total: 50% |
|---|---|---|---|---|---|
| | | Mental Health Needs | DeKalb: 3<br>Fulton: 1<br>Total: 4 | DeKalb: 5<br>Fulton: 2<br>Total: 7 | DeKalb: 60%<br>Fulton: 50%<br>Total: 57% |
| | | Education/Develop-mental Needs | DeKalb: 8<br>Fulton: 7<br>Total: 15 | DeKalb: 10<br>Fulton: 7<br>Total: 17 | DeKalb: 80%<br>Fulton: 100%<br>Total: 88% |
| VI.B.22[21] | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | | Total: 81 | Total: 82 | Total: 99% |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | | DeKalb: 85<br>Fulton: 67<br>Total: 152 | DeKalb: 290<br>Fulton: 147<br>Total: 437 | DeKalb: 29.3%<br>Fulton: 45.6%<br>Total: 35.0% |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | | DeKalb: 0<br>Fulton: 0<br>Total: 0 | DeKalb: 68<br>Fulton: 46<br>Total: 114 | DeKalb: 0%<br>Fulton: 0%<br>Total: 0% |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | | Total: 892 | Total: 927 | Total: 94% |

[21] VI.B metrics are currently Attained Outcomes.

|  |  | Placed | Denominator | Numerator | % |
|---|---|---|---|---|---|
|  | As noted above, the methodology for this metric changed. Rather than being evaluated through case review, the Data Unit generated a metric using the entire class of children in placement on the last day of the period. To generate the final metric – they considered who in placement on 6/30/2018 was placed in the w/in 50 miles of their removal address, was placed within the same county as their removal county or qualified for an exception as stipulated in the agreement. The numerator was adjusted upward to reflected both those that met the standard AND those who were exceptions. The reciprocal of the numerator is the measure. See below for the adjustments. |  |  |  |  |
|  | Total in Placement on 06/30/2021 | 985 | 985 | 926 | 94% |
|  |  |  | % of those placed |  |  |
|  | Placed in Same County | 268 | 27% |  |  |
|  | Placed in Different County | 717 | 73% |  |  |
|  | Different county & exception placement | 229 | 23% |  |  |
|  | Different county | 488 | 50% |  |  |
|  | Diff county & placed w/in 50 miles | 429 | 44% |  |  |
|  | Diff county & place greater than 50 miles | 59 | 6% | 0 |  |
|  | Diff county, > than 50 miles & exempt | 0 | 0% |  |  |
|  | Diff county, > than 50 miles & NOT exempt | 59 | 6% | 59 |  |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | DeKalb: 3190<br>Fulton: 1768<br>Total: 4958 | DeKalb: 3265<br>Fulton: 1823<br>Total: 5088 | DeKalb: 97.7%<br>Fulton: 97.0%<br>Total: 97.4% | |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | DeKalb: 41<br>Fulton: 27<br>Total: 68 | DeKalb: 57<br>Fulton: 35<br>Total:92 | DeKalb: 72%<br>Fulton: 77%<br>Total: 74% | |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of 6 children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three | Total: 7 | Total: 345 | Total: 2.0% | |

| | | | | |
|---|---|---|---|---|
| | children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster. | | | |
| **VII.G.1** | Recurrence of substantiated investigations: Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | DeKalb: 12<br>Fulton: 6<br>Total: 18 | DeKalb: 404<br>Fulton: 381<br>Total: 795 | DeKalb: 3.0%<br>Fulton: 1.5%<br>Total: 2.3% |
| **VII.G.2** | Substantiated investigation following FSS case. Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. For Period 25 – partial data are provided. | DeKalb: 23<br>Fulton: 58<br>Total: 81 | DeKalb: 985<br>Fulton: 1776<br>Total: 2761 | DeKalb: 2.3%<br>Fulton: 3.3%<br>Total: 2.9% |

*Kenny A. v. Deal*

**Table A-3: Case Managers Meeting Caseload Standards in DeKalb County on December 31, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 12/31/21 | Number of Active, On-leave Staff on 12/31/21 | Actual Performance | | | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 23 | 0 | 15 | 65% | 8 | 35% | 19 |
| Family Preservation | 17 families | 8 | 0 | 8 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 16 | 0 | 11 | 69% | 5 | 31% | 4 |
| Specialized Case Manager | 12 children | 25 | 0 | 10 | 40% | 15 | 60% | 1 |
| Adoption Case Manager[22] | 16 children | NA | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | | 72 | 0 | 44 | 61% | 28 | 39% | 24 |

All adoptions caseloads are included in the other totals. There are 11 adoptions case managers

*Cases for assignment. **8 cases still assigned to newly promoted supervisor. SS Admin was also supporting the unit.

**Table A-4: DeKalb County Supervisory Ratios on December 31, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 31 | 23 | 74% | 8 | 26% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 41 | 21 | 51% | 20 | 49% |

[22] All adoptions caseloads are included in the specialized and permanency totals. There were 12 adoptions case managers in DeKalb on this date.

