# Sixth Brief on Infrastructure Standards

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## *Kenny A. v. Kemp*

*State of Georgia*

October 2022

## *State of Georgia*

## ACCOUNTABILITY AGENT AND
## MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge (PK)
Lakewood, New Jersey

Eliza Byrne
Public Knowledge (PK)
Lakewood, New Jersey


The following people were significant contributors to this brief:


Dr. Lijun Chen
Public Knowledge (PK)
Lakewood, New Jersey

Dr. Tanya Royster
Striving for a Better World
Washington, DC

Victor Sims
Public Knowledge (PK)
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge (PK)
Lakewood, New Jersey

Jeff Williamson
Public Knowledge (PK)
Lakewood, New Jersey

*Kenny A. v. Kemp*

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................................................................1

II.   WORKFORCE CRISIS............................................................................................................4

III.   PLACEMENT CRISIS............................................................................................................24

IV. RECOMMENDATIONS..........................................................................................................44

APPENDIX A – METHODOLOGY............................................................................................46

APPENDIX B – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN......50

*Kenny A. v. Kemp*

# I.  INTRODUCTION

This brief is part of a larger effort to improve the operations of the Georgia Department of Family and Child Services (DFCS).  The court approved a Modified Consent Decree and Exit Plan on December 5, 2016.  This brief is part of Section VIII of that Exit Plan, establishing a process and timeline for the development of Infrastructure Standards to correspond with the state's new practice model and reform efforts. The development and subsequent negotiations regarding the new standards extended to December 18, 2017, at which time the parties jointly filed to amend the Exit Plan to include these practice and process elements intended to improve outcomes for children and families in Fulton and DeKalb counties. As a reminder, while the Georgia state Department of Family and Child Services was sued, the parties in negotiations agreed to monitor progress in only two of the 159 counties. The parties intended for focused reform in these two counties to inform and impact reform efforts underway across the state. Thus, while the focus of the monitoring team's reports is Region 14, it is informative to compare its performance with other areas across the state.

The purpose of this Sixth Brief on the Infrastructure Standards is to conduct a deep dive into two crises that are hindering child welfare system improvements- that of workforce turnover and of an inadequate supply of appropriate placements (particularly for older youth). Child welfare is truly a system – a connected network of activities focused on a common goal. Before delving into the details found as a part of this brief, it is important to consider the global context of the current child welfare system, which may be exacerbating the workforce and placement crises.

One stressor potentially contributing to both of these crises in Fulton and DeKalb counties is the flow of cases through the system. While the number of investigations impacts the system, the biggest driver of system volume is child removals.  There are many implications of this driver, including the fit between the needs of children who are removed from home and available service and placement needs, as well as the staff available to best meet the needs of children. In DeKalb and Fulton Counties, removal reasons deviate substantially from the rest of the state.

**Table 1: Reasons for Removal for Children in Foster Care April 2021-March 2022**

|  | DeKalb County | | Fulton County | | Georgia |
|---|---|---|---|---|---|
|  | # removals | percent | # removals | percent | **percent** |
| **Removals for Neglect[1]** | 158/190 | 83% | 85/151 | 56% | **47%** |
| **Removals for Caretaker Drug or Alcohol Use** | 30/190 | 16% | 30/151 | 20% | **44%** |
| **Removals for Physical Abuse** | 46/190 | 24% | 23/151 | 15% | **10%** |
| **Removals for Caretaker Inability to Cope** | 67/190 | 35% | 30/151 | 20% | **11%** |
| **Removals for Inadequate Housing** | 54/190 | 28% | 19/151 | 13% | **19%** |

---

[1] The Children's Bureau defines Neglect *alleged or substantiated negligent treatment or maltreatment of the child, including failure to provide adequate food, clothing, shelter, supervision or care by a person who is responsible for the child's welfare.*

*Kenny A. v. Kemp*

| | | | | | |
|---|---|---|---|---|---|
| **Removals for Incarceration** | 38/190 | 20% | 15/151 | 10% | **11%** |
| **Removals for Child Behavior** | 16/190 | 8% | 34/151 | 23% | **10%** |
| **Removals for Abandonment** | 52/190 | 27% | 59/151 | 39% | **9%** |
| **Removals for Sexual Abuse** | 8/190 | 4% | 3/151 | 2% | **3%** |

Fostering Court Improvement (www.fosteringcourtimprovement.org)

DeKalb County removes 83% of youth for neglect, compared to 56% in Fulton County and 47% in the rest of the state. Many of these removals could be prevented if appropriate preservation services were available at the front end of the system and workers were trained to access and provide these services to children and families.

Removals for the reason of abandonment are particularly high in both counties.  Fulton County removes nearly a quarter of children due to their own behavior, while DeKalb has high removals for inadequate housing, neglect, and caretaker's inability to cope. These removal cases are not the traditional cases of abuse or neglect that new workers might imagine from their training. Moreover, even when placements are available, some children with behavior problems do not do well in traditional foster, group home or relative placements.  These challenges connect the problems caused by a lack of effective front-end services and relative resources to the overburdened workforce and lack of placement issues.  The mismatch between resources and needs sets the context for this Infrastructure Brief.

As background, the Monitoring and Technical Assistance Team (hereinafter "MTAT") developed a new approach and methodology for tracking the state's performance. The approach deliberately recognizes that change in outcomes depends not only on a theory (or theories) of change that link practice and policy to core outcomes, but also on well-developed and carefully implemented plans to execute proposed innovations and strategies. The development and execution of those plans inevitably call for adjustments to the process of care, the quality of care and the investments in capacity – in terms of skills and capabilities of the workforce and financial resources – that are necessary for well-defined and high-quality case practice. Thus, the MTAT's approach to monitoring includes not only the semi-annual outcome reports, but also the publication of a series of briefs that will directly consider the state's execution of the process, quality, and capacity investments necessary for the full implementation of the practices called for in the Infrastructure Standard.

Considering the timing needed for implementation of these standards, MTAT monitored and reported on these standards in several sections at a time.

The First Brief on the Infrastructure Standards, completed in March 2019, focused on the implementation of the new practice model, assessment and investigation of maltreatment in care, and case planning and management.

The Second Brief on the Infrastructure Standards, completed in February 2020, provided an update on the development of the new comprehensive practice model; and the processes related to quality caregiving and placement, child health and education, and the workforce.

The Third Brief on the Infrastructure Standards, completed in October 2020, provided an update on the development and implementation of the new comprehensive practice model, the child welfare information system and quality assurance, monitoring of contract agencies, and maximization of federal funds.

The Fourth Brief on the Infrastructure Standards, completed in June 2021, provided an update on progress being made on the first six Infrastructure Standards, originally reported in the first two briefs, as well as the status of whether DFCS decided to proceed with recommendations made by MTAT.

The Fifth Brief on the Infrastructure Standards provided an update on the last three Infrastructure Standards (VI. Child Welfare Information System and Quality Assurance, VII. Supervision of Contract Agencies, and IX. Maximization of Federal Revenue), originally reported on in the Third Brief, including an update on the recommendations made. The brief was organized in three parts: an introduction; a summary status of the last three Infrastructure Standards; and appendices with updated data performance on all nine of the Infrastructure Standards.

This Sixth Brief explores a new direction, in part influenced by the workforce and placement crises impacting not only Metro Atlanta area, but the rest of the country. In recent months, progress on strategies to improve practice and thereby impact outcomes has slowed in large part to these two crises. This brief, therefore, responds to research questions developed on the two crises, and explores the extent to which the provisions in pertinent Infrastructure Standards aide or hinder factors contributing to the crises.

Appendix A is the methodology for the report.
Appendix B is the Consent Decree.

## II.   WORKFORCE CRISIS

Recent attention on workforce shortages and the "Great Resignation" has focused public attention on the need for a larger and more flexible workforce.  This environment of worker shortages is familiar to child welfare agencies where a technical assistance center was created specifically to help states solve these problems[2].  Child welfare is difficult work, especially when systems are overloaded and appropriate services are lacking.  Some industries in the US are experiencing unprecedented turnover in the last few years, coinciding with the COVID-19 pandemic. An article in the Guardian highlighted recent studies of findings of the motivations of workers to stay or leave their jobs[3]:

- A survey from Gartner consulting found that 70 percent of workers in the Information Technology field were looking to change jobs, and that in adopting a more human-centric work environment, industries should consider a focus on flexible work hours, opportunities for human connection and collaboration;
- Pew research found in a recent study that low pay, a lack of opportunities for advancement and feeling disrespected at work were the top reasons workers in the US quit their jobs in 2021; and
- A study conducted by Zety on the Generation Z workforce found that the most appealing factors of any new job are benefits (67%), matching values (62%), more than just trying to make a profit (61%), advancement opportunities (59%) and strong brand reputation (49%).

### *Context of the Region 14 Workforce Crisis*

Workloads accompanied by high caseloads have been associated with high turnover, due to their combined negative impact on caseworkers' stress, emotional exhaustion, job satisfaction, and time available for key casework functions, including:

- Timeliness, continuity, and quality of service delivery;
- Family engagement and relationship-building; and,
- Safety and permanency outcomes for vulnerable children, youth, and families.[4]

Factors most impacting turnover are stress, exhaustion, a lack of organizational commitment, and low job satisfaction[5]:

---

[2] National Child Welfare Workforce Institute (www.ncwwi.org)
[3] Marks, Gene. Turns out the Great Resignation may be followed by the Great Regret. *The Guardian*. March 20, 2022 (Turns out the Great Resignation may be followed by the Great Regret | Gene Marks | The Guardian).
[4] Child Welfare Information Gateway. (2016). *Caseload and workload management.* State Managers Series [Issue brief]. Retrieved from https://www.childwelfare.gov/pubPDFs/case_work_management.pdf; Children's Research Center (2009). *Agency workforce estimation: Simple steps for improving child safety and permanency.* FOCUS:
Retrievedfrom http://www.nccdglobal.org/sites/default/files/publication_pdf/focus09_agency_workforce_estimation.pdf; Social Work Policy Institute. (2010). *High caseloads: How do they impact delivery of health and human services?* Retrieved from http://www.socialworkpolicy.org/wp-content/uploads/2010/02/r2p-cw-caseload-swpi-1-10.pdf
[5] Kim, H. & Kao, D. (2014). A meta-analysis of turnover intention predictors among US child welfare workers. *Children & Youth Services Review, 47,* 214–223.Retrieved March 22, 2022, from https://www.casey.org/turnover-costs-and-retention-strategies/

States that have succeeded at reducing turnover have also reduced caseloads, which leads to high worker satisfaction and performance.  New Jersey implemented a new case practice model that helped reduce turnover rate by between six and ten percent.[6] New Jersey also has the lowest removal rate in the U.S., making casework less stressful and more rewarding.  Another research study found that while having an education background that included child welfare policy and practice encouraged staff to initially stay at an agency, once those staff had mastered the job, they were less likely to stay than their counterparts with no education background in child welfare.[7] Another study looking at the impact of COVID-19 on child welfare workers and peritraumatic stress found that nearly half of all study participants experienced mild or severe peritraumatic distress stress due to the pandemic.[8] A study in 2014 found that workplace workload, recognition, peer support, supervision, sense of accomplishment and professional development opportunities matter to frontline child welfare workers.[9]

Child welfare work is emotionally taxing.  A young workforce enters the field with a strong desire to help families and make an impact.  Instead, they are asked to place children in office

---

[6] Casey Family Programs. How does New Jersey Maintain a stable child welfare workforce?. February 7, 2022. (Preventing Staff Turnover – Casey Family Programs)

[7] Barbee, A., Antle, B., Sullivan, D., Huebner, R., Fox, S., and Hall, J.C.: Recruiting and Retaining Child Welfare Workers: Is Preparing Social Work Students Enough for Sustained Commitment to the Field. *Child Welfare*. January 2009 (Retrieved from: CWLA_SeptOct2009 (researchgate.net)).

[8] Miller, J., Niu, C., and Moody, S.: Child Welfare workers and peritraumatic distress: The impact of COVID-19. *Child and Youth Services Review*. Vol 119, December 2020. (Retrieved from: Child welfare workers and peritraumatic distress: The impact of COVID-19 - ScienceDirect)

[9] Blome, W. and Steib, S.: The organizational structure of child welfare: Staff are working hard, but it is hardly working. *Children and Youth Services Review*. Vol 44, September 2014. Pages 181-188. (https://www.sciencedirect.com/sdfe/reader/pii/S0190740914002291/pdf)

settings (and potentially stay with them overnight) or hotels and to ignore the underlying needs of troubled families because the appropriate services are not available. This obviously leads to worker burnout and exit, which further fuels the problem.  But there are ways to combat caseworker burnout. For example, New Jersey, with the lowest child removal rate in the county, has been able to focus on quality of work., New Jersey implemented the "Worker2Worker" program in 2013. Worker2Worker supports the workforce through a confidential helpline providing counseling to staff from retired employees who know firsthand the impact of caseworker stressors.[10] Another strategy implemented by the Children's Home Society is Case Aim, which provides case management services to case managers so they can focus on meeting the needs of children and families, while having other staff focus on more time-consuming administrative tasks. An evaluation of the program found[11]:

- Higher chances of reunification by 8.4 percent;
- Reduced placement moves;
- 61 percent of CaseAim children exited foster care within 12 months compared to 45 percent of non CaseAim children;
- Higher satisfaction with case managers; and
- Case Manager turnover rates reduced by more than 50 percent.

