# <u>Seventh Brief on Infrastructure Standards</u>

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

### *Kenny A. v. Kemp*

*State of Georgia*

May 2023

**ACCOUNTABILITY AGENT AND**
**MONITORING AND TECHNICAL ASSISTANCE TEAM**

Accountability Agent
Karen Baynes-Dunning
Attorney, Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge (PK)
Lakewood, New Jersey

The following persons were significant contributors to this brief:

Eliza Byrne
Public Knowledge (PK)
Lakewood, New Jersey

Dr. Lijun Chen
Public Knowledge (PK)
Lakewood, New Jersey

Michael Hoffmeister
Public Knowledge (PK)
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge (PK)
Lakewood, New Jersey

Doug Swisher
Public Knowledge (PK)
Lakewood, New Jersey

Jeff Williamson
Public Knowledge (PK) Lakewood, New Jersey

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................4

II.    NATIONAL TRENDS ON PROVIDER CONTRACT MONITORING, ROBUST WORKFORCE AND REVENUE MAXIMIZATION ....................................................................................................................6

    PROVIDER CONTRACT MONITORING .......................................................................................6

    ROBUST WORKFORCE ...........................................................................................................7

    REVENUE MAXIMIZATION ......................................................................................................8

III.    STATUS OF THE INFRASTRUCTURE STANDARDS ...........................................................8

    OVERVIEW OF THE INFRASTRUCTURE STANDARDS .................................................................8

    INFRASTRUCTURE STANDARD VII: SUPERVISION OF CONTRACT AGENCIES ...............................8

    SAFETY PARAMETERS ...........................................................................................................9

        *Overview* ......................................................................................................................*9*

        *Findings and Themes* ..................................................................................................*10*

    OVERSIGHT PARAMETERS ...................................................................................................12

        *Overview* ....................................................................................................................*12*

        *Findings and Themes* ..................................................................................................*13*

        *Recommendations* ......................................................................................................*16*

    INFRASTRUCTURE STANDARD VIII: ROBUST WORKFORCE .......................................................16

    EMPLOYEE SELECTION PROTOCOL ........................................................................................16

        *Overview* ....................................................................................................................*16*

        *Findings and Themes* ..................................................................................................*17*

        *Recommendations* ......................................................................................................*18*

    HIRING PROCESS WITH OHR ................................................................................................19

        *Overview* ....................................................................................................................*19*

        *Findings and Themes* ..................................................................................................*20*

        *Recommendations* ......................................................................................................*22*

    TRAINING .........................................................................................................................23

        *Overview* ....................................................................................................................*23*

        *Findings and Themes* ..................................................................................................*24*

        *Recommendations* ......................................................................................................*26*

    CASELOAD MANAGEMENT ...................................................................................................27

        *Overview* ....................................................................................................................*27*

        *Findings and Themes* ..................................................................................................*27*

        *Recommendations* ......................................................................................................*28*

    INFRASTRUCTURE STANDARD IX:  MAXIMIZATION OF FEDERAL REVENUE ...............................29

    IV-E ELIGIBILITY SAMPLE REVIEW – DECEMBER 2022 ...........................................................29

        *Overview:* ...................................................................................................................*29*

        *Common Themes Discovered:* ......................................................................................*29*

        *Overall Findings and Recommendations:* .....................................................................*30*

    ELIGIBILITY AND REIMBURSEABILITY ...................................................................................30

        *Overview:* ...................................................................................................................*30*

        *Common Themes Observed:* .......................................................................................*31*

        *Overall Findings and Recommendations:* .....................................................................*32*

    LICENSED AND UNLICENSED .................................................................................................35

        *Overview:* ...................................................................................................................*35*

        *Common Themes Discovered:* ......................................................................................*35*

        *Overall Findings and Recommendations:* .....................................................................*35*

    CLAIMING AND CANDIDACY ................................................................................................36

*Overview:* ...............................................................................................................................*36*

*Common Themes Discovered:* ....................................................................................*37*

*Overall Findings and Recommendations:* ................................................................*37*

Cost Allocation Plan/Proper Claiming and Maximization of Available Funding ...........38

*Overview:* ...............................................................................................................................*38*

*Common Themes Discovered:* ....................................................................................*38*

*Overall Findings and Recommendations:* ................................................................*38*

Availability and Allocation of Resources ....................................................................39

*Overview:* ...............................................................................................................................*39*

*Common Themes Discovered:* ....................................................................................*39*

*Overall Findings and Recommendations:* ................................................................*39*

Medicaid Claiming: ..........................................................................................................39

*Overview:* ...............................................................................................................................*39*

*Common Themes Discovered:* ....................................................................................*39*

*Overall Findings and Recommendations:* ................................................................*39*

**APPENDIX A – INFRASTRUCTURE STANDARD UPDATE TABLE: SUPERVISION OF CONTRACT AGENCIES ............. 41**

**APPENDIX B – INFRASTRUCTURE STANDARD UPDATE TABLE: ROBUST WORKFORCE .......................... 44**

**APPENDIX C – INFRASTRUCTURE STANDARD UPDATE TABLE: MAXIMIZATION OF FEDERAL REVENUE ............... 52**

**APPENDIX D – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN ...................... 1**

**APPENDIX E – METHODOLOGY ................................................................................................ 23**

Interviews and Focus Groups ..........................................................................................23

Infrastructure Standards Data..........................................................................................23

# I.  INTRODUCTION

After negotiations, the parties jointly moved the Court to approve a Modified Consent Decree and Exit Plan on December 5, 2016. Section VIII of that Exit Plan established a process and timeline for the development of new Infrastructure Standards to correspond with the state's new practice model and reform efforts. The development and subsequent negotiations regarding the new standards extended to December 18, 2017, at which time the parties jointly filed to amend the Exit Plan to include these practice and process elements intended to improve outcomes for children and families in Fulton and DeKalb counties.

The purpose of this Seventh Brief on the Infrastructure Standards is to update parties on the following three Infrastructure Standards: Supervision of Contract Agencies, Robust Workforce and Maximization of Federal Revenue, and the extent to which the standard itself has been implemented as described in the December 2017 Stipulated Order Amending the Modified Consent Decree and Exit Plan.

As background, the Monitoring and Technical Assistance Team (hereinafter "MTAT") developed a new approach and methodology for tracking the state's performance. The approach deliberately recognized that change in outcomes depends not only on a theory (or theories) of change that link practice and policy to core outcomes, but also on well-developed and carefully implemented plans to execute proposed innovations. The development and execution of those plans inevitably calls for adjustments to the process of care, the quality of care and the investments in capacity – in terms of skills and capabilities of the workforce and financial resources – that are necessary for well-defined and high-quality case practice. Thus, the MTAT's approach to monitoring includes not only the semi-annual outcome reports, but also the publication of a series of briefs that will directly consider the state's execution of the process, quality, and capacity investments necessary for the full implementation of the practices called for in the Infrastructure Standard.

Considering the timing needed for implementation of these standards, MTAT monitored and reported on these standards in several sections at a time.

The First Brief on the Infrastructure Standards, completed in March 2019, focused on the implementation of the new practice model, assessment, and investigation of maltreatment in care, and case planning and management.

The Second Brief on the Infrastructure Standards, completed in February 2020, provided an update on the development of the new comprehensive practice model; and the processes related to quality caregiving and placement, child health and education, and the workforce.

The Third Brief on the Infrastructure Standards, completed in October 2020, provided an update on the development and implementation of the new comprehensive practice model, the child welfare information system and quality assurance, monitoring of contract agencies, and maximization of federal funds.

The Fourth Brief on the Infrastructure Standards, completed in June 2021, provided an update on progress being made on the first six Infrastructure Standards, originally reported in the first two briefs, as well as the status of whether DFCS decided to proceed with recommendations made by MTAT.

The Fifth Brief on the Infrastructure Standards followed in the same direction of the fourth brief, providing an update on the last three Infrastructure Standards, originally reported on in the Third Brief, including an update on the recommendations made, and updated appendices with updated data performance on all nine of the Infrastructure Standards.

The Sixth Brief on the Infrastructure Standards was a departure from the previous briefs and focused on a deep investigation into the placement and workforce crises the Division was experiencing, which were impacting practice and strategies for system improvement. As part of this work, MTAT assessed whether the applicable infrastructure standards were impacting these crises.

This Seventh Brief on the Infrastructure Standards returns to the previous structure of the Infrastructure Briefs, focusing on finances and DFCSs fiscal policies and practices, and the standards closest tied to those, in part impacted by those crises. The Infrastructure Standards of focus for this brief are Supervision of Contract Agencies, Robust Workforce, and Maximization of Federal Funds.

Appendices A-C detail updated performance on the metrics of the Infrastructure Standards for Supervision of Contract Agencies, Robust Workforce, and Maximization of Federal Revenue, respectively. The entire Stipulated Order Amending the Modified Consent Decree and Action Plan is included in Appendix D. The methodology for analysis and reporting included using the State's administrative data to generate information on child and family outcomes, case file reviews, interviews, focus groups with staff and stakeholders and observations. Details of the methodology is included in Appendix E.

## II.   NATIONAL TRENDS ON PROVIDER CONTRACT MONITORING, ROBUST WORKFORCE AND REVENUE MAXIMIZATION

Despite extraordinary efforts to resolve ongoing issues, DFCS remains in the throes of placement and workforce dilemmas that have had a significant financial impact on operations.  To adequately address these issues and implement sustainable strategies for system improvement, the identification, maximization, and deployment of all available funds is critical at this time.

Specific areas in Georgia struggle with these issues more than others, suggesting that local practice and cultural elements may be contributing factors.  However, this scenario is not unique to Georgia, and it is important to examine research that has been conducted elsewhere and what strategies others have applied, implemented, and found to have had a positive impact on operations.

To effectively allocate existing resources and human capital, it is important for any state child welfare agency to establish positive working partnerships with its contracted providers.  One of the most important aspects of these partnerships is the establishment of effective monitoring efforts aimed at achieving positive outcomes.

Consistent and sustained monitoring of contracted partners, such as those providing services including placements, mental health, developmental disabilities, and substance use treatment is critical to determine the most effective ways to keep children with, or return children to, their families.

### *Provider Contract Monitoring*

There are several strategies currently being employed regarding the effective monitoring of the performance of private agencies, since these contracted entities are often used to help state agencies meet the needs of their customers. Performance-Based Contracting (PBC) is one strategy some states use to monitor and incentivize private providers that ties financial compensation to outcomes from children and families, focusing on the quality, rather than the quantity of services provided.  PBC is used in many different fields in varying degrees. One guide, produced by Health Resources and Services Administration (HRSA), detailing findings from literature and lessons learned from performance-based contracting for Maternal and Child Health in four states, identified the following benefits and challenges to Performance-Based Contracting, including:[1]

| Benefits | Challenges |
|---|---|
| PBC can lead to behavior change among contracted entities to a greater focus on performance | Concerns that agencies may seek out clients deemed easier to serve to help meet contractual targets |
| Creates accountability of working towards meeting milestones for families | If measures are given different weights in contracts, agencies may focus on measures |

---

[1] HRSA. Using Performance-Based Contracting to Strengthen Performance. Retrieved on January 22, 2023 from Using Performance-Based Contracting to Strengthen Performance (hrsa.gov)

| | with higher weights to receive greater incentives |
| Focused use on data to monitor performance | There may be delays between data collection, data analysis and receipt of consequential payment |

There is no one way to structure PBC for child welfare agencies. Different jurisdictions have different determinations of need and seek outcomes endemic to their individual circumstance. One commonly heralded system that has implemented PBC is Tennessee's Department of Children's Services. Tennessee piloted PBC beginning in 2006 with five provider agencies and after the first three years, found with these five agencies an eight percent reduction in foster care days, a six percent increase in permanent exits, and no change to re-entry rates, and after the first five years, saw a $20 million dollar savings based on 235,000 fewer days in care than expected.[2] Another impact from implementing PBC in Tennessee was the reduction of provider agencies from 89 to 30[3], which allowed for easier oversight and management. This reduction occurred in part because to enter PBC, providers needed to have accreditation and 90 days of working capital, which eliminated several providers from the in the beginning, then natural attrition further reduced the number, but to those that were better at meeting the needs of children and achieving outcomes.[4]

## *Robust Workforce*

Caseworker turnover has been an issue nationwide, particularly in child welfare settings. While any organization should expect a 10-12 percent rate of turnover each year, child welfare agencies have been experiencing turnover at between 20-40 percent every year over the last decade[5]. This high turnover is concerning and leaves many child welfare agencies with up to 50 percent vacancies in critical roles[6], impacting the agency and system's ability to meet the needs of their clients.

Many organizations attempt to retain staff with higher pay and reductions in caseload. While both are important strategies, alone, they are not sufficient to retain staff in the long-term[4]. Agencies must assess their policies and practice strategies to address the core issues that are leading to turnover to truly interrupt the cycle. Organizational change that clarifies the caseworker role, manages workflow, and allocates work based on skill rather than tenure or unit schedule will create lasting change that can help to retain staff[4].

---

[2] Chapin Hall, The Center for State Child Welfare Data. Performance Based Contracting in Tennessee's Foster Care System. Retrieved on January 22, 2023 from https://fcda.chapinhall.org/wp-content/uploads/2018/02/Performance-Based-Contracting-in-Tennessee_2.2018.pdf.

[3] Beeck Center for Social Impact & Innovation. How Governments Can Pay for Outcomes. November 4, 2014. Available at Funding-for-Results_BeeckCenter.pdf (georgetown.edu)

[4] Ibid

[5] Casey Family Programs. (2017). *How does turnover affect outcomes and what can be done to address retention?* Retrieved on March 10, 2023 from www.casey.org/turnover-costs-and-retention-strategies/.

[6] Harder, K. & Toole, S. (2022). You can't hire your way out of the staff turnover crisis: Addressing the realities of staff turnover through process. *Policy & Practice,* 22-31.

To support retention, these changes will create consistency and standardize agency policy and processes to better support caseworkers. Caseworkers will have more confidence in their case-related decision-making and their ability to meet administrative requirements of the job. In turn, they will feel effective in their roles and be more likely to stay.

### Revenue Maximization

A review of the most recent Child Trends data from 2018 reveals that Georgia ranks 35th overall nationally in annual child welfare expenditures per child at $351.12.  The same data report ranks Georgia 29th overall nationally in annual per child expenditures from state and local sources and 31st nationally regarding expenditures from federal funds at $155.52.

Adding further perspective, funds from the Temporary Assistance for Needy Families (TANF) program make up 55 percent of the total of federal funding available annually for child welfare programming in Georgia.  This ranks Georgia 6th highest in the nation in annual TANF allocation, per child.

