**Period 36**
**<u>Monitoring Report</u>**

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

***Kenny A. v. Kemp***

*State of Georgia*

July 2024

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Glenda McMillan
Regional Vice President
Public Knowledge
Lakewood, New Jersey

Eliza Byrne
Public Knowledge
Lakewood, New Jersey

The following persons were significant contributors to this report.

Dr. Kimberly Hoyt
Georgia State University
Andrew Young School of Public Policy
Atlanta, GA

Amanda Gutwirth, MSW
Georgia State University
Andrew Young School of Policy Studies
Atlanta, Georgia

Dr. Lijun Chen
Public Knowledge
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge
Lakewood, New Jersey

# TABLE OF CONTENTS

I.  INTRODUCTION ....................................................................................................... 4

    *National, Statewide, and Regional Context Data* ............................................. 5
    *Summary of Key Contextual Findings* ............................................................... 13
    PERIOD 36 DYNAMICS AND HIGHLIGHTS .............................................................. 13
    LEADERSHIP CHANGES ....................................................................................... 15

II.  PERIOD 36 MAJOR FINDINGS AND RESULTS ................................................. 16

    MAJOR FINDINGS ............................................................................................... 17
        *Permanency for Children and Youth in Foster Care* ................................... 17
        *Wellbeing of Children and Youth in Foster Care* ....................................... 23
        *Safety of Children and Youth in Foster Care* .............................................. 26

V. PLACEMENT STANDARDS ...................................................................................... 38

    GENERAL BACKGROUND .................................................................................... 39
    PRIOR TO HOTELING .......................................................................................... 40
    DURING HOTELING ............................................................................................. 42
    AFTER HOTELING ............................................................................................... 45
    CHILDREN AND YOUTH WITH MULTIPLE HOTELING EPISODES .......................... 47
    MAJOR FINDINGS – PLACEMENT STANDARDS ................................................... 48

APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN ................................... 51

APPENDIX B – GLOSSARY ................................................................................................ 63

# I.   INTRODUCTION

This Period 36 report is the thirteenth monitoring report in which the Accountability Agent and the Monitoring and Technical Assistance Team (MTAT) report on the outcomes delineated in the Modified Consent Decree and Exit Plan (Modified Exit Plan) that was filed in Federal District Court in December 2016.[1]

In this report, MTAT's obligation is to report specifically on the measurable requirements articulated in Sections IV, V, and VI of the Modified Exit Plan that relate to activity in DeKalb and Fulton counties from July 1 through December 31, 2023. In addition to discussing the Ongoing and Attained Outcome Measures, MTAT continues to review the use of congregate care, monitor the use of hotels, offices, and other temporary placements for children in foster care, and report caseloads for case managers and supervisors.

MTAT's approach to monitoring serves as an accountability mechanism for the Court, the Plaintiffs, and the public. It also serves as an opportunity to assist the Division of Family and Children Services (DFCS) in establishing data-driven decision-making processes and continuous quality improvement (CQI). The goal is to create a strong CQI process that will remain in place after the state satisfies the terms of the Modified Exit Plan and will no longer be under federal court oversight. As part of this process, MTAT data team members work closely with the state data unit to analyze and review trends observed across longitudinal administrative data.  The analysis is presented below in the Context Data Section.

The MTAT reports on the same Modified Exit Plan standards and outcome measures approximately every six months, using a combination of qualitative and quantitative data.[2]  In addition to the basic and consistent set of metrics as agreed upon in the Modified Exit Plan, the MTAT conducts a deep, quality-focused analysis on a handful of Infrastructure Standards at regular intervals. Data gathering for these can include interviews with stakeholders, focus groups, surveys, observations of processes, targeted case reviews, and reviews of Child and Family Service Reviews (CFSRs) findings. Georgia State University researchers at the Andrew Young School of Public Policy are now assisting with this process.  While there may be opportunities to present this information in monitoring reports, this feedback also assists with developing underlying research questions for monitoring analysis.

MTAT's intention in this effort is to enable Parties' understanding in several key factors associated with each of the Infrastructure Standards:

---

[1] Modified Consent Decree and Exit Plan, *Kenny A. v. Nathan Deal*, Civil Action NO. 1:02-CV-1686-TWT. Go to: https://www.childrensrights.org/wp-content/uploads/2014/08/2016.11.09-745-Exhibit-A-Modified-Consent-Decree-and-Exit-Plan.pdf

[2] Pursuant to the Modified Consent Decree, both the Ongoing Outcome Measures and Attained Outcome Measures have undergone substantial revision to reflect, when possible, the principles of best practices in measurement. Best practices principles include: 1) a clear statement of the analytic question with particular attention to identifying the risk population or the denominator associated with a particular inquiry; 2) use of entry cohorts and prospective measures to characterize systems dynamics and change in outcomes; 3) attention to the sources of variation in system outcomes (e.g. variation over time, among children, or in places); 4) understanding variation to track change accurately; 5) assessing expected change in the appropriate period of performance or window of time; 6) matching the analytic question to the appropriate source data; and 7) using well-understood and organized data resources that are designed to support asking and answering analytic questions.

1. The expectations for practice and the extent to which these processes are occurring

2. The capacity within the system to meet these expectations

3. The extent to which these processes are occurring with sufficient consistency and quality

Moreover, this enables MTAT to focus on emerging issues to mitigate a reactive approach to monitoring. The Infrastructure Standards are key practices and strategies that DFCS identified as their theory of change. If done with fidelity and quality, the standards should lead to improvement in the outcome measures assessed in this monitoring report. The Eighth Brief on the Infrastructure Standards, finalized in July 2024, provides a deep review of quality placement and caregiving, and health and education.

**National, Statewide, and Regional Context Data**

The national child welfare environment has seen important changes over the past five years, beginning with the COVID 19 pandemic.  The decline in child removals initially seemed COVID related but has outlasted the pandemic.  Currently there are nearly 100,000 fewer children in foster care than in 2019, a decline of more than 20%.  Entries into foster care have declined for children across age groups.



Figure 1. National Perspective – Foster Care Entries over Last 5 Years

Source: AFCARS Foster Care File, 6-month periods 2016-2023a)

Trends in Georgia are similar, with the in-care count declining from 14,942 in 2018 to 11,474 in 2023 (The Imprint, 2024).  The rate of placement out of home in the state has declined at the same pace.

**Figure 2. Georgia Statewide Foster Care Entry Rate over Time** (per 1000 children in population)

| | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| | 2.44 | 1.82 | 1.79 | 2.04 | 1.81 |

Source: AFCARS Foster Care File, 6-month periods 2016-2023a

Compared to other states, the foster care entry rate in Georgia is relatively low. Just under 2 per 1000 (1.81) of Georgia's children entered foster care in 2023.  Rates range from the low in New Jersey of .8 per 1000 to a high of over 11 per 1000 children in West Virginia.

**Figure 3.  A National Perspective on Foster Care Entry Rates – FFY 2023**



Source: AFCARS Foster Care File, 6-month periods (2016-2023a)

The data presented from this point forward was calculated from AFCARS files supplied by DFCS and include all children in Georgia's care during FFY 2023.

Region 14 makes up about 9% of the foster care population in the state.  Entries, exits, and the in-care foster care count have varied between the two counties over the last year.  While DeKalb has more children in placement compared to a year ago, the point-in-time count consistently declined in Fulton County.



Figure 4a.  DeKalb County – Entries, Exits, and In Care



Figure 4b. Fulton County – Entries, Exits, and In Care

Across the region, most children placed out of home are Black.  The remainder of children are identified as either White or Latinx.  Few children are identified as multiracial, compared to the population, which may reflect a tendency to collect only one race.



**Figure 5. Racial Breakdown of Children in Care – %**

**Figure 6. Child Removal Reasons – FFY 2023**

Removal reasons vary by age and gender. In both counties, allegations of substance misuse and neglect were among top reasons for the removal of infants.  In Fulton, two-thirds of infants were removed for the reason of neglect. An even higher percentage of teen removals in Fulton were for neglect (87%).  Fewer removals of older children were related to their parent's misuse of alcohol or drugs, but more children were removed for reasons related to child behavior and abandonment.



Figure 7. Removal Reasons For Infants and Teens

The experience of abandonment in child welfare in Fulton County is prevalent for infants and teens. About a third of entries are young children while two-thirds are teens.  Looking at children who were discharged from care in 2023 and had entered for reason of abandonment, most were reunified with a parent in spite of the alleged abandonment.  Few children were adopted, though a larger percentage were discharged to guardianship.

**Table 1. Children and Youth Removed for Reason of Abandonment: Discharge destinations for FFY 2023 Exits**

|  | Reunify | Live with relatives | Adopt | Age out | Guardianship | Runaway |
|---|---|---|---|---|---|---|
| **Fulton** | 45% | 0% | 7% | 28% | 21% | 0% |
| **DeKalb** | 43% | 10% | 12% | 19% | 14% | 2% |

Gender is also a factor in understanding child removal patterns among older children.  In Fulton County, the reason for removal for 33% of females was either child behavior or abandonment.  These removal reasons tend to reflect situations where youth have police or juvenile justice contact and are unable to secure release to a parent or when a child's behavior is difficult to manage.  A comparatively high percentage of teen girls in Fulton County, nearly a third, came into the child welfare system due to their behavior or to allegations of abandonment.

**Table 2. Percent of Removals for Reason of Abandonment or Child Behavior**

|  | Female | Male |
|---|---|---|
| **Fulton** | 33% | 20% |
| **DeKalb** | 10% | 16% |

As shown in Figure 8, a relatively high percentage of children entering foster care for the first time in Fulton County are teenagers.  Over 31 percent are over 13 years old, compared to 25%

over 13 years old in DeKalb County. The percentage of children under 6 is very similar between the two counties.

**Figure 8. Age Distribution at Initial Placement**



In Fulton County, children are more commonly initially placed with kin than in DeKalb County. This is true for all ages except infants. Babies are most likely to be placed with non-kinship foster parents, many interested in adoption.  Residential and runaway placements are limited to teens.  It is unusual to see initial placement to runaway status and may occur when a youth runs from a shelter or hotel.

**Figure 9a. Fulton County – Initial Placement Settings by Agegroup**



Figure 9b. DeKalb County – Initial Placement Settings by Agegroup

The number of children whose first documented placement was "runaway" is of concern to their safety, which is paramount to the mission of the agency, and worth further inquiry.  In Fulton County, five percent of initial placements for teens were to "runaway."  Most of these youth had only one placement on record – to runaway.  In addition, some children had a custody exit reason of runaway, discussed later.

The focus groups conducted by GSU noted the importance of placement stability to youth. Participants in the youth focus groups articulated the disruption caused by changes in placement or setting both in terms of lost belongings but also broken connections with schools, communities, and supportive people in their lives.  Administrative data shows the increased odds of placement disruption experienced by older youth in both Fulton and DeKalb counties. Placement stability is measured both in average moves among all exits and by moves per 100 placement days. Both show large differences by age, with older youth moving more frequently.



Figure 10.  Variation in Placement Stability by Child's Age

About 40% of discharges in both counties were to reunification, the most common exit pathway for both counties, followed by guardianship (28% for Fulton, 23% for DeKalb). Differences between the counties can be observed when looking at those youth that age out of custody with no permanent placement. Twenty-one percent of youth age out in DeKalb, nearly the same amount as those that exit to guardianship, while Fulton had 12% age out of custody. In addition, one percent of youth in Fulton County had an exit reason of runaway, with none for DeKalb.



