# Final
# Ninth Brief on Infrastructure Standards

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

## *Kenny A. v. Kemp*

*State of Georgia*

September 2024

## ACCOUNTABILITY AGENT AND
## MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Attorney, Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

The following persons were significant contributors to this brief:

Eliza Byrne
Public Knowledge (PK)
Lakewood, New Jersey

Donald Manns
Public Knowledge (PK)
Lakewood, New Jersey

Glenda McMillan
Public Knowledge (PK)
Lakewood, New Jersey

Lisa Smith
Public Knowledge (PK)
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge (PK)
Lakewood, New Jersey

Douglas Swisher
Public Knowledge (PK)
Lakewood, New Jersey

Jillian Young
Public Knowledge (PK)
Lakewood, New Jersey

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................................... 1

II.   NATIONAL TRENDS ON THEORIES OF CHANGE AND USE OF FEDERAL REVENUE IN CHILD WELFARE ........... 3

      Theories of Change ............................................................................................................. 3
      Use of State versus Federal Revenue Streams ..................................................................... 4

III.  STATUS OF THE INFRASTRUCTURE STANDARDS ..................................................................... 6

      Infrastructure Standard I: Comprehensive Practice Model ....................................................... 7
            Overview ...................................................................................................................... 7
            Infrastructure Standard versus Current Practice ............................................................. 7
            Recommendations ......................................................................................................... 7
      Infrastructure Standard II: Assessment and Investigation of Maltreatment in Care ...................... 8
            Overview ...................................................................................................................... 8
            Infrastructure Standard versus Current Practice ............................................................. 8
            Recommendations ......................................................................................................... 9
      Infrastructure Standard III: Case Planning and Management ................................................... 9
            Overview ...................................................................................................................... 9
            Infrastructure Standard versus Current Practice ............................................................. 9
            Recommendations ....................................................................................................... 11
      Infrastructure Standard IV: Quality Placement and Caregiving ............................................... 11
            Overview .................................................................................................................... 11
            Infrastructure Standard versus Current Practice ........................................................... 11
            Recommendations ....................................................................................................... 13
      Infrastructure Standard V: Health and Education ................................................................. 13
            Overview .................................................................................................................... 13
            Infrastructure Standard versus Current Practice ........................................................... 13
            Recommendations ....................................................................................................... 14
      Infrastructure Standard VI: Child Welfare Information System and Quality Assurance ................. 14
            Overview .................................................................................................................... 14
            Infrastructure Standard versus Current Practice ........................................................... 15
            Recommendations ....................................................................................................... 15
      Infrastructure Standard VII: Supervision of Contract Agencies ............................................... 16
            Overview .................................................................................................................... 16
            Infrastructure Standard versus Current Practice ........................................................... 16
            Recommendations ....................................................................................................... 17
      Infrastructure Standard VIII: Robust Workforce .................................................................. 17
            Overview .................................................................................................................... 17
            Infrastructure Standard versus Current Practice ........................................................... 17
            Recommendations ....................................................................................................... 18
      Infrastructure Standard IX: Maximization of Federal Funding ................................................. 19
            Overview .................................................................................................................... 19
            IV-E Eligibility Sample Review 2024 ............................................................................ 19
            Eligibility and Reimbursability ..................................................................................... 20
            Licensed and Unlicensed ............................................................................................. 23
            Claiming and Candidacy .............................................................................................. 25
            Cost Allocation Plan/Proper Claiming and Maximization of Available Funding .................... 25
            Availability and Allocation of Resources ....................................................................... 25
            Medicaid Claiming ...................................................................................................... 26
            Recommendations ....................................................................................................... 26

**APPENDIX A – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN** .................... **32**

**APPENDIX B – METHODOLOGY** ................................................................................................................ **54**

Interviews ...........................................................................................................................................54

• ...........................................................................................................................................................54

Data.....................................................................................................................................................54

Research .............................................................................................................................................55

# I.    INTRODUCTION

After negotiations, the parties jointly moved the Court to approve a Modified Consent Decree and Exit Plan on December 5, 2016. Section VIII of that Exit Plan established a process and timeline for the development of new Infrastructure Standards to correspond with the state's new practice model and reform efforts. The development and subsequent negotiations regarding the new standards extended to December 18, 2017, at which time the parties jointly filed to amend the Exit Plan to include these practice and process elements intended to improve outcomes for children and families in Fulton and DeKalb counties.

As background, the Monitoring and Technical Assistance Team (hereinafter "MTAT") developed a new approach and methodology for tracking the state's performance. The approach deliberately recognized that change in outcomes depends not only on a theory (or theories) of change that link practice and policy to core outcomes, but also on well-developed and carefully implemented plans to execute proposed strategies. The development and execution of those plans inevitably calls for adjustments to the process of care, the quality of care and the investments in capacity – in terms of skills and capabilities of the workforce and financial resources – that are necessary for well-defined and high-quality case practice. Thus, the MTAT's approach to monitoring includes not only the semi-annual outcome reports, but also the publication of a series of briefs that will directly consider the state's execution of the process, quality, and capacity investments necessary for the full implementation of the practices called for in the Infrastructure Standards.

Considering the timing needed for implementation of these standards, MTAT monitored and reported on these standards in several sections at a time.

The First Brief on the Infrastructure Standards, completed in March 2019, focused on the implementation of the new practice model, assessment, and investigation of maltreatment in care, and case planning and management.

The Second Brief on the Infrastructure Standards, completed in February 2020, provided an update on the development of the new comprehensive practice model; and the processes related to quality caregiving and placement, child health and education, and the workforce.

The Third Brief on the Infrastructure Standards, completed in October 2020, provided an update on the development and implementation of the new comprehensive practice model, the child welfare information system and quality assurance, monitoring of contract agencies, and maximization of federal funds.

The Fourth Brief on the Infrastructure Standards, completed in June 2021, provided an update on progress being made on the first six Infrastructure Standards, originally reported in the first two briefs, as well as the status of whether DFCS decided to proceed with recommendations made by MTAT.

The Fifth Brief, completed in January 2022, on the Infrastructure Standards followed in the same direction of the fourth brief, providing an update on the last three Infrastructure Standards,

originally reported on in the Third Brief, including an update on the recommendations made, and updated appendices with updated data performance on all nine of the Infrastructure Standards.

The Sixth Brief on the Infrastructure Standards was a departure from the previous briefs and focused on a deep investigation into the placement and workforce crises DFCS was experiencing, which were impacting practice and strategies for system improvement, completed in October 2022. As part of this work, MTAT assessed whether the applicable infrastructure standards were impacting these crises.

The Seventh Brief on the Infrastructure Standards, completed May 2023, returned to the previous structure of the Infrastructure Briefs, focusing on finances and DFCSs fiscal policies and practices, and the standards closest tied to those, in part impacted by those crises. The Infrastructure Standards of focus for the brief were Supervision of Contract Agencies, Robust Workforce, and Maximization of Federal Funds.

The Eighth Brief on the Infrastructure Standards, completed in August 2024, is to update parties on two Infrastructure Standards: Quality Placement and Caregiving and Health Education, and the extent to which the standards itself has been implemented as described in the December 2017 Stipulated Order Amending the Modified Consent Decree and Exit Plan.

This Ninth Brief of the Infrastructure Standards has two focuses. First, to update parties on Infrastructure Standard IX: Maximization of Federal Revenue. Second, MTAT wanted to look at all nine infrastructure standards at a high level to explore whether DFCS still sees these nine standards as the core of their theory of change for system reform and improvement, eight years later after they were first identified in the December 2016 Modified Consent Decree and Exit Plan.

The entire 2017 Stipulated Order Amending the Modified Consent Decree and Action Plan is included in Appendix A. The methodology for analysis and reporting included using the State's administrative data to generate information on child and family outcomes, case file reviews, interviews, focus groups with staff and stakeholders and observations is included in Appendix B.

## II.    NATIONAL TRENDS ON THEORIES OF CHANGE AND USE OF FEDERAL REVENUE IN CHILD WELFARE

State child welfare agencies operate in the larger context of their state's capacities and conditions and in the federal government's regulatory and financing environment. Federal statutes like Child Abuse Prevention and Treatment Act (CAPTA), which provides federal guidance on several activities including prevention, assessment, investigation and treatment, also provides a federal match for state investments in child protective services.  The Children's Bureau also monitors child welfare performance via the Child and Family Services Review (CFSR), Title IV-E reviews, and Performance Improvement Plans (PIPs).  State performance is compared to either national averages, normative state performance, or standards across key measures of safety, permanency and well-being. New statutes add federal mandates to screen for sex trafficking, to better assess ICWA (Indian Child Welfare Act) eligibility, to provide services and plans for older youth transitioning out of the system, to provide for education and special education supports, and to measure service receipt. National trends over the last decade show less foster care use, especially for older children.  This includes a decrease in congregate placements and a concurrent increase in kinship care and dramatic increase of in-home services.

Georgia continues to rely at least partially on federal support from funding streams derived from Title IV of the Social Security Act. While the Children's Bureau plays a key role in establishing outcome measures, the State of Georgia has responsibility for the delivery of child welfare services in the state and for the protection of children in its care. According to Child Trends, on average across states, federal spending was $215 per child with an almost equal amount of state or local spending ($205 per child). Georgia's level of spending was significantly less, at $71 in federal and $43 per child in state or local spending.  Georgia's per capita spending is nearly the lowest across 52 jurisdictions. Georgia's level of federal support ranks 51 of 52 jurisdictions (surpassed by Delaware) while state/local per capita spending ranked 49th of 50 (surpassed by Mississippi).

### *Theories of Change*

A theory of change explains how and why a sequence of logically linked events, pathways of change, should lead to an ultimate outcome.[1] By articulating a "so that" chain, a theory of change defines the paths by which short-, mid-, and long-term outcomes will be achieved. This serves as a framework to guide the implementation of new programs, initiatives, or service areas, and should be regularly revisited, updated, and used to guide on-going reporting and evaluative activities. Developing a Theory of Change can also guide strategic planning processes and should incorporate new learnings and advancements in best practices.

For the purposes of monitoring child welfare performance, the theory of change guides the choice of measures that are monitored with the assumption that positive performance on the measured indicators results from the state's targeted efforts to improve practice and policy and will be reflected in positive child and family outcomes.  This is the ninth in a series of infrastructure briefs that have accompanied 36 monitoring reports as part of the Stipulated

---

[1] Serrat, Oliver, Theories of Change in Knowledge Solutions, 2017, DOI 10.1007/978-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-9_24, p. 237-240.

Consent Decree and Exit Plan, reflecting consistent monitoring of the indicators defined by the parties and approved by the court.

In revisiting the original theory of change guiding the details of the Stipulated Consent Decree, there is an opportunity to evaluate the fit between 1) the guiding framework on what key systemic components lead to good outcomes, and 2) the current practices and priorities of the Department. The Exit Plan was never intended to be static. The fit of the theory of change with current strategic planning efforts needs regular reassessment to ensure that new and ongoing work fits within the lanes defined by the Exit Plan. In line with the cadence of reporting discussed earlier, maintaining a quality system of care requires ongoing attention to the fit between the theory of change, future plans, current activities, and measures of progress.

Adherence to a theory of change, with reliable and valid measurement of relevant indicators, helps ensure a quality focus. Quality of care and investments in capacity – in terms of skills and capabilities of the workforce and financial resources – are foundational for well-defined and high-quality case practice and are the primary subject of this report. But measures should be aligned with current work, hence the need for a periodic reassessment of the theory of change.

## *Use of State versus Federal Revenue Streams*

State child welfare agencies rely on federal funding streams that include Title IV-E, Title IV-B, Temporary Assistance for Needy Families (TANF), Social Services Block Grant (SSBG), and Medicaid. There is substantial variation across states in their use of federal compared to state funding, according to 2020 data compiled by Child Trends. The percentage for agency expenditures from federal versus state sources ranges from a high of 82% federal in New Hampshire to a low of 13% in Delaware.[2]

---

[2] Note that Georgia was one of six states that did not complete the survey in 2020.

**Figure 1. Percentage of Agency Expenditures from Federal vs. State and Local Sources, by State.**

| State | Federal | State/local |
|---|---|---|
| New Hampshire | 82% | 18% |
| Mississippi | 78% | 22% |
| Michigan | 72% | 28% |
| Louisiana | 65% | 35% |
| Missouri | 62% | 38% |
| South Carolina | 61% | 39% |
| Arizona | 60% | 40% |
| Arkansas | 58% | 42% |
| Vermont | 58% | 42% |
| Iowa | 55% | 45% |
| Florida | 51% | 49% |
| Texas | 49% | 51% |
| Illinois | 48% | 52% |
| Connecticut | 48% | 52% |
| South Dakota | 47% | 53% |
| Tennessee | 45% | 55% |
| Nevada | 45% | 55% |
| North Carolina | 43% | 57% |
| Montana | 42% | 58% |
| Utah | 42% | 58% |
| Alaska | 41% | 59% |
| Kentucky | 40% | 60% |
| Maine | 39% | 61% |
| New Jersey | 39% | 61% |
| Ohio | 38% | 62% |
| Virginia | 38% | 62% |
| New York | 38% | 62% |
| Oregon | 37% | 63% |
| Colorado | 36% | 64% |
| Maryland | 35% | 65% |
| Rhode Island | 34% | 66% |
| Wisconsin | 34% | 66% |
| Minnesota | 31% | 69% |
| Kansas | 30% | 70% |
| Massachusetts | 28% | 72% |
| Pennsylvania | 25% | 75% |
| Indiana | 24% | 76% |
| District of Columbia | 20% | 80% |
| Delaware | 13% | 87% |

Source: Child Welfare Finance Survey; Child Trends; data from 2020, reported in 2022.

