**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| KENNY A., by his next friend Linda Winn, et al., | |
| *Plaintiffs*, | |
| v. | No.: 1:02-cv-1686-TWT |
| BRIAN KEMP, et al., | |
| *Defendants*. | |

**BRIEF IN SUPPORT OF
DEFENDANTS' MOTION TO TERMINATE CONSENT DECREE**

## TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................1

II.    BACKGROUND AND STATEMENT OF THE CASE .............................2
    A.    The Complaint ...............................................................2
    B.    The Consent Decree .......................................................3

III.    LEGAL STANDARD .................................................................5

IV.    ARGUMENT..........................................................................10
    A.    There Have Been Significant Changes In Factual And Legal
        Circumstances And New Policy Insights That Make Continued
        Enforcement Of The Consent Decree Inequitable. ...........................10
        1.    A Significant Change In Circumstances Is Shown By The
            Dramatic Transformation In The Legal Landscape
            Regarding Child Welfare Since The Entry Of The
            Consent Decree. ........................................................11
        2.    Since Entering The Consent Decree In 2005, DFCS Has
            Undergone Substantial Changes In Its Structure,
            Operations, And Policies, Demonstrating A Significant
            Change In Circumstances. ............................................15
        3.    There Is A Dramatically Increased Level Of Federal
            Oversight Of State Child Welfare Systems That
            Constitutes A Substantial Change Of Circumstances..............23
        4.    State Defendants' Self-Monitoring Exceeds The
            Requirements Of The Consent Decree. ...................................28
    B.    There Is No Ongoing Violation Of Federal Law That Would
        Support Continued Enforcement Of The Consent Decree.................33
        1.    State Defendants Do Not Violate Plaintiffs' Substantive
            Due Process Rights. ...................................................33
        2.    State Defendants Do Not Violate Procedural Due Process
            Rights. ...................................................................49
        3.    State Defendants Do Not Violate the Equal Protection
            Clause....................................................................50
        4.    State Defendants Do Not Violate Familial Associations.........51
        5.    State Defendants Do Not Violate Statutory Federal Laws. .....51
        6.    State Defendants' Substantial Changes Prove There Is No
            Violation Of Federal Law. ...........................................53

C.     Continued Enforcement Of The Consent Decree Is Against The Public Interest Because It Runs Afoul Of Principles Of Federalism And Unduly Burdens Political Successors.....................53

D.     The State Defendants Have Accomplished The Basic Purpose Of The Consent Decree. ..................................................................57

E.     The Substantial Changes And The State's Response Warrant Relief Under Rule 60(B)(6).................................................................58

V.      CONCLUSION...............................................................................59

VI.     PRAYER FOR RELIEF ................................................................59

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ackermann v. United States*,
   340 U.S. 193 (1950)............................................................................59

*R.C. ex rel. Alabama Disabilities Advocacy Project v. Walley*,
   270 F. App'x 989 (11th Cir. 2008) ...............................................7, 58

*Boulet v. Cellucci*,
   107 F. Supp. 2d 61 (D. Mass. 2000)................................................48

*Burt v. Cnty. of Contra Costa*,
   No. 73-cv-00906-JCS, 2014 WL 253010 (N.D. Cal. Jan. 22, 2014) ................54

*City of Rome v. Hotels*,
   555 F. Supp. 3d 1314 (N.D. Ga. 2021)..............................................8

*Clark v. Hous. Auth. of Alma*,
   971 F.2d 723 (11th Cir. 1992) .........................................................6

*Consumer Advisory Bd. v. Harvey*,
   697 F. Supp. 2d 131 (D. Me. 2010) ....................................................8

*Davis v. Carroll*,
   805 Fed. Appx. 958 (11th Cir. 2020)................................................34

*Does 1-13 by and Through Doe, Sr. 1-13 v. Chiles*,
   136 F.3d 709 (11th Cir. 1998) .........................................................48

*Evans v. Fenty*,
   701 F. Supp. 2d 126 (D.D.C. 2010).............................................8, 42

*Frew v. Hawkins*,
   401 F. Supp. 2d 619 (E.D. Tex. 2005)..............................................48

*Frew v. Hawkins*,
   540 U.S. 431 (2004)...................................................................54, 56

*Griffin v. Sec'y, Fla. Dep't of Corr.*,
   787 F.3d 1086 (11th Cir. 2015) .........................................................6

*Horne v. Flores*,
557 U.S. 433 (2009)....................................................................*passim*

*Jackson v. Los Lunas Cmty. Program*,
880 F.3d 1176 (10th Cir. 2018) ....................................................6, 7

*John B. v. Emkes*,
710 F.3d 394 (6th Cir. 2013) ....................................................35, 48

*LaShawn v. Fenty*,
701 F. Supp. 2d 84 (D.D.C. 2010)....................................................35

*H.A.L. ex rel. Lewis v. Foltz*,
551 F.3d 1227 (11th Cir. 2008) ........................................................34

*Los Angeles Cnty. v. Humphries*,
562 U.S. 29 (2010)............................................................................34

*M.D. v. Abbott*,
907 F.3d 237 (5th Cir. 2018) ...........................................................42

*Martin v. MARTA*,
No. 1:01-CV-3255-TWT, 2022 U.S. Dist. LEXIS 113212 (N.D.
Ga. June 24, 2022) ..............................................................................9

*Milliken v. Bradley*,
433 U.S. 267 (1977)............................................................................9

*Monell v. Dep't of Soc. Servs. of City of New York*,
436 U.S. 658 (1978)..........................................................................34

*Pottinger v. City of Mia.*,
359 F. Supp. 3d 1177 (S.D. Fla. 2019) .............................................57

*Ray v. Foltz*,
370 F.3d 1079 (11th Cir. 2004) ........................................................35

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992)....................................................................*passim*

*Salazar v. District of Columbia*,
954 F. Supp. 278 (D.D.C. 1996).......................................................49

*Sierra Club v. U.S. Dep't of Agric.*,
No. 94-CV-4061-JPG, 2013 WL 811672 (S.D. Ill. Mar. 5, 2013)....................36

*Taylor v. Ledbetter*,
818 F.2d 791 (1987).........................................................................................34

*United States v. Alsol Corp.*,
620 F. App'x 133 (3d Cir. 2015) ......................................................................59

*United States v. City of Mia.*,
2 F.3d 1497 (11th Cir. 1993) ...........................................................................57

*Connor B. ex rel. Vigurs v. Patrick*,
771 F. Supp. 2d 142 (D. Mass. 2011) ..............................................................35

*Youngberg v. Romeo*,
457 U.S. 307 (1982).........................................................................................35

*Younger v. Harris*,
401 U.S. 37 (1971).....................................................................................53, 54

*Yvonne L v. New Mexico Dep't of Human Servs.*,
959 F.2d 883 (10th Cir. 1992) .........................................................................35

**Statutes**

42 U.S.C. § 622 ................................................................................................51

42 U.S.C. § 1983 .....................................................................................3, 33, 51

Adoption and Safe Families Act of 1997..........................................................38

Families First Prevention Services Act........................................................21, 23

Federal Adoption Assistance Act........................................................................3

Adoption Assistance and Child Welfare Act of 1980 .......................................38

Fostering Connections and Strengthening Families Act ...................................21

Medicaid Act........................................................................................3, 46, 51

Multiethnic Placement Act ..........................................................................3. 51

O.C.G.A. §9-2-20 .......................................................................................3

O.C.G.A. §§ 15-11-1 – 15-11-747 .................................................11, 12

O.C.G.A. § 15-11-2 ............................................................................12, 13

O.C.G.A. §15-11-13 ................................................................................3

O.C.G.A. §15-11-58 ................................................................................3

O.C.G.A. § 15-11-98(A) .........................................................................3

O.C.G.A. § 15-11-103 ...........................................................................13

O.C.G.A. § 15-11-135 ...........................................................................14

O.C.G.A. § 15-11-145 ...........................................................................13

O.C.G.A. §§ 15-11-200 – 15-11-204 ....................................................14

O.C.G.A. §§ 15-11-230 – 15-11-232 ....................................................14

O.C.G.A. § 15-11-451 ...........................................................................14

O.C.G.A. § 15-11-476 ...........................................................................12

O.C.G.A. § 15-11-741 ...........................................................................32

O.C.G.A. §20-2-690.1 .............................................................................3

O.C.G.A. § 49-5-12 .................................................................................3

O.C.G.A. § 49-2-1 .................................................................................54

Preventing Sex Trafficking and Strengthening Families Act (2015) .....21

Social Security Act.................................................................24, 25, 46, 49

**Other Authorities**

42 C.F.R. § 441.56 ................................................................................48

42 C.F.R. § 435.911 ..............................................................................48

45 C.F.R. Parts 1355–57 .......................................................................38

45 C.F.R. 1355.50-58 .................................................................................16

Fourteenth Amendment ............................................................................33

Andy Miller, *Progress seen at DFCS, but turnover still a problem* .....................45

Casey Family Programs, *How does turnover in the child welfare workforce impact children and families?* .........................................44

Child Welfare Capacity Building Collaborative, *Child and Family Services Review Program Improvement Plan Development, Implementation, and Monitoring* (September 12, 2024) .............................25, 26

Family and Children Services*, State of Hope* (September 12, 2024) ...............18, 19

Frank Edwards and Christopher Wildeman, *Characteristics of the Front-Line Child Welfare Workforce* ...............................................44

*House Bill 242* (2013) .............................................................................12

Megan Paul, et al.*, Worker Turnover is a Persistent Child Welfare Challenge - So is Measuring It* (Jan. 24, 2022) ...............................44

Melisa Pasli and Dmitry Tumin, *Children's unmet need for mental health care within and outside metropolitan areas* ...........................48

Melissa D. Carter, *Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia*, 54 GA. L. REV. 1133 (2020)...........11, 12

*Pampeti et. al*., *Disparities in Unmet Health Care Needs Among US Children During the COVID-19 Pandemic*, Centers for Disease Control and Prevention........................................47

QIC-WD, *Strategies to Improve Child Welfare Worker Retention* .........................44

Fed. R. Civ. Proc. 60 ...............................................................1, 5, 6, 58

Sarvas EW, et al., *Oral health needs among youth with a history of foster care: A population-based study* ................................................48

Taylor C. Joseph, *Revitalizing the* Youngberg v. Romeo *Professional Judgment Standard to Require Trauma-Informed Care For Detained Children*, 81 MD. L. REV. 1329 (2022) ................................34

# I.    INTRODUCTION

Under Federal Rule of Civil Procedure 60(b)(5) and (6) ("Rule 60(b)(5) and (6)"), Defendants respectfully submit the following in support of their motion for an order terminating the Modified Consent Decree and Exit Plan, Dkt.745[1] (the "Consent Decree"), previously entered in this case.

This case concerns the administration and operation of the Georgia Division of Family and Children Services ("DFCS") in Fulton and DeKalb counties (hereinafter sometimes referred to as "Region 14"), both located in the State of Georgia. Substantial changes to the state and federal administrative and regulatory landscape have impacted the operating environment of the Defendants' foster care systems and have made prospective enforcement of the Consent Decree redundant, unnecessary, counterproductive, and inequitable. Prospective enforcement of the Consent Decree will continue to burden and constrain the State's ability to govern its foster care system in a way best suited to the foster care system's changing and evolving circumstances. Moreover, because of these substantial changes, Defendants now comply with all pled federal laws and federal and state constitutions, such that continued oversight is no longer justified.

