**Period 33**

**Monitoring Report**

of

The Accountability Agent and Monitoring and Technical Assistance Team

In the Case of

*Kenny A. v. Kemp*

*State of Georgia*

December 2022

## ACCOUNTABILITY AGENT AND
## MONITORING AND TECHNICAL ASSISTANCE TEAM

Accountability Agent
Karen Baynes-Dunning
Baynes-Dunning Consulting, LLC
Greenville, South Carolina

Steve Baynes
Baynes Consulting, LLC
Washington, DC

Elizabeth Black
Regional Vice President
Public Knowledge
Lakewood, New Jersey

Eliza Byrne
Public Knowledge
Lakewood, New Jersey

The following persons were significant contributors to this report.

Dr. Lijun Chen
Public Knowledge
Lakewood, New Jersey

Dr. Susan Smith
Public Knowledge
Lakewood, New Jersey

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................................. 3

    PERIOD 33 DYNAMICS AND HIGHLIGHTS .................................................................... 4

    COVID-19: IMPACT, CHANGES, AND EFFORTS IN REGION 14 ...................................... 7

    LEADERSHIP CHANGES ............................................................................................... 9

II.    CONTEXT DATA ........................................................................................................ 10

III.    PERIOD 33 MAJOR FINDINGS AND RESULTS .............................................................. 16

    MAJOR FINDINGS ..................................................................................................... 17

        *Permanency for Children and Youth in Foster Care* .............................................. 17

        *Wellbeing of Children and Youth in Foster Care* ................................................. 22

V    PLACEMENT STANDARDS .......................................................................................... 37

    DISCRIMINATORY PLACEMENT PRACTICES .................................................................. 37

    REIMBURSEMENT RATES ........................................................................................... 37

    MAJOR FINDINGS – PLACEMENT STANDARDS ............................................................ 38

APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN ............................................... 42

APPENDIX B – GLOSSARY ...................................................................................................... 54

# I.    INTRODUCTION

This Period 33 report is the tenth monitoring report in which the Accountability Agent and the Monitoring and Technical Assistance Team (MTAT) report on the outcomes delineated in the Modified Consent Decree and Exit Plan (Modified Exit Plan) that was filed in Federal District Court in December 2016.[1] In addition to this monitoring report, MTAT will issue its Seventh Brief on the Infrastructure Standards in Spring 2023, in accordance with the Stipulated Order Amending the Modified Consent Decree and Exit Plan (Stipulated Order) filed with the Federal District Court in December 2017.

In this report, MTAT's obligation is to report specifically on the measurable requirements articulated in Sections IV, V, and VI of the Modified Exit Plan that relate to activity in DeKalb and Fulton counties from January 1 through June 30, 2022. In addition to discussing the Ongoing and Attained Outcome Measures, MTAT continues to review the use of congregate care, monitor the use of hotels, offices, and other temporary placements for children in foster care, and report caseloads for case managers and supervisors. As discussed in previous reports, MTAT continues to address the impact of COVID-19 on the system, the children and youth under its care, and the families and caregivers with whom it engages. This will be an ongoing exploration as we develop a deeper understanding of the impact and as the agency returns to some of its pre-COVID practices and adopts new practices from lessons learned during the pandemic.

MTAT's approach to monitoring serves as an accountability mechanism for the Court, the Plaintiffs, and the public. It also serves as an opportunity to assist the Division of Family and Children Services (DFCS) in establishing data-driven decision-making processes and continuous quality improvement (CQI). The goal is to create a strong CQI process that will remain in place after the state satisfies the terms of the Modified Exit Plan and will no longer be under federal court oversight.

The MTAT reports on the same Modified Exit Plan standards and outcome measures approximately every six months, using a combination of qualitative and quantitative data.[2] In addition to the basic and consistent set of metrics as agreed upon in the Modified Exit Plan, the MTAT conducts a deep, quality-focused analysis on a handful of Infrastructure Standards at regular intervals. Data gathering for these can include interviews with stakeholders, focus groups, surveys, observations of processes, targeted case reviews, and reviews of Child and Family Service Reviews (CFSRs) findings.

---

[1] Modified Consent Decree and Exit Plan, *Kenny A. v. Nathan Deal,* Civil Action NO. 1:02-CV-1686-TWT. Go to: https://www.childrensrights.org/wp-content/uploads/2014/08/2016.11.09-745-Exhibit-A-Modified-Consent-Decree-and-Exit-Plan.pdf

[2] Pursuant to the Modified Consent Decree, both the Ongoing Outcome Measures and Attained Outcome Measures have undergone substantial revision to reflect, when possible, the principles of best practices in measurement. Best practices principles include: 1) a clear statement of the analytic question with particular attention to identifying the risk population or the denominator associated with a particular inquiry; 2) use of entry cohorts and prospective measures to characterize systems dynamics and change in outcomes; 3) attention to the sources of variation in system outcomes (e.g. variation over time, among children, or in places); 4) understanding variation to track change accurately; 5) assessing expected change in the appropriate period of performance or window of time; 6) matching the analytic question to the appropriate source data; and 7) using well-understood and organized data resources that are designed to support asking and answering analytic questions.

MTAT's intention in this effort is to enable Parties' understanding in several key factors associated with each of the Infrastructure Standards:

1. The expectations for practice and the extent to which these processes are occurring

2. The capacity within the system to meet these expectations

3. The extent to which these processes are occurring with sufficient consistency and quality

Moreover, this enables MTAT to focus on emerging issues to mitigate a reactive approach to monitoring. The Infrastructure Standards are key practices and strategies that DFCS identified as their theory of change. If done with fidelity and quality, the standards should lead to improvement in the outcome measures assessed in this monitoring report.

## Period 33 Dynamics and Highlights

Throughout Period 33, 1,088 children and youth spent time in Region 14's foster care system:

- 660 children and youth in DeKalb County and 428 in Fulton County.

  - This is 40 fewer children and youth than during Period 32. DeKalb County had 38 fewer children in its care, and Fulton County had 2 fewer children in its care.

- Among the 1,088 children, 220 children entered care on or after January 1, 2022, and 185 children exited care by the end of the period on June 30, 2022.

While fewer children and youth spent time in foster care, the mounting challenges for finding placements for youth with high complex needs, coupled with high staff turnover rates, reached a breaking point in May 2022. By June 2022, 25 Child Protective Services staff were terminated for jeopardizing child safety by violating agency policy and protocols through the  organization of a "sick out" to protest unsafe and overwhelming work conditions.

**Placement and Workforce Crises Converge**

The lack of willing and appropriate placements for youth with complex needs is a long-standing issue that has vacillated between reliance upon the use of hotels and the use of offices for placements. During the first quarter of 2016, MTAT verified that 78 children stayed in hotels for a total of 681 nights. The average length of stay was 8.7 nights [minimum: 1 night; maximum: 73 nights; mode: 1 night (19 instances); median: 4 nights]. The cost associated with these stays: hotels, $53,645; behavior aides, $333,690; and other, $14,285. With this increased reliance on hotels, it is important to highlight that the parties agreed to the following language in the Modified Consent Decree and Exit Plan filed with the court in December 2016:

> *Section IV.B.1.*
>
> *c. No child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placements needs require a safe bed in a home-like environment.*

*d. The parties agree that the use of hotels, motels, or similar non-child welfare overnight commercial enterprises is not appropriate for class members' placements. On July 1, 2016, State Defendants submitted, and the Accountability Agent approved, a plan to phase out the use of this practice, such that by December 31, 2016, the State will reduce the number of hotel nights by 50% (fourth quarter of calendar year 2016, as compared to the second quarter of calendar year 2016), and by June 30, 2017, no child will be placed in a hotel, motel, or similar non child welfare placement.*

Leading up to the June 30, 2017, deadline for eliminating the use of hotels, from January 1 – June 30, 2017 (Period 23), MTAT reported that 83 children and youth spent time in Region 14 DFCS offices after hours while awaiting placements. Over the next few years, DFCS leadership put forth efforts to improve the array of placement options for children and youth, including:

- Meetings with MTAT and other state leaders regarding performance-based contracting;

- Contracting with Chapin Hall to provide an analysis of current provider performance;

- Meetings with providers and establishing per diem rates for different levels of care;

- Contracting with MAAC to establish 20 emergency placements, with 10 dedicated to Region 14 youth;

- Recruiting foster families for teens;

- Unsuccessful draft proposal submitted to establish therapeutic foster care;

- Working with judges to mitigate depriving youth for whom parents refused to pick them up from youth detention centers; and

- Enhancing services for relatives and fictive kin willing to provide placements for teens.

Over the past five years, while some of these initiatives provided greater insights and some relief for youth without placements, there were no long-term changes implemented. Moreover, changes in state leadership and priorities, and a lack of evaluation and continuous quality improvement prevented any promising strategies to eliminating the use of hotels and offices from being fully implemented and sustained. Moreover, despite the overall decrease in children entering care during COVID-19 starting in March 2020, the number of children and youth staying in offices increased, as did the average length of stay in the offices.

**Table 1: Office Stay Comparison Over Last Four Monitoring Periods**

| | Period 30 July 1-December 31, 2019 | Period 31 January 1-June 30, 2021 | Period 32 July 1-December 31, 2021 | Period 33 January 1-June 30, 2022 |
|---|---|---|---|---|
| # Of youth with office stays | 14 | 32 | 49 | 62 |
| # Of instances of office stays | 25 | 47 | 79 | 103 |

| Avg. length of stay | 2.8 days | 7.4 days | 11.3 days | 11.5 days |
|---|---|---|---|---|
| # Of stays over 5 days | 1 | 16 | 40 | 58 |

During the 24 months of escalating office stays captured in office stay logs, monitoring reports, and the chart above, leaders and staff within the Region continued trying to work with the state office, private providers, foster homes, and relatives in search of appropriate placements. The number of behavior aides previously available when providers were monitoring youth in hotels (prior to the agreement to end this practice in June 2017) decreased dramatically, necessitating an increasing number of staff to work overtime and stay in the offices overnight with youth. In Fall 2019, MTAT recommended that the state office reach out to providers to develop specialized contracts to provide services and placements for youth without placements.

Simultaneously, regional and county leaders and staff also conceptualized and developed a plan to open and operate a wellness center to screen, assess, and use trauma-informed practices and professionals to find suitable placements for youth within a 24-hour period. During Measure + Leaders meetings in December 2021 and March 2022, plans for the wellness center were discussed with state leaders who participated in the design process. State leaders followed up by requesting information about building specifications and locations. However, no further communication, approvals, or denials from the state office have been provided.[3] During focus groups with Region 14 staff in Fall 2021 and Spring 2022, many expressed frustrations with the mounting pressures, increasing turnover and high caseloads, the overnight responsibilities with youth in offices, and the seeming lack of response or assistance from state leaders in helping to alleviate the challenges.

Unfortunately, the strain on staff climaxed in May 2022 when 25 child protective services staff were accused of jeopardizing child safety by organizing a "sick out" to reportedly protest long hours and unsafe conditions associated with spending the night in offices with youth. They were all placed on administrative leave pending an investigation by the Georgia Office of the Inspector General. The investigators concluded that the staff had engaged in an "organized sick out" and they were all fired.

As reported in the Period 32 Monitoring Report, both Fulton and DeKalb counties were already operating at a staff deficit, with only 64 percent (27 of 42) of CPS workers assigned the agreed upon caseload standard of 12 or fewer families to respond to or investigate reports of maltreatment as of December 31, 2021. MTAT also reported that neither county was able to hire enough new staff to offset the 109 staff who left the agency during Period 32 (104 of whom resigned). Thus, during Period 33, the loss of 25 Fulton child protective services staff at one time exacerbated the already heavy burden shouldered by the staff who remained.

---

[3] During a meeting of the parties in December 2022, Commissioner Broce shared that work was happening behind the scenes to secure funding and work with the Georgia Department of Administrative Services (DOAS) regarding waiver of the procurement process. MTAT will follow up and provide updates in the next monitoring report.

News of the crisis spread quickly, and in June 2022, Fox 5 Atlanta News reported that some teens were staying in county offices for months at a time and that the police were called to Fulton County DFCS offices to address challenges with teen 65 times.[4]

In focus groups and interviews with MTAT, staff reported that these nearly daily calls to the police were due to drug use, vandalism, fights, and assaults on staff. Atlanta News First CBS46 conducted a three-month investigation during which they confirmed these reports. In addition to also finding children living in Fulton County offices for weeks to months at a time, they also reported "instances of drugs, children running away, stealing, fighting workers and each other, conditions which seemingly stem from practice with little oversight."[5]

In a June 2022 interview with the Atlanta Journal Constitution, Commissioner Candice Broce acknowledged that "housing the children in a hotel or office means they're not able to go to school consistently, they're away from their peers, they're not forming those relationships, plus, it causes tremendous strain on staff."[6]

The state reached out to two providers under specialized agreements that were intended to prevent the providers from "rejecting" youth due to past trauma-induced behaviors. However, the provider designated to accept youth from Region 14 continued denying certain youth, expelling youth from its program for minor infractions, and would not accommodate trans youth due to its religious affiliation.

