# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

KENNY A., by his next friend Linda
Winn, *et al.*,

      Plaintiffs,

v.

BRIAN KEMP, *et al.*,

      Defendants.

Civil Action File
No. 1:02-CV-01686-TWT

## PLAINTIFFS' BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO TERMINATE CONSENT DECREE

# TABLE OF CONTENTS

INTRODUCTION..................................................................................1

FACTS...............................................................................................5

I.    History of the Litigation and Controlling December 2016 and December 2017 Court Orders...............................................................5

II.   Defendants' Undisputed Ongoing Noncompliance With the 2016 Exit Plan.....................................................................................10

III.  Plaintiffs' Pending Assertion of Noncompliance and Dispute Resolution Process Under the 2016 Exit Plan ................................13

LEGAL STANDARD ........................................................................15

I.    Defendants Must Prove "Substantial Compliance" or "Unforeseen Changed Circumstances" to Support Relief Under Rule 60(b)(5) .........17

       A.    Substantial Compliance ..........................................................17

       B.    Unforeseen Changed Circumstances ......................................17

II.   Defendants Must Also Prove the Existence of a Durable Remedy to Support Relief Under Rule 60(b)(5).............................................20

ARGUMENT .....................................................................................21

I.    Defendants Are in Undisputed and Ongoing Noncompliance with Numerous Provisions in the 2016 Exit Plan, Resulting in Ongoing Harms to Class Member Children........................................................23

II.   Defendants Fail to Present Any Evidence of Unanticipated Changed Circumstances That Render Continued Enforcement of the 2016 Exit Plan Unjust ........................................................................25

       A.    Programs and Laws that Existed before December 5, 2016 Are Not Unforeseen Changes in Factual Conditions or Law ..............26

B.    Defendants' Remaining Asserted Changes Do Not Support Termination ..............................................................................................29

III.    **In Any Event, Defendants Have Not Implemented a Durable Remedy Under the 2016 Exit Plan** ..........................................................**31**

A.    Defendants Do Not Have a Durable Remedy to Meet the Medical, Dental, Mental Health, and Developmental Needs of the Class Member Children.................................................................................................33

B.    Defendants Have Failed to Establish, Fund, and Implement a Comprehensive Practice Model to Support Consistent Case Practice ..35

C.    Defendants Have Failed to Maximize Available Federal Funds to Improve Services for Class Member Children .....................................40

D.    Defendants Do Not Have a Durable Remedy to Ensure Quality Placement and Caregiving for Class Member Children ......................43

1.    Defendants Do Not Have a Sustainable Plan to Provide Adequate Kinship Support ..........................................................................44

2.    Defendants Do Not Have a Sustainable Plan to Provide Adequate Oversight for the ARGO Automated Placement Matching Tool .46

3.    Defendants Do Not Have a Sustainable Plan to Address the Child Placement Crisis.............................................................................48

E.    Defendants Do Not Have a Durable Remedy to Address the Workforce and Caseload Crises ................................................................................49

IV.    **Defendants' Systemic and Ongoing Violation of the 2016 Exit Plan Substantially Defeats the Objective of the Agreement**............................**54**

V.    **Defendants' Requested Relief Misapplies Important Principles of Federalism** ..............................................................................................**56**

**CONCLUSION**................................................................................................**58**

# TABLE OF AUTHORITIES

*Cases*                                                                                   *Page(s)*

*Anderson v. City of New Orleans*,
    38 F.4th 472 (5th Cir. 2022) ......................................................................... 18

*Bd. of Educ. v. Dowell*,
    498 U.S. 237 (1991) ................................................................. 1, 17, 21, 23, 25

*Davis v. Hot Springs Sch. Dist.*,
    833 F.3d 959 (8th Cir. 2016) .................................................................. 18, 32

*Evans v. Fenty*,
    701 F. Supp. 2d 126 (D.D.C. 2010) ................................................... 21, 31, 32

*Fla. Med. Ass'n, Inc. v. Dep't of Health, Educ., & Welfare*,
    947 F. Supp. 2d 1325 (M.D. Fla. 2013) ...................................................... 20

*Frew v. Hawkins*,
    540 U.S. 431 (2004) ................................................................. 15, 16, 21, 56

*Galbert v. W. Caribbean Airways*,
    715 F.3d 1290 (11th Cir. 2013) .................................................................. 16

*Horne v. Flores*,
    557 U.S. 447 (2009) ....................................... 1, 16, 17, 18, 20, 21, 31, 32, 56

*Jeff D. v. Otter*, 643 F.3d 278,
    (9th Cir. 2011) ......................................................................................... 17

*Johnson v. Florida*,
    348 F.3d 1334 (11th Cir. 2003) .................................................................. 15

*Johnson v. Sheldon*, 2009 WL 3231226,
    (M.D. Fla. Sept. 30, 2009) ......................................................................... 56

*Juan F. v. Rell*,
    No. 3:89-CV-859 2010 WL 5590094 (D. Conn. Sept. 22, 2010) ........... 20, 30

*Kemp v. United States*,
    596 U.S. 528 (2022) ............................................................................ 10, 16

*Kenny A. v. Perdue*, 2004 WL 5503780,
(N.D. Ga Dec. 13, 2004) ........................................................................... 27, 28

*LaShawn A. ex rel. Moore v. Fenty*,
701 F. Supp. 2d 84 (D.D.C. 2010) ........................... 19, 20, 21 30, 31, 55, 56

*Liljeberg v. Health Servs. Acquisition Corp.*,
486 U.S. 847 (1988) .................................................................................... 16

*Peery v. City of Miami*,
977 F.3d 1061 (11th Cir. 2020) ...... 1, 3, 15, 16, 17, 21, 22, 23, 24, 31, 55, 56

*Pottinger v. City of Miami*,
1:88-cv-02406, ECF No. 397, 3 (Sept. 23, 1998) ......................................... 55

*Rufo v. Inmates of Suffolk Cnty. Jail*,
502 U.S. 367 (1992) ........................... 1, 15, 18, 19, 21, 25, 26, 29, 31, 32, 56

*Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*,
769 F.3d 566 (8th Cir. 2014) ...................................................................... 19

*United States v. Tennessee*,
615 F.3d 646 (6th Cir. 2010) ...................................................................... 20

### Statutes

Family First Prevention Services Act (FFPSA) ................................................ 29, 39

Federal Adoption Assistance and Child Welfare Act ............................................. 5

Federal Early Periodic Screening, Diagnosis and Treatment Program of the
Medicaid Act .............................................................................................. 5

Multiethnic Placement Act and the Inter-ethnic Adoption Provisions of 1966 ........ 5

Social Security Act ............................................................................................ 40

42 U.S.C. § 1983 ................................................................................................. 5

O.C.G.A. § 15-11-13 ........................................................................................... 6

O.C.G.A. § 15-11-58 ........................................................................................... 6

O.C.G.A. § 20-2-690 ................................................................6

O.C.G.A. § 49-5-12 ................................................................6

**Regulations**

45 C.F.R. § 1355 ..................................................................45

45 C.F.R. § 1356 ..................................................................45

45 C.F.R. § 1356.21(m) ...........................................................45

**Rules**

Fed. R. Civ. P. 60(b) ...................................................3, 15, 22, 55, 57

Fed. R. Civ. P. 60(b)(1).........................................................16, 57

Fed. R. Civ. P. 60(b)(2).........................................................16, 57

Fed. R. Civ. P. 60(b)(3).........................................................16, 57

Fed. R. Civ. P. 60(b)(4).........................................................16, 57

Fed. R. Civ. P. 60(b)(5)............................... 1, 3, 16, 17, 18, 20, 25, 30, 57

Fed. R. Civ. P. 60(b)(6).........................................................16, 57

**Other**

Casey Family Programs, *Importance of supervision in child welfare*, 2018...........50

High Caseloads: How do they Impact Delivery of Health and Human
    Services .....................................................................50, 52

Jan McCarthy, *Guide for Developing and Implementing Child Welfare
    Practice Models*, National Child Welfare Resource Center for
    Organizational Improvement (Oct. 2012) ......................................36

## INTRODUCTION

Termination of a consent decree is an extraordinary remedy that allows a party to seek relief from a court order only where (1) the moving party has substantially complied with the objectives of the decree or (2) applying it prospectively is no longer equitable, Fed. R. Civ. P. 60(b)(5). In addition, the moving party must have a durable remedy in place that makes it "unlikely . . . [to] return to its former ways." *Peery v. City of Miami*, 977 F.3d 1061, 1069 (11th Cir. 2020) (quoting *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247 (1991)); *see also Horne v. Flores*, 557 U.S. 433, 447, 450 (2009)). What the rule does not allow, however, is what the Defendants seek here: modification because "it is no longer convenient to live with the terms of a consent decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).

Defendants' Motion seeks to terminate the entire governing 2016 Modified Decree and Exit Plan ("2016 Exit Plan")[1] in which this Court approved the Parties agreed-upon plan to address serious safety and welfare issues of children who are or will be in the foster system in Fulton and DeKalb Counties ("Class member children"). Defendants' compliance with the 2016 Exit Plan remains deficient in several material respects. Indeed, Defendants do not dispute they are noncompliant with one-third of the outcome measures ("OMs") in the 2016 Exit Plan. And Defendants' Motion *ignores entirely* their commitment to the "Infrastructure

---

[1] Dkt. 745-1.

1

Standards"—a set of durable remedies Defendants themselves negotiated and agreed to, which this Court approved in 2017.

This omission of the Infrastructure Standards in Defendants' Motion is striking. As the 2016 Exit Plan states, the Infrastructure Standards were intended to create the foundational elements of Georgia's child welfare system "that lead to successful outcomes for safety, permanency, and well-being."[2] Thus, they are a critical component of the plan for Defendants' exit. Indeed, the Parties negotiated the Infrastructure Standards for over a year before the Court approved and entered them in December 2017, and the neutral Accountability Agent ("AA") and her team of national experts, the Monitoring and Technical Assistance Team ("MTAT"), (together, the "Monitoring Team") have met frequently with the Parties to discuss progress and challenges and submitted *nine* briefs to the Court (most recently in September 2024) to report on the Defendants' progress with the Infrastructure Standards. And Plaintiffs' assertion of noncompliance with specific Infrastructure Standards (and OMs) remains pending, as of this filing, in the agreed upon alternate dispute resolution process set forth in the 2016 Exit Plan.[3]

Defendants ask this Court to ignore these shortcomings and terminate the

---

[2] Dkt. 745-1 at 20. All record cite references are to the .pdf/ECF page numbers.
[3] *Id.* at 22 (Section IX.D) & Sept. 2024 Correspondence between David Brackett and Harold Melton, attached hereto as Exhibit A.

consent decree, even though they have not complied with its terms or implemented a durable remedy that will ensure sustained improvement after termination.[4]

Although the 2016 Exit Plan charts the Defendants' path to exit—through achievement of the OMs—Defendants seek termination by other means, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. But Defendants "bear[] a heavy burden" to exit the consent decree. *Peery*, 977 F.3d at 1073. Defendants must prove that the "judgment has been satisfied, released or discharged" or that "applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5), and also that they have a "durable remedy . . . in place." *Peery*, 977 F.3d at 1069. Defendants can do neither.

