EXHIBIT

B



U.S. SENATE COMMITTEE ON THE

# JUDICIARY

# ABUSE & NEGLECT OF CHILDREN IN GEORGIA'S FOSTER CARE SYSTEM
## A CASE STUDY

As Chair of the U.S. Senate Subcommittee on Human Rights and the Law, Senator Ossoff has prioritized protecting our nation's most vulnerable children by leading a deep dive inquiry into human rights violations in the Georgia foster care system.

Senate Judiciary Committee

Subcommittee on Human Rights and the Law

Majority Staff Report - April 9, 2024



# Contents

**I. Executive Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**

Key Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**II. Background** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **8**

A. Federal Funding of Child Welfare Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

B. Federal Oversight of Child Welfare Systems . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

C. Subcommittee Review of Human Rights Violations in State Child Welfare Systems . . . . . . . . . . . . . . 11

**III. Findings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**

A. The Subcommittee's investigation validates OCA's report of DFCS' "systemic" failures to keep children safe from physical and sexual abuse and finds that these failures have contributed to the deaths of children. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. Mismanagement at DFCS is a key contributor to child deaths and serious injuries . . . . . . . . . . . . . . 27

C. Hundreds of children in DFCS' care were likely sex trafficked in a five-year span and nearly 2,000 have been reported missing, according to a National Center for Missing and Exploited Children ("NCMEC") assessment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

D. Judges and former foster youth report that DFCS improperly prolonged children's time in juvenile detention . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

E. DFCS consistently fails to meet children's physical and mental health needs . . . . . . . . . . . . . . . . 38

F. DFCS fails to adhere to its own protocols regarding administration of psychotropic drugs for children . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

G. DHS publicly dismissed OCA's 2022 report of "Systemic" child safety failures without conducting a full and fair investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

H. DHS is weakening independent oversight of Georgia's child welfare system by taking over the selection of members of Georgia's Citizen Review Panels . . . . . . . . . . . . . . . . . . . . . . . . . . 60

**IV. Recommendations** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **63**

# I. Executive Summary

In February 2023, U.S. Senator Jon Ossoff, Chair of the U.S. Senate Subcommittee on Human Rights and the Law ("the Subcommittee"), and Ranking Member Marsha Blackburn launched a bipartisan inquiry into the safety and wellbeing of children in the nation's foster care system ("the Subcommittee's Investigation").[1] The foster care system in the United States is primarily administered by state child welfare agencies but is funded in part and overseen by the U.S. Department of Health and Human Services ("HHS").

The Subcommittee conducted a thorough inquiry into Georgia's child welfare system as a case study to assess the nature and scope of human rights issues presented in state foster care systems.[2] For years, independent oversight bodies and the press have raised serious concerns about failures by Georgia's Division of Family and Children Services ("DFCS"), a division of the Department of Human Services ("DHS"), to protect vulnerable children from abuse and neglect. In 2022, *The Atlanta Journal-Constitution* reported that Georgia's Office of the Child Advocate ("OCA"), which oversees DFCS, found 15 "systemic" breakdowns within DFCS contributing to failures to keep children safe from physical and sexual abuse. OCA described the situation as an "ongoing threat to the safety of child victims." DHS rejected OCA's findings, but OCA stood by its report.

The Subcommittee reviewed thousands of pages of non-public documents from DHS and OCA and interviewed leadership at both agencies, including DHS Commissioner Candice Broce and OCA Director Jerry Bruce. DHS participated in initial interviews with the Subcommittee but declined additional interview requests after the Subcommittee held hearings as part of its inquiry.[3] In total, the Subcommittee interviewed more than 100 witnesses and sources and convened four public hearings to better understand the challenges that states face and the human rights violations children may suffer in foster care. At those hearings, the Subcommittee received testimony from witnesses including juvenile court judges, former foster youth, the National Center for Missing and Exploited Children ("NCMEC"), HHS, the Federal Bureau of Investigation ("FBI"), and the former ombudsman of Georgia's child welfare system.

The Subcommittee acknowledges the inherent difficulty of Georgia DFCS' crucial mission and the many challenges faced by the agency, including chronic underfunding and a shortage of foster care placements. The

---

1    The bipartisan inquiry sent by Senators Ossoff and Blackburn is available here: https://www.ossoff.senate.gov/press-releases/new-sen-ossoff-launches-bipartisan-inquiry-into-alleged-abuse-neglect-of-children-in-georgias-foster-care-system/

2    The inquiry into Georgia's child welfare system was conducted by Subcommittee majority staff.

3     DHS responded to a set of written questions from the Subcommittee after that point.

Subcommittee recognizes and honors the daily efforts of DFCS' frontline workforce — the overwhelming majority of whom work hard in good faith to serve Georgia's vulnerable children. The Subcommittee further acknowledges that the challenges and failures identified in this report are not unique to Georgia DFCS or to the State of Georgia. Indeed, a purpose of this case study is to yield insights that can inform reform of foster care systems nationwide, many of which face similar or even deeper challenges. The Subcommittee looks forward to working alongside Georgia DHS and DFCS, HHS, the FBI, and other local, state, and federal partners to design and implement reforms based upon our findings that promote the safety and wellbeing of foster children in Georgia and nationwide.

## Key Findings

**A. The Subcommittee's investigation validates OCA's report of DFCS' "systemic" failures to keep children safe from physical and sexual abuse and finds that these failures have contributed to the deaths of children.**

The Subcommittee reviewed years of audits conducted by DFCS tracking its performance on federal safety standards. Those audits reveal that DFCS consistently fails to assess and address safety threats to children, including by failing to adequately investigate reports of physical abuse.

The most recent DFCS audit, reviewing cases from spring 2023, found that DFCS failed to properly assess and address safety concerns in 84% of cases reviewed. The Subcommittee's review of prior audits shows that DFCS has failed to meet federal safety standards for at least the last seven years and was fined by the federal government in 2019 for failing to improve its performance.

Further, analyses of child fatalities produced by both DFCS and OCA and reviewed by the Subcommittee illustrate instances where DFCS safety failures have contributed to the deaths of children.

**B. Mismanagement at DFCS is a key contributor to child deaths and serious injuries.**

OCA reports describe mismanagement at DFCS offices. DFCS employees statewide have expressed fear of retaliation to OCA. DFCS itself has identified significant shortcomings that contribute to death and serious injuries, including staffing shortages, insufficient training, and lack of supportive direction and knowledge among supervisors. Georgia's federally-mandated oversight panels cite "leadership" as a top reason for staff attrition.

4

**C. Hundreds of children in DFCS' care were likely sex trafficked in a five-year span and nearly 2,000 have been reported missing, according to a National Center for Missing and Exploited Children ("NCMEC") assessment.**

NCMEC testified before the Subcommittee that nearly 2,000 children in DFCS care were reported missing from 2018 to 2022, with at least 410 children likely sex trafficked— some repeatedly.

According to NCMEC, children who go missing from child welfare placements are particularly vulnerable to trafficking and other "life-threatening" forms of child endangerment.

NCMEC testified that nationwide, based on the reports to NCMEC of children who go missing from child welfare placements have nearly a 1 in 5 chance of being sex trafficked.

**D. Juvenile court judges and former foster youth report that DFCS improperly prolonged children's time in juvenile detention.**

Juvenile court judges told the Subcommittee that DFCS has delayed retrieving foster children from juvenile detention despite their eligibility for release.

Two judges testified at the Subcommittee's October 30, 2023, hearing that in August 2023, DHS proposed that judges consider prolonging detention of foster youth, including children with special needs, due to inadequate foster care placements.

The judges testified that they believed this proposal would violate state law. In the weeks following this hearing, 3 additional judges corroborated this testimony in statements and interviews provided to the Subcommittee.

**E. DFCS consistently fails to meet children's physical and mental health needs.**

DFCS audits measuring its performance on provision of health care to foster youth show that it repeatedly failed to conform to federal standards for the last nine years. Judges and attorneys representing foster children stated in Subcommittee interviews that DFCS fails to provide adequate healthcare to children in foster care and that as a result children with routine medical needs have been left with painful, protracted symptoms.

DHS has asserted that its Medicaid provider, Amerigroup, frequently denies coverage for medically necessary services for foster children, making it difficult for the agency to ensure adequate care, and that DHS often covers the cost of medical services and appeals denials of coverage.

## F. DFCS fails to adhere to its own protocols regarding administration of psychotropic drugs for children.

DFCS has acknowledged in annual reports to the federal government that DFCS does not adequately monitor the provision of psychotropic medications to foster children and that this has resulted in the overmedication of children.

In an interview with the Subcommittee, Commissioner Broce acknowledged that overmedication is a longstanding concern at DFCS. Two former foster youth testified before the Subcommittee that they had been overmedicated while under DFCS' care.

## G. DHS publicly dismissed OCA's 2022 report of "systemic" child safety failures without conducting a full and fair investigation.

In 2022, as discussed above, OCA sounded the alarm about "systemic" DFCS failures to protect children from abuse and neglect. In response, DHS's Office of the Inspector General ("OIG") conducted an inadequate, limited-scope review, which DHS relied upon to publicly dismiss OCA's concerns. The independence of the OIG's review was potentially jeopardized by DHS Commissioner and DFCS Director Broce's instruction that the OIG "refute" and produce as "strong of a rebuttal as possible" of OCA's findings.[4]

The Subcommittee identified numerous deficiencies in OIG's review, including that: (i) OIG failed to conduct critical interviews that would have yielded relevant information, deviating from its normal investigative process; (ii) OIG never reviewed key evidence submitted to DHS; and (iii) OIG never reviewed extensive internal DFCS

---

[4]    On July 20, 2022, Commissioner Broce emailed DHS Inspector General David LeNoir, copying DHS Chief of Staff Craig Foster and Deputy Commissioner of Child Welfare Mary Havick, regarding "OCA's independent review of reports of Children's Advocacy Centers and CACGA" and wrote, "Since your team did a thorough review of these cases, is it possible that they could take each of these findings and refute them?" Inspector General LeNoir replied the same day, agreeing to "write a rebuttal" and asking, "Do you have a time frame for when you would like this back?" Commissioner Broce replied: "No timeline. I'd just request as thorough and strong of a rebuttal as possible. We continue to find that these OCA investigations lack the level of due diligence that we internally afford a complaint, and I think that this one may afford an opportunity to juxtapose what we do versus what they do. I don't want to cause any offense because I sincerely believe in OCA's mission and statutory duties, but we've now received several of these. It's time to raise our concerns with Mr. Bruce. I'll add, however, that if your team finds that their conclusions are actually accurate and we need to fix them, I'd wholeheartedly accept those recommendations and put them into practice." Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009307-08.

audits and reports that would have corroborated OCA's finding of systemic safety failures. As stated in Finding A, the Subcommittee's inquiry has validated OCA's report of "systemic" failures to protect children from abuse and neglect.

## H. DHS is weakening independent oversight of Georgia's child welfare system by taking over the selection of members of Georgia's Citizen Review Panels.

Georgia's Citizen Review Panels ("CRPs") are federally mandated oversight bodies tasked with reviewing DFCS' performance whose members have been appointed by an independent entity for the last 16 years. For years, Georgia's CRPs have been sharply critical of DFCS performance.

DHS recently announced that it—rather than the independent entity—will now appoint Georgia's CRP members. DHS is implementing this change over the objections of multiple serving panelists who argue that it will undermine accountability and oversight of the state's child welfare system. OCA, Juvenile Court Judges, and current CRP members expressed concern to the Subcommittee that this change will inhibit the CRPs' ability to provide independent, candid oversight of DFCS' performance.[5]

---

5    The Subcommittee identified a DFCS internal memorandum announcing that DFCS would both appoint members to Georgia's CRPs. It is unclear to the Subcommittee whether, at the time of this report's publication, DFCS acted on these plans.

# II. Background

The child welfare system is responsible for ensuring the safety and wellbeing of children who have been subjected to abuse and neglect.[6] Child welfare systems are primarily administered by the states but are funded in part and overseen by the U.S. Department of Health and Human Services ("HHS").[7]

## A. Federal Funding of Child Welfare Systems

The federal government provides over $12 billion annually to state child welfare systems through a variety of formula funding and other grant programs.[8] Three primary sources of federal funding and policy for state child welfare programs are Title IV-E and Title IV-B of the Social Security Act and the Child Abuse Prevention and Treatment Act ("CAPTA").[9] To receive funding under these grant programs, state foster care systems must comply with certain requirements and submit to oversight by HHS.[10]

Title IV-E of the Social Security Act provides federal funding to support states' provision of foster care, adoption assistance, guardianship assistance, and kinship care in eligible cases.[11] As a condition of receiving Title IV-E funding, state child welfare systems are required to adopt certain policies and procedures.[12] For example, states must have policies and procedures in place to screen and provide services to victims of human trafficking; procedures for background checks of potential foster parents and kinship caregivers; and standards to ensure that children in foster care receive adequate services to protect their safety and health.[13] State child welfare systems

---

6    Congressional Research Service, Child Welfare: Purposes, Federal Programs, and Funding (October 27, 2023), available at https://sgp.fas.org/crs/misc/IF10590.pdf.

7    Id.; Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children

8    Congressional Research Service, Child Welfare: Purposes, Federal Programs, and Funding (October 27, 2023), available at https://sgp.fas.org/crs/misc/IF10590.pdf.

9    Id.

10   Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children.

11   Social Security Act, 42 U.S.C. § 470. Children are eligible for Title IV-E funding if they have been removed from their homes by a state agency pursuant to a voluntary placement agreement or a judicial determination that staying in the home would be contrary to the welfare of the child and reasonable efforts to prevent removal have been made and their family income is below a certain threshold. Social Security Act, 42 U.S.C. § 472(a). The guardianship care program, which provides funding for the care of children by relatives who have assumed legal guardianship of eligible children for whom they previously cared as foster parents, is optional, and Georgia has not opted in. See HHS Children's Bureau, Title IV-E Guardianship Assistance, Jul. 3 2023, available at https://www.acf.hhs.gov/cb/grant-funding/title-iv-e-guardianship-assistance.

12   Social Security Act, 42 U.S.C. § 471(a).

13   Social Security Act, 42 U.S.C. § 471(a)(35); Id. at (20); Id. at (22).

must submit to HHS a plan describing the relevant laws, regulations and policies in place to ensure compliance with the Title IV-E requirements and receive approval from HHS in order to receive funding.[14]

Title IV-B of the Social Security Act authorizes federal support for child welfare activities through two grant programs: the Child Welfare Services ("CWS") grant and Promoting Safe and Stable Families ("PSSF") grant.[15] In order to receive funding under Title IV-B, states are required to develop a Child and Family Services Plan ("CFSP") that sets forth their vision and goals for provision of services to children and families.[16] States must agree to meet certain requirements to qualify for funding and must receive HHS approval for a plan to comply with those federal requirements.[17]

CAPTA provides grants to states to support prevention, assessment, investigation, prosecution, and treatment activities.[18] To qualify for CAPTA funding, states must have certain policies and procedures including policies related to mandatory reporting of child abuse, screening and responding to reports of child abuse,[19] and training of caseworkers.[20] CAPTA also sets forth a federal definition of child abuse and neglect. In 2023, the federal definitions of "child abuse and neglect" and "sexual abuse" were expanded by the Trafficking Victims Protection Reauthorization Act to include a child who is identified as a victim of sex trafficking.[21]

CAPTA also requires states to establish Citizen Review Panels composed of volunteers and child welfare experts—representative of their communities—who scrutinize, review, and make recommendations to the state's child welfare system in an annual report.[22]

## B. Federal Oversight of Child Welfare System

The Social Security Act authorizes HHS to oversee state child welfare systems' conformity with federal laws and regulations.[23] HHS reviews state child welfare systems through two primary review mechanisms: Title IV-E Reviews and Child and Family Services Reviews ("CFSR").[24] In Title IV-E Reviews, HHS audits a sample of foster care cases to determine whether a state's expenditures for foster care are eligible for reimbursement under

---

14    Social Security Act, 42 U.S.C. § 471(a).
15    Social Security Act, 42 U.S.C. §§ 421 – 438.
16    Social Security Act, 42 U.S.C. § 432.
17    Social Security Act, 42 U.S.C. §§ 422, 432.
18    42 U.S.C. Chapter 67.
19    42 U.S.C. § 5106(b)(2).
20    Id.
21    42 U.S.C. § 5106g(b)(1).
22    42 U.S.C. § 5106a(c).
23    Social Security Act, 42 U.S.C. § 1123A; Id. at § 471(a)(6).
24    Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law., 118th Cong. (2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services.

Title IV-E.[25] In CFSR reviews, HHS conducts a system-wide assessment of state foster care systems by auditing a sample of cases to ensure substantial conformity with requirements under Titles IV-B and IV-E of the Act, regulations promulgated by the Secretary, and HHS-approved State Plans.[26]

Through the CFSR process, HHS measures compliance by assessing a state agency's performance on seven core outcomes, including whether states properly assess and address threats to children's safety, whether children have permanency and stability in their living situations, and whether children receive appropriate services to meet their educational and health needs.[27] The state's performance on these outcomes is based on a review of a sample of cases using an HHS on-site review instrument detailing the standards that must be met to achieve substantial conformity with federal standards across 18 key performance indicators.[28] States that receive approval from HHS may conduct a state-led case review using the HHS on-site review instrument with oversight and consultation from HHS.[29] HHS also evaluates the agency's performance on seven "systemic factors" such as training and quality assurance systems.[30] States that are found to be out of "substantial conformity" with federal policy must develop and successfully implement a Program Improvement Plan ("PIP") to avoid fiscal penalties.[31] HHS placed Georgia on a PIP in 2017 and fined Georgia for failure to achieve some of its required CFSR PIP measurement plan improvements in 2020.[32]

HHS has undertaken three rounds of CFSRs since the reviews were established in 1994 and is currently performing its fourth round of CFSRs.[33] Georgia's Round 4 CFSR review is state-led.[34] Each year, states report their progress on CFSR performance metrics in their Annual Progress and Services Report ("APSR").[35]

---

25  45 CFR § 1356.71.
26  45 CFR § 1355.34.
27  Id.
28  See U.S. Department of Health and Human Services Administration for Children and Families, Child and Family Services Review Onsite Review Instrument and Instructions, June 2022, available at https://www.acf.hhs.gov/cb/report/cfsr-r4-osri; U.S. Department of Health and Human Services Children's Bureau, Round 4 Child and Family Services Reviews, Fact Sheet, available at https://www.acf.hhs.gov/sites/default/files/documents/cb/CFSR_General_Fact_Sheet.pdf.
29  See U.S. Department of Health and Human Services, Child and Family Services Reviews: Requirements and Benefits of State-led Reviews (April 2022), available at https://www.cfsrportal.acf.hhs.gov/resources/round-4-resources/cfsr-round-4-process/state-led-cfsr-case-review-criteria.
30  45 CFR § 1355.34.
31  45 CFR § 1355.36.
32  Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children; Briefing by the U.S. Department of Health and Human Services to the Subcommittee.
33  See U.S. Department of Health and Human Services Children's Bureau, Child and Family Services Reviews, available at https://www.acf.hhs.gov/cb/monitoring/child-family-services-reviews.
34  See CFSR Round 4 Timeline at Bates No. GADHSSEN001559 ("CFSR Self-Assessment").
35  45 CFR § 1357.16.

## C. Subcommittee Review of Human Rights Violations in State Child Welfare Systems

In February 2023, the Subcommittee on Human Rights opened a bipartisan inquiry into conditions in the foster care system. Since concerns about the welfare of Georgia foster children have been long and repeatedly raised by watchdogs, advocates, and the press, the Subcommittee conducted a deep-dive analysis into the child welfare system in Georgia as a case study of human rights issues presented in foster care.

