IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KENNY A., by his next friend Linda
Winn, et al.,

     Plaintiffs,

        v.

DEPARTMENT OF HUMAN
RESOURCES OF THE STATE OF
GEORGIA, et al.,

     Defendants.

CIVIL ACTION FILE
NO. 1:02-CV-1686-TWT

## OPINION AND ORDER

This is an action to correct systemic issues in the foster care system of Fulton and DeKalb counties. It is before the Court on the Defendants' Motion to Terminate the Consent Decree [Doc. 793], the Plaintiff's Motion to Enforce the Consent Decree [Doc. 814], and the Defendants' Motion for a Hearing [Doc. 817]. For the following reasons, the Defendants' Motions to Terminate the Consent Decree [Doc. 793] and for a Hearing [Doc. 817] are DENIED, and the Plaintiff's Motion to Enforce the Consent Decree [Doc. 814] is also DENIED.

## I.  Background

The facts of this case are familiar to the parties, and the Court provides only brief background information here. The Plaintiffs are a class of children in Fulton and DeKalb Counties ("Region 14") who were removed from their family homes and placed into Defendants' custody. In 2002, the Plaintiffs filed this action in state court seeking declaratory and prospective injunctive relief

against the Defendants for statutory violations under state law and federal constitutional violations arising from the Defendants' operation of the foster care system. The Defendants then removed the action to this Court. The parties negotiated a consent decree to end the case, which the Court approved and entered in October 2005. The parties renegotiated the consent decree several times over the years, most recently in December 2016 ("2016 Consent Decree"). [Doc. 745-1]. The 2016 Consent Decree also includes an exit plan, which outlines a plan with specific obligations for the Defendants to meet in order to eventually terminate the consent decree. In early 2017, the parties further agreed to add a set of "Infrastructure Standards" to the decree and exit plan. [Doc. 757]. The Infrastructure Standards are enforceable obligations intended "to measure the foundational elements of the child welfare system that provides care, treatment, placements, services, and protection of the Plaintiff Class." (Infrastructure Standards, at 2); (2016 Consent Decree, at 20).

The 2016 Consent Decree includes 31 Outcome Measures ("OMs") for the Defendants to meet in furtherance of the parties' shared goals, with their performance measured at six and twelve-month intervals and classified as either "attained" or "ongoing." (2016 Consent Decree at 4-5, 9-15, 19). An OM is considered "attained" if, in the previous three consecutive reporting periods, the Defendants improved their performance in the first period and then met or exceeded the measure in the next two periods. (*Id.* at 19). The Defendants are

permitted to seek an order terminating the consent decree "[o]nce all of the outcome measures are designated as [a]ttained [o]utcome [m]easures, and there are no remaining [o]ngoing [o]utcome [m]easures." (*Id.* at 20). Since the 2016 Consent Decree and Infrastructure Standards were entered, the parties have routinely submitted their monitoring reports and briefs on infrastructure standards.

In September 2024, the Defendants filed their Motion to Terminate the Consent Decree [Doc. 793]. The Plaintiffs opposed the Motion and separately filed a Motion to Enforce the Consent Decree. [Doc. 814]. In June 2025, the Defendants notified the Court that a mediation on this matter had failed and moved for a status conference. [Doc. 817]. These Motions are presently before the Court.

## II.  Discussion

### A.  Defendants' Motion to Terminate [Doc. 793]

In moving to terminate, the Defendants argue that there have been significant factual and legal changes and "new policy insights" since the original consent decree was entered in 2005 that make continued enforcement inequitable. (Defs.' Mot. to Terminate, at 10-33). Specifically, the Defendants point to the introduction of Georgia's new juvenile code in 2013, structural and operational changes at DFCS implemented in 2009, 2014, and 2015, the introduction of the State of Hope initiative in 2018, the addition of the Office

of Health Law and Policy in 2022, and increased funding for DFCS workers. (*Id.* at 10-23). They also contend that the federal government has "dramatically increased" its oversight of child welfare systems since 2005. (*Id.* at 23-27). Additionally, the Defendants argue that no ongoing violations of federal law support continued enforcement of the decree, and that continued enforcement is against the public interest. (*Id.* at 33-58).