*Kenny A. v. Deal*

**Table A-5: Case Managers Meeting Caseload Standards in Fulton County on December 31, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 12/31/21 | Number of Active, On-leave Staff on 12/31/21 | Actual Performance Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 19 | 0 | 12 | 63% | 7 | 37% | 4 |
| Family Preservation | 17 families | 10 | 0 | 10 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 13 | 0 | 13 | 100% | 0 | 0% | 0 |
| Specialized Case Manager | 12 children | 24 | 0 | 24 | 100% | 0 | 0% | 0 |
| Adoption Case Manager | 16 children | NA | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 66 | 0 | 59 | 89% | 7 | 11% | 4 |

All adoptions caseloads are included in other totals.there are 14 adoptions case managers

*Cases for assignment

**Table A-6: Fulton County Supervisory Ratios on December 31, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 29 | 22 | 76% | 7 | 24% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 37 | 37 | 100% | 0 | 0% |

*Kenny A. v. Deal*

**Table A-7: Region 14 Caseload Managers Meeting Caseload Standards on December 31, 2021**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 12/31/21 | Number of Active, On-leave Staff on 12/31/21 | Actual Performance | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 42 | 0 | 27 | 64% | 15 | 36% | 23 |
| Family Preservation | 17 families | 18 | 0 | 18 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 29 | 0 | 24 | 83% | 5 | 17% | 4 |
| Specialized Case Manager | 12 children | 49 | 0 | 34 | 69% | 15 | 31% | 1 |
| Adoption Case Manager[23] | 16 children | NA | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 138 | 0 | 103 | 75% | 35 | 25% | 28 |

All adoptions caseloads are included in the other totals: there are 25 adoptions case managers

**Table A-8: Region 14 Supervisory Ratios on December 31, 2021**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 60 | 45 | 75% | 15 | 25% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 78 | 58 | 74% | 20 | 26% |

---

[23] All adoptions caseloads are included in the specialized and permanency totals. There were 15 adoption case managers in the Region on this date.

# APPENDIX B – GLOSSARY

**Adoptive Placement** means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

**Child or Children or Class Member Children or Class Members** mean a child or children who have been, are or will be alleged or adjudicated deprived who 1) are or will be in the custody of the State Defendants; and 2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

**Child Caring Institution (CCI)** is any child-welfare facility which provides full-time room, board, and watchful oversight (RBWO) to six or more children up to 18 years of age. Some CCIs are approved to care for youth up to age 21. The CCI must be approved through the Office of Provider Management (OPM) to serve children in DFCS custody.

**Child Placing Agency (CPA)** is agency that places children in foster and adoptive homes for individualized care, supervision, and oversight. Child placing agencies are responsible for assessing the placement regarding the appropriateness of the room, board, and watchful oversight that the prospective foster and adoptive families will provide. The CPA's employees and their foster and adoptive parents work as a team to provide a stabilizing and nurturing environment that promotes safety, permanency, and well-being.

**Corporal Punishment** means any physical punishment on a child that inflicts pain.

**CPA Foster Home** is a foster home approved by a Child Placing Agency for the temporary placement of children in foster care.

**DeKalb DFCS** means DeKalb County Department of Family and Children Services.

**DFCS** when used alone means the Georgia Division of Family and Children Services.

**DFCS Foster Home** is a non-relative foster homes approved by DFCS for the temporary placement of children in foster care.

**DFCS or CPA Adoptive Home** is an adoptive home approved for the foster care placement of a child for whom the established goal is adoption. Adoptive homes must meet the regular standards of care required for approved family foster homes and any conditions specified in that approval.

**DFCS Relative Foster Home** is a relative foster home approved by DFCS for the temporary placement of minor relatives. It is DFCS' preference that all relatives are approved as foster parents and receive a foster care per diem. The goal of relatives becoming foster parents is to ensure that the child has services to address his/her needs.

**DHHS** means the United States Department of Health and Human Services.

**DHR** means Georgia Department of Human Resources.

**Discipline or Other Serious Foster Care Violation** means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

**EPSDT** means the Early and Periodic Screening, Diagnosis, and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

**Fictive Kin** means a person who is known to a child as a relative, but is not, in fact, related by blood.

**Foster Parent** means volunteers who are trained and certified by DFCS or Child Placing Agencies to provide for the temporary care of children placed in the custody of DFCS. Foster parents work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster parents are asked to assume the responsibility of parenting the children placed in their home.

**Foster Relative** means biological kin who are trained and certified by DFCS to provide for the care of relative children placed in the custody of DFCS. Foster relatives work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster relatives are asked to assume the responsibility of parenting the children placed in their home.

**Fulton DFCS** means the Fulton County Department of Family and Children Services.

**Georgia Health Check Program** means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

**Governor** means the Governor of the State of Georgia.

**Legal Guardianship** means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter15-11-2(36).

**One Episode of Foster Care** means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

**Permanent Legal Custody** means custody granted in accordance with an order of the superior court or the juvenile court, which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

**Permanent Placement with Relatives** means placing a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

**Psychiatric Residential Treatment Facility (PRTF)** is a temporary non-hospital facility with a provider agreement with a State Medicaid Agency to provide intensive therapeutic intervention to a child to ensure safety and stability. PRTFs offer intensive behavioral health services to children in Georgia.

**Relatives** are persons who are related by blood, marriage or adoption including the spouse of any of those persons even if the marriage was terminated by death or divorce.

**Relative Placement** refers to placement in the home of a relative or fictive kin who do not receive a foster care per diem for the care of the child. The relative placement may be a non-paid placement or the relative may receive TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin are not eligible for TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin must become foster parents to receive financial assistance.

Placement with relatives or fictive kin may occur very quickly if there is a satisfactory CPS history check, safety and home assessment check, and a Georgia Crime Information Center (GCIC) check through the Office of the Inspector General (OIG) on all household members 18 years of age or older. A Relative or Non-Relative Care Assessment must be completed no later than 30 calendar days after the placement of a child.

**State DFCS** means the Division of Family and Children Services of the Georgia Department of Human Resources.

**Suspected Abuse or Neglect** means being based on reasonable cause to believe that a child may have been abused or neglected.

**Suspected Corporal Punishment** means being based on reasonable cause to believe that corporal punishment may have been used on a child.

# APPENDIX C – DHS ORGANIZATIONAL CHARTS

*Kenny A. v. Deal*