There are several negative consequences to workforce turnover. Most importantly, children and youth in care have been found to be adversely affected by case worker turnover particularly as it relates to achieving permanency.[12] A study at a Milwaukie Private agency found that children with one case manager achieved permanency in 75 percent of cases, whereas children with two case managers achieved permanency in 18 percent of cases and dropped further to five percent for those children with three case managers.[13] Financially, the agency spends significant resources to replace a worker. One study found that the average cost to a child welfare agency to replace a worker who leaves is $54,000[14]. With the current entry level salary in Region 14 at $35,387, soon to be enhanced to $40,387, and costs associated with training and onboarding staff, there remain significant fiscal ramifications to worker turnover in Georgia.

## *Workforce Research Question 1: How do workforce indicators in Region 14 compare to other jurisdictions?*

Child welfare makes high demands of its workforce.  Young workers leave at very high rates in Georgia because the work is incredibly challenging.  Too many children are entering care for

[10] Casey Family Programs. How does New Jersey Maintain a stable child welfare workforce?. February 7, 2022. (Preventing Staff Turnover – Casey Family Programs)

[11] Children's Home Society: CaseAIM Evaluation. July 16, 2018.
(https://ficw.fsu.edu/sites/g/files/upcbnu1106/files/Final%20Reports/FR%20CaseAim%20Final%20072518.pdf)

[12] Social Work Policy Institute. (2010). *High caseloads: How do they impact delivery of health and human services?* Retrieved from http://www.socialworkpolicy.org/wp-content/uploads/2010/02/r2p-cw-caseload-swpi-1-10.pdf (https://www.casey.org/turnover-costs-and-retention-strategies/)

[13] Flower, C., McDonald, J., & Sumski, M. (2005). Review of Turnover in Milwaukee County Private Agency Child. Welfare Ongoing Case Management Staff. Retrieved from http://louisville.edu/kent/projects/iv-e/turnoverstudy.pdf

[14] Annie E. Casey Foundation: Top Causes of Staff Turnover at Child Welfare Agencies-and What to Do About it. Posted March 4, 2019. (Top Causes of Staff Turnover at Child Welfare Agencies — and What to Do About it - The Annie E. Casey Foundation (aecf.org))

*Kenny A. v. Kemp*

reasons of behavior and abandonment, not protection.   Foster care problems result from unpredictable rates of child removal, failure to use kin resources, and an over-reliance on group care.   The removal rate into foster care in Georgia has fluctuated widely over time, resulting in dramatic swings in the number of children needing placements at any given time.

That said, worker turnover in Region 14 is comparable to other jurisdictions across the country (ranging from 20-40%[15]), and job compensation is on the lower range of the industry standard. In general, social worker salaries vary significantly depending on level of education, position, industry and location.  Compensation for those positions in urban areas are typically higher than in rural sections of the nation and geographically, starting salaries are typically higher in regions like the Northeast as opposed to the Midwest or South.  Higher entry-level salaries and increased earning potential are also associated with those individuals having earned a Master of Social Work (MSW) degree, regardless of location.

The annual national median salary for social workers was $51,760 in May 2020, according to data from the Bureau of Labor Statistics (BLS).   The lowest-earning 10 percent of social workers made less than $33,020 per year in 2020, according to the BLS.  The highest 10 percent of earners made more than $85,820 annually that year.  Social worker salaries vary based on factors such as disparate social work careers, education, and experience.

Regarding turnover and tenure, while similar data is not available for Georgia, in Florida, the Florida Institute of Child Welfare found that 57 percent of new case managers left within first eighteen (18) months of employment and only 15 percent have tenure of three (3) years or more.[16]  Compensation and lack of progressive salaries represented the top reasons for job dissatisfaction.

Region 14 employment patterns are no different. The chart below shows the number of new hires over the past five years in Region 14 and whether they remained in active employment status in the first quarter of 2022.

---

[15] National Child Welfare Workforce Institute. (2011). *Child welfare workforce demographics (2000–2010): Snapshot of the frontline child welfare caseworker*. Retrieved from http://ncwwi.org/files/Workforce_Demographic_Trends_May2011.pdf

[16] Florida TaxWatch. A System in Crisis: Stabilizing Florida's Child Welfare Workforce. A Florida TaxWatch Briefing. February 2022 (A System in Crisis: Stabilizing Florida's Child Welfare Workforce (floridataxwatch.org))

*Kenny A. v. Kemp*

**Chart 1: New DFCS Hires Each Year and Employment Status by Early 2022**

New Hires each Year and Employment Status by early 2022

| | | |
|---|---|---|
| 2017 | 32 | Employed |
| 2018 | 16 | Departed |
| 2019 | 58 | |
| 2020 | 33 | |
| 2021 | 63 | |

Data Supplied by the Georgia Office of Human Resources

Data suggests those hired in recent years are not making a career out of their employment with DFCS. Approximately 70 percent of those hired in 2017 had departed by early 2022. That percentage dropped in 2019 to just over 50 percent. It is concerning that 40 percent of those hired in 2020 and 20 percent of those hired in 2021 had departed by early 2022. It is possible that the pandemic may have played a role in some of those departures. In previous reports, MTAT has observed and reported that the region and the state have different ways of understanding workforce dynamics and turnover, which vary based on the source of the data. Due to the variety of ways this information is reported, it is challenging for leaders to know how many positions they have to fill, including open positions created when someone leaves the agency.

**Chart 2: Total Employees and Departures in Year**



Total Employees and Departures in Year

Data Supplied by the Office of Human Resources

According to the Office of Human Resources, the number of employees in a given year in Region 14 compared to departures for the last 4 years, the percentage of total employees who depart in a given year has fluctuated from 24 to 49 percent. Recent numbers are alarming: as of

late February/early March 2022 when the report was run, already 13 percent of the employees in Region 14 had departed.

Turnover and vacancies have been significant in Region 14. When county directors were asked for their current vacancy numbers in April 2022, the following was reported:

**Table 2: County Director Reported Vacancies, as of April 2022**

| DeKalb County Vacant Positions | | Fulton County Vacant Positions | |
|---|---|---|---|
| **Child Protective Services (CPS)** | | | |
| Case Manager | Approx. 40 | Case Manager | 83 |
| Supervisor | 4 | Supervisor | 4 |
| **Foster Care** | | | |
| Case Manager | Approx. 40 | Case Manager | 58 |
| Supervisor | 8 | Supervisor | 7 |

When reporting the numbers of vacancies, the Budget Office does so by comparing monthly positions filled compared to the number of positions budgeted.

**Chart 3: Funded Position Variance by Office of Budget and Finance**



Data Supplied by the Georgia DHS Office of Budget and Finance

According to the Office of Budget and Finance, the variance between positions filled and those budgeted was greatest closer to the end of the state fiscal year in the months of May and June. Those numbers then decrease to reflect more funded positions than hires at the beginning of the next fiscal year. While helpful for budgeting purposes, reporting vacancies in this manner likely does not reflect the number of positions needed based on the workload and positions filled. The Office of Human Resources (OHR), when asked to provide vacancy data, reported worker and supervisor vacancies by available positions or pin numbers, which may not reflect funded or actionable positions which could be filled by a potential employee. Moreover, because in some instances the counties use the same position titles for roles that do not carry caseloads (e.g.,

family team meeting facilitators), the number of vacancies reported by OHR, does not directly correlate to the number of staff needed to manage caseloads.

Having a mutual understanding of vacancies across an agency is critical to assist in trying to advertise positions and stay ahead of vacancies where possible, and with three separate ways of reporting the information provided, it is difficult to ascertain the number of vacancies in region 14 at any given time. With no consistent data regarding vacancies, it is an even greater challenge to reach a solution.

Several years ago, the division director attempted to remedy this confusion by using a formula (based on number of children in care over time) to allot Full Time Employees (FTEs) to each county at the beginning of the fiscal year.  However, this program was never fully implemented and the state quickly reverted back to determining on a case by case basis whether the budget will support filling a vacated position.  MTAT encourages DFCS to revisit this process or a new methodology so there is mutual understanding among county, region, district and state leaders of filled and vacant positions.

## *Workforce Research Question 2: What is driving staff to leave or think about leaving? Who are the people?*

There are several common themes throughout the various and complex reasons staff cited for leaving their current employment with the Division.  Below are the issues that were most often shared by staff and leaders and the rationale behind the responses.

### *Competitive Wages*
In the current job market, there are a myriad of career options that are much less stressful with comparable or even better compensation.  The current compensation packages for entry-level staff are not seen as competitive within the industry.  Focus group participants listed school systems, the private child welfare sector, and even employers within the retail and hospitality industries as being more attractive options for them with regard to pay and the scope of work involved with employment by the Division. The most common reason cited by both Fulton and DeKalb survey respondents for dissatisfaction with their job was compensation. Similarly, when survey respondents were asked whether they felt they were being financially compensated at a fair market rate for the work being done, answers mirrored those of focus group participants and those interviewed:

*Kenny A. v. Kemp*

**Chart 4: To what extent do you feel you are being financially compensated at a reasonable market rate for the work you do?**



MTAT survey to Region 14 Workers and Supervisors

Salaries do not seem to be in line with the current cost of living, especially within more urban settings.  Workers at least perceive they cannot live in certain areas under the current compensation and pay structure and feel cost of living is simply too high to make working for the Division feasible.  As mentioned previously, many of these individuals are exploring other agencies providing similar services within the child welfare industry as a more attractive option, with one federal agency offering double the current salary for entry level workers.

The number of hours required to do the job led some focus group participants to express  a perceived disparity between the compensation package initially offered and the actual compensation when employment began, This engenders distrust of the Division with regard to the hiring and onboarding process as a whole.  Some existing staff also seemed dissatisfied that new hires would receive enhanced compensation that was unavailable to them upon their hire. In some instances, due to pay increases and overtime compensation, new staff  and those in entry-level positions were making more than those in supervisory positions.  The entire pay structure has led to the perception that it is not a level playing field.  Overall, there was a sense of confusion over the pay structure and compensation packages as a whole, which understandably contributes to employee dissatisfaction.

***Demands of Work***
Several of those interviewed cited the Human Resources onboarding process as overly complicated and sometimes confusing as to the requirements for pre-service as well as in-service training. Many interviewees suggested overhauling the existing process. Some shared that the training as it currently is framed does not adequately prepare an individual for what they will be asked to do once they are caseload carrying staff members.

Younger and less experienced workers felt unprepared for the rigors of the work required once they began the job.  Daily demands of the work are described as "very taxing", and the perception is that no one talks in training about the emotional toll the job can take on an individual, and workers' mental health appears to be of secondary concern.  That, compounded

with COVID and the accompanying restrictions placed on workers as well as the children and youth they serve cause caseworkers to reconsider their commitment to working for the Division.

Younger employees also cited the need for daily childcare for their own children as an issue when deciding whether to accept an offer from the Division for employment or to continue their current employment status. Current compensation is seen as inadequate relative to the high cost of quality, competent childcare to allow their own children the safety they seek to provide for other children and families.

### *Work Environment*

The number of hours worked was a contributing factor for many former employees. In many instances, the demands of the work were cited in tandem with feeing unsafe in some of the environments in which they were asked to work.

It was noted by some that many of these newer staff were hired in the COVID pandemic era and, as such, have no context for the actual day-to-day work in a non-remote environment. When faced with performing their work responsibilities in the "real world": home visits, court appearances, transporting youth to placements, etc., many newer staff are unsatisfied with the actual responsibilities of the day-to-day demands of the work.

The particularly troubling work context is causing additional stress in Fulton County. Children forced to be placed in alternative, temporary placements like the office on a day-to-day basis also places stress on individuals not equipped to handle the situations. Many of those in current Case Management positions say that the youth they are currently asked to serve exhibit high-risk behaviors, show extreme disrespect to staff, and are unafraid of experiencing any consequences for their actions. The uncomfortable nature of this work and the accompanying daily anxiety over "having to deal with" these children and youth in the office on a daily basis are more reasons for uncertainty and anxiety within the workforce, leading to abnormally high turnover.