Availability of funds does not appear to be an issue regarding the application of sufficient programming to affect change in Georgia's child welfare service delivery system, but Georgia is not accessing all available funds and leaving money on the table, which could have an even greater impact on affecting change.  However, the development, implementation and uniform monitoring of funding allocation is a critical concern.  Consistent and sustainable identification and proper claiming of funds, as well as maximization of those funds at the State's disposal are critical from this point forward for DFCS to provide the appropriate care and services for the population of children and families served. Oftentimes, there is money left on the table due to simple administrative oversights, such as missing paperwork or case record determinations in a child's file. These oversights can be corrected relatively easily, resulting in additional resources.

## III.   STATUS OF THE INFRASTRUCTURE STANDARDS

The detailed analysis that follows discusses the first and final three Infrastructure Standards reported in the third brief on the Infrastructure Standards, the status of each standard, and the extent of the standard's implementation as described in the Modified Consent Decree and Exit Plan. This analysis also identifies where the Division decided to modify the standard because other strategies would achieve better outcomes for children and their families in Metropolitan Atlanta. This section will detail the original MTAT recommendations and their implementation status. Appendices A through I contain the status of all nine infrastructure standards and MTAT recommendations.

### Overview of the Infrastructure Standards

The Infrastructure Standards outlined in the Stipulated Consent Decree and Exit Plan (see Appendix A) were developed through party negotiations spanning a year. The Division identified key priorities and practices to achieve better outcomes if practiced with fidelity.

### Infrastructure Standard VII: Supervision of Contract Agencies

This infrastructure standard specifies how DFCS will license and contract with Child Caring Institution (CCI) and Child Placing Agency (CPA) provider placements and monitor those

placements and placement agencies to ensure the safety and well-being of children. Provisions detailed include no child being placed in an unlicensed facility, mandated reporter and safety requirements being detailed in contracts, monitoring compliance with data on outcomes and conducting routine safety reviews of foster homes, and licensing reviews of agencies.

## *Safety Parameters*

### Overview

There are two provisions that relate to ensuring the safety of children and youth who are placed with contracted providers. The first provision of the Infrastructure Standard (VII.C) related to safety has to do with suspected abuse and neglect of a class member while in a provider placement, forbidden use of corporal punishment, and the results of the investigation being considered by RCCL as to whether there should be licensing sanctions or any contractual sanctions. The second provision of the Infrastructure Standard (VII.G) related to safety details how OPM will conduct safety reviews on provider homes and special safety reviews when any additional concerns are identified. For specific findings of DFCS performance on these provisions, please see Appendix A.

The Office of Provider Management (OPM) receives an alert from SHINES when a report of maltreatment is made for children placed in Child Caring Institutions (CCIs) or Child Placing Agencies (CPAs), and all providers are required to complete policy violation assessments. OPM leadership shared that they track corrective action plans for each agency, and routinely run reports on foster homes or foster parents, as it is practice to always look at foster home history when a new report comes into SHINES. If a report shows there is a substantiated report of abuse or neglect on a foster home, the foster home is closed, and if for a CCI, they will follow up with the agency to ensure the staff member is no longer employed with the CCI agency.

OPM shared that the safety review process, which remains unchanged since previously described in Infrastructure Brief 2, is very effective. Leadership did share that agencies seemed to get complacent during the pandemic, when they saw an increase in the number of lower scoring reviews and conducted an elevated number of corrective action plans (CAP) from safety reviews. Special safety reviews are conducted when OPM observes a trend of repeat allegations, or concerns are raised from other sources, such as Residential Child Care Licensing (RCCL) or the Department of Juvenile Justice (DJJ). Trends are also reviewed from significant event reports submitted to OPM. To understand the process better, OPM shared that in the first nine months of 2022, three agencies were placed on suspension due to programmatic or operational concerns. As a result of the suspension a corrective action plan was required and OPM implemented a plan to conduct additional safety reviews to closely monitor provider compliance with the corrective action plan.  OPM conducted two special safety reviews per month and eventually decreased to conducting one safety review one time per month until provider performance improved, and satisfactory corrective measures had taken place.  The provider would then be put back into the regular rotation of having at least one safety review per quarter.

MTAT previously made the following recommendation pertaining to the safety provisions of Infrastructure Standard VII:

*Determine the extent to which there are adequate staffing and resources to monitor the performance of the 180 + contract agencies statewide including, conducting safety reviews and ensuring children are placed in approved homes.*

While a few new positions are actively being advertised for, it is unclear whether this recommendation was adopted. As of April 18, 2023, all positions advertised for had been filled. MTAT will continue evaluating whether the workforce is adequate to effectively monitor the numerous contract agencies.

## Findings and Themes

RCCL still completes full investigations and utilizes the same matrix previously reported in Brief 3 for determining violations and subsequent investigations. They share investigation findings with DFCS. When asked how often RCCL finds that provider agencies failed to report suspected abuse, RCCL shared that in the previous year, 25 CCIs and 21 CPA agencies had been cited for failing to report serious occurrences involving children in care to RCCL, including suspected abuse. Unannounced visits to agencies are still occurring, though admittedly RCCL acknowledges that due to them needing to occur within 365 days and RCCL needing to call ahead to ensure no covid exposures, agencies are generally aware of when the visits will occur. Regardless, it is common for citations to be issued during these visits.

RCCL provided the ten most common citations for CPA homes and CCI facilities for each quarter of 2022, seen in the tables below:

**Table 1: Top Five CPA Citation Reasons for FY 2022**

|  | Total |
|---|---|
| Agency Practices [Do Not] Conform to Written Policies | 21 |
| Involvement of Child, Foster Parent and Agency Representative [Not] Documented in Case Plan | 20 |
| Foster Home Study Reports [Do Not] Include Specific Requested Information | 16 |
| Develop and Implement Policies and Procedures for Behavior Management [Did Not Occur] | 13 |
| Medical and Dental Exams and Services [Not] Provided | 10 |

Data Source: RCCL

**Table 2: Top Five CCI Citation Reasons for FY 2022**

|  | Total |
|---|---|
| RBWO Plan [Not Developed] and [Does Not] Contain Required Information | **28** |
| Child, and Guardians or Agency Representative [Not] Involved in Development of RBWO Plan | **27** |
| Written Personnel Record [Does Not] Contain Health Screening within Specified Timeframe | **22** |
| Completion of a Full Written Assessment and Development of a Plan for each child within a Specified Timeframe [Did Not Occur] | **18** |
| Medication Use and Management Policies and Procedures [Do Not] Contain Required Information | **17** |

Data Source: RCCL

When allegations of abuse and neglect occur, DFCS links the name of the CCI or CPA so OPM gets an alert, which then requires the agency to complete a policy violation assessment. As reported above, safety reviews are reported to be highly effective though an increase in the need for Corrective Action Plans was observed through the pandemic, however scores have improved since in person Safety Reviews resumed in 2021. When looking at the data of Safety Reviews completed in FY 2022 on CPAs and CCIs which held class children youth, other insights can be drawn. The safety reviews provide three primary results: a safety score (0-100), a safety finding (safe, risk identified, and unsafe), and a concern for quality of care finding (none, minor, moderate, and significant). These scores do not always seem to logically correlate, as each has its own scoring logic. For example, the CCI safety review with the lowest safety score in FY 2022 was 25, which had a safety finding of 'risk identified', however the one CCI safety review with a finding of 'unsafe' had a safety score of 50. In another instance, a CCI had a safety finding of 'safe' and a concern for quality of care as 'minor', but a safety score of 55.[7] Examples of the most common issues identified reviewing the safety reviews further include concerns with bedding, cleanliness, physical damage to the property, incomplete CAPs, pest concerns, and improper documentation of residents.

For twelve CPAs housing class children that had a safety review in FY 2022, only three had a safety finding or concern for quality of care above safe/none. The remaining nine reviews had safety scores of 100%, safe finding and no quality-of-care concerns. The table below reflects the overall results of the FY 2022 safety reviews on placements with class children.

---

[7] The Division responded with the following statement: As it relates to the scoring logic used for Safety Reviews, the safety score, safety finding and concern for quality of care finding each have their own logic. Each question is assigned a weight and the response to each question determines the overall score for the safety review.  The safety finding is determined by the reviewer and is based on their assessment of safety during their safety review visit.  The concern for quality of care is also based on the reviewer's assessment of quality of care during their safety review visit.  For this reason, it is possible that a provider can have a score of 25 with a safety finding of "risk identified."

**Table 3: FY 2022 Safety Reviews for Providers Housing Class Children**

| | | CCI | | CPA | |
|---|---|---|---|---|---|
| Number | | 99 | | 12 | |
| Safety Score Range | | 25-100 | | 45-100 | |
| Safety Score Average | | 88.3 | | 91.7 | |
| Safety Finding | Safe | 75 | 75.8% | 9 | 75% |
| | Risk Identified | 23 | 23.2% | 3 | 25% |
| | Unsafe | 1 | 1% | | |
| Quality-of-Care Concern | None | 47 | 47.5% | 9 | 75% |
| | Minor | 22 | 22.2% | 2 | 17.7% |
| | Moderate | 26 | 26.3% | 1 | 8.3% |
| | Significant | 4 | 4% | | |

Data Source: OPM Data Request, Care Solutions

## *Oversight Parameters*

### Overview

There are five provisions in this Infrastructure Standard that relate to the general oversight of contracted provider agencies:

- ***VII.A***: This provision relates to assuring all CCIs and CPAs meet the applicable terms of the Kenny A. Modified Consent Decree and Exit Plan;
- ***VII.B***: This provision ensures that DFCS will only contract with licensed contractors and children not being placed in unlicensed facilities;
- ***VII.D***: This provision requires all CCIs and CPAs to provide DFCS with accurate data so their compliance with the Kenny A. Modified Consent Decree and Exit Plan can be monitored;
- ***VII.E***: This provision requires DFCS to develop reports detailing contract agencies performance for children served and should be used to inform continued utilization, contracting and financial reimbursement; and,
- ***VII.F***: This provision details the licensing and monitoring responsibilities of RCCLs.

For more information about current and prior DFCS performance as it relates to these oversight provisions of Infrastructure Standard VII, please see Appendix A.

Like the information reported in Infrastructure Standard Brief 3, the Office of Provider Management (OPM) has many processes and structures in place to ensure compliance with the provisions of this standard. The Room, Board, and Watchful Oversight Manual, which is updated annually, has Infrastructure Standards and expectations around the Modified Consent Decree built in. Updates that are made generally include any policy changes, or requested clarifications based on provider feedback. OPM also only works with contracted providers, and they typically do not encounter re-licensure issues. OPM leadership report data received from CCIs and CPAs is accurate, as they generally ask for items that can be verified. Leadership estimated that maybe 10-15 percent of the time they may not find supporting documentation or dates reported do not align. The Performance-Based Placement Scorecards are the only data reports being used to monitor agency performance. OPM requires submission of a Performance Improvement Plan for agencies determined to be under-performing, and they will monitor those plans. Consistent,

unsuccessful compliance could be used to terminate contracts, though it was reported that OPM has had no terminations in recent years.

MTAT previously made the following recommendations related to the oversight provisions of this Infrastructure Standard.

*Shift from the current system of monitoring contract agencies (Performance-Based Placement), which is based on process measures, to a monitoring system that relies on an agency's ability to promote and achieve positive outcomes for children and families. This includes demonstration of cultural competence and understanding of race equity, including directing resources to those agencies and community-based organizations most trusted by families. In concert with that, the payment methodology must be aligned with the Division's desired outcomes.*

*DFCS shall not contract with an agency whose license has been revoked. While it is understood that when RCCL has deemed it necessary to revoke an agency's license, they are not bound to cancel that agency's contract.*

Neither of these recommendations have been implemented, though it should be noted that both OPM and RCCL confirm that there would not be a circumstance where RCCL has revoked a license and OPM would continue the agency's contract. When asked about thoughts on performance-based contracting (PBC), the Director of OPM shared that they thought it was a good idea to tie contracting with finances, as it would promote more effective provider compliance and support OPM in addressing non-compliance concerns and/or contract termination.

## Findings and Themes

As detailed in Infrastructure Brief 6, the last year and a half have highlighted significant challenges with securing appropriate placements for children and youth in Georgia and Region 14. From OPM's perspective, staff have coalesced in recent months to address these issues in ways not seen before.  The OPM Director shared there has been a drastic decrease in the number of children without placement.  To address the placement crisis, several strategies have been implemented.

One of the foremost of those has been the encouragement of providers to accept placements by providing both enhanced rates exceeding the normal placement rate, as well as $5,000 grants to providers accepting those children and youth presenting unique placement challenges.  The Director of OPM shared that both strategies had the intended impact as more providers were willing to support the placement push whereas before they were less willing. DFCS shared their tracking log of providers and foster parents who received enhanced rates for Region 14 children as of November 14th. Of the 40 placements reflected in the log, $631,140.54 had been provided to CPA and CCI agencies and $186,493.69 had been provided to foster parents themselves.[8] As it

---

[8] A note on the Enhanced Rate tracking log: The dollar amounts reflect 40 placements, while 44 placements are noted in the log. Of the four not included: one youth's waiver was still pending and therefore not confirmed, one waiver was written and not used, and for the remaining two the enhanced rate was put into existing CCI placements in order to preserve the placements which had been in place one and two years respectively, but it is unknown when the enhanced rates took effect, and therefore are not included. These 40 placements reflect 35 unique children.

relates to the $5,000 grants, a survey was distributed to providers to inquire as to how they used the money. While there was a lower than desired response rate, the majority of those that responded indicated they used the money for staffing or facility repairs. Information on how the grants are used should be analyzed to inform spending plans moving forward.

However, other changes in OPM practices have limited available placement options for older youth. In July 2021, the requirements changed for Independent Living Program (ILP) scatter site placements so that youth must already have a diploma or a GED to be placed, with no waiver process in place, which has resulted in a significant decline in new ILP placements. This change was the result of a workgroup comprised of DFCS, DJJ, the Office of the Child Advocate, and providers.  This workgroup met reviewing trends on non-compliance with ILP placements. They found that youth who did not already have these educational goals achieved did not have great outcomes and were less stable in their placements. While youth living in ILP placements were grandfathered in when the changes took place, this change has impacted an already vulnerable population. Some analysis of this policy shift should be conducted to better understand the impact of this decision.

OPM shared they have been focused on supporting existing providers in handling youth, though several agencies, like DFCS, are having their own staffing crises. As such, Division Leadership has stepped in to help staff provider agencies using a temporary employment agency. This effort began in May or June of 2022 and was slated to end in November, but the decision was made to continue the funding of staffing support to providers.  A total of eight to twelve agencies took advantage of this additional support, several on a short-term basis but some for an extended period of time.  Some of the agencies are relatively large, having a 30-40 placement bed capacity.  These agencies felt this support was critical in helping augment staff capacity to, in turn, positively impact the placement crisis. For those who accepted the assistance, OPM have met regularly with the providers to assist in developing a staffing plan for the agency, including recruitment and retention of staff.