Figure 11.  FY 2023 Exits – Where Children Went After Foster Care

Still, the timelines were different with most of the short stays in Fulton County coming within 30 days.  Another equal portion of exits involved children in care from one to three months. DeKalb County was less likely than Fulton to rely on short stays out of home.  While both counties discharged 40% of children to reunification, DeKalb tended to reunify after 6 months in care. Timing may be influenced by processes connected to the timing of court hearings.



Figure 12. Prevalence of Short Stays in FFY 2023

Short stays are much more prevalent in Fulton compared to DeKalb. Disaggregating exit data by age highlights other differences, including the increased likelihood to use guardianship as an exit reason in DeKalb.  While some systems use guardianship more with older compared to younger children, the opposite is true in DeKalb County, where older children are most likely to age out of care and guardianships are relatively rare.  More than half of youth who aged out in DeKalb had entered as teens, while more than half of children who exited care in Fulton were adopted if they entered as infants.



Figure 13. Exits Destinations by Entry Age– FFY 2023

**Summary of Key Contextual Findings**

The child welfare system dynamics in Fulton and DeKalb counties defy the national pattern of steep foster care reductions over the past couple of years.  Region 14 foster care volume has changed little, reflecting more removals in DeKalb and fewer in Fulton. Both counties, like the state, have low rates of child removal and placement compared to the national average. For the state of Georgia and nationally, the recent peak of removals was in 2018, prior to the pandemic. There are important differences between the two counties in Region 14.  Both counties serve more older children compared to the state and national trends. In DeKalb County, there are very high rates of aging out of care in lieu of permanent options like guardianship. In Fulton County, older children are often in care for reasons historically served by juvenile justice or behavioral health systems.

## Period 36 Dynamics and Highlights

Throughout Period 36, 1181 children and youth spent time in Region 14's foster care system:

- 729 children and youth in DeKalb County and 452 in Fulton County.

  - This is 21 more children and youth than during Period 35. DeKalb County had 30 more children in its care however, Fulton County had 9 less children in its care.

- Among the 1181 children, 223 children entered care on or after July 1, 2023, and 259 children exited care by the end of the period on December 31, 2023.

**Workforce and Placement Crises Update**

As reported in previous monitoring reports, the lack of willing and appropriate placements for youth with complex needs is a long-standing issue that has vacillated between reliance upon the use of hotels and the use of offices for placements. Through various interventions and efforts including staffing cases with county, regional, district, and state staff, as well as contracting with promising programs such as Seeds that Grow, the number of children placed in hotels / offices decreased substantially.  To gain a more comprehensive understanding of the experience of youth without identified placements, MTAT conducted a case file review of 168 youth in Region 14 who were placed in hotels between May 2022 and February 2024. For more details, please see the placement section of the report.

In the last several monitoring reports, MTAT reported data and information that revealed consistent patterns of high workforce turnover, challenges with recruitment, and resulting caseloads that surpassed the required caseload maximums agreed to in the Modified Consent Decree and Exit Plan.  Through focus groups and reviews of exit plans, one of the often-cited reasons for case manager resignations involved the difficulties associated with finding placements for children and/or spending the night in offices and hotels with children. With the current decline in the usage of hotels as temporary placements, the agency's ability to hire and onboard new case managers is now outpacing turnover rates; however, this is not the case for supervisors.

During Period 36, the counties hired 86 new case managers, and 7 new supervisors.  However, during this same period, the counties lost 62 case managers and 7 supervisors.  This resulted in a net gain of 24 case managers and zero gain regarding supervisors.



Figure 13. Caseworker YTD July 2023–December 2023



Figure 14. Supervisors YTD (as of December 2023)

While data regarding net gains and losses provide some information, it is imperative to note that the onboarding process for new case managers requires weeks of training followed by slowly increasing caseloads.  Thus, whenever case managers leave, the case managers who remain must assume the departing case managers' caseloads. In addition, this places an extra burden on supervisors and causes them to exceed their caseload requirements under the consent decree. Overall, this exacerbates the workload of those who stay and leads to future resignations and requests for leave under the FMLA.  Additionally, Pro Re Nata (PRNs ), or temporary employees, have been increasingly used to deal with the high caseloads.  Currently PRNs make up approximately half of the Foster Care/Investigations caseworker positions.  This reliance on a temporary workforce can negatively affect caseworker continuity and overall quality of services. MTAT will further explore the impact of the use of these temporary workers in future reporting periods.

Given the national child welfare workforce crisis, MTAT commends the Region for its hiring and retention efforts.  In fact, with the number of case managers hired now outpacing those leaving the agency, there is some indication that the strategies may be promising.  The Region hosts weekly interviews and quarterly hiring fairs for prospective case managers and supervisors. MTAT observed a hiring fair in Fulton County during Period 37 and was very impressed with the professionalism and the overall process.  Since approximately half of front-line positions are still vacant, MTAT recommends the Region try to streamline the hiring process even further by having the state human resource office on site for the hiring fairs to immediately start background checks for conditionally selected candidates.  This will hopefully cut down the time to onboard new workers.  One promising program, the Education and Guidance Learning Enrichment Services (EAGLES), was deployed by the Region to assist with retention. EAGLES was proposed and implemented as a concept to reinvigorate the Region by offering a more solid, structured, vitalized, inclusive approach to serve not only the needs of new hires but veteran staff alike.

**Technology Updates**

DFCS worked on and implemented several technology enhancements to support practice during the reporting period July 2023-December 2023. In August 2023, a county override function was

input into SHINES that allows counties to override an intake assignment. In October 2023, three enhancements were implemented: Argo Community portal, which automates service requests with delivered services providers; Argo Placements which was rolled out statewide to provide support to the placement process; and Communicare which enables streamlined communication and data access between DFCS and external parties including CASAs foster parents and parents. Finally, in November 2023, DFCS updated its AFCARS with the new data file format and storage process for expanded data to be reported.

**Leadership Changes**

As reported previously, during Period 36, DeKalb County Deputy Director, Nora Lindsey left to become the Director of Clayton County DFCS. During Period 37, the DeKalb County Director, LaToya Wright resigned to take a position with the federal Administration for Children and Families. LaSondra Howard-Boddie has been hired as the new DeKalb County Director, who will start at the beginning of Period 38. Regional Director Kirsten Toliver has been providing leadership at the county level as they seek to fill this vital leadership position. At the state level, Kylie Winston, who most recently served as Director of Communications, will serve as Deputy Commissioner of External Affairs. Ellen Brown, former Deputy Director of Communications became Director of Communications. Changes in leadership are to be expected, however, the agency should ensure that communication with staff at all levels is transparent and clear, and that any changes to practice expectations are thoughtful, fully implemented, and evaluated to ensure intended impact.

**Period 36 Performance**

Despite ongoing challenges with workforce turnover during Period 36, the counties continue meeting the threshold requirements for all five visitation measures, in adherence to post-pandemic state-wide policies and expectations. Period 36 also provides final analysis for each of the annualized measures. While the final results for each of the three permanency rates falls short of the agreed upon thresholds, it is important to note that the counties were within one percentage point of meeting the threshold minimums for OM 6 (children in care between 12-23 months) and OM 7 (children in care for 24+ months).  Unfortunately, the percentage of children re-entering care (OM 3) continued increasing.  Finally, the rate of maltreatment in care (OM 4) decreased to a rate of 6.39, from a rate of 8.21 in Period 35.  However, it is very concerning that the rate of recurrence of maltreatment more than doubled, from 3.22 percent in Period 34 to 7.53 percent in Period 36. The Region's continued high numbers of case manager resignations and the use of PRNs to fill gaps negatively impacted the rate of case worker continuity (OM 12), which remained very low at 60.9 percent for Period 36. The Region's Period 35 performance was 56.7 percent. For several other measures, the lack of staffing also continued impacting the Region's ability to improve performance and outcomes. More details are provided in the next section of this report. Finally, through the hard work of staff and community partners, the Region continues meeting or exceeding the educational attainment outcome (OM 17) for youth exiting foster care.

## II.    PERIOD 36 MAJOR FINDINGS AND RESULTS

This section provides major findings regarding outcomes for children, youth, and families involved with Region 14 of Georgia DFCS during Period 36, July 1, 2023 – December 31, 2023. It also provides a list of the performance of each county and the region for each of the

requirements under the Modified Exit Plan. This includes a status update on the requirements, whether the task or outcome has been attained or is at risk of being re-designated as an ongoing task or outcome. The graphic below reflects the status of outcome measures, including three measures that have dropped below Consent Decree requirements onto the watch list for possible movement out of attained to ongoing (yellow). A detailed description of each outcome, and current and past performance on each is provided in Table 3, later in this section.

| Attained | | | | |
|---|---|---|---|---|
| Outcome 2 | Outcome 4 | Outcome 5 | Outcome 7 | Outcome 8 |
| Outcome 9 | Outcome 10 | Outcome 11 | Outcome 13 | Outcome 14 |
| Outcome15 | Outcome 16 | Outcome 17 | Outcome 18 | Outcome 19 |
| Outcome 20 | Outcome 22 | Outcome 24 | Outcome 25 | Outcome 26 |
| Outcome 28 | | | | |
| Ongoing | | | | |
| Outcome 1 | Outcome 3 | Outcome 6 | Outcome 12 | Outcome 21a |
| Outcome 21b | Outcome 21c | Outcome 21d | Outcome 23 | Outcome 27 |

As stated in the Modified Consent Decree and Exit Plan Section IX.E.1.b., "[A]n Ongoing Outcome Measure is automatically re-designated as an Attained Outcome Measure for the next reporting period, if in the previous three consecutive reporting periods (totaling 18 months) . . ." [or three years for annual measures] State Defendants improved performance in the first period (as compared to the prior period) then met or exceeded the measure for the next two periods. An Attained Outcome Measure "will be re-designated as an Ongoing Outcome Measure only if both of the following conditions occur: (l) the Accountability Agent finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period." Modified Consent Decree and Exit Plan IX.E.2.b.

## *Major Findings*

### Permanency for Children and Youth in Foster Care

Ensuring that children who enter foster care achieve timely permanency is a major goal and responsibility for child welfare agencies across the country.

In 2016, when parties to the *Kenny A* Consent Decree renegotiated a Modified Consent Decree and Exit Plan, they agreed to adopt the current federal requirements and methodology to determine progress toward improving rates and stability of permanency in Region 14. The current federal methodology uses an entry cohort of children in care less than 12 months (OM 23), and an annual point in time analysis of two cohorts of children: those in care 12- 23 months (OM 6), and those children and youth in care over 24 months (OM 7). While using a point-in-time methodology is not as precise as an entry cohort analysis, the parties agreed that aligning *Kenny A* requirements with the existing federal mandates would prevent dual reporting and potentially conflicting analysis. It also allows the agency to compare performance across regions throughout the state.

In addition to the rates upon which children and youth exit foster care, it is important to ensure that once they exit, they do not return. Thus, re-entry rates are also evaluated on an annual basis utilizing the federal requirements and methodology.