States vary a great deal in their approach to financing child welfare services. This variation can be traced back to the passage of the Child Abuse Prevention and Treatment Act (CAPTA), which provided federal funding for states to establish hotlines consistent with federal standards and practices. As a result, states independently accessed a federal match to procure and maintain 50 separate, disconnected case management information systems, and states generally access funding from a very different mix of private, local, state, and federal support.

Current funding practices regarding child welfare prevention, protection, and placement are historical artifacts, growing from a shifting patchwork of local charitable services, local government funds, state funding, and federal oversight and reimbursement. Efforts to reform the funding rule to all financial support for prevention services led to passage of the Family First Prevention Services Act, which expanded the ability of states to access federal funding for prevention services. This change broadened the state's ability to pay for services that are considered evidence-based by the Children's Clearinghouse.

According to Child Trend's periodic survey of states, state and local child welfare agencies spent $31.4 billion using a combination of federal, state, local, and other funds in SFY 2020. In constant dollars, adjusting for inflation, expenditures were steady over the past decade, increasing by just 1 percent. They found that most child welfare agency funding comes from state and local (as opposed to federal) sources, and that almost half of child welfare agency expenditures are spent on out-of-home placements. Child Trends concluded, in 2022, that agencies continue to spend relatively little on efforts to prevent the need for children to enter care.

Child Trends reported that child welfare agencies in 37 states spent a collective $2.6 billion in federal TANF funds while 9 states did not use TANF dollars in 2020. Still, TANF expenditures decreased, in the aggregate, by 5% from SFY 2018 to 2020.  Across all states, 9% of TANF spending was allocated to child welfare services.  About a fifth (21%) was allocated directly to families. In contrast to these state averages, in Georgia, the TANF program spent $450 million, more than half (59%) on child welfare services.[3]  In addition to devoting the majority of its TANF budget on child welfare services, Georgia's child welfare budget relies on TANF for most of its federal support (55%) and for 24.3% of total expenditures.

Georgia's level of spending, measured as spending per child, is much lower than the national average, also according to Child Trends. This holds true of spending from federal as well as state or local sources. Title IV-E has been a consistent funding source for Georgia.  This category includes foster care maintenance and adoption subsidy payments.  Georgia did report to Child Trends that, in 2020, expenditures on adoption subsidies exceeded foster care maintenance payments ($56,732,351 spent on adoption subsidies, compared to $37,824,645 spent on foster care payments).

**Table 1. Incremental Change in Georgia's Federal Funding Sources 2012 to 2018**

|  | 2012 | 2014 | 2016 | 2018 |
|---|---|---|---|---|
| TITLE IV-E | 31% | 33% | 35% | 37% |
| TITLE IV-B | 8% | 6% | 3% | 6% |
| MEDICAID | 4% | 2% | <1% | <1% |
| TANF | 53% | 56% | 56% | 55% |
| SSBG | 3% | 2% | 2% | 1% |
| OTHER | <1% | >1% | 3% | 1% |

## III.   STATUS OF THE INFRASTRUCTURE STANDARDS

The Infrastructure Standards outlined in the Stipulated Consent Decree and Exit Plan (see Appendix A) were developed seven years ago through party negotiations spanning a year. DFCS identified key priorities and practices to achieve better outcomes if practiced with fidelity. This represented DFCS' theory of change of how to improve outcomes and exit the consent decree. These Infrastructure Standards were never intended to be static-priorities; processes change over

---

[3] State Fact Sheets: How States Spend Funds Under the TANF Block Grant | Center on Budget and Policy Priorities (cbpp.org)

time with both administration changes as well as evolving best practices, and different ideas naturally emerge about how best to meet the needs of children and families, improve outcomes, and hopefully exit the Consent Decree. MTAT believes that it does not make sense to monitor provisions detailed in the Consent Decree and Exit Plan that are no longer reflective of current practice and may have been replaced by something else. In addition to a deeper look at Infrastructure Standard 9: Maximization of Federal Revenue, this brief aims to identify which provisions in the remaining Infrastructure Standards reflect current practice, and which provisions do not. It is important to note that in this brief, MTAT is reporting on whether the infrastructure provisions are reflected in current practice, and whether or not those provisions remain expectations, based on policy, practice, and procedure.

Current Executive Leadership was asked to share the current Theory of Change for this Leadership Team. While they do not have a formal Theory of Change, current priorities and areas of focus include:
- Technology Modernization
- Workforce Development
- Youth with Complex Needs
- Safety, Permanency and Well-Being

## *Infrastructure Standard I: Comprehensive Practice Model*

## Overview

Infrastructure Standard I details the development of a comprehensive practice model intended to strengthen the workforce, promote collaboration, and achieve positive outcomes for children and families. The comprehensive practice model, when developed, is intended to be values-driven, safety-focused, results-based, trauma-informed, and partnership-centered.

## Infrastructure Standard versus Current Practice

In Infrastructure Brief Five, it was reported that development of the practice model continued, and plans were being developed to integrate the practice model development and implementation with the roll out of Family First Prevention Services Act (FFPSA). Since that time, no further work has been done to develop, refine, align or implement a comprehensive practice model. It was discussed in recent DFCS interviews that decisions need to be made by this DFCS administration about whether or not Georgia still plans to pursue a comprehensive practice model.

## Recommendations

1. **MTAT continues to recommend DFCS pursue a comprehensive practice model that aligns with Georgia's theory of change and strategic goals to positively impact children and families.**

There are many benefits to implementing a well-articulated practice model for all levels of an organization[4]:

---

[4] McCarthy, Jan. *Guide for Developing and Implementing Child Welfare Practice Models*. National Child Welfare Resource Center for Organizational Improvement. October 2012.

- Assists leaders to develop their vision and provides a consistent rationale for decisions;
- Helps supervisors monitor and assess staff performance and model the agency's values; and
- Provides workers a consistent framework for decision making and clear expectations of how to approach the work.

In addition to promoting consistency of practice, MTAT believes a practice model will increase staff confidence in the work that they do, which could also have a positive impact on staff morale and retention as well as outcomes for children, youth, and families.

## *Infrastructure Standard II: Assessment and Investigation of Maltreatment in Care*

### Overview

Infrastructure Standard II focuses on DFCS' intent to conduct safety assessments throughout each stage of the case to evaluate the safety of children in their caregiving environment using a trauma-informed lens to assess, engage, and deliver services. Past briefs have outlined the capacity and quality of DFCS' efforts to provide active engagement, partnerships, and shared decision-making to provide timely and accurate safety assessments. This brief outlines the extent to which the details in this standard reflect current practice or if DFCS is focusing their efforts on other practices instead.

### Infrastructure Standard versus Current Practice

#### *Infrastructure Standard Provisions that Reflect Current Practice*

There are several provisions regarding intake that reflect current practice. Infrastructure Brief Nine interviews with staff reported that practice standards were consistent with current DFCS policy 10.18 that outlines considerations of trauma history. DFCS staff indicated that there are standardized safety procedures that include specific training on effectively conducting ongoing assessment. In addition, it was noted during the interviews that safety is continuously assessed at each stage of the case. It was reported in interviews that Child Protective Services Intake Communications Center (CICC) gathers sufficient information to determine the stage of development in the family life cycle, as detailed in the infrastructure standard, by gathering the age of the child(ren).

There are several provisions that reflect current practice in investigations. Despite dismantling the Special Investigations Unit in 2019, there has been no evidence of a negative impact on maltreatment in care investigations. During Infrastructure Brief Nine interviews with DFCS staff, it was reported that the 24-hour response time for maltreatment in care remains the standard. DFCS Policy 3.09 and DFCS Policy 6.11 are the current DFCS policies for meeting appropriate timeframes for face-to-face safety visits once a report has been screened out as well as timeframes for staffing case findings and case decisions for policy violations.

#### *Current Practices that Differ from the Infrastructure Standard Provisions*

Regarding intake provisions, as outlined in Infrastructure Brief Four, CICC implemented the Clear Capture process in September of 2020.  Infrastructure Brief Four indicated that intake workers reported they faced barriers to gathering certain information from callers consistent with

the Infrastructure Standards, including information about family functioning and life cycle. Infrastructure Brief Four noted that while the Clear Capture process does not specifically gather all of the information detailed the Infrastructure Standards, it allows intake workers to use a script to gain the required information with timeliness, and efficiency, while reducing potential bias.  In Infrastructure Brief Four, MTAT recommended that DFCS provide new infrastructure standards that reflect the current Clear Capture process. MTAT further recommended that Parties should assess if amendment is needed to the Modified Consent Decree and Exit Plan to reflect this change.

Regarding investigation provisions, in Infrastructure Brief Five, it was noted that the DFCS Resource Development Program Director would begin tracking follow-up with foster homes as of September 1, 2021, to monitor compliance with timeframes of policy violations. During Infrastructure Brief Nine interviews with DFCS staff, it was reported that this standard is currently operating in accordance with DFCS policy, and it was also noted that additional processes had been implemented last year that required notification to the case manager and county director when there was a policy violation in a foster home.  In addition, it was reported that if a policy violation occurs within a specific age range of the child, then an additional addendum is added to the foster home information and the state indicates they have added a flagging system in ARGO Placements.

## Recommendations

**2.   MTAT recommends monitoring the Clear Capture process and the extent to which necessary information and the assessment of safety is occurring, as opposed to the old provisions of the Exit Plan.**

MTAT is recommending the parties amend Infrastructure Standard II provisions to reflect the information gathered in the Clear Capture process.

**3.   MTAT recommends monitoring the new Policy Violation process, where counties are being sent notification when policy violations have been levied on active foster homes.**

MTAT is recommending parties amend Infrastructure II provisions to include the new process of informing county directors about policy violations.

## *Infrastructure Standard III: Case Planning and Management*

## Overview

This Infrastructure Standard focuses on DFCS's commitment to a case planning and management process that is family-owned and focused on addressing and resolving agreed-upon safety concerns. Past briefs have outlined the status and implementation of case planning and case management based on case reviews, data reviews, documentation and policy reviews, and interviews with key stakeholders and agencies. This brief outlines the extent to which the provisions in the standard reflect current practice regarding case planning and case management of children in custody.

## Infrastructure Standard versus Current Practice

### *Infrastructure Standard Provisions that Reflect Current Practice*
Several of the provisions in this infrastructure standard reflect current practice and procedure:

- The DFCS has tried several strategies for addressing and ensuring lasting permanency over the years, including genograms, the regular review of data, as well as Region 14's strategies for preventing re-entry several years ago. Utilizing strategies to achieve lasting permanency remains current practice, however the strategies themselves may change overtime.
- During Infrastructure Brief Four, it was reported that DFCS was still evaluating assessment tools, including the Family Functioning Assessment (FFA). The FFA remains an assessment tool during the Child Protective Service (CPS) Investigation, utilized to inform case planning, as does the Comprehensive Child and Family Assessment (CCFA), though these assessments are done at the beginning of the case.
- Family Team Meetings (FTMs) are reported to still drive case planning for the initial case plan, with DeKalb holding FTMs in 3-9 days of entering custody and Fulton within 25 days. However, there are no concrete timeframes for subsequent FTM meetings.[5]
- Genograms, as noted in Infrastructure Brief Four, were a key practice standard introduced with Solution Based Casework (SBC) to better understand the composition of a child's immediate and extended family and exploring relative resources and placements. While SBC is not being fully used anymore, genograms remain a primary strategy in achieving permanency. In addition, Infrastructure Brief Nine interviews revealed that genograms are being utilized and updated as changes occur with the family composition. It was noted that there are plans to add six-month updates to the Quality Assurance case reviews, but that these do not currently take place as accuracy with the initial genograms was the first priority.
- Referrals for services occur within the stated timeframe in the Exit Plan, though there may be longer delays in getting the service in place.
- Staffings between workers and supervisors occurs on a regular, monthly basis and are documented in SHINES, as well as 8-month permanency reviews in Region 14.

***Current Practices that Differ from the Infrastructure Standard Provisions***

Some of the provisions in Infrastructure Standard 3 are slightly modified from what is detailed in the exit plan. Solution Based Casework (SBC), and all of the detailed activities and efforts to certify staff in SBC, are no longer being pursued. However, Infrastructure Standard Nine interviews revealed key concepts of SBC are imbedded in training and practice, particularly in developing an action plan and family and individual level outcomes. So, while new workers may not indicate they are using SBC by name, several components are core to practice expectations.

Data review in Infrastructure Brief Four indicated that Fulton County was conducting transfer staffings every Friday, and DeKalb County was scheduling transfer staffings thirty minutes before the 3-9 -day family team meeting, which may mean that in some instances they may not be happening within 5 days of entry into care. However, they are considered an important practice for case planning and are occurring regularly.

---

[5] The Solution Focused Family Team Meeting Pocket Guide, available on the Online Directives Information System (ODIS) (odis.dhs.ga.gov) indicates the following regarding required FTMs: within 25 calendar days of entry, prior to a change in permanency planning, transition planning for youth with a reunification plan, beginning at age 16 and every 6 months, withing the most recent 90 days prior to the youth's 18th birthday, prior to case closure, and anytime a need to formally engage is identified.

During interviews, it was reported that War Rooms replaced the Region's SWAT strategy to combine with case consultations. In Infrastructure Brief Nine interviews, it was reported that case consultations in Fulton County are occurring at three, six, nine, and twelve months. It was also reported that the three-month consultations are helping Fulton County achieve better permanency outcomes.  It was further reported that War Rooms completed at three, six, and nine months are smaller, internal groups that take deeper dives into the details of the cases, while War Rooms for children at twelve months are larger groups that are assessing strengths and needs of services already in place.

Per Infrastructure Brief Nine interviews, there are no current processes or criteria for identifying children at risk for long-term foster care. It was noted in interviews that during case consultations at three, six, and nine-months, dialogue occurs about these risk factors.