---

[1] The Modified Consent Decree and Exit Plan replaced the Consent Decree entered in 2005, Dkt.488. For sake of clarity, State Defendants seek termination of the Modified Consent Decree and Exit Plan and all prior injunctive relief.

Therefore, Defendants request that this Court terminate the Consent Decree as set forth below.

## II.   BACKGROUND AND STATEMENT OF THE CASE

### A.   The Complaint.

On June 6, 2002, Plaintiffs filed their original complaint initiating this current action in the Superior Court of Fulton County. Dkt.1 at 8–85. Because the original complaint alleged violations federal statutory rights, Defendants successfully removed the action to this Court. *See* Dkt.1. As amended on August 20, 2003, the complaint ("Complaint") sought class action certification and named as defendants then-Governor Roy Barnes, the Department of Human Resources, James Martin (then-Commissioner of DHR), Fulton County Department of Family and Children Services, Beverly Jones (then-Director of Fulton County DFCS), DeKalb County Department of Family and Children Services, Wayne Drummond (then-Director of DeKalb DFCS), Fulton County and DeKalb County. Dkt.194.

The Complaint identified eight named plaintiffs aged 11 months to 16 years (today roughly 21 to 36 years of age) and alleged the following violations:

- Dangerous and inappropriate out of home placements (shelters, other out-of-home placements), Dkt.194-1 at 20;
- Inadequate services to children (health, education, independent living services, services necessary to ensure placement in a permanent home, independent living and transitional services), *id*. at 34;
- Inadequate reimbursement payments to foster parents, *id*. at 42;
- Inadequate selection, training and supervision of caseworkers, *id*. at 43;
- Excessive caseworker caseloads, turnover and lack of continuity, *id*. at 45;

2

- Inadequate management information system, *id.* at 46;
- Denial of adequate and effective representation, *id.* at 48; and
- Breach of Georgia's contract with the federal government, *id.* at 50.

Lastly, the Complaint asserted eighteen causes of action listed below:

1. Permanent injunctive relief, Dkt.194-2 at 80;
2. Declaratory judgment, *id.* at 82;
3. Substantive due process under the Georgia State Constitution, *id.* at 86;
4. Substantive due process under the United States Constitution, *id.* at 87;
5. First, Ninth, and Fourteenth Amendments to the United States Constitution asserted pursuant to 42 U.S.C. § 1983, *id.* at 90;
6. Right to a properly screened and supervised home, O.C.G.A. § 49-5-12, *id.* at 91;
7. Right to case plans and their implementation and permanent placement, O.C.G.A. §15-11-58, *id.* at 92;
8. The Federal Adoption Assistance Act asserted pursuant to 42 U.S.C. §1983, *id.* at 93;
9. Right to case, protection, training, education and physical, mental and moral welfare, O.C.G.A. §15-11-13, *id.* at 95;
10. Right to schooling, O.C.G.A. §20-2-690.1, *id.* at 96;
11. Nuisance: Georgia common law, *id.* at 97;
12. Breach of contract, O.C.G.A. §9-2-20(b) and Georgia common law, *id.* at 98;
13. Inadequate and ineffective legal representation, due process under Georgia State Constitution and O.C.G.A. § 15-11-98(A), *id.* at 99;
14. Equal protection under the equal protection clause of the Georgia Constitution, *id.* at 100;
15. The Multiethnic Placement Act and the Inter-ethnic Adoption Provisions of 1966 asserted pursuant to 42 U.S.C. §1983, *id.* at 102;
16. Federal Early Periodic Screening, Diagnosis and Treatment Program of the Medicaid Act, asserted pursuant to 42 U.S.C. §1983, *id.* at 103;
17. Procedural due process under the United States Constitution, asserted pursuant to 42 U.S.C. §1983, *id.* at 104; and
18. Litigation expenses, *id.* at 105.

## B.   The Consent Decree.

Following three years of litigation, the parties presented to this Court a comprehensive consent decree on September 19, 2005 to resolve the issues raised

in the Amended Complaint. *See* Dkt.475. This Court approved and signed the proposed consent decree on October 28, 2005. Dkt.488 ("2005 Consent Decree"). There have been no independent conclusions of fact or law by this Court determining that Defendants have violated any applicable constitutional or statutory requirements.

The 2005 Consent Decree governed nearly every facet of Georgia's child welfare system in Fulton and DeKalb counties, including case planning, placement, caseloads, training, and foster parent screening and licensing. The 2005 Consent Decree culminated in 31 "Outcome Measures" ("OMs") by which the Court could track and judge the State's performance in six-month "Reporting Periods." Dkt.488 at 31–38. The 2005 Consent Decree established court-appointed "Accountability Agents" responsible for conducting necessary factual investigation and verification of data to track and monitor the State's compliance with the Consent Decree. *Id*. at 31, 38–39.

The 2005 Consent Decree was subsequently modified. *See* Dkts.612, 687, 740. In 2016, the Parties negotiated the latest Modified Consent Decree and Exit Plan, which the Court approved. *See* Dkts.745 (the "Consent Decree"), 747. This modification reflected the significant and substantial progress in the State's foster care system generally, and specifically with respect to the OMs and reforms initiated pursuant to the 2005 Consent Decree. Notably, the Consent Decree

separates the original 31 OMs into two categories: (1) a group of 21 updated "Ongoing Outcome Measures," and (2) a group of seven "Attained Outcome Measures," and revised language of many of the Ongoing OMs. Dkt.745 at 3–7. The Consent Decree contemplates exit solely by the State satisfying each Ongoing OM for three consecutive Reporting Periods, a year and a half minimum. *Id*. at 7, 23.

Since the Complaint was filed in 2002, Georgia has had four Governors (Barnes, Perdue, Deal, and Kemp); there have been four Presidential administrations (Bush, Obama, Trump, and Biden); and several DFCS Directors. The regulatory and legal landscape has changed as well. In short, the justifications for the Consent Decree can no longer support its continued enforcement.

### III.   LEGAL STANDARD

State Defendants move to terminate the Consent Decree pursuant to Rule 60(b) which provides grounds for relief from final judgment. Specifically, Rule 60(b)(5) permits relief from a judgment where "[i] the judgment has been satisfied, released or discharged; [ii] it is based on an earlier judgment that has been reversed or vacated; *or* [iii] *applying it prospectively is no longer equitable*." Fed. R. Civ. P. 60(b)(5) (emphasis and numbering added). Each of the provision's three grounds for relief are independently sufficient and relief may be warranted even if petitioners

have not completely "satisfied" the original order. *Horne v. Flores*, 557 U.S. 433, 454 (2009).

Consent decrees are final decisions within the meaning of Rule 60(b)(5). *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992); *Jackson v. Los Lunas Cmty. Program*, 880 F.3d 1176, 1190 (10th Cir. 2018) (explaining that consent decrees are subject to Rule 60). However, a court may reopen, modify, or terminate a consent decree when equity so requires. *See Griffin v. Sec'y, Fla. Dep't of Corr.*, 787 F.3d 1086, 1091 (11th Cir. 2015) ("A consent decree ordinarily provides a form of equitable relief that has long been recognized as subject to potential modification by the court in the future."); *Clark v. Hous. Auth. of Alma*, 971 F.2d 723, 725 (11th Cir. 1992). Furthermore, "[m]odification of a consent decree may be warranted when changed factual conditions make compliance with the decree substantially more onerous . . . the decree proves to be unworkable because of unforeseen obstacles . . . or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 384–85 (citations omitted).

Specifically, Defendants move to terminate the Consent Decree because the judgment has been substantially satisfied, and the prospective application is no longer equitable under the first and third ground prescribed in Rule 60(b)(5), and, alternatively, any other justifiable reason under Rule 60(b)(6). The party seeking to terminate a consent decree carries the burden of showing "a significant change in

either factual conditions or the law" from the original judgment that would warrant termination, such as a showing that continued enforcement of the decree is detrimental to public interest. *Rufo*, 502 U.S. at 384; *Horne*, 557 U.S. at 447–48, 454–55. To determine if continued enforcement of a consent decree is "detrimental to the public interest," courts evaluate "changes in the nature of the underlying problem, changes in governing law or its interpretation by the courts, and new policy insights." *Horne*, 557 U.S. at 447–48.

In institutional reform cases like this one, it is "crucial" that courts use a "flexible approach" to evaluate the equities of a motion to terminate a consent decree. *Jackson*, 880 F.3d 1176 at 1201 (citation omitted). The flexible approach is critical because consent decrees in reform cases often remain in effect for protracted periods, increasing the prospect that a significant change in factual circumstances will occur, restricting state and local officials' ability to implement new ideas to old problems, and raising sensitive federalism concerns that are heightened when a decree effectively dictates state or local budget priorities. *Id.* (citation omitted). This flexible approach "seeks to return control to state and local officials as soon as a violation of federal law has been remedied" and to "inquir[e] broadly into whether changed conditions" provide evidence of a durable remedy and compliance with federal law. *Horne*, 557 U.S. 433 at 451; *see also R.C. ex rel. Alabama Disabilities Advocacy Project v. Walley*, 270 F. App'x 989, 992 (11th Cir. 2008) (affirming

7

district court's termination of consent decree where Alabama's child welfare system had "undergone radical changes and was on secure footing to continue its progress in the years to come, without court supervision," even if the system was "not yet perfect and may never be"). Once a durable remedy has been implemented, continued enforcement of the order is not only unnecessary, but improper. *Horne*, 557 U.S. at 450, 451. Durable remedies include state statutes and self-monitoring programs. *Consumer Advisory Bd. v. Harvey*, 697 F. Supp. 2d 131, 138 (D. Me. 2010); *Evans v. Fenty*, 701 F. Supp. 2d 126, 176 (D.D.C. 2010) (acknowledging that "improvements in internal monitoring are critical to the existence of a durable remedy").

Once a movant has met its burden of showing a change in circumstances, the evaluating court must determine whether the requested remedy—termination in this case—is suitably tailored to the changed circumstances. *Rufo*, 502 U.S. at 384, 391. In this analysis, a court must consider that the public interest and principles of federalism require it to defer to state or local government officials and to take into account a state or local government's financial constraints. *Id* at 392. When the changed circumstances show that there are no ongoing violations of federal law, and a durable remedy demonstrating that the improper acts are unlikely to occur again is in place, termination of a consent decree is the suitably tailored remedy. *Horne*, 557 U.S. at 450, 451; *see also City of Rome v. Hotels*, 555 F. Supp. 3d 1314, 1322 (N.D.

8

Ga. 2021) ("If Defendants carry this burden, the Court abuses its discretion if it refuses to modify the Consent Orders in light of the shown changes."). Broadly, the purpose of any consent decree is to remedy a violation of federal law, and once the federal law violation is remedied, the consent decree is no longer proper. *See Horne*, 557 U.S. at 490–91*; see also Milliken v. Bradley,* 433 U.S. 267, 282 (1977); *see also Martin v. MARTA*, No. 1:01-CV-3255-TWT, 2022 U.S. Dist. LEXIS 113212 (N.D. Ga. June 24, 2022) (granting a motion to terminate a consent decree because the defendant complied with federal law, despite not meeting the discrete metrics of a consent order).