The state then began offering higher per diem and $5,000 grants to providers and caretakers willing to accept children without placements. The state also contracted with a temporary staffing agency to provide staff to provider agencies.

To mitigate the heightened staffing shortages, volunteers from the state office, the quality assurance unit, regional field placement specialists, specialized mentor supervisors, and staff from other counties (including DeKalb) took on CPS cases in Fulton County to assist with investigations and family support cases. While the timeliness of closing these cases has decreased significantly during Period 33 (72.6 percent and 78.4 percent, respectively, compared to 90.2 percent and 91.8 percent, respectively in Period 32), the state and counties are to be commended for meeting a high percentage of timely initial contacts under these extraordinary circumstances. The state also instituted higher per diems, and additional financial and staff resource supports for private providers willing to accept youth without placements. This dynamic is further discussed and illustrated in *Section IV: Caseload Requirements* of this monitoring report.

## COVID-19: Impact, changes, and efforts in Region 14

As of the writing of this report, DeKalb and Fulton County DFCS staff have returned to the offices and ended remote work policies that were in place throughout the pandemic. While the statewide Georgia Supreme Court Judicial Emergency Orders expired on June 30, 2021, local judicial districts had the discretion to maintain emergency orders and practices. Both DeKalb and

---

[4] https://www.fox5atlanta.com/news/georgia-dfcs-offices-used-to-house-at-risk-teens
[5] https://www.atlantanewsfirst.com/2022/08/15/children-under-fulton-dfacs-care-housed-offices-creating-dangerous-conditions/
[6] https://www.ajc.com/politics/foster-children-housed-in-child-welfare-offices-officials-work-to-end-practice/YCMAHV7YFFFFPDPTJEHQOYPFGI/

Fulton County Juvenile Courts continue safety practices and a combination of in-person and virtual court hearings.

Statewide, DFCS returned to its policy of requiring one in-person visit per month for children in foster care and their caregivers. Under the *Kenny A* Consent Decree, Region 14 must complete two monthly visits. Given the ongoing spread of COVID-19, and Georgia hosting among the highest rates of influenza in the country,[7] state policy requires staff in Region 14 to conduct two monthly visits: one in-person and an additional visit that can be in-person or virtual.

With widespread testing and vaccinations available, children entering foster care no longer face major delays in placement due to questions about their COVID status. However, recruitment of more placements and enhancing relative supports should be a high priority for the Region moving forward.

As this major transformation to a post-COVID child welfare system takes place, it is imperative that state, regional, and county DFCS leaders work closely with human resources and child welfare stakeholders to examine lessons learned during the pandemic. While the shift to remote work, virtual meetings and service delivery, and virtual court hearings happened quickly in March 2020, the modified practices and policies may have had both positive and negative unintended consequences. In Region 14, staff and stakeholders have reported anecdotally that there is a perceived increase in parental participation in court hearings. Others note that while they missed the interaction with co-workers during the height of the pandemic, working from home enabled some to improve work-life balance. At the same time, there have been some reports that virtual services, such as therapy, did not work well for families. Unfortunately, there was also some abuse of the remote working policies, as at least one staff member was terminated for having another full-time job while still reportedly working for DFCS.

Nationally, studies are emerging that examine this period of time for the child welfare workforce. In the article, *Transformative lessons learned from COVID-19 to reimagine child welfare work*, published in July 2022 in the Journal of Public Child Welfare[8], the authors describe three themes for recommended permanent child welfare system changes gleaned from their research:

1. Flexible workplace (work from home and office hybrid);

2. Enhanced use of technology (continued virtual meetings and technical support for remote access); and

3. Supporting worker well-being (safety, addressing secondary trauma, and work-life balance).

The authors also note that while responding to a worldwide pandemic, complex systems like child welfare can implement major changes successfully and swiftly.

---

[7] https://www.cdc.gov/flu/weekly/usmap.htm
[8] Amy S. He, Julie A. Cederbaum & Robin Leake (2022) Transformative lessons learned from COVID-19 to reimagine child welfare work, Journal of Public Child Welfare, DOI: 10.1080/15548732.2022.2101175.

In an issue brief published by the Administration for Children & Families in May 2021[9], six child welfare agencies participating in the Fathers and Continuous Learning in Child Welfare cohort examined practices before and during the pandemic as they sought to improve engagement with fathers and paternal relatives. While the rapid changes were fraught with connectivity and technical challenges, they also bred creative problem solving. Some agencies used Title IV-E Waiver Funds to purchase tablets for families needing technology to participate in virtual meetings; others simplified by using conference calls and group text feed discussions. The virtual platforms for meetings and classes removed the traditional barriers to participation, such as lack of transportation, the need for child care, and scheduling conflicts. Overall, the cohort reported the following improvements in their engagement with fathers and paternal relatives:

1. Higher attendance by fathers;

2. Lower cancellation rates by fathers;

3. Improved father – social worker relationships; and

4. Greater involvement in cases by paternal relative caregivers.

While shifting back to pre-pandemic policies and practices may seem the easiest path to take, those systems that take the time to evaluate the impact of pandemic changes could improve engagement with children and families, better stabilize the workforce, and facilitate better outcomes. MTAT highly recommends that GA DFCS work with stakeholders to evaluate COVID-19 practices to determine which if any should continue.

## Leadership Changes

During Period 33, Commissioner for the Department of Human Services and DFCS Division Director Candice Broce continued making changes to the state office leadership. Some of these changes were the result of retirements and resignations.

Long-time DFCS Finance Director, Clifford O'Connor, retired after nearly two decades of service. Melissa Barwick, former Deputy Director of Governor Kemp's Office of Health Strategy and Coordination, has been hired into this vital role. In addition to this change, the General Counsel and Chief Ethics Officer, Stephen Harris, and Deputy General Counsel, Judy Holdaway and George Dean, all resigned from the agency. Regina Quick was hired to replace Stephen Haris and Dana Carroll was promoted to fill Judy Holdaway's position.

As reported in the Period 32 Monitoring Report, the Fulton County Director resigned her position effective mid-June 2022. After an unsuccessful search for her replacement, the position has been reposted with a higher salary floor, and Regional Director Kristin Toliver continues assuming the responsibilities for both positions.

---

[9] Abendroth, Eliza, Jennifer Bellamy, Diletta Mittone, Roseana Bess, and Matthew Stagner (2021). Opening Up Possibilities: Father Engagement Lessons During the COVID-19 Public Health Emergency, OPRE Report # 2021-82, Washington, DC: Office of Planning, Research, and Evaluation, Administration for Children and Families, U.S. Department of Health and Human Services.

Despite the system dynamics and challenges during Period 33, the counties were able to meet the threshold requirements for all five visitation measures, the rate of maltreatment in care continued decreasing, and the rate of timely commencement of maltreatment in care investigations improved as well. Although re-entry is an annual measure, the Period 33 midpoint indicates that they are progressing even closer to the requirement. For several other measures, such as caseworker continuity and meeting the identified needs of children in care, the lack of staffing continues to impact the Region's ability to improve performance and outcomes. More details are provided in Section III Period 33 Major Findings and Results.

The next section provides contextual data and information that tracks Region 14's performance under the Consent Decree over time.

## II.    CONTEXT DATA

Region 14 has made significant efforts aimed at improving the experience of children and their families in the face of many daunting challenges, including leadership changes, the pandemic, and workforce and placement crises. It is very easy to get preoccupied or focused on the acute situation, the crises that often drive the immediate work. The context section of the Monitoring and Technical Assistance Team Monitoring Reports provides the opportunity to step back and look at performance and the experience of children and families over time.

An insightful framework for understanding acute concerns in the child welfare system is looking deeper at the number of children flowing in and out of the system, as it can dictate caseloads, workloads, placement availability and stability, and achievement of permanency for children and families. The charts below show the number of entries, exits, and children in care in each county in Region 14 for the last six years.

**Chart 1: Entries, Exits and In Care Population for DeKalb County**



| | 2017a | 2017b | 2018a | 2018b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Entered | 221 | 221 | 249 | 189 | 174 | 212 | 219 | 142 | 120 | 68 | 121 | 114 |
| Exited | 207 | 218 | 183 | 209 | 220 | 258 | 239 | 190 | 167 | 152 | 140 | 141 |
| In Care 9/30 | 859 | 855 | 917 | 889 | 842 | 795 | 777 | 726 | 682 | 596 | 573 | 546 |

The number of children exiting foster care in DeKalb County has exceeded those entering since mid-2018 which has significantly contributed to the steady decrease in the number of children in foster care. Conversely, the number of exits began exceeding entries in Fulton County in 2020, coinciding with the pandemic and significantly contributed to a decrease in the number of children in care. Of concern in Fulton County, though, is the recent spike in foster care entries. The pattern of decline seen in DeKalb County is replaced in Fulton with a large uptick in entries

and the in-care count. The Covid pandemic reduced entries and exits across the country. However, evidence is lacking as to whether the reductions will be temporary (as it seems in Fulton) or lasting (as in DeKalb). As time passes, these trends will be more open to interpretation.

**Chart 2: Entries, Exits and In Care Population for Fulton County**



| | 2017a | 2017b | 2018a | 2018b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Entered | 200 | 233 | 192 | 166 | 212 | 219 | 130 | 75 | 101 | 67 | 84 | 143 |
| Exited | 186 | 210 | 183 | 219 | 194 | 202 | 204 | 178 | 155 | 138 | 104 | 86 |
| In Care 9/30 | 650 | 639 | 684 | 650 | 606 | 611 | 540 | 452 | 384 | 318 | 303 | 361 |

Looking further at these three metrics of entries, exits, and in care populations, further patterns emerge, especially when comparing DeKalb to Fulton counties.

*Entries*

Looking deeper at why children are entering care provides insights into practice and the experience of children and families in Region 14. The reasons why children have come into state custody change over time because of changing policies, practices, and statutes and in response to the larger environment. In both counties, across all time points, most removals are for the reason of neglect. AFCARS files, which are the source of these data, include twelve potential removal reasons. The top six in each county are reported here. The most common reasons for removal in DeKalb are neglect, physical abuse, and abandonment, compared to Fulton, where the top removal reasons are neglect, abandonment, and a parent's inability to cope.

### Chart 3: DeKalb County Reasons for Removal Over Time



| | 2017a | 2017b | 2018a | 2918b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| neglect | 0.52 | 0.50 | 0.52 | 0.57 | 0.67 | 0.84 | 0.88 | 0.85 | 0.68 | 0.90 | 0.81 | 0.68 |
| physical abuse | 0.15 | 0.19 | 0.20 | 0.10 | 0.16 | 0.19 | 0.13 | 0.30 | 0.15 | 0.30 | 0.30 | 0.18 |
| abandonment | 0.15 | 0.17 | 0.19 | 0.14 | 0.10 | 0.27 | 0.15 | 0.16 | 0.25 | 0.25 | 0.29 | 0.19 |
| Inability to cope | 0.10 | 0.08 | 0.12 | 0.14 | 0.23 | 0.12 | 0.10 | 0.09 | 0.29 | 0.27 | 0.27 | 0.17 |
| inadequate housing | 0.10 | 0.15 | 0.08 | 0.08 | 0.16 | 0.21 | 0.22 | 0.18 | 0.28 | 0.37 | 0.24 | 0.17 |
| Parent incarc | 0.14 | 0.06 | 0.12 | 0.14 | 0.10 | 0.10 | 0.11 | 0.09 | 0.16 | 0.16 | 0.22 | 0.12 |

These removal reasons are different than is common across the state of Georgia, where the top three reasons are neglect, parental drug use, and inadequate housing. It is not typical for such a high portion of removals to be attributed to abandonment.[10] Children in care for the reason of abandonment will be explored more later in this report.

### Chart 4: Fulton County Reasons for Removal FFY 2022



| | 2017a | 2017b | 2018a | 2918b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| neglect | 0.81 | 0.72 | 0.76 | 0.84 | 0.82 | 0.80 | 0.70 | 0.76 | 0.66 | 0.71 | 0.46 | 0.75 |
| abandonment | 0.35 | 0.12 | 0.10 | 0.07 | 0.14 | 0.18 | 0.27 | 0.28 | 0.29 | 0.38 | 0.40 | 0.20 |
| child behav | 0.15 | 0.18 | 0.17 | 0.21 | 0.20 | 0.16 | 0.29 | 0.17 | 0.16 | 0.21 | 0.24 | 0.19 |
| Inability to cope | 0.24 | 0.34 | 0.22 | 0.30 | 0.34 | 0.25 | 0.36 | 0.35 | 0.29 | 0.26 | 0.15 | 0.28 |
| inadequate housing | 0.24 | 0.13 | 0.16 | 0.16 | 0.23 | 0.25 | 0.12 | 0.21 | 0.22 | 0.11 | 0.13 | 0.18 |
| physical abuse | 0.17 | 0.09 | 0.18 | 0.13 | 0.10 | 0.14 | 0.14 | 0.23 | 0.20 | 0.20 | 0.12 | 0.15 |

---

[10] County leadership and judges are exploring whether there are inconsistencies between counties use of the code, or other local practices that may be impacting the differences.