Defendants admit, as they must, that they remain noncompliant with ten OMs in the 2016 Exit Plan. As a result, their motion to terminate only briefly discusses satisfaction of the consent decree as a ground for termination. Instead, Defendants' Motion focuses on their argument that continued Court supervision is inequitable due to purported changed circumstances. But this argument does not withstand minimal scrutiny. Most of these changes Defendants rely on occurred *before* they

---

[4] Defendants also do not reference the 2024 Subcommittee report, titled "Abuse & Neglect of Children in Georgia's Foster Care System: A Case Study," or its specific findings of the current DFCS Administration's lack of accountability structures over the safety and well-being of foster children in Georgia DFCS custody, which support Plaintiffs' argument that termination of the consent decree is premature. The report is attached hereto as Exhibit B.

agreed to—and the Court adopted—the 2016 Exit Plan in December 2016 and before the adoption of the related Infrastructure Standards in December 2017. In other words, the Parties fully anticipated and considered these changes when negotiating the 2016 Exit Plan. The few changes that occurred after that, moreover, provide no basis for termination, whether characterized as "changed circumstances" making the decree more onerous, or repackaged as new or alternative remedies.

Ultimately fatal to Defendants' Motion is the fact that Defendants do not have a durable remedy in place. This reveals a request to terminate based on perceived inconvenience, not actual improvement for Class member children. Defendants also dilute and misapply important federalism concerns by requesting complete termination of this matter on a weak record of performance under the very outcomes and remedies they negotiated. While the Plaintiff Class hopes for a day soon when Defendants' child welfare programming supports termination, that day has not yet arrived. Defendants' Motion must be denied.[5]

---

[5] To the extent Defendants propose new or updated Infrastructure Standards, programs, or policies as part of the dispute resolution process established by Section IX.D of the 2016 Exit Plan, which is ongoing, such efforts demonstrate that the consent decree is working as designed. The consent decree is a dynamic agreement, as evidenced by the amendments over the years, and Plaintiffs welcome new proposals from Defendants to create durable remedies. However, while new programs and policies would be a positive step, such new efforts are not yet "durable." If Defendants are able to identify modifications to the Infrastructure Standards that are specifically directed to meet the noncompliant OMs—a flexible

**FACTS**

## I.    History of the Litigation and Controlling December 2016 and December 2017 Court Orders

Plaintiffs, a class of children and youth who are or will be in foster care in Fulton and DeKalb Counties, brought this case seeking declaratory and prospective injunctive relief against local and state agencies and officials[6] for constitutional and statutory violations arising from their operation of the foster care systems in their counties. Plaintiffs alleged unlawful and harmful practices endangering the safety, permanency, and wellbeing of Class member children.[7] The Parties negotiated a

---

process the consent decree expressly contemplates—then the Monitoring Team would need to assess performance under those modified remedies to ensure they are having the intended positive durable impact on the OMs. Such a showing, which is the subject of ongoing discussions as part of the dispute resolution process, further compels denial of Defendants' Motion as the durability of any such remedies remains in question.

[6] The remaining defendants are the Governor of Georgia, the Georgia Department of Human Services and its Commissioner, Fulton County Department of Family and Children Services and its Director, and DeKalb County DFCS and its Director (hereinafter, "Defendants" or "DFCS"), all in their official capacities. The original lawsuit also named Fulton and DeKalb Counties, who separately settled the claims against them. Fulton and DeKalb Counties satisfied the terms of their consent decrees and, therefore, were dismissed from the case. Dkts. 595 & 706.

[7] Plaintiffs filed their original complaint alleging state and federal claims in Georgia Superior Court. Defendants then removed the case to this Court. The federal claims included counts under 42 U.S.C. § 1983 for violations of the Substantive and Procedural Due Process clauses of the U.S. Constitution; the First, Ninth, and Fourteenth Amendments to the U.S. Constitution; the Federal Adoption Assistance and Child Welfare Act; the Multiethnic Placement Act and the Inter-ethnic Adoption Provisions of 1966; and the Federal Early Periodic Screening, Diagnosis and Treatment Program of the Medicaid Act. Plaintiffs' state law claims included

consent decree, which the Court approved and entered on October 28, 2005, that targeted specific aspects of the child welfare system, including the care, treatment, placements, services, and protection of Class member children.[8]

The Parties have modified the terms of the consent decree several times since 2005, most recently through a complete renegotiation in 2016 and 2017.[9] The 2016 Exit Plan, which this Court entered on December 5, 2016, contains significant modifications to reflect Defendants' progress in certain areas and outlines the remaining improvements needed for them to exit the agreement.[10] The 2016 Exit Plan contains a revised set of 31 OMs that Defendants must meet before seeking exit and an updated system for assessing their performance on each.[11] These revised OMs include updated metrics to reflect the Parties' goals and progress under the decree.[12]

---

violations of the right to a properly screened and supervised home, O.C.G.A. § 49-5-12; the right to case plans and their implementation, and permanent placement, O.C.G.A. § 15-11-58; the right to care, protection, training, education, and physical, mental and moral welfare, O.C.G.A. § 15-11-13; and the right to schooling, O.C.G.A. § 20-2-690.

[8] Dkt. 488, 488-1.

[9] The Parties modified the 2005 consent decree in June 2009, *see* Dkt. 613, November 2010, *see* Dkt. 687, and November 2015, *see* Dkt. 740, Dkt. 747 (adopting 2016 Exit Plan, Dkt. 745-1).

[10] Dkt. 747 (adopting 2016 Exit Plan, Dkt. 745-1).

[11] Although the 2016 Exit Plan lists OMs numbered 1 through 28, there are 31 OMs in total because OM 21 is split into four parts that are each individually measured: OMs 21(a)–(d). *See* Dkt. 745-1 at 12–18.

[12] *Id.*; *see also* Nov. 9, 2016 DFCS Press Release (announcing that the modified decree included "[u]pdated outcome measures that more appropriately measure and

Under this new governing set of obligations, the Parties agreed to a significant role for the Monitoring Team, which includes "conduct[ing] the factual investigation and verification of State Defendants' data and documentation necessary to issue public reports on [their] performance."[13] The Monitoring Team also serves as a consultant to Defendants, "provid[ing] guidance and technical assistance to" them with the goal of building capacity "to meet and sustain their obligations under this Exit Plan."[14] Every year, the AA must submit an updated and revised monitoring budget to the Parties and the Court.[15] Defendants, including the current Administration, have never objected to or opposed the budget in any way.[16]

Under the 2016 Exit Plan, each OM is classified as either "Attained" or "Ongoing" based on whether Defendants meet the agreed-upon metric.[17] This system—under which the Parties currently operate—reduces oversight for Attained OMs to limit monitoring, litigation, and oversight costs, allowing Defendants to

---

reflect the Division's overall performance in meeting the needs of children"), https://dfcs.georgia.gov/press-releases/2016-11-09/ga-dhs-files-exit-plan-kenny-consent-decreehttps://dfcs.georgia.gov/press-releases/2016-11-09/ga-dhs-files-exit-plan-kenny-consent-decree.

[13] Dkt. 745-1 at 18.

[14] *Id.*

[15] *Id.* at 19.

[16] Similarly, by agreement, Plaintiffs submit semi-annual requests for attorneys' fees to defense counsel. Since 2016, the Parties have always negotiated these fee requests without Court involvement.

[17] *Id.* at 12–18.

focus their efforts on Ongoing OMs.[18] The AA's measuring and reporting focuses on Ongoing OMs, which move into the Attained category once Defendants meet and sustain the goal (and show durability) for three consecutive reporting periods.

In the 2016 Exit Plan, Defendants agreed they could not seek termination of the consent decree until they achieve compliance with—*i.e.*, attain—all of the OMs: "Once all of the [OMs] are designated as Attained . . . and there are no remaining Ongoing [OMs], then State Defendants may request that the Court issue an order terminating jurisdiction over all provisions of this Exit Plan and this action."[19] At the time of the 2016 Exit Plan, 7 OMs were Attained, and 24 were Ongoing.[20] In addition to the OMs, the Parties negotiated other key enforceable provisions in the 2016 Exit Plan, such as standards for the placement of children into foster care and

---

[18] *Id.* at 16 ("The Attained [OMs] will not be reported in subsequent reporting periods after the entry of this Exit Plan, except as provided in Section IX.E.2."). Under Section IX.E.2, an OM "will be re-designated as an Ongoing Outcome Measure only if both of the following conditions occur: (1) the [AA] finds that the decline in performance is notable, meaning that it was caused by a deterioration in State Defendants' practice and process that is expected to impact the safety, permanency, or well-being of class members in subsequent periods, and (2) State Defendants do not meet the required threshold for that outcome measure in the next reporting period." *Id.* at 23.

[19] *Id.*; *see also* Nov. 9, 2016 DFCS Press Release (announcing that the modified decree included "[r]evision of the required 'Demonstration of Compliance' to allow the Division to exit from the Court's supervision when all of the outcome measures are 'attained'"), available at https://dfcs.georgia.gov/press-releases/2016-11-09/ga-dhs-files-exit-plan-kenny-consent-decree.

[20] Dkt. 745-1 at 12–18.

the caseloads of case managers in Fulton and DeKalb Counties (also known as "Region 14").[21]

The Parties also agreed, based on recommendations from the Monitoring Team, to replace a more cumbersome and prescriptive set of obligations with a "set of measurable and enforceable Infrastructure Standards," which are structural improvements that drive Defendants' performance on the OMs.[22] The Parties agreed that, once developed, the "final Infrastructure Standards are enforceable obligations . . . and the [Monitoring Team] will measure and report on the Infrastructure Standards in each subsequent reporting period."[23]

In this Court's 2017 order updating the 2016 Exit Plan to include the Infrastructure Standards, the Court reiterated that the standards are "enforceable obligations" and explained their purpose: "to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection to the Plaintiff Class."[24] The 2016 Exit Plan gave Defendants significant input and control in developing the final Infrastructure Standards and flexibility to decide the best processes to meet the OMs.[25]

---

[21] *Id.* at 8–12; *see also id.* at 18.
[22] *See* Period 21 Monitoring Report, Dkt. 748 at 9; Dkt. 745-1 at 20.
[23] Dkt. 745-1 at 21.
[24] Order Amending Modified Consent Decree & Exit Plan ("2017 Infrastructure Standards Order"), Dkt. 757 at 2.
[25] *Id.*; Dkt. 745-1 at 20–21.

Since entry of the 2016 Exit Plan, the Monitoring Team has filed a report evaluating Defendants' performance on the OMs and other provisions ("Monitoring Report") with the Court every six months. The Monitoring Team has also filed nine briefs measuring and reporting on the Infrastructure Standards ("Infrastructure Standards Brief"). The Parties review and submit feedback on drafts before each filing. About every quarter for the past seven years, the Parties and Monitoring Team have held a Meeting of the Parties to discuss progress and issues raised in the latest Monitoring Reports and Infrastructure Standards Briefs.

Current Defendant Governor Kemp took office in 2019. None of the Defendants, including the current DFCS leadership, has ever asked the Court to modify any provision in the 2016 Exit Plan or the 2017 Infrastructure Standards for any reason.

## II.    Defendants' Undisputed Ongoing Noncompliance With the 2016 Exit Plan

Defendants have failed to comply with key provisions of the 2016 Exit Plan. First, Defendants remain in undisputed ongoing noncompliance with ten OMs.[26] This lack of compliance harms the children in their care. Ongoing OMs include Defendants' failure to (i) meet the physical, dental, mental, and educational needs of

---

[26] Dkt. 745-1 at 12–18; *see* Br. in Supp. of Mot. to Terminate, Dkt. 793-1 ("Defs. Br.") at 46. The remaining ongoing OMs are OM 1, OM 3, OM 6, OM 12, OMs 21(a)–(d), OM 23, and OM 27.