Georgia's foster care system is administered by the Georgia Division of Family and Children's Services ("DFCS"), a unit within the Department of Human Services ("DHS"). Georgia's Office of the Child Advocate ("OCA") oversees Georgia's child welfare system by providing case evaluation and assistance, policy and practice consulting, education and advocacy.[36]

As noted above in the Executive Summary, OCA in 2022 reported "systemic" failures to protect Georgia foster youth from physical and sexual abuse; DHS strongly denied the report, but OCA stood by its finding. The Subcommittee's inquiry sought information on potential systemic failures to protect children in Georgia from abuse and neglect in violation of their human rights.[37]

During its review, the Subcommittee reviewed over ten thousand pages of documents produced by DHS and others. It conducted over a hundred interviews with child welfare stakeholders in Georgia, including DHS leadership and staff, former foster children, foster and adoptive parents, families whose children were removed, former DFCS employees, juvenile court judges, former members of Georgia's Citizen Review Panels, and OCA leadership. The Subcommittee also received briefings and testimony from HHS and the FBI regarding human rights issues in child welfare.

---

36      See Georgia Office of the Child Advocate, Home Page (January 2024), available at https://oca.georgia.gov
37      Letter from Sens. Ossoff and Blackburn to the Georgia Department of Human Services Commissioner Candice Broce (Feb. 17, 2023), available at https://www.ossoff.senate.gov/wp-content/uploads/2023/02/23.02.17_-DFCS-Letter.pdf.

# III. Findings

## A. The Subcommittee's investigation validates OCA's report of DFCS' "systemic" failures to keep children safe from physical and sexual abuse and finds that these failures have contributed to the deaths of children

Evidence reviewed by the Subcommittee validates OCA's 2022 report that DFCS systemically fails to keep children safe from abuse and neglect.

The Subcommittee reviewed years of audits conducted by DFCS tracking its performance on federal safety standards. Those audits reveal that DFCS consistently fails to adequately assess and address the safety risks and safety concerns relating to children. The most recent DFCS audit, reviewing cases from spring 2023 as part of the CFSR process (the "CFSR Self-Assessment"), found that DFCS failed to properly assess and address safety concerns in 84% of cases reviewed.[38] Reviews of prior Annual Progress and Services Reports ("APSRs") submitted to HHS[39] and internal audits performed by DFCS' Quality Assurance Unit ("Quality Assurance Audits"),[40] which both track the CFSR federal metrics, show that DFCS' performance assessing and addressing safety risks was, as of Q1 2023, the worst it has been in the last seven years.[41] The Quality Assurance Audits include case examples illustrating that children are exposed to serious threats when DFCS fails to comply with federal safety standards.[42]

The Subcommittee has reviewed fatality reports from OCA where DFCS safety failures contributed to children's deaths.[43]

---

38   State Comparison Chart, March-June 2023 at Bates No. GADHSSEN001561. DHS objected to the accuracy of CFSR reviews based on their relatively small sample size (100 cases were reviewed for compliance with federal risk assessment and safety management standards in the CFSR Self-Assessment) and the fact that the reviews assess whether safety protocols were followed, not whether the children were actually safe. But DFCS' quality assurance reviews analyzing CFSR metrics, discussed at p. 20 below, reveal that these gaps in safety protocols often leave children at serious risk.

39   See Georgia Department of Human Services Division of Family & Children Service, Annual Progress and Service Reports (2019-2022), available at https://dfcs.georgia.gov/data/federal-reviews-and-plans.

40   Quality Assurance Quarterly Trend Report, January – March 2022 at Bates No. GADHSSEN001518; Quality Assurance Quarterly Trend Report, May – July 2022 at Bates No. GADHSSEN001525.

41   See Figure 1, infra, p. 10.

42   See e.g., Child Welfare Quality Assurance Review, Annual Executive Summary, Region 3 at Bates No. GADHSSEN000989; Child Welfare Quality Assurance Review, Annual Executive Summary, Region 4 at Bates No. GADHSSEN001006; Child Welfare Quality Assurance Review, Annual Executive Summary, Region 7 at Bates No. GADHSSEN001054.

43   Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (May 2023); Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (November 2022); Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (July 2023); Georgia Office of the Child Advocate, Child Fatality Report: Gwinnett County (April 2022); Georgia Office of the Child Advocate, Child Fatality Report: Chatham County (October 2022).

In Critical Incident Reviews, in which DFCS reviews its management of cases that resulted in child fatalities, DFCS found that "staffing shortages," "demand-resource mismatch," and "lack of [staff] knowledge" contributed to safety failures in some of the cases reviewed.[44]  Both Georgia's former OCA Director and reports issued by the Georgia Citizen Review Panels reveal that DFCS suffers from high staff turnover, and as a result, critical safety decisions are made by inexperienced workers.[45]

### i. DFCS has failed for at least seven years to conform to federal risk assessment and safety management standards with recent precipitous further decline, and Georgia was fined by the federal government for failure to improve

Data from DFCS audits over the past seven years show that DFCS has consistently failed to meet federal standards for the assessment and management of children's safety at home and in foster care, and that the DFCS' safety performance has declined precipitously in 2023. The Subcommittee reviewed data tracking DFCS' risk assessment and safety management performance from three sources: (1) The APSRs submitted to HHS by DFCS in which DFCS self-reports its performance on CFSR standards; (2) Quality Assurance Audits, which are internal audits performed by DFCS periodically to track its performance on CFSR standards; and (3) the CFSR Self-Assessment, which DFCS conducted in connection with the current Round 4 CFSR review with secondary oversight by HHS.

---

44    2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009260-61; 2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009270-72; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009281-83; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009292-94.

45    The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Melissa Carter, Executive Director of the Emory Law Barton Child Law and Policy Center), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children; Georgia Department of Human Services Division of Family & Children Services, CAPTA Panel Program Report (2022), available at https://dfcs.georgia.gov/capta-panel-annual-reports.

**Percentage of Cases Reviewed Under DFCS' APSR, DFCS Quality Assurance Audits, and the CFSR Self-Assessment Which Meet Federal Child Safety Metric ("Safety Outcome 2, Item 3")**

| Time Period Reviewed | Review Type | Percentage of Cases Reviewed that Met Federal Standard |
|---|---|---|
| December 2016 | APSR | 32% |
| October 2017-March 2018 | APSR | 29% |
| March 2018-March 2019 | APSR | 28% |
| March 2019-March 2020 | APSR | 30% |
| January-March 2021 | APSR | 35% |
| April-June 2021 | APSR | 29% |
| July-September 2021 | APSR | 35% |
| October-December 2021 | APSR | 39% |
| January-March 2022 | Quality Assurance Audit | 33% |
| May-July 2022 | APSR | 27% |
| October – December 2022 | APSR | 41% |
| March-June 2023 | CFSR Self-Assessment | 16% |

**Figure 1.** *This table shows the percentage of cases that met the federal standard for Safety Outcome 2, Item 3, which measures whether children are kept safe from abuse and neglect both in their homes and in foster care, under three types of reviews: (1) APSRs, (2) Quality Assurance Audits, and (3) the CFSR Self-Assessment.*



**Figure 2.** *This graph shows a decline in DFCS performance on the federal metric assessing how well DFCS keeps children safe in their homes or in foster care by assessing threats and managing children's safety.*

As shown in **Figures 1 and 2**, DFCS' performance on the cases reviewed and reported in the APSR for assessing risk and managing safety has not exceeded 41% of reviewed cases in the past seven years. Moreover, the most recent DFCS audit shows declining scores. The CFSR Self-Assessment hits an all-time low score of 16% of cases reviewed—meaning DFCS failed from March to June 2023 to adequately assess and respond to safety risks in 84% of cases reviewed.[46] Under HHS standards, failing to meet this metric means DFCS failed to make "concerted efforts to assess and address the risk and safety concerns relating to the child(ren) in their own homes or while in foster care" in 84% of cases reviewed.[47]

According to HHS, failure to make "concerted efforts" means that at least one of the following process deficiencies was present in a reviewed case:

- Failure to conduct an initial assessment that accurately assessed all risk and safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home.

- Failure to conduct ongoing assessments that accurately assessed all risk and safety concerns for the target child in foster care and/or any child(ren) in the family remaining in the home.

- In cases where safety concerns were present, failure to either develop a safety plan with the family or continually monitor and update the safety plan.

- There were safety concerns pertaining to the target child in foster care and/or any child(ren) in the family remaining in the home that were not adequately or appropriately addressed by the agency.

- For children in foster care, there were safety concerns during visitation with parents/caregivers or other family members that were not adequately or appropriately addressed by the agency.[48]

Federal law requires DFCS to have policies in place to assess risk and manage safety to receive federal funding for foster care.[49] Under its own policies, DFCS must assess a child's safety upon receiving reports of abuse.[50] These safety assessments require visiting the family, assessing the parents' capacity to care for the children, inspecting all rooms in the home, and private, face-to-face conversations with the child, the child's parents, the person alleged to have mistreated the child, and anyone else in the household.[51] The safety assessment also requires engaging "collateral contacts," or individuals who can provide critical information about a child's mistreatment, such as doctors or teachers, and inspecting children for evidence of abuse.[52]

---

46   State Comparison Chart, March-June 2023 at Bates No. GADHSSEN001561 ("CFSR Self-Assessment").
47   U.S. Department of Health and Human Services Administration for Children and Families, Child and Family Services Review Onsite Review Instrument and Instructions (June 2022), available at https://www.acf.hhs.gov/cb/report/cfsr-r4-osri.
48   Id.
49   Title IV-E, Social Security Act, 42 U.S.C. § 472(a); 45 CFR §1356.71 (defining the HHS Children's Bureau's power to review title IV-E foster care eligibility and to monitor certain requirements of title IV-E including safety requirements); 42 U.S.C. 5106a(b)(2)(B)(iv-vi) (requiring states receiving CAPTA funds to have procedures in place to screen reports of child abuse, perform risk and safety assessments, and ensure the safety of children at imminent risk of harm).
50   Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 4, Policy No. 4.0 (December 2020). ("Policy Manual").
51   Id., Policy No. 4.2 (January 2022) at §§ 2, 7, 10.
52   Id., at §§ 9-10, 14.

DFCS' CFSR Self-Assessment found that in four of fourteen regions across the state, zero reviewed cases demonstrated adequate safety management.[53] While DFCS timely initiated investigations in the majority of cases reviewed,[54] Professor Melissa Carter, Director of the Barton Child Law and Policy Center at Emory University and former Director of OCA from February to December 2010, testified that "initiating timely investigations" refers only to whether DFCS made contact with a child within DFCS' prescribed response times.[55] But in the cases reviewed by DFCS in the CFSR Self-Assessment, even when DFCS contacted a child, safety concerns then usually remained unaddressed or were improperly managed.[56] The CFSR Self-Assessment also shows that DFCS did not conform to federal standards for providing services to families to protect children and prevent removals in 80% of cases reviewed.[57]

The CFSR Self-Assessment identified "trends" in DFCS' practice that contributed to low scores on federal metrics for both (1) risk assessment and safety management, and (2) providing services to families to protect children and prevent removals:

- delays in providing services to address identified safety concerns, or failure to provide needed services altogether;

- failure to thoroughly assess and address safety concerns;

- failure to assess and engage all household members;

- lack of visits occurring in the home environment;

- failure to engage collaterals, or contacts with individuals outside the family under review who can provide insights on the child's safety, such as pediatricians and teachers; and delays or failures to develop and monitor safety plans or plans to ensure a child's immediate safety by identifying and putting into action controls and resources.[58]

When states are found to be out of conformity with federal requirements, HHS requires states to develop a program improvement plan ("PIP"), and states that fail to complete their plans face financial penalties.[59] HHS placed Georgia on a CFSR PIP in 2017 to address failures to meet federal safety standards, among other deficiencies.[60] On December 14, 2023, Rebecca Jones Gaston, Commissioner of the Administration for

---

53  CFSR Self-Assessment at Bates No. GADHSSEN001564. DFCS organizes its offices by geographic region, with a total of 14 regions across the state.
54  Id., at Bates No. GADHSSEN001561.
55  The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Melissa Carter, Executive Director of the Emory Law Barton Child Law and Policy Center), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.
56  CFSR Self-Assessment at Bates No. GADHSSEN001561.
57  Id.
58  Id., at Bates No. GADHSSEN001565.
59  U.S. Department of Health and Human Services Children's Bureau, Round 4 Child and Family Services Reviews, Fact Sheet, available at https://www.acf.hhs.gov/sites/default/files/documents/cb/CFSR_General_Fact_Sheet.pdf; 45 CFR § 1355.36.
60  Georgia Department of Human Services Division of Family & Children Services, State of Georgia 2014-2019 Child and Family Services Plan, 2020 Annual Progress and Services Report at p. 104, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553; Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Adminis-

Children, Youth, and Families at HHS, testified before the Subcommittee that Georgia failed to complete its PIP and was subsequently fined for failure to achieve some of its required CFSR PIP measurement plan improvements.[61] Yet data show that even after being fined by HHS, DFCS' performance on federal safety metrics continued to decline. HHS raised concerns about DFCS' poor performance on safety metrics in response to the 2022 Annual Progress and Services Report, asking DFCS "what accounts for the big drop in performance from the CFSR in 2015 to the numbers in 2020 and 2021?"[62]

## ii. OCA fatality reports illustrate DFCS safety failures that contributed to the deaths of children

OCA produced to the Subcommittee several child fatality reports illustrating DFCS' mismanagement of cases where children died of abuse or neglect.[63] These child fatality reports describe failures by DFCS to implement its own child safety policies, including failures to comprehensively address safety by engaging pediatricians and teachers who are familiar with the child, assessing parents' capacity, or physically inspecting households.[64]

> **<u>Fulton County May 2023 Child Fatality:</u>** In this child fatality report, OCA wrote, **"[i]mmediate protective action by law enforcement or DFCS could have prevented [the] child's death."**[65] According to OCA's report, DFCS received a police report describing a mother of a 12-month-old baby wandering outside with her child, who was naked, in an obvious state of delusion and distress.[66] Despite these circumstances, DFCS classified the case as a situation where there was an indication of child maltreatment, but no impending safety threat, allowing itself a full five days to contact the family and perform an initial safety assessment.[67] OCA wrote in its report that "intake should not have been dispositioned as [a] 5-day response given the mother's obvious state of delusion and inability to protect the child."[68] Although a DFCS worker unsuccessfully attempted to contact the family prior to the child fatality, including knocking on the

---

tration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children; Briefing by the U.S. Department of Health and Human Services to the Subcommittee. Commissioner Jones Gaston testified that all states have been placed on a PIP at some point. Id.

61  Id. Georgia is appealing the fine.

62  U.S. Department of Health and Human Services Children's Bureau, Response to DFCS 2022 Annual Progress and Services Report at Bates No. GADHSSEN014691, 14730, 732. The Subcommittee does not have a copy of any response from DFCS to HHS.

63  Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (May 2023); Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (November 2022); Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (July 2023); Georgia Office of the Child Advocate, Child Fatality Report: Gwinnett County (April 2022); Georgia Office of the Child Advocate, Child Fatality Report: Chatham County (October 2022). Under Section 106(b)(2)(B)(x) of the Child Abuse and Prevention Act, child fatality reports must be disclosed to the public.

64  Id.

65  Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (May 2023).

66  Id.

67  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 4, Policy No. 3.2 (November 2023). ("Policy Manual").

68  Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (May 2023).

door to the family's apartment and calling the mother's cell phone, OCA told the Subcommittee that they did not believe DFCS responded with appropriate urgency in light of the seriousness of the allegations.[69] The mother drowned her child two days later.[70]

**Fulton County November 2022 Child Fatality:** In this child fatality report, involving the death of a Fulton County child in a fire set by her mother, OCA wrote that "[a] relative reported on-going concerns to [DFCS] staff regarding the mother's declining mental health and concerns with the children's safety; however, the concerns were not documented."[71] Before the child died, the child's grandmother reported to DFCS that the mother was struggling with mental illness and referred to one of her children—who was ultimately killed in the fire set by the mother—as "the devil."[72] Instead of performing a safety assessment as required by policy, which would have involved visiting the family and speaking with the mother and the twins and could have revealed that the twins were in imminent danger, DFCS instead requested that law enforcement perform a "welfare check."[73] The fatality report noted that the decision to outsource the welfare check to law enforcement took place after a mass termination of staff in Fulton County, leaving staff with "more work than they had the capacity to maintain in a manner consistent with policy."[74] Body camera footage obtained by reporters showed that the officer made contact with the family but did not confirm that the household conditions were safe.[75] Based upon the wellfare check, allegations of abuse were deemed unsubstantiated, and the case was closed.[76] The child was killed approximately five months later, when the mother set fire to the home.[77]

**Dekalb County June 2023 Child Fatality:** In this child fatality report, OCA wrote, "this case was an abbreviated closure... although allegations of possible physical abuse and substance abuse by the [biological mother] should have been dispositioned as an investigation [...]."[78] In 2020, DFCS received a report that three children in Dekalb County appeared unfed and to be wearing the same clothes with feces on them.[79] One of the children was also observed to have bruises and be seizing,

---

69    Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023).
70    Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (May 2023).
71    Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (November 2022).
72    Id., at 4, 6.
73    Id.
74    Id.
75    Ciara Cummings, Woman pleaded for DFCS help before child dies in fatal fire, Atlanta News First (Apr. 10, 2023), available at https://www.atlantanewsfirst.com/2023/04/10/overloaded-welfare-system-could-mean-life-or-death-georgia-kids/
76    Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (November 2022) at 1,4.
77    Id.
78    Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (June 2023) at 1.
79    Id.

allegedly because the mother was not providing prescribed epilepsy medication, and the parents allegedly used illegal substances.[80] OCA's fatality report shows that OCA was unable to locate any documentation that DFCS followed up with the child's pediatrician or teachers, which could have substantiated the allegations and may have led to a removal action.[81] "Instead, the abuse continued, and three years later, one of the children was found "mummified… [with] all internal organs [] decomposed" in a closet at the parents' former apartment," along with "a plastic grocery bag in the abdominal cavity with feces from the child."[82] The child's mother was charged with murder.[83] OCA summarized the following deficiencies in DFCS' handling of the case in its fatality report: No drug screens were obtained; no professional collateral contacts were obtained with the children's pediatrician, school, or WIC; documentation of the case was minimal and hard to follow; parental and protective capacities were not assessed; there was no documentation of diligent efforts to find the mother or conduct a forensic interview with the deceased's sibling who may have witnessed her death; there was no request for medical records; and DFCS failed to complete a child fatality report as required by policy.[84]  There was a three year lag between DFCS' initial deficient response and the child's death, making it difficult to establish causation. However, OCA noted that DFCS' initial failure to adequately investigate the alleged abuse—which was substantially similar to the abuse that ultimately resulted in the child fatality—could have been a factor in the child's death, because an adequate investigation would have allowed DFCS to identify the risks to the child that ultimately resulted in the fatality and intervene.[85]

**Gwinnett County April 2022 Child Fatality:** In this child fatality report, OCA documented that DFCS had received reports of abuse in a home which were screened out or unsubstantiated several years prior to the child fatality.[86] OCA explained to the Subcommittee that DFCS did not perform a full investigation into the allegations of abuse at the time, as required by policy.[87] According to OCA's report, years later, one of the children in a home set a fire "due to abuse inflicted by his parents" and the fire killed one of their siblings.[88] Following the fire, DFCS found