In response, the Plaintiffs argue that the Defendants are not in compliance with at least six OMs, negating their contention that they have substantially complied with the decree's terms. (Pls.' Opp. to Mot. to Terminate, at 23-25). Further, the Plaintiffs contend that none of the factual or legal changes relied upon by the Defendants were both significant and unforeseen. (*Id.* at 25-30). Regardless, they assert, the Defendants have not shown the implementation of a durable remedy to the Plaintiffs' allegations such that prospective relief is no longer warranted. (*Id.* at 31-54).

On motion and just terms, the Court can relieve a party from its order when the judgment has been satisfied, applying the order prospectively is no longer equitable, or for any other reason that justifies relief. Fed. R. Civ. P. 60(b)(5), (6). The party seeking termination "bears a heavy burden of persuasion" to justify termination. *Peery v. City of Miami*, 977 F.3d 1061, 1073 (11th Cir. 2020) (citation omitted). In an institutional reform case where the movant argues that enforcement of the consent decree is no longer equitable,

4

"a party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992). Modification or termination may be warranted when the factual conditions have changed such that "compliance with the decree [is] substantially more onerous;" when the "decree proves to be unworkable because of unforeseen obstacles; or continued enforcement of the decree would be "detrimental to the public interest." *Id.* at 384. However, a party may not seek modification of a consent decree on the grounds that "it is no longer convenient to live with the terms of a consent decree." *Id.* at 383. And to that end, "modification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree." *Id.* at 385 ("If it is clear that a party anticipated changing conditions that would make performance of the decree more onerous but nevertheless agreed to the decree, that party would have to satisfy a heavy burden to convince a court that it agreed to the decree in good faith, made a reasonable effort to comply with the decree, and should be relieved of the undertaking under Rule 60(b)."). Only once the Court has determined that changed circumstances warrant a modification does the Court consider whether the proposed modification, in this case termination, is the appropriate remedy to the problems posed by the change in circumstances. *Id.* at 391. And once these two factors are met, the court must still ensure that

"the objects of the decree have been attained" before it may terminate it. *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 442 (2004).

Additionally, a movant can show that a judgment has been satisfied under Rule 60(b)(5) if it is in "substantial compliance" with the consent decree. *Peery*, 977 F.3d at 1075. The court must begin its analysis "by determining the basic purpose of the decree" and then, "[i]f there is good-faith compliance, the decree is satisfied, and the court may terminate it." *Id.* Further, "[b]ecause a consent decree is a contract . . . compliance [is measured] in terms of substantial performance." *Id.* Substantial compliance is achieved when the consent decree's "fundamental purpose has been accomplished[] and any deviations from the decree are unintentional and so minor or trivial as not substantially to defeat the object which the parties intended to accomplish." *Id.* (quotation marks, citation, and brackets omitted).

As an initial matter, the parties' arguments confuse the relevant legal framework under Rule 60(b)(5)'s "no longer equitable" prong. First, it is the Defendants' burden under *Rufo* to show that there is a significant change in either the factual conditions or the law since the original consent decree was entered, *and* that change must meet one of the three *Rufo* criteria. *Rufo*, 502 U.S. at 383-84; *see also Horne v. Flores*, 557 U.S. 433, 453 (2009) ("It takes the original judgment as a given and asks only whether a significant change in either factual conditions or in law renders continued enforcement of the

6

judgment detrimental to the public interest." (quotation marks and citation omitted)). Of the three criteria, the Defendants here argue only that the significant changes they outline make continued enforcement of the decree detrimental to the public interest. *Id.* at 384; (Defs.' Mot. to Terminate, at 53-57). The Defendants' arguments regarding the basic purpose of the consent decree go towards the "judgment has been satisfied" prong of Rule 60(b)(5), rather than the equitability prong. *See Peery*, 977 F.3d at 1075. Further, the Plaintiffs' argument that the changed circumstances identified must always be unforeseen is not supported by *Horne*; unworkability due to unforeseen obstacles is only one of the three criteria under *Rufo* that the Defendants may establish and, again, the Defendants here only present arguments as to the "detrimental to the public interest" factor. *Rufo*, 502 U.S. at 384-85 (listing modification because the decree is "unworkable because of unforeseen obstacles" as a separate ground from the "detrimental to the public interest" ground). Therefore, the Court need not address the foreseeability of the Defendants' proffered changed circumstances.