More "Behavior Aides" have been introduced in some areas in order to monitor children without placements that are staying in the office or hotels and to support some children in traditional placements. However, many case management staff report that they have trouble identifying who these aides actually *are* and are uncertain as to the role and qualifications of the Behavior Aides. This only adds to the confusion and uncertainty surrounding their own responsibilities and leads to further disenchantment with the entire child welfare management process.

There is a further perception that some administration or "upper management" are sufficiently removed from the problems faced by front-line staff, and they have little context under which to assess workers at the field level. There are stringent policy-driven requirements and timelines for visits, case documentation, time entry, Human Resource demands for ongoing training, etc. that are seen as superfluous, and some caseworkers believe the administration is concerned with the data associated with meeting these requirements to the detriment of the actual worker performing these tasks.

Staff themselves cited high turnover rates as a daily issue affecting their own job performance and satisfaction. Many caseworkers felt the demands of the job would cause many of their peers

to resign, thereby exacerbating their own already difficult job condition by adding to their already unmanageable workload.

Exit interviews in Region 14 conducted by both Education and Guidance Learning Enrichment Services (EAGLES) staff in the region, as well as Human Resources suggest work environment may play a larger role than compensation as a reasons for resignations.

**Chart 5: Most Common Reasons Given to OHR for Exit in Region 14 Over Time**



Data supplied by Office of Human Resources

The chart above shows that Personal Reasons decreased over time as a reason for leaving, while Supervision/Management/ Leadership increased between FY 2018 and FY 2022. Work conditions, on the whole, remained fairly constant over time.

Exit interviews conducted by EAGLES staff in Region 14 between March 2021 and March 2022 were also provided for comparison purposes. For the 52 exit interviews conducted for DeKalb County and 71 exit interviews conducted for Fulton County, the most common exit reason mentioned was 'Other' (DeKalb: 39, 75.0%; Fulton: 37, 52.1%). This category includes reasons such as education, lack of promotional opportunities, health concerns, and a lack of work/life balance. The second most common theme noted was 'Lack of Support'(DeKalb: 23, 44.2%; Fulton: 22, 31.0%), followed by 'Issues with Leadership' (DeKalb: 18, 34.6%; Fulton: 14, 19.7%).

All of the above work environment conditions have created a "trickle-down effect", where newer staff leave, and the work is often distributed to those already overburdened. This breeds frustration and leads to perceived over-utilization of Family Medical Leave Act (FMLA) time

spent away from work[17].  Staff members feel there is no attention paid to this issue, nothing changes, and the cycle simply continues in perpetuity.  The situation is causing many to reconsider their employment with the division.

While 88.9 percent of DeKalb survey respondents and 79.7 percent of Fulton survey respondents had considered leaving DFCS in the past for another job, 50 percent of DeKalb survey respondents and 52.5 percent of Fulton survey respondents indicated they are currently actively seeking employment elsewhere.

### Additional Insights into Factors Impacting Exits of New Staff
Interviews and polling of those in a day-to-day supervisory role uncovered some consistent thoughts on the current system of hiring and retention of the current workforce.  Many indicated that some individuals within the current and prospective workforce appear to have certain job-related expectations not seen with previous staff.

Opinions articulated about new staff include their need for more individual freedom to do the job the way <u>they</u> feel it needs to be done, having their own theory about how the work can best be done, and are subsequently less concerned with following an established protocol.  The perception is that they do not possess the same work styles as their predecessors and many times are perceived by those managing them as disloyal or insubordinate.

Those in the supervisory role agreed with their subordinates that communication between administration and field-level staff is fragmented and somewhat disconnected.  It is felt that, by and large, the "administration" does not share the same values toward the work or exhibit a full understanding of the challenges those actually performing the work face on a daily basis. Supervisors generally reported that they feel limited support from leadership in dealing with these issues.  Some also felt that issues encountered at the county level had to be addressed at the county level and the state office was reluctant to provide support in problem-solving in the counties.

Overall, these supervisors largely envision no end to the current problems they encounter on a daily basis and anticipate no relief from the hiring of new staff in the near future.  They shared that many new hires leave shortly after getting certified or after they get their first few cases assigned.  Those resigning often do not give a two-week or other type of notice; they just leave immediately.  Turnover among this supervisory group is high as well.  They further shared that many of those responsible for the actual hiring (Hiring Managers) of staff have left as well due to many of the same issues. Management is also not immune to the struggles of the current work environment. Some expressed a willingness to take a demotion instead of supervising staff given the present state of affairs. There seemed to be a prevalent feeling of being in a constantly reactive frame of mind instead of proactively identifying and addressing problem areas.

### Recommendations from the Regional Staff at all levels on What would Help
System stability would benefit the workforce and placements.  Stress and exhaustion result from working in unsafe and overwhelming conditions. In addition to addressing the current lack of appropriate resources, several individuals shared some thoughts on what might help to offer

---

[17] On August 18, 2022, the OHR Director indicated that there were 14 individuals on FMLA in Fulton County, and 9 in DeKalb County.

some type of relief from the current state of affairs.  Some of those spoken to cite the following as potential strategies for system improvement:

- Increased compensation (a general overall feeling that there is not adequate compensation for the work required to be performed);
- Hybrid work, meaning a remote location-office blend of work responsibilities (not having to actually go to an office will offer a better work experience);
- Flexible day-to-day expectations;
- Implementation of work-life balance practices that the agency leadership claims to be committed to; Reimbursement for day care costs and/or on-site daycare provided through the agency; Promotion of self-care ("like tech companies do") with relaxation, meditation, quiet time, etc.; and
- Increased opportunity for Team Building exercises across regional units in order to improve morale and employee ownership of their work.

## Related Infrastructure Standards

As discussed in the sections above, many factors were identified as contributing to what is driving staff to leave the Division, though many of them are related to the stress of the work and accompanying workload, which of course only gets exacerbated when more staff continually leave, causing others remaining to make up the difference. *Infrastructure Standard VII Robust Workforce, Part D-Caseload Management* articulates:

- DFCS has committed to maintaining caseload caps for specific types of cases and that caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.
- DFCS will develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis, including workforce dynamics, climate and culture assessments, and metrics to strategize caseload management.
- DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan.

The workforce crisis has had a significant impact on DFCS' ability to maintain caseload caps. According to the Period 32 Monitoring Report, 89 percent of Fulton case managers and 61 percent of DeKalb case managers met the caseload caps articulated in the settlement agreement.[18] However, this has been in line with recent performance. Data reports detailing

---

[18] Caseload Caps articulated in the Modified Consent Decree and Exit Plan: No CPS case manager shall have more than 12 cases; No ongoing case manager shall have more than 17 cases; No placement case manager shall have more than 15 cases; No adoption case manager shall have more than 16 cases; No specialized case manager shall have more than 12 cases

caseload numbers have been developed and are distributed on a regular basis. Data reports on workforce dynamics (i.e. hiring, turnover, etc.) are also distributed, however it is unclear the extent to which these data reports are being used to drive change, and instead are being used to monitor the situation. Analytic monthly reports on culture and climate, as has been reported in previous Infrastructure Briefs, have not been developed.  Such reports could inform strategies to develop and maintain the current workforce, as reported in this Brief.

## Workforce Research Question 3: For people who have stayed more than 2 years, why are they staying?

County and Regional staff and leaders were asked what they thought were the reasons some workers were choosing to stay more than two years in order to better understand where the Division could focus their efforts to grow this group of staff. The following themes emerged in their insights:

- *Understanding of the pendulum nature of the work* – Several noted that workers who stay understand that depending on inside or outside influences on the work of child welfare, there will be highs and lows in the field, and therefore they know to 'ride it out'.
- *Strong supervision is key* – Having a strong supervisor, one who knows the work, can provide guidance and support and is willing to advocate for their workers was another common theme expressed by county and regional leaders.
- *Understanding of teamwork* – Another theme lending itself to staff remaining with the Division was a sense of community, camaraderie and being able to rely on peers when times are tough.

Workers with two (2) or more years of experience in the Division were also asked in a focus group, "What do you love most about your job?".  Three common responses appear below, in no particular order:

- *Commitment to Community* – Several shared that the chance to serve and make a difference in their own communities as an overriding reason for their continued work for the Division.  The personal satisfaction of seeing families reunited or helping provide the services that kept children from coming into care at all was a strong persuasion for continuing in their current positions.  One related, "When you see a child receive permanency, it keeps you going every day."
- *Commitment to the Agency* – Feeling comfortable with the manner in which the Division is being run was also mentioned as a reason for longevity within this group.  The ability to structure their work life in such a manner that will allow them the time needed to function effectively in their own family life was also seen as a reason continued work with the Division was attractive.
- *Commitment to Peers* – There was a common feeling among these individuals that team cohesion and working toward a common goal were critical in keeping up team morale and, subsequently, keeping teams together over extended periods of time.  When these individuals rally around one another and support each other, even in these trying times, it creates a bond that serves to keep people together despite conditions being challenging.

In general, most felt accustomed to the highs and lows of the job and were committed to continued employment, secure in their experience that things are largely cyclical and feeling the environment would shift for the better over time, similar as observed by county and regional staff interviewed.  They shared that having their level of experience and the accompanying professional and emotional skills to navigate the workplace environment gave them the ability to handle the rigors of their work.

To further understand the motivation behind workers' desire to stay in their role at the Division, workers with less than six (6) months of experience in the Division were also asked, "What do you like best about your job?"

- *Remote Work* – Being able to sometimes work from home, either on occasion or basically full-time, proved to be an attractive reason for accepting work within the Department and continuing that work experience.
- *Affection Toward Others* – Feeling a closeness to the children and families with whom they work was reason in that several felt a commitment to the ongoing well-being of the children and families in their caseloads and they experienced a vested interest in their sustained success.
- *Opportunity to Work with Supervisor* – Several related that they were drawn to the supervisor they had and would likely stay for an extended period of time, given the opportunity to be mentored by that particular individual.  It should also be mentioned that it was generally felt that has changed to some degree with some of those supervisory staff leaving in the recent past.
- "*Break Down Barriers*" – This was interpreted as a commitment to the direction in which the Division is moving and being part of an organization that is working to change the stereotypical notion of Child Welfare workers in general from those in an adversarial position to those committed to helping better the lives and circumstances of families.

The responses by new workers somewhat mirror the results from the worker and supervisor survey, when respondents were asked what they loved most about their job.

**Chart 6: Survey Results for Question-What do you love most about your job (pick top 3)**



MTAT Survey of Region 14 Workers and Supervisors

The two most common responses, for both DeKalb and Fulton County, were 'flexibility in work' and 'making a difference', followed by 'clients' for DeKalb staff, and 'coworkers' for Fulton staff. The reverse also seems parallel the responses of seasoned workers and supervisors. New workers were asked, "What do you like least (about your job)?"

- *Supervisor Inexperience* – Some shared that their supervisors seemed as unacquainted with the most effective way to conduct the work as they were, citing that almost every day there seemed to be an unfamiliar experience for which their supervisors were incapable of offering guidance. Paraphrasing one, "My supervisor is new and when I reach out, she doesn't know what to do [and] it makes my job harder."
- *Lack of Communication with Supervisor* – Some shared this as a prevalent issue and stated that communication was sparse and sometimes non-existent, making their job more difficult.
- *Dissatisfaction with Perceived Role* – Some related that they saw working remotely and making their own schedule as reasons for initially accepting an offer for employment with the Division and now feel that those opportunities are not as they were portrayed during recruitment.

In this same vein, some felt a lot of their time was wasted performing tasks others could do such as completing Service Authorizations, locating resources, transporting children to and from school, etc.  When citing these reasons for occasionally missing  required deadlines , some stated that supervisors did not understand the time limitations or chose not to accept that reasoning In their minds this has led to decreased morale.

A private provider, who indicated they had stability and strong retention pointed to several factors in their program which  contributed to their success, and lessons learned that may be applied to Region 14 and Georgia:

- The private provider is fortunate to have intact strong leadership (i.e., the same staff in administrative roles for extended periods of time) and feels they experience lower turnover and higher retention rates due to this fact.
- Stability of the organization was cited as a positive factor along with their agency valuing a healthy work-life balance and the ability to be flexible in scheduling.
- Financial incentives and the time given to seek further education to work toward their Master's Degree, and flexibility to offer other more attractive financial compensation than similar positions within the Division.
- A robust internship program often leading to Full Time Employment (FTE) positions, where the former interns are already familiar with agency culture and expectations and are more likely to remain with that agency for extended periods of time, as a result.