OPM themselves shared that they only have one current vacancy and are onboarding one staff now, accounting for 25 total. RCCL currently has 30 positions, with four vacancies (two surveyors, an attorney, and a supervisor); three of these vacancies have been open for an extended period of time. In addition, RCCL is working to add two new positions as trainers who will go out and work with providers to improve the work and documentation of their staff. When the current Director of RCCL started in February 2021, the quality of the work being conducted and the position requirements were found not to be in alignment. One of her first changes was to work with Human Resources to reallocate job codes, which in turn emphasized a definite career path for staff: from worker, to lead worker, to supervisor, to manager.

RCCL shared their greatest challenges, as well as their biggest opportunities for improvement, involve technology and funding to improve technology. The current electronic Tracking Residential Applications, Incidents & Licenses System (TRAILS) is problematic, with limited capacity and limited ability to adapt; this presented challenges that RCCL wishes to improve upon.  The TRAILS system is the current web-based portal that is accessed by providers to enter data, including waiver requests and incident reports. RCCL is currently focusing their efforts on returning to full re-licensure evaluations now that onsite reviews are occurring post-pandemic.

They began this process in September 2022, targeting January 2023 to be back to full re-licensure reviews as opposed to abbreviated reviews. They have also been focused on running a pilot for providers to enter information directly into the system and supporting that roll out.

When asked about the current vision for the direction of OPM, it was shared that the primary focus was on offering more training opportunities and looking for ways that they can better meet the placement needs in the state of Georgia. In previous reports, MTAT shared that DFCS had begun providing quarterly reports detailing the demographics and placement needs for children in custody, though those have not been distributed in the last year. Current leadership is looking into putting those reports back into distribution, as providers indicated they were helpful.

To further relations with providers, OPM and RCCL regularly engage in meetings with providers to further promote the relationship and understanding of their needs. There are monthly provider leadership calls led by Together Georgia, as well as monthly meetings with CPA providers and quarterly meetings with CCI providers. DFCS reports these meetings have a great turnout and providers are eager. A common theme from providers through the course of this relationship building is staffing and how to best deploy existing staff. Providers have shared with DFCS that they like the support they are receiving from the division, the willingness to hear what the providers have to say, and the opportunity to be a part of creative solutioning.

OPM still utilizes its 'Performance-Based Placement' system to monitor CPA and CCI provider agencies on various performance metrics. As reported in Brief 3, these measures are largely self-reported metrics, which are verified at onsite reviews, and are not tied to outcomes or financial reward/penalty. Agencies with continuous low performing metrics are put under corrective action, and contracts are not likely to be renewed should performance not improve. Looking at scores over the first three quarters of 2022, some patterns emerge.

**Table 4: Average RBWO Placements and Overall Scores over First Three Quarters in 2022**

|  | Q1 | | Q2 | | Q3 | |
|---|---|---|---|---|---|---|
|  | Placements | Score | Placements | Score | Placements | Score |
| CPA | 12.3 (n=54) | 89.2 (n=54) | 12.2 (n=56) | 89.0 (n=56) | 12.0 (n=50) | 91.7 (n=50) |
| CCI | 56.9 (n=53) | 90.9 (n=53) | 56.9 (n=54) | 93.2 (n=54) | 58.9 (n=51) | 93.2 (n=51) |
| Metro | 26.2 (n=52) | 88.3 (n=52) | 27.9 (n=54) | 90.6 (n=54) | 28.0 (n=49) | 93.3 (n=49) |
| North | 59.0 (n=22) | 89.9 (n=22) | 57.3 (n=22) | 90.9 (n=22) | 69.1 (n=20) | 93.3 (n=20) |
| South | 30.9 (n=33) | 92.9 (n-33) | 29.1 (n=34) | 91.8 (n=34) | 26.6 (n=32) | 90.5 (n=32) |
| Total | 34.4 (n=107) | 90.1 (n=108) | 34.1 (n=110) | 91.1 (n=110) | 35.7 (n=101) | 92.4 (n=101) |

Data Source: OPM Data Request, Care Solutions

The average number of CPA placements decreased slightly over the three-quarter period while the average number CCI placements increased. Scores for both CPA and CCI providers increased over the three-month period.

Looking at scores of individual agencies over the three-quarter period, Metro agencies saw the most improvement in their scores from Q1 to Q3, with a six percent and three percent increase in scores in CPA and CCI agencies respectively. North agencies saw a ten percent increase in their CPA scores, while a twelve percent decrease in their CCI scores, and South agencies saw one

percent and two percent decreases in performance over the period for CPA and CCI agencies respectively.

While this form of monitoring does provide insight into various metrics with which to understand compliance to policy, it does not help the Division understand the extent to which the services delivered have been cost-effective and whether they are having the desired impact of timely and sustainable permanency.

## Recommendations

1. **Shift from the current system of monitoring contract agencies (Performance-Based Placement), which is based on process measures, to a monitoring system that relies on an agency's ability to promote and achieve positive outcomes for children and families. This includes demonstration of cultural competence and understanding of race equity, including directing resources to those agencies and community-based organizations most trusted by families. In concert with that, the payment methodology must be aligned with the Division's desired outcomes.**

MTAT respectfully continues to recommend the Division to implement a Performance Based Contracting system as it continues to increasingly rely on contracted providers to provide needed services to children under their care.

### *Infrastructure Standard VIII: Robust Workforce*

This infrastructure standard specifies how DFCS will develop and support a competent and professional workforce. To do so, DFCS is committed to providing a continuous learning environment to address emerging best practices, maintain professional ethics, and build the skills and competencies necessary to address the needs of vulnerable children and families. Provisions detailed include implementation and monitoring of an Employee Selection Protocol (ESP), recruitment and hiring practices, supervision, and training practices to support staff, and caseload standards.

### *Employee Selection Protocol*

#### Overview

There are three provisions in this Infrastructure Standard that relate to the Employee Selection Protocol (ESP):

- *VIII.A.1*: This provision relates to assuring the ESP is utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.
- *VIII.A.2*: This provision ensures that DFCS employs a continuous quality improvement process to evaluate and determine the effectiveness of the ESP.
- *VIII.A.3*: This provision requires DFCS to implement an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen the DFCS workforce.

The ESP was re-implemented after adjustments were made in 2019, and the ESP evaluation was first conducted in 2021. For more information about the ESP, please see description provided in

Infrastructure Brief 2. For more information about current and prior DFCS performance as it relates to these oversight provisions of Infrastructure Standard VIII, please see Appendix B.

## Findings and Themes

Interviews and focus groups highlighted a few themes, particularly regarding the outcome of the ESP as it relates to both the employees selected and the applicants applying for positions with DFCS. First, applicants do not generally have realistic expectations of what the job entails and do not have experience related to child welfare. While applicants for Social Service Specialist 1 (SS1) positions may meet requirements in that they have a bachelor's degree, their lack of experience limits their ability to understand the work and ultimately take on roles in child welfare. The ESP and other hiring processes are not sufficiently assessing applicant understanding of or readiness for child welfare work.

Given the identified limitations associated with the current quality of candidates, those interviewed who participate in the interviewing process indicated that they try to seek clarification of applicants in interviews to determine job appropriateness. First, interviewers will focus on identifying the applicant's experience and its relation to child welfare work. While not all applicants have direct child welfare practice experience, similar roles with case management or investigative responsibilities may be applicable. Additionally, interviewers look to assess an applicant's perception of families receiving support from the government to understand their passion for the work and any judgement or biases that may impact their ability to do the work. Interviewers also seek to understand if an applicant is teachable; if they do not have the education or experience that makes them an easy fit but appear to be able to learn and grow in the role, they may be a better candidate than someone who fits the ESP criteria but is not interested in learning or growing.

In addition, interview and focus group participants indicate there may be a mismatch between ESP criteria and supervisor expectations of applicants. While an applicant with a bachelor's degree and no child welfare experience would qualify for an SS1 position, hiring managers often seek applicants with experience and the ability to take on caseloads more quickly. Because of this mismatch, many of the eligible candidates OHR sends to the county for consideration are not interviewed or not hired after interview.

As of November 7, 2022, 616 staff statewide had been trained on the ESP. One hundred reviews on the practice and fidelity to the ESP were conducted between May 2021 and February 2022. In February 2022, ESP fidelity reviews were put on hold as the ESP training and guide needed to be updated to reflect policy changes, including phone interviews no longer being required to be conducted as part of the protocol.

Of those 100 reviews conducted May 2021-February 2022, only 50 percent (n=50) fully completed the ESP Checklist in HR PASS. In addition, 91 percent (n=91) indicated that not all staff who participated in the recruitment and selection of Social Services Specialist applicants were ESP trained. While most of those 91 reviews included at least one staff member who was ESP trained (n=73, 80.22%), almost one-fifth (n=18, 19.78%) of those 91 did not have any ESP trained staff participating in recruitment and selection of staff.

The 100 reviews also show some areas of strength related to the ESP. The reviews show that 78% (n=78) of the interview panels consisted of 3 or more interviews and 77% (n=77) had the applicant complete the in-basket exercise. Further, all reviews included an on-site (or video) interview with the applicant, included interviewers on the panel with an understanding of the job responsibilities required of the Social Services Specialists, and included a panel de-brief following the on-site interview.

## Recommendations

**2.  Engage county leadership on priorities for job candidates and alignment with ESP.**

State Office of Human Resources (OHR) leadership should engage with county leadership to discuss how to prioritize candidates to ensure alignment with ESP. Focus group themes suggest there may be a disconnect between what the ESP identifies as an eligible candidate and those candidates that county partners will prioritize. Re-aligning these expectations and determining priorities for ideal candidates will help to streamline the recruitment and hiring processes and ensure interviews are reserved for the most qualified candidates.

**3.  Prioritize applicants with child welfare work experience when hiring**

Applicants who have direct experience as child welfare workers in other jurisdictions should be actively prioritized in the hiring process and recognized in job classification decisions. Job-fit is consistently identified as a predictor of job satisfaction and workforce retention in child welfare[9]. When staff experience a perceived lack of clarity or fit with their job responsibilities, they are more likely to leave[5]. Hiring staff who already have experience in child welfare or related settings ensures that they have a realistic understanding of the requirements of the job and perceive an individual fit with those requirements. In turn, those staff will be more likely to stay in the job for a longer tenure than other applicants that are eligible for the role based on the ESP, but have no experience related to the work.

**4.  Recruitment bonus for staff who refer applicants who are hired and maintain employment for a certain period of time.**

Current staff are the best recruiters for new workers and deserve recognition for their recruitment efforts when successful. An internal referral from a current staff-member helps the agency to ensure good job-fit up front and ensures that the new staff member has a built-in peer support upon hire[10]. The job-fit and support benefits result in less turnover for both the original employee and the referred employee[7]. A monetary bonus or other contingent reward should be provided if the referred applicant is successfully hired and retained for six months or one year. This is a

[5] Harder, K. & Toole, S. (2022). You can't hire your way out of the staff turnover crisis: Addressing the realities of staff turnover through process. *Policy & Practice,* 22-31.

[9] Kim, H & Kao, D. (2014). A meta-analysis of turnover intention predictors among U.S. child welfare workers. *Children and Youth Services Review, 27(3),* 227-248.

[5] Harder, K. & Toole, S. (2022). You can't hire your way out of the staff turnover crisis: Addressing the realities of staff turnover through process. *Policy & Practice,* 22-31.

[7] Kim, H & Kao, D. (2014). A meta-analysis of turnover intention predictors among U.S. child welfare workers. *Children and Youth Services Review, 27(3),* 227-248.

[10] Kmec, J. A. (2007). Ties that bind? Race and networks in job turnover. *Social Problems, 54(4),* 483-503.

useful strategy to encourage current staff to make these referrals for appropriate friends and family, both giving them a stake in recruiting and retaining staff and providing them with recognition that will influence them to stay[5]. According to the Division this was explored and denied by the Office of Planning and Budget.

**5. Follow up on ESP utilization to determine why certain steps in the protocol are not consistently followed.**

The 100 ESP reviews show that not all the steps in the protocol are being completed. To ensure the ESP is utilized to its full potential, we recommend following up on ESP utilization to determine why the ESP checklist is not consistently uploaded into HR PASS and why untrained staff are participating in interview panels. Determining why the protocol is not consistently followed will help to highlight any existing barriers in the process and to determine appropriate action to move forward to support the recruitment and hiring of new staff.

## *Hiring Process with OHR*

### Overview

There are seven provisions in this Infrastructure Standard that relate to the hiring process with the Office of Human Resources (OHR):

- *VIII.B.1*: This provision requires OHR to post positions within three business days of an approved request.
- *VIII.B.2*: This provision involves OHR identification and report of vacancies to the County, Regional, and District Directors on a monthly basis.
- *VIII.B.3*: This provision ensures that an OHR recruiter conducts a recruitment event at least monthly.
- *VIII.B.4*: This provision stipulates that OHR share recruitment efforts with respective counties on a quarterly basis through e-mail correspondence to the associated County, Regional, and District directors.
- *VIII.B.5*: This provision gives OHR five business days to screen and forward a list of qualified applicants to the County Director and designee following closure of the posting.
- *VIII.B.6*: This provision requires OHR to finalize all recruitment efforts, from initiation of recruitment to offer letter, no later than five business days after receipt of the cleared criminal background check.
- *VIII.B.7*: This provision ensures OHR will coordinate with DFCS on all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

For more information about current and prior DFCS performance as it relates to these oversight provisions of Infrastructure Standard VIII, please see Appendix B.

OHR continues their efforts to recruit and interview potential employees. They use various recruitment strategies to identify interested applicants by hosting job fairs, participating in career fairs hosted by local universities, weekly interviewing events, and listing the SS1 position for continuous recruitment. In addition, OHR utilizes flyers, word-of-mouth referrals, and web-based staffing and employment platforms to identify applicants. The SS1 job description was

revamped in 2018 to align with the new case management process associated with changes from the Blueprint.

The recruitment team sends candidates from recruitment events to OHR, who then screened against minimum job qualifications to determine eligibility. To deem eligible for entry level requirements, the applicant must have the minimum of a bachelor's degree.

After identifying applicants who would meet the minimum job qualifications, OHR provides a list of applicants to the county hiring manager(s) to schedule interviews. Counties attempt to interview weekly, often interviewing applicants on Thursday or Friday of the same week they receive the referral. Interviews are conducted with a two-person panel, even though the ESP prescribes a three-person panel. The panel asks applicants a list of pre-determined questions to gauge interest and appropriateness for the associated position.

The applicants deemed appropriate for hire following their interview are then referred to OHR to complete the hiring process. The county hiring manager(s) are required to upload the candidate's interview packet to HR PASS so the required background checks and other hiring processes prior to making any offers for employment.