**1. While coming close to the threshold on two of the permanency rate outcomes, the Region failed to meet all three permanency measures.**

The three permanency annual measures are calculated each year for the period ending in December. Below is a chart of annual performance over the past 4 years.

| Outcome Measure | Period 30 Annual (2020) (10 months COVID PHE) | Period 32 Annual (2021) (Full-Year of COVID PHE) | Period 34 Annual (2022) (Full Year of COVID PHE) | Period 36 Annual (2023) (9 months Post COVID PHE) |
|---|---|---|---|---|
| **OM 6 – Exits for children in care 12 – 23 months. (Threshold 43.6%)** | 45% | 42% | 38% | 42.1% |
| **OM 7 – Exits for children in care over 24 months. (Threshold 30.3%)** | 37.4% | 38% | 35.1% | 29.9% |
| | | | | |
| **OM 23 – Exits for children in care 12 months or less. (Threshold 40.5%)** | 41% | 35% | 31.5% | 32.6% |

For children in care for 24 + months (OM 7) the Region has implemented several initiatives over the past six years, including Push to Permanency, Half the Life, and Push 24.  Although it is difficult to ascertain which initiative or combination of initiatives led to improved results, the Region was able to surpass the threshold beginning in December 2018.  Thus, 2024 marks the first time in six years that the Region fell short of the threshold requirements for this population of children in foster care.  For the next Infrastructure Brief, MTAT will be working with the Region to evaluate which initiatives are still being implemented, at what frequency, and with

how much quality.  In accordance with the terms of the Modified Consent Decree and Exit Plan, OM 7 will be placed on the "watch" list to determine of the Region is able to meet the threshold in 2024.

For children in their first year of foster care (OM 23), the Region met or exceeded the required threshold in 2017, 2019, and 2020.  However, since 2020, the rates of permanency for children in care for less than 12 months have declined to a low of 32 percent.  During Period 36, the rates slightly improved to 33 percent, still far below the required 40.5 percent. The intent of this measure is to increase the likelihood that children will be reunified with their families, which is harder the longer they are in care.[3]

Finally, for children in foster care between 12 and 23 months (OM 6), the Region met the threshold for the first time in December 2020, however, the rate has been below the required 43.6 percent ever since.  During Period 36, the permanency rate for this population of youth in foster care was just short of the threshold at 42.1 percent.  In collaboration with the QA Unit, MTAT will work with the Region to identify barriers to permanency, and to better understand what efforts are occurring for children in foster care up to their 24th month.

## 2.  The re-entry rates increased during Period 36, reversing the Region's steady improvement trend.

Over the past four years, the Region has been on a course of consistent improvement in preventing children from re-entering foster care within 12 months of exit.  However, during period 36, the performance declined. The chart below illustrates a comparison of annual results over the past four years.

| Outcome Measure | Period 30 | Period 32 | Period 34 | Period 36 |
|---|---|---|---|---|
| **OM 3 – No more than 8.3% of children exiting care will re-enter care within 12 months.** | 13.1% | 11.9% | 8.6% | 12.1% |

Unfortunately, the trauma of removal is only exacerbated when children leave foster care only to re-enter within 12 months. MTAT recommends that the counties revisit its initiative to prevent re-entries through consistent discharge staffings and ensuring that services are in place for children who reunite with their families.

**Other Consent Decree Measures that Support Permanency**

There are several processes included in the consent decree that also have a direct impact on achieving permanency for children in foster care. The processes with the most direct impact involve the juvenile court system, its ability to hold timely hearings, and the production of valid court orders that document the reasons for removal, the reasonable efforts of DFCS, and the

---

[3] Child Welfare Information Gateway. (2017). Supporting successful reunifications. Washington, DC: U.S. Department of Health and Human Services, Children's Bureau

action steps needed to achieve permanency. Also important is consistent, regularly scheduled visits among case managers, children, birth parents, caregivers, and siblings, and the ability of DFCS to limit the number of changes in a child's assigned case worker. These policy expectations mitigate trauma associated with being in foster care and prevent unnecessary delays in a child's case due to hand-offs between different workers and caregivers. There are also several infrastructure standards that relate to achieving timely permanency such as the implementation of a comprehensive case practice model and case planning and decision-making, including transfer staffings, family functional assessments, genograms, and family team meetings.

**3.  Juvenile courts in Fulton and DeKalb counties continued exceeding the threshold requirements for six-month court reviews (OM 19).  However, DeKalb County declined significantly in holding timely twelfth-month permanency reviews (OM 20) and finalizing adoptions and guardianships (OM 8).**

During Period 36, the six-month case plan review hearings (97%) continued occurring timely. However, in DeKalb County, only 89 percent of the twelfth-month permanency hearings were timely.  While Fulton County heard all of these hearings timely, the performance across the Region declined to 94 percent, below the 95 percent threshold.  This is the first time since December 2016, that the Region did not meet this requirement.  MTAT will work closely with DeKalb County and its court stakeholders to identify existing barriers and develop strategies to ensure that these hearings are occurring in a timely manner.

Likewise, the timely finalization of guardianships and adoptions following a termination of parental rights is paramount in mitigating trauma and ensuring that children achieve permanency, so that they do not age out of foster care without legal parents/guardians. Following the low performance during Period 34, preceded by low performances with COVID-related challenges, MTAT recommended that OM 8 be placed on the "watch" list. However, during Period 35, the counties worked closely with the courts to ensure that adoptions and guardianships occurred timely for 82 percent of children whose parental rights were terminated during the reporting period.  Unfortunately, the performance in DeKalb County declined to 53 percent.  While Fulton County completed all of its hearings timely, the regional performance declined to 60 percent. MTAT is recommending that OM 8 and OM 20 be placed on the watch list for moving to the ongoing category of outcome measures.

**4.  Continuity of case manager assignments for children in foster care remained very low during Period 36 (OM 12).**

In accordance with the negotiated Modified Consent Decree and Exit Plan, the state agreed that each child should have no more than two assigned case managers while in foster care. The goal is that continuity of case managers would occur for at least 90 percent of children in care. Period 31 marked the third consecutive period that the Region met or exceeded this threshold (93% for Period 31), triggering a recommendation by MTAT that this measure be moved to the attained category. However, during Period 32, the region fell below the threshold to 83 percent, a

significant decline in performance. MTAT noted in its Period 32 report that this was especially troubling given the numerous exceptions that are not considered "changes" when analyzing the number of case managers assigned to each child.[4] During Period 33, case manager continuity declined even further to 65 percent. There was a slight improvement during Period 34, yet only 68 percent of children had two or fewer case managers.  During Period 35, the counties experienced another significant decline in performance with only 56.65% of children in foster care having two or fewer DFCS placement case managers.  Although there was a slight improvement in Period 36, the Region's performance remained very low at 60.9%.

As reported in the Period 33 report, researchers have correlated high caseworker turnover with poor outcomes for children in foster care.  According to a Casey Family Programs report[5]:

> High workloads can have a domino effect: staff burnout and stress lead to staff attrition that can result in decreased worker-family contact and failure to meet professional standards for investigation response and completion; case plan completion and updates, and service provision; as well as increased time to permanency, rates of maltreatment recurrence, and the number of foster care placements and re-entries into foster care.

MTAT strongly recommends that the state reevaluate its current strategies to recruit, hire, and retain a robust workforce.  As discussed in the Introduction section and again in the Caseload section of this report, the number of case managers resigning from the agency continues to be high, creating higher caseloads and more challenging work conditions, which leads to more resignations and requests for FMLA.  The impact on children, youth, and families is evidenced throughout this report.  Thus OM 12 remains in the ongoing category and needs to be a primary focus for the agency moving forward.

> **5.  Ninety-one percent of cases reviewed had court orders or all applicable language in court orders necessary to be eligible for federal funding reimbursement (OM 27).  This marks the ninth consecutive reporting period that the counties did not meet the required 95 percent threshold.**

The DeKalb and Fulton County court systems continue working with stakeholders so that every child in a dependency case has timely executed and filed valid court orders. The court order serves as a blueprint for permanency, delineating the reasons for removal and the actions or behavioral changes needed for reunification or other permanency options. Thus, it is a vital factor for achieving timely permanency. The federal government requires valid court orders that include specific findings regarding custody and reasonable efforts for states to qualify for reimbursements to cover the costs of foster care.

---

[4] Exceptions built into OM 12 for analysis of case worker continuity include: Cases transferred to an adoption case manager; Case managers who have died, been terminated, promoted, or transferred to another county; and Case managers who have covered a case during another case manager's sick or maternity leave
[5] https://www.casey.org/turnover-costs-and-retention-strategies/#:~:text=High%20caseloads%20and%20workloads&text=Cost%20of%20processing%

During Period 34, the case file review revealed that only 68 percent of children had all court orders and/or court orders with the applicable language necessary to assess qualification for federal funding under Title IV-E of the Social Security Act (a decline from 71 percent during Period 33). The case file review for Period 35 revealed that 90 percent of the cases reviewed had all valid court orders uploaded into SHINES. After receiving a list of the missing court orders, the counties were able to locate and/or finalize additional court orders bringing the total up to 92 percent. Fulton County was able to locate enough orders to bring its performance up to 95 percent, which is the Consent Decree threshold established by the parties. During Period 36, 91 percent of the cases reviewed had all valid court orders uploaded into SHINES.  This demonstrates a sustained effort to improve this vital aspect of the legal process. It is important to note that Fulton County improved its performance to 97 percent, while DeKalb lagged at 88 percent. Collaboration and sharing initiatives between the counties may enable continued improvement in DeKalb and thus the Region. Although this marks the ninth consecutive reporting period that the Region fell below the requirement, MTAT remains hopeful that the counties are on the right track.

While the case file review is a statistically significant sample utilized by MTAT for its analysis, DFCS regularly evaluates IV-E eligibility for all children in its custody (penetration rate). This analysis includes the presence of valid court orders among other federal requirements, that ultimately impacts the agency's ability to maximize federal funding to support the child welfare system. Below is a graph of the statewide penetration rates from 2010 to present.

**Figure 16. State IV-E Penetration Rates**



State IV-E Penetration Rates

Source:  COSTAR through SFY 2010, SHINES SFY 2011  Beginning Jan 2011 SSI Elig Children included in IV-E rate per Federal Policy.   (As of  02-12-24)

Maximizing federal funding is a core component of the agreed upon Infrastructure Standards. For Brief Nine, MTAT will be working with state leaders to ascertain whether they have followed up on previous recommendations to improve in this area.

**6. Despite continued challenges with staff turnover, shortages, and case manager continuity, the counties continued surpassing threshold requirements for all five visitation outcome measures.**

Visitation is a vital component of achieving permanency and ensuring the well-being of children in foster care. Despite high staff turnover, shortages, and case manager continuity, both counties surpassed the visitation threshold requirements for all five outcomes (OMs 13-16, OM 26) for Period 36.  This is the third straight period during which the region met or exceeded the threshold for all visitation metrics. During focus groups with youth, some indicated that visits with case managers sometime occur at their schools, which disrupts class and can be embarrassing in front of their peers. MTAT recommends that the county continue reviewing the quality of the visits during monthly staffings with supervisors and consider the impact of the visitation location.