## Recommendations

4. **MTAT recommends that the parties amend this standard to reflect current practices including the following: core practices driving initial case planning and war rooms, and case consultations have replaced the initial SWAT strategy. In addition, MTAT believes, due to their critical importance, strategies for lasting permanency and identifying children at risk for long-term foster care should remain and be more clearly articulated in the standards as practice expectations.**

MTAT is making this recommendation in order to better monitor what DFCS articulates as best and current practice expectations for war rooms, case consultations, and case planning to ultimately improve permanency outcomes.

## *Infrastructure Standard IV: Quality Placement and Caregiving*

## Overview

This Infrastructure Standard focuses on DFCS' specific commitments to ensuring that every child in foster care will have a stable, nurturing placement. Past briefs have outlined DFCS priorities relating to maintaining family ties by providing safe, nurturing placements with relatives. This brief outlines the extent to which the details in the standard reflect current practice with screening, training, and supports for caregivers.

## Infrastructure Standard versus Current Practice

### *Infrastructure Standard Provisions that Reflect Current Practice*

Most provisions of this standard reflect current practice and are detailed in policy and the Room, Board and Watchful Oversight (RBWO) manual for contracted providers, though the quality or effectiveness of the practice may differ. There is a linear process for screening and approval of prospective foster parents, including informational sessions, preservice training, and an initial family evaluation, in less than five to six months. The training has recently changed from IMPACT to the National Training Development Curriculum (NTDC). Ongoing training or Continued Professional Development (CPD) for foster parents is also the current practice. In Infrastructure Brief Two, it was noted that DFCS Policy 14.09 requires that caregivers complete a minimum of fifteen hours of ongoing education activities each calendar year, with at least five hours of in-person instruction.

Current practice expectations, detailed in DFCS policy 19.20, indicates that diligent search efforts occur at the onset and throughout the life of a case. To support relatives, Georgia offers an Enhanced Relative Rate (ERR) which is a monthly subsidy available to relative placement caregivers, detailed in policy 22.08. In addition, it was noted in Infrastructure Brief Two that relative placements can have non-safety requirements waived, including sleeping arrangements, income, and timeframes for completion of preservice training. Placement with relatives in general remains a current practice for DFCS, and they continue to assess barriers with kinship foster homes seeking full licensure and use of the waiver options. However, a workgroup has been formed to develop separate licensure/approval standards for relatives which would provide equal foster care maintenance payments, and their recommendations will be presented this fall to state leadership for approval.

In Infrastructure Brief Four, it was confirmed that in addition to a central phone number for caregivers, a prompt was added in the Child Protective Services Intake Communications Center (CICC) phone tree to allow a foster parent to move ahead in the queue. In Infrastructure Brief Four it was also noted that DFCS continues to conduct exit surveys with foster parents at the state office, compiling the information, and sending it to the regions. Of note in Infrastructure Brief Eight, DFCS reported having annual training requirements for Reasonable and Prudent Parenting training; however, there was no noted process by DFCS for monitoring compliance.

### *Current Practices that Differ from the Infrastructure Standard Provisions*
Beginning in September 2019, CPAs and DFCS began using the Structured Analysis Family Evaluation (SAFE) in lieu of the Initial Family Evaluation (IFE). SAFE is an evidenced based model aimed at systematically evaluating strengths and challenges. This was reported in Infrastructure Brief Two.

Infrastructure Brief Eight reported that DFCS was utilizing a new portal, ARGO, to exchange information and make placements of children in custody as opposed to earlier paper versions. It was noted that clear expectations for timeframes and utilization of ARGO had not been established by DFCS, while the current Infrastructure Standard indicates 'at the time of placement'. During Infrastructure Brief Nine interviews, staff stated that prior to ARGO there was no way to identify appropriate placement matches for children. It was also noted that there is no current way to measure the impact of ARGO; however, it was reported that information was being pulled directly out of SHINES into a universal app which gives the providers more information. DFCS did indicate they were going to make it a policy expectation for workers to check ARGO for any corrective action plans prior to placement, though there is no current CQI process to ensure its use or that this is occurring.

Recent policy changes were made indicating that reevaluations of foster homes are to occur every two years as opposed to the annual basis noted in the Infrastructure Standard.

## Recommendations

5. **MTAT recommends that the parties amend this Infrastructure Standard to reflect current practice and priorities, including the use of SAFE evaluations and the utilization of ARGO to provide information to foster parents with detailed timeframes and expectations of when this information is to be shared.**

MTAT should no longer monitor practices in the Infrastructure Standards that no longer reflect current practice and have been updated or changed to reflect different priorities or theories for improving processes and outcomes. Specifically, the standard should be amended to reflect SAFE evaluations occurring instead of Initial Family Evaluations, as well as the new timeframe for reevaluations being due.

## *Infrastructure Standard V: Health and Education*

## Overview

This Infrastructure Standard focuses on DFCS' commitment to ensuring that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity. The infrastructure standard has provisions that focus on initial screenings and follow-up treatment, periodic health screenings and treatment, engagement and monitoring, and education. Prior briefs have outlined the status and implementation of the health and education standards based on case reviews, data reviews, documentation and policy reviews, and interviews with key stakeholders and agencies. This brief outlines the extent to which the provisions of the Infrastructure Standard reflect current practice and if practice differs from what is detailed as it relates to the health and education of children in custody.

## Infrastructure Standard versus Current Practice

### *Infrastructure Standard Provisions that Reflect Current Practice*

Children are currently receiving medical, dental, and mental health services without overt discrimination, with the exception of trans youth. It should be noted, however, that Senate Bill 140 was passed in July 2023 that issued a ban on providing gender-affirming care to children in the state of Georgia. In August 2023, a federal court issued an order that blocked the enforcement of the hormone therapy ban while a lawsuit challenging the law continues. This will continue to be monitored by MTAT for potential impact on children in the class and beyond.

It is current practice to support the individualized educational needs and stability of children in custody and this is an identified area of strength in the most recent Infrastructure Brief. Infrastructure Brief Eight outlines DFCS' use of the Educational Programming, Assessment, and Consultation Unit (EPAC) to complete assessments on children in foster care. Infrastructure Brief Eight noted that the EPAC unit reported increased progress with completing the educational assessment to determine the individualized needs of the child as well as completion of the Transitional Living Plan that includes educational goals and milestones as well as vocational and employment goals. With the noted successes, Infrastructure Brief Eight data indicated ongoing struggles with frequent changes in school placement, though it is still current practice expectation to make every effort to keep children in the same school.

*Current Practices that Differ from the Infrastructure Standard Provisions*

Infrastructure Standard Five details how DFCS shall monitor the well-being of each child who is prescribed psychotropic medication. However, this process has continued to change since MTAT began monitoring the efforts. While there was once a medical director to provide oversight and consultation, that position has been eliminated, leaving County Directors to make medical decisions without adequate training. More recently, DFCS leadership reported new efforts to contract with medical professionals to provide consultation to staff on the use and controls over the administration of psychotropic medications. In Infrastructure Brief Eight, it was noted that under DFCS policy 10.12 the County Director responsible for medication authorization for children in custody. In addition, Region 14 developed additional support through a Field Placement Specialist (FPS) position to manage and monitor psychotropic medication authorizations. During interviews for Infrastructure Brief Eight, the role of the FPS was reported to be an effort to support monitoring and oversight on the dosage, quantity, and frequency of medications prescribed for each child in custody prescribed psychotropic medications; however, the data management practices to effectively track was inconsistent. An additional limitation noted from Infrastructure Brief Eight was the lack of state approved guidelines/parameters or clinical oversight to support the County Director with informed decision-making. More recently, DFCS leadership reported new efforts to contract with medical professionals to provide consultation to staff on the use and administration of psychotropic medications.

## Recommendations

**6. MTAT recommends updating policy 10.12 to reflect new processes of how the well-being of each child prescribed psychotropic medication will be monitored and achieved.**

MTAT believes DFCS needs a clear and consistent process on how both the medical and well-being needs of children prescribed psychotropic medications will be tracked and monitored. This should include medical oversight, accurate medical information documentation and tracking especially as children change placements, consistent data usage and monitoring, "red flag" prescriptions that are known to be potentially very dangerous, secondary reviews, appropriate training for DFCS case managers, and other checks and balances in place to identify concerns and promote consistency in the oversight of g overmedication and/or medication interaction.

## *Infrastructure Standard VI: Child Welfare Information System and Quality Assurance*

## Overview

This Infrastructure Standard details the obligation for DFCS to develop and maintain a child welfare information system meeting federal standards for accuracy and supporting functionality and casework practice. This standard also has provisions related to monitoring, quality assurance and ongoing continuous quality improvement (CQI) efforts. This brief outlines the extent to which the provisions of the Infrastructure Standard reflect current practice or if practice differs from what is detailed as it relates to the Child Welfare System and Quality Assurance.

## Infrastructure Standard versus Current Practice

### *Infrastructure Standard Provisions that Reflect Current Practice*

As detailed in the Exit Plan, DFCS gave notice to the federal government of their intent to transition to a Child Welfare Information System (CCWIS) information system. There is no timeframe for this effort, as the Children's Bureau interviews necessary to move forward are delayed for the next 18 months, or more, which Georgia reports is from a backlog due to Covid. Prior briefs indicated there was a data dictionary, not a data quality plan. However, recent interviews shared that a data quality plan exists. Indications are that it is being updated and will be shared with MTAT when complete. All interviews confirmed that SHINES, the current information system, supports the end user's obligation to enter child and case specific information throughout the life of the case.

Regarding the provisions related to quality assurance (QA) and CQI, data reports have been developed and exist in the data warehouse and are available on the LENSES system. Ad hoc data reporting is also available to be requested. The methodology adopted and followed by DFCS for Quality Assurance is the process set forth by the Children's Bureau. The QA teams have been trained on the Onsite Review Instrument (OSRI) and conduct ongoing case reviews utilizing the instrument, supplemented by interviews with case specific stakeholders, including parents, children, foster parents, and service providers. Feedback is given to regions and districts on their performance on child welfare outcomes through these reviews. In Region 14, the quality assurance unit reviews 100% of foster care cases each month to assess the quality of work being conducted through the review of documentation, and feedback is provided to staff as a result of those reviews. Interviews indicated that counties meet monthly to discuss performance on outcomes from data derived from the information system. It is also current practice to evaluate progress on child welfare outcomes as evidenced by the development of a data dashboard, which includes Kenny A outcomes as well as broader child welfare outcomes.

### *Current Practice Expectation that Differ from the Infrastructure Standard Provisions*

Some provisions in the Exit Plan do not reflect current practice for the child welfare information system. Changes have not been made to the information system to support the roll out of the comprehensive practice model, as no comprehensive practice model has been implemented since SBC no longer was the practice model being pursued. In addition, recent interviews indicated that there was no data exchange standard developed.

A provision of this Infrastructure Standard states that the administrative data should be used to monitor progress for the standards. However, for several of the Infrastructure Standards when MTAT requested administrative data, like genograms, data was provided based on a query, leading MTAT to believe that the state is not using administrative data on a regular basis to monitor provisions of the Infrastructure Standards.

## Recommendations

7. **MTAT recommends DFCS make concerted efforts to implement their robust CQI process across all units and all levels to ensure consistency in monitoring and implementing improvement efforts.**

Interviews revealed DFCS employs a robust CQI model including performance analysis and root cause analysis utilizing the behavioral engineering module, however the state and regional CQI

units that have been established appear to operate in isolation. All CQI units get the training on DFCS's CQI model, however it was shared that it is their choice whether to use it. The CQI training is available for anyone that wants it, however there is no mandate that units analyzing and developing improvement strategies follow the state's CQI model for improvement.

## *Infrastructure Standard VII: Supervision of Contract Agencies*

### Overview

This Infrastructure Standard focuses on DFCS requiring and taking appropriate steps to ensure that all CCIs and CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan. The Infrastructure Standard has provisions that focus providing minimum standards for integrating applicable terms of the Modified Consent Decree and Exit Plan as well as monitoring and compliance regarding the safety and well-being of children in custody placed with the contracted agencies. Past briefs have outlined the status and implementation of the supervision of contract agencies. This brief outlines the extent to which the provisions of the Infrastructure Standard reflect current practice or if practice differs from what is detailed as it relates to the supervision of contract agencies caring for children in custody.

### Infrastructure Standard versus Current Practice

*Infrastructure Standard Provisions that Reflect Current Practice*
Infrastructure Brief Three and Infrastructure Brief Five noted DFCS' efforts to coordinate with the Office of Provider Management (OPM) to integrate the applicable terms and requirements from the Modified Consent Decree and Exit Plan. Infrastructure Standards are documented verbatim into the minimum practice standards outlined in the RBWO. Per Infrastructure Brief Three, contract language with contracted agencies includes terms of policies for both DFCS and OPM that outline requirements of contracted agencies specific to the Modified Consent Decree and Exit Plan.  In addition, OPM holds regular meetings with providers to support compliance.

Infrastructure Brief Seven noted processes were in place through Residential Child Care Licensing (RCCL) for monitoring and notification of findings for investigations of suspected abuse, neglect, or corporal punishment. In addition, Infrastructure Brief Seven reported current processes for implementing and monitoring corrective actions for repeat allegations. There are processes in place to ensure children are not placed in an unlicensed facility. There are some placements that occur in unapproved homes for various reasons. OPM/DFCS is responsible for home approvals, while., RCCL is over licensing. OPM conducts safety reviews on a regularly prescribed process for contracted placements.

*Current Practices that Differ from the Infrastructure Standard Provisions*
Infrastructure Brief Five outlined the current monitoring system for contracted agencies through use of a Performance-Based Placement based on provider processes, data gathered by OPM staff and self-reported data. However, this report card system does not determine the basis for continued utilization or financial reimbursement as described in the Infrastructure Standard. During Infrastructure Brief Nine interviews with DFCS staff, it was reported that DFCS was further exploring a true Performance-Based contracting system including financial compensation, but no commitment has been made in this area.