In summary, under controlling precedent, a movant must first show that circumstances have changed significantly from the original order due to changes in the factual situation, the applicable law, and/or new policy insights to render continued enforcement of a consent decree inequitable and that the requested remedy of termination is suitably tailored to the change in circumstances. If the movant is no longer in violation of the federal laws contemplated by the original consent decree with a durable remedy in place to protect against future violations of such federal laws, termination of a consent decree is the suitable remedy according to precedent and the notions of equity and justice.

9

## IV.   ARGUMENT

The Consent Decree's continued prospective enforcement is inequitable because (i) the circumstances have changed significantly since the entry of the Consent Decree; (ii) there is no ongoing violation of federal law as contemplated by the Consent Decree; (iii) continued enforcement of the Consent Decree is unjust because it runs afoul of the principles of federalism and unduly binds successors and the political process; and (iv) the basic purpose of the Consent Decree has been achieved.

**A.    There Have Been Significant Changes In Factual And Legal Circumstances And New Policy Insights That Make Continued Enforcement Of The Consent Decree Inequitable.**

The DFCS of 2024 is unrecognizable when compared to the DFCS of 2005, when the Court first entered the original order. In the early 2000s, DFCS was characterized by high caseworker caseloads, caseworker turnover, and other shortcomings, including shortfalls in child safety monitoring, placement and infrastructure resources, information management systems, and case planning and support services. *See* Dkt.486 at 15. The combination of these situations led to negative outcomes for the children of Georgia's foster care system that desperately required identification and redress. *See id*. In the nearly 20 years since the Consent Decree was originally entered in 2005, Georgia has enacted a comprehensive overhaul of its Juvenile Code, DFCS has improved its structure, operations, and

10

policies, and federal oversight of state child welfare systems has dramatically intensified. *Infra* 15–28. For over 19 years, Defendants have implemented numerous improvements and dramatically revitalized Georgia's child welfare services. DFCS is now equipped to protect Georgia's children within a new construct of oversight and accountability, leaving this Court's continued oversight unnecessary. *Infra* 28–33.

**1.    A Significant Change In Circumstances Is Shown By The Dramatic Transformation In The Legal Landscape Regarding Child Welfare Since The Entry Of The Consent Decree.**

Since the Consent Decree was originally entered in 2005, the legal landscape regarding child welfare in Georgia has changed dramatically. In 2013, following years of planning, discussion, diligence and input from a wide variety of stakeholders, the Georgia legislature unanimously passed, and Governor Nathan Deal signed into law, HB 242, which rewrote and streamlined the Juvenile Code. O.C.G.A. §§ 15-11-1 – 15-11-747. The new Juvenile Code made several technical and structural changes and advanced substantive policies bringing "a more developmentally appropriate approach to administering justice for children involved in dependency (abuse and neglect), delinquency, competency, and status offense cases that is based in research and best practice." Melissa D. Carter, *Bending the Arc Toward Justice: The Current Era of Juvenile Justice Reform in Georgia*, 54 GA. L. REV. 1133, 1155 (2020). The new code is "stylistically consistent and reflects a new

organizational structure in which provisions relating to different types of cases are separated into integrated, self-contained sections (or articles)." *Id.* "Substantive [code] provisions" were amended to "comply with federal law, incorporate social science research and best practices, and reflect consensus among practitioners and stakeholders." *Id.* The new 2013 Juvenile Code reformed a variety of subjects, including dependency proceedings, placement of children, reunification determinations, termination of parental rights, children with mental health issues, detention assessments, emancipation of minors, permanency plans for children, and the establishment of the Children in Need of Services ("CHINS") approach. *See* JUSTGeorgia, *2013 Juvenile Justice Reform Legislation: House Bill 242* (2013) (providing a summary of key elements of HB 242).

Over the last decade, the Juvenile Code has reshaped DFCS and its policies into the modernized organization. Broadly, the Juvenile Code led to an increased level of state judicial oversight into the child welfare system and processes that did not previously exist. *See generally* O.C.G.A. §§ 15-11-1 *et seq*. The Juvenile Code provided children with party status, giving them a voice in proceedings whereas before they had none. *See* O.C.G.A. § 15-11-2 (52). The Juvenile Code also entitled children to a court-appointed guardian ad litem in circumstances where the child is before the court without a parent, guardian, or legal custodian capable or willing to make decisions in the best interest of the child. *See* O.C.G.A. § 15-11-476. Further,

12

children now have the right to an attorney during all stages of proceedings under the Juvenile Code. *See* O.C.G.A. § 15-11-103. Each of these changes allows for a child's best interest to be better represented and advanced.

DFCS must comply with newer statutory timeframes relating to petitions for dependency, dependency adjudication hearings, submission of written case plans, and other various hearings and orders, especially as they relate to preliminary protective hearings. *See* O.C.G.A. § 15-11-145. An initial periodic review hearing occurs within 75 days of a child being removed from their home, and additional periodic reviews may be conducted by the Judicial Citizen Review Panel. *Id.* Further, the Juvenile Code established strict timelines for hearings related to permanency plans submitted to the courts. *See id*. No similar provisions previously existed.

The Juvenile Code also created and defined a new category for children, "Children in Need of Services," ("CHINS"), O.C.G.A. § 15-11-2(11), and procedures designed to keep at-risk children out of custody and enable upstream intervention to prevent dependency proceedings. *Id.* §§ 15-11-380 – 15-11-451, 15-11-400, 15-11-404, 15-11-442, 15-11-442.1. CHINS creates a process by which families can receive services and reach resolutions before formal court involvement. *Id*. §§ 15-11-390, 400. For example, in truancy cases, DFCS and others will consider

13

whether there is underlying neglect before considering delinquency proceedings. *See Id.* § 15-11-442.1.

The Juvenile Code impacts how DFCS handles foster care in numerous ways. It mandates that the physical placement of a child upon removal must be approved by the court. *See* O.C.G.A. § 15-11-135. Placement resources and Guardians Ad Litem also must now receive notice of a change in a child's placement and be provided an opportunity to be heard. *See* O.C.G.A. § 15-11-451(b). The Juvenile Code further introduced strict timing requirements and an exhaustive list of what each child's case plan[2] must include. *See* O.C.G.A. §§ 15-11-200 – 15-11-204.

The transformative Juvenile Code totally re-works Georgia's child welfare laws and substantially overlaps with the Consent Decree. Particularly, there is substantial overlap in the Consent Decree's OMs relating to measurements of placement, permanency, and case planning. For example, the Juvenile Code overlaps with OMs 3, 6, 7, and 23. *See* Dkt.786 ("*Period 35 Report*") at 8–9; O.C.G.A. §§ 15-11-230 – 15-11-232. The complete re-work of the Juvenile Code is a substantial change in circumstances that was not foreseen when the Consent Decree was entered. Even the Consent Decree as modified in 2016 did not effectively reflect the changes that were brought about by the enactment of the Juvenile Code because its impact on DFCS was not then known so soon after the law's passage. Because the

---

[2] The case plan is a written document that is a discreet part of the case record.

Juvenile Code overlaps with the Consent Decree, establishes new requirements and oversight, and significantly establishes DFCS' policy, it is a substantial change in circumstances that supports State Defendant's showing of changed circumstances under *Rufo*.

> ### 2. Since Entering The Consent Decree In 2005, DFCS Has Undergone Substantial Changes In Its Structure, Operations, And Policies, Demonstrating A Significant Change In Circumstances.

Since entry of the 2005 Consent Decree, DFCS has improved its structure, operations, and policies, and has remedied many of the long-standing issues that inspired this litigation. Additionally, DFCS has implemented (and continues to implement) a number of system and programmatic improvements: its SHINES system, ARGO Placements, the Centralized Intake Call Center ("CICC"), the Supervisor Mentorship Program, a comprehensive Kinship Care Continuum, and the UniteUs Program. It has also pursued the State of Hope Initiative, strategically allocated its budgets, and implemented many other programs and reforms.

A. In 2009 DFCS implemented the SHINES program, a statewide computer system for all child welfare case records. Affidavit of Mary Havick ("Havick Aff.") ¶ 6 (Exhibit C). Prior to SHINES, all case records were paper based with handwritten notes. SHINES enables DFCS workers across the State to view real-time qualitative and quantitative data relating to its child welfare cases. *Id*. SHINES monumentally impacts the agency's ability to evaluate and optimize its child welfare practice.

Related to SHINES is the ARGO Placement program, which helps staff identify placement options with criteria to uniquely meet each child's needs. *Id*. By implementing SHINES and ARGO Placements, DFCS has advanced its child monitoring beyond that of many states who have yet to reform their systems despite the federal government's requirements.

In 2018, DFCS obtained conditional approval of an "As-Needed Advance Planning Document (APD) Update for SHINES" from the Office of the Administration for Children & Families of the Children's Bureau ("Children's Bureau") and provided notice of its intention to transition SHINES to meet Comprehensive Child Welfare Information System ("CCWIS") requirements outlined at 45 C.F.R. 1355.50-58. Havick Aff. ¶ 7. Now in the eighth year of CCWIS implementation, the Children's Bureau helps States plan, develop, and implement child welfare reporting systems to enable data collection and analysis of important information about children and families. *Id*. ¶ 8. DFCS continues to make improvements and upgrades to SHINES and to maintain it as an operational statewide automated child welfare information system in transitional CCWIS status. *Id*. ¶ 10; *CCWIS Status of Child Welfare Information Systems* (June 30, 2024)[3] (noting that none of the 48 states or territories have fully implemented an operational

---

[3]  Available at https://www.acf.hhs.gov/cb/training-technical-assistance/ccwis-status (all websites last accessed September 10, 2024).

system or project designated a CCWIS). Work on transitioning the existing automated functions of SHINES to a CCWIS will continue.[4]

B. In 2014 DFCS implemented the CICC program to address the growing need for a statewide child abuse and neglect reporting hotline to improve customer service with the community when reporting alleged abuse and neglect as well as to standardize the Intake Assessment process. Affidavit of Candice Broce ("Broce Aff.") ¶ 5 (Exhibit B). The centralized hotline created one emergency phone number for child abuse reporting in Georgia. *Id*. ¶ 6. Prior to CICC's implementation, each county office had its own phone number manned by staff at the county level. Broce *Id*. The hotline is now staffed centrally and handles tremendous volume. *Id*. For the State Fiscal Year ("FY") 2023-2024, CICC handled 26,995 emails, 35,458 webforms, and 123,645 phone calls, totaling 186,098 interactions, resulting in 152,672 intake reports entered in the SHINES system. *Id*.