*Exits*

Looking deeper at the ways in which children in Region 14 are further exiting care, other patterns emerge. The percentage of children who exited to reunification in both counties decreased substantially over the last five years, while other exit patterns are specific to one county or the other. The number that has exited to guardianship has steadily increased. The increase in use of guardianship as an exit pathway may be attributed to a previous DFCS director being wary of using guardianship as an exit pathway over other options, which may have naturally increased when he left the division. It is concerning that nearly as many of the children exiting custody to guardianship in DeKalb in the last six-month data reporting period exited to reunification. This is concerning because it may suggest that less effort is being made to work with birth families to regain custody. This pattern did not hold in Fulton, where guardianships have been more stable.

### Chart 5. DeKalb Counties Discharge Reasons



| | 2017 a | 2017 b | 2018 a | 2018 b | 2019 a | 2019 b | 2020 a | 2020 b | 2021 a | 2021 b | 2022 a | 2022 b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reunification | 57% | 61% | 51% | 49% | 39% | 40% | 47% | 38% | 32% | 35% | 34% | 32% |
| Live with Relatives | 7% | 5% | 3% | 7% | 0% | 0% | 0% | 0% | 1% | 1% | 1% | 3% |
| Adoption | 7% | 13% | 12% | 15% | 20% | 19% | 11% | 24% | 14% | 19% | 16% | 19% |
| Emancipation | 11% | 8% | 11% | 10% | 8% | 8% | 12% | 11% | 22% | 12% | 10% | 17% |
| Guadianship | 11% | 9% | 7% | 8% | 17% | 26% | 24% | 20% | 28% | 25% | 34% | 28% |
| Transfer | 2% | 0% | 2% | 1% | 1% | 1% | 0% | 0% | 1% | 0% | 0% | 0 |

### Chart 6. Fulton Counties Discharge Reasons



| | 2017a | 2017b | 2018a | 2018b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reunification | 60% | 59% | 70% | 55% | 50% | 54% | 47% | 42% | 40% | 39% | 48% | 44% |
| Live with Relatives | 2% | 2% | 1% | 6% | 2% | 2% | 5% | 5% | 6% | 4% | 0% | 5% |
| Adoption | 10% | 9% | 8% | 11% | 8% | 13% | 11% | 18% | 12% | 14% | 12% | 13% |
| Emancipation | 13% | 13% | 10% | 12% | 17% | 10% | 14% | 12% | 13% | 17% | 10% | 22% |
| Guadianship | 5% | 14% | 5% | 13% | 17% | 16% | 21% | 19% | 27% | 23% | 22% | 10% |
| Transfer | 6% | 0% | 0 | 1% | 0% | 1% | 1% | 1% | 0% | 1% | 1% | 3% |

At first glance, the large increase in the number of youth aging out is concerning. But emancipations were postponed during the pandemic; if the count over the last two periods is averaged, the rate is consistent with past performance. Also concerning is the steady increase in the percent of children who age out or experience some other non-permanent exit from foster care, representing 17 percent of exits from March 2022-September 2022. This warrants further scrutiny moving forward.

Another metric of exits that speaks to the volume of children in custody is short stayers, identified as those that exit custody in under 30 days, and raises the question as to whether those children needed to be removed from their home in the first place. Fulton County has historically had a large proportion of short stayers in their exit population, though there has been some improvement in the last few years. The chart below shows all exits from custody in the last five years, and the percent of those exits that were in less than 30 days.

**Chart 7: Percent of Children Discharging in Under 30 Days**



| | 2017a | 2017b | 2018a | 2018b | 2019a | 2019b | 2020a | 2020b | 2021a | 2021b | 2022a | 2022b |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DeKalb All Exits | 207 | 218 | 183 | 209 | 220 | 258 | 239 | 190 | 167 | 152 | 140 | 141 |
| Fulton All Exits | 186 | 210 | 183 | 219 | 194 | 202 | 204 | 178 | 155 | 138 | 104 | 86 |
| DeKalb % Short-Stayers | 19% | 15% | 17% | 7% | 6% | 8% | 11% | 10% | 5% | 1% | 5% | 7% |
| Fulton % Short-Stayers | 25% | 25% | 29% | 18% | 22% | 21% | 15% | 10% | 15% | 9% | 11% | 12% |

Looking at entries and exits above shows the flow of children in and out of care, while looking at the in-care population can show impacts on the system, including caseload and workload, placement needs, and efforts to permanency, particularly when looking at how long the people in custody have been in out of home care. Most children and youth in care at a single point in time have been in care for about two years. The median time in care in 2022 is 1-2 years. About 40 percent of children have been in care for more than two years. This is true in both counties.

Thirty percent of Fulton exits in less than 30 days in the first six months of the federal fiscal year 2018, which decreased until 2021 with a low of 9 percent, and a slight increase in 2022 with 12 percent of exits in Fulton being characterized as short stayers. At the same time, the overall number of exits in Fulton County decreased substantially over time, from a high of 219 in 2018 to 86 in the most recent AFCARS submission. DeKalb county has also experienced a decrease in the overall number of exits, though it has leveled off in the last two years. DeKalb has also seen the percentage of short stayers increase in the previous year, from 1 percent of exits to 7 percent most recently. This should continue to be monitored, and the division should continue to seek opportunities to understand this short stayer population and if there are opportunities to prevent

their entry and meet their needs in their own home. In both counties, the proportion of children in custody for four or more years in the point in time outlook has increased overall in the last seven years, though nearly half of children in custody overtime have been in custody for four months to two years. Understanding the dynamics of why children are entering custody and consequently exiting when they do, can help shed light on potential opportunities for improvement, either through eliminating the need to enter custody in the first place or achieving reunification in a timely manner. MTAT will continue exploring data with DFCS and stakeholders to develop hypothesis and further analyze exits to permanency.

*Cross-Cutting Observation*

In discussing child removals, the increasing use of abandonment as a child placement reason was noted as an area of observation.. Outcomes for abandoned children are particularly concerning at every point of child welfare system involvement. Abandoned children are more likely to be placed in institutional care, and then they are the most likely to age out without permanency. This removal reason might offer a flag that a potential service mix is recommended to increase the odds of permanency for children flagged for this reason. Older children who are removed for the reason of abandonment likely have high need for behavioral health services.  Even though a child's biological parent abandoned them, it is important to recognize that there are other relatives in the lives of abandoned children who couldserving as placement resources, informal supports, and discharge destinations. Moreover, some children coded as "abandoned" may be the result of parental frustration with an inability to access appropriate mental / behavioral health services on their own. "Abandoned" children were reunified almost half of the time.

**Table 2: Exit Pathways by Removal Reasons**

|  | All other removal reasons | Abandonment removal reason |
|---|---|---|
| Adopted | 30% | 25% |
| Placed with relative | 55% | 40% |
| Placed in group home or institution | 12% | 23% |
| Reunified | 56% | 48% |
| Aged Out | 10% | 22% |

In both counties, the proportion of children in custody for four or more years in the point in time outlook has increased overall in the last seven years, though nearly half of children in custody over time have been in custody for four months to two years.

The next section explores the major findings from the Period 33 data and outcomes.

## III.    PERIOD 33 MAJOR FINDINGS AND RESULTS

This section provides major findings regarding outcomes for children, youth, and families involved with Region 14 of Georgia DFCS during Period 33, January 1, 2022 – June 30, 2022. It also provides a list for the performance of each county and the region for each of the requirements under the Modified Exit Plan. This includes a status update on the requirements, specifically whether the task or outcome has been attained or is at risk of being re-designated as an ongoing task or outcome. Period 33 includes six-month snapshots for annual measures. While this provides some insights into performance, the Region still has six months before results can be fully analyzed. The chart below reflects the status of outcome measures, including those annual measures that are on the watch list for possible movement out of attained to ongoing (yellow) and those six-month measures that are also on the watch list or are being recommended by MTAT to move back to the ongoing category (red).

| Attained | | | | |
|---|---|---|---|---|
| Outcome 2 | Outcome 4 | Outcome 5 | Outcome 7 | Outcome 8 |
| Outcome 9 | Outcome 10 | Outcome 11 | Outcome 13 | Outcome 14 |
| Outcome15 | Outcome 16 | Outcome 18 | Outcome 19 | Outcome 20 |
| Outcome 22 | Outcome 23 | Outcome 24 | Outcome 25 | Outcome 26 |
| Outcome 28 | | | | |
| **Ongoing** | | | | |
| Outcome 1 | Outcome 3 | Outcome 6 | Outcome 12 | Outcome 21a |
| Outcome 21b | Outcome 21c | Outcome 21d | Outcome 27 | |

As stated in the Modified Consent Decree and Exit Plan Section IX.E.1.b., "[A]n Ongoing Outcome Measure is automatically re-designated as an Attained Outcome Measure for the next reporting period, if in the previous three consecutive reporting periods (totaling18 months) . . ." [or three years for annual measures] State Defendants improved performance in the first period (as compared to the prior period) then met or exceeded the measure for the next two periods. An Attained Outcome Measure "will be re-designated as an Ongoing Outcome Measure only if both of the following conditions occur: (l) the Accountability Agent finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period." Modified Consent Decree and Exit Plan IX.E.2.b. For annual measures, this determination will take place after Period 34.

## *Major Findings*

### Permanency for Children and Youth in Foster Care

Ensuring that children who enter foster care achieve timely permanency is a major goal and responsibility for child welfare agencies across the country.

In 2016, when parties to the *Kenny A* Consent Decree renegotiated a Modified Consent Decree and Exit Plan, they agreed to adopt the current federal requirements and methodology to determine progress toward improving rates and stability of permanency in Region 14. The current federal methodology uses an entry cohort of children in care less than 12 months (OM 23), and an annual point in time analysis of two cohorts of children: those in care 12- 23 months (OM 6), and those children and youth in care over 24 months (OM 7).While using a point-in-time methodology is not as precise as an entry cohort analysis, the parties agreed that aligning *Kenny A* requirements with the existing federal mandates would prevent dual reporting and potentially conflicting analysis. It also allows the agency to compare performance across regions throughout the state.

In addition to the rates upon which children and youth exit foster care, it is important to ensure that once they exit, they do not return. Thus, re-entry rates are also evaluated on an annual basis utilizing the current federal requirements and methodology.

Period 33 marks the mid-point for these annual measures and is therefore provided for informational purposes only.

### 1. There is still time for the Region to surpass the threshold requirements for all three permanency outcome measures.

The three permanency annual measures are calculated each year for the period ending in December. The six-month snapshot presented in this monitoring report only provides an indication of performance during the first half of the year. Thus, the Region still has an opportunity to obtain permanency for more children in each cohort prior to the end of the year. The table below provides a mid-year comparison over the course of four years, 2019, 2020, 2021, and 2022.

| Outcome Measure | Period 27 Midyear | Period 29 Midyear | Period 31 Midyear | Period 33 Midyear |
|---|---|---|---|---|
| **OM 6 – Exits for children in care 12 – 23 months. (Threshold 43.6%)** | 22.4% | 17.8% | 21.9% | 20.1% |
| **OM 7 – Exits for children in care over 24 months. (Threshold 30.3%)** | 29% | 16.6% | 20.7% | 17.4% |
| **OM 23 – Exits for children in care 12 months or less. (Threshold 40.5%)** | 37% | 37% | 32% | 29% |

To demonstrate that the above data points are not indicative of what the annual results may be, the lowest mid-year performance for OM 6 was 17.8 percent. Yet, the Region was able to rally and surpass the threshold with an annual performance that year of 45 percent. Likewise, for OM 7, the lowest mid-year performance was 16.6 percent, yet the annual results that year also surpassed the required threshold at 37.4 percent. With focus and attention, the Region has an opportunity to finish strong on each of these annual measures.

## 2. Region 14 continues improving re-entry rates, as it inches closer to meeting the annual threshold than the past seven years.

The Region continues moving closer to reaching the threshold requirement (less than 8.3 percent) for the percent of children re-entering foster care within 12 months of exiting care. The chart below illustrates a comparison of midyear performance over the past four years

| Outcome Measure | Period 27 Midyear | Period 29 Midyear | Period 31 Midyear | Period 33 Midyear |
|---|---|---|---|---|
| **OM 3 – No more than 8.3% of children exiting care will re-enter care within 12 months.** | 19.8% | 13.5% | 11.9% | 8.6% |

Unlike the three permanency measures in which the Region has six additional months to significantly improve performance, the agreed-upon measure for annual re-entry rates does not allow for great fluctuation. In fact, for Periods 27 and 31 depicted in the chart above, the subsequent annual results were the same. However, for Period 29, the midyear snapshot was 13.5 percent, and the annual measure reported in Period 30 improved to 13.1 percent. With a threshold of no more than 8.3 percent, the Region is within striking distance from a midyear snapshot of 8.6 percent.