Class member children, (ii) ensure Class member children exiting care do not re-enter in a short timeframe, (iii) find permanent placements for Class member children after they leave foster care, (iv) timely investigate reports of abuse and neglect, (v) ensure Class member children maintain the same caseworker throughout their time in care, and (vi) ensure Class member children's cases have court orders necessary for obtaining federal funding. In addition, for multiple OMs, when Defendants have made progress on OMs, they have struggled to maintain attained status.[27] The Defendants' inconsistency on these OMs strongly suggests the absence of a permanent and durable solution.

Second, Defendants have failed to comply with several enforceable provisions related to placements for Class member children and the caseloads of case managers in Region 14. *See supra* at pp. 8–9.[28] Regarding placements, the Monitoring Team has reported on DFCS's long-standing, crisis-level "lack of willing and appropriate placements for youth with complex needs."[29] This lack of placements has led to Defendants relying on hotels and offices as temporary placements for Class member

---

[27] *Compare* Period 26 Monitoring Report. Dkt. 764 at 29 (OM 21(a) attained in Period 27), *id*. at 23 (OM 21(d) attained in Period 26) with Period 33 Monitoring Report, Dkt. 803 at 23–24 (both OM 21(a) and (d) moved to ongoing in Period 33); *see also* Period 35 Monitoring Report, Dkt. 786 at 17 (returning OM 1 to ongoing status in Period 35); Period 36 Monitoring Report, Dkt. 787 at 20–21 (describing Defendants' performance on OM 12); *Id*. at 18–19 (OM 23).
[28] *See* Dkt. 745-1 at 8–12, 18.
[29] *See* Period 36 Monitoring Report, Dkt. 787 at 14.

children, which is prohibited by the 2016 Exit Plan.[30] With regard to caseloads, Defendants have historically struggled to meet the standards they agreed to in the 2016 Exit Plan. The Monitoring Team has reported "consistent patterns of high workforce turnover, [and] challenges with recruitment[] and resulting caseloads that surpassed the required caseload maximums agreed to" in the 2016 Exit Plan.[31]

Finally, Defendants have not complied with several agreed-upon Infrastructure Standards, which, if implemented, would create a consistent framework across all aspects of service delivery and improve outcomes in Region 14.[32] Nor have Defendants attempted to update the Infrastructure Standards to reflect current case practice, an option available to them under the terms of the 2016 Exit Plan.[33] Across nine Infrastructure Standards Briefs, the Monitoring Team has identified gaps between the standards and current practice and issued recommendations to address those gaps.[34] *See infra* at pp. 33–54. Defendants'

---

[30] *See* Dkt. 745-1 at 10.

[31] *See* Period 36 Monitoring Report, Dkt. 787 at 14.

[32] *See id.* at 5 (noting that, if done with fidelity and quality, the Infrastructure Standards "should lead to improvement in the [OMs]").

[33] *See* Ninth Br. (Sept. 2024), Dkt. 791 at 11. Specifically, if any formal DFCS policy affects the Infrastructure Standards, "DFCS will provide notice to the [AA] and to Plaintiffs to discuss the potential impact on the Infrastructure Standards," and "[o]nce the new or revised DFCS policies become effective, these Infrastructure Standards automatically will conform to the revised DFCS policies, unless the parties and [AA] otherwise agree to revise the affected Infrastructure Standard(s)." Infrastructure Standards, Dkt. 757 at 4.

[34] *See, e.g.*, Ninth Br. (Sept. 2024), Dkt. 791.

Motion entirely omits any mention of the Infrastructure Standards, despite their failure to implement or update many of them.

Defendants' failure to ensure the safety and wellbeing of foster children in Georgia has gained the attention of federal oversight bodies, including a 2024 investigation and report by the U.S. Senate Judiciary Committee's Subcommittee on Human Rights and the Law ("Subcommittee"), titled "Abuse & Neglect of Children in Georgia's Foster Care System: A Case Study" ("Senate Subcommittee Report").[35] Although the Subcommittee's investigation was not limited to Fulton and DeKalb Counties, its findings confirm that serious accountability issues persist and that Defendants' ongoing non-compliance with the 2016 Exit Plan is not aberrational.

## III.    Plaintiffs' Pending Assertion of Noncompliance and Dispute Resolution Process Under the 2016 Exit Plan

On September 9, 2024, the Parties and the Monitoring Team held the quarterly Meeting of the Parties to discuss the Period 36 Monitoring Report and draft Ninth Infrastructure Brief. At the meeting, Plaintiffs requested an additional, follow-up

---

[35] The Subcommittee reviewed over ten thousand pages of documents and conducted over one hundred interviews with child welfare stakeholders in Georgia, including agency leadership and staff, former foster children, foster and adoptive parents, families whose children were removed, former DFCS employees, juvenile court judges, former members of Georgia's Citizen Review Panels, and the Office of the Child Advocate (OCA) leadership. Ex. B, Senate Subcommittee Rpt. at 11. The Subcommittee also reviewed OCA fatality reports, several of which involved children in Fulton and DeKalb Counties. *Id.* at 12, n. 43.

meeting to address Defendants' non-compliance with, and potential revision of, the Infrastructure Standards. Defense counsel would not commit to a meeting. On September 11, 2024, Plaintiffs' counsel wrote to reiterate its concern regarding Defendants' apparent abandonment of Infrastructure Standards, highlight the link between the Infrastructure Standards and the ongoing OMs, and renew the request to meet to discuss these issues.[36]

Plaintiffs' letter noted that without an agreement to meet, they would trigger the 2016 Exit Plan's dispute resolution provision, which delineates a process for the Parties to resolve issues with the assistance of the AA prior to raising them with the Court.[37]

In response, Defendants initially expressed a willingness to meet.[38] But then, in an about-face, Defendants advised that they planned to file the instant Motion to Terminate and that it was "up in the air" whether the proposed meeting would occur.[39] As a result, Plaintiffs triggered the dispute resolution process under the 2016

---

[36] *See* Ex. A, Sept. 2024 Correspondence between David Brackett and Harold Melton.

[37] *See* Dkt. 745-1 at 22 (providing that "[p]rior to seeking judicial remedies for a violation of this Exit Plan," Plaintiffs shall notify Defendants of the alleged violation, after which "[t]he parties, with the assistance of the [AA], shall engage in a 30-day period [or longer, on consent] of good faith negotiations in an effort to resolve the alleged violation").

[38] *See* Ex. A at Sept. 12 H. Melton Letter.

[39] *See id.* at Sept. 16 D. Brackett Email.

Exit Plan, highlighting Defendants' failure to comply with multiple Infrastructure Standards and ongoing OMs.[40] As part of this process, the Parties had an initial session under the AA's direction on October 10, 2024. Since then, the Parties have exchanged communications and agreed to extend the period for dispute resolution twice, with the dispute resolution process now set to continue at least until December 16, 2024.[41]

## LEGAL STANDARD

A consent decree is a "final judgment that may be reopened only to the extent that equity requires." *Rufo*, 502 U.S. at 391. Federal Rule 60(b) permits a party to seek relief from a final judgment only in limited circumstances and the party seeking to modify or terminate a consent decree "bears a heavy burden of persuasion." *Peery*, 977 F.3d at 1073 (quoting *Johnson v. Florida*, 348 F.3d 1334, 1341 (11th Cir. 2003)).

Consent decrees are contracts embodying an agreement "that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Frew v. Hawkins,* 540 U.S. 431, 437 (2004) (quoting *Rufo*, 502 U.S. at 378). Because consent decrees

---

[40] *See id.*
[41] *See* Oct./Nov. 2024 Correspondence between David Brackett and Harold Melton, attached hereto as Exhibit C.

are contractual in nature, they are enforceable even if they impose greater obligations on defendants than those required by the underlying federal law. *Id.*[42]

As relevant here, institutional reform decrees may be terminated under Rule 60(b)(5) when either the "judgment has been satisfied, released or discharged" or when "applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5).[43] The former ground requires a showing of "substantial compliance" with the terms of the consent decree and the latter requires a showing of unforeseen "changed circumstances." *See Peery*, 977 F.3d at 1069 (substantial compliance); *Horne v.*

---

[42] A consent decree can require more "steps" than the underlying statute because consent decrees reflect a choice among the various ways a state can implement federal law. *See Frew*, 540 U.S. at 437. If the state has not established that a court should make changes to the consent decree, "the decree should be enforced according to its terms." *Id.* at 441.

[43] Rule 60(b)(5)'s remaining ground for relief—that the decree "is based on an earlier judgment that has been reversed or vacated"—is obviously inapplicable here, and Defendants do not contend otherwise. *See* Defs. Br. at 13. Defendants do, however, invoke the catchall provision of Rule 60(b)(6), which permits relief for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). However, Rule 60(b)(6) "is available only when Rules 60(b)(1) through (b)(5) are inapplicable," *Kemp v. United States*, 596 U.S. 528, 533 (2022), and cannot be "premised on one of the grounds for relief enumerated in clauses (b)(1) through (b)(5)." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 863 (1988); *see also id*. at 863 n.11 (also noting that clause (6) and clauses (1) through (5) are mutually exclusive"). When it is applicable, Rule 60(b)(6) requires a high standard for relief: the movant "must demonstrate that the circumstances are sufficiently extraordinary to warrant relief, that is, movants must show that absent such relief, an extreme and unexpected hardship will result." *Galbert v. W. Caribbean Airways*, 715 F.3d 1290, 1294 (11th Cir. 2013) (citations omitted). As discussed *infra* note 163, Defendants can neither seek nor obtain relief under Rule 60(b)(6).

*Flores*, 557 U.S. 433, 447, 450 (2009) (changed circumstances). In addition, under *either* ground for relief, the movants must also show they have a "durable remedy" in place that makes it "unlikely" they will "return to [their] former ways." *Peery*, 977 F.3d at 1069 (quoting *Bd. of Educ. v. Dowell*, 498 U.S. 237, 247 (1991)); *see also Horne*, 557 U.S. at 447, 450.

## I.   Defendants Must Prove "Substantial Compliance" or "Unforeseen Changed Circumstances" to Support Relief Under Rule 60(b)(5)

### A.   Substantial Compliance

To establish that the "judgment has been satisfied" under Rule 60(b)(5), a movant must prove "substantial compliance" with the consent decree. *Peery*, 977 F.3d at 1069 ("Because a consent decree is a contract, we measure compliance in terms of substantial performance.") (citation omitted). Good-faith performance is not enough. Rather, substantial compliance exists when (1) "the decree's fundamental purpose has been accomplished," and (2) "any deviations from the decree are 'unintentional and so minor or trivial as not substantially to defeat the object which the parties intended to accomplish.'" *Id.* (quoting *Jeff D. v. Otter*, 643 F.3d 278, 285, 287 (9th Cir. 2011)).

### B.   Unforeseen Changed Circumstances

A movant seeking to terminate a decree because "applying [it] prospectively is no longer equitable" under Rule 60(b)(5) must demonstrate that changed circumstances "render[] continued enforcement 'detrimental to the public interest.'"