---

80  Id.
81  Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (July 2023) at 1; Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023).
82  Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (July 2023) at 1.
83  Fox 5 Atlanta Digital Team, Mom of girl found dead in DeKalb County closet makes 1st court appearance, Fox 5 Atlanta (Jul. 5, 2023), available at https://www.fox5atlanta.com/news/alondra-hobbs-court-appearance-daughter-murder-dekalb-county-apart-ment-closet.
84  Georgia Office of the Child Advocate, Child Fatality Report: DeKalb County (July 2023) at 1, 3.
85  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023).
86  Georgia Office of the Child Advocate, Child Fatality Report: Gwinnett County (April 2022).
87  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023).
88  Georgia Office of the Child Advocate, Child Fatality Report: Gwinnett County (April 2022).

that the children had in fact suffered from severe abuse and neglect, calling into question the adequacy of DFCS' investigation and adherence to its policy in its prior investigation of allegations of maltreatment.[89] The home had no sewage system, the children were forced to relieve themselves in buckets and did not know how to use toilets and toilet paper.[90] The children were confined to their rooms with no contact for as long as months at a time until they earned their parents' "trust" again.[91] The child who died was forced to sleep in the bathroom on a piece of plywood that had been placed over the bathtub.[92] Children who were recovered from the fire were found to have scars showing that they had been physically abused.[93]

**<u>Chatham County October 2022 Child Fatality:</u>**  In this fatality case, the deceased child was staying with their grandmother as part of a Safety Plan, since the child's mother had a history of substance abuse and an open case with DFCS regarding the child's one-year-old sibling.[94] The mother was not supposed to be left alone with the one-year-old.[95] The grandmother, who also had a history with CPS, went out of town, and the one-year-old sibling was left alone with the mother.[96] The one-year-old's body was later found in a landfill and the mother was indicted for murder.[97] OCA identified several deficiencies in how DFCS handled this case, including failing to speak to the grandmother until the child went missing, even though the grandmother was temporarily the child's caregiver, and failing to adequately investigate the grandmother's long history with CPS.[98]

### iii. Internal DFCS documents confirm and illustrate systemic failures to protect children

A review by the Subcommittee of the DFCS' Quality Assurance Audits confirmed both that safety failures are systemic and widespread. For example:

- In an audit of DFCS Region 3[99] reviewing cases from June to October 2020 finding an overall 39% rate of compliance with risk assessment and safety management standards, DFCS described a case where it did not investigate the circumstances regarding the death of a three-month old child with unexplained rib fractures.[100]  DFCS previously noted the need

---

89   Id.; Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023).
90   Georgia Office of the Child Advocate, Child Fatality Report: Gwinnett County (April 2022).
91   Id.
92   Id.
93   Id.
94   Georgia Office of the Child Advocate, Child Fatality Report: Chatham County (October 2022).
95   Id.
96   Id.
97   Associated Press, "Indictment: Mom used drugs before killing Georgia toddler, December 15, 2022.  Available at https://wpde.com/news/nation-world/indictment-mom-used-drugs-before-killing-georgia-toddler-leilani-simon-quinton-si-mon-savannah-chatham-county.
98   Georgia Office of the Child Advocate, Child Fatality Report: Chatham County (October 2022); Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (Aug. 29, 2023)
99   DFCS Region 3 covers Bartow, Douglas, Floyd, Haralson, Paulding, and Polk counties.
100  Child Welfare Quality Assurance Review, Executive Summary, Region 3 at Bates No. GADHSSEN000988-89.

for a skeletal survey of the deceased child several months earlier, which was not performed.[101] DFCS had not spoken with the parents about the deceased child's injuries. At the time of the audit, there was a child still living in the home who would be at risk of any abuse that may have been suffered by their deceased sibling.[102]

- In an audit of DFCS Region 4[103] reviewing cases from June to October 2020 and finding an overall compliance rate of 41%, DFCS observed that it failed to make any contact whatsoever with one of the children in a home where physical abuse had been reported, which was "especially important" because "the mother had left a mark on one of the children's faces."[104]

- In an audit of DFCS Region 7[105] reviewing cases from February to August 2020 and finding an overall compliance rate of 47%, DFCS found that it had failed to perform an adequate safety assessment after a child had been stabbed by her caregiver.[106] Even after the child told DFCS she was stabbed by her caregiver, DFCS took no action for over a month and did not contact the family for another four months.[107]

In addition, internal DFCS emails discussing child fatality cases demonstrate that DFCS itself has identified safety failures in its handling of cases where children died. For example:

- In December 2021, DFCS leadership reviewed records of a fatality case involving a child with a "history of trafficking and abuse" who was reported to DFCS as having run away to her pimp because her home was uninhabitable.[108] DFCS leadership concluded that the agency did not appear to have to "fully addressed" concerns raised in its most recent investigation in the child's case.[109] The Children's Advocacy Centers of Georgia ("CACGA") reported that less than a month before the fatality, the child's mother reported that she could not supervise the child at home and the Department of Juvenile Justice recommended that the child be released to DFCS custody, but DFCS did not respond.[110] According to CACGA, the child reunited with her pimp instead and was killed in a police chase in the car with him.[111]

- In 2021, DFCS leadership analyzed an infant fatality case involving a family with an open family preservation case.[112] DFCS noted the following "key takeaways from our FPS [Family Preservation Services] involvement leading up to the child's death... A. there seems to have been a significant impact regarding the lack of sufficient [American Sign Language]

101 Id.
102 Id.
103 DFCS Region 4 covers Butts, Carroll, Coweta, Fayette, Heard, Henry, Lamar, Meriwether, Pike, Spalding, Troup, Upson counties.
104 Child Welfare Quality Assurance Review, Executive Summary, Region 4 at Bates No. GADHSSEN001005-06.
105 DFCS Region 7 covers Burke, Columbia, Glascock, Hancock, Jefferson, Jenkins, Lincoln, McDuffie, Richmond, Screven, Taliaferro, Warren, Washington, and Wilkes counties.
106 Child Welfare Quality Assurance Review, Executive Summary, Region 7 at Bates No. GADHSSEN001055-54.
107 Id.
108 Internal Georgia Department of Human Services Emails re: Child Victim (Dec. 15, 2021) at Bates No. GADHSSEN016204-09.
109 Id. at Bates No. GADHSSEN016204.
110 Children's Advocacy Centers of Georgia, CSEC Response Team, Chronological Timeline of Case Proceedings at Bates No. GADHSSEN016080.
111 Children's Advocacy Centers of Georgia, CSEC Response Team, Chronological Timeline of Case Proceedings at Bates No. GADHSSEN016080.
112 Email from Lon Roberts to Mary Havick re: "please have someone review – UPDATED with 2/5/2021 INV" (June 8, 2021) at Bates No. GADHSSEN010921. In a family preservation case, DFCS provides supportive services to at-risk families to mitigate or alleviate factors that place children in unsafe environments. Child Welfare Policy Manual, Chapter 8, Policy No. 8.0 (August 2016).

translator services. B. **there is a lack of any active services or interventions,** C. there are inconsistent contacts and contacts without purpose, and D. **there are multiple safety "red flags" in this case,** including... a collateral contact from the maternal grandmother about three weeks before the child's death that notes, "MGM [Maternal Grandmother] encouraged cm [case manager] to put the BMO children [biological mother's children] into foster care while BMO [biological mother] receives a psychiatric help. MGM believes the children are not safe in the home and stated the children are being abused by BMO in the home."[113] Three weeks later, the mother reported to the police that she found her baby cold and unresponsive.[114] After the infant died, the mother was charged with second-degree murder and second-degree cruelty to children.[115]

• In a 2023 child fatality case where a toddler was killed by "blunt force trauma" to the head after being neglected and abused in the custody of foster parents, DFCS identified numerous failures in its handling of the case.[116] For example, DFCS reported that background information on the foster parents, including CPS history and criminal history, were not discovered in the vetting process, and stated that "[i]t remains unclear to Agency [DFCS] staff… what specific criminal background information can and is, routinely shared during the vetting process… if the potential foster parents do not freely disclose [their criminal history], critical information may never be known."[117]  The foster family had a documented history of using inappropriate corporal punishment against children in their care, and a previous DFCS directive prohibited the placement of non-verbal children in the home because they could not report potential abuse or neglect.[118] DFCS determined that under that directive, the deceased child, who was young and non-verbal, never should have been placed with the foster parents who ultimately killed her.[119]

> * A federal court monitor appointed in connection with the ongoing *Kenny A* consent decree, which requires DFCS to maintain certain practice standards related to investigation of maltreatment allegations and placement of children, noted that this fatality was "particularly troubling in that [it] indicated serious systemic challenges that are at the core of the Consent Decree."[120]

### iv. In testimony and interviews before the Subcommittee, witnesses provided additional examples of safety failures that contributed to the deaths of children

The Subcommittee has identified additional cases where DFCS failed to properly address safety concerns. For example:

---

113   Email from Lon Roberts to Mary Havick re: "please have someone review – UPDATED with 2/5/2021 INV" (June 8, 2021) at Bates No. GADHSSEN010921 (emphasis added).
114   Alexis Stephens, Atlanta's 2021 Homicide Victim's, Atlanta Constitution Journal (Jan. 15, 2022), available at https://www.ajc.com/news/atlantas-2021-homicide-victims/EVKLI56XNFFXNDOQLDOG6K332U/.
115   Id.
116   Georgia Department of Family & Children Services, Summary of Information Shared During MTAT Staffing at Bates No. GADHSSEN013967-85
117   Id. at Bates No. GADHSSEN013984. DHS noted that there are restrictions under state law that limit discovery in the vetting process, but did not cite any specific provisions of Georgia law or explain whether those restrictions were applicable in this case.
118   Id. at Bates No. GADHSSEN013981.
119   Id. at Bates No. GADHSSEN013984.
120   Email from Karen Baynes-Dunning to Mary Havick, Lon Roberts, and Mable Gibson re: "Child Death Staffing" (July 27, 2023) at Bates No. GADHSSEN012855.

On October 25, 2023, the Subcommittee heard testimony from Rachel Aldridge, whose two-year-old daughter, Brooklynn, was murdered after DFCS placed her with her father and his girlfriend under a Safety Plan, or a temporary non-custodial arrangement where Brooklynn would live with her father and his girlfriend, that her mother neither saw nor signed.[121] A representative of DFCS admitted in a deposition that DFCS did not perform background checks required by its own policies, which would have revealed that Brooklynn's caregivers had felony criminal records and were subjects of prior reports of abuse and neglect to DFCS.[122] DFCS also failed to adequately monitor Brooklynn's safety during the time she was placed with her father and his girlfriend, even after Brooklynn was found to have a large bruise on her leg.[123]

In a public letter, DHS stated that a suit by Rachel Aldridge against DHS seeking redress for the death of her child was dismissed, and that by the time Brooklynn was murdered, a judge had granted custody of Brooklynn to her father.[124] Ms. Aldridge's attorney submitted a statement for the record explaining that Ms. Aldridge's state court suit was dismissed "on a technicality because the government has sovereign immunity protections" and that DFCS eventually settled a suit brought against the DFCS employees who worked on Brooklynn's case for $3 million.[125] Columbia Law Professor Joshua Gupta Kagan, who advised on Ms. Aldridge's case, explained in a statement for the record that the eventual grant of custody to Brooklynn's father "does not change the fact that DFCS effectuated the initial separation of Brooklynn from her mother, the continued separation after Ms. Aldridge's release, and Brooklynn's placement that turned deadly..."[126]

Judge Nhan-Ai Simms, a juvenile court judge in Gwinnett County, testified about a case in her courtroom where a child's safety plan involved placing the child into the care of his grandparents after his mother overdosed. DFCS failed to monitor the safety plan or seek court oversight of its implementation, even though the safety plan was violated on several occasions when the mother retrieved her child from the grandparents. The mother overdosed three more times in front of her child. After her third overdose, the mother died.[127]

---

121   The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Rachel Aldridge), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.
122   Rachel Aldridge, Plaintiff, v. Beverly Beaumier et al., Defendants, Civil Action No.: 5:21-CV-15 (S.D. Ga. Feb. 16, 2021), Price Deposition.
123   Id. Plaintiff's Partial Motion For Summary Judgment And Brief In Support Thereof, Document 86.
124   Letter from the Georgia Department of Human Services to Sens. Ossoff and Blackburn (Oct. 31, 2023), available at https://newschannel9.com/resources/pdf/dc788088-b93d-47f5-8f13-fac5f931722f-2023.10.31GADHSLetter.pdf
125   Rachel Aldridge, Plaintiff, v. Beverly Beaumier et al., Defendants, Civil Action No.: 5:21-CV-15 (S.D. Ga. Feb. 16, 2021), Savage Statement for the Record.
126   Rachel Aldridge, Plaintiff, v. Beverly Beaumier et al., Defendants, Civil Action No.: 5:21-CV-15 (S.D. Ga. Feb. 16, 2021), Gupta Kagan Statement for the Record.
127   Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Nhan-Ai Simms, Gwinnett County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts.

### v. OCA reports that DFCS does not adequately address sexual abuse and rape of children

In its July 2022 letter to DFCS, OCA stated that "In June 2022, the Office of the Child Advocate investigated complaints of a systemic nature that Georgia DFCS county offices consistently fail to protect children who are reported by local children's advocacy centers to be victims of physical or sexual abuse or child sexual exploitation."[128]

The Subcommittee obtained documentation from OCA describing examples where, according to OCA, DFCS failed to protect children from sexual abuse. According to OCA's 2022 audit of the Glynn County DFCS Office, a child was raped by an adult resident of their group home, Morningstar, but "the initial report was screened out in December 2021 without any inquiry by Glynn County DFCS."[129] OCA reported that the child was raped again after the initial complaint was screened out—that is, after Glynn County DFCS declined to open an investigation.[130] In another case, OCA found that a child in DFCS custody reported to his school that he was molested at his group home, Safe Harbor.[131] DFCS screened out his report instead of investigating the allegations.[132] No action was taken until a juvenile court judge later referred the incident to law enforcement, who arrested and charged the offender.[133] In an interview with the Subcommittee, Deputy Commissioner Mary Havick stated that she recalled that, based on a review of DFCS database, some of the cases identified by OCA as having been screened out were referred back to existing open cases and some of the children were not in foster care at the time, but did not recall specifics.[134]

In another instance, in March 2023, DFCS refused to comply with a court order to remove children from a foster care placement after information was presented to the court regarding allegations of inappropriate sexual contact between the children and an adult in the home.[135] Subsequently, one of the children in the home, who was under the age of consent in Georgia, contracted a sexually transmitted disease as a result of DFCS' "callous" decision to defy the court's order to remove the children from an "unsafe" foster home.[136] The court ordered DFCS to find a new placement within 24 hours, under threat of being held in contempt for non-compliance, and sent a copy of the order to OCA.[137]

---

128   Office of Inspector General Review, FY20220-12 Addendum, DFCS, at Bates No. GADHSSEN000041-42.
129   Office of the Child Advocate, Glynn County Division of Family and Children Services Audit Summary (Aug. 26, 2022) at 2 ("Glynn County Audit").
130   Id.
131   Id. at 7.
132   Id.
133   Id.
134   Subcommittee Interview with Deputy Commissioner Mary Havick (Sept. 2023).
135   Gwinnett County Juvenile Court, 03/06/2023 - ORDER ON PLACEMENT, Case Numbers 2100105 through 2100113.
136   Id.
137   Id.

An investigation by OCA into Rainbow House, a group home in Jonesboro where children in DFCS custody resided, found that there had been multiple complaints of sexual abuse that were not adequately investigated.[138] On March 14, 2023, the Clayton County Police Department's Human Trafficking Unit received an anonymous tip about sexual misconduct occurring at Rainbow House.[139] The police investigated and arrested four Rainbow House employees, including the executive director's son, who was charged with statutory rape, sexual abuse, and molestation on March 16.[140] According to news and media reports, the executive director knew about her son's misconduct and failed to report it, rehiring him instead.[141] More victims came forward shortly afterwards.[142]

DFCS suspended Rainbow House from receiving new placements on March 15, 2023.[143]  OCA investigated and found that there had been multiple complaints of sexual abuse to DFCS before staff were arrested.[144] A heavily redacted memorandum regarding Rainbow House prepared by DFCS and provided to the Subcommittee includes a section titled, "recent cases/similar concerns timeline," but all information under that heading is redacted.[145] DHS refused requests from the Subcommittee to narrow the redactions, citing confidentiality laws, denying the Subcommittee evidence regarding prior reports of sexual abuse of children at Rainbow House, and refused to answer questions from the Subcommittee about whether there had been prior complaints of sexual abuse at Rainbow House on the same grounds.[146]

DHS informed the Subcommittee via email that, in addition to Rainbow House, DFCS substantiated sexual abuse of foster children at the following group homes from 2018 to 2022: (1) Alternative Youth Services, Inc. d/b/a Georgia Center (2018); (2) Invictus Transformational Wellness Center (2018); (3) Murphy-Harpst Children's Center (2018), and (4) Kidspeace National Centers of Georgia, Bowden Campus (2023).[147]

---

138   Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023).

139   Jennifer Lifsey and Madeline Montgomery, More Child Victims Discovered in Rainbow House Sexual Abuse Case, Atlanta News First (Mar. 24, 2023), available at https://www.atlantanewsfirst.com/2023/03/24/clayton-pd-discuss-rainbow-house-sexual-abuse-case/; Tyler Fingert, At Least 4 Employees Arrested in Sexual Assault, Cover-Up at Youth Shelter; More Victims Discovered, Fox5 Atlanta, (Mar. 24, 2023), available at https://www.fox5atlanta.com/news/rainbow-house-sexual-assault-investigation-clayton-county-arrests-update.

140   Id.

141   Id.

142   Id.

143   Internal Email Exchange re Rainbow House Investigation Update (Mar. 29, 2023) at Bates No. GADHSSEN009310.

144   Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023).

145   Internal Email Exchange re Rainbow House Investigation Update (Mar. 29, 2023) at Bates No. GADHSSEN009405.

146   Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023).

147   Georgia Department of Humans Services Response Letter to Subcommittee Follow-Up Questions (Dec. 20, 2023) at Bates No. GADHSSEN009447.

## B. Mismanagement at DFCS is a key contributor to child deaths and serious injuries

### i. OCA, Citizen Review Panels, and the former Statewide Child Welfare Ombudsman attribute safety failures to mismanagement

OCA, Georgia's Citizen Review Panels, and experts attribute some of DFCS' declining performance to management failures such as high turnover, lack of training, and poor leadership.

Professor Carter, Director of the Barton Child Law and Policy Center at Emory University and former Director of OCA, testified that "[i]n Georgia, historically high rates of turnover mean that new, inexperienced, and sometimes temporary contract workers are making critical safety decisions" and that "case managers are not properly trained or adequately supervised."[148]

Similarly, Georgia's Citizen Review Panels, the federally-mandated panels of child welfare experts, cited overwhelming caseloads and leadership challenges as key drivers of DFCS staff attrition in 2022.[149] The Citizen Review Panels noted that "[a]lthough several strategies have been implemented, the annual turnover rate remains high" and recommended an evaluation of the efficacy of retention strategies.[150]

In an audit of the DFCS offices in Glynn County, OCA has described "severe internal office disfunction . . . causing child safety not to be prioritized by staff,"[151] and reported that "[a]s a result of their treatment by leadership, lack of adequate training and support, and hostile work environment, morale among staff at Glynn County DFCS is extremely low."[152] OCA reported that "[t]he Regional Director has reportedly been aware of all of the above concerns and for quite some time and has failed to take effective action to address them. The Regional Director is reported to forward grievances from county staff about county leadership to be handled by the county leadership about whom the complaints are made – a clear conflict of interest."[153] Similarly, in an audit of the DFCS offices in Bulloch County, OCA found that "Interviews with staff consistently demonstrated a sentiment that county leadership creates a hostile work environment for staff."[154]

148  The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Melissa Carter, Executive Director of the Emory Law Barton Child Law and Policy Center), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.