Second, the Defendants' arguments with regard to whether there is an ongoing violation of federal law misconstrue *Horne* to require that analysis in every case. *Horne* is factually distinguishable from the present case for two major reasons—first, *Horne* involved a court-issued injunction rather than a settlement-related consent decree, and second, the injunction in *Horne* was

7

issued after the Court held a bench trial and found that certain federal law violations were occurring. *Horne*, 557 U.S. at 440-41. As such, the injunctions and resulting modifications were crafted specifically to remedy the federal law violations that the Court found occurred. *Id.* at 441-42. When the parties later moved to modify the injunction under the equitability prong of Rule 60(b)(5), the Supreme Court held that under the specific facts of the case, the changed circumstances inquiry required the court to consider whether "ongoing enforcement of the original order was supported by an ongoing violation of federal law." *Id.* at 453-54. The dissent bore out that the question of whether there was an ongoing violation of federal law would not be at issue in every case, relying on *Rufo* and *Frew*. *Id.* at 492-93. In *Rufo*, which dealt with an actual consent decree, the Supreme Court noted that if the obligations the parties agreed to in a consent decree were only legally enforceable to the extent they achieved the "minimal constitutional . . . standards," it would become necessary for the court to make "a constitutional decision every time an effort was made either to enforce or modify the decree by judicial action." *Rufo*, 502 U.S. at 389-90. In so noting, the Supreme Court further explained that in order to "save themselves the time, expense, and inevitable risk of litigation," parties often settled their disputes over constitutional violations by "undertaking to do more than the Constitution itself requires" and "more than what a court would have ordered absent the settlement." *Id.* at 389. Likewise, in *Frew*, the

Supreme Court rejected the idea that a court lacks power to enforce or modify a consent decree "unless the court first identifies, at the enforcement stage, a violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 438 (2004).

Here, unlike in *Horne*, the parties resolved this matter by consent decree before any factual findings on the Plaintiffs' claims were ever made by the Court. Thus, this case is on squarer footing factually with *Rufo* and *Frew*. Nor does it make sense, practically speaking, for the Court to conduct a summary judgment-like inquiry into whether there are federal and constitutional law violations for the first time over twenty years into the administration of this case. This conclusion is buttressed by the Supreme Court's discussion of consent decrees generally in *United States v. Armour & Co.*, where the court held that

> [b]ecause the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation.

402 U.S. 673, 681-82 (1971). For these reasons, the Court need not address the Defendants arguments as to whether there are ongoing violations of federal law to be remedied by continued enforcement of the 2016 Consent Decree.

Having outlined the proper framework to apply, the Court turns to the Defendants' assertions of changed circumstances. The Court agrees with the Defendants that a myriad of things have changed with regard to DFCS's structure, operations, and policies since the original consent decree was entered in 2005. In particular, the implementation of the SHINES system and ARGO placement program brought much needed changes to the administration side that allowed DFCS to review case-related information in real time and identify placement options uniquely suited to a particular child's needs. Additionally, the CICC program made child abuse and neglect reporting more streamlined and accessible, resulting in more at-risk children receiving intervention. DFCS also introduced new training programs for its caseworkers and supervisors and increased funding for both existing staff and the hiring of new staff, with the goal of reducing staff turnover by making worker caseloads more manageable. And notably, DFCS added the Office of Health Law and Policy to assist caseworkers with filing appeals for denial of medical treatment and to increase overall access to medical care for the state's foster children. These are all commendable improvements to the DFCS system since the initiation of this litigation.