The effect of COVID was also given as a major reason for the current recruitment and retention situation.  Several caseworkers cited the  pandemic led many long-term staff to simply leave the Department or express dissatisfaction with the work environment.  They were hesitant to return to on-site work within the community.  Some caseworkers were uncomfortable going into the homes of families on their caseloads due to COVID concerns.  Many t selected to discontinue their own employment rather than face the prospect of being in close physical proximity to those individuals.

## Related Infrastructure Standards

Capitalizing on the thoughts and opinions of staff who are choosing to stay despite the crises and challenges they are currently facing is a solid strategy to stabilize the workforce. Infrastructure Standard VIII. Robust Workforce, A. Employee Selection Protocol, 2. calls for DFCS to implement an employee satisfaction survey for all staff to guide strategies to continuously strengthen the workforce.

As reported in the second and fifth Infrastructure Briefs, in lieu of an employee satisfaction survey, DFCS participated in a Comprehensive Organizational Health Assessment in June 2019 as part of a Workforce Excellence site from the National Child Welfare Workforce Institute (NCWWI). Several demonstration projects were implemented around the state as a result of this assessment. However, due to the current need for workforce stabilization and an overall dissatisfaction with the existing culture, a new assessment is warranted.

## *Workforce Research Question 4: What is the impact of the workforce supports that have been put in place to date?*

As the workforce crisis has grown in the last year, DFCS state office has embarked on or explored a wide variety of workforce supports to try to stabilize the workforce in Region 14 and the rest of the state:

- There is a mobility project in its pilot phase in which parts of SHINES are on an app so updates, like case narratives, can be made from the field. As part of this, they are a community-based portal for delivered services (i.e. behavior aide and parent aides) is in Phase I, and they are exploring a portal for placement providers.
- Updating LENSES reports to be more helpful in managing the work.
- Streamlining the process for how to pay bills for youth who are without a placement.
- Awaiting approval on being able to provide incentives to recruit friends to DFCS.
- Considering creating more hourly positions to assist case workers with various day-to-day responsibilities: more behavior aides, more hourly positions that help support the work, "techs" to help case managers with overload work, etc.
- Considering reexamining on-call schedules and exploring the possibility of increased compensation for the time spent conducting after-hours, on-call responsibilities.
- Giving the counties more latitude in the screening out of CPS calls.

Not enough time has passed to determine whether these supports being put in place or under consideration will have the desired impact of assisting the workforce and easing some of the significant burdens they face on a day-to-day basis.

When asked "What more can DFCS do to help you succeed and thrive in your work?", workers employed six (6) months or less responded in the following manner, in no particular order.

- *Increase Transparency* – There was a perceived lack of communication on various levels. The perception is that teamwork is not valued at the field level and middle management does little to rectify the situation.
- *Increase Time for Self-Care* – Some shared it would be helpful to have more time off in order to decompress and take care of their own personal needs. However, it was also felt there is not currently adequate staffing for this additional time away from work.
- *Expand the role of mentors* – Some mentioned that the additional supports provided by EAGLES to new hires was beneficial and expanding the role of these mentors would be a possible benefit to offer additional support to overwhelmed staff.

The EAGLES program in Region 14 was designed to serve as a look into what the work will be once training has been completed as well as to provide ongoing training support in the region. EAGLES has been an especially well-received aspect of the Department's onboarding process. Some of the more positive and popular aspects of the EAGLES training process mentioned include regular one-to-one check-in conferences, the ten (10) day orientation process, and mentors to explore different aspects and roles available within the Department were further examples of satisfaction with the way the EAGLES process is conducted.

Workers with less than six (6) months experience were asked to consider their training, mentoring, and coaching receive, and whether or not they felt adequately prepared for the work they faced. Responses, in no particular order, appear below:

- *Inadequate Training Time* – Some felt their pre-service training was rushed and critical pieces of the training were covered too quickly.

- *Facilitators' Subject Matter Knowledge Lacking* – Some felt training facilitators were unable to answer their questions and this led to a lack of confidence on the part of participants.
- *More On-the-Job Training Needed* – Some suggested that training should more closely resemble their internship with experienced staff assisting. Some also felt that shadowing was largely ineffective and those acting as mentors should be more invested in the process.
- *Training Theories Do Not Match Reality* – Some shared that the fundamentals taught in pre-service training did not reconcile with the skills needed once they were out on their own. Paraphrasing one, "I don't use [the training fundamentals]. Once we leave training, [we are] thrown to [the] wolves.". Some additionally felt they were initially given a caseload size they were unprepared to manage, and this leads to undue levels of stress.

Regarding ongoing trainings once on the job, nearly half of survey respondents shared that they were 'Absolutely' or 'Mostly' able to attend the trainings they choose, though around a quarter of survey respondents shared they 'all the time' or 'usually' experience training access issues, like the time, location or trainings being offered filled.

**Chart 7: To What Extent Do Ongoing Trainings Help You in Your Work**



MTAT Survey of Region 14 Workers and Supervisors

Fulton respondents appear to be more favorable on the utility of trainings, with 52.5 percent responding 'Absolutely' or 'Mostly', compared to 38.9 percent of DeKalb respondents.

Various groups interviewed by MTAT were also asked if they felt workforce supports that have been implemented (supervision, training, coaching/mentoring, etc.) have been effective in supporting and stabilizing the workforce? Some prevalent responses appear below.

- Regarding training, there is not an adequate number of trainers for the work. Some also thought there are not enough effective mentors.

- Shadowing was felt to be an effective exercise but there were not enough capable role models to staff the shadowing experience.
- Some felt that regional concerns went largely unaddressed and little action is taken when issues are raised by staff or leaders.
- The chain of command is strictly adhered to, sometimes to the detriment of the process.
- Supervisor turnover is an issue.

In general, supervisors and supervision were considered a strength in the region, though significantly impacted by supervisor turnover. Over two thirds of survey respondents indicated they 'Absolutely' or 'Mostly' feel supported by their supervisor. In addition, approximately two thirds of survey respondents also felt their supervisor 'Absolutely' or 'Mostly' provided coaching and mentoring to help them do their job better.

## Related Infrastructure Standards

Several of the Infrastructure Standards articulated in the Modified Consent Decree and Exit Plan directly or indirectly address supports provided to the workforce in the region, though each have varying degrees to date of implementation and therefore impact. To date, *Infrastructure Standard I. Comprehensive Practice Model* has not been implemented. As articulated in the exit plan from 2016:

> DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

As was reported in the previous Infrastructure Brief, while work has been done to develop and define the practice model, the decision was made to wait to roll out initial implementation of the practice model to coincide with the roll out of the Families First Prevention Services Act (FFPSA). Georgia's FFPSA plan is still in the process of being reviewed and approved by the Children's Bureau. Having a well-defined and implemented practice model can provide many benefits to the workforce, including an organizing purpose and broad understanding guiding the agency and the work being done. It helps provide overarching direction and guidance to staff who may feel overwhelmed or unsure of what they should do. While not a panacea to the workforce crisis, an implemented practice model will provide support to the workforce and may help stabilize the turnover and create a more positive culture and climate.

Infrastructure Standard VIII. Robust Workforce, C. focuses on the training requirements of supervisors, and in particular the development and utilization of a mentoring program to support and develop a strong supervisory workforce. Supervisors are also held to a caseload standard of one supervisor to five case managers. The last Infrastructure Brief highlighted that a mentoring

program for supervisors has in fact been developed and is in place as a support for staff. The Period 32 Monitoring Report highlighted that 74.6% of supervisors met the ratio requirement. While there is definite room for improvement in that area, survey respondents and those participating in focus groups generally responded favorably to the support they are provided from their supervisor.

MTAT has previously made the recommendation relating to *Infrastructure Standard IX: Maximization of Federal Revenue* to enhance the focus on claiming IV-E funding for administrative training at the rate allowable. Based on the provided curriculum, documentation of staff time associated with creating and conducting these trainings should be tracked electronically and monitored on a monthly or quarterly basis. The money should then be allocated to the benefitting programs.

The time staff actually spends completing the trainings on the provided curriculum is also not being properly documented and is under-claimed. To date this recommendation has not been pursued by DFCS but would allow additional funds which could be further utilized to support the workforce.

## *Workforce Research Question 5: How effective are the recruitment efforts?*

There was an overall uncertainty regarding the effectiveness of recruitment and retention efforts as a whole by county and regional staff, though everyone throughout the region and state considered it a high priority. The feeling is that the onboarding process is unduly burdensome, despite streamlining efforts that have occurred in recent years, and this may be leading to the slow nature of the hiring process. Workers who were employed six months or less were asked to share their experience onboarding with the department. These experiences included applying online via a job board, participating in a virtual hiring event, and a recently-graduated student. Tenure ranged from two (2) to five (5) months.

Human Resources shared that they report out monthly on hires, terminations, exit interview information, etc. and information is shared with regional and state leaders to improve and streamline the hiring process. They are continuously striving to be more flexible within the current process while also keeping the commitment to a fully vetted and fully trained workforce.

Interview events have been conducted and new Hiring Managers have been brought onboard to address these issues. While it takes time for these efforts to bear fruit, as one program administrator shared , while they brought in a hiring manager, that person has already left.

Human Resources shared that they have been back filling positions since the beginning of 2022 and they believe it is getting better. They are strategizing on how to relieve the administrative burdens to get new hires into positions quicker. Human Resources has also worked with the Department of Administrative Services to develop initiatives with 'pipelines for entry level positions' and has developed partnerships with the University of Southern Georgia and the Technical College System of Georgia. Other efforts have focused on financial or job advancement strategies, including:

- Enhanced pay for multi-lingual capabilities;
- A 10 percent increase in pay for master's degree level applicant chosen;
- Discussions regarding the possibility of tuition reimbursement; and
- Refining the career path to automatically promote staff based on tenure (with no performance issues)

One source that should not be overlooked when considering the effectiveness of recruitment strategies are newly hired staff. Workers with less than six (6) months of experience in the Division were asked, "What led you to wanting to work for DFCS?".  Some of the more prevalent responses and their accompanying reasoning appear below, in no particular order:

- *Working with Children* – A commitment to working with and caring for children and their families was given as a major reason for choosing to accept employment within the Department.
- *Getting Valuable Hands-On Experience* – Several cited this as a reason for initially accepting a position with the Department and saw it as an opportunity to get their foot in the door of Child Welfare work, either to advance within the Division or to seek a more attractive position within the private provider community.

However, hiring staff and county leaders discussed that this last point of is that entry-level staff using their employment with the Department merely as a steppingstone as a major challenge. Individuals get the training and experience that comes with employment through the Department and then leave for a similar, more lucrative position within the private provider network.

## Related Infrastructure Standards

As articulated above, staff in the region shared being unclear of what recruitment efforts were being made by Human Resources. *Infrastructure Standard VIII. Robust Workforce, A. Employee Selection Protocol, and B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)* both articulate specific requirements and timeframes aimed at streamlining and expediting the hiring process for new staff in the state.

New workers in the focus group conducted described a several month process from interview/application to actual hire date, and a few highlighted a lack of clarity or communication about the process and next steps. OHR has continued to meet the timeframes articulated in the Infrastructure Standards, suggesting successful recruitment may be more contingent on having a desirable package to entice the right candidates who will be successful in working with children and families in Metro Atlanta.


## III.   PLACEMENT CRISIS

In addition to the workforce crisis, the COVID-19 pandemic has shed light on a growing placement crisis in child welfare across the nation.   An article in a Chicago news outlet noted that the uncertain landscape of a pandemic makes it harder to find willing foster parents and

appropriate family members who would have, under normal circumstances, been inclined to help since they are having difficulties in their own lives.[19]

Recent data from Texas found the number of children sleeping two consecutive nights in offices, hotels or other makeshift placements went from 13 youth in January 2020, to 148 in January 2021 and 221 in January 2022.[20]  Oregon was sued in 2016-2017 for their overuse of unsuitable settings including hotel and office-stay use.[21] In another example, the Illinois DFCS director was held in contempt of court for the 12th time due a youth staying in psychiatric hospitals beyond medical necessity because of lack of other placement options.[22]

Several states have tried various strategies to address different aspects of the placement crisis. St. Louis, Missouri piloted a program called Extreme Recruitment, focused on trying to find permanent placement for youth deemed hard to place.  Results found that the relative contact rate increased from 23 percent to 80 percent once an investigator was hired, and the rate of finding a permanent family increased from 40 percent to 70 percent.[23]

## *Context of the Region 14 Placement Crisis*

To understand the context of the placement crisis, as previously state in the Introduction, it is important to examine the long-term trends in the use of foster care over the last 25 years in Region 14.  The lowest rates were from 2011-2015.  Region 14 tends to be higher than the state, notably in the early 2000s, then lower for the past ten years.  There is not a huge fluctuation in the number of children needing placement in recent years.