## Findings and Themes

Overall, candidates who are interviewed seem eager to do the work. Some come with experience from other states or have had experience in similar roles in Georgia. However, themes from focus groups and interviews highlight some continuing barriers related to the recruitment and hiring processes.

At the recruitment level, respondents identified a few useful options that are not currently being utilized. One such example is social media. While the Division indicates social media is used to advertise positions, during interviews it was suggested that SS1 postings are not advertised on social media channels, even though the target audience of the postings are often easily accessible on social media. Additionally, recruitment processes are not identifying applicants with a realistic understanding of the work, limiting the options for hire after OHR review or county interview processes.

In addition, barriers in scheduling interviews were identified. As listed above, interviews occur with two panelists. However, current staff available to participate in the panel have limited scheduling options given their regular job responsibilities, which restricts the options for interviews and the number of applicants that can be interviewed each week. The limited quantity of interviews also limits the number of new hires, given that not all applicants interviewed receive offers of employment. The Division should explore providing overtime or otherwise monetarily incentivize staff to participate in interviews.

Recent changes to interview protocol were also consistently highlighted by respondents as barriers to hiring. Previously, applicants were asked scenario-based questions in interviews to gauge their decision-making and critical thinking processes. Over the last few years, these questions have been removed from the protocol and limit interviewers' ability to determine if applicants have the skills necessary to fulfill work requirements.

Respondents also highlighted a need for questions that gauge the applicant's understanding of and commitment to the work. Previously, interviews included a "life of a case" video to give applicants a realistic preview of the work. However, the video is no longer used, limiting applicants' understanding of the reality of work in child welfare and interviewers' ability to determine applicant appropriateness for the job.

Post-interview, many identified the timeline associated with the hiring process as a significant barrier. Respondents indicated that the hiring process is taking too long. After counties send OHR the packet of information required to complete the hiring process, they report it can be weeks before an offer is extended, and the new employee begins. To those outside of OHR, the process feels disorganized and too time-consuming, sometimes leading to a loss of appropriate candidates to other agencies who can make offers and onboard more quickly.

At the end of 2022, Region 14 had 302 staff in Social Services Specialist and Social Services Specialist Supervisor positions, compared to 2,049 staff statewide. Like the statewide sample, the highest proportion of staff are under the Social Services Specialist 1 entry level position. However, Region 14 has lower proportions of entry level Social Service Specialist positions (n=121, 40.07%) and larger portion of staff in the highest Social Service Specialist position (n=63, 20.86%) than in the statewide workforce (SS1: n=883, 43.09%; SS3: n=336, 16.40%).

**Table 5: Positions Filled by Type**

| Job Title | Region 14 | | Statewide | |
|---|---|---|---|---|
| Social Svcs Spec 1 | 121 | 40.07% | 883 | 43.09% |
| Social Svcs Spec 2 | 49 | 16.23% | 367 | 17.91% |
| Social Svcs Spec 3 | 63 | 20.86% | 336 | 16.40% |
| Social Svcs Spec Spv | 69 | 22.85% | 463 | 22.60% |
| **TOTAL** | **302** | 100% | **2049** | 100% |

Data Source: Office of Human Resources

OHR does utilize university partnerships to recruit applicants through Title IV-E Child Welfare Training programs. As outlined in Table 6, 30 students have graduated from Title IV-E programs since 2016, 24 from Georgia State University, four from the University of Georgia, and two from other universities. Of these 30 Title IV-E alumni, six are employed by Region 14, six are employed elsewhere (Gwinnett, Cobb, and private agency), thirteen are no longer employed with DFCS, and five are in the process of completing their degree.

**Table 6: Number of Title IV-E Student Graduates in Region 14 by Year**

| Year | Number of Students |
|------|--------------------|
| 2016 | 8 |
| 2017 | 7 |
| 2018 | 1 |
| 2019 | 2 |
| 2020 | 5 |
| 2021 | 4 |
| 2022 | 3 |
| **TOTAL** | **30** |

Data Source: Office of Human Resources

## Recommendations

**5. Expand university partnerships to continue to participate in job fairs, recruit Title IV-E students, and field placements**

Expanding university partnerships is a useful way to recruit and retain new staff with specialized preparation for work in child welfare. A 2020 evaluation of Colorado's Title IV-E Child Welfare Training Program finds that 92% of the state's Title IV-E alumni completed their work payback and that graduates of the program stay for an average of 4.79 years[11]. This average tenure is notably higher than the 1.8-year average tenure of the general child welfare workforce[12]. Title IV-E programming and other university-based partnerships allows the agency to capitalize on students' interest in public child welfare work and to support specialized training that meets the needs of the agency following students' graduation from the program. Targeting job fairs for both social work and non-social work programs is recommended.

**6. Update recruitment strategies to include recruitment on social media and other job-search sites used by target population**

The general workforce in the United States is in a transition phase, as Baby Boomers and Generation X workers are beginning to retire, and Millennial and Generation Z workers become the majority[13]. With this generational change, agencies must also re-consider their recruitment strategies to ensure they are reaching the right populations. Updating current strategies to include social media and other web-based platforms to recruit will help to reach target populations that are looking for work.

---

[11] Trujillo, K. C., Bruce, L., de Guzman, Al., Wilcox, C., Melnyyk, A., & Clark, K. (2020). Preparing the child welfare workforce: Organizational commitment, identity, and desire to stay. *Child Abuse & Neglect, 110,* 1-10.

[12] Edwards F. & Wildeman, C. (2018). Characteristics of the front-line child welfare workforce. *Children and Youth Services Review, 89,* 13-26.

[13] Zlotnik, J. L., Strand, V. C., & Anderson, G. R. (2009). Introduction: Achieving positive outcomes for children and families: Recruiting and retaining a competent child welfare workforce. *Child Welfare, 88(5),* 7-21.

**7. Bring back scenario-based questions in interviews, competency-based hiring models**

Interviews should include scenario-based questions to highlight the applicant's critical thinking skills and competency related to child welfare situations. Competency-based hiring decisions allow agencies to ensure applicants have the knowledge and skills necessary for work in child welfare[14]. With realistic scenario questions, the interview panel can assess the applicant's ability to respond to situations and give the applicant a realistic preview of the decisions they will be required to make in the role.

**8. Update and utilize "realistic job preview video" in interviews, as well as an opportunity to speak with current case managers.**

Use of videos that highlight the reality of work in child welfare supports retention[15]. The videos help interested applicants clarify the specific role of child welfare case workers and gives them the opportunity to self-select into or out of the hiring process given their perception of the worker role. Updating the video to provide an up-to-date preview of child welfare work in Georgia and utilizing it in the interview process to explore the applicant's perception of and comfort with the responsibilities of child welfare workers will help to prioritize applicants who fit well with the work. Georgia has invested in and currently utilizes Virtual Reality goggles in their pre-service training which has been well received, and there may be an opportunity to use this technology for the realistic job preview.

**9. Increase the number of eligible panel members**

The limited availability of current panel members limits the options for interviews for potential staff and the number of applicants that can be offered positions. Expanding the number of eligible panel members will allow agencies to interview more applicants each week and make offers of employment in an expedited manner.

## *Training*

### Overview

There are five provisions in this Infrastructure Standard that relate to the supervision and training of DFCS case managers:

- *VIII.C.1*: This provision requires that no case manager assumes primary responsibility for a CPS, family preservation, foster care, or adoption case until they receive certification of successful participation in new worker training.
- *VIII.C.2*: This provision requires all supervisors of case managers with caseloads to complete the DFCS supervisory training within 120 days of promotion and receive a minimum of 20 hours of in-service training each year.
- *VIII.C.3*: This provision ensures that a mentoring program for child welfare supervisors is implemented to ensure case managers are appropriately supported by their supervisor.

---

[14] United States General Accounting Office. (2003). *Child Welfare: HHS Could Play a Greater Role in Helping Child Welfare Agencies Recruit and Retain Staff.* Report to Congressional Requesters.

[15] Webb, C. M. & Carpenter, J. (2012). What can be done to promote the retention of social workers? A systematic review of interventions. *British Journal of Social Work, 42,* 1235-1255.

- ***VIII.C.4***: This provision stipulates that private provider agencies contracting with DFCS to provide placement for children in DFCS custody must certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS.
- ***VIII.C.5***: This provision requires all case manager supervisors to meet minimum requirements, including a bachelor's degree in social work or a related field, and two years of experience as a case manager in child welfare, or a master's degree in social work or related field and at least one year of experience as a case manager in child welfare.

For more information about current and prior DFCS performance as it relates to these oversight provisions of Infrastructure Standard VIII, please see Appendix B.

The statewide training team has been focusing their time on new worker training due to high turnover and the high number of new hires. Previously, about 20 new workers were trained per month, however, in the last few months, 50-70 new workers are being trained per pay period. In addition to this influx of new workers needing training, the new worker training sessions transitioned back to in-person delivery of training in 2022 after being presented virtually in 2020 and 2021 due to the COVID-19 pandemic.

Some time ago, a simulation-based training model was implemented. A classroom was set up as an apartment, and trainees were asked to respond to real life scenarios in the "apartment" space. In Spring 2022, the simulation training shifted from this apartment-based model to virtual reality simulations. The change to virtual reality simulations allows for a wider group of trainees to participate in simulations at the same time and requires less trainer resources to do so. Also in 2022, the training team implemented team-based learning. Workers are assigned to groups in the training space and discuss real life scenarios. They are tasked with coming up with a team consensus regarding the task assigned in the scenario and learn together as they consider the details of the scenario to make a final decision.

In addition to these training modality updates, a modified training pilot is being implemented to reduce the training time required before a caseworker can begin supporting cases. This expedited training still provides new workers with the same content, only amending the timeline of content delivery.

## Findings and Themes

Themes from focus groups and interviews highlight some outstanding concerns related to caseworker training.

First, some caseworkers are resigning prior to completion of the training. Some of this turnover is associated with the worker's perception of their role before training. For example, workers come into the role expecting that they will be visiting children without realizing they will also have responsibilities to attend and participate in court, provide services, and have sensitive conversations with parents. When newly hired workers who are ill informed about their role attend training and discover the true nature of work in child protective services, they oftentimes make the decision to leave before training is complete.

Relatedly, workers have been less likely to pass the certification test following training. Some of this may be attributed to changing the training model from in-person to virtual due to the COVID-19 pandemic and related limitations for field-based learning. However, the decrease in passing grades following training may also support claims heard in focus groups and interviews that the training is not adequately preparing new workers to do the job.

Workers do not feel completely prepared for the work after they leave training. While focus group and interview respondents highlighted that training does successfully summarize the job role and general responsibilities at a high level, there was also agreement among respondents that more nuanced training is needed. Respondents identified a need for more practical training, including field-based training and/or mock staffing sessions with real cases and examples. The training process should include additional field-based mentoring or teach-back opportunities so that new staff can apply what they learn in the classroom.

Respondents also report that the pilot training, with a shortened timeframe to allow workers to take on caseloads more quickly, limits their understanding of the job. They suggest that the pilot training needs to be expanded to include more case examples and hands-on training to ensure new staff have the confidence to do the job. Following the shortened training, workers stated that they did not know where to start when taking on new cases and needed more support to work with families.

Themes from interviews and focus groups also suggest that increased onboarding support would be useful. New staff report they do not receive sufficient training on payroll processes, how to submit mileage for reimbursement, or support regarding documentation requirements.

These findings are also consistent with reports regarding the EAGLES program. Respondents report that EAGLES programming is too short and fails to train them on important aspects of the work. In addition, reports suggest that the onboarding and training processes are disorganized. Respondents highlighted a disconnect between academy training, EAGLES, and specialized supervisor programming due to different beliefs about the purpose of the different trainings and a disconnect between what is listed on paper and what occurs in practice. Clarification regarding the purpose of these different programs would be useful.

The specialized supervisors were described as helpful to support some of these training and support needs. However, respondents indicate that the transition from specialized supervisor to ongoing supervisor can be difficult. In the transition, workers are reporting to both a specialized supervisor and their ongoing supervisor and sometimes receiving different guidance from each supervisor. This is an additional stressor for new staff, especially as they are still figuring out their role and need consistent support to build their confidence and work-related competency. Respondents identified that an increase in confidence in their work would also result in an increase in worker morale.

Supervisor training data also show that supervisors are generally not receiving training within the required 120 days of promotion. For the 35 supervisors hired or promoted since 2019, it took an average of 335 days, or 11.2 months, for them to receive training. Fifteen of these 35 supervisors

have since left their positions, staying an average of 656 days, or 22 months, after promotion date.

**Table 7: Time from Hire/Promotion to Training for Supervisors**

| Job Title | Days before training | Mos before training | N |
|---|---|---|---|
| Social Svcs Spec 2 | 398 | 13.3 | 1 |
| Mgr Social Svcs | 352 | 11.7 | 1 |
| Social Svcs Prgm Consultant 3 | 350 | 11.7 | 1 |
| Social Svcs Spec Spv | 313 | 10.4 | 31 |
| **Total Average** | **318** | **10.6** | **34** |

Data Source: Training Department Data Request

As for ongoing training, supervisors in Dekalb and Fulton counties have a wide range of credit hours. As of this brief, hours range from 0 hours to 368 hours, with an average of 95.02 hours and a median of 58.75 hours.

## Recommendations

### 10. Re-structure pre-service training to prioritize field-based training

Pre-service training should emphasize more field-based options rather than classroom-based training. Caseworkers who participate in training that utilizes field experiences to satisfy training objectives feel more confident in their roles than those who participate in classroom-based training[16].This increase in confidence also leads to retention; caseworkers trained with field-based curricula are more satisfied and more likely to stay than those trained in a classroom[13].

### 11. Reconsider the structure of expedited training model

Reconsider the structure of the expedited training model to ensure case managers feel confident to do their job following completion. While the expedited model may successfully ensure case managers can carry caseloads more quickly, turnover will likely continue if caseworkers do not feel confident to meet the requirements of their job. Using case manager feedback regarding options to enhance the training model would continue to expedite the time from hire to certification and ensure case managers feel confident in their jobs once they leave training.

### 12. Determine why supervisors are not receiving supervision training within required timeframe

Training data indicates that supervisors are not receiving training within the required 120-day timeframe following promotion or hire. To ensure supervisors have the training and skills required to successfully support their staff, they must have access to training early in their tenure

---

[13] Webb, C. M. & Carpenter, J. (2012). What can be done to promote the retention of social workers? A systematic review of interventions. *British Journal of Social Work, 42,* 1235-1255.

[16] Osborne, C., Huffman, J., Caldera, S., & Galbraith, A. L. (2020). The influence of field-based training on caseworker turnover. *Children and Youth Services Review, 108,* 1-10.

as supervisor. Determining the current barriers to access will support future planning to better support the training needs of supervisors and ensure that training is received within mandated timeframes.