<u>**Wellbeing of Children and Youth in Foster Care**</u>

In accordance with its own policies, as well as federal regulations, DFCS must make reasonable efforts to *maintain the family unit and prevent the unnecessary removal of a child from his/her home, as long as the child's safety is assured*[6]. If safety issues require a child to enter foster care, the removal of a child from his/her family is intended to be short-term to address those issues, and the state serves as a temporary guardian, responsible for every aspect of the child's well-being.  In accordance with DFCS policy:

> *Children require a variety of services to promote their health, well-being and safety. Due to the trauma experienced by children who enter foster care, many of them will have one or more needs that require immediate attention and sometimes ongoing care and treatment. Foster care provides an opportunity to conduct a comprehensive trauma-informed assessment of each child's needs and respond to those needs through a combination of short and long-term interventions. Exposure to intensely traumatic events may require ongoing treatment after a child exits foster care. Consequently, case managers must be knowledgeable and resourceful in developing and utilizing resources to enable children to achieve the highest level of functioning possible to support successful permanency outcomes.*[7]

In order to minimize trauma for children who are removed from their parents, DFCS policy regarding selecting a placement resource requires staff to *identify a safe, least restrictive, and most family-like setting in close proximity to the home of the parent, guardian or legal custodian,*

---

[6] O.C.G.A. §15-11-202 Reasonable Efforts by DFCS to Preserve or Reunify Families
[7] Public Law 96-272 Adoption and Safe Families Act of 1997 Public Law 105-89

*when the permanency plan is reunification.*[8] The Modified Exit Plan and Consent Decree also addresses this practice expectation in OM 25 (placement proximity).

OM 21 addresses DFCS' ability to identify and meet the medical, dental, mental health, educational, and developmental needs of children in care. As the substitute guardian for children when they enter foster care, it is imperative that the state meets each child's individualized needs. In fact, separating a child from his or her parent for abuse or neglect and then neglecting to meet the child's needs undermines the overall mission of the child welfare system. DFCS policy delineates particular screenings and assessments that are expected to be completed for each child when they enter care, including a trauma assessment as part of a Comprehensive Child and Family Assessment for each family member. In addition, needs should be identified periodically through well-child visits and other required screenings and assessments in accordance with the Early Periodic Screening, Diagnostic, and Treatment (EPSDT) schedule outlined by Medicaid. It is then the case manager's responsibility to coordinate follow-up for needs identified during these screenings and assessments.

## 7. The counties continued surpassing the agreed upon placement proximity requirements under the Consent Decree (OM 25), however, most children continue to be placed out of their home counties.

Under the Modified Consent Decree and Exit Plan, *at least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed.* There are several exceptions, including appropriate placements with relatives, ICPC placements, the child's needs are so exceptional that they can't be met within the geographic agreement, and/or the child is in a preadoptive placement. The counties have consistently met and exceeded the threshold of this requirement. During Period 36, 92.8 percent of children met this requirement.

As discussed in the previous monitoring report, the purpose of this measure and the intent of the agency's policy expectation that children will be placed close to the homes from which they were removed is to mitigate the trauma of removal. Placing a child close to home increases the possibility of education stability (continuing to attend the same schools), as well as maintaining connections to friends, family members, activities, and familiar places. To better understand whether the current practices are meeting this intent, it is important to consider some of the underlying data.

During Period 36, while 92.8 percent of children's placements met the letter of the outcome, only 33 percent (309 out of 928 children) were placed within their same county. In other words, 619 children left their neighborhoods, and those who were school-aged were also forced to change schools. Moreover, those children who were considered exceptions were justified with subjective reasons such as depression, adjustment disorder, speech disabilities, and PTSD to name a few. Given that Fulton and DeKalb Counties should have the resources to address children's needs within their own county and community, it is unclear why those services or specialized placements could not be cultivated within each child's county of removal.

---

[8] 10.4 Selecting a Placement Resource MT 2023-02

During future reporting periods, MTAT will be working with the state data unit to better understand the placements of children and why more children in Region 14 are not being placed within their home counties.

## 8. The Region continued struggling meeting identified needs for children in foster care. (OM 21)

The Region's performance in meeting the needs of youth in care continues to be up and down as they strive to meet the 92 percent threshold for each metric. Below is a chart depicting the performance in each category over the past four monitoring reports.

|  | Period 33 | Period 34 | Period 35 | Period 36 |
|---|---|---|---|---|
| **Medical Needs** | 58% | 60% | 88% | 79% |
| **Dental Needs** | 80% | 55% | 53% | 58% |
| **Mental Health Needs** | 29% | 89% | 81% | 64% |
| **Educational/Developmental Needs** | 80% | 83% | 80% | 82% |

It should be noted that Outcome Measure 21 is captured through a case file review of a sample of cases open during the reporting period. The percentages in the chart above are based on relatively low numbers. For example, only 34 children were identified during the case review with documented medical needs in their files. Only 19 children were identified with documented dental needs in their files. Similarly, only 28 children were identified with mental health needs in their files and 17 children had educational/developmental needs identified. Given the high number of children with complex needs regularly reported by the agency as a reason for the lack of adequate placements, the file review should reveal more children with documented needs. This may be a documentation challenge or the assessments for children as they enter care, and the regular checkups are not occurring as required by DFCS policy and EPSDT expectations.

According to interviews conducted, when children enter care there are two assessment processes that occur simultaneously, are to a certain extent duplicative, and don't necessarily inform either each other or the case plan based on when they are completed. Per policy, the Comprehensive Child and Family Assessment (CCFA) is to be conducted by an approved DFCS provider within 25 days of referral, and the trauma assessment is conducted by an approved Amerigroup provider within 10 days. While it is possible that the same provider is conducting both assessments, and therefore contains shared information, it might also be done by two separate providers, and therefore important content contained in one may not be contained in the other, in addition to re-exposing the child and youth to difficult questions. Another confounding factor is that Amerigroup cannot schedule the trauma assessment until the child is enrolled and there is contact information to schedule the assessment, which was reported could take anywhere from one day to 90 days. DFCS is currently working on a fix to the existing reform process that gets Amerigroup the information they need. A final confounding factor is that the case plan for the child needs to be approved in the first 30 days of custody, so important assessment information may not be included or informing case plan decisions.

In addition, the Region's performance may be indicative of the staffing challenges that began heightening in Period 32, reached crisis levels in Period 33, and continued through Period 36 (see caseload section).  Not having enough staff to ensure the coordination of appointments and transportation limits the ability to follow up on the needs of children. Thus, MTAT anticipates that performance under OM 21 will continue fluctuating. MTAT began analyzing the assessments and follow-up process for Brief Eight and will continue working with all parties to determine if a core problem is the failure to identify children with needs required to be met under OM 21, and also if there is a better way to evaluate whether the agency is meeting the needs of youth in care.

### Safety of Children and Youth in Foster Care

When children enter foster care, the state is required to ensure their safety from further maltreatment. There are several measures that monitor the agency's ability to timely investigate allegations of maltreatment in foster care and ensure that children are placed in approved placements.  OM 1 focuses on the timely initiation of investigations, OM 2 focuses on the timely completion of investigations (which includes required conduct in the investigations), and OM 4 focuses on the rate of maltreatment in care. All three measures improved from Period 35 to Period 36. Other outcome measures related to the safety of children include OM 18, focused on children being placed in homes with full approval status, which has continued to meet the threshold despite the placement crisis occurring in Region 14 and statewide.

> **9.  A notable percentage of the population of children in custody who were the subject of a maltreatment in care investigation (OM 1 and 2) experienced unique circumstances compared to earlier reporting periods.**

Four children in custody who were subject to an investigation in Period 36 were on runaway for some or all of the investigation period. While an occasional child on runaway for the investigation happens, four in one period is out of the norm. In addition, two children in custody who were subject to an investigation had died while in custody (nature of the intake report), which is also unique and concerning. In one case, the child was 5 months old and had come into custody a little over two months prior. The case was unsubstantiated for lack of supervision. In the other case, the child was 5 years old and had come into custody a little less than four months prior. The case was also unsubstantiated as for lack of supervision.

A total of 13 child death notifications in Fulton and DeKalb counties were received through the Child Death Review process between July 1 and December 31, 2023. Five of the children were infants under the age of one. Two children had complex issues at birth. Three children died in accidents (one in a car accident, one by drowning during a family vacation in Florida, and one by accidental hanging while playing superhero). Two children died from gunshot wounds (one caught in the crossfire as a gunman shot into the family's car, and one self-inflicted after a four-year-old found her father's loaded gun.  Finally, one child died after being starved and physically abused by her father, who was subsequently arrested for her murder.  A high number of child deaths continued into 2024, with 13 cases reported thus far during Period 37.

**10. The rate of maltreatment in care (OM 4) improved from the previous period, however this outcome measure in general has fluctuated greatly over time and should be analyzed further.**

Georgia as a state ranks 9th best of 52 jurisdictions for Maltreatment in Care rate at 2.54. In Region 14, since 2016, the rate of maltreatment in care steadily decreased and then, in 2019, began steadily increasing, surpassing the 8.50 victims per 100,000 days maximum threshold in Period 30. However, the Region has remained below the threshold in 8 of the last nine reporting periods:



**Figure 17. Region 14 Maltreatment in Care Rates Overtime**

To understand more about what may be impacting this trend or the fluctuations observed, MTAT looked further at the seven children who were found substantiated of Maltreatment in Care during Period 36. The age range of substantiated victims was 8 to 16, with the average age of 12.5 years old. Four children were in custody of DeKalb County and three in Fulton County, however three of the DeKalb County children were placed in perimeter counties. Three children were placed in DFCS foster homes at the time of the maltreatment, two in CCI's, one in a relative placement and one placed with their birth father. Three children had substantiated allegations of Physical Abuse (bruises, welts, abrasions), two had substantiated allegations of Neglect (lack of supervision), one had substantiated allegations of both Physical Abuse (bruises, welts, abrasions) and Neglect (lack of supervision), and the final child had substantiated allegations of Sexual Abuse (fondling by non-household member). MTAT plans to do further analysis of the substantiated victims in future monitoring reports..

Perhaps even more concerning is that the rate of Recurrence of Maltreatment (Section VI.G.1 of the Modified Exit Plan and Consent Decree) more than doubled from 3.22 percent in Period 34 to 7.29 percent in Period 35.  The performance for Period 36 was slightly higher at 7.53%. The rate in Fulton County continued to be very high at 9.65%. Additionally, the number of children who were victims of a second substantiated investigation within 12 months of a Family Support

Services (FSS) case (Modified Consent Decree and Exit Plan VI G.2) increased slightly from 5.33 percent in Period 35 to 6.31 percent in Period 36 for children in Region 14.

## 11. Region 14 rebounded, ensuring that 99.3 percent of placements were in full approval status (OM 18).

Under the Modified Consent Decree and Exit Plan, the parties agreed that at least 98 percent of all foster placements serving class member children shall be in full approval or licensure status. The approval and licensure process enables DFCS to ensure caregivers are knowledgeable about policies, regulations, safety measures, and trauma-informed care for children in its custody. This is an attained measure. Ninety-eight percent of placements were in full approval status at the end of Period 34 (down from 98.6 percent in Period 32). And during Period 35 this continued declining to 96 percent, resulting on this measure being moved to a "watch" list.  However, during Period 36, 99 percent of placements were in full approval status, once again surpassing the agreed upon threshold. The chart below provides an analysis for each type of placement.

| Outcome 18 - Placements in Full Approval Status | | | | | |
|---|---|---|---|---|---|
| Placement Type | Number of Placements with a Class Member in Care on 12/31/2023 | Number of Placements with a Class Member in Care on 12/31/2023 that were in Full Approval Status | Overall Capacity of Placement Settings with a Class Member in Care on 06/30/2023 | Capacity of Placements with a Class Member in Care on 12/31/2023 that were in Full Approval Status | Capacity of Placements in Full Approval Status as a Percentage of Overall Placement Capacity |
| Relative Placement | 166 | 161 | 365 | 362 | 99.2% |
| DFCS - supervised Foster Home | 81 | 79 | 225 | 225 | 100% |
| Provider - supervised Foster Home | 247 | 242 | 755 | 740 | 98.0% |
| Child Caring Institution | 50 | 50 | 1246 | 1246 | 100.0% |
| Total | 544 | 532 | 2591 | 2564 | 99.3% |

| |
|---|
| Of the 166 total Relative homes, 5 were Unapproved. This left a total of 161 Approved homes. |
| Of the 81 DFCS FH's, 2 were over capacity, which leaves the total Approved at 79 |
| Of the 247 total CPA FH's, 5 were unapproved for various reasons, which left a total of 242 Full Approved CPA's |
| Of the 50 CCI's, 0 was Suspended and 0 were Inactive and Closed, which left a total of 50 Full Active homes. |

As the state continues staffing cases for children without placements, it is imperative that children with high complex needs are placed in approved placements to increase the probability of safety and well-being.  MTAT is recommending that OM 18 be taken off the "watch" list and remain in the attained category.