## Recommendations

**8. MTAT recommends DFCS implement a true performance-based contracting system including financial reimbursement to reflect the service being contracted.**

## *Infrastructure Standard VIII: Robust Workforce*

### Overview

This Infrastructure Standard focuses on DFCS' commitment to developing and supporting a competent and professional workforce. The Infrastructure Standard described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families. Past briefs have outlined the status of DFCS' efforts to develop a culture and environment that supports the recruitment, onboarding, mentoring, and retention of competent staff. This brief outlines the extent to which the provisions of the Infrastructure Standard reflect current practice or if practice differs from what is detailed as it relates to the development of a robust workforce.

### Infrastructure Standard versus Current Practice

#### *Infrastructure Standard Provisions that Reflect Current Practice*

Infrastructure Brief Two and Infrastructure Brief Four highlighted DFCS' reported efforts to enhance professional development opportunities for staff in Region 14, specifically with the Education and Guidance Learning Enrichment Services (EAGLES) program. Infrastructure Brief Two and Infrastructure Brief Four further outlined efforts to develop and support new case managers being fully trained prior to being assigned a caseload.  Infrastructure Brief Two also identified building out supervisor development opportunities and efforts to provide mentoring to case managers. OPM indicated in interviews that they provide modified training to provider staff based on the DFCS pre-service training. It is a 40-hour instructor-led training with additional eLearning self-paced modules that they have four months to complete. Like DFCS staff, there is a test that is required to be taken and passed. Ongoing training requirements are being met and tracked, per interviews for Infrastructure Standard Nine interviews. The supervisor mentoring program remains in place, with mentors being available on an ad hoc basis after supervisors have gone through the mentoring program.

In Infrastructure Brief Seven, it was noted that DFCS participated in the last Comprehensive Organizational Health Assessment in June 2019 as part of a Workforce Excellence site from the National Child Welfare Workforce Institute (NCWWI).  During Infrastructure Brief Nine interviews with DFCS staff, it was indicated that there was no recent survey; however, it was reported that new hires and current staffing were followed-up with at scheduled checkpoints, such as entry and exit interviews. In interviews, it was reported that an agency-wide organizational assessment is being discussed to possibly occur for 2025.

The Employee Selection Process (ESP) is a research-based process that supports informed-hiring decisions for managers and supervisors. Infrastructure Brief Two indicated that DFCS worked with the University of Georgia (UGA) in 2016-2017 to evaluate the barriers to success with ESP. Infrastructure Brief Seven also reported that data showed that only 5% of applicant files reviewed had ESP checklist completed. Interviews for Infrastructure Brief Nine indicate that

17

ESP is more of a best practice than a leadership requirement. Infrastructure Brief Seven reported on recruitment strategies, including hosting job fairs, participating in career fairs hosted by local universities, and weekly interviewing events.

Caseload standards, as outlined by the Modified Consent Decree and Exit plan, remain policy in Region 14, and are monitored through the Monitoring Reports, however staffing shortages have created challenges in maintaining the prescribed caseload caps.

***Current Practices that Differ from the Infrastructure Standard Provisions***
In November 2017, DFCS implemented a project team to employ changes and fidelity implementation of ESP. During Infrastructure Brief Two, it was indicated that no fidelity reviews were completed; rather, implementation was scheduled to start in 2020. A follow-up in Infrastructure Brief Four indicated that a fidelity review did not occur, and the review was scheduled for 2021. Recent interviews confirmed there is still no CQI process in place to evaluate the effectiveness of ESP.

During Infrastructure Brief Nine interviews with DFCS staff, it was indicated that the Social Services 1 worker position maintains a continuous posting and other positions maintain a three-day posting as opposed to the timeframes noted in the Exit Plan.

MTAT has not received a sufficient level of clarity on the consistency of reporting on vacancy, hiring, and recruitment status from OHR to County Directors, Regional Directors, and District Directors. Infrastructure Brief Nine interviews indicated discrepancies in that while reports are to be emailed, there were indications that the reports were instead shared on SharePoint. In Infrastructure Brief Six, it was reported that there was no methodology or mutual understanding among county, region, and state leaders on filled or vacated positions.

During Infrastructure Brief Nine interviews, DFCS staff reported that there is a monthly analytical report in place; however, there are no consistent metrics regarding climate and cultural needs or strategic caseload management as detailed in the Exit Plan.

Finally, this Infrastructure Standard indicates that no worker will be primarily responsible for a case before being certified through the pre-service training. However, changes were made in 2022 for workers to receive a training or provisional caseload once the fundamentals training has been completed, but before the online training and field and practice guide activities are completed for full certification.

## Recommendations

**9. MTAT recommends that parties update the provisions of the Infrastructure Standard to reflect current process and practice, particularly around the training caseload and CQI process to evaluate the ESP.**

## *Infrastructure Standard IX: Maximization of Federal Funding*

### Overview

This Infrastructure Standard details the priority for the division of efforts to maximize federal funding, specifically identifying Titles IV-B and IV-E of the Social Security Act, and Medicaid funding. The analysis below represents MTAT's assessment of the extent to which these efforts are occurring and the impact of those efforts.

### IV-E Eligibility Sample Review 2024

In the fourth quarter of the state fiscal year 2024, a representative sample of 50 IV-E eligibility cases was requested from DFCS staff for the purpose of reviewing and assessing the current process for determination of IV-E eligibility of children coming into care.  This sample was submitted, and the review of these case determinations was conducted in June, and July 2024.  Each case was examined for accuracy and consistency of practice.

This review underscored several issues that were prevalent and consistent with other areas of deficiency uncovered in previous examinations and reported in previous Infrastructure Briefs. The following section reports the findings of this most recent review and includes common themes discovered, trends observed, and recommendations for improving the process of eligibility determination.

Of the 50 cases reviewed, 38 (76%) were determined to be ineligible for IV-E assistance.  Note that in the 38 ineligible determinations, multiple reasons were given for the determination of ineligibility.  In our review of the designations of ineligibility assigned by workers responsible for case determinations, several recurring themes were identified. The review revealed various inconsistencies that could have been addressed through a timely and thorough administrative review by management. These issues are detailed below. The most frequently occurring themes are as follows:

| | |
|---|---|
| **Income Verification** | In 32 percent of the ineligible cases (12 of 38), the eligibility worker's review of the case indicated household income exceeded the AFDC threshold for IV-E eligibility. |
| **Court Orders** | In 42 percent (16 of 38) of the ineligible cases, the worker designated the Court Order as either missing (12 of 16) altogether or present but failing to contain the requisite "Contrary to the Welfare" or "Reasonable Efforts" language at removal. Eligibility should go back and see if any of those 16 could be deemed eligible, either through obtaining the court order or if there was a misinterpretation of the court language. |
| **Deprivation** | In 24 percent of the ineligible cases (9 of 38), the worker indicated that Deprivation could not be properly determined. Cases being deprived due to inability to verify income is an opportunity to go back to the caseworker to gather more information and potentially make eligible. |
| **Deprivation with no income** | In six of the nine deprivation cases no income was documented for either parent. Based on the information on the Eligibility Determination Worksheet, the child appears to have been deprived of parental support by the primary wage earner being unemployed or underemployed. |

| | |
|---|---|
| | Currently, there is no documentation in the case file that gives reason(s) on why deprivation was not met. It appears in any two-parent household that the eligibility worker will determine deprivation was not met. |
| **Household Makeup** | In 11 percent of the ineligible cases (4 of 38), the inability to accurately determine the makeup of the Household of Removal was given as a reason for ineligibility. This is information that could and should be obtained from the ongoing caseworker. |
| **Non-U.S. Citizen** | In one instance of the ineligible cases, the inability to confirm citizenship was given as a reason for ineligibility, and there was no documentation as to how this had been verified. |

Following the review of the IV-E eligibility determinations provided by DFCS, it is clear that initial determinations need to be conducted with greater thoroughness to ensure accurate documentation of eligibility in each case, within the bounds of normal circumstances. Additionally, it is evident that supervisory oversight of the determination process is insufficient, both in terms of policy and practical implementation.

This inability to consistently determine IV-E eligibility will cause the opportunity for claiming federal financial assistance to be inaccurately measured; thus, leading to significant and repeated unclaimed federal funding for the state. The process should be monitored, and rigorous attention paid to gathering and maintaining vital information in a consistent manner.

## Eligibility and Reimbursability

As previously reported, DFCS eligibility determination staff continue to display undue risk-aversion when making determinations aligned with established federal policy, like when they are determining AFDC eligibility. The current environment, determined through MTAT information gathering, causes staff to be reluctant to make what would be otherwise proper determinations, for fear of creating errors and possible audit findings for erroneous claims.

Additionally, current staff are unable to handle the workload volume, and this contributes to a backlog of cases to be reviewed. This backlog causes stress on the entire system. It is unclear if this system deficiency is due to inadequate staffing patterns, issues with retention, or inadequate training. However, the root cause(s) must be identified and addressed.

Decisions regarding ineligibility are often made prematurely when a more comprehensive review of documentation would have revealed an eligible determination. In these instances, there is no accompanying evidence that reasonable efforts were made to engage others to obtain the documentation needed. Unresponsive requests for missing and incomplete paperwork (the issue of missing Court Orders remains prevalent) is also a contributor to premature denials. Case managers sometimes fail to provide complete or proper paperwork to Eligibility Determination staff to make informed decisions regarding IV-E eligibility. Communication and partnership between those seeking eligibility determinations and other team members responsible for management of the case is critical and does not appear to be occurring consistently.

County case management staff oftentimes, as a result, have pending applications that have been left unprocessed for extended periods of time. Obviously, this creates a significant delay in the

completion of necessary data and information to be entered into SHINES. The apparent lack of administrative management of this process from a direct supervisory standpoint is a major factor that continues to contribute to the ongoing issues surrounding deficiencies in this area.  A renewed emphasis on managerial oversight must be present for any sustainable change to be affected in this area.

Determination of IV-E eligibility remains a primary issue.  All efforts must be made to make correct verifications on a consistent basis. At the time of this review, current practice does not indicate that this is happening.  The current DFCS policy regarding determination is more than adequate to ensure proper compliance with federal guidelines, and therefore there may be an issue with implementation or fidelity to practice.

As stated earlier, DFCS is not fully maximizing its claiming of Title IV-E and other federal revenues. The current method DFCS uses to calculate the state's Title IV-E Administrative Penetration Rate is inconsistently applied and does not conform with allowable federal policy, as discussed further in Infrastructure Brief Three. This must be corrected as soon as possible.  Additionally, the correct and timely submission of federal financial reports is an issue. MTAT has concerns about the accuracy of data reported on the CB-496, described further below, and also observed that submissions of these reports were often made past the 30-day deadline.

Overall confidence in data validity is a critical issue.  Oftentimes reports utilized, both administratively and in the Regions, are incongruent.  Data production and verification must align for staff to have confidence that reports they are using inform practice effectively and accurately.

Several issues that were prevalent in earlier reviews relative to initial case documentation for eligibility continue to be an unfortunate part of day-to-day practice at this time.  Common themes in this area include the following:
- Income Verification and Documentation;
- Absent Parent Determinations;
- Findings of Deprivation; and,
- Verifying Unemployment and Under-Employment.

**Table 2: Eligibility on July 17, 2024**

| | State | Region 14 |
|---|---|---|
| **Total Number Children in Care on July 17, 2024** | **11,097** | **1,145** |
| IV-E Eligible | 3,482 | 378 |
| IV-E Eligible & Reimbursable | 2,060 | 225 |
| IV-E Eligible but not Reimbursable | 1,422 | 153 |
| Percentage IV-E Eligible & Reimbursable | 19% | 20% |
| Non-IV-E Eligible | 7,615 | 767 |
| **Reason Not IV-E Eligible (Duplicated Count)** | | |
| • The Assistance Unit's Income (minus deductions) is greater than or equal to the AFDC Standard of Need Income Limit for this Assistance Unit. | 2,950 | 192 |
| • Reasonable Efforts determination was not made within 60 days. | 2,712 | 366 |
| • The Assistance Unit's Income is greater than the AFDC Gross Income Limit. | 2,233 | 148 |
| • The first child removal order did not contain the proper judicial language. | 2,113 | 194 |
| • A court order did not give DFCS custody. | 2,042 | 170 |
| • Deprivation does not exist in the Removal Home. | 1,821 | 94 |
| • The child does not meet the specified relative criteria. | 614 | 43 |
| • The child is 18 years of age or older. | 175 | 27 |
| • The Child's Net Countable Income (minus deductions) is greater than or equal to the IV-E Standard of Need Limit. | 81 | 11 |
| • The child is not a U.S. Citizen, Other Qualified Alien, or Permanent Resident. | 72 | 6 |
| • The Child's Income is greater than or equal to the IV-E Gross Income Limit. | 71 | 10 |
| • The household has more than $10,000 equity in property or resources. | 33 | 1 |
| • The child has more than $10,000 equity in property or resources. | 1 | 1 |

Of particular concern, there was a large discrepancy in the information that is reported in Table 2 and the numbers the Department has been reporting on the quarterly CB-496 report to the Children's Bureau. The CB-496 report is the federal quarterly report from the state which reports actual Title IV-E expenditures and claiming and serves as the basis for the states allowable claims and reimbursement from the federal government. Either the Department is not accurately reporting to the federal government and is over claiming Title IV-E administrative revenue, or the Revenue Maximization unit report is incorrect.  Either one is very troubling. MTAT reached out to DFCS, and the Chief Financial Officer for DFCS provided the following response to the identified discrepancy: "We plan to involve RevMax and DFCS Fiscal Leadership in the

reporting process for the CB-496 to ensure that the proper and accurate counts are provided to the grants division by subject matter experts."