C. In 2015, in response to the Governor's Child Welfare Reform Council's recommendation, DFCS created the Supervisor Mentor Program. Havick Aff. ¶ 11. The program provides focused, one-on-one mentoring to new supervisors and to more veteran supervisors who may be in need of additional support. *Id*. The goal of

---

[4] SHINES is pending transitional CCWIS compliance per a required site visit from the Children's Bureau Administration for Children and Families (ACF). ACF needs to conduct both the site visit and interviews with DFCS employees before granting CCWIS compliance to SHINES. Due to the pandemic, ACF's site visits were postponed.

mentoring is to enhance the capabilities of supervisory staff so that they can perform their duties more effectively. *Id.*

D. In 2015, DFCS began the development of a comprehensive Kinship Care Continuum ("Continuum") to improve outcomes for children by reducing incidents of substantiated abuse or neglect, shortening the length of time in custody, and reducing reentry to foster care. *Id.* ¶ 12. The Continuum created positions for experienced foster and adoptive parents to serve as caregiver navigators supporting existing caregivers or prospective caregivers going through the onboarding process. *Id.* The caregiver navigators respond to questions online[5] and on the phone,[6] and answer questions regarding the on-boarding process. *Id.* Each prospective caregiver who completes the state office information session receives a welcome email from their assigned navigator. *Id.* The email provides the contact information and reminds caregivers to connect with the navigator if they have questions/concerns. *Id.*

E. Since 2018, DFCS has pursued its State of Hope initiative. *See* Georgia Department of Human Services Division of Family and Children Services*, State of Hope* (September 12, 2024).[7] The State of Hope seeks to activate nonprofits, philanthropies, government agencies, businesses, and other community members to collaborate to build local safety nets that will prevent conditions that contribute to

---

[5] Via fostergeorgia.com.
[6] Via 1877-210-Kids.
[7] Available at https://dfcs.georgia.gov/about-us/state-hope.

disparities in education, threaten a family's self-sufficiency, and could lead to child abuse and neglect. *Id.* The State of Hope aims to create an environment that keeps children out of the foster care system in the first instance. *See id.* It ultimately has established an ecosystem of over 250 designated sites throughout Georgia that are actively engaged in positively impacting child well-being in their communities through the State of Hope's four focus points—education, trauma-awareness, quality caregiving, and economic self-sufficiency. *Id.*

F. DFCS formed a specialized team of healthcare attorneys and legal professionals in 2022 to ensure access to timely care for children in custody through enforcement and appeals with contracted and non-contracted providers. Broce Aff. ¶ 9. This Office of Health Law and Policy meets monthly with the executive leadership of both the State Medicaid Agency and Amerigroup, which administers Georgia Families 360° for children in foster care and receiving adoption assistance, to discuss any issues regarding the continuum of care, medical necessity, coverage denials, and similar functions. *Id.* The Office of Health Law and Policy directly assists DFCS county offices and caseworkers to file appeals where there has been a denial of medically necessary treatment, and the team continues to represent the interests of the foster child who is affected by the denial of medical services until conclusion of the matter. *Id.* Additionally, this team allows State Defendants to now track all CMO decisions and actions affecting medical treatment on a daily and

monthly basis and provides tracking data on those foster children most affected by the denial of medical services. *Id*. ¶ 10. Due to these efforts, the State Defendants have successfully re-opened access to medical care for thousands of foster children annually. *Id*.

G. DFCS has also contracted with UniteUs, a software and service platform that reduces costs, streamlines processes, and coordinates resources, to foster connectivity and streamline the delivery of social care services. *Id*. ¶ 11. Included in the UniteUs program is an upgraded case assessment and management platform, a new family self-referral form, and a data-centric analysis tool that helps identify where to allocate resources. *Id*. The UniteUs program also connects DFCS case management to community organizations, such as service boards, schools, interagency planning teams, and the court system, providing multi-agency collaboration and synchronicity. *Id*. ¶ 12. Additionally, UniteUs offers a closed-loop referral system for juvenile court judges and staff to refer at-risk families with Child in Need of Services (CHINS) cases to community providers to mitigate vulnerabilities, including bases for possible dependency and removal of the children, and families can also access this system via online self-referrals. *Id* ¶ 13. This pilot is expected to keep countless families safely intact by lessening the need for their children to enter protective custody. *Id*. DFCS is implementing UniteUs in Region 14 and in select counties across the state. *Id.* ¶ 12.

H. Recognizing competing priorities, the State has significantly enhanced portions of DFCS's budget to improve and ensure manageable caseloads in Fulton and Dekalb counties. To address workforce and caseloads, the State has increased salary and funding to add 453 Child Protective Services caseworkers over the last several years totaling $55.7 million in additional state funds to the program. HB 682 (FY 2018A), Senate.gov, 17 (Feb. 1, 2018).[8]  For FY2018, $25.9 million in state funds were allocated for an average 19% salary increase for caseworkers to help with recruitment and retention. *Id.* For FY2017, $7.3 million in state funds were allocated for an additional 175 child protective service positions. *Id.* For FY2016, $5 million in state funds was allocated to annualize 103 positions added during FY2015 as well as $7.5 million for 175 new child protective service positions. *Id.* $5 million was added to implement ladders and performance-based increases for caseworkers and supervisors. *Id.* Finally, for FY2015 $5 million added in the supplemental for 103 new positions (76 caseworkers and 27 supervisors). *Id.* DFCS and the State also implemented numerous other programs, policies, and improvements to rectify the issues identified in the early 2000s, including: implementation of the Fostering Connections and Strengthening Families Act (2010), Preventing Sex Trafficking and Strengthening Families Act (2015), and Families First Prevention Services Act

---

[8] Available at https://www.senate.ga.gov/sbeo/Documents/Appropriations Documents/FY2018/Amended/FY18A_HAC_HumanDevelopment.pdf.

21

(2018); a new Practice Model informed by Solution Based Casework (2016); new initial safety assessments (2016); creation of Safety, Permanency, and Well-Being teams (2009); revitalization of the Office of Provider Management; and many others.

Governor Kemp's Administration and the Georgia Legislature have significantly increased funding for state employee pay, benefits, preventative services and programs, and similar initiatives to strengthen families. Additionally, they continue to dramatically increase base funding to DFCS, providing new funding for provider rate increases for foster homes, relative caregivers, and congregate care providers; clothing allowances for children in state custody; pilots for in-home intensive interventions, the UniteUs program, and autism respite care; expansion of statewide access to court-appointed special advocates; technology advancements for improved case management; and annual cost-of-living increases, with the highest increases in pay going to the lowest-salaried workers, many of whom serve on DFCS's frontline protecting children and preserving families. The Governor and Georgia Legislature allocated $1,537,644,067 in FY2024 to Georgia DFCS. HB 19, 2023 Session. The Legislature also amended the FY2024 budget to provide for a one-time $1,000 salary supplement to employees in adoptions, child abuse and neglect prevention, child welfare services, and federal benefits services, and increased the final FY2024 budget to $1,627,209,181. HB 915, 2024 Session. For FY2025, the Legislature increased the budget to $1,652,027,042. HB 916, 2024

Session. This new budget includes a 4% raise, capped at $3,000 per employee, for all DFCS employees, county customer service staff, another rate increase (3%) for foster care and guardianship caregivers, funding for child advocacy centers to expand mental health services and forensic interviewing, and increased funds for technology upgrades and improvements to SHINES. *Id*. The Legislature specifically targeted caseworkers and provided an additional $3,000 salary enhancement to child protection and placement services caseworkers. *Id*. The vast range of improvements to the structure, operations, and policies of DFCS show a significant change in circumstances that supports State Defendants' showing of changed circumstances under *Rufo*.

3.      **There Is A Dramatically Increased Level Of Federal Oversight Of State Child Welfare Systems That Constitutes A Substantial Change Of Circumstances.**

The federal government has dramatically increased its oversight of state child welfare systems since the 2005 Consent Decree. The U.S. Department of Health and Human Services' Children's Bureau is involved in the regulation of state child welfare systems through its Child and Family Services Reviews ("CFSR") program. Through CFSR, the Children's Bureau ensures conformity with federal child welfare requirements, determines the effect of child welfare services on children and families, and assists states in enhancing their capacity to help children and families

23

achieve positive outcomes. *See* Children's Bureau Child and Family Services Reviews Fact Sheet.[9]

According to CFSR's fact sheet, "[t]he 1994 Amendments to the Social Security Act authorize[d] the U.S. Department of Health and Human Services to review state child and family service programs to ensure conformity with the requirements in Titles IV-B and IV-E of the Social Security Act." *Id*. The Children's Bureau, part of the Department of Health and Human Services, administers the review system, known as the Child and Family Services Reviews. In 2000, the Children's Bureau published its initial final rule in the Federal Register to establish a process for monitoring state child welfare programs. *See* Round 4 Child and Family Services Reviews Fact Sheet, HHS.[10] Under the rule, states are assessed for substantial conformity with federal requirements for child welfare services. *Id*. In response, all 50 states, the District of Columbia, and Puerto Rico completed their first review by 2004 and their second review by 2010. General Findings from the

---

[9] Available at https://www.acf.hhs.gov/sites/default/files/documents/cb/cfsr_general_factsheet.pdf.
[10] Available at https://www.acf.hhs.gov/sites/default/files/documents/cb/CFSR_General_Fact_Sheet.pdf.

Child and Family Services Review, HHS[11]; Rounds 1 and 2 of the CFSRs, Children's Bureau (June 30, 2024).[12]

Each round of CFSR evaluates state performance on seven systemic factors, including (1) the state-wide child welfare information system; (2) the case review system; (3) the quality assurance system; (4) staff and provider training; (5) the service array and resource development; (6) the agency's responsiveness to the community; and (7) foster and adoptive parent licensing, recruitment, and retention. *Id*. The CFSR process requires a statewide assessment of systemic issues contributing to review performance along with root cause analysis.

After each round, states that do not pass CFSR—and no state has ever passed—must propose a PIP. *See* Round 3 of the CFSRs, Children's Bureau (June 30, 2024) (displaying a PIP for each state).[13] These PIPs are comprehensive plans that set forth a state's goals and identify the action steps that will be taken to meet those goals. *See* Child Welfare Capacity Building Collaborative, *Child and Family Services Review Program Improvement Plan Development, Implementation, and*

---

[11] Available at https://www.acf.hhs.gov/sites/default/files/documents/cb/summary_of_the_results_of_the_2001_2004_cfsr.pdf.

[12] Available at https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews/rounds1-2.

[13] Available at https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews/round3#map_states_text_data.

*Monitoring* (September 12, 2024).[14] A PIP is required for every item on the review that is not in substantial compliance. Child and Family Services Review Technical Bulletin #5, HHS (Nov. 9, 2010).[15] Financial penalties are associated with failure to successfully complete the PIP. *Id.* States that do not complete all of the requirements of the PIP are at risk of being heavily penalized by the withholding of federal funds. *Id.*

Since the 2005 Consent Decree, Georgia has completed four rounds of CFSR. Havick Aff. ¶ 13. Georgia conducted a state-led case record review which was completed on March 31, 2024. *Id.* The PIP development process for the fourth round is expected to begin in the coming months. *Id.*

In addition, the Administration for Children and Families requires each state requesting Title IV-B funds to submit a "Child and Family Services Plan" every five years along with annual updates in order to receive federal funding under Title IV-B.[16] Georgia DHS, Federal Review and Plans.[17] While the "Child and Family Services Plan" is not technically associated with CFSR, it is yet another federal oversight requirement with which the State must conform and comply. DFCS has

---

[14] Available at https://capacity.childwelfare.gov/about/cb-priorities/cfsr-pip-development.

[15] Available at https://www.acf.hhs.gov/sites/default/files/documents/cb/cfsr_tb5.pdf.

[16] Georgia recently submitted its fifth plan submission under the CFSP since the Consent Decree was entered in 2005.