**Other Consent Decree Measures that Support Permanency**

There are several processes included in the consent decree that also have a direct impact on achieving permanency for children in foster care. The processes with the most direct impact involve the juvenile court system, its ability to hold timely hearings, and the production of valid court orders that document the reasons for removal, the reasonable efforts of DFCS, and the action steps needed to achieve permanency. Also important is consistent, regularly scheduled visitations and the ability of DFCS to limit the number of changes in a child's assigned case worker. This mitigates trauma associated with being in foster care and prevents unnecessary delays in a child's case due to hand-offs between workers and caregivers.

## 3. Juvenile courts in Fulton and DeKalb counties continued meeting and exceeding the threshold requirements for six-month court reviews (OM 19) and twelfth-month permanency reviews (OM 20). However timely finalizations of adoptions and guardianships (OM 8) fell below the threshold requirement.

As previously discussed in Section I, the juvenile courts of DeKalb and Fulton Counties continued successfully operating with virtual hearings and specially set in-person or hybrid hearings. During Period 33, the six-month case plan review hearings and the twelfth-month permanency hearings were all completed as required. Timely finalizations of adoptions and guardianships dropped to 76 percent, just under the threshold requirement of 80 percent.

Both juvenile courts are to be commended for completing the six-month court reviews and holding timely twelfth-month permanency hearings for 100 percent of eligible cases. The finalizations of adoptions and guardianships within twelve months of a Termination of Parental Rights (TPR) decreased from 88 percent in Period 32 to 76 percent in Period 33. For this measure, DeKalb County successfully and timely processed 85 percent of adoptions and guardianships. In comparison, Fulton County successfully and timely processed only 61 percent of these cases (a decline from 84 percent during Period 32). Some of the decline in performance can be attributed to COVID (a judge and attorney contracted COVID, thus delaying proceedings). Therefore, while this type of decline would normally place OM 8 on the "watch" list, MTAT is recommending that it remains in its current status until after analyzing Period 34.

> **4. After exceeding the requirement for continuity of case managers (OM 12) for three consecutive periods, the region continued its Period 32 decline dropping further below the required threshold.**

In accordance with the negotiated Modified Consent Decree and Exit Plan, the state agreed that each child should have no more than two assigned case managers while in foster care. The goal is that continuity of case managers would occur for at least 90 percent of children in care. Period 31 marked the third consecutive period that the Region met or exceeded this threshold (93 percent for Period 31), triggering a recommendation by MTAT that this measure be moved to the attained category. However, during Period 32, the region fell below the threshold to 83 percent, a significant decline in performance. MTAT noted in its Period 32 report that this was especially troubling given the numerous exceptions that are not considered "changes" when analyzing the number of case managers assigned to each child.[11] During Period 33, case manager continuity declined even further to 65 percent.

As discussed in Section I, in May 2022, 25 Fulton CPS staff, including case managers, supervisors, and an administrator, were placed on administrative leave pending an investigation into allegations jeopardizing child safety by organizing a "sick out" Some staff reported that it was not an orchestrated "sick out", however, they also expressed frustration with the lack of placements for children resulting in a need for staff to stay in the offices overnight until placements could be secured. As MTAT reported in the Sixth Brief on the Infrastructure Standards, staff also reported that the situation had become dangerous, and the police department was called to the offices on a regular basis. However, following an investigation by the Office of Inspector General (OIG), the 25 staff were dismissed from the agency. As reported in the Period 32 Monitoring Report, the Fulton CPS staff was already operating at a deficit:

---

[11] Exceptions built into OM 12 for analysis of case worker continuity include: Cases transferred to an adoption case manager; Case managers who have died, been terminated, promoted, or transferred to another county; and Case managers who have covered a case during another case manager's sick or maternity leave

*For [Fulton]CPS case managers only 64 % (27 of 42) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of December 31, 2021. An additional 23 cases were assigned to case managers on leave or supervisors, awaiting assignment, which is an increase compared to 11 cases during Period 31.*

Thus, the mass vacancies resulting from the terminations further exacerbated the already burgeoning caseloads. State staff, county leaders, field program assistants, and staff from other counties (including DeKalb) were deployed to assist Fulton County to ensure that investigations were completed and response times were met.

As discussed in the Caseload section, CPS was not the only area of practice with high turnover rates. The Region is attempting to mitigate this by hiring more hiring managers, holding frequent interviews, and working with the state training unit to shorten the length of time in training before new workers can report to the county and begin taking cases. For caseworker continuity, while terminations are an exception for the negotiated measure, the region continues to decline in performance, reaching a new low of 65 percent.

Researchers have correlated high caseworker turnover with poor outcomes for children in foster care.  According to a Casey Family Programs report[12]:

*High workloads can have a domino effect: staff burnout and stress lead to staff attrition that can result in decreased worker-family contact and failure to meet professional standards for investigation response and completion; case plan completion and updates, and service provision; as well as increased time to permanency, rates of maltreatment recurrence, and the number of foster care placements and re-entries into foster care.*

Thus, with the continued decline in performance, MTAT is recommending that OM 12 Continuity of Case Managers move from the "watch list" to the "Ongoing" category of outcome measures.

**5.  While the court systems have established protocols to improve the percentage of children with all applicable language in court orders necessary to be eligible for federal funding reimbursement (OM 27), this is the sixth consecutive reporting period that the counties did not meet the required 95 percent threshold.**

As the DeKalb and Fulton County court systems move toward post-pandemic operations, judges continue to work with stakeholders so every child in a dependency case has timely executed and filed valid court orders. As part of those protocols, DFCS continues to implement its responsibilities by uploading the court orders into each child's electronic record in Georgia SHINES. The court order serves as a blueprint for permanency, delineating the reasons for removal and the actions or behavioral changes needed for reunification or other permanency options. Thus, it is a vital factor for achieving timely permanency. The federal government

---

[12] https://www.casey.org/turnover-costs-and-retention-
strategies/#:~:text=High%20caseloads%20and%20workloads&text=Cost%20of%20processing%20changes%20in,an
d%20decreased%20chances%20of%20reunification

requires valid court orders that include specific findings regarding custody and reasonable efforts for states to qualify for reimbursements to cover the costs of foster care.

During Period 33, the case file review revealed that only 71 percent of children had all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. The Consent Decree threshold established by the parties is 95 percent, and this is the sixth consecutive reporting period falling below this requirement. In Fulton 94 percent of cases had the applicable language in the court orders, however, Dekalb's performance was only 55 percent. While the case file review is a statistically significant sample utilized by MTAT for its analysis, DFCS regularly evaluates IV-E eligibility for all children in its custody (penetration rate). Below is a graph of the statewide penetration rates from 2010 to present.

**Chart 8: State IV-E Penetration Rates**



Source: COSTAR through SFY 2010, SHINES SFY 2011  Beginning Jan 2011 SSI Elig Children
included in IV-E rate per Federal Policy.  (As of  08-26-22)

The statewide penetration rate continued to decrease slightly during Period 33 to an average of 34.85 percent compared to the SFY 22 average of 35.6 percent. The Revenue Maximization Unit has the opportunity to institute new practices that may help shift this trend and increase the penetration rate for Georgia. MTAT made recommendations to improve the penetration rate in the Third Brief on the Infrastructure Standards. The Seventh Brief on the Infrastructure Standards will once again revisit these recommendations and explore other strategies with the new DFCS Finance Director.

## 6. Despite continued challenges with staff turnover and shortages, the counties surpassed threshold requirements for all five visitation outcome measures.

Visitation is a vital component of achieving permanency and ensuring the well-being of children in foster care. During Period 32, the rates of visitation decreased in every category except monthly private in-placement visits between case managers and children (OM 26). In fact, two of the outcomes declined below their respective thresholds. MTAT concluded that the workforce crisis prevented the counties' ability to coordinate required visits and placed OM 13 (worker-child visits) and OM 14 (parent-child visitation) on the "watch list."

Fortunately, despite continued workforce challenges during Period 33, both counties surpassed the visitation threshold requirements for all five outcomes. Thus, MTAT is recommending that OM 13 and OM 14 be removed from the "watch list" and that all visitation-related outcomes remain in the attained category.

### Wellbeing of Children and Youth in Foster Care

OM 21 addresses DFCS' ability to identify and meet the medical, dental, mental health, educational, and developmental needs of children in care. As the substitute guardian for children when they enter foster care, it is imperative that the state meet each child's individualized needs. In fact, separating a child from his or her parent for abuse or neglect and then neglecting to meet the child's needs undermines the mission of the child welfare system. Screenings and assessments are completed for each child when they enter care and periodically through well-child visits in accordance with the Early Periodic Screening, Diagnostic, and Treatment (EPSDT) schedule outlined by Medicaid. It is then up to the case manager to coordinate follow-up for needs identified during these screenings. With the high rates of case manager turnover, the follow-up is often lacking and is again evident in the data analyzed during Period 33.

## 7. The Region continued struggling to meet identified health, dental, and mental health needs for children in foster care.

Since the pandemic, the Region's performance in meeting the health needs of youth in care has been a mixed bag across all the health metrics. During Period 32, the Region met 88 percent of medical health needs but declined to only 58 percent (7 out of 12) in Period 33. However, dental needs went from 50 percent in Period 32 to 80 percent (8 out of 10) in Period 33. The Region's performance in meeting educational needs dropped slightly from 88 percent (4 out of 5) in Period 32 to 80 percent in Period 33. Of note, the region continues to struggle to meet the mental

health needs of youth in care. The Region's performance decreased appreciably from 57 percent in Period 32 to only 29 percent in Period 33. It should be noted that Outcome Measure 21 is captured through a case file review of a sample of cases open during the reporting period. The number of children identified with needs decreased significantly during Covid and have not since rebounded. MTAT plans to explore the root of this issue with case reviewers in Period 34. In addition, the region's performance may be indicative of the staffing challenges that began heightening in Period 32 and reached crisis levels in Period 33, especially in Fulton County. Thus, MTAT anticipates that performance under OM 21 will continue fluctuating. Moreover, as the universe of children with identified needs continues to decrease, missing any follow-up greatly impacts the performance measured by percentage. At the same time, with fewer children identified with needs, there should also be an increased opportunity to meet all the needs. Thus, MTAT is recommending that OM 21, medical and educational, transition back to the ongoing category.

The state reports the following enhancements have occurred or are in the works that they believe will improve their ability to meet the needs of the children in foster care:

- There is a new team of Medicaid attorneys, two paralegals, and a veteran case worker to appeal adverse healthcare decisions by Amerigroup;

- Reprocurements by DCH for managed care Medicaid; and

- Conversion of $425 million from TANF to SSBG to spend on services and treatment for youth in care.

## 8. The rate of maltreatment in care (OM 4) continued decreasing below the maximum threshold, and the counties improved performance on initiating timely investigations (OM 1) for alleged maltreatment in care cases.

Since 2016, the rate of maltreatment in care decreased and then, in 2019, began steadily increasing, finally surpassing the 8.50 victims per 100,000 days maximum threshold. However, during Period 31, the rate significantly declined to 5.16, well below the maximum, and continued declining to the rate of 3.93 during Period 32.

- Period 27 (January-June 2019) – 3.45
- Period 28 (July – December 2019) – 7.28
- Period 29 (January-June 2020) – 6.64
- Period 30 (July-December 2020) – 9.65
- Period 31 (January-June 2021) – 5.16
- Period 32 (July – December 2021) – 3.93
- Period 33 (January – June 2022) – 3.66

Moreover, the rate of Recurrence of Maltreatment (Section VI.G.1 of the Modified Exit Plan and Consent Decree) decreased from 2.26 percent in Period 32 to 1.56 percent in Period 33.

During Period 32, the state was not able to meet the threshold for initiating timely investigations for maltreatment in care investigations, declining to 82.1 percent. Outcome Measure 1 requires that at least 95 percent of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim within 24 hours of receipt of the report, in accordance with Section 2106 of the Social Services Manual. During Period 33, the state rebounded to timely initiate investigations in 93.7 percent of the alleged maltreatment in care[13]. However, this is still short of the threshold, and MTAT is therefore recommending that OM 1 be moved from the "watch" list to the ongoing category.

### 9.    Region 14 continued meeting the threshold of 98 percent for placements in full approval status (OM 18), however, the lack of placements for children with complex needs reached crisis levels.

Under the Modified Consent Decree and Exit Plan, the parties agreed that at least 98 percent of all foster placements serving class member children shall be in full approval or licensure status. The approval and licensure process enables DFCS to ensure caregivers are knowledgeable about policies, regulations, safety measures, and trauma-informed care for children in its custody. This is an attained measure. Ninety-eight percent of placements were in full approval status at the end of Period 33 (down from 98.6 percent in Period 32).However, there continues to be a need for deep and focused attention on the array of placement options for children and youth with high complex needs.