*Horne*, 557 U.S. at 447 (quoting *Rufo*, 502 U.S. at 367). This inquiry allows courts to return "responsibility for discharging the State's obligations . . . to the State and its officials *when the circumstances warrant*." *Id.* at 450 (emphasis added). A party seeking to modify a decree on this ground must satisfy the two-part test established in *Rufo*. 502 U.S. 367; *see also Horne*, 557 U.S. at 453 & n.5 (requiring courts to "engage in the changed-circumstances inquiry prescribed by *Rufo*," and be "true to the *Rufo* standard").

First, the movant "must establish that a significant change in facts or law warrants revision of the decree." *Rufo*, 502 U.S at 393. Under this prong, the movant must show that the change in circumstances was "unforeseen" and not based on events that were anticipated at the time the movant entered the decree. *Id.* at 384; *see e.g.*, *Anderson v. City of New Orleans*, 38 F.4th 472, 479 (5th Cir. 2022) (same). As part of this showing, the movant must establish that the change actually affects its obligations under the decree such that prospective application of the decree is *inequitable*, not just *inconvenient*. *Rufo*, 502 U.S. at 383; *see also, e.g.*, *Davis v. Hot Springs Sch. Dist.*, 833 F.3d 959, 964 (8th Cir. 2016) (affirming denial of Rule 60(b)(5) motion because movants failed to show that full termination was appropriate and supported by anything "more than the notion [it is] 'no longer convenient to live with'").

For a <u>change in facts</u> to warrant modification, the movant must show that the

changes "make compliance with the decree substantially more onerous;" the "decree proves to be unworkable because of unforeseen obstacles;" or "enforcement of the decree without modification would be detrimental to the public interest." *Rufo*, 502 U.S. at 383; *see, e.g., LaShawn A. ex rel. Moore v. Fenty*, 701 F. Supp. 2d 84, 101 (D.D.C. 2010), *aff'd sub nom.*, 412 F. App'x 315 (D.C. Cir. 2011) ("The defendants here have similarly neglected to explain how any alleged changes make the decree 'unworkable.'").

For a change in law to warrant modification, the movant must show that "one or more of the obligations placed upon [it] has become impermissible under federal law" or that "statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502 U.S. at 388.

Second, if the court finds there are significant changes in fact or law that warrant revision of the consent decree, such modification should be "suitably tailored" to the changed circumstances. *Id.* at 391. A court should only terminate a consent decree if such modification will not "resolve the problems created by the change in circumstances." *Id.*; *see also e.g.*, *Smith v. Bd. of Educ. of Palestine-Wheatley Sch. Dist.*, 769 F.3d 566, 570–71 (8th Cir. 2014) (change of circumstances warranted modification of some provisions, but not termination of the full

19

agreement). [44]

In a motion to terminate asserting changed circumstances, the movant may not re-litigate the original claims underlying a validly entered decree. *Juan F. v. Rell*, No. 3:89-CV-859, 2010 WL 5590094, at *4 (D. Conn. Sept. 22, 2010) ("[Rule] 60(b)(5) motions [are not] vehicles to relitigate the original claims of the underlying litigation, in an effort to determine whether ongoing violations of federal law exist.") (discussing *Horne*)); *LaShawn A.*, 701 F. Supp. 2d at 95 ("[A Rule 60(b)(5) motion] is not, however, a vehicle for relitigating underlying violations.").[45]

## II. Defendants Must Also Prove the Existence of a Durable Remedy to Support Relief Under Rule 60(b)(5)

Substantial compliance or significant, unforeseen changed circumstances alone are insufficient to modify or terminate a consent decree under Rule 60(b)(5). Under either ground, the movant must also demonstrate there is a durable remedy in

---

[44] Courts generally hold asserted "legal changes" to a high standard. *E.g., United States v. Tennessee*, 615 F.3d 646, 653 (6th Cir. 2010) (requiring movant to "put forward new court decisions or statutes that make legal what once had been illegal"); *Fla. Med. Ass'n, Inc. v. Dep't of Health, Educ., & Welfare*, 947 F. Supp. 2d 1325, 1350 (M.D. Fla. 2013) (vacating an injunction where subsequent Eleventh Circuit decisions made "evident that the Privacy Act no longer authorizes any of the injunctive relief" at issue, so the obligation under the injunction "has become impermissible under federal law").

[45] In light of this Court's governing orders from 2016 and 2017 setting forth the prerequisites for exit and the Parties' use of the validated Monitoring Reports under those provisions for the past seven years, it would not make sense for this Court to re-open discovery and conduct a trial on current violations of state and federal claims pled in 2003.

place. As the Supreme Court explained in *Horne*, court oversight should be terminated upon a showing of substantial compliance or a showing of unforeseen changed circumstances "*if* a durable remedy" has been achieved. *Horne,* 557 U.S. at 450 (addressing changed circumstances) (emphasis added); *see also e.g.*, *Evans v. Fenty*, 701 F. Supp. 2d 126, 176 (D.D.C. 2010) (addressing changed circumstances) ("[D]efendants have not demonstrated a durable remedy as required by *Horne*."); *LaShawn A.*, 412 F. App'x at 315 (termination of decree inappropriate where the defendant "fail[ed] to demonstrate durable statutory compliance"). Accordingly, a movant seeking exit must prove that "it is 'unlikely . . . [to] return to its former ways' absent the consent decree." *Peery*, 977 F.3d at 1075 (quoting *Dowell*, 498 U.S. at 247).

## ARGUMENT

Defendants fail to establish any ground for terminating the 2016 Exit Plan, an agreement they negotiated and entered with Plaintiffs. Both the Supreme Court and Eleventh Circuit have consistently held that a consent decree is a contract enforceable by the court. *See Rufo*, 502 U.S. at 378 (consent decree is "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees"); *Frew*, 540 U.S. at 440 ("Federal courts are not reduced to approving consent decrees and hoping for compliance . . . [O]nce entered, a consent decree may

be enforced."); *Peery*, 977 F.3d at 1069 ("Because a consent decree is a contract, [courts] follow the rules for interpretation of contracts and apply principles of state contract law."). Under this contract, which the Court approved and entered as its injunctive order after a hearing, Defendants negotiated and agreed to a clear path for exit and a termination of their obligations.[46] The 2016 Exit Plan states that Defendants may request termination only "[o]nce all of the outcome measures are designated as Attained Outcome Measures, and there are no remaining Ongoing Outcome Measures."[47]

Defendants have not met the agreed-upon prerequisites for exit and termination because they have not substantially complied with the agreement's terms. Instead, driven by the inconvenience of compliance, they claim prospective enforcement is now inequitable. Defendants have not established the legal grounds for that argument either, as shown below. Their motion is not based on any credible assertion of unforeseen changed circumstances or the establishment of a durable remedy, as required by Rule 60(b) and Supreme Court precedent.

---

[46] Dkt. 745, Dkt. 745-1.
[47] Dkt. 745-1 at 23.

**I.    Defendants Are in Undisputed and Ongoing Noncompliance with Numerous Provisions in the 2016 Exit Plan, Resulting in Ongoing Harms to Class Member Children**

Defendants' insistence that the "basic purpose of the Consent Decree" has been achieved[48] is belied by their ongoing violations of the 2016 Exit Plan. A consent decree's purpose is "fully achieved" only when a defendant establishes "(1) current, substantial, good-faith compliance, and (2) that it is 'unlikely . . . [to] return to its former ways' absent the consent decree." *Peery*, 977 F.3d at 1075 (quoting *Dowell*, 498 U.S. at 247). Substantial compliance with a consent decree allows only minor, trivial deviation from the terms of the agreement. *Id.* at 1069.

Defendants' deficiencies are far from minor or trivial. As shown in the following chart, they have failed to meet nearly one third of the OMs:

| OM | Target | Current |
|:---:|---|:---:|
| 1 | Begin abuse & neglect investigations w/in 24hrs of reporting in 95% of cases | 88.9%[49] |
| 3 | No more than 8.3% of children re-enter care w/in 12 months | 12.1%[50] |
| 6 | At least 43.6% of children in custody for 12–23 months in permanent placement | 42.1%[51] |
| 12 | Continuity: at least 90% of children have no more than 2 case managers while in foster care | 60.9%[52] |

---

[48] Defs. Br. at 65–66.
[49] Period 36 Monitoring Report, Dkt. 787 at 30.
[50] *Id.* at 16, 19.
[51] *Id.*
[52] *Id.* at 16, 20–21.

| OM | Target | Current |
|---|---|---|
| 21(a) | Medical healthcare needs are identified and met for at least 92% of children | 79%[53] |
| 21(b) | Dental healthcare needs are identified and met for at least 92% of children | 58%[54] |
| 21(c) | Mental healthcare needs are identified and met for at least 92% of children | 64%[55] |
| 21(d) | Educational/development needs are identified and met for at least 92% of children | 82%[56] |
| 23 | At least 40.5% of children in permanent placement w/in 12 months entering foster care | 32.6%[57] |
| 27 | At least 95% of cases have timely, valid court orders that are eligible for federal reimbursement | 91%[58] |

These failures "substantially [] defeat" the objective of the consent decree. *Peery*, 977 F.3d at 1075. Each failure has a severe, ongoing detrimental impact on the wellbeing of Class member children, including in their fundamental healthcare needs. Moreover, Defendants completely ignore the unmet Infrastructure Standards they agreed to in the 2016 Exit Plan and finalized in the December 2017 Order. Because Defendants cannot establish "current, substantial, good-faith compliance" with the 2016 Exit Plan (much less demonstrate a durable remedy to prevent them

---

[53] *Id.* at 25.

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Id.* at 18–19.

[58] *Id.* at 21–22.

from "return[ing] to [their] former ways absent the consent decree"), termination of the consent decree is inappropriate. *Id.* at 1075 (quoting *Dowell*, 498 U.S. at 247).

## II. Defendants Fail to Present Any Evidence of Unanticipated Changed Circumstances That Render Continued Enforcement of the 2016 Exit Plan Unjust

Rule 60(b)(5) allows a party to seek relief from a court order when "it is no longer equitable that the judgment should have prospective application." *Rufo*, 502 U.S. at 383. What the rule does not allow, however, is modification just because "it is no longer convenient to live with the terms of a consent decree." *Id*. Defendants may be tired of this Court's oversight, but they cannot establish any changes in factual or legal circumstances that make continued compliance with the 2016 Exit Plan inequitable. First, as explained further below, few of the efforts and laws asserted by Defendants as changes were "unforeseen"; most predate 2016 and were in place when the parties renegotiated the operative 2016 Exit Plan.[59] Defendants cannot raise these changes as justification for exit because they negotiated and signed an agreement after those changes had occurred. A court should not grant modification where a party relies on events that were anticipated (here, had already

---

[59] Defendants erroneously measure their alleged "changes" from the date of the original 2005 Consent Decree, which is not the Parties' operative agreement. *See, e.g.*, Defs. Br. at 19 ("Since the Consent Decree was originally entered in 2005, the legal landscape regarding child welfare has changed dramatically."); *id*. at 23 ("Since entry of the 2005 Consent Decree, DFCS has improved its structure, operations, and policies….").

occurred) at the time it entered a decree. *Rufo*, 502 U.S. at 385. The Court must consider only unforeseen "significant changes" in fact or law since Defendants entered the 2016 Exit Plan.

Second, any changes raised by Defendants that occurred after the 2016 Exit Plan do not impact their current failure to meet their obligations. *See id.* at 384. (movant must show that factual changes "make compliance with the decree substantially more onerous;" the "decree proves to be unworkable because of unforeseen obstacles;" or "enforcement of the decree without modification would be detrimental to the public interest").