149  Georgia Department of Human Services Division of Family & Children Services, CAPTA Panel Program Report (2022), available at https://dfcs.georgia.gov/capta-panel-annual-reports.

150  Id.

151  Glynn County Audit at p. 3.

152  Id.

153  Id.

154  Bulloch County Audit at p. 3.

DFCS employees statewide have expressed fear of retaliation to OCA.[155] DFCS employees have also anonymously expressed fear of retaliation from DFCS for speaking out about poor working conditions.[156] In May 2022, DFCS employees in Fulton County staged a "sick-out" to call attention to concerns about work conditions including safety, salary, and trainings.[157]  The 25 DFCS employees who participated in the sick-out were terminated.[158] Following the mass termination of DFCS staff in Fulton County, anonymous DFCS employees sent a letter to Commissioner Broce urging her to address the underlying concerns that led the Fulton County staff to engage in the sick-out.[159] The anonymous employees wrote that "field staff… consistently screen out cases where children are in danger" and reported that there was a hostile work environment in Fulton County, where according to the letter writers, leadership prioritized keeping case counts down over child safety.[160] The letter was signed, "the voice of many DFCS staff who are afraid to sign their names" and ended by noting that "people are scared to speak up" about their experiences at DFCS.[161]

The report on the Fulton County November 2022 child fatality described on page 18 above noted that the mass termination of staff in Fulton County resulted in increased caseloads for remaining staff, leaving staff with "more work than they had the capacity to maintain in a manner consistent with policy" when safety concerns were raised about the family in May-June 2022 prior to the ultimate fatality.[162]

In an interview with the Subcommittee, Commissioner Broce stated that she had undertaken initiatives to reduce administrative burdens on staff, including technological improvements, and provided pay raises.[163] Documents obtained by the Subcommittee show that these technological initiatives include: implementing a system called "Argo" to improve connections to service providers for vulnerable families; ensuring more thorough documentation of field work through a program called "mCase;" and integrating data with other state agencies.[164] In addition, DFCS is reportedly pursuing "community action treatment teams" and using federal funding under the Families First program to pay for preventative services for families at risk of entering foster

---

155   Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (February 2, 2024); see also Glynn County Audit; Bulloch County Audit; May 2023, 2022 Letter from anonymous DFCS staff to Commissioner Broce regarding firings in Fulton County.
156   May 23, 2022 letter from anonymous DFCS staff to Commissioner Broce regarding firings in Fulton County.
157   Georgia DHS Office of Inspector General FY2022 – 024 SUMMARY (Fulton County DFCS) at GADHSSEN000126; GADHSSEN000142.
158   Katherine Landergan, Child's Death, Other Breakdowns Raise Questions for DHS, Atlanta-Journal Constitution (Dec. 1, 2022), available at https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX-4ND6TGIQTMARJLFYSE/
159   May 23, 2022 letter from anonymous DFCS staff to Commissioner Broce regarding firings in Fulton County.
160   Id.
161   Id.
162   Georgia Office of the Child Advocate, Child Fatality Report: Fulton County (November 2022).
163   Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023).
164   Email from Commissioner Broce to Kylie Winton re: "Atlanta News First (CBS46) -- request for comment" (March 17, 2023) Bates at No. GADHSSEN011096 –97.

care.[165] Commissioner Broce also reported to the Subcommittee that turnover was reduced but did not provide exact numbers.[166] According to DHS, in FY2022, DHS received $110 million in additional funding for child welfare related services to serve at-risk families.

## ii. DFCS' reviews of child fatality and injury cases confirm mismanagement and understaffing contribute to deaths of children

DFCS prepares internal reports called Critical Incident Reviews, analyzing systemic "gap[s] between what families needed and the services families received during the course of DFCS involvement"[167] in cases where children died or were seriously injured. In the Critical Incident Reports, DFCS has identified "staffing shortages," "absence of supportive direction and lack of knowledge" from managers, and "unmanaged" and "chaotic" work environments as contributing factors in cases where children died or were seriously injured.[168]

The four most recent Critical Incident Reviews, from 2021 to 2022, evaluated DFCS' performance in 212 child fatality cases and identified many of the same, recurring practice issues:

> Insufficient Knowledge Base: Each of the four Critical Incident Reports that the Subcommittee received highlighted insufficient knowledge base as one of the primary systemic gaps in cases where children died, affecting 90 of the 212 cases reviewed in total (42.45%).[169] DFCS reported that because of insufficient knowledge base, staff could not perform basic elements of their jobs. The most recent report found that "[s]taff struggled with gathering pertinent information during assessments such as obtaining drug screens, making maltreatment/dispositional decisions, and understanding how substance use affected safe sleep . . . staff were unable to implement effective safety plans and refer families for needed interventions . . . [t]he inability to navigate SHINES [the DFCS case information database] often prevented staff from reviewing pertinent historical information to support case decisions."[170] A 2021 report noted that it was particularly challenging for staff to synthesize information in the safety assessment process under time pressure, and "when coupled with balancing best practice with time constraints, critical case components were not followed up on or completed before case closures."[171]

165  Id.
166  Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023).
167  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009256.
168  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009261; 2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009271; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009282-83.
169  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009259; 2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009270; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009281; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009292.
170  2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009281.
171  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009259.

<u>Bias:</u> DFCS identified "bias" and "cognitive bias" among staff as systemic problems in all four Critical Incident Reviews that the Subcommittee received.[172] One of the reports describes "certainty bias," wherein caseworkers would claim to be certain that court intervention in critical cases would not be helpful.[173] Consequently, they did not seek court intervention even when it was warranted.[174] DFCS had previously identified instances of bias where staff made assumptions, relied upon others' opinions about a child's situation, and ultimately failed to conduct an "independent assessment to verify information and assess safety."[175]

<u>Lack of Diligence and Knowledge by DFCS Supervisors:</u> DFCS identified problems with management in all four Critical Incident Reviews,[176] including that "supervisors did not regularly understand or have knowledge regarding the facts of the case and **did not review case records.**"[177] According to DFCS, this meant supervisors were "unable to ensure" that case workers had the skills, knowledge, and resources to make "sound casework decisions."[178]

<u>Mismanagement and Staffing Shortages</u>: Staffing shortages and failures to allocate staff to areas of critical need (referred to collectively as "Demand Resource Mismatch") is cited as a practice issue in all four Critical Incident Reviews.[179] DFCS work environments were "frequently described as stressful, chaotic, and unmanaged and were linked to cases being closed without follow up to gather critical information, and/or, without . . . address[ing] identified needs such as: substance abuse interventions."[180]

<u>Production Pressure or "Practice Drift":</u> In three of the four Critical Incident Reviews, DFCS highlighted pressure on staff to manage extreme caseloads and to meet deadlines in ways that create critical tradeoffs affecting work quality and thoroughness.[181] "[I]n an effort to meet deadlines

---

172  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009259; 2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009270; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009281; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009292.

173  2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009281.

174  Id.

175  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009259.

176  2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009271; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009282; 2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009260; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009293.

177  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009260.

178  Id.

179  2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009272; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009283; 2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009261; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009294.

180  2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009261.

181  2021 Third and Fourth Quarter Critical Incident Review (June 2022) at Bates No. GADHSSEN009272; 2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009282; 2022 First and Second Quarter Critical Incident Review (October 2022) at Bates No. GADHSSEN009293.

and quotas," DFCS found that "[b]est practices and full family assessments were waived [...]."[182] Consequently, cases were closed prematurely, before assessments were complete and before case workers could identify families' needs.[183] DFCS also observed that as cases near their deadlines, front line workers receive "cadence calls," which takes time away from critical tasks.[184] The Subcommittee received multiple reports from former DFCS case workers, who spoke anonymously, and from OCA that cadence calls have been intimidating and create pressure to provide false information to give the appearance that cases have progressed.

Under DFCS' methodology in Critical Incident Reviews, each of these practice areas is "actionable," meaning they represented gaps in services and opportunities for improvement.[185]

OCA ordinarily receives Critical Incident Reports from DFCS, but emails from December 2022 show that OCA advised DFCS that it was not receiving Critical Incident Reports and asked DFCS to "remedy" the situation.[186] In an internal email reacting to OCA's request, DFCS called the timing "suspect."[187] DFCS did not specify why the timing was "suspect" in the email, but OCA's request came one day after *The Atlanta Journal Constitution* published an article describing OCA's findings of systemic failures at DFCS.[188] OCA told the Subcommittee that they eventually received the requested Critical Incident Reports.[189]

## C. Hundreds of children in DFCS' care were likely sex trafficked in a five-year span and nearly 2,000 have been reported missing, according to a National Center for Missing and Exploited Children ("NCMEC") assessment.

Federal law requires DFCS to report children who go missing from their care to NCMEC.[190] Analysis performed by NCMEC at the Subcommittee's request found that 1,790 children were reported missing to NCMEC from the care of DFCS between 2018 and 2022 (5 years), and 410 of those missing children were likely sex trafficked.[191] NCMEC analyzed the nearly 2,500 reports of individual children missing from DFCS

---

182  2022 Third and Fourth Quarter Critical Incident Review (March 2023) at Bates No. GADHSSEN009282.
183  Id.
184  Id.
185  See 2021 First and Second Quarter Critical Incident Review (April 22, 2022) at Bates No. GADHSSEN009257 (stating that actionable ratings identify where support or action was needed).
186  Email from Jerry Bruce to Lee Biggar re: "Child Fatality Information" (Dec. 2, 2022) at Bates No. GADHSSEN011083, 085-6.
187  Id.
188  Id. at Bates No. GADHSSEN011084; Katherine Landergan, Child's Death, Other Breakdowns Raise Questions for DHS, Atlanta-Journal Constitution (Dec. 1, 2022), available at https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX4ND6TGIQTMARJLFYSE/
189  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (June 26, 2023).
190  42 U.S.C. § 671(a)(35)(B).
191  Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Dr. Samantha Sahl, DSW, LCSW, Supervisor, Child Sex Trafficking Recovery Services Team National Center for Missing & Exploited Children), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.

care from 2018 to 2022, identified the number of children who had been reported missing—1,790[192]—and determined the number of children who were considered likely victims of sex trafficking.[193] Likely victimization through sex trafficking is based on a number of risk factors and endangerments identified during NCMEC's intake process and ongoing engagement with stakeholders (parents, caregivers, social workers, and/or law enforcement) while the child is missing through their recovery.[194] NCMEC determined that several of those children who are likely victims of sex trafficking had gone missing from care multiple times, for a total of 624 missing episodes involving children likely to be sex trafficked.[195]

NCMEC testified that children who go missing from child welfare placements particularly vulnerable to trafficking and other "life-threatening" forms of child endangerment.[196] In a later hearing before the Subcommittee, the FBI confirmed that "vulnerable populations tend to be at higher risk of being trafficked. Traffickers can and will identify and exploit vulnerabilities."[197] NCMEC testified that of the children reported missing to them from foster care placements in 2022, close to 1 in 5 are identified as likely victims of child sex trafficking.[198]

DHS's outside counsel, Consovoy McCarthy, wrote in a public letter to the Subcommittee that it had been "denied the opportunity to understand" NCMEC's data on the number of children reported missing from its care because the Subcommittee did not share the NCMEC data with DHS prior to publicly discussing it.[199] NCMEC informed the Subcommittee that DHS sought a meeting with NCMEC to discuss the data on children missing from their DFCS' care shortly thereafter.[200] DHS also pointed out in its public letter that other state foster care systems have even higher rates of missing child episodes than Georgia.[201]

---

192   Id. The number of missing children is lower than the number of missing children episodes because some children went missing multiple times.
193   Id.
194   Subcommittee Interview with the National Center for Missing and Exploited Children (July 17, 2023).
195   Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Dr. Samantha Sahl, DSW, LCSW, Supervisor, Child Sex Trafficking Recovery Services Team National Center for Missing & Exploited Children), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
196   Id.
197   Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Jose A. Perez, Deputy Assistant Director, Criminal Investigative Division, Federal Bureau of Investigation), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children.
198   Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Dr. Samantha Sahl, DSW, LCSW, Supervisor, Child Sex Trafficking Recovery Services Team National Center for Missing & Exploited Children), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
199   Letter from Patrick Strawbridge, Consovoy McCarthy, Counsel to DHS, to Senator Ossoff and Senator Blackburn (Oct. 31, 2023). Children may be reported missing from care by Georgia DHS or other entities, including the Department of Juvenile Justice ("DJJ") or Children's Advocacy Centers. According to NCMEC, between 2018-2022, 16 children in Georgia were either reported missing to NCMEC by DJJ or DJJ was the legal guardian of the child reported to NCMEC at the time they went missing. In some of these cases, the DJJ reported the child missing, but identified another individual or agency as the guardian.
200   Subcommittee Interview with NCMEC (Nov. 27, 2023).
201   Letter from Patrick Strawbridge, Consovoy McCarthy, Counsel to DHS, to Senator Ossoff and Senator Blackburn (Oct. 31, 2023)

NCMEC testified that "it is a national crisis when children feel like being on the streets or with a trafficker is a better place for them to be than their foster care placement."[202] NCMEC explained in its testimony that traffickers target foster youth due to the abuse and neglect they have often experienced prior to foster care, coupled with "the ongoing struggle that child welfare agencies nationwide face in supporting foster home placements that can support youth who are experiencing trauma."[203] Children in foster care "are often placed in foster homes or congregate care settings that may not have the training, policies, or tools to support youth in processing and healing from their trauma.... For many children, running away from their placements can be an attempt to keep themselves safe, to meet unmet needs, or as a trauma response."[204] As Brian Atkinson, an attorney who works with victims of sexual exploitation, testified, "where children are poorly cared for, the child welfare system inadvertently plays a part in making [children] vulnerable to exploitation."[205]

For example, Tiffani McLean-Camp, who was trafficked while in DFCS' care, testified before the Subcommittee about the poor conditions she endured in DFCS placements.[206] Ms. McLean-Camp was shuffled between group homes, detention centers, and foster homes, moving more than 20 times over 3 years in DFCS custody.[207] Ms. McLean-Camp's placements included a group home for victims of trafficking where she stated the staff fought other children in the home, used drugs, and prevented them from going to school.[208] The conditions there made her feel like "an animal locked in a cage" and made her and other girls "want to run away."[209] Ms. McLean-Camp was also placed in a lock-down psychiatric facility for 8 months where, according to her testimony, she was overmedicated and kept in isolation.[210] Ms. McLean-Camp testified that her caseworker never visited her in her eight months at the facility.[211]

One recent former foster youth from Georgia who was a victim of sexual abuse told the Subcommittee that she was placed in a group home where she was unable to leave her room for up to seven days at a time, was not permitted to go to school of any kind—not even virtual school—and witnessed other girls at the facility

---

202  Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (2023) (Testimony of Dr. Samantha Sahl, DSW, LCSW, Supervisor, Child Sex Trafficking Recovery Services Team National Center for Missing & Exploited Children), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
203  Id.
204  Id.
205  Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Brian Atkinson, Child Endangerment and Sexual Exploitation Clinic Staff Attorney) (citing Malika Saada Saar, et. al, The Sexual Abuse to Prison Pipeline: The Girls' Story (2015)), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
206  Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Tiffani McLean-Camp), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
207  Id.
208  Id.
209  Id.
210  Id.
211  Id.

attempting suicide.[212] She was later placed in another group home where, to escape the deplorable conditions, the youth "took matters into [her] own hands" and ran away—leading to her being exploited again.[213]

Another youth, whose story was shared in testimony given by Emma Hetherington, Clinical Associate Professor and Director of the University of Georgia's Wilbanks Child Endangerment and Sexual Exploitation Clinic ("CEASE"), which serves survivors of child sexual abuse and exploitation, called herself "a victim of Georgia DFCS," and reported that she "put [her] life in jeopardy and placed [herself] in dangerous situations in attempts to leave DFCS' care—the care that has failed to provide [her] with adequate, or any medical, dental, or mental health care."[214] Professor Hetherington testified that *all* of the children she represented reported "experiencing abuse and neglect while in the legal and physical custody of Georgia DFCS, including children placed in therapeutic foster homes, psychiatric residential treatment facilities, and CSEC [Commercially Sexually Exploited Children]-specific placements."[215]

Data from the Adoption and Foster Care Analysis and Reporting System ("AFCARS"), a database that collects case-level information on children in the foster care system, show that from 2018 to 2022, DFCS discharged from its custody 61 children who were "on runaway"—meaning that the children were missing at the time DFCS terminated its custody.[216] These discharges appear to violate DFCS' policy on missing children, which states that "DFCS maintains responsibility to conduct a comprehensive search to locate the children and ensure their safety and well-being... DFCS does not seek to be relieved of custody based on the child being missing."[217] Deputy Commissioner of Child Welfare Mary Havick explained to the Subcommittee that she was not aware of any circumstances under which DFCS policy would permit the agency to discharge custody of a minor child who had run away and not been recovered.[218]

OCA explained in an interview with a Subcommittee that when children who have gone missing from care are

212  Subcommittee Interview with Foster Youth Who Wish to Remain Anonymous (Dec. 4, 2023).
213  Id.
214  The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Emma Hetherington, Director of the Wilbanks Child Endangerment and Sexual Exploitation Clinic), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.
215  Id.
216  These data are compiled at Fostering Court Improvement, a website that receives data from AFCARS submissions that child welfare agencies are required to submit to the federal government every six months as well as annual data from the National Child Abuse and Neglect Data System (NCANDS) which contain information on allegations of child maltreatment. The most recent data are available on their website: http://fosteringcourtimprovement.org/state_websites.php. Fostering Court Improvement provided historical data on the numbers of children discharged as runaways to the Subcommittee.
217  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 19, Policy No. 19.22 (December 2020) at 7; Deputy Commissioner of Child Welfare, Mary Havick, confirmed in an interview with the Subcommittee that DFCS policy prohibited the agency from discharging custody of minor children who were missing (Sept. 12, 2023).
218  Deputy Commissioner of Child Welfare, Mary Havick, confirmed in an interview with the Subcommittee that DFCS policy prohibited the agency from discharging custody of minor children who were missing (Sept. 12, 2023).

discharged from DFCS custody while missing, this represents a failure on the part of multiple actors: DFCS, which should not have requested the discharge; the child's attorney, who should vigorously advocate against the discharge; and the judge, who should not grant the discharge.[219] OCA explained that when courts discharge children from DFCS custody while they are still missing, the result is often that nobody is looking for the missing child.[220]

The Subcommittee is unable to review individual case records to assess the circumstances of these discharges due to confidentiality restrictions governing foster care records under Georgia law.[221] Absent a clear explanation for these discharges, this data raises questions about the adequacy of DFCS' efforts to locate children missing from its care.