However, the existence of changed circumstances alone is not enough to warrant termination of the consent decree, and the Defendants have not carried their burden of demonstrating that, due to these (and other) changed

circumstances, continued enforcement of the 2016 Consent Decree would be detrimental to the public interest. The Defendants argue that the identified changes mean that continued enforcement would either duplicate the work it is already doing or would impose "marginally pertinent additional requirements." (*See* Defs.' Mot. to Terminate, at 27). The Court fails to see how, applying this logic, an order requiring DFCS to keep doing what it is already doing would be in any way detrimental, and the Defendants do not identify what requirements the 2016 Consent Decree places on it that are "marginally pertinent" to those required by the currently applicable laws and DFCS policies. The remainder of the Defendants' public interest arguments attempt to raise federalism concerns, with the Defendants arguing that there is no ongoing violation of a federal right that justifies this Court's ongoing oversight. (*Id.* at 54-56). The problem with this argument is its erroneous reliance on *Horne* and the fact that the Defendants here agreed to the Court's oversight after waiving the right to have the Court determine whether such federal law and constitutional violations were actually occurring in the first place. *See Armour & Co.*, 402 U.S. at 681-82. The same is true of the Defendants' argument that the cost of monitoring is detrimental to the public interest. While it is true that government budgets are a legitimate concern for the Court in tailoring a modification after it has been established that a modification is warranted, *see Rufo*, 502 U.S. at 392, the Defendants here are attempting to

11

use the monitoring costs to justify a modification in the first place. And there is no indication that the cost of monitoring has increased beyond what it anticipated when it entered the consent decree or most recently modified it in 2016; rather, the Defendants' concern appears to be nothing more than a generalized grievance. Taken together, the Defendants' oversight and budget concerns amount to nothing more than gripes that the 2016 Consent Decree is "no longer convenient to live with," which is not a consideration warranting termination. *Rufo*, 502 U.S. at 383. For these reasons, the Defendants have failed to carry their burden of demonstrating that significant changes in circumstances make continued enforcement of the decree detrimental to the public interest under the equitability prong of Rule 60(b)(5).

Next, as to the satisfied judgment prong of Rule 60(b)(5), the Court disagrees with the Defendants that the basic purpose of the 2016 Consent Decree has been satisfied. The Defendants contend that the basic purpose of the decree was "to make lasting reform to the child welfare system of Georgia." (Defs.' Mot. to Terminate, at 58). This purpose is too general for the Court's analysis. *Peery*, 977 F.3d at 1075 ("[T]he purpose of the decree . . . is not to be conceived at too high a level of generality."). Review of the 2016 Consent Decree reveals a narrower and more specific set of purposes, which the Court will condense and summarize: (1) promoting safe, stable, permanent placement with family or kin before other permanent homes in the "least restrictive, most

12

family-like setting possible"; (2) to that end, maintaining non-destructive family ties; (3) and ensuring children in need of welfare services receive full and equal access to "the best available services." (2016 Consent Decree, at 4-5). Contrary to the Defendants' position, the Court does not find that their meeting 21 of the 31 "excessive metrics" agreed to constitutes substantial compliance under *Peery*.

To start, the parties do not dispute that the Defendants are currently not meeting 10 OMs.[1] While the Court agrees with the Defendants that it is on a "positive trajectory" towards substantial compliance and has made good faith, meaningful progress over the years, including attaining 21 OMs, the subject matter of the outstanding OMs leads the Court to conclude that they are not "minor or trivial" in nature. *Peery*, 977 F.3d at 1075. For example, OM #1 requires that abuse and neglect investigations must begin within 24 hours of being reported, and OM # 3, 6, and 23 deal with permanency of placements, which ties directly to one of the purposes identified in the 2016 Consent Decree. (Period 36 Monitoring Report, [Doc. 787] at 16-19, 30); (2016 Consent Decree, at 4). OM #21, with its four subparts, relates to identifying and meeting the medical, dental, mental health, and educational needs of the children in DFCS care, which also relates directly to one of the purposes identified in the decree.

---

[1] One of these OMs, #21, is divided into four distinct subparts, which the parties treat as individual OMs. (*See, e.g.*, Pls.' Resp. in Opp. to Mot. to Terminate, at 23-24). The Court will do the same.