---

[19] CBS Chicago News. Foster Parents Needed As COVID-19 Pandemic Strains Families. December 25, 2020. (Foster Parents Needed As COVID-19 Pandemic Strains Families - CBS Chicago (cbsnews.com))

[20] Garrett, Robert: Children sleeping in CPS offices won't end unless Texas officials take bolder action, lawyers say. *The Dallas Morning News*. February 14, 2022. (Children sleeping in CPS offices won't end unless Texas officials take bolder action, lawyers say (dallasnews.com))

[21] Oregon Accountability Project. Oregon Officials agree to reduce the use of hotels as temporary homes for foster children. (https://oregonaccountabilityproject.com/gov-brown-ignored-foster-children-housing-crisis/)

[22] Youngerman, Michele: Illinois DFCS Director Marc Smith Found in Contempt of Court for 12th time over Improper Placement. CBS News Chicago. July 8, 2022. (Illinois DFCS Director Marc Smith found in contempt of court for 12th time over improper placement of child - CBS Chicago (cbsnews.com)

[23] Foster and Adoptive Care Coalition. 30 Days to Family Study: Achieving Results for Children, Families and Child Welfare. (2019_30DaystoFamily_Study_Brochure_Email.pdf (netdna-ssl.com))

*Kenny A. v. Kemp*



These and other circumstances taken together have led to the scarcity of options for children and youth, making placement an arduous prospect.  This lack of placement options is fundamentally responsible for the increase in instances of children and youth having to stay in offices or hotels.

In spite of the lack of available placements, placement instability, even within the first 90 days of custody, has decreased in the last few years in Region 14.

**Chart 8: Percent of Removals with 1, 2 or 3 Placements within 90 Days**



Data provided by Georgia State Office Data Unit

The percentage of children entering custody with only one placement in the first 90 days has decreased in the last two years, while the percentage of children entering custody with three placements in the first 90 days has increased.

**Chart 9: Placements in the First 90 Days of Custody by Placement Type**



Data provided by Georgia State Office Data Unit

Foster homes remain the predominant setting when looking at placements in the first 90 days of custody in Region 14.  While relative placements are the second most common initial placement, children are less likely to be placed with relatives as a second or third placement.  Placement in childcare institutions, the third most common initial placement, becomes more common as a second or third placement type.  It is likely that first placements vary by age, with older youth more likely to have a first placement in a congregate setting while younger children are initially placed with kin.

## *Placement Research Question 1: How do placement indicators in Region 14 compare to other jurisdictions?*

The placement crisis is manifesting in several ways, including an inadequate array of placement options and inappropriate placements being utilized for some children and youth in custody, which leads to more placement moves for children and youth. Understanding how Region 14 *c*ompares to other jurisdictions' standard indicators around placement helps provide some context and perspective.

**Chart 10: Percent of Children in Custody in 2020 with Two or More Placements**



Percent of Children in Custody in 2020 with Two or More Placements

*AECF KidsCount [Children in foster care with more than two placements by race and Hispanic origin | KIDS COUNT Data Center](#)

In Georgia, thirty-six percent of children in custody in 2020 had two or more placements, which is around the middle of the range for the rest of the country, which ranges from 24-49 percent. Comparatively, according to the Fostering Court Improvement project, of the children who exited custody in Region 14 in 2020, 51.6 percent had two or more placements, which is higher than any other state in the country.

**Chart 11: Percent of Children in Custody in 2020 Placed in Relative Foster Homes**

Percent of Children in Custody in 2020 Placed in Relative Foster Homes

*AECF KidsCount [https://datacenter.kidscount.org/data/tables/6247-children-in-foster-care-by-placement-type?loc=1&loct=2#detailed/2/2-53/false/574,1729,37,871,870,573/2622,2621,2623,2620,2625,2624,2626/12994](#)

In 2020, Georgia had 24 percent of children in custody placed in relative resource homes. This places Georgia in the middle of other states, which nationwide ranged from 7-54 percent.

*Kenny A. v. Kemp*

Conversely, according to the Fostering Court Improvement project, on March 31, 2021, 21 percent of the population of children in custody in Region 14 were placed in relative foster care, slightly below the average for Georgia as a whole. Regarding placement in a group home or institution, Region 14 performance is on par with the rest of Georgia.

**Chart 12: Percent of Children in Custody in 2020 Placed in Relative Foster Homes**



*AECF KidsCount https://datacenter.kidscount.org/data/tables/6247-children-in-foster-care-by-placement-type?loc=1&loct=2#detailed/2/2-53/false/574,1729,37,871,870,573/2622,2621,2623,2620,2625,2624,2626/12994

## *Placement Research Question 2:  What are the trends or similarities among the list of hard-to-place/office stay youth?*

Many youth who would fall into the "hard-to-place" or "office stay" category tend to be adolescents (12 – 17 years of age) and some present with unique behavioral and mental health needs.  Staff are not trained to address the unique needs and underlying trauma exacerbating the observed behaviors, and therefore find these youth difficult to manage.  Staff are faced with placing these youth daily, and many are not appropriate (from a behavioral standpoint) for the Foster Home setting. At the same time, Group Homes, or other even more restrictive residential placements, do not wish to accept that type of youth given their facility's current milieu, and have routinely declined placements even when offered a higher daily rate. One youth spoken to indicated that many of the young people sleeping in offices self-identify as LGBTQIA. They explained many providers do not have affirming environments which is especially hard for trans youth, and rules regarding sleeping spaces with like-assigned birth gender youth leave them vulnerable to bullying and assaults.

Interviews with some of those staff affected by this issue were conducted and the following thoughts relative to the current placement situation and its effectiveness as well as any ideas for system enhancement appear below.

Many of those surveyed in both DeKalb and Fulton counties felt that the issue was more often appropriate placement *availability* rather than a lack of the appropriate services and supports.

There were simply not enough available beds (in their minds) to meet the placement need for these youth at the rate at which they appear from court in need of shelter each day. Several of those surveyed had experience monitoring youth who were without placement:

- 80.6 percent of DeKalb survey respondents had some experience staying with youth in the office during the day while waiting on a placement, compared to 66.1 percent of Fulton survey respondents.
- 61.1 percent of DeKalb survey respondents had experience staying overnight with a child in the office compared to 47.5 percent of Fulton survey respondents.

Workers with at least two or more years of experience on the job were asked, "What do you think is needed to help get them (these youth without placements) into a stable supportive placement and out of the office?"

Regarding the actual coordination and supervision of youth in these situations, some shared that it was extremely difficult for all involved (children and staff) to sleep in offices or to be temporarily housed in a hotel room. Additionally, many shared it was problematic to locate and engage Behavior Aides that might be available to assist, especially on the weekend. One long-time worker stated that it was impossible to provide for the safety and well-being of these children and young people when they had basically nothing to offer them.

Workers were also asked, "What do you think is the primary driver of the placement crisis in Region 14?" and, "What do you think it will take to stabilize the youth staying in the office (and hotels)?" Some felt private providers should be incentivized financially to accept these youth without placements. A higher per diem should be paid to providers who will accept these placements and there would have to be a "no reject" item in their contract. These are some strategies that the State Office has since begun to employ.

Nearly all staff spoken to felt that the issue was more about a lack of willing placements to accept this population and less about unavailable supports to stabilize children and address underlying trauma. This suggests a need among staff to look beyond surface level concerns and dig down to the root causes leading to the 'challenging behaviors' observed and disrupted or lack of placement options available. Staff should be trained to understand the impact of trauma on children and resulting behavioral responses; without this understanding, caregivers can inadvertently exacerbate the youth's trauma by blaming, shaming, punishing or disconnecting youth.[24] Even if there are placements willing to accept youth with these behaviors, without the adequate support, the placement is likely to disrupt. A more holistic approach is needed.

Providers complain that taking these youth is a very real business risk for them in that if one of these youth runs away from placement, they get a negative outcome as a result. This negative outcome is then attached to their agency's overall performance and affects them adversely in the Division's periodic evaluations. As such, it is difficult for them to take a chance and accept any youth with a history of running away from placements.

---

[24] The Healing Guidebook: Practical tips and tools for working with children and youth who have experienced trauma (and the adults who love them too). 2018.

There was a general feeling of just keeping your head down and attempting to do the job you were being asked to do at the time, regardless of it not being included in the original responsibilities of the position.  People expressed fear of being reprimanded should they complain, including regarding the responsibility of monitoring youth in the office.  The overall feeling was one of uncertainty, not knowing if one would have a job from one day to the next.  This is similar to concerns expressed by staff in the previous section regarding feeling a lack of support.

Traumatized youth sometimes act out by causing property damage to State offices where they are being temporarily housed and then running away.  This creates community risk and safety issues that staff cannot, and should not, be expected to handle.  Law Enforcement is called to these offices on an almost daily basis to assist staff in the management of these youth and that has resulted in a strained relationship between DFCS staff and Law Enforcement in several counties.

Another prevalent issue some felt was contributing to the increase in the hard-to-place youth was the fact that judges are now often finding youth to be Dependent & Neglected (D&N) who have some intense, high-risk delinquent charges.  This is due to the frequent practice of the parent or caregiver simply refusing to physically take the youth home with them from the court.  This then causes the court to place the youth into foster care. DFCS workers expressed not being equipped to handle what they experience or perceive as violent and otherwise disruptive behaviors of these youth.  Additionally, many providers are aware of this phenomenon as well and are reluctant to accept these emergency placements as a result.

It is clear that a more therapeutic approach is warranted as opposed to a focus on 'just finding a bed.' The Healing Guidebook: Practical Tips and Tools for Working with Children and Youth Who Have Experienced Trauma (and the Adults Who Love Them Too) developed by Alia in 2018 provides guidance on ways to better support this population, help heal their trauma and build trust so they can develop relationships with others, including alternate caregivers:

- **PROTECT: Help parents and caregivers understand trauma and build resilience and protective factors.**
- **GRIEVE: Address grief, loss and trauma.**
- **CONNECT: Build networks of support and connection.**
- **HEAL: Engage in integrative healing interventions.**

### *Placement Research Question 3: What is the impact of the placement supports that have been put in place to date?*

In recent years, Behavior Service Aides or "Behavior Aides" have been introduced in some areas in order to deal with the alternative placement issue.  A Behavior Aide is an enhancement to a package of bundled services authorized for the child.  Individual services can be provided by multiple providers and agencies to meet the needs of the child or youth. The primary responsibility of a Behavior Aide is the supervision and management of youth in the custody of the State.  They have recently been utilized in State offices and other temporary placement settings in order to assist State casework staff in the management of their caseloads.

The utilization of Behavior Aides has grown in recent years. With this growing use came some concerns regarding the level of skill and ability of these Aides to be effective in assisting caseworkers. Some staff reflected that Behavior Aides were never intended to manage complex mental health issues, and their ability to handle issues involving de-escalation and even the most fundamental disruptive behaviors appeared limited.

Two-thirds of DeKalb survey respondents and 81.4 percent of Fulton respondents had experience using a Behavior Aide to support a child on their caseload. Respondents from both counties indicated that it most often took between one and two weeks to get an Aid in place. Despite the lag in time for deployment of an Aid, 49 percent of Fulton respondents and 39.1 percent of DeKalb respondents indicated the Behavior Aide was "very effective" or "usually effective" in providing the needed support.

Most recommended greater screening and training for these individuals and a "certification" of some type in order to help ensure they have the requisite abilities prior to being assigned as Behavior Aides to assist in the supervision of children and youth. Additionally, many case management staff report they have trouble identifying who these Behavior Aides actually *are* and are uncertain as to the role of a Behavior Aide. This only adds to the confusion and disenchantment with the entire child welfare management process.

Many discussions on placement supports circled back around to the subject of bed availability. Paraphrasing one staff member, "Services don't matter until you can find the bed. Everyone understands the importance of the services, but in crisis mode, the bed needs to be first."

To combat the ever-increasing need for the use of these residential beds, there are ongoing efforts and work to decrease the overall use of Primary Residential Treatment Facility (PRTF) placements and increase Managed Care Organization (MCO) approvals of all therapeutic services. It is the hope that decreasing the overall use of these types of beds will make room for the placement of those children and youth who need that level of residential services.

Beyond bed availability, some specific supports requested include the following:

- Increased involvement of a child's assigned therapist (recognizing not all children have, or need, a therapist);
- Access to Psychologists;
- More specific training for Foster Parents (LGBTQ+ youth, internet pornography, vaping and marijuana use, de-escalation of aggression, etc.);
- Providing Trauma-Informed Care support; and,
- Programs specifically designed to enhance empowerment and self-worth.