## *Caseload Management*

### Overview

There are four provisions in this Infrastructure Standard that relate to caseload standards:

- *VIII.D.1*: This provision ensures that DFCS maintains a caseload cap for specific types of cases.
- *VIII.D.2*: This provision specifies that caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.
- *VIII.D.3*: This provision requires DFCS to develop analytic monthly reports to support efforts to manage caseloads.
- *VIII.D.4*: This provision provides the Plaintiffs and the MTAT with access to the monthly CPS caseload reports.

For more information about current and prior DFCS performance as it relates to these oversight provisions of Infrastructure Standard VIII, please see Appendix B.

As part of the Kenny A Modified Consent Decree and Exit Plan, DFCS has adopted caseload standards and supervisor ratios for provision of caseload management in Region 14. Those standards indicate:

- No CPS case manager shall have more than 12 cases.
- No ongoing case manager shall have more than 17 cases.
- No placement case manager shall have more than 15 cases.
- No adoption case manager shall have more than 16 cases.
- No specialized case manager shall have more than 12 cases.
- No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties.

### Findings and Themes

One significant barrier to fulfilling the caseload cap provisions is the continual turnover the region is experiencing. Individuals who participated in focus groups and interviews indicate that turnover and caseload impacts feel cyclical; workers leave, requiring those cases to be redistributed among remaining staff, increasing worker caseloads, and again leading to caseworker burnout and ultimate turnover. Respondents indicated that current caseloads are not manageable and associated case expectations are unrealistic given the demands of high caseloads.

Due to staffing issues and the associated high caseloads, workers feel unable to provide quality services for the children and families for whom they are responsible. In addition, workers are forced to prioritize policy-required timeframes over quality casework. They do not have time available to provide intensive services to all of their cases. In some cases, supervisors have been required to carry caseloads to manage the number of cases in their jurisdiction.

In addition, staff feel they are given caseloads before they are fully confident in their roles. One respondent reported having 20 cases assigned within a month of being certified. Others were required to begin taking on cases before fully completing their training.

Overall, designated caseload caps are not consistently being met. As of Period 33, only 72 percent of case managers in Fulton County (n=42 of 58) and 56 percent of case managers in DeKalb (n=35 of 62) were meeting the designated caps. These counties' inability to consistently meet caseload standards is connected to continual issues with high case manager turnover. During Period 33, 56 case managers left DeKalb (51 resignations and 5 dismissals) and only 41 hires were made to replace those who left, and 76 case managers left Fulton (49 resignations and 23 dismissals) with only 32 hires made to replace those who left. The imbalance between turnover and hire limits the number of staff available to meet caseload requirements.

The state began testing a redesign of new staff training during Period 33 to reduce the time required for training to ensure staff can begin taking cases more quickly, while receiving the same training content. The original case manager training takes seven weeks, and the redesigned curriculum takes four weeks. While the training may make case managers available to take cases more quickly, themes from interviews and focus groups suggest that case managers feel that they need more training than the four weeks provided to feel confident in their new roles.

Further, designated supervisor ratios are not consistently met. In Period 31, both Fulton and DeKalb met the associated 1 to 5 ratios, whereas by Period 33, both agencies were no longer compliant with the ratio. Only 56% of DeKalb supervisors (n=35 of 63) and 72% of Fulton supervisors (n=41 of 57) were supervising 5 or fewer case managers.

## Recommendations

### 13. Consider training tracks based on employee experience

Creating track trainings that match workers with training requirements based on their experience, which will allows DFCS to leverage prior knowledge to let new staff take on cases more quickly. In this way, caseworkers with no experience in child welfare can complete remedial trainings that give a more in-depth training to help them learn the responsibilities of their job. Those with applicable experience can receive expedited modules with a higher-level review of necessary information to meet training requirements that also allows them to finish certification to take on cases more quickly.

### 14. Utilize shared caseloads to integrate new staff

Staff indicate feeling overwhelmed when required to take on full caseloads within a short period of time, especially when they are still learning how to meet administrative requirements of their job. Matching new staff with seasoned staff members to support caseload management creates natural options for field-based learning and can help to increase the case manager's confidence with case decision-making and administrative tasks. Shared caseloads allow supervisors to closely monitor the growth and support needs of their new staff and help staff engage in

relationship building that allows them to feel support from their peers, both of which are associated with higher staff retention[17].

## *Infrastructure Standard IX:  Maximization of Federal Revenue*

This Infrastructure Standard provides guidance relevant to the maximization of federal funding and specifically addresses the following: "DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming. DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding."

## *IV-E Eligibility Sample Review – December 2022*

### Overview:

In the second quarter of the state fiscal year 2023, a representative sample of 52 IV-E eligibility cases was requested from DFCS staff for the purpose of reviewing and assessing the current process for determination of IV-E eligibility of children coming into the care of the Division. This sample was submitted, and the review of these case determinations was conducted in December 2022, and January 2023.  Each of these sample cases was examined for accuracy and consistency of practice.

This review underscored several issues that were prevalent and consistent with other areas of deficiency uncovered in previous examinations.  The following section of this Infrastructure Brief details the findings of this most recent review and includes common themes discovered, trends observed, and recommendations for improving the process of eligibility determination.

### Common Themes Discovered:

In the 52 cases reviewed, 26 (50%) of those were determined to be ineligible for IV-E assistance. It should be noted that in the 26 ineligible determinations, multiple reasons were given for the determination of ineligibility.  As a result, the number of reasons for the determination of ineligibility exceeds the number of individual cases determined to be ineligible.

There were several common themes discovered in designations of ineligibility on the part of workers assigned to the determination of those cases in the sample.  Our review uncovered various inconsistencies that could have been corrected with a proper and timely administrative review on the part of management.  Those are noted here.  Themes occurring with the most frequency included the following:

- Income Verification – In 58 percent of the ineligible cases (15 of 26), the eligibility worker's review of the case indicated household income either exceeded the AFDC threshold for IV-E eligibility or the worker cited the inability to correctly verify household income.

---

[17] de Guzman, A., Carver-Roberts, T., Leake, R., & Rienks, S. (2020). Retention of child welfare workers: Staying strategies and supports. *Journal of Public Child Welfare, 14(1),* 60-79.

- Court Orders – In 27 percent (7 of 26) of the ineligible cases, the worker designated the Court Order as either missing altogether or present but failing to contain the requisite "Contrary to the Welfare" or "Reasonable Efforts" language at removal.
- Deprivation – In 23 percent of the ineligible cases (6 of 26), the worker indicated that Deprivation could not be properly determined.
- Household Makeup – In two instances (8%), the inability to accurately determine the makeup of the Household of Removal was given as a reason for ineligibility.
- Unable to Determine Specified Relative was cited in an additional two cases (8%).

## Overall Findings and Recommendations:

After reviewing the sample of IV-E eligibility determinations provided by DFCS, it is evident that initial determinations should be conducted more thoroughly to guarantee appropriate eligibility is documented in each case to the degree possible, given normal circumstances.  It is also apparent that supervisory oversight of the determination process is lacking, either from the standpoint of policy or in practice.

This inability to consistently determine IV-E eligibility will cause the opportunity for claiming federal financial assistance to be inaccurately measured.  The state would be allowing a significant amount of federal funding to go unclaimed year after year if the process is not properly monitored and rigorous attention is not paid to gathering vital information timely and maintaining that information ed in a consistent manner.

In other observations, system-generated, correct determinations of eligibility were made upon entry of the available information.  The system-generated determination was then manually overridden to make the case ineligible.  If data from all available documentation has been correctly entered into the system, the correct determination would be made automatically.  A system override would not be unnecessary.

In these instances, there was no proof evident that any higher level of supervisory or other form of quality review was conducted to rectify these incorrect manual overrides.  When all pertinent documentation is available and entered into the system, there should be <u>no</u> instance where manual override is necessary.

### 15. Increased training for Eligibility Workers and Supervisors

Increased training both for eligibility workers as well as training for supervisors in secondary and second-level reviews should be either implemented or increased.  Overall, general training in the various aspects of eligibility determination is recommended at all levels.

## *Eligibility and "Reimburseability"*

### Overview:

DFCS eligibility determination staff appear to be unduly risk-averse in making determinations that align with established federal policy.  Current staff are unable to handle the workload volume, and this contributes to a backlog of cases to be reviewed.  This backlog causes stress on the entire system for determination.  It is unclear if this system deficiency is due to inadequate

staffing patterns, issues with retention, or inadequate training, but this issue must be addressed. The current environment causes staff to be reluctant to make what would be otherwise proper determinations, fearing errors and possible audit findings for erroneous claiming.

Possible decisions regarding ineligibility are often made prematurely when a more comprehensive review of documentation would have revealed an eligible determination.  In these instances, there is no accompanying evidence that reasonable efforts were made to engage others to obtain the documentation needed.  Communication and partnership between those seeking eligibility determinations and other team members responsible for management of the case is critical and does not appear to be consistent.

County case management staff are oftentimes unresponsive to requests for missing and incomplete paperwork (the issue of missing Court Orders remains prevalent).  Case managers sometimes fail to provide complete or proper paperwork to Eligibility Determination staff to make informed decisions regarding IV-E eligibility.  As a result, pending applications have been left unprocessed for extended periods of time.  Obviously, this creates a significant delay in the completion of necessary data and information to be entered into SHINES.

The apparent lack of administrative management of this process from a direct supervisory standpoint is a major factor that continues to contribute to the ongoing issues surrounding deficiencies in this area.  A renewed emphasis of managerial oversight must be evident for any sustainable change to be affected in this area.

## Common Themes Observed:

Determination of IV-E eligibility remains a primary issue.  All efforts must be made to make correct verifications on a consistent basis. This is not the case at the time of this review.  The current DFCS policy regarding determination is more than adequate to ensure proper compliance with federal guidelines.  The responsibility is not being carried out with any measure of stability.

The Division is not fully maximizing its claiming of Title IV-E and other federal revenues and the current method DFCS is using to calculate the state's Title IV-E Administrative Penetration Rate is inconsistently applied and does not comply with federal policy.  This must be rectified as soon as possible.  Additionally, the correct and timely submission of federal financial reports is an issue.

Overall confidence in data validity is a critical issue.  Oftentimes reports utilized, both administratively and in the Regions, are incongruent.  Data production and verification must align for staff to have confidence that reports they are using inform practice in an effective and accurate manner.

Several issues that were prevalent in earlier reviews relative to initial case documentation for eligibility continue to be an unfortunate part of day-to-day practice at this time.  Common themes in this area include the following:
- Income Verification and Documentation;
- Absent Parent Determinations;
- Findings of Deprivation; and,

- Verifying Unemployment and Under-Employment.

**Table 8: Eligibility on August 18, 2022**

| Total Number Children in Care on August 18, 2022 | 10,780 |
|---|---|
| IV-E Eligible | 3,654 |
| IV-E Eligible & Reimbursable | 1,881 |
| IV-E Eligible but not Reimbursable | 1.773 |
| Percentage IV-E Eligible & Reimbursable | 17% |
| Non-IV-E Eligible | 7,126 |
| **Reason Not IV-E Eligible (Duplicated Count)** | |
| • Assistance Unit's Income is greater than or equal to the AFDC Standard of Need Income Limit for this Assistance Unit. | 2,913 |
| • Reasonable Efforts determination was not made within 60 days. | 2,707 |
| • The initial child removal order did not contain the proper judicial language. | 2,329 |
| • Court order did not give DFCS custody. | 2,237 |
| • The Assistance Unit's Income is greater than the AFDC Gross Income Limit. | 2,097 |
| • Deprivation does not exist in the Removal Home | 2,077 |
| • The child does not meet the specified relative criteria. | 601 |
| • The child is not a U.S. Citizen, Other Qualified Alien, or Permanent Resident. | 68 |
| • The household has more than $10,000 equity in property or resources. | 21 |
| • The child is 18 years of age or older. | 3 |
| • The Assistance Unit's Income (minus deductions) is greater than or equal to the AFDC Standard of Need Income Limit for this Assistance Unit (based on $30 and 1/3 Test). | 1 |

Data Source: Revenue Maximization Unit, DFCS

## Overall Findings and Recommendations:

**16. Adopting a more aggressive approach to determining IV-E Eligibility and monitoring the work through the use of accurate and valid data**

On balance, **ascertaining IV-E eligibility should be more aggressive** on the part of all parties involved in determination.  If all documentation necessary to make a fully informed eligibility determination is not made available to Revenue Maximization staff within the prescribed time frames, they must routinely notify Case Managers of the need for completing the application process.  If that does not rectify the issue, this deficiency should be immediately brought to the attention of those in charge of managing the process for timely resolution.

**Generation and use of accurate and valid data** to understand IV-E eligibility is inconsistent. Determining the specific reasons for eligibility, or ineligibility, in a somewhat anecdotal manner makes it difficult, if not impossible, to improve the current rate of federal IV-E claiming.  Only through the analysis of valid data will staff be afforded the opportunity to explore the specific

reasons incorrect determinations are being made and rectify those deficiencies. This has been an observation in earlier reviews and remains an issue at the date of this report. Data confidence has yet to be adequately addressed.

It should be noted in this review that relevant data has begun to be collected and has served to give valuable insight into the data fidelity issue. Revisions to processes have also given staff adequate tools to conduct the work and the ability to make more consistently accurate determinations. Effective primary and continuing staff education in this area is critical and should continue to be developed and implemented.

## 17. Apply a more robust supervisory review for initial eligibility determinations

It does not appear evident that **adequate checks and balances on the part of those in supervisory and management positions** are being carried out regarding the scrutiny of initial reviews for eligibility. In previous practice updates, increasing supervisory reviews of eligibility determinations have been a recommendation for improving this process. Given the sample of eligibility cases examined, this recommendation does not appear to have been properly or consistently implemented at the time of this review.

In current practice, the Revenue Maximization Unit is reviewing only those determinations for children that have been deemed eligible for IV-E. This may serve to adequately prepare the Department for any future IV-E audit samples to be pulled but does very little to ensure the appropriate and consistent claiming of federal funds.

The current cadence of iterative reviews should be enhanced to require quality assurance reviews of both eligible <u>and</u> non-eligible determinations by supervisory and/or administrative staff. Eligibility should always be determined whenever possible. Adequate determination details should be evident in case records, interviews with family, income verification, self-declaration, etc. DFCS' policy on this issue is more than sufficient to ensure this is carried out to the fullest in each case, but fidelity to the policy must be a priority for DFCS in order for the policy to be effective.