According to GA Score, during Period 36, the number of foster homes and correlated bed counts declined in DeKalb County, while the number of foster homes increased in Fulton and the correlated bed counts decreased.  In July 2023, there were 309 foster homes with an 832-bed count capacity.  By the end of the period in December 2023 there were 306 foster homes with an 816-bed count capacity.

The Region 14 Resource Development Unit reported that 12 new Partnership families (21 beds), 8 new resource families (13 beds), 1 new adoptive home (1 bed), 13 new kinship partnership families (19 beds), 1 new kinship resource families (1 bed), and 1 kinship adoptive home (2 beds) were approved this period.

During Period 36, 42 homes closed (an increase from the 21 homes that closed during Period 35). The Resource Development Unit reported the following from exit interviews:

- 11 (up from 7) of the closures were kinship homes that closed and eight of those were due to guardianship or adoption, two for relative placements, and one for noncompliance.

- 11 partnership homes, three resource homes, and 1 adoptive family closed.

- Three homes closed due to substantiated CPS. One closed due to lack of partnership with the agency. None closed due to lack of training.

- One home transferred to another region.

- One home finalized adoptions and closed.

- The remaining eight homes closed for other personal reasons, including traveling for work, having a baby, identified child being reunited, and other personal reasons.

Likewise, the number of CPA foster homes decreased in Region 14 during the period.  The Office of Provider Management for CPAs with foster homes reports that Fulton County had 19 approved CPA foster homes and DeKalb County had 22 approved homes during Period 36.

- Fulton County had a net loss of 5 foster homes and DeKalb County maintained its Period 35 levels.

- A total of 42 foster homes closed (19 in Fulton and 23 in DeKalb).

- 25 homes closed citing personal reasons.

- Five homes closed due to adoption finalizations.

Both the state Office of Provider Management and the Region 14 Resource Development Unit are focusing on retention efforts.  Region 14 is also focusing on making the first placement for a child with kin.

For a complete listing of Period 36 performance for all measures required in the Modified Consent Decree and Exit plan, see the tables below.

This report also has three appendices. Appendix A is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Consent Decree and Exit Plan and describes the method for producing the metric. A technical document, Detailed Outcome Measures for Period 35, provides the numerator and denominator for each metric displayed and includes additional explanation or data that support the interpretation of the outcome metric under the Modified Consent Decree and Exit Plan.

Appendix B contains a glossary of common terms that are relevant to Georgia.

## *Table 3: Period 36 Ongoing Modified Exit Plan Requirements*

| Ongoing Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 1**: Commencement of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | **86.3%** | 91.8% | 82.6% | **88.9%[9]** |
| **Outcome 3**: Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than **8.3%** shall have re-entered care within 12 months from the date of discharge. Children who were in foster care for less than eight days are not counted in this measure. | **11.1%** | 7.3% | 15.5% | **12.1%** |
| **Outcome 6**: At least **43.6%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of | **19.5%** | 46.5% | 34.5% | **42.1%** |

[9] Six children were removed from the sample (numerator and denominator): Four due to runaway status, two due to death.

| Ongoing Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | | |
| **Outcome 12**: Caseworker Continuity: At least **90%** of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | **57%** | 56% | 68% | **61%** |
| **Outcome 21**: Health and Educational Needs: Of children in care at a point in time at the end of the reporting period, according to the service needs documented in the child's most recent case plan: [10] | | | | |
| **Outcome 21a**: At least **92%** shall not have any unaddressed medical needs | **88%** | 82% | 75% | **79%** |
| **Outcome 21b**: At least **92%** shall not have any unaddressed dental needs | **53%** | 54% | 67% | **58%** |
| **Outcome 21c**: At least **92%** shall not have any unaddressed mental health needs | **81%** | 56% | 80% | **64%** |
| **Outcome 21d**: At least **92%** shall not have any unaddressed education/development needs. | **80%** | 79% | 100% | **82%** |
| **Outcome 23**: Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least **40.5%** shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | **28.0%** | 27.5% | 38.3% | **32.6%** |
| **Outcome 27: Court Orders: At least 95% of foster children in custody at a point in time** | **90%** | 88% | 97% | **91%** |

[10] All health and educational needs data are very limited due to COVID-19, so numbers are very skewed.

| Ongoing Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | | | | |

## *Table 4: Period 36 Attained Outcome Measures*

| Attained Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 2**: Completion of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | **98.2%** | 100% | 100% | **100%**[11] |
| **Outcome 4**: Maltreatment in Care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than **8.50** victims per 100,000 days. | **8.21** | 7.49 | 4.58 | **6.39** |
| **Outcome 5**: Search for Relatives: At least **95%** of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | **100%** | 100% | 100% | **100%** |
| **Outcome 7**: At least **30.3%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **12.3%** | 33.5% | 23.5% | **29.9%** |

[11] Six children were removed from the sample (numerator and denominator): Four due to runaway status, two due to death. One case experienced a documented SHINES glitch preventing submission of paperwork for case closure until 2 days after the 45 day deadline and credit was given.

| Attained Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 8**: Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least **80%** will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights | **82%** | 53% | 100% | **60%** |
| **Outcome 9**: Permanency Efforts (15/22): At least **95%** of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | **95%** | 97% | 100% | **98%** |
| **Outcome 10**: Sibling Placement: At least **80%** of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relatives. | **100%** | 86% | 100% | **93%** |
| **Outcome 11**: Multiple Placement Moves: The rate of placement moves in foster care shall be no more than **3.67** moves per 1,000 days in foster care. | **2.79** | 2.72 | 3.00 | **2.83** |
| **Outcome 13**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | **96.5%** | 96.8% | 98.1% | **97.3%** |
| **Outcome 14**: Visitation (Parent-Child): At least **85%** of the children with a goal of reunification shall | **86.63%** | 86.28% | 89.93% | **87.38%** |

| Attained Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| have had appropriate visitation with their parents to progress toward reunification. | | | | |
| **Outcome 15**: Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least **95%** of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | **96.69%** | 95.89% | 96.75% | **96.22%** |
| **Outcome 16**: Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least **90%** of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | **94.5%** | 90/16% | 94.74% | **91.65%** |
| **Outcome 17: Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED.** | **NA** | 52% | 62% | **56%** |
| **Outcome 18**: Placements Not in Full Approval Status: At least **98%** of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | **96%** | | | **99%** |
| **Outcome 19**: Six-Month Case Plan Review: At least **95%** of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan | **97%** | 95% | 100% | **97%** |

| Attained Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | | | | |
| **Outcome 20**: Permanency Hearing: At least **95%** of foster children in custody for 12 or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | **100%** | 89% | 100% | **94%** |
| **Outcome 22**: Corporal Punishment: At least **98%** of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | **100%** | | | **100%** |
| **Outcome 24**: Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | **0%** | 0% | 0% | **0%** |
| **Outcome 25**: Placement Within County: At least **90%** of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, b) the child is placed through the ICPC consistent with its terms, c) the child is appropriately placed with relatives, or d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | **96.3%** | | | **92.8%** |
| **Outcome 26**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of monthly | **97.12%** | 97.33% | 98.40% | **97.74%** |

| Attained Outcome Measures | Period 35 Performance Region 14 | Period 36 Performance DeKalb | Period 36 Performance Fulton | Period 36 Performance Region 14 |
|---|---|---|---|---|
| *private*, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | | | | |
| **Outcome 28**: Capacity Limits: No more than **10%** of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home with no other children in the home. | **0.6%** | | | **1.8%** |
| **Other Consent Decree Requirements** | | | | |
| Visitation in First Week of New Placement | | | | |
| (VI.G.1) Recurrence of Maltreatment. | **7.29%** | 4.79% | 9.65% | **7.53%** |
| (VI.G.2) Number of children who were victims of a second substantiated investigation within 12 months of FSS case. | **5.33%** | 5.18% | 6.31% | **5.92%** |

# IV   CASELOAD REQUIREMENTS

For the purpose of this report, this section is focused solely on the caseload standards and supervisory ratios included in the Modified Consent Decree and Exit Plan Section V.

- No CPS case manager shall have more than 12 cases.
- No ongoing case manager shall have more than 17 cases.
- No placement case manager shall have more than 15 cases.
- No adoption case manager shall have more than 16 cases.
- No specialized case manager shall have more than 12 cases.
- No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties.

For Period 36, of the 74 case managers in Fulton on December 31, 2023, 61 (82 percent) met the designated caps. Of note, 17 out of 26 (65 percent) CPS Investigators met the designated caps

which is a decrease from Period 35 where 79 percent met the cap. DeKalb had several case managers, especially specialized case managers, that did not meet the caseload caps. Only 50 out of 76 (66%) case managers in Dekalb met the cap.

During Period 36, Dekalb made some progress with increasing their workforce.  There were 40 new hires and 37 losses (33 resignations) in DeKalb.  This was a significant increase from Period 35 where there were only 25 new hires.  Fulton also made inroads in increasing their workforce. Fulton had 43 new hires, 9 re-hires and 35 losses (30 resignations). Fulton only had 25 new hires in Period 35.  The counties need to continue focusing on hiring more staff and retaining the staff that they bring onboard especially since it takes weeks even months to onboard new staff. Additionally focus group feedback from several Region 14 case managers, supervisors and administrators indicate that many of the new caseworkers are not fully prepared to provide quality services to children and families.  Many recommended that new hires be exposed to the rigors of the job while still in a training status.  Therefore, when they report to their respective offices, they will be more prepared to meet the challenges the job entails.  Managing expectations of new hires is critical to their future success.

Without a robust workforce, the required practice expectations regarding visitation, timely investigations, searching for relatives and other appropriate placements, meeting the health and educational needs of children in care, as well as outcome requirements such as achieving timely permanency, and preventing re-entry into care will continue being hampered.  Ongoing workforce challenges must be continuously addressed so services for children and families are not negatively impacted.

## Supervisors

As of December 31, 2023, in Dekalb, 21 out of 29 (72%) supervisors met the ratio of 5 or less caseworkers per supervisor.  This decreased from 89 percent in Period 35.  Overall, for DeKalb 50 supervisors out of 76 (65 percent) met the required ratio, while 61 supervisors out of 74 (82 percent) in Fulton met the ratio.

## CPS Case Managers

For CPS case managers, 65 percent (32 of 49) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of December 31, 2023. This is a decrease from 85 percent for Period 35. An additional 19 cases were assigned to case managers on leave or supervisors awaiting assignment, which is less than the 28 cases during Period 35.

## Family Preservation Case Managers

Family preservation case managers generally were assigned 17 or fewer families to be able to provide services and help ensure child safety. The same was true on December 31, 2023. All 15 of these case managers met the standard.