In addition, DFCS' partnership with Juvenile Courts has been a concern in past reviews and two court-related gaps in practice have been considered pervasive.  The first of those is timely submission of court orders to eligibility staff, based on the case review.  For those custodial cases determined to be IV-E eligible, DFCS must establish and maintain a positive working relationship with the local Juvenile Courts, the Administrative Office of the Courts (AOC), the Attorney General's Office, and the Council of Juvenile Court Judges (CJCJ) to ensure that a valid court order granting custody to DFCS is executed and provided for the Department to establish care and maintenance.

An additional practice challenge is ensuring final custodial Court Orders are uploaded into SHINES in a timely manner for utilization in IV-E determinations.  Several steps have been developed and implemented to address these gaps However, based on the data evident for analysis, this continues to be an issue. While they do seem to be getting substantially more court orders, they are not getting them timely or acting on the information in a timely manner after it is received to impact eligibility and claiming. Efforts should continue to make the gathering of court documentation relevant to custody a major priority in standard practice.

The review indicated that there remains a shortfall in DFCS court orders and process.  DFCS could improve this situation by streamlining the court order procedures, fostering stronger relationships with the juvenile court judges to expedite obtaining court orders, and assisting in the development of standardized court orders that include the required language for claiming Title IV-E funding. This would reduce the reliance on handwritten orders and minimize omissions that could affect a child's eligibility for the full foster care episode.

## Licensed and Unlicensed

The placement of children and youth in unlicensed foster home settings continues to be an issue impacting reimbursability of the child and the placement while they are in that unlicensed home that perpetuates inappropriate placements and prevents the Department from fully realizing the amount of federal funding available for child welfare programming.  There are strategies that could be considered for implementation that would allow for the more effective and comprehensive determination of licensed and/or approved (and therefore IV-E eligible) placements for custodial youth.

The overriding theme of this observed deficiency centers around the restrictive and overburdening current process of foster home licensure.  The process could be streamlined, and still be appropriately accessible for those relatives or extended family support options wishing to be considered licensed placements. As mentioned previously a workgroup was formed to develop standards for a separate licensure/approval for relatives, and recommendations will be sent to DFCS leadership for approval this fall.

**Table 3: Unlicensed or Unapproved Placements on August 6, 2024, Only DFCS/CPA Foster Homes**

| Unlicensed or Unapproved Placements on 8/6/2024 | Children Placed in Homes on August 6, 2024 | Homes with Children Placed on August 6, 2024 |
|---|---|---|
| Statewide | 6,402 | 3,132 |
| Unapproved Home | 258 | 114 |
| Pending Full Approval | 45 | 25 |
| Placed in Homes Where Status Was Closed | 3 | 1 |
| Percent Unapproved, Pending Full Approval, or Closed Statewide | 5% | 5% |
| | Children Placed in Region 14 Homes | Region 14 Homes |
| Total | 624 | 385 |
| Unapproved | 13 | 10 |
| Pending Full Approval | 6 | 3 |
| Placed in Homes Where Status Was Closed | 0 | 0 |
| Percent Unapproved or Pending Full Approval (or Closed) in DeKalb and Fulton County Homes | 3% | 3% |

Data Source: State Data Unit

**Table 4: Unlicensed or Unapproved Placements on August 6, 2024, All Homes Including Kinship**

| Unlicensed or Unapproved Placements on 8/6/2024 | Children Placed in Homes on August 6, 2024 | Homes with Children Placed on August 6, 2024 |
|---|---|---|
| Statewide | 8,279 | 4,254 |
| Unapproved Home | 1,189 | 687 |
| Pending Full Approval | 681 | 397 |
| Placed in Homes Where Status Was Closed | 282 | 163 |
| Percent Unapproved, Pending Full Approval, or Closed Statewide | 26% | 29% |
| | Children Placed in Region 14 Homes | Region 14 Homes |
| Total | 833 | 512 |
| Unapproved | 32 | 23 |
| Pending Full Approval | 136 | 79 |

| | | |
|---|---|---|
| **Placed in Homes Where Status Was Closed** | 58 | 37 |
| **Percent Unapproved or Pending Full Approval (or Closed) in DeKalb and Fulton County Homes** | 27% | 27% |

## Claiming and Candidacy

The Department is not maximizing its claim of Title IV-E and other federal revenues, and the current method used to calculate the state's Title IV-E Administrative Penetration Rate is inconsistent and incompliant with federal policy.  This must be rectified as soon as possible.  Additionally, the correct and timely submission of federal financial reports is an issue.

The collection of court documentation relative to custody, the review of that documentation and its entry into the system of record continue to be prevalent issues given the review of information for this infrastructure report.  Continuing to allow this to be an issue has a deleterious effect on the calculations needed for the consistent and appropriate claiming of federal funds. Until these efforts are addressed, accurate claiming will not be possible.

## Cost Allocation Plan/Proper Claiming and Maximization of Available Funding

Cost allocation is a critical function in the process of appropriate federal claiming.  At the current time, DFCS does not have a process in place that will allow for consistent and correct allocation of costs to all benefiting programs.  Change and revision to the current process must be explored.

The current Random Moment Sample (RMS) process does not allow for an accurate record for claiming.  Additionally, the DFCS portion of the DHHS Cost Allocation Plan appears to need revision.  Updates to these processes will allow DFCS to identify candidates for foster care more comprehensively.  FFPSA implementation makes it even more critical since there will be two candidacy pools as opposed to the previous one alone.  The Cost Allocation Plan, which would identifies the candidacy pool for the RMS, appears to not have been updated since 2018 and claiming has not begun for FFPSA.

## Availability and Allocation of Resources

Inadequate staff to execute the various responsibilities associated with the consistent and appropriate claiming of federal IV-E may be a contributor.  Additional or enhanced training of those tasked with these responsibilities is also a concern.

The collection of the information (data as well as actual documentation) required to consistently make accurate eligibility determinations continues to prohibit DFCS from making the most comprehensive attempt to properly claim federal funds.

Increasing the number of Social Service Techs/Family Services Workers and Revenue Maximization Specialists to help Case Managers collect the information needed to determine eligibility would be a step toward addressing this issue.  Rightsizing staffing patterns would

allow Revenue Maximization Specialists greater access to Case Managers, which would then allow for the acquisition of needed or missing documentation in a timely manner.

## Medicaid Claiming

Former Director Rawlings previously made available a list of recommendations relative to Medicaid and other claiming issues in a White Paper titled "Leveraging Optional Medicaid Services". The recommendations in that document should be closely scrutinized for possible inclusion in any resulting action plan. The previous concerns relative to substantive changes in DFCS's approach to Medicaid claiming remain an issue at the date of this report.

## Recommendations

**10. Develop a succession plan for replacing the Revenue Maximization Director.**

This is an opportunity to redefine some of the roles, responsibilities, and current policies and practices of this position and the unit.

**11. Increased training for Eligibility Workers and Supervisors**

Increased training for eligibility workers and supervisors in secondary and second-level reviews should be implemented or increased. Overall, general training in the various aspects of eligibility determination is recommended at all levels.

**12. Adopting a more aggressive approach to determining IV-E Eligibility and monitoring the work through the use of accurate and valid data**

On balance, **ascertaining IV-E eligibility should be more aggressive** on the part of all parties involved in determination. If all documentation necessary to make a fully informed eligibility determination is not made available to Revenue Maximization staff within the prescribed time frames, they must routinely notify Case Managers of the need for completing the application process. If that does not rectify the issue, this deficiency should be immediately brought to the attention of those responsible for managing the process to achieve timely resolution. Revenue Maximization staff seems to make a negative determination without a concerted effort to receive all required documentation.

**Generation and use of accurate and valid data** to understand IV-E eligibility is inconsistent. Determining the specific reasons for eligibility, or ineligibility, in a somewhat anecdotal manner makes it difficult, if not impossible, to improve the current rate of federal IV-E claiming. Only through the analysis of valid data will staff be afforded the opportunity to explore the specific reasons incorrect determinations are being made and rectify those deficiencies. This has been an observation in earlier reviews and remains an issue at the date of this report. Data confidence has yet to be adequately addressed.

It should be noted in this review that relevant data has begun to be collected and has served to give valuable insight into the data fidelity issue. Revisions to processes have also given staff adequate tools to conduct the work and the ability to make more consistently accurate determinations. Effective primary and continuing staff education in this area is critical and

should continue to be developed and implemented. DFCS staff has a way to track missing court orders; however, it appears they fail to obtain the missing court order timely. Currently, if a court order is missing, a monthly report is sent to county offices. The current process to obtain a court order should not take more than 45 days, however, a case is not reviewed for up to six months. Failure to redetermine eligibility once the court order is received has a negative impact on the state's penetration rate and missing out on administrative IV-E revenue.

Per the June 2024 Monthly IV-E Denial Report, there is almost a two-month backlog of pending determinations. Industry's best practice is to have the backlog not exceed the 30-day average of the initial determinations received.

### 13. Apply a more robust supervisory review for initial eligibility determinations.

It does not appear evident that **adequate checks and balances on the part of those in supervisory and management positions** are being carried out regarding the scrutiny of initial reviews for eligibility.  In previous practice updates, increasing supervisory reviews of eligibility determinations have been a recommendation for improving this process.  Given the sample of eligibility cases examined, this recommendation does not appear to have been properly or consistently implemented at the time of this review.

In previous practice, the Revenue Maximization Unit was reviewing only those determinations for children that have been deemed eligible for IV-E.  This may serve to adequately prepare the Department for any future IV-E audit samples to be pulled but does very little to ensure the appropriate and consistent claiming of federal funds.

After reviewing the 20 amended sample cases, it seems the previous practice of the Revenue Maximization Unit only reviewing those determinations for children deemed eligible for IV-E has been updated. From the review of the amended sample, the Revenue Maximization Unit is reviewing non-eligible IV-E cases to redetermine eligibility. In the 20-case amended sample, 95 percent (19 of 20) cases that were previously determined not eligible for IV-E were amended and deemed eligible.

The timeline allows for this practice of reviewing the eligible and non-eligible cases to be strengthened as it happens six months after the child enters care. One contributing factor to ineligible determinations is that an eligibility worker will find a case to be ineligible for missing court order or other documentation. If a missing court order or other documentation is the reason the case is determined ineligible, these cases should be prioritized and pended to locate the missing documentation. The goals are to strengthen the process around missing court orders and to redetermine eligibility as quickly as possible. By strengthening and streamlining this process, DFCS could claim additional Title IV-E administrative federal revenue.

The current cadence of iterative reviews should be enhanced to require quality assurance reviews of both eligible <u>and</u> non-eligible determinations by supervisory and/or administrative staff.  Eligibility should always be determined whenever possible.  Adequate determination details should be evident in case records, interviews with family, income verification, self-declaration, etc.  DFCS' policy on this issue is more than sufficient to ensure this is carried out to

the fullest in each case, but fidelity to the policy must be a priority for DFCS in order for the policy to be effective.

### 14. More robust documentation practices and policies should be considered:

| | |
|---|---|
| **Income Verification and Documentation** | This process as it is currently carried out remains more restrictive than should be required.  This has been noted in past reviews and continues to be noted in the current iteration.  Georgia's current policy does allow for a parent's self-declaration of income and resources be a part of the application.  As such, the determination process should include the acceptance of the parent's self-declaration unless there is a well-founded (and well-documented) reason to doubt the validity of the self-declaration. |
| **Determination of the Assistance Unit** | A perceived inability to determine household makeup is not a reason to deny eligibility. Listing this as a reason for ineligibility it would appear the eligibility worker did not exhaust all efforts or utilize all resources to determine the household makeup. DFCS needs to develop a plan or implement a practice to determine the assistance unit in a uniform manner. |
| **Absent Parent Determinations** | Current practice should afford those documenting eligibility the ability to routinely determine first if there *is* an absent parent and if not, review the primary wage earner's current employment to see if the child can meet the deprivation test and become IV-E eligible.  A determination of an absent parent could be as simple as the foster care eligibility application form not being accurately or comprehensively completed. |
| **Findings of Deprivation** | Fervent effort must be applied to correctly and uniformly establish Deprivation.  The current DFCS policy is more than adequate to ensure correct and consistent determination.  Revenue Maximization Specialists should be trained to be (and encouraged to be) vigorous in engaging Case Managers and their supervisors, if needed, in obtaining complete and accurate Deprivation determinations. Additionally, it appears based on the documentation, that the eligibility worker determines that deprivation was not met because the family unit has a two-parent. The Eligibility worker should document the reason(s) why deprivation was not met in a two-parent family with neither parent earning income. This should be added to the RevMax protocol. |
| **Verifying Unemployment and Under-Employment** | Examination and improvement of staff training to consistently meet the unemployment and under-employment requirements would benefit DFCS in the correct determinations of Deprivation.  RevMax needs to make better efforts to obtain and document income and obtain additional documentation to support initial information provided when needed. This is also a continuing issue noted in previous Briefs. |
| **Eligibility workers should isolate instances in which there are only one or** | Identifying these and placing a focused emphasis on those that may be ephemeral will benefit the overall process.  Many certifications for initial ineligibility that can be managed, such as issues with placement setting, 12-month permanency findings, and IV-E eligibility in non-licensed homes will serve to increase eligibility determinations.  These factors should be |

| two reasons the child may not be IV-E eligible | routinely recorded and tracked monthly to establish patterns in the system for documentation that may be effectively addressed in the future. |
|---|---|
| Holding timely Permanency Hearings | This remains an issue as they are often not conducted and/or documented consistently.  This deficiency has an adverse effect on reimbursability and results in the inability of the State to maximize the federal revenue to which it is entitled had these hearings been conducted timely.  A CQI process should be developed and implemented to ensure system-generated permanency finding alerts are addressed according to established time frames.  This process should alert the case manager in ample lead time that a 12-month permanency finding is soon coming due, and a hearing should be scheduled with the court to address permanency finding requirements. |

### 15. Regularly identify those children placed in unapproved DFCS or CPA homes or otherwise placed with relatives

Table 3 Unlicensed or Unapproved Placements as August 6, 2024, displays Only DFCS/CPA Homes in Region 14 and across the state. The data shows that five percent of children in non-relative placements are in unapproved homes across the state while there are three percent in Region 14. Expanding the data to include kinship on Table 4 Unlicensed or Unapproved Placements as of August 6, 2024, 26 percent of children across the state are in unapproved homes. In addition, 27 percent of children in Region 14 are in unapproved homes. There are a few reasons why this data is concerning and should be addressed: (1) placing children in non-relative homes without all the safety checks and requirements and (2) loss of federal revenue based on restricts on reimbursement for children in unapproved homes. There could be multiple reasons that children pending reapproval will stay in IV-E status while the initial pending full approval will not go into IV-E status until fully approved.