[17] Available at https://dfcs.georgia.gov/data/federal-reviews-and-plans.

multiple teams of staff dedicated to ensuring compliance with federal oversight requirements. Havick Aff. ¶¶ 15, 22.

The CFSR, Child and Family Services Plan, and its related monitoring represent the comprehensive level of federal oversight and scrutiny of state child welfare systems which was not contemplated by the Consent Decree due to the CFSR's infancy during initial negotiations. The level of federal oversight and scrutiny that state child welfare systems are subject to and comply with today simply did not exist when the Consent Decree was originally entered. As such, there is substantial, if not complete, overlap between topics and areas covered by CFSR, Child and Family Services Plan, and the Consent Decree.

Taken together, the enactment of a comprehensive Juvenile Code, the transformations to DFCS' structure, operations, and policies, and the aggressive regime of federal oversight and scrutiny constitute circumstances that have changed significantly since this Court entered the Consent Decree in 2005. Accordingly, the significant change in factual conditions, law, and new policy insights, render Defendants' compliance with the Consent Decree redundant. By either duplicating the work already being done or imposing marginally pertinent additional requirements, continued enforcement of the Consent Decree would be detrimental to the public interest, necessitating termination.

### 4. State Defendants' Self-Monitoring Exceeds The Requirements Of The Consent Decree.

Since the Court began oversight in 2005, State Defendants have implemented several programs that have made the Consent Decree monitoring redundant, costly, and vestigial. Havick Aff. ¶ 14. Several of these programs have been described above, including the SHINES program. State Defendants have also created new departments and implemented new programs to comply with federal mandates. *Id.* One meaningful example is the Federal Regulations and Data Section ("FRD Section"), which was created around 2010, and comprises internal and external stakeholders. *See* Federal Regulations and Data, Georgia Department of Health and Human Services[18]; Havick Aff. ¶ 15. This FRD Section includes the Data Analysis unit; Accountability, Research, and Evaluation unit; Office of Quality Management; SHINES; and Data Integrity unit. *See* Federal Regulations and Data, Georgia Department of Health and Human Services; Havick Aff. ¶ 15. These monitoring groups "produce quality data and analyses that are subsequently used to inform decision making and drive systemic change." *See* Federal Regulations and Data, Georgia Department of Health and Human Services; Havick Aff. ¶ 15. These programs are not only significant changed circumstances in their own right but are

---

[18] Available at https://dfcs.georgia.gov/data/federal-regulations-and-data.

also durable remedies that will ensure State Defendants' continued compliance with federal law and federal and state constitutions.

DFCS additionally satisfies self-monitoring requirements through its Continuous Quality Improvement ("CQI") program. CQI identifies key performance indicators as the fundamentals of child welfare practice through continuous evaluation. Havick Aff. ¶ 16. Each region has an assigned Quality Assurance ("QA") Specialist to assist the CQI teams with educational needs related to CFSR. *Id*. CQI teams include frontline staff and supervisors, county leadership, and the regional C3 Coordinator. CQI teams are operational in all fourteen regions and CICC. *Id*. CQI teams use Gilbert's Behavior Engineering Model to conduct root cause analysis. *Id*. ¶ 16. This model includes six categories within two domains: Environment (Expectations and Feedback; Tools and Resources; and Incentives and Consequences) and Individual (Knowledge and Skills; Capacity; and Motivation). *Id*. Each team also uses a Performance Improvement Process planning worksheet to develop and evaluate strategies. *Id*.

This CQI process consists of five phases: Performance Analysis, Cause Analysis, Intervention Selection and Development, Implementation and Change Management, and Evaluation. *Id*. ¶ 18. When developing interventions, CQI teams create a Quality Improvement Plan ("QIP"). *Id*. ¶ 17. Once the performance problem and cause have been analyzed, the CQI strategy is included in the QIP, as well as

how it will be measured, and its expected outcome. *Id*. DFCS trains individual teams on an "as-needed" basis to ensure they understand and can effectively use CQI tools and resources. *Id*. DFCS identified key performance indicators including: (1) <u>Timely Investigations</u>—investigations are completed within 45 days to ensure a timely transfer to needed supportive services, as appropriate, and to minimize agency intrusiveness when services are not appropriate, with a minimum goal of 95%. *Id*. ¶ 19. (2) <u>Timely Family Support Services</u>—family support services are completed within 45 days to ensure a timely transfer to needed supportive services, as appropriate, and to minimize agency intrusiveness when services are not appropriate, with a minimum goal of 95%. *Id*. (3) <u>Response Times</u>—consistent with the CFSR, assigned priority response times are met in all assigned intakes to assess initial safety and to initiate the larger assessment and provision of services, with a minimum goal of 95%. *Id*. (4) <u>Every Child, Every Month</u>—another federal requirement for children in Foster Care is Every Child Every Month, which is a quantitative measure of monthly visits between the child and the case manager. DFCS tracks this standard for children in Family Preservation cases as well. All children should be seen monthly (at a minimum) to ensure his or her safety and to assess and impact well-being and permanency with a minimum goal of 95%. *Id*. (5) <u>Every Parent, Every Month</u>—consistent with the CFSR, every parent or caretaker in Foster Care and Family Preservation Services is seen monthly (at a minimum) to ensure safety

30

management and behavioral change management through case planning with a minimum goal of 95%. *Id*. (6) <u>Monthly Case Staffing</u>—every case is staffed with the assigned case manager to provide guidance and consultation with a minimum goal of 95%. *Id*. (7) <u>Collateral Contacts</u>—additional sources of information are collected and leveraged monthly to assist with the assessment and management of safety and behavioral change through case planning, with a minimum goal of 95%. *Id*.

In 2015, DFCS created the role of C3 Coordinator to designate one staff person in each region to coordinate activities and ensure connection between the Child and Family Service Plan ("CFSP"), CFSR and CQI. *Id*. ¶ 20. The C3 Coordinator understands each of these strategic planning activities, helps others to understand this work, and tracks and monitors the region's progress toward goals in each area. *Id*. The C3 Coordinators receive and obtain feedback regularly from service providers in the region who attend stakeholder meetings and share experiences of families receiving services. *Id*. This feedback assists in monitoring and improving service provisions, and provides support for C3 Coordinators to educate staff on available services. *Id*. New service providers attend these stakeholder meetings as an introduction to staff and other providers. *Id*. The C3 Coordinators are able to connect providers to each other and enhance partnerships and collaborations. *Id*. Regional CQI teams analyze CFSR data and performance to

develop specific strategies to improve outcomes. *Id.* ¶ 18. The strategy is included in the regional QIP, the measurement of the QIP, and its expected outcome. *Id.* Every CQI team develops a mechanism in measuring the progress of a strategy. *Id.* In most cases, CQI teams are completing random monthly regional case reviews to verify the strategy is being used and used with fidelity. *Id.* Case reviews provide indicators that assess whether the strategy is working as intended, or identify areas where modifications may be warranted. *Id.*

In addition to the internal DFCS self-monitoring, the Office of the Child Advocate provides independent oversight of persons, organizations, and agencies responsible for providing services to or caring for children who are victims of child abuse and neglect, or whose domestic situation requires intervention by the state, including State Defendants. *See* O.C.G.A. § 15-11-741; *see also* O.C.G.A. § 15-11-743. Specifically, the Office of the Child Advocate independently oversees cases that involve a child who has received protective services from DFCS, for whom DFCS has an open case file, or who has been, or whose siblings, parents, or other caretakers have been, the subject of a report to DFCS within the previous five years. O.C.G.A. § 15-11-741(3).

The State Defendants' vast self-monitoring regime and the OCA significantly overlap with the subjects and metrics contained within the Consent Decree. As such,

the Court's continued enforcement of the Consent Decree is a redundant and unnecessary expense covering the same ground State Defendants already monitor.

## B. There Is No Ongoing Violation Of Federal Law That Would Support Continued Enforcement Of The Consent Decree.

State Defendants are not violating any federal law contemplated by the Consent Decree. The Consent Decree responds to thirteen substantive federally based claims against the State Defendants, divisible into two categories: (i) alleged constitutional violations ("Constitutional Claims") and (ii) alleged violations of federal statutes. Dkt.194 at 80–105. The alleged constitutional violations can be further divided between substantive due process, procedural due process, the Equal Protection Clause, and the First, Ninth, and Fourteenth Amendment liberty, privacy, and associational rights ("Familial Rights"). *Id.* Regardless of the state of affairs as they existed almost 20 years ago, it cannot be said that Defendants are in violation of constitutional or statutory standards to justify the continued oversight of the Court.

### 1. State Defendants Do Not Violate Plaintiffs' Substantive Due Process Rights.

A. Plaintiffs asserted their Substantive Due Process claims under 42 U.S.C. § 1983. Dkt.193 at 2. For the State Defendants to be liable under § 1983, there must be in place a custom, policy, or practice that violates the Plaintiffs' rights under

federal law. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Los Angeles Cnty. v. Humphries*, 562 U.S. 29, 30–31 (2010).

Courts evaluate violations of constitutional rights under the deliberate indifference standard or the professional judgment standard. *See* Taylor C. Joseph, *Revitalizing the* Youngberg v. Romeo *Professional Judgment Standard to Require Trauma-Informed Care For Detained Children*, 81 MD. L. REV. 1329, 1330 (2022) ("There are two available options [for a constitutional standard for adequate treatment of children]: the . . . 'deliberate indifference' standard . . . and . . . 'professional judgment standard.'"). This Court previously decided the professional judgment standard should apply to analysis of the Constitutional Claims, Dkt.410 at 10, but this conclusion was contrary to Eleventh Circuit precedent existing at the time, *Taylor v. Ledbetter*, 818 F.2d 791, 794 (1987) (en banc), and that has been developed since, *see, e.g.*, *H.A.L. ex rel. Lewis v. Foltz*, 551 F.3d 1227, 1231 (11th Cir. 2008); *Davis v. Carroll*, 805 Fed. Appx. 958, 962 (11th Cir. 2020).

Under the professional judgment standard, state officials may be liable for decisions that are "such a *substantial departure* from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." Dkt.410 at 6 (emphasis added) (quoting *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982)). In contrast, deliberate indifference "is not the same thing as negligence or carelessness;" but

occurs when "a state official acts with deliberate indifference [and] only when he disregards a risk of harm of which he is actually aware." *Ray v. Foltz*, 370 F.3d 1079, 1083 (11th Cir. 2004). Ultimately, there is no appreciable difference between the two standards in the context of foster care analysis. *See Yvonne L v. New Mexico Dep't of Human Servs*., 959 F.2d 883, 894 (10th Cir. 1992) ("As applied to a foster care setting we doubt there is much difference in the two standards. 'Failure to exercise professional judgment' does not mean mere negligence as we understand *Youngberg*; while it does not require actual knowledge the children will be harmed, it implies abdication of the duty to act professionally in making the placements." (citation omitted)); *Connor B. ex rel. Vigurs v. Patrick*, 771 F. Supp. 2d 142, 162 n.4 (D. Mass. 2011). Under either standard, the State Defendants are not violating the constitutional rights of Plaintiffs or anyone else the Consent Decree covers.