---

[13] MTAT wanted to note one of the investigations that did not meet the threshold involved a case where the report came in on the day custody was returned to the parent, for an incident that occurred weeks prior while the child was in care. The parent was hesitant to give access to the child who had just been returned from out of home care where the alleged incident occurred, and therefore response time was not met.

**Outcome 18 - Placements in Full Approval Status**

| Placement Type | Number of Placements with a Class Member in Care on 06/30/2022 | Number of Placements with a Class Member in Care on 06/30/2022 that were in Full Approval Status | Overall Capacity of Placement Settings with a Class Member in Care on 06/30/2022 | Capacity of Placements with a Class Member in Care on 06/30/2022 that were in Full Approval Status | Capacity of Placements in Full Approval Status as a Percentage of Overall Placement Capacity |
|---|---|---|---|---|---|
| Relative Placement | 112 | 110 | 259 | 253 | 97.7% |
| DFCS - supervised Foster Home | 79 | 79 | 203 | 203 | 100% |
| Provider - supervised Foster Home | 262 | 244 | 803 | 746 | 92.9% |
| Child Caring Institution | 50 | 50 | 1366 | 1366 | 100% |
| Total | 503 | 483 | 2631 | 2568 | 97.6% |
| Change from Period 32 | -9 | -20 | +398 | +367 | -1% |

Of the 112 total Relative homes, 2 were Unapproved. This left a total of 110 homes, of which all were Approved.

Of the 79 DFCS FH's, 0 was over capacity, which leaves the total 79 approved.

Of the 262 total CPA FH's, 18 were unapproved for various reasons.

Of the 50 CCI's, 0 were Suspended, and 0 were Inactive and Closed, which left a total of 50 Full Active.

The Region 14 Resource Development Unit reports a continued focus on recruiting more homes for teens, developing better support for homes currently taking teens, and increasing receiving homes and kinship partnership and adoptive homes. The unit believes that these three areas still represent the biggest placement needs. During Period 33, 29 new families were approved, including nine homes specifically for teens (three kinship homes approved included teens, and six traditional partnership and adoptive homes approved will accept teens). This is less than half the number of homes for teens from the last review period and only four fewer homes overall.

During Period 33, 29 homes also closed. The Resource Development Unit reported the following from exit interviews:

- 14 of the closures were kinship homes, 12 of which closed due to guardianship or adoption.

- Of the remaining closures, 15 were partnership homes (up seven from the previous period), and two were adoptive families.

- No homes closed due to substantiated CPS claims

- One kinship home and one partnership home were closed due to policy violations.

- Six partnership homes and one adoptive home closed for personal reasons.

- Four partnership families moved out of the region, one retired, one passed away, and one closed due to not taking placements.

- One partnership home and one adoptive home closed after finalizing adoptions.

The Resource Development Unit has started hosting more in-person recruitment, training, and retention activities for resource families. By opening 29 homes and closing 29, the Region did not increase its overall number of potential family placements for children entering care.

During Period 33, the number of children without placements and sleeping in county offices reached crisis levels, necessitating an emergency approach. This included increasing the per diem rates, offering a $5,000 grant for providers accepting youth with high complex needs, and frequent staffing meetings that included state, regional, and county staff and leadership. (Although it was originally reported that the grants would be available for CPAs as well as CCI's, MTAT was unable to confirm any instances of grants to individual CPA or DFCS foster homes).

The Region quickly transitioned from children sleeping in the offices and once again began placing children in hotels until placements could be secured. (For an in-depth analysis, see the Sixth Brief on the Infrastructure Standards). For the first several weeks after the transition, the weekly number of children in hotel rooms fluctuated between zero and six. However, each month, the average number continues to increase and is now consistently in the range of sixe to eight children per week. The state officediscontinued its $5,000 grant initiative, however it has now been reauthorized.  State staff continue collecting data to analyze how the grants were utilized and whether they improved services for those children without placements.

The state office also reports that private provider staffing was also identified as an impediment to providing placements for children during the crisis. The state took the unusual step of paying a staffing company to provide staff for private providers. Several providers participated in the initiative, and the staffing company allowed providers to hire the temp staff full-time if it was a good fit. The program was  slated to end in November 2022, however it too has been extended.

Given the historic fluctuation between utilizing hotels and offices as temporary placements for children, it is imperative that the state thoroughly evaluate the effectiveness of its initiatives to date to secure placements for children and youth with high complex needs. Those initiatives that demonstrate promising results should continue to be implemented with fidelity. In addition, MTAT highly recommends working with stakeholders and the courts to divert some of the extensive financial resources and services currently being provided to acute and congregate

settings to parents, relatives, and fictive kin. The state office and regional weekly consultations should continue in order to ensure that children do not linger in hotels. Eventually the state can end its reliance on these inappropriate non-child welfare placement settings.

For a complete listing of Period 33 performance for all measures required in the Modified Consent Decree and Exit plan, see the below tables.

This report also has three appendices. Appendix A is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Consent Decree and Exit Plan and describes the method for producing the metric. A technical document, Detailed Outcome Measures for Period 32, provides the numerator and denominator for each metric displayed and includes additional explanation or data that support the interpretation of the outcome metric under the Modified Consent Decree and Exit Plan.

Appendix B contains a glossary of common terms that are relevant to Georgia.

## *Table 3: Period 33 Ongoing Modified Exit Plan Requirements*

| Ongoing Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 1**: Commencement of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | **89%** | 100% | 84.8% | **93.7%** |
| **Outcome 3**: Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than **8.3%** shall have re-entered care within 12 months from the date of discharge. Children who were in foster care for less than eight days are not counted in this measure. | **11.9%** | 7.1% | 10.4% | **8.6%**[14] |
| **Outcome 6**: At least **43.6%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 | **42%** | 20.9% | 18.2% | **20.1%**[15] |

[14] Period 33 data reflects the first six months of the year and not the entire outcome.
[15] Period 33 data reflects the first six months of the year and not the entire outcome.

| Ongoing Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | | |
| **Outcome 17**: Education: At least **56%** of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | **58%** | | | |
| **Outcome 21**: Health and Educational Needs: Of children in care at a point in time at the end of the reporting period, according to the service needs documented in the child's most recent case plan: [16] | | | | |
| **Outcome 21b**: At least **92%** shall not have any unaddressed dental needs | **50%** | 100% | 60% | **80%** |
| **Outcome 21c**: At least **92%** shall not have any unaddressed mental health needs | **57%** | 50% | 0% | **29%** |

## *Table 4: Period 33 Attained Outcome Measures*

| Attained Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 2**: Completion of CPS Investigations Concerning Foster Children: At least **95%** of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | **100%** | 100% | 100% | **100%** |
| **Outcome 4**: Maltreatment in Care: Of all children in foster care during the reporting | **3.93** | 0.96 | 8.32 | **3.66** |

---

[16] All health and educational needs data are very limited due to COVID-19, so numbers are very skewed.

| Attained Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| period, the rate of victimization shall be no more than **8.50** victims per 100,000 days. | | | | |
| **Outcome 5**: Search for Relatives: At least **95%** of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | **100%** | 90% | 100% | **95%** |
| **Outcome 7**: At least **30.3%** of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | **38.0%** | 22.8% | 8.3% | **17.4%**[17] |
| **Outcome 8**: Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least **80%** will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights | **88%** | 85% | 61% | **76%**[18] |
| **Outcome 9**: Permanency Efforts (15/22): At least **95%** of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | **96%** | 94% | 99% | **96%** |

---

[17] Period 33 data reflects the first six months of the year and not the entire outcome.

[18] In Fulton County, a judge and an attorney contracted COVID, thus delaying the finalization hearings. Thus, MTAT is not recommending that this outcome measure go on the watch list.

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 32 Performance<br><br>Region 14 | Period 33 Performance<br><br>DeKalb | Period 33 Performance<br><br>Fulton | Period 33 Performance<br><br>Region 14 |
|---|---|---|---|---|
| **Outcome 10**: Sibling Placement: At least **80%** of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions:<br>(a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relatives. | **100%** | 100% | 100% | **100%** |
| **Outcome 11**: Multiple Placement Moves: The rate of placement moves in foster care shall be no more than **3.67** moves per 1,000 days in foster care. | **3.13** | 2.27 | 3.81 | **2.83** |
| **Outcome 12**: Caseworker Continuity: At least **90%** of all children in custody at a point in time during the reporting period shall have had two or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave | **83%** | 61% | 71% | **65%** |
| **Outcome 13**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be | **95.9%** | 97.8% | 97.4% | **97.6%** |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| excluded when calculating this percentage. | | | | |
| **Outcome 14**: Visitation (Parent-Child): At least **85%** of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | **80%** | 85.6% | 86.4% | **85.9%** |
| **Outcome 15**: Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least **95%** of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage | **97%** | 95.3% | 96.9% | **95.9%** |
| **Outcome 16**: Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least **90%** of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | **92%** | 95.3% | 96.7% | **95.7%** |
| **Outcome 18**: Placements Not in Full Approval Status: At least **98%** of all foster placements serving class member children shall be in full approval and/or | **98.6%** | | | **98%** |

*Kenny A. v. Kemp*

| Attained Outcome Measures | Period 32 Performance<br><br>Region 14 | Period 33 Performance<br><br>DeKalb | Period 33 Performance<br><br>Fulton | Period 33 Performance<br><br>Region 14 |
|---|---|---|---|---|
| licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | | | | |
| **Outcome 19**: Six-Month Case Plan Review: At least **95%** of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | **95%** | 100% | 100% | **100%** |
| **Outcome 20**: Permanency Hearing: At least **95%** of foster children in custody for 12 or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | **100%** | 100% | 100% | **100%** |
| **Outcome 21a**: At least **92%** shall not have any unaddressed medical needs | **88%** | 43% | 80% | **58%** |
| **Outcome 21d**: At least **92%** shall not have any unaddressed education/development needs. | **88%** | 100% | 50% | **80%** |
| **Outcome 22**: Corporal Punishment: At least **98%** of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | **99%** | | | **100%** |

| Attained Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| **Outcome 23**: Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least **40.5%** shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | **35.0%** | 20.5% | 39.9% | **29.0%[19]** |
| **Outcome 24**: Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | **0%** | 0% | 0% | **0%** |
| **Outcome 25**: Placement Within County: At least **90%** of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, b) the child is placed through the ICPC consistent with its terms, c) the child is appropriately placed with relatives, or d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | **96%** | | | **96%** |
| **Outcome 26**: Visitation (Worker-Child): At least **96.25%** of the total minimum number of monthly *private*, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall | **97.44%** | 97.90% | 97.73% | **97.84%** |

---

[19] Period 33 data reflects the first six months of the year and not the entire outcome.

| Attained Outcome Measures | Period 32 Performance Region 14 | Period 33 Performance DeKalb | Period 33 Performance Fulton | Period 33 Performance Region 14 |
|---|---|---|---|---|
| be excluded when calculating this percentage. | | | | |
| **Outcome 27**: Court Orders: At least **95%** of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | **75%** | 55% | 94% | **71%** |
| **Outcome 28**: Capacity Limits: No more than **10%** of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of six children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster home with no other children in the home. | **2.0%** | | | **0.6%** |
| **Other Consent Decree Requirements** | | | | |
| Visitation in First Week of New Placement | | | | |
| (VI.G.1) Recurrence of Maltreatment. | **2.26%** | 0.9% | 2.29% | **1.56%** |
| (VI.G.2) Number of children who were victims of a second substantiated investigation within 12 months of FSS case. | **2.93%** | 2.12% | 2.88% | **2.58%** |

# IV    CASELOAD REQUIREMENTS

For the purpose of this report, this section is focused solely on the caseload standards and supervisory ratios included in the Modified Consent Decree and Exit Plan Section V.[1]

- No CPS case manager shall have more than 12 cases.
- No ongoing case manager shall have more than 17 cases.
- No placement case manager shall have more than 15 cases.
- No adoption case manager shall have more than 16 cases.
- No specialized case manager shall have more than 12 cases.
- No supervisor shall supervise more than five case managers at any one time in Fulton or DeKalb Counties.

For Period 33, of the 58 case managers in Fulton on June 30, 2022, 42 (72 percent) met the designated caps. Of note, only 5 out of 14 (36 percent) of Specialized Case Managers and 14 out of 20 (70 percent) CPS Investigators met the designated caps. DeKalb had many case managers that did not meet the caseload caps. Of the 62 CPS, family preservation, permanency, and specialized case managers that were active on December 31, 2021, only 35 (56 percent) met the specified caps. Only 6 out of 16 (38 percent) Permanency Case Managers and 3 out of 17 (18 percent) Specialized Case Managers met the designated caps.