### A. Programs and Laws that Existed before December 5, 2016 Are Not Unforeseen Changes in Factual Conditions or Law

Thirteen of the changes listed in Defendants' Motion occurred, by Defendants' own admission, before the Parties entered the 2016 Exit Plan:[60]

1. 2001 – First Child and Family Services Reviews ("CFSR")
2. 2007 – Second CFSR
3. 2009 – Creation of safety, permanency, and well-being teams
4. 2009 – SHINES (statewide computer system for case records)
5. 2010 – Fostering Connections and Strengthening Families Act
6. 2013 – Juvenile Code revision
7. 2014 – Centralized Intake Call Center ("CICC") (abuse hotline)
8. 2015 – Supervisor Mentor Program
9. 2015 – Kinship Care Continuum

---

[60] *See generally*, Defs. Br. at 18–41.

10. 2015 – Preventing Sex Trafficking and Strengthening Families Act

11. 2015 – Third CFSR

12. 2016 – Introduction of new practice model concept "informed by" Solution Based Casework[61]

13. 2016 – New initial safety assessments

Many of these items were discussed in litigation and settlement documents leading up to 2016. For example, this Court's 2004 order denying Defendants' Motion for summary judgment discussed Georgia's CFSR, *see Kenny A. v. Perdue*, No. 1:02-CV-1686-MHS, 2004 WL 5503780, at *8–10 (N.D. Ga Dec. 13, 2004), and monitoring reports preceding the 2016 Exit Plan discussed SHINES, the Juvenile Code revision, CICC, initial safety assessments, and the Supervisor Mentor Program.[62] Several of the OMs in the 2016 Exit Plan also address the initial safety assessments and the Kinship Care Continuum.[63] The implementation of a comprehensive practice model and initial safety assessments are also referenced in the 2017 Infrastructure Standards Order.[64]

Defendants also claim the CFSR program is evidence of "dramatically

---

[61] Defs. Br. at 30. Despite introduction of the concept, Defendants never adopted a practice model. *See* Ninth Br. (Sept. 2024), Dkt. 791 at 11–12.

[62] *See* Period 18 Monitoring Report, Dkt. 734, *passim* (SHINES); *id.* at 16, 21, 54, 82–85, 133 (Juvenile Code); *id.* at 9, 34–37, 49–50, 144, 159 (CICC); *id.* at 10–11, n. 1 (initial safety assessments); 153 (Supervisor Mentor Program).

[63] *See* Dkt. 745-1 at 12–14 (OM 1, OM 2, OM 5, OM 10).

[64] *See* Infrastructure Standards, Dkt. 757 at 4.

increased" federal oversight since the original 2005 Consent Decree.[65] However, as Defendants concede, the CFSR program has been in place since 2000—five years before the original Consent Decree, and sixteen years before the operative one.[66] Thus, the continued system of federal oversight over funding of child welfare agencies does not warrant termination of the 2016 Exit Plan.[67]

Defendants' Motion omits that they raised a similar argument in their 2004 motion for summary judgment, claiming their constitutional and statutory violations should be evaluated and monitored through the CFSR process rather than Plaintiffs' private cause of action. *See Kenny A.*, 2004 WL 5503780, at *9. This Court rejected that argument and denied the motion, reasoning "the federal regulatory scheme embodied in the CFSR process does not relieve State Defendants of their obligation to fulfill their statutory duties to plaintiff[s] nor does it provide a legal excuse for their failure to do so." *Id*. at *10. This "law of the case" and reasoning continues to apply today.[68]

---

[65] Defs. Br. at 31.

[66] *Id.* at 32.

[67] The same holds true for initiatives Defendants took relating to federal oversight prior to 2016, such as the creation of a Federal Regulations and Data Section in 2010, *see* Defs. Br. at 36, the Continuous Quality Improvement program in 2014, *see id.* at 37–39, and the role of a C3 Coordinator in 2015 to ensure connection between the Child and Family Services Plan, CFSR and CQI. *See id.* at 39–40.

[68] The Subcommittee Report also found that DFCS has "consistently failed" to meet federal standards for children's safety and healthcare *despite* the CFSR reporting

**B. Defendants' Remaining Asserted Changes Do Not Support Termination**

None of Defendants' remaining asserted "changed circumstances" support termination of this decree. To the contrary, rather than showing how these changes make compliance onerous, unworkable, or detrimental to the public interest, *see Rufo,* 502 U.S. at 383, Defendants, at most, point to changes that should make it easier for them to meet their obligations under the decree.

For example, Defendants claim their 2018 computer system upgrade is a significant change warranting termination of the 2016 Exit Plan. Defendants have not shown how this upgrade was unforeseen or makes compliance with the 2016 Exit Plan onerous or unworkable. Defendants also concede the system is still not in compliance with federal regulations.[69] Similarly, the other items raised by Defendants—contracting with a new software platform (UniteUs), the State of Hope initiative, the Office of Health Law and Policy, "reviving" the Office of Provider Management, ARGO, and the Family First Prevention Services Act—are not significant changes that render Defendants' compliance with the 2016 Exit Plan more difficult or hinder their ability to achieve the OMs. Indeed, some have not yet been fully implemented.

---

structure. Ex. B, Senate Subcommittee Rpt. at 13, 38–39. Clearly the CFSR process has not resulted in sustainable compliance at Georgia DFCS.

[69] *See* Defs. Br. at 24 (acknowledging non-compliance with 45 C.F.R. § 1355.50–58).

While these system upgrades and initiatives may help Georgia improve its foster care system, they do not constitute the kind of significant changes that warrant termination under Rule 60(b)(5) because they do not affect Defendants' obligations under the decree. *E.g.*, *LaShawn A.*, 701 F. Supp. 2d at 101 (termination not warranted where defendants "neglected to explain how any alleged changes make the decree 'unworkable'"); *Juan F.*, 2010 WL 5590094, at *4 ("The substantial progress the state has made to better fund, staff and operate DCF is to be commended, but it does not make continuing enforcement by this Court of the Exit Plan unworkable or inequitable."). And to the extent Defendants seek to present these same post-2016 updates as new "durable remedies," they would not pass that test, *see infra* at 31–33; Defendants do not link them to their failure to comply with the remaining ongoing OMs or failure to implement or update the Infrastructure Standards, and Defendants have no evidence that these items have either improved outcomes or proven to be lasting solutions.

Because Defendants cannot identify any legally cognizable, unforeseen, significant changes in fact or law since the 2016 Exit Plan, they fail to meet their burden under Rule 60(b)(5).[70]

---

[70] Even assuming, arguendo, that Defendants show any legally cognizable changed circumstances (which they do not), they also fail to show that their requested relief— full termination of the entire decree in the face of undisputed non-compliance—

### III.   In Any Event, Defendants Have Not Implemented a Durable Remedy Under the 2016 Exit Plan

Whether arguing that "prospective application is no longer equitable" *or* that "the judgment has been satisfied," Defendants must show the implementation of a durable remedy to justify the drastic remedy of early termination of a consent decree. *See Horne*, 557 U.S. at 450 (where a movant argues that prospective application is no longer applicable due to "changed circumstances," the court must determine whether "a durable remedy has been implemented"); *Peery,* 977 F.3d at 1076 (movant arguing that the judgment has been satisfied must show both "substantial compliance" *and* that it is "unlikely to return to its former ways absent the consent decree" such that there is a "'durable remedy' in place") (quoting *Horne,* 557 U.S. at 450)).[71] Defendants fail to make this critical showing.

In 2017 the Parties agreed that the Infrastructure Standards would help the

---

would be "suitably tailored" to any of their alleged changed circumstances. *Rufo*, 502 U.S. at 383. At most, Defendants' mixed history of progress on some OMs and noncompliance or regression on others suggests the need for some modification of the ignored Infrastructure Standards, not termination of the consent decree. As discussed above, *see supra* at pp. 13–15, the Parties are engaged in the dispute resolution process established by the 2016 Exit Plan to address both noncompliant OMs and updated Infrastructure Standards.

[71] *See also Evans*, 701 F. Supp. 2d at 171 ("[D]efendants have not demonstrated a durable remedy as required by *Horne*. While it is true that the District has made significant strides in the last year or two under new leadership, the Court does not have confidence that the agency's progress is durable and self-sustaining."); *LaShawn A.*, 701 F. Supp. 2d at 112 (denying motion to terminate where defendants failed to demonstrate durable compliance).

State achieve durable remedies. These standards are meant to create the foundational elements of Georgia's child welfare system "that lead to successful outcomes for safety, permanency, and well-being."[72] Defendants played a large role in crafting these standards and, for seven years, the Monitoring Team has assessed Defendants' efforts to execute them and recommended actions to further them along.

Defendants' Motion altogether ignores these standards as potential durable remedies and offers nothing in their place that would be linked to the ongoing OMs. *Cf. Evans*, 701 F. Supp. 2d at 171 ("Whether there is a durable remedy . . . necessarily depends on the actual impacts or outcomes experienced by the plaintiffs."). With no proven durable remedy in place, Defendants cannot meet their burden for relief under *Horne*. 577 U.S. at 450; *Rufo,* 502 U.S. at 383 (relief from a consent decree is appropriate when it is no longer equitable, "not when it is no longer convenient"); *see, e.g., Davis*, 833 F.3d at 964 ("Termination of the entire Agreement would be supported by nothing more than the notion [it is] 'no longer convenient to live with.'" (citation omitted)). Defendants also fail to identify any other "durable remedy" directly linked to the remaining ongoing OMs, including the supposed "new" programs identified in the motion to terminate. With no proven durable remedy in place, Defendants cannot meet their burden for relief under *Horne*.

---

[72] Dkt. 745-1 at 20.

**A.      Defendants Do Not Have a Durable Remedy to Meet the Medical, Dental, Mental Health, and Developmental Needs of the Class Member Children**

In addition to their failure to attain relevant OMs, Defendants point to no durable remedy to address the medical, dental, mental health, and developmental needs of the Class member children as required under the consent decree. *See supra* pp. 10–24. And their failure to meet the Infrastructure Standards underscores the importance of having such a durable remedy.

Take for example initial health screenings and early Medicaid eligibility determinations, both of which are core components of identifying and meeting these needs as children come into care. The Monitoring Team tracks Defendants' completion of these required initial screenings, and this data reveals inadequate performance, resulting in unmet needs:[73]

**Table 3: Status of Initial Health Screenings**

| Action Under Review | P31 | P32 | P33 | P34 | P35 | P36 |
|---|---|---|---|---|---|---|
| Child received initial physical health screen within 10 days of placement | 51.7% | 56.7% | 50.0% | 30.0% | 45.0% | 63.3% |
| Child received initial dental health screen within 10 days of placement | 26.7% | 28.3% | 18.3% | 13.3% | 15.0% | 25.0% |
| Child received initial trauma assessment within 30 days of placement | 71.9% | 54.1% | 48.6% | 25.0% | 48.6% | 56.3% |
| Child received initial developmental assessment within 30 days | 28.6% | 43.5% | 69.6% | 52.2% | 60.9% | 50.0% |
| Identified mental health needs and all treatment received and scheduled | 68.8% | 62.5% | 81.3% | 57.1% | 58.8% | 61.1% |

Source: Diligent Search Case Record Review

---

[73] Eighth Br. (Aug. 2024), Dkt. 788 at 20.