## D. Judges and former foster youth report that DFCS improperly prolonged children's time in juvenile detention

In interviews and testimony before the Subcommittee, multiple juvenile court judges in Georgia reported that DFCS has suggested that judges improperly prolong children's time in juvenile detention, exposing them to unsafe conditions where they cannot access the care and services they need.[222] Judges reported to the Subcommittee that they have had cases where DFCS refused to retrieve children who were eligible for release until a court compelled it to do so.[223]

Research demonstrates that juvenile detention "negatively affects a child's mental state, academic aptitude, and employment prospects… [and] hinders the juvenile's developmental process, leads to depression, and increases the risk of suicide or other self-harm.[224]

Judge Carolyn Altman, a juvenile court judge in Paulding County, testified before the Subcommittee on October 30, 2023, about the harms children experience when they are detained unnecessarily, explaining that they are "absolutely terrified…" and "there are a lot bigger, smarter, more violent children" in detention centers

---

219  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023).
220  Id.
221  GA Code § 49-5-40 (2022).
222  Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Carolyn Altman, Paulding County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts; Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Nhan-Ai Simms, Gwinnett County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts.
223  Subcommittee Interviews with Current and Former Juvenile Court Judges Who Wish to Remain Anonymous (Sept. 26, 2023, Oct. 11, 2023, and Nov. 14, 2023).
224  Alternatives to Detention and Confinement, Literature Review, Office of Juvenile Justice and Delinquency Prevention (Aug. 2014), available at https://ojjdp.ojp.gov/model-programs-guide/literature-reviews/alternatives_to_detection_and_confinement.pdf.

with them.[225] She added, "keeping [foster children] detained is going to worsen their behaviors, is going to worsen their outbursts and is going to create more hardship for them."[226] At the same hearing, Judge Nhan-Ai Simms, a juvenile court judge in Gwinnett County, testified that "when children are in these facilities, they are not receiving the services they need" including counseling and psychological evaluations, and that children's safety is compromised due to understaffing at detention centers.[227]

Judge Altman and Judge Simms' fears about the safety of children in juvenile detention centers are well-founded. DFCS fatality reports show that a former foster child, who was incarcerated at RYDC, died in August 2022 after a Department of Juvenile Justice ("DJJ") corrections officer forced Tucker and another child to stay in a closet and hit one another.[228]

On October 25, 2023, the Subcommittee heard testimony from one former foster youth who was subjected to prolonged detention. On October 25, 2023, former foster youth Mon'a Houston testified before the Subcommittee that she was arrested and taken to juvenile detention following an altercation at her group home.[229] DFCS refused to pay her bail.[230] Ms. Houston testified that one month later, she became eligible for release, but she was forced to stay in detention for an extra month because DFCS refused to pick her up.[231]

On October 30, 2023, Judge Carolyn Altman recounted attending an August 2023 meeting of 30 juvenile court judges where Commissioner Broce requested that the judges consider locking up children with special needs in juvenile detention centers while DFCS "looked for placements."[232] Judge Altman testified that when a judge at the meeting told Commissioner Broce that detaining children for lack of an adequate placement would violate Georgia law,[233] DFCS General Counsel Regina Quick said, "well, we can change that."[234] Judge Simms corroborated this account in her testimony before the Subcommittee.[235]

225  Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Carolyn Altman, Paulding County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts.
226  Id.
227  Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Nhan-Ai Simms, Gwinnett County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts.
228  See Log of Contact Narratives Describing Death of Former Foster Child Loyce Tucker at Bates No. GADHSSEN012731. Loyce Tucker, whose mother had a history of drug addiction, came into foster care in 2018 but "custody was returned to the [biological mother] after he was committed to the RYDC." Id.
229  The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Mon'a Houston), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.
230  Id.
231  Id.
232  Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Carolyn Altman, Paulding County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts
233  Judge Altman explained in her testimony that Georgia Code §15-11-503 provides that that children are only to be detained in the most limited circumstances and cannot be detained due to a lack of a more appropriate facility.
234  Id.
235  Foster Children in the Courts, Field Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 30, 2023) (Testimony of the Honorable Nhan-Ai Simms, Gwinnett County Juvenile Court Judge), available at https://www.judiciary.senate.gov/committee-activity/hearings/foster-children-in-the-courts.

The Council of Juvenile Court Judges in Georgia submitted a letter for the Subcommittee which stated that Judges Altman and Simms testified in their private capacities on not on behalf of the Council, which the Subcommittee entered into the record.[236]

DHS has not denied it requested that juvenile court judges prolong children's detention.[237] Commissioner Broce stated to the *Atlanta-Journal Constitution* that she "didn't recall" making the request, and that the August 2023 meeting was a "brainstorming session," where judges "opined that they can extend detention" in certain scenarios—and, referring to the judges, "[s]ome felt that using detention in that way is proper; some didn't."[238] After the Subcommittee's October 2023 hearing, at which two judges testified that DHS asked judges to consider prolonging time in juvenile detention for children with special needs, multiple current juvenile court judges, two of whom agreed to be named in this report, have corroborated Judge Altman's and Judge Simms' testimony.

Polk County Chief Juvenile Court Judge Crystal Bice, who also attended the meeting, said that "Commissioner Broce asked judges to consider detaining children with special needs while DFCS looked for placements, even though doing this would be illegal."[239] Judge Jeremy D. Clough, a juvenile court judge in the Enotah Judicial Circuit also attended the meeting and recalled that DHS requested that judges prolong children's detention, but recalled Regina Quick, General Counsel of DHS, making the request, rather than Commissioner Broce.[240] He told the Subcommittee that he advised DFCS that detaining children due to lack of other placement options would violate Georgia law.[241] Judge Clough told the Subcommittee in an interview that "no judge would have suggested detaining children like this. This is black letter law."[242]

DFCS has acknowledged it has a shortage of appropriate placements for children with complex medical, psychological, and psychiatric needs. In an interview with the Subcommittee, former DFCS Deputy Chief of Staff Matthew Krull confirmed that children with complex needs who are placed in prolonged juvenile detention otherwise would have been placed in hotels or in DFCS offices due to lacking placements.[243]

---

236   Letter from the Council of Juvenile Court Judges of Georgia to Chairman Ossoff and Ranking Member Blackburn, Re: Testimony Before the United States Senate Subcommittee on Human Rights on October 30, 2023(Nov. 1, 2023).

237   Letter from Consovoy McCarthy PLLC on behalf of Georgia Department of Human Services to Senators Ossoff and Blackburn (Oct. 31, 2023) at 2-3 (protesting that there is important "context" left out of the judges' testimony about this meeting, but failing to deny that the meeting happened, and that Commissioner Broce made this request).

238   Bill Torpy, Opinion: Sen. Ossoff Whacks the Complex, Troubled Pinata Known as DFCS, Atlanta-Journal Constitution, available at https://www.ajc.com/opinion/columnists/opinion-sen-ossoff-whacks-the-complex-troubled-pinata-known-as-dfcs/TC-7NO7IQPRCFPB2CJ77BALXWHU/.

239   Subcommittee Interview with Judge Crystal Bice (Nov. 8, 2023).

240   Subcommittee Interview with Judge Jeremy D. Clough (Nov. 7, 2023).

241   Id.

242   Id.

243   Subcommittee Interview with the former Georgia Department of Human Services Deputy Chief of Staff Matthew Krull (Oct. 3, 2023).

However, not all DFCS requests for children to be placed in juvenile detention relate to inadequate placements. Former DFCS Deputy Chief of Staff Matthew Krull acknowledged to the Subcommittee that DFCS has "fought tooth and nail" to keep children with complex needs and juvenile court histories in detention so they "can't revictimize" others.[244] Mr. Krull first described a case where a teenager in DFCS custody with a history of sexually abusing his adoptive siblings was to be released back into the custody of the same family and same adoptive siblings.[245] DFCS asked that the child—who Mr. Krull stated would have otherwise been placed in a hotel—remain in juvenile detention.[246] Mr. Krull described another case where a child who had been arrested, but who was not charged with a crime, would be released into DFCS custody because his parent would not pick him up.[247] Mr. Krull objected to having to "send our 26-year-old social worker who just got out of college to pick up this gangbanger."[248] According to Mr. Krull, DFCS petitioned the court to keep this child in detention despite the lack of pending charges.[249]

## E. DFCS CONSISTENTLY FAILS TO MEET CHILDREN'S PHYSICAL AND MENTAL HEALTH NEEDS

Federal law requires state foster care agencies to have policies in place to coordinate and oversee healthcare for children in foster care, including mental health care and dental care.[250] Among other things, the policies must include procedures to schedule health screenings; monitor and treat healthcare needs identified through screenings, including emotional trauma arising from the child's maltreatment and removal from the home, and oversee prescription medications, including psychotropic medications.[251] DFCS policy requires the arrangement of "appropriate and timely" medical and dental care to children in foster care.[252] DFCS policy also requires DFCS to screen children in foster care for behavioral health needs, to coordinate appropriate services with Amerigroup, the Medicaid Managed Care Provider for foster children in Georgia, and to seek certain approvals prior to administering psychotropic medications.[253] While Amerigroup is responsible for ensuring access to specific providers, Georgia is responsible for enrolling eligible children in Medicaid and coordinating with Amerigroup to identify providers.[254] An Amerigroup Care Management Team must schedule timely appointments for children in foster care,[255] and DFCS must ensure those children receive their care and monitor their treatment.[256]

---

244  Id.
245  Id.
246  Id.
247  Id.
248  Id.
249  Id.
250  Social Security Act, 42 U.S.C. § 422(b)(15).
251  Id.
252  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 10, Policy No. 10.11 (December 2020) at 1.
253  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 10, Policy No. 10.12 (December 2020).
254  Contract between Georgia Department of Community Health and Amerigroup at Bates No. GADHSSEN009533-39.
255  Id., at Bates No. GADHSSEN009462.
256  Social Security Act, 42 U.S.C. § 422(b)(15); Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 10, Policy No. 10.12 (December 2020).

### i. DFCS Consistently Fails to Conform to Federal Standards for the Provision of Health Care to Foster Children

HHS assesses whether state foster care agencies are complying with federal healthcare obligations through the Child and Family Services Review ("CFSR") process, as described on page 10.[257] HHS uses two metrics to measure a state agency's compliance: whether the agency addressed the physical and health needs of children, including dental needs; and whether the agency addressed the mental and behavioral health needs of children.[258]

A recent DFCS audit assessing its performance with respect to the federal CFSR healthcare standards shows that DFCS fails to meet children's physical and mental health needs. This audit from the spring of 2023 (the "CFSR Self-Assessment") found that children in DFCS care received adequate services for children's physical health in only 40% of cases reviewed and received adequate services for children's mental and behavioral health needs in only 13% of cases reviewed.[259]

Annual reports that DFCS submits to HHS known as Annual Progress and Services Reports ("APSRs") also show that DFCS has consistently failed to meet federal standards with respect to provision of healthcare recent years:

- The 2022 APSR, reporting data from 2021, found that children received adequate physical healthcare in only 52% of cases reviewed, and only received adequate mental health services in 21% of cases reviewed.[260]

- The 2021 APSR, reporting data from 2020, found that children received adequate physical healthcare in only 50% of cases reviewed, and received mental healthcare in only 20% of cases reviewed.[261]

- The 2020 APSR, reporting data from 2015 to 2019, found that children did not receive adequate healthcare over the four-year span:

  * Children received adequate physical healthcare in 49% of cases in federal fiscal year 2015; 47% of cases in 2016; 50% of cases in 2017; 51% of cases in 2018; and 35% of cases in 2019.[262]

---

257 45 CFR § 1355.34.
258 Id; U.S. Department of Health and Human Services Administration for Children and Families, Child and Family Services Review Onsite Review Instrument and Instructions (June 2022), available at https://www.acf.hhs.gov/cb/report/cfsr-r4-osri.
259 CFSR Self-Assessment.
260 Georgia Department of Human Services Division of Family & Children Services, DFCS Annual Progress and Services Report for FY 2023 (June 30, 2022) at p. 73, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553. These numbers are averages of the data reported across four quarters in 2021. DHS noted that in some cases, healthcare may have been delayed but eventually provided to children. DHS also noted that in some cases, access to healthcare may be affected by lack of providers.
261 Georgia Department of Human Services Division of Family & Children Services, State of Georgia 2014-2019 Child and Family Services Plan, 2021 Annual Progress and Services Report at p. 102, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553.
262 Georgia Department of Human Services Division of Family & Children Services, State of Georgia 2014-2019 Child and Family Services Plan, 2020 Annual Progress and Services Report at p. 104, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553 (Reporting data from December 2016, September 2017, March 2018, and March 2019).

    \* Children received adequate mental healthcare in 29% of cases in federal fiscal year 2015; 20% of cases in 2016; 27% of cases in 2017; 24% of cases in 2018; and 8% of cases in 2019.[263]

DFCS did not report data on provision of physical and mental healthcare in the 2023 APSR.[264]

According to HHS, failure to provide adequate physical healthcare services means that one of the following deficiencies was identified in the case under review:

- The child's physical or dental healthcare needs were not accurately assessed;

- The agency did not ensure that appropriate services were provided to meet identified physical or dental needs;

- The child's health care records were not up-to-date, included in the child's case file, or provided to the child's guardians; or the child's case plan does not address the issue of physical and dental needs; or
- The agency failed to provide appropriate oversight of prescription medications for physical health issues.[265]

According to HHS, failure to provide adequate mental and behavioral healthcare services means that one of the following deficiencies was identified in the case under review:

- The child's mental and behavioral health needs were not accurately assessed initially, either upon intake or an ongoing basis;

- The agency failed to provide appropriate oversight of prescription medication for children in foster care; or

- The agency did not provide appropriate services to address the child's mental or behavioral health needs.[266]

Internal DFCS Quality Assurance audits from 2020 tracking its performance on the federal CFSR healthcare standards identified the following cases as examples of failure to provide adequate services:

- "In one placement case, upon entering care the child was taken to the dentist for a routine exam and follow up treatment was needed. However, at the time of QA interviews (six months later) the dental issue had still not been addressed by the agency."[267]

- "In one permanency case, the agency did not provide appropriate oversight regarding psychotropic medication that the child was prescribed. There was no consent for psychotropic medication signed by the County Director/designee located at time of review."[268]

---

263  Id.
264  Georgia Department of Human Services Division of Family & Children Services, DFCS Annual Progress and Services Report for FY 2023 (June 2023), available at https://dfcs.georgia.gov/data/federal-reviews-and-plans.
265  U.S. Department of Health and Human Services Administration for Children and Families, Child and Family Services Review Onsite Review Instrument and Instructions (June 2022), available at https://www.acf.hhs.gov/cb/report/cfsr-r4-osri.
266  Id.
267  Child Welfare Quality Assurance Review, Region 1 at Bates No. GADHSSEN000970.
268  Child Welfare Quality Assurance Review, Region 6 at Bates No. GADHSSEN001046.

• "Since birth, child 2 had struggled with medical issues related to swallowing and asthma. Child 2 was on several medications for these conditions. It was reported that the Mother was not providing child 2 with her medications as prescribed. The Mother denied these allegations, however, there were no collaterals [interviews] completed with medical providers to determine child 2's current medical condition, what medications she was prescribed and if the caretakers were ensuring child 2's medical needs were being addressed."[269]

• "Concerns identified included the CPA documenting accidental injuries that required emergency treatment, and the DFCS case manager never addressed the injury or obtained medical records, all prescribed medications not being included on the medication log, abnormal test results with no follow up appointments made to address, and the psychologist recommended follow up to assess for a traumatic brain injury that was not done. A child in a kinship placement (but in DFCS custody) did not receive an assessment until she had to be moved to a foster home, at which time she was found to have significant dental decay requiring fillings and caps. The CCFA [Comprehensive Child and Family Assessment] recommended a nutritional assessment that was not done. When the child exited foster care to relative custody she was found to be malnourished."[270]

## ii. Judges and advocates report that DFCS fails to provide adequate health care to children in foster Care

Nine current and former juvenile court judges across the state reported to the Subcommittee routine challenges procuring medical and dental care for children in DFCS care.

One judge observed that it "usually takes four hearings to yell at DFCS and get care."[271] A second judge described that it takes 8 to 9 months for DFCS to obey a court order and procure the requested medical care for a child.[272] By this time, that judge recounted, the child's condition has often become urgent and painful.[273] A third judge stated that, due to DFCS' noncompliance with orders to provide medical care, she often feels compelled to withhold a finding of reasonable efforts[274] in cases on her docket because DFCS has failed to timely provide medical care previously ordered by the court.[275] The first judge further described a case where a young child in foster care had wisdom teeth growing rapidly into the side of her mouth and spent seven months in "unnecessary pain because DFCS would not schedule her surgery in a timely manner."[276] That same judge described another case where DFCS claimed that it could not provide required healthcare due to a child's

---

269   Child Welfare Quality Assurance Review, Region 7 at Bates No. GADHSSEN001075.
270   Child Welfare Quality Assurance Review, Region 13 at Bates No. GADHSSEN001134.
271   Subcommittee Interview with Current Juvenile Court Judge Who Wishes to Remain Anonymous (Aug. 17, 2023).
272   Subcommittee Interview with Current Juvenile Court Judge Who Wishes to Remain Anonymous (Nov. 14, 2023).
273   Id.
274   Federal law requires state agencies to demonstrate that they have made "reasonable efforts" to reunify foster children with their families, which requires the agency to provide services and supports to assist the family in addressing the problems that contribute to the children being placed in foster care. Reasonable efforts can include providing healthcare services and behavioral health evaluation and treatment. See Department of Health and Human Services Children's Bureau, Reasonable Efforts to Preserve or Reunify Families and Achieve Permanency for Children (Sept. 2019), available at https://cwig-prod-prod-drupal-s3fs-us-east-1.s3.amazonaws.com/public/documents/reunify.pdf?VersionId=9TZI5le9_LWS7Ba4iYpeET8ApUDVXmTh.
275   Id.; Subcommittee Interview with Current Juvenile Court Judge Who Wishes to Remain Anonymous (Aug. 10, 2023).
276   Subcommittee Interview with Two Current Juvenile Court Judges Who Wish to Remain Anonymous (Aug. 17, 2023).

undocumented status.[277] In that case, a young immigrant girl was brought to the U.S. by a now-deceased parent. While in the U.S., she was raped and became a victim of incest. She required medical assistance and counseling, but she could not get it while in DFCS care. DFCS argued that a state law prevented it from using state funds to assist undocumented children.[278]

Advocates in Georgia's child welfare system have also reported delays or denials of necessary healthcare services. Professor Emma Hetherington, the Clinical Associate Professor and Director of the CEASE Clinic, testified to the Subcommittee that "0% of our clients have received consistent and adequate pediatric gynecological care . . . while in DFCS custody," and that "0% of our clients have received consistent and adequate mental health services."[279] On November 6, 2023, the Subcommittee heard testimony from Tiffani McLean-Camp, a youth receiving DFCS services and one of Professor Hetherington's clients, who, while in DFCS care, had retained placenta, ovary infections, and post-partum depression and did not receive a gynecology appointment for six months, even though, according to her attorney a judge ordered at "every hearing" in the case that the child receive gynecological care.[280]

One attorney at a law firm that represents immigrant children in DFCS care reported to the Subcommittee that her client, a seventeen-year-old child, entered DFCS' custody after being diagnosed with an STD in a hospital emergency room.[281] According to the child's attorney, DFCS never inquired how this child contracted an STD, and she never received counseling.[282]

### iii. DHS identifies insurance coverage as a barrier to obtaining necessary healthcare

DHS has asserted that its Medicaid provider, Amerigroup, frequently denies coverage for medically necessary services for foster children, making it difficult for the agency to provide adequate healthcare.[283]

In a letter to the Georgia Department of Community Health (DCH), which manages the Amerigroup contract, Commissioner Broce wrote that "the State's most vulnerable children cannot access the physical, mental, or

---

277  Id.
278  Id.
279  The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Emma Hetherington, Director of the Wilbanks Child Endangerment and Sexual Exploitation Clinic), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.
280  Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Tiffani McLean-Camp), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
281  Subcommittee Interview with an Attorney Who Wishes to Remain Anonymous (Sept. 1, 2023, and Jan. 5, 2024).
282  Id.
283  Letter from Georgia Department of Human Services to Georgia Department of Community Health Commissioner Caylee Noggle (Aug. 12, 2022), available at https://www.documentcloud.org/documents/23728366-dhs-amerigroup-letter.

behavioral health treatment they need—and deserve—in state custody or through post-adoptive care…"[284] She described months-long waitlists for medical appointments for foster children and argued that Amerigroup's definition of "medical necessity" was unduly narrow, in violation of state and federal law.[285] Commissioner Broce wrote that DHS hired three attorneys to appeal denials of care based on a determination by Amerigroup that services were not medically necessary.[286] DHS urged DCH not to renew Amerigroup's contract.[287]

Commissioner Broce told the Subcommittee that DHS often covers the cost of medical services and appeals denials of coverage.[288]

## F. DFCS FAILS TO ADHERE TO ITS OWN PROTOCOLS REGARDING ADMINISTRATION OF PSYCHOTROPIC DRUGS FOR CHILDREN

As discussed in Section E, above, federal law requires state foster care agencies to have policies to oversee prescription medications, including psychotropic medications, given to children.[289] DFCS policy also requires DFCS to seek certain approvals prior to administering psychotropic medications to children.[290] Yet, DFCS acknowledges that it fails to adequately monitor psychotropic medication for children in foster care. In the 2022 APSR, DFCS reported that it lacked "adherence to agency psychotropic medication protocol" requiring it to monitor medication.[291] In the 2021 APSR, DFCS reported that, "Despite increased efforts in this area, the agency's monitoring of psychotropic medications for children in Foster Care in accordance with the State's policy related to this topic remains problematic. Psychotropic medications for foster children were adequately monitored in only 10% of applicable cases."[292]

In an interview with the Subcommittee, Commissioner Broce admitted that she was aware of cases where concerns had been raised at DFCS related to the overmedication of children and noted that overmedication was a longstanding concern at DFCS.[293]

---

284  Id.
285  Id.
286  Id.
287  Id.
288  Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023). According to DHS, DFCS will receive $800,000 from Amerigroup as a result of its appeals.
289  Social Security Act, 42 U.S.C. § 422(b)(15).
290  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 10, Policy No. 10.12 (April 2020).
291  Georgia Department of Human Services Division of Family & Children Services, DFCS Annual Progress and Services Report for FY 2023 (June 30, 2022) at p. 76, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553.
292  Georgia Department of Human Services Division of Family & Children Services, DFCS 2021 Annual Progress and Services Report (June 2020) at p. 111, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553.
293  Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023).