(Period 36 Monitoring Report, at 25); (2016 Consent Decree, at 4). Further, the percentage goal for each of OM #21's subparts is 95%, but the Defendants' compliance with these measures ranges from a staggering 58% on the low end to 82% on the high end. (Period 36 Monitoring Report, at 25). Because compliance is determined "in relation to the object which the parties intended to accomplish," the Court cannot find that the Defendants have substantially complied with the basic purpose of the 2016 Consent Decree at this time because the failure to attain these OMs, and particularly OM #21, directly undermines the goals and purposes set forth in the decree. *Peery*, 977 F.3d at 1076 (quotation marks, brackets, and citation omitted). Accordingly, the Defendants have not carried their burden of demonstrating that termination of the 2016 Consent Decree is warranted under the satisfied judgment prong of Rule 60(b)(5), either.

Lastly, the Defendants argue that Rule 60(b)(6)'s catch-all "any other reason" provision justifies termination here based on the same changed circumstances just discussed. The Court does not find these changes so extraordinary as to justify termination. *Kemp v. United States*, 596 U.S. 528, 533 (2022) (requiring a demonstration of "extraordinary circumstances" under Rule 60(b)(6)). For these reasons, the Defendants' Motion to Terminate [Doc. 793] will be denied.[2]

---

[2] Because the Court is denying the Defendants' Motion to Terminate,

14

### B.  Plaintiffs' Motion to Enforce [Doc. 814]

In their Motion, the Plaintiffs argue that although 21 of the 31 OMs have been attained, the Defendants remain "in significant noncompliance" with the remaining OMs. (Pl.'s Mot. to Enforce, at 8-11). They also argue that the Defendants have failed to implement or update four core Infrastructure Standards. (*Id.* at 11-15). Based on these violations, the Plaintiffs ask the Court to hold the Defendants in contempt. (*Id.* at 16-22). In response, the Defendants argue that the Plaintiffs filed this motion "offensive[ly]" as a response to the Motion to Terminate and that they are not violating the 2016 Consent Decree by failing to attain Outcome Measures. (Defs.' Resp. in Opp. to Mot. to Enforce, at 2, 6-10). They also argue that there is no clear and unambiguous order in place with regard to the Infrastructure Standards because it provides the Defendants leeway to deviate. (*Id.* at 11-15). Finally, the Defendants argue that they are unable to comply with the 2016 Consent Decree in full but have sought to attain the outstanding Outcome Measures in good faith. (*Id.* at 16-18).

"Under traditional principles of equity practice, courts have long imposed civil contempt sanctions to coerce the defendant into compliance with an injunction or compensate the complainant for losses stemming from the

there is no need for a status conference or hearing at this time. Accordingly, the Defendants' Motion for a Hearing [Doc. 817] will also be denied.

defendant's noncompliance with an injunction." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019) (quotation marks and citation omitted). But "civil contempt should not be resorted to where there is a fair ground of doubt as to the wrongfulness of the defendant's conduct," as it is a severe remedy. *Id.* at 561-62 (noting that Supreme Court precedent suggests that "civil contempt sanctions may be warranted when a party acts in bad faith") (quotation marks and alterations omitted). Before a court can find a party in contempt, "the movant must first establish by clear and convincing evidence that the alleged contemnor violated a court's earlier order." *Peery*, 977 F.3d at 1076. This clear and convincing evidence must demonstrate that: "(1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order." *Id.* (quotation marks and citation omitted). Any ambiguities must be construed in the non-movant's favor. *Id.* at 1077. If the movant makes this showing, the burden shifts to the non-movant "to produce evidence explaining its noncompliance at a show cause hearing." *Id.* (quotation marks, citation, and brackets omitted).

The Court concludes that to the extent the Defendants are not currently in compliance with the 2016 Consent Decree and Infrastructure Standards, their conduct does not warrant the harsh sanction of contempt. *See Taggart*, 587 U.S. at 561-62. The parties do not dispute that (1) the Defendants are currently not in compliance with the OMs the Plaintiffs identify in their

Motion; (2) they agreed in the 2016 Consent Decree that the Defendants were required to attain all 31 OMs in order to terminate the decree, and; (3) even though the parties agreed that the Infrastructure Standards are enforceable, they did not require the Defendants' compliance with the Infrastructure Standards in order to terminate the consent decree. (2016 Consent Decree, at 20). They also do not dispute the first element of the three-prong contempt standard: that the 2016 Consent Decree and Infrastructure Standards are valid and lawful orders. *Peery*, 977 F.3d at 1076. The Court will address the Plaintiffs' arguments regarding the ongoing OMs before turning to the Infrastructure Standards arguments.