Workers were asked, "What are you seeing as the most common concerns or complex needs of children that come to your attention?" Some of the more prevalent issues where they feel helpless to manage include:

- Children and youth at various points on the Autism spectrum;
- Children and youth with low IQs;
- Fire starters;
- Those who have exhibited cruelty to animals in the past;
- Victims and perpetrators of sex trafficking;
- Youth who identify as LGBTQ+;
- Youth with gang affiliation;
- Those youth who have been adjudicated as juvenile sex offenders and those (more common) who have exhibited sexualized behavior but have not been diagnosed or otherwise formally recognized as a potential sex offending threat; and
- Youth who have been the cause of multiple disruptions and have "burned through" every placement option (both residential and in the Foster Home setting) in the past.

## Related Infrastructure Standards

There are several Infrastructure Standards that are related to this research question regarding the impact of placement supports. *Infrastructure Standard IV. Quality Placement and Caregiving, B. Placement with Relatives and Fictive Kin* covers diligent search throughout the life of the case, expedited placement for relatives and fictive kin, and assisting potential caregivers with paperwork and obtaining necessary items as needed. Despite efforts made to identify, support and place children and youth with relatives, the number of children and youth in custody placed with relatives remains low.

According to the *Kenny A* Diligent Search Case Review for Monitoring Period 30 (July-December 2020) 57.1 percent of children were placed with relatives or already placed with relatives in the first 60 days of placement. In the Period 32 Monitoring Report (July-December 2021), that decreased to 40 percent. Greater efforts should be made to engage and support relatives in the placement of their kin in their homes, not only as a strategy to assist with the placement crisis, but more importantly because it is better for children and youth to be placed with family they know.

Other Infrastructure Standards address ways in which more support can be given to relatives and fictive kin to encourage them to become placement resources. *Infrastructure Standard IX. Maximization of Federal Funding* discusses exploring effective ways to maximize federal revenue to pay for services and supports for children and families. MTAT has previously recommended that DFCS consider waiving non-safety related requirements for the licensing of relatives:

- If a relative foster home applicant does not meet the training requirement and that is the only reason they are not "fully licensed," there should be a waiver of the training requirement and the home should be considered "fully licensed" for IV-E purposes. This is already allowable under current Georgia licensing standards.

As DFCS struggles with finding appropriate and necessary placement resources, and grapples with existing placement resources deciding not to continue, exploring this recommendation is more important than ever.

Finally, *Infrastructure Standard IV. Quality Placement and Caregiving, D. Support for Children and Caregivers*, discusses gathering information from service providers to understand, among other things, the role of services in strengthening and/or stabilizing the placement. To date, no information has been provided on this Standard in other Briefs. Anecdotally, as reported above, staff reported that some Behavioral Aides are ineffective and not prepared to handle the behaviors of children they are asked to watch, due in part to their role never being designed to address these behaviors.

Efforts to gather concrete data from these service providers as well as others may shed some light on which support services work well and what is needed to stabilize and strengthen placements in Region 14.

### *Placement Research Question 4: How do the state, regional and county resource development teams work together to meet the placement needs of children?*

The intensity and frequency with which urgent placements present themselves on a daily basis have forced staff at all levels to adjust their perspective and participation in the placement process.  County, regional, and state office staff work together to do what is necessary to find a placement, many times for children and youth with elevated behavioral or mental health needs. State Office efforts have been focused on addressing the current placement crisis for some time now.

Recently, a Complex Care Coordinator was hired and is participating in the PASS staffings of children and youth who have been determined to present prospective placement challenges at least weekly.  Supervisors in the Regions are conducting weekly staff meetings to assess their placement issues and strategize efforts to have their children and youth appropriately placed on a daily basis.  The frequency of individual staffings for youth who are difficult to place and the list of participants in those staffings has been broadened.

Unlike in years past, staff now have a dashboard with current data, allowing them to track how many placements are available every day and how many youth are in need of a placement.  This was implemented in July of 2020 and has reportedly been a tremendously valuable asset since its inception.

Resource Development is using data to inform resource recruitment efforts and pushing to establish placement options in areas where children and youth are most likely to be removed. This strategy should serve to increase parent involvement from the outset as well as increase the likelihood of permanency and decrease the time it takes to achieve reunification.

As a result of these and other strategies currently being deployed, there has been a recent measurable decline in some Regions in the number of non-traditional placements being utilized on a daily basis.  However, it should be noted that this practice is not evident in all areas.

Regarding the private provider network, when the per diem has presented itself as a barrier to placement for individual youth, State office staff have been willing to lead the conversation with providers regarding an enhancement in the rate of compensation for an individual youth who

may require a unique response to their service needs.  This has been very helpful to Regional and County staff in their daily placement efforts.

Based on information provided and industry norms, there appears to be an adequate array of mental health services that should be available to support the needs of children in care based on what is offered by DCH and enhanced by Amerigroup.  However, this does not guarantee access to, or quality of, services.  As with many states, Georgia has challenges with partner and peer agencies offering different rates to providers which often inadvertently decreases access for children depending on the payor source.

At the current time, there is a strong consensus across partner agencies that they are working together better and more creatively to meet the needs of children, particularly those with higher-level needs.  Inter-agency meetings are now being held to discuss and strategize on state policy issues and required legislative changes.  Many agencies now jointly staff challenging cases to develop interagency solutions and treatment planning.

State, Regional and County staff face challenges in having an adequate Foster Home network that will consistently meet their daily needs for placement.  Many state that the process of getting a prospective Foster Home through the system and ready to accept children and youth for placement is too long.  Generally, it takes six to eight months to get a home approved with many saying that time is more realistically twelve months or more.  Some also mentioned that many Foster Parents go through the Foster Home approval process as an avenue to become eligible to adopt a child or children.  In almost all cases of this type, these Foster Parents become approved resources only to adopt and are not available for future placements after an adoption is finalized.

The diligent search, identification, and engagement of relatives willing to provide kinship care for children and youth has risen recently and continues to be a positive development.  Relatives completing Relative Care Assessments (RCAs) to become placement resources increased steadily from 2018 to 2020, followed by a significant drop in 2021, as seen in the chart below.

**Chart 13: Days to Complete Relative Care Assessment**



Data provided by Georgia State Office Data Unit

Interestingly, while the number of RCAs being completed increased 2018-2020, the number of days to complete those RCAs decreased.  While the drop in the number of RCAs completed can likely, in part, be attributed to COVID, this should be monitored moving forward to see if the numbers regain their pre-pandemic levels or if other factors are impacting relative's willingness to become placement resources. Conversely, the median number of days between the first inquiry to the initial approval of new foster homes increased from instances of 135 in 2018 to 259 in 2021, while the overall number of new homes has decreased from 266 in 2018 to 158 in 2021.

**Chart 14: Days from 1ˢᵗ Inquiry to Initial Approval of New Homes**



Data provided by Georgia State Office Data Unit

DFCS reports that in order to help maintain the families as resources for future placements, foster families are instructed and encouraged to ask for funding for any activity the Foster Parent believes would support a child's success in the community.  There are multiple funding sources specifically designated to support non-traditional, non-Medicaid billable services for children in care.  With this in mind, State, Regional, and County staff have been encouraged to explore all existing avenues for service identification and delivery.  DFCS reports a high approval rate for granting foster parent requests for funding.  Amerigroup uses a fiduciary agent organization (MAAC) so the funds can be dispensed more quickly and easily to foster parents.

It should be noted, however, that the amounts associated with this funding are varied and sometimes limited.  Also, the process associated with accessing these funds has been reported as being too intimidating for Foster Parents to complete, making their use inconsistent.  Regional and County staff are encouraged to assist Foster Parents in this process at any time needed.

## Related Infrastructure Standards

*Infrastructure Standard I. Comprehensive Practice Model* discusses the importance of implementing a practice model not only to align practices based on guiding principles and a common foundation, but also to "promote collaborative partnerships." Implementing the practice model will have a direct impact on this research question focused on how different resource development departments work together to meet the needs of children and youth in care. DFCS has made admirable steps to develop a teaming structure and process for cross-department

collaboration specifically for the hard to place youth in the region, but these principles should be applied more broadly to be able to shift from being reactive to proactive.

This includes the engagement of CCI and CPA placement providers. *Infrastructure VII. Supervision of Contract Agencies* discusses ensuring contract agency practice aligns with the requirements and standards of the Modified Consent Decree and Exit Plan, and that data reports should be developed to understand the extent to which contract agencies deliver on the outcomes for children they serve. To date, DFCS has declined the recommendation to implement Performance Based Contracting with their placement provider agencies, though this has and will remain a recommendation of MTAT, not only to financially reward providers who deliver on desired outcomes for children and youth, but to further promote collaboration and coordination between agencies and departments.

### *Placement Research Question 5: What is the impact of the placement recruitment/retention efforts?*

The number of resource homes licensed in the last four years overall has outpaced the number of homes that discontinued service, however number of homes that discontinued in 2020 and 2021 outnumbered the number of new homes licensed, as shown in the chart below.  The most common reason provided for home closure is "not ready".

**Chart 15: New Home Licensed and Homes Discontinued, 2018-2021**



Data provided by Georgia State Office Data Unit

The impact of the number of homes approved decreasing in recent years has led to an increase in the percentage of homes sitting vacant each month, as shown in the chart below.

**Chart 16: Number and Percent of Homes Vacant for Each Month 2018-2021**



Data provided by Georgia State Office Data Unit

The number of Foster Homes approved each month has slowly been declining since 2019 in Region 14, with the number of homes sitting vacant each month between 2018 and 2021 hovering around 200.  Taken as a whole, this means on any given month between 2018 and 2021, 30 percent to 40 percent of approved homes were sitting vacant. Reasons some homes remain vacant include narrow parameters provided by foster parents on who they will accept in their home and the type of children and youth who need Foster Home placements.

There have been increased efforts at recruitment and retention of relatives and kin for approved placement options and as a result of those efforts, 66.7 percent of DeKalb respondents felt DFCS is "absolutely"' or "mostly" making efforts to engage relatives and kin to provide placement. Comparatively, 78 percent of Fulton respondents replied in the same manner.

**Chart 17: Placement Types Most Lacking in Fulton and DeKalb**



MTAT Survey to Region 14 Workers and Supervisors

Fulton county survey respondents identified Levels of Care placements as most lacking, followed by Foster Homes and Residential Treatment Facilities (RTFs), while DeKalb County survey respondents felt RTFs were most lacking, followed by Group Homes and Foster Homes. Both DeKalb and Fulton survey respondents indicated that existing Foster Homes were most likely "absolutely" meeting the needs of children, and Residential Treatment Facilities (RTFs) were most likely "not really" meeting the needs of youth they serve. This alone is a reason for DFCS to focus on recruiting foster home and relative placements rather that RTF placements.

Some Regional or County staff have reported not having the proper amount of time in their schedules to devote to recruitment and they cannot manage a large number of inquiries in the queue.  If this is truly the situation, the monitoring and management of that list of potential resources is not being managed effectively or to its fullest capacity.

One of the recurring thoughts on the issues surrounding recruitment and retention centered around time from inquiry to approval.  The current time from inquiry to approval is 17 or more months.  Private providers report a much lower time to approval.  The reasoning given by those interviewed included the private agencies' ability to staff up in such a way as to have an adequate amount of people involved in this exercise at various levels and at various times in the process.  Private agencies reported a six-month time to home approval, almost a year quicker than the State's typical effort. Private agencies were asked to list some of the strategies they have implemented in order to attract and retain more Foster Parents.  Their responses included the following:

- Social media (this has been a hugely effective piece of their recruitment push);
- Multiple high-profile community events;
- Fliers in libraries and schools;
- Canvasing sporting events (ex: created "baseball cards" to distribute on how to become a Foster Parent);
- Celebrate Foster Parent Appreciation Month;
- Provide childcare when conducting in-person training;

- Offering transportation support if/when Foster Parents need help with appointments;
- Cards of Appreciation throughout the year.

**Chart 18: DFCS Survey Question on 'First Placement, Best Placement'**



MTAT Survey to Region 14 Workers and Supervisors

It is the expectation of the Division that each initial placement is the best and most appropriate placement for each individual child or youth in care, throughout that child's entire time in out-of-home care.  Each initial placement should be made with the chances for timely permanency foremost in the minds of those deciding on each placement and the track record of outcomes associated with the provider utilized in making that placement.

To help ensure that the State is purchasing the most effective services from its private provider network, DFCS reports it has increased its expectations regarding provider accountability as one strategy to reduce placement disruptions.  Providers are now expected to be a part of transition planning before an actual discharge or transfer can occur.