**Income Verification and Documentation** – This process as it is currently carried out remains more restrictive than should be required. This has been noted in past reviews and continues to be noted in the current iteration. Georgia's current policy does allow for a parent's self-declaration of income and resources be a part of the application. As such, the determination process should include the acceptance of the parent's self-declaration unless there is a well-founded (and well-documented) reason to doubt the validity of the self-declaration.

**Absent Parent Determinations** – Current practice should afford those documenting eligibility the ability to routinely determine first if there *is* an absent parent and if not, review the primary wage earner's current employment to see if the child can meet the deprivation test and become IV-E eligible. A determination of an absent parent could be as simple as the foster care eligibility application form not being accurately or comprehensively completed.

**Findings of Deprivation** – Fervent effort must be applied to correctly and uniformly establish Deprivation. The current DFCS policy is more than adequate to ensure correct and consistent determination. Revenue Maximization Specialists should be trained to be (and encouraged to be) vigorous in engaging Case Managers and their supervisors, if needed, in obtaining complete and accurate Deprivation determinations.

**Verifying Unemployment and Under-Employment** – Examination and improvement of staff training to consistently meet the unemployment and under-employment requirements would benefit DFCS in the correct determinations of Deprivation. This is also a continuing issue noted in previous reviews.

**Eligibility workers should isolate instances in which there are only one or two reasons the child may not be IV-E eligible**. Identifying these and placing a focused emphasis on those that may be ephemeral will benefit the overall process. Many certifications for initial ineligibility that can be managed, such as issues with placement setting, 12-month permanency findings, and IV-E eligibility in non-licensed homes will serve to increase eligibility determinations. These factors should be routinely recorded and tracked monthly in order to establish patterns in the system for documentation that may be effectively addressed in the future.

**DFCS' partnership with Juvenile Courts** has been a concern in past reviews and two court-related gaps in practice have been considered pervasive. The first of those is timely submission of court orders. For those custodial cases determined to be IV-E eligible, DFCS must establish and maintain a positive working relationship with the local Juvenile Courts, the Administrative Office of the Courts (AOC), the Attorney General's Office and the Council of Juvenile Court Judges (CJCJ) to ensure that a valid court order granting custody to DFCS is executed and provided for the Department to establish care and maintenance.

An additional practice challenge is ensuring final custodial Court Orders are uploaded into SHINES in a timely manner for utilization in IV-E determinations. Several steps have been developed and implemented to address these gaps. However, based on the data evident for analysis, this continues to be an issue. Efforts should continue to make the gathering of court documentation relevant to custody a major priority in standard practice.

**Holding timely Permanency Hearings** remains an issue as they are oftentimes not conducted and/or documented in a consistent manner. This deficiency has an adverse effect on reimburseability and results in the inability of the State to maximize the federal revenue to which it is entitled had these hearings been conducted timely. A CQI process should be developed and implemented to ensure system-generated permanency finding alerts are addressed according to established time frames. This process should alert the case manager in ample lead time that a 12-month permanency finding is soon coming due, and a hearing should be scheduled with the court to address permanency finding requirements.

## *Licensed and Unlicensed*

## Overview:

The placement of children and youth in unlicensed foster home settings continues to be an issue that prevents the Department from fully realizing the amount of federal funding available for child welfare programming.  There are strategies that could be considered for possible implementation that would allow for the more effective and comprehensive determination of licensed and/or approved (and therefore IV-E eligible) placements for custodial youth.

**Common Themes Discovered:**

The overriding theme of this observed deficiency centers around the somewhat restrictive and overburdening current process of foster home licensure.  The process could be made more easily, and still appropriately accessible for those relatives or extended family support options wishing to be considered licensed placements.

**Table 9: Unlicensed or Unapproved Placements on August 13, 2022**

| Unlicensed or Unapproved Placements on 8/13/2022 | Children Placed in Homes on August 13, 2022 | Homes with Children Placed on August 13, 2022 |
|---|---|---|
| **Statewide** | 9,178 | 4,992 |
| **Unapproved Home** | 932 | 477 |
| **Pending Full Approval** | 563 | 321 |
| **Placed in Homes Where Status Was Closed** | 79 | 43 |
| **Percent Unapproved, Pending Full Approval, or Closed Statewide** | 17% | 17% |
|  | **Children Placed in Region 14 Homes** | **Region 14 Homes** |
| **Total** | 999 | 633 |
| **Unapproved** | 287 | 187 |
| **Pending Full Approval** | 51 | 36 |
| **Placed in Homes Where Status Was Closed** | 8 | 4 |
| **Percent Unapproved or Pending Full Approval (or Closed) in DeKalb and Fulton County Homes** | 35% | 36% |

Data Source: State Data Unit

## Overall Findings and Recommendations:

**18. Regularly identify those children placed in unapproved DFCS or CPA homes or otherwise placed with relatives.**

As part of the process, determine why these homes are unapproved and whether they could be IV-E eligible.  Develop a database that specifies the reason(s) a relative or kinship foster home cannot be "fully licensed".

If a relative foster home applicant does not meet the training requirement and that is the only reason they are not "fully licensed," there should be a **waiver of the training requirement** and the home should be considered licensed for IV-E purposes.  It is understood that this would not be a blanket waiver, but a decision made on a case-by-case basis after careful review. This is already allowable under current Georgia licensing standards.

## 19. Revise the initial and annual training requirement for all foster care applicants.

DFCS has already established that initial and annual training is not a safety standard.  Certain modifications to the current standard should be considered.  For example: a) initial training can be only a few hours and can be conducted by the licensing agent at the time of the home study, b) DFCS should make the DFCS-approved training requirement a simple process and relatively easy to achieve.

Implementation of this recommendation will take longer and will require a change in the administrative code.  However, it is important to remember that children are still being placed into "approved" relative and kinship foster, or pre-adoptive homes and the providers are being paid the same amount as homes that are fully licensed.  The only difference being that none of the maintenance costs are IV-E reimbursable and the care is completely being paid for by other funds, including state general funds.

Data related to this issue has been requested and has been partially available.  At the date of this review, the data provided for analysis has yet to make evident the reasons why many placements have been found to be ineligible.  It is further recommended that a renewed emphasis be placed on producing and analyzing this information.

At the time of this review, it is not evident that a process has been firmly established and applied to address this issue.  Streamlining the approval process for homes of this type should continue to be a priority (when safety is not a concern). This is especially true in light of the current placement crisis affecting youth in Region 14.

Work should continue in this area according to recommendations from previous reviews.  A comprehensive analysis of training development and implementation should be conducted with an eye toward making the training and approval process more "user-friendly".

## *Claiming and Candidacy*

## Overview:

The Department is not maximizing its claiming of Title IV-E and other federal revenues and the current method used to calculate the state's Title IV-E Administrative Penetration Rate is inconsistent and compliance with federal policy is an area of concern.  This must be rectified as

soon as possible.  Additionally, the correct and timely submission of federal financial reports is an issue.

## Common Themes Discovered:

The collection of court documentation relative to custody, the review of that documentation and its entry into the system of record continue to be prevalent issues given the review of information for this infrastructure report.  Continuing to allow this to be an issue has a deleterious effect on the calculations needed for the consistent and appropriate claiming of federal funds. Until these efforts are addressed, accurate claiming will not be possible.

## Overall Findings and Recommendations:

**20. Children and youth without court orders properly granting DFCS custody should not be included as a part of the denominator when calculating the penetration rate**.

Services cannot be properly applied to a case in which the state technically has no custody due to erroneous or lacking paperwork or documentation practices.  Either the data reviewed is invalid to some degree and extensive case review is needed, or the Division should address the legal custody of the child by returning to court to rectify the issue.  The most recent review of sampled cases and data provided reveals this to be a continuing issue.  It is not evident that comprehensive efforts are being made to gather the appropriate documentation, given the resources available.  Consistent and targeted administrative review of eligibility case determinations is critical for the Division to be secure in the value of the process of checks and balances.  It is not clear that these reviews are being conducted.

**Periodic reviews should be consistently conducted by management and/or administrative staff**, either monthly, quarterly or at the discovery of an abundance of errors, in order to ensure additional levels of vetting are being consistently applied regarding the collection and review of Initial Custody Orders.

**21. Add the candidate for foster care definition to Georgia's Random Moment Study (RMS) for Child Welfare.  This may also require a thorough review, and subsequent revision, of the current Cost Allocation Plan (CAP).**

Data submitted suggests that deficiencies in candidacy claiming continue to be prevalent at this time.  Analysis of the CB-496 documentation submitted for this review indicates that no candidacy claims were made by the State for the entire 2022 fiscal year.  DFCS continues to drastically under-claim federal reimbursement for "Candidates for Foster Care".

Correcting this process will benefit DFCS to potentially enhance federal reimbursement through the Family First Prevention Services Act.  In the interim, there will be additional federal reimbursement based on the current IV-E foster care eligibility ratio.

**22. Enhance the focus on claiming IV-E funding for administrative training at the rate allowable.**

Documentation of staff time associated with creating and conducting these training courses should be tracked electronically and monitored on a monthly or quarterly basis.  This can then be allocated to the benefiting programs at the established rate.

Time staff spends completing the training on the provided curriculum is also not being properly documented and is under-claimed. Completion of this training should be tracked electronically and monitored on a monthly or quarterly basis.

**23. Develop and implement a federally funded subsidized permanent guardianship program as an additional permanency option for children and youth in foster care.**
DFCS is currently using state funding for some guardianship cases. Implementation of a Subsidized Permanent Guardianship program remains an opportunity for system improvement. The recommendation currently is to continue to plan for the development and implementation of this program as soon as is reasonable to expect.

Overall, the data reviewed for analysis in preparation of this report suggests that deficiencies in claiming continue to be prevalent at this time.

## *Cost Allocation Plan/Proper Claiming and Maximization of Available Funding*

### Overview:

Cost allocation is a critical function in the process of appropriate federal claiming. At the current time, the Division does not have a process in place that will allow for consistent and correct allocation of costs to all benefiting programs. Change and revision to the current process must be explored.

### Common Themes Discovered:

The current Random Moment Sample (RMS) process does not allow for an accurate record for claiming. Additionally, the DFCS portion of the DHHS Cost Allocation Plan appears to need revision. Updates to these processes will allow the Division to identify candidates for foster care more comprehensively. FFPSA implementation makes it even more critical since there will be two candidacy pools as opposed to the previous one alone.

### Overall Findings and Recommendations:

**24. Georgia must update its Cost Allocation Plan to properly allocate training costs to Title IV-E and other benefiting programs based on the curriculum of the training provided to staff, foster, and kinship parents and providers.**
Information reviewed for this report suggests that deficiencies in candidacy claiming continue to be prevalent at this time. **Review and revision of the current Random Moment Sampling (RMS) process** and as well as the current iteration of Georgia's portion of the DHHS Cost Allocation Plan (CAP) remain areas to be addressed.

**25. The Division should execute a fiscal impact study on the implementation of Family First to include a focus on classification of programs as QRTPs and the effect of such classification on the system.**
Information reviewed for this report suggests that deficiencies in candidacy claiming continue to be prevalent at this time. Until both the current RMS process and CAP document are thoroughly reviewed and subsequently revised, deficiencies will remain, and the correct allocation of training costs will fail to be distributed to the appropriate benefiting programs.

## *Availability and Allocation of Resources*

### Overview:

Adequate staff to execute the various responsibilities associated with the consistent and appropriate claiming of federal IV-E may be an issue at this time. Additional or enhanced training of those responsible for carrying out these responsibilities also continues to be a concern.

### Common Themes Discovered:

The collection of the information (data as well as actual documentation) required to consistently make accurate eligibility determinations continues to prohibit the Division from making the most comprehensive attempt to properly claim federal funds.

### Overall Findings and Recommendations:

An **increase in the number of Social Service Techs/Family Services Workers and Revenue Maximization Specialists** to assist Case Managers in the collection of the information needed to determine eligibility would be a step toward addressing this issue. Rightsizing staffing patterns would allow Revenue Maximization Specialists greater access to Case Managers, which would then allow for the acquisition of needed or missing documentation in a timely manner.

**26. Those working on the eligibility verification side should also be trained and encouraged to work closely with Case Managers to collect accurate information regarding income and other eligibility documentation and supply that information to each individual Case Manager.**

Earlier recommendations of this type do not appear to have been fully implemented. There is little evidence that staffing in this area has been bolstered in any substantive manner as of the date of this report. This remains an opportunity for system improvement.

## *Medicaid Claiming:*

### Overview:

Former Director Rawlings previously made available a list of recommendations relative to Medicaid and other claiming issues in a White Paper document titled "Leveraging Optional Medicaid Services". The recommendations in that document should be closely scrutinized for possible inclusion in any resulting action plan.

### Common Themes Discovered:

The previous concerns relative to substantive changes in the Division's approach to Medicaid claiming remain an issue at the date of this report.

### Overall Findings and Recommendations:

**27. Further Review and Consider Recommendations in the *Leveraging Optional Medicaid Services* White Paper**

As of the date of this review, it is not evident that any recommendations in the *Leveraging Optional Medicaid Services* White Paper have been either considered or adopted. Previous

recommendations relative to the improvement and enhancement of Medicaid claiming strategies such as claiming reimbursement for Targeted Case Management activities remain unchanged.