## *Permanency Case Managers*

On December 31, 2023, 90 percent (45 out of 50) of permanency case managers were meeting caseload expectations. This is a substantial increase from Period 35 (59 percent).

## *Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer*

Previously known as specialized case managers, case managers assigned to children in foster care for 18 months or longer are to be assigned no more than 12 children at any given time. Many of these children require extra support to achieve permanency. During Period 36, only 53 percent (19 of 36) of these case managers met caseload expectations on December 31, 2023. This is a slight increase from the performance for Period 35 (47 %).

## *DeKalb County on December 31, 2023*

The caseloads for 34 percent of the case managers in DeKalb County on December 31, 2023, exceeded the caseload cap. This is a decrease to their Period 35 performance in which 48 percent had caseloads exceeding the requirements. It should be noted that all family preservation case managers were assigned caseloads that met agreed-upon standards.  See Appendix A, *Table A-3 and Table A-4* for more information.

## *Fulton County on December 31, 2023*

For Fulton County, 18 percent of case managers exceeded caseload expectations which was similar to Period 35 (19 percent) It should also be noted that all family preservation met the caseload requirements during Period 36. See Appendix A, *Table A-5 and Table A-6* for more information.

# V. PLACEMENT STANDARDS

The quality placement and caregiving standards include specific DFCS commitments to ensure every child in foster care will have a stable, nurturing placement in accordance with the principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks, so family ties are maintained and nurtured, children are able to remain with parents and relatives as often as possible, and the screening, training, approval, and support process for all caregivers are operating well. The Second and Fourth Brief on the Infrastructure Standards included an analysis of these standards.

The Modified Consent Decree also states, "no child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placement needs require a safe bed in a home-like environment."

In July 2017, the state also agreed to end the use of hotels as temporary placements for children entering foster care or those already in foster care with disrupted placements.  Although the

practice of hoteling children continued throughout the state, the practice ended in Region 14, due to the parties' agreement.  Unfortunately, without addressing the lack of adequate placements to meet the varying needs of children and youth, the Region began using their offices as temporary placements. The use of DFCS offices for temporary placements for youth in Region 14 hit crisis levels during Period 33. During an emergency meeting in May 2022, MTAT discussed concerns with state leaders, and Commissioner Broce pledged to end office stays in Region 14. As the state transitioned from office stays, the parties acknowledged that limited use of hotels may be needed until long-term sustainable systemic solutions could be implemented. Initially, the counties' reliance on hotels was limited, however this again increased after the first reported hotel stay on May 20, 2022.

As reported previously, while the number of children and youth staying in hotels in Region 14 steadily rose throughout Periods 34 and 35, subsequent dramatic declines have been observed during Period 36.

To better understand the placement challenges and the impact on youth in care of utilizing hotels as temporary placements, MTAT conducted a targeted case file review. While significant progress has been made in mitigating the use of hotels in recent months, hotel and/or office use has ebbed and flowed over the last decade. Thus, it is important to gather as much information as possible to assess whether the current strategies are effective and sustainable over time. Below are the results of this review.

## General Background

Use of hotels as a temporary, emergency placement resource began increasing again in May 2022 after overnight office stays had escalated creating unsafe situations. Hotel use peaked in the spring and early summer of 2023, but has dramatically fallen since then, a great success for the region and the state. The Monitoring and Technical Assistance Team (MTAT) conducted a targeted case review on those Region 14 children and youth who experienced a hotel stay for three primary reasons:

- To learn more about who were the children and youth that came to stay in a hotel and how;

- To better understand their experience while in a hotel; and,

- To better understand whether the interventions and efforts by DFCS to prevent the use of hotels as temporary placements was having the intended impact.

One hundred and sixty-eight unique children and youth from Region 14 have experienced a stay in a hotel since hotel stays began again in May 20, 2022. The majority of children were from Fulton County (58.9%), Black/African American (94%), and Female (60.1%). As of the time they went to the hotel, 64.9% had a medical or mental health diagnosis, 60.1% were prescribed at least one medication, and 50.6% had a medical or mental health diagnosis and were prescribed at least one medication.

Information on Lesbian, Gay Bisexual, Transgender, Queer/Questioning, Intersex and Asexual (LGBTQIA) and Commercial Sexual Exploitation of Children (CSEC) status is not consistently identified in SHINES. However, there was clear evidence that 6.5% of children and youth who

stayed in hotels identified as LGBTQIA. More notably, 15.5% of children and youth who stayed in hotels from Region 14 were CSEC confirmed.

Of the 168 unique children and youth who experienced a hotel stay in Region 14, 53 (31.5%) exited from care as of May 1, 2024.

**Figure 18. Exit Pathways of Children and Youth in the Hotel Case Review**



The most common exit was to Reunification (27 children and youth) followed by Aging Out (17 youth). For those that exited to reunification, a little over 25% (7) exited to reunification within one month of the hotel start, with six of the seven children going straight from the hotel to their removal home. Four children (14.8%) exited to reunification 1-3 months after hotel start, nine (33.3%) within 3-9 months, and the remaining seven exited nine or more months after the hotel episode start.

## Prior to Hoteling

A significant proportion of the 168 children and youth who were hoteled at least once had the hotel as their first placement upon coming into custody (either from their removal home, RYDC or a hospital).

**Figure 19. Children by Length of Time in Custody to First Hotel Stay**



Forty-four children and youth (26.2%) were placed in a hotel within 1 day of custody start, either directly from their removal home, or placed from RYDC or a hospital. A total of 95 (56.5%) children or youth were placed in a hotel within their first year of custody, with the remaining 73 (53.5%) children or youth having their first stay in hotels after their first year in custody. Not surprisingly, the most frequent placement prior to placement in the hotels was the children or youth's removal home.

**Figure 20. Placement Directly Prior to First Hotel Episode**



An additional 50 children or youth (29.8%) also came from placement types not typically representative of a placement disruption: 19 from runaway, 15 from hospital, 15 from RYDC and 1 from the offices at the beginning of the hoteling timeframe. As such, it is not surprising that there was clear evidence in only 16 cases that there was intentional staffing (pause call or otherwise) to try and prevent the need for a placement in a hotel.

# During Hoteling

Children and youth stayed in their initial hotel setting between one and 92 days (about 3 months) since hoteling began May 20, 2022. While half of children and youth (84) stayed in the hotel setting for seven days or less, the average stay across the 168 children and youth was 14.83 days (about 2 weeks).  Median, or 50th percentile, was 7.5 days. This difference between the median and mean is evidence of a skewed distribution, with outliers biasing the mean upward.  This is not uncommon in cases where the low end of the distribution is fixed at 0, while the upper end is driven by the greatest outlier.

Figure 21 shows the decile distribution of placement days, showing much less spread among the lower half of stays compared to the upper half.  In addition to the median at 7.5 days, note that placements range from under a day for the l day for the lowest ten percent to over three months (92 days) for the 10% of children with the longest stays. Note the small differences in the lower half of the distribution and nearly and nearly two-month gap between the top and bottom of the 90th percentile.

**Figure 21. Decile Distribution of Days in Hotel Placement**



This is further born out in the Figure 22 data showing the frequency of stays of different lengths. Most stays in hotels are short under 20 days.   Longer stays are experienced by a smaller number of children.

**Figure 22. Frequency Distribution of Hotel Stay Duration (in days)**



Longer stays were observed in three primary clusters: in the beginning around May and June of 2022, in the fall around September 2022, and around March to May 2023. There was a significant drop in both short stays as well as long stays beginning in August 2023, which coincides with a significant push by DFCS to get children and youth out of hotels and keeping them out statewide.

**Figure 21. Average Days in Hotel by Hotel Start Month**



The majority of children and youth remained in one hotel for their initial hotel stay, although children are required to check out each morning due to daily placement efforts. Twenty-three children and youth stayed in more than one hotel during their hotel episode. Some of the reasons gleaned from the documentation as to why hotels were changed include the Behavioral Aide agency changing, there being incidents in the hotel leading to the hotel requesting them to leave, and in one case the hotel needing to be shut down for a few days due to an infestation of bedbugs.

Region 14 children and youth stayed in 31 different cities and towns during their initial hotel episode. Twenty-three (13.7%) children and youth stayed in more than one hotel for their initial stay.

**Figure 22. Location of Hotels**



The most common locale utilized for hotel stays was Atlanta (31), followed by Columbus (23) and Albany (21) which are both several hours from DeKalb and Fulton counties.

There was clear documentation of only 41 of the 168 (24.4%) children and youth who spent time in the hotel receiving supportive services while in the hotel. The duplicated table below describes the type of services documented as being received:

| Service | Frequency |
|---|---|
| Medication | 29 |
| Therapy | 12 |
| Referral for Services | 6 |
| Drivers License Assistance | 1 |
| Resource Center Access | 1 |
| CHOICES Program | 1 |
| Independent Living | 1 |
| Day Treatment | 1 |
| Mentor | 1 |

While it is entirely possible there were more children and youth who received services in the hotel which were not documented for whatever reason, the low percentage of children with documented receipt of supportive services is concerning, especially given the number of children identified with a medication prescribed (101) or a medical or mental health diagnosis (109). Fifty-one (30.4%) of the 168 children and youth had a documented caseworker visit which occurred at the hotel. Other caseworker visits that may have occurred happened in the office, the community or at medical appointments. The focus of the visits that did occur in the hotel varied in depth and quality.

For cases where it was documented by service authorizations (136 of 168 cases), 26 different Provider Agencies were utilized to provide Behavior Aide services while children and youth were hoteled, however about half of these were with three agencies. Behavioral aide services represent a service that all 168 children and youth received while they were hoteled, 24 hours a day. Based on the 2,492 hotel days represented for children and youth's first hotel episode, and

the rate which is paid for Behavioral Aide services an hour, this represents a minimum expenditure of $2,272,704.[12]

## After Hoteling

The majority of children (62.5%) were placed in a contracted provider setting post hotel episode.

**Figure 23. Subsequent Placement After Hotel**



CCI's were the most common placement type post hoteling, followed by CPA agencies. It is interesting to note that there was more variety in the CCI agencies utilized than the CPAs. Thirty-six unique CCI agencies were used as placements post hotel compared to 19 CPA agencies. The length of time children remained in subsequent placements varied significantly. While the goal is to place the children in the best placement where they can experience stability and hopefully permanency, that may not always occur, and likewise some children may have been placed in known shorter term placements, like receiving homes which have a 30-45 day limit. The intent of receiving homes is to provide needed services so the child can be placed in a more stable setting. Thus, the length of stay in subsequent placements can not be analyzed across the hoteled population, as it is unique to each child and their individual circumstances and needs. Nineteen children and youth exited custody after the subsequent placement. Fifteen were reunified, three went to custody with a relative, and one aged out. The subsequent placements where these children were placed include: Parent (eight children), CCI (seven children), Relative (two children) and CPA (two children). The time in the subsequent placement ranged from one day to 272 days, with an average of 83 days and a median of 49 days.

Two of the strategies to get children and youth out of hotels employed by DFCS was to offer a $5,000 grant through June 2023, as well as offer an enhanced rate on top of the foster care or RBWO rate for DFCS homes, CPA or CCI placements. The condition of receiving these enhancements was to agree to keep the child in the placement for at least 6 months.

---

[12] Subsequent hoteling episodes were not included in this estimation, nor were cases where more than one behavioral aide were assigned to provide oversight to a child or youth at the same time.