As part of the process, determine why these homes are unapproved and whether they could be IV-E eligible.  Develop a database that specifies the reason(s) a relative or kinship foster home cannot be "fully licensed".

If a relative foster home applicant does not meet the training requirement and that is the only reason they are not "fully licensed," there should be a **waiver of the training requirement,** and the home should be considered licensed for IV-E purposes.  It is understood that this would not be a blanket waiver, but a decision made on a case-by-case basis after careful review. This is already allowable under current Georgia licensing standards.

### 16. Revise the initial and annual training requirement for all foster care applicants.

DFCS has already established that initial and annual training is not a safety standard.  Certain modifications to the current standard should be considered.  For example: a) initial training can be only a few hours and can be conducted by the licensing agent at the time of the home study, b) DFCS should make the DFCS-approved training requirement a straightforward process that is easy to achieve.

Implementation of this recommendation will take longer and will require a change in the administrative code.  However, it is important to remember that children are still being placed into "approved (aka licensed)" relative and kinship foster, or pre-adoptive homes and the providers are being paid the same amount as homes that are fully licensed.  The only difference is that none of the maintenance costs are IV-E reimbursable; thus, the care is being paid for completely by other funds, including state general funds.

Request for this data has not resulted in full access due to it only being partially available.  Additionally, as of the date of this review, the data provided for analysis has yet to make evident the reasons why many placements have been found to be ineligible.  In order to provide supporting documentation, it is recommended that the agency place a renewed emphasis on producing and analyzing this information.

At the time of this review, it is not evident that a process has been firmly established and applied to address this issue.  Streamlining the approval process for homes of this type should continue to be a priority (when safety is not a concern). This is especially true in light of the current placement crisis affecting youth in Region 14.

Work should continue in this area according to recommendations from previous reviews.  A comprehensive analysis of training development and implementation should be conducted with an eye toward making the training and approval process more "user-friendly".

**17. Children and youth without court orders properly granting DFCS custody should not be included as a part of the denominator when calculating the penetration rate**.
Services cannot be properly applied to a case in which the state technically has no custody due to erroneous or lacking paperwork or documentation practices.  Either the data reviewed is invalid to some degree and extensive case review is needed, or DFCS should address the legal custody of the child by returning to court to rectify the issue.  The most recent review of sampled cases and data provided reveals this to be a continuing issue.  It is not evident that comprehensive efforts are being made to gather the appropriate documentation, given the resources available.  Consistent and targeted administrative review of eligibility case determinations is critical for DFCS to be secure in the value of checks and balances.  It is not clear that these reviews are being conducted.

**Periodic reviews should be consistently conducted by management and/or administrative staff**, either monthly, quarterly or at the discovery of an abundance of errors, in order to ensure additional levels of vetting are being consistently applied regarding the collection and review of Initial Custody Orders.

**18. Add the candidate for foster care definition to Georgia's Random Moment Study (RMS) for Child Welfare.  This may also require a thorough review, and subsequent revision, of the current Cost Allocation Plan (CAP).**
Earlier recommendations of this type do not appear to have been fully implemented. This is a repeat finding that does not seem to be fully implemented. There is little evidence that the cost allocation plan in this area has been bolstered in any substantive manner as of the date of this report.  This remains an opportunity for system improvement. In the four periods April 2023 –

March 2024 there were no claims for candidacy, traditional or candidates under Family First Prevention Services Act (FFPSA).

Data submitted suggests that deficiencies in candidacy claiming continue to be prevalent.  Analysis of the CB–496 documentation submitted for this review indicates that no candidacy claims were made by the State from April 2023 – March 2024.  DFCS continues to drastically under-claim federal reimbursement for "Candidates for Foster Care".

Correcting this process will benefit DFCS to potentially enhance federal reimbursement through the Family First Prevention Services Act.  In the interim, there will be additional federal reimbursement based on the current IV-E foster care eligibility ratio.

**19. Enhance the focus on claiming IV-E funding for administrative training at the rate allowable.**

Documentation of staff time associated with creating and conducting these training courses should be tracked electronically and monitored monthly or quarterly, as previously noted in Infrastructure Brief Three.  This can then be allocated to the benefiting programs at the established rate.

Time staff spends completing the training on the provided curriculum is also not being properly documented and is under-claimed. Completion of this training should be tracked electronically and monitored monthly or quarterly.

There were minimal claims for training in the four periods reviewed April 2023- March 2024. The total amount claimed was $218,249 as a prior period adjustment, DFCS is massively under claiming for these costs.

**20. Develop and implement a federally funded subsidized permanent guardianship program as an additional permanency option for children and youth in foster care.**

This has still not been implemented. DFCS is currently using state funding for some guardianship cases, and TANF for others.  Implementation of a Subsidized Permanent Guardianship program, which would be reimbursable from the federal government and would adequately cover the cost for the Maintenance and Care for those children, remains an opportunity for system improvement.  The recommendation currently is to continue to plan for the development and implementation of this program as soon as is reasonable to expect. Overall, the data reviewed for analysis in preparation of this report suggests that deficiencies in claiming continue to be prevalent at this time. Based on the review of federal claims, this recommendation does not appear to have been properly or consistently implemented at the time of this review.

**21. Georgia must update its Cost Allocation Plan to properly allocate training costs to Title IV-E and other benefiting programs based on the curriculum of the training provided to staff, foster, and kinship parents and providers.**

Earlier recommendations of this type do not appear to have been implemented.  There is little evidence that the cost allocation plan in this area has been bolstered in any substantive manner as of the date of this report.  This remains an opportunity for system improvement.

Information reviewed for this report suggests that deficiencies in candidacy claiming continue to be prevalent.  **Review and revision of the current Random Moment Sampling (RMS) process** and as well as the current iteration of Georgia's portion of the DHHS Cost Allocation Plan (CAP) remain areas to be addressed.

**22. DFCS should execute a fiscal impact study on the implementation of Family First to include a focus on classification of programs as QRTPs and the effect of such classification on the system.**

Information reviewed for this report suggests that deficiencies in candidacy claiming continue to be prevalent.  Until the current RMS process and CAP document are reviewed and revised, deficiencies will remain, and the correct allocation of training costs will fail to be distributed to the appropriate benefiting programs.

**23. Those working on the eligibility verification side should also be trained and encouraged to work closely with Case Managers to collect accurate information regarding income and other eligibility documentation and supply that information to each individual Case Manager.**

Earlier recommendations of this type do not appear to have been fully implemented.  There is little evidence that staffing in this area has been bolstered in any substantive manner as of this report's date.  This remains an opportunity for system improvement.

**24. Further Review and Consideration of Recommendations in the *Leveraging Optional Medicaid Services* White Paper.**

As of this review's date, it is not clear that any recommendations in the Leveraging Optional Medicaid Services White Paper have been considered or adopted.  Previous recommendations relative to the improvement and enhancement of Medicaid claiming strategies such as claiming reimbursement for Targeted Case Management activities remain unchanged.


# APPENDIX A – STIPULATED ORDER AMENDING THE MODIFIED CONSENT DECREE AND EXIT PLAN

This Order is included behind this page in its entirety.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| KENNY A., by his next friend Linda Winn, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | CIVIL ACTION NO. |
| v. | : | 1:02-CV-1686-TWT |
| NATHAN DEAL, *et al.*, | : | |
| | : | |
| Defendants. | : | |

**STIPULATED ORDER AMENDING THE
MODIFIED CONSENT DECREE AND EXIT PLAN**

On December 5, 2016, the Court entered the parties' Modified Consent

Decree and Exit Plan [dkt. nos. 747 & 745-1] ("Exit Plan").  The parties jointly

moved the Court to approve and enter this Stipulated Order to amend one Outcome

Measure in the Exit Plan and incorporate the final Infrastructure Standards.

The parties have agreed (with the Accountability Agent's concurrence) to

revise one Outcome Measure in the Exit Plan to make it consistent with DFCS'

statewide policy regarding the time permitted to complete investigations of

reported abuse or neglect of foster children.  Section VI.A.2 of the Exit Plan is

hereby amended as follows (revision noted in underlined text):

2. Completion of CPS Investigations Concerning Children in Foster Care: At least
   95% of all investigations of reported abuse or neglect of foster children shall be
   completed, in accordance with Chapter 6 of DFCS' Child Welfare Policy Manual,
   within <u>45</u> days of receipt of the report.

Section VIII of the Exit Plan set forth a process and timeline for establishing

a set of Infrastructure Standards that will be used to measure the foundational

elements of the child welfare system that provides care, treatment, placements,

services, and protection to the Plaintiff Class of foster children in state custody in

Fulton and DeKalb Counties.  After a specified negotiation period (which was

extended through December 18, 2017 [dkt. no. 755]), the parties reached

agreement on the Infrastructure Standards, which are attached hereto as <u>Exhibit A</u>.

Pursuant to Section VIII.B of the Exit Plan, these "final Infrastructure Standards

are enforceable obligations under th[e] Exit Plan, and the Accountability Agent,

with the assistance of MTAT, will measure and report on the Infrastructure

Standards in each subsequent reporting period."

Except as amended herein, all other provisions of the Modified Consent

Decree and Exit Plan entered by this Court on December 5, 2016, shall remain in

full force and effect.

IT IS SO ORDERED, this 19th  day of December, 2017.

  /s/Thomas W. Thrash
THOMAS W. THRASH

- 2 -

# EXHIBIT A

## INFRASTRUCTURE STANDARDS

DFCS retains the sole and complete authority to implement new or revise existing child welfare policies.  If DFCS proposes any revisions to the portions of the DFCS policies referenced in these Infrastructure Standards, DFCS will provide notice to the Accountability Agent and to Plaintiffs to discuss the potential impact on the Infrastructure Standards.  Once the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and Accountability Agent otherwise agree to revise the affected Infrastructure Standard(s).

## I.  COMPREHENSIVE PRACTICE MODEL

DFCS is in the process of developing a comprehensive practice model that will serve to strengthen its workforce, promote collaborative partnerships, and most importantly, achieve positive safety, well-being, and permanency outcomes for children and families. When fully developed, the model is expected to evidence essential foundational attributes to include being: values-driven, safety-focused, results-based, trauma-informed, and partnership-centered. Upon these attributes, the model will be comprised of key structural components to include guiding principles, Solution Based Casework (SBC), quality caregiving, and safety-related practices and tools. This will be needed to ensure that priority practice expectations in Fulton and DeKalb counties fully align with the expectations throughout Georgia.

## II. ASSESSMENT AND INVESTIGATION OF MALTREATMENT IN CARE

DFCS seeks to ensure that every child in care is physically and emotionally safe. DFCS will do so in accordance with the Principles described in the Modified Consent Decree and Exit Plan § III.  To do so, DFCS will:
- conduct safety assessments throughout each stage of the case (intake, ISA investigations, and foster care) to determine if children are safe or unsafe in their caregiving environment. Information gathered from the assessment including, but not limited to, analysis of history of DFCS involvement with the family will inform the safety decisions made on each case;
- take into account the traumatic stress of children;
- be informed of the impact of traumatic stress on children and parents as a part of the assessment, engagement, and service delivery processes;

1

- actively engage ongoing partnerships with families and stakeholders to assure child safety; and
- provide timely and accurate individual and family centered assessments through a partnership of building consensus and shared decision-making.

A. Intake Assessment

1. As part of the intake assessment for possible maltreatment in care, the DFCS CICC intake case manager shall gather information about family functioning, including identifying their stage of development in the family life cycle.

2. DFCS shall incorporate an analysis of DFCS history as part of the intake assessment for possible maltreatment in care and throughout the life of a case. Some of the information that can be gathered from a family's history includes, but is not limited to:
    a. the family's previous response to intervention and treatment strategies;
    b. support networks previously used to reduce or mitigate safety concerns and the effectiveness of such supports;
    c. traumatic events affecting family members; and
    d. coping skills used by the family to deal with traumatic events.

B. Investigation

1. For reports of possible maltreatment of children in care that meet the criteria for child abuse and/or neglect, the DFCS CICC intake worker shall assign a special investigation of maltreatment in care.  The response time for a special investigation of maltreatment in care is immediate or within 24 hours.