Importantly, the legal standard is not whether the State Defendants have achieved the Consent Decree's requirements, but whether there are any current violations of constitutional rights or federal law that were in existence at the original judgment. *Horne*, 557 U.S. at 454; *see also LaShawn v. Fenty*, 701 F. Supp. 2d 84, 110 (D.D.C. 2010) ("[T]he Court may accept a level of compliance that falls short of these benchmarks as sufficient (especially in light of significantly changed circumstances), even over the plaintiffs' objection."); *John B. v. Emkes*, 710 F.3d 394, 398, 413 (6th Cir. 2013) ("Consent decrees are not entitlements. Instead, a

decree may remain in force only as long as it continues to remedy a violation of federal law."); *Sierra Club v. U.S. Dep't of Agric.*, No. 94-CV-4061-JPG, 2013 WL 811672, at *5 (S.D. Ill. Mar. 5, 2013) (quoting *Horne*, 557 U.S. 433, 450 (2009)). Consent decree requirements often overreach beyond what the Constitution requires. *See Horne*, 557 U.S. at 448 ("[T]he dynamics of institutional reform litigation differ from those of other cases. Scholars have noted that public officials sometimes consent to, or refrain from vigorously opposing, decrees that go well beyond what is required by federal law."). Furthermore, the Court considers a movant's good faith effort to comply with a consent decree. *Rufo*, 502 U.S. at 668.

B. Plaintiffs claimed the "State Defendants substantially depart[ed] from minimal professional standards for ensuring foster children's safety by failing to (1) adequately investigate and respond to allegations of abuse, (2) ensure reasonable caseloads for caseworkers, (3) ensure that caseworkers regularly visit foster children to monitor their safety, (4) provide consistent casework services, (5) maintain accurate and timely casework documentation, and (6) adequately screen and approve foster homes." Dkt.410 at 11. Plaintiffs further argued that, in deviating from the professional standard, State Defendants placed children in (7) inappropriate and (8) overcrowded homes, (9) unnecessarily shuffled children from one unsuitable home to another, and failed to provide (10) temporary placements and reimbursement rates, (11) medical, dental, and mental health services to foster children, (12) timely

36

case plans and services necessary to facilitate prompt reunification of children with their families or (13) to achieve prompt adoptions. *Id* at 12. The Consent Decree established measurements to determine the remedy of the supposed violations, as shown in Table 1 below.

**Table 1.**

| | Plaintiff's Federally-Based Grievances | Corresponding Outcome Measure(s) | Attained Measures | Ongoing Measures |
|---|---|---|---|---|
| 1. | Investigation and response to allegations of abuse | 1, 2 | 2 | 1 |
| 2. | Reasonable caseloads for caseworkers | N/A (Exit Plan Section V) | | |
| 3. | Regular visits from caseworkers to monitor safety of foster children | 13, 15, 26 | 13, 15, 26 | |
| 4. | Consistent casework services | 12 | | 12 |
| 5. | Maintaining accurate and timely casework documentation | 19 | 19 | |
| 6. | Adequately screening and approving foster homes | 4, 22 | 4, 22 | |
| 7. | Appropriateness of foster homes | 4, 18, 22 | 4, 18, 22 | |
| 8. | Overcrowdedness of foster homes | 28 | 28 | |
| 9. | Shuffling of foster children between homes | 11 | | |
| 10. | Placement | N/A (Exit Plan Section IV) | | |
| 11. | Providing of education, medical, dental, and mental health services as mandated by professional standards of care | 17, 21(a)–(d), 27 | 17 | 21(a)–(d), 27 |
| 12. | Reunification/familial relations | 5, 10, 14, 16, 25 | 5, 10, 14, 16, 25 | |
| 13. | Permanency | 3, 6, 7, 8, 9, 20, 23, 24 | 7, 8, 9, 20, 24 | 3, 6, 23 |

Dkt.787 ("*Period 36 Report*").

The OMs exceed the compliance threshold for constitutional rights and federal laws with regard to the professional judgment or deliberate indifference standards.[19] Of the 31 OMs remaining in the current modified consent decree, State Defendants have attained 21 OMs, *Period 36 Report* at 17.  As a result, there are only 10 Ongoing OMs. None of these rise to a level of violation of federal law.

The OMs were drafted in response to Plaintiffs' constitutional claims, and the ten Ongoing OMs correspond to only six of Plaintiffs' constitutional claims. These are: (1) appropriate reimbursement rates for foster care and placements for children (evaluated under Section IV of Consent Decree); (2) reasonable caseloads for caseworkers (evaluated under Section V of Consent Decree); (3) investigation and response to allegations of abuse (OM 1); (4) consistent casework services (OM 12); (5) provision of medical, dental, and mental health services as mandated by professional standards of care (OMs 21(a)–(d) and 27); and (6) achievement of permanency outcomes (OMs 3, 6, and 23).[20]

---

[19] The Court never determined what, if any, federal law violations existed, and it is likely some, if not most or even all, of the OMs do not actually cover alleged federal law violations. *See infra* 39–53.

[20] Permanency claims were brought under the federal Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997 (collectively the "AACWA") and the regulations promulgated under the Act, 45 C.F.R. Parts 1355–57. Dkt.194 at 100–03; *infra* 51–52.

State Defendants do not violate any federal or constitutional law under these remaining measurements and so this Order must be terminated. *Horne*, 557 U.S. 433 at 451. There is no custom, policy, or practice of State Defendants that is a substantial departure from the professional judgment standard for these claims. *Infra* 39–53. And there certainly is no deliberate indifference to concerns raised. *Supra* 15–23.

      **(a)**    **Appropriate Reimbursement Rates For Foster Care And Placements For Foster Care Children (Section IV Of Consent Decree).**

While not tied to a specific OM, Section IV of the Consent Decree requires that State Defendants reimburse foster parents for maintenance payments related to basic foster family services at specified rates, *Consent Decree* at 5–6, and comply with all reimbursement criteria. *See* Period 33 Report at 37–38[21]; Affidavit of Melissa Barwick ("Barwick Aff."), ¶ 4 (Exhibit C). Additionally, State Defendants have implemented new customs, policies, and practices regarding temporary placements of foster children to ensure continued compliance with the professional judgment standard. *See supra* 15–33. Far from being deliberately indifferent, State Defendants have increased reimbursement rates as recently as July 1, 2024 when funds were appropriated to increase all per diem rates by 3%. Barwick Aff. ¶ 4.

---

[21] The Period 34 and 35 Reports do not mention reimbursement rates outside of the context of OM 27.

Between SFY2016 and 2025, average per diem rates have increased by 81.9% for DFCS Family Foster Homes and Child Placing Agencies and 17.2% for Child Caring Institutions. *Id.* Agency administrative rates paid to Child Placing Agencies increased by 17.9% in the same time frame. *Id.* To the extent Plaintiffs assert more should still be done regarding reimbursement rates, their protests implicate the kind of entanglement with State budgetary and policy debates the federal courts seek to avoid. *Horne*, 557 U.S. at 447–48, 454–55.

### (b)  Reasonable Caseloads For Caseworkers (Section V Of Consent Decree).[22]

Section V of the Consent Decree sets forth the maximum number of cases that may be assigned to caseworkers, Dkt.745 at 22, but the Consent Decree's criteria for caseworker caseload are stricter than the national average and greatly exceed the constitutional threshold. *See* Research Summary: Caseload Standards & Weighting Methodologies, Joanne Chen, Academy for Professional Excellence (Oct. 2019) (listing multiple studies showing (i) a minimum caseload of 13 to 24 cases per worker, (ii) a ratio of 12 to 15 children per caseworker, (iii) a maximum of 18

---

[22] The standards for Section V, as summarized by Section 35 Report, are "No CPS case manager shall have more than 12 cases. No ongoing case manager shall have more than 17 cases. No placement case manager shall have more than 15 cases. No adoption case manager shall have more than 16 cases. No specialized case manager shall have more than 12 cases. No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties." *Section 35 Report* at 27.

children caseworker, (iv) and range of 10 to 110 children with caseworkers handling an average of 24 to 31 children per caseworker).[23] Most of State Defendants' caseworker caseloads meet the Consent Decree requirements and the caseloads that do not meet the Consent Decree requirements are still in substantial compliance with constitutional customs, policies, and practices of the national standards. *Period 36 Report* at 36–37 (reporting that 82% and 65% of Fulton County and DeKalb County case managers, respectively, met the designated cap). State Defendants have also implemented policies to reduce child per caseworker numbers and have shown increased performance with their good faith effort. *See supra* 15–23; 28–33.

### (c)   Investigation And Response To Allegations Of Abuse (OM 1).

State Defendants timely respond to allegations of abuse. OM 1 requires that at least 95% of all investigations of reports of abuse or neglect of foster children be commenced within 24 hours of receipt of the report, in accordance with Chapter 6 of DFCS Child Welfare Policy Manual. Dkt.745 at 22. State Defendants have 88.9% compliance as of Period 36. *Period 36 Report* at 30; Barwick Aff. ¶ 5. Actual compliance is higher than the Period 36 Report represents, because three of the eight missed responses were caused by delayed reporting of the incident by non-DFCS individuals outside the control of State Defendants, Barwick Aff. ¶ 5. Barwick Aff.

---

[23] Available at https://theacademy.sdsu.edu/wp-content/uploads/2021/10/CWDS-Research-Summary_Caseload-Standards-and-Weighting.pdf.

¶ 5. So, while this number falls short of OM 1, it is lower than State Defendants' actual compliance. Barwick Aff. ¶ 5. Regardless, State Defendants still comply with constitutional requirements.[24]

In reality, there is no set standard for when investigations must commence. Benchmarks vary across the U.S., and standards are often dependent upon the kind of abuse and neglect reported and the risk involved. For example, Texas's state foster care system uses a shorter timeline for children who face "death or serious harm" due to a safety threat (24 hours) than those foster children facing "substantial harm" due to a safety threat (72 hours). *M.D. v. Abbott*, 907 F.3d 237, 276 (5th Cir. 2018). Another court found a 91% achievement rate acceptable to exit a consent decree, but with the requirement of a 48-hour response time and noted that the percentage of initiated cases measurement failed to account for good faith attempts. *Fenty*, 701 F. Supp. 2d at 104–05.

Under the Consent Decree, State Defendants are likely subject to the strictest court-mandated investigation requirement in the Nation. Additionally, the variations between the degrees of abuse and response time demonstrate that OM 1's 95% standard is too unforgiving and too broad to use as a constitutional measurement.

---

[24] OM 1, previously an Attained Measure, was moved to an Ongoing Measure is because it was "impacted by the lower number of children in custody and lower number of children subject to investigations, both of which are positive for children in Region 14 . . ." Dkt.783 at 20.

The Consent Decree requires a 24-hour investigation for *all* reported violations. The Consent Decree's requirement that State Defendants must respond in 24 hours for all cases—when other courts have determined that a 48- or 72-response time and a good faith effort are constitutionally sufficient, *supra* 42—clearly extends State Defendants' requirements beyond what is necessary to comply with the Constitution. State Defendants' 88.9% response rate—which excludes good faith efforts and non-urgent incidents—proves that State Defendants' customs, practices, and polices substantially comply with, and are in no way deliberately indifferent, to the Constitution despite not reaching the lofty standard of the Consent Decree.