During Period 33, there were 31 new hires, 10 re-hires and 56 losses (51 resignations) in DeKalb, while in Fulton there were 25 hires, 7 re-hires, and 76 losses (49 resignations and 23 dismissals) for the same period. Until the counties can hire more staff than they lose to terminations and resignations, there will not be enough staff to meet caseload requirements.

One strategy that the state began testing during Period 33 was a redesign of the required state training for new staff. The current state training for new case managers is approximately seven weeks. Training staff assisted in developing a pilot training for RegionRegion 14 to implement a provisional certification program for new SS staff. The first cohort of staff began the program mid-June 2022. Training and Professional Development Unit management provided on-site support for this pilot training process. Following the expedited training that will take approximately four weeks, new staff are assigned coaches to assist as they begin taking cases. While it is too soon to determine the effectiveness of the new training program, MTAT highly recommends that county leaders and state training leaders work closely together to provide feedback and input to continue tweaking and improving the curriculum.

The continued erosion of the workforce is very concerning and should be addressed immediately so services for children and families are not negatively impacted.

## *Supervisors*

As of June 30, 2022, Dekalb continued to show a decline in the number of supervisors overseeing CPS investigations, family preservation, permanency, and specialized case managers for children in foster care that were assigned five or fewer case managers. Only 35 supervisors out of 62 (56 percent) met the required ratio, while Fulton had 41 supervisors out of 57 (72 percent) meet the ratio. For Period 31, all supervisors in Region 14 met the 1 to 5 ratio.

## CPS Case Managers

For CPS case managers, 78 percent (32 of 41) were assigned 12 or fewer families to respond to or investigate reports of maltreatment as of June 30, 2022. An additional 40 cases were assigned to case managers on leave or supervisors awaiting assignment, which is an increase compared to 23 cases during Period 32.

## Family Preservation Case Managers

Family preservation case managers generally were assigned 17 or fewer families to be able to provide services and help ensure child safety. The same was true on June 30, 2022. All 21 of these case managers met the standard.

## Permanency Case Managers

On June 30, 2020, only 59 percent (16 out of 27) of permanency case managers were meeting caseload expectations. This is the same as performance in Period 32 (59 percent).

## Case Managers with Children Assigned to Them Who Have Been in Foster Care for 18 Months or Longer

Previously known as specialized case managers, case managers assigned to children in foster care for 18 months or longer are to be assigned no more than 12 children at any given time. Many of these children require extra support to achieve permanency. During Period 33, only 26 percent (8 of 31) of these case managers met caseload expectations on June 30, 2022. This is a significant decrease from the performance (69 percent) for Period 32.

## DeKalb County on June 30, 2022

The caseloads for 44 percent of the case managers in DeKalb County on June 30, 2022, exceeded the caseload cap. This is a slight increase to their Period performance in which 42 percent had caseloads exceeding the requirements. It should be noted that all family preservation case managers were assigned caseloads that met agreed-upon standards. In addition, only 6 out of the 16 (38 percent) Permanency Case Managers and 3 out of 17 (18 percent) specialized case managers met the caseload requirement. See Appendix A, *Table A-3 and Table A-4* for more information.

## Fulton County on June 30, 2022

For Fulton County, 28 percent of case managers exceeded caseload expectations, which was an increase to their performance in Period 32 when only 11 percent exceeded the requirement. It should also be noted that all family preservation case managers met the caseload requirements during period 33. Additionally, 10 out of 11 (91 percent) of permanency case managers, and 5 out of 14 (36 percent) specialized case managers met the caseload requirements during Period 33. See Appendix A, *Table A-5 and Table A-6* for more information.

# V    PLACEMENT STANDARDS

The quality placement and caregiving standards include specific DFCS commitments to ensure every child in foster care will have a stable, nurturing placement in accordance with the principles outlined in the Modified Consent Decree and Exit Plan § III. These standards address the specific tasks so family ties are maintained and nurtured, children are able to remain with parents and relatives as often as possible, and the screening, training, approval, and support process for all caregivers are operating well. The Second and Fourth Brief on the Infrastructure Standards included an analysis of these standards.

This section of the report provides an update on agreed-upon placement standards in the Modified Consent Decree and Exit Plan § IV.

## Discriminatory Placement Practices

Section IV.B.3 of the Modified Consent Decree and Exit Plan prohibits discriminatory placement practices. [20] MTAT continues working with the state office to evaluate its array of placement providers. While the focus is on outcomes, the state continues exploring the willingness of providers to accept all children within their stated scope of expertise, regardless of race, ethnicity, religion, sexual orientation, or gender identity.

During Period 33, the state experienced continued challenges ensuring that youth who self-identify as members of the LGBTQIA community are in affirming placements. While some providers expressed concern regarding cottage assignments based on gender identification, the state also needs to provide more guidance for providers providing placement for trans youth.

### *Reimbursement Rates*

A memorandum was sent July 15, 2022 to all Room, Board and Watchful Oversight (RBWO) placement providers indicating that in FY23, reimbursement rates for foster care will increase by 10 percent across all program types and designations, with additional supplements being added for those identified with special needs.. The table below reflects the new rate structure:

---

[20] Specifically, this section states: "Race and/or ethnicity and/or religion shall not be the basis for a delay or denial in the placement of a child, either with regard to matching the child with a foster or adoptive family or with regard to placing a child in a group facility. DHS shall not contract with any program or private agency that gives preference in its placement practices by race, ethnicity, or religion…" Moreover, the Principles outlined in the Exit Plan include: "All children in need of child welfare services should receive; full and equal access to the best available services, regardless of race, religion, ethnicity, disabilities, sexual orientation, or gender identity."

**Table 5: FY23 Rate Schedule**

|  | Payment to Agency | Payment to FP Ages 0-5 | Payment to FP Ages 6-12 | Payment to FP Ages 13+ | Rate Description |
|---|---|---|---|---|---|
| **Base WO** | $34.21 | $27.80 | $29.99 | $32.62 | Age Based FP Rate |
| | | $21.38 | $19.48 | $17.18 | FP Rate Supplement |
| | | $83.39 | $83.68 | $84.01 | TOTAL RATE |
| | | | | | |
| **Max WO** | $47.23 | $27.80 | $29.99 | $32.62 | Age Based FP Rate |
| | | $35.40 | $33.50 | $31.20 | FP Rate Supplement |
| | | $110.43 | $110.72 | $111.05 | TOTAL RATE |
| | | | | | |
| **Specialty Base WO** | $53.05 | $27.80 | $29.99 | $32.62 | Age Based FP Rate |
| | | $30.40 | $28.50 | $26.20 | FP Rate Supplement |
| | | $111.25 | $111.54 | $111.87 | TOTAL RATE |
| | | | | | |
| **Specialty Max WO** | $81.33 | $27.80 | $29.99 | $32.62 | **Age Based FP Rate** |
| | | $40.40 | $38.50 | $36.20 | **FP Rate Supplement** |
| | | $149.53 | $149.82 | $150.15 | **TOTAL RATE** |
| | | | | | |
| **Specialty MFWO** | $95.48 | $27.80 | $29.99 | $32.62 | **Age Based FP Rate** |
| | | $67.40 | $65.50 | $63.20 | **FP Rate Supplement** |
| | | $190.68 | $190.97 | $191.30 | **TOTAL RATE** |

In addition, for children without placements (those children currently staying in offices or hotels), the state has offered providers a higher rate of per diem and a $5,000 grant to cover services needed to address each youth's high complex needs at the end of the Period.

The major findings regarding the placement standards during Period 33 are presented below.

## Major Findings – Placement Standards

**1. Toward the end of Period 33, the Region stopped using its administrative offices to house youth without placements. However, the use of hotels is now increasing.**

The Modified Consent Decree states, "no child shall spend more than 23 hours in a county DFCS office. Any child who spends time in a county DFCS office between the hours of 8:00 p.m. and 8:00 a.m. shall be reported to the MTAT. The intent of this provision is to prevent the use of DFCS offices as an overnight placement for children, as children with urgent placement needs require a safe bed in a home-like environment."

As discussed above, the use of DFCS offices for temporary placements for youth in Region 14 hit crisis levels during Period 33. During an emergency meeting in May 2022, MTAT discussed concerns with state leaders, and Commissioner Broce pledged to end office stays in Region 14. As the state transitioned from office stays, the parties acknowledged that limited use of hotels may be needed until long-term sustainable systemic solutions could be implemented. Initially, the counties' reliance on hotels was limited. However, the number of youth and the length of stays have fluctuated but appear to both be increasing, with significant more hotel utilization occurring in Fulton compared to DeKalb. Between May and October 2022, DeKalb County placed 14 youth in hotels for a total of 134 days, compared to 49 youth placed in hotels by Fulton County for a total of 733 days.

**Chart 9: Daily Number of Children in Hotels in Region 14 Through 10/31/2022**



The number of children staying in hotels on any given day peaked in June with a high of 12, then slowly decreased, coinciding with the $5,000 grants to agencies and enhanced rates, down to zero at the end of July. Since August 2022, the number of children in hotels has slowly been increasing and by the end of October 2022, there were eight children staying in a hotel. Looking at hotel stays by the length of stay, increases can also be observed overtime. The chart below shows the length of each hotel stay by the day of entry into hotels.

### Chart 10: Length of Stay of Hotel Placements Over Time



The forecast line shows while there have been great variety in the length of stays from 1 or 2 days to a high of 80 days, over the five month period since hotel stays resumed, the length of stays has steadily increased. This warrants further examination in the coming months, should this trend continue to increase. For the 63 youth placed between May and October 2022, the following chart illustrates their placements after hoteling:

### Table 6: Destinations of Children After Hoteling

| Exit Type | # |
|---|---|
| CCI | 30 |
| Runaway | 8 |
| CPA FH | 7 |
| DFCS FH | 5 |
| Fictive Kin | 4 |
| Back to Parents | 3 |
| Back to Guardian | 2 |
| Relative | 2 |
| Aged Out | 1 |
| RYDC | 1 |

An overwhelming number of children (30 of 63 exits, 44.1%) exited hotels into CCIs. If the state continues moving away from the use of congregate care for all children and youth, other options must be explored or created for youth with high complex needs. MTAT highly recommends that the state continue pursuing the creation of therapeutic foster care.

## 2. The state continues to ensure young children are not placed in congregate care placements unless necessary for the child's welfare.

The Consent Decree has several restrictions related to the use of group care, including limiting the use of congregate care for young children. The reported information is for all children under the age of 12 in care between January 1 and June 30, 2022.

According to verified state reports, no children under the age of 12 entering foster care or already in care during the period were placed in group homes or child-caring institutions except as allowed under the Modified Exit Plan. Of youth under the age of 12 who entered foster care during Period 33, 16 were placed in hospitals to meet their physical health needs,17 were hospitalized for mental health issues, seven were placed in receiving homes, and one was an infant with a teen mom.

## 3. The overwhelming number of children are not remaining in temporary facilities longer than 30 days and the Region continues to place fewer children in more than one temporary facility while in foster care.

The Modified Consent Decree states:

- No child shall be placed in a temporary facility, or any other foster home or group facility beds used on any temporary basis, for more than 30 days: and
- Children shall not be placed in more than one temporary facility within one episode of foster care (meaning the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care).

During Period 33, out of the 1,133 children in foster care at the beginning of the period or entered during the period, nine children were placed in a temporary facility or any other foster home or group facility beds used on a temporary basis for more than 30 days. This is a decrease from Period 32, during which there were 12 children in a temporary facility.

In addition, the state continues striving to reduce the number of children experiencing two or more temporary placements. During Period 33, seven of 229 (3 percent) children were placed in two or more temporary facilities within one episode of foster care. There were only 20 out of 3,538 (6 percent) in Period 32.

# APPENDIX A – METRICS UNDER THE MODIFIED EXIT PLAN

This Appendix contains two tables summarizing the metrics under the Modified Exit Plan and the methods for generating each of them.

*Table A-1* is a Measures Grid that identifies each measurable outcome, practice standard, or performance measure required under the Modified Ext Plan and describes the method for producing that metric.

*Table A-2* is a technical document, Detailed Outcome Measures Period 33, that provides the numerator and denominator for each metric displayed in *Tables 4 and 5* above and includes additional explanation or data that support the interpretation of the outcome metric under the Modified Consent Decree and Exit Plan. It also contains additional technical explanations and historical data that provide context for reviewing and interpreting Period 33 performance data.

*Tables A-3 through A-8* provide caseload data as reported from the state.