As noted in the Senate Subcommittee Report, Defendants' 2023 federal reporting similarly shows that children in their custody receive adequate physical health care in only 40% of cases reviewed and adequate mental and behavioral health care in only 13% of cases reviewed.[74] Defendants' response to the screening data and the Subcommittee Report is to blame Amerigroup (the contractor that administers Georgia's Medicaid plan) for frequently denying coverage.[75] But when the Monitoring Team provided specific recommendations to improve coordination among DFCS, Amerigroup, and other system partners, Defendants failed to implement these recommendations.[76]

Likewise, the monitoring and oversight of psychotropic medication—ignored in Defendants' Motion—is a component of the Infrastructure Standards relating to identifying and meeting children's medical and mental health needs, yet the Monitoring Team has repeatedly identified multiple failures in DFCS' system for monitoring psychotropic medication administered to Class member children. Such failures include (1) the lack of any State-approved guidelines or parameters to assist decision-making on the appropriateness of each medication request;[77] (2) the failure to develop and implement a process for case managers to consult with medical

---

[74] Ex. B, Senate Subcommittee Rpt. at 38.
[75] *Id.* at 41.
[76] Ninth Br. (Sept. 2024), Dkt. 791 at 17–18.
[77] Eighth Br. (Aug. 2024), Dkt. 788 at 27, 30, 32; Ninth Br., Dkt. 791 at 18.

professionals on medication requests or issues;[78] (3) the failure to provide required training specific to psychotropic medications for case managers;[79] (4) confusion between DFCS's and Amerigroup's policies for monitoring psychotropic medications;[80] and (5) the fact that providers who prescribe psychotropic medications report they do not have capacity to conduct initial screenings.[81] Although the Monitoring Team provided Defendants with recommendations to address gaps related to psychotropic medications,[82] Defendants have either refused to, or failed to, address these recommendations in practice. The Senate Subcommittee Report found similar failures statewide.[83]

Without a durable remedy in place to identify these health care needs of Class member children, it is not surprising that Defendants cannot attain each OM related to meeting these needs (OMs 21(a)–(d)).

## B.    Defendants Have Failed to Establish, Fund, and Implement a Comprehensive Practice Model to Support Consistent Case Practice

One possible avenue to a durable remedy that would ensure continual improvement in child welfare and safety outcomes would be a comprehensive

---

[78] Eighth Br. (Aug. 2024), Dkt. 788 at 32–33; Ninth Br., Dkt. 791 at 18.

[79] Eighth Br. (Aug. 2024), Dkt. 788 at 30, 32; Ninth Br., Dkt. 791 at 18.

[80] *See* Eighth Br. (Aug. 2024), Dkt. 788 at 27–29.

[81] *Id.* at 31.

[82] Ninth Br. (Sept. 2024), Dkt. 791.

[83] Ex. B, Senate Subcommittee Rpt. at 6.

practice model, but Defendants have all but abandoned that as well. A comprehensive practice model would provide a structure and framework for consistent decision-making, help supervisors monitor and assess staff performance, and provide clear expectations for front line workers.[84] Comprehensive practice models are proven to strengthen workforce, promote partnership, and "most importantly, achieve positive safety, well-being, and permanency outcomes for children and families."[85]

Far from just a planning document, a comprehensive practice model is a complex remedial undertaking. Successful implementation requires "the resources and supports needed," as well as thorough training, coaching, and evidence of "fidelity to the practice model, the implementation process, and outcomes for children[,] youth and families."[86]

Defendants agreed in 2016 and 2017 that a comprehensive practice model would be a key element to their path to successful safety and welfare outcomes, and

---

[84] *See* Ninth Br. (Sept. 2024), Dkt. 791 at 7–8 (citing Jan McCarthy, *Guide for Developing and Implementing Child Welfare Practice Models*, National Child Welfare Resource Center for Organizational Improvement (Oct. 2012), https://ncwwi.org/files/Developing__Implementing_Child_Welfare_Practice_Models.pdf).

[85] Infrastructure Standards, Dkt. 757 at 4.

[86] McCarthy, Guide for Developing and Implementing Child Welfare Practice Models at 2.

ultimately, exit from the consent decree.[87] The comprehensive practice model required by the Infrastructure Standards would serve as a well-funded, service-driven, and evaluated roadmap driving consistent positive outcomes. That is surely why Defendants touted the development of a practice model at the hearing where this Court approved the 2016 Exit Plan, explaining that their practice model "will aid [DFCS's] ability to meet these new standards that we have adopted in the exit plan in a realistic, shorter time period for the purposes of exiting[.]"[88] They even emphasized their development of a comprehensive practice model in CFSR documents and a Program Improvement Plan submitted to the federal government.[89]

Yet Defendants have still been unable or unwilling to establish such a comprehensive model. In fact, years into the 2016 Exit Plan, the Monitoring Team concluded that there had been no progress on this front, reporting in March 2019, that "to date there are no plans to develop a comprehensive practice model as described in the Infrastructure Standards,"[90] though some legacy components from

---

[87] Infrastructure Standards, Dkt. 757 at 4.

[88] *See* December 5, 2016 Hearing Tr., excerpt attached hereto as Exhibit D at 15:9–13.

[89] *See, e.g.* Georgia Performance Improvement Action Plan, Child and Family Services Review Round 3, Performance Improvement Plan (PIP), Apr. 2017, p. 1, 6, 8 ("blueprint for change" is "[a]doption of a Practice Model that will serve as the foundation to keep children safe and strengthen families," which will inform various other strategies), *available at* https://dfcs.georgia.gov/document/ publication/cfsr-pip/download.

[90] First Br. (Mar. 2019), Dkt. 763 at 18.

2016 were partially implemented.[91]

To be sure, after that, Defendants refocused on the development of a comprehensive practice model. As the Monitoring Team noted in February 2020, a "senior DFCS staff member has taken on the responsibility of more thoroughly addressing the need" for a "clearly written and articulated" comprehensive practice model, and that DFCS leadership was still committed to a model and viewed it as critical.[92] Later that year, the Monitoring Team reported that DFCS had developed internal and external steering committees and created a first draft, that plans to finalize the model by June 2020 were delayed by Covid-19, and that once finalized, "DCFS plans to pilot the model in diverse sites."[93] The Monitoring Team noted the link between the practice model and specific OMs.[94] And in June 2021, the Monitoring Team emphasized key issues for the next implementation phase, including the need for "an implementation and communication plan," "necessary supports and resources," and assessing whether there are early indications that the

---

[91] *See id.* at 17–24.

[92] Second Br. (Feb. 2020), Dkt. 767 at 19.

[93] Third Br. (Oct. 2020), Dkt. 768 at 16.

[94] *See* Fourth Br. (Jun. 2021), Dkt. 770 at 7 ("The model was developed to reduce the recurrence of maltreatment, keep children and families together, reduce the length of time children are separated from their families, reduce maltreatment of children and youth who are in foster care and keep children and youth in foster care in stable placements.").

four outcomes "are being impacted positively."[95]

By January 2022, however, Defendants had paused any effort to adopt a comprehensive practice model. They say this delay was due to their "decision to tie the practice model with the implementation of the 2021 federal Family First Prevention Services Act (FFPSA)."[96] But regardless of the reason, the result was that Defendants stopped working on this potential durable remedy and ultimately abandoned it.[97]

While a comprehensive practice model alone would not suffice as the durable remedies the Defendants need to obtain the relief they seek, it would certainly help. Indeed, without such a model, Defendants have been unable to attain multiple OMs, including OM 1 (commencement of investigations), OM 3 (re-entry into care), OM 12 (caseworker continuity), and OM 23 (timely discharge to permanency), as well as the caseload requirements. A comprehensive practice model would also improve workforce morale and reduce persistent caseworker turnover, likely improving Defendants' ability to maintain the robust workforce needed to achieve lasting compliance with the 2016 Exit Plan.[98] Defendants' apparent decision to abandon this

---

[95] *Id.* at 9.

[96] This made the timeline for its rollout uncertain, as Georgia's FFPSA Plan had been submitted but not yet approved. Fifth Br. (Jan. 2022), Dkt. 772-1 at 4, 7–8.

[97] Ninth Br. (Sept. 2024), Dkt. 791 at 11 (Since January 2022, "no further work has been done to develop, refine, align or implement a comprehensive practice model.").

[98] *Id.* at 11–12.

effort without offering anything in its place undermines any argument that they have durable remedies in place that justify terminating the decree.

### C.    Defendants Have Failed to Maximize Available Federal Funds to Improve Services for Class Member Children

Another key component of any durable remedy is sufficient and consistent funding, but Defendants have made no strides there, either. By agreeing to the Infrastructure Standards, Defendants committed to maximizing federal funds available through Titles IV-B and IV-E of the Social Security Act by having mechanisms in place for budgeting and reporting on federal and state dollars.[99] As explained below, Defendants have failed to implement this key component of a durable remedy and, according to the Monitoring Team, may be inaccurately reporting relevant data to the federal government. Inadequate funding negatively affects the entire system and contributes to Defendants' inability to meet all OMs.[100]

The Monitoring Team identified several deficiencies limiting Defendants' ability to claim federal reimbursement for eligible children, including data inconsistencies and various issues related to initial orders granting DCFS custody, which are necessary to obtain federal funding.[101] Defendants have repeatedly failed

---

[99] Infrastructure Standards, Dkt. 757 at 20–21.
[100] Third Br. (Oct. 2020), Dkt. 768 at 48 ("More financial resources will help DFCS ensure needed services and support for families and maintain certain workforce capacities.")
[101] *Id*. at 48–52.

to address these issues or implement the Monitoring Team's recommended changes.

Defendants also systemically fail to maximize the revenue they can claim from the federal government. They lack a method to track the efficiency of their claims and supervise eligibility determinations[102] and they do not have a system in place to ensure that eligibility determinations are thorough and accurate, resulting in "significant and repeated unclaimed federal funding for the state."[103] Because of these failures, Defendants funding for Georgia's child welfare system is near the lowest of all states. In the Ninth Brief (Sept. 2024), the Monitoring Team reported that on average, states spend around $215 federal dollars and $205 state and local dollars per child.[104] By comparison, Georgia spends only $71 federal dollars and $43 state and local dollars per child.[105] Georgia's per capita federal spending ranked 51 out of 52 jurisdictions and its level of state/local spending ranked 49 out of 50.[106] Defendants have never implemented the recommended durable remedies to correct these issues.[107]

---

[102] Ninth Br. (Sept. 2024), Dkt. 791 at 23–24.

[103] *Id.* at 24.

[104] *Id.* at 7.

[105] *Id.*

[106] *Id.*; *see also* Child Welfare Financing Survey SFY2020 at https://www.child trends.org/publications/child-welfare-financing-survey-sfy2020 and KidsCount Data Center at https://datacenter.aecf.org/data/tables/ 99-total-population-by-child-and-adult-populations#detailed/2/2-53/false/574/39/416.

[107] *See generally*, Ninth Br. (Sept. 2024), Dkt. 791 at 23–36.

Strikingly, the Monitoring Team found "a large discrepancy" between the information it reviewed and the numbers reported by Defendants to the federal government.[108] This means that "[e]ither the Department is not accurately reporting to the federal government and is over claiming Title IV-E revenue, or the Revenue Maximization unit report is incorrect," and "[e]ither one is very troubling."[109] In fact, "[o]verall confidence in data validity is a critical issue," with administrative reports and regional office reports often being "incongruent."[110] The Monitoring Team provided detailed recommendations to remedy these failings, which have also gone unnoticed and unimplemented by Defendants.[111] Defendants' Motion presents no clear plan to adopt the Monitoring Team's specific recommendations or otherwise fix these deficiencies.