Failure to monitor psychotropic medication may lead to inappropriate dosing of medication.[294] The Subcommittee heard testimony from two former foster youth who described being overmedicated while in DFCS' care. Mon'a Houston testified that she was "overmedicated" while in foster care to control her behavior.[295] Ms. Houston testified that she was on multiple medications simultaneously for depression, ADHD, and other mental health conditions, and that the combination of these medications caused her to have difficulty walking and breathing.[296] Ms. Houston testified that when she requested that the dosages be adjusted, DFCS told her she was "aggressive" and instead told the doctors to raise her dosage.[297] Rather than provide her with appropriate counseling, she testified, DFCS placed her at Deveraux Advanced Behavioral Health, a maximum-security psychiatric facility, where she was placed in solitary confinement for days at a time, physically and violently restrained, and injected with sedatives. Ms. Houston stated that she was treated "as an inmate."[298] DFCS also placed former foster youth Tiffani McLean-Camp at Deveraux.[299] Ms. McLean-Camp testified that she was treated "like [she] wasn't a human" in Deveraux.[300] Like Ms. Houston, Ms. McLean-Camp testified that she was placed in solitary confinement and held down and overmedicated with sedatives by facility staff.[301]

Georgia is not alone in its failure to monitor psychotropic medications. The HHS Office of Inspector General reviewed case files for a sample of foster children in five states and found that one in three children in foster care who were treated with psychotropic medications did not receive required treatment planning or medication monitoring in 2018.[302]

## G. DHS publicly dismissed OCA's 2022 report of "Systemic" child safety failures without conducting a full and fair investigation

In 2022, OCA and the Children's Advocacy Centers of Georgia ("CACGA") warned that DFCS was failing to keep children safe from abuse and neglect. CACGA sent a list of systemic concerns to DHS in January 2022.[303] In response, Commissioner Broce requested an investigation by DHS's Inspector General ("OIG"), whose role is to

---

294 U.S. Department of Health and Human Services Office of Inspector General, Treatment Planning and Medication Monitoring Were Lacking for Children in Foster Care Receiving Psychotropic Medication, available at https://oig.hhs.gov/oei/reports/oei-07-15-00380.pdf.

295 The Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Oct. 25, 2023) (Testimony of Mon'a Houston), available at https://www.judiciary.senate.gov/committee-activity/hearings/the-human-rights-of-foster-children.

296 Id.

297 Id.

298 Id.

299 Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Tiffani McLean-Camp), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.

300 Id.

301 Id.

302 U.S. Department of Health and Human Services Office of Inspector General, Treatment Planning and Medication Monitoring Were Lacking for Children in Foster Care Receiving Psychotropic Medication, available at https://oig.hhs.gov/oei/reports/oei-07-15-00380.pdf.

303 Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN0000010.

conduct independent oversight and investigations of DHS operations.[304] The request to have OIG review CACGA's systemic operational concerns was unusual. According to the OIG staff that conducted the review of the CACGA concerns, they typically review individual cases of waste, fraud or abuse.[305] Amidst the ongoing OIG review of the CACGA concerns, CACGA sent DHS an additional 37-page document outlining additional systemic concerns in May 2022 supported by examples from multiple Children's Advocacy Centers ("CACs") across the state.[306] DHS never sent the additional 37-page document to the OIG.[307] Instead, DHS referred the letter to child welfare staff at DFCS who analyzed CACGA's May 2022 submission and corroborated some of CACGA's systemic concerns.[308] This 37-page document was uncovered in the Subcommittee's document request to DHS.

About a month later, OIG issued a report analyzing the original January 2022 CACGA complaint, which dismissed and belittled the CACGA's concerns based on a limited-scope review.[309] OIG did not conduct interviews in the course of its review, even though the investigators proclaimed to be "perplexed" about the nature of CACGA's concerns and speculated that CACGA may have simply been annoyed that DFCS did not accept their recommendations.[310] OIG concluded that it was unable to analyze CACGA's concerns about systemic operational failures at DFCS because CACGA had only provided three case examples, ignoring DFCS' own analysis showing systemic operational failures, including audits concluding that DFCS failed to meet federal safety standards described in Section A above.[311] OIG still did not have a copy of the 37-page document from CACGA submitting evidence from across the state to support its concerns regarding systemic failures.[312]

In July 2022, OCA sent a letter to DHS stating that it had reviewed a list of systemic concerns from CACGA— substantially the same as the ones CACGA sent to DHS in May 2022—and confirmed that OCA encountered the same problems in its work across the state.[313] OCA also reviewed a sample of cases submitted by CACGA and "in

304   Id. at Bates No. GADHSSEN000014. OIG describes the role of its Internal Investigations Unit, which investigated the CAC concerns, as follows: "OIG has oversight responsibility for all DHS programs and offices, through its functions previously explained; OIG must maintain independence and refrain from opinion when carrying out its duties; OIG's duty is to report the facts and findings of audits and investigations, based on relevant laws, rules, regulations, and policy." Georgia Department of Human Services Office of Inspector General PowerPoint at Bates No. GADHSSEN000940.

305   Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).

306   See Compilation of CAC Concerns Raised in May 19, 2022 Meeting with Craig Foster and Matthew Krull, at Bates No. GADHSSEN000771.

307   Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).

308   Georgia Division of Family & Children Services response to Children's Advocacy Center Concerns (May 2022) at Bates No. GADHSSEN000001.

309   Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000009-36.

310   Id. at Bates No. GADHSSEN000023; Subcommittee Interviews with Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 19, 2023, and Sept. 15, 2023, respectively) (see footnote 351, infra).

311   See Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000029-35.

312   Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).

313   Office of the Child Advocate letter to the Georgia Division of Family and Children Services (July, 19, 2022) at Bates No. GADHSSEN000037.

all cases reviewed, OCA found that DFCS failed to take adequate steps to respond to allegations of physical and sexual abuse."[314]

Commissioner Broce sent OCA's letter to OIG to review, this time asking OIG to "refute" OCA's findings and provide as "strong of a rebuttal as possible," because she believed OCA's investigations "lack the level of due diligence we internally afford a complaint."[315] Commissioner Broce caveated that she would accept OCA's conclusions if OIG found that they were "actually accurate."[316] According to OIG interviews with the Subcommittee, DHS did not send OIG the evidence that it had received in May 2022 in support of those same systemic complaints from CACGA.[317]

In August 2022, DHS issued a report dismissing OCA's systemic concerns based upon another limited-scope review.[318] OIG was still unaware of the evidence submitted by CACGA in May 2022 supporting those same systemic concerns.[319] Consequently, OIG dismissed OCA's complaints based on OIG's mistaken belief that OCA's concerns stemmed from a single Children's Advocacy Center within CACGA.[320] This time, OIG did conduct interviews—but still never spoke to anyone at the CACs.[321] Once again, OIG said it was "perplexed" by the nature of the concerns and advised the CAC staff to "stay in [their] lane."[322] OIG still did not review any analysis of the DFCS' performance at a systemic level, including DFCS' own analysis of the same systemic concerns, which OIG told the Subcommittee it never received from DHS—and which would have substantiated some of the very concerns that OIG dismissed.[323]

DHS did not send the results of its review to OCA until *The Atlanta Journal Constitution* began inquiring about the status of the OCA letter in November 2022.[324] DHS then relied on OIG's limited-scope review to strongly deny OCA's concerns to the press.[325] OCA stood by their report.[326]

---

314    Id.
315    Georgia Department of Human Services Commissioner Candice Broce Email Exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009307-08.
316    Id.
317    Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).
318    Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000040-81.
319    Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).
320    Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000040-81.
321    Id. at Bates No. GADHSSEN000081.
322    Id. at Bates No. GADHSSEN000067.
323    Id. at Bates No. GADHSSEN000040-81; Georgia Division of Family & Children Services response to Children's Advocacy Center Concerns (May 2022) at Bates No. GADHSSEN000001.
324    Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023); Georgia Department of Human Services Commissioner Candice Broce Email Exchange with Georgia Inspector General David LeNoir (Nov. 4, 2022) at Bates No. GADHSSEN009300.
325    Katherine Landergan, Child's Death, Other Breakdowns Raise Questions for DHS, Atlanta-Journal Constitution (Dec. 1, 2022), available at https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX-4ND6TGIQTMARJLFYSE/.
326    Id.

DHS's review of the concerns presented by OCA and the CACs is laid out chronologically below.

### i. Children's Advocacy Centers of Georgia (CACGA) sends list of Children's Advocacy Center (CAC) systemic concerns to DHS in January 2022; DHS requests investigation by OIG

On January 15, 2022, a lobbyist retained by CACGA emailed DHS Commissioner Broce and DHS Chief of Staff Craig Foster (the "January 2022 CACGA Email") following a meeting between CACGA and Commissioner Broce where CACGA laid out a "comprehensive list of challenges the CAC Directors are experiencing throughout Georgia" and offering their time and expertise to help Commissioner Broce "right this ship."[327] CACGA is a group of Children's Advocacy Centers ("CACs") in Georgia, which are community-based organizations that coordinate a multidisciplinary response to child maltreatment allegations.[328] CACGA's concerns included the following issues:

- "Boots on the ground workers are becoming increasingly difficult to get in touch with... DFCS is still not going out into the field. They are doing 'home visits' virtually and by phone calls. Often our children are telling us that the alleged perpetrator . . . was standing at the door listening or even sitting in the room with them. Therefore, DFCS closes their case when the child reports to them nothing is wrong […]."[329]

- "[DFCS closes cases prematurely] before services and sometimes assessments can be completed by the CAC."[330]

- "CACs are telling us that the lack of communication between DFCS and [law enforcement] has become debilitating. At best DFCS is faxing in reports to [law enforcement] in most areas. This is not filing a police report for abuse allegations which is what is typically necessary."[331]
- "DFCS has no concrete, evidence-based, cohesive response to allegations of sexual abuse made against juveniles."[332]

CACGA described "decisions DFCS and its staff have made that have caused us to fear for the immediate safety of children" and provided case examples illustrating their concerns.[333] (This case information was redacted in DHS's productions to the Subcommittee, so the Subcommittee was unable to review it.[334])

On January 25, 2022, Commissioner Broce forwarded the email laying out CACGA's concerns to the Inspector General David LeNoir.[335] She requested that Inspector General LeNoir and his staff review CACGA's

---

327   Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000010.
328   Id. at Bates No. GADHSSEN0000016.
329   Id. at Bates No. GADHSSEN000011.
330   Id.
331   Id.
332   Id.
333   Id. at Bates No. GADHSSEN000012
334   Id.
335   Id. at Bates No. GADHSSEN000014.

submission, beginning by reviewing the cases CACGA provided.[336]

OIG's Chief Investigator, Scott Ellison, then contacted CACGA to request additional information about the three cases, which CACGA provided, along with contact information for the CAC director who had worked on them.[337] CACGA also offered to speak with OIG and provide additional information about "systemic failures/gaps/shortages" it was observing statewide.[338]  However, Mr. Ellison told the Subcommittee that he did not follow up with CACGA.[339]

The OIG investigators assigned to review the CACGA concerns told the Subcommittee that it was unusual for OIG to be asked to investigate systemic concerns related to child welfare practice, and that OIG typically focused on reviewing specific cases alleging waste, fraud abuse, or employee misconduct.[340] Commissioner Broce told the Subcommittee that she tasked OIG with reviewing CACGA's concerns because she believed they would conduct an independent review.[341]

### ii. Amidst ongoing OIG review, CACS sent DHS a 37-page document outlining additional systemic concerns in May 2022 which is never sent to OIG

On May 19, 2022, CACGA met with DHS Chief of Staff Craig Foster and Former Deputy Chief of Staff Matthew Krull and presented a list of systemic concerns that the CACs continued to experience with DFCS, attaching 37 pages of examples compiled from CACs across the state ("May 2022 CACGA Submission").[342]

Some of the systemic concerns laid out in the May 2022 CACGA Submission overlapped with the January 2022 CACGA email—for example, lack of communication with law enforcement and closure of cases before services were completed.[343] Other issues had not been presented in the January 2022 CACGA email, such as concerns about children in "imminent danger with no response," "inappropriate placements and referrals for CSEC [Commercial Sexual Exploitation of Children] victims," and "SB158 [a Georgia law that permits DFCS to take

---

336   Id.; Internal Georgia Department of Human Services Emails re: "DFCS Issues from CAC Perspective" (Jan.-Feb. 2022) at Bates No. GADHSSEN000680-89.
337   Id. at Bates No. GADHSSEN000015-16.
338   Id. at Bates No. GADHSSEN000015.
339   Subcommittee Interview with Georgia Office of the Inspector General Chief Investigator Scott Ellison (Sept. 19, 2023).
340   Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).
341   Subcommittee Interview with the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 18, 2023).
342   Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000771; Subcommittee Interview with Georgia Department of Human Services Chief of Staff Craig Foster (Oct. 10, 2023).
343   Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000011; Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000771.

emergency custody of trafficking victims and requires DFCS to refer trafficking victims for appropriate services] is not being used."[344]

in the May 2022 CACGA Submission, multiple CACs described concerns that DFCS was failing to keep children safe from abuse.[345] For example, a CAC in Blairsville wrote that "Towns County Sheriff's Office and Union County Sheriff's Office have consistently expressed concern… that their reports [of child abuse to DFCS] are often screened out" even when there are immediate concerns about child safety.[346] The Blairsville CAC reported that a DFCS employee explained that "DFCS does not respond to child-on-child crime because it does not involve abuse by parents" and pointed out that "children who are being abused by other children in the home are not being protected by their parents."[347]

Multiple CACs reported that DFCS either did not share information or had little to contribute because they were unprepared at Multidisciplinary Team meetings, which are meetings where teams of professionals including law enforcement, child protective services, medical professionals, and others involved in responding to potential child abuse or neglect formed to ensure a coordinated response.[348] A CAC in Paulding County described a case where "assistance from DFCS was requested multiple times, but a case manager was never sent to assist in this investigation [information redacted] How do we ensure that we will receive assistance from DFCS in an emergency situation, *which this very clearly was?*"[349] A victim advocate from a District Attorney's office wrote that DFCS "will find any reason to leave children in unsafe environments because there is nowhere to place them if they cannot find a relative who will take them in."[350]

The compilation also included a request for a child fatality review from the Director of Commercial Sexual Exploitation for CACGA, who noted her concern that "DFCS is screening out CSEC cases."[351] The deceased child had a history of running away and a 50-year-old "boyfriend."[352] CACGA noted that the deceased

---

344   Id.
345   Id.
346   Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000777.
347   Id. at Bates No. GADHSSEN000778.
348   See e.g. id. at Bates No. GADHSSEN000778-79 (describing lack of participation in MDTs in Towns and Union, Carrollton, and Columbus counties. The Towns and Union County CAC reported that "The Towns and Union County Multidisciplinary Meetings are another example of the disorganization and inability to prioritize by DFCS. A local DFCS employee attends each time but usually has no updated information about each case. They are searching for cases as we go through the meeting, causing hold ups in the meeting. They often do not have notes available to them to answer simple questions, such as if the victim child is in therapy." The Carrollton CAC reported that "DFCS has little if anything to say at MDT. Will not expound on answers." The Columbus CAC reported that DFCS was "not sharing at MDT."); U.S. Department of Justice Office of Justice Programs, Office of Juvenile Justice and Delinquency Prevention, Forming a Multidisciplinary Team to Investigate Child Abuse (Mar. 2000), available at https://www.ojp.gov/pdffiles1/ojjdp/170020.pdf.
349   Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000782.
350   Id. at Bates No. GADHSSEN000790.
351   Id. at Bates No. GADHSSEN000805.
352   Id. at Bates No. GADHSSEN000803-06. Deputy Commissioner Mary Havick agreed that the description of the child's behaviors were indicators of commercial sexual exploitation. Subcommittee Interview with the Deputy Commissioner of Child Welfare at the Georgia Department of Human Services Mary Havick (Sept. 12, 2023).

child "had multiple intakes in 2021 with DFCS" and the last one was screened out in June 2021.[353] CACGA lost contact with the child shortly thereafter.[354] The child was ultimately murdered and her body was found approximately nine months later.[355]

This May 2022 CACGA Submission was briefed to Mr. Krull and Mr. Foster while the OIG investigation into the January 2022 CACGA concerns was ongoing.[356] However, at no time did anyone in DHS leadership provide this submission to OIG to assist in its ongoing investigation of CACGA's complaints.[357] Inspector General David LeNoir, Chief Investigator Scott Ellison, and Lead Investigator Hailey Kraut all said they were unaware of the May 2022 CACGA Submission.[358] Inspector General LeNoir told the Subcommittee that he would have expected the OIG investigative team to review the May 2022 CACGA Submission if they had been aware of it.[359]

### iii. DFCS analyzes the May 2022 CACGA submission and corroborates some systemic concerns

Following the May 19, 2022 meeting between CACGA and Mr. Krull and Mr. Foster, DFCS reviewed, at least in part, the systemic concerns presented in the May 2022 CACGA Submission ("DFCS Analysis of CACGA Concerns").[360] The DFCS Analysis of CACGA Concerns is unsigned.[361] OIG told the Subcommittee it was not involved in—or even aware of—DFCS' analysis of these concerns.[362]

DFCS reviewed a sample of cases and appears to have reviewed at least part of the documentation provided by the CACs.[363] Based on the sample review, the DFCS Analysis of CACGA Concerns reported no evidence of "mass, indiscriminate screening-out of sexual abuse referrals" and generally found the screen-outs in the