To determine whether the Defendants are violating the 2016 Consent Decree due to the outstanding OMs, the Court applies standard rules of contract interpretation. *Id.* at 1069. In Georgia, the cardinal rule of contract interpretation is to "ascertain the parties' intent, and where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties." *Parris Props., LLC v. Nichols*, 305 Ga. App. 734, 738 (2010). The parties' intent with regard to the OMs is clear from the plain language of the 2016 Consent Decree—all OMs would be considered "ongoing" unless and until the Defendants met certain measured goals for three consecutive reporting periods, at which point an OM would be considered "attained." (2016 Consent Decree, at 19-20). There is no defined timeline in the

17

decree for the Defendants to obtain all OMs. The nature of this agreement to strive for all attained OMs means the parties anticipated that, at certain points, some OMs would remain ongoing, negating the Plaintiffs' argument that the Defendants are violating the decree by having some OMs outstanding. To that end, although there have been several OMs outstanding at different points over the last nearly twenty years that the consent decree has been in effect, the Plaintiffs have never before moved for contempt on the grounds that the Defendants had failed to attain an OM. The Defendants have made great overall progress over the years towards attaining the OMs, and the Court expects the Defendants to continue strive towards attaining the outstanding OMs. But at this juncture, the Court cannot conclude that the 2016 Consent Decree contained a "clear and unambiguous" directive with regard to attaining OMs such that the Defendants are in contempt for violating the decree by continuing to have some OMs in ongoing status. *See Peery*, 977 F.3d at 1076. The Plaintiffs' contentions with regard to the Defendants' alleged failure to implement the MTAT recommendations are also unavailing. The decree contemplates that the MTAT would provide "guidance and technical assistance" to the Defendants to further "the goal of capacity building to meet and sustain their obligations" under the decree. (2016 Consent Decree, at 15). But there is no clear and unambiguous directive in the decree requiring the Defendants to implement all of the MTAT recommendations and advice.

The Court also finds no clear and unambiguous directive that the Defendants have violated with regard to the Infrastructure Standards. Unlike the OMs, which contain measurement guideposts to gauge compliance, the parties intended the Infrastructure Standards to be a flexible framework that would, in the Plaintiffs' own words, "drive compliance with the OMs" but are not themselves "barriers to exit." (Pls.' Mot. for Contempt, at 6-7). In fact, the Infrastructure Standards are so flexible that they permit DFCS to "implement new or revise existing child welfare policies" and, if DFCS does so, the Infrastructure Standards "automatically will conform to the revised DFCS policies" unless the parties agree otherwise. (Infrastructure Standards, at 1). This inherent flexibility coupled with the fact that the 2016 Consent Decree would permit the Defendants to seek termination of the decree regardless of whether they are complying with the Infrastructure Standards leads the Court to conclude that there is no clear and unambiguous directive the Defendants are violating by failing to comply to the letter with the Infrastructure Standards.

For these reasons, the Court concludes that the Plaintiffs have failed to clearly and convincingly establish that the Defendants are violating the 2016 Consent Decree or Infrastructure Standards order. The Court also notes that, even assuming the Defendants' progress towards complying with the OMs has stalled, the Plaintiffs' allegations do not persuade the Court that the

19

Defendants have acted wrongfully or even intentionally, which cuts against a finding that contempt is warranted. *See Taggart*, 587 U.S. at 560. The Court reminds the parties, however, to be mindful of their respective continued obligations under these orders and encourages them to continue working towards bringing this litigation to a conclusion. *United States v. City of Miami*, 2 F.3d 1497, 1506 (11th Cir. 1993) (noting that "[i]n institutional reform litigation, injunctions should not operate inviolate in perpetuity." (quotation marks and citation omitted)).

## III. Conclusion

For the foregoing reasons, the Defendants' Motions to Terminate the Consent Decree [Doc. 793] and for a Hearing [Doc. 817] are DENIED, and the Plaintiff's Motion to Enforce the Consent Decree [Doc. 814] is also DENIED.

SO ORDERED, this ___27th___ day of August, 2025.


THOMAS W. THRASH, JR.
United States District Judge

20