Before a child is moved, the provider must give specific reasoning as to why they cannot appropriately meet the needs of that individual child and identify alternative programming with a provider who does have the ability to meet those needs.  Until an acceptance and successful transition plan has been documented with the receiving provider the child must remain with the original provider to avoid disruption in placement and a break in the continuity of care.

Strategies have also been developed and implemented for caseworkers to explore with foster parents the reasons for a request in placement disruption and delve into solutions that would keep the child in the home before a change in placement is approved.  The discussion and potential solutions must then be discussed with a supervisor and regional county staff.  This intentional deceleration of a placement change request often allows for the acute situation to resolve and the placement to be preserved.

## Related Infrastructure Standards

Infrastructure Standards supporting Recruitment and Retention efforts are primarily focused more on the 'retention' side, as detailed in *Infrastructure Standard IV. Quality Placement and*

*Caregiving*. Part D, Support for Children and Caregivers details how DFCS shall maintain Caregiver Recruitment and Retention staff to meet the needs of caregivers, as well as request that caregivers terminating service participate in a Foster Parent Exit Survey. Both of these standards have been implemented and maintained. However, it is unclear how the lessons learned from these efforts are being used in a Continuous Quality Improvement effort to apply and improve the quality and longevity of placement resources.

## Placement Research Question 6: To what extent has Georgia tried to partner with sister agencies to address placement crisis?

Leadership reports their understanding of the importance of partnership, and that partnership can only happen through relationship and trust-building.  Leadership also shared that they have found partnering to find solutions for specific youth is often more effective than broader partnering efforts aimed at groups, or subsets, of youth.

For example, recent efforts to find placements for children staying in offices and hotels around the state included reaching out to specific agencies and negotiating a special rate and dedicated beds for this population.  These efforts were borne out of discussions with leadership from agencies with whom the State has an ongoing, positive relationship.  These discussions revealed that several of those agencies had large campuses with unused beds.  Those agencies were subsequently contacted and engaged for participation in this initiative, which began at the close of April 2022.

In the beginning, this process was not implemented as designed, including providers denying placement to certain children and youth that were appropriate for the placement setting in question.  That decision to deny appropriate placement was not an option for providers when the original agreement was implemented.  After additional discussions led by State staff, private provider leadership has now pivoted and is advertising incentives for placing this population more broadly to all placement agencies.

The placement provider with whom MTAT spoke, who was identified as a provider who is more likely to help take children and youth in Region 14 when contacted, shared that partnership with DFCS is stronger in general than it has been in the past, particularly with the Office of Provider Management (OPM).  At the regional level, partnership and communication was reported to have decreased.  This provider indicated before the COVID pandemic, DeKalb would have monthly meetings with providers and Fulton would have quarterly meetings as a way to hear from providers and share information, however, these meetings are no longer occurring.

Despite partnership being more individual-driven and often focused on specific agencies, ongoing collaboration meetings are in fact occurring between DFCS and the Department of Behavioral Health and Developmental Disabilities (DBHDD), and Memorandums of Understanding (MOUs) have been developed with the Department of Juvenile Justice (DJJ) and Department of Community Supervision (DCS).  In addition, the DFCS Well-Being attorney has regular communication with sister agencies and DFCS and DBHDD are creating a liaison position split between the two agencies.

*Kenny A. v. Kemp*

There is a strong consensus across partner agencies with whom MTAT spoke that they are working together more effectively and more creatively to meet the needs of children and youth, particularly those with higher-level needs. There are meetings that discuss and strategize around state policy issues and required legislative changes. The agencies jointly staff challenging cases to develop interagency solutions and treatment planning.

Regarding the relationship with Amerigroup, DFCS leadership reports that Amerigroup is more helpful than ever, and progress is being made, through relationship building, on approvals for service. A major improvement identified was Amerigroup's willingness to accept appeals to denials via e-mail and not solely via fax, as was previously the case. In addition, the DFCS healthcare attorney worked jointly with Amerigroup to get them to agree to send denials to both the State office and the County. In this manner denials can be collected and monitored. Denials with concerns are collected weekly and are sent to a single person at the State level for follow-up and possible appeal. Denials, however, have remained at approximately 50 percent for the last several years.

**Chart 19: Denial Rates for PRTF**



Data provided by Amerigroup

Amerigroup reports the most common reasons for Primary Residential Treatment Facility (PRTF) denials as:

- lack of current or complete information from the provider;
- child no longer meeting Medical Necessity (i.e., baseline reached); or,
- provider stating that DFCS simply requested the PRTF application be submitted (rather than the submission being for a justifiable, clinical reason).

If these are, in fact, the most common reasons for denial, this should be easily corrected through education and training. As this denial rate is fairly high, there may also need to be increased education on what constitutes sound clinical reasoning for admission to a PRTF. Amerigroup

reports that IC3 only has a 5 percent denial rate, and the most common reason for those denials is that the request does not meet the DBHDD-MNC admissions criteria.

## Related Infrastructure Standards

Engaging with sister agencies (DBHDD, DCH, Amerigroup) is critical to addressing the placement crisis. *Infrastructure IX. Maximization of Federal Funding* speaks to maximizing the use of federal funds, in addition to state funds which DFCS has already done an admirable job of securing.  A focused effort toward consistent and proper federal claiming is critical to enhancing available funding for the development and maintenance of a provider network that can meet the needs of the department. As previously reported, DFCS has explored the use of Therapeutic Foster Care by submitting a soft proposal to DCH, who is working with DFCS to re-develop the proposal in order for it to be approved.

## IV. RECOMMENDATIONS

As a result of the information gathered for this Infrastructure Brief, MTAT offers the following streamlined recommendations.

### 1.   Prioritize Planning and Implementation of the Practice Model

MTAT is aware that the practice model has been developed, however roll out of piloting the practice model is on hold until Families First rolls out.  While implementation is stalled, that doesn't mean planning, marketing and promotional work could not be underway. Having a set of universal, organizing principles provided by a practice model may go a long way to strengthen the culture and climate of the agency, and provide direction and comfort to those overwhelmed with the current crises. In addition, a blueprint for daily practice would serve to inform both individual counties and the Division as a whole when developing strategies for improvement.

### 2.   Streamline Strategies and Efforts at Improvement

Right now, the Division has been trying or considering numerous strategies to try and address these crises as well as the work as a whole. MTAT offers that leaders should determine "what is most important, crucial" to the Division and focus efforts at improving in those areas incrementally.  Exclude any superfluous activities that do not move that process forward. Especially in times of crisis, it is critical to do a few things well as opposed to many things partially. A streamlined approach to the work would also bolster staff morale.

### 3.   Increase Communication Internally and Externally

Several of the people MTAT spoke with shared the lack of transparency about initiatives in the pipeline or feeling isolated and not heard. Increasing communication and transparency both internally within the Division as well as externally with stakeholders and community partners may go a long way in addressing some of the culture and climate issues underpinning these crises.

### 4.   Prioritize Initiatives Impacting Reducing Redundancies and Streamlining Work

The current DFCS leadership has shared that they are currently exploring forms and work processes to identify redundancies and opportunities to streamline work. It is unclear what progress has been made in this area, but MTAT fully supports and encourages prioritizing initiatives that will have the greatest impact on reducing redundancies and streamlining work.

### 5.   Pursue Performance Based Contracting (PBC)

MTAT resubmits the original recommendation that the Division should pursue PBC in order to ensure that they are buying the services that they want for children and their families. Internal consensus should be reached regarding what they want from contracted providers, whether it is simply purchasing bed space or if it is to purchase certain outcomes for children and families, and what are those outcomes. When this consensus is reached, the identified outcomes should be shared with those in the private provider network for their thoughts and feedback.  Efforts can then begin in earnest to shift the focus of private provider strategies to most effectively address the department's identified needs.

*Kenny A. v. Kemp*

## 6.   Initiate Intensive Permanency Services to Support Children and Youth in Placement

MTAT recommends Georgia develop and initiate Intensive Permanency Services for hard to place children and youth.  Hard to place children and youth need more trained, supportive care to help them heal from the trauma they are expressing which is manifesting itself through placement instability and 'challenging behaviors.' Several states have implemented similar models as a new, more collaborative and trauma-focused approach to serving this population, with a focus on wrapping services around the youth, including trained licensed social workers following the youth wherever they go, in order to build rapport and establish trust.

# APPENDIX A – METHODOLOGY

**Research Questions**

When the decision was made to try and further understand the current workforce and placement crises, due to them dominating the focus as it relates to practice and improvements in the region and state. To ensure MTAT stuck to the narrow focus, they developed research questions and possible related indicators to try and answer through their data gathering processes. Plaintiffs and Defendants were provided the opportunity to review and provide feedback on the research questions and draft indicators before they were finalized. The finalized research questions used to develop this report were as follows:

| Research Question | Possible Indicators |
|---|---|
| **Workforce Crisis** | |
| How do workforce indicators compare to other jurisdictions? | • From 2018 to date, what has been the (monthly?) hires, departures, vacancies in R14?<br>• How long have frontline staff stayed over time?<br>• From 2018 to date, what are the hiring, departure and vacancy trends in other cities? States? Nationally? |
| What is driving staff to leave or think about leaving? Who are the people? | • What reasons are staff giving for leaving? How has that changed over time?<br>• What is driving job dissatisfaction?<br>• What is their education background?<br>• How long were they employed with DFCS?<br>• What position did they hold?<br>• Who was their supervisor? |
| For people who have stayed more than 2 years, why are they staying? | • What do staff love about their job?<br>• How long are people staying, overtime?<br>• Who is good at keeping staff-lessons learned? And Who is losing staff?<br>• Do staff feel supported?<br>• Do staff feel they have overall job security?<br>• Do staff feel as if they are being financially compensated at market rate? |
| What is the impact of the workforce supports that have been put in place to date? | • How much/what types of trainings are people completing?<br>• Are there any access issues to trainings?<br>• How much is coaching/mentoring engaged?<br>• What has been completed on state office efforts to streamline work, take things off the table?<br>• How do Infrastructure Standards support? |
| How effective are the recruitment efforts? | • Where have state efforts been focused?<br>• Where have local efforts been focused?<br>• How do Infrastructure Standards support? |

| | • How do recruitment efforts compare to other jurisdictions? |
|---|---|
| ***Placement Crisis*** | |
| How do placement indicators in Region 14 compare to other jurisdictions? | • From 2018 to date, what has been the placement stability and office stay trends in R14? <br> • From 2018 to date, what are the placement stability and office stay trends in other cities? States? Nationally? <br> • What are the number of placements, frequency, by placement type, by placement agency (DFCS/CPA/CCI)? <br> • What are the placement moves in the first 30-60-90 days of custody? <br> • Is there anyone who is being successful in this area? <br> • What is the frequency of placement disruptions? |
| What are the trends or similarities among the list of hard to place/office stay youth? | What are the reasons hard to place/office stay youth express for refusing to go to identified placements? |
| What is the impact of the placement supports that have been put in place to date/. | • What is the frequency/duration of use of Behavior Aides? <br> • How have relatives/kin been engaged and what supports are they provided? <br> • Is the support provided to kin parents different than foster parents? <br> • What Behavioral/Mental Health Services are made available to support placements, children and what are needed? <br> • How do Infrastructure Standards support? <br> • How quickly are kin being licensed? |
| How do the state, regional and county resource development teams work together to meet the placement needs of children? | • How do county, region and state resource development work together to identify needs and access Behavioral/Mental Health Services for children in care? <br> • How do Infrastructure Standards support? <br> • What is the spectrum of services available for children with higher needs? <br> • What is the ease of accessing natural supports (ie yoga, meditation, etc? <br> • What is the denial rate of Amerigroup? <br> • Percentage of placements that take one child and stop <br> • How do workers identify where and how to access services? |
| What is the impact of the placement recruitment/retention efforts? | • What are the State level and region level recruitment/retention efforts? <br> • What is the frequency of outreach efforts? <br> • What engagement efforts are made with private providers? <br> • Are placement providers more successful regarding placement stability than DFCS providers? <br> • What is the attrition rate of placement array pre and post covid? <br> • What are the demographic trends in foster families? <br> • What % of homes empty? What % never take a child? Patterns |

| | • Is there regional representation on statewide crisis response efforts?<br>• How do Infrastructure Standards support?<br>• Who is getting denied as a foster parent and why? |
|---|---|
| To what extent has GA tried to partner with sister agencies to address the placement crisis? | • What efforts have been made to engage Behavioral/Mental Health Services to support kids in placement?<br>• What efforts have been made to engage DBHDD, DCH, etc to support kids in placement?<br>• What work is being done to re-engage CMS on Therapeutic Foster Care?<br>• What efforts are made with state partners (DJJ, DBHDD, etc) to prevent and address placement crisis? |

**Data Requests**

MTAT requested data from DFCS State Office, DFCS Regional Office, the Office of Human Resources and Amerigroup to support the analysis and answering of the research questions. All available data was provided upon request.