## APPENDIX A – INFRASTRUCTURE STANDARD UPDATE TABLE: SUPERVISION OF CONTRACT AGENCIES

| Infrastructure Standard | | Implementation Status Reported in the Third Brief* | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|---|
| VII.A | DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan | • The RBWO incorporates applicable terms for the Modified Consent Decree. | The RBWO incorporates applicable terms for the Modified Consent Decree. | The RBWO incorporates applicable terms for the Modified Consent Decree. |
| VII.B | DFCS shall only contract for placements or services with licensed contractors or sub-contractors. No child shall be placed in an unlicensed facility. | • 92% of children placed in approved placements in Period 28 (July-December 2019). | 99% of children placed in approved placements in Period 30 (July-December 2020). | 98% of children placed in approved placements in Period 33 (July-December 2022). |
| VII.C | DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary. The findings of investigations of suspected abuse or neglect, or the assessment or | • This is incorporated into the RBWO manual. | This is incorporated into the RBWO manual. | This is incorporated into the RBWO manual.<br><br>RCCL requires reporting suspected abuse within 24 hours of the incident. Twenty-five CCIs and 21 CPAs were cited for failing to report serious occurrences including suspected abuse in the last year. |

| Infrastructure Standard | Implementation Status Reported in the Third Brief* | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|
| investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations. The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract. | | | |
| VII.D   DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured | • | The RBWO incorporates applicable terms for the Modified Consent Decree. Information provided is manually validated during reviews. | The RBWO incorporates applicable terms for the Modified Consent Decree. Information provided is manually validated during reviews. |

| Infrastructure Standard | | Implementation Status Reported in the Third Brief* | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|---|
| VII.E | DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve. These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement. | • A review of 50 contracted agencies with Kenny A children placed in the second quarter of FY2020 found average scorecard score of over 90% | DFCS still relies on the scorecard system for assessing performance of contract agencies. MTAT did not conduct an updated review of the scorecards. | For the 101 contracted agencies with Kenny A children placed in the third quarter of 2022 found the average scorecard score for CCI's was 91.7% and for CPAs was 93.2%. |
| VII.F | DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type. As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations. The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary. With respect to license holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable | • | Licensing evaluations are still occurring, but will start up to pre-pandemic level review by January 1, 2022. | Licensing evaluations are back in person, however due to covid precautions, agencies are aware more or less when they will occur |

| Infrastructure Standard | | Implementation Status Reported in the Third Brief* | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|---|
| | Georgia statutes and rules and regulations. | | | |
| VII.G | The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified. | • A case review of 50 safety reviews found average score for CPAs of 74.6% and 73.4% CCIs | Data provided by OPM's data management system called CareSolutions found that for the 33 safety reviews that occurred in foster homes from January 1, 2020-July 31, 2021 involving Kenny A children, the average score was 85%. | Data provided by OPM's data management system called CareSolutions found that for the 99 safety reviews that occurred in CCIs in FY2022 foster homes from involving Kenny A children, the average score was 88.3%, and for the 12 CPAs, the average score was 91.7% |

## APPENDIX B – INFRASTRUCTURE STANDARD UPDATE TABLE: ROBUST WORKFORCE

| Infrastructure Standard | | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|---|
| DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families. | | | | |
| VIII.A.1 | The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS. | • The ESP was re-implemented in late spring 2019.<br>• 375 staff were trained in the new process as of June 30, 2019. | The June 2021 statewide ESP fidelity review found that of the 20 applicants assessed, 5 (25%) had the ESP checklist fully completed and uploaded in HR pass. | 616 staff had been trained on the ESP process as of November 7, 2022<br><br>For the 100 fidelity reviews completed from May 2021 to February 2022, 50 (50.0%) had the ESP checklist completed and uploaded in HR pass. |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| VIII.A.2 DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol. | The first fidelity review of the ESP was scheduled for early 2020. | Monthly reports are developed answering 15 questions assessing the extent to which ESP is utilized and whether staff involved are trained. | Reports are developed answering 15 questions assessing the extent to which ESP is utilized and whether staff involved are trained. |
| VIII.A.3 DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce. | DFCS participated in a Comprehensive Organizational Health Assessment in June 2019 as part of a Workforce Excellence site from the National Child Welfare Workforce Institute (NCWWI). | The same as reported in the previous Brief, participation in the Workforce Excellence site selection remains in lieu of an employee satisfaction survey. | The same as reported in the previous Brief, participation in the Workforce Excellence site selection remains in lieu of an employee satisfaction survey. |
| VIII.B.1 Office Human Resources (OHR) will post positions within three (3) business days of an approved request. | Data was not provided as it relates to this portion of the infrastructure standard. OHR began 'continuous job posting' beginning May 1, 2019. | Data shared from the Office of Human Resource (OHR) showed that for the 72 requisitions (positions to post) in June 2021, and the 11 requisitions in July 2021, the average time to post was 1 business day | Continuous job postings continue. Based on data provided for requisitions between July 1, 2022-October 20, 2022, the average time between approved requisitions to job posts was 5 days. |
| VIII.B.2 OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director | Data was not provided as it relates to this portion of the infrastructure standard. | A monthly report is provided by OHR. | A monthly report is provided by OHR.

As of October 21, 2022, DeKalb had 74 budgeted SSS vacancies and 15 budgeted Supervisor vacancies. Fulton |

| Infrastructure Standard | | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|---|
| | | | | had 80 SSS and 9 Supervisor budgeted vacancies |
| VIII.B.3 | An OHR recruiter will conduct recruitment events at least monthly. | Data was not provided as it relates to this portion of the infrastructure standard. | Data not provided for this standard. | Data not provided for this standard. |
| VIII.B.4 | Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence. | Data was not provided as it relates to this portion of the infrastructure standard. | Data not provided for this standard, however email correspondence appears to be occurring. | Data not provided for this standard, however email correspondence appears to be occurring. |
| VIII.B.5 | OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting. | OHR indicated it takes 3-5 days for the HR recruiter to bet candidates, and a day or so for conducting a telephone screening of candidates. | Data shared from OHR showed that for the 72 requisitions in June 2021, the average time from job posting closure to candidate referral was 9 days, and for the 11 requisitions in July 2021, the average time from job posting closure to candidate referral was 2 days. | Data shared from OHR showed that for the 49 requisitions from July 2022-October 2022, the average time from job posting closure to candidate referral was 1 day. |
| VIII.B.6 | OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check. | • Data was not provided as it relates to this portion of the infrastructure standard.<br>• Background checks were reported to take 1-2 weeks, and upon receipt of the screens, and the HR generalist offers the candidate a job, it may take up to two weeks for the | Data shared from OHR showed that for the 72 requisitions in June 2021, and the 11 requisitions in July 2021, the average time to post was 1 business day. | Data shared from OHR showed that for the 49 requisitions from July 1, 2022-October 2022, and the 11 requisitions in July 2021, the average time from the background clearance to offer letter averaged 3 days. |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| | | candidate to begin work, as start days are always on the 1st or 15th of the month. | |
| VIII.B.7 OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director | The average number of days to complete 114 routine and non-routine salary increases and compensation requests between July 1-August 31, 2019 was 6.92 days. | According to OHR, 679 compensation requisitions were received and completed July 1, 2020 to June 30, 2021 and took on average 1.90 business days to process. | According to OHR, 515 compensation requisitions were received and completed July 1, 2022 to September 30, 2022 and took on average 1.89 business days to process statewide, and 1.68 days for Region 14. |
| VIII.C.1 No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training. | • From the period of January-June 2018, 5 of 164 caseload carrying case managers in DeKalb had a "provisional status" and 0 of 104 caseload carrying case managers in Fulton had a "provisional status." • From the period of July-December 2018, 1 of 135 caseload carrying case managers in DeKalb had a "provisional status" and 6 of 99 caseload carrying case managers in Fulton had a "provisional status."' | It was reported that there is no longer a provisional status. As soon as workers pass their test at the end of pre-service training, they are caseload eligible. | It was reported that there is no longer a provisional status. As soon as workers pass their test at the end of pre-service training, they are caseload eligible. |
| VIII.C.2 All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or | Data was not available for this part of the infrastructure standard. | Data was not available for this part of the infrastructure standard. | For the 35 supervisors hired or promoted since 2019 in Region 14, it took an average of 335 |

| Infrastructure Standard | | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|---|
| | appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year. | | | days, or 11.2 months, for them to receive training. |
| VIII.C.3 | DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors. | Data was not available for this part of the infrastructure standard, however the mentoring program was implemented. | There is a mentoring program for supervisors that is in place. | There is a mentoring program for supervisors that is in place. |
| VIII.C.4 | Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training | Data was not available for this part of the infrastructure standard. | Per DFCS: "All provider staff in a Case Management or Supervisory roles are required to complete RBWO Foundations Training. The training was developed from the DFCS training and is updated as needed to ensure it remains comparable to the DFCS training. The RBWO Foundations training consists of a classroom component and an e-learning component.  Due to the pandemic, [there was a] temporarily pause the in-person classroom training for several months.  From March of 2020 through October 2020, [they] were unable to host the classroom portion of the training, | No update on this part of the infrastructure standard |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| | | however, [they] developed the training on a virtual platform and resumed offering the classroom portion in November 2020.  Since January 2021, [they] have held 11 RBWO Foundations Classroom trainings virtually, training a total of 120 provider staff during this period. [They] have also had 67 E-Learning trainings that have been completed during this time as well." | |
| VIII.C.5 All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program. | Data was not available for this part of the infrastructure standard. | Per the Office of Human Resources (OHR) in August 2021, 26 of 73 (36%) supervisors in Fulton and DeKalb had a master's degree or doctorate, and 47 of 73(64%) had a bachelor's degree. Data was not provided on the years of experience part to this standard. | No update on this part of the infrastructure standard was available |
| VIII.D.1 In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases. That measurement of caseloads shall include | • Looking over the two year period 2017-2018 (in four 6 month increments of the monitoring periods the percent of caseworkers | Looking at the Period 30 monitoring period (July-December 2020), the percent of caseworkers | Looking at the Period 33 monitoring period (January-June 2022), the percent of caseworkers meeting the caseload caps were: |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| | deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads | meeting the caseload caps ranged from:<br>• Family Preservation: 73%-100%<br>• CPS Investigations: 69%-86%<br>• Permanency: 32%-63%<br>• Specialized Case Managers: 13%-36% | meeting the caseload caps were:<br>• Family Preservation: 100%<br>• CPS Investigations: 94%<br>• Permanency: 65%<br>• Specialized Case Managers: 72% | • Family Preservation: 100%<br>• CPS Investigations: 78%<br>• Permanency: 59%<br>• Specialized Case Managers: 36% |
| VIII.D.2 | Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case. | • See above | See above. | See above. |
| VIII.D.3 | DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:<br>a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);<br>b. climate and culture assessments; and<br>c. metrics to strategize caseload management (including timely and safe case closure practices). | • Data was not available for much of this part of the infrastructure standard.<br>• The region produces the following regular reports:<br>  • average number of social service case managers and social service supervisors, as well as turnover rates for both populations<br>  • all metro county positions filled and vacant, by county<br>  • all metro staff starting as well as leaving the agency, by month | • The region produces the following regular reports:<br>  • average number of social service case managers and social service supervisors, as well as turnover rates for both populations<br>  • all metro county positions filled and vacant, by county.<br>  • all metro staff starting as well as leaving the agency, by month.<br>• No data was provided on climate and culture assessments and metrics to strategize caseload management | • The region produces the following regular reports:<br>  • average number of social service case managers and social service supervisors, as well as turnover rates for both populations.<br>  • all metro county positions filled and vacant, by county.<br>  • all metro staff starting as well as leaving the agency, by month.<br>• No data was provided on climate and culture assessments and metrics to strategize caseload management |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| VIII.D.4 DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan. | Data was not available for this part of the infrastructure standard | • The Kenny A 2021 Q1 Quarterly Report found that the percent of timely initiation of investigations was 84.3% (113 of 134) and percent of timely initiation of initial safety assessments was 92.5% (1880 of 2033) in Region 14. In the calendar year of 2020, the percent was 86.4% for investigations and 91.1% for initial safety assessments.<br>• The Kenny A 2021 Q1 Quarterly Report found that the percent of timely completed investigations was 65.8% and 58.6% for Family Support, compared to 92.4% and 92.4% in calendar year 2020 for Region 14 (please note approximately 1/3 of Q1 2021 were still pending when the report was generated 4/13/2021)<br>• The Kenny A 2021 Q1 Quarterly Report found that the substantiation rate for Q1 2021 in Region 14 | • The Kenny A 2022 Q4 Quarterly Report found that the percent of timely initiation of investigations was 76.2% (109 of 143) and percent of timely initiation of initial safety assessments was 86.0% (1542 of 1793) in Region 14. In the calendar year of 2022, the percent was 80.8% for investigations and 86.0% for initial safety assessments.<br>• The Kenny A 2022 Q4 Quarterly Report found that the percent of timely completed investigations was 64.6% and 85.3% for Family Support, compared to 72.2% and 82.1% in calendar year 2022 for Region 14<br>• The Kenny A 2022 Q4 Quarterly Report found that the substantiation rate for Q4 2022 in Region 14 was 19.0% (with 17.9% pending results), compared to 19.6% in calendar year 2022<br>• The Kenny A 2022 Q4 Quarterly Report indicated 1 policy violations in Q4 2022, |

| Infrastructure Standard | Implementation Status Reported in Second Briefs* | Implementation Status Reported in Fifth Brief | Current Performance |
|---|---|---|---|
| | | was 10.5% (with 26.9% pending results), compared to 13.5% in calendar year 2020<br>• The Kenny A 2021 Q1 Quarterly Report indicated 5 policy violations in Q1 2021, compared to 15 in the calendar year 2020 in Region 14 | compared to 14 in the calendar year 2022 in Region 14 |

## APPENDIX C – INFRASTRUCTURE STANDARD UPDATE TABLE: MAXIMIZATION OF FEDERAL REVENUE

| Infrastructure Standard | Implementation Status Reported in the Third Brief | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|
| IX With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming. DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding. DFCS shall establish baselines for present levels of | • DFCS could pull down an additional $0.67 in federal Medicaid funds for each state dollar spent on children with significant behavioral health needs, resulting in an additional $46.9M<br>• On August 18, 2020, 18% of children in care were iv-e eligible and reimbursable<br>• 2,653 of 11,785 (22.5%) kids in care lacked evidence of an | On July 31, 2021, 23.3% of children in Region 14 were IV-Eligible and Reimbursable.<br>• As of July 31, 2021, of the 631 children in Region 14 Non IV-E eligible:<br>  • 364 (57.7%) did not have a Reasonable Efforts determination made in 60 days, | On August 18, 2022, 17% of children in care in Georgia were IV-E Eligible and Reimbursable. As of August 18, 2022, of the 7,126 children in Georgia Non IV-E Eligible:<br>  • 2,707 (38%) did not have a Reasonable Efforts determination made in 60 days, |

| Infrastructure Standard | Implementation Status Reported in the Third Brief | Implementation Status Reported in the Fifth Brief | Current Performance |
|---|---|---|---|
| state and federal funding in order to identify increases in federal funding. The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding. | initial custody court order granting custody<br>• 21 of 450 children reviewed in January 2020 denied IV-E temporarily due to lack of a 12-mo permanency finding<br>• During 2019 calendar year, $868,331 federal funding claimed for training costs of staff, providers and partners; no claims for candidate administrative costs<br>• On August 13, 2020, 20% of kids placed in unapproved homes and 21% of kids placed in DeKalb and Fulton homes considered unapproved, pending or closed | • 306 (48.5%) initial child removal orders lacked the proper judicial language, and<br>• 294 (46.6%) court orders did not give DFCS custody.<br>• On June 30, 2021, 14.2% of children statewide placed in unapproved, pending or closed homes, and 13% of children in DeKalb and Fulton homes placed in unapproved, pending or closed homes (Note: this is a different data source and process than what is reported in the Monitoring Reports) | • 2,329 (32.7%) initial child removal orders lacked the proper judicial language, and<br>• 2,237 (31.4%) court orders did not give DFCS custody.<br><br>• On August 13, 2022, 17% of children statewide placed in unapproved, pending or closed homes, and 35% of children in DeKalb and Fulton homes placed in unapproved, pending or closed homes (Note: this is a different data source and process than what is reported in the Monitoring Reports) |

## APPENDIX D – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN

This Order is included behind this page in its entirety.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KENNY A., by his next friend Linda | : | |
| Winn, *et al.*, | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| v. | : | 1:02-CV-1686-TWT |
| NATHAN DEAL, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**STIPULATED ORDER AMENDING THE
MODIFIED CONSENT DECREE AND EXIT PLAN**

On December 5, 2016, the Court entered the parties' Modified Consent

Decree and Exit Plan [dkt. nos. 747 & 745-1] ("Exit Plan"). The parties jointly

moved the Court to approve and enter this Stipulated Order to amend one Outcome

Measure in the Exit Plan and incorporate the final Infrastructure Standards.