**Figure 24. Children in Hotels with Rate Enhancement for Subsequent Placement**



Of those subsequent placement types where an enhancement was possible based on who currently can be offered an enhancement, 63% received an enhanced rate. Parents, Hospitals, RYDC, Runaway and Relative placements are not currently eligible for an enhance rate. There was evidence in only four cases that a $5,000 grant was received.

Looking at those who received enhanced rates or grants and those that did not and the length of time the child or youth remained in the subsequent placement, some variation can be observed. Of the 35 children or youth placed in a DFCS Home, CPA or CCI placement who did not get an enhancement (rate or grant), the average days in the subsequent placement was 129.7 days (about 4 and a half months). For the 82 children or youth placed in a DFCS Home, CPA or CCI placement who did get an enhancement (rate or grant), the average days in the subsequent placement was 121.8 days (about 4 months). Further analysis is necessary to determine the efficacy of the enhanced rate intervention.

There was clear documentation in 99 of the 159 (62.3%) cases that services were provided in the subsequent placement.[13] The table below represents the duplicated count of the type of services provided:

---

[13] Please Note: This does not mean 60 children needed and didn't receive services in subsequent placements-services may not have been necessary in all subsequent placements.

| Service | Frequency |
|---|---|
| Therapy (individual, group, family) | 67 |
| Medication Monitoring | 56 |
| Behavioral Aide | 11 |
| Crisis Stabilization | 4 |
| Life Coach, Mentor | 4 |
| Educational Support | 3 |
| Assessments | 3 |
| Independent Living Services | 2 |
| Boys and Girls Club | 2 |
| Intensive Family Intervention | 1 |
| ESOL Services | 1 |
| CHOICES Program | 1 |
| LGBTQIA Support Group | 1 |

Of the 159 children and youth who did not exit custody after their hotel placement, the number of total subsequent placements (not counting respite) a child or youth had ranged from 1 placement to 26 placements.

**Figure 25. Count of Subsequent Placements for Children**



## Children and Youth with Multiple Hoteling Episodes

Nearly 1/3 of children and youth (52, 31%) experienced multiple hotel episodes since hoteling began May 20, 2022.

**Figure 26. Children with Multiple Hotel Episodes**



82.7% of these children and youth with multiple episodes had a medical or mental health diagnosis, and 78.8% had a medication prescribed. Only 12 youth (23.1%) identified as CSEC confirmed had multiple hotel episodes.

The major findings regarding the placement standards during Period 36 are presented below.

## Major Findings – Placement Standards

### 12. The Region substantially decreased its use of hotels during Period 36.

Significant efforts were made to reduce the reliance of hotels for children and youth where placements were not immediately available or identified. While more research should be done, as suggested above on the overall impact and implications of the enhanced rate on helping achieve placement stability, at a bare minimum, it can be considered a positive impact on reducing the reliance of hotels as temporary placements. Research should also be done to try and identify and study those that would have gone to hotels had it not been for PRO team efforts and the enhanced rate. The stability of these enhanced rate placements should be evaluated over time and MTAT highly recommends that the state continue working toward improving its array of placements to meet the individualized needs of youth. The state should also consider offering the enhanced rate to relatives and kin, and evaluate the impact of those supports.

During Period 36, planning was underway to open a 24-bed facility for children who are victims of commercial sexual exploitation (CSEC) called Grace's Place.  The state developed partnerships with Deveraux and other treatment providers, the Children's Healthcare of Atlanta, and law enforcement, and the facility opened in January 2024.

Another promising intervention involves a new model of receiving homes designed in partnership with Seeds That Grow, Inc (STG). The provider has recruited receiving homes with a demonstrated desire and ability to work with teens who present with high complex needs.  STG employs case managers who are dedicated to the receiving home program and who are in daily

and weekly contact with the youth and the caregivers. The program is designed to be youth and family centered and trauma informed, with youth to be served for up to 45 days. The Director and staff describe a "can do", think outside the box approach that wraps each youth with a community of caring adults inside and outside of the placement.  Preliminary data shared with MTAT during a site visit indicates promising outcomes for youth.  Once the program is fully evaluated, DFCS and STG should determine whether and how the program can be scaled.

## 13. The state continues to ensure young children are not placed in congregate care placements unless necessary for the child's welfare.

The Consent Decree has several restrictions related to the use of group care, including limiting the use of congregate care for young children. The reported information is for all children under the age of 12 in care between July 1 and December 2023.

According to verified state reports, no children under the age of 12 entering foster care or already in care during the period were placed in group homes or child-caring institutions except as allowed under the Modified Exit Plan. Of youth under the age of 12 who entered foster care during Period 36, 32 were placed in hospitals to meet their physical health needs, six were hospitalized for mental health issues, three experienced hotel stays and three were placed in receiving homes.

## 14. The overwhelming number of children are not remaining in temporary facilities longer than 30 days and the Region continues to place fewer children in more than one temporary facility while in foster care.

The Modified Consent Decree states:
- No child shall be placed in a temporary facility, or any other foster home or group facility beds used on any temporary basis, for more than 30 days: and
- Children shall not be placed in more than one temporary facility within one episode of foster care (meaning the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care).

During Period 36, out of the 1181 children in foster care at the beginning of the period or entered during the period, 19 children were placed in a temporary facility, or any other foster home or group facility beds used on a temporary basis for more than 30 days.[14] This is slight increase from Period 35, during which there were 16 children in temporary facilities.

In addition, the state continues striving to reduce the number of children experiencing two or more temporary placements. During Period 36, 21 out of 504 (4 percent) children were placed in two or more temporary facilities within one episode of foster care.[15] This includes youth placed in hotels two or more separate times within one reporting period.

---

[14] MTAT is working with DFCS to verify these numbers.
[15] MTAT is working with DFCS to verify these numbers.

As the state continues working toward ending the use of hotels and offices, it is imperative that they also closely monitor usage of other temporary placements for more than 30 days and the use of multiple temporary placements.  MTAT will work closely with the state during the next monitoring period to ensure that all types of temporary placements are being captured in its analysis.

# APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN

This Appendix contains two tables summarizing the metrics under the Modified Exit Plan and the methods for generating each of them.

*Table A-1* is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Ext Plan and describes the method for producing that metric.

*Table A-2* is a technical document, Detailed Outcome Measures Period 36, that provides the numerator and denominator for each metric displayed in *Tables 4 and 5* above and includes additional explanation or data that support the interpretation of the outcome metric under the Modified Consent Decree and Exit Plan. It also contains additional technical explanations and historical data that provide context for reviewing and interpreting Period 36 performance data.

*Tables A-3 through A-8* provide caseload data as reported from the state.

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.1 | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | DeKalb: 13 Fulton: 9 Perimeter: 42 Total: 64 | DeKalb: 14 Fulton:12 Perimeter: 46 Total: 72 | DeKalb: 92.9% Fulton: 75.0% Perimeter: 91.3% Total: 88.9% |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | DeKalb: 13 Fulton: 12 Perimeter: 27 Total: 52 | DeKalb: 13 Fulton: 12 Perimeter: 27 Total: 52 | DeKalb: 100% Fulton: 100% Perimeter:100% Total: 100% |
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | DeKalb: 3 Fulton:9 Total: 12 | DeKalb: 41 Fulton: 58 Total: 99 | DeKalb: 7.3% Fulton: 15.5%% Total: 12.1% |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | DeKalb: 8 Fulton: 3 Total: 11 | DeKalb: 106781 Fulton: 65455 Total: 172236 | DeKalb: 7.49 Fulton: 4.58 Total: 6.39 |
| | This a new measure which relies on the CFSR 3 methodology. That methodology controls for "exposure time" for the risk of maltreatment by calculating the total number of days that children with a least one day of care in the period experienced. It also counts any substantiated investigation associated with a child in care, regardless of who was the perpetrator of the maltreatment. | | | |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | DeKalb: 37 Fulton: 23 Total: 60 | DeKalb: 37 Fulton: 23 Total: 60 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.6 | Permanency: At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 47 Fulton: 20 Total: 67 | DeKalb: 101 Fulton: 58 Total: 159 | DeKalb: 46.5% Fulton: 34.5% Total: 42.1% |
| VI.A.7 | Permanency: At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes | DeKalb: 78 Fulton: 31 Total: 109 | DeKalb: 233 Fulton: 132 Total: 365 | DeKalb: 33.5% Fulton: 23.5% Total: 29.9% |

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | DeKalb: 16<br>Fulton: 5<br>Total: 21 | DeKalb: 30<br>Fulton: 5<br>Total: 35 | DeKalb:53%<br>Fulton: 100%<br>Total:60% |
| | *During this reporting period, two (2) DeKalb cases were on track to finalize timely but were delayed due to COVID | | | |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | DeKalb: 307<br>Fulton: 194<br>Total: 501 | DeKalb: 318<br>Fulton: 194<br>Total: 512 | DeKalb: 97%<br>Fulton: 100%<br>Total: 98% |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions:<br>(a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relative. | DeKalb: 36<br>Fulton: 45<br>Total: 81 | DeKalb: 42<br>Fulton: 45<br>Total: 87 | DeKalb: 86%<br>Fulton: 100%<br>Total: 93% |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | DeKalb: 562<br>Fulton: 390<br>Total: 952 | DeKalb: 206381<br>Fulton: 130047<br>Total: 336428 | DeKalb: 2.72<br>Fulton: 3.00<br>Total 2.83 |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave. | DeKalb:315<br>Fulton: 245<br>Total: 560 | DeKalb: 561<br>Fulton: 359<br>Total: 920 | DeKalb: 56%<br>Fulton: 68%<br>Total: 61% |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have | DeKalb: 6376<br>Fulton: 3986 | DeKalb:6589<br>Fulton: 4065 | DeKalb: 96.77%<br>Fulton: 98.06% |

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | Total: 10362 | Total: 10654 | Total: 97.26% |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | DeKalb: 1214<br>Fulton:545<br>Total: 1759 | DeKalb: 1407<br>Fulton: 606<br>Total: 2013 | DeKalb: 86.28%<br>Fulton: 89.93%<br>Total: 87.38% |
| VI.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 3185<br>Fulton: 1996<br>Total: 5191 | DeKalb: 3332<br>Fulton: 2063<br>Total: 5395 | DeKalb: 95.89%<br>Fulton: 96.75%<br>Total: 96.22% |
| VI.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 458<br>Fulton: 234<br>Total: 692 | DeKalb: 508<br>Fulton: 247<br>Total: 755 | DeKalb: 90.16%<br>Fulton: 94.74%<br>Total: 91.65% |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | DeKalb:17<br>Fulton: 19<br>Total: 36 | DeKalb: 33<br>Fulton: 31<br>Total: 64 | DeKalb: 52%<br>Fulton: 62%<br>Total: 56% |
| | This metric is generated annually in the report covering the period that ends December 31 of each year. | | | |
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | Total: 2564 | Total: 2591 | Total: 99% |

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | DeKalb:40<br>Fulton: 28<br>Total: 68 | DeKalb: 42<br>Fulton: 28<br>Total: 70 | DeKalb: 95%<br>Fulton: 100%<br>Total: 97% |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | DeKalb: 25<br>Fulton: 21<br>Total: 46 | DeKalb: 28<br>Fulton: 21<br>Total: 49 | DeKalb: 89%<br>Fulton: 100%<br>Total: 94% |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | See Below | | |
| | Medical Needs | DeKalb: 18<br>Fulton: 9<br>Total: 27 | DeKalb: 22<br>Fulton:12<br>Total34 | DeKalb: 82%<br>Fulton: 75%<br>Total: 79% |
| | Dental Needs | DeKalb: 7<br>Fulton: 4<br>Total: 11 | DeKalb: 13<br>Fulton: 6<br>Total: 19 | DeKalb: 54%<br>Fulton: 67%<br>Total: 58% |
| | Mental Health Needs | DeKalb: 10<br>Fulton: 8<br>Total: 15 | DeKalb: 18<br>Fulton: 10<br>Total: 17 | DeKalb: 56%<br>Fulton: 80%<br>Total: 88% |
| | Education/Develop-mental Needs | DeKalb: 11<br>Fulton: 3<br>Total: 14 | DeKalb:14<br>Fulton: 3<br>Total: 17 | DeKalb: 79%<br>Fulton: 100%<br>Total: 82% |