2. For reports that do not meet criteria for child abuse and/or neglect, the DFCS CICC intake worker shall either screen in for assignment of a policy violation assessment or screen out the report, in accordance with the timeframes specified in DFCS Policy 14.22 (effective Aug. 2016), as revised, and summarized below.

    a. When the report is screened out, the DFCS placement case manager is responsible for conducting a face-to-face visit to confirm child safety and the safety of other children in the placement. This applies to all

2

placement types (DFCS foster homes, CPS foster homes, CCI group homes) and must be completed within 24 hours of being notified of the screen out intake report(s).

   b.  When the report is screened in as a possible policy violation, the DFCS case manager or the CPA/CCI case manager, based on where the child is currently placed, is responsible for: (1) making the first face-to-face contact within 24 hours; and (2) conducting the assigned policy violation assessment within 15 days from the date of the report. The assessment includes, but is not limited to:
      i.   visiting the home of the caregiver;
      ii.  conducting separate face-to-face interviews with children, caregivers, and other household members; and
      iii. completing a policy violation assessment in the applicable foster parent record in SHINES.

   c.  Once the policy violation assessment has been completed, a staffing must be conducted within 48 hours to discuss the findings, including any observed deficiencies in caregiver capacity. If a policy violation has occurred, and if the home is to remain open, then a corrective action plan (CAP) must be written and approved within three (3) days of the staffing and must be completed within six months.

## III.   CASE PLANNING AND MANAGEMENT

DFCS is committed to a case planning process that is family owned and focused on addressing and resolving agreed upon safety concerns. This case planning process is undergirded by the four milestones of Solution Based Casework: (1) building toward a consensus summary; (2) forming family agreements around outcomes; (3) creating a specific action plan; and (4) noticing, documenting, and celebrating success. Up-to-date assessment information about child and family strengths and needs are used to inform case plan development and revision. Regular family meetings serve as the primary means to ensure that families are continually engaged in case planning and decision-making.

DFCS will develop a specific process for promoting timely and lasting permanency. In this process, special consideration will be given to children at risk of being in long-term foster care.

A. DFCS will use current assessment information to inform case planning in foster care.

1. A transfer staffing shall occur within five (5) business days of the child(ren) entering care, in accordance with DFCS Policy 19.4 (eff. Dec. 2016), as revised.

2. The DFCS case manager will develop a Family Functioning Assessment (FFA) to inform case planning in foster care, which will strengthen caregiver capacity to ensure child well-being and safety over the long term.  The FFA:
   a. includes engagement of the family in a partnership to identify safety concerns;
   b. describes the allegation of maltreatment both reported and found in the context of the family's everyday life routine;
   c. tracks the sequence of everyday life events that led to the incident of maltreatment;
   d. identifies family developmental stages and associated challenges;
   e. identifies family supports;
   f. identifies child/youth development and associated vulnerabilities; and
   g. identifies caregiver patterns of behavior issues that affect parental capacity to care and protect.

B. DFCS will convene family meetings to drive the case planning process. DFCS is revising its policy regarding Family Team Meetings (*see* DFCS Policy 19.3 (eff. Dec. 2016)) to define a collaborative planning process that will best enable families to build consensus and make decisions for themselves. Family Team Meetings will provide the structure for this collaborative planning process and will be used to develop the Family Plan with agreed upon individual level outcomes (ILOs) and family level outcomes (FLOs).  By the end of calendar year 2018, DFCS will determine its model for Family Team Meetings (including the name of the model, persons responsible for facilitating the meetings, timeframes for the meetings, and specific expectations for DFCS staff and providers staff); DFCS will conduct all necessary training for case managers, supervisors and staff at all levels regarding the new model for Family Team Meetings; and DFCS will begin implementation.

4

C. DFCS will create and utilize genograms in case planning.

1.  To more fully understand the composition of the child's immediate and extended family (including fictive kin/natural helpers) and, more importantly, to identify how they could serve as resources to help mitigate safety concerns and promote strengthening of family functioning, the DFCS case manager in partnership with the family shall construct a genogram.  The genogram will be used throughout the case process to identify potential placements and family supports.

2.  Construction of the genogram shall:
    a.  include at least three generations of family members on both sides of the family;
    b.  embrace cultural differences regarding "who is family" and include all who serve in parental capacity;
    c.  include natural helpers, friends, confidants of the caretakers, and older children; and
    d.  indicate who was living in the home at the time of the assessment.

3.  Composition of a genogram should be evolved over the life of a case as trust between the case manager and the family is strengthened and additional family members and natural helpers are identified and shared by the family. As such, the genogram should be revisited periodically and continuously serve as a tool to broaden the pool of resources available to the family both during and after DFCS involvement.

D. DFCS shall assist the family to create plans, implement them and track progress.

1.  DFCS shall assist the family in creating initial action plans and the case plan.  Action plans are the steps and tasks needed to meet the goal of the family agreement/case plan. Action plans will be based on updated assessments of the child and family and will be used to guide case planning for permanency.

2.  Within 30 days of entry into foster care, a case plan with all required elements will be submitted to the Juvenile Court for approval. Case plans with all required elements and service needs shall be reviewed, updated, and revised (with submission to the Juvenile Court for approval)

5

whenever necessary, based on DFCS Policy 10.23 (eff. Feb. 2017), as revised, and in accordance with state law.

3. DFCS shall engage parent(s)/caregiver(s), child(ren)/youth, and collaterals during purposeful contacts to measure progress and determine the effectiveness of the action plan(s).

4. DFCS shall revise the action plan in partnership with the family or youth when barriers to Family Level Outcome (FLO) or Individual Level Outcome (ILO) achievement are identified.

5. DFCS shall provide or arrange for individualized services for families involved in a child welfare case, based on the developmental challenges they are experiencing in their everyday life. Referrals for services shall occur within five (5) business days of the identification of the need for services to address safety, permanency, and well-being.

E. DFCS will take steps to promote timely and lasting permanency.

1. DFCS will use the monthly case staffing to ensure key practice activities are occurring, identify permanency barriers, and develop action items to promote timely permanency.

2. The Kenny A. Permanency Review Team and MTAT will analyze data to understand the factors that may delay permanency or promote timely and lasting permanency.   The Kenny A. Permanency Review Team also will provide coaching support for monthly case staffings. Coaching summaries will be shared with county, regional, district, and state leadership to address systemic issues.

3. In order to promote consistency and clarity, to share information and expertise, and to coordinate recommendations obtained through various permanency reviews that are conducted for children in care, Fulton and DeKalb counties will conduct quarterly "SWAT" meetings throughout calendar year 2018.

   a. A "SWAT" meeting is conducted on foster care cases at intervals of three, six, nine, and 12 months in care and incorporates all other staffings due in that month (including the SBC Case Consultation at the sixth month interval).  The SWAT tool is used in lieu of other staffing

6

tools. Action steps from any prior permanency staffing are streamlined into the SWAT staffing and monitored in the following months.

    b. Participants in these quarterly "SWAT" meetings will include case managers, supervisors, administrators, the Kenny A. Permanency Review Team, Quality Assurance, and a SWAT facilitator. DFCS also will consider whether it is appropriate to include families in these quarterly "SWAT" meetings.

    4. Once these steps have been implemented for one year, leadership will assess to determine permanency effectiveness. If revisions are needed to this process, those changes will replace requirements in this section.

## IV.   QUALITY PLACEMENT AND CAREGIVING

The infrastructure standards below describe specific DFCS commitments at every level to ensure that every child in care will have a stable, nurturing placement in accordance with the Principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks that will be done so that family ties are maintained and nurtured. DFCS prioritizes children being placed with relatives who are able to provide a safe, nurturing home for them. Critical components of the screening, training, approval, and support process for all caregivers are also described in this section.

    A. Screening, Training, and Approval Process for Prospective Foster and/or Adoptive Parents

      1. DFCS shall provide screening, pre-service training and a comprehensive written Initial Family Evaluation (IFE) for all prospective caregivers within the timeframes outlined in DFCS Policy 14.10 (eff. Aug. 2016), as revised.

      2. DFCS shall include in caregiver screening and ongoing support the caregiver's ability to support the child's relationship with his/her birth family, including extended family. This includes the degree of support for contacts between the child and his/her siblings and other birth family and the caregivers' feelings, willingness, and ability to work with birth families toward reunification, including methods used to support this plan.

7

3. DFCS shall complete a written re-evaluation of the overall quality and functioning of each approved caregiver on an annual basis.

4. DFCS shall support each caregiver's involvement in initial and continuing education activities that enable them to develop competencies and skills needed to be successful in meeting the needs of children in foster care.  DFCS shall ensure Continued Parent Development (CPD) is relevant to the characteristics of children being placed in the home.  DFCS shall verify that all approved foster caregivers obtain CPD each year, as outlined in DFCS Policy 14.9 (eff. July 2017), as revised.

B. Placement with Relatives and Fictive Kin

1. Diligent Search

   a.  DFCS shall begin diligent search for absent parents, relatives, and other committed individuals at the onset of involvement with the family, using all sources outlined in DFCS Policy 19.20 (eff. Oct. 2015), as revised.

   b. DFCS shall conduct diligent searches throughout the duration of the child remaining in foster care and shall submit to the court results and responses from individuals contacted as a result of searches at each judicial or citizen judicial panel review.

2. Expedited placement to allow for immediate placement with relatives and fictive kin. This will include, but not be limited to:
   a. prior to placement, screen all household members;
   b. prior to placement, conduct criminal history search of adult household members; and
   c. prior to placement, assess the relative or fictive kin home for appropriateness and child safety.

3.  The DFCS or provider case manager will facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications or provide financial support.

C.  Disclosure of Information

1. DFCS shall provide caregivers with as much information as possible about children being placed in their home, including current and

8

historical information about children's mental health, developmental trajectory, physical health, and education, as well as a copy of the Child's Plan (Provider View Only) and the Family Plan and Written Transitional Living Plan (WTLP), if applicable.

2. DFCS shall keep the caregivers informed of plans for the children and of birth family information that affects the child placed in their home.

3. DFCS shall provide the caregivers with procedures for agency contact (DFCS and other agency staff) should emergencies arise in the home and discuss a plan with the caregivers for handling emergency situations.

4. DFCS shall give the caregivers timely notice of periodic reviews or hearings to be held in regard to the children in their home.  Caregivers are encouraged to attend reviews, hearings and other family meetings in order to share information regarding the children.

D.  Support for Children and Caregivers

1. DFCS shall obtain relevant and sufficient information on a monthly basis from service providers involved with the child to determine the effectiveness of services, the impact of services on the achievement of the permanency plan, and the role of services in strengthening and/or stabilizing the placement.

2. DFCS shall maintain specialized Caregiver Recruitment and Retention (formerly Resource Development) staff to meet the specific needs of caregivers.

3. DFCS will make available one centralized number (1-877-210-KIDS option 2) for all caregivers to call whenever help is needed related to one or more of the children in their home.

4. DFCS shall request all caregivers participate in an exit meeting with the agency at termination of caregiver service and request completion of the Foster Parent Exit Survey.

5. DFCS shall assure caregivers understand and apply the reasonable and prudent parenting standard, as described in DFCS Policy 14.26 (eff. Oct. 2015), as revised, when determining whether to allow children in foster care to participate in particular extracurricular, enrichment, cultural, and social activities.

**V. HEALTH AND EDUCATION**

DFCS will ensure that children receive the medical, dental, mental health, and educational services that they need regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity.

   A. Initial Screenings and Follow-Up Treatment

      1.  Physical Health Screening:  All children shall receive a medical screening in compliance with Early Periodic Screenings, Diagnostics, and Treatment (EPSDT) standards, within ten (10) days of placement, including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing physician.

      2.  Dental Health Screening:  All children shall receive a dental screening within ten (10) days of placement in compliance with EPSDT standards including at a minimum the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing dentist or pediatrician.

      3.  Mental Health:  All children five (5) years of age and older shall receive a trauma assessment conducted by a licensed mental health professional and completed within 30 days of placement, and shall receive any and all treatment as directed by the child's assessing licensed mental health professional.

      4.  All children four (4) years of age and under shall receive a developmental assessment conducted by a licensed professional and completed within 45 days of placement in compliance with EPSDT standards including at a minimum, the components identified in the Georgia Health Check Program, and shall receive any and all treatment as directed by the child's assessing professional.

   B. Periodic Health Screenings and Treatment – Each child will have a physical examination at least once a year in addition to all EPSDT consistent with all recommendations for preventative pediatric healthcare posted at: https://brightfutures.aap.org/Pages/default.aspx.

C.  DFCS shall monitor the well-being of each child prescribed psychotropic medication in accordance with DFCS Policy 10.12 (eff. June 2016), as revised.

D.  DFCS shall invite parent(s) to attend all of their child(ren)'s medical and dental appointments, unless prohibited by court order or child safety concerns.

E.  DFCS shall refer all children between the ages of five (5) and 18 for an educational assessment (EPAC) within one (1) business day of the Preliminary Protective Hearing (if the child remains in DFCS custody).

F.  DFCS shall ensure each child in foster care over five (5) years of age is enrolled a full time elementary or secondary school or has completed secondary school in accordance with DFCS Policy 10.13 (eff. Sept. 2017), as revised.

G.  DFCS shall ensure youth above the age of compulsory school attendance (age 16 or above) and interested in pursuing a GED rather than a high school diploma are referred to EPAC for assessment and determination of the most appropriate educational program.

H.  DFCS shall ensure the educational stability of all children while in foster care including making every effort to keep children in their current school.

I.  DFCS shall develop or update the Written Transitional Living Plan (WTLP) for a child in foster care who has attained 14 years of age, in the timeframes prescribed by DFCS Policy 13.3 (eff. Oct. 2015), as revised.

## VI.   CHILD WELFARE INFORMATION SYSTEM AND QUALITY ASSURANCE

The Infrastructure Standards below pertain to DFCS' obligation to continue to develop, maintain, and use an automated child welfare information system in which data accuracy and integrity is maintained on a continuous basis, and which is both compliant with current federal standards and meets current federal reporting standards.  The Statewide Automated Child Welfare Information System (SACWIS) shall include functionalities that support automated case management and that conform to DFCS Policy 2.1 (eff. Mar. 2015), as revised, including those functionalities necessary to support SBC. And finally, it shall support monitoring

11

and quality assurance efforts consistent with on-going continuous quality improvement efforts.