### (d)     Consistent Casework Services (OM 12).

State Defendants provided consistent casework services to Plaintiffs to increase child outcomes up through COVID-19 when the metrics first faltered, but the State Defendants still meet the constitutional standards. *Period 36 Report* at 20–21. The Consent Decree measures State Defendants' progress via OM 12 which requires at least 90% of children in Defendants' custody at any point in time have 2 or fewer DFCS placement case managers during the prior 12 months in custody. *Id*. The purpose of OM 12 is to provide consistent caseworker services at the individual level by minimizing caseworker turnover.

Consistent casework service[25] is a near-impossible number to quantify. *See* Megan Paul, et al.*, Worker Turnover is a Persistent Child Welfare Challenge - So is Measuring It* (Jan. 24, 2022)[26]; Casey Family Programs, *How does turnover in the child welfare workforce impact children and families?* Aug. 29, 2023.[27]   As such, turnover statistics vary significantly. *See, e.g.*, QIC-WD, *Strategies to Improve Child Welfare Worker Retention*, May 18, 2020 (national average caseworker turnover rate of 30% with individual agencies ranging from 6.1% to 65% turnover)[28]; Frank Edwards and Christopher Wildeman, *Characteristics of the Front-Line Child Welfare Workforce, 89 CHILD. AND YOUTH SERVS. REV. 13 (2018)* (14% to 22% median turnover from 2003-2015)[29]; *supra, Casey Family Programs* (20% to 40% average turnover). COVID-19 has anecdotally increased turnover rates. *Supra, QIC-WD* ("Now, two years into the COVID-19 pandemic, anecdotal reports [show] that

---

[25] Caseworker turnover has many variations. Functional turnover is considered beneficial to the organization, and dysfunctional turnover is detrimental to the organization. There can be internal turnover and external turnover. OM 12 excludes from its calculations cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave.

[26] Available at https://www.qic-wd.org/qic-take/worker-turnover-persistent-welfare-challenge.

[27] Available at https://www.casey.org/turnover-costs-and-retention-strategies.

[28] Available at https://www.qic-wd.org/blog/strategies-improve-child-welf are-worker-retention.

[29] Available at https://www.sciencedirect.com/science/article/abs/pii/S01907 40918300823?via%3Dihub.

turnover and recruitment challenges are escalating even further than in past years, but there are no recent national data in child welfare to ascertain the extent of the problem."). These statistics demonstrate that the required caseworker consistency standards are not only nebulous, but whatever (if any) existing federal law standard is far below OM 12's lofty standard.

Regardless, State Defendants have strived to achieve the OM 12 metric. Barwick Aff. ¶ 6. By June 2020, State Defendants had a 90% caseworker continuity rate and OM 12 was an "Attained Measure." Barwick Aff. ¶ 6. The COVID-19 pandemic greatly exasperated the statistics for casework continuity in line with the decline in other states. Barwick Aff. ¶ 6. In FY2023, the state's caseworker turnover was 48.6%, down from the FY2022 rate of 55.4% and within the national average. Barwick Aff. ¶ 6. Region 14's FY2024 turnover rate is around 68%, but supervisor turnover is at a much lower 23.75%. Barwick Aff. ¶ 6. Although DFCS has enacted policies to improve turnover, the Region 14 area has challenges not faced in other areas throughout the country, including increased job competition in metro Atlanta. *See* Andy Miller, *Progress seen at DFCS, but turnover still a problem*, Georgia Health News (Aug. 6, 2015).[30]

---

[30] Available at https://www.georgiahealthnews.com/2015/08/progress-dfcs-turnover-challenge/.

State Defendants have enacted policies that are constitutionally sufficient, as demonstrated by the prior Attained Measure status for OM 12. The COVID-19-related variance does not change the fact that State Defendants' policies have complied, and will continue to comply, with constitutional standards. While a short-term remedy may have been needed to counter the temporary increase in turnover, the goal and purpose of the Consent Decree is to ensure the State Defendants' policies do not violate Plaintiffs' federal rights (if the policies were ever in violation). After eighteen years, the State Defendants, in meeting the Attained Measures, have in good faith proven themselves constitutionally compliant.

> **(e)** **Provision Of Medical, Dental, And Mental Health Services As Mandated By Professional Standards Of Care (OMs 21(A)–(D), 27) And The Early And Periodic Screening, Diagnosis, And Treatment Program Of The Medicaid Act.**

State Defendants are to provide medical, dental, and health services pursuant to professional standards of care, and Early and Periodic Screening, Diagnosis, and Treatment ("EPSDT") related court orders must include Title IV-E language as measured in Ongoing Measures 21(a)–(d) and 27.[31] Barwick Aff. ¶ 7. State

---

[31] The Consent Decree requires "Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational" and "At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act." *Period 36 Report* at 31–32, 55.

Defendants satisfy these requirements under the Constitution. State Defendants' provision of these medical services is controlled by the terms and conditions of the State Medicaid Agency's Care Management Organization ("CMO") contract with its contracted vendor, Amerigroup. Barwick Aff. ¶ 7. As a result of this contractual arrangement, State Defendants are a third-party beneficiary of the CMO contract and have no ability to directly enforce compliance with the terms of the contract as this power is solely vested in the State Medicaid Agency. Barwick Aff. ¶ 7. State Defendants have created the Office of Health Law and Policy to overcome this impediment and its effect on medical treatment of foster children in the state of Georgia. *Supra* 19–20; Barwick Aff. ¶ 8.

The Consent Decree's standards are so high, that the *national* average of *all* children with unmet needs would violate the Consent Decree. For example, at least 16% of all American children had unmet healthcare needs during the COVID-19 pandemic. *See* Pampati, *et. al*., *Disparities in Unmet Health Care Needs Among US Children During the COVID-19 Pandemic*, Centers for Disease Control and Prevention, 22 Annals of Fam. Med. 2024, 130–39 (Mar. 2024).[32] Even more disparity exists in the OM 21 92% mental health requirement because the "overall rate of unmet need for specialty mental health care *among US children* with mental

---

[32] Available at https://www.annfammed.org/content/annalsfm/22/2/130.full.pdf.

health conditions has been estimated at *nearly 50%."* Melisa Pasli and Dmitry Tumin, *Children's unmet need for mental health care within and outside metropolitan areas*, Pediatrics and Neonatology (Mar. 2, 2022) (emphases added).[33] 32.2% of youth *with no foster care experience* report unaddressed dental needs. Sarvas EW, et al., *Oral health needs among youth with a history of foster care: A population-based study*, 152 J. AM. DENT ASS'N, 589, 589–95 (2021) (emphasis added)[34]; *compare Frew v. Hawkins*, 401 F. Supp. 2d 619, 655–56 (E.D. Tex. 2005) (37% in Texas). The standard of initial screening within 10 days is likewise stricter than the constitutional requirement. *See, e.g., Boulet v. Cellucci*, 107 F. Supp. 2d 61, 81–82 (D. Mass. 2000) (90 days is reasonable under Medicaid services); *Does 1-13 by and Through Doe, Sr. 1-13 v. Chiles*, 136 F.3d 709, 711 (11th Cir. 1998) (90 days); *Chisholm ex rel. CC v. Gee*, 2017 WL 3730514, at *5 (E.D. La. Aug. 30, 2017) (6 months); *see also* 42 C.F.R. § 435.911, 42 C.F.R. § 441.56(e) ("[Agencies] must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of 6 months after the request for screening services."). Other courts agree lower thresholds are sufficient for constitutional purposes, and one court vacated a consent decree after the movant screened less than 80% of EPSDT-eligible children who should have received a screen. *See, e.g.*, *John B.*, 710 F.3d at 413;

---

[33] Available at https://www.pediatr-neonatol.com/article/S1875-9572(22)00119-X/fulltext.

[34] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8324544/.

*compare Salazar v. District of Columbia*, 954 F. Supp. 278, 304 (D.D.C. 1996) (finding a violation where between 24% and 64% of EPSDT eligible children were screened).

The State Defendants' actual performance measures for this area vary widely from nearly meeting the OMs, 88% (mental health needs), 82% (education/developmental needs), 79% (medical needs), to 58% (dental), *Period 36 Report* at 55, but the State Defendants have in place customs, practices, and policies that comply with the professional judgment and deliberate indifference standards. Barwick Aff. ¶ 9. As indicated above, these rates are better than the national average. Barwick Aff. ¶ 9. Additionally, 91% of foster children in custody had applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. *Period 36 Report at* 31–32; Barwick Aff. ¶ 9. State Defendants have made a good faith effort to increase these statistics—for example, training DFCS Special Assistant Attorneys General to include applicable language in draft orders to juvenile courts—but ultimately, achievement in this area is beyond the control of State Defendants since juvenile court judges are ultimately responsible for orders. Barwick Aff. ¶ 9.

### 2.      State Defendants Do Not Violate Procedural Due Process Rights.

The analysis of whether the State Defendants are violating Plaintiff's procedural due process rights mirrors that of substantive due process. Dkt.410 at 15

(stating that Plaintiffs' procedural due process claim is "in connection with plaintiffs' substantive due process claim"). Plaintiffs did not specify the particular liberty or property interest for which they were allegedly deprived of due process of law but instead asserted, and the Consent Decree reflects, that State Defendants' services "constitute a policy, pattern, practice and/or custom that is inconsistent with the exercise of reasonable professional judgment and amounts to deliberate indifference to the serious and constitutionally protected rights." *Id*. As discussed above, *supra* 33–49, State Defendants are not in violation of that standard as it relates to due process rights in the Constitution. Additionally, State Defendants have proactively set up extensive systems to prevent such violations. *Supra* 10–33.

### 3.     State Defendants Do Not Violate the Equal Protection Clause.

Plaintiffs claimed that the State Defendants made placement decisions based on race without a compelling government interest. Dkt.410 at 6. State Defendants then made and still make all placement decisions for all children based on the quality and appropriateness of the foster family or adoptive parents. Policy Number 11.7, Division of Family and Children Services Child Welfare Policy Manual (Sept. 8, 2023). State Defendants use a variety of factors to determine whether an adoption or placement is not in the child's best interest, and race is not among them. *Id*. There is no evidence suggesting that State Defendants violate the Equal Protection Clause and MTAT has confirmed compliance. *Period 35 Report* at 29.

### 4.     State Defendants Do Not Violate Familial Associations.

Plaintiffs claimed that the State Defendants violated the Plaintiffs' rights under the First, Ninth, and Fourteenth Amendments "not to be deprived of a child-parent or a child-sibling family relationship absent compelling reasons." Dkt.410 at 17. The Consent Decree quantifies the rights of Familial Associations in OMs 5, 10, 14, 16, and 25. The State Defendants have met each of these OMs and consequently are not in violation of any constitutional right of familial association.

### 5.     State Defendants Do Not Violate Statutory Federal Laws.

Plaintiffs brought § 1983 claims against State Defendants for alleged violations of the AACWA, the Multiethnic Placement Act, as amended by the Interethnic Adoption Provisions of 1996 (collectively "MPA"), and EPSDT Program of the Medicaid Act (collectively, the "Federal Laws"). *Id.* at 2. State Defendants are not in violation of these Federal Laws. These Federal Laws set forth mandates that must be met for a state to receive federal child welfare funding. The statutes, however, provide relatively minimal guidance on how conformity shall be determined or what steps must be taken when conformity is lacking. *See* 42 U.S.C. §§ 622(b)(8)(A)(i) (formerly codified at 622(b)(10)(B)(i)), 671(a)(10), (16), (18) & (22), 675(1) & 5(E), 1396d(a)(i), (4)(B), (r)(1)-(5). Instead, the Secretary of HHS is directed to oversee implementation of the statutory requirements. *See, e.g.*, *id.* §§ 622(a), 670, 671(a), 1396(c).