**Table A-2: Detailed Outcome Measures for Period 33**

|  | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.A.1 | At least 95% of all investigations of reports of abuse or neglect of foster children shall be commenced, including timely face-to-face private contact with the alleged victim, in accordance with Section 2106 of the Social Services Manual, within 24 hours of receipt of the report. | DeKalb: 19<br>Fulton: 14<br>Perimeter: 41<br>Total: 74 | DeKalb: 23<br>Fulton: 14<br>Perimeter: 42<br>Total: 79 | DeKalb: 82.6%<br>Fulton: 100%<br>Perimeter: 97.6%<br>Total: 93.7% |
| VI.A.2 | At least 95% of all investigations of reported abuse or neglect of foster children shall be completed, in accordance with Section 2106 of the Social Services Manual, within 45 days of receipt of the report. | DeKalb: 23<br>Fulton: 14<br>Perimeter: 42<br>Total: 79 | DeKalb: 23<br>Fulton: 14<br>Perimeter: 42<br>Total: 79 | DeKalb: 100%<br>Fulton: 100%<br>Perimeter: 100%<br>Total: 100% |
| VI.A.3 | Re-entry into Care: Of all children who enter foster care in a 12-month period who were discharged within 12 months from foster care to reunification (including aftercare), living with a relative, or guardianship no more than 8.3% shall have re-entered care within 12 months from the date of discharge. | DeKalb: 6<br>Fulton: 7<br>Total: 13 | DeKalb: 85<br>Fulton: 67<br>Total: 152 | DeKalb: 7.1%<br>Fulton: 10.4%<br>Total: 8.6% |
| VI.A.4 | Maltreatment in care: Of all children in foster care during the reporting period, the rate of victimization shall be no more than 8.50 victims per 100,000 days. | DeKalb: 1<br>Fulton: 5<br>Total: 6 | DeKalb: 103735<br>Fulton: 60084<br>Total: 163819 | DeKalb: 0.96<br>Fulton: 8.32<br>Total: 3.66 |
| | This a new measure which relies on the CFSR 3 methodology. That methodology controls for "exposure time" for the risk of maltreatment by calculating the total number of days that children with a least one day of care in the period experienced. It also counts any substantiated investigation associated with a child in care, regardless of who was the perpetrator of the maltreatment. | | | |
| VI.A.5 | Search for Relatives: At least 95% of all foster children entering care shall have had a diligent search for parents and relatives undertaken and documented within 60 days of entering foster care. | DeKalb: 27<br>Fulton: 30<br>Total: 57 | DeKalb: 30<br>Fulton: 30<br>Total: 60 | DeKalb: 90%<br>Fulton: 100%<br>Total: 95% |
| VI.A.6 | Permanency: At least 43.6% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) between 12 and 23 months shall be discharged from foster care to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | DeKalb: 34<br>Fulton: 12<br>Total: 46 | DeKalb: 163<br>Fulton: 66<br>Total: 229 | DeKalb: 20.9%<br>Fulton: 18.2%<br>Total: 20.1% |
| VI.A.7 | Permanency: At least 30.3% of all children in foster care on the first day of a 12-month period who had been in foster care (in that episode) for 24 months or more shall be discharged to permanency within 12 months of the first day of the period. Permanency, for the purposes of this measure includes discharges | DeKalb: 61<br>Fulton: 13<br>Total: 74 | DeKalb: 268<br>Fulton: 157<br>Total: 425 | DeKalb: 22.8%<br>Fulton: 8.3%<br>Total: 17.4% |

**Table A-2: Detailed Outcome Measures for Period 33**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | from foster care to reunification with the child's parents or primary caregiver, living with a relative, guardianship, or adoption. | | | |
| VI.A.8 | Adoption/Guardianship Finalization: For all children whose parental rights are terminated or released during the reporting period (and any appeals completed), at least 80% will have their adoptions or guardianships finalized within 12 months of final termination or release of parental rights. | DeKalb: 23 Fulton: 11 Total: 34 | DeKalb: 27 Fulton: 18 Total: 45 | DeKalb: 85% Fulton: 61% Total: 76% |
| | *During this reporting period, two (2) DeKalb cases were on track to finalize timely but were delayed due to COVID | | | |
| VI.A.9 | Permanency Efforts (15/22): At least 95% of all foster children who reached the point of being in custody for 15 of the prior 22 months shall have had either (a) a petition for the termination of parental rights filed as to both parents or legal caregivers as applicable, or (b) documented compelling reasons in the child's case record why termination of parental rights should not be filed. | DeKalb: 357 Fulton: 219 Total: 576 | DeKalb: 378 Fulton: 222 Total: 600 | DeKalb: 94% Fulton: 99% Total: 96% |
| VI.A.10 | Sibling placement: At least 80% of all children who entered foster care during the reporting period along with one or more siblings shall be placed with all of their siblings, subject to the following exceptions: (a) doing so is harmful to one or more of the siblings, (b) one or more of the siblings has exceptional needs that can only be met in a specialized program or facility, (c) the size of the sibling group makes such placement impractical notwithstanding diligent efforts to place the group together; or (d) the siblings are placed with relative. | DeKalb: 43 Fulton: 18 Total: 61 | DeKalb: 43 Fulton: 18 Total: 61 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.11 | Multiple Placement Moves: The rate of placement moves in foster care shall be no more than 3.67 moves per 1,000 days in foster care. | DeKalb: 229 Fulton: 216 Total: 445 | DeKalb: 100688 Fulton: 56651 Total: 157339 | DeKalb: 2.27 Fulton: 3.81 Total: 2.83 |
| VI.A.12 | Caseworker Continuity: At least 90% of all children in custody at a point in time during the reporting period shall have had 2 or fewer DFCS placement case managers during the prior 12 months in custody. This measure shall not apply to cases that are transferred to an adoption case manager; case managers who have died, been terminated, promoted, or transferred to another county; or case managers who have covered a case during another case manager's sick or maternity leave. | DeKalb: 334 Fulton: 251 Total: 585 | DeKalb: 550 Fulton: 354 Total: 904 | DeKalb: 61% Fulton: 71% Total: 65% |
| VI.A.13 | Visitation (Worker-Child): At least 96.25% of the total minimum number of one in-placement visit per month and one additional private visit per month between case managers and children during the reporting period shall have | DeKalb: 4785 Fulton: 2743 Total: 7528 | DeKalb: 4892 Fulton: 2818 Total: 7710 | DeKalb: 97.81% Fulton: 97.35% Total: 97.64% |

*Kenny A. v. Kemp*

**Table A-2: Detailed Outcome Measures for Period 33**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| | taken place. Visits in excess of this required minimum of one in-placement and one private visit per month shall be excluded when calculating this percentage. | | | |
| VI.A.14 | Visitation (Parent-Child): At least 85% of the children with a goal of reunification shall have had appropriate visitation with their parents to progress toward reunification. | DeKalb: 1314 Fulton:612 Total: 1926 | DeKalb: 1535 Fulton: 708 Total: 2243 | DeKalb: 85.6% Fulton: 86.4% Total: 85.9% |
| VI.A.15 | Visitation (Worker-Caregiver): DFCS placement case managers shall visit each child's foster parent, group care setting, or other caregiver setting at least one time each month. At least 95% of the total minimum number of required monthly visits by placement case managers to caregivers during the reporting period shall have taken place. Visits to any caregiver with respect to the same child in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 3145 Fulton: 1804 Total: 4949 | DeKalb: 3301 Fulton: 1862 Total: 5163 | DeKalb: 95.3% Fulton: 96.9% Total: 95.9% |
| VI.A.16 | Visitation (Between Siblings): Children who have one or more siblings in custody with whom they are not placed shall be provided a visit with their siblings at least one time each month, unless the visit is harmful to one or more of the siblings, the sibling is placed out of state in compliance with ICPC, or the distance between the children's placements is more than 50 miles and the child is placed with a relative. At least 90% of the total minimum number of required monthly sibling group visits shall have taken place during the reporting period. Visits among siblings in excess of the required one visit per month shall be excluded when calculating this percentage. | DeKalb: 510 Fulton: 232 Total: 742 | DeKalb: 535 Fulton: 240 Total: 775 | DeKalb: 95.3% Fulton: 96.7% Total: 95.7% |
| VI.A.17 | Education: At least 56% of children discharged from foster care at age 18 or older shall have graduated from high school or earned a GED. | | | |
| | This metric is generated annually in the report covering the period that ends December 31 of each year. | | | |
| VI.A.18 | Placements Not in Full Approval Status: At least 98% of all foster placements serving class member children shall be in full approval and/or licensure status. In computing this percentage, each placement shall be weighted by the approved and/or licensed capacity of that placement. | Total: 2568 | Total: 2631 | Total: 97.6% |

**Table A-2: Detailed Outcome Measures for Period 33**

| | Outcome | | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
| VI.A.19 | Six-Month Case Plan Review: At least 95% of foster children in custody for six months or more shall have either had their six-month case plan review completed by the Juvenile Court within six months of their prior case plan review, or DFCS shall have submitted the child's six-month case plan to the Juvenile Court and filed a motion requesting a six-month case plan review within 45 days of the expiration of the six-month period following the last review. | | DeKalb:44 Fulton: 26 Total: 70 | DeKalb: 44 Fulton: 26 Total: 70 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.20 | Permanency Hearing: At least 95% of foster children in custody for twelve or more months shall have either had a permanency hearing held by the Juvenile Court within 12 months of the time the child entered foster care or had his or her last permanency hearing, or DFCS shall have submitted the documents required by the Juvenile Court for and requested a permanency hearing within 45 days of the expiration of the 12-month period following the time the child entered foster care or had his or her last permanency hearing. | | DeKalb: 34 Fulton: 34 Total: 68 | DeKalb: 24 Fulton: 24 Total: 68 | DeKalb: 100% Fulton: 100% Total: 100% |
| VI.A.21 | Health/Educational Needs. Of children in care at a point in time at end of reporting period, 92% shall have met each need documented in most recent plan: Medical, Dental, Mental Health, Educational. | | See Below | | |
| | | Medical Needs | DeKalb: 3 Fulton: 4 Total: 7 | DeKalb: 7 Fulton: 5 Total: 12 | DeKalb: 43% Fulton: 80% Total: 58% |
| | | Dental Needs | DeKalb: 5 Fulton: 3 Total: 8 | DeKalb: 5 Fulton: 5 Total: 10 | DeKalb: 100% Fulton: 60% Total: 80% |
| | | Mental Health Needs | DeKalb: 2 Fulton: 0 Total: 2 | DeKalb: 4 Fulton: 3 Total: 7 | DeKalb: 50% Fulton: 0% Total: 29% |
| | | Education/Developmental Needs | DeKalb: 3 Fulton: 1 Total: 4 | DeKalb: 3 Fulton: 2 Total: 5 | DeKalb: 100% Fulton: 50% Total: 80% |

**Table A-2: Detailed Outcome Measures for Period 33**

| | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| VI.B.22[21] | Corporal Punishment: At least 98% of all foster homes will not have an incident of corporal punishment (any physical punishment of a child that inflicts pain) within the previous 12 months. | Total: 82 | Total: 82 | Total: 100% |
| VI.B.23 | Timely Discharge to Permanency: Of all children who enter foster care in a 12-month period, at least 40.5% shall be discharged to permanency within 12 months of entering foster care. Permanency, for the purposes of this measure, includes reunification with the child's parents or primary caregivers, living with a relative, guardianship, or adoption. | DeKalb: 36<br>Fulton: 55<br>Total: 91 | DeKalb: 176<br>Fulton: 138<br>Total: 314 | DeKalb: 20.5%<br>Fulton: 39.9%<br>Total: 29.0% |
| VI.B.24 | Adoption Disruptions: No more than 5% of adoptions finalized during the reporting period shall disrupt within the 12 months subsequent to the reporting period. | DeKalb: 0<br>Fulton: 0<br>Total: 0 | DeKalb: 54<br>Fulton: 23<br>Total: 77 | DeKalb: 0%<br>Fulton: 0%<br>Total: 0% |
| VI.B.25 | Placement Within County: At least 90% of all children at a point in time during the reporting period shall be placed in the county from which they were removed or within a 50-mile radius of the home from which they were removed. This measure is subject to the following exceptions: (a) the child's needs are so exceptional that they cannot be met by a family or facility meeting these geographical restrictions, (b) the child is placed through the ICPC consistent with its terms, (c) the child is appropriately placed with relatives, or (d) the child is in an adoptive placement with a prospective adoptive family pursuant to an appropriate placement agreement, but before the entry of the adoption decree by the court. | Total: 866 | Total: 904 | Total: 96% |

| | | | | |
|---|---|---|---|---|
| As noted above, the methodology for this metric changed. Rather than being evaluated through case review, the Data Unit generated a metric using the entire class of children in placement on the last day of the period. To generate the final metric – they considered who in placement on 6/30/2022 was placed in the w/in 50 miles of their removal address, was placed within the same county as their removal county or qualified for an exception as stipulated in the agreement. The numerator was adjusted upward to reflected both those that met the standard AND those who were exceptions. The reciprocal of the numerator is the measure. See below for the adjustments. | | | | |

| | Placed | Denominator | Numerator | % |
|---|---|---|---|---|
| Total in Placement on 06/30/2022 | 985 | 985 | 926 | 94% |
| | | % of those placed | | |
| Placed in Same County | 268 | 27% | | |

---

[21] VI.B metrics are currently Attained Outcomes.