A significant structural shortcoming related to funding is Defendants' failure to create a streamlined licensing process for kinship providers and a related lack of a viable guardianship program. Each of these efforts would provide a permanent, federally subsidized route out of custody for Class member children who are placed

---

[108] *Id.* at 26.

[109] *Id.* Defendants have subsequently stated they are not overclaiming Title IV-E revenue, but, instead, that the Revenue Maximization report submitted to the federal government is incorrect.

[110] *Id.* at 25.

[111] *Id.* at 26–36.

with relatives and kin.[112] Using evidence from other jurisdictions, the Monitoring Team found that making this permanency option available in Georgia could substantially increase the number and percent of Class member children exiting care to permanency and improve the timelines for doing so, while reducing administrative and other costs associated with keeping them in foster care.[113]

Defendants' deficient funding practices deprive them and, in turn, Class member children, of opportunities for better staff support (and better-supported staff), improved caregiver resources, and enhanced services—factors that would lead to improved outcomes for Class member children. Defendants' failure to identify a durable remedy to address these deficiencies is fatal to their motion to terminate.

### D.    Defendants Do Not Have a Durable Remedy to Ensure Quality Placement and Caregiving for Class Member Children

Defendants further offer no durable remedy to address quality placement and caregiving for class member children.[114] This is yet another area that the Infrastructure Standards expressly address, and that Defendants now ignore.

The Monitoring Team has consistently identified three specific gaps related to this standard—inadequate kinship support, inadequate oversight of placements,

---

[112] *Id.* at 27–29.

[113] Third Br. (Oct. 2022), Dkt. 768 at 55.

[114] Infrastructure Standards, Dkt. 757 at 10–12.

and an ongoing placement crisis. As discussed below, failure to implement durable remedies related to placements contributes to Defendants' noncompliance with several outcomes: OM 3 (re-entry into care), OM 6 (discharge to permanency), OMs 21(a)–(d) (health and educational needs), and OM 23 (timely discharge to permanency).

### 1. Defendants Do Not Have a Sustainable Plan to Provide Adequate Kinship Support

Under the Infrastructure Standards, Defendants committed to "prioritize[] children being placed with relatives who are able to provide a safe, nurturing home" and "facilitate the approval process by providing potential caregivers with assistance to complete necessary paperwork, obtain items that are required for approval, make home modifications, or provide financial support."[115] Children placed with kin experience better outcomes, including fewer placement changes, better education outcomes, a lower likelihood of re-entering foster care, and higher rates of achieving permanency.[116]

Early monitoring revealed "barriers and inherent inequities" in this area.[117] Relatives reported feeling "taken through the ringer" by the onerous licensure

---

[115] *Id.* at 10–11.
[116] Eighth Br. (Aug. 2024), Dkt. 788 at 6.
[117] Second Br. (Feb. 2020), Dkt. 767 at 31.

process, leading to a decrease in relative foster homes.[118] Services were not offered to relatives at the same level as non-relative foster parents.[119] The Monitoring Team recommended, among other things, providing "equivalent funding and support to relative foster parents as is provided to non-relative foster parents."[120]

Despite some reported improvements in 2021 by a new kinship support unit for Region 14, Class member children were still being placed in unapproved kinship homes that received a "lesser rate" than foster parents, and many kin continued to avoid pursuing full approval.[121] The Sixth Brief (Oct. 2022) noted a continued decline in Class member children being placed with relatives and the urgent need for increased efforts to engage and support relative foster homes.[122]

Defendants report they plan to complete and implement streamlined kinship licensing standards by the end of 2024.[123] The Ninth Brief (Sept. 2024) reported that "a workgroup has been formed to develop separate licensure/approval standards for

---

[118] *Id.* A new federal regulation explicitly authorizes child welfare agencies to implement a streamlined separate set of licensing or approval standards specific to kin placements. 45 C.F.R. §§ 1355 and 1356. This arrangement promotes equity and can prevent children from being placed in unnecessarily restrictive settings and allows federal reimbursement for the placements. Under the Rule, all licensed or approved kin receive the same foster care reimbursement payment amounts as licensed non-kinship placements. 45 C.F.R. § 1356.21(m).

[119] Second Br. (Feb. 2020), Dkt. 767 at 31.

[120] *Id.* at 32.

[121] Eighth Br. (Aug. 2024), Dkt. 788 at 14.

[122] Sixth Br. (Oct. 2022), Dkt. 777 at 36.

[123] Eighth Br. (Aug. 2024), Dkt. 788 at 14

relatives which would provide equal foster care maintenance payments, and their recommendation will be presented this fall to state leadership for approval."[124] While it appears Defendants *may* be taking steps toward fully and equally supporting relative and kinship placements—potentially leading to improvement in noncompliant outcomes for Class member children in these placements—this component of a durable remedy remains unrealized.

## 2. Defendants Do Not Have a Sustainable Plan to Provide Adequate Oversight for the ARGO Automated Placement Matching Tool

Another key aspect of the Quality Placement and Caregiving section of the Infrastructure Standards concerns the tracking and disclosure of information to and from caregivers (including providers), and again, Defendants offer no durable remedy that addresses this.[125] The Monitoring Team recently gave a detailed report on a new portal called "ARGO" designed to replace legacy paper systems with an automated system for tracking, evaluating, and matching placements, as required by the Infrastructure Standards.[126] Signaling the value of ARGO if implemented, DFCS staff "stated that prior to ARGO there was no way to identify appropriate placement matches for children."[127]

---

[124] Ninth Br. (Sept. 2024), Dkt. 791 at 16.
[125] Infrastructure Standards, Dkt. 757 at 11–12.
[126] Eighth Br. (Aug. 2024), Dkt. 788 at 16.
[127] Ninth Br. (Sept. 2024), Dkt. 791 at 16.

However, the Monitoring Team has reported significant issues with ARGO. The Eighth Brief (Aug. 2024) noted that the platform is not user-friendly due to issues such as lacking information in service authorizations about a child's current needs, untimely notifications to providers regarding placement requests or actual placements, and frustration among providers over communication gaps.[128] Further, the Ninth Brief (Sept. 2024) revealed that "there is no current way to measure the impact of ARGO" and that Defendants have not established "clear expectations for timeframes and utilization of" the system.[129] Additionally, Defendants indicated there would be "a policy expectation for workers to check ARGO for any corrective action plans prior to placement," but there was "no current CQI process to ensure" this practice was occurring.[130]

Quality assurance is essential for the Monitoring Team to assess whether ARGO is functioning effectively, as it carries potential life-saving implications. ARGO's capability to check for corrective action plans arose from an investigation into the death of a Class member who was placed in a home with an open corrective

---

[128] Eighth Br. (Aug. 2024), Dkt. 788 at 16.
[129] Ninth Br. (Sept. 2024), Dkt. 791 at 16.
[130] *Id.*

action plan ("CAP"). Knowledge of the CAP might have prevented that tragic placement.[131]

Thus, while Defendants tout the development of ARGO,[132] they entirely miss the mark because they have not built the critical policy and quality assurance functions necessary for assessing the remedy. Without these protections, the system lacks the requisite proven durability.

### 3. Defendants Do Not Have a Sustainable Plan to Address the Child Placement Crisis

There is also no durable remedy in place to address an ongoing child placement crisis. As stated above, since at least 2022, Defendants have been experiencing a crisis-level lack of placements for youth in custody with complex needs.[133] The 2016 Exit Plan prevents Defendants from using offices as overnight placements, and in July 2017, Defendants agreed to stop using hotels as temporary

---

[131] Defendants announced ARGO to Plaintiffs at a September 2023 meeting to discuss a Class member who died while in DCFS's custody. The child, also discussed in the Subcommittee Report, *see* Ex. B, Senate Subcommittee Rpt. at 22, was killed after being placed in a foster home with a CAP which, if followed, would have prohibited her placement in the home. *See also* Period 36 Monitoring Report, Dkt. 787 at 16, 26.

[132] Defs. Br. at 23–24.

[133] *See* Period 36 Monitoring Report, Dkt. 787 at 14; *see also* Sixth Br. (Oct. 2022), Dkt. 777 at 30–33 (discussing ongoing "placement crisis," including DFCS staff reportings that the "issue [is] . . . appropriate placement *availability*" and that "[t]here [are] simply not enough available beds"); Seventh Br. (May 2023), Dkt. 778 at 37 (noting the "current placement crisis affecting youth in Region 14").

placements.[134] However, due to their failure to procure adequate placements, Defendants resorted to using office placements at crisis levels during Period 33, leading to an emergency meeting of the parties in May 2022, where Commissioner Broce pledged to end the practice.[135] Despite this pledge, Defendants then *increased* their use of hotels to house Class member children in Periods 34 and 35.[136] Most of the children placed in hotels during this crisis were Black females, and almost 65% of the children placed in hotels had a medical or mental health diagnosis.[137]

To ameliorate this situation, in early 2022, Defendants began offering $5,000 to providers who placed hotel-ed children and offered an enhanced monthly rate to placements.[138] While this effort has had a "positive impact," the Monitoring Team cannot yet assess whether Defendants' current strategies are "effective and sustainable."[139] In other words, there is still no durable remedy for this serious placement issue.

### E.   Defendants Do Not Have a Durable Remedy to Address the Workforce and Caseload Crises

Defendants also point to no durable remedy to address serious staffing concerns. There is no question that Defendants have struggled to create a competent,

---

[134] Period 36 Monitoring Report, Dkt. 787 at 38; Dkt. 745-1 at 10.
[135] *See* Period 36 Monitoring Report, Dkt. 787 at 39.
[136] *Id.*
[137] *Id.*
[138] *Id.* at 45.
[139] *Id.* at 39, 48.

professional workforce carrying manageable caseloads. In Period 36 (July 1–Dec. 31, 2023), for example, only 66% of case managers in DeKalb County, and only 82% of case managers in Fulton County, met the designated caseload cap.[140] During the same period, only 65% of supervisors in DeKalb County, and only 82% of supervisors in Fulton County, met the agreed-upon ratio of caseworkers per supervisor.[141] The designated caps are intended to prevent high caseloads, which contribute to staff burnout, staff attrition and turnover, poor case practice, service interruption, and poor outcomes for children and families.[142] The designated supervisory ratios are intended to ensure necessary oversight and leadership, as well as retention of existing staff.[143] Such ratios, which reflect national standards, are crucial to ensuring the timeliness, quality, and effectiveness of child welfare services.[144] Indeed, the Monitoring Team has repeatedly found that ongoing issues with caseloads and caseworker turnover negatively impact the quality of practice

---

[140] *See id.* at 36–37.

[141] *Id.* at 37.

[142] *See generally*, High Caseloads: How do they Impact Delivery of Health and Human Services, *available at* https://www.socialworkpolicy.org/wp-content/uploads/2010/02/r2p-cw-caseload-swpi-1-10.pdf.

[143] *See* Period 34 Monitoring Report, Dkt. 783 at 14, 33.