---

353  Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000803-06.
354  Id.
355  Id.
356  Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000771; Subcommittee Interview with Georgia Department of Human Services Chief of Staff Craig Foster (Oct. 10, 2023).
357  Subcommittee Interview with Department of Human Services Chief of Staff Craig Foster (Oct. 10, 2023) (stating that he did not send the Submission to OIG when he received it). Neither former Deputy Chief of Staff Krull nor Commissioner Broce recall receiving the document at the time. Subcommittee Interviews with the former Georgia Department of Human Services Deputy Chief of Staff Matthew Krull and the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 3, 2023 and Oct. 18, 2023).
358  Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively).
359  Id.
360  Georgia Division of Family & Children Services response to Children's Advocacy Concerns (May 2022) at Bates No. GADHS-SEN000001.
361  Id.
362  Subcommittee Interviews with Georgia Inspector General David LeNoir and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023 and Sept. 15, 2023, respectively).
363  Georgia Division of Family & Children Services response to Children's Advocacy Concerns (May 2022) at Bates No. GADHSSEN000001. DFCS referred to one example provided by CACGA – the letter from Blairsville at Bates No. GADHS-SEN000008—but in other places in the report, DFCS states that it is unable to analyze systemic concerns without specific information provided by the CACs despite the fact that the CACs appear to have provided relevant information, e.g. regarding DFCS' lack of communication with law enforcement.

sample review to be "reasonable and justified," but identified "premature closures, friendly visits (versus assessment-based contacts), and inconsistent supervisory oversight" as "practice issues" that DFCS was aware of that were "reinforced" by the CACGA submission.[364] DFCS also noted that additional clarity was needed on the use of SB-158, which the CACs perceived to be "more of an asset and value" than DFCS.[365] Additionally, DFCS apparently agreed with the CACs that "Family Preservation Services are not being used to address" the systemic issues identified in the CACGA Submission, responding that "Family Preservation is likely underutilized in terms of addressing the core families its designed to serve while likely overutilized for lower- risk families and to finalize investigations."[366]

The DFCS Analysis of CACGA concerns addresses some, but not all, evidence compiled by CACGA in the May 2022 CACGA Submission. DFCS referred to an example (fully redacted in the copy of the DFCS Analysis provided to the Subcommittee) in the May 2022 CACGA Submission from the Blairsville CAC as evidence that DFCS did not always screen out sibling-on-sibling sexual abuse.[367] However, the DFCS Analysis seems to ignore other relevant evidence from the same May 2022 CACGA Submission. For example, DFCS concluded that it was unable to analyze concerns that DFCS was not following its protocols with respect to suspected commercial sexual exploitation of children ("CSEC") victims or respond appropriately in instances where parents identified that they could not keep children safe from CSEC "at face value," without acknowledging the child fatality case described by CACGA involving CSEC where the deceased child's mother could not keep her safe that was screened out by DFCS.[368] Likewise, DFCS states that it was unable to analyze concerns regarding lack of communication between DFCS and law enforcement "at face value" and does not assess the letter from the Blairsville CAC describing difficulties experienced by Towns and Union County Sheriffs offices coordinating with DFCS.[369]

DFCS noted that several of the CAC concerns "speak to the need for clear communications between DFCS and CACs" without assessing the merit of the concerns.[370] DHS told the Subcommittee that it attempted to improve communication with the CACs by resuming regular meetings between DFCS staff and the CACs that had been in place previously.[371] DFCS also began holding breakfasts between DFCS staff and law enforcement to improve communication.[372]

---

364   Id.
365   Id. at Bates No. GADHSSEN000003-04.
366   Id. at Bates No. GADHSSEN000005.
367   Id. at Bates No. GADHSSEN000008.
368   Id. at Bates No. GADHSSEN000003; GADHSSEN000005.
369   Id. at Bates No. GADHSSEN000004.
370   Id. at Bates No. GADHSSEN000003- GADHSSEN000005.
371   Subcommittee Interview with Department of Human Services Chief of Staff Craig Foster (Oct. 10, 2023).
372   Id.

### iv. OIG Conducts limited review of January 2022 CACGA complaint, dismisses and belittles CAC concerns

On June 27, 2022, OIG issued a report analyzing the January 2022 CACGA Email.[373] OIG found that "while it may appear to CAC staff that DFCS may have made some questionable 'judgment calls' regarding various cases, OIG finds no information to suggest that DFCS staff made any egregious decisions or errors in any of the three listed cases… case records that we examined do not show or have not revealed any type of systemic issues within DFCS, as were alleged by CAC in their complaint to the Commissioner… Are the issues [CACGA] pointed out systemic? OIG is unable to gauge and/or determine if that claim is true, as the specific examples provided did not represent a fair sampling of all the offices (DFCS and CACs)."[374]

OIG's analysis, however, was limited in scope from the outset. OIG reviewed only the three cases cited by CACGA as examples in their February 1, 2022 email to Chief Investigator Ellison for violations of DFCS policies and noted that "our review and findings are based primarily on the information that was available for us to review in *GA SHINES* [the state's child welfare information database]. As such, this review is only as good as the information that was entered in the case records by DFCS staff, as well as the information that was provided to the OIG staff by the CAC"[375]—an important caveat, because in Quality Assurance reviews, DFCS has documented instances where case records in the database have been falsified[376] or were incomplete.[377]

OIG did not conduct any interviews during its investigation into the January 2022 CACGA Email and did not follow up with CACGA on their offer in response to Mr. Ellison's initial email outreach to provide additional information from across the state illustrating their concerns.[378] According to OIG staff, the decision not to conduct

---

373  Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000009.

374  Id. at Bates No. GADHSSEN000029-30.

375  Id.

376  See e.g. Child Welfare Quality Assurance Review, Region 8, reviewing cases from 2019 -2020 and noting that interviews reflected considerable falsification of contacts with the family on a Family Preservation Case at Bates No. GADHSSEN001085; see also Draft media response in connection with inquiries related to a child fatality case, noting that "the case worker falsified details in the DFCS case notes" to reflect that a home visit by law enforcement showed adequate sleep arrangements, food, and utilities, when body camera footage showed that the law enforcement did not actually observe those conditions at Bates No. GADHS-SEN012189.

377  See e.g., Clayton Child Welfare Quality Assurance Review, Semi-Annual Executive Summary, Clayton County, reviewing cases from 2019, noting that multiple cases had "face plates of contacts with no documentation" at Bates No. GADHSSEN001158, GADHSSEN001162. According to an August 1, 2023 DFCS memo re: "Case Record Integrity" explains that face plating refers to entries in SHINES that record the date and time of contact with a family but do not include any additional information, which "can endanger children just as much as a falsely documented contact." In an interview with the Subcommittee, Chief Investigator Scott Ellison acknowledged that information in SHINES could be incomplete (Sept. 19, 2023).

378  Ellison told the Subcommittee that he did not believe any interviews took place in the course of the investigation into the January 2022 CACGA concerns. Ms. Kraut and Mr. Ellison told the Subcommittee that any witness interviews would typically be included in a witness list at the end of a report; no witness interviews are documented in the report concerning the January 2022 CACGA concerns. Subcommittee Interviews with Georgia Office of the Inspector General Chief Investigator Scott Ellison and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 19, 2023 and Sept. 15, 2023, respectively); Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000036.

interviews in this case represented a deviation from OIG's standard practice. In an interview with the Subcommittee, OIG's lead investigator, Hailey Kraut, explained that in her experience, "there has never been a case where the complaint-maker wasn't interviewed" before the investigation into the January 2022 CACGA Email.[379] Inspector General LeNoir told the Subcommittee that while he would not necessarily have expected his staff to conduct interviews in every case, he would have expected his staff to interview CACGA in this case to understand the nature of their concerns, but ultimately signed off on the report without objecting to the lack of interviews.[380]

OIG's analysis of the systemic concerns raised by CACGA consisted only of evaluating the three example cases cited by CACGA.[381] Because OIG had not been provided with the further May 2022 CACGA Submission, it was unable to analyze any of the additional case examples and reports provided by CACGA from across the state.[382] OIG was also unaware that DFCS had conducted a separate review of the May 2022 CACGA Submission and confirmed there were multiple "practice challenges" at DFCS related to the issues raised by CACGA.[383]

OIG did not review any other internal documents analyzing DFCS' performance to determine whether there may have been indicia of systemic operational problems, such as Quality Assurance Reports analyzing CFSR data, or Critical Incident Reports.[384] When asked if his office would have conducted a different type of analysis if he wished to establish whether the complaints CACGA relayed were systemic, Inspector General LeNoir replied that he would have performed a broader case review and statistical analysis, and that OIG "would have [done that analysis] if we were asked to do so."[385] In this case, he said, "we were not asked [by Commissioner Broce]."[386]

As a result of the limited scope of review, OIG concluded that it was unable to analyze many of the systemic concerns without a specific example provided by the CACs.[387] If OIG had expanded the scope of its review, it

---

379  Subcommittee Interview with Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 15, 2023).

380  Subcommittee Interviews with Georgia Inspector General David LeNoir (Sept. 20, 2023).

381  Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000030-35.

382  Subcommittee Interview with Georgia Inspector General David LeNoir (Sept. 20, 2023) (stating that he would have expected OIG staff to review the May 2022 CAC Submission if they had access to it); Subcommittee Interview Georgia Office of the Inspector General Chief Investigator Scott Ellison (Sept. 19, 2023) (stating that OIG did not review the CACGA concerns in the May 2022 CAC Submission); Subcommittee Interview with Department of Human Services Chief of Staff Craig Foster (Oct. 10, 2023) (stating that he did not send the Submission to OIG when he received it). Neither former Deputy Chief of Staff Krull nor Commissioner Broce recall receiving the document at the time. Subcommittee Interviews with the former Georgia Department of Human Services Deputy Chief of Staff Matthew Krull and the Commissioner of the Georgia Department of Human Services Candice Broce (Oct. 3, 2023 and Oct. 18, 2023).

383  Subcommittee Interview with Georgia Inspector General David LeNoir (Sept. 20, 2023) (stating that he was not familiar with the DFCS report); Subcommittee Interview with Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (stating that she was not familiar with the DFCS analysis at Bates No. GADHSSEN00001).

384  Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively). Investigator Kraut was familiar with the reports but did not request any additional data. Id.

385  Subcommittee Interview with Georgia Inspector General David LeNoir (Sept. 20, 2023).

386  Id.

387  Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000030-35.

would have found potentially relevant information related to some of the concerns they determined they were unable to analyze.

For example, OIG claimed it was unable to analyze concerns regarding difficulties getting in touch with DFCS staff "on the ground" and lack of communication between DFCS and law enforcement.[388] But OIG never conducted any interviews to investigate this issue — again, a deviation from standard investigative practice according to its own staff. If OIG had reviewed the May 2022 CACGA Submission, which was in DHS's possession at the time, it would have seen a letter from a CAC in Blairsville describing difficulties experienced by local sheriffs' offices coordinating with DFCS.[389]  It would have also seen a letter from a CAC in Paulding County expressing concern that it was unable to secure DFCS' assistance in a critical situation and providing timeline of the CAC's unsuccessful attempts to get in touch with DFCS caseworkers.[390]

The report does not contain any analysis of CACGA's concern in the January 2022 CACGA Email that "DFCS has no concrete, evidence-based, cohesive response to allegations of sexual abuse against juveniles."[391] In the May 2022 CACGA Submission that OIG did not review, the Blairsville CAC identified a DFCS employee who stated that DFCS had a policy of not responding to child-on-child crime, including sexual abuse, and expressed concern that DFCS refused to intervene in these cases given that the parents may be unable to protect the children being victimized in their homes.[392] If OIG had interviewed personnel at the Blairsville CAC or the DFCS employee who reported the alleged non-intervention policy, it could have obtained relevant information regarding the merit of CACGA's concerns.

In response to CACGA's concern that DFCS may not be aware of the authority they have to "assist families or mandate services" and "if they do, they are not exercising it," OIG replied that CACGA's concern suggested that DFCS staff "are ignorant" and found the concern to be "trivial, petty, meritless, and without substance, as [CACGA] provided no specific examples of situations that would support this claim… OIG staff entertain the possibility that CAC's complaints and concerns regarding the agency appear to have resulted from CAC staff becoming annoyed, offended, or simply upset that DFCS staff do not give CAC staff the authority and priority that they (CAC staff) seem to believe they are entitled to."[393]

---

388   Id. at Bates No. GADHSSEN000031-32.
389   Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000773.
390   Id. at Bates No. GADHSSEN000784-85.
391   Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000033.
392   Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000778.
393   Georgia Office of Inspector General Report of Investigation into Complaint by Children's Advocacy Centers of Georgia (June 27, 2022) at Bates No. GADHSSEN000034.

In the Subcommittee's view, it is startling and improper that OIG would engage in pejorative speculation that CAC reports of failures to protect children were motivated by personal animus or jealousy, particularly given the wealth of internal reporting and assessment available to OIG which, if reviewed, may have substantiated many of the concerns raised by the CACs.

For example, if OIG had reviewed the agency's publicly available 2021 Annual Progress and Services Report, it could have found that DFCS itself reported that "the State of Georgia continues to struggle with providing services to protect children in home and prevent removal or re-entry into foster care"[394] and identified "lack of critical thinking" and "lack of policy knowledge" as "gaps" contributing the agency's failure to provide needed services to families.[395]

### v. OCA Reviews and Substantiates CACs' Concerns

In June 2022, OCA investigated complaints from the CACs that Georgia DFCS systemically fails to protect children who the CACs report are victims of physical or sexual abuse.[396] OCA reviewed eight cases identified by the CACs as illustrative of their concerns.[397] In a letter dated July 19, 2022 (the July 2022 OCA Letter), OCA found that "[i]n all of the cases reviewed," DFCS "failed to take adequate steps to respond to allegations of physical and sexual abuse" and that the systemic issues identified by the CACs reflected problems encountered by OCA throughout the state.[398] In the letter, OCA noted that DFCS had been made aware of these systemic issues ten months prior, and explained that "[i]n order to accelerate corrective action from Georgia DFCS, OCA was contacted to objectively review" CACGA's concerns.[399]

The systemic issues identified by the CACs and confirmed by OCA included the following:

- Multidisciplinary Teams ("MDTs") report to DFCS that specific children are in imminent danger and DFCS does not respond.

- DFCS closes substantiated cases of abuse and neglect without creating or requiring completion of any case plan or otherwise ensuring that the recommendations provided by the MDT are followed.

- Placements and services for suspected victims of CSEC, sexual abuse, or physical abuse are often inappropriate or inadequate.

---

394  Georgia Department of Human Services Division of Family & Children Services, State of Georgia 2014-2019 Child and Family Services Plan, 2021 Annual Progress and Services Report at p. 91, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553.
395  Id.
396  Office of the Child Advocate letter to the Georgia Division of Family and Children Services (July, 19, 2022) at Bates No. GADHSSEN000037.
397  Id.
398  Id. In a May 11, 2022 interview with the Subcommittee, OCA explained that the systemic issues described in the July 2022 OCA Letter reflected CACGA's findings, and that while OCA substantiated those findings and felt that they reflected OCA's experience, the findings did not originate with OCA.
399  Office of the Child Advocate letter to the Georgia Division of Family and Children Services (July, 19, 2022) at Bates No. GADHSSEN000037.

- Voluntary kinship placements [where DFCS places a child with a relative, with the consent of the parent or legal guardian, because there are safety threats in the home[400]] are not being properly vetted and CACs have reported cases where children are placed in the homes of people with histories of sex crimes or DFCS involvement.[401]

OCA Deputy Director Jenifer Carreras sent the July 2022 OCA Letter to Commissioner Broce, Mr. Foster, and Mary Havick, the Deputy Commissioner for Child Welfare.[402] OCA explained in an interview to the Subcommittee that it intended for this letter to be "an opening statement in a conversation that we'd flush out more" and that they did not send the evidence supporting the CACs' concerns that they had received from the CACs because OCA understood that DHS already had a copy of that evidence.[403]

### vi. Commissioner Broce asks Inspector General to "refute" OCA's findings of systemic failures

On July 20, 2022, Commissioner Broce forwarded Ms. Carreras's email, including the July 19, 2022, OCA Letter, to Inspector General LeNoir.[404] Commissioner Broce wrote, "Since your team did a thorough review of these cases, is it possible that they could take each of these findings and refute them?"[405] In fact, at that time, OIG had not reviewed the concerns articulated in the July 19, 2022, Letter or most of the cases cited by OCA[406] nor, as previously discussed, had the review undertaken to date been "thorough."

Inspector General LeNoir agreed to ask his team to draft a "rebuttal" and asked if Commissioner Broce had a timeline in mind.[407] Commissioner Broce replied that there was no timeline, she just wanted "as thorough and strong of a rebuttal as possible" and stated that OCA's reviews "lack the level of due diligence we internally afford a complaint."[408] Commissioner Broce caveated that if OIG found that OCA's conclusions were accurate, she would wholeheartedly accept their recommendations.[409]

Inspector General LeNoir told the Subcommittee that if Commissioner and DFCS Director Broce's request to "refute" OCA's allegations were "[taken] at its plain meaning" it would compromise the independence of an

---

400  Georgia Department of Human Services Division of Family & Children Services, Child Welfare Policy Manual, Chapter 22, Policy No. 22.1 (December 2020).
401  Office of the Child Advocate letter to the Georgia Division of Family and Children Services (July, 19, 2022) at Bates No. GADHSSEN000039.
402  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000041-42.
403  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023).
404  Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009307-08.
405  Id.
406  Subcommittee Interview with Georgia Inspector General David LeNoir (Sept. 20, 2023).
407  Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009302.
408  Id.
409  Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009307.

OIG inquiry.[410] Inspector General LeNoir told the Subcommittee that he interpreted Commissioner Broce's request to be for an independent review, despite the language she used, and Commissioner Broce told the Subcommittee that she expected OIG to undertake an independent review.[411] Inspector General LeNoir also told the Subcommittee that he and his team sought to perform an independent and objective review.[412] Yet, Inspector General LeNoir's email in reply to Commissioner Broce shows that he agreed to provide a "rebuttal" of OCA's concerns.[413]

### vii. OIG Dismisses OCA's allegations based on limited scope review

In August 2022, OIG released a report purporting to analyze the issues raised in the July 19, 2022, OCA Letter.[414] The report concluded that OIG was "unable to confirm or refute most of the concerns identified in OCA's correspondence… this is primarily based on an overall lack of specific information necessary to identify cases associated with these concerns."[415]

OIG concluded that OCA "received some concerning information about DFCS from [a single CAC], and they either did not investigate thoroughly or only made a cursory attempt to investigate the situation before developing a document that directs the DHS Commissioner to immediately enact changes in how DFCS operates… had OCA conducted a detailed review of those cases, they would have seen what OIG did, that all the cases were based out of two neighboring counties which make up one judicial circuit and are served by the same CAC." [416]

OIG continued, "OCA apparently took the information it had received at face value. OCA then zeroed in on DFCS, suggesting that changes be immediately implemented without providing any specific information to explain why they felt those changes were needed. Surely, OCA cannot expect this agency to enact change in the manner they suggest, simply because they suggested it when they have provided this agency with no specific information in which to acknowledge or refute the assertions that were made. Quite frankly, it seems that OCA staff are saying 'we've told you there is a problem, now figure out what the problem is, because we aren't going to give you any information, and then figure out how you (DFCS) are going to fix it.'"[417]

---

410  Subcommittee Interviews with Georgia Inspector General David LeNoir (Sept. 20, 2023).
411  Id.
412  Id.
413  Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (July 20, 2022) at Bates No. GADHSSEN009302. At the time of Inspector General LeNoir's interview with the Subcommittee, DHS had not produced the full email exchange between Commissioner Broce and David LeNoir. The Subcommittee was only able to ask questions about an incomplete version of the email exchange that had been produced at the time. Id.
414  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000040-81.
415  Id. at Bates No. GADHSSEN000069.
416  Id.
417  Id.