**National Research**

MTAT conducted national research, analyzing and compiling information cited in research studies, innovative programs, and news articles on both the workforce and the placement crises.

**Survey**

MTAT developed a survey which was distributed to DFCS supervisors and workers in Region 14 to inform both sections of the Infrastructure Brief. A total of 97 recipients responded to the survey, 36 from DeKalb County, 61 from Fulton County. Forty-one of the respondents were supervisors or administrators. The average length of time the respondent was in their position was 4.8 years, and the median was 3 years.[25]

**Focus Groups**

- MTAT conducted focus groups with the following groups of people:4/4/2022: Staff in Region 14 employed 2+ years
- 4/11/2022: Staff in Region 14 less than 1 year
- 4/14/2022: Director of Well-Being and Caregiver Services, Kenny A Director, PRO Director, Complex Care Coordinator (all DFCS), Director of Georgia Families 360 and Director of Community Services, DBHDD 4/14/2022: Program Directors in Region 14

**Interviews**

The following interviews were conducted in support of the data gathering for the Sixth Infrastructure Brief:

- 3/15/2022: DFCS Metro District Director
- 3/15/2022: Deputy Commissioner, Child Welfare
- 3/15/2022: Region 14 Resource Development Program Director
- 3/17/2022: PRO Director

---

[25] While a larger response rate may have made the results more statistically significant, the responses received provided deep insights into staff mindset and experiences regarding these two areas.

*Kenny A. v. Kemp*

- 3/18/2022: Fulton County Director
- 3/18/2022: Region 14 Training and Development Manager
- 3/21/2022: Deputy Commission, Human Resources
- 3/22/2022: DeKalb County Director
- 3/25/2022: Director of Georgia Families 360 and Director of Community Services, DBHDD
- 4/4/2022: Deputy Commission, Human Resources
- 4/18/2022: Director of Georgia Families 360

# APPENDIX B – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN

This Order is included behind this page in its entirety.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KENNY A., by his next friend Linda Winn, *et al.*, | : : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| v. | : | 1:02-CV-1686-TWT |
| NATHAN DEAL, *et al.*, | : : | |
| Defendants. | : | |

**STIPULATED ORDER AMENDING THE
MODIFIED CONSENT DECREE AND EXIT PLAN**

On December 5, 2016, the Court entered the parties' Modified Consent Decree and Exit Plan [dkt. nos. 747 & 745-1] ("Exit Plan"). The parties jointly moved the Court to approve and enter this Stipulated Order to amend one Outcome Measure in the Exit Plan and incorporate the final Infrastructure Standards.

The parties have agreed (with the Accountability Agent's concurrence) to revise one Outcome Measure in the Exit Plan to make it consistent with DFCS' statewide policy regarding the time permitted to complete investigations of reported abuse or neglect of foster children. Section VI.A.2 of the Exit Plan is hereby amended as follows (revision noted in underlined text):

2. Completion of CPS Investigations Concerning Children in Foster Care: At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Chapter 6 of DFCS' Child Welfare Policy Manual, within <u>45</u> days of receipt of the report.

Section VIII of the Exit Plan set forth a process and timeline for establishing a set of Infrastructure Standards that will be used to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection to the Plaintiff Class of foster children in state custody in Fulton and DeKalb Counties.  After a specified negotiation period (which was extended through December 18, 2017 [dkt. no. 755]), the parties reached agreement on the Infrastructure Standards, which are attached hereto as Exhibit A. Pursuant to Section VIII.B of the Exit Plan, these "final Infrastructure Standards are enforceable obligations under th[e] Exit Plan, and the Accountability Agent, with the assistance of MTAT, will measure and report on the Infrastructure Standards in each subsequent reporting period."

Except as amended herein, all other provisions of the Modified Consent Decree and Exit Plan entered by this Court on December 5, 2016, shall remain in full force and effect.

IT IS SO ORDERED, this 19th  day of December, 2017.

   /s/Thomas W. Thrash
   THOMAS W. THRASH

# EXHIBIT A

*Kenny A. v. Kemp*

## INFRASTRUCTURE STANDARDS

DFCS retains the sole and complete authority to implement new or revise existing child welfare policies. If DFCS proposes any revisions to the portions of the DFCS policies referenced in these Infrastructure Standards, DFCS will provide notice to the Accountability Agent and to Plaintiffs to discuss the potential impact on the Infrastructure Standards. Once the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and Accountability Agent otherwise agree to revise the affected Infrastructure Standard(s).

## I. COMPREHENSIVE PRACTICE MODEL

DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

## II. ASSESSMENT AND INVESTIGATION OF MALTREATMENT IN CARE

DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III. To do so, DFCS will:
- conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case;
- take into account the traumatic stress of children;
- be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes;

- actively engage ongoing partnerships with families and stakeholders to assure child safety; and
- provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making.

A. Intake Assessment

   1. As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle.

   2. DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to:
      a. the family's previous response to intervention and treatment strategies;
      b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports;
      c. traumatic events affecting family members; and
      d. coping skills used by the family to deal with traumatic events.

B. Investigation

   1. For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care. The response time for a special investigation of maltreatment in care is immediate or within 24 hours.

   2. For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below.

      a. When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all

2

placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s).

b. When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from the date of the report. The assessment includes, but is not limited to:
  i.   visiting the home of the caregiver;
  ii.  conducting separate face-to-face interviews with children, caregivers, and other household members; and
  iii. completing a policy violation assessment in the applicable foster parent record in SHINES.

c. Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months.

## III. CASE PLANNING AND MANAGEMENT

DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making.

DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care.

*Kenny A. v. Kemp*

A. DFCS will use current assessment information to inform case planning in foster care.

1. A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised.

2. The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term.  The FFA:
   a. includes engagement of the family in a partnership to identify safety concerns;
   b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine;
   c. tracks the sequence of everyday life events that led to the incident of maltreatment;
   d. identifies family developmental stages and associated challenges;
   e. identifies family supports;
   f. identifies child/youth development and associated vulnerabilities; and
   g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect.

B. DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (*see* DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs).  By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation.

Kenny A. v. Kemp

C. DFCS will create and utilize genograms in case planning.

1. To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram. The genogram will be used throughout the case process to identify potential placements and family supports.

2. Construction of the genogram shall:
   a. include at least three generations of family members on both sides of the family;
   b. embrace cultural differences regarding "who is family" and include all who serve in parental capacity;
   c. include natural helpers, friends, confidants of the caretakers, and older children; and
   d. indicate who was living in the home at the time of the assessment.

3. Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement.

D. DFCS shall assist the family to create plans, implement them and track progress.

1. DFCS shall assist the family in creating initial action plans and the case plan. Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family and will be used to guide case planning for permanency.

2. Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval)

5

whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law.

3. DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s).

4. DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified.

5. DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being.

E. DFCS will take steps to promote timely and lasting permanency.

1. DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency.

2. The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency.   The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings. Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues.

3. In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018.

   a. A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval).  The SWAT tool is used in lieu of other staffing

tools.  Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months.

    b.  Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator.  DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings.

4.  Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness.  If revisions are needed to this process, those changes will replace requirements in this section.

## IV.   QUALITY PLACEMENT AND CAREGIVING

The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured.  DFCS prioritizes children being placed with relatives who are able to provide a safe, nurturing home for them.  Critical components of the screening, training, approval, and support process for all caregivers are also described in this section.

    A. Screening, Training, and Approval Process for Prospective Foster and/or Adoptive Parents

      1.  DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised.

      2.  DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan.

3. DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis.

4. DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care. DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home. DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised.

B. Placement with Relatives and Fictive Kin

1. Diligent Search

   a.  DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised.

   b. DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review.

2. Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:
   a. prior to placement, screen all household members;
   b. prior to placement, conduct criminal history search of adult household members; and
   c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety.

3. The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support.

C. Disclosure of Information

1. DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and

historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable.

2. DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home.

3. DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations.

4. DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home.  Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children.

D.  Support for Children and Caregivers

1. DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement.

2. DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers.

3. DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home.

4. DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey.

5. DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities.

*Kenny A. v. Kemp*

**V. HEALTH AND EDUCATION**

DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity.

    A. Initial Screenings and Follow-Up Treatment

        1. Physical Health Screening:  All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

        2. Dental Health Screening:  All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician.

        3. Mental Health:  All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional.

        4. All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional.

    B. Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx.

C.  DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised.

D.  DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns.

E.  DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody).

F.  DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised.

G.  DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program.

H.  DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school.

I.  DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised.

## VI.   CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

The Infrastructure Standards below pertain to DFCS' obligation to continue to develop, maintain, and use an automated child welfare information system in which data accuracy and integrity is maintained on a continuous basis, and which is both compliant with current federal standards and meets current federal reporting standards.  The Statewide Automated Child Welfare Information System (SACWIS) shall include functionalities that support automated case management and that conform to DFCS Policy 2.1 (eff. Mar. 2015), as revised, including those functionalities necessary to support SBC. And finally, it shall support monitoring

and quality assurance efforts consistent with on-going continuous quality
improvement efforts.

A. Meeting Federal Standards

1. The Comprehensive Child Welfare Information System (CCWIS) final
   rule became effective August 2016.  States have until August 1, 2018 to
   notify the Administration for Children and Families (ACF) of their intent
   to either transition the existing SACWIS System to CCWIS, develop a
   new CCWIS System, or opt out.

2. CCWIS requirements focus on quality data and program outcomes
   including: developing and implementing a data quality plan; new data
   exchanges; and requiring a data exchange standard.

B. Case Management Functionalities

1. The DFCS automated child welfare information application shall support
   end users in their obligation to enter child and case specific information
   across all stages of a child welfare case.

2. DFCS shall continue to modify system functionalities to align with the
   development and roll out of the DFCS comprehensive practice model.

3. DFCS shall continue to develop, validate, and modify reports based on
   data housed in the administrative data system that support on-going case
   management and case review.

C. Monitoring, Quality Assurance, and Continuous Quality Improvement

1. DFCS shall develop methodologies for monitoring adherence to
   Infrastructure Standards that rely on validated state administrative data
   analysis and reports.

2. DFCS shall develop methodologies for quality assurance, including case
   reviews that are reliant on data stored in the administrative database.

3. DFCS shall develop methodologies for on-going evaluation of progress
   on child welfare outcomes, including those specified in the Modified
   Consent Decree and Exit Plan, that are based on validated data stored in
   the state administrative data system.

*Kenny A. v. Kemp*

## VII.  SUPERVISION OF CONTRACT AGENCIES

This section applies to any contract for the provision of placements and services to class members into which DHS enters during the contract cycle, or as soon as practicable following the entry of the Modified Consent Decree and Exit Plan. Standards below relate to these recommendations as well as the requirements that contract agencies comply with the terms of the Modified Consent Decree and Exit Plan, including its Principles, and meet or exceed agreed upon outcomes for children and families.

A.  DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan.

B.  DFCS shall only contract for placements or services with licensed contractors or sub-contractors.  No child shall be placed in an unlicensed facility.

C.  DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary.

The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations.  The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract.

13

*Kenny A. v. Kemp*

D. DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured.

E. DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve. These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement.

F. DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type.

As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations.

The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license-holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations.

G. The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified.

## VIII. ROBUST WORKFORCE DEVELOPMENT

DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families.

*Kenny A. v. Kemp*

A. Employee Selection Protocol

1. The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.

2. DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol.

3. DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce.

B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)

1. OHR will post positions within three (3) business days of an approved request.

2. OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director.

3. An OHR recruiter will conduct recruitment events at least monthly.

4. Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence.

5. OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting.

6. OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check.

7. OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

15

*Kenny A. v. Kemp*

C.  Training

1.  No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training.

2.  All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year.

3.  DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors.

4.  Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training.

5.  All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program.

D.  Caseload Management

1.  In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases.  That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads.

*Kenny A. v. Kemp*

2. Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.

3. DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:
   a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);
   b. climate and culture assessments; and
   c. metrics to strategize caseload management (including timely and safe case closure practices).

4. DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan.

## IX.   MAXIMIZATION OF FEDERAL FUNDING

Effective and cost-efficient child welfare systems depend on multiple funding streams to pay for services and supports for the children and families they serve. In recent years, DFCS leadership has made notable progress in securing state funds to provide needed child welfare services. With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming.

DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding. DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.

*Kenny A. v. Kemp*

The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.