The parties have agreed (with the Accountability Agent's concurrence) to

revise one Outcome Measure in the Exit Plan to make it consistent with DFCS'

statewide policy regarding the time permitted to complete investigations of

reported abuse or neglect of foster children. Section VI.A.2 of the Exit Plan is

hereby amended as follows (revision noted in underlined text):

2. Completion of CPS Investigations Concerning Children in Foster Care: At least
   95% of all investigations of reported abuse or neglect of foster children shall be
   completed, in accordance with Chapter 6 of DFCS' Child Welfare Policy Manual,
   within 45 days of receipt of the report.

Section VIII of the Exit Plan set forth a process and timeline for establishing a set of Infrastructure Standards that will be used to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection to the Plaintiff Class of foster children in state custody in Fulton and DeKalb Counties.  After a specified negotiation period (which was extended through December 18, 2017 [dkt. no. 755]), the parties reached agreement on the Infrastructure Standards, which are attached hereto as Exhibit A. Pursuant to Section VIII.B of the Exit Plan, these "final Infrastructure Standards are enforceable obligations under th[e] Exit Plan, and the Accountability Agent, with the assistance of MTAT, will measure and report on the Infrastructure Standards in each subsequent reporting period."

Except as amended herein, all other provisions of the Modified Consent Decree and Exit Plan entered by this Court on December 5, 2016, shall remain in full force and effect.

IT IS SO ORDERED, this 19th  day of December, 2017.

                                                      /s/Thomas W. Thrash
                                                     THOMAS W. THRASH

# EXHIBIT A

## INFRASTRUCTURE STANDARDS

DFCS retains the sole and complete authority to implement new or revise existing child welfare policies.  If DFCS proposes any revisions to the portions of the DFCS policies referenced in these Infrastructure Standards, DFCS will provide notice to the Accountability Agent and to Plaintiffs to discuss the potential impact on the Infrastructure Standards.  Once the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and Accountability Agent otherwise agree to revise the affected Infrastructure Standard(s).

## I.  COMPREHENSIVE PRACTICE MODEL

DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

## II. ASSESSMENT AND INVESTIGATION OF MALTREATMENT IN CARE

DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III.  To do so, DFCS will:
- conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case;
- take into account the traumatic stress of children;
- be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes;

1

- actively engage ongoing partnerships with families and stakeholders to assure child safety; and
- provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making.

A. Intake Assessment

1. As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle.

2. DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to:
   a. the family's previous response to intervention and treatment strategies;
   b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports;
   c. traumatic events affecting family members; and
   d. coping skills used by the family to deal with traumatic events.

B. Investigation

1. For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care. The response time for a special investigation of maltreatment in care is immediate or within 24 hours.

2. For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below.

   a. When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all

placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s).

    b. When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from the date of the report. The assessment includes, but is not limited to:

        i. visiting the home of the caregiver;

        ii. conducting separate face-to-face interviews with children, caregivers, and other household members; and

        iii. completing a policy violation assessment in the applicable foster parent record in SHINES.

    c. Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months.

## III.  CASE PLANNING AND MANAGEMENT

DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making.

DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care.

A. DFCS will use current assessment information to inform case planning in foster care.

1. A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised.

2. The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term.  The FFA:
   a. includes engagement of the family in a partnership to identify safety concerns;
   b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine;
   c. tracks the sequence of everyday life events that led to the incident of maltreatment;
   d. identifies family developmental stages and associated challenges;
   e. identifies family supports;
   f. identifies child/youth development and associated vulnerabilities; and
   g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect.

B. DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (*see* DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs).  By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation.

4

C. DFCS will create and utilize genograms in case planning.

    1. To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram.  The genogram will be used throughout the case process to identify potential placements and family supports.

    2. Construction of the genogram shall:
        a. include at least three generations of family members on both sides of the family;
        b. embrace cultural differences regarding "who is family" and include all who serve in parental capacity;
        c. include natural helpers, friends, confidants of the caretakers, and older children; and
        d. indicate who was living in the home at the time of the assessment.

    3. Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement.

D. DFCS shall assist the family to create plans, implement them and track progress.

    1. DFCS shall assist the family in creating initial action plans and the case plan.  Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family and will be used to guide case planning for permanency.

    2. Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval)

whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law.

3. DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s).

4. DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified.

5. DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being.

E. DFCS will take steps to promote timely and lasting permanency.

1. DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency.

2. The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency. The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings. Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues.

3. In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018.

   a. A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval). The SWAT tool is used in lieu of other staffing

tools. Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months.

    b. Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator. DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings.

4. Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness. If revisions are needed to this process, those changes will replace requirements in this section.

## IV.   QUALITY PLACEMENT AND CAREGIVING

The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured. DFCS prioritizes children being placed with relatives who are able to provide a safe, nurturing home for them. Critical components of the screening, training, approval, and support process for all caregivers are also described in this section.

  A. Screening, Training, and Approval Process for Prospective Foster and/or Adoptive Parents

    1. DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised.

    2. DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan.

7

3. DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis.

4. DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care. DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home. DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised.

B. Placement with Relatives and Fictive Kin

1. Diligent Search

   a. DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised.

   b. DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review.

2. Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:
   a. prior to placement, screen all household members;
   b. prior to placement, conduct criminal history search of adult household members; and
   c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety.

3. The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support.

C. Disclosure of Information

1. DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and

historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable.

2. DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home.

3. DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations.

4. DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home. Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children.

D. Support for Children and Caregivers

1. DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement.

2. DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers.

3. DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home.

4. DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey.

5. DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities.

**V. HEALTH AND EDUCATION**

DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity.

   A. Initial Screenings and Follow-Up Treatment

      1. Physical Health Screening:  All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

      2. Dental Health Screening:  All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician.

      3. Mental Health:  All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional.

      4. All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional.

   B. Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx.

10

C. DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised.

D. DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns.

E. DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody).

F. DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised.

G. DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program.

H. DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school.

I. DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised.

## VI.   CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

The Infrastructure Standards below pertain to DFCS' obligation to continue to develop, maintain, and use an automated child welfare information system in which data accuracy and integrity is maintained on a continuous basis, and which is both compliant with current federal standards and meets current federal reporting standards.   The Statewide Automated Child Welfare Information System (SACWIS) shall include functionalities that support automated case management and that conform to DFCS Policy 2.1 (eff. Mar. 2015), as revised, including those functionalities necessary to support SBC. And finally, it shall support monitoring

and quality assurance efforts consistent with on-going continuous quality improvement efforts.

A. Meeting Federal Standards

1. The Comprehensive Child Welfare Information System (CCWIS) final rule became effective August 2016.  States have until August 1, 2018 to notify the Administration for Children and Families (ACF) of their intent to either transition the existing SACWIS System to CCWIS, develop a new CCWIS System, or opt out.

2. CCWIS requirements focus on quality data and program outcomes including: developing and implementing a data quality plan; new data exchanges; and requiring a data exchange standard.

B. Case Management Functionalities

1. The DFCS automated child welfare information application shall support end users in their obligation to enter child and case specific information across all stages of a child welfare case.

2. DFCS shall continue to modify system functionalities to align with the development and roll out of the DFCS comprehensive practice model.

3. DFCS shall continue to develop, validate, and modify reports based on data housed in the administrative data system that support on-going case management and case review.

C. Monitoring, Quality Assurance, and Continuous Quality Improvement

1. DFCS shall develop methodologies for monitoring adherence to Infrastructure Standards that rely on validated state administrative data analysis and reports.

2. DFCS shall develop methodologies for quality assurance, including case reviews that are reliant on data stored in the administrative database.

3. DFCS shall develop methodologies for on-going evaluation of progress on child welfare outcomes, including those specified in the Modified Consent Decree and Exit Plan, that are based on validated data stored in the state administrative data system.

12

## VII.   SUPERVISION OF CONTRACT AGENCIES

This section applies to any contract for the provision of placements and services to class members into which DHS enters during the contract cycle, or as soon as practicable following the entry of the Modified Consent Decree and Exit Plan. Standards below relate to these recommendations as well as the requirements that contract agencies comply with the terms of the Modified Consent Decree and Exit Plan, including its Principles, and meet or exceed agreed upon outcomes for children and families.

   A. DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan.

   B. DFCS shall only contract for placements or services with licensed contractors or sub-contractors.  No child shall be placed in an unlicensed facility.

   C. DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary.

     The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations.  The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract.

D.  DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured.

E.  DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve.  These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement.

F.  DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type.

As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations.

The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary.  With respect to license-holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations.

G.  The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified.

## VIII.  ROBUST WORKFORCE DEVELOPMENT

DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families.

A. Employee Selection Protocol

1. The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.

2. DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol.

3. DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce.

B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)

1. OHR will post positions within three (3) business days of an approved request.

2. OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director.

3. An OHR recruiter will conduct recruitment events at least monthly.

4. Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence.

5. OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting.

6. OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check.

7. OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

15

C. Training

1. No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training.

2. All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year.

3. DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors.

4. Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training.

5. All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program.

D. Caseload Management

1. In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases.  That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads.

16

2. Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.

3. DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:
   a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);
   b. climate and culture assessments; and
   c. metrics to strategize caseload management (including timely and safe case closure practices).

4. DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan.

## IX.   MAXIMIZATION OF FEDERAL FUNDING

Effective and cost-efficient child welfare systems depend on multiple funding streams to pay for services and supports for the children and families they serve. In recent years, DFCS leadership has made notable progress in securing state funds to provide needed child welfare services.  With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming.

DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding.  DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.

The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.

# APPENDIX E – METHODOLOGY

## *Interviews and Focus Groups*

*Infrastructure Standard 7: Supervision of Contract Agencies*
- Resource Development Program Director: **October 26, 2022**
- Director of RCCL: **October 27, 2022**
- Director of OPM: **November 3, 2022 and November 17, 2022**
- R14 Hiring Manager(s): **November 10, 2022**
- DeKalb County Director: **November 10, 2022**
- Fulton County Director: **November 7, 2022**
- Deputy Commissioner, Human Resources: **October 28, 2022**
- HR Specialist, Generalist: **December 1, 2022**
- Director of Education and Training: **December 9, 2022**
- DeKalb Case Manager Focus Group: **November 22, 2022**
- Fulton Case Manager Focus Group: **December 7, 2022**
- Supervisor Focus Group: **December 6, 2022**
- Supervisor Mentors Focus Group: **November 16, 2022**
- FPS Focus Group: **November 14, 2022**

## *Infrastructure Standards Data*

*Infrastructure Standard 7: Supervision of Contract Agencies*
- Updated Performance Based Placement Scorecard summary by Provider (Q3 2020-Q3 2022) housing Kenny A children
- List of all Safety Reviews conducted in provider homes with Kenny A children in 2022 (to conduct targeted case review)
- Updated quarterly CW Summary reports done by OPM (Q3 2020-Q3 2022)
- Updated Unapproved CPA Placements of Kenny A children OPM Verification (Periods 30-33)
- For children who exited custody in 2020-Sept 30, 2022 and were placed in a CPA or CCI prior to discharge:
  - Time to exit by provider and exit type
  - Number of placement moves in life of case
- For children who entered custody 2018- Sept 30, 2022, time to discharge by initial placement type (CPA, DFCS Home, Kinship Relative, etc), by exit type (or still in care), last placement type
- Data on agencies that received enhanced rate to place hard to place children (agency name, amount received compared to contracted amount)
- Agencies who received 5k supplement (agency name, amount of 5k supplements received)

*Infrastructure Standard 8: Robust Workforce*
- Updated ESP evaluation/fidelity data
- Updated organizational culture survey (if available-last one was NCWWI June 2019)
- Number of staff trained on ESP

- OHR Data time to post positions, screening and sending qualified applicants to counties, time to offer letter from background check, time to salary and compensation requests
- OHR documentation of recruitment events held in 2022
- Data on receipt of supervisory training (all R14 supervisors hired since 2019)
- Data on in service training hours for supervisors (all R14 supervisors since 2019)
- Documentation of mentoring received by supervisors

*Infrastructure Standard 9: Maximization of Federal Revenue*
- Current Organizational Chart
- The last 2 fiscal years of CB-496s (to include Foster Care, Adoption, and Guardianship)
- Annual Adoption Savings Reports for FY 2021 and 2022
- The Master Denial Report as of September 30, 2022
- The current Departmental Budget
- The current number of authorized positions (Statewide and for Region 14), delineated by filled and vacant, by position.
- A sample of 50 CWB determinations on kids in custody as of September 30th to review for errors
- The current Child Welfare Benefits Eligibility Manual
- The current Cost Allocation Plan
- Documentation relative to cases where they have re-reviewed the original determination, found errors and corrected them.
- The following information to reflect the current data as of a specific date:
  - Total Number of Children in Care
  - IV-E Eligible
  - IV-E Eligible and Reimbursable
  - IV-E Eligible but not Reimbursable
  - Non IV-E Eligible
  - Reasons not IV-E Eligible (Duplicated Count)
    - Assistance Unit's Income is greater than or equal to the AFDC Standard of Need Income Limit for this Assistance Unit.
    - Reasonable Efforts determination was not made within 60 days.
    - The initial child removal order did not contain the proper judicial language.
    - Court order did not give DFCS custody.
    - The Assistance Unit's Income is greater than the AFDC Gross Income Limit.
    - Deprivation does not exist in the Removal Home.
    - The child does not meet the specified relative criteria.
    - The child is not a U.S. Citizen, Other Qualified Alien or Permanent Resident.
    - The child is 18 years of age or older
    - The household has more than $10,000 equity in property or resource.
    - The Assistance Unit's Income (minus deductions) is greater than or equal to the AFDC. Standard of Need Income Limit for this Assistance Unit (based on $30 and 1/3 Test).

- The following information (broken down by Children Placed in Homes and Homes with Children Placed, as well as Statewide and Region 14 specific) to reflect the current data as of a specific date:
  - Unlicensed or Unapproved Placements
    - Unapproved Home
    - Pending Full Approval
    - Placed in Homes where Status was Closed
    - Percent Unapproved, Pending Full Approval or Closed