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.B.22[16] | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | Total: 82 | Total: 82 | Total: 100% |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | DeKalb: 70 Fulton: 88 Total: 158 | DeKalb: 255 Fulton: 230 Total: 485 | DeKalb: 27.5% Fulton: 38.3% Total: 32.6% |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | DeKalb: 0 Fulton: 0 Total: 0 | DeKalb: 54 Fulton: 23 Total: 77 | DeKalb: 0% Fulton: 0% Total: 0% |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | Total: 861 | Total: 928 | Total: 93% |

| | As noted above, the methodology for this metric changed. Rather than being evaluated through case review, the Data Unit generated a metric using the entire class of children in placement on the last day of the period. To generate the final metric – they considered who in placement on 6/30/2022 was placed in the w/in 50 miles of their removal address, was placed within the same county as their removal county or qualified for an exception as stipulated in the agreement. The numerator was adjusted upward to reflected both those that met the standard AND those who were exceptions. The reciprocal of the numerator is the measure. See below for the adjustments. | | | |
|---|---|---|---|---|

| | Placed | Denominator | Numerator | % |
|---|---|---|---|---|
| Total in Placement on 6/30/2023 | 928 | 928 | 861 | 93% |
| | | % of those placed | | |
| Placed in Same County | 309 | 33% | | |

---

[16] VI.B metrics are currently Attained Outcomes.

**Table A-2: Detailed Outcome Measures for Period 36**

| | Outcome | Numerator | | Denominator | Metric |
|---|---|---|---|---|---|
| | Placed in Different County | 619 | 67% | | |
| | Different county and exception placement | 169 | 18% | | |
| | Different county | 619 | 67% | | |
| | Different county and placed w/in 50 miles | 383 | 41% | | |
| | Different county and place greater than 50 miles | 67 | 7% | | |
| | Different county, > than 50 miles and exempt | 0 | 0% | | |
| | Different county, > than 50 miles and NOT exempt | 67 | 4% | | |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | DeKalb: 3249 Fulton: 2028 Total: 5277 | | DeKalb:3338 Fulton: 2061 Total: 5399 | DeKalb: 97.3% Fulton: 98.% Total: 97.7% |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | DeKalb: 50 Fulton: 34 Total: 84 | | DeKalb: 57 Fulton: 35 Total:92 | DeKalb: 88% Fulton: 97% Total: 91% |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of 6 children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster. | Total: 6 | | Total: 328 | Total: 1.8% |
| VII.G.1 | Recurrence of substantiated investigations: Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | DeKalb: 26 Fulton: 68 Total: 94 | | DeKalb: 543 Fulton: 705 Total: 1248 | DeKalb: 4.8% Fulton: 9.7% Total: 7.5% |

*Kenny A. v. Deal*

**Table A-2: Detailed Outcome Measures for Period 36**

|  | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| **VII.G.2** | Substantiated investigation following FSS case. Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. For Period 25 – partial data are provided. | DeKalb: 61<br>Fulton: 140<br>Total: 201 | DeKalb: 1177<br>Fulton: 2218<br>Total: 3395 | DeKalb: 5.2%<br>Fulton: 6.3%<br>Total: 5.9% |

*Kenny A. v. Deal*

**Table A-3: Case Managers Meeting Caseload Standards in DeKalb County on December 31, 2023**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 12/31/23 | Number of Active, On- leave Staff on 12/31/23 | Actual Performance Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 23 | 0 | 15 | 65% | 8 | 35% | 13 |
| Family Preservation | 17 families | 6 | 0 | 6 | 100% | 0 | 0% | 0 |
| Permanency Case Manager | 15 children | 27 | 0 | 23 | 85% | 4 | 15% | 11 |
| Specialized Case Manager | 12 children | 20 | 0 | 6 | 30% | 14 | 70% | 5 |
| Adoption Case Manager[17] | 16 children | 0 | 0 | 0 | | 0 | 0 | 0 |
| Total | 12 children | 76 | 0 | 50 | 66% | 26 | 34% | 29 |

All Adoptions caseloads are included in the other totals. There are 11 Adoptions case managers.

**Table A-4: DeKalb County Supervisory Ratios on December 31, 2023**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 29 | 21 | 72% | 8 | 28% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 47 | 29 | 62% | 18 | 38% |

[17] All adoptions caseloads are included in the specialized and permanency totals. There were 12 adoptions case managers in DeKalb on this date.

*Kenny A. v. Deal*

**Table A-5: Case Managers Meeting Caseload Standards in Fulton County on December 31, 2023**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Actual Performance | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | Number of Active Staff on 12/31/23 | Number of Active, On-leave Staff on 12/31/23 | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 26 | 0 | 17 | 65% | 9 | 35% | 11 |
| Family Preservation | 17 families | 9 | 0 | 9 | 100% | 0 | 0% | 2 |
| Permanency Case Manager | 15 children | 23 | 0 | 22 | 96% | 1 | 4% | 8 |
| Specialized Case Manager | 12 children | 16 | 0 | 13 | 81% | 3 | 19% | 8 |
| Adoption Case Manager | 16 children | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 74 | 0 | 61 | 82% | 13 | 18% | 29 |

All Adoptions caseloads are included in other totals. There are 8 Adoptions case managers

**Table A-6: Fulton County Supervisory Ratios on December 31, 2023**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 35 | 26 | 74% | 9 | 26% |

*Kenny A. v. Deal*

| | | | | | |
|---|---|---|---|---|---|
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 39 | 35 | 90% | 4 | 10% |

**Table A-7: Region 14 Caseload Managers Meeting Caseload Standards on June 30, 2023**

| Region 14: Period 36 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Case Manager Function** | **Caseload Cap: Number of cases (families and children)** | **Number of Active Staff on 12/31/23** | **Number of Active, On-leave Staff on 12/31/23** | **Actual Performance** | | **Not Meeting Cap On Assigned Caseload** | | **Cases Assigned to Workers On Leave/ Supervisors** |
| | | | | **Meeting Caps on Assigned Caseload** | | | | |
| | | | | **Number** | **%** | **Number** | **%** | **Number** |
| CPS Investigations | 12 families | 49 | 0 | 32 | 65% | 17 | 35% | 24 |
| Family Preservation | 17 families | 15 | 0 | 15 | 100% | 0 | 0% | 2 |
| Permanency Case Manager | 15 children | 50 | 0 | 45 | 90% | 5 | 10% | 19 |
| Specialized Case Manager | 12 children | 36 | 0 | 19 | 53% | 17 | 47% | 13 |
| Adoption Case Manager | 16 children | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 150 | 0 | 111 | 74% | 39 | 26% | 58 |

# APPENDIX B – GLOSSARY

**Adoptive Placement** means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

**Child or Children or Class Member Children or Class Members** mean a child or children who have been, are or will be alleged or adjudicated deprived who 1) are or will be in the custody of the State Defendants; and 2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

**Child Caring Institution (CCI)** is any child-welfare facility which provides full-time room, board, and watchful oversight (RBWO) to six or more children up to 18 years of age. Some CCIs are approved to care for youth up to age 21. The CCI must be approved through the Office of Provider Management (OPM) to serve children in DFCS custody.

**Child Placing Agency (CPA)** is agency that places children in foster and adoptive homes for individualized care, supervision, and oversight. Child placing agencies are responsible for assessing the placement regarding the appropriateness of the room, board, and watchful oversight that the prospective foster and adoptive families will provide. The CPA's employees and their foster and adoptive parents work as a team to provide a stabilizing and nurturing environment that promotes safety, permanency, and well-being.

**Corporal Punishment** means any physical punishment on a child that inflicts pain.

**CPA Foster Home** is a foster home approved by a Child Placing Agency for the temporary placement of children in foster care.

**DeKalb DFCS** means DeKalb County Department of Family and Children Services.

**DFCS** when used alone means the Georgia Division of Family and Children Services.

**DFCS Foster Home** is a non-relative foster homes approved by DFCS for the temporary placement of children in foster care.

**DFCS or CPA Adoptive Home** is an adoptive home approved for the foster care placement of a child for whom the established goal is adoption. Adoptive homes must meet the regular standards of care required for approved family foster homes and any conditions specified in that approval.

**DFCS Relative Foster Home** is a relative foster home approved by DFCS for the temporary placement of minor relatives. It is DFCS' preference that all relatives are approved as foster parents and receive a foster care per diem. The goal of relatives becoming foster parents is to ensure that the child has services to address his or her needs.

**DHHS** means the United States Department of Health and Human Services.

**DHR** means Georgia Department of Human Resources.

**Discipline or Other Serious Foster Care Violation** means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

**EPSDT** means the Early and Periodic Screening, Diagnosis, and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

**Fictive Kin** means a person who is known to a child as a relative, but is not, in fact, related by blood.

**Foster Parent** means volunteers who are trained and certified by DFCS or Child Placing Agencies to provide for the temporary care of children placed in the custody of DFCS. Foster parents work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster parents are asked to assume the responsibility of parenting the children placed in their home.

**Foster Relative** means biological kin who are trained and certified by DFCS to provide for the care of relative children placed in the custody of DFCS. Foster relatives work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster relatives are asked to assume the responsibility of parenting the children placed in their home.

**Fulton DFCS** means the Fulton County Department of Family and Children Services.

**Georgia Health Check Program** means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

**Governor** means the Governor of the State of Georgia.

**Legal Guardianship** means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter15-11-2(36).

**One Episode of Foster Care** means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

**Permanent Legal Custody** means custody granted in accordance with an order of the superior court or the juvenile court, which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

**Permanent Placement with Relatives** means placing a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain

in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

**Psychiatric Residential Treatment Facility (PRTF)** is a temporary non-hospital facility with a provider agreement with a State Medicaid Agency to provide intensive therapeutic intervention to a child to ensure safety and stability. PRTFs offer intensive behavioral health services to children in Georgia.

**Relatives** are persons who are related by blood, marriage or adoption including the spouse of any of those persons even if the marriage was terminated by death or divorce.

**Relative Placement** refers to placement in the home of a relative or fictive kin who do not receive a foster care per diem for the care of the child. The relative placement may be a non-paid placement or the relative may receive TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin are not eligible for TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin must become foster parents to receive financial assistance.

Placement with relatives or fictive kin may occur very quickly if there is a satisfactory CPS history check, safety and home assessment check, and a Georgia Crime Information Center (GCIC) check through the Office of the Inspector General (OIG) on all household members 18 years of age or older. A Relative or Non-Relative Care Assessment must be completed no later than 30 calendar days after the placement of a child.

**State DFCS** means the Division of Family and Children Services of the Georgia Department of Human Resources.

**Suspected Abuse or Neglect** means being based on reasonable cause to believe that a child may have been abused or neglected.

**Suspected Corporal Punishment** means being based on reasonable cause to believe that corporal punishment may have been used on a child.