A. Meeting Federal Standards

1. The Comprehensive Child Welfare Information System (CCWIS) final rule became effective August 2016.  States have until August 1, 2018 to notify the Administration for Children and Families (ACF) of their intent to either transition the existing SACWIS System to CCWIS, develop a new CCWIS System, or opt out.

2. CCWIS requirements focus on quality data and program outcomes including: developing and implementing a data quality plan; new data exchanges; and requiring a data exchange standard.

B. Case Management Functionalities

1. The DFCS automated child welfare information application shall support end users in their obligation to enter child and case specific information across all stages of a child welfare case.

2. DFCS shall continue to modify system functionalities to align with the development and roll out of the DFCS comprehensive practice model.

3. DFCS shall continue to develop, validate, and modify reports based on data housed in the administrative data system that support on-going case management and case review.

C. Monitoring, Quality Assurance, and Continuous Quality Improvement

1. DFCS shall develop methodologies for monitoring adherence to Infrastructure Standards that rely on validated state administrative data analysis and reports.

2. DFCS shall develop methodologies for quality assurance, including case reviews that are reliant on data stored in the administrative database.

3. DFCS shall develop methodologies for on-going evaluation of progress on child welfare outcomes, including those specified in the Modified Consent Decree and Exit Plan, that are based on validated data stored in the state administrative data system.

12

## VII.  SUPERVISION OF CONTRACT AGENCIES

This section applies to any contract for the provision of placements and services to class members into which DHS enters during the contract cycle, or as soon as practicable following the entry of the Modified Consent Decree and Exit Plan. Standards below relate to these recommendations as well as the requirements that contract agencies comply with the terms of the Modified Consent Decree and Exit Plan, including its Principles, and meet or exceed agreed upon outcomes for children and families.

A. DFCS shall require, and shall take appropriate steps to ensure, that all CCIs or CPAs that provide placements and services to class members meet all applicable terms of this Modified Consent Decree and Exit Plan.

B. DFCS shall only contract for placements or services with licensed contractors or sub-contractors.  No child shall be placed in an unlicensed facility.

C. DFCS will also specify in any such contract that the suspected abuse or neglect of any class member while receiving such placement or services shall be reported per mandated reporter requirements. All placement providers for foster children in DFCS custody are prohibited from using or authorizing the use of corporal punishment, and that any suspected corporal punishment while in the provider's care shall be reported to DFCS for screening, assessment, or investigation as necessary.

The findings of investigations of suspected abuse or neglect, or the assessment or investigation of suspected corporal punishment, shall be considered by DHS, through its Residential Child Care Licensing (RCCL) Unit, in determining whether to impose a licensing sanction against a contract agency for violation of applicable rules and regulations. With respect to contract agencies' contractual violations, DHS may use such contractual remedies as provided by the contract and by applicable Georgia statutes and/or rules and regulations.  The failure of a contract agency to report suspected abuse or neglect, or corporal punishment, of a child to DFCS shall result in appropriate disciplinary action being followed in accordance with child welfare policies, RBWO Minimum Standards, from immediate termination of the contract or placement of the provider on admission suspension, through termination of the contract.

13

D. DFCS shall ensure that all CCIs or CPAs that provide placement and services to class members report to DFCS accurate data in accordance with the standards so that their compliance with the terms of this Modified Consent Decree and Exit Plan can be measured.

E. DFCS shall develop reports that characterize contract agency performance on outcomes for the children they serve.  These reports shall be developed using the state administrative data system. The reports that are produced shall be the basis for continued utilization and overall contracting as well as financial reimbursement.

F. DHS, through its Residential Child Care Licensing (RCCL) Unit, shall conduct licensing evaluations of all child-caring institutions and child-placing agencies providing placement and services to class members, to ensure, among other things, the safety and well-being of class members in accordance with the rules and regulations of the licensed facility type.

As part of such evaluations, RCCL Unit shall ensure that each CCI and CPA shall receive at least one unannounced inspection a year to review all relevant aspects of the agency/institution's operations.

The RCCL Unit shall prepare a written report after each visit detailing its findings, and shall provide follow-up visits or monitoring if deemed necessary.  With respect to license-holders' deficiencies, the RCCL Unit may use such remedies as provided by applicable Georgia statutes and rules and regulations.

G. The Office of Provider Management (OPM) shall complete safety reviews of foster homes depending on the size of the agency and special safety reviews of foster homes when additional concerns are identified.

## VIII.  ROBUST WORKFORCE DEVELOPMENT

DFCS is committed to developing and supporting a competent and professional workforce. The Infrastructure Standards described below reflect that commitment and will provide a continuous learning environment that addresses emerging best practices, maintains professional ethics, and builds the skills and competencies necessary to address the needs of vulnerable children and families.

14

A. Employee Selection Protocol

1. The Employee Selection Protocol shall be utilized during the hiring process to ensure the selection of the most appropriate child welfare employment candidates for DFCS.

2. DFCS shall employ a continuous quality improvement process to evaluate and determine the effectiveness of the Employee Selection Protocol.

3. DFCS shall implement the provision of an employee satisfaction survey for all DFCS staff to guide development and implementation of strategies intended to continuously strengthen DFCS' workforce.

B. Hiring Process and Coordination with the Department of Human Services' Office of Human Resources (OHR)

1. OHR will post positions within three (3) business days of an approved request.

2. OHR will identify vacancies and provide a monthly report to the County Director, Regional Director, and District Director.

3. An OHR recruiter will conduct recruitment events at least monthly.

4. Recruitment efforts will be shared with the respective counties quarterly to County Director, Regional Director, and District Director by way of email correspondence.

5. OHR will screen and forward the list of qualified applicants to the County Director and designee within five (5) business days of the closure of the posting.

6. OHR will finalize all recruitment efforts from initiation through offer letter in an expeditious fashion, but no later than five (5) business days after receipt of the cleared criminal background check.

7. OHR in coordination with DFCS will process all position requests, salary increase requests, and temporary salary supplements within 20 days of approval and recommendation from the County Director, Regional Director, and District Director.

15

C.  Training

1.  No case manager shall assume primary responsibility for a CPS, family preservation, foster care, or adoption case, until achieving certification as a result of their successful participation in new worker training.

2.  All supervisors who supervise case managers with caseloads shall complete the DFCS supervisory training within 120 days of promotion to the position or appointment. All supervisors of case managers with caseloads shall receive a minimum of 20 hours of in-service training each year.

3.  DFCS shall implement a mentoring program for child welfare supervisors to ensure that child welfare case managers are appropriately supported by their direct supervisors.

4.  Private provider agencies with whom DFCS contracts for the provision of placement for children in DFCS custody shall be required, through contract provisions, to certify that employees providing case management or supervisory services for DFCS have completed a curriculum approved by DFCS to ensure that the general content areas are appropriate to the work being performed. Where casework activities mirror those of DFCS case managers or supervisors, the curriculum shall be comparable to DFCS' pre-service and in-service training.

5.  All case manager supervisors shall have either: (i) a minimum of a bachelor's degree in social work or a related field and at least two years of experience as a case manager in child welfare; or (ii) a Master's degree in social work or a related field and at least one year of experience as a case manager in child welfare, or in a lead/supervisory role in a social services program of the DFCS or similar human services delivery program.

D.  Caseload Management

1.  In accordance with the Modified Consent Decree and Exit Plan § V, DFCS has committed to maintaining caseload caps for specific types of cases.  That measurement of caseloads shall include deployed workers, PRNs, and any DFCS staff that have a child from Fulton and DeKalb counties on their caseloads.

16

2. Caseload standards are applicable for all cases on a case manager's load, regardless of the stage of the case.

3. DFCS shall develop analytic monthly reports that will support their efforts to manage caseloads and staffing on an on-going basis. Those reports will involve:
   a. workforce dynamics (recruitment, hiring, turnover and vacancy rates);
   b. climate and culture assessments; and
   c. metrics to strategize caseload management (including timely and safe case closure practices).

4. DFCS will provide to Plaintiffs and MTAT monthly CPS caseload reports. DFCS shall generate quarterly reports, verified by MTAT, detailing DeKalb's and Fulton's progress in meeting timeframes for case assessments from intake to closure in accordance with DFCS policy and case practice expectations (including the Initial Intake Safety Assessment and case track assignment). This information, in conjunction with caseload reports, will be used to assist in monitoring caseloads starting in the intake phase in order for DFCS to meet its staffing goals for CPS, family support, family preservation, foster care, and adoption cases, but does not expand the scope of the Modified Consent Decree and Exit Plan. These reports and other information gathered in this Robust Workforce Development section shall replace the Curative Action Plan for CPS caseloads dated December 18, 2014 that was referenced Section X.C. of the Modified Consent Decree and Exit Plan.

## IX.   MAXIMIZATION OF FEDERAL FUNDING

Effective and cost-efficient child welfare systems depend on multiple funding streams to pay for services and supports for the children and families they serve. In recent years, DFCS leadership has made notable progress in securing state funds to provide needed child welfare services.  With respect to federal funds, DFCS leadership shall continue to consider opportunities to maintain and expand federal revenue through IV-E eligible programming including: approving relatives as foster parents; offering federal reimbursed guardianship subsidies; and developing federally reimbursable extended foster care programming.

DFCS shall maximize funds available through Titles IV-B and IV-E of the Social Security Act, and Medicaid funding.  DFCS shall establish baselines for present levels of state and federal funding in order to identify increases in federal funding.

The parties intend that any increase achieved in federal funding shall not supplant state funds for foster care services. DFCS shall demonstrate to the reasonable satisfaction of the Accountability Agent that DFCS has an appropriate mechanism in place for reporting the budgeting of both federal and state dollars. Plaintiffs' agreement herein is premised upon the good faith representation by DFCS and the Governor that their policy will be to urge the General Assembly that state dollars committed to DFCS for the provision of services and resources to benefit children in the class shall not be decreased from current levels if efforts to maximize federal dollars result in additional federal funding.

# APPENDIX B – METHODOLOGY

## *Interviews*

- June 27th: Fulton County Director
- June 27th: Region 14 Director
- June 27th: RevMax Field Program Specialists
- June 28th: RevMax Quality Assurance Unit
- July 2nd: Data and Quality Assurance Director
- July 10th: Director of Quality Assurance, Region 14
- July 11th: State Training Director
- July 15th: SHINES Director
- July 26th: Director of Office of Human Resources
- July 26th: Director of Office of Provider Management
- July 29th: Director of Well-Being
- July 30th: State CQI Director and Region 14 CQI Director
- August 1st: Chief Financial Officer
- August 8th: Region 14 Resource Development Director
- August 9th: Georgia DFCS Data Unit
- August 9th: Deputy Commissioner for Child Welfare

## *Data*

- Current Organizational Chart
- The last 4 qtrs of CB-496s (to include Foster Care, Adoption, and Guardianship and Prevention )
- Current Title IV-E Preprint
- Annual Adoption Savings Reports for FY 2023
- The Master Denial Report as of June, 2024
- The current Departmental Budget
- The current number of authorized positions (Statewide and for Region 14), delineated by filled and vacant, by position.
- A sample of 50 CWB determinations on kids in custody as to review for errors
- The current Child Welfare Benefits Eligibility Manual
- The current Cost Allocation Plan
- Documentation relative to cases where they have re-reviewed the original determination, found errors and corrected them.
- The following information to reflect the current data as of a specific date:
  - Total Number of Children in Care
  - IV-E Eligible
  - IV-E Eligible and Reimbursable
  - IV-E Eligible but not Reimbursable
  - Non IV-E Eligible
  - Reasons not IV-E Eligible (Duplicated Count)

- o Assistance Unit's Income is greater than or equal to the AFDC Standard of Need Income Limit for this Assistance Unit.
  - o Reasonable Efforts determination was not made within 60 days.
  - o The initial child removal order did not contain the proper judicial language.
  - o Court order did not give DFCS custody.
  - o The Assistance Unit's Income is greater than the AFDC Gross Income Limit.
  - o Deprivation does not exist in the Removal Home.
  - o The child does not meet the specified relative criteria.
  - o The child is not a U.S. Citizen, Other Qualified Alien or Permanent Resident.
  - o The child is 18 years of age or older
  - o The household has more than $10,000 equity in property or resource.
  - o The Assistance Unit's Income (minus deductions) is greater than or equal to the AFDC. Standard of Need Income Limit for this Assistance Unit (based on $30 and 1/3 Test).
- The following information (broken down by Children Placed in Homes and Homes with Children Placed, as well as Statewide and Region 14 specific) to reflect the current data as of a specific date:
  - o Unlicensed or Unapproved Placements
  - o Unapproved Home
  - o Pending Full Approval
  - o Placed in Homes where Status was Closed
  - o Percent Unapproved, Pending Full Approval or Closed

## *Research*

- Child Trends. Child Welfare Financing Report. May 2023.
- Child Trends. Spending of State & Local Funds by Child Welfare Agencies in SFY 2020. May 2023.
- Child Trends. State Variation in Child Welfare Agency Use of Federal Funding Sources. June 2018.
- Child Trends State Fiscal Year 2020-Financial Expenditures Spreadsheet.
- Congressional Research Service. The Temporary Assistance for Needy Families (TANF) Block Grant. April 3, 2024.
- Serrat, Oliver, Theories of Change in Knowledge Solutions, 2017, DOI 10.1007/978-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-9_24, p. 237-240.
- State Fact Sheets: How States Spend Funds Under the TANF Block Grant | Center on Budget and Policy Priorities (cbpp.org)
- Urban Institute: Shoring Up the Child Welfare-TANF Link. Short Takes on Welfare Policy, Number 7. June 2002.