State Defendants do not violate the MPA because the State Defendants do not delay or deny adoptions based on race. *See supra* 50. State Defendants also do not violate EPSDT because OM 21(a)-(d) correspond to EPSDT and State Defendants are not in violation of EPSDT. *See supra* 46–49.

State Defendants are not in violation of the AACWA. The AACWA-related Ongoing Measures, *supra* 37, are OM 3 (requiring that no more than 8.3% of children exiting care will re-enter care within 12 months); OM 6 (requiring that at least 43.6% of all children between 12 and 23 months shall be discharged from foster care to permanency within 12 months); and OM 23 (requiring that at least 40.5% of children who enter foster care be discharged to permanency within 12 months of entering foster care). *Period 36 Report* at 18–19. The MTAT's commentary reveals that these OMs are not the most precise method of measurement for permanency. *Period 36 Report* at 17–23. State Defendants have also enacted systems to increase permanency rates, strengthening the constitutional protections of children. *See, e.g., supra* 15–33. Additionally, the Federal Government itself considers the State Defendants in compliance with the AACWA because the State Defendants receive funding through the CFSR. *See supra* 23–28. If the State Defendants were in violation of the AACWA, then the Federal Government could decide to not (and likely would not) provide support through the CFSR.

### 6.    State Defendants' Substantial Changes Prove There Is No Violation Of Federal Law.

The significant and durable changes to state and federal law, *see supra* 10–15, State Defendants' prolonged and continuous attainment of the majority of OMs, *see supra* 36–37, and the State Defendants' innovative and integral changes to DFCS administration, *see supra* 15–33, all prove that State Defendants have achieved a durable remedy and remove the likelihood of any future systemic violations of Plaintiffs' rights under federal law as contemplated by the 2005 Consent Decree.

### C.    Continued Enforcement Of The Consent Decree Is Against The Public Interest Because It Runs Afoul Of Principles Of Federalism And Unduly Burdens Political Successors.

This Court's continued enforcement of the Consent Decree violates the public interest and federalism principles. The framers of the Constitution established "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States." *Younger v. Harris,* 401 U.S. 37, 44 (1971). "It should never be forgotten that this slogan, 'Our Federalism,' born in the early struggling days of our Union of States, occupies a highly important place in our Nation's history and its future." *Id.* at 44–45.

Federalism concerns are paramount in the context of modifying and terminating long-standing consent decrees. *Horne*, 557 U.S. at 434–35, 448. Institutional reform cases "raise sensitive federalism concerns, which are heightened when . . . a federal-court decree has the effect of dictating state or local budget priorities." *Id.*; *see also Burt v. Cnty. of Contra Costa*, No. 73-cv-00906-JCS, 2014 WL 253010 at *19–20 (N.D. Cal. Jan. 22, 2014) (finding that a state unit's annual payment of "tens of thousands of dollars" to plaintiffs' attorneys raised substantial federalism concerns). Further, "institutional reform injunctions bind state and local officials to their predecessors' policy preferences and may thereby 'improperly deprive future officials of their designated legislative and executive powers.'" *Id.* (quoting *Frew v. Hawkins*, 540 U.S. 431, 441 (2004)).

Federal judicial oversight, absent a clear and compelling violation of a federal right by a state, improperly infringes upon the right of the people of that state to self-govern. *See Younger,* 401 U.S. at 44; *see also Frew,* 540 U.S. at 441. The Board of Human Services, comprised by members appointed by the Governor, appoints the Department of Human Services ("DHS") Commissioner with the Governor's approval and removable directly by the Governor of Georgia. O.C.G.A. §§ 49-2-1, 49-2-2. Moreover, the Governor directly appoints and removes the DFCS Director.[35]

---

[35] There is also the Legislature's constitutional impeachment and removal authority for state executive officers, judges, and legislators.

Consequently, the DHS Commissioner and DFCS are politically accountable to the people of Georgia through their Governor.

There is no ongoing violation of a federal right by the state that justifies the continued compromising of the right of Georgians to self-govern. *See supra* 33–53. Ongoing judicial oversight by which Plaintiffs and this Court continually look over the shoulders of agency officials as they carry out their roles, impose ongoing and additional reporting requirements and conduct regular and persistent staff interviews is antithetical to how courts operate with respect to the states and their agencies. The totality of the funds spent on this Court's monitoring, plaintiffs' attorneys' fees, and the State Defendants' attorneys' fees to simply administer the Consent Decree creates a massive burden on the State's budget. In total, the State has spent over $43 million since 2005, and over $17 million on monitoring alone. Barwick Aff. ¶ 5.

DFCS already admirably endeavors to perform a difficult, often thankless, job of caring for the children of the state of Georgia who are victims of familial and societal ills that are much broader than the State can control. State Defendants are involved in an area that is inherently saddled with debilitating plight, with no clear solutions in sight. State Defendants plan ahead but still have to react to unforeseeable waves of calamity. And under the Consent Decree, Plaintiffs are allowed to do more than protect against violations of constitutional and federal proportion. They are

allowed to second guess and advise in a way that is contrary to our system of government.

Like the *Horne* court warned against, the State's budgetary priorities are substantially dictated by the Consent Decree and the cost of continued enforcement, 557 U.S. at 437. The valuable funds that the State Defendants are being forced to spend on the enforcement of the Consent Decree (MTAT and Plaintiffs' ongoing attorneys' fees and expenses, including travel from New York for periodic in-person meetings of the parties) actively impede its mission and frustrate its very purpose. The policy preferences of the State and its agencies are certainly constrained by a Consent Decree that was entered into almost twenty years ago. Yet, "[a]s public servants, the officials of the State must be presumed to have a high degree of competence in deciding how best to discharge their governmental responsibilities," and "[a] State, in the ordinary course, depends upon successor officials, both appointed and elected, to bring new insights and solutions to problems of allocating revenues and resources." *Frew,* 540 U.S. at 442. However, the Consent Decree itself threatens the equal protection of children across the state as it forces the state to divert substantial resources from non-Region 14 children to Region 14.

The competent and dedicated officers of the State and its agencies are the most appropriate officials to determine how the State can best serve its children while complying with the Constitution. Because the Consent Decree chains State

56

Defendants in budgetary and administrative bondage, its termination would allow the State Defendants to use their unique and local insights to tackle the challenges that face Georgia's child welfare system without the restraints of 2005.

### D. The State Defendants Have Accomplished The Basic Purpose Of The Consent Decree.

The basic purpose of the Consent Decree was to create long-lasting reform in DFCS Region 14. The State Defendants have met and exceeded this goal, all in the absence of an express finding by this Court of actual deficiencies.

The Eleventh Circuit has explained that "[a] court faced with a motion to terminate . . . a consent decree" in institutional reform litigation "must begin by determining the basic purpose of the decree." *United States v. City of Mia.*, 2 F.3d 1497, 1504 (11th Cir. 1993). Once a court determines the basic purpose, it must decide "whether the [moving party] has complied in good faith with the core purpose of the decree, whether the purposes of the litigation have, to the extent practical, been achieved, and whether it is necessary or sensible, under current circumstances, for the Court to continue to exercise judicial oversight." *Pottinger v. City of Mia.*, 359 F. Supp. 3d 1177, 1194 (S.D. Fla. 2019) (citing *City of Mia.*, 2 F.3d at 1508). The Eleventh Circuit has held that a child welfare system is ready for termination when it has "undergone radical changes and [is] on secure footing to continue its progress in the years to come, without court supervision," even if it is "not yet perfect

and may never be." *Walley*, 270 F. App'x at 992 (11th Cir. 2008) (affirming district court's termination of a consent decree controlling Alabama's child welfare system).

The basic purpose of the Consent Decree, along with the specific purpose of remedying potential violations of federal law, was to make lasting reform to the child welfare system of Georgia. This has undoubtedly been achieved. *See supra* 10–53. The State Defendants, over the course of the last two decades, have wholly transformed the system into an organized, effective, and dedicated organization. As this Court recognized in 2016 when it approved the modification of the Consent Decree, the State Defendants substantially comply with the terms the Parties agreed to. *See supra* 33–53. The State Defendants have only continued on their positive trajectory since then and have substantially complied with the Consent Decree even if not meeting every one of the excessive metrics set out in the Consent Decree, *supra* 10–33. Given the revolutionary structural changes that have taken place within DFCS and intense oversight that has been installed at both the federal and state levels, this Court can be assured that the positive trajectory will continue without its continued oversight through the Consent Decree.

### E. The Substantial Changes And The State's Response Warrant Relief Under Rule 60(B)(6)

Relief is warranted under Rule 60(b)(5), but even if Rule 60(b)(5) is not an available remedy, the Court should order the Consent Decree vacated under Rule 60(b)(6). The Supreme Court has held that relief under Rule 60(b)(6) may be granted

under "extraordinary circumstances." *Ackermann v. United States*, 340 U.S. 193, 197–99 (1950); *United States v. Alsol Corp.*, 620 F. App'x 133, 136 (3d Cir. 2015). As noted above, the drastically different landscape has made the Consent Decree redundant, unnecessary, counterproductive, and inequitable.

## V.    CONCLUSION

In conclusion, State Defendants' proposed termination of the Consent Decree is necessary and suitably tailored to address the substantial changes in Georgia's legal and foster care environment and continuous and enduring compliance with federal law and federal and state constitutions. State Defendants note that granting the requested relief would be advantageous to Georgia's and Region 14's ability to administer the State's foster care system adaptively and effectively without the onerous constraint of the Consent Decree and without detriment to the public interest. Accordingly, the Court should find that State Defendants are entitled to the requested relief.

## VI.    PRAYER FOR RELIEF

State Defendants therefore respectfully request that this Court enter an order that:

- terminates the prospective relief contained in the Consent Decree, including but not limited to any ongoing obligations with respect to the reporting requirements of the Consent Decree;

59

- provides that as of the date of this Court's Order granting relief Defendants will have no further obligations under the Consent Decree;

- dismisses the case with prejudice; and

- grants any other such relief as may equitable and just.

## <u>RULE 7.1D CERTIFICATE</u>

The undersigned hereby certifies that the foregoing was prepared using 14-point Times New Roman font, in accordance with Local Rule 5.1B, and the Court's September 19, 2024 Order granting an extension of the page limit to sixty pages. Dkt.792.

Dated this 19th day of September, 2024.

<u>*/s/ Harold D. Melton*</u>
Harold D. Melton
Georgia Bar No. 501570
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, GA  30308
T: (404) 885-3000
F: (404) 885-3900
E: harold.melton@troutman.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 19, 2024, a true and correct copy of the foregoing was electronically filed with the Court's CM/ECF system, which will send a notice of electronic filing to all counsel of record in this case.

*/s/ Harold D. Melton*
Harold D. Melton
Georgia Bar No. 501570
Troutman Pepper Hamilton Sanders LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, GA  30308
T: (404) 885-3000
F: (404) 885-3900
E: harold.melton@troutman.com