*Kenny A. v. Kemp*

**Table A-2: Detailed Outcome Measures for Period 33**

| | Outcome | | Numerator | Denominator | Metric |
|---|---|---|---|---|---|
| | Placed in Different County | 717 | 73% | | |
| | Different county and exception placement | 229 | 23% | | |
| | Different county | 488 | 50% | | |
| | Different county and placed w/in 50 miles | 429 | 44% | | |
| | Different county and place greater than 50 miles | 59 | 6% | 0 | |
| | Different county, > than 50 miles and exempt | 0 | 0% | | |
| | Different county, > than 50 miles and NOT exempt | 59 | 6% | 59 | |
| VI.B.26 | Visitation (Worker-Child): At least 96.25% of the total minimum number of monthly private, in-placement visits between case managers and children during the reporting period shall have taken place. Visits in excess of the required one private visit per month shall be excluded when calculating this percentage. | | DeKalb: 2983<br>Fulton: 1680<br>Total: 4663 | DeKalb: 3047<br>Fulton: 1719<br>Total: 4766 | DeKalb: 97.9%<br>Fulton: 97.7%<br>Total: 97.8% |
| VI.B.27 | Court Orders: At least 95% of foster children in custody at a point in time during the reporting period shall have all applicable language in court orders necessary to assess qualification for federal funding under Title IV-E of the Social Security Act. | | DeKalb: 31<br>Fulton: 34<br>Total: 65 | DeKalb: 56<br>Fulton: 36<br>Total:92 | DeKalb: 55%<br>Fulton: 94%<br>Total: 71% |
| VI.B.28 | Capacity Limits: No more than 10% of all foster home placements serving class member children at any time during the reporting period shall exceed the following capacity limits: a) no placement shall result in more than three foster children in a foster home, or a total of 6 children in the home, including the foster family's biological and/or adopted children, without the written approval of the County Director, and b) no placement will result in more than three children under the age of three in a foster home. The only exception to these capacity limits shall be the placement of a sibling group in a foster. | | Total: 2 | Total: 341 | Total: 0.6% |
| VII.G.1 | Recurrence of substantiated investigations: Of children in each county during prior two reporting periods who experienced substantiated maltreatment, the number who were victims of a second substantiated maltreatment report during the following 12 months. | | DeKalb: 4<br>Fulton: 9<br>Total: 13 | DeKalb: 427<br>Fulton: 379<br>Total: 806 | DeKalb: 0.9%<br>Fulton: 2.29%<br>Total: 1.56% |

*Kenny A. v. Kemp*

**Table A-2: Detailed Outcome Measures for Period 33**

|  | Outcome | Numerator | Denominator | Metric |
|---|---|---|---|---|
| **VII.G.2** | Substantiated investigation following FSS case. Of cases that were referred to FSS, the number and percent for which there was a subsequent substantiated referral w/in 11-365 days of the FSS referral. For Period 25 – partial data are provided. | DeKalb: 26<br>Fulton: 57<br>Total: 83 | DeKalb: 1227<br>Fulton: 1979<br>Total: 3206 | DeKalb: 2.1%<br>Fulton: 2.9%<br>Total: 2.6% |

**Table A-3: Case Managers Meeting Caseload Standards in DeKalb County on June 30, 2022**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 06/30/2022 | Number of Active, On-leave Staff on 06/30/2022 | Actual Performance | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 21 | 0 | 18 | 86% | 3 | 14% | 21 |
| Family Preservation | 17 families | 8 | 0 | 8 | 100% | 0 | 0% | 2 |
| Permanency Case Manager | 15 children | 16 | 0 | 6 | 38% | 10 | 62% | 37 |
| Specialized Case Manager | 12 children | 17 | 0 | 3 | 18% | 14 | 82% | 40 |
| Adoption Case Manager[22] | 16 children | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 62 | 0 | 35 | 56% | 27 | 44% | 100 |

All Adoptions caseloads are included in the other totals. There are 7 Adoptions case managers.

**Table A-4: DeKalb County Supervisory Ratios on June 30, 2022**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
| --- | --- | --- | --- | --- | --- |
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 29 | 26 | 90% | 3 | 10% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 33 | 9 | 27% | 24 | 73% |

---

[22] All adoptions caseloads are included in the specialized and permanency totals. There were 12 adoptions case managers in DeKalb on this date.

**Table A-5: Case Managers Meeting Caseload Standards in Fulton County on June 30, 2022**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Number of Active Staff on 6/30/22 | Number of Active, On-leave Staff on 6/30/22 | Actual Performance | | | | Cases to be Assigned by Supervisors |
|---|---|---|---|---|---|---|---|---|
| | | | | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 12 families | 20 | 0 | 14 | 70% | 6 | 30% |
| Family Preservation | 17 families | 17 families | 13 | 0 | 13 | 100% | 0 | 0% |
| Permanency Case Manager | 15 children | 15 children | 11 | 0 | 10 | 91% | 1 | 9% |
| Specialized Case Manager | 12 children | 12 children | 14 | 0 | 5 | 36% | 9 | 64% |
| Adoption Case Manager | 16 children | 16 children | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 12 children | 58 | 0 | 42 | 72% | 16 | 28% |

All Adoptions caseloads are included in other totals. There are 6 Adoptions case managers

**Table A-6: Fulton County Supervisory Ratios on June 30, 2022**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 33 | 27 | 82% | 6 | 18% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 24 | 14 | 58% | 10 | 42% |

**Table A-7: Region 14 Caseload Managers Meeting Caseload Standards on June 30, 2022**

| Case Manager Function | Caseload Cap: Number of Cases (Families and Children) | Actual Performance | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Number of Active Staff on 6/30/22 | Number of Active, On-leave Staff on 6/30/22 | Meeting Caps on Assigned Caseload | | Not Meeting Cap on Assigned Caseload | | Cases to be Assigned by Supervisors |
| | | | | Number | % | Number | % | Number |
| CPS Investigations | 12 families | 41 | 0 | 32 | 78% | 9 | 22% | 40 |
| Family Preservation | 17 families | 21 | 0 | 21 | 100% | 0 | 0% | 15 |
| Permanency Case Manager | 15 children | 27 | 0 | 16 | 59% | 11 | 41% | 55 |
| Specialized Case Manager | 12 children | 31 | 0 | 8 | 26% | 23 | 74% | 54 |
| Adoption Case Manager[23] | 16 children | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Total | 12 children | 120 | 0 | 77 | 64% | 43 | 36% | 164 |

All adoptions caseloads are included in the other totals: there are 13 adoptions case managers

*Kenny A. v. Kemp*

**Table A-8: Region 14 Supervisory Ratios on June 30, 2022**

| Program/Service Area | Number of Units | Meeting 1 to 5 Ratio | | Not Meeting 1 to 5 Ratio | |
|---|---|---|---|---|---|
| | Total | Number | Percent | Number | Percent |
| Child Protective Services (Investigations and Family Preservation) | 62 | 53 | 85% | 9 | 15% |
| Permanency Case Managers (Regular and Specialized) (includes Adoptions) | 57 | 23 | 40% | 34 | 60% |

# APPENDIX B – GLOSSARY

**Adoptive Placement** means the interval during which a child is placed with a prospective adoptive family following the signing of the appropriate adoptive placement agreement form, but before the entry of the adoption decree by the court.

**Child or Children or Class Member Children or Class Members** mean a child or children who have been, are or will be alleged or adjudicated deprived who 1) are or will be in the custody of the State Defendants; and 2) have or will have an open case in Fulton County DFCS or DeKalb County DFCS.

**Child Caring Institution (CCI)** is any child-welfare facility which provides full-time room, board, and watchful oversight (RBWO) to six or more children up to 18 years of age. Some CCIs are approved to care for youth up to age 21. The CCI must be approved through the Office of Provider Management (OPM) to serve children in DFCS custody.

**Child Placing Agency (CPA)** is agency that places children in foster and adoptive homes for individualized care, supervision, and oversight. Child placing agencies are responsible for assessing the placement regarding the appropriateness of the room, board, and watchful oversight that the prospective foster and adoptive families will provide. The CPA's employees and their foster and adoptive parents work as a team to provide a stabilizing and nurturing environment that promotes safety, permanency, and well-being.

**Corporal Punishment** means any physical punishment on a child that inflicts pain.

**CPA Foster Home** is a foster home approved by a Child Placing Agency for the temporary placement of children in foster care.

**DeKalb DFCS** means DeKalb County Department of Family and Children Services.

**DFCS** when used alone means the Georgia Division of Family and Children Services.

**DFCS Foster Home** is a non-relative foster homes approved by DFCS for the temporary placement of children in foster care.

**DFCS or CPA Adoptive Home** is an adoptive home approved for the foster care placement of a child for whom the established goal is adoption. Adoptive homes must meet the regular standards of care required for approved family foster homes and any conditions specified in that approval.

**DFCS Relative Foster Home** is a relative foster home approved by DFCS for the temporary placement of minor relatives. It is DFCS' preference that all relatives are approved as foster parents and receive a foster care per diem. The goal of relatives becoming foster parents is to ensure that the child has services to address his or her needs.

**DHHS** means the United States Department of Health and Human Services.

**DHR** means Georgia Department of Human Resources.

**Discipline or Other Serious Foster Care Violation** means and includes those acts or situations by the caregiver that pose an immediate or potential risk to the safety or well-being of the child in care. These may include, but are not limited to, inappropriate disciplinary measures (both physical/corporal and emotional), violations of supervision or other safety requirements that pose serious risk factors to the child.

**EPSDT** means the Early and Periodic Screening, Diagnosis, and Treatment Program for individuals under 21 years of age contained in Title XIX of the Social Security Act, as amended.

**Fictive Kin** means a person who is known to a child as a relative, but is not, in fact, related by blood.

**Foster Parent** means volunteers who are trained and certified by DFCS or Child Placing Agencies to provide for the temporary care of children placed in the custody of DFCS. Foster parents work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster parents are asked to assume the responsibility of parenting the children placed in their home.

**Foster Relative** means biological kin who are trained and certified by DFCS to provide for the care of relative children placed in the custody of DFCS. Foster relatives work as a part of a team to assure that a child's physical, emotional, medical, and psychological needs are met while they are in foster care. Although it is not the goal to replace the child's parents, foster relatives are asked to assume the responsibility of parenting the children placed in their home.

**Fulton DFCS** means the Fulton County Department of Family and Children Services.

**Georgia Health Check Program** means Georgia Medicaid's well-child or preventive health care program adopted pursuant to EPSDT and shall contain such components as they exist in the Georgia Health Check Program as of February 1, 2005.

**Governor** means the Governor of the State of Georgia.

**Legal Guardianship** means the appointment of an individual as a legal guardian for a child as authorized by either the probate court under O.C.G.A. Title 29 or the juvenile court under O.C.G.A. Chapter15-11-2(36).

**One Episode of Foster Care** means the period of time that a child is in foster care from the date of removal from the home until the child is discharged from DFCS custody, except that a runaway does not trigger a new episode of foster care.

**Permanent Legal Custody** means custody granted in accordance with an order of the superior court or the juvenile court, which places a child in the custody of an individual or individuals until the child reaches 18 years of age.

**Permanent Placement with Relatives** means placing a child with a relative who is willing to assume long-term responsibility for the child but has reasons for not adopting the child or obtaining guardianship or permanent legal custody, and it is in the child's best interests to remain

in the home of the relative rather than be considered for adoption, permanent legal custody, or guardianship by another person. In such circumstances, there shall be in place an agreement for long-term care signed by DFCS and the relative committing to the permanency and stability of this placement unless it is necessary to disrupt the long-term placement.

**Psychiatric Residential Treatment Facility (PRTF)** is a temporary non-hospital facility with a provider agreement with a State Medicaid Agency to provide intensive therapeutic intervention to a child to ensure safety and stability. PRTFs offer intensive behavioral health services to children in Georgia.

**Relatives** are persons who are related by blood, marriage or adoption including the spouse of any of those persons even if the marriage was terminated by death or divorce.

**Relative Placement** refers to placement in the home of a relative or fictive kin who do not receive a foster care per diem for the care of the child. The relative placement may be a non-paid placement or the relative may receive TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin are not eligible for TANF or an Enhanced Relative Rate (ERR) Subsidy. Fictive kin must become foster parents to receive financial assistance.

Placement with relatives or fictive kin may occur very quickly if there is a satisfactory CPS history check, safety and home assessment check, and a Georgia Crime Information Center (GCIC) check through the Office of the Inspector General (OIG) on all household members 18 years of age or older. A Relative or Non-Relative Care Assessment must be completed no later than 30 calendar days after the placement of a child.

**State DFCS** means the Division of Family and Children Services of the Georgia Department of Human Resources.

**Suspected Abuse or Neglect** means being based on reasonable cause to believe that a child may have been abused or neglected.

**Suspected Corporal Punishment** means being based on reasonable cause to believe that corporal punishment may have been used on a child.