[144] *See* Casey Family Programs, *Importance of supervision in child welfare*, 2018 ("The two established sources for supervisory ratio standards, the Child Welfare League of America and the Council on Accreditation, both identify the best practice standard for supervisor-supervisee ratios in child and family services to be 1:5."), *available at* https://www.casey.org/media/HO_What-Strategies-Strengthen-Quality-Supervision-1.pdf.

and other related OMs.[145]

There are many causes for these staffing problems, none of which Defendants address in their motion. For example, Monitoring Team focus groups reveal that the most common reason case managers resign is "the difficulties associated with finding placements for children and/or spending the night in offices and hotels with children."[146] But yet again, Defendants offer no durable remedy for these problems. Likewise, the Senate Subcommittee Report found that DFCS caseworkers report feeling pressured to show progress in their cases, resulting in the reporting of false information.[147] These failures contribute to low morale and a fear of speaking out among DFCS staff, which resulted in a staged "sick out" by 25 employees in May 2022 in Fulton County, all of whom were thereafter terminated.[148]

The consequences of this workforce and caseload crisis can be catastrophic. In one case discussed earlier, *see supra* at p. 48 & note 131, a non-verbal toddler was killed by blunt force trauma to the head after being abused while in the custody of foster parents. The child had been placed with the foster parents despite the parents' documented history in DFCS's database, SHINES, of inappropriate

---

[145] *E.g.*, Period 36 Monitoring Report, Dkt. 787 at 15, 21; Period 35 Monitoring Report, Dkt. 786 at 9, 12, 28; Period 34 Monitoring Report, Dkt. 783 at 33.
[146] Period 35 Monitoring Report, Dkt. 786 at 6.
[147] Ex. B, Senate Subcommittee Rpt. at 29–30.
[148] *Id.* at 27.

corporal punishment against children in their care and a corrective action plan that prohibited the placement of non-verbal children in that home.[149] Heartbreakingly, in almost half of cases in which a child died in Defendants' custody, Defendants reported that staff could not perform basic elements of their jobs due to an insufficient knowledge base, like the inability to navigate the SHINES database to review historical case information.[150]

The problems associated with high caseloads and high turnover flow from Defendants' failure to implement a durable remedy. The Ninth Brief (Sept. 2024) highlights specific gaps in Defendants' workforce commitments.[151] For example, one Infrastructure Standard concerns the use of an Employee Selection Process (ESP), a research-based tool designed to "support[] informed hiring decisions for managers and supervisors."[152] Defendants are supposed use the ESP during the hiring process to select the most appropriate candidates and employ a CQI process to evaluate the effectiveness of the ESP.[153] However, reports indicated the ESP was rarely used after it was implemented in 2021.[154] And in 2024, the Monitoring Team

---

[149] Ex. B, Senate Subcommittee Rpt. at 22; *see also* Period 36 Monitoring Report, Dkt. 787 at 26.

[150] Ex. B, Senate Subcommittee Rpt. at 28; *see also id.* at 13 ("critical safety decisions are made by inexperienced workers").

[151] Ninth Br. (Sept. 2024), Dkt. 791 at 21.

[152] *Id.*

[153] Infrastructure Standards, Dkt. 757 at 18.

[154] Ninth Br. (Sept. 2024), Dkt. 791 at 21–22.

found "there is still no CQI process in place to evaluate the effectiveness of ESP."[155] This is a critical issue because the Monitoring Team has not received clear or consistent reporting on vacancy, hiring, and recruitment status from Defendants, further complicating efforts to address these workforce challenges.[156] The Monitoring Team has found that Defendants "need to continue focusing on hiring more staff and retaining the staff that they bring onboard especially since it takes weeks [or] even months to onboard new staff."[157]

Another gap identified by the Monitoring Team relates to training. A key component of the Infrastructure Standards mandates that case managers should not receive primary responsibility for cases until they achieve certification of successful participation in new workers training.[158] However, the Monitoring Team found that in 2022, Defendants changed their policy to allow workers to receive a training or provisional caseload after completing fundamentals training but before completing online training and field practice guide activities.[159] This unilateral change, contrary to the express language in the Infrastructure Standards, was made without any agreement of the Parties or evaluation by the Monitoring Team regarding its safety

---

[155] *Id.* at 22.
[156] *Id.*
[157] Period 36 Monitoring Report, Dkt. 787 at 37.
[158] Infrastructure Standards, Dkt. 757 at 19.
[159] Ninth Br. (Sept. 2024), Dkt. 791 at 22.

and efficacy. This is concerning because in May 2023, the Monitoring Team found that "workers have been less likely to pass the certification test following training," and assigning pre-certification caseloads to these workers introduces significant safety risks.[160]

Defendants' Motion is silent on how and whether they plan to address these problems if the Court terminates the decree.

## IV.   Defendants' Systemic and Ongoing Violation of the 2016 Exit Plan Substantially Defeats the Objective of the Agreement

The basic purpose of the 2016 Exit Plan was implementation of reform through the Infrastructure Standards, leading to compliance with the OMs. But even under Defendants' self-declared and vague "basic purpose" of achieving "lasting reform to the child welfare system of Georgia," Defendants cannot show success.[161] First, right now Defendants are noncompliant with 10 of 31 OMs and are rebounding from a recent placement and workforce crisis that required emergency intervention from the Monitoring Team and senior DFCS officials. *See supra* pp. 10–12, 23–25. Second, Defendants' self-declared "basic purpose" assumes a durable remedy, but Defendants have not demonstrated, nor can they, that compliance would continue without judicial oversight—a key factor in determining whether termination under

---

[160] Seventh Br. (May 2023), Dkt. 778 at 26.
[161] Defs. Br. at 66.

Rule 60(b) is appropriate. *See LaShawn A.*, 412 F. App'x 315; *Peery*, 977 F.3d at 1076. Third, as discussed above, Defendants' ongoing noncompliance stems from the Infrastructure Standards Defendants ignore in their motion, which are essential for achieving lasting reform under the 2016 Exit Plan (and comprise an independent source of non-compliance). Fourth, Defendants' assertion of lasting reform is contradicted by the grave findings in the aforementioned Senate Subcommittee Report on the dangerous lack of accountability at DFCS.

Defendants improperly rely on *Peery* to support their "basic purpose" argument. In *Peery*, the Eleventh Circuit affirmed the trial court findings that the City of Miami substantially complied with a consent decree reforming the manner in which police treated homeless people. *Peery*, 977 F.3d at 1075. However, the *Peery* settlement agreement was quite different than the 2016 Exit Plan. In *Peery*, the City agreed to implement law enforcement training, create an advisory committee, create a system to compensate homeless people injured by police conduct, draft new policies and protocols related to police treatment of homeless people, and maintain records related to these new initiatives. *See Pottinger v. City of Miami*, No. 1:88-cv-02406 (S.D. Fla. Sept. 18, 1998). The Eleventh Circuit found the City did each of these things, and demonstrated that compliance was durable, supported by evidence of a $60 million Homeless Trust and various programs to provide shelter and services to homeless people. *Peery*, 977 F.3d at 1076. Therefore,

*Peery* is distinguishable because the City implemented each of the required reforms and provided evidence that the reforms would last into the future. Here, Defendants fail by a wide margin to establish they have achieved the agreed-upon reforms.[162]

## V. Defendants' Requested Relief Misapplies Important Principles of Federalism

Defendants' request for full termination—despite a weak performance record, the absence of durable remedies, and the undisputed noncompliance with one third of the OMs—misapplies the federalism concerns outlined in *Horne*, *Rufo*, and *Frew*, as well as the Eleventh Circuit's application of those principles in *Peery*.

While Defendants made commendable progress before the 2016 Exit Plan and in several areas since, these improvements were expected as part of the settlement. The issue before the Court now is what Defendants have yet to achieve. The undisputed areas of noncompliance are serious and harm the Class member children whom Defendants have removed from their homes and placed in the State's custody. Defendants make a weak case for permission to walk away from these obligations

---

[162] Defendants' "compliance-in-part" with the 2016 Exit Plan is a positive development and an expected result of their agreement to the decree. However, it does not mandate this Court grant the instant motion. District courts have appropriately denied motions to terminate despite some progress being made when the request was "premature" considering issues still prevalent in the system. *See e.g., LaShawn A.*, 412 F. App'x 315; *Johnson v. Sheldon*, No. 8:87-cv-369-T-24 TBM, 2009 WL 3231226, at *7 (M.D. Fla. Sept. 30, 2009) (denying motion to exit consent decree because the objective of the decree had not been achieved despite "sweeping modifications and improvements to the community mental health system").

now. Particularly glaring is Defendants' deliberate omission of the Infrastructure Standards (*i.e.*, potential durable remedies) from their argument, despite agreeing to these standards in December 2017 and working under them for the last seven years. This underscores a motion based on inconvenience rather than genuine compliance, as well as inadequate accountability at DFCS, as found by the Senate Subcommittee Report.

Defendants' Motion fails by a wide margin to meet the standard of Rule 60(b) and related governing law. Defendants cannot carry their burden to show that the "judgment has been satisfied, released or discharged" or that "applying it prospectively is no longer equitable" under Rule 60(b)(5). A "durable remedy" is not in place.[163]

The Class member children are eager for Defendants to achieve exit and termination and await a performance record justifying such relief. But Defendants are simply not there yet. The ongoing dispute resolution process seeks to modify the ignored Infrastructure Standards and move Defendants toward compliance and exit. The Parties' efforts should be focused on those solutions, not the present unfounded

---

[163] As discussed above, *see supra* at note 43, to the extent Defendants also seek relief under Rule 60(b)(6), that argument fails because Rule 60(b)(6) is available only when Rules 60(b)(1) through (b)(5) are not applicable. Moreover, Defendants do not provide evidence of extraordinary circumstances or extreme hardship, as required for relief under Rule 60(b)(6) (nor can they). The Court should therefore deny that portion of Defendants' Motion brought pursuant to Rule 60(b)(6).

motion to terminate.

## CONCLUSION

Defendants have not carried their heavy burden of showing substantial compliance with the 2016 Exit Plan or the existence of unforeseen significant changed circumstances that justify termination of the decree. They have no durable remedy in place, and they have not implemented the durable remedy outlined in the Parties' agreement. The extent of their undisputed noncompliance mandates continued judicial oversight to accomplish the purpose of the agreement. For these reasons, and as stated throughout, the Court should deny Defendants' Motion.

Respectfully submitted this 18th day of November, 2024,

/s/ David G.H. Brackett
David G.H. Brackett
Ga. Bar No. 068353
Jane D. "Danny" Vincent
Ga. Bar. No. 380850
Michael R. Baumrind
Ga. Bar No. 960296
BONDURANT MIXSON & ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
T: (404) 881-4100
brackett@bmelaw.com
vincent@bmelaw.com
baumrind@bmelaw.com

Ira Lustbader
admitted pro hac vice

N.Y. Bar No. 2516946
Lindsey Frye
*admitted pro hac vice*
N.C. Bar No. 47752
Eugénie Iseman
*admitted pro hac vice*
N.Y. Bar No. 5815196
CHILDREN'S RIGHTS, INC.
88 Pine St.
New York, NY 10005
Phone: (212) 683-2210
Facsimile: (212) 683-4015
ilustbader@childrensrights.org
lfrye@childrensrights.org
eiseman@childrensrights.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

Pursuant to Local Rule 7.1(D), I hereby certify that this brief has been prepared with Times New Roman 14-point font and does not exceed 60 pages as set by this Court's September 18, 2024 Order. Dkt. 799.

/s/ David G.H. Brackett
David G.H. Brackett
Ga. Bar No. 068353

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 18th day of November, 2024, I electronically filed the foregoing brief with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to counsel of record.


*/s/ David G.H. Brackett*
David G.H. Brackett
Ga. Bar No. 068353