OIG, believing that the only support for OCA's concerns came from a single CAC, spent 12 pages of its report analyzing the relationship between DFCS and that single CAC. [418] OIG concluded that the director of that CAC "has a habit of manipulating situations or circumstances for her benefit… OIG staff are perplexed as to why [the CAC Director] feels she should have an opinion on how DFCS cases handled… [she] *needs to stay in her lane.*"[419] OIG expressed concern that the CAC staff "become upset and lash out at DFCS staff" when they were not able to access information, and that "they are publicly "*bashing*" the agency.[420] OIG noted that the director of the CAC had been asked to step down in a letter that was jointly signed by DFCS and local law enforcement.[421]

Once again, OIG's investigation was limited in scope. Unlike the inquiry into the January 2022 CACGA Email, OIG did conduct interviews this time, speaking to DFCS staff in Region 1 as well as Mary Havick, Deputy Director of Child Welfare.[422] OIG also spoke with OCA to seek additional information regarding cases reviewed by OCA and requested additional documentation from OCA, which OIG told the Subcommittee OCA did not provide.[423] OIG still never spoke to anybody at CACGA or the CACs to understand the nature of their concerns.[424] As with its analysis of the January 2022 CACGA Email, OIG did not review the May 2022 CACGA Submission, the May 2022 DFCS Analysis of CACGA Concerns, or any systemic analysis of operational issues at DFCS.[425] Deputy Commissioner of Child Welfare Mary Havick told the Subcommittee that CFSR and quality assurance data would have been a critical resource in assessing whether the types of systemic concerns described by OCA occurred at DFCS.[426] Deputy Commissioner Havick also told the Subcommittee that nobody from OIG asked her for guidance on how they might analyze the systemic concerns described by OCA.[427]

Setting aside the substance of the supporting evidence provided by the CACs in the May 2022 CACGA Submission—much of which is redacted—the fact that the May 2022 CACGA submission provided information from several counties across the state[428] would have undermined one of the underlying premises of OIG's dismissal of OCA's findings, that the concerns originated with a single CAC.[429] The May 2022 CACGA

418  Id. at Bates No. GADHSSEN000057-69.
419  Id. at Bates No. GADHSSEN000067 (emphasis in original).
420  Id. at Bates No. GADHSSEN000068 (emphasis in original).
421  Id. at Bates No. GADHSSEN000054-55.
422  Id. at Bates No. GADHSSEN000081.
423  Id. at Bates No. GADHSSEN000052; Subcommittee Interview Georgia Office of the Inspector General Chief Investigator Scott Ellison (Sept. 19, 2023).
424  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000081.
425  Subcommittee Interviews with Georgia Inspector General David LeNoir, Georgia Office of the Inspector General Chief Investigator Scott Ellison, and Georgia Office of the Inspector General Internal Investigations Unit Lead Investigator Hailey Kraut (Sept. 20, 2023, Sept. 19, 2023, and Sept. 15, 2023, respectively) (all confirming that OIG had not seen the May 2022 CACGA Submission). Investigator Kraut acknowledged that the investigative team did not review any systemic analysis. Id.
426  Subcommittee Interview with Deputy Commissioner Mary Havick (Sept. 2023).
427  Id.
428  Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000771-807.
429  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000069.

Submission also provided relevant examples that touched on systemic issues identified by OCA that were dismissed by OIG because they were not aware of specific illustrative cases. For example, the May 2022 CACGA Submission included a child fatality case review request stating that "DFCS is screening out CSEC cases,"[430] which would have been relevant to the analysis of OCA's concern that "DFCS is not following the statutory and policy referral requirements for suspected CSEC victims established by SB 158."[431]

Likewise, the May 2022 DFCS Analysis of CAC Concerns would have undermined OIG's conclusion that there was a lack of evidence of systemic failures. DFCS itself concluded that several of the concerns identified in OCA's letter were in fact acknowledged "practice issues."[432] For example, OIG concluded that there was insufficient evidence to assess OCA's concern that "DFCS closes substantiated cases without creating or requiring completion of any case plan" because "OCA failed to cite a specific case."[433] In the May 2022 DFCS Analysis of CAC Concerns, in response to a recommendation from the CACs that DFCS keep "cases open and have case plans in place," DFCS reported that "premature closures" were an identified practice issue.[434]

Finally, if OIG had reviewed DFCS reports analyzing its compliance with CFSR metrics, it could have found additional relevant evidence of potential systemic failures. For example, OCA reported that "Voluntary kin placements are not appropriately vetted and CACs have reported cases where children are placed in the homes of people with histories of sex crimes or DFCS involvement, and OIG found that because OCA failed to cite a specific case, OIG was unable to "adequately respond to the concern."[435] DFCS' 2022 Annual Progress and Services Report, released roughly six weeks before the OIG report, stated that Georgia was "trending in a negative direction" on CFSR child safety metrics and noted in particular that "[g]aps in safety assessment [were] increasingly prevalent in relative/voluntary kin placements."[436] In addition, internal quality assurance reports described cases where children were placed with relatives who had not undergone proper vetting and had prior criminal or DFCS history.[437]

430  Notes from Meeting with Craig Foster and Matthew Krull (May 19, 2022) at Bates No. GADHSSEN000803-807.
431  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000048. The Subcommittee also heard testimony from a Deputy District Attorney recounting an incident where DFCS refused to take emergency custody of a child who had been trafficked under SB 158 and as a result, the child was returned home where she was revictimized. Abuse in Foster Care: A Deeper Look, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Nov. 6, 2023) (Testimony of Earnelle Winfrey, Deputy District Attorney in the Special Victims Division, Fulton County), available at https://www.judiciary.senate.gov/committee-activity/hearings/abuse-in-foster-care-a-deeper-look.
432  Georgia Division of Family & Children Services response to Children's Advocacy Concerns (May 2022) at Bates No. GADHSSEN000001.
433  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000048.
434  Georgia Division of Family & Children Services response to Children's Advocacy Concerns (May 2022) at Bates No. GADHSSEN000003.
435  Georgia Office of Inspector General Report of Investigation into Office of the Child Advocate Concerns (Aug. 16, 2022) at Bates No. GADHSSEN000051.
436  Georgia Department of Human Services Division of Family & Children Services, DFCS Annual Progress and Services Report for FY 2023 (June 30, 2022) at pp. 44-45, available at https://www.acf.hhs.gov/cb/cfsp-apsr-state-reports#GA_25553.
437  Child Welfare Quality Assurance Review, Annual Executive Summary, Region 8 at Bates No. GADHSSEN001084-85.

**viii. DHS Relies on limited-scope OIG review to publicly deny OCA's report of "systemic" failures to protect children**

Inspector General LeNoir sent the OIG report to Commissioner Broce on August 16, 2022.[438] Commissioner Broce replied to Inspector General LeNoir that the report "was one of the most thorough case reviews [she had] ever seen."[439]

Commissioner Broce did not send the OIG report to OCA until the *Atlanta Journal Constitution* began looking into OCA's concerns in November 2022 and only upon request from OCA after OCA heard about the report from other sources.[440] OCA told the Subcommittee that DHS never substantively discussed the OIG report with them.[441]

In its story regarding OCA's allegations of systemic failures, the *Atlanta Journal Constitution* reported that DHS "vehemently disagree[d], saying that OCA failed to provide any evidence backing up its claim of widespread, systemic failures within DFCS that leave children in danger." [442] The *Atlanta Journal Constitution* reported that in response to OCA, "the state's Office of the Inspector General, an internal investigations unit at DHS, said that the allegations in the report were not backed by evidence."[443] Jerry Bruce, the Director of OCA, responded in a statement that "OCA stands by the results of its investigation."[444]

## H. DHS is weakening independent oversight of Georgia's child welfare system by taking over the selection of members of Georgia's Citizen Review Panels

To qualify for federal funding under the Child Abuse Prevention and Treatment Act ("CAPTA"), each state must create panels of volunteers and child welfare experts—representative of their communities—who scrutinize, review, and make recommendations to the state's child welfare system in an annual report.[445] These panels are called Citizen Review Panels ("CRPs"), and their oversight is a critical accountability mechanism for child welfare.[446] From 2006-2023, Georgia had three CRPs: the Child Protective Services Advisory Committee

438  Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (Aug. 30, 2022) at Bates No. GADHSSEN009299.
439  Id. at Bates No. GADHSSEN009298.
440  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023) (stating that OCA did not receive a reply until the Atlanta Journal Constitution began inquiring about the matter); Georgia Department of Human Services Commissioner Candice Broce email exchange with Georgia Inspector General David LeNoir (Nov. 4, 2022) at Bates No. GADHSSEN009300.
441  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (May 11, 2023)
442  Katherine Landergan, Child's Death, Other Breakdowns Raise Questions for DHS, Atlanta-Journal Constitution (Dec. 1, 2022), available at https://www.ajc.com/news/atlanta-news/childs-death-other-breakdowns-raise-questions-for-dfcs/C5UUBQXX-4ND6TGIQTMARJLFYSE/
443  Id.
444  Id.
445  42 U.S.C. § 5106a(c).
446  Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law, 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services), available at https://www.judiciary.senate.gov/committee-activity/hearings/protecting-the-human-rights-of-foster-children.

("CPSAC"), the Children's Justice Act Task Force ("CJATF"), and the Child Fatality Review Panel ("CFRP").[447] For the last 16 years, DFCS contracted with an external entity, Care Solutions, to coordinate and independently staff the CRPs with knowledgeable experts across Georgia.[448]

Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth and Families at HHS, testified before the Subcommittee about the importance of CRPs: "Having citizens of the community, as part of an assessment process, and digging into doing case reviews, and giving a non-agency perspective on what's happening around a particular case, or overall in regards to the agency's practices, is important to be able to have diverse perspectives and insight into what's happening, in order to be able to really fully continue to focus on and continued improvement, in practice, and striving for better and better outcomes."[449]

Georgia's CPSAC raised concerns about failures to keep children safe in the 2019 and 2021 CAPTA Panel Annual Reports. In 2019, the CPSAC noted that DFCS' rate of compliance with federal standards on risk assessment and safety management had declined and warned "that a rigorous evaluation is needed to determine a cause for declined performance" on the CFSR metric tracking risk assessment and safety management, from 43% compliance in the 2015 CFSR to 28% compliance in 2019.[450] In their 2021 report, the CPSAC wrote that concerns about the CFSR metric tracking risk assessment and safety management "continued to dominate discussions" and noted the lack of "significant progress" improving performance.[451] DFCS responded that a root cause analysis and continuous quality improvement initiatives were underway.[452]

In the 2022 CAPTA Review Panel Annual Report, CPSAC raised concerns about DFCS' workforce capacity, noting that 20% of supervisory positions and 40% of caseworker positions were open at any given time.[453] CPSAC stated that "several workforce retention strategies have been implemented, yet turnover remains high"[454] and recommended a joint evaluation of the effectiveness of retention strategies. DHS acknowledged the

---

447  See Georgia Department of Human Services Division of Family & Children Services, CAPTA Review Panels, available at https://dfcs.georgia.gov/services/child-abuse-prevention-treatment-act-citizen-review-panels/capta-citizen-review-panels.

448  See Care Solutions Contract at Bates No. GADHSSEN000829-914; Recording of September 2023 meeting where a panelist stated that Care Solutions coordinated the panels for 16 years, infra, at note 428.

449  Protecting the Human Rights of Foster Children, Hearing Before the Senate Judiciary Subcommittee on Human Rights and the Law. 118th Cong. (Dec. 14, 2023) (Testimony of Rebecca Jones Gaston, Commissioner of the Administration on Children, Youth, and Families, at the Administration for Children and Families within the U.S. Department of Health and Human Services).

450  Georgia Child Abuse Prevention & Treatment Act, Citizen Review Panels, 2019 Annual Report (June 22, 2020) at 41, available at https://dfcs.georgia.gov/capta-panel-annual-reports.

451  Georgia Child Abuse Prevention & Treatment Act, Citizen Review Panels, 2021 Annual Report at 15, available at https://dfcs.georgia.gov/capta-panel-annual-reports.

452  Georgia Department of Human Services Division of Family & Children Services, 2021 Child Abuse Prevention and Treatment Act Panel Recommendations and Agency Response (June 2022) at 3-4, available at https://dfcs.georgia.gov/capta-panel-annual-reports.

453  Georgia Child Abuse Prevention & Treatment Act, CAPTA Program Panel Report (2022) at 11-12, available at https://dfcs.georgia.gov/capta-panel-annual-reports.

454  Id.

recommendation and stated that it would share it with the Office of Human Resources.[455]

The Subcommittee obtained a DFCS internal memorandum dated August 1, 2023, announcing that DFCS—not Care Solutions—will coordinate and staff all future CRPs to "better streamline operations and provide easier access to information for panel review and recommendations."[456] DFCS replaced the existing panels with three panels divided by geographic region: North, South and Metro.[457] Deputy Commissioner Mary Havick explained to the Subcommittee that DFCS' Director of Federal Plans, Arleymah Gray, proposed to move the panels in-house.[458]

Ms. Gray reported these decisions at a September 2023 meeting with current and former CRP panel members. The Subcommittee obtained a recording of this meeting.[459] Although Deputy Commissioner Havick attributed the idea to restructure the CRPs to Ms. Gray, Ms. Gray stated that the decision was made by DFCS leadership.[460] Experts and advocates immediately sounded the alarm that DFCS would moderate the information coming from the CRPs and suppress candid feedback from the child welfare community.[461] One panel member asked whether "DFCS recognize[s] that it does look suspicious that they're internalizing an independent review process."[462] Ms. Gray stated that she "[could not] speak to how, you know, leadership would perceive that."[463] Two panel members raised concerns that having DFCS coordinate the panels would prevent panelists, who may receive grants or partner with DFCS, and DFCS staff from openly discussing their concerns.[464] Ms. Gray did not directly respond to those concerns.[465]

OCA and others expressed concern to the Subcommittee that the transition to internal coordination of CRPs will limit external accountability for the agency.[466] In interviews with the Subcommittee, multiple CRP members —who spoke anonymously because they feared retaliation from DFCS— expressed concern that moving the CRPs in-house would undermine transparency and oversight.[467] For example, one former CRP

---

455  Georgia Department of Human Services Division of Family & Children Services, 2021 Child Abuse Prevention and Treatment Act Panel Recommendations and Agency Response (June 2023) at 6, available at https://dfcs.georgia.gov/capta-panel-annu-al-reports.

456  DFCS Internal Memorandum to Georgia's CAPTA Citizen Review Panels, from Mary Havick, Deputy Commissioner for Child Welfare, August 1, 2023, Re Transition Process, at 2.

457  December 20, 2023 Letter from Consovoy McCarthy to the Subcommittee, GADHSSEN009446.

458  Subcommittee Interview with Deputy Commissioner Mary Havick (Sept. 2023). Deputy Director Havick stated that she was "involved" in the decision to move the CRPs in-house, but said that the idea was Ms. Gray's. Id.

459  Georgia CAPTA Panel Retreat, Recording of Interview (Sept. 2023), available at https://us02web.zoom.us/rec/share/7nY-TQCeUK7IY7-V9CBXALcAho6mQwhuvSeBFDLFExFfl8tYQh3omOWTHFY7Ko30.4g9mbaQGXoAW2JfX Passcode: 27Uz#HjD.

460  Id.

461  Id.

462  Id.

463  Id.

464  Id.

465  Id.

466  Subcommittee Interview with the Director of the Georgia Office of the Child Advocate Jerry Bruce and Deputy Director Jenifer Carreras (June 26, 2023); Subcommittee Interviews with Citizen Review Panelists Who Wish to Remain Anonymous (n.d.).

467  Subcommittee Interviews with Citizen Review Panelists Who Wish to Remain Anonymous (n.d.).

member described having DFCS staff the panels as a "blow to [CRPs'] independence."[468] Another former CRP member stated that the transition of the panels was an example of DFCS being in "crisis management mode," an "attempt to control the panels' output," and as "wanting less external chiming in while [DFCS] figure[s] out what's up."[469] Two juvenile court judges also expressed concern that moving the panels in-house at DFCS could undermine their independence.[470]

There is no federal requirement that the CRPs be coordinated by an independent entity. However, considering the serious safety failures and mismanagement uncovered in this investigation, the Subcommittee shares the concerns of OCA and the former panel members that the in-house panels will undermine independent oversight and accountability at DFCS.

---

468   Subcommittee Interviews with Citizen Review Panelists Who Wish to Remain Anonymous (n.d.).
469   Subcommittee Interviews with Citizen Review Panelists Who Wish to Remain Anonymous (n.d.).
470   Interview with anonymous juvenile court judge, October 30, 2023; Interview with anonymous juvenile court judge, October 13, 2023.

# IV. Recommendations

Based on the above findings, the Subcommittee recommends:

1. HHS should request from Congress additional funding to support operation and oversight of state child welfare services. The State of Georgia should prioritize allocating the funding necessary to rectify longstanding staffing, placement, and technical deficiencies.

2. DFCS should implement urgent and focused management interventions to dramatically improve compliance with internal DFCS policies governing risk assessment and investigations of reported or suspected abuse or neglect aimed at improving conformity with CFSR Safety Outcome 2, Item 3: "making concerted efforts to assess and address risk and safety concerns relating to children in their own homes or in foster care." HHS should consider additional action to address Georgia DFCS' marked decline in keeping children safe and consistent failure to conform to federal safety standards. Congress should consider whether federal statutory changes are necessary to ensure HHS has the authorities and resources to identify and remedy failure or lack of capacity by state agencies, including any additional authorities needed to effectuate more agile interventions where oversight reveals health and safety risks to children.

3. Congress should assess whether legislative changes are necessary to ensure the independence of Citizen Review Panels. The State of Georgia should strengthen independent oversight of the child welfare system by establishing the independence of the DHS OIG from the Department's political leadership and preserving the independence of federally-mandated Citizen Review Panels.

4. DFCS should prioritize rigorous compliance with DFCS policies requiring criminal background checks for potential caregivers and prompt screening of caregivers for substance abuse.

5. HHS should exercise oversight over state agencies' practices with respect to the placement of youth who are at risk of or survivors of child sex trafficking. Congress should consider legislative changes to ensure HHS has the necessary authorities and resources to conduct such oversight. DFCS should diligently assess whether placements provide adequate services for youth who are either at risk of or survivors of child sex trafficking. DHS should implement a rigorous oversight and inspection regime to monitor safety and quality of care in all congregate settings and facilities including no-notice inspections and confidential interviews with youth to assess

the adequacy of their services.

6. HHS should report to Congress whether enhanced audits, oversight, or regulation of insurers may be warranted to ensure foster children's access to healthcare. The State of Georgia should ensure its relationship with insurers is structured to ensure adequate coverage and care coordination services to meet the health care needs of foster children.

7. DFCS should ensure that the use of psychotropic medication for foster children is appropriately managed and train staff to recognize and report signs of overmedication or contraindicated prescriptions.

8. The State of Georgia should improve access to and quality of legal representation in dependency and other child welfare cases, including by providing funding to ensure access to counsel. Federal funds may be available to support such efforts by the State.

9. HHS should strengthen state child welfare agencies' cooperation with NCMEC by providing technical assistance to ensure compliance with federal reporting requirements. Congress should determine whether legislative action may be necessary to address any identified barriers that prevent states from reporting children missing from care in compliance with federal law. DFCS should deepen its cooperation with NCMEC to fully understand the scope of potential sex trafficking of youth in the state's care.